# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| HUGHES RIVER FM, LLC,<br>a Delaware limited liability company,<br><br>        Plaintiff,<br><br>v.<br><br>XIMALAYA, INC.,<br>a Cayman Islands corporation,<br><br>YU JIANJUN,<br>an individual,<br><br>SEAMAN YU,<br>an individual,<br><br>XIAOYU CHEN,<br>an individual,<br><br>LI HAIBO,<br>an individual, and<br><br>TENCENT MUSIC ENTERTAINMENT GROUP, INC.,<br>a Cayman Islands corporation,<br><br>        Defendants. | Case No. 1:25-cv-06217<br><br>Hon. Judge Edmond E. Chang |

## DECLARATION OF JONATHAN GUY MANNING

I, Jonathan Guy Manning, hereby declare and state under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1.    I have been asked by Baker & McKenzie LLP, US counsel for Tencent Music Entertainment Group ("**TME**")[1], an exempted company organized and existing under the laws of

---

[1] The Amended Complaint (as defined below) names "Tencent Music Entertainment Group, Inc" as a Defendant. As of the date of this Report, there is no Cayman Islands company with the name

the Cayman Islands, to provide a declaration on legal issues under Cayman Islands law related to the existence of a claim against an acquirer for aiding and abetting breaches of fiduciary duties by a target's fiduciaries, and the sufficiency of allegations in a complaint to sustain such a claim or similar claim under Cayman Islands law. This declaration is made on the basis of my personal knowledge, experience and expertise as a Cayman Islands attorney.

2.      In particular, I have been asked to give an opinion on the position under Cayman Islands law as to the allegation - as particularised at paragraphs 109 to 125 in the Plaintiff's Amended Complaint dated 23 July 2025 (the "**Amended Complaint**") as the Eighth Claim - that TME, the acquirer in a proposed merger between Ximalaya, Inc. ("**Ximalaya**") and TME (the "**Merger**"), aided and abetted purported breaches of fiduciary duty by Ximalaya's Board of Directors (the "**Eighth Claim**").[2]

3.      I have been provided with a copy of the Amended Complaint and the Circular and Notice of Extraordinary General Meeting of Ximalaya dated 27 May 2025, which I have reviewed and considered in preparing this report. I am therefore familiar from those documents with the allegations as set out in the Amended Complaint and the relevant circumstances of the transaction. Insofar as I have made any assumptions, they are set out expressly below.

4.      Appendix A to this report contains the statutory provisions and cases referred to in my report.

---

"Tencent Music Entertainment Group, Inc". I have proceeded on the basis that TME is the intended Defendant to the Amended Complaint.

[2] In this regard I have been instructed to assume that this Honourable Court will apply Cayman Islands law in its determination of the Eighth Claim. If the Eighth Claim was being pursued against TME in the Cayman Islands courts then they too would undoubtedly do so by applying Cayman law.

5.　　My report is structured as follows:

Section A: Professional Experience and Qualifications

Section B: Judicial Precedent in the Cayman Islands

Section C: Directors' Duties Overview

Section D: Aiding and Abetting Breaches of Fiduciary Duties

Section E: Dishonest Assistance

Section F: Knowing Receipt

Section G: Expert Declaration

## A.　　PROFESSIONAL EXPERIENCE AND QUALIFICATIONS

6.　　I received my LLB Hons. Law degree in 1995, and my Postgraduate Diploma in Legal Practice in 1996, from the University of Sheffield, England. I was admitted as a Solicitor of the Supreme Court of England and Wales in April 1999 and practised as an English solicitor continuously from 1999 to 2005. In September 2005, I moved to the Cayman Islands and was admitted as a Cayman attorney.　Since then I have practised continuously as a Cayman attorney, with Campbells, in the Cayman Islands. In 2011, I was also admitted as a solicitor of the Eastern Caribbean Supreme Court in the British Virgin Islands, but I do not reside there.　In April 2011 I was made a partner of Campbells, and in January 2016 I became head of the firm's Litigation, Insolvency & Restructuring Group.　I therefore have over 26 years' post qualification experience practising law, including almost 20 years practising Cayman Islands law.

7.　　My practice throughout my career has always focused on insolvency, restructuring and corporate and commercial litigation. I frequently appear as an advocate before the Grand Court of the Cayman Islands (the "**Grand Court**"), and I have previously provided expert evidence of Cayman Islands law to various foreign Courts, including the United States Bankruptcy Courts for

the Southern District of New York and the District of Delaware. I am a member of the Cayman Islands Law Society and the local chapters of INSOL International in the Cayman Islands and the British Virgin Islands. I am ranked as a Cayman Islands dispute resolution lawyer by the leading legal directories, including Chambers & Partners and Legal 500.

8. As a practising Cayman Islands attorney, I am competent to testify with respect to the Cayman legal matters discussed in this report, which are well within my experience.

## B. JUDICIAL PRECEDENT IN THE CAYMAN ISLANDS

9. The doctrine of judicial precedent applies in the Cayman Islands, as it applies in England and (I understand) the United States of America. The court of final appeal in the Cayman Islands is the Judicial Committee of the Privy Council in London (the "**Privy Council**"), whose decisions bind both the Cayman Islands Court of Appeal (the "**CICA**") and the Grand Court. Decisions of the CICA also bind the Grand Court as the court of first instance. Although decisions of one Grand Court judge do not bind other Grand Court judges, a Grand Court judge will not depart from an earlier first instance decision unless he or she is convinced that the earlier decision was wrongly decided.[3]

10. There is a comparatively small body of case law in the Cayman Islands, comprising unreported decisions as well as cases reported in the Cayman Islands Law Reports (the "**CILR**"). Where there is no applicable Cayman Islands case law, the Cayman Islands courts consider other common law authorities, and in particular decisions of the English courts. Although these are not binding, they are persuasive insofar as they are not inconsistent with Cayman Islands legislation or case law, or based on statutory provisions which have no counterpart in Cayman Islands legislation.

---

[3] See, for example, *China Shanshui Cement Group Limited* [2015 (2) CILR 255] at [60] – [64].

## C.    DIRECTORS' DUTIES: OVERVIEW

11.    In this section of my report, given that the Plaintiff has alleged a claim against TME for "aiding and abetting" a breach of fiduciary duty, I provide a brief overview of the concept of fiduciary duties under Cayman Islands law.

12.    I then address in Section D of my report whether the concept of "aiding and abetting" breaches of fiduciary duty is recognised as a matter of Cayman Islands law, and whether the Eighth Claim in the Amended Complaint properly pleads a recognised cause of action against TME.

### C1.    General duties of a Fiduciary

13.    Directors occupy a fiduciary position in relation to the company and owe duties as such.  These common law duties arise from case law as opposed to statute. The classic statement of what is a fiduciary duty comes from Millett LJ in *Bristol and West Building Society v Mothew* [1998] Ch 1, which has been cited with approval in the Cayman Islands in a number of cases.[4] In *Renova Resources v Gilbertson* [2012 (2) CILR 416] at [427], Foster J in the Grand Court cited with approval the following passages from *Mothew*:

> "A fiduciary is someone who has undertaken to act for or on behalf of another in a particular matter in circumstances which give rise to a relationship of trust and confidence. The distinguishing obligation of a fiduciary is the obligation of loyalty. The principal is entitled to the single-minded loyalty of his fiduciary. This core liability has several facets. A fiduciary must act in good faith; he must not make a profit out of his trust; he must not place himself in a position where his duty and his interest may conflict; he may not act for his own benefit or the benefit of a third person without the informed consent of his principal. This is not intended to be an exhaustive list, but it is sufficient to indicate the nature of fiduciary obligations. They are the defining characteristics of the fiduciary. As Dr. Finn pointed out in his classic work Fiduciary Obligations (1977), p. 2, he is not subject to fiduciary obligations because he is a fiduciary; it is because he is subject to them that he is a fiduciary."

---

[4] See the CICA's decision in *Al Sadik v Investcorp* [2017 (1) CILR 1] and *Renova Resources v Gilbertson* [2012 (2) CILR 416] (reversed in part in *Autumn Holdings Asset Inc. v Renova Resources Private Equity Ltd* [2017 (2) CILR 136], but not on this point of principle).

"The nature of the obligation determines the nature of the breach. The various obligations of a fiduciary merely reflect different aspects of his core duties of loyalty and fidelity. Breach of fiduciary obligation, therefore, connotes disloyalty or infidelity."

14.     Although directors of a company are not technically trustees, their positions are in some respects analogous: as Lindley LJ said at page 631 of *Re Lands Allotment Company* [1894] 1 Ch 616, "*they have always been considered and treated as trustees of money which comes to their hands or which is actually under their control; and ever since joint stock companies were invented directors have been held liable to make good moneys which they have misapplied upon the same footing as if they were trustees*". In *JJ Harrison (Properties) Ltd v Harrison* [2002] BCC 729 at [25], Chadwick LJ set out the following four propositions in this regard:

"(i) that a company incorporated under the Companies Act is not trustee of its own property; it is both legal and beneficial owner of that property; (ii) that the property of a company so incorporated cannot be lawfully disposed of other than in accordance with the provisions of its memorandum and articles of association; (iii) that the powers to dispose of the company's property, conferred on the directors by the articles of association, must be exercised by the directors for the purposes, and in the interests, of the company; and (iv) that, in that sense, the directors owe fiduciary duties to the company in relation to those powers and a breach of those duties is treated as a breach of trust".

## C2.    To whom are duties owed?

15.     Save in certain limited circumstances which do not apply to the Amended Complaint, the fiduciary duties owed by directors of a Cayman Islands incorporated company are owed to the company of which they are directors. Directors do not, by virtue of their office, owe such duties to third parties, including creditors of or shareholders in the company. This is a very long-standing principle derived from English common law (and consistently applied in the Cayman Islands): see, for example, *Percival v Wright* [1902] 2 Ch 421, and also *Peskin v Anderson* [2001] BCC 874 (CA) in which the English Court of Appeal held that directors do not generally owe fiduciary duties to

shareholders individually. Any such duty arises only in "*special factual circumstances*," such as where directors undertake to act on behalf of shareholders or deal directly with them in a manner giving rise to reliance.[5] This exception is narrowly confined: see also *Coleman v Myers* [1977] 2 NZLR 225 (CA) (which has been applied in both English and Cayman jurisprudence as an example of the unusual facts giving rise to such a duty in the context of familial relationships between the directors and shareholders and their relative personal positions of influence in the company concerned).

16.     Accordingly, the allegations made repeatedly in the Eighth Claim[6] that the Ximalaya Board of Directors owed fiduciary duties as directors to the Plaintiff and to other Ximalaya shareholders are incorrect as a matter of Cayman Islands law, misconceived and fail to state an actionable claim by the Plaintiff individually in its own capacity.  Cayman Islands law is clear that directors' fiduciary duties are owed to the company, and not to individual shareholders.

**C3.     Authorisation and Ratification**

17.     The shareholders of a company may authorise (prospectively) or ratify (retrospectively) certain actions of the directors which would otherwise be a breach of their fiduciary duties or common law duties. The directors cannot then be liable for those actions. I understand that the shareholders of Ximalaya prospectively approved the Merger by special resolution at an extraordinary general meeting on 9 June 2025.

---

[5] *Peskin v Anderson* [2001] BCC 874 (CA) at [33].

[6] See for example paragraphs 110, 111, 115, 118, 119, 120, 121 and 122 of the Amended Complaint.

## D. AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES

18. Cayman Islands law does not recognise a free-standing civil cause of action for "aiding and abetting" a breach of fiduciary duty. That terminology derives from criminal law and has no application in civil law in the Cayman Islands.[7]

19. The Cayman Islands courts have never treated "aiding and abetting" as an actionable civil claim. Accordingly, as pleaded in the Amended Complaint, the Plaintiff's claim would not be recognized under Cayman Islands law. Instead, the analogous equitable doctrines for secondary liability in respect of a breach of fiduciary duty are likely to be either dishonest assistance or knowing receipt.

20. However, both of these equitable doctrines are predicated on the existence of a breach of fiduciary duty and cannot be maintained unless the claimant is able to establish that such a breach has occurred, i.e. if there has been no breach of fiduciary duty there can be no actionable claim for secondary liability against a third party.

## E. DISHONEST ASSISTANCE

### E1. Cayman Islands law on Dishonest Assistance

21. The leading Cayman Islands authority on dishonest assistance is *Ritter and Geneva Insurance SPC Ltd (in Voluntary Liquidation) v Butterfield Bank (Cayman) Ltd* [2018 1 CILR 529] ("***Ritter***"). In that case, the Grand Court set out the three necessary elements of a claim of dishonest assistance:

> "There are three elements of a dishonest assistance claim which should be pleaded and must be proved. The first is that there has been a disposal of assets in breach of a trust or fiduciary duty. The second is that the defendant assisted in that breach or

---

[7] See, for example, s.19(c) of the Cayman Islands Companies Act (2025 Revision) which provides for criminal penalties for concealment of names of creditors of a company.

disposal. The third … is that the defendant assisted the breach of trust dishonestly.
…"[8]

22. When considering these elements, the Cayman Islands courts will apply the following test:

> "The standard of proof required is the civil standard of proof, the balance of probabilities. It is not an absolute standard. When considering allegations of dishonesty and fraud, a court will naturally require for itself a higher degree of probability than that which it would require when asking if negligence is established. It does not adopt so high a degree as a criminal court, but it still does require a degree of probability commensurate with the occasion and the seriousness of the allegation. The more serious the allegation the more cogent the evidence in support needs to be."[9]

23. In *Ritter*, the Grand Court considered and applied the English decision of *Singularis Holdings Ltd v Daiwa Capital Markets Europe Ltd* [2017] EWHC 257 (Ch) (and the authorities cited therein), thereby incorporating the principles established in those cases into Cayman Islands law on the tort of dishonest assistance. It is clear from the authorities that the fundamental feature of such a claim is dishonesty, such that it "*is a necessary ingredient of accessory liability*".[10]

24. In *Ritter*, the Grand Court also set out the principles that apply where dishonest assistance is alleged on the part of a corporate entity:

> "In cases of dishonest assistance against a corporate entity, a particular individual (or particular individuals) must be identified as having acted dishonestly given the fact that, although a company has legal personality and capacity, it functions through human agents. Therefore the statement of claim must identify and particularize what the defendant did to assist in the breaches of fiduciary duty or trust, how the assistance caused, contributed or resulted in the plaintiff's loss and how the defendant is alleged to have acted dishonestly in assisting the main perpetrator. The bank rightly highlights the requirement that it may be permissible not to identify the

---

[8] *Ritter* at [176].

[9] *Ritter* at [178].

[10] *Singularis Holdings Ltd. V Daiwa Capital Markets Europe Ltd* [2017] EWHC 257 at [144].

relevant dishonest individual(s), at the stage of pleading the case, if the plaintiff was unaware, as in this case, of their identity, so long as the plaintiff otherwise properly pleads and particularizes the dishonest conduct and identifies an individual employee by name or even by post with relevant knowledge."[11]

**E2.    The Amended Complaint does not plead dishonesty or identify a particular individual**

25.    The Amended Complaint does not plead that TME acted dishonestly at all, let alone identify a particular individual or individuals at TME who are alleged to have acted dishonestly.

26.    Further, the Amended Complaint provides scant detail on what TME is said to have done to assist in the purported breaches of fiduciary duty. The Amended Complaint alleges that TME's conduct in offering to pay Ximalaya's Board of Directors USD$10 per share held by them, while agreeing to pay other shareholders USD$5 per share, actively induced the Board of Directors to breach their fiduciary duties to Ximalaya, the Plaintiff and the other shareholders.[12] However, as stated above, Ximalaya's Directors do not owe fiduciary duties to the Plaintiff or to other shareholders of the company.

27.    The Amended Complaint also alleges that TME actively assisted certain of the Board of Directors designing and approving the terms of the Merger. However, there is no identification or particularisation of what TME did as part of this purported active assistance. Even if a breach of fiduciary duty had occurred, the Plaintiff has not pleaded facts capable of showing that TME assisted in its commission aside from mere participation in commercial negotiations.

28.    The allegations in the Amended Complaint as they pertain to TME also fail to identify and particularise how TME's purported assistance caused, contributed or resulted in the

---

[11] *Ritter* at [198].

[12] Amended Complaint, paragraph 121.

Plaintiff's loss. I understand that the Merger was approved by the majority of shareholders by special resolution at an extraordinary general meeting of the Company on 9 June 2025 but is yet to complete. Accordingly, even if it were accepted that TME did assist Ximalaya's Board of Directors in some way, and that assistance met the requisite level of dishonesty, the Plaintiff has not suffered any loss which would be recoverable under Cayman Islands law in circumstances where the Merger has not completed and the Plaintiff remains a shareholder of Ximalaya.

29.     Finally, the Amended Complaint does not satisfy any of the three essential elements of a dishonest assistance claim under Cayman Islands law:

(a)     As the Merger has not yet completed, there has been no disposal of assets. Further, as the Board of Directors owed their fiduciary duties to the Company and not the Plaintiff or the Shareholders, there is no actionable claim by the Plaintiff individually for breach of fiduciary duty under Cayman Islands law.

(b)     Since there has been no disposal of assets in breach of fiduciary duty or otherwise, it follows that TME cannot have assisted, dishonestly or otherwise, in a breach of fiduciary duty.

(c)     The Amended Complaint fails to identify and particularise how TME, or any individual at TME, is alleged to have acted dishonestly in assisting Ximalaya's Board of Directors. As noted above, dishonesty is an essential element of any claim for dishonest assistance and, given the seriousness of the allegations, the Grand Court would "*require a degree of probability commensurate with the occasion and the seriousness of the allegation*".[13] However, the Amended Complaint fails to

_____

[13] *Ritter* at [179].

particularise any dishonesty on the part of TME, let alone to discharge this onerous burden of proof.

## F.    Knowing Receipt

30.    The cause of action for knowing receipt is targeted at third parties who receive property as a consequence of a breach of fiduciary duty, and is concerned with the liability of an accessory to the breach.

31.    The leading Cayman Islands authority on knowing receipt is *Renova Resources v Gilbertson* [2012 2 CILR 416] which affirms the test set down by the English Court of Appeal:

> There is no dispute between the parties that the essential elements of liability for knowing receipt are as set out by Hoffmann, L.J. in El Ajou v. Dollar Land Holdings PLC (7) ([1994] 2 All E.R. 685 at 700):
>
> "… [T]he plaintiff must show, first, a disposal of his assets in breach of fiduciary duty; secondly, the beneficial receipt by the defendant of assets which are traceable as representing the assets of the plaintiff; and thirdly, knowledge on the part of the defendant that the assets he received are traceable to a breach of fiduciary duty."[14]

32.    Applying this to the Amended Complaint, it is clear that the Plaintiff fails to make out an actionable claim for knowing receipt under Cayman Islands law:

(a)    As to the first two limbs of the test, for example, as the Merger has not yet completed there has been no disposal of any assets (in breach of fiduciary duty or otherwise), nor has there been any beneficial receipt by TME of any assets (in breach of fiduciary duty or otherwise); and

---

[14] *Renova Resources v Gilbertson* [2012 2 CILR 416], page 456 at [75].

(b)     As the first two limbs of the test have not been met for those reasons alone, it follows that the third limb is not met either, because TME can have no knowledge of the occurrence of something which has not happened.

## G.    **EXPERT DECLARATION**

33.    I, Jonathan Guy Manning, DECLARE THAT:

(a)     I confirm that I have not entered into any arrangement where the amount or payment of my fees is in any way dependent on the outcome of the case;

(b)     I know of no conflict of interest of any kind, other than any which I have disclosed in my report;

(c)     I do not consider that any interest which I have disclosed affects my suitability as an expert witness on any issues on which I have given evidence; and

(d)     I have shown the sources of all information I have used.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

----------------------------------------

Jonathan Guy Manning

George Town, Cayman Islands

27 August 2025

# APPENDIX A

## AL SADIK v. INVESTCORP BANK BSC and FIVE OTHERS

C OURT OF A PPEAL (Chadwick, Mottley and Campbell, JJ.A.) September 21st, 2016

*Investments and Securities—investment management—powers and duties of investment manager—only duties of disclosure arising out of investment management agreement those specified in agreement—where fiduciary relationship arises out of contract, scope of fiduciary relationship defined by contractual terms—not appropriate to superimpose additional fiduciary duties*

*Investments and Securities—investment management—scope of management agreement—agreement allowing investment in leveraged funds and wide discretionary mandate interpreted as permitting economically equivalent leveraging of investment at portfolio level—contractual document to be interpreted according to meaning conveyed to reasonable person having all background knowledge reasonably available to those to whom addressed—not interpreted in way that would flout business common sense*

The appellant brought claims in the Grand Court alleging, *inter alia*, breach of contract, breach of fiduciary duty and breach of trust against the respondents.

The appellant was a wealthy businessman with previous experience of high-value investments. Meetings took place between the appellant and the first respondent, a regulated international investment bank, regarding a proposed investment, at which the appellant indicated that he wished to obtain a 45% return on an investment of AED500m. after three years.

The first respondent's hedge-fund platform comprised a number of funds of hedge funds, emerging-manager funds and single-manager funds which included those material to the present proceedings, namely Investcorp Diversified Strategies Fund ("DSF"), Investcorp Leveraged Diversified Strategies Fund ("LDSF"), Investcorp Single-Managers Fund Ltd. SPC ("SMFCo") and six (later, seven) single-manager funds known collectively as "the single-managers."

The first respondent drew up an investment proposal, proposing investment in leveraged funds. The appellant transferred AED500m. to the first respondent in February 2008, and in March the appellant and the first respondent entered into a share purchase agreement ("the SPA") which *inter alia* (a) provided that the investment account would be established as

1

a special purpose vehicle—Shallot IAM Ltd. (the third respondent); (b) gave the first respondent a discretion to manage and invest the plaintiff's moneys; (c) required the first respondent to provide the appellant with monthly statements of each hedge fund or account in which his moneys were invested; but (d) did not contain the standard form disclaimer that the investment was speculative and could be lost completely.

The appellant's investment was leveraged at the portfolio level ("first-layer leverage") through Blossom IAM Ltd.—a wholly owned subsidiary of Shallot established as a SPV—rather than being invested in leveraged funds as contemplated by the investment proposal. A multi-party credit facility ("White Ibis III") was used to achieve this leveraging. The first respondent did not inform the appellant that his investment had been leveraged in this way and failed to provide him with complete monthly statements in accordance with the SPA. Blossom invested US$79m. in a fund of hedge funds (DSF). The remaining balance, some US$56m., was invested in five single-manager funds. The appellant believed his investment was being leveraged by means of "second-layer leverage"—*i.e.* being used for investment in hedge funds which sought to achieve a certain specified level of leverage.

Following the market collapse beginning in September 2008, the appellant's investments began to perform poorly. He gave instructions to redeem the investment in December 2008. He asserted that he had the benefit of a guaranteed 45% return by way of collateral contract. The first respondent denied the existence of this guarantee. The final redemption proceeds reflected a total loss since inception of approximately AED207.6m., which represented a return on investment of –42%. He brought proceedings against the respondents in the Grand Court for fraudulent misrepresentation, breach of the SPA, deceitful non-disclosure, breach of trust and/or fiduciary duty and breach of guarantee (the claim for fraudulent misrepresentation was subsequently withdrawn).

*The Grand Court decision*

The Grand Court (Jones, J.) dismissed the appellant's claims (the decision is reported at 2012 (1) CILR 451). The judge held that the first respondent had not breached the SPA in leveraging the appellant's investment at the portfolio level. The SPA gave the first respondent a wide discretion to manage the investment. It would flout business common sense to construe the SPA as prohibiting leveraging at the portfolio level since it achieved a result that was economically equivalent to investing in leveraged funds, which clearly was permitted. In the alternative, if the first respondent had not been entitled to leverage the investment as it did, it was likely that the different portfolio construction that would have been adopted would have resulted in a worse return for the appellant. Therefore, even if he had established that the first respondent breached the SPA, he would have failed to prove any loss or damage. The court also held that the first respondent was not liable to the appellant by reason of deceitful non-disclosure. The first respondent's duty of disclosure was defined by the SPA. It had not deliberately or deceitfully failed to disclose details of

the leveraging. The court held that the first respondent had not acted in breach of trust and/or fiduciary duty, and in making its investment decisions it had not ignored the appellant's best interests in favour of its own. The court also found that there was no legally enforceable guaranteed return of 45%.

The appellant appealed against that decision.

*Breach of the SPA*

The appellant submitted that (a) the Grand Court was wrong to hold that the first respondent was not in breach of the SPA either when it caused Shallot to transfer the investment amount to Blossom for investment or when it caused Blossom to leverage that investment by borrowing under the White Ibis III credit facility; and (b) it was wrong to have held that, even if there had been a breach of the SPA, the first respondent would not have been liable for damages.

The first respondent submitted that (a) the Grand Court's assessment of the factual matrix (including the investment proposal) against which it construed the meaning of the SPA was correct, as was its application of the law, and that, on the evidence before it, the only conclusion the court could have reached was that the first respondent had authority to leverage the appellant's investment in the manner that it did; and (b) the appellant's claim for damages was misconceived as it was a fundamental principle that, if a party were to have suffered the loss for which he now claimed irrespective of whether there had been a breach of contract, then that breach could not be said to have caused his loss.

*Deceitful non-disclosure*

The appellant submitted that the Grand Court had erred in failing to hold that the first respondent had been in breach of duty in failing to disclose, before the parties entered into the SPA, its intention to leverage the assets at portfolio level. It also submitted that the Grand Court had wrongly held that the first respondent's post-investment breaches of its contractual disclosure obligation had not been deceitful.

The respondent submitted in respect of the alleged pre-investment non-disclosure that (a) this was a new claim that had not been part of the pleaded case nor advanced at trial; (b) the new claim was an impermissible attempt to resurrect the abandoned fraudulent misrepresentation claims; and (c) in any event the new claim could not be sustained given the judge's finding that the first respondent had acted honestly when it had not disclosed its intention to apply first-layer leverage. In respect of the post-investment breaches of the disclosure obligations in the SPA, there was no basis on which to overturn the Grand Court's assessment that the first respondent had not dishonestly or deceitfully sought to conceal the leverage.

*Breach of trust and/or fiduciary duty*

The appellant submitted that (a) the Grand Court had misconstrued his case on the issue of whether the first respondent had exercised the

3

investment power in its own interests in breach of fiduciary duty; and (b) the judge had been led by his flawed approach to the evidence to hold, wrongly, that the first respondent had exercised the power in his interest.

The respondent submitted that the Grand Court's approach to the evidence and application of the burden of proof had been plainly correct and, regardless of questions about the approach to the evidence at trial, the only conclusion available to the court had been that the first respondent had at all times acted in the appellant's interests.

**Held,** dismissing the appeal:

**Breach of the SPA**

(1) On the true construction of the SPA, the first respondent had been authorized to leverage the appellant's assets for investment purposes at the portfolio level. The Grand Court had correctly found that the transfer of funds from Shallot to Blossom had been an administrative step intended to enable investment of the transferred funds—not, of itself, an investment of the funds—and this had not breached the terms of the SPA. In the absence of an investment agreement, the terms of the SPA stood alone. (Blossom was not a fund in which assets could be invested but a customized SPV created for the appellant's benefit to facilitate the achievement of his investment objectives.) When determining the true construction of the SPA, the judge had correctly enquired into the factual background and, in particular, (i) the investment proposal was an important part of the factual matrix of the circumstances in which the SPA was entered into and the judge had correctly had regard to it when determining whether the first respondent was authorized to leverage the contributed funds at portfolio level; and (ii) the judge had correctly had regard to the fact, that must have been clear to the appellant as well as to the first respondent, that the 45% return on investment over three years that the appellant required could not be achieved without leveraging in some form. The purpose of the SPA was to authorize the first respondent to implement the investment proposal to the extent that this was not inconsistent with what had been expressly agreed by the parties and that, on its true construction, the SPA authorized the first respondent to construct a leveraged portfolio consistent with the investment proposal. The judge did not reach this conclusion by implying a term that the first respondent was authorized to do so. The question whether the use of the White Ibis III credit facility to implement first-layer leverage had in fact produced an economically equivalent outcome to the use of second-layer leverage was irrelevant to an analysis of the contractual effect of the SPA. The judge had not erred in concluding that, as an aid to construing the SPA, he could regard first-layer (or portfolio-level) leverage through an SPV (such as Blossom) as economically equivalent to second-layer leverage through, say, LDSF. There was nothing in the terms of the SPA that suggested that leveraged investment in DSF at the portfolio level was not permitted. There was no reason for the judge to construe the SPA in a way that permitted investment in DSF by means of second-layer leverage but did not permit investment in DSF by means of

4

first-layer leverage, provided that he was satisfied that borrowing by an SPV upon the security of investments for the purpose of leveraging at the portfolio level was permitted by that agreement. The SPA authorized Shallot to take any actions that it believed necessary or desirable to effectuate the purposes of the investment. The judge had correctly concluded that on its true construction the SPA did authorize first-layer leverage (paras. 64–67; paras. 75–76; para. 99; paras. 110–112).

(2) The Grand Court had been entitled to have concluded that even if the appellant had established that the transfer of the assets to Blossom had been an unauthorized investment, the measure of damages available to the appellant would have been the difference between the position in which he would have been if his investments had been made without Blossom and the position in which he had been in as a result of the interposition of Blossom. The appellant would have been in no better position if Blossom had not been used. If, however, the judge had been wrong to hold that first-layer leverage was authorized by the SPA, there would have been breaches of contract when Blossom borrowed for investment. The measure of damages would have been the difference between the position in which the appellant would have been if the borrowings had not taken place and the position in which he was in consequence of the borrowings. However, the court had heard no argument on the alleged loss and made no finding on it (paras. 126–127).

**Deceitful non-disclosure**

(3) It was not open to the appellant to advance a claim on appeal which alleged pre-investment misrepresentation by the first respondent (namely that the appellant's investment would be authorized under the SPA) based on active or explicit misrepresentation. The appellant's claim was an attempt to revive, in another form, a former claim for fraudulent misrepresentation and/or deceitful non-disclosure which had been abandoned at trial (paras. 150–153).

(4) Nor was it open to the appellant to advance on this appeal a claim based on the proposition that there was an implied representation by the first respondent that there was nothing relevant to disclose in circumstances where it had been under a fiduciary duty to disclose its intention to use the Blossom structure. A fiduciary did not owe a separate and independent duty to disclose to his principal his own misconduct or, more generally, to disclose information of relevance to the principal. A fiduciary duty to disclose might arise—as an element or facet of the fiduciary's duty of loyalty in particular circumstances—in respect of matters (including his own misconduct) which a person in the fiduciary's position, acting in good faith, would appreciate should be disclosed (in that, without such disclosure, the fiduciary would be unable to fulfil his duty of loyalty). The Grand Court had correctly concluded that the first respondent had not owed the appellant a fiduciary duty, before the SPA was entered into, to disclose its intention to leverage the appellant's investment at portfolio level because it had not formed that intention prior to entering the SPA.

5

The Grand Court had also found that after entering the SPA the fiduciary relationship which arose had not imposed upon the first respondent any disclosure obligation which was additional to or independent of the contractual obligations imposed by the SPA, upon which the parties had contractually agreed. Without an appeal against the judge's conclusion on this issue, the appellant could not re-open the point (paras. 154–166).

(5) The Grand Court had been entitled to have concluded that the first respondent's non-disclosure of details of the leveraging arrangements was not deceitful. It was not open to the Court of Appeal to overturn the court's finding of fact made, as this was, on the basis of the judge's assessment of the evidence heard at trial, which was the subject of lengthy cross-examination, without very cogent reasons. The appellant's arguments provided no basis on which the present court should hold that the Grand Court had erred in reaching any of its conclusions as to the honesty of the first respondent's witnesses. In particular, the judge had been entitled to reject the submission that some witnesses had had a motive to conceal from the appellant the fact that his assets were being leveraged through Blossom at the portfolio level. It would be wrong for the Court of Appeal to reverse the Grand Court's findings as to the honesty of the witnesses, when it was the judge who had had the advantage of seeing and hearing the evidence given by the witnesses at trial (paras. 177–178).

(6) It was unnecessary to address the appellant's claims for damages in so far as they had been advanced on the basis of breach of fiduciary duty, deceitful non-disclosure and/or pre-contractual misrepresentation. On a true analysis, the appellant's claims appeared to lie in contract, for innocent breach of the terms of the reporting obligations in the SPA. The judge made no finding as to an award of damages for innocent breach of those obligations as the matter had not been before him for determination. In the circumstances, the court rejected the submission that, having held that the first respondent was in breach of the duty to report but that the breach was innocent, the judge should have gone on to consider whether the breach caused the appellant loss and damage (para. 181; paras. 185–186).

**Breach of trust and/or fiduciary duty**

(7) The Grand Court had correctly construed the appellant's claim for breach of trust as a claim founded on allegations of dishonesty. The substance of the allegation was that in using first-layer leverage the first respondent had acted dishonestly. The Grand Court had also correctly placed the burden of establishing breach of trust (or breach of fiduciary duty) on the appellant. The primary rule that the burden of proof lay on the party who asserted the truth of an issue in dispute had not been displaced. The allegations of dishonesty that were at the core of the appellant's case were serious allegations against professional bankers and the judge had been correct to approach them on that basis. In particular, he had been correct not to make findings against them on issues that had not been properly put to them in cross-examination (paras. 215–217).

6

   (8) The judge had not erred in his conclusion that the appellant had failed to prove his case that there had been an ulterior purpose for the first respondent's asset allocation decisions, namely preference of its own interests to those of the appellant. Nor had the judge failed to take into account material circumstances. The court would not infer that the judge had ignored or had not taken into account the arguments that had been advanced at trial. That inference could not be drawn either (i) from the judge's decision not to refer to each and every argument put to him; or (ii) from the judge's decision to make findings of fact that differed from those that the arguments had been advanced to support (paras. 225–230).

**Cases cited:**

   (1) *Abbey Forwarding Ltd.* v. *Hone*, [2010] EWHC 2029 (Ch), referred to.
   (2) *Arnold* v. *Britton*, [2015] UKSC 36; [2015] A.C. 1619; [2015] 2 W.L.R. 1593; [2016] 1 All E.R. 1, applied.
   (3) *Att. Gen. (Belize)* v. *Belize Telecom Ltd.*, [2009] UKPC 10; [2009] 1 W.L.R. 1988; [2009] 2 All E.R. 1127, considered.
   (4) *Bristol & West Bldg. Socy.* v. *Mothew*, [1998] Ch. 1; [1997] 2 W.L.R. 436; [1996] 4 All E.R. 698, referred to.
   (5) *British Westinghouse Elec. & Mfg. Co.* v. *London Underground Elec. Ry. Co. (No. 2)*, [1912] A.C. 673, referred to.
   (6) *Davidson* v. *Noram Capital Mgmt. Inc.* (2005), 13 B.L.R. (4th) 35; 2005 Can LII 63766, referred to.
   (7) *Dempster* v. *H.M. Rev. & Customs*, [2008] STC 2079; [2008] BTC 5150; [2008] B.V.C. 275, referred to.
   (8) *Eagil Trust Co. Ltd.* v. *Piggot-Brown*, [1985] 3 All E.R. 119, referred to.
   (9) *H (Minors) (Sexual abuse: standard of proof), In re*, [1996] A.C. 563; [1996] 2 W.L.R. 8; [1996] 1 All E.R. 1; [1996] 1 FLR 80, referred to.
  (10) *Hospital Prods. Ltd.* v. *United States Surgical Corp.*, [1984] HCA 64; (1984), 156 CLR 41; 55 ALR 417; 58 ALJR 587, referred to.
  (11) *Investors' Compensation Scheme Ltd.* v. *West Bromwich Bldg. Socy.*, [1998] 1 W.L.R. 896; [1998] 1 All E.R. 98; [1998] 1 BCLC 531; [1997] C.L.C. 1243, considered.
  (12) *Item Software (UK) Ltd.* v. *Fassihi*, [2004] EWCA Civ 1244; [2004] BCC 994; [2005] 2 BCLC 91; [2005] ICR 450, applied.
  (13) *Kelly* v. *Cooper*, [1993] A.C. 205; [1992] 3 W.L.R. 936; [1994] 1 BCLC 395, referred to.
  (14) *Laflamme* v. *Prudential-Bache Commodities Canada Ltd.*, [2001] 1 S.C.R. 638; (2000), 185 D.L.R. (4th) 417, referred to.
  (15) *Livingstone* v. *Rawyards Coal Co.* (1880), 5 L.R. App. Cas. 25, referred to.
  (16) *Robinson* v. *Harman* (1848), 1 Exch. 850; 154 E.R. 363; [1843–60] All E.R. Rep. 383, referred to.
  (17) *Ryder* v. *Osler, Wills, Bickle Ltd.* (1985), 49 O.R. (2d) 609; 16 D.L.R. (4th) 80, referred to.

(18) *Shepherd Invs. Ltd.* v. *Walters*, [2006] EWHC 836 (Ch); [2007] 2 BCLC 202; [2007] IRLR 110; [2007] F.S.R. 15, applied.
(19) *Williamson* v. *Williams* (1997), 160 N.S.R. (2d) 106, referred to.

*M. Black*, *Q.C.* and *M. Staff* for the appellant;
*Lord Falconer of Thoroton*, *Q.C.* and *D. Nambisan* for the respondents.

1   **CHADWICK, J.A.:** This is an appeal from an order made on May 18th, 2012 by Jones, J. dismissing the claims made by the appellant, Riad Tawfiq Al Sadik ("Mr. Al Sadik"), as plaintiff in proceedings brought against Investcorp Bank BSC and five other defendants (together, unless it is necessary to distinguish between them, "Investcorp") (the Grand Court decision is reported at 2012 (1) CILR 451).

2   Mr. Al Sadik was described by the judge as a wealthy businessman resident in Dubai, United Arab Emirates. In 2007 he sold part of his holding in a major construction and engineering company for AED1.2 bn. (US$327m.), which he received in cash.

3   The first named respondent/defendant, Investcorp Bank BSC ("Investcorp Bank"), is incorporated in the Kingdom of Bahrain as a Bahraini stock company. It carries on business as an international investment bank, with offices in Bahrain, London and New York. The second named respondent/defendant, Investcorp Investment Advisers Ltd. ("Investcorp Advisers"), is a subsidiary of Investcorp Bank, incorporated and registered in the Cayman Islands and licensed by the Cayman Islands Monetary Authority. The fifth and sixth named respondents, Investcorp Nominee Holder Ltd. ("Investcorp Nominee 1") and Investcorp Trading Ltd. ("Investcorp Nominee 2") are also subsidiaries of Investcorp Bank, incorporated and registered in the Cayman Islands. The third named respondent/defendant, Shallot IAM Ltd. ("Shallot"), was incorporated and registered in the Cayman Islands on February 28th, 2008. Its non-voting preference shares were issued to (and were, at the material times, held by) Investcorp Nominee 1 for Mr. Al Sadik. Its ordinary (voting) shares were issued to (and were, at the material times, held by) Investcorp Nominee 2. The fourth named respondent/defendant, Blossom IAM Ltd. ("Blossom"), was incorporated and registered in the Cayman Islands on December 27th, 2007. Its non-voting preference shares were issued to (and were, at the material times, held by) Shallot. Its ordinary (voting) shares were also issued to (and were, at the material times, held by) Investcorp Nominee 2.

4   On February 27th, 2008, Mr. Al Sadik transferred AED500m. to Investcorp Bank. As I have said, Shallot was incorporated on the following day. On March 1st, 2008, Mr. Al Sadik, Shallot, Investcorp Bank and Investcorp Nominee 1 entered into an agreement, described as a share purchase agreement and headed "Investcorp Hedge Funds—Separately

Managed Account" ("the SPA"), the purpose of which was set out, in the introductory paragraph, in the following terms (so far as material):

"A. Purpose

I [Mr. Al Sadik] have requested Investcorp Bank B.S.C. . . . to establish a separately managed account (the 'Investment Account') which will invest in certain hedge funds or segregated accounts with any hedge fund managers selected by the Investment Manager (as defined below), including, but not limited to, any Investcorp hedge fund (whether an Investcorp Fund of Hedge Funds, an Investcorp Single Manager Fund or any other Investcorp hedge fund product) . . . The Investment Account will be established as a special purpose vehicle, Shallot IAM Limited which will be incorporated under the laws of the Cayman Islands ('the Company') . . ."

In that context "the Investment Manager" meant Investcorp Advisers, with whom (as provided by cl. D of the SPA) the company (Shallot) would enter into an investment management agreement. By cl. B of the SPA, Mr. Al Sadik agreed to purchase for an aggregate purchase price equal to the "investment amount," and Investcorp Bank agreed to procure the issuance and sale of UAE dirham denominated participating non-voting redeemable preference shares of the company at par. The "investment amount" (indicated on the signature page of the SPA) was AED500m.

5   On March 4th, 2008, Investcorp Bank converted the investment amount into US dollars and credited the proceeds of conversion (US$136,138,505) to the account of Shallot. Shallot retained a small part of that amount (some US$1.129m.) and paid the balance to Blossom. Blossom invested US$79m. in a fund of hedge funds—known as Investcorp Diversified Strategies Fund ("DSF")—and the balance (some US$56.009m.) in five single-manager funds ("SMFs") which had been established by Investcorp. The investments were treated as having been made as at March 1st, 2008.

6   On April 10th, 2008, Blossom entered into a loan agreement ("the White Ibis III credit facility") with Royal Bank of Scotland ("RBS") for the purpose of using funds borrowed under that agreement to leverage Mr. Al Sadik's investments. Drawings amounting in aggregate to US$214.1m. were made under that credit facility in the period May to September 2008 and were applied for that purpose.

7   As the judge observed, the timing of Mr. Al Sadik's hedge funds investments was most unfortunate: 2008 turned out to be the hedge fund industry's worst year. Mr. Al Sadik's investment with Investcorp suffered badly in the market crash following the bankruptcy of Lehman Brothers on September 15th, 2008. The final redemption proceeds—realized after he had given instructions to redeem the investment on December 10th,

2009—reflected a total loss since inception of about AED207.6m. (US$56m.), representing a negative return on investment of 42%. The loss was aggravated by the leveraging which had been effected by Investcorp. In these proceedings Mr. Al Sadik seeks to recover his loss.

**The claims advanced in these proceedings**

8    In his statement of claim, dated December 23rd, 2009, Mr. Al Sadik advanced his claims under the six heads set out in section C of that pleading. Given that not all of those heads of claim were pursued at trial, it is sufficient at this stage to refer to them in the summary form in which they are described in the original statement of claim: 1st claim, breach of collateral contract; 2nd claim, fraudulent misrepresentation; 3rd claim, deceitful non-disclosure; 4th claim, breach of contract (unauthorized leveraging); 5th claim, breach of trust; 6th claim, conspiracy. The statement of claim was amended on August 26th, 2010, re-amended on December 19th, 2011, and re-re-amended (during the course of the trial) on January 31st, 2012. Following re-amendment, the statement of claim (as re-amended and re-re-amended) included a further five heads of claim: 7th claim, fraudulent misrepresentation (performance representation); 8th claim, fraudulent misrepresentation (investment presentation); 9th claim, breach of contract (unauthorized investment); 10th claim, breach of contract (entry into the investment management arrangement ("the IMA")); 11th claim, breach of contract (duty to act fairly).

9    The judge recorded that, on the 26th day of the trial (after the conclusion of the evidence), 4 of those 11 pleaded heads of claim—the 2nd, 6th, 7th and 8th claims—were abandoned. He analysed the position at para. 1.14 of his judgment dated May 18th, 2012:

"At the commencement of the trial counsel opened Mr. Al Sadik's case on the basis of eleven pleaded claims which can be summarised in the following way. Firstly, he claimed that Investcorp orally agreed to guarantee him a 45% return on his initial investment of AED500 million after three years and that it has dishonestly repudiated this agreement. This guarantee is said to comprise a collateral contract made in consideration for entering into the Share Purchase Agreement ('the SPA') which is the equivalent of an investment management agreement. Investcorp denies having entered into any such collateral contract. This claim (the 1st claim in the Re-Re-Amended Statement of Claim) remains on foot. Secondly, he claimed that Investcorp had fraudulently misrepresented to him certain aspects of his investment, including the level of risk associated with it; Investcorp's belief in the attainability of the target return and the basis upon which the investment would be made. These claims, coupled with a conspiracy claim (the 2nd, 6th, 7th and 8th claims in the Re-Re-Amended Statement of Claim) were abandoned after the

conclusion of the evidence on the 26th day of the trial. Thirdly, Mr. Al Sadik claims that Investcorp leveraged his investment without authority and then deceitfully concealed that it had done so. In brief summary, his case is that Investcorp represented to him that his funds would be invested in Investcorp's leveraged proprietary hedge funds offering which disclosed predetermined levels of leverage. Instead, it is alleged that Investcorp acted in breach of contract and in breach of its fiduciary duties by secretly leveraging his assets at the portfolio level through a credit facility established with Royal Bank of Scotland Plc ('RBS'). These claims (the 3rd, 4th and 9th claims in the Re-Re-Amended Statement of Claim) remain on foot. Finally, there is the 5th claim in the Re-Re-Amended Statement of Claim, described as a breach of trust claim which is essentially based upon the allegation that Investcorp was under a duty to do everything in its power to ensure that the terms of the SPA were carried into effect in an honest manner in the interest of Mr. Al Sadik. The pleaded breach of trust was based upon the allegation, now abandoned, that Investcorp's investment decisions were motivated by a desire to alleviate a pressing liquidity crisis . . ." [Footnote omitted.]

10    In that passage the judge identified five heads of claim—out of the 11 which had been pleaded—as claims which, by the end of the trial, Mr. Al Sadik continued to pursue. Those were the 1st claim (breach of collateral contract), the 3rd claim (deceitful non-disclosure), the 4th claim (breach of contract (unauthorized leveraging)), the 5th claim (breach of trust), and the 9th claim (breach of contract (unauthorized investment)). He did not refer, in terms, to the 10th claim (breach of contract (entry into the IMA)) or to the 11th claim (breach of contract (duty to act fairly)). But he went on to say this (*ibid.*):

"The case put in Counsel's written Closing Submission is that the investment decisions were made for the improper purposes of providing complementary capital for its single manager programme (including the proposed Alt Beta fund) and generating two layers of fees. Whether it is open to the Plaintiff to pursue this un-pleaded claim is an issue I have to decide."

**The issues which the judge determined**

11    At para. 1.15 of his judgment, the judge identified the four issues which, in his view, he needed to resolve:

(1) Whether or not there was a collateral contract by which Investcorp guaranteed Mr. Al Sadik's capital, together with a 45% return over three years.

(2) Whether, on the true construction of the SPA, Investcorp was not authorized to leverage Mr. Al Sadik's assets for investment purposes at the

portfolio level (as opposed to investing in hedge fund products designed to provide leveraged investments), whether through a special purpose vehicle or otherwise.

(3) Whether Investcorp deceitfully concealed its intention to leverage the assets, the manner in which the assets were leveraged and the extent of the leverage actually employed.

(4) Whether the asset allocation decisions, including decisions about the application of leverage, were made in breach of fiduciary duty.

12    He determined each of these issues against Mr. Al Sadik for the reasons which he gave in, respectively, sections 3, 4, 5 and 6 of his judgment. He summarized his conclusions in section 7 of that judgment (at paras. 7.2–7.5):

"7.2 No Collateral Contract, encompassing the Promise to Guarantee, was concluded between the parties with the result that the Plaintiff's First Claim is dismissed. Had I accepted the evidence of Mr. Al Sadik in preference to that of Mr. Al Khatib and concluded that an oral promise of a guaranteed return was made prior to execution of the SPA on 1st March 2008, I would have dismissed the First Claim on the basis that the promise was a matter of honour and that the parties had not intended to form a legally binding contract.

7.3 On its true construction, the SPA authorized the Defendants to leverage the investment amount for investment purposes by means of First Layer Leverage and/or Second Layer Leverage and the method by which this was done through Blossom (rather than Shallot) did not constitute a breach of contract. The transfer of the investment amount (less a small retention) from Shallot to Blossom was an administrative step which did not constitute an investment at all. It follows that the Plaintiff's Fourth and Ninth Claims are dismissed.

7.4 The Defendants' failure to inform the Plaintiff about their intention to leverage his assets by means of First Layer Leverage using the White Ibis III credit facility does not constitute a breach of its reporting obligations under the SPA. The fiduciary relationship arising out of the SPA did not impose upon the Defendants any disclosure obligation which was additional to or independent of the contractual obligation. The Defendants breached their obligations under Clause F.4 of the SPA in that, on its true construction, the Defendants failed to provide the Plaintiff with any statements of the underlying investments held through Blossom. Had the Defendants complied with Clause F.4, the fact that they had employed First Layer Leverage and the amount of the borrowing would have been disclosed to Mr. Al Sadik in the report for May 2008 (which would have been delivered in mid June). The Defendants' breach of contract

resulted in Mr. Al Sadik not being informed about the level of leverage and the manner in which it had been carried out until 2nd March 2009. However, the Defendants' reporting was done bona fide in a manner which Mr. Kironde honestly believed would best serve Mr. Al Sadik's interest. There was no intention to conceal from Mr. Al Sadik the fact that his portfolio had been leveraged or the level of leverage or the manner in which it had been carried out. For these reasons I conclude that the non-disclosure was not deceitful with the result that the Plaintiff's Third Claim is dismissed.

    7.5 The Defendants' initial asset allocation decision and the subsequent decisions in relation to the application of leverage were made bona fide for a proper purpose in accordance with the SPA. The allocation of half the Investment Amount to Single Managers (with $3\times$ leverage), on the basis that the investment would be diversified across an additional four Single Managers (including Alt Beta funds) as and when new funds were launched, was made in what Investcorp believed to be in Mr. Al Sadik's interest and not for the ulterior purpose of capitalizing the new funds and/or increasing its fee income through the fee sharing arrangement with the Single Managers. For these reasons the Plaintiff's Fifth Claim is dismissed."

13    At para. 7.6 of his judgment, the judge explained why he had reached the conclusion that, having decided the liability issues in favour of Investcorp, it would not be appropriate to say anything about the causation and quantum issues which would have arisen if he had found in favour of Mr. Al Sadik. He said this:

"Counsel's written Closing Submissions disclose areas of disagreement which were not ventilated in the oral argument on the basis that further and more detailed written submissions would be made if I were to find in favour of the Plaintiff on all or any of his claims. For this reason it would not be appropriate for me to comment on any of these points."

**The grounds of appeal**

14    Notice of appeal from the judge's order of May 18th, 2012 was filed on May 30th, 2012. The relief sought is an order that "the judge's judgment and order be set aside and judgment entered for the Plaintiff with damages to be assessed or that there be a re-trial of the Plaintiff's claims." A memorandum of grounds of appeal was filed on June 29th, 2012. It sets out 28 numbered grounds and (with two schedules) extends over 53 pages. The 28 grounds of appeal are grouped under four heads: (i) "Breach of Collateral Contract to return his investment to the Appellant plus 45% at the end of three years" (Grounds 1–8); (ii) "Breach of the SPA" (Grounds 9–19); (iii) "Breach of Duty to Disclose" (Grounds

20–24); and (iv) "Breach of Duty to Act in the Appellant's Best Interests" (Grounds 25–28). Those four heads correspond (broadly) with the matters addressed, respectively, in sections 3, 4, 5 and 6 of the judge's judgment.

15   On September 28th, 2012, those representing Mr. Al Sadik filed a document described as "Appellant's Skeleton Argument." That document extended over 98 pages. After referring (at para. 4) to the grounds of appeal set out in the memorandum of grounds of appeal, it is said (at para. 5) that Mr. Al Sadik no longer pursues "Grounds 1 to 7 and 8 (*sic*)" in relation to the breach of collateral contract. But, in the following sentence, it is said that "Ground 6 which challenges findings about the credibility of the Respondent's witnesses is maintained." Further, it is said that "Ground 21 is not pursued" and that—

> "Ground 22 is pursued in relation to the judge's finding that the breach of Clause F.4 of the share purchase agreement (SPA) occurred innocently insofar as the finding meant that the respondents were not deceitful or led him to fail to award damages for the breach."

16   In the skeleton argument filed on behalf of Mr. Al Sadik (at para. 50), it is said that six issues are raised on the appeal. They are described in these terms:

   (1) *Breach of contract*: the judge was wrong to hold that cl. A of the SPA was not breached by Investcorp when it caused Shallot to invest in Blossom (Grounds 9–16).

   (2) *Loss and damage (cl. A)*: the judge was wrong to hold that even if cl. A had been breached Investcorp would not be liable for damages (Grounds 18–19).

   (3) *Pre-contractual deceitful non-disclosure*: the judge erred when he failed to decide that Investcorp deceitfully did not disclose its intention to invest in Blossom (Ground 23).

   (4) *Post-contractual deceitful non-disclosure (breach of cl. F.4)*: the judge was wrong to hold that Investcorp's breach of cl. F.4 was not done deceitfully (Ground 24).

   (5) *Loss and damage (for breach of cl. F.4)*: the judge was wrong not to proceed to consider issues of loss and damage arising from the breach of cl. F.4 (Ground 17).

   (6) *Breach of fiduciary duty*: the judge was wrong to hold that Investcorp exercised the power of investment in cl. A ("the investment power") in Mr. Al Sadik's interests and not in its own interests (Ground 27).

17   None of those issues is relevant to the judge's decision to dismiss the 1st claim (breach of collateral contract). The issues numbered (1) and (2)

14

relate to the challenge to the judge's decision to dismiss the 4th claim (breach of contract (unauthorized leveraging)) and the 9th claim (breach of contract (unauthorized investment)). The issues numbered (3) and (4) relate to the judge's decision to dismiss the 3rd claim (deceitful non-disclosure). And the issues numbered (5) and (6) relate to the judge's decision to dismiss the 5th claim (breach of trust). Given (i) the claims that were pursued at the trial; (ii) the structure of the judge's judgment (which addresses those claims under the four sections 3, 4, 5 and 6); and (iii) the structure of the memorandum of grounds of appeal (in which, as I have said, the grounds are set out under four heads which correspond (broadly) to those four sections of the judge's judgment), the orderly and convenient course, as it seems to me, is to follow (in this judgment) the structure of the memorandum of grounds of appeal rather than a new structure imposed by Mr. Al Sadik's skeleton argument. I have in mind that permission to amend the grounds of appeal was neither sought nor granted, so that grounds raised for the first time in the skeleton argument which are not found in the memorandum of grounds of appeal (if any) are not properly before this court.

**The first issue: whether there was a collateral contract by which Investcorp guaranteed Mr. Al Sadik's capital, together with a 45% return over three years**

18    As I have said, the judge's reasons for dismissing the 1st claim are set out in section 3 of his judgment. The issue which he addressed was whether or not there was a collateral contract by which Investcorp guaranteed Mr. Al Sadik's capital, together with a 45% return over three years. He held that there was no such contract.

19    Grounds of appeal 1–8—which, as I have said, were grouped in the memorandum of grounds of appeal under the head "Breach of Collateral Contract to return his investment to the Appellant plus 45% at the end of three years"—were in these terms:

"*Ground 1*: The learned Judge erred in finding that the Appellant's case was inherently improbable.

*Ground 2*: The learned Judge misdirected himself as to the nature of the Appellant's case in relation to the collateral contract.

*Ground 3*: Each of the learned Judge's errors in finding that the Appellant's case was inherently improbable and/or founded on dishonesty led him to err in law as to the correct test in making findings of fact.

*Ground 4*: Each of the learned Judge's errors in finding that the Appellant's case was inherently improbable and/or founded on dishonesty and as to the test for making findings of fact, led him to

15

apply (a) the wrong test for cogency of proof and/or (b) the wrong threshold of proof.

*Ground 5*: The learned Judge erred in law when he held that there was no intention to create legal relations on or about 1st March, 2008 even if an oral promise to guarantee had been given to the Appellant by the First Respondent.

*Ground 6*: The learned Judge erred in law when he decided that all of the witnesses of fact of the Respondents were consistently credible (and that their evidence on every material issue was to be preferred over the evidence of the Appellant and Mr. Zaidi). His findings were inconsistent with his own findings, ignored evidence inconsistent with the findings and based upon generalisations about the credibility of 'professional' bankers.

*Ground 7*: The learned Judge erred in law when he decided that the Appellant and Mr. Zaidi were not credible on every material issue and the evidence of the Respondents' witnesses should be preferred.

*Ground 8*: By reason of the matters set out in Grounds 1 to 7 the learned Judge's decision in relation to the collateral contract was so unsafe, and/or a substantial wrong to the Appellant was occasioned, so as to render it just to order a re-trial."

20  Notwithstanding the conflicting statements in para. 5 of the appellant's skeleton argument—that "Grounds 1 to 7 and 8" are not pursued but that Ground 6 is maintained—to which I have referred and, notwithstanding the absence of an express abandonment of an appeal from so much of the judge's order as dismisses the 1st claim, it is clear that there is no longer a challenge on this appeal to the judge's finding in relation to the alleged breach of collateral contract. First, no such challenge was pursued, either in Mr. Al Sadik's skeleton argument or in oral argument at the hearing of the appeal. Secondly, it is impossible to see how such a challenge could be pursued in the circumstances that all the grounds of appeal grouped under the first head ("Breach of Collateral Contract to return his investment to the Appellant plus 45% at the end of three years") in the memorandum of grounds of appeal—other than, perhaps, Ground 6—were expressly abandoned in the appellant's skeleton argument.

21  In those circumstances, I need refer only to the judge's findings of fact in section 3 of his judgment which are of relevance to his conclusions on other issues.

### The judge's findings of fact in section 3 of his judgment (so far as now material)

22  At para. 3.1 of his judgment, the judge explained that Mr. Al Sadik's pleaded case was that Investcorp had promised him that, if he invested the

investment amount (AED500m.) in its hedge fund platform and kept his money there for three years, it would guarantee a return of 45% at the end of that period. The promise upon which Mr. Al Sadik relied was referred to in the pleaded case, at the trial and by the judge in his judgment as "the promise to guarantee."

23   Investcorp's hedge fund platform had been described by the judge at paras. 1.8 to 1.12 of his judgment. It is, I think, sufficient at this stage to refer to para. 1.8, in which the judge had said this:

"At the times material to this action, Investcorp's hedge fund platform comprised a number of funds of hedge funds, emerging manager funds and single manager funds having total assets under administration of about US$8 billion, of which about US$2 billion comprised its own proprietary capital. Those with which this case is most directly concerned are the Investcorp Diversified Strategies Fund Limited ('DSF'), the Investcorp Leveraged Diversified Strategies Fund Limited SPC ('LDSF'), the Investcorp Single Managers Fund Limited SPC ('SMFCo') and six (later seven) single manager funds, referred to collectively as the 'Single Managers.' All these funds are incorporated in the Cayman Islands and are subject to the regulatory regime established under the Mutual Funds Law."

24   The promise to guarantee was said to have been offered to Mr. Al Sadik orally on or about January 22nd, 2008, and accepted by him, orally or by conduct, either on February 27th, 2008 (when he transferred the investment amount to Investcorp), or on March 1st, 2008, when he entered into the SPA. Mr. Al Sadik's claim under this head—based on the premise that Investcorp's subsequent denial of the existence of a binding promise to guarantee constituted an anticipatory repudiation of the collateral contract that had been made—was for damages in the principal sum of AED432.6m., that being AED725m. (145% of the investment amount of AED500m.) less the amount of the redemption proceeds (AED292.4m.).

25   The judge found that, on October 18th, 2007, Mr. Mazin Al Khatib ("Mr. Al Khatib")—a relationship manager and a member of Investcorp's placement and relationship management ("PRM") team based in Bahrain—sent Mr. Al Sadik a hedge funds investment proposal document ("the investment presentation") in which there was set out a proposal for an investment amount of US$50m. in either a "balanced" or a "growth" portfolio, including potential asset allocations and expected returns and volatility figures. For the balanced portfolio, which had an expected return of 12.3% and an expected volatility of 6.3%, the investment presentation proposed that 50% be invested in the Investcorp Balanced Fund ("IBF"), 15% in the Investcorp Event Driven Fund ("EDF"), 15% in the Investcorp Early Stage Fund ("ESF") and 20% in the LDSF (×3 equity leverage). For the growth portfolio, which had a higher allocation to leveraged funds and

a correspondingly higher expected return of 14.7% and volatility of 8.3%, the investment presentation proposed that 30% be invested in the IBF, 20% in the ESF, 30% in the LDSF (×3 equity leverage) and 20% in the Investcorp Leveraged Event Driven Fund ("LEDF") (×l equity leverage).

26   The judge went on to hold that there was a follow-up meeting between Mr. Al Sadik and Mr. Al Khatib on December 25th, 2007 at which Mr. Al Sadik told Mr. Al Khatib that he wanted a return of 15% p.a. and asked if Investcorp would be prepared to guarantee such an investment return. Mr. Al Khatib told him that Investcorp could not do so.

27   Following that meeting, Mr. Al Khatib discussed Mr. Al Sadik's request for a guaranteed return with Mr. Janick Fierens ("Mr. Fierens"), who was the chief of staff of the PRM team responsible for managing client relationships within the countries of the Gulf Co-operation Council. The judge accepted Mr. Fierens' evidence that his discussion with Mr. Al Khatib was not directed to the question whether it would be possible to offer a guaranteed 15% return on investment (because, as the judge found, they both knew that that was out of the question); it was directed at identifying possible alternatives which might give Mr. Al Sadik confidence in Investcorp's hedge fund programme. The judge found that Mr. Fierens suggested that Mr. Al Sadik should be offered a higher hurdle rate for determining Investcorp's performance fee. He observed that an important feature of Investcorp's business model was the concept of an "alignment of interest" between the bank and its clients—in that the bank's proprietary capital was invested in parallel with that of its clients in all of its lines of business, including the hedge funds programme—and that Mr. Fierens' suggestion that Investcorp should not receive a performance fee unless Mr. Al Sadik's return exceeded 45% over three years was consistent with that concept.

28   The judge found that there was then a meeting on January 22nd, 2008, attended by Mr. Al Sadik, Mr. Al Khatib and Mr. Sewanyana Kironde ("Mr. Kironde"), another member of the PRM team and a hedge fund product specialist. The judge accepted Mr. Kironde's contemporary written record of that meeting—described as a "call note" and, as the judge observed, "prepared and circulated [routinely in the ordinary course of business] for the purpose of informing team members about meetings with clients and the essentials of what was said at those meetings"—as a reliable record of what had been said at that meeting. It was recorded in Mr. Kironde's call note that—

"we discussed the Investcorp platform, and how it could deliver returns that are more interesting than deposits. He wants a tailored portfolio that would give him a return of 45% flat over three years. He is very keen on the idea of 'risk sharing.' We told him that we cannot guarantee him the return, but that we can work out some sort

of higher hurdle for the performance fee trigger. We promised him a proposal by next week."

Mr. Al Khatib's evidence, at para. 4.17 of his witness statement dated June 9th, 2011, was to the same effect. He had said this:

"... I am quite clear in my mind that by the end of our meeting with Mr. Al Sadik he understood that Investcorp was not guaranteeing and could not guarantee any return to him for the investment we were discussing. I am also quite clear that Mr. Al Sadik understood that we were demonstrating our faith in Investcorp's ability to achieve his targeted return by offering to take a performance fee only once that return had been achieved There was no room for confusion—there could be no guarantee, but we believed the target could be achieved and were prepared to forego the major part of our fees until this happened."

The judge summarized the oral evidence which Mr. Al Khatib and Mr. Kironde gave at the trial, and described it as consistent with the position described by them, respectively, in the witness statement and in the call note. They were adamant, he said, that Mr. Al Sadik had been told at the meeting on January 22nd, 2008 that Investcorp could not provide him with the guarantee he was seeking and the position was left on the basis that they would get back to him with a proposal for a higher hurdle rate for the performance fee. The judge accepted that evidence.

29    The judge found that the content of Mr. Kironde's call note was considered by Mr. Ibrahim Gharghour ("Mr. Gharghour") and Mr. Deepak Gurnani ("Mr. Gurnani"), who were, at the time, joint heads of Investcorp's Hedge Funds Group, based in New York, and that they agreed in principle to the suggestion that a performance fee be charged only after a 45% return on investment had been achieved but subject to a three-year lock-up. In an email sent to Mr. Zahid Zakiuddin, then the head of the PRM team, on January 24th, 2008, Mr. Gharghour wrote:

"To meet a 15% return annually, we are assuming we can have a vol/risk budget of 8–10%. We are also assuming the portfolio will be locked up for 3 years to allow for some credit opportunities exposure. We will also assume we can use our single-managers. All of which will help in getting to the return targets as well as internally justify the unique performance fee calculations. We will also assume we have discretion in making changes in the portfolio."

On January 25th, 2008, Mr. John Franklin, head of asset allocation within the Hedge Funds Group, sent his initial ideas to Mr. Gurnani suggesting a 40% allocation to LDSF (×3 leverage), 20% allocation to SMFCo (×1 leverage) and a 40% allocation to the Credit Opportunities Fund ("COF") which was then planned but had not been launched. That document

(referred to at the trial and in the judgment as the "investment proposal" so as to distinguish it from the original "investment presentation") was completed and dated January 28th, 2008, following further work by Mr. Franklin with input from Mr. Fierens. The judge observed that there was nothing in any of the email traffic passing amongst them to suggest that there was any intention to formulate a proposal for a guaranteed product.

30   The investment proposal was presented to Mr. Al Sadik at a meeting on January 28th, 2008, at which Mr. Al Khatib, Mr. Kironde and Mr. Fierens were present. It included, on the first page, the following "Portfolio Objectives":

   "–   Target return of 45%+ over 3-year investment horizon

   –   Funding and expected return in AED

   –   Alignment of interest with risk to Investcorp if target return is not realized."

The judge accepted that the call note made by Mr. Kironde after the meeting fairly and accurately reflected what had taken place. It was in these terms:

   "We presented the proposal, and emphasised that we take no performance fees until he has a return of 45%. After that we take 30% of the returns. He liked this alignment of interests. He is also fine with the three year term of the investment, and he no longer brings up the subject of the guarantee. Thus, the terms we offered are consistent with his expectations. He did not have many questions about the proposal. He also had another proposal (we think from HSBC), and he read off some of the managers in that proposal. There was some overlap with our managers. He thanked us for the work we had done on such short notice, and said that he wants to work with us. He will decide in the next couple of weeks as to how he will proceed Our best read is that we probably have an 80% chance of getting at least half of the amount originally discussed. Whilst his deposit does not mature until 20 February we should finalise the hedging strategy that we will employ, and start drafting the share purchase agreement so that if he decides to go ahead we can deliver everything right away."

31   The judge explained that, the investment proposal having been accepted by Mr. Al Sadik, at least in general terms, the next step was to agree the details and execute an investment management agreement. That took the form of a share purchase agreement (for the purchase of shares in the company (Shallot) which was to be used as the investment vehicle). The judge found that the process of agreeing the SPA began with a further meeting at Mr. Al Sadik's office in Dubai on February 24th, 2008, with Mr. Al Khatib, Mr. Kironde and Mr. Fierens present. He referred to an

email sent by Mr. Kironde to Mr. Gharghour and Mr. Gurnani shortly after the meeting in which it was recorded that Mr. Al Sadik would not agree to a one-year hard lock-up unless Investcorp would give him a one-year principal guarantee and that Mr. Al Sadik had sought to reduce the management fee and the performance fee on gains above the 45% hurdle rate. The judge was satisfied that that email contained a reliable account of what took place. As he put it (at para. 3.16 of his judgment):

> "The focus was on Mr. Al Sadik's liquidity requirements . . . he wanted better liquidity so that he could redeem his investment if it was performing badly . . . None of this is consistent with the notion that Investcorp had already agreed to guarantee his return and in my judgment the evidence clearly points to the conclusion that the parties were negotiating on the assumption that the return was not being guaranteed."

In reaching that conclusion, the judge rejected the evidence of Mr. Al Sadik—and of Mr. Saiyid Zaidi ("Mr. Zaidi"), Mr. Al Sadik's employee and investment adviser—that the promise to guarantee was reconfirmed by Mr. Al Khatib on February 24th, 2008.

32    The judge found that the terms of the SPA were negotiated at several meetings between February 26th and 29th, 2008. He referred to Mr. Al Sadik's reliance upon the deletion of cl. E.1 as evidence tending to support the existence of the alleged collateral contract. He pointed out that that clause was included in Investcorp's standard form documentation and had appeared in all the drafts of the SPA but not in the document as signed. It took the form of a representation by the investor that "I/We understand that an investment in the Company may be viewed as speculative and may result in the complete loss [of] a/my/our investment due to the risks inherent in the underlying investments." The judge noted that Mr. Al Sadik's evidence was that this clause was a "deal breaker" because it was inconsistent with the alleged promise to guarantee and that, on each occasion that the clause appeared in a draft, he complained to Mr. Al Khatib and demanded that it be removed. The judge rejected that evidence. He found that the request for the removal of cl. E.1 was first raised by Mr. Zaidi on February 29th, 2008, not on the grounds that it would be inconsistent with a guarantee but because "there were quite enough disclaimers in the SPA." He found that the clause was removed by Mr. Zaidi from the draft of the SPA that was on his computer, and did not appear in the document signed by Mr. Al Sadik, and he found that its removal was accepted by Investcorp because it was seen as a representation having no effect on the commercial terms. The judge concluded that the removal of cl. E.1 from the draft SPA was not evidence tending to support the existence of the collateral contract. In reaching that conclusion the judge observed (at para. 3.17) that—

"Mr. Zaidi steadfastly refused to recognize even the possibility that he might have amended the document. This was an example of his unswerving adherence to every word of his witness statement, irrespective of any evidence to the contrary, which suggested to me that he is not a reliable witness."

33   At para. 3.18 the judge addressed the question whether, if (contrary to his finding on the facts) the promise to guarantee had been offered by Investcorp, that offer had been made with intention to create legal relations. For the reasons which he set out in that paragraph—including, in particular, evidence given by Mr. Al Sadik in the course of cross-examination at the trial—he concluded that, even if an oral promise to guarantee was given by Mr. Al Khatib, there was no intention to create legal relations on or about March 1st, 2008 (when, as pleaded, the alleged collateral contract was made).

34   The judge then turned to consider whether support for the existence of a collateral contract could be found in the parties' conduct after the execution of the SPA. He held that, following execution of the SPA, the parties continued to behave as if there were no promise to guarantee: in particular, he said that during the following six months Mr. Al Khatib and Mr. Kironde communicated with Mr. Al Sadik on a number of occasions and that the call notes reflect that Mr. Al Sadik expressed disappointment with the poor results but made no mention of having a guarantee. The judge referred (at para. 3.19 of his judgment) to a meeting between Mr. Al Sadik and Mr. Al Khatib on September 8th, 2008. In an email sent by Mr. Al Khatib to Mr. Gharghour and Mr. Kironde on September 15th, 2008, Mr. Al Khatib recorded that Mr. Al Sadik was "extremely unhappy or angry rather" with Investcorp's performance and that "he wants to see results otherwise he probably will redeem by year end." The judge observed that that was "not the reaction one might expect from a client who has the benefit of a guaranteed return with more than two years left to run." He went on to say this (at para. 3.19):

"In his written evidence Mr. Al Sadik denies having expressed unhappiness or anger and denies having threatened to redeem. In cross-examination he admitted that he was unhappy with the performance but continued to deny having threatened to redeem. Mr. Al Sadik's reaction to this e-mail is consistent with his reaction to other contemporaneous written evidence which appears to be inconsistent with his case. He disputes its accuracy or asserts that it is flat-out wrong. This is the reaction of someone who is re-inventing and re-interpreting the factual story to suit his case."

The judge held (at para. 3.20 of his judgment) that it was only after the market collapse which followed the bankruptcy of Lehman Brothers on September 15th, 2008 that Mr. Al Sadik began to assert that he had the

benefit of a guaranteed return. He said that it was not in dispute that, in the period immediately after a meeting held on September 17th, 2008, "Mr. Al Sadik telephoned Mr. Al Khatib repeatedly, insisting that he must be given a 'letter of guarantee.'"

35   The judge referred (at para. 3.21 of his judgment) to a meeting on October 20th, 2008 between Mr. Al Sadik and Mr. Al Khatib at which there was an exchange of letters. He found that Mr. Al Khatib's call note in respect of that meeting recorded that Mr. Al Sadik was "extremely angry" and compared Investcorp's performance unfavourably with that of Citigroup and HSBC, whose representatives were introduced to Mr. Al Khatib as they were leaving the office, and that Mr. Al Khatib's response was that Investcorp's performance must have been worse "because of the leverage," to which Mr. Al Sadik had responded that "everybody was leveraged." The judge said that Mr. Al Khatib was very clear in his evidence that there was a discussion at this meeting about the use of leverage as the explanation for the relatively bad performance of the Investcorp portfolio in the market crash and held that his evidence was consistent with the contemporaneous call note. He observed (at para. 3.21) that—

> "given that Mr. Al Sadik had met with HSBC immediately before his meeting with Mr. Al Khatib, it seems to me inherently likely that there should have been some discussions about the relative performance of the two portfolios, which would have lead on to a discussion about Investcorp's use of leverage."

The judge rejected the evidence of Mr. Al Sadik (and Mr. Zaidi who had said that he was present at the meeting) that no such discussion took place. And he rejected their evidence that Mr. Al Khatib had confirmed, orally at the meeting, the existence of the promise to guarantee.

36   Mr. Al Sadik's letter, dated October 20th, 2008, and exchanged at the meeting on that day, was in these terms (so far as material):

> "... I agreed to deposit with you Five Hundred Million Dirhams ... on the commitment by Investcorp that it will return to me at the end of a 3 year period ... a minimum of 145% of the amount deposited. Of course I left it to you to do whatever you thought is appropriate in terms of how and where you invest these funds. I kindly ask you to confirm that we share the same understanding and the same commitment."

The judge found that, following "considerable internal discussion," Investcorp's response to that letter, on October 26th, 2008, included the statement that "we would like to confirm that we share your understanding of the investment objectives of the hedge fund portfolio you have entrusted us with" but without confirming the promise to guarantee. He

went on to find that (at para. 3.22) "having been put under extreme pressure by Mr. Al Sadik," Mr. Al Khatib wrote a second reply on October 30th, 2008 which included the statement that "we acknowledge receipt of your letter and would like to confirm that we agree with the content and share your understanding of the investment objectives of the hedge fund portfolio you have entrusted us with." The judge noted (*ibid.*) that Mr. Al Sadik relied on that second reply as constituting written confirmation of the oral guarantee, although (as he observed) that was not what he thought at the time because he continued to complain in subsequent telephone conversations that the response did not meet his requirements. He concluded that it might be said that the October correspondence "reflects a studied ambiguity." He said this (*ibid.*):

> "I conclude that Mr. Al Sadik avoided using the word '*guarantee*' because he knew perfectly well that no guarantee, whether of capital alone or capital and the 45% return, had ever been offered to him. I also think that Investcorp's personnel refrained from specifically denying that any guarantee had been offered, not because they thought a guarantee had been offered, but because they were trying to manage down the unrealistic expectations of a difficult client in a diplomatic way, without provoking him to redeem."

He held that the letter of October 30th, 2008 was not to be regarded as confirmation of the alleged promise to guarantee or as evidence that any oral promise to guarantee had ever been given.

37   The judge referred (at para. 3.23 of his judgment) to a meeting on November 6th, 2008 between Mr. Al Sadik and Mr. Nemir Kirdar (the founder and executive chairman of Investcorp) at which Mr. Al Khatib and Mr. James Tanner (who had become head of Investcorp's PRM team on the retirement of Mr. Zakiuddin) were present. He described the events at the meeting in some detail, relying on the evidence given by Mr. Tanner, whom he found to be "a relatively independent observer" and "a capable industry professional who was plainly telling the truth." The judge found that Mr. Kirdar had told Mr. Al Sadik, "in terms," that Investcorp had not guaranteed his return on investment. That statement, the judge found, led to "a highly charged verbal confrontation (in Arabic) between Mr. Al Sadik and Mr. Al Khatib." The judge went on to record that Mr. Al Sadik had said in evidence that shortly after that meeting he dictated a file note which was typed up by his assistant and sent to his lawyers a few days later. The judge held that the content of that note bore "no resemblance to what actually took place at the meeting." He said this (at para. 3.23):

> "It purports to record that Mr. Al Khatib had 'confirmed the agreement' by which Investcorp would 'return to me at the end of a 3 year period at least 145% of the invested amount' and that Mr. Kirdar said that Investcorp would 'stand by any agreement or commitment' made

by its senior officers. I regard this file note and Mr. Al Sadik's subsequent letter of 23rd November to Mr. Kirdar as thoroughly disingenuous misrepresentations of what was actually said at the meeting."

38    In a letter dated December 30th, 2008 and written by Mr. Lawrence B. Kessler ("Mr. Kessler"), then Investcorp's general counsel, based in its head office in Bahrain, it was confirmed, in clear terms, that it was Investcorp's position that no guarantee had ever been offered. There was a further meeting on January 14th, 2009, at which Mr. Al Sadik, Mr. Tanner, Mr. Al Khatib and Mr. Fierens were present. The purpose of that meeting, as the judge found, was to discuss Mr. Al Sadik's claim to have the benefit of a guarantee and to try and work out a way forward in circumstances where it had become obvious that the 45% return could not be achieved or at least not within the original timeline. Following that meeting, Mr. Zaidi prepared a document entitled "minutes of meeting," which purported to record that Mr. Al Khatib confirmed the existence of the promise to guarantee. The judge found that, at the date of the meeting on January 14th, 2009, Mr. Al Khatib knew that the guarantee issue had been investigated by Mr. Tanner and Mr. Kessler: he knew that Mr. Kessler's letter of December 30th, 2008 had explicitly denied that any guarantee had been offered. In these circumstances, he held that it was inherently unlikely that Mr. Al Khatib would change his mind and confirm what had previously been denied. He accepted the evidence of Mr. Tanner, Mr. Al Khatib and Mr. Fierens who each denied that Mr. Al Khatib had "said any such thing." The judge held that "This part of Mr. Zaidi's minutes is not simply self serving. In my judgment, it is plainly untrue."

39    In summarizing his conclusions on the first issue, the judge observed (at para. 3.25 of his judgment) that he had approached his analysis of the evidence on the basis that it was inherently improbable that any investment bank would guarantee a return on a hedge fund portfolio of 45% over three years (which, he said, was then three times the risk-free rate available on US treasury bills). He reminded himself of the observations of Lord Nicholls of Birkenhead in *In re H (Minors) (Sexual abuse: standard of proof)* (9) ([1996] A.C. at 586) that "the inherent probability or improbability of an event is itself a matter to be taken into account when weighing the probabilities and deciding whether, on balance, the event occurred." And he went on to say this (at para. 3.25):

"I am unable to accept the evidence of Messrs. Al Sadik and Zaidi that the Promise to Guarantee was made at any of the meetings in January and February 2008 or confirmed at any of the meetings in September, October or November 2008. Their evidence in this regard is wholly unsupported by the contemporaneous documents, which point to the opposite conclusion. The Investment Proposal makes no reference to a guarantee for the simple reason that Mr. Al Sadik's

request for one had been rejected. His argument about the deletion of Clause E.1 from the SPA is contrived. Mr. Al Sadik's assertion that he would never have made a substantial investment in hedge funds without the benefit of a guarantee is not credible having regard to the fact that he had invested some US$167 million in a hedge fund portfolio with HSBC just a few months earlier. The parties' behaviour after the investment was made is consistent with there being no guarantee. It was the occurrence of very serious losses following the bankruptcy of Lehman Brothers which prompted Mr. Al Sadik to embark upon an increasingly disingenuous attempt to extract from Investcorp confirmation of a guarantee which had never been offered by any of its executives. In my judgment the existence of a collateral contract comprising the Promise to Guarantee has not been proved . . ."

He added that, if he had accepted Mr. Al Sadik's evidence that Mr. Al Khatib had promised to guarantee a 45% return over three years, he would also have been led to the conclusion (also on the basis of Mr. Al Sadik's evidence) that there was no intention to create any legally enforceable contract.

**The second issue: whether, on the true construction of the SPA, Investcorp was authorized to leverage Mr. Al Sadik's assets for investment purposes at the portfolio level**

40    The judge's reasons for dismissing the 4th and 9th claims are set out in section 4 of his judgment. The issue which he addressed was whether, on the true construction of the SPA, Investcorp was not authorized to leverage Mr. Al Sadik's assets for investment purposes at the portfolio level (as opposed to investing in hedge fund products designed to provide leveraged investments), whether through a special purpose vehicle or otherwise. He held that, on its true construction, the SPA authorized Investcorp to leverage the investment amount for investment purposes by means of first-layer leverage and/or second-layer leverage and the method by which this was done through Blossom (rather than Shallot) did not constitute a breach of contract: the transfer of the investment amount (less a small retention) from Shallot to Blossom was an administrative step which did not constitute an investment at all.

41    The judge explained (at para. 4.1 of his judgment) that Mr. Al Sadik's 4th and 9th claims were that Investcorp applied "first-layer leverage" to the investment amount and caused Shallot to transfer the value representing the investment amount to Blossom, which was not an authorized investment, in breach of the express terms of the SPA. He explained what he meant by "first-layer leverage"—and the related expression "second-layer leverage"—in a footnote to that paragraph:

"The expressions 'First Layer Leverage' and 'Second Layer Leverage' are not terms of art in the hedge fund industry. These expressions have been invented by counsel for the purposes of drafting the Plaintiff's Statement of Claim. I have adopted counsel's expression 'First Layer Leverage' to mean leveraging an investor's contributed funds at the portfolio level, which is what Investcorp in fact did on behalf of Mr. Al Sadik. I have adopted the expression 'Second Layer Leverage' to mean using an investor's contributed funds for investing in hedge funds which seek to achieve a certain level of leverage as part of their investment strategy, such as LDSF and SMFCo. From the Investor's point of view, assuming that First Layer Leverage is done through an SPV with limited recourse, it is possible to use either of these investment techniques to achieve an equivalent economic result."

It was, he said, Mr. Al Sadik's case that the SPA did not give Investcorp any power to borrow for investment purposes and that the leveraging of the investment amount by way of Blossom was, as well as being a breach of fiduciary duty, also done in breach of contract and in excess of authority. It was alleged (in the 9th claim) that Blossom was not an authorized investment because it was not a "hedge fund" or a "segregated account" within the meaning of cl. A of the SPA. Further, even if Blossom were an authorized investment, it was alleged (in the 4th claim) that it had no authority to employ first-layer leverage: meaning that it had no authority to leverage its assets at the portfolio level for investment purposes.

42    The judge went on to explain (*ibid.*) that Investcorp's defence to the 9th claim was that (i) Blossom was an investment authorized under cl. A of the SPA, whether as an "Investcorp hedge fund product" or an "Investcorp fund of hedge funds"; (ii) Blossom was used as an administrative step for the purpose of compliance with the SPA; and (iii) even if the use of Blossom was a technical breach of the SPA, this caused no loss to Mr. Al Sadik in excess of that which he would have suffered had he been invested in the vehicles specifically referred to in the investment proposal. Investcorp's pleaded defence to the 4th claim was that (i) Blossom was authorized under cl. A of the SPA; and (ii) Investcorp was authorized under the SPA to invest in any authorized vehicle, including a leveraging vehicle.

43    The judge identified what he saw as the real issue between the parties: whether, on its true construction, the SPA permitted Investcorp to leverage the investment amount at the portfolio level, as opposed to investing in hedge funds, such as LDSF and SMFCo, which sought to achieve a certain level of leverage as part of their investment strategy. He said this (at para. 4.2):

27

"If Investcorp was authorized to leverage Mr. Al Sadik's contributed funds at the portfolio level, and then it must have been empowered to do so either directly through Shallot and/or indirectly through a wholly owned subsidiary, such as Blossom, incorporated specifically for this purpose. Clause D.2 of the SPA states that Shallot's—

'. . . board of directors will authorize or otherwise cause the Company to take any actions that the board believes are necessary or desirable in order to effectuate the purposes of this investment or otherwise manage the affairs of the Company.'

If all or any part of Shallot's assets were to be leveraged at the portfolio level for investment purposes, I would expect this to be done through a wholly owned subsidiary incorporated especially for this purpose. In my judgment any suggestion that Investcorp had no power (acting by its employees who constituted Shallot's board of directors) to incorporate a subsidiary for this purpose would be unsustainable. The issue which I have to decide is whether or not Investcorp was authorized to leverage the contributed funds at the portfolio level and this turns upon the true meaning and effect of the SPA."

The judge answered the question which he had posed in the affirmative. At para. 4.9 of his judgment he said this: "My conclusion is that, on its true construction, the SPA does authorize First Layer Leverage . . ."

### The judge's findings in section 4 of his judgment

44   The reasoning which led the judge to that conclusion may, I think, be summarized as follows:

(1) The law relating to the construction of contractual agreements was, he said, well settled. He identified, as the two leading authorities which had been followed and applied in the Grand Court, the decision of the House of Lords in *Investors' Compensation Scheme Ltd.* v. *West Bromwich Bldg. Socy.* (11) and the decision of the Privy Council in *Att. Gen. (Belize)* v. *Belize Telecom Ltd.* (3). He cited passages from the speeches of Lord Hoffmann in each of those appeals. Those passages are well known: they are found at [1998] 1 W.L.R. at 912–913 and at [2009] 1 W.L.R. 1988, at paras. 16–19 and para. 21, and it is unnecessary to set them out in this judgment at this stage (if at all).

(2) Having set out the terms of cl. A of the SPA, to which I have referred earlier in this judgment, the judge pointed out that Shallot was duly incorporated and capitalized in accordance with that provision. He pointed out, also, that (as I have mentioned) cl. D.1 provided that Shallot would enter into an investment management agreement ("the IMA") with

Investcorp Advisers but that this was not done (for reasons not explored by the parties in evidence). The result, he said, was that the SPA stood alone. He recorded that it was common ground that the SPA conferred upon Investcorp a discretionary mandate to manage and invest the investment amount in accordance with the purposes stated in cl. A. He went on to say "for the sake of completeness" that cl. I ("Borrowing Relationships") authorized Investcorp to cause Shallot to borrow money to meet possible temporary cash shortfalls and for other corporate purposes, described as "Liquidity Borrowings," the amount of which would be limited to 25% of the company's equity, but that it was common ground that borrowing for liquidity purposes was materially different from borrowing for investment purposes, and that cl. I related only to the former. He noted that cl. L.1 provided that the contract should be governed and construed in accordance with the law of the Cayman Islands.

(3) The judge then turned to examine the relevant factual background. He explained, at para. 4.5 of his judgment, that the investment proposal, which was discussed with Mr. Al Sadik at the meeting on January 28th, 2008, to which I have referred, was not incorporated as a term of the SPA but was an important part of the factual matrix against which the SPA must be construed. He pointed out that it was stated, on p.2 of the investment proposal (under the heading "Overview of Proposal"), that 50% of the portfolio was to be invested in the DSF "to function as core hedge fund holding" and that 50% was to be invested in two satellite portfolios—25% in Investcorp's single-manager platform and 25% in opportunistic/theme funds—with "leverage at each underlying portfolios taking into account portfolio volatility." He said this:

> "On any objective analysis, it is plainly obvious that this part of the document is proposing a leveraged investment and there is nothing in any other part of the document tending to suggest otherwise."

He referred to p.5 of the investment proposal ("Indicative Terms") which, as he said, indicated (*inter alia*) the way in which such a portfolio could be constructed (*ibid.*):

> "1. Leveraged Diversified Strategies Fund (×3 equity leverage)
>
> 2. Single Manager Fund Co. (initially ×1 equity leverage)
>
> 3. Leveraged Event Driven Fund (×1 equity leverage)."

And he went on to say this (*ibid.*):

> "The first page to which I have referred (page 2) sets out an overview of the proposal which is that 50% should be invested in DSF as the core holding and 50% should be divided between two satellite portfolios comprising multiple single manager funds and multiple opportunistic and/or theme funds. The second page to which I have

referred (page 5) gives an indication of the way in which this proposal could be implemented. This is explained more fully in the Appendices at pages 8, 9 and 10. Page 8 describes how the core holding in DSF can be leveraged 3× by investing in LDSF which is effectively a feeder fund established for this purpose . . . Page 9 describes how the proposed satellite portfolio of single manager funds could be leveraged up (then at 1× only) through SMFCo and adds the comment that the level of leverage is expected to increase as more single managers are added to the platform. The planned COF had not been launched and so page 10 explains how a satellite portfolio of theme funds (of which there were five, as identified on page 13) could be achieved by investing in the LEDF which is a leveraged hedge fund product, similar to LDSF. It seems to me that the 'Indicative Terms' indicate (inter alia) how the proposed leveraged investment could be implemented. It indicates that the core investment in DSF with 3× leverage can be achieved by investing in LDSF. It indicates that satellite portfolios of single manager funds and theme funds with 1× leverage can be achieved by investing in SMFCo and LEDF respectively. Although it does not say so in terms, it seems to me that the Investment Proposal tells the reader that an investment in LDSF is the economic equivalent of a leveraged investment in DSF and that investments in SMFCo and LEDF are the economic equivalent of leveraged investments in portfolios comprising the six single manager funds and the five theme funds. There is nothing in the Investment Proposal which tends to suggest that it will be a term of the SPA that the investments in DSF and portfolios of single manager/theme funds should not be leveraged at the portfolio level. It merely indicates that the desired level of leverage could be achieved at the underlying fund level by investing in the identified feeder fund and funds of hedge funds." [Footnote omitted.]

(4) The judge accepted that the purpose of the SPA was for Mr. Al Sadik to establish a managed account with Investcorp, by which he would invest in a portfolio of hedge funds managed by Investcorp pursuant to a discretionary mandate: its purpose was not to implement the investment proposal as such. He accepted that cl. A of the SPA made it clear that Investcorp was to have a wide discretion, not limited to implementing exactly what was proposed in the investment proposal. Nevertheless, in his view, the purpose of the SPA was to authorize Investcorp to implement the investment proposal to the extent that its implementation was not actually inconsistent with what had been expressly agreed by the parties. By way of example, he pointed out that, although Investcorp was not authorized to implement any part of the investment proposal which would be inconsistent with the liquidity terms expressly agreed between the parties in cll. H.1 and H.2 of the SPA, it would be wrong in principle to construe the SPA in a way which involved implying a term which would make it

impossible to implement any part of the investment proposal. As a further example, he pointed out that the investment proposal proposed that leveraged investments would be made in DSF and a satellite portfolio of single-managers and said that it would not be proper to imply a term into the SPA which would prevent such investments from being made but, conversely, it would be improper to imply a term to the effect that such investments must only be made in precisely the way set out in the indicative terms. In the final sentence of para. 4.6 of his judgment, he said this (at para. 4.6):

> "The application of the legal principles explained in the dicta of Lord Hoffmann cited above, leads me to the conclusion that, on its true construction, the SPA authorizes Investcorp to construct a leveraged portfolio consistent with the Investment Proposal, save to the extent that the parties have expressly agreed otherwise."

(5) At para. 4.8 of his judgment, the judge expressed agreement with the submission made on behalf of Investcorp that it was helpful to consider what he described as "the economic equivalency point" as a cross-check. He said this:

"The Investment Proposal says that 50% of the assets should be invested in DSF as the portfolio's core holding. It also says that this investment should be leveraged 3×. It is perfectly clear, and would be clear to anyone reading the SPA in the light of the investment proposal, that this economic result can be achieved in either of two ways. Leveraging 50% of the assets ×3 at the portfolio level produces US$270 million to invest in DSF. This is consistent with the investment proposal. Investing US$67.5 million in the high risk ×3 portfolio of LDSF, results in LDSF investing US$270 million in DSF. This is also consistent with the Investment Proposal. The two different scenarios can produce an economically equivalent result for Mr. Al Sadik for the following reasons. The evidence is that LDSF is the equivalent of a feeder fund. Its sole purpose is to act as a vehicle by which Investcorp's clients can obtain a leveraged exposure to DSF. By incorporating LDSF as a segregated portfolio company under Part XIV of the Companies Law, it is possible to offer Investcorp's clients a multiple choice of leverage at various different levels. Each portfolio is a special purpose vehicle. In principle, its only asset is its investment in DSF and its only liability is the amount owing to the bank. It follows that by investing US$67.5 million in LDSF, the investor's actual exposure, in economic terms, is equivalent to a US$270 million investment in DSF subject to a US$202.5 million liability to a lender. There is nothing else on LDSF's balance sheet. The investor can achieve exactly the same result by investing US$67.5 million in his own SPV which then borrows US$202.5 million (secured, with limited recourse) and invests US$270 million

directly into DSF. In principle, the two balance sheets will look the same. The only difference is that LDSF's balance sheet will be larger because it reflects the investments of multiple clients. Looked at objectively, there can be no justification for implying into the SPA a term to the effect that either one of these scenarios is prohibited, whereas the other is not. This would flout business common sense, because either scenario can produce an economically equivalent result for Mr. Al Sadik. Having regard to the content of the Investment Proposal and the fact that the parties are agreed that Clause A of the SPA permits an investment in LDSF, both scenarios must be permitted."

And he went on to make three further observations (*ibid.*):

"First, I appreciate that SMFCo is not structured in exactly the same way as LDSF. It is also a segregated portfolio company and exists for the same purpose as LDSF. It provides Investcorp's clients with the opportunity to make leveraged investments in the single manager platform, but it is more like a fund of hedge funds because it is investing in six (or more) single manager funds in varying proportions, whereas LDSF has only one investment. It follows that a leveraged investment in all of the single manager funds will never be the exact economic equivalent of an investment in SMFCo. Second, it makes no difference to the economics whether a leveraged investment in DSF and the single manager funds is made directly by Shallot or indirectly through a wholly owned subsidiary such as Blossom. Third, whether or not the use of the White Ibis III credit facility in fact produced an economically equivalent outcome is a different point which has no bearing on my analysis of the terms of the contract."

45   The judge said that his conclusion that, on its true construction, the SPA did authorize first-layer leveraging disposed of Mr. Al Sadik's 4th and 9th claims. But he went on to address two other arguments:

(1) He accepted that Blossom was not a hedge fund or, I think, a "segregated account" or a "hedge fund product" but he rejected the submission advanced on behalf of Mr. Al Sadik that, for that reason, an investment in Blossom was unauthorized and constituted a breach of contract. He held that the submission was founded upon an artificial interpretation of the facts. He said this (at para. 4.10 of his judgment):

"A transfer of the whole or part of Mr. Al Sadik's contributed funds from Shallot to a wholly owned subsidiary [Blossom] cannot be characterized as an 'investment' at all. It was merely a transfer of assets which, by itself, could have no impact upon Shallot's NAV. Whether the transfer of assets is done by means of a loan and/or subscription for shares (as in this case) is irrelevant. In my judgment,

it is plainly obvious that Blossom is simply a vehicle through which Investcorp performed (or failed to perform) its contractual obligations. The issue is whether or not the SPA permits First Layer Leverage. The manner in which it is done has no bearing upon this threshold question. If First Layer Leverage is unauthorized, Investcorp would be in breach of contract whether or not the relevant transaction(s) were put through Shallot or a subsidiary of Shallot or a combination of both."

(2) He accepted the submission advanced on behalf of Investcorp that Mr. Al Sadik had failed to establish that, even if there had been an unauthorized investment in breach of contract, that breach had caused loss and damage. At para. 4.11 of his judgment he said this:

"The measure of damages for the purposes of the Fourth and Ninth pleaded breach of contract claims is the sum required to put the plaintiff in the position he would have been in had the contract been performed in accordance with its terms. The asset allocation contained in the Investment Proposal was not implemented because the proposed investment in opportunistic/theme funds was ruled out by the liquidity provisions subsequently incorporated in the SPA, which in turn led to the decision to make a 3× leveraged investment in the single manager funds rather than an investment in SMFCo. The burden of proof rests on the plaintiff, but [counsel for Mr. Al Sadik] did not cross-examine Messrs. Franklin or Gurnani about how they would have constructed the portfolio, if the use of First Layer Leverage had not been open to them. Nor did he attempt to ascertain how they could have applied leverage incrementally, if the use of First Layer Leverage was not open to them. In my judgment the most reasonable inference to draw from the evidence is that they would have allocated 50% to LDSF (×3) and 50% to SMFCo in March 2008. Had they done so, Mr. Opp's evidence leads to the conclusion that Mr. Al Sadik's loss would have been greater than that which he actually suffered. In conclusion, if Mr. Al Sadik had established that Investcorp was in breach of contract, as alleged in the Fourth and Ninth Claims, he would have failed to prove that the breaches caused any loss and damage."

***The questions for determination by this court in relation to the second issue***

46   The questions for determination by this court in relation to the second issue fall under two principal heads: (i) whether, in causing Shallot to transfer the investment amount to Blossom for investment, with leverage at the portfolio level (first-layer leverage), Investcorp acted in breach of the SPA, and (ii) whether, if so, the investment made through

Blossom was the cause of loss to Mr. Al Sadik which he can recover from Investcorp by way of damages for that breach.

47    In summary, it is submitted on behalf of Mr. Al Sadik, first, that the judge was wrong to hold that Investcorp was not in breach of the SPA either when it caused Shallot to transfer the investment amount to Blossom for investment or when it caused Blossom to leverage that investment by borrowing from RBS under the White Ibis III credit facility ("the breach of contract issue") and, secondly, that the judge was wrong to hold that, even if there had been a breach of the SPA, Investcorp would not be liable for damages ("the causation issue"). It is submitted on behalf of Investcorp, first, that the judge's assessment of the factual matrix against which he construed the meaning of the SPA was impeccable, as was his application of the law, and that, on the evidence before him, the only conclusion the judge could have reached was that Investcorp had authority to leverage Mr. Al Sadik's investment in the manner that it did and, secondly, that the approach to the causation issue advanced on behalf of Mr. Al Sadik is misconceived in that it is based on a misunderstanding of the fundamental principle that, if a plaintiff would have suffered the loss for which he now claims irrespective of whether there was a breach of contract, then that breach cannot be said to have caused the loss.

### The breach of contract issue

48    In support of his challenge to the judge's conclusion on the breach of contract issue, Mr. Al Sadik relies on Grounds 9–16 in the memorandum of grounds of appeal:

"*Ground 9*: The learned Judge erred in law when he misdirected himself as to the issue he had to decide on the Appellant's Fourth Claim and consequently failed to find that the transfer of the investment amount (less a small retention) from Shallot to Blossom was made in breach of the SPA.

*Ground 10*: The learned Judge erred in law when, in order to decide the issue he identified in Ground 9 he inquired into the 'factual background.'

*Ground 11*: Even if it were permissible for the learned Judge to inquire into the factual background as an aid to the construction of the SPA, the learned Judge erred in law because his inquiry led him wrongly to imply a term (the Implied Term).

*Ground 12*: Even if it were correct for the learned Judge to inquire into the factual background he erred in law because his inquiry led him to imply the Implied Term and in any event to misconstrue the SPA, because no reasonable person would have

34

concluded the Implied Term was contemplated by the parties or have construed the SPA in the way the learned Judge did.

*Ground 13*: The learned Judge erred in law when he held that the investments made by Blossom (pursuant to the Implied Term) were not made in breach of the SPA because such a finding required the implication of further terms: (a) that there was a power to borrow for investment purposes and (b) that there was a power to grant security interests over the value representing the investment amount in order to borrow for investment purposes: whereas each of the additional implied terms imposes an unreasonable and/or perverse meaning on the express terms of the SPA.

*Ground 14*: Further or in the alternative, if the learned Judge were correct to hold that the investments made by Blossom were not made in breach of the SPA on the basis of his construction of the SPA, such a finding required the implication of terms that there was a power to borrow for investment purposes and that there was a power to grant security interests over the value representing the investment amount in order to borrow for investment purposes and was therefore wrong in law.

*Ground 15*: The learned Judge was wrong when he found that the transfer of the investment amount (less a small retention) from Shallot to Blossom was merely an 'administrative step' and not an investment.

*Ground 16*: The learned Judge was wrong when he held that the investment through Blossom was not prohibited because it was 'economically equivalent' to investments made on the express terms of the SPA."

49   In addressing the questions raised by those grounds it is necessary, first, to have in mind the terms of cl. A of the SPA. I have set out the terms of that clause earlier in this judgment but it is, I think, convenient to do so again:

"A. Purpose

I/We have requested Investcorp Bank B.S.C. ('Investcorp') to establish a separately managed account (the 'Investment Account'), which will invest in certain hedge funds or segregated accounts with any hedge funds managers selected by the Investment Manager (as defined below), including, but not limited to, any Investcorp hedge fund (whether an Investcorp Fund of Hedge Funds, an Investcorp Single Manager Fund or any other Investcorp hedge fund product (any of the foregoing, an 'Investcorp Hedge Fund') or a hedge fund or a segregated account with any other hedge fund manager; provided, however that any such other hedge fund manager is at the time

of investment a manager with which an Investcorp Hedge Fund is invested. The Investment Account will be established as a special purpose vehicle, Shallot IAM Ltd. which will be incorporated under the laws of the Cayman Islands (the 'Company'). All assets of the Company are hereafter referred to as the 'Assets Under Management' and each hedge fund or segregated account in which Assets Under Management are invested is hereafter referred to as an 'Underlying Investment.' To the extent that Assets Under Management are invested in any Investcorp Fund of Hedge Funds, such investment will be made in non fee bearing shares."

The structure of the clause may be summarized as follows:

(1) Investcorp Bank is to establish a separately managed account—which is to take the form of a special purpose vehicle (Shallot)—for the purpose of investing in hedge funds or in segregated accounts with hedge funds managers.

(2) The hedge funds or segregated accounts with hedge fund managers in which Shallot is to invest are to be selected by the investment manager (Investcorp Advisers).

(3) The hedge funds or segregated accounts with hedge fund managers to be selected might include (but were not limited to) any Investcorp hedge fund—that is to say, an Investcorp fund of hedge funds, an Investcorp single-manager fund or any other Investcorp hedge fund product—or a hedge fund or a segregated account with any other hedge fund manager which was, at the time of investment, a manager with which an Investcorp hedge fund was invested.

The hedge funds or segregated accounts in which assets of Shallot (defined as "Assets Under Management") were invested were defined as "underlying investments."

50   As the judge pointed out, in the events which happened and for reasons that were not explored in evidence, Shallot and Investcorp Advisers did not enter into an investment management agreement. In those circumstances the scheme for which cl. A of the SPA provided could not take effect strictly in accordance with its terms—in that the hedge funds and segregated accounts with hedge funds managers which were to be selected by Investcorp Advisers (as investment manager) for investment of the assets under management were not selected by Investcorp Advisers—but that has not been a matter of complaint in these proceedings. The parties appear to have been content to treat the entity by which investment decisions were made—whether Investcorp Bank, Investcorp Advisers, Shallot or Blossom—as immaterial to the questions in issue and, in the circumstances that Investcorp Advisers, Shallot and Blossom were

36

each controlled by Investcorp and that the individuals who were responsible for those decisions were Investcorp employees, there is no reason to think that that approach was other than realistic. In particular, there is no reason to think that different investment decisions would have been made if Investcorp Advisers had been appointed investment manager.

51   It is necessary, also, to have in mind the sequence of events which took place after Mr. Al Sadik had transferred funds (the investment amount) to Investcorp Bank. As I have said earlier in this judgment, Investcorp Bank converted the investment amount (AED500m.) to US$136,138,505 and credited that amount to the account of Shallot on March 4th, 2008. Shallot retained a small part of that amount (some US$1.129m.) and paid the balance to Blossom. Blossom invested US$79m. in Investcorp Diversified Strategies Fund ("DSF") and the balance (some US$56.009m.) in five single-manager funds ("SMFs") which had been established by Investcorp. The investments were treated as having been made as at March 1st, 2008. Subsequently, on April 10th, 2008, Blossom entered into the White Ibis III credit facility with RBS for the purpose of drawing funds under that facility in order to leverage Mr. Al Sadik's investments. Drawings amounting in aggregate to US$214.1m. were made in the period May to September 2008 and were applied, by way of leverage, in making further investments in DSF and in SMFs. It has not been suggested on behalf of Mr. Al Sadik that DSF and the SMFs in which Blossom invested were not hedge funds or segregated funds with hedge fund managers which could properly have been selected for investment under cl. A of the SPA.

52   In my view, the question raised by Ground 15 in the memorandum of grounds of appeal—whether the judge was wrong to hold that the transfer of the investment amount (less a small retention) from Shallot to Blossom was merely an "administrative step" and not an investment—is logically anterior to the questions raised under the other grounds. If the judge ought to have held that the transfer of funds to Blossom was an investment and not merely an administrative step taken in the course of investing those funds in DSF and the SMFs, then, given his finding that Blossom was not an Investcorp hedge fund, he should have concluded that there had been a breach of cl. A of the SPA. The premise upon which the question which the judge identified as the real issue between the parties rests—whether, on its true construction, the SPA permitted Investcorp to leverage the investment amount at the portfolio level, as opposed to investing in hedge funds, such as LDSF and SMFCo, which sought to achieve a certain level of leverage as part of their investment strategy—that is (as the judge assumed at para. 4.2 and held at para. 4.10 of his judgment) the transfer of funds from Shallot to Blossom was not, itself, to be treated as an investment of those funds for the purposes of the SPA. Whether he was correct to take the view that the transfer of funds from Shallot to Blossom

was merely an administrative step is, I think, the first question which this court needs to determine in relation to the appeal against the judge's decision that, on its true construction, the SPA authorized Investcorp to leverage Mr. Al Sadik's assets for investment purposes at the portfolio level. It is only if the answer to that question is "Yes" that the other questions—raised under Grounds 9–14 and 16 in the memorandum of grounds of appeal—arise in relation to that appeal.

53   Further, in my view, the first limb of Ground 12 in the memorandum of grounds of appeal—that the judge was led to misconstrue the SPA "because no reasonable person would have concluded the Implied Term was contemplated by the parties"—adds little (if anything) to Ground 11—that the judge was wrong "to imply a term (the Implied Term)." The question raised by Ground 12—but not raised by Ground 11—is found in the second limb: whether the judge was led to misconstrue the SPA "because no reasonable person would have construed the SPA in the way the learned Judge did." Logically, as it seems to me, that question is properly to be considered after consideration of the other questions raised under Grounds 9–11 and 13–16.

54   With those observations in mind, the questions raised by Grounds 9–16 in the memorandum of grounds of appeal may be summarized as follows:

(1) Was the judge correct to conclude—as he did, at para. 4.10 of his judgment—that the transfer of funds from Shallot to Blossom was an administrative step taken in contemplation of the investment of those funds and was not, itself, to be treated as an investment of those funds (Ground 15)?

(2) Was the judge correct to direct himself—as he did, at para. 4.2 of his judgment—that the issue which he had to decide was "whether or not Investcorp was authorized to leverage the contributed funds at the portfolio level" (Ground 9)?

(3) If so, in deciding that issue, was the judge correct to have regard—as he did, at para. 4.5 of his judgment—to the factual background and, in particular, to the terms of the investment proposal (Ground 10)?

(4) If so, (a) in construing the SPA, was the judge led by his inquiry to imply a term (the implied term) that Investcorp was authorized "to construct a leveraged portfolio consistent with the investment proposal, save to the extent that the parties had expressly agreed otherwise," and (b) was he wrong to do so because no reasonable person would have concluded that the implied term was contemplated by the parties (Grounds 11 and 12)?

(5) In holding that the investments made by Blossom were not made in breach of the SPA, (a) was it necessary for the judge to imply further

terms (i) that there was a power to borrow for investment purposes and (ii) that there was a power to grant security interests over the value representing the investment amount in order to borrow for investment purposes, and (b) was he wrong to do so (Grounds 13 and 14)?

(6) Was the judge correct to conclude—as he did, at para. 4.8 of his judgment—that the investment through Blossom was not prohibited because it was "economically equivalent" to investments made on the express terms of the SPA (Ground 16)?

(7) Did the judge misconstrue the SPA, because no reasonable person would have construed the SPA in the way that the judge construed it (Ground 12)?

*Was the judge correct to conclude that the transfer of funds from Shallot to Blossom was an administrative step and was not to be treated as an investment of those funds?*

55    As I have said, the judge took the view, expressed at para. 4.10 of his judgment, that a transfer of the whole or part of Mr. Al Sadik's contributed funds from Shallot to a wholly owned subsidiary (Blossom) was not to be characterized as an "investment" for the purposes of cl. A of the SPA: it was, he said, "plainly obvious that Blossom is simply a vehicle through which Investcorp performed (or failed to perform) its contractual obligations." The judge had indicated in the course of observations which he had made on the first day of the trial, during opening submissions made on behalf of Mr. Al Sadik, that that was likely to be his view. He had said this:

"I am assuming it is proved that they did agree there should be what you call first-layer leverage . . . If that is proved, then in the ordinary course of business I would expect it to be done through a special purpose vehicle such as Blossom. I find it hard to treat Blossom as an investment. It seems to me they have transferred funds to Blossom for the purposes of leveraging those funds for the purposes of then investing a greater amount . . ."

And he returned to that point in the course of Mr. Al Sadik's closing submissions:

"Why should I characterise it as an investment? They have merely transferred—formally they have subscribed for shares—Shallot has subscribed for shares in Blossom, but Blossom is a wholly owned subsidiary and was never intended to be other than a wholly owned subsidiary. In the context of the SPA why should I regard that as an investment? It was a step towards making an investment. Now whether or not that was done in breach of contract is perhaps a

different point, but isn't it just an administrative step. Isn't it the mechanism by which they carry out the SPA?"

56   Investcorp adopts that approach in resisting the challenge to the judge's conclusion on this point. It is said that the transfer of funds, effected by Shallot's subscription for shares in Blossom, was simply a step taken towards making the "investment" for Mr. Al Sadik: that is to say, it was the mechanism by which Investcorp performed its obligations under the SPA. It was not an "investment" at all.

57   It is said on behalf of Investcorp that that proposition may be tested by considering what the position would have been had Investcorp done nothing other than transfer moneys to Blossom. That would not have been an "investment" under the SPA any more than a decision (say) to buy US dollars with Mr. Al Sadik's UAE dirham funds (which had initially been transferred to Shallot) and then to put those US dollars into Blossom would have been an "investment." The judge observed (at para. 4.2 of his judgment) that, if leverage at the portfolio level was authorized, then he would expect this to be carried out through a wholly owned subsidiary incorporated especially for this purpose. The judge's conclusion, it is said, was supported by the unchallenged evidence of Professor Stowell, an expert witness. He expressed the view that—

"Blossom was essentially a customised special purpose vehicle created for Mr. Al Sadik's benefit to facilitate achievement of his investment objectives by enabling leverage to be applied to DSF and SMF investments and consistent with the discretionary investment mandate."

It was submitted that the incorporation of a subsidiary, such as Blossom, was plainly within the scope of the powers conferred upon Investcorp by the terms of the SPA; whether expressly, under cl. D.2, or as a matter of contractual construction.

58   Clause D.2 of the SPA was in these terms (so far as material):

"D. Actions to be taken prior to acceptance of subscription

In contemplation of my/our investment, and as a condition precedent to the final acceptance thereof, I/we understand and agree that the following actions shall be taken:

1. . . . I/we further understand that [Shallot's] board of directors will authorize or otherwise cause [Shallot] to take any actions that the board believes are necessary or desirable in order to effectuate the purpose of this investment or otherwise manage the affairs of [Shallot]."

59   It is submitted on behalf of Mr. Al Sadik that the judge was wrong to hold that the transfer of the investment amount (less a small retention)

from Shallot to Blossom was merely an "administrative step" and not an "investment" for the purposes of cl. A of the SPA. It is said, first, that Blossom was structured as a special investment fund; secondly, that the transfer of the investment amount to Blossom incurred risks and constraints which investment in accordance with the investment power contained in cl. A of the SPA would not have incurred; and thirdly, that the use of Blossom to leverage the investments which it had made, by borrowing on the security of those investments for the purpose of making further investments, was inconsistent with cl. I.1 of the SPA.

60    Clause I.1 of the SPA was in these terms:

    "I. Borrowing relationships

    In connection with my/our investment, I/we understand and agree that [Shallot] may be involved in certain borrowing relationships in accordance with the following terms:

        1. [Shallot] may borrow from third-party lenders, and in some cases from Investcorp, to meet possible temporary cash shortfalls and for other corporate purposes 'Liquidity Borrowings.' The aggregate amount of Liquidity Borrowings shall not exceed 25% of the equity of [Shallot] . . ."

61    In support of the submission that Blossom was structured as a special investment fund it is said (i) that the shares in Blossom for which Shallot subscribed were preference shares, the value of which fluctuated with the value of Blossom's assets (which represented the value of the investment amount, less a small retention), and (ii) that, from the moment when Blossom borrowed money on the terms of its loan facility from RBS (the White Ibis III credit facility), its assets were grouped in a fund, the investment of which was subject to special rules that were defined by the terms of the White Ibis III credit facility.

62    In support of the submission that the transfer of the investment amount to Blossom incurred risks and constraints which would not have been incurred if that investment amount had been invested in accordance with the investment power conferred by cl. A of the SPA, it is said on behalf of Mr. Al Sadik (i) that the pledge of shares held by Blossom in the SMFs had the effect that RBS could have recourse to those shares in the event that the value of the DSF shares was insufficient to cover the borrowings for the purchase of the DSF shares; (ii) that the effect of the product concentration limits under the White Ibis III rules had the effect that a decline in the value of one product might force the sale of other investments; (iii) that a decline in the value of Blossom's investments might force a sale of those investments in order to maintain the LTV ratio required under the White Ibis III rules; (iv) that, if one of Blossom's co-issuers was subject to a "Global Early Termination Event," then (even

if Blossom was not in default of its own obligations under the terms of the White Ibis III credit facility) RBS had the right to foreclose on Blossom and take control of and sell its assets; (v) that, if Blossom needed to redeem investments to avoid or remedy a breach of the LTV ratio and/or the product concentration limits, it would not be able to do so timeously, given the long redemption dates of the hedge funds in which its funds were invested; and (vi) that, if Blossom did not have sufficient funds to pay its debts to RBS, Mr. Al Sadik was exposed to the risk (an insolvency risk) that he would be subject to claims to claw back any proceeds he received on exercising his power to redeem. It was said that the investment rules by which Blossom was governed under the terms of the White Ibis III credit facility had the effect that it was a leveraged fund with unique risks not present in an investment in or among "Investcorp Hedge Funds" and, further, that Blossom was a special investment fund with characteristics which differed in material respects from an "Investcorp Hedge Fund" in that it was a secret fund (which, it is said, had the effect that investment in it was a breach of cl. A).

63   In support of the submission that the use of Blossom to leverage the investments which it had made, by borrowing on the security of those investments for the purpose of making further investments, was inconsistent with cl. I.1 of the SPA, it was said that the effect of that clause was that Shallot was permitted to borrow only for liquidity purposes ("liquidity borrowings") and not for any other purposes: in particular, borrowing for investment purposes under that clause was not permitted. It was said that, if cl. I.1 of the SPA prohibited borrowing for investment purposes, it must follow that the transfer of the investment amount by Shallot to Blossom could not be treated as an administrative step for purposes of enabling Investcorp to perform its contractual obligations under the SPA because the transfer was made for a purpose that was outside—indeed, inconsistent with— those obligations.

64   In my view, the submissions advanced on behalf of Mr. Al Sadik in support of his challenge to the judge's conclusion that the transfer of funds from Shallot to Blossom was an administrative step taken in contemplation of the investment of those funds and was not, itself, to be treated as an investment of those funds fail to distinguish between (i) the transfer of funds from Shallot to Blossom on March 4th, 2008 and the investment of those funds by Blossom in DSF and the SMFs, and (ii) the subsequent drawdown of funds from RBS under the White Ibis III credit facility, against the security of the shares in DSF and the SMFs then held by Blossom, in the period May to September 2008 and the application by Blossom of those borrowed funds, by way of leverage, in making further investments in DSF and in SMFs during that period. The transfer of funds from Shallot to Blossom on March 4th, 2008 was made in order to enable Blossom to invest those funds, forthwith, in underlying investments (DSF

42

and the SMFs). DSF and the SMFs were hedge funds or segregated funds with hedge funds managers which could properly have been selected for investment under cl. A of the SPA. At the time of that transfer Blossom and RBS had not entered into the White Ibis III credit facility agreement. The fact that the transfer of funds from Shallot to Blossom on March 4th, 2008 was made with a view to enabling leverage to take place in the future, once the White Ibis III credit facility was in place, does not lead to the conclusion that, at the time when that transfer was made, it was, itself, more than an administrative step, albeit a step taken not only for the purpose of the immediate investment of those funds in underlying investments which were authorized but also in contemplation of the possible use of those underlying investments in the future, by way of leverage, in making further investments in hedge funds and segregated accounts with funds managers. Whether or not the use of the underlying investments acquired in March 2008, by way of leverage, to enable further investments to be made in DSF and SMFs was authorized by the SPA is a question which has to be addressed but it is a distinct question from the question whether the transfer of funds from Shallot to Blossom on March 4th, 2008 was an administrative step taken in contemplation of the investment of those funds and was not, itself, to be treated as an investment of those funds. The answer to the one question does not provide the answer to the other. In my view the judge's answer to the question whether the transfer of funds from Shallot to Blossom was an administrative step and not, itself, an investment of those funds was correct. I reject Mr. Al Sadik's challenge to the conclusion that the judge reached on that question.

*Was the judge correct to direct himself that the issue which he had to decide was "whether or not Investcorp was authorized to leverage the contributed funds at the portfolio level"?*

65    At para. 4.2 of his judgment the judge directed himself that "the issue which I have to decide is whether or not Investcorp was authorized to leverage the contributed funds at the portfolio level and this turns upon the true meaning and effect of the SPA." It is said on behalf of Mr. Al Sadik that the judge was wrong to take that view: properly understood, it is said, the only issue which the judge had to decide was whether, on the true meaning and effect of the SPA, Blossom was to be regarded as an Investcorp hedge fund or a hedge fund or segregated account with any other hedge fund manager which at the time of investment was a manager with which an Investcorp hedge fund was invested. And, it is said, in re-casting Mr. Al Sadik's case as he did, the judge demonstrated that his reasoning was inductive: he was working back from the conclusion that he was seeking to reach, rather than working forward from the facts towards the conclusion which he should have reached. Had he adopted the correct approach—which was to begin with the SPA and apply the appropriate

principles of contractual construction—he could not have reached the conclusion which he did.

66    Investcorp's response is that the judge did address the correct issue—whether on its true construction the SPA permitted Investcorp to leverage Mr. Al Sadik's investment at portfolio level—and that Mr. Al Sadik's criticism is misplaced. In developing that response in written submissions and at the oral hearing of the appeal, it is said on behalf of Investcorp that the contention that the judge misdirected himself as to the issue he had to decide is unsustainable. The judge's approach, it is said, was wholly consistent with the approach adopted on behalf of Mr. Al Sadik at trial. Reliance is placed on an exchange between the judge and counsel on the first day of the trial.

67    I reject the submission that the only issue of contractual interpretation that the judge had to decide was whether, on the true meaning and effect of the SPA, Blossom was to be regarded as an Investcorp hedge fund or a hedge fund or segregated account with any other hedge funds manager which at the time of investment was a manager with which an Investcorp hedge fund was invested. As I have said, the logically anterior question was whether the transfer of funds from Shallot to Blossom on March 4th, 2008 was an administrative step taken in contemplation of the investment of those funds and was not, itself, to be treated as an investment of those funds. If, as the judge held (correctly, in my view), the answer to that question was "Yes," then the question whether Blossom itself was an Investcorp hedge fund or a hedge fund or segregated account with any other hedge fund manager did not arise. That question did not arise because, as Professor Stowell explained in his evidence (and the judge held): "Blossom was essentially a customised special purpose vehicle created for Mr. Al Sadik's benefit to facilitate achievement of his investment objectives by enabling leverage to be applied to DSF and SMF investments . . ." The relevant questions, in this context, were (i) whether, under the terms of cl. A of the SPA, the funds transferred by Shallot to Blossom could properly be invested in DSF and the SMFs, and (ii) if so, whether Blossom's investments in DSF and the SMFs could be leveraged at the portfolio level. If, but only if, the answer to each of those questions is "Yes," there is a third question to be determined: whether, in leveraging Blossom's investment, it was appropriate for Blossom to borrow under the terms of the White Ibis III credit facility. But that is not a question of contractual interpretation.

68    As I have said, the judge described Investcorp's hedge fund platform (at para. 1.8 of his judgment) as comprised of "a number of funds of hedge funds, emerging manager funds and single manager funds having total assets under administration of about US$8 billion." He explained (at para. 1.9 of his judgment) that "DSF was launched in April 1998 as a multi-manager, multi-strategy fund of hedge funds" and that "as at 30th

44

June 2008 it was invested in about 77 different managers employing nine different investment strategies and had AUM of about US$2.1 billion." Investcorp group companies acted as both investment manager and administrator of DSF. Mr. Al Sadik does not contend that DSF was not an Investcorp hedge fund. The judge went on to explain (at para. 1.11 of his judgment) that a single-manager fund (an SMF) "is a pure play on one investment strategy employed by a single investment manager." He said that Investcorp's single-manager platform was launched in December 2004 and that, by December 31st, 2007, it comprised six Investcorp branded funds, each employing a different investment strategy with a different independent investment manager, having a total assets under management of about US$1.2bn. of which about US$474m. was Investcorp's own proprietary capital. Mr. Al Sadik does not contend that the SMFs were not hedge funds or segregated accounts with other hedge funds managers which at the time of investment were managers with which an Investcorp hedge fund was invested. It follows that the answer to the question whether, under the terms of cl. A of the SPA, the funds transferred by Shallot to Blossom could properly be invested in DSF and the SMFs is not in doubt: the funds transferred could be so invested.

69    In those circumstances the question of contractual interpretation for decision by the judge was, indeed, "whether or not Investcorp was authorized to leverage the contributed funds at the portfolio level." In my view the judge was correct to direct himself as he did.

*Was the judge correct to have regard to the factual background and, in particular, to the terms of the investment proposal?*

70    The judge reminded himself of the principles of law relating to contractual interpretation. In particular, he reminded himself of passages from the speeches of Lord Hoffmann in *Investors' Compensation Scheme Ltd.* v. *West Bromwich Bldg. Socy.* (11) and in *Att. Gen. (Belize)* v. *Belize Telecom Ltd.* (3). In the first of those cases Lord Hoffmann had pointed out ([1998] 1 W.L.R. at 912) that—

"... Interpretation is the ascertainment of the meaning which the document would convey to a reasonable person having all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract ..."

and that, subject to the requirement that the admissible background knowledge does not include the previous negotiations of the parties and their declarations of subjective intent, it includes absolutely anything which would have affected the way in which the language of the document would have been understood by a reasonable man.

71   The correct approach to the interpretation of contracts has been reviewed by the United Kingdom Supreme Court in *Arnold* v. *Britton* (2). In his judgment (with which Lord Sumption, Lord Hughes and Lord Hodge, JJSC agreed), Lord Neuberger of Abbotsbury, PSC observed ([2015] A.C. 1619, at para. 15) that—

"when interpreting a written contract, the court is concerned to identify the intention of the parties by reference to 'what a reasonable person having all the background knowledge which would have been available to the parties would have understood them to be using the language in the contract to mean', to quote Lord Hoffmann in *Chartbrook Ltd v Persimmon Homes Ltd* [2009] AC 1101, para 14. And it does so by focussing on the meaning of the relevant words, in this case clause 3(2) of each of the 25 leases, in their documentary, factual and commercial context. That meaning has to be assessed in the light of (i) the natural and ordinary meaning of the clause, (ii) any other relevant provisions of the lease, (iii) the overall purpose of the clause and the lease, (iv) the facts and circumstances known or assumed by the parties at the time that the document was executed, and (v) commercial common sense, but (vi) disregarding subjective evidence of any party's intentions. In this connection, see *Prenn* [*v Simmonds*] [1971] 1 WLR 1381, 1384–1386, and *Reardon Smith Line Ltd v Yngvar Hansen-Tangen (trading as HE Hansen-Tangen)* [1976] 1 WLR 989, 995–997, per Lord Wilberforce; *Bank of Credit and Commerce International SA v Ali* [2002] 1 AC 251, para 8, per Lord Bingham of Cornhill, and the survey of more recent authorities in *Rainy Sky* [*SA v Kookmin Bank*] [2011] 1 WLR 2900, paras 21–30, per Lord Clarke of Stone-cum-Ebony JSC."

In relation to (iv)—the facts and circumstances known or assumed by the parties at the time that the document was executed—Lord Neuberger emphasized (*ibid.*, at para. 21) that—

"when interpreting a contractual provision, one can only take into account facts or circumstances which existed at the time that the contract was made, and which were known or reasonably available to both parties. Given that a contract is a bilateral, or synallagmatic, arrangement involving both parties, it cannot be right, when interpreting a contractual provision, to take into account a fact or circumstance known only to one of the parties."

72   At para. 4.4 of his judgment, the judge set out the terms of cl. A of the SPA. He pointed out that, in the absence of the investment agreement which had been contemplated by that clause, the SPA stood alone. He commented that it was common ground that the SPA conferred upon Investcorp a discretionary mandate to manage and invest the investment amount in accordance with the purposes stated in cl. A. He drew attention

to the provisions in cl. I.1 of the SPA (the terms of which I have set out earlier in this judgment) but observed that it was agreed that borrowing for liquidity purposes was materially different from borrowing for investment purposes and that cl. I related only to the former. The question which he had to address—given that he had directed himself at para. 4.2 of his judgment (correctly, as I have held) that "the issue which I have to decide is whether or not Investcorp was authorized to leverage the contributed funds at the portfolio level and this turns upon the true meaning and effect of the SPA"—was whether, as a matter of contractual interpretation, the SPA permitted borrowing for investment purposes or, more particularly, whether the SPA permitted borrowing on the security of existing investments in order to gear up (or add to) those investments by way of leverage.

73   At para. 4.5 of his judgment, the judge turned to an examination of the circumstances in which Investcorp Bank, Investcorp Nominee 1 and Shallot entered into the SPA. He described the investment proposal—which (as he said) was presented to Mr. Al Sadik at a meeting on January 28th, 2008, at which Mr. Al Khatib, Mr. Kironde and Mr. Fierens were present—as an important part of the factual matrix. He noted that the investment proposal included, on the first page amongst "Portfolio Objectives," a target return of 45%+ over a three-year investment horizon and that, on the second page under the heading "Overview of Proposal," it was stated that the portfolio was to be invested as to 50%, in DSF and as to the other 50% in two satellite portfolios (25% in the Investcorp single-manager platform and 25% in opportunistic/theme funds) with "Leverage at each underlying portfolios taking into account portfolio volatility." He observed that "on any objective analysis, it is plainly obvious that this part of the document is proposing a leveraged investment, and there is nothing in any other part of the document tending to suggest otherwise." At para. 4.6 of his judgment the judge said this:

> "The purpose of the SPA is for Mr. Al Sadik to establish a managed account with Investcorp, by which he will invest in a portfolio of hedge funds managed by Investcorp pursuant to a discretionary mandate. Its purpose is not to implement the Investment Proposal as such. The language of Clause A makes it clear that Investcorp is to have a wide discretion which is not limited to implementing exactly what was proposed in the Investment Proposal. However, I think that the purpose of the SPA was to authorize Investcorp to implement the Investment Proposal, to the extent that its implementation is not actually inconsistent with what has been expressly agreed by the parties."

74   At Ground 10 in the memorandum of grounds of appeal it is said that the judge erred in law when, in order to decide the issue he had identified (whether or not Investcorp was authorized to leverage the contributed funds at the portfolio level), he inquired into the "factual background." In

elaboration of that ground, it is submitted that the judge was wrong to construe the SPA by reference to the contents of the investment proposal, in that the factual background would have been relevant if, and only if, (i) there was a clear mistake on the face of the SPA—in the sense that something had gone wrong with the language and it was clear what correction ought to be made in order to cure the mistake—or (ii) the SPA did not expressly provide for what was to happen when some event occurred (so that there was a potential need for the implication of a term). In the present case, it is said, neither of those conditions was satisfied. There was no such mistake on the face of the SPA—the judge was not invited by either Mr. Al Sadik or Investcorp to find that there was and he did not do so. The event that did occur (the investment in Blossom) occurred, it is said, only because Investcorp Bank did not make an investment in accordance with the express terms of the SPA. Accordingly, an examination of the factual background was unnecessary in order to construe cl. A of the SPA. The proper approach was to exclude examination of the terms of the investment proposal when construing the text of the SPA on the basis that the investment proposal was of no relevance to the construction of the SPA, being only evidence of something said during the course of the negotiation of that agreement.

75　　I reject the submission that, as a matter of law, the judge was wrong to have regard to the investment proposal when addressing the question which he had held he needed to determine: that is to say, the question whether or not Investcorp was authorized to leverage the contributed funds at the portfolio level. It is important to keep in mind that, in the events which happened, it was Blossom—and not Investcorp Bank or Shallot—that leveraged the funds which had been transferred to it and that it did so by investing those funds in DSF and the SMFs (which were investments authorized under cl. A of the SPA), borrowing against those investments under the terms of the White Ibis III credit facility and then investing those borrowed funds in further shares in DSF and the SMFs. In order to answer the question whether Investcorp was authorized to leverage the contributed funds at the portfolio level, the judge needed to ask himself whether the terms of the SPA required Investcorp Bank and/or Shallot (which were parties to that agreement) not to cause or permit Blossom (which was not a party to that agreement) to exercise its own corporate powers to enter into the White Ibis III credit facility and to draw down funds under that facility. The judge was entitled to take the view that the answer to that question turned on the scope of the statement, in cl. D.2 of the SPA to which he had referred at para. 4.2 of his judgment—that is to say, to the statement that "I/we further understand that the Company's board of directors will authorize or otherwise cause the Company to take any actions that the board believes are necessary in order to effectuate the purposes of this investment." In asking himself whether that statement in the SPA required Investcorp and/or Shallot not to cause or permit Blossom

to act as it did, the judge was entitled—indeed, I would hold, needed—to inquire into the discussions which had taken place at the meeting on January 28th, 2008 (and the terms of the investment proposal which was presented to Mr. Al Sadik at that meeting), in order to determine whether the meaning to be given to that statement—as a matter of contractual interpretation—did have that effect.

76    For those reasons, I hold that the judge was correct to inquire into the factual background and, in particular (i) that he was correct to have regard to the investment proposal in determining the question whether or not Investcorp was authorized to leverage the contributed funds at the portfolio level, and (ii) that he was correct to have regard to the fact, which must have been obvious to Mr. Al Sadik as well as to Investcorp, that the return on investment (45% over three years) which Mr. Al Sadik required—and which Investcorp needed to achieve if it were to earn a performance fee—was not capable of being achieved without leveraging in some form.

*Was the judge led by his inquiry to imply a term (the implied term) that Investcorp was authorized "to construct a leveraged portfolio consistent with the investment proposal, save to the extent that the parties had expressly agreed otherwise" and, if so, was he wrong to do so, because no reasonable person would have concluded that the implied term was contemplated by the parties?*

77    As I have said earlier in this judgment, the judge directed himself (at para. 4.2 of his judgment) that the question which he needed to decide—whether or not Investcorp was authorized to leverage the contributed funds at the portfolio level—turned on the true meaning and effect of the SPA. He examined the relevant factual background and explained (at para. 4.5 of his judgment) that the investment proposal presented to Mr. Al Sadik at the meeting on January 28th, 2008 was not incorporated as a term of the SPA but was an important part of the factual matrix against which the SPA must be construed and he concluded (at para. 4.9 of his judgment) that, on its true construction, the SPA did authorize "first-layer leverage" (by which expression he meant, as he explained at para. 4.1 of his judgment, "leveraging an investor's contributed funds at the portfolio level").

78    At para. 4.2 of his judgment, the judge had pointed out that, if Investcorp was authorized to leverage Mr. Al Sadik's contributed funds at the portfolio level, then "it must have been empowered to do so either directly through Shallot and/or indirectly through . . . Blossom, incorporated specifically for this purpose." He referred to, and cited from, the third sentence in cl. D.2 of the SPA. He went on to say that, if all or any part of Shallot's assets were to be leveraged at the portfolio level for investment purposes, he would expect this to be done through a wholly owned subsidiary incorporated especially for this purpose. And he held that, in his judgment, "any suggestion that Investcorp had no power

(acting by its employees who constituted Shallot's board of directors) to incorporate a subsidiary for this purpose would be unsustainable."

79   At para. 4.5 of his judgment, after referring to statements on p.2 of the investment proposal (under the heading "Overview of Proposal"), the judge observed that, on any objective analysis, it was plainly obvious that that part of the investment proposal was proposing a leveraged investment and that there was nothing in any other part of the document tending to suggest otherwise. He referred to, and set out, the indicative terms stated on p.5 of the investment proposal. He explained, by reference to the appendices at pp. 8, 9 and 10 of the investment proposal, that the indicative terms showed (i) that the core holding in DSF can be leveraged ×3 by investing in LDSF; (ii) that the proposed satellite portfolio of SMFs could be leveraged up (then at ×1 only) through SMFCo (with the comment that the level of leverage was expected to increase as more single-managers were added to the platform; and (iii) that a satellite portfolio of theme funds could be achieved by investing in the LEDF (which, he explained, was a leveraged hedge fund product similar to LDSF).

80   The judge had described the characteristics of LDSF and SMFCo earlier in his judgment. At para. 1.10 he had said this:

"LDSF is incorporated under Part XIV of the Companies Law as a segregated portfolio company. It is a hedge fund structured product which I characterize as a feeder fund, the sole purpose of which is to provide investors with the opportunity to make leveraged investments into DSF, through separate portfolios which offer investors the choice of 1×, 2×, 2½× or 3× leverage. Each portfolio is a separate economic entity with its own assets and liabilities. It is not necessary for the purposes of this judgment to explain the mechanics of the synthetic financing arrangement between LDSF and Deutsche Bank AG, or any other relevant banks. Suffice it to say that the evidence establishes that it is the economic equivalent of a feeder fund whose only asset is its 'investment' in DSF and only liabilities are its 'loans' from Deutsche Bank, or any other relevant banks. An investment in LDSF is the economic equivalent of a leveraged investment in DSF and the investor determines his level of leverage by choosing the portfolio in which he will invest."

And, at para. 1.12, this:

"SMFCo is also a segregated portfolio company which was launched on 1st January 2008. It serves the same purpose as LDSF, in that it provides investors with a leveraged exposure to all of the Single Managers. Investors pay no fees at the SMFCo level, but indirectly bear management and performance fees at the Single Manager level. Like LDSF, SMFCo is structured so as to provide a

choice of leverage at 1× or 2×, but at the material time it was only in fact offering 1× leverage, which was to have a significant impact upon the construction of Mr. Al Sadik's portfolio. I do not characterize it as a feeder fund, because an investment in SMFCo is not the economic equivalent of a 1× leveraged investment in any one of the Single Managers. It has some of the characteristics of a fund of hedge funds because it is invested in all of the Single Managers."

He went on, at para. 4.5 of his judgment, to observe that, in his view, the investment proposal told the reader that an investment in LDSF was the economic equivalent of a leveraged investment in DSF and that investments in SMFCo and LEDF were the economic equivalent of leveraged investments in portfolios comprising the six SMFs and the five theme funds. But he pointed out that there was nothing in the investment proposal which suggested that it would be a term of the SPA that the investments in DSF and portfolios of single-manager/theme funds should not be leveraged at the portfolio level (rather than through LDSF, SMFCo and LEDF).

81    I have set out the first three sentences of para. 4.6 of the judge's judgment in the previous section of this judgment, but (at the risk of unnecessary repetition) I think it convenient to do so again:

> "The purpose of the SPA is for Mr. Al Sadik to establish a managed account with Investcorp, by which he will invest in a portfolio of hedge funds managed by Investcorp pursuant to a discretionary mandate. Its purpose is not to implement the Investment Proposal as such. The language of Clause A makes it clear that Investcorp is to have a wide discretion which is not limited to implementing exactly what was proposed in the Investment Proposal. However, I think that the purpose of the SPA was to authorize Investcorp to implement the Investment Proposal, to the extent that its implementation is not actually inconsistent with what has been expressly agreed by the parties."

Consistently with his view that the purpose of the SPA was not to implement the investment proposal "as such," the judge went on to say that it would be improper to imply a term that investments "must only be made in precisely the way set out in the *Indicative Terms.*" Nevertheless, consistently with his view that the purpose of the SPA was to authorize Investcorp to implement the investment proposal, the judge observed that it would be wrong in principle to construe the SPA in a way which involved implying a term which would make it impossible to implement any part of the investment proposal. Given that the investment proposal proposed that leveraged investments would be made in DSF and a satellite portfolio of SMFs, it would, he said, be improper to imply a term into the

SPA which would prevent such investments from being made. He held that—

> "on its true construction, the SPA authorizes Investcorp to construct a leveraged portfolio consistent with the Investment Proposal, save to the extent that the parties have expressly agreed otherwise."

82   It is said on behalf of Mr. Al Sadik (in his challenge under Ground 11 in the memorandum of grounds of appeal) that, even if it were permissible for the judge to inquire into the factual background as an aid to the construction of the SPA, he erred in law because his inquiry led him wrongly to imply into that agreement a term to the effect that Investcorp had power to implement the investment proposal to the extent that its implementation was not actually inconsistent with its express terms ("the Implied Term") and (in his challenge under the first limb of Ground 12) that the judge misconstrued the SPA "because no reasonable person would have concluded the Implied Term was contemplated by the parties or have construed the SPA in the way the learned Judge did."

83   In support of the submission that the judge reached his conclusion by implying a term that the SPA authorized Investcorp to construct a leveraged portfolio consistent with the investment proposal, save to the extent that the parties have expressly agreed otherwise—rather than by a process of construction of the words used—it is said on behalf of Mr. Al Sadik that, although the judge purported to reach his conclusion by construing the SPA, his underlying reasoning demonstrates that he was not engaged in an exercise of construction. It is said that nowhere in the judge's reasoning did he attempt to interpret the words used by the parties, that he failed to ask himself what the parties would reasonably have been understood to mean when they used the words that they did in the circumstances known to them. Rather, it is said, the exercise in which the judge was engaged was the implication of a term concerning the construction of a leveraged portfolio in circumstances where the words in the agreement negotiated and agreed between the parties did not do so. Without the implied term, it is said, there was no basis upon which investment in Blossom could be justified.

84   It is submitted on behalf of Investcorp that the "implied term" analysis adopted on behalf of Mr. Al Sadik is artificial. First, it is said that the judge, at the invitation of both parties, approached the particular issue that he was addressing at trial— whether or not Investcorp was authorized to leverage Mr. Al Sadik's investment at the portfolio level—as a question of construction of the SPA; that both parties invited him to construe the SPA by applying essentially agreed legal principles; and that, as part of his analysis (at para. 4.6 of his judgment) he expressly rejected the implication of a term that Investcorp was permitted to effect investments only in the precise manner set out in the "indicative terms" in the investment

proposal (and, it might be added, a term that would prevent leveraged investments being made in DSF and a satellite portfolio of SMFs). In those circumstances it is most unlikely that he would have intended to imply other terms. Secondly, it is said, Mr. Al Sadik's implied term analysis fails to explain why, if the judge did think it necessary to imply a term into the SPA, he chose to do so in terms which differed from those in which he expressed his conclusion (at paras. 4.9 and 7.3 of his judgment) on the particular issue that he was addressing: that first-layer leverage was authorized. The implication of an implied term—in the terms asserted by Mr. Al Sadik—was not a necessary step in the reasoning which led to that conclusion and it served no purpose.

85    In my view there is force in the submissions advanced on behalf of Investcorp. I reject the submission, advanced on behalf of Mr. Al Sadik, that the judge was led by his inquiry to imply a term that Investcorp was authorized "to construct a leveraged portfolio consistent with the investment proposal, save to the extent that the parties have expressly agreed otherwise." I accept that the judge took the view (as he said in the fourth sentence of para. 4.6 of his judgment) that the purpose of the SPA was to authorize Investcorp to implement the investment proposal, to the extent that its implementation was not actually inconsistent with what had been expressly agreed by the parties and that he held (in the final sentence of para. 4.6) that, on its true construction, the SPA did authorize Investcorp to construct a leveraged portfolio consistent with the investment proposal (again, save to the extent that the parties had expressly agreed otherwise). But I am not persuaded that the judge reached his conclusion on the particular issue that he was addressing— that first-layer leverage was authorized—on the basis that it was necessary for him to imply a term in the terms asserted by Mr. Al Sadik, or that he did so.

86    In those circumstances it is unnecessary to address, in this judgment, the submissions advanced on behalf of each of the parties on the question whether or not the judge erred in implying the implied term. Given that, in my view, the judge did not imply such a term, that question does not arise.

*In holding that the investments made by Blossom were not made in breach of the SPA, was it necessary for the judge to imply further terms (i) that there was a power to borrow for investment purposes; and (ii) that there was a power to grant security interests over the value representing the investment amount in order to borrow for investment purposes and, if so, was he wrong to do so?*

87    It is said on behalf of Mr. Al Sadik (at Ground 13 in the memorandum of grounds of appeal) that the judge erred in law when he held that the investments made by Blossom (pursuant to the implied term) were not made in breach of the SPA; in that such a finding required the implication of further terms: (i) that there was a power to borrow for investment

purposes; and (ii) that there was a power to grant security interests over the value representing the investment amount in order to borrow for investment purposes, whereas each of the additional implied terms imposed an unreasonable and/or perverse meaning on the express terms of the SPA. Further or in the alternative, it is said (at Ground 14 in the memorandum of grounds of appeal) that, if the judge was correct to hold that the investments made by Blossom were not made in breach of the SPA on the basis of his construction of the SPA, such a finding required the implication of terms that there was a power to borrow for investment purposes and that there was a power to grant security interests over the value representing the investment amount in order to borrow for investment purposes and was therefore wrong in law.

88   In elaboration of Grounds 13 and 14, it is said on behalf of Mr. Al Sadik that—

   (1) an additional term that there was a power to borrow for investment purposes (if implied) would impose an unreasonable and/or perverse meaning on the express terms of the SPA, because:

      (i)  Clause I authorizes borrowing for liquidity purposes only. The judge was correct to hold (at para. 4.4 of his judgment) that "borrowing for liquidity purposes is materially different from borrowing for investment purposes, and relates only to the former." Clause I is the only clause in the SPA that provides for borrowing: unless borrowing was permitted by that clause, it was not permitted.

      (ii) It was not in dispute that the transfer of the investment amount (less a small retention) from Shallot to Blossom was made in order to facilitate borrowing for investment purposes. The implied term would have the effect that Investcorp was permitted to borrow for investment purposes, notwithstanding that the express terms of the SPA did not permit borrowing for such purposes and so the implied term and/or the additional implied term that there was a power to borrow for investment purposes would have the effect that Investcorp was permitted to circumvent the express term contained in the SPA that borrowing could only be for liquidity purposes.

   (2) An additional term that there was a power to grant security interests in order to borrow for investment purposes over the value representing the investment amount (if implied) would impose an unreasonable and/or perverse additional term on the express terms of the SPA, because:

      (i)  The SPA did not contain any authorization, whether direct or indirect, to offer the value or any part of the value representing the investment amount as security in order to borrow for

        investment purposes and Mr. Al Sadik did not agree to confer such a
        power.

   (ii)  If Mr. Al Sadik did not agree to confer a power to grant security
        interests over the value of the investment amount then no power to grant
        security interests in order to borrow for investment purposes can have
        been created.

89   As I have said—in the course of addressing, in the previous section of this
judgment, the question whether the judge was led by his inquiry to imply a term
(the implied term) that Investcorp was authorized to construct a leveraged portfolio
consistent with the investment proposal, save to the extent that the parties had
expressly agreed otherwise—it is submitted on behalf of Investcorp that the
"implied term" analysis adopted on behalf of Mr. Al Sadik is artificial. In the
present context, it is pointed out on behalf of Investcorp that the combined effect
of the terms which are said by Mr. Al Sadik to have been implied by the judge adds
nothing to the judge's decision on the true construction of the SPA. Taken together
the effect of the first "implied term" (that the SPA authorized Investcorp to
construct a leveraged portfolio consistent with the investment proposal, save to the
extent that the parties have expressly agreed otherwise), the second "implied term"
(that the SPA authorized borrowing for investment purposes) and the third "implied
term" (that the SPA authorized the grant of security interests over the value
representing the investment amount in order to borrow for investment purposes)
was that the SPA authorized first-layer leverage. But that was the conclusion which
the judge reached at para. 4.9 of his judgment and, in reaching that conclusion, the
judge did not adopt Mr. Al Sadik's implied term analysis. The implied term analysis
adds nothing to the judge's reasoning or to his conclusion.

90   Again, in my view, there is force in those submissions. I reject the submission
advanced on behalf of Mr. Al Sadik that, in holding that the investments made by
Blossom were not made in breach of the SPA, it was necessary for the judge to
imply further terms (i) that there was a power to borrow for investment purposes,
and (ii) that there was a power to grant security interests over the value representing
the investment amount in order to borrow for investment purposes. I accept that the
judge took the view that, in order to construct a leveraged portfolio consistent with
the investment proposal with the use of first-layer leverage, it was necessary to
borrow for investment purposes and necessary to secure that borrowing against the
value of the investments which then represented the investment amount but again
I am not persuaded that the judge reached his conclusion on the particular issue that
he was addressing—that first-layer leverage was authorized—on the basis of
implied terms.

91   As I have said, the judge had observed (at para. 4.2 of his judgment) that if all
or any part of Shallot's assets were to be leveraged at the

portfolio level for investment purposes, he would expect this to be done through a wholly owned subsidiary of Shallot, incorporated especially for this purpose. And, after referring to cl. D.2 of the SPA, he had held that any suggestion that Investcorp had no power (acting by its employees who constituted Shallot's board of directors) to incorporate a subsidiary for this purpose would be unsustainable. And, as I have said, whether or not the use of the underlying investments acquired in March 2008 by way of leverage to enable further investments to be made in DSF and SMFs was permitted under the SPA is a question which has to be addressed but it is plain that the judge did not reach his conclusion that they could be used for that purpose by recourse to implied terms which were not expressed in the SPA. He reached that conclusion by construing the SPA—and, in particular, the scope of cl. D.2—on the basis of his view that the purpose of that agreement was to implement the investment proposal (save to the extent that the implementation of the investment proposal was inconsistent with what had been expressly agreed by the parties).

92   Given that, as I have held, the judge did not imply the additional terms that Mr. Al Sadik has identified—that is to say, terms (i) that there was a power to borrow for investment purposes, and (ii) that there was a power to grant security interests over the value representing the investment amount in order to borrow for investment purposes—it is unnecessary to consider whether he would have been wrong to do so; that question does not arise.

*Was the judge correct to conclude that the investment through Blossom was not prohibited because it was "economically equivalent" to investments made on the express terms of the SPA?*

93   Investcorp had submitted to the judge at trial that it was helpful, in construing the SPA, to consider what counsel had described as "the economic equivalency point" as a cross-check. The judge accepted that submission and addressed that point at para. 4.8 of his judgment. In doing so he identified what he described as two scenarios in relation to the proposal (contained in the investment proposal) that 50% of the assets to be invested (that is to say, 50% of US$135m., or US$67.5m.) should be invested in DSF and leveraged ×3. The two scenarios were (i) leveraging 50% of the assets ×3 at the portfolio level, which, he explained, would produce US$270m. (that is to say, the aggregate of US$67.5m. and ×3 US$67.5m.) to invest in DSF, or (ii) investing US$67.5m. in the high risk ×3 portfolio of LDSF (which would lead to the investment by LDSF of US$270m. in DSF). The judge explained that each of those two different scenarios would produce an economically equivalent result for Mr. Al Sadik, in that each would lead to an actual exposure, in economic terms, equivalent to an investment of US$270m. in DSF subject to a liability of US$202.5m. to a lender. The judge went on to say this:

"Looked at objectively, there can be no justification for implying into the SPA a term to the effect that either one of these scenarios is prohibited, whereas the other is not. This would flout business common sense, because either scenario can produce an economically equivalent result for Mr. Al Sadik. Having regard to the content of the Investment Proposal and the fact that the parties are agreed that Clause A of the SPA permits an investment in LDSF, both scenarios must be permitted."

He observed that whether or not the use of the White Ibis III credit facility did, in fact, produce an economically equivalent outcome was of no relevance to his analysis of the contractual effect of the SPA.

94   It is submitted on behalf of Mr. Al Sadik (under Ground 16 in the memorandum of grounds of appeal) that the judge was wrong to hold that the investment through Blossom was not prohibited because it was "economically equivalent" to investments made in accordance with the express terms of the SPA. In particular, it is said that the judge was wrong to conclude, at para. 4.8 of his judgment, that there could be no justification for implying into the SPA a term to the effect that the investments made by using Blossom were prohibited and that to find an implied term which had that effect would flout business common sense because either scenario could produce an economically equivalent result for Mr. Al Sadik, in that (i) the only issue the judge had to decide was whether or not the investment in Blossom was permitted (so his comment that he was (in effect) being invited by Mr. Al Sadik to imply a term that the investment was prohibited was misconceived), and (ii) the judge reached his conclusion without having regard to the terms of the White Ibis III credit facility (which had the effect that investments made through Blossom were materially different from investments made on the express terms of the SPA). It is said that, if two investments could produce the same return but with materially different risk profiles, the investments cannot be regarded as "equivalent" in any meaningful way, as the judge should have appreciated if he had had regard to the evidence of the investment expert called on behalf of Mr. Al Sadik (which, it is said, he failed to do).

95   Investcorp's response to the challenge under Ground 16 is that the judge was entitled to rely, as a cross-check, on the economic equivalence of first-layer leverage and second-layer leverage. It is said that the judge was right to hold that the economic equivalence of investments made using the Blossom and Shallot structures was a helpful cross-check in that, as he observed at para. 4.8 of his judgment, if there was no meaningful difference between first-layer leverage and second-layer leverage and the latter was authorized under the SPA, then it "would flout business common sense" to construe the SPA on the basis that the former was prohibited.

96    Further, Investcorp points out that Mr. Al Sadik does not challenge the judge's analysis directly, rather, he appeals on the basis that Blossom was an investment (but not an investment authorized by the SPA) and that an investment in Blossom was not economically equivalent to an investment using the Shallot structure. It is said that, in advancing an appeal on that basis, Mr. Al Sadik confuses two discrete concepts: (i) the use of first-layer leverage, whether by an investment vehicle such as Blossom or otherwise, and (ii) leveraging at the portfolio level by borrowing on the particular terms of the White Ibis III credit facility. Investcorp submits that the judge was right to hold that the question whether or not Blossom's entry into the White Ibis III credit facility (by which means portfolio-level leverage was obtained) was a permissible exercise of the authority to use first-layer leverage did not arise unless the use of first-layer leverage (or leverage at portfolio level) was itself authorized.

97    Investcorp submits that, on a true analysis, Mr. Al Sadik's complaint about the White Ibis III credit facility is a complaint that Investcorp acted in breach of fiduciary duty in causing Blossom to use that facility, not a complaint that Investcorp acted in excess of authority in seeking to leverage at portfolio level through Blossom and that the judge was correct to address the question of breach of fiduciary duty in section 6 of his judgment, rather than in section 4. The question of breach of fiduciary duty, it is said, arises only once the anterior question of authority has been determined. Properly analysed, the question whether the use of the White Ibis III credit facility was a permissible exercise of authority or a breach of fiduciary duty cannot arise unless, in principle, the use of first-layer leverage was authorized: if Investcorp did not have authority to use first-layer leverage, then the terms on which it was used are irrelevant to questions of liability.

98    In that context (while contending that it is of relevance only to the question whether Investcorp acted in breach of fiduciary duty in using the White Ibis III credit facility and not to the question whether, in principle, the SPA conferred authority to leverage), Investcorp draws attention to the judge's conclusion that, if first-layer leverage was authorized, then there was nothing unusual about the terms of the White Ibis III credit facility. It is pointed out that, in the face of much complaint about those terms, the judge found (at paras. 6.16–6.20 of his judgment) that there was nothing unusual or peculiar about them: they were entirely consistent with what he would expect to see in credit facilities of this type. And it is pointed out that Mr. Al Sadik did not suggest at trial, and does not assert on appeal, that the judge was wrong to make that finding.

99    In my view the judge was right to take the view that the question whether or not the use of the White Ibis III credit facility to implement first-layer leverage did, in fact, produce an economically equivalent outcome to the use of second-layer leverage was of no relevance to his

analysis of the contractual effect of the SPA. It is important to keep in mind that Blossom was not a party to the SPA and that, at the date that those who were parties to the SPA (Investcorp Bank, Investcorp Nominee 1 and Shallot) entered into that agreement, Blossom and RBS had not entered into the White Ibis III credit facility. Further, it was some two months later before Blossom first made a drawdown of funds under that facility. In those circumstances, in determining whether, as a matter of construction of the SPA, first-layer leverage was authorized, it would not have been appropriate for the judge to construe the SPA by reference to the terms of the White Ibis III credit facility and he was correct not to do so. I reject the submission, advanced on behalf of Mr. Al Sadik, that the judge was wrong to conclude that, as an aid to construing the SPA, he could regard first-layer (or portfolio-level) leverage through a special purpose vehicle (such as Blossom) as "economically equivalent" to second-layer leverage through, say, LDSF.

*Was the judge correct to conclude that, on its true construction, the SPA did authorize first-layer leverage ?*

100   At para. 4.2 of his judgment, the judge had directed himself that the issue of contractual interpretation which he had to decide was whether, on its true construction, the SPA authorized first-layer leverage. At para. 4.9 he concluded that, on its true construction, the SPA did authorize first-layer leverage. That conclusion is challenged on the ground (in addition to those which I have already addressed), raised under the second limb of Ground 12 in the memorandum of grounds of appeal, that the judge was led to misconstrue the SPA "because no reasonable person would have construed the SPA in the way the learned Judge did."

101   In advancing that challenge, it is submitted on behalf of Mr. Al Sadik that—

   (1) the investment proposal was a marketing presentation suggesting possible investments, given to Mr. Al Sadik at a meeting at his office in Dubai on January 28th, 2008, before the negotiation of the detailed terms of the SPA (which took place between February 24th and 28th, 2008). At that meeting on January 28th, 2008, Mr. Al Sadik raised no questions in relation to the contents of the investment proposal: he said no more than that he wanted to work with Investcorp and that he would decide in the next couple of weeks how to proceed. The investment proposal was not discussed again by the parties before the SPA was signed on March 1st, 2008, nor at any material time thereafter. In those circumstances, Investcorp was right to concede that the investment proposal was never anything other than an example of proposed investments into Investcorp hedge funds. The references in the Investcorp proposal to leverage were confined to references to leveraged funds (LDSF, LEDF and SMFCo) which were no more than possible investments which might be made under the

discretionary mandate created by the SPA. There was nothing in the circumstances in which the investment proposal was given to Mr. Al Sadik—or in the contents of that document—to support the judge's conclusion that Mr. Al Sadik agreed that, unless an action relating to the investment of his money was not prohibited by the SPA, it was permitted. The evidence as to the background to the negotiation of the SPA on which the judge relied did not support the conclusions he reached.

(2) The finding by the judge (at para. 4.5 of his judgment) that there was nothing in the investment proposal "which tends to suggest that it will be a term of the SPA that the investments in DSF and portfolios of single-manager/theme funds should not be leveraged at the portfolio level" was wrong as a matter of law and, in any event, led the judge to misconstrue the SPA, because: (i) there is nothing in the SPA which tends to suggest that it will be a term of, or otherwise permitted by, the SPA that investments in DSF and portfolios of single-manager/theme funds may be leveraged at the portfolio level; (ii) the investment proposal proposed investment in proprietary hedge funds that leveraged their own assets in accordance with advertised policies and consequently only contemplated and permitted an investment in the funds identified in cl. A of the SPA and was consistent with the express terms of the SPA; (iii) the contents of the SPA and the investment proposal do not support the conclusion that leveraged investment was permitted otherwise than on the express terms of the SPA; and (iv) no other background facts in addition to the investment proposal support the conclusion that leveraged investment was permitted otherwise than on the express terms of the SPA.

(3) As a matter of construction, no term to the effect that the SPA authorized leverage at the portfolio level—and/or authorized the construction of a portfolio consistent with the investment proposal save to the extent that the parties had agreed otherwise—can be found in the SPA because (i) notwithstanding that it was plainly open to the parties to refer to the investment proposal in the SPA, there are no words in the SPA that do so; (ii) the words of cl. A of the SPA are consistent only with investment by Shallot in Investcorp branded leveraged funds or other hedge funds in which Investcorp were co-investors; and (iii) the parties dealt expressly with Shallot's borrowing powers at cl. I of the SPA.

(4) In those circumstances, the judge was wrong to conclude that a person knowing the terms of the investment proposal and the SPA would have concluded that the SPA authorized leverage at the portfolio level and/or the construction of a portfolio consistent with the investment proposal save to the extent that the parties had agreed otherwise. There was nothing in the factual background that could have led a court properly directing itself on the facts and the law to find that anything had gone wrong with the language of the SPA. It was clear what the parties meant by the terms of the SPA: indeed, the factual background indicated that cl.

A of the SPA expressly, unambiguously and exhaustively set out the investments authorized to be made.

102    In developing the submission that, as a matter of construction, no term to the effect that the SPA authorized leverage at the portfolio level—and/or authorized the construction of a portfolio consistent with the investment proposal save to the extent that the parties had agreed otherwise—can be found in the SPA because the parties had dealt expressly with Shallot's borrowing powers at cl. I of the SPA, it is said that, at cl. I.1 of the SPA, Shallot was given power to incur temporary "liquidity borrowings" to a limit equivalent to 25% of the equity of that company and that is inherently unlikely that, if the parties had intended that Shallot was to have an unlimited and generalized power to borrow for the purpose of leverage at the portfolio level, they would not have said so. It is pointed out that cl. I.1 began with the words: "In connection with my/our investment, I/we understand and agree that [Shallot] may be involved in certain borrowing relationships in accordance with the following terms" (so indicating that there would not be other borrowing relationships) and that cl. I.2 regulated the interest on liquidity borrowings from Investcorp and it is inherently improbable that interest on other borrowings (if permitted) would be unregulated. In those circumstances, it is said, cl. I.1 is a bar to the "administrative step" and to leverage at the portfolio level. It is said that the judge's construction of the SPA deprived cl. I.1 of any effect and, in particular, deprived Mr. Al Sadik of the protection that cl. I.1 was intended to provide.

103    In response to those submissions, it is said on behalf of Investcorp that the contents of the investment proposal show that the parties did not intend that Mr. Al Sadik's investment should not be leveraged at portfolio level. It is said that the judge made three findings at para. 4.5 of his judgment:

(1) That the investment proposal made it "plainly obvious" that a leveraged investment was proposed; that Mr. Al Sadik had acknowledged in his witness statements that he was perfectly happy for his investment to be placed into funds using second-layer leverage; that he confirmed this in his oral evidence and that it was clear from that evidence that Mr. Al Sadik's real complaint was (and is) about the wisdom of Investcorp's leverage decisions in respect of his investment, not the type of leverage used. It is said that Mr. Al Sadik's real complaint might have given rise to the need to examine whether there was a breach by Investcorp of its duty of care but that it has nothing to do with issues of authority.

(2) That Mr. Al Sadik did not dispute that the investment proposal told the reader (albeit not in terms) that an investment in LDSF was the economic equivalent of a leveraged investment in DSF and that investments in SMFCo and LEDF were the economic equivalent of leveraged

investments in portfolios comprising the six SMFs and the five theme funds identified at p.13 of that proposal.

(3) That there was nothing in the investment proposal which suggested that it would be a term of the SPA that investments in DSF or portfolios of SMFs should not be leveraged at the portfolio level. The investment proposal simply indicated that the desired level of leverage could be achieved at the underlying fund level by investing in the identified feeder fund (LDSF) and fund of hedge funds (SMFCo). The "Indicative Terms" on p.5 of the investment proposal not only set out how the portfolio might be constructed but also identified that the proposed investment of Mr. Al Sadik's moneys would use leverage, with portfolio leverage at ×2.5 across the indicative asset allocation and with 50% with ×3 leverage.

104    Further, it is said on behalf of Investcorp that the judge set out in his judgment the principles of law relating to the construction of contracts—which, it is said, had been referred to by each of the parties in their respective written closing submissions and were common ground—and applied those principles to the facts as he had found them to be. It is said that, in reaching his conclusions—expressed at paras. 4.6 and 4.9 of his judgment—the judge relied upon his finding (at para. 4.8 of his judgment) that there was no meaningful distinction between first-layer leverage and second-layer leverage and on his view that, if there were no meaningful distinction between first and second-layer leverage, then there was no basis on which a reasonable person with knowledge of the relevant facts would construe the SPA as authorizing second-layer leverage but not authorizing first-layer leverage. He relied, also, on his finding (at para. 4.1 of his judgment, on the basis of the evidence of Mr. Opp) that no distinction between first-layer leverage and second-layer leverage was recognized anywhere in the hedge funds industry. Further, he relied on his finding (at paras. 4.4 and 4.6 of the judgment) that the parties had agreed that Investcorp would have a broad discretionary mandate.

105    In developing the submission that the parties had agreed that Investcorp would have a broad discretionary mandate, it is said on behalf of Investcorp: (i) that it was common ground at trial that the SPA conferred upon Investcorp a mandate to manage and invest the investment amount in accordance with the purposes set out in cl. A; (ii) that the judge was correct to observe that the language of cl. A, on its face, made it clear that Mr. Al Sadik granted Investcorp a wide discretion; (iii) that there was nothing on the face of cl. A which imposed any particular limitation; nothing, for example, which required that Investcorp was to implement exactly what was set out in the investment proposal or which prohibited the use of first-layer leverage; and (iv) that it would have made no sense for there to be any such limitation.

106   It is said on behalf of Investcorp that it would have made no sense for there to be a limitation in cl. A of the SPA (or elsewhere in that agreement) in circumstances where (i) there was no meaningful difference between first-layer leverage and second-layer leverage; (ii) both parties accepted that Investcorp was to have a discretion as to the investment of Mr. Al Sadik's money, including investing it in funds which used leverage; (iii) cl. D.2 of the SPA gave Shallot the authority to take "any actions that the board believes are necessary or desirable in order to effectuate the purposes of the investment or otherwise manage the affairs of [Shallot]"; (iv) Professor Stowell's unchallenged expert evidence was that, under a discretionary mandate such as this, the money manager would ordinarily be permitted to decide on the particular structure to be used to make the investment; and (v) that Professor Stowell's unchallenged expert evidence was that there was nothing surprising about the use of a structure such as Blossom to effect Mr. Al Sadik's investment.

107   Investcorp submits that cl. I of the SPA did not prohibit the use of first-layer leverage. It is pointed out that the judge found, at para. 4.4 of his judgment, that—

"... Clause I (under the heading Borrowing Relationships) authorizes Investcorp to cause Shallot to borrow money to meet possible temporary cash shortfalls and for other corporate purposes, described as 'Liquidity Borrowings,' the amount of which will be limited to 25% of the company's equity. It is agreed that borrowing for liquidity purposes is materially different from borrowing for investment purposes, and that Clause I relates only to the former."

It is said Mr. Al Sadik did not dispute in his written closing submissions at trial that the parties were agreed that borrowing for liquidity purposes is not the same thing as borrowing for investment purposes: his counsel had made oral closing submissions on this basis:

"... [T]he issue in relation to borrowing power ... is whether Shallot had the power under SPA to borrow for investment purposes. It is not disputed and I think never has been that it had the power to borrow for liquidity purposes under I."

In those circumstances it is said to be difficult to understand the basis on which Mr. Al Sadik now seeks to reopen the point by contending that cl. I.1 has the effect that Shallot was permitted to borrow only for liquidity purposes and not for any other purposes, in particular, not for investment purposes. It is said that the significance of the fact that the parties agreed (and the judge held) that borrowing for liquidity is not the same thing as borrowing for investment is not that this shows that first-layer leverage was not authorized under the SPA, rather, as the judge recognized, it shows that cl. I has nothing to do with the authority issue. It is said that Mr. Al Sadik has misunderstood the purposes of provisions such as cl. I.

Clause I did not limit or restrict any other clause of the SPA; in particular, it did not limit or restrict the scope of cl. A and it did not limit or restrict Investcorp's authority to leverage the sums invested at the portfolio level. Investcorp seeks to rely on Mr. Boynton's oral evidence that cl. I was intended to deal with the limits of Shallot's direct borrowing, primarily in order to cover short-term liquidity issues, which was unchallenged. It is said that Blossom's auditors, Ernst & Young, signed off on the accounts to June 30th, 2009, on the basis of this interpretation of cl. I, as confirmed by Habib Al Mulla & Co., one of Dubai's leading law firms. Mr. Al Sadik's assertion, first made in these proceedings in his second witness statement, that the question of borrowing by Shallot was specifically discussed during the SPA negotiations and the results of those discussions were recorded in cl. I of the SPA, contradicted his previous assertion, made in his first witness statement, that leverage of his investment was never discussed during the SPA negotiations. And it is said his oral evidence at trial made it clear that his understanding was that cl. I had nothing to do with borrowing for leverage. In those circumstances, it is said on behalf of Investcorp that cl. I of the SPA was not intended to, and did not, prohibit borrowing for investment and that that is what a reasonable person with knowledge of the background would have understood.

108   In approaching Mr. Al Sadik's challenge, under the second limb of Ground 12 in the memorandum of grounds of appeal, to the judge's conclusion that on its true construction the SPA did authorize first-layer leverage—a challenge based upon the assertion that the judge was led to misconstrue the SPA "because no reasonable person would have construed the SPA in the way the learned Judge did"—it is important, in my view, to have in mind that, in reaching that conclusion, the judge held (i) that the transfer of the investment amount (less a small retention) from Shallot to Blossom was an administrative step (and was not itself an "investment" in Blossom for the purposes of the SPA); (ii) that it was "plainly obvious" that the investment proposal was proposing a leveraged investment; (iii) that the purpose of the SPA was to authorize Investcorp to implement the investment proposal (save to the extent that its implementation was actually inconsistent with what had been expressly agreed by the parties); and (iv) that he could regard first-layer (or portfolio-level) leverage through a special purpose vehicle (such as Blossom) as "economically equivalent" to second-layer leverage through, say, LDSF. In my view he was correct to make each of those findings.

109   It is also important to have in mind that it was common ground that, notwithstanding that no investment manager had been appointed to carry out the task of selection, the investments permitted under cl. A of the SPA included any Investcorp hedge fund or a hedge fund or segregated account with any hedge funds managers (provided that any such other hedge fund manager is at the time of investment a manager with which an Investcorp

hedge fund is invested) and that that class included (*inter alia*) DSF and LDSF. As the judge explained, investment in a high risk (leveraged) portfolio of LDSF was economically equivalent to investment in DSF leveraged at the portfolio level. Given that investment in DSF was authorized under cl. A, there was no reason—in the absence of clear words either in cl. A of the SPA or elsewhere in that agreement—to construe the SPA in a way which permitted leveraged investment in DSF by one means (second-layer leverage through a high risk portfolio of LDSF) but did not permit leveraged investment in DSF by the other means (first-layer leverage at the portfolio level through a special purpose vehicle controlled by Investcorp).

110   I agree with the judge's view that there is nothing in cl. A of the SPA which suggests that leveraged investment in DSF at the portfolio level is not permitted: cl. A does not address that question. I also agree with the judge's view that there is nothing in cl. I of the SPA which leads to the conclusion that leveraged investment in DSF at the portfolio level is not permitted. Clause I authorizes borrowing by Shallot to meet possible temporary cash shortfalls and for other corporate purposes: it does not address the question whether borrowing by an SPV controlled by Investcorp in order to leverage investments at the portfolio level is, or is not, authorized.

111   In those circumstances, there was no reason for the judge to construe the SPA in a way which permitted leveraged investment in DSF by means of second-layer leverage but did not permit leveraged investment in DSF by first-layer leverage, provided that he was satisfied that borrowing by an SPV upon the security of investments for the purpose of leveraging at the portfolio level was permitted by that agreement. In that context, it is important to have in mind that the question whether Blossom itself had power to borrow on the security of the investments which it held (or would acquire) did not depend on the terms of the SPA. Blossom was not a party to the SPA and its power to borrow on the security of the investments which it held was derived from its own constitution. The relevant question, as it seems to me, was whether Investcorp (or Shallot) would be in breach of the SPA if it caused or permitted Blossom, which it controlled, to borrow. The judge found the answer to that question in the terms of cl. D.2 of the SPA: Shallot's board of directors was authorized to cause Shallot "to take any actions that the board believes are necessary or desirable in order to effectuate the purposes of this investment . . ." The judge was satisfied that leveraging was necessary in order to effectuate the purposes of the investment. If Shallot's board of directors believed that leveraging at the portfolio level (rather than second-layer leveraging through LDSF) was desirable, then there was no reason to think that Investcorp or Shallot would be in breach of the SPA if Blossom was

caused or permitted to borrow for that purpose, upon the security of the investments which it held (or would acquire).

112   I reject the submission, advanced on behalf of Mr. Al Sadik, that the judge was led to misconstrue the SPA "because no reasonable person would have construed the SPA in the way the learned Judge did." In my view the judge was correct to conclude that, on its true construction, the SPA did authorize first-layer leverage.

### The causation issue

113   The judge observed (at para. 4.11 of his judgment) that—

"if, contrary to my findings, Investcorp was not authorized to leverage the investment amount at the portfolio level and/or Blossom is characterized as an unauthorized investment, Investcorp's case is that the breach of contract caused no loss and damage."

It is clear from that observation that the judge identified two distinct cases in which a claim for damages might arise: (i) if he ought to have held that the transfer of funds by Shallot to Blossom on or about March 4th, 2008 was not merely an administrative step but was an investment in Blossom (so that, properly analysed, the breach of contract lay in making an unauthorized investment); and (ii) if he were correct in his conclusion that the transfer of funds to Blossom was merely an administrative step, but wrong to hold that leverage at the portfolio level was authorized by the SPA (so that, properly analysed, the breach of contract lay, not in making an unauthorized investment in Blossom but in causing or permitting Blossom to make further, leveraged, investments in DSF and the SMFs in the period May to September 2008 with borrowed funds). For convenience, I shall refer to those cases, respectively, as "the unauthorized investment claim" and "the leveraged investments claim."

114   Given that I would hold (i) that the judge was correct to take the view that the transfer of funds by Shallot to Blossom was merely an administrative step, and so not properly to be regarded as an investment in Blossom for the purposes of the SPA, and (ii) that the judge was also correct to take the view that leverage at the portfolio level was authorized by the SPA, it is, perhaps, unnecessary for me to address the causation issue in this judgment. But it may be of assistance if I do so to the extent that that issue arises in the context of the 4th claim.

115   Although the judge identified, correctly, that there were (at least) those two distinct cases in which—if he were wrong in his conclusions as to the meaning and effect of the SPA—a claim for damages might arise, it appears that, in addressing the causation issue, he made no distinction between them. At para. 4.11 of his judgment, he said this:

"The burden of proof rests on the plaintiff, but [counsel for Mr. Al Sadik] did not cross-examine Messrs. Franklin or Gurnani about how they would have constructed the portfolio, if the use of First Layer Leverage had not been open to them. Nor did he attempt to ascertain how they could have applied leverage incrementally, if the use of First Layer Leverage was not open to them. In my judgment the most reasonable inference to draw from the evidence is that they would have allocated 50% to LDSF (×3) and 50% to SMFCo in March 2008. Had they done so, Mr. Opp's evidence leads to the conclusion that Mr. Al Sadik's loss would have been greater than that which he actually suffered. In conclusion, if Mr. Al Sadik had established that Investcorp was in breach of contract, as alleged in the Fourth and Ninth Claims, he would have failed to prove that the breaches caused any loss and damage." [Footnote omitted.]

116   In support of his challenge to the judge's conclusion on the causation issue, Mr. Al Sadik did not rely—either in the appellant's skeleton argument or in oral submissions made at the hearing of the appeal—on Ground 17 in the memorandum of grounds of appeal: that when the judge found that cl. F.4 of the SPA had been breached he ought to have proceeded to consider and decide whether or not the breach had caused Mr. Al Sadik loss and damage. He relied on that ground in support of his challenge to the judge's conclusion on what I have described as the third issue. In relation to the 4th claim, Mr. Al Sadik relies on Grounds 18 and 19 in the memorandum of grounds of appeal:

"*Ground 18*: The learned Judge erred in law when in connection with the Appellant's Fourth Claim he held that even if the First Respondent had exercised the Investment Power correctly the Appellant would not have suffered loss or damage.

*Ground 19*: Further and in the alternative to Ground 18 the learned Judge erred in equity when in connection with the Appellant's Fourth Claim he held that even if the First Respondent had exercised the Investment Power correctly the Appellant would not have suffered loss or damage."

117   It is, perhaps, less than clear whether the phrase "even if the First Respondent had exercised the investment power correctly" is intended to cover both (i) the hypothesis that Shallot had not made a transfer of funds to Blossom in March 2008 ("the unauthorized investment claim"), and (ii) the hypothesis that that transfer had been properly made (as merely an administrative step) but that Blossom had not made further, leveraged, investments in DSF and the SMFs in the period May to September 2008 with borrowed funds ("the leveraged investments claim"). The probability, I think, is that the judge saw no reason to distinguish between the outcome if Mr. Al Sadik succeeded on the unauthorized investment claim and the

outcome if Mr. Al Sadik succeeded only on the leveraged investments claim. The reasonable inference to draw, in either case, was that the investment amount would have been allocated, in March 2008, equally between LDSF and SMFCo and that, if that had occurred, Mr. Al Sadik's loss would have been greater than that which he actually suffered.

118   Grounds 18 and 19 in the memorandum of grounds of appeal, taken together, raise the question whether the applicable principles of causation differ if the claim is brought in equity (for breach of trust or breach of fiduciary duty) rather than in law (for breach of contract). In its submissions in response to the causation issue under the 4th claim, Investcorp's submissions did not distinguish between those two grounds. That is understandable, given that the 4th claim was pleaded in the re-re-amended statement of claim, at paras. C21 and C22 under the head "Breach of Contract (Unauthorised Leveraging)," as a claim for breach of contract and the judge treated it as such. In those circumstances, it seems to me inappropriate—as well as being unnecessary for the reasons already mentioned—that I should address the question raised by Ground 19: that is to say, the question whether the applicable principles of causation differ if the claim is brought in equity (for breach of trust or breach of fiduciary duty) rather than in law (for breach of contract) and, if so, whether the judge was wrong to conclude (if and in so far as he did so), that, if Mr. Al Sadik had established (i) the unauthorized investment claim, and/or (ii) the leveraged investments claim, he would have failed to recover damages in equity for breach of trust or breach of fiduciary duty on the ground that Mr. Al Sadik had not suffered loss by reason of that breach.

119   The question which arises under Ground 18 in the memorandum of grounds of appeal is whether the judge was wrong to conclude that, if Mr. Al Sadik had established (i) the unauthorized investment claim, and/or (ii) the leveraged investments claim, he would have failed to recover damages at law for breach of contract on the ground that Mr. Al Sadik had not suffered loss by reason of that breach.

120   Before addressing that question I should add that it is pointed out on behalf of Mr. Al Sadik that the judge recorded (at para. 7.6 of his judgment):

"... I came to the conclusion that it would not be appropriate for me to say anything about the causation and quantum issues which would have arisen in the event that I had found in favour of the Plaintiff. Counsels' written Closing Submission disclose areas of disagreement which were not ventilated in the oral argument on the basis that further and more detailed written submissions would be made if I were to find in favour of the Plaintiff on all or any of his claims. For this reason it would not be appropriate for me to comment on any of these points."

It is said to be the case, therefore, that the judge's findings were made without the benefit of full argument of the parties.

*Was the judge wrong to conclude that, if Mr. Al Sadik had established (i) the unauthorized investment claim and/or (ii) the leveraged investments claim, he would have failed to recover damages at law for breach of contract on the ground that Mr. Al Sadik had not suffered loss by reason of that breach?*

121   It is submitted on behalf of Mr. Al Sadik that the judge was wrong to hold, at para. 4.11 of his judgment, that, even if Investcorp had exercised the investment power correctly, Mr. Al Sadik would have been in no better position than that in which (in the events which happened) he was. It is clear from the submissions advanced that Mr. Al Sadik relies, primarily at least, on the unauthorized investment claim rather than on the leveraged investment claim. It is said on his behalf that the judge's decision to draw the inference that Investcorp would have allocated "50% to LDSF (×3) and 50% to SMFCo in March 2008" was wrong in law because the investment in Blossom made by Investcorp was not a legitimate performance of the SPA but an unauthorized investment—and so a breach of contract—which caused loss to Mr. Al Sadik and there is no rule or principle of law that enables a contract-breaker to claim there was no causation where he has chosen an illegitimate method of performance (rather than chosen between legitimate methods of performance).

122   In developing that submission it is said that—

   (1) Shallot undertook to appoint—and Investcorp Bank undertook to procure the appointment of—Investcorp Advisers to be the investment manager. It was for the investment manager to exercise the power of selection of investments (the investment power) under cl. A of the SPA. The appointment of investment manager was not made and it is not in dispute that Investcorp Bank took responsibility for the investment power and exercised it. Mr. Al Sadik claims that Investcorp breached the investment power when it selected and transferred to Blossom US$135m. His claim is for losses caused by that selection and transfer. He contends that Investcorp failed to perform the SPA in the manner to which he was contractually entitled, in that (although because the investment power was a fiduciary power of investment it did not need to be exercised at all) he was entitled to expect that, if any investments were selected, these would be investments permitted by the investment power. His claim for loss and damages is advanced under the general principle that damages for breach of contract are to compensate a plaintiff for damages he has suffered through the breach. Mr. Al Sadik did not bargain for an investment in Blossom and the loss he claims is loss sustained through and caused by that breach.

(2) The breach of contract of which Mr. Al Sadik complains deprived him of a real profit, equal to the losses incurred by the blended leverage element of an investment in Blossom. When Mr. Al Sadik redeemed his shares in Shallot he received AED292,398,778. He suffered a gross loss on his investment in Shallot of the difference between that amount and AED500m.—that is to say, a gross loss of AED207,601,222. Nevertheless, he has quantified his claim at AED202,937,666, by calculating what the value of Shallot's shares would have been but for the element of blended leverage applied to the investment in Blossom and excluding losses resulting from investments which Blossom made to the extent these were not leveraged. The reduction which he has made is on the basis that the unleveraged portion of the investments were (as good as) disclosed to him and would have been permitted if Shallot had made them (which, it is said, he believed it had done until March 2009, when Investcorp sent him the false IMA in a deceitful attempt to justify the investment in Blossom).

123   It is said on behalf of Mr. Al Sadik that the relevant question is whether or not there is a basis in law for the proposition that because Investcorp had a choice of investments it can avoid liability in damages by proving that, if it had not breached its contract, it could and would have chosen a single investment which would have led to an even greater loss than that actually suffered. There are, it is said, three ways in which that question may be resolved: first, by reference to the so-called "minimum performance rule," secondly, by reference to the principles of causation and, thirdly, by reliance on breach of trust. In developing that submission (in the context of the claim for damages at law for breach of contract) it is said that—

(1) Damages for expectation losses may be limited by the minimum performance rule, which requires that, where the promisor has a discretion between the mode or level of performance, his liability in damages is presumptively limited to the mode or level least burdensome to him and not (if different) the one least beneficial to the promisee. But the minimum performance rule has no application in the circumstances of the present case. The investment power in cl. A of the SPA is discretionary: it provides for the investment manager to make a selection. But it was not more burdensome for the investment manager to select one investment rather than to select another. And the same was true for Investcorp which, in the events which happened, chose to exercise the power. Exercise of the investment power imposed the same burden on each occasion: the burden of making (or of deciding not to make) a selection. Further, the relevant measure for the reduction of damages under the minimum performance rule is not what is least beneficial to the promisee but what is least burdensome to the promisor. There was no difference in the burden on Investcorp (as contract breaker) between different modes of performance

because in every case the burden was the same. Therefore the minimum performance rule has no application in the present case.

(2) There is no rule or principle of law that permits a contract breaker to argue that there is no causation by advancing a hypothesis about what he (the contract breaker) would have done if he had not broken his contract. Such a hypothesis may be advanced in respect of what the plaintiff or a third party would have done (*i.e.* to prove that the loss would have occurred despite the breach complained of) but that does not arise in this case. Accordingly, the fact that Mr. Al Sadik's counsel did not cross-examine the Investcorp witnesses about what they would have done, if (instead of acting in breach of the investment power) Investcorp had acted under that power, is not to the point.

(3) Accordingly, the principles of causation do not excuse Investcorp from liability in damages for breach of contract.

124   Investcorp's response to Ground 18 in the memorandum of grounds of appeal is that the judge was correct to hold that, even if Investcorp had acted in breach of its contractual obligations under the SPA, that breach was not the cause of Mr. Al Sadik's loss, in that it was open to him on the evidence (which Mr. Al Sadik had not challenged in cross-examination at the trial) to conclude that that loss would have occurred—and, indeed, would have been greater—if Investcorp had fulfilled those obligations. Mr. Opp's unchallenged expert evidence, it was said, was (i) that, had investments been made in LDSF (×2 leverage portfolio) and SMFCo (×3 leverage portfolio, extrapolating the performance of SMFCo with ×1 leverage), Mr. Al Sadik would have suffered losses which exceeded those which he did suffer as a result of the investments made by Blossom to the extent of some AED97.57m., and (ii) that had investments been made in LDSF (×2 leverage portfolio) and SMFCo (×1 leverage portfolio), Mr. Al Sadik would have suffered losses which exceeded those which he did suffer as a result of the investments made by Blossom to the extent of some AED8.44m. Accordingly, it is said, even if Mr. Al Sadik were to succeed in his breach of contract claims he is unable to recover anything in excess of nominal damages: reliance is placed on observations in *McGregor on Damages*, 18th ed., at paras. 10–004 – 10–005 (2009).

125   In developing that response, it is said on behalf of Investcorp that the principles by reference to which issues of causation, foreseeability and remoteness are determined in the context of a breach of contract claim are well established and may be summarized as follows:

(1) Where a party sustains a loss by reason of breach of contract he is, so far as can be done by a monetary award, to be placed in the same position as he would have been if the contract had been performed: *Robinson* v. *Harman* (16) (1 Exch. at 855); *Livingstone* v. *Rawyards Coal Co.* (15) (5 L.R. App. Cas. at 39); *British Westinghouse Elec. & Mfg. Co.*

v. *London Underground Elec. Ry. Co. (No. 2)* (5) ([1912] A.C. at 688–689).

(2) There must be a causal connection between a defendant's breach of contract and a plaintiff's loss: *Chitty on Contracts*, 30th ed., at para. 26–032 (2008). In other words, a successful plaintiff cannot recover damages in respect of loss not caused by the defendant's conduct: *McGregor on Damages*, 18th ed., at para. 1–024 (2009).

(3) A defendant's wrongful conduct is a cause of a plaintiff's harm if such harm would not have occurred without it, *i.e.* "but for" it. Even then, satisfying the "but for" test is a necessary condition for the imposition of liability but is by no means sufficient: *McGregor on Damages*, 18th ed., at paras. 6–005 – 6–007 (2009).

It is said that the judge found, at para. 4.11 of his judgment, that even if Mr. Al Sadik had established that Investcorp was in breach of contract, as alleged in his 4th and 9th claims, he would have failed to prove that the breaches caused any loss and damage. The judge accepted Investcorp's case—pleaded at paras. 19 and 199 of the amended defence—that, even if the use of Blossom had amounted to a technical breach of the SPA, this had caused Mr. Al Sadik no loss in excess of that which he would have suffered had he been invested in the funds specifically referred to in the investment proposal. He was entitled to find—on the basis of Investcorp's expert evidence on this point which was not challenged at trial—that, even if Investcorp did breach the SPA (which it did not), had it performed its contractual obligations then Mr. Al Sadik would have suffered greater losses than he did as a result of Investcorp's use of the Blossom structure. It is submitted on behalf of Investcorp that the judge's application of basic principles of causation was correct.

126   I agree that the judge reached the correct conclusion in relation to the unauthorized investment claim. As I have said, the obligation of Investcorp under the SPA was to establish an SPV (Shallot) as a separately managed account for the purpose of investing in hedge funds or in segregated accounts with hedge fund managers to be selected by Investcorp Advisers. On the evidence at trial the judge was entitled to conclude that, if that obligation had been performed without the interposition of Blossom, the probability was that the investment amount would have been allocated equally between LDSF (×3 leveraged portfolio) and SMFCo in March 2008. The measure of damages (if any) for breach of contract in law is the difference between the position in which Mr. Al Sadik would have been if that had been done and the position in which he was as a result of the interposition of Blossom. Mr. Al Sadik would have been in no better position if Blossom had not been used.

127   It seems to me, however, that the position is different in relation to the leveraged investments claim. That claim arises if the judge was correct

to hold that there was no breach of contract on March 4th, 2008—when the investment amount (less a small retention) was transferred by Shallot to Blossom—but wrong to hold that first-layer leverage was authorized by the SPA. On that basis there were breaches of contract when Blossom borrowed for investment on May 1st, June 1st, August 1st and September 1st, 2008. The measure of damages (if any) for these breaches of contract, as it seems to me, is the difference between the position that Mr. Al Sadik would have been in if those borrowings had not taken place and the position in which he was in consequence of those borrowings. *Prima facie,* that would equate to the figure of AED202,937,666 which Mr. Al Sadik claims to be his loss after calculating what the value of Shallot's shares would have been but for the element of blended leverage applied to the investment in Blossom and excluding losses resulting from investments which Blossom made to the extent these were not leveraged. But the court heard no argument on that question and I make no finding that that figure is correct.

**The third issue: whether Investcorp deceitfully concealed its intention to leverage the assets, the manner in which the assets were leveraged and the extent of the leverage actually employed**

128    The judge's reasons for dismissing the 3rd claim are set out in section 5 of his judgment. The issue which he addressed was whether Investcorp deceitfully concealed its intention to leverage the assets, the manner in which the assets were leveraged and the extent of the leverage actually employed. He held that Investcorp's failure to inform Mr. Al Sadik about its intention to leverage his assets by means of first-layer leverage using the White Ibis III credit facility did not constitute a breach of its reporting obligations under the SPA in that the fiduciary relationship arising out of the SPA did not impose upon Investcorp any disclosure obligation which was additional to or independent of the contractual obligation. He accepted that Investcorp was in breach of its obligations under cl. F.4 of the SPA, in that Investcorp failed to provide Mr. Al Sadik with any statements of the underlying investments held through Blossom and he found that, had Investcorp complied with cl. F.4, the fact that it had employed first-layer leverage and the amount of the borrowing would have been disclosed to Mr. Al Sadik in the report for May 2008 (which would have been delivered in mid-June) and that, in the events which happened, Investcorp's breach of contract led to Mr. Al Sadik not being informed about the level of leverage and the manner in which it had been carried out until March 2nd, 2009. But he held that, nevertheless, Investcorp's reporting was done *bona fide* in a manner which Mr. Kironde honestly believed would best serve Mr. Al Sadik's interests and that there was no intention to conceal from Mr. Al Sadik the fact that his portfolio had been leveraged or the level of leverage or the manner in which it had

been carried out. He concluded that, in those circumstances, the non-disclosure was not deceitful.

### The judge's findings in section 5 of his judgment

129 The judge explained (at para. 5.1 of his judgment) that Mr. Al Sadik's case was that Investcorp had no authority to borrow money on the security of his assets and that by doing so, Investcorp not only acted in breach of contract but did so deliberately for its own improper purposes and that it then dishonestly concealed what had been done. It followed, he said, that there were two elements to the factual case on deceitful non-disclosure:

(1) Whether (as alleged) Investcorp acted in breach of its fiduciary duty in March 2008 by failing to tell Mr. Al Sadik that it had decided to leverage his assets at the portfolio level and invest the proceeds directly in DSF and the single-manager funds, rather than invest in LDSF and SMFCo which is what he probably expected. In that context, it was Mr. Al Sadik's case that the use of Blossom as the vehicle through which to leverage the assets was a device by which to conceal the existence of the borrowing.

(2) Whether, having entered into the White Ibis III credit facility with RBS, there was a further ongoing breach of duty in that Investcorp deliberately failed to comply with its reporting obligation under cl. F.4 of the SPA in order to conceal both the existence of the credit facility and the subsequent application of leverage from time to time during the period from May 1st, 2008 onwards.

The judge acknowledged that Mr. Al Sadik's case had not been put on the basis that there were two distinct breaches of fiduciary duty but took the view that it was convenient to analyse the two elements separately.

130 At paras. 5.2–5.6 of his judgment, the judge reminded himself of the relevant principles of law. He noted that it was not in dispute that Investcorp owed a fiduciary duty to Mr. Al Sadik and that the core obligation of a fiduciary was that of loyalty, as explained by Millett, L.J. in *Bristol & West Bldg. Socy.* v. *Mothew* (4). The dispute on the law, he said, was whether or not the existence of the fiduciary relationship gave rise to a reporting obligation which was additional to and independent of the contractual duty. He held that it did not. He reached that conclusion on the basis of observations in the opinion of the Judicial Committee of the Privy Council in *Kelly* v. *Cooper* (13) ([1993] A.C. at 213–214) and in the judgment of the High Court of Australia in *Hospital Prods. Ltd.* v. *United States Surgical Corp.* (10) (156 CLR at 97). After setting out the passages in those authorities on which he relied, he said this (at para. 5.3 of his judgment):

"In my judgment, it follows that the scope of the fiduciary duties owed by Investcorp to Mr. Al Sadik (and in particular the duty to disclose information about the investments made on his behalf) are to be defined by reference to the terms of the SPA."

In reaching that conclusion he rejected the submission advanced on behalf of Mr. Al Sadik that under the law in the Cayman Islands an investment manager owes a fiduciary duty to disclose to its client everything that is or may be material to the exercise of the client's judgment, whatever the terms of the reporting obligations contained in the investment management agreement (in this case, cll. F.2 and F.4 of the SPA), with the consequence, it was said, that Investcorp was under a continuing obligation to disclose from time to time all the facts and information which would be material to any decision which Mr. Al Sadik might reasonably be expected to make (including a decision to terminate the mandate or give instructions to redeem investments or to de-leverage the investments or to change the investment criteria). He held that that proposition was wrong in principle and was not supported by the Canadian decisions—*Davidson* v. *Noram Capital Mgmt. Inc.* (6), *Laflamme* v. *Prudential-Bache Commodities Canada Ltd.* (14), *Ryder* v. *Osler, Wills, Bickle Ltd.* (17) and *Williamson* v. *Williams* (19)—on which counsel for Mr. Al Sadik relied. In his view "these authorities are entirely consistent with *Kelly* v. *Cooper* and lead to the conclusion that the existence of a fiduciary relationship does not impose upon Investcorp a reporting obligation over and above that for which Mr. Al Sadik contracted."

131   At paras. 5.7–5.11 of his judgment, the judge addressed the first of the two elements of the factual case on deceitful non-disclosure which he had identified: whether Investcorp acted in breach of its fiduciary duty in March 2008 by failing to tell Mr. Al Sadik that it had decided to leverage his assets at the portfolio level and invest the proceeds directly in DSF and the SMFs, rather than invest in LDSF and SMFCo. He concluded, at para. 5.11, that the evidence established that Investcorp believed that it had authority to make leveraged investments, through the mechanism of first- and/or second-layer leverage and that, given the discretionary mandate, there was no need to explain the actual arrangements to Mr. Al Sadik. He held that the evidence did not establish that Investcorp deceitfully concealed the borrowing arrangements from Mr. Al Sadik or that Blossom was incorporated as a mechanism for achieving that purpose.

132   The judge set out the passages in the evidence on which he relied in reaching those conclusions. It is not, I think, necessary to do so in this judgment (at least at this stage): it is sufficient to identify the steps in the judge's reasoning:

(1) At para. 5.7 the judge explained that the construction of the portfolio was the work of Mr. Franklin, in conjunction with Mr. Gurnani and Mr.

Gharghour (who, he said, was responsible for making the final decision). He explained that Mr. Al Sadik's liquidity requirements had the effect that the original plan to invest in COF could not be implemented and that, in those circumstances, it was decided to invest 50% of his portfolio in SMFs with ×3 leverage. And he explained that, because SMFCo did not offer that level of leverage, an alternative arrangement had to be adopted. That, he said, was the context in which the decision to apply first-layer leverage was made.

(2) He found that the evidence established that it never occurred to Mr. Franklin, Mr. Gharghour, Mr. Boynton or anyone else involved in the process that Investcorp might not have authority to construct a portfolio using first-layer leverage rather than second-layer leverage. He went on to say this (at para. 5.7):

"Having decided to apply First Layer Leverage, I think that it is equally clear that they simply took it for granted, without really applying their minds to the point, that the credit facility would be established through an SPV incorporated as a subsidiary of Shallot."

In support of that view he referred to paras. 6.9–6.17 and 9.18–9.19 in the first witness statement of Mr. Franklin, dated June 9th, 2011, and to para. 5.5 in the witness statement of Mr. Boynton, of the same date.

(3) At para. 5.8 of his judgment, the judge said this:

"Messrs. Franklin, Boynton, Gurnani and Kironde were all cross-examined at length on this subject. They are all experienced industry professionals. They impressed me as honest witnesses whose evidence can be relied upon. They all deny that Blossom was created for the purpose of concealing from Mr. Al Sadik the fact that his investment would be leveraged. In my judgment the contemporaneous e-mail traffic passing amongst these (and other) Investcorp executives in March 2008 reflects the kind of discussion one would expect to see in the ordinary course of business. It is consistent with their oral evidence and I found no documentary evidence tending to suggest that they were behaving dishonestly or had any motive to do so."

The judge set out the passages from the transcript of the oral evidence given at trial by Mr. Franklin, Mr. Boynton and Mr. Gurnani. He summarized Mr. Franklin's evidence. It was, he said, that Mr. Franklin had never considered the question of using Shallot as the borrowing vehicle and that the incorporation of Blossom was a normal and natural thing for the funds administration team to do; that the first time he came across any suggestion that Blossom had been created to hide leverage was when he saw the allegation in the statement of claim; and that, whilst it would obviously have been possible to put the borrowing transaction through

Shallot, his understanding was that Mr. Gharghour and Mr. Gurnani had decided upon the use of a "clean structure," meaning an SPV. Mr. Gurnani, he said, had "focused on the economics and was 'agnostic' about the mechanics for achieving the desired result"; by which he meant (as the judge said) that, so long as the desired level of leverage was achieved, it did not matter whether it was done through first- or second-layer leverage. Mr. Gurnani did not accept that Blossom was inserted into the structure so that borrowing could be hidden from Mr. Al Sadik and he said that, when he and Mr. Gharghour had first met Mr. Al Sadik, leverage would have been raised.

(4) The judge found that the credit facility was arranged by Mr. Ravi Nevile ("Mr. Nevile"), a member of Investcorp's banking department based in London. He said this (at para. 5.9 of his judgment):

"[Mr. Nevile] conducted the negotiations with RBS as a result of which Blossom was added into an existing credit facility known as White Ibis III . . . During the course of his negotiations, on 31st March, 2008, he sent an e-mail addressed to Messrs Kironde, Mirza and Khatib, with a copy to Mr. Gharghour, asking them to confirm to him what language is contained in the SPA on the subject of giving security to the lender. He commented that 'in order for me to close the leverage for the client we will need to pledge some of the shares in the portfolio,' meaning some of the underlying assets. The only reply came from Mr. Gharghour, who said 'It may be a problem having client sign a new SPA with a pledge of his shares.' Neither Mr. Gharghour nor Mr. Nevile was called to give evidence and there are no follow-up e-mail exchanges. In fact Blossom, as the borrower, gave security over its assets, which is what I would expect to happen in a limited recourse transaction of this sort. Mr. Gharghour's response suggests that he misunderstood the question and thought that Mr. Nevile was suggesting that Mr. Al Sadik or Shallot might have to join in the transaction for the purpose of pledging Mr. Al Sadik's shares in Shallot or Shallot's shares in Blossom. The fact that Mr. Gharghour did not want to go back to his client for this purpose does not lead me to draw the inference he was acting for some improper purpose or believed that he was acting without authority." [Footnote omitted.]

(5) At para. 5.10 of his judgment, the judge explained that Mr. Al Sadik's pleaded case was that the reason for Investcorp's deceitful non-disclosure was that it was suffering a liquidity crisis and needed to borrow large sums of money to inject into its hedge fund platform and indirectly obtain liquidity for itself. He went on to say that, in the light of overwhelming evidence that no such liquidity crisis existed, this allegation was rightly abandoned and that no other motive was suggested. He observed that it had been put to Mr. Gurnani, Mr. Franklin and Mr.

Boynton that Blossom was incorporated because they all knew that the SPA did not contain an adequate borrowing power. But, he said, the evidence was that they did not know the terms of the SPA or did not apply their minds to the scope of the borrowing powers: they all took it for granted that there was no contractual limitation upon the ability of Shallot to employ first-layer leverage, whether directly or indirectly through a subsidiary incorporated specially for this purpose. He found that there was no evidence that RBS asked for the SPA and/or IMA (which did not exist) and that there was no reason to suppose that RBS would have looked behind the borrower's memorandum and articles of association and the usual resolutions of its board of directors. He said this:

> "It seems to me that Mr. Gharghour's desire to present the bank with a 'clean structure' is exactly what is to be expected of any asset manager in these circumstances. Blossom could be presented to the bank as a special purpose vehicle whose sole function is to enter into the credit facility and own the assets purchased with the proceeds of the loan. The bank would have security over all its assets and its audited financial statements (reported in US dollars) would tell the bank what it needs to know about its customer's financial position in the simplest possible way. In contrast, Shallot could not be presented as a special purpose vehicle because it will enter into a series of forward foreign currency transactions. Its financial statements will be presented in Dirhams and it will have other assets over which the bank has no security."

133   At paras. 5.12–5.22 of his judgment, the judge addressed the second of the two elements of the factual case on deceitful non-disclosure which he had identified: whether, having entered into the credit facility with RBS, there was a further ongoing breach of duty in that Investcorp deliberately failed to comply with its reporting obligation under cl. F.4 of the SPA in order to conceal both the existence of the credit facility and the subsequent application of leverage from time to time during the period from May 1st, 2008 onwards. He accepted that there had been a breach of the contractual reporting obligation but held (at para. 5.22) that the evidence did not point to the conclusion that anybody on the Investcorp side had deliberately intended to mislead Mr. Al Sadik by concealing the fact that his investment had been leveraged from May 1st, 2008 onwards. In their minds (he said) there was nothing to conceal: the evidence showed that they took it for granted that they had authority to leverage the investment and that they did not draw any distinction between what has been described as first-layer leverage and second-layer leverage.

134   The reasoning which led the judge to that conclusion may be summarized as follows:

(1) He noted (at para. 5.12 of his judgment) that there was no material dispute about what reports were actually sent to Mr. Al Sadik during the relevant period up to March 2009: he was sent NAV statements every month. He described those as single page documents, each specifying the number of redeemable preference shares issued by Shallot, the net asset value per share and the net asset value of the company expressed in UAE dirhams. He recorded that it was accepted that the production of this information and its presentation in this simple format was all that Investcorp was required to provide in order to comply with its obligation under cl. F.4.

(2) He found that, in addition, Mr. Al Sadik was provided with reports generated from Investcorp's funds processing system, referred to as "FPS2 Reports," which contained an estimate of the portfolio value, information about the portfolio's performance (presented in a graphical and statistical format), the annualized rate of return and the asset allocation (presented as a pie chart). Those reports, he said, were prepared monthly for the months ending April 30th, 2008 through to October 31st, 2008 and most, if not all of them, were received by Mr. Al Sadik. He explained that the asset allocation pie charts in the FPS2 Reports for May and each subsequent month are headed "Asset Allocation (Blossom IAM Ltd.) as at [date]."

(3) He accepted Mr. Zaidi's evidence that, on receipt of the first of these reports (on June 5th, 2008), he called Mr. Kironde to enquire about the reference to Blossom and that he was told that it referred to an internal arrangement to distinguish between the UAE dirham and US dollar accounts. He observed that, on any view, that was an incomplete explanation of the reasons for having incorporated Blossom but that it was an explanation which apparently made sense to Mr. Zaidi at the time and it was consistent with the fact that Blossom's functional currency was US dollars and Shallot's reporting currency was UAE dirhams. He was satisfied that the failure to provide a full and complete explanation for the use of Blossom did not lead to the conclusion that Mr. Kironde was intending to mislead his client.

(4) He found that, on June 26th, 2008, in response to a request from Mr. Zaidi for information about the underlying investments, Mr. Kironde sent him the first of two documents referred to as "allocation tables." He explained that those tables comprised two parts. The first part identified each of the underlying hedge fund investments and stated what appeared to be the market value as at the beginning and end of each month from inception until May 31st, 2008; the second part set out the percentage allocation (that is to say, the value of each investment as a percentage of Shallot's total NAV). The judge described the second part as accurate but he took the view that the first part was misleading (at least, in the absence of an explanatory footnote), in that, although the first drawdown of US$67.5m. was made from the RBS credit facility on May 1st, 2008, the

additional amount invested into each of the underlying funds was not reflected in either the opening values for May 1st, 2008, or the market values for May 31st, 2008. Instead, he said, the numbers for the month of May 2008 were the notional net value of the investments after setting off against each one a pro-rated share of principal and accrued interest owing to RBS. A second allocation table was sent to Mr. Zaidi containing up-dated information for the months of June, July and August 2008. Again, as the judge said, this table accurately reflected Shallot's NAV and the percentage of the total portfolio allocated to each of the underlying hedge funds as at the beginning and end of each month from inception until August 31st, 2008. In the final sentence of para. 5.13 of his judgment the judge said this:

> "However, in the absence of any footnote to explain the accounting treatment which has been adopted, I consider the first parts of both Allocation Tables to be misleading because they appear to reflect the market value of the underlying investments, rather than an analysis of Shallot's NAV."

(5) He explained (at para. 5.14 of his judgment) that an FPS2 Report (including Blossom's name) and an allocation table (including the information that he had described as misleading) was contained in the portfolio update—August 2008 discussed at the meeting between Mr. Kironde and Mr. Al Sadik and Mr. Zaidi on September 17th, 2008. He held that Mr. Kironde was responsible for determining how the information would be presented in the allocation table. He explained that the original draft, prepared by Mr. Mirza, included a column entitled "Cash and Other Assets" which was said to reflect a number of components including loan interest but that that column had been removed on Mr. Kironde's instructions. He held that, given that that table was intended to reflect the notional net value of the investments comprised in the portfolio (that is to say, the net value of each investment after setting off a pro-rated share of the liabilities, the accrued interest expense and other minor items on Shallot's balance sheet), it should have been treated in the same way as the principal amount owing to RBS. But, he said, Mr. Kironde categorically denied that the removal of this column was motivated by a desire to hide the existence of the leverage. The judge accepted that evidence, for reasons which he gave—in particular, he held that Mr. Kironde would not have invited Mr. Zaidi to go to Bahrain to meet the funds administration department (as the judge found that he did) if he were trying to conceal the fact that the portfolio had been leveraged.

(6) He summarized (at para. 5.15 of his judgment) the evidence of Mr. Boynton, on which he had confidence in relying. He found that the funds administration department (of which Mr. Boynton was head at the material time) had not appreciated that the SPA required other than standard monthly and quarterly reporting, which they understood to be restricted to

the issue of monthly estimated and quarterly final NAV statements in respect of Shallot. He summarized the basis upon which those statements would be prepared and concluded, on the basis of his analysis of the underlying accounting records, that that was done in exactly the way one would expect of a professional fund administrator.

(7) He explained (at para. 5.16 of his judgment) that cl. F.4 of the SPA required Investcorp to provide a statement of the "underlying investments," a term which was defined by cl. A of the SPA to mean each hedge fund or segregated account in which the assets of Shallot were invested. He held that a statement of the investments contained in a portfolio required particulars of the identity, quantity, cost price and market value of each security: it did not require Investcorp to perform a complex accounting exercise of the kind performed, on Mr. Kironde's instructions, to produce the allocation tables. It was enough, he said, that Mr. Al Sadik be provided with the information contained in the schedule entitled "Client/Entity Holdings"; with that information, he would have the opportunity to review the performance of the hedge funds in which he was invested, using the fact sheets and all the other information available to him on Investcorp's client website and cl. F.4 of the SPA cannot have been intended to serve any other purpose. He said this (at para. 5.16):

"It seems to me that the Funds Administration department was in fact collating the information called for by Clause F.4 in the ordinary course of preparing the monthly NAV statements and it would have been perfectly simple to put it into the form of a client report. However, as a result of an administrative oversight, the Funds Administration department failed to produce the reports necessary to discharge the contractual reporting obligations in respect of six clients, including Mr. Al Sadik. Mr. Boynton said that there was a 'generic problem' in relation to these managed accounts caused by a lack of communication between PRM and Funds Administration, with the result that his department failed to produce reports tailored to the reporting requirements specified in individual share purchase agreements."

(8) He found that, on February 26th, 2009, a table headed "Blossom IAM Limited (Since Inception on 01 March 2008 to 31 January 2009)" was sent to Mr. Zaidi. He said that the table was in three parts: the first part was entitled "Underlying Manager Performance" and set out the monthly performance figures for each of the hedge funds; the second part was entitled "Allocation (Based on Total Equity + Debt)" and set out the percentage of the gross amount of the investment allocated to each fund; the third part was entitled "Approx. Performance Attribution" and reflected the performance of Blossom, so enabling Mr. Al Sadik to see the effect of the leverage upon the performance of his portfolio. The judge found that Mr. Al Sadik responded angrily to this information and claimed

not to know that leverage had been applied to his investment; that he asked for more detail about the leverage and that, in response, on March 2nd, 2009, he was sent a document described as a "decomposition statement." The judge described that as "simply another three part table setting out the market value of the investments, the percentage allocation, the amount of leverage, the debt-to-equity ratio, total equity and percentage return for each month from inception to 31st January 2009."

(9) He held (at para. 5.17 of his judgment) that, on any view, Investcorp's reporting was unsatisfactory and there was a failure to comply with the requirements of cl. F.4 of the SPA. But he went on to remind himself that the issue which he had to decide was whether the failings in reporting which he had identified reflected a deliberate and deceitful attempt to mislead Mr. Al Sadik and to conceal from him the fact that his assets had been leveraged.

(10) In addressing that issue, he observed that it was related to the question whether Investcorp had authority to leverage the investment: if Investcorp's executives believed they had authority to leverage the assets (as in his view, they did), an obvious motive for deceit disappeared and it became difficult to infer that the reporting (or absence of reporting) was done in bad faith.

(11) He noted (at para. 5.18 of his judgment) that it was not in dispute that Investcorp had failed to provide Mr. Al Sadik with any proper explanation for having incorporated Blossom until March 2nd, 2009 but, he said, the evidence did not point to the conclusion that Investcorp had deliberately and deceitfully concealed Blossom's existence. He summarized the evidence which led him to that view:

(i) Blossom's existence, he said, was disclosed in the FPS2 Reports sent to Mr. Zaidi in respect of the months from May to October 2008. Mr. Kironde explained that he had some control over the format and could exclude (but not add) certain fields. The judge observed that if Mr. Kironde was attempting to conceal the existence of Blossom he would have taken its name (or the pie chart containing its name) out of these documents.

(ii) Mr. Kironde was in a position to influence the extent of the information sent to Mr. Zaidi in response to his request made in February 2009. There was no evidence to suggest that Mr. Kironde attempted to exclude information about the borrowings from the documents sent on February 26th and March 2nd, 2009.

(iii) By an email dated March 1st, 2009, Mr. Mirza sent a draft of the "decomposition statement" to those involved, including

Mr. Al Khatib and Mr. Tanner. He pointed out to them that "[Mr. Al Sadik] will see the total leverage amount and will not be happy. The IMA is being signed today/early tomorrow." No one suggested that there should be anything other than full disclosure of the leverage although (as the judge noted) Mr. Tanner did respond by asking the recipients of that email to delete it from their systems on the ground that he did not like the statement to which we have just referred.

(iv) On receipt of the document sent to him on February 26th, 2009, Mr. Zaidi had asked for a copy of the "investment management agreement"; which, pursuant to cl. D.1 of the SPA, was to be entered into between Investcorp Advisers Ltd. and Shallot. Mr. Zaidi's request exposed the fact that no investment management agreement had ever been executed. The judge found that Investcorp's response to the request was deceitful. He said this (at para. 5.19 of his judgment):

"A standard form investment management agreement was prepared, including an express term authorizing First Layer Leverage, and executed on 1st March 2009. The parties are Shallot, Investcorp Bank B.S.C. and Investcorp Investment Advisers Limited. It purports to have retrospective effect and is dated 'effective as of March 4, 2008' which is the date on which the first investments were made. This document was sent to Mr. Al Sadik on 8th March 2009 without explaining to him that it had been executed only a few days beforehand. When he complained about the use of leverage, Investcorp wrote to him on 10th March 2009 and said 'In our discussions with and presentations to you prior to setting up this portfolio we made it clear that to achieve the returns you wished for, it was anticipated that we would introduce leverage to the portfolio.' This is true, but the letter goes on to say 'This is provided for in Section 1(b) of the Investcorp Hedge Funds Management Agreement,' without disclosing that the document had only been executed the previous week and could not have had retrospective effect. Investcorp rightly places no reliance upon this document which is not binding and enforceable in accordance with its terms, but it is relevant to my assessment of the credibility of the evidence of those involved in its production."

135  The judge set out his conclusions on the third issue—whether Investcorp deceitfully concealed its intention to leverage the assets, the manner in which the assets were leveraged and the extent of the leverage actually employed—at paras. 5.20–5.22 of his judgment. It is, I think, appropriate in this judgment to include those paragraphs in full:

"5.20 Mr. Al Sadik knew that Investcorp believed the target return of 45% could only be achieved by making a leveraged investment. The Investment Proposal clearly spells out a proposal to make a leveraged investment and Mr. Al Sadik could not have been under any misapprehension about Investcorp's intention. The Investment Proposal also proposes specific levels of leverage and indicates how this can be achieved through investments in LDSF (×3), SMFCo. (×1) and LEDF (×1). It is reasonable to infer that Mr. Al Sadik would have expected his portfolio to be structured in this way, but he also understood that he was giving Investcorp a discretionary mandate which meant that he would not necessarily be consulted or informed about the actual asset allocation or the way in which the desired level of leverage would be achieved. The evidence establishes that Investcorp believed that it had authority to make a leveraged investment and had no reason to doubt that Mr. Al Sadik agreed with this approach. Investcorp's executives did not focus on the language of the SPA, even when asked to do so by Mr. Nevile, and it never occurred to them that they might be authorized to make a leveraged investment directly through LSDF and SMFCo, but not authorized to enter into a limited recourse credit facility for the purpose of making a leveraged investment directly into DSF and the single manager funds. The failure to inform Mr. Al Sadik about the way in which the leveraged investment was in fact being made is not indicative of any intention to conceal anything. Furthermore, if he had been fully informed in March or April 2008 about the way in which Investcorp intended to leverage the investment, I find it difficult to envisage why he would have objected in principle to the use of a limited recourse credit facility offered by a bank but accepted an investment in LDSF and SMFCo, when the two approaches were intended to achieve an equivalent economic result for him. In principle, the returns would be the same and the management fee would also be the same, because he had already agreed that no fee would be charged on leverage.

5.21 The failure to inform Mr. Al Sadik in advance about the intention to apply First Layer Leverage was not a breach of duty, but the failure to inform him after the fact came about as a result of a breach of the reporting requirements of Clause F.4. The Funds Administration department collated the information necessary to produce an F.4 Report. This was done routinely each month as a necessary step in the calculation of Shallot's NAV and the information could easily have been put into the form of a report for distribution to clients. The Funds Administration department failed to produce these reports because it was not part of the 'standard reporting' and, as a result of an innocent oversight, they failed to appreciate that there was a requirement to produce various reports for six clients, including Mr. Al Sadik. When Mr. Zaidi asked for this

information on or about 5th June 2008, the relevant information was provided to Mr. Kironde, but he does not appear to have applied his mind to the contractual requirements of the SPA.

5.22 Instead, he focused on how to respond to the request for information in a way which would best meet what he perceived to be his client's needs. He concluded, rightly in my judgment, that the provision of an F.4 Report by itself would be unhelpful and that something more was required to reconcile the statement of underlying investments with the NAV statement (the F.2 Report). This could have been done by adding in a brief summary of the other components on Shallot's balance sheet which were the principal and interest owing to RBS, the market value of the hedging transactions (which could be an asset or a liability) and the accrual for fees and start-up costs. This would be the conventional approach. Instead, Mr. Kironde decided that it would be more helpful to provide his client with the Allocation Table, which constitutes a 'netted down' version of what would otherwise be the F.4 Report. The end result is that he failed to comply with the contractual requirement, but I am satisfied that his decision was made bona fide for a proper purpose. He approached the exercise in exactly the same way three months later when preparing the Allocation Table for the period ended 31st August. The evidence does not point to the conclusion that Mr. Kironde (or anybody else) was deliberately attempting to mislead Mr. Al Sadik by concealing the fact that his investment had been leveraged from 1st May onwards. In their minds there was nothing to conceal. The evidence shows that they took it for granted (rightly in my judgment) that they had authority to leverage the investment and that they did not draw any distinction between what has been described as First and Second Layer Leverage. Mr. Kironde must bear principal responsibility for Investcorp's failure to comply with the requirements of Clause F.4, but I am satisfied that this breach of contract occurred innocently and does not equate to a breach of fiduciary duty. He was not deceitfully attempting to conceal the fact that Mr. Al Sadik's portfolio was being leveraged. In Mr. Kironde's mind, there was nothing to hide."

### The questions for determination by this court in relation to the third issue

136   As I have said, in reaching his conclusion that the third of the four issues which (at para. 1.15 of his judgment) he had identified as those which he needed to resolve—whether Investcorp deceitfully concealed its intention to leverage the assets, the manner in which the assets were leveraged and the extent of the leverage actually employed—should be determined in favour of Investcorp, the judge held that—

(1) Investcorp's failure to inform Mr. Al Sadik in advance about its intention to leverage his assets by means of first-layer leverage using the White Ibis III credit facility did not constitute a breach of its reporting obligations under the SPA, in that the fiduciary relationship arising out of the SPA did not impose upon Investcorp any disclosure obligation which was additional to or independent of the contractual obligation.

(2) Although Investcorp was in breach of its obligations under cl. F.4 of the SPA and, in the events which happened, Investcorp's breach of those contractual obligations led to Mr. Al Sadik not being informed about the level of leverage and the manner in which it had been carried out until March 2nd, 2009, nevertheless, Investcorp's reporting was done *bona fide* in a manner which it (through Mr. Kironde) honestly believed would best serve Mr. Al Sadik's interests and that there was no intention to conceal from Mr. Al Sadik the fact that his portfolio had been leveraged or the level of leverage or the manner in which it had been carried out.

137    The judge's conclusion that, in the circumstances of the present case, the fiduciary relationship arising out of the SPA did not give rise to a reporting obligation which was additional to and independent of the contractual duty, was challenged by Mr. Al Sadik in the memorandum of grounds of appeal. Ground 21 is in these terms:

"The learned Judge erred when he held that that the existence of a fiduciary duty did not give rise to a reporting obligation which is additional to and independent of the contractual duty to report under Clause F.4 of the SPA."

That ground was abandoned by Mr. Al Sadik in his appellant's skeleton argument and there was no attempt to pursue it at the oral hearing of the appeal. In those circumstances it might be thought that the issue whether the fiduciary relationship arising out of the SPA gave rise to a reporting obligation which was additional to and independent of the contractual duty is no longer for determination by this court.

138    Nevertheless, Mr. Al Sadik does challenge the judge's failure to hold that Investcorp was in breach of duty in failing to disclose to him, before March 4th, 2008, that it was intending to leverage his assets at the portfolio level and invest the proceeds directly in DSF and the SMFs; rather than to invest those assets in LDSF and SMFCo (which, as the judge observed at para. 5.1 of his judgment, is what Mr. Al Sadik probably expected to occur). Grounds 20 and 23 in the memorandum of grounds of appeal are in these terms:

"*Ground 20*: The learned Judge erred when he omitted to decide the issues in connection with the Appellant's case that the Respondents were in breach of a duty to disclose arising from their fiduciary duty of loyalty to the Appellant."

"*Ground 23*: The learned Judge erred in law when he omitted to consider and make findings on the issue whether or not the Respondents' alleged breach of the duty to disclose (consequent upon its fiduciary duty of loyalty), arising before the SPA was entered into or in any event before 4th March 2008, was deceitful."

It is convenient to refer to the issues raised by those grounds as "the pre-investment non-disclosure issues."

139    Investcorp's response in relation to the pre-investment non-disclosure issues is (i) that the non-disclosure claim which Mr. Al Sadik is now seeking to advance is a new claim which was not part of his pleaded case and was not advanced at trial; (ii) that, properly understood, the new claim is (in part) an impermissible attempt to resurrect his abandoned fraudulent misrepresentation claims; and (iii) that, in any event, the new claim cannot be sustained given the judge's finding that Investcorp acted honestly when it did not disclose its intention to apply first-layer leverage (a finding which, it is said, an appellate court should not overturn without compelling reasons). In those circumstances, it is said, this court should hold that it is not open to Mr. Al Sadik to advance the new non-disclosure claim on this appeal.

140    The judge explained (at para. 5.1 of his judgment) that Mr. Al Sadik's case was that Investcorp had no authority to borrow money on the security of his assets; that by doing so Investcorp not only acted in breach of contract but did so deliberately for its own improper purposes and that it then dishonestly concealed what had been done. In those circumstances the judge took the view that there were two elements to the factual case on deceitful non-disclosure: (i) whether (as alleged) Investcorp acted in breach of its fiduciary duty in March 2008 by failing to tell Mr. Al Sadik that it had decided to leverage his assets; and (ii) whether, having entered into the White Ibis III credit facility with RBS on March 10th, 2008, there was a further ongoing breach of duty in that Investcorp deliberately failed to comply with its reporting obligation under cl. F.4 of the SPA in order to conceal both the existence of the credit facility and the subsequent application of leverage from time to time during the period from May 1st, 2008 onwards.

141    As I have said, in relation to the second of those elements, the judge held that Investcorp had failed to comply with its reporting obligations under cl. F.4 of the SPA. Nevertheless, he held that Investcorp had sought, *bona fide*, to comply with those obligations in a manner which it honestly believed would best serve Mr. Al Sadik's interests and that there was no intention to conceal from Mr. Al Sadik the fact that his portfolio had been leveraged or the level of leverage or the manner in which it had been carried out. He made no award of damages in respect of what he regarded as an "innocent" breach of cl. F.4 of the SPA. Mr. Al Sadik challenges

both the judge's conclusion that, in failing to comply with its reporting obligations, Investcorp had acted honestly and the judge's failure to award damages for what he had held to be an innocent breach of cl. F.4. Ground 22 (read with the clarification in the appellant's skeleton argument) and Ground 24 in the memorandum of grounds of appeal are in these terms:

> "*Ground 22*: The learned judge was wrong in law to hold that insofar as he held the Respondents' breach of Clause F.4 occurred innocently he should not award damages for that breach."

> "*Ground 24*: The learned Judge misdirected himself when he found that the breach of Clause F.4 was not deceitful."

Ground 22 in the memorandum of grounds of appeal supplements ground 17:

> "*Ground 17*: When the learned Judge found that Clause F.4 of the SPA had been breached he ought to have proceeded to consider and decide whether or not the breach had caused the Appellant loss and damage."

It is convenient to refer to the issues raised by those grounds as "the post-investment non-disclosure issues."

142    Investcorp's response in relation to the post-investment non-disclosure issues is (i) that Mr. Al Sadik's challenge to the judge's finding that Investcorp's breach of cl. F.4 of the SPA was not deceitful is founded on assertions of inference with no evidential basis and should be rejected on the ground that an appellate court should not overturn a finding that a witness was honest without compelling reasons; and (ii) that the judge was correct not to have considered loss and damage on the basis of an innocent breach of cl. F.4: no such claim was either pleaded or advanced at trial.

143    It follows that the questions for determination by this court in relation to the third issue fall under four main heads:

(1) Whether it is open to Mr. Al Sadik to pursue, on appeal, a claim in respect of pre-investment non-disclosure.

(2) If so, whether the judge ought to have held that Investcorp's failure to disclose, before March 4th, 2008, that it was intending to leverage his assets at the portfolio level, was deceitful.

(3) Whether the judge was wrong to hold that Investcorp's post-investment breaches of cl. F.4 of the SPA were not deceitful.

(4) Whether, given the judge's finding that Investcorp's post-investment breaches of cl. F.4 were innocent and not deceitful, he should, nevertheless, have made findings on the loss and damage caused to Mr. Al Sadik by reason of that breach.

*Is it open to Mr. Al Sadik to pursue a claim in respect of pre-investment non-disclosure on this appeal?*

144   It is said, in the appellant's skeleton argument, that Mr. Al Sadik's claim in deceit rested on two foundations: (i) active representation, in that Investcorp made a representation in the form of a statement to Mr. Al Sadik, reckless as to its truth or falsity, on which he relied when he authorized Investcorp Bank to transfer US$135m. to Shallot on March 4th, 2008 for investment on the terms of the SPA; and (ii) implied representation, in that the law recognizes that non-disclosure where there is a duty to disclose is tantamount to an implied representation that there is nothing relevant to disclose.

145   In advancing his challenge under Ground 20 in the memorandum of grounds of appeal it is said on behalf of Mr. Al Sadik that, having noted (at para. 5.1 of his judgment) that he alleged that "Investcorp acted in breach of its fiduciary duty in March 2008 by failing to tell [him] that it had decided to leverage his assets at the portfolio level and invest the proceeds directly in DSF and the single-manager funds, rather than invest in LDSF and SMFCo which is probably what he expected," the judge was wrong to decide that issue summarily, on the basis that "the use of Blossom as a vehicle through which to leverage the assets is alleged to have been a device by which to conceal the existence of borrowing" and that "the evidence does not establish that Investcorp deceitfully concealed the borrowing arrangements from Mr. Al Sadik or that Blossom was incorporated as a mechanism for achieving that purpose." It is said that the judge ought to have addressed the issues to which Mr. Al Sadik's allegation of breach of fiduciary duty gave rise.

146   In developing that submission it is said that, properly understood, Mr. Al Sadik's claim in respect of pre-investment non-disclosure was that Investcorp had represented to him that it was intending to make investments authorized by the terms of the SPA when it knew full well that that was not what it was intending to do; that is to say, it knew that it was going to invest in Blossom. The effect of the judge's approach was that he did not address or decide the main issues arising from the claim of pre-investment non-disclosure and he was wrong not to do so. It is said that the material before this court—in particular, the judgment and Investcorp's amended defence—is sufficient to identify the issues which the judge ought to have decided. The elements of Mr. Al Sadik's claim in respect of pre-investment non-disclosure are said to be these:

(1) Mr. Al Sadik claimed, and Investcorp admitted, that he sent the investment amount (AED500m.) to Investcorp Bank on February 27th, 2008 and that it was received and accepted on trust for him "for the purpose of investing it on the terms of an agreement in writing to be negotiated."

(2) Mr. Al Sadik pleaded that Investcorp Bank "undertook" that the AED500m. which he had transferred to it would be invested in Shallot on the terms of the SPA, and that Investcorp (i) deliberately did not disclose (and deceived him as to) its intention to invest in Blossom before the signature of the SPA; (ii) intended (secretly) to invest in Blossom "contrary to the representations they had made and to make an investment [in Blossom] which was not an authorised investment," which it then did; and (iii) never "intended to do what it represented to Mr. Al Sadik would be done" and "deceived Mr. Al Sadik to obtain his money to do something different."

(3) The core of the claim for "Deceitful Non-Disclosure" is at paras. C16–C20 of the re-re-amended statement of claim. Those paragraphs contain the following claims:

   (i) that Investcorp was under a duty to disclose to Mr. Al Sadik and not to conceal from him its intention to divert US$135m. to Blossom (which was not an authorized investment on the terms of the SPA);

  (ii) that the disclosure of Investcorp's intention should have been made before the SPA was signed and that Investcorp breached its duty to disclose "knowingly or recklessly (and deceitfully)";

 (iii) that the failure to disclose the intention to invest in Blossom was a breach of duty because Investcorp did not make the disclosure before entry into the SPA.

(4) Mr. Al Sadik's claim contained a specific allegation that Investcorp was under a pre-investment fiduciary duty to disclose, which (it is said) is an aspect of a separate allegation that Investcorp represented that it would abide by the SPA (but deceitfully did not do so).

(5) Accordingly Mr. Al Sadik claimed that, by reason of Investcorp's deceitful non-disclosure, he authorized Investcorp Bank to transfer his AED500m. to Shallot as an investment on the terms of the SPA and thereby suffered loss in the value of the investment amount.

147  In further development of his submission that the judge ought to have addressed the issues to which Mr. Al Sadik's allegation of breach of fiduciary duty gave rise, it is said that the findings of fact which the judge made (at paras. 5.19 and 6.2 of the judgment)—that the date on which "the first investments were made" and "implemented" was March 4th, 2008—are relevant to that pleaded case in relation to the breach of the pre-investment fiduciary duties to disclose because (i) it was on that date (March 4th, 2008) that Investcorp transferred the investment amount to Shallot and caused it to invest in Blossom; (ii) it was on that date that the SPA was carried into effect (that is to say, it was on that date that the

investment in Shallot was made); and (iii) until that date, Investcorp held the investment amount on trust for Mr. Al Sadik to invest according to the terms of the SPA. In those circumstances it is submitted that the judge ought to have addressed the issues (i) whether or not Investcorp was under a duty, on or before March 4th, 2008, to disclose to Mr. Al Sadik its intention not to make an investment authorized by cl. A of the SPA and/or to divert the value representing the investment amount to Blossom; and (ii) if so, whether or not Investcorp was in breach of that duty.

148     It is submitted on behalf of Investcorp that the pre-investment non-disclosure claim which Mr. Al Sadik seeks to advance is not open to him on this appeal. It is said that, in seeking to advance that claim on appeal, Mr. Al Sadik has ignored the basis on which the 3rd claim was pleaded and advanced at trial. In essence, it is said, the 3rd claim (as pleaded and advanced at trial) was that Investcorp dishonestly acted in breach of various "duties to disclose" which arose on Investcorp's receipt of Mr. Al Sadik's moneys and the entry into the SPA on March 1st, 2008. The premise on which Mr. Al Sadik appeals (namely that this aspect of his appeal is in respect of his 3rd claim) is wrong. Properly analysed, these "pre-investment non-disclosure" elements of Mr. Al Sadik's appeal are an impermissible attempt, first, to resurrect the 8th claim (for fraudulent misrepresentation) abandoned at trial at the conclusion of the evidence—and possibly also the 2nd claim, which was in related terms—and, secondly, to advance a new, unpleaded, claim based on new allegations of fraudulent misrepresentation. The first of those allegations—described by Mr. Al Sadik as the "active representation" basis of his appeal—is that Investcorp represented that Mr. Al Sadik's investment would be authorized under the SPA. The second—described as the "implied representation" basis of the appeal—is that there was an implied representation by Investcorp (in circumstances where, it is said, Investcorp was under a fiduciary duty to disclose its intention to use the Blossom structure) that there was nothing relevant to disclose.

149     In developing those submissions, it is said that—

(1) the pleaded allegations in support of the 3rd claim were (in summary):

(i) that Investcorp was under a duty to disclose: (a) the intention to use first-layer leverage through an SPV incorporated for that purpose; (b) the full extent of first-layer leverage from time to time; and (c) the intention to divert—and the diversion of—his investment amount into Blossom: para. C16 of the re-re-amended statement of claim;

(ii) that the duty to disclose arose: (i) from cl. F.4 of the SPA and Investcorp's duties to disclose as a trustee and (ii) upon receipt of Mr. Al Sadik's investment amount on February

91

27th, 2008 (and/or on March 1st, 2008) "when the SPA was entered into": paras. C17 and C19 of the re-re-amended statement of claim);

(iii) that Investcorp breached each of the duties "knowingly or recklessly (and deceitfully)": para. C18 of the re-re-amended statement of claim and that the particulars of breach alleged are all particulars of an alleged intention to deceive Mr. Al Sadik: para. C20 of the re-re-amended statement of claim;

(iv) that the investment in Blossom was made in secret to facilitate unauthorized leverage: para. C20.2 of the re-re-amended statement of claim;

(v) that Investcorp was suffering a liquidity crisis and that its motive for acting as it did was that Investcorp wanted to raise funds as quickly as possible in order to invest in its hedge funds: paras. A22.4(b)(iv) and (v), A23 and A26A of the re-re-amended statement of claim;

(vi) that the loss and damage alleged to flow from the deceitful non-disclosure is the investment amount and the lost opportunity to invest it elsewhere (that is to say, the tortious measure of damage): para. C29 of the re-re-amended statement of claim.

(2) The new and unpleaded version of the 3rd claim was not advanced at trial and rests on two bases, "active representation" and "implied representation":

*Active representation*

(i) Investcorp made "active representations" to Mr. Al Sadik that: (a) the only leveraged investments made would be in "Investcorp Hedge Funds" which were authorized by cl. A of the SPA; and (b) that Investcorp would abide by the terms of the SPA ("the representations");

(ii) Mr. Al Sadik acted on the representations on March 4th, 2008, when Investcorp invested in Blossom—by that date Investcorp had decided to invest in Blossom which was an unauthorized investment—accordingly, by that date, Investcorp knew that the representations were untrue;

(iii) in those circumstances, the failure to correct the representations on or before March 4th, 2008 was deceitful.

*Implied representation*

(iv) Investcorp made an implied representation that there was nothing relevant to disclose in circumstances where it had a

92

fiduciary duty to disclose its intention to invest in Blossom, but did not do so.

(3) In seeking to advance the 3rd claim on the basis of pre-investment representations (whether "active" or "implied"), Mr. Al Sadik is attempting to revive (in another form) a case in fraudulent misrepresentation (or deceit) which was abandoned at trial. Indeed, the active representation formulation of Mr. Al Sadik's new claim is advanced in terms which are virtually identical to those in which the abandoned 8th claim (described on its face as being a claim for "Fraudulent Misrepresentation") at para. C26B (and summarized at para. A16B of the re-re-amended statement of claim) had been advanced.

(4) The essence of the 8th claim was that Investcorp deliberately led Mr. Al Sadik to believe that the investment amount would be invested in Investcorp hedge funds or other authorized investments, when at all times prior to the SPA being signed Investcorp knew this was untrue. Further, the 2nd claim ("the risk representation claim")—which was the "inverse" of the 8th claim (in that Mr. Al Sadik alleged, at paras. C11–C15 of the re-re-amended statement of claim, that Investcorp deliberately led him to believe that the only investment technique that would be used was a direct (that is to say, unleveraged) investment in hedge funds and that no other technique would be employed)—was abandoned at the same stage of the trial. Mr. Al Sadik expressly abandoned these two claims prior to closing submissions; neither party made submissions on them and the judge was told by Mr. Al Sadik that they were not being pursued. It is now too late for him to reintroduce those claims in another guise.

(5) Even if he had not already abandoned the "active representation" element of his new claim—which, of itself, is sufficient to preclude him from reintroducing it—Mr. Al Sadik should not be allowed to advance his new pre-investment non-disclosure claim because neither formulation of that new claim had been pleaded or advanced at trial. In particular:

  (i) the 3rd claim is not a fraudulent misrepresentation claim; it is neither pleaded nor framed in those terms;

  (ii) none of Investcorp's PRM or hedge funds witnesses was cross-examined on the basis that they had deliberately misled Mr. Al Sadik as to their intention to apply first-layer leverage before he agreed to invest his funds; indeed, an inconsistent case—(a) that the investment proposal did not make any representation as to the structure of the investment; and (b) that they had not told Mr. Al Sadik about the possibility of using first-layer leverage before he signed the SPA because they were unaware that this was the hedge funds team's

intention—was put to the PRM witnesses involved in presenting the investment proposal to Mr. Al Sadik and negotiating the SPA;

(iii) the pre-investment non-disclosure case which Mr. Al Sadik seeks to advance on this appeal was not developed at trial in his written or oral closing submissions in relation to the 3rd claim; in particular, neither (a) the active and implied representation analysis, nor (b) the suggestion that March 4th, 2008 was the critical date on which Mr. Al Sadik relied upon the Bank's representations; nor (c) the claim that Mr. Gurnani and Mr. Gharghour were "reckless" as to whether there was authority to invest through Blossom—a core allegation on which Mr. Al Sadik seeks to advance his "new" fraudulent misrepresentation claim—were relied upon in those written or oral submissions.

In those circumstances, it is said, the judge cannot be criticized for failing to identify—and so failing to address—any pre-investment non-disclosure claim in the terms set out (at paras. 152 and following) in the appellant's skeleton argument: Mr. Al Sadik's criticism of the judge's failure to consider not only a claim that was expressly abandoned but also an unpleaded claim first formulated only in the memorandum of grounds of appeal is ill-founded.

150   In my view there is force in the submission that it is not open to Mr. Al Sadik to advance on this appeal a claim based on the allegation that Investcorp made a deceitful pre-investment "active representation" that his investment would be authorized under the SPA.

151   As Mr. Al Sadik asserts in the appellant's skeleton argument, the "core" of the 3rd claim—the claim for "Deceitful Non-Disclosure"—is at paras. C16–C20 of the re-re-amended statement of claim. Those paragraphs are in these terms (so far as material in the present context):

"16. Investcorp Bank was under a duty to disclose to Mr. Al Sadik and not to conceal from him—(i) the intention of Investcorp Bank, Shallot, Blossom and Investcorp Nominee 1 or each of them to arrange First Layer Leverage and/or (ii) the fact of the arrangement of the First Layer Leverage and/or (iii) the full extent of First Layer Leverage from time-to-time, and/or (iv) the intention to divert and the diversion of the value representing the Investment Amount to Blossom (which was not an authorised investment on the terms of the SPA and which served as a screen to conceal the true state of affairs from Mr. Al Sadik) ('the Duties to Disclose'). An honest person would have discharged the Duties to Disclose.

94

17. The Duties to Disclose were each continuing duties which arose immediately upon the receipt by Investcorp Bank of the investment amount on 27th February, 2008 and in any event on 1st March, 2008 when the SPA was entered into. Investcorp Bank was in breach of each of the Duties to Disclose from the moment when the duties arose until on or about 2nd March, 2009 when Mr. Al Sadik received the Decomposition Statement in which the disclosure was for the first time made.

18. Investcorp Bank breached each of the Duties knowingly or recklessly (and deceitfully) and so breached its contractual and/or fiduciary duty owned to Mr. Al Sadik to disclose those facts to Mr. Al Sadik and/or not to conceal them from him. Each of the breaches of duty caused loss and harm to Mr. Al Sadik.

19. The duties to disclose arose from 2 independent sources—

19.1 Duty in contract . . .

19.2 Duty as a trustee: Upon the receipt by Investcorp Bank of the Investment Amount on 28th February, 2008 to hold and invest the same on the terms of the SPA, and from and upon the parties' entry into the SPA on or about 1st March, 2008 Investcorp Bank was constituted Mr. Al Sadik's trustee on the terms more particularly described in Part A at paragraphs 14 to 16 and Part B at paragraphs 51 to 57. As Mr. Al Sadik's trustee Investcorp Bank was under each of the Duties to Disclose.

Particulars of Breach

20. The intention to deceive is shown by Investcorp Bank's conduct (done by its servants or agents) who actively sought to conceal the true facts from Mr. Al Sadik:

20.1 the intention to use First Layer Leverage was not disclosed to Mr. Al Sadik on or before his entry into the SPA;

20.2 as pleaded in Part A in paragraph 21 the investment in Blossom was done in secret in order to facilitate unauthorised leveraging so as to exclude the effect of leveraging from the net asset value of the shares of Shallot . . ."

152   Investcorp is correct to point out that, as pleaded, Mr. Al Sadik's 3rd claim was not advanced on the basis of active (or explicit) misrepresentation: there is no allegation of explicit misrepresentation—in particular, no allegation of explicit pre-investment representation—in the paragraphs that I have just set out. The 3rd claim is for "Deceitful Non-Disclosure" not for "Fraudulent Misrepresentation." And that is how the judge understood the position when he said at para. 5.1 of his judgment that there

were two aspects to Mr. Al Sadik's factual case on deceitful non-disclosure (at para. 5.1):

"Firstly, it is alleged that Investcorp acted in breach of its fiduciary duty in March 2008 by failing to tell Mr. Al Sadik that it had decided to leverage his assets at the portfolio level and invest the proceeds directly in DSF and the single manager funds, rather than invest in LDSF and SMFCo which is what he probably expected . . ."

153    Investcorp is also correct to point out that Mr. Al Sadik's claim in respect of fraudulent misrepresentation was advanced as the 8th claim—the claim for "Fraudulent Misrepresentation (Investment Representation)"—which is pleaded at para. 26B of the re-re-amended statement of claim:

"(1) Investcorp Bank made the investment representation [that the entire value of the Investment Amount would be invested in Investcorp Hedge Funds or in other Authorized Investments] between about November 2007 and about 1st March, 2008 when the SPA was signed . . .

(2) The Investment Representation was made for and on behalf of Investcorp Bank by Mr. Al Khatib and Mr. Kironde. The Investment Representation became a misrepresentation when the bank decided that it was not going to invest the investment amount in Investcorp Hedge Funds or other authorised investments, but instead in Blossom. Investcorp Bank and/or Mr. Al Khatib and Mr. Kironde knowingly or recklessly allowed Mr. Al Sadik to rely on the truth of the Investment Representation whereas they had no honest belief that it was true.

(3) Mr. Al Sadik was induced to enter into the SPA by the Investment Representation and when Mr. Al Khatib signed the SPA for and on behalf of Investcorp Bank he knew (i) that Mr. Al Sadik believed the Investment Representation was true and (ii) knowingly concealed the falsity of the Investment Representation in order to induce Mr. Al Sadik to enter into the SPA.

(4) For the reasons given in Part A at paragraph 16B Mr. Al Sadik was materially deceived by the [Investment] Representation.

Particulars

(5) Investcorp Bank's knowledge that the Investment Representation was false (or that it was reckless as to its truth or falsity) is shown by the fact that it did not make the investments it had proposed to Mr. Al Sadik and instead made the investment in Blossom which was not an Authorised Investment as particularised in Part A at paragraph 36.

(6) The speed with which the investment was made in Blossom (that is to say, on the same day the SPA was signed) shows that before and on signature of the SPA Investcorp Bank intended the entire value representing the Investment Amount to be invested in Blossom only. The circumstances in which the investment was made are particularised in Part B at paragraph 105.3A. Investcorp Bank's motives for making the misrepresentation are pleaded in Part A at paragraph 13C."

As I have said—and as the judge recorded at para. 1.14 of his judgment—the 8th claim was expressly abandoned on the 26th day of the trial (after the conclusion of the evidence). In my view Investcorp's submission that, in seeking to advance on appeal the 3rd claim on the basis of pre-investment active (or explicit) representations, Mr. Al Sadik is attempting to revive (in another form) a case in fraudulent misrepresentation (or deceit) which was abandoned at trial is correct. It is not open to him to do so and that attempt should be rejected.

154   I take the view, also, that it is not open to Mr. Al Sadik to advance on this appeal a claim based on the proposition that there was an implied representation by Investcorp that there was nothing relevant to disclose in circumstances where, it is said, Investcorp was under a fiduciary duty to disclose its intention to use the Blossom structure.

155   At para. C17 of the re-re-amended statement of claim it is pleaded that the duties to disclose upon which Mr. Al Sadik relied "... were each continuing duties which arose immediately upon the receipt by Investcorp Bank of the Investment Amount on 27th February, 2008 and in any event on 1st March, 2008 when the SPA was entered into." It is not in dispute that, in the period between the receipt of the investment amount and the execution of the SPA, Investcorp Bank held the investment amount upon trust "for Mr. Al Sadik for the purpose of investing it on the terms of an agreement in writing to be negotiated." For convenience, I shall refer to that trust as "the pre-SPA trust." Given the terms of the pre-SPA trust, it necessarily came to an end when Investcorp Bank and Mr. Al Sadik (with other parties) entered into the SPA on March 1st, 2008. From that date until March 4th, 2008 (when Investcorp Bank converted the investment amount into US dollars and credited the proceeds to the account of Shallot), the investment amount was held by Investcorp Bank upon the trusts of the SPA ("the post-SPA trust"). In the circumstances that there is no appeal before this court from the judge's finding that the fiduciary relationship arising out of the SPA did not impose upon Investcorp any disclosure obligation which was additional to or independent of the contractual obligation imposed by cl. F.4 of the SPA, it is necessary to consider the position under the pre-SPA trust and the position under the post-SPA trust as separate questions.

156   In advancing the submission that the fiduciary relationship between Investcorp Bank and Mr. Al Sadik under the pre-SPA trust gave rise to a fiduciary duty to disclose, Mr. Al Sadik relies on the judgment of Arden, L.J. (with which, on the relevant issue, the other members of the Court of Appeal, Mummery, L.J. and Holman, J. agreed) in *Item Software (UK) Ltd.* v. *Fassihi* (12).

157   The issue before the Court of Appeal in *Item Software* (so far as material in the present context) was whether the trial judge had been right to hold that the appellant, Mr. Fassihi, was in breach of his duties as a director of the respondent company, Item Software Ltd. ("Item"), in failing to disclose to Item his own misconduct at the time that that misconduct occurred ("the disclosure issue"). The facts which gave rise to the disclosure issue may be summarized as follows. At the relevant time a major part of Item's business was the distribution of software products for Isograph Ltd. ("Isograph"). In November 1998, Item decided to attempt to negotiate more favourable terms with Isograph. At the same time, Mr. Fassihi secretly approached Isograph with his own proposals, which involved establishing his own company, RAMS International Ltd. ("RAMS"), to take over the contract between Item and Isograph. In the events which happened, the negotiations between Item and Isograph failed because Mr. Dehghani, the managing director of Item, insisted—with the encouragement of Mr. Fassihi—on terms that Isograph was not prepared to accept. Isograph terminated its contract with Item by giving 12 months' notice expiring on May 11th, 2000. Item then discovered what Mr. Fassihi had done, and he was summarily dismissed for misconduct on June 26th, 2000. Item brought proceedings against Mr. Fassihi alleging (so far as material) that he was in breach of duty as a director and employee in seeking to divert the contract to RAMS ("the diversion issue") and for having pressed Mr. Dehghani to take a hard line in the negotiations with Isograph so as to improve the prospects of obtaining the business for himself ("the sabotage issue"). Those claims failed before the trial judge, who was not satisfied that Mr. Fassihi's conduct in seeking to divert the contract to RAMS or in pressing Mr. Dehghani to take a hard line in negotiations with Isograph was the cause of Item losing its contract but Item succeeded on the disclosure issue. In holding that Mr. Fassihi was in breach of duty in failing to disclose to Item his own wrongdoing, the trial judge was satisfied that loss had resulted from that non-disclosure. He held that it was highly probable that, had Mr. Fassihi disclosed what he had done, this would indeed have changed Mr. Dehghani's attitude to the negotiations with Isograph radically and would have led him to accept Isograph's proposal "instead of indulging in the further brinkmanship which caused Isograph to lose patience and serve notice of termination."

158   In dismissing the appeal against the decision of the trial judge on the disclosure issue, Arden, L.J. said this ([2004] BCC 994, at para. 41):

98

"For my part, I do not consider that it is correct to infer from the cases to which I have referred that a fiduciary owes a separate and independent duty to disclose his own misconduct to his principal or more generally information of relevance and concern to it. So to hold would lead to a proliferation of duties and arguments about their breadth. I prefer to base my conclusion in this case on the fundamental duty to which a director is subject, that is the duty to act in what he in good faith considers to be the best interests of his company. This duty of loyalty is the 'time-honoured' rule: per Goulding J in *Mutual Life Insurance Co of New York v The Rank Organisation Ltd* [1985] BCLC 11 at p.21 . . ."

And she went on to say this (*ibid.*, at para. 44):

". . . [O]n the facts of this case, there is no basis on which Mr. Fassihi could reasonably have come to the conclusion that it was not in the interests of Item to know of his breach of duty. In my judgment, he could not fulfil his duty of loyalty in this case except by telling Item about his setting up of RAMS, and his plan to acquire the Isograph contract for himself."

159   It is accepted on behalf of Mr. Al Sadik that the Court of Appeal in the *Item Software* case (12) held that a fiduciary does not owe a separate and independent duty to disclose to his principal his own misconduct or, more generally, to disclose information of relevance to the principal. The *ratio* of the decision on the disclosure issue, it is said, is that a duty to disclose is a facet of the duty of loyalty and arises if there is an expectation of disclosure: a fiduciary is under a duty to disclose to his principal information which it is in the economic interests of the principal to know unless he can prove he had a reasonable belief that the principal's economic interests would not be affected if he did not disclose: the fiduciary may escape liability if he can show that in the circumstances there was no expectation of disclosure.

160   Investcorp's response is that, properly understood, the *Item Software* case does not support the proposition for which Mr. Al Sadik contends. Arden, L.J. explained that a fiduciary does not owe a separate and independent duty to disclose his misconduct. *Item Software* is authority for the proposition that a company director may be obliged to report his own wrongdoing. A director is, of course, a fiduciary but the case was decided on the basis of the duty owed by a director as director. Reliance is placed, also, on the observations of Etherton, J. in *Shepherd Invs. Ltd.* v. *Walters* (18) ([2006] EWHC 836 (Ch), at paras. 85–86). When referring to the judgment of Arden, L.J. in the *Item Software* case, Etherton, J. said this (*ibid.*, at para. 86):

"The Court of Appeal held, on the facts of the case, that there was no basis on which the defendant could reasonably have come to the

conclusion that it was not in the interests of the claimant company to know of his breach of duty: he could not fulfil his duty of loyalty on the facts of that case except by telling the claimant of his setting up of his own company, and his plan to acquire the contract for himself."

He explained (*ibid.*, at para. 132) that—

"In the case of the acts of his fellow directors in promoting a rival business, the breach of fiduciary duty of the director is failing to disclose matters which are of relevance and concern to the company and which, if acting in good faith in the best interests of the company, the director would disclose. Those are straightforward applications of ordinary principles of equity concerning fiduciary duties."

161    In my view, the true position, in the light of the observations of the Court of Appeal in *Item Software* (12) and those of Etherton, J. in *Shepherd Invs.*, is that there is no separate and independent duty upon a fiduciary to disclose his own misconduct or, more generally, to disclose information of relevance to the principal. But a fiduciary duty to disclose may arise—as an element or facet of the fiduciary's duty of loyalty in the particular circumstances—in respect of matters (including his own misconduct) which a person in his position, acting in good faith, would appreciate should be disclosed (in that, without such disclosure, he would be unable to fulfil his duty of loyalty).

162    In order, therefore, to answer the question whether the judge ought to have held that Investcorp Bank owed to Mr. Al Sadik a fiduciary duty, before they each entered into the SPA on March 1st, 2008, to disclose its intention to leverage his investment at the portfolio level, it is necessary to ask, first, whether Investcorp had indeed formed such an intention at the relevant time and (if so), secondly, whether the judge should have found on the facts that were before him at trial that Investcorp Bank, acting in good faith, should have appreciated that it could not fulfil its duties of loyalty under the pre-SPA trust without disclosing that intention to Mr. Al Sadik.

163    Adopting that approach, the answer to the question whether the judge ought to have held that Investcorp Bank owed to Mr. Al Sadik a fiduciary duty, before they each entered into the SPA on March 1st, 2008, to disclose its intention to leverage his investment at the portfolio level must be "No." That is because, by the conclusion of the trial, it was common ground between the parties (and the subject of a finding of fact by the judge) that Investcorp had not formed that intention before March 1st, 2008. The position is stated at para. 92.8 of the written closing submissions on behalf of Mr. Al Sadik, dated February 28th, 2008:

> "92. Based on the evidence at trial, the following facts are understood to be agreed between the parties in relation to the reporting/non-disclosure issues:
>
> . . .
>
> 92.8 It was not until March 1st, 2008 at the earliest that Investcorp formed the intention to arrange leverage through an SPV instead of a direct investment in leveraged Products."

That that was the position is said to be supported by the evidence of Mr. Franklin and it is consistent with the judge's analysis of the evidence at paras. 5.7–5.8 of his judgment. It is, also, the judge's finding of fact at para. 6.2 of his judgment. In my view, it is not open to Mr. Al Sadik to advance on this appeal a case of implied non-disclosure based on the premise that in order to fulfil its duties of loyalty under the pre-SPA trust Investcorp Bank was under a fiduciary duty to disclose an intention to arrange leverage at the portfolio level.

164    Nor is it open to Mr. Al Sadik to advance on this appeal a case of implied non-disclosure based on the premise that, in order to fulfil its duties of loyalty under the post-SPA trust, Investcorp Bank was under a fiduciary duty to disclose the intention (which, on the evidence, it did form shortly after March 1st, 2008) to arrange leverage at the portfolio level. The reason which leads to that conclusion is that, as I have said, the judge held that the fiduciary relationship arising out of the SPA did not impose upon Investcorp any disclosure obligation which was additional to or independent of the contractual obligation imposed by cl. F.4. In reaching that conclusion he pointed out that it was not disputed that Investcorp owed a fiduciary duty to Mr. Al Sadik and that the core obligation of a fiduciary was that of loyalty. He referred to the observations of Millett, L.J. in *Bristol & West Bldg. Socy.* v. *Mothew* (4) ([1998] Ch. at 18):

> "A fiduciary is someone who has undertaken to act for or on behalf of another in a particular matter in circumstances which give rise to a relationship of trust and confidence. The distinguishing obligation of a fiduciary is the obligation of loyalty. The principal is entitled to the single-minded loyalty of his fiduciary. This core liability has several facets. A fiduciary must act in good faith; he must not make a profit out of his trust; he must not place himself in a position where his duty and his interest may conflict; he may not act for his own benefit or the benefit of a third person without the informed consent of his principal. This is not intended to be an exhaustive list, but it is sufficient to indicate the nature of fiduciary obligations."

But, after reviewing the authorities (at paras. 5.2–5.6 of his judgment), he held that the fiduciary relationship which arose under the post-SPA trust

imposed no obligations to disclose other than those for which the parties had contracted in the SPA itself. Although, as I have said, that conclusion was challenged (at Ground 21 in the memorandum of grounds of appeal), that challenge was withdrawn in the appellant's skeleton argument and it was not pursued at the oral hearing of the appeal. Absent an appeal from the judge's conclusion on this issue, Mr. Al Sadik cannot re-open the point.

*Ought the judge to have held that Investcorp's failure to disclose, before March 4th, 2008, that it was intending to leverage his assets at the portfolio level, was deceitful?*

165   Ground 23 in the memorandum of grounds of appeal is in these terms:

"The learned Judge erred in law when he omitted to consider and make findings on the issue whether or not the Respondents' alleged breach of the duty to disclose (consequent upon its fiduciary duty of loyalty), arising before the SPA was entered into or in any event before 4th March 2008, was deceitful."

In advancing that ground on behalf of Mr. Al Sadik it is said that the judge did not address the issue whether or not Investcorp's failure to make pre-contractual (or pre-investment) disclosure of its intention to leverage Mr. Al Sadik's investment at the portfolio level through Blossom was deceitful, because, having held that no additional duty to disclose (that is to say, no duty to disclose in addition to the contractual duty under cl. F.4 of the SPA) arose by reason of the fiduciary relationship between Investcorp and Mr. Al Sadik, he did not go on to decide whether or not Investcorp's breach of its fiduciary duty to disclose before the SPA was entered into (or in any event on or before March 4th, 2008) was deceitful.

166   Given that I would hold—for the reasons set out in the previous section of this judgment—that it is not open to Mr. Al Sadik to pursue, on this appeal, a claim in respect of pre-investment non-disclosure, I find it unnecessary to address the question whether the judge ought to have held that Investcorp's failure to disclose, before March 4th, 2008, that it was intending to leverage his assets at the portfolio level, was deceitful. If it is not open to Mr. Al Sadik to pursue a claim in respect of pre-investment non-disclosure, that question does not arise on this appeal.

*Was the judge wrong to hold that Investcorp's post-investment breaches of cl. F.4 of the SPA were not deceitful?*

167   Ground 24 of the memorandum of grounds of appeal is in these terms:

"*Ground 24*: The learned Judge misdirected himself when he found that the breach of Clause F.4 was not deceitful."

In advancing that ground it is said on behalf of Mr. Al Sadik that the judge was correct to identify the second factual element of the 3rd claim ("Deceitful Non-Disclosure") as he did (at para. 5.1 of his judgment):

"Secondly, having entered into the credit facility with RBS, it is alleged that there was a further on-going breach of duty in that Investcorp deliberately failed to comply with its reporting obligation under Clause F.4 of the SPA in order to conceal both the existence of the credit facility and the subsequent application of leverage from time to time during the period from 1st May 2008 onwards."

And correct, also, to accept that there had been a breach of the contractual reporting obligation under cl. F.4 of the SPA but that the judge was wrong to conclude (at para. 5.22 of his judgment) that the evidence did not point to the conclusion that anybody on the Investcorp side had deliberately intended to mislead Mr. Al Sadik by concealing the fact that his investment had been leveraged from May 1st, 2008 onwards:

"The evidence does not point to the conclusion that Mr. Kironde (or anybody else) was deliberately attempting to mislead Mr. Al Sadik by concealing the fact that his investment had been leveraged from 1st May onwards. In their minds there was nothing to conceal. The evidence shows that they took it for granted (rightly in my judgment) that they had authority to leverage the investment and that they did not draw any distinction between what has been described as First and Second Layer Leverage."

It is submitted that the judge's conclusion was wrong in that (i) he failed to have regard to the findings he had made—that the IMA was deceitful and that Investcorp was reckless about its powers—which tended to show that Investcorp had a motive to deceive Mr. Al Sadik about the investments that had been made in and by means of Blossom; and (ii) his findings on the issue of deceit (set out in Schedule 2 of the memorandum of grounds of appeal) were wrong.

168   In developing those submissions it is said that, in addressing the facts (and the judge's findings) in relation to Investcorp's failure to comply with its reporting obligations, it is important to have in mind that:

(1) At the time the relevant reports were sent to Mr. Al Sadik, he did not know that Shallot had invested in Blossom, what Blossom was, or that it existed as a fund to do with his investment.

It is said that those matters should have been brought to Mr. Al Sadik's attention at the time the relevant reports were sent to him because the

investments had been made by Blossom, which had incurred liabilities when it borrowed from RBS. The periodical reports sent to Mr. Al Sadik should have stated, but did not state, all the assets or any of the liabilities incurred; they showed only a quantity of investments made in DSF and the SMFs in a value that reflected the equity of Mr. Al Sadik's investment and were represented as investments made by Shallot. The investments shown had in fact been made by Blossom and not by Shallot.

(2) The reports were under the control of Mr. Kironde.

It is said that, on February 26th, 2009, a table headed "Blossom IAM Limited (Since Inception on March 1st, 2008 to 31 January 2009)," prepared by Mr. Kironde, was sent to Mr. Zaidi in response to an information request from him. The judge held that on this occasion (and for the first time) Mr. Al Sadik could see the use of leverage. If Blossom were an investment in a fund then Blossom should have been named in Investcorp's report of "underlying investments"; because that is what Blossom was. The problem for Investcorp was that Blossom was not an authorized investment. Investcorp sought to overcome that problem by not reporting the existence of Blossom (or all of its assets and liabilities). Further, it is said, Investcorp's case that Blossom was not actually an investment and, secondly, that Investcorp's reporting systems were disorganized does not stand up to analysis and the judge was wrong to hold that it did.

(3) The picture presented by the reports was misleading.

It is said that the picture presented by the reports was also seriously deficient in that it had the effect that Mr. Al Sadik did not have information he had a right to know pursuant to cl. F.4 and which he needed to know. He needed to know because that information would inform him whether or not to exercise his right to redeem (a right conferred by cl. H of the SPA).

(4) Mr. Kironde was a well-educated and intelligent man who went to Harvard and he was an experienced banker.

It is said to be beyond doubt that Mr. Kironde knew precisely what the SPA obliged Investcorp to report to Mr. Al Sadik and why Mr. Al Sadik needed to know it, in that Mr. Kironde was very well informed about the background to and contents of the SPA. He had been at the meeting on January 28th, 2008 when the investment proposal was given to Mr. Al Sadik; he negotiated the terms of the SPA in person with Mr. Al Sadik; he was Mr. Zaidi's point of contact and source of information about the investment and he knew about Blossom and that it was a leveraged vehicle with a variety of reference assets in which it was making leveraged investments. Even if others at Investcorp were incompetent, Mr. Kironde was not. It is not credible that Mr. Kironde did not know that Mr. Al Sadik

had a right to know about Blossom's assets and liabilities or why he needed to know that information.

(5) Mr. Kironde could have provided Mr. Al Sadik with the missing information.

It is said also to be beyond doubt that, if Mr. Kironde did not have that information to hand he could have obtained it. He chose not to provide it. He made that choice despite knowing that Mr. Al Sadik had a right and need to know what it would have disclosed. Indeed it is not in dispute that Mr. Kironde deliberately removed information that would have shown leverage so that Mr. Al Sadik would not see it.

(6) The judge held that Investcorp's letter of March 10th, 2009 was a deceitful response to Mr. Al Sadik's request for the IMA.

It is said that Mr. Kironde wrote and signed that letter and that it is established he knew when the IMA was drafted and signed because he had received the "Please delete this email" instruction sent by Mr. Tanner on March 1st, 2009 to disguise the date the IMA had been entered into. Therefore Mr. Kironde was fully informed about the import and intended effect of the IMA. An honest person knowing what Mr. Kironde knew would have refused to send the letter of March 10th, 2009. In sending that letter, Mr. Kironde was dishonest. This follows "axiomatically" from the judge's findings on the IMA.

(7) Mr. Kironde's conduct in relation to the IMA needs to be put in context.

It is said that Mr. Kironde's conduct in relation to the IMA entailed a fraud whereby a false and dishonest statement was made to Mr. Al Sadik. The fiduciary (Investcorp) deceived its beneficiary. Mr. Kironde was a central participant in that. The judge should have condemned such conduct in the strongest terms. The IMA and missing information both relate to the fact that an investment had been made in Blossom. The IMA was produced to justify the hitherto unexplained or reported investments of Blossom. The circumstances of non-disclosure (the missing information) and false disclosure are so closely connected as to be inseparable and the judge was wrong not to assess Mr. Kironde's conduct in relation to reporting with his dishonesty in relation to the IMA.

169   Amongst the findings of fact made by the judge which are challenged on behalf of Mr. Al Sadik are those set out in Schedule 2 to the memorandum of grounds of appeal:

(1) *The first finding*: It is said that his finding (at para. 5.12 of his judgment) that Mr. Kironde "had no reason to mislead his client about the use of leverage" was wrong because Mr. Kironde was subject to the same motives as Investcorp to mislead Mr. Al Sadik about the use of leverage.

Behind the motive to mislead Mr. Al Sadik lay Investcorp's desire to earn fees and propagate its hedge funds line of business. Withholding information about what had actually been done lowered the risk that Mr. Al Sadik would redeem and deprive Investcorp of fees and funds for its business was a motive. In addition, because Investcorp had not made immediate disclosure it had put itself in an embarrassing position, because if eventually it did disclose it would have to explain why it had not disclosed before: thus the initial failure to disclose generated a motive not to disclose later. Investcorp's eventual response to its embarrassment was to deceive Mr. Al Sadik with the false IMA.

(2) *The second finding*: It is said that his finding (at para. 5.12 of his judgment) that Mr. Kironde was not intending to mislead his client (Mr. Al Sadik) about Blossom was wrong because, in answer to a direct question put by Mr. Zaidi to Mr. Kironde about the significance of the name "Blossom" which had appeared without explanation in a pie chart sent by Investcorp, he replied with an answer that was neither full nor complete (as the judge found) when he claimed that it was an internal matter and nothing more than to differentiate between the USD and AED. Mr. Kironde knew what Blossom was and could have given an explanation about it but he chose not do to so (then or subsequently); therefore he knew that the answer he gave was misleading and in the premises he was being deceitful, that is to say an honest person would have given a full and complete answer to the question put.

(3) *The third finding*: It is said that his finding (at para. 5.14 of his judgment) that Mr. Kironde's decision to remove information from the reports sent to Mr. Zaidi which would have shown the amount of leverage was not "motivated by a desire to hide the existence of leverage" was wrong because Mr. Kironde did in fact alter the information that was sent to Mr. Al Sadik about his investments in a way that made it misleading which is not something an honest person with nothing to conceal would have done.

(4) *The fourth finding*: It is said that his finding (at para. 5.18 of his judgment) that because Mr. Kironde left a reference to Blossom in a pie chart he was not attempting to conceal its existence was wrong because (i) there is a material probability that Mr. Kironde left the reference to Blossom in the pie chart only because he was careless in his perpetration of the deceit of Mr. Al Sadik; (ii) a small amount of accurate information which is not full information may be deployed by a deceitful person who wishes afterwards to claim that he was not being deceitful; and (iii) Mr. Kironde misled Mr. Zaidi as to the true function of Blossom and admitted that he never informed him that the purpose of Blossom was to enable the borrowing from RBS.

106

(5) *The fifth finding*: It is said that the finding (at para. 5.14 of his judgment) that Mr. Kironde's invitation to Mr. Zaidi to visit Bahrain to meet with Investcorp's funds administration department to discuss reporting shows that he was not trying to conceal the portfolio had been leveraged is wrong because (i) all of the facts about leverage were known to Mr. Kironde but he chose not to explain them to Mr. Zaidi; and (ii) the invitation to visit Investcorp's funds administration department could not reasonably be construed as meaning that leverage was not being deliberately concealed from Mr. Zaidi and Mr. Al Sadik.

170     In those circumstances, it is said, the judge ought to have concluded that Mr. Kironde made a conscious and deliberate choice to withhold information in breach of cl. F.4 of the SPA. An honest person in possession of the information, knowing that Mr. Al Sadik had a right to it and needed to know it, would not have withheld it. The judge ought to have concluded that Mr. Kironde intended Mr. Al Sadik to rely on the incomplete information he was sent in order to induce him not to redeem his investment. Investcorp was as deceitful about its disclosure of the assets and liabilities of Blossom as it was deceitful about the IMA: that is what the judge should have found.

171     In response to those submissions it is said on behalf of Investcorp that, applying well-established principles of appellate review, there is no basis on which to overturn the judge's assessment that Mr. Kironde had not dishonestly or deceitfully sought to conceal the leverage of Mr. Al Sadik's investment at portfolio level, in that (i) Mr. Al Sadik's arguments give no meaningful explanation why the judge erred in reaching any of his conclusions on the honesty of Investcorp's witnesses (and in particular Mr. Kironde); (ii) in any event, Mr. Al Sadik's newly identified motives for what he says was Mr. Kironde's dishonest behaviour were never put to that witness; and (iii) Mr. Al Sadik's suggestion that the judge did not take into account his own findings in connection with the preparation of the IMA in assessing Mr. Kironde's credibility is wrong, given that (at para. 5.19 of the judgment) the judge stated in terms that he was taking those findings into account.

172     In developing that response, it is said that Mr. Al Sadik's appeal from the judge's finding of fact that Mr. Kironde had not deceitfully attempted to conceal the fact that Mr. Al Sadik's portfolio was being leveraged is without merit, in that—

(1) an appellate court should be extremely reluctant to overturn a finding of fact made—as this finding was made—on the basis of the judge's assessment of the evidence he heard at trial and which was the subject of lengthy cross-examination.

(2) The judge found (at para. 5.12 of his judgment) that Mr. Kironde was an honest witness. Mr. Al Sadik has advanced no clear challenge to

the judge's assessment of Mr. Kironde's evidence. Again, an assessment of honesty in a witness whom the judge has had the advantage of hearing and seeing under cross-examination is not susceptible to review by an appellate court in the absence of compelling reasons.

(3) Mr. Al Sadik does not, either in his grounds of appeal or skeleton argument, explain how or why the judge erred in reaching any of his conclusions. Rather, Mr. Al Sadik seeks to re-argue the factual case in relation to reporting and deceit. In doing so, he makes a series of bare assertions that certain inferences are "beyond doubt." None of those assertions is supported by the evidence—most are founded on Mr. Al Sadik's contention that the use of Blossom and the application of first-layer leverage were unauthorized—a view which the judge rejected and most (if not all) are founded on contentions that were not put to Mr. Kironde in cross-examination.

(4) Mr. Al Sadik cannot mount any sensible challenge to the judge's finding (at para. 5.17 of his judgment) that Mr. Kironde had no motive to conceal leverage from Mr. Al Sadik. If there is no basis on which to challenge that finding, then there is no basis on which the finding that Mr. Kironde did not deliberately conceal the application of leverage from Mr. Al Sadik can be challenged. As the judge put it, correctly, without a motive to conceal leverage from Mr. Al Sadik "it becomes difficult to infer that the reporting (or absence of reporting) was done in bad faith."

173    Investcorp points out that the judge's finding that Mr. Kironde had no motive to conceal leverage from Mr. Al Sadik was based on his findings (at paras. 5.20 and 5.22 of his judgment) that Mr. Kironde, along with other Investcorp employees, "believed that [Investcorp] had authority to make a leveraged investment and had no reason to doubt that Mr. Al Sadik agreed with this approach" and, in relation to that authority, did not draw any distinction between first- and second-layer leverage. Mr. Al Sadik does not challenge those findings: it would be difficult for him to do so, given that they are founded on Mr. Kironde's evidence on those matters which was not challenged at the trial. Rather, it is said on behalf of Investcorp, that the case which Mr. Al Sadik advances on appeal is that the judge was wrong to conclude that Mr. Kironde had no reason to mislead him about the use of leverage, because Mr. Kironde was "subject to the same motives as the Bank." The motives on which Mr. Al Sadik now relies, it is said, are (i) to "lower the risk that Mr. Al Sadik would redeem and deprive the Bank of fees and funds," and (ii) to escape from the embarrassing position in which Investcorp Bank found itself as a result of its initial failure to disclose the use of leverage at the portfolio level. But, it is said, Mr. Al Sadik's attempt to rely on those supposed motives is hopeless, in that—

108

(1) Mr. Al Sadik fails to explain why Mr. Kironde might have feared either that Mr. Al Sadik would redeem if he found out about Blossom or considered that the fact of having not disclosed this at the outset was "embarrassing." The basis advanced in the appellant's skeleton argument (at para. 213)—that Investcorp knew that Blossom was not an authorized investment—cannot stand with the judge's finding that Mr. Kironde believed that Blossom was authorized—a finding which is not challenged on appeal.

(2) Neither of the two motives on which Mr. Al Sadik now seeks to rely was put to Mr. Kironde in cross-examination. Indeed, it is said, the trial record shows that no alleged motive at all was ever put to Mr. Kironde.

In summary, it is said that Mr. Al Sadik advances no sensible basis upon which the judge's finding of fact that Mr. Kironde had no motive to conceal leverage can be overturned by this court: his inability, or failure, to do so is fatal to his appeal.

174   It is said on behalf of Investcorp that, absent any motive for Mr. Kironde (and Investcorp) to act in breach of cl. F.4, Mr. Al Sadik's case in support of his appeal from the judge's finding of fact that Mr. Kironde did not deliberately (and deceitfully) withhold information in breach of the reporting obligation which that clause contains rests on two arguments:

(1) That Mr. Kironde knew what the SPA obliged Investcorp to report—a matter which Mr. Al Sadik contends is beyond doubt—and could have easily provided Mr. Al Sadik with that information to which he had a right and which he needed and that it is to be inferred from Mr. Kironde's decision not to provide that information that the breach of cl. F.4 was deliberate. That argument is said to be devoid of merit, in that—

   (i) the judge made a finding (at para. 5.21 of his judgment)—to which Mr. Al Sadik makes no reference—that Mr. Kironde did not apply his mind to the reporting obligations set out in the SPA and it is implicit in the judge's overall finding (at para. 5.22 of his judgment) that Mr. Kironde's breach of cl. F.4 was innocent that he did not know what cl. F.4 required.

   (ii) The judge's finding that Mr. Kironde did not apply his mind to the reporting obligations set out in cl. F.4 is consistent with Mr. Kironde's unchallenged evidence that (a) funds administration was generally responsible for discharging SPA reporting requirements; (b) cl. F.4 was not a standard reporting provision and Mr. Kironde had not focused on the provision before February 2009; and (c) that he did not think (when he was asked to consider cl. F.4 in the witness box) that the provision required him to report the assets and liabilities of Blossom, or that it was necessary to do so. Further, it was not

put to Mr. Kironde in cross-examination that he knew what cl. F.4 required or indeed, even that this was something he should have known.

(iii) Mr. Al Sadik's challenge to the judge's finding that Mr. Kironde did not apply his mind to the reporting obligations set out in cl. F.4 is unsustainable: it amounts to no more than the bare assertion that it is "beyond doubt" that Mr. Kironde knew what was required under the SPA because (i) Mr. Kironde is "an intelligent man who went to Harvard and he is an experienced banker"; (ii) Mr. Kironde was involved in presenting the investment proposal to Mr. Al Sadik, in negotiating the SPA and was the point of contact for Mr. Zaidi in relation to reporting; and (iii) he knew what Blossom was. That assertion provides no basis on which this court can overturn the judge's finding of fact that a witness whom he has seen and heard did not act dishonestly in relation to a breach of contract.

(2) That "it is not in dispute that Mr. Kironde deliberately removed information that would have shown leverage so that Mr. Al Sadik would not see it." In advancing that argument it is said that Mr. Al Sadik is referring to Mr. Kironde's preparation of an "allocation table" that was sent to Mr. Zaidi on September 11th, 2008 after a "cash" column, the negative figure in which would have revealed (amongst other things) the existence of leverage, had been removed from a draft on Mr. Kironde's instruction. Mr. Al Sadik's statement as to what is "not in dispute" is misleading: it suggests that the parties agreed (and/or that the judge found) that Mr. Kironde removed the "cash" column in order to conceal leverage. But that is an incomplete statement of the facts: the judge accepted (at para. 5.14 of his judgment) Mr. Kironde's denial that this was the reason for removing the column. Mr. Al Sadik offers no basis on which the judge's finding may be overturned beyond the bare assertion that this was "not something an honest person with nothing to conceal would have done." Again, that assertion provides no basis on which this court can overturn the judge's finding of fact that a witness whom he has seen and heard did not act dishonestly in relation to a breach of contract.

175   Further, it is said that Mr. Al Sadik's contention that the judge was "wrong not to take account of his finding that Mr. Kironde's conduct in relation to the IMA was dishonest" is without foundation, in that—

(1) the judge did not expressly make any criticism of Mr. Kironde in relation to the IMA and there was no evidence upon which he should have done.

(2) Even if the judge did intend to criticize Mr. Kironde (amongst others) in relation to the IMA, it is incorrect to assert that he did not take

110

account of the circumstances in which the IMA was prepared by Investcorp and sent to Mr. Al Sadik in the letter dated March 10th, 2009. The judge expressly acknowledged (at para. 5.19 of his judgment) that Investcorp's conduct with respect to the IMA was "relevant to [his] assessment of the credibility of the evidence of those involved in its production."

(3) The basis on which the contention that the judge ought to have taken the conduct of Investec and its employees in relation to the IMA into account in reaching his conclusion that Mr. Kironde did not deliberately (and deceitfully) withhold information in breach of the reporting obligation is advanced is that—

"if the Bank was prepared as it did to deceive Mr. Al Sadik about his investment in March 2009 in connection with the false IMA in order to disguise a breach of contract which occurred when it invested in Blossom, then it is very likely that it was reckless in 2008 too when Mr. Gurnani and Mr. Gharghour took the decision to invest in Blossom."

Leaving aside what is said to be the wholly illogical nature of that proposition, it is submitted on behalf of Investcorp that it has no evidential basis, it was not put to Mr. Gurnani and, in particular, it was not put to either Mr. Kironde or Mr. Boynton, the individuals involved in dealing with the preparation of IMA. If Mr. Al Sadik's case was that the IMA was drafted to cover up the alleged recklessness of Investcorp's hedge funds team in making the investment in circumstances where they were uncertain about their authority to do so, then Mr. Al Sadik was under an obligation to advance that case at trial and put it to the relevant witnesses. He did not do so and it is not open to an appellate court to make such a finding *a fortiori*, having regard to the judge's other findings of fact.

176    Further, it is said that Mr. Al Sadik's challenges to the findings in Schedule 2 to the memorandum of grounds of appeal cannot be maintained. The criticisms of the "first finding" (in relation to motive) and the "third finding" (in relation to the allocation table) have been addressed on behalf of Investcorp in submissions to which reference has already been made. The other three findings that Mr. Al Sadik seeks to challenge are the "second finding" (that Mr. Kironde was not intending to mislead Mr. Al Sadik about Blossom when he gave him an incomplete explanation of the reason for it), the "fourth finding" (that, because Mr. Kironde left a reference to Blossom in the FPS2 reports sent to Mr. Al Sadik, he was not attempting to conceal its existence) and the "fifth finding" (that Mr. Kironde's invitation to Mr. Zaidi to visit Bahrain to meet with the bank's funds administration department to discuss reporting showed that he was not trying to conceal that the portfolio had been leveraged). These challenges have no prospects of success, in that—

(1) none of them can be supported without establishing a motive for Mr. Kironde to conceal Blossom and/or leverage from Mr. Al Sadik.

(2) None of the allegations which Mr. Al Sadik now seeks to advance as to Mr. Kironde's intentions was put to him in cross-examination. They are no more than mere assertions of inferences which Mr. Al Sadik submits the judge should have drawn without any evidential foundation.

177 As I have said, the 3rd claim ("deceitful non-disclosure") is pleaded at paras. C16–C20 of the re-re-amended statement of claim. The particulars of the deceitful post-investment non-disclosure relied upon are set out at para. 20(3)–(6) of that pleading. They are in these terms:

"20.3 None of the Monthly Summaries, the Tabular Summaries or the Allocation Tables . . . disclosed the fact of, or the full extent from time-to-time of, the First Layer Leverage . . . and it was impossible for Mr. Al Sadik to detect the same from any of those documents;

20.4 No other communication was made during the material time to Mr. Al Sadik by Investcorp Bank (or any other person) informing him of the fact and full extent from time-to-time of the First Layer Leverage . . .

20.5 When . . . Mr. Zaidi asked Mr. Kironde about the reference to Blossom in the Monthly Summaries Mr. Kironde replied falsely that it was part of an internal arrangement to show the value of the asset in a foreign currency;

20.6 When Mr. Al Sadik became alarmed about the precipitous drop in the value of his investment in about October 2008 he began to seek explanations from Investcorp Bank about why this had occurred. The explanations sought by Mr. Al Sadik and the answers given to him by Investcorp Bank are described in Part B at paragraphs 66 to 88;

20.7 One of the main causes for the reduction in the value Mr. Al Sadik's investment was the very large extent (from time-to-time) of the First Layer Leverage but Investcorp Bank did not explain this to Mr. Al Sadik despite many opportunities to do so . . ."

The issue for the judge was whether that course of non-disclosure was deceitful. He held that it was not. I am not persuaded that he was wrong to take that view.

178 The principal reasons which lead me to take that view are these:

(1) I accept that an appellate court should not overturn a finding of fact made—as this finding was made—on the basis of the judge's assessment of the evidence he heard at trial and which was the subject of lengthy cross-examination without very cogent reasons.

(2) I accept that the arguments advanced on behalf of Mr. Al Sadik provide no basis on which this court should hold that the judge erred in reaching any of his conclusions on the honesty of those of Investcorp's witnesses who gave evidence in relation to the matters pleaded. In particular, I accept:

> (i) that the judge was entitled to reject the submission that Mr. Kironde (or, so far as material, Mr. Gurnani, Mr. Franklin or any other Investcorp employee) had a motive to conceal from Mr. Al Sadik the fact that his assets were being leveraged through Blossom at the portfolio level; in particular, I accept that he was entitled to reject that submission in the circumstances that the motives on which Mr. Al Sadik now seeks to rely were not put to those witnesses in the course of cross-examination on their evidence; and

> (ii) that the submission that the judge assessed the credibility of Mr. Kironde (and other witnesses) without having regard to his findings in relation to the IMA—in so far as those findings were of relevance to events which had occurred some months earlier—is ill-founded, given the judge's statement (at para. 5.19 of his judgment) that that document was relevant to his assessment of the credibility of those involved in its production.

In those circumstances, it would be wrong, as it seems to me, for this court to reverse the findings of the judge as to the honesty of Mr. Kironde (and others) whom he had the advantage of seeing and hearing when they gave evidence at the trial.

*Given the judge's finding that Investcorp's post-investment breaches of cl. F.4 were innocent and not deceitful, should he, nevertheless, have made findings on the loss and damage caused to Mr. Al Sadik by reason of that breach?*

179   Grounds 17 and 22 in the memorandum of grounds of appeal are in these terms:

> "*Ground 17*: When the learned Judge found that Clause F.4 of the SPA had been breached he ought to have proceeded to consider and decide whether or not the breach had caused the Appellant loss and damage."

> "*Ground 22*: The learned judge was wrong in law to hold that insofar as he held the Respondents' breach of Clause F.4 occurred innocently he should not award damages for that breach."

It is submitted on behalf of Mr. Al Sadik that, having found (at para. 5.16 of his judgment) that Investcorp was in breach of the duty to report under

cl. F.4 of the SPA, the judge should have gone on to consider whether or not that breach had caused Mr. Al Sadik loss and damage. Had the judge considered that question, it is said that he should have found that Mr. Al Sadik had suffered loss and damage because he would have exercised his power to redeem to the maximum extent available on the first date that a monthly statement pursuant to cl. F.4 had been issued in which the RBS loan was shown (that is to say the statement for May 2008) and that the loss and damage which he suffered was to be measured by all of the losses incurred in consequence of leverage through Blossom from the date that he would have redeemed in exercise of that power until the date he did redeem.

180    In developing those grounds it was submitted that—

(1) the judge was wrong to have any regard as to whether or not the breach was innocent. It is said that the judge ought to have held that the breach of cl. F.4 was also a breach of fiduciary duty because the fiduciary duty to disclose (consequent upon Investcorp's fiduciary duty of loyalty) was a continuing duty and that the unsatisfactory reporting by Investcorp, which he had found at para. 5.17 of the judgment, was both a breach of cl. F.4 of the SPA and a breach of fiduciary duty, irrespective of Investcorp's innocence or otherwise and that Mr. Al Sadik was therefore entitled to the appropriate relief.

(2) Mr. Al Sadik rescinded the SPA on November 24th, 2009 for misrepresentation and for deceitful non-disclosure. In these proceedings he seeks (i) an order confirming his rescission and for restitution by Investcorp of the full amount of his investment (AED500m.); and (ii) damages for consequential loss to be assessed by reference to what he would have earned.

181    Given that (i) I would hold that no fiduciary duty to disclose an intention to leverage at the portfolio level arose under the pre-SPA trusts (because, if for no other reason, Investcorp had not formed such an intention before the SPA was executed); (ii) the judge held that no fiduciary duty to disclose (independently of or in addition to the contractual duty to report under cl. F.4) arose under the SPA and there is no appeal on that issue; and (iii) the judge held (and I agree) that the non-disclosure in breach of cl. F.4 was not deceitful, I find it unnecessary to address the claims to damages in so far as they are advanced on the basis of breach of fiduciary duty or on the basis of deceitful non-disclosure. Nor do I find it necessary to address a claim for damages based on pre-contractual misrepresentation. In my view, no such claim was pleaded or established. On a true analysis, as it seems to me, Mr. Al Sadik's claims lay in contract, for innocent breach of the reporting obligations imposed by cl. F.4.

114

182    In response to the submission that the judge ought to have addressed the question whether Mr. Al Sadik was entitled to an award of damages in respect of what he had held to be an innocent breach of cl. F.4 of the SPA, it is said on behalf of Investcorp that the judge was correct not to make findings on the loss and damage caused to Mr. Al Sadik by reason of the breach of cl. F.4 in that no such loss and damage was pleaded: Mr. Al Sadik's claim for loss and damage was put on the tortious and not the contractual basis. More particularly, it is said that—

(1) no such loss and damage was pleaded. Mr. Al Sadik's claim for loss and damage for deceitful non-disclosure (pleaded at para. C29 of the re-re-amended statement of claim) is on the tortious basis: that is to say, it is for the full investment amount and the loss of the opportunity to invest that amount elsewhere. This reflects and is only consistent with Mr. Al Sadik's claim that there was a deceit that was planned and executed from the inception of Blossom. There is no alternative pleading for loss and damage on the basis that had cl. F.4 been complied with (*i.e.* the contractual basis for a damages claim), Mr. Al Sadik would have redeemed particular amounts at various points in time when he received Investcorp's reports.

(2) Mr. Al Sadik did not advance any such case at trial. Although Mr. Al Sadik made claims (for the first time) in his oral evidence that he would have redeemed at various points, a claim for loss and damage based on cl. F.4 was not pursued in his written closing submissions. The point was specifically raised on behalf of Investcorp in counsel's oral closing submissions:

"*Counsel*: In relation to F4—and I will come to this in more detail—the nature of the case that has been put and pleaded is one of deceitful non-disclosure.

*The judge*: Which is not the same thing as breach of contract?

*Counsel*: Exactly, my Lord, and indeed that has a significance in relation to pleading, because the way the loss and damage is pleaded is right from the start there was a deceit being planned and executed to deceive as to what was going on, damages claimed, the whole of the sum invested, and the opportunity to invest it in something else. There is no plea of, 'At some stage during the course of the process, maybe June after leverage had been applied, I would have been told this, I would have done something different.' So if Mr. Al Sadik fails on his deceitful non-disclosure case, he can't then try to revive it by saying it is an F4 case without the deceitful element, because he has not pleaded such a case. If one looks at the way the case is pleaded, the F4 is pleaded as part of 'the intention to

deceive.' So I respectfully say that's the end of the deceitful non-disclosure case."

Counsel for Mr. Al Sadik did not dissent from that analysis when the loss and damage pleading point was raised with him directly in his oral closing submissions.

183   In seeking to advance a claim in contract for innocent breach of the reporting obligations imposed by cl. F.4, it is said on behalf of Mr. Al Sadik (correctly) that, given that leverage at the portfolio level was first effected by Investcorp on May 1st, 2008, Investcorp was under a contractual duty to provide a report in the course of June 2008 which disclosed that that had occurred. It is said that, if Investcorp had provided such a report to Mr. Al Sadik in the course of June 2008 (as it should have done) then, pursuant to cl. H.1, he would have been able to redeem AED166m. at the end of the next calendar quarter on 60 days' written notice. That is to say, he would have redeemed AED166m. as at September 30th, 2008 and the balance as at March 29th, 2009. It is said that, in the course of his cross-examination, Mr. Al Sadik repeatedly stated that he would have redeemed if he had learned about the use of leverage by reference to an investment in LDSF: if he had discovered that his investment had been leveraged in a fund like Blossom (and all that implied) he would have redeemed. The judge was wrong not to proceed to assess Mr. Al Sadik's claim for loss and damage for breach of cl. F.4 for which he claimed.

184   In response to that submission, it is said on behalf of Investcorp that Mr. Al Sadik's assertion that he would have redeemed if he had learned about the use of leverage is not to be believed. In determining whether the judge should have considered loss and damage in consequence of breach of cl. F.4, no weight should be given to Mr. Al Sadik's assertion that he "repeatedly stated" in evidence that he would have redeemed had he seen from the reports that leverage (in any form) had been applied. Investcorp relies on the judge's observation (at para. 5.20 of his judgment) that—

"... [it is] difficult to envisage why [Mr. Al Sadik] would have objected in principle to the use of a limited recourse credit facility offered by a bank but accepted an investment in LDSF and SMFCo, when the two approaches were intended to achieve an equivalent economic result for him. In principle, the returns would be the same and the management fee would also be the same, because he had already agreed that no fee would be charged on leverage."

Further, it is said that the references in the appellant's skeleton argument to Mr. Al Sadik's oral evidence at trial are all examples of Mr. Al Sadik saying (in effect) that he would have objected to the leverage and redeemed because of the volatility in the markets in 2008. This evidence, it is said, is not credible having regard to: (i) the judge's findings in relation to the credibility of Mr. Al Sadik (in particular, the judge's finding, at para. 3.11 of

his judgment, that Mr. Al Sadik had given "disingenuously contrived" evidence in relation to his appetite for risk); (ii) the abandonment of Ground 7 in the memorandum of grounds of appeal (in which Mr. Al Sadik had sought to challenge the judge's finding that Mr. Al Sadik's evidence on every major issue was simply not credible); (iii) the fact that Mr. Al Sadik made these assertions for the first time in his oral evidence (they do not appear anywhere in his 69 pages of written evidence); (iv) Mr. Al Sadik's written evidence that he believed he had been offered a guaranteed return of 45% over three years (if that were his belief, why would he redeem his funds in those circumstances?); (v) Mr. Al Sadik's evidence that he was personally indifferent as to whether he received any reports; (vi) the judge's finding (at para. 5.20 of his judgment) that, during the investment proposal stage and the negotiation of the SPA, Mr. Al Sadik was content for his investment to be leveraged through leveraged funds, and that he knew that the 45% target return could only be achieved by making a leveraged investment; and (vii) the judge's finding (at para. 3.21 of his judgment) that there was discussion between Mr. Al Khatib and Mr. Al Sadik about leverage having been applied to his investment on October 20th, 2008 and the absence of any evidence that Mr. Al Sadik raised any objection to the application of leverage at that time.

185    In my judgment, if the judge had been minded to make an award of damages in respect of a claim in contract for innocent breach of the reporting obligations imposed by cl. F.4, he would have needed to decide whether, and if so when, on or after September 30th, 2008, Mr. Al Sadik would have redeemed his investment pursuant to cl. H of the SPA. It is clear, given the points advanced on behalf of Investcorp to which I have referred, that those issues would have been contested. The judge made no findings on those issues. He was entitled to take the view—having regard to (i) the absence of any pleading raising those issues; (ii) the decision, on behalf of Mr. Al Sadik, not to re-raise those issues in his closing written submissions; and (iii) the exchanges during oral closing submissions to which I have referred—that he did not need to: those issues were not before him for determination.

186    In those circumstances—for the reasons which I have set out—I would reject the submission that, having held that Investcorp was in breach of the duty to report under cl. F.4 of the SPA but that that breach was innocent, the judge should have gone on to consider whether or not that breach had caused Mr. Al Sadik loss and damage.

**The fourth issue: whether the asset allocation decisions, including decisions about the application of leverage, were made in breach of fiduciary duty**

187    The judge's reasons for dismissing the 5th claim are set out in section 6 of his judgment. The issue which he addressed was whether the

asset allocation decisions, including decisions about the application of leverage, were made in breach of fiduciary duty. He held that Investcorp's initial asset allocation decision and the subsequent decisions in relation to the application of leverage were made *bona fide* for a proper purpose in accordance with the SPA, in that the allocation of half the investment amount to SMFs (with ×3 leverage), on the basis that the investment would be diversified across an additional four SMFs (including Alt Beta funds) as and when new funds were launched, was made in what Investcorp believed to be Mr. Al Sadik's interest and not for the ulterior purpose of capitalizing the new funds and/or increasing its fee income through the fee-sharing arrangement with the SMFs.

### The judge's findings in section 6 of his judgment

188    At para. 6.1 of his judgment the judge explained that, although the 5th claim, as pleaded, alleged breach of trust by Investcorp Bank and/or Investcorp Nominee 1 in the capacity as trustee of the shares issued by Shallot, on a true analysis the obligation to manage the assets of Shallot (as opposed to its shares), whether held directly or through its subsidiary, was a contractual one arising under the SPA— that, in the absence of any investment management agreement between Shallot and Investcorp Advisers, that obligation was performed at the material times by Investcorp Bank and that the facts and matters pleaded constituted a claim against Investcorp Bank that it exercised its discretionary powers under the SPA in breach of its fiduciary duties. It was on that basis, he said, that he intended to address the 5th claim.

189    At paras. 6.2 and 6.3 of his judgment, the judge described how the 5th claim had evolved in the pleadings and at the trial. He explained that it was common ground that the SPA conferred a discretionary mandate upon Investcorp; that investing in DSF and/or the SMFs fell within the scope of Investcorp's authority under the SPA and that Investcorp owed Mr. Al Sadik a fiduciary duty to exercise its power for a proper purpose in accordance with the terms of the SPA. Investcorp's obligation, he said, was to manage the portfolio in what it *bona fide* believed to be the interests of its client, Mr. Al Sadik, and not for some ulterior purpose in its own interest. He explained that the 5th claim, "as finally articulated in counsel's written Closing Submission," was that Investcorp's asset allocators (Mr. Gharghour and Mr. Gurnani) formulated a plan to put one half of Mr. Al Sadik's money in DSF (with ×2 leverage) and the other half in SMFs (with ×3 leverage), with the intent that the SMF portion would be notionally divided into 10 equal parts: six of those parts to be invested in the six existing SMFs (one part in each SMF) and the remaining four parts to be invested in new SMFs and/or Alt Beta products as and when these became available. He said that the fact that such a plan was formulated on about March 2nd, 2008, and was implemented from March 4th, 2008

onwards, was not in dispute. Mr. Al Sadik's case, the judge said, was that it was an illegitimate and dishonest plan designed to serve Investcorp's interests: first, by generating capital for the development of Investcorp's hedge funds line of business and, secondly, by generating two layers of fees from Mr. Al Sadik's investment in the SMFs. The allegation pleaded on behalf of Mr. Al Sadik was that Investcorp pursued that plan without regard to Mr. Al Sadik's interests from March 4th, 2008 (when the first investments were made) until September 1st, 2008 (when leverage was added for the last time) and that it was abandoned around September 16th, 2008, only because the asset allocators had reason to believe Mr. Al Sadik might redeem his investment. It was alleged that the decision to employ first-layer leverage through Blossom, using the White Ibis III credit facility, lay at the heart of the breach of fiduciary duty because Blossom was the vehicle through which the fraud was committed and the means by which it was concealed from Mr. Al Sadik.

190   The judge observed that, although the re-re-amended statement of claim contained an express plea of fraud and dishonesty, that case (and the case advanced by counsel for Mr. Al Sadik in his written opening submissions) differed in material respects from the case put in Mr. Al Sadik's written closing submissions. The judge pointed out that motive for allegedly dishonest conduct was an important element of the case to be put to witnesses in cross-examination. The motive that had been advanced, when the case was opened, was that Investcorp needed to resolve a liquidity crisis which it was then facing. But, as the judge held, there was overwhelming evidence that Investcorp was never facing any liquidity crisis. When, as the judge put it at para. 6.3 of his judgment, it became apparent to Mr. Al Sadik's counsel that the case, as opened, was unsustainable, it was abandoned and, thereafter, the case was put on the basis of what counsel described as "the plan." That case, the judge observed, was based on a distinctly different motive for the dishonest behaviour alleged against Investcorp. But he was not persuaded that, in asserting a different motive of the dishonest behaviour alleged, the factual case, as ultimately presented to the court, was so fundamentally different from the pleaded case that he should dismiss it for that reason alone. At its core, he said, the case against Investcorp was—and always had been—that it ignored Mr. Al Sadik's best interests and acted for some selfish interest of its own.

191   Nevertheless, as the judge explained at para. 6.3 of his judgment, the fact that the case had altered at a late stage of the trial in the way that he had described did have an effect on his approach to the evidence. After referring to observations of Lewison, J. in *Abbey Forwarding Ltd.* v. *Hone* (1) ([2010] EWHC 2029 (Ch), at para. 47)—citing with approval observations of Briggs, J. in *Dempster* v. *H.M. Rev. & Customs* (7) ([2008] STC 2079, at para. 26)—the judge held (at para. 6.3) that—

"where the actions or statements of Investcorp's witnesses are open to an innocent interpretation, I should not draw the contrary inference that they were acting dishonestly for some improper purpose if the allegation was not fairly and squarely put to them in cross-examination."

192    The judge then turned to address, at paras. 6.4–6.9 of his judgment, "how and why Investcorp's investment plan for Mr. Al Sadik's portfolio was formulated." His findings of fact may be summarized as follows:

(1) The portfolio construction work was done by Mr. Franklin, with input from Mr. Gharghour and Mr. Gurnani (to whom he reported) and from Mr. Mirza. Mr. Franklin's work began on January 24th, 2008, when Mr. Gharghour forwarded to him an email from Mr. Mirza notifying him about the potential new client, the client's requirements and a suggested portfolio. Mr. Mirza's summary of the client's requirements included a three-year lock-up period. That turned out to be inconsistent with Mr. Al Sadik's liquidity requirements. His asset allocation proposal comprised 50% in Investcorp Balanced Fund ("IBF"), 30% in Investcorp Event Driven Hedge Fund ("EDF") and 20% in SMFCo with overall portfolio leveraged ×1 or ×1.5 "depending on what is possible from banks and impact of hedging cost on client returns." In other words, the judge said, Mr. Mirza was contemplating first-layer leverage and his email reflected that he had already contacted Mr. Nevile, who was a banker employed in Investcorp's banking department in London.

(2) Mr. Al Sadik's requirement for a hedge fund portfolio denominated in UAE dirhams was highly unusual. It was driven by his belief that the dirham might be revalued against the US dollar. There was discussion amongst members of the hedge fund and PRM groups about the cost of hedging the currency risk. In his email dated January 24th, 2008, Mr. Kironde suggested that the hedging cost might be as much as 4%–5% p.a.

(3) Mr. Franklin's initial work was sent to Mr. Gurnani on January 25th, 2008. Mr. Franklin made some assumptions which had an important impact on the gross returns needed to generate a net return of 45% over three years (equivalent to 13.2% p.a. compounded). He assumed that the management and administration fees would be 1.2% of NAV p.a.; whereas, as the judge pointed out, the management fee ultimately negotiated by Mr. Al Sadik was only 0.5% of the initial equity for the first year and thereafter 0.5% of NAV calculated annually. Mr. Franklin assumed that the hedging cost would be 3% whereas the overall actual net cost turned out to be lower. He initially proposed to allocate 40% of the assets to LDSF with ×3 leverage, 20% to SMFs with ×1 leverage and 40% to "Credit Opportunities Fund/Opportunistic Funds" unleveraged (which included reference to the planned COF which had not then been launched). He estimated the volatility at 12% to 13% which he considered

reasonable given that he was looking at a gross return target of 20%. The expected returns were derived from information reflected in Investcorp's then current "Hedge Fund Asset Allocation Policy Manual." Some, but not all, of his spreadsheets and draft workings were put in evidence.

(4) While Mr. Franklin was working on the portfolio construction, Mr. Nevile was thinking about ways in which the leverage and currency hedging might be done. He summarized his initial ideas in an email sent on January 25th, 2008 to all those members of the hedge fund and PRM groups involved in the matter. He proposed that Investcorp set up an SPV for the client and that the SPV would invest into a leveraged note which would be either a US dollar denominated note with Dresdner Bank (on the basis that Investcorp would do the hedging) or a UAE dirham denominated note with UBS (on the basis that UBS would also deal with the hedging). The judge found that Mr. Nevile obviously intended that those proposals would be discussed with Mr. Al Sadik at the meeting to be held on January 28th, 2008 but Mr. Gharghour responded that he should "forget all this for the time being." Mr. Gharghour's view was that the mechanics of the hedging (and leverage) and the corporate structure should be left until the next stage of discussion with Mr. Al Sadik.

(5) Mr. Franklin sent his final draft of what was to become the investment proposal to the PRM team on January 26th, 2008, expecting that they would make amendments. His proposed asset allocation was 50% in LDSF with ×3 leverage, 25% in SMFs with ×2 leverage and 25% in "Opportunistic Funds" with ×1 leverage (including the planned COF). He expected the PRM team to make presentational alterations but not to make any fundamental changes to the portfolio composition.

(6) Mr. Mirza and Mr. Fierens worked on the proposal. The final asset allocation, as it appeared in the investment proposal handed to Mr. Al Sadik at the meeting on January 28th, 2008, was described by the judge in para. 4.5 of his judgment, to which I have already referred. The general description of the proposed portfolio, contained in the "Overview of Proposal" (on p.2 of the investment proposal) remained the same but the "Indicative Terms" (on p.5) referred to SMFCo (rather than to the underlying SMFs) and to LEDF (rather than to COF, which did not then exist). The judge found that two fundamental elements of the investment proposal were clear: first, it did not propose a guaranteed return; secondly, it did propose a leveraged investment.

(7) The meeting on January 28th, 2008 was attended by Mr. Al Khatib, Mr. Kironde and Mr. Fierens. The investment proposal was in the form of a slide presentation. Mr. Kironde took Mr. Al Sadik through it but Mr. Al Sadik moved the discussion along quickly and would not allow him to linger on the individual slides. There was no discussion at the meeting about the way in which the investment would be leveraged. The judge

concluded that, following that meeting, Mr. Al Sadik must have been left with the impression that it would be done by investing in the identified hedge fund products which offer a specific level of leverage. He said this (at para. 6.7):

> "My analysis of the evidence relating to the preparation of the Investment Proposal and its presentation to Mr. Al Sadik does not lead me to conclude that any of the Investcorp personnel were acting unprofessionally. In particular, the evidence does not support the allegation that Mr. Franklin deliberately overestimated the gross returns needed to meet Mr. Al Sadik's target in order to justify increased leverage and therefore increased AUM."

(8) Mr. Franklin did no further work on the portfolio construction until February 24th, 2008, when he received an account of the meeting which had taken place with Mr. Al Sadik on that day. The judge found that, from the perspective of Mr. Franklin (as the person responsible for the portfolio construction), the key point to emerge from that meeting was the change in Mr. Al Sadik's liquidity requirements. For this reason his original proposal to include COF in the portfolio would have to be dropped because that proposal envisaged an initial two-year hard lock-up period. Mr. Franklin ran the figures for two alternative portfolios which sought to offset the anticipated reduction in the expected return resulting from the exclusion of COF by increasing the leverage and increasing the exposure to SMFs. He conducted various back testing exercises and sent the result of his calculations to Mr. Gurnani on February 27th, 2008. He put forward two alternative scenarios: the first based on one half of the assets being allocated to SMFs ($\times 3$ leverage) and one half to LDSF ($\times 2$ leverage); the second based on two thirds allocated to SMFs ($\times 3$ leverage) and one third to LDSF ($\times 2$ leverage). The expected returns (gross of hedging costs) were estimated at 21% and 22.3% respectively. Mr. Franklin initially made a mistake in his volatility calculations, which was corrected in an email later in the day. His revised volatility estimate was 13–14% for the first scenario and 16–17% for the second scenario. Mr. Gurnani responded by email indicating that the first scenario should be adopted. That was both lower risk and involved a lower allocation to SMFs than the second scenario. The judge observed that that response was inconsistent with the case advanced on behalf of Mr. Al Sadik. As he said (at para. 6.8):

> "If Mr. Gurnani had been motivated by a desire to use Mr. Al Sadik's money for the purpose of generating two layers of fees, one might expect him to have decided upon Mr. Franklin's second scenario."

193    At para. 6.9 of his judgment, the judge recorded that both Mr. Franklin and Mr. Gurnani were cross-examined at length about the details of the work done and decisions made in relation to the construction of the initial portfolio and that it was put to each of them that the asset allocation

exercise was "driven by the fees" and "the economics of the deal." He pointed out that the allegation was that the increased allocation of 50% to SMFs (×3 leverage)—rather than the 25% allocation to SMFCo (×1 leverage) reflected in the investment proposal—was driven by the existence of fee-sharing arrangements between Investcorp and the SMFs. It was also put to Mr. Gurnani that Mr. Al Sadik's portfolio was intended to be used as a source of "complementary capital" for the purposes of capitalizing the new SMFs and the Alt Beta fund, thus reducing the amount of seed capital needed from Investcorp itself. In order to put these allegations in their proper context, the judge took the view that it was necessary to say something about the concept of SMFs and the way in which they were promoted.

194   He did so, at paras. 6.10–6.12 of his judgment, in a section headed "The single-manager concept—fee sharing arrangements." After setting out passages from the evidence of Mr. Gurnani and of Professor Stowell (an expert witness called by Investcorp) and explaining that, in the present context, SMFs were funds managed by independent investment managers selected by Investcorp, he said this (at para. 6.11):

> "They [the independent investment managers] are experienced individuals whose investment strategies and track record (working with established investment management firms) have impressed Investcorp and met its selection criteria. Investcorp provides the seed capital (which is usually locked up for two years), risk management oversight (which is highly important in the context of a start-up operation), and back office services. The single manager funds will usually charge investors a standard '2 and 20' fee structure, meaning a management fee of 2% of NAV per annum plus a performance fee of 20% of realized profits, over a hurdle rate. In consideration for providing the seed capital and on-going services, Investcorp is remunerated by receiving a percentage of the fees on a sliding scale depending upon the amount of Investcorp's capital contribution and the size of the NAV. It is not disputed that this arrangement is consistent with established industry practice and that it is fully disclosed in the offering documents published by each of the Single Managers, copies of which were readily available to Mr. Al Sadik . . ."

But the judge went on to point out that it was accepted that these fee-sharing arrangements were not brought to Mr. Al Sadik's attention, either at the time of executing the SPA or at any time thereafter. And he accepted that investing Mr. Al Sadik's money in the SMFs indirectly generated a higher fee income for Investcorp than an investment in DSF (for instance) would have done and that investing in SMFCo, which in turn invested in the SMFs, had the same indirect result. Nevertheless he noted that both Mr. Franklin and Mr. Gurnani "emphatically denied" that

the portfolio construction was "driven by fees" or by "the economics of the deal." The judge set out passages from the evidence of Mr. Gurnani which were to that effect. At para. 6.12 of his judgment he said this:

> "The terms of the fee sharing arrangements vary. In each case there is a sliding scale starting at nil and rising to a maximum which varies considerably. In each case the fixed management fee is 2% of NAV and I assume that the performance fee is 20% of realized gains over some specified hurdle rate. It follows that Investcorp's maximum share of the management fee varies from 0.2% up to 1% of the Single Manager's NAV and its maximum share of any performance fee would vary from 2% to 10% of the profit over the hurdle rate. I do not have any evidence about the actual amount received by Investcorp from the Single Managers as a result of the investments made on behalf of Mr. Al Sadik, but it would always be negligible relative to Investcorp's total income of US$383 million for the year ended 30th June 2008, of which US$85.7 million was earned from the hedge funds line of business. In these circumstances, it must be inherently unlikely that the existence of this type of fee sharing arrangement (which is actually compensation and not a commission or profit share) would motivate Messrs. Franklin, Gurnani and Gharghour to behave unprofessionally. Mr. Gurnani explained quite convincingly that what matters from a commercial point of view is generating good returns for clients. In my judgment the evidence leads to the conclusion that the decision to allocate half of the Investment Amount to Single Managers (leveraged 3×) was made bona fide in the belief that it was an appropriate component for Mr. Al Sadik's portfolio having regard to the 45% return target over three years. If Messrs. Gurnani and Gharghour's decision had been 'driven by the fees' one might expect them to have opted for Mr. Franklin's Scenario #2 which involved allocating two-thirds to Single Managers rather than Scenario #1 which proposed allocating only half to them."

195   At paras. 6.13–6.15 of his judgment, the judge addressed the case, advanced on behalf of Mr. Al Sadik, that the allocation of one half of his investment to SMFs was driven by a need to replace or complement proprietary capital. He referred to an email chain sent by Mr. Kapoor on February 19th, 2008, on which counsel for Mr. Al Sadik relied. He explained that Mr. Kapoor had informed the hedge funds group about his budget plan for the amount of Investcorp's proprietary capital to be allocated to its hedge fund business for 2008 and that had led Mr. Franklin to set out his proposed plan for the following 6 to 12 months on the assumption that the budget figure was US$1.9 bn. and to project a US$400m. investment in four new SMFs and three new Alt Beta products. But the judge held that that documentation did not lead him to infer that

Mr. Franklin's portfolio construction was in any way driven by an intention that part of Mr. Al Sadik's capital could be used to substitute or "complement" Investcorp's proprietary capital. He set out passages from the written evidence of Mr. Gurnani and referred to answers which he (Mr. Gurnani) and Mr. Franklin had given and he went to say this (at para. 6.14 of his judgment):

> "Investcorp did decide to reduce the amount of proprietary capital allocated to its hedge fund line of business but this decision was not communicated to the Hedge Fund group until after they had made the decision to deploy Mr. Al Sadik's funds in the Single Managers. Nor did this decision prevent the launch of new Single Managers."

Those conclusions, he said, were apparent from the examination of a series of emails, beginning in May 2008, when Mr. Kapoor explained to Mr. Gurnani and others that he did not wish to allocate US$50–100m. of proprietary capital to COF. He explained that Mr. Kapoor had written in his email sent on May 4th, 2008, that his primary concern was that Investcorp already had significant exposure to the credit opportunities strategy, both through the Washington Corner and investments in DSF and IBF. This email exchange prompted discussions between Mr. Kapoor and Mr. Chehime about the scale of Investcorp's hedge funds co-investments and they agreed that the amount should be reduced. The conclusions reached were set out by Mr. Chehime in a presentation entitled "Optimizing HF Investment Risk Profile" which he sent to Mr. Kapoor on May 1st, 2008. The judge said that the presentation proposed a staged reduction of hedge fund proprietary capital, starting with a reduction to US$1.75 bn. by July 1st, 2008 and culminating in a target proprietary capital of US$1.25 bn. by July 1st, 2009. The reduction was to be achieved by reducing the investment in the funds of hedge funds, thus enabling Investcorp to continue providing seed capital for the single-manager programme. The judge found that the overall reason for this strategy was the re-allocation of capital to new ventures. In consequence, he said, a redemption request was made on May 26th, 2008 but Mr. Gurnani and Mr. Gharghour sought to defer redemption on the basis that, although it could be met, it would prevent the continuing reduction of DSF's overdraft which had been mandated by a recent review of the hedge fund line of business. The result, he said, was that they agreed to postpone the proposed redemption and settled on a target phased reduction of the proprietary capital invested in the hedge fund line of business down to US$1.25 bn. by July 1st, 2009. He concluded (at para. 6.15 of his judgment) that Mr. Kapoor's email of June 4th, 2008 reflected a decision to provide proprietary capital of US$25m. (rather than the previously agreed amount of US$50m.) for each of three Alt Beta strategies and he noted that Mr. Kapoor also agreed, later in June 2009, to provide just under US$100m. of proprietary capital to seed two further SMFs, namely White Eagle and Hawkstone. The judge

held that those decisions did not support Mr. Al Sadik's case that the allocation of half of his money to SMFs was motivated by a need to replace or complement proprietary capital. He said (at para. 6.15) that—

> "the injection of just under US$100 million of capital to two new seeded managers in June and July 2008, and the fact that the planned reduction in proprietary capital co-investments was to be from a fund of hedge funds, not Single Managers suggests that Investcorp continued to be fully committed to its single manager programme."

196   At paras. 6.16–6.20 of his judgment, the judge addressed Mr. Al Sadik's complaint that the use of first-layer leverage caused him substantial disadvantages over and above those which would have resulted from an investment in leveraged hedge fund products such as LDSF and SMFCo and that (in particular) the terms of the White Ibis III credit facility exposed him to a materially higher degree of risk of loss. The judge explained (at para. 6.21) that the decision to invest in SMFs with ×3 leverage necessarily required the use of first-layer leverage because SMFCo offered only ×1 leverage.

197   The judge explained that "White Ibis III" was the name used by Investcorp to describe the master note purchase agreement dated as of January 2nd, 2008 and originally made between LEDF and SMFCo (in each case acting solely for only one of their respective segregated portfolios), as issuers of loan notes, and RBS, as the initial noteholder. The purpose of this agreement, he said, was to enable LEDF and SMFCo to obtain credit with which to make leveraged investments in EDF and the SMFs respectively. It was amended and restated on April 10th, 2008 for the specific purpose of adding Blossom as an additional issuer for the purpose of financing leveraged investments in DSF and the SMFs (including the proposed Alt Beta fund).

198   The judge pointed out (at para. 6.17 of his judgment) that the three issuers (LEDF, SMFCo and Blossom) were unrelated entities and that, accordingly, the White Ibis III credit facility necessarily constituted a limited recourse facility under which RBS had recourse to Blossom's assets only for the purpose of discharging Blossom's liabilities. There was never, he said, any question of the issuers' assets being used to cross-collateralize each other's liabilities. He referred to what he described as the theoretical possibility that a default on the part of one issuer could have an adverse impact on the other two issuers: a possibility which, he said, could arise because a default by one issuer could constitute a "global early termination event"; giving RBS the option to terminate the facility as a whole and so putting the other issuers in the position of having to re-finance their borrowings, either with RBS itself or another bank. He described that as a risk inherent in any multi-party credit facility and said that it had no more significance for Blossom than for LEDF and SMFCo.

199   At para. 6.18 the judge explained that, under the White Ibis III credit facility, the issuers (LEDF, SMFCo and Blossom) were subject to restrictions of a kind ordinarily included in this type of credit facility. Blossom, he said, was subject to a loan to value ratio of 70%, which had the effect that its equity of US$135m. would support borrowings up to US$315m., so limiting the overall leverage ratio to ×2.3 or thereabouts. He explained that, during the first year of the White Ibis III credit facility the concentration of Blossom's investments was subject to the following limitations: (i) at least 40% of the portfolio was to be invested in DSF (reducing to 33% in the second year); (ii) no more than 60% of the portfolio was to be invested in SMFs; and (iii) no more than 20% of the portfolio was to be invested in Alt Beta. He said that Mr. Franklin's involvement in the negotiations with RBS ensured that the investment restrictions were consistent with asset allocation decisions made in respect of Blossom. But he accepted that it was right to say that the existence of such specific borrowing restrictions would present a need to renegotiate in the event that Investcorp decided to re-allocate the assets—for example, by investing in IBF rather than DSF—and also right to say that the existence of investment restrictions might force a borrower to re-balance his portfolio as a result of changes in the relative market values of its components. He expressed the view that that consequence would not necessarily be against the interests of the borrower. He held that it was normal for this type of credit facility to include borrowing restrictions; that the restrictions agreed with RBS were intended to facilitate Mr. Al Sadik's portfolio construction and that there was no reason to suppose that those restrictions could not have been renegotiated to accommodate a different portfolio, so long as the change did not adversely impact upon RBS's assessment of its counterparty risk.

200   The judge went on to explain (at para. 6.19 of his judgment) that the use of first-layer leverage resulted in a concentration of risk, compared with leveraging the investment through separate vehicles such as LDSF and SMFCo. Leveraging investments in DSF and the SMFs separately, through LDSF and SMFCo, would lead, he said, to what counsel had called "product isolation": that is to say, that a catastrophic loss or insolvency of DSF, for example, would have no impact upon the value of Mr. Al Sadik's investment in the SMFs. To have replicated that position using first-layer leverage it would have been necessary to enter into two or more limited recourse credit facilities with different banks for the purpose of leveraging each investment separately. By causing Blossom to enter into a single credit facility, Investcorp had deprived Mr. Al Sadik of the benefit of "product isolation." But this was equally true in relation SMFCo. The fullest "product isolation" for Mr. Al Sadik could have been achieved not by investing in SMFCo but by leveraging his investments in the SMFs separately through six limited recourse credit facilities with six different banks.

201   The judge explained (at para. 6.20 of his judgment) that the purpose of entering into the White Ibis III credit facility was twofold: first, it was necessary because a ×3 leveraged exposure to the SMFs could not be achieved through SMFCo; and secondly, it was desirable to use first-layer leverage because it provided Investcorp with the flexibility to apply leverage incrementally and control the level of leverage more easily. He went on to say this (at para. 6.20):

> "With the benefit of hindsight, it can be said that this advantage was real because Mr. Al Sadik's losses would have been greater if he had been fully invested in LDSF and SMFCo from day one. However, the use of a multi-party credit facility in the terms of White Ibis III also carried with it certain disadvantages and risks, but it cannot be said that they were in any way unusual or peculiar to Blossom. Both Prof. Stowell and Mr. Opp said that, in their experience, the investment restrictions and other terms of White Ibis III intended to protect the lender's interest, were consistent with what they would normally expect to see in credit facilities of this sort. There is nothing about these terms which leads me to the conclusion that Investcorp was disregarding Mr. Al Sadik's best interests by entering into this credit facility."

202   At paras. 6.21–6.27 of his judgment, the judge addressed Mr. Al Sadik's complaint that, in applying leverage to his portfolio incrementally, Investcorp was serving its own interests, and acting to his disadvantage. At para. 6.21 he set out (in a table) the amounts drawn down, for the purpose of leverage, in the months of May, June, August and September 2008. That table showed that the first drawdown was on May 1st, 2008. The judge explained that it was said, on behalf of Mr. Al Sadik, that drawdown commenced on May 1st, 2008, only because that was the earliest opportunity after the funds became available and that the reason for not applying the maximum amount which could be drawn down under the credit facility "on day one" was that Investcorp was "saving the bullets" for use when the new SMFs and Alt Beta fund were launched. But, he said, Mr. Gurnani emphatically denied this allegation: he insisted that leverage was applied incrementally because Investcorp was cautious about the economic environment and market outlook. The judge observed that the phrase "saving the bullets," adopted by counsel on behalf of Mr. Al Sadik, was taken from an email sent by Mr. Gharghour on June 18th, 2008 to Mr. Kironde and Mr. Franklin in response to a request from Mr. Kironde for an explanation why the Interlachen Fixed Income Relative Value Fund had been excluded from Blossom's asset allocation. The email was in these terms:

> "Very simple: we are not yet sure if we will roll out this fund as a stand alone fund and want to save our bullets for single-managers and alt beta (we have 4 new fundings soon, 2 alt beta and 2 new

single-managers, white eagle, which is European event, and Hawkstone which is long/short European fund).”

After setting out passages from the oral evidence of Mr. Franklin and Mr. Gurnani, the judge concluded that he should not draw any adverse inference from what he described as “Mr. Gharghour's colourful use of language.” He said this (at para. 6.23 of his judgment):

“It seems to me that it describes a perfectly legitimate investment strategy which has been fully explained by the evidence of Mr. Franklin and Mr. Gurnani. The decision to diversify the portfolio of Single Managers by adding four additional funds/strategies (but not duplicating strategies) does not raise a red flag in my mind and suggest that Investcorp was putting its own interest ahead of Mr. Al Sadik's interest. Mr. Franklin and Mr. Gurnani struck me as honest, experienced industry professionals. There was nothing about their explanation for the original asset allocation decision or the subsequent applications of leverage which tended to suggest that they were acting dishonestly for some improper purpose.”

203    The judge went on to explain (at para. 6.24 of his judgment) that Mr. Al Sadik also relied on email exchanges on May 23rd to 25th, 2008, in which Mr. Gurnani, Mr. Gharghour and Mr. Franklin discussed the decision to apply leverage on June 1st, 2008, and on an email sent on May 28th, 2008, in which the outcome of those discussions was reported to Mr. Boynton. After setting out the terms of those emails and observing, first, that the outcome was consistent with the policy that Investcorp should use its own proprietary capital to launch a new SMF and that client capital should follow some months later and, secondly, that, in the light of the decision, Mr. Franklin proposed to make a corresponding increase in the allocation to the existing six SMFs, with the result that US$67.5m. was drawn down, thereby increasing the overall leverage ratio from 0.5% to 1.0%, the judge said this (at para. 6.24):

“I do not infer from this e-mail exchange any improper motive on the part of Investcorp. To the contrary, it seems to me that it is evidence that the decision makers were complying with Investcorp's established policy and acting in their client's interest. If Messrs. Gurnani and Gharghour were intent upon using Mr. Al Sadik's portfolio simply as means of launching White Eagle for Investcorp's own commercial benefit, one might expect them to have followed Mr. Franklin's suggestion. They did not.”

204    At para. 6.25 of his judgment, the judge explained that, at around this time (May 2008), Investcorp was conducting the annual review of its various lines of business. He said that Mr. Al Sadik relied on a memorandum dated May 14th, 2008 sent by the chief operating officer (Mr. Long) to the chairman (Mr. Kirdar), with a copy to the chief financial officer (Mr.

Kapoor). That memorandum comprised a summary of key action points and key points for discussion. Under the heading "Hedge Fund (HF) Review," it was said that—

"1. HF Group to agree a set of actions with Rishi to get HF Group (all business activities within HFs) to the 40% net fee margin benchmark within a defined period of time.

2. No LDSF (i.e. the levered product) campaign to be launched by PRM until the market stabilizes (and when a campaign is launched, HF/PRM to consider a minimum 1 year lock up period).

3. HF to de-risk LDSF at the Fund level (as opposed to going to clients suggesting a shift from the levered product)."

The judge said that Mr. Fierens (the chief of staff of PRM), in explaining this memorandum, had explained that para. 2 did not mean that Investcorp intended to cease marketing its leveraged hedge funds—it simply meant that there would be no "campaign-based approach, where we would do a marketing blitz around a certain product"; that para. 3 meant "protecting the downside" by making sure that no leverage was being run accidentally at the underlying fund level (meaning DSF) and that Investcorp never made the decision to "get people out of LDSF into unlevered products." The judge said that Mr. Gurnani explained this part of the review in the same way. The judge held (at para. 6.25) that "this evidence does not point to the conclusion that the decision to add leverage on 1st June was inconsistent with Investcorp's market outlook or any high level policy."

205    The judge explained (at para. 6.26 of his judgment) that, on June 25th, 2008, Mr. Franklin sent an email to Mr. Gharghour and Mr. Gurnani with his asset allocation recommendations for July 1st. Those included a recommendation for a further drawdown from the credit facility for the purpose of investing an additional US$33.9m. in DSF (which would take the leverage ratio up to ×1.5) and a recommendation that nothing more be added to the SMFs, with a view to investing in the two new ones (White Eagle and Hawkstone) on September 1st or October 1st and then three Alt Beta products for a total of 11, rather than 10, SMFs. The judge said that that proposal was discussed in a conference call on the following day, in which Mr. Gharghour, Mr. Gurnani, Mr. Kironde and Mr. Mirza took part. The judge held that that evidence did not suggest "blind adherence to an investment strategy without regard to Mr. Al Sadik's interest." To the contrary, he said, it evidenced that a review was conducted. In the event, as the judge found, Mr. Franklin's recommendation was not followed—no leverage was added on July 1st and, as at June 30th, 2008, the portfolio's performance was slightly down.

206    As the table at para. 6.21 of the judgment shows, leverage was added as at August 1st, 2008, when an additional US$33.9m. was invested

into DSF, taking the leverage ratio up to ×1.5 for DSF and ×1.3 for the portfolio as a whole. The judge explained that that proposal was reflected in an email from Mr. Nirav Shah but that there was no documentary evidence recording that the proposal was reviewed in a conference call, as in the prior month. The judge said that, although Mr. Gurnani had no specific recollection of what took place, he had explained in the course of his cross-examination that there was a process which was followed every time; that Mr. Franklin did not have authority to make asset allocation decisions; that he was absolutely sure that he (Mr. Gurnani) would have participated in the review and made the final decision and that the decision was recorded in the follow-up email which constituted the instructions to Mr. Boynton who was responsible for its implementation. The judge held that, in the light of Mr. Gurnani's evidence that there was a review process which was always followed, it would not be reasonable to infer that no review took place simply because there is no documentary evidence of it having done so.

207    At para. 6.28 of his judgment, the judge referred to a similar email, which was circulated on August 25th, 2008, in respect of the proposed asset allocations for September 1st, 2008. That email, he said, related to SMFCo, Blossom and another client company. In it, Mr. Franklin recommended adding US$22.8m. to Blossom's investment in DSF which would take the leverage ratio to ×1.85; he commented that this would be "slightly short of intended 2.0x since the debt that RBS allowed slightly fell short of plan" and recommended investing:

"Blossom in white eagle: 7th single-manager—22.4m, reserving place for 1 more SM after white eagle and 3 alt beta products. The current leverage level on single-managers after white eagle investment is 1.3× (planned leveraged is 3.0×)."

The judge went on to explain that Mr. Franklin also recommended, in that email, that SMFCo invest an additional US$7.5m. and that the other client invest US$2.5m. (representing 4% of its equity of US$62.5m.) in White Eagle. All those proposals, he said, were approved by both Mr. Gharghour and Mr. Gurnani and, at the time that decision was made, they must have known that the NAV of DSF and the SMFs had fallen in the month, although they would not have known the precise numbers until later. He explained that, as at August 31st, 2008, the NAV of Mr. Al Sadik's portfolio was US$128.2m., compared with US$132.6m. at July 31st, and US$135m. at inception. That decision, he said, was consistent with the original asset allocation decision made at the beginning of March 2008 but he did not regard it as evidence of a blind adherence to the plan without regard to Mr. Al Sadik's interests. After setting out passages in the evidence of Mr. Gurnani in answer to questions as to the reasons for increasing the leverage incrementally—which were to the effect (as the judge summarized) that the asset allocation decision made in March 2008,

with a three-year time horizon, was still being pursued six months later, notwithstanding that the NAV of the portfolio had fallen from US$135m. to US$128.2m. during the period—the judge said this (at para. 6.28):

"In my judgment, the evidence does not allow me to infer that this decision was made without regard to Mr. Al Sadik's interest, in blind adherence to a plan which was improper from its inception. With the benefit of hindsight, it can be said that wrong decisions were made and that Mr. Al Sadik would have been better off if his investment had not been leveraged but those decisions were honestly made in accordance with an established review and decision making process."

### The questions for determination by this court in relation to the fourth issue

208   Mr. Al Sadik's case in respect of his 5th claim ("Breach of Trust") was pleaded in these terms (at paras. C23 and 24 of the re-re-amended statement of claim):

"23. On the terms of the Trust arising between Investcorp Bank and Mr. Al Sadik . . . Investcorp Bank was under a duty ('the Trust Duties')—(i) to do everything within its power to ensure that the terms of the SPA were carried into effect in a fair and honest manner and (ii) and under a duty of loyalty and fidelity to Mr. Al Sadik.

24. By organising and permitting the investment of the trust fund (in the value of the investment amount) in circumstances in which first-layer leverage would be used each of Investcorp Bank and/or Investcorp Nominee 1 committed a breach of the first and/or the second of the Trust Duties."

But, as the judge explained (at paras. 6.2 and 6.3 of his judgment) the claim evolved during the course of the trial and, "as finally articulated in counsel's written Closing Submission," was advanced on the basis that, on or about March 2nd, 2008, Investcorp's asset allocators (Mr. Gharghour and Mr. Gurnani) formulated a plan ("the plan") for the investment of the investment amount which was implemented from March 4th, 2008 and pursued, without regard to Mr. Al Sadik's interests, until September 2008 and which was "an illegitimate and dishonest plan designed to serve Investcorp's interests: first, by generating capital for the development of Investcorp's Hedge Funds line of business and, second, by generating two layers of fees from Mr. Al Sadik's investment in the SMFs." The judge observed that the motive for allegedly dishonest conduct was an important element of the case and needed to be put to witnesses in cross-examination. That observation was of particular relevance in a case where, as in the present case, the motive (or motives) alleged and relied upon by Mr. Al Sadik had changed in the course of the trial. He accepted that, at its core, the case against Investcorp was—and always had been—that it

132

ignored Mr. Al Sadik's best interests and acted for some selfish interest of its own. But he directed himself that, where the actions or statements of Investcorp's witnesses were open to an innocent interpretation, he should not draw the contrary inference that they were acting dishonestly for some improper purpose if the allegation was not fairly and squarely put to them in cross-examination.

209   In summary, it is submitted on behalf of Mr. Al Sadik, first, that the judge misconstrued his case on the issue whether or not Investcorp exercised the investment power in its own interests in breach of fiduciary duty and that, as a result approached the evidence on the basis that allegations of fraud were being made against Investcorp and its witnesses and secondly, that the judge was led by his flawed approach to the evidence to hold, wrongly, that Investcorp exercised the power of investment in cl. A in Mr. Al Sadik's interests and not in its own interests. It is said on behalf of Investcorp that the judge's approach to the evidence and his application of the burden of proof was plainly correct and that, regardless of questions about the "approach" to the evidence he heard at trial, the only conclusion available to the judge, as he found, was that Investcorp at all times acted in Mr. Al Sadik's interests.

210   The questions for determination by this court in relation to the fourth issue are:

   (1) Whether the judge misconstrued the nature of Mr. Al Sadik's case that Investcorp exercised the investment power in breach of fiduciary duty and so approached the evidence on the wrong basis.

   (2) Whether the judge's approach to the evidence led him to conclude, wrongly, that Investcorp had exercised the investment power in Mr. Al Sadik's interests rather than in its own interests.

***Did the judge misconstrue the nature of Mr. Al Sadik's case that Investcorp exercised the investment power in breach of fiduciary duty and so approach the evidence on the wrong basis?***

211   Grounds 25 and 26 in the memorandum of grounds of appeal were in these terms:

   "*Ground 25*: The learned Judge misconstrued the Appellant's case on the issue whether or not the First Respondent exercised the Investment Power in its own interests in breach of fiduciary duty.

   *Ground 26*: The learned Judge erred in law when he incorrectly approached the evidence about breach of fiduciary duty on the basis that allegations of fraud were being made."

212   It is submitted on behalf of Mr. Al Sadik that, in stating (at para. 6.2 of his judgment) that "the Plaintiff's case is that [the plan] was an

illegitimate and dishonest plan designed to serve Investcorp's interests," the judge misconstrued Mr. Al Sadik's case and that he was wrong to state that Mr. Al Sadik had alleged "fraud" because Mr. Al Sadik did not make any such allegation. Correctly understood, it is said, Mr. Al Sadik's case was: (i) that the investment power under the SPA was a fiduciary power; (ii) that because the IMA had not been executed the investment power was held on trust by Investcorp; (iii) that Investcorp was under a duty of loyalty in respect of the exercise of the investment power; (iv) that Investcorp was under a duty to exercise the investment power only in the best interests of Mr. Al Sadik; (v) that Investcorp exercised the investment power for its own benefit and/or without any or any proper regard for the interests of Mr. Al Sadik; (vi) that Investcorp exercised the investment power primarily for its own benefit to propagate its hedge funds line of business and/or to earn additional fees from the SMFs; (vii) that Mr. Al Sadik did not give his informed consent to the exercise by Investcorp of the investment power primarily for its own benefit; and (viii) that Investcorp was in breach of its duty to exercise the investment power only in the best interests of Mr. Al Sadik in that it acted in circumstances where it had a personal interest which was in conflict with the duty it owed to Mr. Al Sadik.

213   In developing the submission that the judge erred in treating Mr. Al Sadik's case as founded on an allegation of dishonesty—and that the judge's observation, at para. 6.3 of his judgment that—

> "where the actions or statements of Investcorp's witnesses are open to innocent interpretation, I should not draw the contrary inference that they were acting dishonestly for some improper purpose if the allegation was not fairly and squarely put to then in cross-examination,"

was wrong as a matter of law, it is said:

(1) Mr. Al Sadik's case was that Investcorp was in breach of its fiduciary duty of loyalty, not that Investcorp had been dishonest—the issue whether or not Investcorp's witnesses had an honest or dishonest state of mind was not relevant to the issues the judge had to decide in relation to the 5th claim.

(2) The judge was wrong to approach the 5th claim on the basis that Mr. Al Sadik "explicitly pleads a case of fraud and dishonesty." He seems to have arrived at this wrong conclusion because a pleaded motive for fraudulent misrepresentation claims (which Mr. Al Sadik did not eventually pursue) was that Investcorp had suffered from a liquidity crisis. However, the 5th claim was not put on the basis of fraud and the judge was wrong to approach the 5th claim as he did.

(3) The judge's approach led him to make the observation at para. 6.3 of his judgment (set out above); that approach coloured the judge's assessment of the evidence of Investcorp's witnesses in relation to the 5th claim and renders the entire judgment in respect of the 5th claim unsafe.

(4) The approach was wrong and unsafe for the additional reason that the judge should have recognized that, because the investment power was a fiduciary power, the burden lay on Investcorp to show that it had been exercised in the best interests of Mr. Al Sadik.

In summary, it is said that, having concluded, wrongly, that Investcorp's admitted fiduciary duties added nothing to its contractual duties—and notwithstanding the recognition of Investcorp's own witnesses that Investcorp was bound to act in Mr. Al Sadik's best interests—the judge not only reversed the burden of proof (by assuming that it lay on Mr. Al Sadik) but imposed an inappropriate standard of proof (namely that applicable to fraud). His analysis of the evidence was entirely vitiated by these fundamental errors of law.

214   In response, it is submitted on behalf of Investcorp that the judge correctly described and assessed the 5th claim and that Mr. Al Sadik's partial quotation of para. 6.3 of the judgment provides no support for the submission that the judge considered the wrong case. In short, it is said, Mr. Al Sadik appears to have misunderstood not only what the judge said but also his own case as advanced at trial. More particularly, it is said that—

(1) The judge's observation, at para. 6.3 of his judgment, that where the actions or statements of Investcorp's witnesses were open to an innocent interpretation he should not draw the inference that they were acting dishonestly for some improper purpose if the allegation was not fairly and squarely put to them in cross-examination, must be understood in the context in which it was made. Counsel for Mr. Al Sadik had been challenged, on a number of occasions during the trial, for failing properly to put his case to Mr. Gurnani and Mr. Franklin, among others. The judge's conclusion was self-evidently correct.

(2) The judge approached the issue of what findings he could properly make in relation to the honesty of Investcorp's witnesses against the background of his description of the evolution of the 5th claim. The 5th claim had alleged breach of trust based on Investcorp's arrangement and application of first-layer leverage (at paras. C23 and C24 of the re-re-amended statement of claim). The judge's approach to the issue to which he referred at para. 6.3 of his judgment was consistent with the pleaded case that Investcorp had breached the duty to carry out the SPA honestly.

(3) In the latter stages of trial, the case advanced by Mr. Al Sadik in respect of the 5th claim changed radically, and was finally formulated only

in paras. 224–275 of his written closing submissions, served after 26 days of trial. But that change was in respect of the alleged motive for Investcorp's behaviour. At para. 1.14 of his judgment the judge described that reformulated case in these terms:

"Finally, there is the 5th claim in the Re-Re-Amended Statement of Claim, described as a breach of trust claim which is essentially based upon the allegation that Investcorp was under a duty to do everything in its power to ensure that the terms of the SPA were carried into effect in an honest manner in the interests of Mr. Al Sadik. The pleaded breach of trust was based upon the allegation, now abandoned, that Investcorp's investment decisions were motivated by a desire to alleviate a pressing liquidity crisis. The case put in Counsel's written Closing Submissions is that the investment decisions were made for the improper purpose of providing complementary capital for its single manager programme (including the proposed Alt Beta fund) and generating two layers of fees. Whether it is open to the Plaintiff to pursue this un-pleaded claim is an issue I have to decide."

The judge correctly identified (at para. 6.3 of his judgment) that "the plan" first alleged by Mr. Al Sadik at trial was a "distinctly different motive for the dishonest behaviour originally alleged against Investcorp." The central allegation that Mr. Gurnani and Mr. Franklin knowingly pursued an improper purpose, deliberately acting in Investcorp's own interests and acting against the interests of Mr. Al Sadik, plainly involved the implicit allegation of dishonest conduct. Mr. Al Sadik overlooks the fact that his allegations concerning "the plan" were inextricably linked to his case on the use of Blossom and its inclusion in the investment structure, which was also put on the basis that Investcorp had acted dishonestly. This was acknowledged by counsel for Mr. Al Sadik in his oral closing submissions. The judge observed (at para. 6.2 of his judgment) that the decision to use first-layer leverage through Blossom, using the White Ibis III credit facility, went to the heart of Mr. Al Sadik's allegations of fiduciary duty.

(4) It is not open to Mr. Al Sadik to suggest, on this appeal, that his case at trial was not that Investcorp acted dishonestly having regard to the exchange between judge and counsel in the course of his unsuccessful application to amend his case on the eve of trial:

"*The judge*: I think there would be more force in that point if this really was a negligence action. It's not—it's a breach of fiduciary duty to which you're making serious allegations of dishonesty.

*Counsel*: Yes, we are, My Lord."

Further, in response to the submissions that, in making his findings of fact, the judge shifted the burden of proof and applied the wrong standard of proof, it is said on behalf of Investcorp that—

(5) Mr. Al Sadik's contention that the burden of proof lay on Investcorp to establish that it did not act in breach of trust is ill-founded. It is readily apparent from the judgment that the judge applied well-established principles. Mr. Al Sadik has identified no basis on which it can be said that the judge was wrong to do so and cites no authority in support of his unreasoned assertion. It is accepted as trite law that a fiduciary is bound to account for any profit that he has received in breach of fiduciary duty. The taking of an account is the means by which the beneficiary requires the trustee to justify his stewardship of trust property—the trustee must show what he has done with that property—on the taking of an account, the court lays the burden on the defaulting fiduciary to show that the profit is not one for which he must account. But, it is said, that is not this case: (i) Investcorp had not been found to have acted in breach of fiduciary duty; (ii) there is no dispute as to what Investcorp did with the moneys invested by Mr. Al Sadik; and (iii) no account has been ordered in respect of any profit. Mr. Al Sadik ignores the wider point of principle that the burden of proof lies on the party who asserts the truth of the issue in dispute: in the present context that issue was whether Investcorp acted in breach of fiduciary duty. If that party adduces sufficient evidence to raise a presumption that what is claimed is true, the burden (the so-called evidential burden) shifts to the other party, who will fail on the issue in question unless he adduces evidence sufficient to rebut the presumption.

(6) It is then for the court to make its decision on the "balance of probabilities," and this is the standard of proof required in civil cases. Mr. Al Sadik has failed to identify any basis for his submission that the judge applied the wrong standard of proof. Nowhere in his judgment did the judge suggest that he was applying anything other than the ordinary civil standard of proof.

Accordingly, it is said, the judge was correct to conclude that he should only make a finding of dishonesty if that allegation had been fairly put to a witness: that was a relevant and necessary conclusion in the context of the case that Mr. Al Sadik advanced at trial. The attempt to overturn the judge's first-hand impressions of the relevant witnesses is hopeless.

215    The 5th claim ("Breach of Trust") was pleaded at paras. C23 and C24 of the re-re-amended statement of claim:

"23. On the terms of the Trust arising between Investcorp Bank and Mr. Al Sadik . . . Investcorp Bank was under a duty ('the Trust Duties')—(i) to do everything within its power to ensure that the terms of the SPA were carried into effect in a fair and honest manner and (ii) and under a duty of loyalty and fidelity to Mr. Al Sadik.

24. By organising and permitting the investment of the trust fund (in the value of the Investment Amount) in circumstances in which First Layer Leverage would be used each of Investcorp Bank and/or Investcorp Nominee 1 committed a breach of the first and/or the second of the Trust Duties."

In my view the judge was right to treat that as a claim founded on allegations of dishonesty. Paragraph 24 of the re-re-amended statement of claim alleged that, by investing the trust fund in circumstances in which first-layer leverage would be used, Investcorp committed a breach of the first of the trust duties identified in para. 23, namely, a duty to do everything in its power to ensure that the terms of the SPA were carried into effect "in a fair and honest manner." Taken together, the substance of the allegation is that, in using first-layer leverage, Investcorp failed to act in an honest manner: that is to say, that Investcorp acted dishonestly.

216   The claim evolved during the course of the trial—as the judge explained (at paras. 6.2 and 6.3 of his judgment)—because Mr. Al Sadik (through his counsel) recognized that the motive originally relied upon as the foundation for the allegation of dishonesty could not be established, the case against Investcorp remained "that it ignored Mr. Al Sadik's best interests and acted for some selfish interest of its own." As the judge put it—correctly, in my view—the factual case ultimately presented to the court, although "asserting a different motive of the dishonest behaviour alleged," was not fundamentally different from the pleaded case. In those circumstances, I reject the submission that the judge misconstrued the nature of Mr. Al Sadik's case in relation to the 5th claim. The claim was at the outset, and remained, a claim based on allegations of dishonest conduct on the part of Investcorp and its relevant employees. The judge was right to treat it as such.

217   I reject, also, the submission that the judge approached the evidence on the wrong basis. I agree with Investcorp that the burden of establishing the case that it was in breach of trust—or in breach of fiduciary duty—lay on Mr. Al Sadik and that the evidential burden did not shift in the course of the trial. In my view, that submission is correct, for the reasons which Investcorp has advanced. The 5th claim was not a claim for an account of profits: the primary rule that the burden of proof lies on the party who asserts the truth of the issue in dispute was not displaced. And I agree with Investcorp that there is nothing in the judge's judgment to suggest that the judge applied a standard of proof other than the civil standard of proof. But the allegations of dishonesty that were at the core of Mr. Al Sadik's case were serious allegations against professional bankers and the judge was right to approach them on that basis. In particular, he was right not to make findings against Mr. Kironde (and others) on issues that had not been fairly and squarely put to them in cross-examination.

138

***Did the judge's approach to the evidence lead him to conclude, wrongly, that Investcorp had exercised the investment power in Mr. Al Sadik's interests rather than in its own interests?***

218  Grounds 27 and 28 in the memorandum of grounds of appeal were in these terms:

"*Ground 27*: The learned Judge's errors of law caused him wrongly to hold that the Appellant had failed to prove his case that there was an 'ulterior purpose' for the Respondents' asset allocation when in fact the burden of proof was on the Respondents to demonstrate that they had obtained the Appellant's informed consent to the asset allocation.

*Ground 28*: The learned Judge's failure to adopt the correct approach to determining the question of whether the Respondents had acted in the Appellant's best interests caused him to fail to take into account the arguments by the Appellant that the allocation decisions taken by the First Respondent were taken for its own benefit without regard to the interests of the Appellant."

219  It is said on behalf of Mr. Al Sadik that had the judge adopted the correct approach he would have held that Investcorp had failed to establish that it had acted in Mr. Al Sadik's best interests in exercising the discretionary investment power. In particular, Investcorp failed to answer, adequately or at all, why it was in Mr. Al Sadik's best interests that Investcorp chose the investments that it did; why it exposed Mr. Al Sadik to the risks that it did and why it applied leverage to Mr. Al Sadik's portfolio when and in the sums it did. Investcorp failed to establish that there was any process to consider, or any actual consideration of, the performance of Mr. Al Sadik's portfolio against the risks to which he was exposed and failed to establish that it acted otherwise than in its own interests in the undisclosed maximization of its fee income and the propagation of its hedge funds line of business.

220  In developing that ground it is submitted that—

(1) the judge's findings of fact—that Mr. Gurnani's decision to adopt Scenario 1 instead of Scenario 2 "was not motivated by a desire to use Mr. Al Sadik's money for the purpose of generating two layers of fees" (at para. 6.8 of his judgment) and that the decision to allocate half of the investment amount to the SMFs (×3 leverage) "was made bona fide in the belief that it was an appropriate component for Mr. Al Sadik's portfolio having regard to the 45% target return over three years" (at para. 6.12 of his judgment)—were wrong, in that the judge failed to take into account the following material circumstances:

(i) that Scenario 1 and Scenario 2 were each in respect of an unauthorized investment;

(ii) that he had made findings of fact, at paras. 6.11 and 6.12 of the judgment (a) that Investcorp earned two layers of fees (that is to say management and performance fees on the terms of the SPA and fees from each of the SMFs from investments made on behalf of Mr. Al Sadik); (b) that the fee-sharing arrangements between Investcorp and the SMFs "were not brought to Mr. Al Sadik's attention, either at the time of executing the SPA or at any time thereafter"; and (c) that "It is correct to say that investing Mr. Al Sadik's money in the Single Managers indirectly generates a higher fee income for Investcorp";

(iii) that, under the terms of the SPA, Investcorp had delegated the selection of investments to the holder of the investment power and that, therefore, the onus of reading the offering documents of the SMFs did not fall on Mr. Al Sadik but on the holder of the investment power, and that it was for the holder of the investment power to obtain Mr. Al Sadik's informed consent to permit Investcorp to earn additional fees from the SMFs which were identified in the offering documents;

(iv) that Investcorp's motivation was not relevant to the question whether or not it had breached its fiduciary obligation not to put itself in a position where there was a conflict between its own interest and the interest of Mr. Al Sadik; and

(v) that the burden of proving that Investcorp had obtained the informed consent of Mr. Al Sadik to permit it to make investments where there was a conflict between Investcorp's duty and interest lay on Investcorp and Investcorp did not discharge that burden.

(2) Investcorp's intended course of action ("the plan") was to invest Mr. Al Sadik's money 50% in DSF ×2 and 50% divided equally between SMF ×3 and/or Alt Beta ×3. The way in which the plan was implemented reveals the reasons for it and this can be seen in the pattern of investments made. The judge failed to consider Mr. Al Sadik's submissions (set out at para. 235 of his written closing submissions) in which he demonstrated that leverage was not applied carefully and incrementally, but systematically and in accordance with a single asset allocation decision that had been taken on March 2nd, 2008. That asset allocation decision was not reconsidered and there was no deviation from it. The decision was taken for the benefit of the development of Investcorp's hedge funds line of business and not for the benefit of Mr. Al Sadik. In those circumstances, it is said, the asset allocation decision was taken in breach of the overriding

duty of loyalty and was selfish conduct and contrary to Investcorp's duty to act only in Mr. Al Sadik's best interests. More particularly:

   (i) Under the White Ibis III credit facility an equity investment of US$135m. could produce a maximum buying power of US$450m. The effect was that, to invest in DSF ×2 (under the plan), the allocation of buying power intended for that category had to be US$193m. and, to invest in SMF ×3 (under the plan), the allocation of buying power intended for that category had to be US$257m.

   (ii) The "investments table" (Appendix 1 to the appellant's skeleton argument on this appeal) shows that already, by July 1st, 2008 (see row D), each of the six SMFs then in existence had received nearly the entire allocation that the plan envisaged would (and on the terms of the RBS loan could) be allocated to it: that is to say, US$22.4m. When Blossom invested in a seventh SMF (White Eagle, launched only two months earlier), Investcorp allocated an identical amount (US$22.4m.) to that SMF also (see row F). The table shows that, by September 1st, 2008, Blossom had reached its leverage target in respect of DSF at ×2: that is to say, US$192.3m. had been invested).

   (iii) It can be seen from the investments table (a) that, by September 1st, 2008, Investcorp had leveraged Mr. Al Sadik's investment very nearly to the maximum amount possible in accordance with the plan; and (b) that it was only waiting for new SMFs and/or Alt Beta products before leveraging to maximum. The only thing that constrained Investcorp was the lack of SMFs and/or Alt Beta products.

   (iv) In mid-September 2008, Investcorp was determined to invest all funds Blossom could raise out of the RBS facility in a new SMF (Hawkstone) to be launched on October 1st, 2008 and in Alt Beta products which Investcorp was planning to launch on the same day. The only reason the final investments were not made is that Investcorp believed that Mr. Al Sadik had threatened to redeem by the year end. The internal emails show that Investcorp was desperate for funding for its new projects and saw Blossom as a ready source (in fact the only available external source) to propagate its hedge funds line of business.

  (3) The plan was devised in order to use Mr. Al Sadik's investment as a source of capital to propagate Investcorp's hedge funds line of business. The investment pattern demonstrates that the decisions to apply leverage when (and in the amounts) that it was applied were driven by the

availability of new products. Investcorp was acting in its own interests and not in the interests of Mr. Al Sadik. This is further evidenced by the fact that, although (under the SPA) it had a choice of over 80 funds in which to invest, it chose to invest only in Blossom. Investcorp made that choice so that it could implement the plan.

(4) The findings of the judge, at para. 7.5 of his judgment, that—

"the Defendants' initial asset allocation decision and the subsequent decisions in relation to the application of leverage were made bona fide for a proper purpose in accordance with the SPA. The allocation of half the Investment Amount to Single Managers (with 3× leverage), on the basis that the investment would be diversified across an additional four Single Managers (including Alt Beta funds) as and when new funds were launched, was made in what Investcorp believed to be in Mr. Al Sadik's interest and not for the ulterior purpose of capitalizing the new funds and/or increasing its fee income through the fee sharing arrangement with the Single Managers,"

indicates that he ignored, or did not take into account, the arguments which had been advanced at trial. In particular, the judge failed to take into account that each of the following decisions taken by Investcorp was taken to enable it to make investments in new single-manager funds and in new Alt Beta products as and when these became available:

(i) the decision to generate funds by making the investment in Blossom and to negotiate the White Ibis III facility;

(ii) the decision not to obtain Mr. Al Sadik's consent to borrowing by means of the White Ibis III credit facility;

(iii) the decision not to make investments in named Investcorp leveraged funds but instead to make the investment in Blossom;

(iv) the decision to negotiate the maximum allocation with RBS to invest into the SMFs and new, untried and untested Alt Beta products (which were not hedge funds but accounts traded to simulate returns that could be expected from hedge funds);

(v) the decision to divide the capital available from the White Ibis III credit facility for SMFs and Alt Beta into 10 equal parts without discrimination contrary to weighting adopted by SMFCo and Mr. Franklin's recommendation;

(vi) the decision to reserve the maximum allocation of capital to Alt Beta products under RBS's liquidity guidelines for Alt Beta products;

(vii)    the decision to leverage Mr. Al Sadik's investment in due course to the level of the maximum LTV under the White Ibis III credit facility;

(viii)    the decision to abandon its policy not to use client capital to seed Alt Beta products and use Mr. Al Sadik's capital to seed Alt Beta products;

(ix) the decision to increase leverage in DSF in step with investments in new SMFs and Alt Beta products;

(x) decision to make an investment of 10% of the capital allocation for the SMFs and Alt Beta as soon as each such fund or product was or would be available;

(xi) the decision to plan to borrow and draw down the maximum available under the White Ibis III credit facility in the immediate aftermath of the collapse of Lehman Brothers in the single-minded pursuit of their own interest in the launch of the Alt Beta products and without any or any proper regard to the interests of Mr. Al Sadik.

And, further, the judge failed to take into account that because Investcorp had less and less capital available to propagate its hedge funds line of business it needed Mr. Al Sadik's funds to do so.

(5) Notwithstanding that the burden of proving that Investcorp exercised the investment power in the best interest of Mr. Al Sadik lay on Investcorp and not on Mr. Al Sadik, Investcorp did not produce any documentary evidence that it ever considered the best interests of Mr. Al Sadik in the way his investments were structured. In support of Mr. Al Sadik's grounds of appeal, reliance is placed on the matters identified in Schedules 1 and 2 to the memorandum of grounds of appeal.

221    In response to the submission that the judge failed to consider Mr. Al Sadik's case (advanced at para. 235 of his written closing submissions) that Investcorp had taken its investment decisions in breach of the duty of loyalty and contrary to the duty to act in Mr. Al Sadik's interests, it is said on behalf of Investcorp that the judge's decision not to address in his judgment a number of the matters raised in para. 235 of Mr. Al Sadik's written closing submissions is not a proper ground for challenge: reliance is placed on the observations in *Eagil Trust Co. Ltd.* v. *Piggot-Brown* (8) that there is no duty on a judge, in giving his reasons, to deal with every argument presented by counsel in support of his case. It is said that the evidence set out in section 6 of his judgment supports the judge's finding that Investcorp was acting in Mr. Al Sadik's best interests when applying leverage to his portfolio; that Mr. Al Sadik has failed to point to any convincing reason why the judge should have addressed the arguments in

para. 235 of his written closing submissions and that his complaint that the judge did not do so has no weight.

222    In response to Mr. Al Sadik's submission that, on the facts, Investcorp failed to establish that it had acted in Mr. Al Sadik's best interests in exercising the discretionary investment power, it is submitted on behalf of Investcorp that it had adduced extensive evidence in relation to the portfolio construction and asset allocation process—as can be seen from the judge's consideration of that evidence throughout section 6 of his judgment—a significant portion of which formed the basis of the judge's findings. That evidence included:

(1) The reasons for Mr. Gurnani's decision to adopt Scenario 2, following the tightening of Mr. Al Sadik's portfolio liquidity requirements, which had the effect that he selected (of the two alternatives) the portfolio with a lower risk profile and lesser allocation to SMFs. That decision, and its effect, contradicted Mr. Al Sadik's case: as the judge observed, at para. 6.8 of his judgment, if the motive had been fees, Mr. Gurnani could have been expected to select the alternative scenario.

(2) The process by which Investcorp selected and promoted SMFs, which was described in detail by Mr. Gurnani—as the judge found at para. 6.11 of his judgment—and was not criticized in any way.

(3) The reasons for revenue sharing arrangements with the SMFs, which were recognized by the judge as a form of compensation and not as a commission or profit share. The judge found (at para. 6.12 of his judgment) that it must be inherently unlikely that the existence of a revenue sharing arrangement with the SMFs would motivate Mr. Franklin, Mr. Gurnani or Mr. Gharghour to behave unprofessionally.

(4) The email chain from February 19th, 2008—discussing the budget plan for proprietary capital—did not lead the judge to infer (as he said at para. 6.13 of his judgment) that Mr. Franklin's portfolio construction was in any way driven by the motive that part of Mr. Al Sadik's capital could be used to substitute or "complement" Investcorp's proprietary capital. The judge found (at para. 6.14 of his judgment) that Investcorp's decision to reduce the amount of proprietary capital allocated to its hedge fund line of business was not communicated to the hedge fund group until after they had made the decision to deploy Mr. Al Sadik's funds in the SMFs.

(5) The reasons for Mr. Kapoor's decision to seed two further SMFs (White Eagle and Hawkstone), which, as the judge held (at para. 6.15 of his judgment) did not support Mr. Al Sadik's case that the allocation of half of Mr. Al Sadik's money to the SMFs was motivated by a need to replace or "complement" proprietary capital.

(6) The reasons for the decision to defer investment of Mr. Al Sadik's capital into White Eagle until after the initial investment of proprietary

capital into that fund, which, as the judge held (at para. 6.24 of his judgment) supported the view that the decision makers were complying with Investcorp's established policy and acting in its client's interest.

223   In developing the submission that, in any event, it is plain from his judgment that the judge did consider Mr. Al Sadik's case in reaching his decision (at para. 7.5 of his judgment) that Investcorp's investment and leverage decisions were made *bona fide* and for a proper purpose in accordance with the SPA, it is said that the judge made the following findings:

(1) At para. 6.23 of his judgment, that there was nothing about Mr. Gurnani and Mr. Franklin's explanation of the original asset allocation decision or the subsequent applications of leverage which tended to suggest that they were acting dishonestly for some improper purpose.

(2) At para. 6.12 of his judgment, that the decision to allocate half of the investment amount to SMFs (×3 leverage) was made *bona fide* in the belief that it was an appropriate component for Mr. Al Sadik's portfolio having regard to the 45% return target over three years.

(3) At para. 6.23 of his judgment that the strategy of investing in SMFs and Alt Beta, and saving funds for investment in new products, was perfectly legitimate and was fully explained by the evidence of Mr. Franklin and Mr. Gurnani.

(4) At paras. 6.26 and 6.28 of his judgment, that the evidence did not support an allegation of blind adherence to an investment strategy without regard to Mr. Al Sadik's interests but, on the contrary, investment decisions were made honestly in accordance with an established review and decision-making process.

(5) At para. 7.5 of his judgment, that the allocation to SMFs was made in what Investcorp believed to be in Mr. Al Sadik's interest and not for the ulterior purpose of capitalizing the new funds and/or increasing its fee income through the fee-sharing arrangement with SMFs.

224   It is pointed out on behalf of Investcorp that the judge's conclusions were reached with the benefit of extensive written evidence (over 100 pages of witness statements from the hedge funds team alone) and lengthy cross-examination and that they were largely informed by his judgment of the credibility of Mr. Gurnani and Mr. Franklin, whom he found (at para. 6.23 of his judgment) to be honest and experienced industry professionals. It is said that, in challenging those conclusions, Mr. Al Sadik seeks to rely on the pattern of investments by Investcorp from March to September 2008. The nature and timing of these investments is not in dispute and in any event the judge properly considered and addressed these matters when he found (at para. 6.28 of his judgment) that the investment decisions were

made honestly in accordance with an established review and decision-making process. At para. 7.5 of his judgment the judge rejected Mr. Al Sadik's case (which he now seeks to revive on appeal) that Investcorp used "the plan" as a source of capital to propagate its hedge funds business. The judge rejected that case on the basis of the evidence and Mr. Al Sadik has identified no basis on which the judge's decision to do so may be overturned on appeal.

225   It is asserted in Ground 27 in the memorandum of grounds of appeal that the judge reached his conclusion that Mr. Al Sadik had failed to prove his case that there was an "ulterior purpose" for Investcorp's asset allocation as a result of "errors of law" and, at Ground 28, that it was the judge's "failure to adopt the correct approach to determining the question of whether the Respondents had acted in the Appellant's best interests" which led him to leave out of account Mr. Al Sadik's arguments that the allocation decisions were taken for the benefit of Investcorp without regard to his interests. Given that I have held that the judge did not err in his approach to the evidence in relation to the 5th claim—whether in laying the burden of proving his case on Mr. Al Sadik or in applying the wrong standard of proof—I reject those assertions. If the judge was wrong to hold that, in exercising its power to allocate assets to Mr. Al Sadik's investment, that was not because he adopted the wrong approach to the evidence: if he was wrong, it was because he misunderstood the evidence or failed in his task of evaluating the evidence in the light of the arguments which had been put to him.

226   I reject, also, the submissions—advanced on behalf of Mr. Al Sadik—that (i) the judge's finding of fact (at para. 6.8 of his judgment) that Mr. Gurnani's decision to adopt Scenario 1 instead of Scenario 2 was not motivated by a desire to use Mr. Al Sadik's money for the purpose of generating two layers of fees, and (ii) that the judge's finding (at para. 6.12 of his judgment) that the decision to allocate half of the investment amount to the SMFs (×3 leverage) "was made bona fide in the belief that it was an appropriate component for Mr. Al Sadik's portfolio having regard to the 45% target return over three years" were flawed, in that the judge failed to take into account material circumstances. In particular:

   (1) Given that the judge had reached the conclusion (with which I agree) earlier in his judgment that leveraging at the portfolio level was authorized by the SPA, it cannot be said that either Scenario 1 or Scenario 2 was "in respect of an unauthorized investment."

   (2) The judge accepted (in making the findings that he did at paras. 6.11 and 6.12 of his judgment) that investing in the SMFs "indirectly generates a higher fee income for Investcorp" but explained (at para. 6.12) why he took the view that "it must be inherently unlikely that the existence of this type of fee sharing arrangement (which is actually compensation and not a

commission or profit share) would motivate Messrs. Franklin, Gurnani and Gharghour to behave unprofessionally."

(3) The judge appreciated that Investcorp had not obtained Mr. Al Sadik's informed consent to the fee-sharing arrangements. It is not in dispute that Mr. Al Sadik could have informed himself of those arrangements if he had chosen to read the SMFs offering documents but, whether or not there was any onus upon him to do so is irrelevant in the present context.

(4) It is irrelevant, also, to the findings of fact which the judge made at paras. 6.8 and 6.12 of his judgment that Investcorp had not obtained Mr. Al Sadik's informed consent to the fee-sharing arrangements. The 5th claim was not a claim for the recovery of undisclosed profits.

(5) The claim which was before the judge was not based on an allegation that Investcorp had put itself in a position of conflict: the allegation was that Investcorp's conduct was dishonest in that it had deliberately chosen to prefer its own interest to the interest of Mr. Al Sadik. In that context the question of motivation was of obvious relevance.

227   It is said on behalf of Mr. Al Sadik that the judge's conclusion (at para. 7.5 of his judgment) that Investcorp's initial asset allocation decision and the subsequent decisions in relation to the application of leverage were made *bona fide* for a proper purpose in accordance with the SPA—in what Investcorp believed to be in Mr. Al Sadik's interest and not for the ulterior purpose of capitalizing the new funds and/or increasing its fee income through the fee-sharing arrangement with the SMFs—indicated that the judge ignored, or did not take into account, the arguments which had been advanced at trial. In particular, it is said that the judge did not take account of the arguments at para. 235 of Mr. Al Sadik's written closing submissions, in that the judge did not refer expressly to each of those arguments. In addressing that criticism, it seems to me appropriate (notwithstanding the length of para. 235 in the written closing submissions) to set it out in this judgment:

"It is important to keep in mind some basic mathematics—

235.1 The amount invested in Blossom by Shallot on March 4th, 2008 was just less than USD135 million. For the purpose of illustrating the mathematics 135 million is taken as the starting point and all amounts of money are in millions (A) 50% of 135 at 2× leverage produces 202.5; (B) 50% of 135 at 3× leverage produces 270. This means that according to the Plan when it was originally formulated the asset allocators would have been looking at buying power of USD 472.5 million and finance for leverage of USD337.5 million.

235.2 The terms of the RBS facility were as follows: (A) there was a loan to value ratio (LTV) fixed at 70%; (B) in the first year of the facility the concentration of investments was limited: to 60% of the portfolio in SMs; to 20% of the portfolio in Alt Beta and to 10% of the portfolio in any given Alt Beta. In addition at least 40% of the portfolio had to be invested in DSF at any given time.

235.3 The 70% LTV ratio means that with 135 million of equity it would be possible to borrow no more than USD315 million and the maximum buying power would be USD450 million (i.e. equity+debt). If the RBS facility concentration limits are applied to these numbers it means that: no more than USD270 million could be allocated to SM (because the SM component was capped at 60%) of which no more than 90 million could be allocated to Alt Beta of which no more than 45 million could be allocated to any given Alt Beta product.

235.4 The concentration limits referred to the 'portfolio,' therefore, in order for an investment of USD270 million to be made in SMs (on these figures) it would have been necessary to invest USD180 million in DSF.

235.5 For the avoidance of doubt (by reference to what is said in the foregoing para.) it is to be noted that if, e.g., only USD100 million was invested in DSF then the maximum funding available for SMs would be USD150 million. Of course, if from such a position the value of DSF were to decline then the LTV limits could easily be breached and it would be necessary to redeem SMs or vice versa. Such a situation could give rise to distress depending on the ability to redeem from SMs in order to rebalance the concentration. By October 2008 precisely that problem had arisen on Blossom's account and there was a forced redemption of USD80 million in November. This is because the 80% of Investcorp's suspension/redemption trigger was at a real risk of being breached.

235.6 There is a pattern to the way the AA was done. Again working from a figure of USD135 million of equity. 50% of available debt was allocated to the SMs/Alt Betas side, i.e., USD450 million divided by 2 which produces USD225 million. If this is divided by 10 SMs (the target) USD22.5 million is available to each. By the 1 June the existing 6 single-managers had each received USD22.4 million (i.e. just below the equal allocation figure). This meant that on the SMs/Alt Beta side on 1 June 2008 there remained USD90.6 million, i.e., USD22.6 million was left over for each in future. These calculations are consistent with the contemporaneous documents which are referred to below.

148

235.7 In order to fund more SM/Alt Beta managers it would have been necessary to leverage DSF up so that the initial (self-imposed) fifty fifty concentration limit would be maintained. For each SM added it was necessary to add equal funding to the DSF side. It is to be noted that redemptions from DSF were available only quarterly on 60 days' notice therefore if Investcorp believed that a new Single Manager would be ready for follow on funding or an Alt Beta product was ready for seeding imminently actually storing funds in DSF would have been impractical because the funds would not have been instantly available.

235.8 The position on 1 September (having regard to debt) was as follows. At that stage DSF stood at 2× leverage (see the table in Mr. Franklin's first witness statement). This means that DSF had reached its target maximum leverage according to the AA Plan. Therefore, in so far as this could support the application of leverage to the SMs/Alt Beta side that is where all the remaining AAs would be. In the course of September AA decisions were being taken that would use up all of the remaining credit on the SMs/Al Beta side: investment in one more SM (Hawkstone) and capital used to seed 2 Alt Beta products—which was all to happen on 1 October 2008. It did not happen only because Investcorp formed the belief on or about 16 September that the Plaintiff was threatening to redeem.

235.9 The Plaintiff's case is that leverage was not applied carefully and incrementally but systematically and according to one AA decision that was taken on 2 March 2008, which was not reconsidered and not deviated from, and which was taken for the benefit of the development of Investcorp's Hedge Fund LOB and not for the benefit of the Plaintiff (whose interests were merely incidental). That was a breach of the overriding duty of loyalty and was selfish conduct and contrary to the duty to act fairly. Investcorp has admitted it was a fiduciary in all respects, it was exercising a fiduciary power and therefore it owed a duty to the Plaintiff of the highest order, which he says it did not discharge. The burden is on Investcorp to prove the reverse.

235.10 Investcorp's main witness on AA was Mr. Gurnani. His colleague Mr. Gharghour was not called. Those two were the asset allocation decision takers. Mr. Gurnani's evidence showed that at all material times he had a pure and unswerving faith in the benefits of the Single Manager Program and Alt Beta products. He believes that the newer a fund is the more likely it is to make money, which is bizarre and should not be given credit because ex hypothesi, if he is right then Investcorp would set up and abandon funds on a regular basis. Above all, he showed that there was never a shadow of a doubt in his mind that his original AA decision (to organize the Plaintiff's

investment to fund new SMs and Alt Beta products) might not have been the right one. This is inexplicable because the stark fact is that Mr. Gurnani's decisions (on which he relied for Mr. Franklin's help) lost almost USD75 million of the Plaintiff's money in a matter of months pursing a disastrous investment policy: he applied leverage in a very bad market (to which his trite response is that even in bad markets hedge funds are expected to do well which might be the case for some specific hedge fund based on particular information, but as a general statement is meaningless.

235.11 It is undeniable that when Investcorp decided to invest the Plaintiff in SMs they obtained 2 lots of fees. The first fee was charged at the level of the SPA (*sic*). The second fee was Investcorp's share of the fees of the SMs. The higher the leverage the higher the fee. An ordinary investor, going into SMFCo would have paid only one set of fees. Mr. Gurnani testified that Investcorp's flagship funds did not invest in the SM platform, because, as Mr. Gurnani explained at great length, it would not be an arm's length arrangement (by which he clearly meant there would be a conflict of interest) and it would be necessary to go back to the investors on every occasion. The obvious and only legal reason why DSF would have to go back to the investors to approve such a decision is because it would have to be disclosed that the investment manager (Investcorp) was not impartial because it was taking a fee on both sides of the deal and that therefore it had a conflict of interest. It is not possible to draw a meaningful distinction between the position of investors in DSF and the Plaintiff for these purposes. There was a conflict of interest and the fees should have been but were not disclosed to the Plaintiff. It is in the very nature of a fiduciary discretionary power of investment that the fiduciary looks out for the principal's interests; the principal has conferred the power, so that someone else will have the responsibility of looking after his interest unselfishly, with absolute loyalty: therefore it does not behove a fiduciary to turn around and say, 'you should have known' or 'you could have read the fund memoranda yourself': that was the fiduciary's job, it lay within the ambit of his fiduciary responsibility and the fiduciary cannot turn around and say that to his principal that he should have been looking after his own interest by doing a task which the principal had conferred on the fiduciary. The Defendants' position on this is tautologous: they have no way out. Equity does not tolerate a fiduciary to obtain a collateral benefit by reason of his fiduciary relationship unless he has been permitted to do so by his principal after giving the most full and frank disclosure.

235.12 Mr. Gurnani's evidence that Investcorp's flagship funds did not invest in SMs is simply wrong. It is wrong because on 1 January

2008 IBSF invested in the SM's when it became the only invention (*sic*) in SMFCo.

235.13 Yet another aspect of the Investcorp's breach of fiduciary duty lies in the nature of the high risk investments it pursued. The law says that a person who has a discretionary power of investment is not obliged to exercise it. He can choose not to do so. If he does so he must do so in good faith. The Plaintiff demonstrated massive faith in Investcorp when he conferred the discretionary power on it: he did not for one minute believe that it would play fast and loose with his money. He was an experienced investor but he was not an expert and it is too much to expect him to have understood or second guessed each and every aspect of his investment. It was a complicated investment (as this case has demonstrated) in funds of hedge funds: e.g., it involved the use of leverage through investment in leveraged vehicles (such as LDSF 3×), or so the Plaintiff thought—in fact the position was much more complicated than that: Blossom borrowed money from RBS in order to pursue a combined 2× and 3× strategy in which concentration limits applied, this meant that if one side of the equation did badly the LTV ratio could be breached and forced redemptions would occur giving rise to a situation in which the Investment Manager has lost control: and that is precisely what did occur in October 2008. This was an unwise, high stakes and very risky way to structure the Plaintiff's investment: and it was done without the Plaintiff's knowledge or consent. There is a very real and material difference in control between an isolated investment that is leveraged, and one that is interdependent with another investment that is leveraged: the latter type of arrangement is apt to veer out of control.

235.14 Mr. Gurnani says that he was a numbers man, all he was interested in was the asset allocation: he left the detail on which he based his decisions to Mr. Franklin, and if it was a complicated decision, e.g., to do with structuring and leverage, he left it to Mr. Gharghour. Mr. Gurnani says it was Mr. Gharghour who took the decisions about leverage. So far as Mr. Gurnani was concerned, as long as the asset allocations he wanted were made, he did not mind how it was done. Mr. Gurnani admitted that he did not know the terms of the SPA; or the terms of the RBS facility: and, he thought that if he needed to know these terms someone else would tell him about them. He did not even see the investment proposal that had been put to the client before he took his AA decisions. Mr. Gurnani's attitude towards the responsibilities that his own job [imposed] displays breath taking insouciance: it is astonishing that the person exercising a fiduciary power of investment did not understand the scope of his investment mandate or the constraints upon it, or even

receive a properly detailed memorandum about what the client wanted. What the client wanted should have been checked and verified. Mr. Gurnani was relying, in relation to what he intended to be an investment worth almost half a billion dollars (*sic*), on information provided by employees (Mr. Al Khatib and Mr. Kironde) who he knew would be amply rewarded for the investments that had been made by reference to the AUM that had been brought in. Mr. Franklin said in evidence that the PRM team's compensation was linked to the amount of leverage applied. He should have checked, he did not check. The way Investcorp was organised meant that the asset allocators did not know things they should have made it their business to find out."

228    I reject the submission that this court can be asked to infer that the judge ignored, or did not take into account, the arguments which had been advanced at trial. In my view that inference cannot be drawn either (i) from a judge's decision not to refer to each and every argument put to him; or (ii) from the judge's decision to make findings of fact which differ from those which the arguments were advanced to support. The inference that the judge took no account of the arguments cannot be drawn because it ignores the obvious possibilities (i) that in a lengthy, detailed and obviously careful judgment, the judge chose not to refer to arguments which he found irrelevant or of little assistance, and (ii) that the judge made the findings that he did because he preferred to rely on the evidence of the witnesses that he had seen and heard rather than on counsel's submissions.

229    The question for the judge in relation to the 5th claim was whether, in making the initial asset allocations and applying leverage, Investcorp (through its relevant employees) improperly and in breach of fiduciary duty, preferred its own interests to those of Mr. Al Sadik. The question was not whether the investment decisions that were made were sensible or wise, or whether other investment managers would or might have made other investment decisions. The question for this court is not whether it would have reached the conclusions of fact on those issues which the judge reached but whether, on the evidence which was before him at trial, those were conclusions of fact which were open to the judge. And, in addressing that question, this court must have proper regard to the fact that the judge had the advantage (which this court does not have) of seeing and hearing the witnesses give their evidence.

230    In my view there is no basis on which this court could hold that it was not open to the judge to reach the conclusions that he did in relation to the 5th claim.

**Conclusion and disposal of appeal**

231   For the reasons that I have set out in this judgment, I would dismiss this appeal.

232   In the circumstances that I would reject all (or substantially all) of the submissions advanced on behalf of Mr. Al Sadik, I take the view that there is no reason why the costs of the appeal should not follow the event. Costs should be assessed on the standard basis. But the parties should have the opportunity to make representations to the Court of Appeal, if they so wish, that some other order as to costs would be more appropriate. Such representations (if any) should be made in writing within 28 days of the delivery of this judgment.

233   **MOTTLEY, J.A.:** I have read the judgment of Chadwick, J.A. in draft and have nothing to add.

234   **CAMPBELL, J.A.:** I have had the advantage of reading in draft the judgment of Chadwick, J.A. and for the reasons that he has given I agree that the appeal should be dismissed.

*Appeal dismissed.*

Attorneys: *Harney Westwood & Reigels* for the appellant; *Walkers* for the respondents.

———————————————

# AUTUMN HOLDINGS ASSET INC v. RENOVA RESOURCES PRIVATE EQUITY LIMITED (as a shareholder of Pallinghurst (Cayman) General Partner LP (GP) Ltd.), PALLINGHURST (CAYMAN) GENERAL PARTNER LP (GP) LIMITED, PALLINGHURST (CAYMAN) GENERAL PARTNER LP and PALLINGHURST RESOURCES MANAGEMENT LP

# RENOVA RESOURCES PRIVATE EQUITY LIMITED (derivatively on behalf of Pallinghurst (Cayman) General Partner LP (GP) Ltd., Pallinghurst (Cayman) General Partner LP and Pallinghurst Resources Management LP) and OTHERS v. GILBERTSON and AUTUMN HOLDINGS ASSET INC

C.A. (Chadwick, Mottley and Forte, JJ.A.) September 12th, 2017

*Companies — directors — powers and duties — general principle that director of limited company owes fiduciary duties — principal duties to act in company's best interests, avoid conflict of interest and not profit from position — may be varied by company's articles, shareholders' agreement or clear implication from circumstances*

*Trusts — constructive trusts — knowing receipt — liable to account as constructive trustee if disposal of assets in breach of fiduciary duty; beneficial receipt by defendant of traceable assets; and knowledge on defendant's part that assets traceable to breach*

Renova Resources Private Equity Ltd. brought a multiple derivative action in the Grand Court alleging breach of fiduciary duty and knowing receipt.

Renova Resources Private Equity Ltd. ("Renova"), a company incorporated in the Bahamas, was a wholly owned subsidiary of Renova Holding Ltd. They were members of a large Russian group of companies which had a range of major commercial business interests. At the material time, the chairman and principal beneficial owner of the group was Mr. Vekselberg, a Russian billionaire. The Chief Investment Officer of the Renova group was Mr. Kuznetsov.

Between 2004 and 2005, Mr. Gilbertson, an experienced businessman, and Mr. Vekselberg had agreed to set up a new private equity fund as a joint venture. Mr. Gilbertson would manage the fund and it would be financed by Renova, with the profits to be shared between them. From the start, Mr. Gilbertson had identified—and, with his son, Sean Gilbertson, had been actively exploring—the acquisition of the rights to the Fabergé luxury goods brand and business from Unilever plc as a potential investment project. Mr. Vekselberg, as a collector of Fabergé items, was enthusiastic about the project, termed "Project Egg."

In January 2006, the terms of the joint venture were set out in a letter from Renova Holding Ltd. to Mr. Gilbertson, signed by both parties as partners ("the letter agreement"). It confirmed that Renova Holding would establish the investment fund and the fund management vehicle and that Mr. Gilbertson would be responsible for all investment projects; he would be appointed chairman of the investment fund and the fund management vehicle, with his duties being those customary for an executive chairman of a company. The letter agreement provided that approval to proceed with an investment project required the unanimous consent of the investment committee (which comprised Mr. Gilbertson and Mr. Kuznetsov). Further, it provided that the agreement would automatically terminate if the investment fund and fund management vehicle were not operating in a way reasonably satisfactory to each of the partners within 16 months.

The investment structure ("the Pallinghurst structure") was established, which consisted of three Cayman Islands entities: Pallinghurst Resources Management LP ("the master fund"); Pallinghurst (Cayman) General Partner LP ("GPLP"); and Pallinghurst (Cayman) General Partner LP (GP) Ltd. ("the company"). The company was the general partner of GPLP, and GPLP was the general partner of the master fund. Mr. Gilbertson and Mr. Kuznetsov were appointed as the directors of the company, and the trustee of Mr. Gilbertson's family trust ("Fairbairn") and Renova were the two equal shareholders. Long form agreements ("the Pallinghurst agreements") setting out the terms of the partnership between Renova and the Pallinghurst structure were agreed, but not signed.

In May, an offer was made on behalf of the master fund to purchase the Fabergé rights for US$20m., which Unilever declined. Since the maximum bid Mr. Kuznetsov could approve on Renova's behalf (without detailed due diligence, a business assessment and various internal approvals) was US$20m., he suggested that Mr. Vekselberg consider investing his personal funds to acquire the rights. Mr. Vekselberg agreed personally to put forward US$30m. but in August that offer was also declined. It had, by that time, become apparent that Unilever was seeking about US$40m.

On December 1st, Mr. Vekselberg agreed personally to put forward up to US$40m., and a Cayman company called Project Egg Ltd. ("PEL," now "Fabergé Ltd.") was incorporated as a wholly owned subsidiary of the master fund to acquire the rights. By December 15th, a purchase price of US$38m. had been agreed with Unilever and negotiations about completion were taking place. On December 20th, however, it became clear to the

Gilbertsons that in return for his personal investment, Mr. Vekselberg required ownership of the Fabergé brand through the Lamesa group, which comprised his personal companies, on the basis that the management, control and economic benefits of the brand would be licensed to the master fund. The Gilbertsons ostensibly accepted Mr. Vekselberg's requirements for restructuring and, the next day, Sean Gilbertson emailed Mr. Kalberer, the deputy chief legal officer of Renova Management AG ("Renova Management"), a draft "implementation agreement" ("the first draft IA") relating to the implementation of Project Egg in accordance with them.

On December 22nd, the sale and purchase agreement ("SPA") was signed by Unilever and PEL on the basis that Mr. Vekselberg's structure would be pursued (although the precise terms of the restructuring had not been finally agreed). In the following days, Sean Gilbertson sent Mr. Kalberer further draft implementation agreements ("the second draft IA" and "the third draft IA"). The third draft IA provided, *inter alia*, that a Lamesa group company ("BrandCo") would, upon the transfer to it of the Fabergé brand in return for Lamesa Arts Inc. ("Lamesa") procuring payment of the purchase price to Unilever, grant PEL ("OpCo") a licence to use and exploit the Fabergé brand, which would be valid until the winding up of the master fund pursuant to the Pallinghurst agreements, at which time BrandCo could terminate the licence on 90 days' notice.

Over the previous two weeks, however, Mr. Gilbertson had been secretly setting up a consortium of investors consisting of himself, Dr. Jelinek, Mr. Mende and Mr. Kundrun, to purchase the rights without any involvement by Mr. Vekselberg, Lamesa or Renova. On January 1st, 2007, he decided to implement this plan and "then negotiate with [Mr. Vekselberg] from a position of strength"; he therefore proceeded to finalize the arrangements with his consortium, pursuant to which he would contribute 25% of the purchase price from his own money.

While Mr. Gilbertson was communicating with his consortium of investors, the Gilbertsons continued to communicate with Mr. Kalberer about the third draft IA and, on January 2nd, Mr. Kalberer provided the fourth draft IA. This draft did not significantly change the provisions of the third draft IA—but it did insert a new clause which provided that BrandCo could terminate the licence on 60 days' notice without having to pay anything to OpCo if the master fund disposed of OpCo or if the master fund were wound up under the Pallinghurst agreements.

Also on January 2nd, Mr. Gilbertson contacted Mr. Thomas, a director of Fairbairn, to request his contribution to the purchase price (US$9.5m.) from one of his family trusts ("the BPG Settlement"). Mr. Gilbertson reported that he had "bought [himself] a Christmas present" and requested "some money to pay for it," which Mr. Thomas readily approved. Mr. Gilbertson then sent an email to Mr. Vekselberg stating that there was little likelihood of reaching an agreement in respect of the implementation of Project Egg in time to meet the scheduled completion date of January 3rd and that, accordingly, he had "triggered alternative arrangements."

On January 3rd, the SPA was completed by payment of US$38m. by Mr. Mende's and Mr. Kundrun's company, K-M Investment Corp. ("K-MIC"). The same day, a loan to PEL from Autumn Holdings Asset Inc. ("Autumn") (a wholly owned subsidiary of Fairbairn in its capacity as trustee of the Gilbertson family trust), K-MIC and Dr. Jelinek, of US$38m., repayable on seven days' notice plus interest at about 7% compounded monthly, was approved. Additionally, 100 new shares in PEL were issued at par value to the lenders, pro rata to their contribution to the loan, so that the master fund's interest in PEL was reduced from 100% to just under 1% (1/101). The effect of these steps was that, save as to the master fund's 1/101 interest, the economic benefit of the development, exploitation and management of the Fabergé rights passed to Autumn, Dr. Jelinek and K-MIC, outside the Pallinghurst structure. In May, the interest rate on the loan was unilaterally increased by PEL to 25% per annum.

The subsequent negotiations between Mr. Gilbertson and Mr. Vekselberg concerning the rights were not successful and, on May 27th, Renova Holding gave written notice of termination of the letter agreement. Renova then brought the present multiple derivative action on behalf of the company, as ultimate owner and controller of the master fund, for compensation for breach of fiduciary duty by Mr. Gilbertson, and for knowing receipt by Autumn. Mr. Gilbertson defended the claims on various grounds and counterclaimed against the Renova parties. After a contested hearing, the Grand Court (Foster, Ag. J.) gave Renova leave to continue the action pursuant to GCR O.15, r.12A(2) (in proceedings reported at 2009 CILR 268). (Renova had indicated that if it were granted leave to continue the action on behalf of the company it would seek leave (on behalf of the company) to proceed in the name of GPLP, and on behalf of GPLP to proceed in the name of the master fund, but in the event no further applications were made.) At a further contested hearing, Foster, J. dismissed its application for summary judgment against the counterclaim (in proceedings reported at 2010 (1) CILR 344). Renova, the company, GPLP and the master fund were referred to collectively as "the Renova parties" and Mr. Gilbertson and Autumn were referred to as "the Gilbertson parties."

Renova alleged that Mr. Gilbertson had breached his fiduciary duties as a director of the company by diverting away from the master fund, and thus from the company, for his own benefit, the valuable economic benefit of developing, exploiting and managing the Fabergé brand, and then procuring the gratuitous issue of new shares in PEL to his own trust and other investors thereby virtually eliminating the interest of the master fund in PEL. It sought reconstitution of the master fund to the position in which it would have been but for the alleged breach of duty.

Renova's claim against Autumn was for an account of the shares in PEL which it was said Autumn had received gratuitously, and for an account of the interest which Autumn had earned on the loans it had made by way of contribution to the purchase price of the Fabergé rights and for working

capital. It was said that Autumn knew or ought to have known that Mr. Gilbertson was acting in breach of fiduciary duty, alternatively, that Autumn had not paid for the shares and held them as a volunteer.

Mr. Gilbertson and Autumn counterclaimed against Renova, Mr. Vekselberg, Mr. Kuznetsov and Renova Holding on various grounds for damages by way of indemnity for any liability they were found to have in respect of Renova's derivative claims.

At trial, Foster, J. allowed the claims in part and dismissed the counterclaims. He held that Mr. Gilbertson did owe the duties of a fiduciary as director of the company, and that he had breached those duties in acting as he did in late December 2006 and January 2007. However, the judge held that Mr. Gilbertson's breach of fiduciary duty had caused the master fund no significant economic loss. If the master fund were to be put in the position it would have been in but for Mr. Gilbertson's breach of duty, it would be in a significantly negative financial position. The judge therefore dismissed the claim for equitable compensation. The judge further held that Autumn held the 25 PEL shares issued to it in January 2007 on constructive trust for the master fund/GPLP/the company on the basis that it knew or should have known of Mr. Gilbertson's breach of fiduciary duty, and it received the shares as a volunteer and was liable to account for them. He also held that Autumn was liable to account for the interest it received on the loans to PEL. Two of the five counterclaims brought by the Gilbertson parties were abandoned at trial and the remaining counterclaims were dismissed (that decision is reported at 2012 (2) CILR 416).

The judge ordered (1) that Autumn held 25,000 ordinary shares in Fabergé Ltd. (formerly PEL) as constructive trustee for the master fund; (2) that Autumn transfer those shares to the master fund (the 25,000 shares to which the judge referred had been 25 shares in PEL prior to its 2008 sub-division and change of name and did not include any shares in Fabergé Ltd. subsequently acquired by Autumn); (3) that Autumn pay to the master fund the sum of US$2,306,320.35 (inclusive of pre-judgment interest, from January 3rd, 2007 to the date of the order, in the amount of US$507,347.35); (4) that the claim for equitable compensation against Mr. Gilbertson be dismissed; (5) that the counterclaims against the Renova parties be dismissed; and (6) that each party bear its own costs for the proceedings.

Autumn appealed against the order seeking the setting aside of paras. 1–3 and an order that the Renova parties pay its costs of the appeal (as well as its costs from the court below). It submitted that (a) the judge misdirected himself and erred in law in entertaining and granting relief in respect of derivative claims that were not before him; (b) the judge misdirected himself and erred in law and/or in fact in holding that Mr. Gilbertson owed or was in breach of any fiduciary duty in relation to the Fabergé rights and so in holding that there was any substratum on which to found a claim against Autumn; (c) the judge had misdirected himself and erred in law and/or fact in holding that, notwithstanding the rule in

140

*Nurcombe* v. *Nurcombe*, the conduct of the Renova parties was not such as to disentitle Renova from any relief; (d) the judge misdirected himself and erred in law and/or fact in holding that, having regard to its relationship with Mr. Gilbertson, the property it received, the person from whom it received it and its state of knowledge at the time of receipt, Autumn was liable in knowing receipt; (e) the judge misdirected himself and erred in law and/or fact in holding that Autumn was liable as a volunteer; and (f) the judge misdirected himself and erred in law and/or fact in granting relief against Autumn (i) by way of an account of profits (comprising the interest that Autumn received on its loan to PEL) and (ii) in respect of pre-judgment interest from January 3rd, 2007 on the interest payment which Autumn received from Fabergé Ltd. on September 28th, 2007.

Renova (derivatively on behalf of the company, GPLP and the master fund), as plaintiff in the action, and Mr. Vekselberg, Mr. Kuznetsov, Renova Holding and Renova (on its own account), as defendants to the counterclaim, also appealed against the judge's order. Mr. Gilbertson and Autumn were the respondents to that cross-appeal. The relief sought by the cross-appeal was (a) that so much of the order as dismissed Renova's claim against Mr. Gilbertson for equitable compensation be quashed, and that either judgment be entered for Renova against Mr. Gilbertson in the sum of US$82,582,000 (and interest) or that it be declared that Autumn held a further and additional 16,190,575 ordinary shares in Fabergé Ltd. as constructive trustee for the master fund, and ordered that Autumn should forthwith transfer full legal title in those further shares to the master fund; (b) that Mr. Gilbertson and Autumn pay Renova's costs of the proceedings in the court below on the standard basis; (c) that Mr. Gilbertson and Autumn pay the costs of the defendants to counterclaim in the court below on the indemnity basis; and (d) that Mr. Gilbertson and Autumn pay the cross-appellants' costs of the cross-appeal on the standard basis. The grounds of the cross-appeal were that (a) the judge erred in law and/or in principle and/or misdirected himself as to the evidence in valuing at nil the loss that Mr. Gilbertson was liable to make good to the master fund by way of equitable compensation; (b) alternatively, the judge erred in law and/or in principle and/or misdirected himself as to the evidence in failing to hold that the entirety of Autumn's shareholding in Fabergé Ltd. (and not only the 25,000 shares which represented the 25 shares issued by PEL in January 2007) should be held on constructive trust for (and transferred to) the master fund; and (c) the judge erred in law or exercised his discretion outside the ambit within which reasonable disagreement was possible in making no order as to the costs of the action and counterclaim.

**Held,** ordering as follows:

(1) The judge had been correct to entertain the derivative claims advanced by Renova. In particular, he had been right to hold that, having chosen not to appeal against his order made some 3½ years earlier, it was not open to the Gilbertson parties to challenge, at trial, the standing of

Renova to advance claims in the action on behalf of GPLP and the master fund, including the claim founded on the unpleaded contention that Mr. Gilbertson had acted in breach of the fiduciary duties he owed to the master fund. While it was accepted that Renova, in its summons issued in July 2008, had not sought leave to proceed by way of multiple derivative action on behalf of GPLP and/or the master fund, it was important to note that, first, it had not been required to do so under GCR O.15, r.12A (which did not apply to multiple derivative actions) and, secondly, there had been no other rule of practice that leave was required to bring a multiple derivative action under the general law. It was at least arguable that the cause or causes of action which Renova sought to pursue against Mr. Gilbertson and/or Autumn were vested in the master fund (and not in the company). In those circumstances, it was necessary, in order to determine whether to allow the action as constituted to go forward, for the judge to address whether Renova could bring multiple derivative proceedings for loss said to have been suffered by the master fund. There was no doubt that that question had been properly before the judge in April 2009, and no doubt that he had intended to and did in fact decide it ([paras. 26–29](#); [para. 281](#)).

   (2) The judge had been correct to hold that Mr. Gilbertson owed and was in breach of fiduciary duties in relation to the Fabergé rights. In particular, he had been correct to hold that, as a director of the company, Mr. Gilbertson owed the duties of a fiduciary to the company (and, more generally, to the master fund and the Pallinghurst structure) throughout the relevant period and that he was in breach of those duties in acting as he did in late December 2006 and January 2007. The judge had correctly held that Mr. Gilbertson owed fiduciary duties to the company in relation to Project Egg (*i.e.* the acquisition of the Fabergé rights). There was no challenge in this appeal to the judge's assumption that it was common ground that, until the issue of the additional shares in January 2007, PEL had been a wholly owned subsidiary of the master fund. In those circumstances, it was not open to the present court to question whether the judge had been correct to proceed on that basis. The court was therefore satisfied that whatever fiduciary duties might have been owed by Mr. Gilbertson to the company (or more generally to the Pallinghurst structure) in relation to Project Egg (as an investment project) under the terms of the letter agreement, the judge had been correct to accept, and the Renova parties were correct to submit in this court, that *prima facie* Mr. Gilbertson owed fiduciary duties as a director of the company in relation to the assets of the entities (including the master fund and, from its incorporation on December 1st, 2006, PEL) which it controlled, and that, from the execution of the SPA on December 22nd, 2006, those assets included the contractual interest of PEL as purchaser of the Fabergé rights and, after completion of the purchase under the SPA on January 3rd, 2007, as owner of those rights. The judge had also correctly held that Mr. Gilbertson's fiduciary duties owed to the company in respect of Project Egg had not been modified or attenuated so as to enable him to act

in his own interests notwithstanding that they might conflict with the interests of the company. There was nothing in the letter agreement that enabled Mr. Gilbertson to take for himself a project he had brought to the investment committee. In particular, first, it could not be said that Mr. Kuznetsov (or, more broadly, the Renova parties) had done anything that could be construed as a veto of Project Egg. Secondly, the evidence did not support the contention that what had been said to Mr. Sean Gilbertson on December 20th, 2006, agreed between Mr. Gilbertson and Mr. Vekselberg the following day and reflected in the draft IAs which followed, did not involve the master fund at all but amounted to a new and separate arrangement outside the Pallinghurst structure. Thirdly, the evidence did not support the contention that the effect of the agreement or understanding was that if Mr. Vekselberg walked away from the deal Mr. Gilbertson could take whatever steps he thought fit to acquire the Fabergé rights for his own benefit, nor the contention that, when Mr. Gilbertson acquired the rights for his own benefit, Mr. Vekselberg had walked away from the deal. The judge had been correct to hold that Mr. Gilbertson had acted in breach of the fiduciary duties he owed to the company or the master fund in acting as he did in late December 2006 and January 2007 (paras. 80–125; para. 281).

(3) The judge had been correct to hold that, notwithstanding the so-called rule in *Nurcombe* v. *Nurcombe*, the conduct of the Renova parties was not such as to disentitle Renova from equitable relief in this action. The underlying principle of the so-called *Nurcombe* defence was that, in permitting a derivative action to be brought by a person in whom the cause of action was not vested for the benefit of the "proper" plaintiff, the court was exercising an equitable jurisdiction on the grounds that justice so required. The jurisdiction would not be exercised where to do so would lead to injustice. Circumstances in which the exercise of the jurisdiction would lead to injustice would include those in which the derivative plaintiff would benefit indirectly (*e.g.* as a shareholder of the defendant company) from the successful pursuit of a claim to which, as between that person and the defendant, the defendant would have had an equitable defence on which it would have succeeded if (on the hypothesis that the derivative plaintiff was the proper plaintiff) the action had been brought by the plaintiff in his own right. In the present case, the judge had been correct to reject the contention that these proceedings had not been brought and pursued by Renova for the benefit of the company (or more generally for the benefit of the master fund and the other entities within the Pallinghurst structure) but for the benefit of Mr. Vekselberg personally. There was no evidence to support that contention. None of the matters relied upon by the Gilbertson parties in support of their challenge to the judge's conclusion would have given rise to an equitable defence on which the Gilbertson parties would have succeeded if the action had been brought by Renova in its own right. The judge had correctly considered that there was no reason under this head to refuse Renova the equitable relief it sought in this derivative action. Renova's past failures to comply

with its discovery obligations did not now provide a ground upon which the action should be dismissed (paras. 135–146; para. 281).

(4) The judge had been correct to value at nil the loss that Mr. Gilbertson was liable to make good to the master fund by way of equitable compensation. In particular, he was correct to hold on the evidence before him that the current value (as at the date of trial) of the right to manage and exploit the Fabergé rights as licensee (to which the master fund (through OpCo) would probably have been entitled but for Mr. Gilbertson's breach of fiduciary duty) was less than the costs (other than acquisition costs) and expenses that would have been incurred in funding the development of those rights. The judge had explained that equitable compensation in respect of loss caused by breach of fiduciary duty was assessed as the sum required to put a plaintiff back into the position in which he would have been at the time of the trial if he had not sustained that loss. Renova's claim was for compensation in the sum required to reconstitute the master fund to the position in which it would have been, at the date of judgment, but for Mr. Gilbertson's breach of duty. The court would not interfere with the judge's determination that the undiscounted value of Fabergé Ltd. at the date of the trial was not more, and possibly significantly less, than US$120m. An appellate court must be cautious, where expert witnesses gave oral evidence at trial, before rejecting the trial judge's evaluation of that evidence. There was nothing to suggest that the judge's evaluation should be rejected. The judge had also been entitled to apply a discount of 50% to the value that he placed on Fabergé Ltd. to reflect his finding that, had Mr. Gilbertson not acted in breach of fiduciary duty, the master fund would not have become owner of the Fabergé rights but would have been entitled only to develop, exploit and manage those rights under licence for a limited period on the terms of the fourth draft IA or very similar terms. The judge had also been correct to deduct from the current value of the business the costs and expenses that would have been incurred by the master fund in carrying on that business under licence since that date. The costs and expenses to be deducted included the post-acquisition expenses and future investment incurred in respect of the development, exploitation and management of the Fabergé rights, *i.e.* about US$102m. The judge had therefore correctly considered that he did not need to determine how the acquisition cost of US$38m. should be treated. His conclusion that, after deducting post-acquisition costs of US$102m. from the hypothetical current value of the business which, but for Mr. Gilbertson's breach of duty, it would have carried on since January 2007, the master fund had suffered no loss was the same whether or not the acquisition cost of the Fabergé rights was included as a cost or expense to be deducted. Renova's appeal against the judge's order dismissing its claim to equitable compensation would therefore be dismissed (paras. 179–180; para. 281).

(5) The judge had been correct to hold that Autumn was liable to account as a constructive trustee of the shares issued by PEL in January

144

2007 because (a) it received those shares as a volunteer, and (b) in any event, it was in "knowing receipt" having regard to its relationship with Mr. Gilbertson, the property which it received, the person from whom it received the property and its state of knowledge at the time of receipt. In particular, the judge had been correct to hold that the value of the single share in PEL held by the master fund before the issue of the 100 new PEL shares could be traced, in part, into the 25 new PEL shares issued to Autumn on that date; that Autumn gave no value for those 25 new shares; and that the knowledge of Mr. Gilbertson (and so far as relevant of Mr. Thomas) as to the circumstances in which those new PEL shares were issued was to be attributed to Autumn. Immediately before the issue of the 100 new shares, PEL was the owner of the Fabergé rights and, as owner of the single share then in issue, the master fund was the owner of 100% of the issued share capital of PEL. The position immediately after the 100 additional shares were issued was that PEL remained the owner of the Fabergé rights but that the issued share capital of PEL was owned as to 100/101 by the members of the consortium and as to 1/101 by the master fund. Substantially the whole of the value of the master fund's interest in PEL and (indirectly through PEL) in the Fabergé rights had been transferred to the members of the consortium as owners of the new shares. The effect of the issue of the new shares was that, *inter alia*, 25/101 of the master fund's ownership of the whole issued share capital of PEL was transferred to Autumn. The value of what was transferred was represented by the new shares held by Autumn and the other members of the consortium and could be traced accordingly. To hold otherwise would be to allow corporate form to defeat commercial substance. The judge had been correct to hold that there was never any doubt that Mr. Thomas would comply with Mr. Gilbertson's wishes in relation to the funding of the acquisition of the Fabergé rights and the receipt of the new PEL shares. In relation to that transaction, Mr. Gilbertson had been the directing mind of Autumn and, accordingly, his knowledge was properly attributed to Autumn in that context. The judge had also been correct to hold that Mr. Thomas knew or should have known that what Mr. Gilbertson was asking him to do on behalf of Autumn in relation to the funding of the acquisition of the Fabergé rights and the receipt of the new PEL shares was, or was likely to be, contrary to the interests of the master fund and in breach of his (Mr. Gilbertson's) fiduciary duties as a director of the company, and that to implement Mr. Gilbertson's request in the circumstances would be inappropriate for a prudent trustee. In so far as Mr. Thomas's own knowledge was relevant, it was not in dispute that it could be attributed to Autumn. If Autumn received the new PEL shares as a purchaser for value, it held those shares as a constructive trustee for the master fund on the basis of "knowing receipt" (paras. 196–225; para. 281).

(6) The judge had been correct to hold that Autumn was not liable to account as constructive trustee for shares (other than the 25,000 shares which represented the 25 shares issued to it by PEL in January 2007) which it held in Fabergé Ltd. at the date of the trial, and so did not have to transfer such additional shares to the master fund. No claim in respect of the additional 16,190,575 shares had been before the court at the trial and the judge could not therefore be criticized for failing to address Renova's arguments in support of the claim in its submissions. The Gilbertson parties had pointed out that the claim had not been pleaded and Renova had not sought leave to amend its pleading so as to introduce it. Nor had the Renova parties appealed against that ruling. It was not now open to Renova to contend that the Gilbertson parties had allowed the claim by failing to raise any objection at the appropriate time. The material before the judge at the trial did not enable him to make the findings of fact which would have been necessary in order to support that claim and the present court was also not in a position to do so (paras. 230–234; para. 281).

(7) The judge had been wrong to hold that Autumn was liable to account (by way of an account of profits) as a constructive trustee for the payment of US$1,798,973 which it received on September 28th, 2007 in respect of interest on the loans which it had made to PEL on January 3rd, 2007. In particular, he had been wrong to hold that the value of any asset held or formerly held by the master fund could be traced into that payment. The loans to PEL on January 3rd, 2007 had not had the effect of diverting the economic opportunity to acquire the Fabergé rights away from PEL; the loans enabled PEL to take advantage of that economic opportunity by using funds lent to it to complete the purchase. Immediately before the loans were made on January 3rd, 2007, the interest of the master fund in the acquisition of the Fabergé rights by PEL was as owner of 100% of the issued capital of PEL. The making of the loans did not alter that position. That position was altered by Mr. Gilbertson's breach of fiduciary duty in procuring the dilution of the master fund's ownership of the share capital of PEL by the issue of the 100 new shares to the members of the consortium. But the terms of the loans had been agreed without regard to the decision to issue the new shares. Therefore, although it could be said that the payment by PEL to Autumn in September 2007 of interest on the loans made in January was a profit derived from the funding of the acquisition of the Fabergé rights and that the economic opportunity to fund the acquisition arose from PEL's rights as contractual purchaser under the SPA, there was no basis on which it could be said that the opportunity to fund the acquisition or PEL's rights as purchaser had been diverted from the Pallinghurst structure by Mr. Gilbertson's breach of fiduciary duty. Properly understood, what had been so diverted was substantially the whole (100/101) of the ownership of PEL (and thus the value of the Fabergé rights after deduction of the cost of acquisition), not the right to receive interest paid by PEL on the loans which enabled it to acquire those rights. It followed that the judge had been wrong, also, to award pre-judgment interest—in the amount of US$507,347.35 or in any

146

other amount—on an amount equal to that payment. If (contrary to the court's view) the judge had not been wrong to hold that Autumn was liable to account for the payment of US$1,798,973 which it received on September 28th, 2007, he had nevertheless been wrong to include in the sum awarded (US$507,347.35) as pre-judgment interest an amount (US$95,407.18) in respect of interest attributable to the period from January 3rd, 2007 to September 27th, 2007. He had been wrong to do so because, on the material before him, it had not been open to him to hold that Autumn was liable to account for interest on the loans in the amount of US$1,798,973 (or at all) as a "knowing recipient" before the date (September 28th, 2007) on which the relevant cause of action for the purposes of s.34(1) of the Judicature Law (2007 Revision) arose (paras. 235–248; para. 281).

(8) The court would not interfere with the judge's making no order as to the costs of the action or, as between the Gilbertson parties and Renova, in making no order as to the costs of the counterclaim. It could not be said that the judge had exercised his discretion outside the ambit within which reasonable disagreement was possible. Nevertheless, in relation to the costs of the counterclaim, the judge had erred in failing to distinguish between the position of Renova and that of its co-defendants to the counterclaim (namely Mr. Vekselberg, Mr. Kuznetsov and Renova Holding). Had he done so, he would have appreciated the necessity to make a separate order for their costs of the counterclaim. The appropriate order was that the costs of the counterclaim (as between the Gilbertson parties and the three co-defendants other than Renova) should follow the event, assessed on the indemnity basis, to be paid by the Gilbertson parties (paras. 263–281).

(9) Autumn's appeal against paras. 1–2 of the November 6th, 2012 order would be dismissed, but its appeal against para. 3 of that order would be allowed. Renova's cross-appeal against paras. 4 and 6 of the order would be dismissed, as would its appeal against para. 6. The appeals of Mr. Vekselberg, Mr. Kuznetsov and Renova Holdings against para. 6 of the order would be allowed. As between the Gilbertson parties and the three defendants to the counterclaim just mentioned, para. 6 of the order would be varied by setting aside that paragraph in so far as it related to their costs of defending the counterclaims and by adding a direction that the Gilbertson parties pay the costs of the counterclaims incurred by Mr. Vekselberg, Mr. Kuznetsov and Renova Holding (including costs ordered to be costs in the cause), such costs (if not agreed) to be assessed on the indemnity basis. Further consideration of the costs of the appeal and cross-appeal required an application to the court (para. 282).

**Cases cited:**

(1) *Ahmad Hamad Algosaibi & Bros. Co.* v. *Saad Invs. Co. Ltd.*, Grand Ct., November 28th, 2011, unreported, considered.

(2)*Arthur* v. *Att. Gen. (Turks & Caicos Islands)*, [2012] UKPC 30, considered.

(3)*Att. Gen. (Hong Kong)* v. *Reid*, [1994] 1 A.C. 324; [1993] 3 W.L.R. 1143; [1994] 1 All E.R. 1; (1993), 143 N.L.J. 1569, referred to.

(4)*Bank of Credit & Commerce Intl. (Overseas) Ltd.* v. *Akindele*, [2001] Ch. 437; [2000] 3 W.L.R. 1423; [2000] 4 All E.R. 221; [2000] Lloyd's Rep. Bank. 292; [2000] BCC 968; [2000] WTLR 1049; (2000), 2 ITELR 788, referred to.

(5)*Banks* v. *Arch, 2004–05 CILR 441*, referred to.

(6)*Barrett* v. *Duckett*, [1995] BCC 362; [1995] 1 BCLC 243, referred to.

(7)*Belmont Fin. Corp. Ltd.* v. *Williams Furniture Ltd. (No. 2)*, [1980] All E.R. 393, referred to.

(8)*Bhullar* v. *Bhullar*, [2003] EWCA Civ 424; [2003] 2 BCLC 241; [2003] WTLR 1397; *sub nom. Re Bhullar Bros. Ltd.*, [2003] BCC 711, *dicta* of Jonathan Parker, L.J. referred to.

(9)*Boardman* v. *Phipps*, [1967] 2 A.C. 46; [1966] 3 W.L.R. 1009; [1966] 3 All E.R. 721, referred to.

(10)*Bristol & West Bldg. Socy.* v. *Mothew*, [1998] Ch. 1; [1997] 2 W.L.R. 436; [1996] 4 All E.R. 698, referred to.

(11)*Charter plc* v. *City Index Ltd.*, [2007] EWCA Civ 1382; [2008] Ch. 313; [2008] 2 W.L.R. 950; [2008] 3 All E.R. 126; [2008] 2 All E.R. (Comm) 425; [2007] 2 CLC 968; [2008] P.N.L.R. 16; [2008] WTLR 1773, referred to.

(12)*Commonwealth Oil & Gas Co. Ltd.* v. *Baxter*, [2009] CSIH 75; 2010 S.C. 156; 2009 SLT 1123; 2009 S.C.L.R. 898; 2009 G.W.D. 35–592, referred to.

(13)*Competitive Ins. Socy. Co. Ltd.* v. *Davies Invs. Ltd.*, [1975] 1 W.L.R. 1240; [1975] 3 All E.R. 254, referred to.

(14)*Cook* v. *Deeks*, [1916] 1 A.C. 554; (1916), 85 L.J.P.C. 161; 114 L.T. 636; [1916–17] All E.R. Rep. 285, referred to.

(15)*Criterion Properties plc* v. *Stratford UK Properties LLC*, [2004] UKHL 28; [2004] 1 W.L.R. 1846; [2004] BCC 570; [2006] 1 BCLC 729, considered.

(16)*El Ajou* v. *Dollar Land Hldgs. plc*, [1994] 2 All E.R. 685; [1994] BCC 143; [1994] 1 BCLC 464; [1993] N.P.C. 165, considered.

(17)*Foskett* v. *McKeown*, [2001] 1 A.C. 102; [2000] 2 W.L.R. 1299; [2000] 3 All E.R. 97; [2000] Lloyd's Rep. I.R. 627; [2000] 5 LRC 664; [2000] WTLR 667; (2000), 2 ITELR 711, applied.

(18)*Foss* v. *Harbottle* (1843), 2 Hare 461; 67 E.R. 189, referred to.

(19)*G* v. *G (Minors: Custody Appeal)*, [1985] 1 W.L.R. 647; [1985] 2 All E.R. 225; [1985] FLR 894; [1985] Fam. Law 321, referred to.

(20)*Guinness plc* v. *Saunders*, [1990] 2 A.C. 663; [1990] 2 W.L.R. 324; [1990] 1 All E.R. 652; [1990] BCC 205; [1990] BCLC 402, referred to.

(21)*Gwembe Valley Dev. Co. Ltd.* v. *Koshy (No. 3)*, [2003] EWCA Civ 1048; [2004] 1 BCLC 131, *dicta* of Mummery, L.J. referred to.

(22) *Halton Intl. Inc. (Hldgs.) SARL* v. *Guernroy Ltd.*, [2005] EWHC 1968 (Ch); [2006] 1 BCLC 78, *dicta* of Patten, J. referred to.

(23) *Japan Abrasive Materials Pty. Ltd.* v. *Australian Fused Materials Pty. Ltd.*, [1998] WASC 60, referred to.

(24) *Meridian Global Funds Mgmt. Asia Ltd.* v. *Securities Commn.*, [1995] 2 A.C. 500; [1995] 3 W.L.R. 413; [1995] 3 All E.R. 918; [1995] BCC 942; [1995] 2 BCLC 116; [1995] 4 LRC 423; [1994] 2 NZLR 291, referred to.

(25) *National Trust for the Cayman Islands* v. *Planning Appeals Tribunal*, 2002 CILR 59, referred to.

(26) *Neath Rugby Ltd.*, *Re*, [2009] EWCA Civ 291; [2009] 2 BCLC 427; [2010] BCC 597, referred to.

(27) *Nisbet & Potts' Contract*, *Re*, [1906] 1 Ch. 386; (1906), 75 L.J.Ch. 238; 54 W.R. 286; 94 L.T. 297; 22 T.L.R. 233; [1904–07] All E.R. Rep. 865, referred to.

(28) *Nurcombe* v. *Nurcombe*, [1985] 1 W.L.R. 370; [1985] 1 All E.R. 65; [1984] BCLC 557; (1984), 1 BCC 99269, considered.

(29) *Nurdin & Peacock plc* v. *DB Ramsden & Co. Ltd.*, [1999] 1 EGLR 119; [1998] EGCS 123, considered.

(30) *Pilmer* v. *Duke Group Ltd.*, [2001] HCA 31; (2001), 207 CLR 165; 75 ALJR 1067; 38 ACSR 122; [2001] 2 BCLC 773; [2001] 5 LRC 417, referred to.

(31) *Rolled Steel Products (Hldgs.) Ltd.* v. *British Steel Corp.*, [1986] Ch. 246; [1985] 2 W.L.R. 908; [1985] 3 All E.R. 52; (1984), 1 BCC 99158, referred to.

(32) *Sagicor General Ins. (Cayman) Ltd.* v. *Crawford Adjusters (Cayman) Ltd.*, 2008 CILR 482, referred to.

(33) *Satnam Invs. Ltd.* v. *Dunlop Heywood & Co. Ltd.*, [1999] 3 All E.R. 652; [1999] 1 BCLC 385; [1999] 2 L.S.G. 30; [1998] EGCS 190; [1999] FSR 722, referred to.

(34) *Story* v. *Windsor (Lord)* (1743), 26 E.R. 776; 2 Atk. 630, referred to.

(35) *Target Hldgs. Ltd.* v. *Redferns*, [1996] A.C. 421; [1995] 3 W.L.R. 352; [1995] 3 All E.R. 785; [1995] CLC 1052; [1995] N.P.C. 136; [1995] 3 LRC 162, referred to.

(36) *Texaco Ltd.* v. *Arco Technology Inc.*, Queen's Bench, October 3rd, 1989, unreported, referred to.

(37) *Towers* v. *African Tug Co.*, [1904] 1 Ch. 558; (1904), 73 L.J. Ch. 395; 11 Mans. 198; 52 W.R. 532; 90 L.T. 298; 20 T.L.R. 292; [1904–7] All E.R. Rep. Ext. 1583, referred to.

(38) *Ultraframe (UK) Ltd.* v. *Fielding*, [2005] EWHC 1638 (Ch); [2006] F.S.R. 17; [2007] WTLR 835, referred to.

(39) *Universal Project Mgmt. Servs. Ltd.* v. *Fort Gilkicker Ltd.*, [2013] EWHC 348 (Ch); [2013] Ch. 551; [2013] 3 W.L.R. 164; [2013] 3 All E.R. 546; [2013] BCC 365; (2013), 163 N.L.J. 268, referred to.

(40) *Waddington Ltd.* v. *Chan Chun Hoo Thomas*, [2008] HKCFA 63;

(2008), 11 HKCFAR 370; [2009] 4 HKC 381; [2008] HKCU 1381; [2009] 2 BCLC
    82, referred to.

**Legislation construed:**
Grand Court Rules 1995 (Revised), O.15, r.12A: The relevant terms of this rule are
    set out at para. 23.
O.62, r.4(5): The relevant terms of this paragraph are set out at para. 253.

Judicature Law (2007 Revision), s.34: The relevant terms of this section are set out
    at para. 246.
*M. Bloch*, *Q.C.* with *D. Butler* for Autumn Holdings Asset Inc. and Gilbertson;
*R. Millett*, *Q.C.* with *J. Eldridge* for Renova Resources Private Equity Ltd. and the
other respondents/cross-appellants.

1   **CHADWICK, J.A.:** This appeal and cross-appeal are from an order made on
November 6th, 2012 by Foster, J. in proceedings brought in the Financial Services
Division of the Grand Court by Renova Resources Private Equity Ltd. ("Renova")
against Brian Patrick Gilbertson ("Mr. Gilbertson"), Autumn Holdings Asset Inc.
("Autumn") and others.

2   Renova is (or was at the material time) a company incorporated in the Bahamas.
It is a wholly owned subsidiary of Renova Holding Ltd. ("Renova Holding"), also
a company incorporated in the Bahamas. Renova and Renova Holding are members
of the Renova group of companies, described by the judge as "a very large Russian
owned conglomerate, consisting of some one hundred or so corporate and other
entities, incorporated or established in various jurisdictions" and as having "a range
of major commercial business interests, particularly, although not exclusively, in
oil and metals in Russia and elsewhere." At the relevant time, the chairman and
principal beneficial owner of the Renova group was Mr. Viktor Vekselberg, whom
the judge described as "a well-known, very successful and influential Russian
billionaire businessman, based in Moscow." The overall management of the
Renova group was carried on from Zurich through a Swiss company, Renova
Management AG ("Renova Management"). The Chief Investment Officer of the
Renova group was Mr. Vladimir Kuznetsov, a Russian national based in Zurich.
Mr. Vekselberg, Mr. Kuznetsov and Renova Holding were, with Renova,
defendants to the counterclaim in the proceedings.

3   The judge explained that one of Mr. Vekselberg's major interests during the
relevant period, held through the Renova group, was a substantial share in a large
Russian aluminium producing company, Siberian Urals Aluminium Co. (to which
the judge referred as "SUAL"). At the relevant time, Mr. Vekselberg was the
chairman of SUAL.

Mr. Gilbertson was Chief Executive Officer of SUAL between 2004 and 2007. The judge went on to say this (at paras. 3.1–3.3 of his judgment):

"3.1   During the later part of 2004 and 2005 Mr. Gilbertson discussed with Mr. Vekselberg a proposal by Mr. Gilbertson to set up a private equity fund, which Mr. Gilbertson would establish and manage and which would be financed by Renova, with the profits effectively to be shared equally between them. The fund was to invest in assets with potential in the mining sector, and the fund by Mr. Gilbertson was to have responsibility for sourcing and proposing opportunities for investment by the fund. This proposal developed into what was in effect a joint venture in which, as Mr. Vekselberg described it, he and Mr. Gilbertson would be partners.

3.2   After a lengthy period of negotiation the terms of the arrangement were set out in a letter from Renova Holding to Mr. Gilbertson known as the Letter Agreement. It was signed by Renova Holding on 20th January 2006 and by Mr. Gilbertson on 24th January 2006, although the letter itself was dated 24th November 2005 . . .

3.3   . . . The Letter Agreement then defined 'Investment Fund' as an investment fund in a jurisdiction and legal form to be agreed between Mr. Gilbertson and Renova Holding. The 'Fund Management Vehicle' was to be the vehicle charged with establishing, marketing and managing the Investment Fund and the 'Initial Capital' meant a founding capital of US$4m in cash at the establishment of the Fund Management Vehicle. The 'Investment Committee' meant a committee comprising Mr. Gilbertson or his nominated representative on the one hand and the CEO of Renova Management or its nominated representative on the other hand. In the event the Investment Committee comprised Mr. Gilbertson and Mr. Kuznetsov . . ."

4   The judge explained in his judgment that the structure established pursuant to the letter agreement comprised three Cayman Islands entities: Pallinghurst Resources Management LP ("the master fund"), a Cayman Islands exempted limited partnership established on May 19th, 2006; Pallinghurst (Cayman) General Partner LP ("GPLP"), a Cayman Islands exempted limited partnership established on March 19th, 2006; and Pallinghurst (Cayman) General Partner LP (GP) Ltd. ("the company"), a company incorporated in the Cayman Islands on March 15th, 2006. The company was the general partner of GPLP, and GPLP was the general partner of the master fund. Together the three entities were known as "the Pallinghurst structure."

5   Renova is (or was at the material time) the owner of 50% of the issued shares in the company. The other 50% of the issued shares in the company were held by Fairbairn Trust Ltd. ("Fairbairn"), a Jersey-based trust company, as trustee of the Brian Patrick Gilbertson Settlement ("the BPG

Settlement"), a settlement established by Mr. Gilbertson. At the material time the two directors of the company were Mr. Gilbertson and Mr. Kuznetsov. These proceedings were brought by Renova as a shareholder of the company, and so are, in form, a derivative action. The company, GPLP and the master fund were joined as co-defendants (with Mr. Gilbertson and Autumn). The judge referred, in his judgment, to Renova, the company, GPLP and the master fund (collectively) as "the Renova parties" and to Mr. Gilbertson and Autumn (collectively) as "the Gilbertson parties": it will be convenient if I adopt those descriptions in this judgment.

6   The background against which these proceedings were brought was explained by the judge (at paras. 1 and 5.1 of his judgment):

"1   This case concerns the well-known Fabergé brand, renowned for high quality jewellery and originally for the famous Fabergé jewel encrusted eggs made in Imperial Russia. The brand name and associated business have changed hands since then on several occasions and in 1989 the brand and business were acquired by the large English company, Unilever PLC. The brand and business were then sold by Unilever PLC in early January 2007 to a consortium of investors, which included indirectly and which was arranged and set up by Mr. Brian Gilbertson. He is the principal beneficial owner and controller of Pallinghurst Resources Limited, an English company, which is now the largest investor in Fabergé Limited, the owner, developer and manager of the Fabergé brand and business . . ."

"5.1   Project Egg was the name given to the project for the acquisition of the Fabergé brand and its business from the then owner, Unilever PLC. The evidence of Mr. Gilbertson, which was not disputed in this respect, was that from about 2002, he had identified the Fabergé brand as an asset and business which was not then being exploited to its full potential and which he thought would make a good investment for profitable development and exploitation. Although the Fabergé brand was not obviously an investment project 'in the metal and mining industry' as contemplated by the Letter Agreement, Mr. Gilbertson, after meeting Mr. Vekselberg, correctly thought that it would nonetheless be of considerable interest to him. Mr. Vekselberg was a collector of Fabergé items and had recently acquired a very significant and expensive collection of imperial Fabergé eggs, which had been very well received in Russia. He was very interested in Fabergé and its Russian heritage. Accordingly, Mr. Vekselberg was enthusiastic when Mr. Gilbertson, early on in his proposals with regard to a private equity fund, suggested the Fabergé brand and business as a potential investment for the private equity fund which subsequently became the Master Fund within the Pallinghurst Structure. From the start, therefore, Project Egg was one of a

152

number of investment opportunities sourced and put forward by Mr. Gilbertson as potential Investment Projects."

7    As I have said, the defendants to Renova's claim in these proceedings included Mr. Gilbertson and Autumn. Autumn, a company incorporated in the British Virgin Islands, was owned by Fairbairn, the trustee of the BPG Settlement (and other Gilbertson family trusts). It was a member of the "consortium of investors" ("the consortium"), to which the judge made reference in para. 1 of his judgment (in the passage which I have set out). Other members of the consortium were Dr. Milan Jelinek, an acquaintance of Mr. Gilbertson, and K-M Investment Corp. ("K-MIC"), the holding company of American Metals and Coal International ("AMCI"), a large coal marketing business owned jointly by Mr. Hans Mende (known to Mr. Gilbertson through their mutual acquaintance, Dr. Jelinek) and Mr. Fritz Kundrun. Dr. Jelinek, K-MIC, Mr. Mende and Mr. Kundrun are not parties to the proceedings.

8    The Fabergé brand and business ("the Fabergé rights") were acquired from Unilever plc ("Unilever") by Project Egg Ltd. ("PEL"), a Cayman Islands company incorporated for that purpose by Mr. Gilbertson on December 1st, 2006, under a sale and purchase agreement ("the SPA") signed on December 22nd, 2006. The acquisition price was US$38m. The acquisition was completed on January 3rd, 2007 with funds provided by way of loan by Autumn, Dr. Jelinek and K-MIC. On the same day, 100 shares were issued by PEL: 25 shares to each of Autumn and Dr. Jelinek and 50 shares to K-MIC. In March 2007, PEL changed its name to Fabergé Ltd.

9    The effect of the acquisition of the Fabergé rights by PEL and the issue by PEL of shares to Autumn, Dr. Jelinek and K-MIC—steps which, it is said, were procured by Mr. Gilbertson—was that (save as to the 1/101 interest which remained in the master fund as the continuing owner of the one share in PEL issued on incorporation) the economic benefit of the development, exploitation and management of those rights passed to Autumn, Dr. Jelinek and K-MIC, all of whom were outside and unrelated to the Pallinghurst structure, and was no longer held by the master fund within the Pallinghurst structure as had been originally intended.

10    In section 6 of his judgment (under the heading "Brief Summary of the Parties' Cases"), the judge explained that Renova's principal claim in the proceedings—a claim which it advanced on behalf of the company, as one of the ultimate owners of the master fund—was for reconstitution of the master fund to the position in which it is said it would have been but for the alleged breach of duty by Mr. Gilbertson as a director of the company. The judge summarized the basis on which that claim was advanced (at paras. 6.2–6.3):

"6.2 ... [Renova] claims that Mr. Gilbertson, who was at all material times a director of the Company, acted in breach of his fiduciary duties to the Company by, at the last minute, diverting away from the Master Fund, and thus ultimately from the Company, for his own benefit the valuable economic benefit of developing, exploiting and managing the Fabergé brand, and doing so covertly without the knowledge of his fellow director, Mr. Kuznetsov or of [Renova] as 50% shareholder in the Company or of any of the other Renova Parties. Mr. Gilbertson, it is said, did this by secretly arranging alternative financing of the purchase price of the Rights by his own trust and the other investors to enable the acquisition and ownership of the Rights ultimately for his own personal benefit and that of his fellow investors, rather than for the benefit of the Master Fund. He further procured the gratuitous issue of new shares in PEL, as the acquirer of the Rights, to his own trust and to the other investors, thereby virtually eliminating the interest of the Master Fund in PEL and hence in the economic benefit of developing, exploiting and managing the Fabergé brand.

6.3 [Renova] contends that as a director of the Company Mr. Gilbertson owed fiduciary duties to the Company, including the duty to act in good faith, in the best interests of the Company, not to place himself in a position where his duties to the Company and his own interests might conflict, to refrain from self-dealing and not to make a secret profit. By his actions he was in breach of those duties to the loss of the Master Fund and thus the Company."

Renova's claim against Autumn—as the judge explained at para. 6.5 of his judgment—was for an account of the shares in PEL which (it was said) Autumn had received gratuitously, and for an account of the interest which Autumn had earned on the loans which it made by way of contribution to the funding of the purchase price of the Fabergé rights and for working capital. Those claims were advanced on the basis that Autumn knew or ought to have known that Mr. Gilbertson was acting in breach of fiduciary duty in procuring the purchase of the Fabergé rights as he did and in procuring the issue of the new shares in PEL. Alternatively, it is said that, in the circumstances that Autumn did not pay for the PEL shares, it received them as a volunteer, and that, on that basis also, Autumn held those shares as a constructive trustee.

11 The judge went on to explain (at para. 6.7 of his judgment) that Mr. Gilbertson and Autumn counterclaimed in the proceedings, not only against Renova but also against Mr. Vekselberg, Mr. Kuznetsov and Renova Holding, on various grounds for damages by way of indemnity for any liability which they were found to have in respect of Renova's derivative claims. As the judge pointed out, the counterclaim was contingent on Renova succeeding on its derivative claims.

12   The judge held (2012 (2) CILR 416, at paras. 57 and 152) that Mr. Gilbertson owed the duties of a fiduciary as a director of the company throughout the relevant period, and that he was in breach of those duties in acting as he did in late December 2006 and January 2007. But he went on to hold that Mr. Gilbertson's breach of fiduciary duty had caused the master fund "no significant economic loss." He said this (*ibid.*, at para. 150):

"In the circumstances, if the Master Fund were to be put in the position in which it would now be, it would be in a significantly negative financial position. I must therefore conclude that it would be of no benefit to put the Master Fund into the financial position in which it would now have been but for Mr. Gilbertson's breach of fiduciary duty and that no equitable compensation is payable."

Accordingly, the judge dismissed the claim for equitable compensation brought against Mr. Gilbertson.

13   The judge held (2012 (2) CILR 416, at paras. 82, 95 and 153) that Autumn held the 25 PEL shares issued to it in January 2007 on a constructive trust for "the master fund/GPLP/the company"—on the ground that, when it received those shares, it was not a bona fide purchaser for value without notice in that (i) it knew or ought to have known of Mr. Gilbertson's breach of fiduciary duty, and (ii) it received the shares gratuitously, as a volunteer—and was liable to account for them. He held, also (*ibid.*, at para. 153), that Autumn was liable to account for the interest which it had received on the loans which it made to PEL for the purpose of funding the acquisition of the Fabergé rights.

14   As the judge recorded (*ibid.*, at para. 103), two of the five counterclaims brought by the Gilbertson parties—those for lawful means conspiracy and for breach of fiduciary duty by Mr. Kuznetsov—were abandoned during the course of the trial. For the reasons which he gave (*ibid.*, at paras. 105–112), the judge concluded that the remaining specific counterclaims—those for repudiatory breach of the letter agreement, for inducement and/or procurement of breach of the letter agreement and for unlawful means conspiracy—were without merit and should be dismissed.

### The order of November 6th, 2012

15   By the order which he made on November 6th, 2012 (filed on November 13th, 2012) the judge declared (under para. 1) that Autumn held 25,000 ordinary shares in Fabergé Ltd. (formerly PEL) as constructive trustee for the master fund, and directed (at para. 2) that Autumn should transfer forthwith those shares to the master fund. The reference to "25,000 ordinary shares in Fabergé Limited" gave effect to the judge's intention that the shares in respect of which Autumn was held to be constructive trustee were the 25 shares in PEL issued in January 2007

(which had become 25,000 shares in Fabergé Ltd. following a sub-division in 2008 and the change of name) and did not include any shares in Fabergé Ltd. subsequently acquired by Autumn. At para. 3 of that order, the judge directed that Autumn should pay to the master fund the sum of US$2,306,320.35 (inclusive of pre-judgment interest from January 3rd, 2007 to the date of the order in the amount of US$507,347.35). At paras. 4 and 5, respectively, he dismissed the claim for equitable compensation against Mr. Gilbertson and the counterclaims against the Renova parties. At para. 6, the judge directed that each party should bear its own costs of the proceedings (so far as such costs were not already the subject of orders in favour of one or other of the parties).

**The appeal and cross-appeal**

16   On November 27th, 2012, Autumn filed notice of appeal (Appeal No. 21 of 2012) from the order of November 6th, 2012. The Renova parties are the respondents to that appeal. The relief sought was an order that the appeal be allowed: that paras. 1, 2 and 3 of the order be set aside, and that the Renova parties pay Autumn's costs of the appeal and in the court below. The grounds of that appeal are set out in the memorandum of grounds of appeal filed on behalf of Autumn on February 1st, 2013 under six main heads:

  (A) The judge misdirected himself and erred in law in entertaining and granting relief in respect of derivative claims that were not before him.

  (B) The judge misdirected himself and erred in law and/or fact in holding that Mr. Gilbertson owed or was in breach of any fiduciary duty in relation to the Fabergé rights and so in holding that there was any substratum on which to found a claim against Autumn.

  (C) The judge misdirected himself and erred in law and/or fact in holding that, notwithstanding the rule in *Nurcombe* v. *Nurcombe* (28), the conduct of the Renova parties was not such as to disentitle Renova from any relief.

  (D) The judge misdirected himself and erred in law and/or fact in holding that, having regard to its relationship with Mr. Gilbertson, the property which it received, the person from whom it received the property and its state of knowledge at the time of receipt, Autumn was liable in knowing receipt.

  (E) The judge misdirected himself and erred law and/or fact in holding that Autumn was liable as a volunteer.

  (F) The judge misdirected himself and erred in law and/or fact in granting relief against Autumn (i) by way of an account of profits (comprising the interest which Autumn received on the loan it made to PEL); and (ii) in respect of pre-judgment interest (from January 3rd, 2007)

on the interest payment which Autumn received from Fabergé Ltd. on September 28th, 2007.

17   Also on November 27th, 2012, Renova (derivatively on behalf of the company, GPLP and the master fund), as plaintiff in the action, and Mr. Vekselberg, Mr. Kuznetsov, Renova Holding and Renova (on its own account), as defendants to the counterclaim, filed notice of appeal (Appeal No. 22 of 2012) from the order of November 6th, 2012. Mr. Gilbertson and Autumn are the respondents to that cross-appeal. The relief sought by the cross-appeal was (i) that so much of the order as dismissed Renova's claim against Mr. Gilbertson for equitable compensation be quashed and that either judgment be entered for Renova against Mr. Gilbertson in the sum of US$82,582,000 and interest under statute, or (in the alternative) that it be declared that Autumn holds a further and additional 16,190,575 ordinary shares in Fabergé Ltd. as constructive trustee for the master fund and ordered that Autumn shall forthwith transfer full legal title in those further shares to the master fund; (ii) that Mr. Gilbertson and Autumn pay Renova's costs of the proceedings in the court below on the standard basis; (iii) that Mr. Gilbertson and Autumn pay the costs of the defendants to counterclaim in the court below on the indemnity basis; and (iv) that Mr. Gilbertson and Autumn pay the cross-appellants' costs of the cross-appeal on the standard basis. The grounds of the cross-appeal are set out in the memorandum of grounds of appeal filed on behalf of Renova and the other cross-appellants, also on February 1st, 2013, under three heads:

(A) The judge erred in law and/or in principle and/or misdirected himself as to the evidence in valuing at nil the loss which Mr. Gilbertson was liable to make good to the master fund by way of equitable compensation.

(B) Alternatively, the judge erred in law and/or in principle and/or misdirected himself as to the evidence in failing to hold that the entirety of Autumn's shareholding in Fabergé Ltd. (and not only the 25,000 shares which represented the 25 shares issued by PEL in January 2007) should be held on constructive trust for (and transferred to) the master fund.

(C) The judge erred in law or exercised his discretion outside the ambit within which reasonable disagreement is possible in making no order as to the costs of the action and the counterclaim.

18   In those circumstances the questions for determination by this court are these:

(1) Was the judge wrong to entertain (and grant relief in respect of) derivative claims that were not before him?

(2) Was the judge wrong to hold that Mr. Gilbertson owed and was in breach of fiduciary duties in relation to the Fabergé rights?

(3) Was the judge wrong to hold that, notwithstanding the rule in *Nurcombe* v. *Nurcombe* (28), the conduct of the Renova parties was not such as to disentitle Renova from any relief?

(4) Was the judge wrong to value at nil the loss which Mr. Gilbertson was liable to make good to the master fund by way of equitable compensation?

(5) Was the judge wrong to hold that Autumn was liable as a constructive trustee of the shares issued by PEL in January 2007 (a) because it was in "knowing receipt" having regard to its relationship with Mr. Gilbertson, the property which it received, the person from whom it received the property and its state of knowledge at the time of receipt, and/or (b) because it received those shares as a volunteer?

(6) Was the judge wrong in failing to hold that the entirety of Autumn's shareholding in Fabergé Ltd. (and not only the 25,000 shares which represented the 25 shares issued by PEL in January 2007) should be held on constructive trust for (and transferred to) the master fund?

(7) Was the judge wrong to grant relief against Autumn by way of an account of profits (comprising the payment which Autumn received on September 28th, 2007 in respect of interest on the loan which it had made to PEL on January 3rd, 2007) and, if not, was the judge wrong to award pre-judgment interest from January 3rd, 2007 (rather than from September 28th, 2007) on the payment which Autumn received?

(8) Did the judge exercise his discretion outside the ambit within which reasonable disagreement is possible in making no order as to the costs of the action and the counterclaim, and, if so, what orders as to costs should be made?

**Whether the judge was wrong to entertain (and grant relief in respect of) derivative claims that were not before him**

19    It is said on behalf of the Gilbertson parties that the judge misdirected himself and erred in law in entertaining a derivative claim or derivative claims on behalf of the GPLP or the master fund notwithstanding that no such claim or claims were contained in the originating process and the only derivative claim for which leave had been granted was a claim brought on behalf of the company, and that, had the judge directed himself properly, he should have refused to grant any relief on the derivative claim brought by Renova on behalf of the company.

20    The judge addressed the availability of derivative relief in his judgment re-dated and re-issued on November 5th, 2012. He said this (2012 (2) CILR 416, at paras. 59–60):

158

"*Availability of derivative relief*

59    In their pleading and opening submissions, the Gilbertson parties raised again the derivative nature of the plaintiff's claim and contended that the plaintiff was not entitled, on behalf of the company, to claim for alleged loss sustained by the master fund. I say that they raised this issue 'again' because the entitlement of the plaintiff to pursue this action derivatively on behalf of the company (including by way of multiple derivative action also on behalf of GPLP and/or the master fund) in respect of loss sustained by the master fund was addressed in the ruling dated April 14th, 2009 giving leave to the plaintiff to proceed with this action (in proceedings reported at 2009 CILR 268). The question was fully argued at the hearing which resulted in that ruling by reference to the relevant authorities, including and particularly *Waddington Ltd.* v. *Chan Chun Hoo . . .* in the Court of Final Appeal in Hong Kong and the judgment of Lord Millett, N.P.J., as well as the other authorities referred to in the ruling.

60    The uncontroversial facts necessary to enable this court to rule on this issue were before me at that hearing and in my view no facts relevant to this relatively limited legal argument have emerged since. As I have already said, there was no appeal from any part of the ruling, including the decision on this particular issue, which, although made in the context of the plaintiff's application for leave to proceed with this action, is nonetheless, in my view, a conclusive and not a summary ruling on this particular issue. There having been no appeal against the court's decision on this particular issue, in my opinion it was not open to the Gilbertson parties to revisit it at the trial. Accordingly, I reject the Gilbertson parties' submissions in this regard."

The judge's ruling of April 14th, 2009 is reported at 2009 CILR 268. The judgments of the Hong Kong Court of Final Appeal in *Waddington Ltd.* v. *Chan Chun Hoo Thomas* (40), to which the judge referred in his ruling (and in the passage of his judgment of November 5th, 2012 which I have just set out) are reported *inter alia* at [2008] HKCU 1381.

21    These proceedings were commenced by writ of summons issued on May 20th, 2008. The plaintiff was described in that writ as "Renova Resources Private Equity Limited (A company incorporated in the Bahamas suing as shareholder of the Second Defendant, Pallinghurst (Cayman) General Partner LP (GP) Limited)." Pallinghurst (Cayman) General Partner LP (GP) Ltd. (the company), as the party on whose behalf the derivative action was brought, was joined as a defendant to the proceedings, as would be usual in such circumstances. But it is important to have three matters in mind. First, GPLP and the master fund were also joined as

defendants to the proceedings. Secondly, the relationship between the company, GPLP and the master fund was set out at para. 3 of the statement of claim, as filed on May 20th, 2008:

"3. The Second Defendant (the 'Company') is a company incorporated in the Cayman Islands and is the general partner of a Cayman Islands limited partnership called Pallinghurst (Cayman) General Partner LP (the 'Third Defendant'). The Third Defendant ('GPLP') is in turn the general partner of the Fourth Defendant, a Cayman Islands limited partnership called Pallinghurst Resources Management LP (the 'Master Fund')."

Thirdly, relief was sought in the proceedings for the benefit of the company, GPLP and the master fund collectively or in the alternative. Paragraphs 32 and 33 of the statement of claim, as filed, were in these terms:

"32.   As a result of the matters set out above, the Company, including in its capacity as general partner of GPLP and, in turn, the Master Fund, is entitled to, and the Plaintiff hereby seeks on behalf and in the interests of the Company, the following relief against the First and Fifth Defendants:

32.1 a declaration that the entry into and/or closing of the Rights Purchase Agreement was effected without the proper and due authority of the Company, or of either GPLP or the Master Fund;

32.2 a declaration that Autumn holds its PEL shares (i.e. the 25% holding) on constructive trust for the Company and/or GPLP and/or the Master Fund;

32.3 an order that Mr Gilbertson takes all steps to procure that Autumn deals with its shares in PEL as constructive trustee for the Company and/or GPLP and/or the Master Fund;

32.4 further or alternatively, an account to the company and/or GPLP and/or the Master Fund of profits received by Mr Gilbertson and/or Autumn and/or by individuals or entities associated with them, namely an account of the value of the 25% PEL shares;

32.5 further or alternatively, an order for payment by Mr Gilbertson to the Company and/or GPLP and/or the Master Fund of equitable compensation for breach of fiduciary duty arising from Mr Gilbertson's failure to obtain the prior approval of the Board of the Company to the acquisition of the Rights and/or thereafter to agree to the terms of the Third Draft IA or Fourth Draft IA and/or an agreement on substantially

similar terms and/or to continue to negotiate terms in good faith notwithstanding that such terms were reasonable and in the best interests of the Company and/or his actions which led to the dilution of the Company and/or GPLP and/or the master fund's economic interest in PEL;

32.6 further or alternatively, an order for payment by Autumn to the Company and/or GPLP and/or the Master Fund of equitable compensation for knowing receipt of property traceable to a breach of fiduciary duty.

33.   Further, the Plaintiff seeks an order that the First and Fifth Defendants pay the Company and/or GPLP and/or the Master Fund interest (including compound interest with yearly rests) on all sums found to be due to it pursuant to section 34 of the Judicature Law and/or the rules of equity for such period and in such amount as the Court considers appropriate."

22   By summons issued on July 29th, 2008, Renova sought leave, pursuant to O.15, r.12A(2) of the Grand Court Rules, to continue the action on behalf of the company. In the skeleton argument filed in support of that application, Renova indicated (at para. 24) that, if such leave were granted, "it will similarly formally be able to procure that the company proceed in the name of the GPLP, which in turn will be able formally to procure that the Master Fund proceed on its own behalf." Leave to continue these proceedings was granted by the judge for the reasons which he set out in his ruling of April 14th, 2009. In the event, Renova did not think it necessary to make any further application (on behalf of the company) for leave to proceed in the name of GPLP or, if such leave were granted, any further application on behalf of GPLP for leave to proceed in the name of the master fund.

23   It is clear from para. 1 of his ruling of April 14th, 2009 that the judge appreciated that the application before him was an application under GCR O.15, r.12A(2) for leave to continue a derivative action brought by Renova on behalf of the company. Paragraphs (1) and (2) of that rule, to which the judge referred (2009 CILR 268, at para. 2), are in these terms:

"(1) This rule applies to every action begun by writ by one or more shareholders of a company where the cause of action is vested in the company and relief is accordingly sought on its behalf (referred to in this rule as a 'derivative action').

(2) Where a defendant in a derivative action has given notice of intention to defend, the plaintiff must apply to the Court for leave to continue the action."

An application by Renova for leave to continue a multi-derivative action on behalf of the master fund (or on behalf of GPLP) would not have been

within the scope of GCR O.15, r.12A for the reason that if (and so far as) the relevant cause of action was vested in the master fund (or in GPLP), it was not vested in a company of which Renova was a shareholder. Nevertheless, the question whether Renova could pursue proceedings in circumstances where (upon a true analysis) the cause of action was vested in the master fund (and not in the company) was in the judge's mind. In identifying the issues which arose for determination, the judge said this (*ibid.*, at para. 3):

> "Thirdly, there is the question whether a derivative action may be brought by a shareholder in the holding company of the company (or in this case the exempted limited partnership) which is its ultimate subsidiary and in which, at least arguably, the cause of action against the defendant(s) is vested. Such an action is usually described as a multiple derivative action. There is also a question as to whether such a shareholder in a holding company may claim for loss or damage which, having arguably been sustained by a subsidiary company, is reflective loss. These are the principal issues arising in this matter but there are other peripheral issues as well."

24   The judge addressed that question in the section of his ruling ([paras. 62–66](#)) headed "The multiple derivative action." He explained that it had been argued on behalf of the Gilbertson parties that the relevant exception to the rule in *Foss* v. *Harbottle* (18)—that is to say, the exception on which the power to entertain a derivative action was founded—arose only in the context of loss or damage suffered by the company of which the plaintiff was a shareholder, and that, in the present case, the loss alleged was suffered not by the company but by the master fund, whose shareholding in PEL was diluted as a result of Mr. Gilbertson's actions from 100% to a nominal amount. He referred to the facts in *Waddington Ltd.* v. *Chan Chun Hoo Thomas* (40), in which (as he said) it appeared that the appellant/defendant, who was a director of the ultimate holding company as well as of the subsidiary company and the sub-subsidiary companies, had made the same (or a similar) submission to that which had been advanced on behalf of the Gilbertson parties in this context. He referred to the conclusion of Lord Millett, sitting as a non-permanent judge of the Hong Kong Final Court of Appeal in that case ([2009] 2 BCLC 82, at para. 70), that "the only question is whether the action, which may be brought by a member of the company, may be brought by a member of its parent or ultimate holding company. This is simply a question of locus standi." And he referred to Lord Millett's observations at paras. 74 and 75 of his judgment in *Waddington* (*ibid.*):

> "[74]   ... On a question of standing, the court must ask itself whether the plaintiff has a legitimate interest in the relief claimed sufficient to justify him in bringing proceedings to obtain it. The answer in the case of person wishing to bring a multiple derivative

action is plainly 'Yes'. Any depletion of a subsidiary's assets causes indirect loss to its parent company and its shareholders. In either case the loss is merely reflective loss mirroring the loss directly sustained by the subsidiary and as such it is not recoverable by the parent company or its shareholders for the reasons stated in *Johnson v Gore Wood & Co* [2001] 1 BCLC 313, [2002] 2 AC 1. But this is a matter of legal policy. It is not because the law does not recognise the loss as a real loss; it is because if creditors are not to be prejudiced the loss must be recouped by the subsidiary and not recovered by its shareholders. It is impossible to understand how a person who has sustained a real, albeit reflective, loss which is legally recoverable only by a subsidiary can be said to have no legitimate or sufficient interest to bring proceedings on behalf of the subsidiary.

[75]   This is not to allow economic interests to prevail over legal rights. The reflective loss which a shareholder suffers if the assets of his company are depleted is recognised by the law even if it is not directly recoverable by him. In the same way the reflective loss which a shareholder suffers if the assets of his company's subsidiary are depleted is recognised loss even if it is not directly recoverable by him. The very same reasons which justify the single derivative action also justify the multiple derivative action. To put the same point another way, if wrongdoers must not be allowed to defraud a parent company with impunity, they must not be allowed to defraud its subsidiary with impunity."

In his ruling of April 14th, 2009, the judge concluded (2009 CILR 268, at para. 66):

"In my opinion, Lord Millett's analysis and conclusion also represents the law in this country and I can see no reason why, in appropriate circumstances, a multiple derivative action should not be permitted. In the present case, the company is the general partner of and therefore controls the exempted limited partnership, GPLP. GPLP is itself the general partner and therefore controls the master fund. The master fund is, in my view, no different from a sub-subsidiary of the company for these purposes. On the plaintiff's case, the master fund has sustained significant loss as a result of the dilution of its 100% shareholding in PEL, procured by Mr. Gilbertson without the knowledge, still less the consent, of the master fund or GPLP or the company. In the circumstances, a multiple derivative action on behalf of the company in respect of Mr. Gilbertson's actions is not, in my judgment, objectionable."

25   It is said on behalf of the Gilbertson parties that the judge was wrong to hold (2012 (2) CILR 416, at para. 59) that, when giving leave to Renova to proceed with this action, he had addressed the issues whether Renova

was entitled, on behalf of the company, to claim for alleged loss sustained by the master fund and to pursue this action derivatively on behalf of the company (including by way of multiple derivative action also on behalf of GPLP and/or the master fund) in respect of loss sustained by the master fund. In particular, it is said that:

(1) There is "no room for serious dispute" that the issue whether Renova was entitled to pursue this action by way of multiple derivative action on behalf of GPLP and/or the master fund was not before the judge; given that Renova had indicated in the skeleton argument filed in support of its application under GCR O.15, r.12A(2) that, if that application were successful, it would make further applications (i) on behalf of the company for leave to proceed in the name of GPLP, and (ii) on behalf of GPLP for leave to proceed in the name of the master fund. Renova would not have contemplated that there would be a need for it to make such further applications if it had thought that an application for leave to proceed by way of multiple derivative action on behalf of GPLP and/or the master fund was already before the judge.

(2) The persons with an interest in GPLP and the master fund were not the same as those who (as members of the company) had an interest in the company. A consequence of the irregular manner in which the judge dealt with the issue of leave to proceed was that those who were the partners in GPLP and the master fund were deprived of the opportunity to oppose the proceedings. The judge was wrong to take the view (as, it is said, he appears to have done) that the fact that those with an interest in GPLP and the master fund were not the same as the members of the company was a technicality of little or no significance. The unpleaded claim that Mr. Gilbertson owed a fiduciary duty to the master fund was not only an essential ingredient of any claim in an action pursued by the master fund itself, it was also a prerequisite of a multiple derivative action pursued on behalf of the master fund. It is impossible to understand the rights and obligations owed by the parties to one another without understanding the nature and extent of the interests at stake.

In those circumstances, it is said, the judge was wrong to hold that—if, following the order which he made on Renova's application of July 29th, 2008, Autumn wished to object to Renova pursuing this action on behalf of the master fund—it should have appealed from that order. The flaw in the judge's reasoning (it is said) is apparent on its face.

26   I do not find those submissions persuasive. I accept that, in the summons issued on July 29th, 2008 (before the judgments in the Hong Kong Final Court of Appeal in *Waddington* (40) had been delivered), Renova did not seek leave to proceed by way of multiple derivative action on behalf of GPLP and/or the master fund but it is important to have in mind, first, that it was not required to do so under GCR O.15, r.12A

(which, in the restrictive form in which that order had been made, had no application to multiple derivative actions) and, secondly, that there was no other rule of practice which required that leave was required to bring a multiple derivative action under the general law. It is clear, from the judgments in *Waddington* and from the observations of Briggs, J. in *Universal Project Mgmt. Servs. Ltd* v. *Fort Gilkicker Ltd.* (39), that the practice under the general law in relation to the pursuit of derivative claims—which predated the introduction of GCR O.15 r.12A—was abrogated by that rule in relation to single derivative actions but continued to apply (after the introduction of that rule) in relation to multiple derivative actions. As Ribeiro, P.J. pointed out in *Waddington* ([2009] 2 BCLC 82, at paras. 13–14):

"[13]   . . . Procedurally, there is no requirement at common law for a person seeking to sue derivatively first to obtain the leave of the court . . .

[14]   The time honoured practice at common law is for the plaintiff to issue proceedings 'on behalf of himself and the other shareholders other than the defendants', naming the company on whose behalf the proceedings are brought as one of the defendants. A challenge to the plaintiff's locus generally takes the form of an application by the relevant defendants to strike out the claim or to have the court determine as a preliminary issue that the plaintiff has no locus to sue on the company's behalf."

27   I accept, also, that it is reasonably clear that, when preparing and filing the skeleton argument in support of Renova's application of July 29th, 2008, its advisers took the view that the appropriate course in the case of a multiple derivative claim was to proceed incrementally by a series of linked single derivative claims. But that view was based on a misunderstanding of the premise underlying the court's willingness to entertain a derivative claim for relief; as explained by Lord Millett, N.P.J. in *Waddington* (40) and by Briggs, J. in *Universal Project Mgmt. Servs. Ltd.* v. *Fort Gilkicker Ltd.* (39). As Briggs, J. put it in the latter case ([2013] Ch. 551, at paras. 26 and 44 of his judgment):

"26   In my judgment the common law procedural device called the derivative action was . . . clearly sufficiently flexible to accommodate as the legal champion or representative of a company in wrongdoer control a would-be claimant who was either (and usually) a member of that company or (exceptionally) a member of its parent company where that parent company was in the same wrongdoer control. I would not describe that flexibility in terms of separate forms of derivative action, whether headed 'ordinary', 'multiple' or 'double'. Rather it was a single piece of procedural ingenuity designed to serve

the interests of justice in appropriate cases calling for the identification of an exception to the rule in *Foss v Harbottle*."

"44  . . . [T]he court could permit a person or persons with the closest sufficient interest to litigate on behalf of a company by seeking for the company relief in respect of a cause of action vested in it. Those persons would usually be a minority of the company's members, but might, if the company was wholly owned by another company, be a minority of the holding company's members. These were not separate derivative actions, but simply examples of the efficient application of the procedural device, designed to avoid injustice, to different factual circumstances."

The judge appreciated—as he said in his ruling of April 14th, 2009 (2009 CILR 268, at para. 3)—that it was, at the least, arguable that the cause or causes of action which Renova sought to pursue against Mr. Gilbertson and/or Autumn were vested in the master fund (and not in the company). In those circumstances it was necessary—in order to determine whether to allow the action, as constituted, to go forward—that he address the question whether Renova could bring multiple derivative proceedings for loss said to have been suffered by the master fund. In my view, there is no doubt that that question was properly before the judge in April 2009, and no doubt that he intended to and did decide it.

28    The judge explained (*ibid.*, at para. 36) that the members of the company (each holding 50% of its shares) were Renova and Fairbairn. Fairbairn (he said) was "effectively controlled by the first defendant, Mr. Brian Gilbertson." He explained (*ibid.*, at para. 37) that the company was the general partner of GPLP, and that GPLP was, in turn, the general partner of the master fund. A diagram of the Pallinghurst structure was attached to the statement of claim which was before him. That diagram showed that Mr. Sean Gilbertson, Mr. (Brian) Gilbertson's son, was the only person (other than the company) with an interest (as limited partner) in GPLP, and that Pallinghurst (Cayman) Founder Partner LP ("the Founder fund") was the only person (other than GPLP) with an interest (also as limited partner) in the master fund. It appeared, also, from that diagram that the general partner of the Founder fund was Pallinghurst Founder GP Ltd. ("Founder GP"), and that Mr. Sean Gilbertson was the sole limited partner of the Founder fund. A more complete analysis of the position under the short form agreements pursuant to which the Pallinghurst structure was established (shown diagrammatically in the appendix to the written submissions of the Gilbertson parties prepared for this appeal) indicates that the persons interested in Founder GP were Renova and Fairbairn (as to 50% each): that is to say, the persons interested in Founder GP were the same persons as those who held the shares in the company. In those circumstances, the Gilbertson parties are correct to point out that the members of the company were not, themselves, the only

persons interested in GPLP and the master fund. In addition to Renova and Fairbairn—which, together, held (in equal shares) indirect interests equivalent to 50% of GPLP (through the company) and 50% of the master fund (as to 25% through GPLP and 25% through Founder GP and the Founder fund)—Mr. Sean Gilbertson held 50% interests in GPLP and the master fund (in the latter case, indirectly through GPLP, as to 25%, and the Founder fund, as to the other 25%). But, as it seems to me, the submission that those who were the partners in GPLP and the master fund were deprived of the opportunity to oppose these proceedings is not well founded. The company, GPLP and the master fund were joined as defendants with Mr. Gilbertson and Autumn (a company of which Fairbairn, a Gilbertson family trust controlled by Mr. Gilbertson, was the owner); the company was the general partner of GPLP and GPLP was the general partner of the master fund; and Mr. Gilbertson and Mr. Kuznetsov were the directors both of the company and of Founder GP. Mr. Sean Gilbertson was closely involved in the circumstances which gave rise to the claims brought on behalf of the master fund: he made a witness statement and gave oral evidence at the trial. In substance this was litigation between Renova interests and Gilbertson interests. Those on the Gilbertson side with an interest in resisting the claims made in the litigation were well able to do so.

29   In my view, the judge was correct to hold (2012 (2) CILR 416, at para. 60) that, having chosen not to appeal from the order which he had made some three and a half years earlier, it was not open to the Gilbertson parties to challenge, at trial, the standing of Renova to advance claims in the action on behalf of GPLP and the master fund including, in particular, a claim founded on the unpleaded contention that Mr. Gilbertson had acted in breach of fiduciary duties which he owed to the master fund.

**Was the judge wrong to hold that Mr. Gilbertson owed and was in breach of fiduciary duties in relation to the Fabergé rights?**

30   As I have said, in section 6 of the judgment issued on November 5th, 2012, the judge explained that Renova's principal claim in the proceedings—advanced on behalf of the company, as one of the ultimate owners of the master fund—was for reconstitution of the master fund to the position in which (it is said) it would have been but for the alleged breach of duty by Mr. Gilbertson as a director of the company. At para. 7.5 of his judgment, the judge observed that the question whether Mr. Gilbertson owed fiduciary duties to the company—and, if so, what fiduciary duties—turned on the particular circumstances. Accordingly, he said, it was necessary to consider—and, in so far as disputed, determine—what those circumstances were. He addressed that task at sections 8, 9 and 10 of his judgment. He made findings of fact by reference to three successive periods: (i) the period up to December 2006 (section 8); (ii) the

period from December 2006 to January 3rd, 2007 (section 9); and (iii) the period after January 3rd, 2007 (section 10). But he observed that "the most significant circumstances arose during the short period between about mid-December 2006 and mid-January 2007."

*The judge's findings of fact*

(i) *The period up to December 2006*

31    At para. 8.1 of his judgment, the judge reminded himself that he had already explained (earlier in that judgment) that, from as early as 2002, Mr. Gilbertson had identified the Fabergé brand as a potentially profitable investment; that, at a relatively early stage in their discussions about a private equity fund, Mr. Gilbertson had suggested to Mr. Vekselberg that the Fabergé brand and business could be an investment project in that context; and that, given his personal interest in Fabergé, Mr. Vekselberg's response to that suggestion had been positive. The judge went on to explain (at para. 8.2) that, during 2005, an initial approach was made to Unilever as to the possibility of purchasing the Fabergé brand; that discussions and negotiations took place in respect of the structure which eventually became the Pallinghurst structure; and that, in the course of those discussions and negotiations various draft documents ("the short form agreements") were produced and exchanged. At para. 8.3 of his judgment he noted that, on October 27th, 2005, Pallinghurst Resources LLP ("Pallinghurst LLP") was established in England by Mr. Gilbertson as an investment management vehicle, and that, on November 24th, 2005, the letter agreement (initialled by Mr. Kuznetsov) was sent to Mr. Gilbertson. At para. 8.4 he explained that, from November 2005, Mr. Sean Gilbertson initiated a number of cancellation actions in respect of various Fabergé trademarks, on the ground of alleged non-use, with a view to reducing the value of the Fabergé brand and so strengthening the negotiating position in relation to the proposed purchase of that brand from Unilever.

32    At para. 8.5 of his judgment, the judge referred to a meeting on January 20th, 2006 of the "Pallinghurst Resources Private Equity Fund" attended by Mr. Gilbertson, Mr. Sean Gilbertson and Mr. Kuznetsov. He noted that the agenda for that meeting included several "investment projects," including the purchase of the Fabergé brand and business (which was described as "Project Egg"), and that a briefing document circulated prior to that meeting by Mr. Sean Gilbertson reported, with regard to Project Egg, that meetings with Unilever had taken place since April 2005 but without success. The judge held (at para. 8.5) that "clearly Project Egg was being explored and pursued as an opportunity and potential Investment Project in accordance with the terms of the Letter Agreement." The judge rejected (at para. 8.6 of his judgment) the

168

submission, made on behalf of the Gilbertson parties, that (notwithstanding the agenda and briefing document) the meeting on January 20th, 2006 could not be taken to indicate that Project Egg was an approved investment project of the master fund because (it was said) the letter agreement had not been finally signed and the master fund had not been established. The judge said this (*ibid.*):

> "While it is no doubt correct that Project Egg was not at that stage an approved Investment Project of the Master Fund, it seems to me that the commercial reality was that it was by then being treated *de facto* as a potential Investment Project of the equity fund which became the Master Fund. Although the Letter Agreement had not been formally signed, it had been delivered to Mr. Gilbertson on 24th November 2005 and was signed by him only 4 days after that meeting. By the time of the meeting it must have been in final form because it was signed on that day on behalf of Renova Holding. The proposed Investment Projects which were discussed at the meeting were all sourced and put forward by Mr. Gilbertson in accordance with the Letter Agreement as proposed Investment Projects. Mr. Gilbertson himself gave evidence to the effect that at that time they, meaning he and Mr. Kuznetsov, were not concerned with the legal niceties, which the lawyers were working on, but simply wanted to get on with the proposed Investment Projects. While the acquisition of the Fabergé brand was clearly at an early stage, in my view it is equally clear that it was nonetheless being considered as an Investment Project of the proposed Investment Fund, which became the Master Fund."

33   The judge had referred to the terms of the letter agreement earlier in his judgment (at paras. 3.3–3.6). As he had said, the letter agreement defined "Investment Fund" as an investment fund in a jurisdiction and legal form, to be agreed between Mr. Gilbertson and Renova Holding; "Fund Management Vehicle" as the vehicle charged with establishing, marketing and managing the investment fund; and the "Initial Capital" as a founding capital of US$4m. in cash on the establishment of the fund management vehicle. The "Investment Committee" meant a committee comprising Mr. Gilbertson or his nominated representative on the one hand and the CEO of Renova Management or its nominated representative on the other hand. In the event, the investment committee comprised Mr. Gilbertson and Mr. Kuznetsov. Mr. Gilbertson and Renova Holding were defined in the letter as "Partners." The letter agreement provided for Renova Holding to establish the investment fund and the fund management vehicle with the initial capital. It provided that the purpose of the investment fund was "to explore, acquire and develop opportunities in the metals and mining industry (the 'Investment Projects')."

34    The judge had gone on to explain (at para. 3.3 of his judgment) that the letter agreement further provided that the Partners would work together to add value to the investment fund, and that Mr. Gilbertson would "assume responsibility for developing and implementing the strategy for the Investment Fund and for all Investment Projects," including, but not limited to, "searching for and introducing Investment Projects to the Investment Committee," "supervising of the implementation of the approved Investment Projects," and "providing strategic advice on corporate development of the Investment Fund, Fund Management Vehicle and Investment Projects." Clause 2.5 of the letter agreement was in these terms:

"Any of the Partners may bring a proposed Investment Project for consideration by the Investment Fund and Fund Management Vehicle. Approval to proceed with an Investment Project via the Investment Fund, at an Agreed Value, shall require the unanimous consent of the Investment Committee. It is contemplated by the Partners that each approved Investment Project will be pursued through the most appropriate structure, and that equity or other interests in such Investment Projects may be allocated to other minority partners (including managing partners) as agreed by the Investment Committee on a case by case basis."

And, as the judge explained (at para. 3.6 of his judgment), cl. 8.2 of the letter agreement provided that—

"this letter and its terms shall automatically terminate and become null and void if the Investment Fund and the Fund Management Vehicle are not established and operating in a way reasonably satisfactory to each of the Partners within 16 months of the last signature to this letter. In this regard, the Partners, using their best endeavours, agree to do (and procure the doing by other parties) of all acts necessary and to refrain (and procure that other parties will refrain) from any acts hindering the successful establishment and operation of the Investment Fund and the Fund Management Vehicle."

35    The judge found (at para. 8.7 of his judgment) that the letter agreement (already signed on behalf of Renova Holding) was given to Mr. Gilbertson on January 20th, 2006 (the day of the meeting to which he had referred), and was countersigned by Mr. Gilbertson on January 24th, 2006. On March 9th, 2006, Mr. Sean Gilbertson sent out to Mr. David Kalberer (the Deputy Chief Legal Officer of Renova Management), Mr. Kuznetsov and Mr. Gilbertson an update on what was referred to as the "Pallinghurst Resources Private Equity Fund," setting out a then current summary ("the March update") of the arrangements, the Pallinghurst structure and the various responsibilities. The March update described Mr. Gilbertson's

170

duties under the terms of the letter agreement, and contained an express statement that these duties would be owed by Mr. Gilbertson to the company. Shortly thereafter, on March 15th, 2006, Pallinghurst (Cayman) General Partner LP (GP) Ltd. ("the company") was incorporated in the Cayman Islands. As the judge had said, Mr. Gilbertson and Mr. Kuznetsov were the two directors of the company, and its shares were held equally by Renova and Fairbairn.

36    Project Egg was included amongst "Current Investment Projects" referred to in the minutes of meeting of the "Establishment Steering Committee" held on April 24th, 2006 and attended by Mr. Gilbertson, Mr. Sean Gilbertson, Mr. Kuznetsov and Mr. Kalberer. The judge held (at para. 8.10 of his judgment) that steps to acquire the Fabergé brand from Unilever as an investment project continued. On May 17th, 2006, Mr. Sean Gilbertson wrote to UBS (who were, by then, representing Unilever in relation to the sale of the Fabergé rights), informing them that the investment committee of the "Pallinghurst Resources Fund LP" (by which, as the judge said, he must be assumed to mean the master fund) had authorized an offer of US$20m. to purchase those rights, subject to agreeable terms and conditions. That letter was expressly approved by Mr. Kuznetsov on behalf of Renova. As the judge found, US$20m. was the maximum expenditure on a single investment which could be approved by Mr. Kuznetsov without the need for detailed due diligence, a business assessment and various internal approvals. Although that offer was supported (at the request of Unilever) by a comfort letter confirming the prospective purchaser's ability to pay US$20m., the offer was refused. But the fact that it was made led the judge to conclude (at para. 8.11 of his judgment) that—

> "the agreement between Mr. Kuznetsov and Mr. Gilbertson to offer US$20m and the terms of Sean Gilbertson's offer letter of 17th May 2006, indicated that Mr. Gilbertson was actively pursuing Project Egg, with the agreement of Mr. Kuznetsov, as an Investment Project of the Master Fund."

37    A further meeting of the "Establishment Steering Committee," attended by Mr. Gilbertson, Mr. Sean Gilbertson and Mr. Kuznetsov was held on July 25th–26th, 2006. Project Egg was among the several investment projects that were discussed at that meeting. It was recorded in the minutes of that meeting, under the heading "Project Egg—Brand Acquisition," that—

> "after an overview of the present status and reiteration of the recommendation that an offer of US$30m be submitted, VK [Mr. Kuznetsov] noted that the fund could only make an investment decision based on a detailed analysis and business plan. Hence he suggested that VV [Mr. Vekselberg] be approached with a view to

risking his personal funds as this would not require the usual rigour. It was agreed that the project would still fall within the Pallinghurst structure. VK would revert with VV's view."

The judge found (at para. 8.14 of his judgment) that, following that meeting, Mr. Kuznetsov obtained Mr. Vekselberg's support for an increased offer of US$30m. for the Fabergé brand—which Mr. Vekselberg was willing to pay from his own funds—and that, on that basis, an offer of US$30m. was made to Unilever on August 22nd, 2006, in a letter from Mr. Sean Gilbertson. In particular, the judge held (*ibid.*) that—

"Mr. Gilbertson was clearly aware sometime between 26th July and 22nd August 2006 that Mr. Vekselberg was willing to pay the purchase price for the Rights himself out of his personal resources rather than Renova doing so . . . I am satisfied that it was understood by the Gilbertsons that such approval was being given on behalf of Mr. Vekselberg personally and not on behalf of Renova . . . The circumstances were, in my opinion, clearly consistent with Mr. Gilbertson being aware and understanding that the offer to Unilever of US$30m had been approved on behalf of Mr. Vekselberg personally and not on behalf of Renova."

The offer of US$30m. was rejected by Unilever. Eventually, at a meeting between Mr. Sean Gilbertson and UBS in November 2006, UBS expressly pressed for a purchase price of US$40m. On November 29th, 2006, Mr. Gilbertson (who had informed Mr. Kuznetsov of this development), sent an email to Mr. Vekselberg asking him whether he was "on board or not, up to the maximum of $40m."

38  In the meantime, on August 8th, 2006, Mr. Kalberer sent to Mr. Sean Gilbertson a series of draft documents relating to the proposed exempted limited partnerships under the Pallinghurst structure ("the long form agreements"), with comments and proposed changes, for his review. The judge found (at para. 8.13 of his judgment) that Mr. Sean Gilbertson expressed some exasperation to his father about the number of those documents and proposed changes involved. Mr. Gilbertson, in an email to Mr. Sean Gilbertson sent later that day, wrote: "Buy the Egg, and I'll pull the plug on 'em." The judge accepted that that remark was made "in the heat of a moment of frustration" generated by the time it was taking to finalize the documentation with Renova but held that, in his assessment (at para. 8.13):

"Mr. Gilbertson did seem to consider Project Egg as his own idea, which indeed it was, and that it was basically his project to do with as he wished . . . his conduct in early January 2007 . . . is reflective of the attitude he expressed in his brief e-mail of 8th August 2006."

39   The long form agreements had been finalized in mid-September 2006. The judge found (at para. 8.16 of his judgment) that, although those documents were never executed—and therefore never became legally binding on the parties—the parties nonetheless proceeded on the common understanding that the drafts were final and agreed, and that both the Renova parties and Mr. Gilbertson proceeded on the basis that the master fund, and the Pallinghurst structure generally, were operational well before the events of December 2006 and January 2007. He said this (*ibid.*):

> "The meetings, discussions and actions of Mr. Gilbertson and Mr. Kuznetsov in particular even before the execution of the Letter Agreement pursuant to which the Master Fund and the Pallinghurst Structure were subsequently established, including the approval in July 2006 of the Angolan Project and what became known as Project Charlie as Investment Projects of the Master Fund and thereafter, all, in my opinion, clearly show that the Master Fund and the Pallinghurst Structure of which it was part, were being treated by the parties as real and effective."

(ii) *The period from December 2006 to January 3rd, 2007*

40   On December 1st, 2006, Mr. Vekselberg—in response to Mr. Gilbertson's email of November 29th, 2006—agreed in a telephone conversation that Mr. Gilbertson should proceed to acquire the Fabergé brand for a price not exceeding US$40m. Mr. Gilbertson confirmed that understanding in an email, copied to Mr. Kuznetsov, later on that day.

41   On December 6th, 2006, there was a meeting in London attended by Mr. Gilbertson, Mr. Sean Gilbertson, Mr. Kuznetsov, Mr. Mende (a joint owner, with Mr. Kundrun, of AMCI) and representatives of First Reserve (a very large investment fund specializing in energy related projects) to discuss further the possibility (discussed earlier in the year) of AMCI and First Reserve becoming investors in the master fund. The meeting also considered the status of the various projects which were being pursued as investment projects for the master fund, including Project Egg. Mr. Mende/AMCI remained interested—particularly in relation to Project Charlie, a proposal for the acquisition of an Australian manganese mining company—but First Reserve subsequently dropped out.

42   On December 13th, 2006, Mr. Kuznetsov and Mr. Gilbertson met, informally, at the Swissôtel, Moscow. The judge found—resolving a difference of recollection between them—that, although Mr. Kuznetsov was adamant that he had told Mr. Gilbertson at that meeting that Mr. Vekselberg required (as a condition of supporting the bid for the Fabergé rights) that one of his own companies would own the actual title to the Fabergé brand (outside the Pallinghurst structure, but on the basis that the

economic benefit of the business of developing, exploiting and managing the Fabergé brand would remain with the master fund within the Pallinghurst structure), Renova had not established that Mr. Gilbertson did understand and agreed to Mr. Vekselberg's requirements at, or as a result of, that meeting. After reviewing the evidence and surrounding circumstances, the judge said this (at para. 9.10 of his judgment):

> "On balance it is my overall assessment that Mr. Gilbertson first fully understood Mr. Vekselberg's requirements following the telephone conversation between Sean Gilbertson and Mr. Kalberer on 20th December 2006."

It was in the course of that telephone conversation, as the judge explained later in his judgment, that Mr. Sean Gilbertson first learnt of Mr. Vekselberg's requirements. As the judge observed (at para. 9.16):

> "I consider it improbable that, if Mr. Gilbertson was already aware of or understood Mr. Vekselberg's requirements, he would not have passed that information on very quickly to Sean Gilbertson. I therefore conclude that if Sean Gilbertson did not know of Mr. Vekselberg's requirements until Mr. Kalberer told him, which I accept is the case, then Mr. Gilbertson did not know or understand them either until that point."

43   On December 15th, 2006 (two days after the meeting between Mr. Gilbertson and Mr. Kuznetsov in Moscow), Mr. Sean Gilbertson agreed with UBS/Unilever a purchase price of US$38m. for the Fabergé rights. Mr. Gilbertson informed Mr. Kuznetsov that the price had been agreed. Later on that day (December 15th, 2006), Mr. Kuznetsov sent an email to Mr. Gilbertson, with copies to Mr. Sean Gilbertson and Mr. Igor Cheremykin (the Chief Legal Officer of Renova Management, based in Moscow), to congratulate him on reaching agreement as to the purchase price. That email included the sentence: "It is very important that we use the right group company for the purchase so could you please communicate with Igor Cheremykin, the head of our legal and corporate department on this …" The judge explained that there was a dispute as to what the Gilbertsons understood, or should have understood, by the reference to "the right group company for the purchase": the Renova parties contending that the Gilbertsons would or should have understood "the right group company" as a reference to a company within the Renova group (or a company within Mr. Vekselberg's family office) and the Gilbertsons contending that they understood "the right group company" to be a reference to a company within the Pallinghurst structure. The judge accepted—on the basis of his finding that, on December 15th, 2006, the Gilbertsons did not know of Mr. Vekselberg's requirement that he would, himself, own the title to the Fabergé rights through one of his personal companies—that they did not understand Mr. Kuznetsov to be referring to

anything other than the Pallinghurst structure. That view, he held, was confirmed by Mr. Sean Gilbertson's response by email to Mr. Cheremykin, with a copy to Mr. Kuznetsov, sent later the same day, in which he informed them that a Cayman Islands company, Project Egg Ltd. (PEL) had been incorporated as a wholly owned subsidiary of the master fund to acquire the Fabergé rights. The judge observed (at para. 9.13 of his judgment) that PEL had been incorporated on December 1st, 2006, with Mr. Sean Gilbertson and Mr. Willis, an employee of Pallinghurst LLP, as its directors, but that "rather surprisingly" the Renova parties were not made aware of that until Mr. Sean Gilbertson's email of December 15th, 2006.

44    On December 18th, 2006, Mr. Sean Gilbertson notified Mr. Kalberer by email that Unilever was insisting on completion of the purchase of the Fabergé rights before the year end. But, on the following day (December 19th, 2006), Unilever indicated (through its solicitors) that, provided that contracts were exchanged before December 31st, 2006, it was content to defer completion until January 3rd, 2007.

45    At para. 9.16 of his judgment, the judge returned to the telephone conversation between Mr. Sean Gilbertson and Mr. Kalberer on December 20th, 2006 to which he had referred earlier. He described that as "an important conversation" in that (as the Gilbertson parties contended and the judge accepted) it was the first time that the Gilbertson parties had been informed of Mr. Vekselberg's requirement that the Fabergé rights would be owned by one of his private companies. Shortly after that telephone conversation, Mr. Kalberer identified the company that was to own the Fabergé rights as Lamesa Arts Inc., a company incorporated in Panama, and provided Mr. Sean Gilbertson with a copy of a power of attorney in his (Mr. Kalberer's) favour executed by that company. On the following day (December 21st, 2016), Mr. Sean Gilbertson responded with an email to Mr. Kalberer, copied to Mr. Kuznetsov, which—after stating that Mr. Gilbertson was waiting for a call from Mr. Kuznetsov—included the following observation:

> "Clearly switching entities in this fashion at the 11th hour is not in the spirit of the arrangements with the Pallinghurst team and it is thus crucial that this call take place so that we might understand what arrangements [Mr. Kuznetsov] has in mind."

He went on to say that that Unilever, UBS and their solicitors were waiting to hear about the signing of the sale and purchase agreement ("the SPA").

46    As I have said, that email was sent by Mr. Sean Gilbertson on December 21st, 2006. The judge found that, on the previous day (December 20th, 2006), Mr. Gilbertson had received an email from Dr. Jelinek. The email was in these terms:

"I have spoken to Hans [Mr. Mende] and convinced him to express his interest and being ready to cover abt MIL to secure the brand name. He will do it outside AMCI and with my silent contribution either half or one third depending if Kudrun wants to participate . . ."

The judge observed (at para. 9.18 of his judgment) that—

"clearly Mr. Gilbertson must have spoken to Dr. Jelinek prior to this e-mail about purchasing the Fabergé brand and, in turn, Dr. Jelinek had spoken to Mr. Mende to ascertain whether he would be interested in contributing about US$15m to the purchase price. Dr. Jelinek was saying that he would contribute either half or one third of the price depending on whether Mr. Kundrun wanted to participate. It seems to me that this clearly shows that Mr. Gilbertson was actively setting up a consortium consisting of Dr. Jelinek, Mr. Mende, possibly Mr. Kundrun and, secretly, himself, to purchase the Fabergé brand, without any participation or involvement by Mr. Vekselberg, Lamesa or Renova."

Early on December 21st, 2006, Mr. Gilbertson had responded by email to Dr. Jelinek:

"Many thanks, Milan. That is very helpful indeed!

I will have my phone conversation with Viktor later today and will keep you informed."

47   The judge found that a number of other relevant events took place on December 21st, 2016:

(1) Later on that day Mr. Sean Gilbertson sent an email to Mr. Kalberer, again copied to Mr. Kuznetsov, to inform him that UBS was eager that the SPA be signed forthwith. That email contained the following paragraph:

"We are in the meantime preparing a draft of a one page agreement that could be signed by BPG, VK and VV to give comfort that at least 75% of 'Project Egg Limited' will be purchased by VV's vehicle and that the Pallinghurst team's rights will be protected. I will also send the necessary resolution of the 'GP of the GPLP' [the company] authorising that BPG [Mr. Gilbertson] (or VK, if you prefer) sign the sale & purchase agreement on behalf of Pallinghurst Resources Management LP [the master fund] (this is, as discussed with you yesterday, in connection with this vehicle guaranteeing the obligations of Project Egg Limited under the sale and purchase agreement)."

The judge explained that Mr. Sean Gilbertson's reference to discussions between Mr. Kalberer and himself on the previous day concerning Mr. Gilbertson (or Mr. Kuznetsov) signing the SPA on behalf of the master

fund confirmed the parties' agreement that the master fund would be the guarantor of the obligations of PEL and would sign the SPA as such.

(2) Still later on the same day (December 21st, 2006), Mr. Sean Gilbertson sent a further email to Mr. Kalberer, copied to Mr. Kuznetsov and Mr. Vekselberg, attaching a one-page draft "Implementation Agreement" ("the first draft IA"). He wrote:

> "Further to my earlier e-mail, please find attached the proposed one page agreement relating to implementation of Project Egg (allowing Mr. VV to retain at least 75%). UBS are pushing hard to complete signature of the sale and purchase agreement today and your assistance in this regard would be appreciated. I see no reason why we cannot accomplish this, particularly if we sign the attached agreement giving comfort to all parties. BPG confirms that Hans Mende is very enthusiastic to join VV in this initiative and committed earlier today to taking the remaining 25% . . ."

The judge observed that the first draft IA attached to Mr. Sean Gilbertson's email provided that the Fabergé rights would be purchased forthwith by PEL on the terms negotiated between Pallinghurst LLP (the investment management vehicle established in England by Mr. Gilbertson to which he had referred at para. 8.3 of his judgment) and Unilever; that Mr. Kuznetsov and Mr. Gilbertson were to be deemed to have signed an attached resolution enabling the master fund to become a party to the SPA as guarantor of the obligations of PEL; and that an entity nominated by Mr. Vekselberg would pay the purchase price (US$38m.). The first draft IA also provided that a documented transaction—under which not less than 75% of the ownership of PEL would be transferred to an entity nominated by Mr. Vekselberg and 25% of the ownership of PEL would be offered to AMCI (Mr. Mende's company) at a corresponding percentage of the purchase price—would be executed after completion of the SPA. The intended effect, he said, was that the economic benefits in relation to the Fabergé rights and the decision-making rights attributable to the Pallinghurst team and all commercial opportunities arising from them were not to be any less than those contemplated in the long form agreements.

(3) Mr. Kalberer replied by email, sent to Mr. Sean Gilbertson and Mr. Gilbertson with copies to Mr. Kuznetsov and Mr. Vekselberg, in these terms:

> "Following a telephone conversation with VK [Mr. Kuznetsov] of a moment ago I gather the following:
>
> 1 We would agree to the Pallinghurst Team getting the economic benefit of Project Egg as if the Faberge rights were purchased by Pallinghurst Resources Management LP [the master fund] and the

remuneration mechanics set out in the last drafts [of the long form agreements] agreed by Renova were applied.

2 As to Project Egg Ltd. [PEL], we request that 75% of its shares are transferred to Lamesa Arts Inc. within the next 2 business days after signing of the agreement regarding the Fabergé rights or, if ever possible before. Please confirm (i) who controls and (ii) how: (1) the shareholder and (2) the directors of this company.

3 The remaining 25% in Project Egg Ltd can be purchased by AMCI at the corresponding percentage of the purchase price for the Fabergé rights under the following cumulative conditions:

(a) Project Charley [*sic*] is closed within the next 6 months by Renova and AMCI (at a relation of 43% to 50% by Renova and 50% to 57% by AMCI);

(b) Renova obtains a firm commitment from an AMCI vehicle with the respective substance that it will take up, at Renova's discretion, between 50% to 57% in Charley.

If one of the conditions is not met Renova has the right to purchase the 25% in Project Egg Ltd. at USD 0.25. I could not talk to VK regarding the decision making and management issues as the acoustic quality of the call was very bad."

(4) Some two hours later (but still on December 21st, 2006), Mr. Gilbertson sent an email to Mr. Kalberer, copied to Mr. Kuznetsov and Mr. Vekselberg:

"The acoustic quality of your line to VK must have been bad indeed for these proposals to emerge at this late stage.

The Management issue is critical, and VK confirmed in response to my specific question during our telecon earlier this afternoon that the management arrangements, now long-established between Pallinghurst and Viktor, would not be diluted. Even if he had not done so, there are no grounds to seek any change at this late stage.

Regarding item 3: It is not reasonable to now require a new set of negotiations with AMCI in the Egg arrangements. I cannot reasonably do this in the time scale to which we are working. Also, VK made no mention of these conditions in our telecon this afternoon, neither during our meeting last week in the Swisshotel in Moscow. On the contrary, he welcomed the idea of an international investor. How can you seek such changes in the last hours? Just accept that you have a good partner, in a partnership that will to lead to much bigger things in future. If he does not, you lose nothing.

178

Regarding item 2: Two days is simply too short, particularly over this time of the year. But we will accept the principle of a rapid transfer against appropriate assurance, in the transfer agreement, on item 2 and on the Management arrangements. In response to your questions in item 2, 100% of the equity in Project Egg Ltd is held by Pallinghurst Resources LP, and the directors are Sean and Andrew Willis, as we have previously advised you.

After 18 months of negotiation by Pallinghurst, the deal is now there for the taking. Let us get on with it!"

(5) Still later the same day, December 21st, 2006, Mr. Gilbertson spoke to Mr. Vekselberg on the telephone. He followed up that conversation with an email to Mr. Vekselberg, with copies to Mr. Kuznetsov and Mr. Kalberer, in these terms:

"Further to our conversation of 45 minutes ago, I have as yet received no call from Mr Kuznetsov.

As I said to you, the lawyers on the other side are actually sitting in the London office, waiting to sign the documentation that Pallinghurst has painstakingly drafted and negotiated over the past months, and which will secure the Fabergé brand for us. Unilever wish to book the transaction in their 2006 financial year, with payment on 3rd January 2007. If they fail to achieve that, we do not have a deal, and they may re-approach the other parties with whom they have been in negotiation. We have in the last 10 minutes had confirmation that Unilever have signed, and that their lawyers are waiting to exchange documents.

I have just tried to phone you, unsuccessfully; you will find the missed call on your phone. Acting on the assurances that you gave me during this evening's telephone conversation, namely that you want me to buy the brand on the basis of the arrangements that we have established between us over the past many months, I will therefore now trigger the Unilever-Pallinghurst transaction to conclude the deal. Project Egg Ltd, a Pallinghurst company, will be the owner of the Fabergé brand. I confirm that I shall work closely with your team to conclude payment and to achieve a structure that suits your needs, in particular an arrangement whereby there is no Third Party involvement, though the latter will be a little complicated in view of developments since I met with Mr Kuznetsov in the Swisshotel last week, when he believed you would welcome an international partner with a 25% stake. (At some stage soon, you should meet Mr Mende of AMCI: you will like him, and he will be an excellent partner in Charlie, so you should try hard to ensure that he is not offended by being excluded from Fabergé, in which he has already agreed to invest).

179

I shall advise you as soon as you are officially the global 'Mr. Fabergé.'"

The judge observed (at para. 9.24 of his judgment) that, in his view—

"it is clear from all of this that Mr. Gilbertson had not refused to consent to or vetoed Mr. Vekselberg's requirements for re-structuring the way in which the Rights should be pursued as an Investment Project for the Master Fund. Indeed he was proceeding on the basis that Mr. Vekselberg's structure was being pursued."

And he said this (at para. 9.25):

"The confirmation by Mr. Gilbertson that he would work closely with Mr. Vekselberg 'to achieve a structure that suits your needs' clearly indicates, in my opinion, that Mr. Gilbertson was not refusing to consent to or vetoing the structure which Mr. Vekselberg wished to be pursued in respect of the Rights as an Investment Project. Furthermore, his reference to Mr. Vekselberg as becoming the global 'Mr. Fabergé' can only have been a reference to Mr. Vekselberg's ownership of the title to the Fabergé brand; it clearly was not a reference to ownership of the title to the Fabergé brand by the Master Fund as part of the Pallinghurst Structure. It was, it seems to me, an indication of Mr Gilbertson's acceptance of that."

48   On the following day, December 22nd, 2006, the SPA was signed in London by Unilever and by PEL. The judge observed that Mr. Gilbertson accepted, in the course of his evidence, that when he procured PEL, acting by Mr. Sean Gilbertson, to sign the SPA, he acquired the contractual entitlement to the Fabergé rights for the master fund and entities within the Pallinghurst structure and not for himself personally; he accepted that in no sense was PEL acting as his own nominee or agent in entering into the contract for the Fabergé rights; and he accepted that, following the execution of the SPA, the entitlement to acquire the Fabergé rights was owned by PEL, which was in turn owned by the master fund as part of the Pallinghurst structure. The judge went on to say this (at para. 9.28 of his judgment):

"It seems to me to follow that, even if the precise terms on which the Master Fund was to hold the economic benefit of the Rights could not be finally agreed with the Renova Parties, Mr. Gilbertson would not in any event be entitled to withhold the Rights for himself."

The judge accepted the submission (made on behalf of Renova) that, in circumstances where the entitlement to the Fabergé rights was wholly owned by PEL, there was no way in which Mr. Gilbertson could acquire title to the Fabergé rights himself without the co-operation of PEL. Furthermore, he said, Mr. Gilbertson accepted that it was PEL that had contracted to purchase the Fabergé rights from Unilever, and that it had

done so on the basis that the acquisition would be funded by Renova money for the benefit of the PEL/master fund/Pallinghurst structure: the acquisition was not a Gilbertson transaction for the Gilbertsons' benefit.

49  On the same day (December 22nd, 2006), Mr. Kalberer sent an email to Mr. Sean Gilbertson, copied to Mr. Kuznetsov and Mr. Gilbertson, in these terms:

> "After a conversation with VK we have to insist and make it a condition precedent that the agreement ('Agreement') regarding the transfer of 100% of the shares in Project Egg Ltd. ('PEL') is finalized and signed prior to the closing of the purchase agreement regarding the Fabergé rights, i.e. the payment of the USD 38m.

> For the Agreement we envisage the following provisions:

> 1.  All of the shares shall be transferred to Lamesa Arts Inc, the details of which I provided you earlier.

> 2.  Clear references regarding the preparation and taking of decisions and the ongoing the [*sic*] process of taking decision as to the management of PLE [*sic*] and any other decisions relating to it.

> 3.  Clear references and description as to how the various entities of the Pallinghurst structure economically benefit from PEL and its business and how these rights terminate with what consequences.

> 4.  That the directors of PEL are nominee directors provided by a service provider, which are instructed by the Executive Committee of the GP and of the GPLP.

> To ensure a smooth closing please assure that I get a first draft of the Agreement early next week, I will have to review and discuss with VK . . ."

The judge observed that Mr. Sean Gilbertson had said in evidence that he did not see this email until December 28th, 2006.

50  On December 23rd, 2006, Mr. Gilbertson sent an email to Mr. Vekselberg, copied to Mr. Kuznetsov, Mr. Kalberer and Mr. Sean Gilbertson, in these terms:

> "I am happy to be able to tell you that we have received confirmation from our attorneys, Clifford Chance, that Pallinghurst is now the owner of the Fabergé brand. I hope you will be as pleased about this outcome as I am, for I believe that there is great future potential and value to be realised. *I congratulate you on this entrenchment of your interests in this revered brand name.*

The purchase agreement incorporates a pre-agreed Press Release by Unilever and Pallinghurst, which is quite brief and which your colleagues have seen. I am sure you will wish to make your own personalised Press Release, for the news will almost certainly attract strong international interest, and possibly headlines in major world newspapers, I am happy to draft this for you if you wish, but your own PR machine will no doubt be more aware than I of your requirements.

*Mr. Kuznetsov and I have discussed arrangements to transfer 100% of the ownership of the brand to one of your companies and I confirm to you my willingness to do so against binding commitments that the Pallinghurst team will retain all of the economic benefits and management rights that it would have under Pallinghurst's agreements with Renova.* Payment of the US$38million is due on 3rd January, 2007. I MUST HAVE written confirmation from Messrs Kuznetsov and Kalberer by the middle of next week that this will be done.

If you need any further action or information, please let me know." [Emphasis supplied.]

Also on December 23rd, 2006, Mr. Gilbertson sent an email to Mr. Mende copied to Dr. Jelinek:

"Please see the e-mail below [that is, the email sent to Mr. Vekselberg just set out] which I sent off in the early hours this morning.

You will note that the Fabergé purchase is done, and the trademark is currently owned by Pallinghurst, (subject to payment of the $38million on 3rd January) but Viktor's crowd played hard-ball during the final hours, and there were some tense moments. Along the line, Viktor insisted that 100% of (only) the trade-mark should be owned by one of his companies (though not necessarily its harvesting, exploitation and development) and *I have agreed that I am willing to implement that, but only against binding commitments that the management control and economic benefits should lie with Pallinghurst in accordance with the previously agreed arrangements.* Also recently, Viktor's consigliere [Mr. Kuznetsov], has re-confirmed their willingness to bring you in as a 25% partner, on condition that AMCI joins in the broader initiative, including Charlie. Clearly there is still some boxing that must take place before we have finality, and before Viktor's empire makes payment on the 3rd January. I have told [Mr. Kuznetsov] that unless I have binding assurances, well in advance, that they will pay on time, I will finance the $38million from other sources. I do not think they could live with losing a brand that Viktor now wants so much, so am fairly confident we will get to a good outcome . . ." [Emphasis supplied.]

182

The judge observed that it was clear that, by the second of those emails, Mr. Gilbertson was informing Mr. Mende and Dr. Jelinek that he had agreed with Mr. Vekselberg (as, indeed he had) that effect would be given to Mr. Vekselberg's requirement that 100% of the Fabergé brand should be owned by one of his companies (although not "its harvesting, exploitation and development"), against a commitment that the management, control and economic benefits should remain with the master fund as part of the Pallinghurst structure in accordance with the previous arrangements.

51    The judge went on to say this (at para. 9.31 of his judgment):

"Clearly Mr Gilbertson was aware at this time, only a day after Sean Gilbertson's telephone conversation with Mr Kalberer, that under the new structure for the Investment Project required by Mr Vekselberg and the Renova Parties, although title to the Fabergé brand would be held outside the Pallinghurst Structure, the economic benefits of developing, exploiting and managing the Rights would remain with the Master Fund within the Pallinghurst Structure."

And, he observed (at para. 9.32 of his judgment) that—

"in his e-mail to Mr. Mende Mr. Gilbertson also told Mr. Mende and Dr. Jelinek that he had told Mr. Kuznetsov that unless he had binding assurances that they would pay on time he would finance the $38 million from other sources. That was not strictly true. Mr. Gilbertson had said emphatically in his previous e-mail to Mr. Vekselberg, copied to Mr. Kuznetsov and Mr. Kalberer, that he must have written confirmation by the middle of the following week that payment of the US$38 million would be made on 3rd January 2007 and later that day, 23rd December 2006, Mr. Kalberer e-mailed Mr. Gilbertson, with copies to Mr. Vekselberg, Mr. Kuznetsov and Mr. Gilbertson, confirming that Lamesa Arts had arranged for sufficient funds to pay the purchase price of US$38 million. However, in his evidence Sean Gilbertson asserted that this e-mail was also stuck in his spam filter and not seen by him until 28th December 2006, some 5 days later. At one point, Mr. Gilbertson did however say that he would have to make alternative arrangements if it was not confirmed that the US$38 million would be paid on 3rd January 2007. The overall evidence of the Renova Parties was that Mr Gilbertson did not specify the nature of such alternative arrangements and that they were not made aware that Mr. Gilbertson was arranging and subsequently had arranged to make the payment to Unilever with other investors, including his own trust, until after he had actually done so and the payment had been made. In fact Mr. Kuznetsov said he thought Mr. Gilbertson would seek an extension of time from Unilever. Mr. Gilbertson's statement in his e-mail to Mr. Mende that he had told Mr. Kuznetsov that if he did not receive the assurances he

was seeking he would use finance from other sources to pay US$38m was at least disingenuous if not deceptive."

52    On December 26th, 2006, Mr. Sean Gilbertson, on behalf of his father, sent to Mr. Kuznetsov and Mr. Kalberer, with a copy to Mr. Vekselberg, a further draft implementation agreement ("the second draft IA"). In this draft, PEL (as the entity by which the Fabergé brand had been acquired under the SPA) was referred to as "OpCo," and the company controlled by Mr. Vekselberg (as the entity by which the Fabergé brand was to be owned, but with the economic benefits and decision-making rights remaining with OpCo)—was referred to as "BrandCo." The second draft IA provided:

(1) That BrandCo would pay the purchase moneys payable under the SPA on January 3rd, 2007; that ownership of the Fabergé brand should be transferred to BrandCo as soon as practicable after completion of the purchase for a nominal consideration; and that BrandCo should own and hold the Fabergé brand until the winding up of the master fund pursuant to the Pallinghurst agreements.

(2) That Opco would manage and operate the Fabergé rights as a portfolio company of the master fund pursuant to the Pallinghurst agreements (which, as the judge said, meant the unsigned but agreed long form agreements), and that OpCo would be the beneficiary of all proceeds arising from its right to develop and pursue all commercial opportunities arising from the Fabergé brand.

(3) That there would be a payment by BrandCo on the eventual winding up of the master fund in respect of the enhancement of the value of the Fabergé brand as a result of the successful implementation of the development and pursuit by OpCo of the commercial opportunities arising from and relating to it, and that the parties should use their best endeavours to draw AMCI into the master fund.

(4) That AMCI should have the right to purchase up to 25% of BrandCo, subject to certain conditions relating to its involvement in Project Charlie.

The draft provided for the second implementation agreement to be signed by Mr. Gilbertson and Mr. Kuznetsov on behalf of the company.

53    On December 29th, 2006, Mr. Kalberer sent an email to Mr. Sean Gilbertson, copied to Mr. Kuznetsov and Mr. Gilbertson, attaching a copy of the second draft IA, marked up to show the changes which he proposed. Those proposed changes included the following:

(1) That the master fund, represented by Mr. Kuznetsov and Mr. Gilbertson as members of the "Executive Committee" (which, as the judge said, meant the investment committee) of the company, as the general

partner of GPLP, should be parties to the agreement, as should PEL and a Lamesa group entity.

(2) That BrandCo would be a Lamesa company, and that it would pay to OpCo (PEL) the purchase price due under the SPA on January 3rd, 2007, in order to enable OpCo to pay the purchase price to Unilever on that date.

(3) That payment by BrandCo to OpCo was to be on conditions (i) that OpCo transferred the title to the Fabergé brand to BrandCo or its nominee (which, as the judge said, was to be a Lamesa group company) for nominal consideration; and (ii) that the directors of OpCo be replaced by a director or directors nominated by the master fund and an equal number nominated by BrandCo.

(4) That the new directors of OpCo were to act upon the written instructions of the master fund given through the investment committee of the general partner of GPLP (which, as the judge said, meant the company).

(5) That, upon the transfer of the title to the Fabergé brand to BrandCo, BrandCo would conclude a licence agreement with OpCo for as long as the Fabergé brand was managed and held as an investment of the master fund.

(6) That the terms of the licence were to include, *inter alia*, (i) a provision that OpCo would be responsible for developing and pursuing all the commercial opportunities arising from and relating to the Fabergé brand and should have the benefit of the proceeds so arising, and should be the vehicle "in which all revenues, accruals and expenditures arising from the Fabergé brand shall vest"; (ii) a provision that the Fabergé brand should be owned by Lamesa Arts but should in all respects be treated as if it were an investment of the master fund; and (iii) a provision that, accordingly, Opco would be managed and operated as a portfolio company of the master fund pursuant to the Pallinghurst agreements as agreed.

Later on that day (December 29th, 2006), Mr. Kalberer sent a further email to Mr. Sean Gilbertson in which he wrote that, subject to agreement regarding his proposed changes to the second draft IA, they would prefer to transfer the US$38m. purchase price to Unilever direct, on behalf of PEL.

54   On December 30th, 2006, Mr. Sean Gilbertson sent an email to Mr. Kalberer, copied to Mr. Kuznetsov and Mr. Vekselberg, to which he attached a further draft implementation agreement ("the third draft IA"). The third draft IA provided, *inter alia*:

(1) That BrandCo (a Lamesa group company) would, upon the transfer to it by OpCo of the Fabergé brand (in return for Lamesa Arts procuring payment of the purchase price to Unilever), grant OpCo "a royalty-free,

exclusive, world-wide, sub-licensable, perpetual and irrevocable licence to use and exploit the Fabergé Brand."

(2) That the licence was to be valid until the winding up of the master fund pursuant to the Pallinghurst agreements, at which time BrandCo could terminate the licence on 90 days' notice, and that the parties should negotiate in good faith a written licence agreement to give effect to this and other specified terms.

(3) That OpCo should be managed and operated as a portfolio company of the master fund pursuant to the Pallinghurst agreements and should be the legal and beneficial owner of all revenues, accruals and expenditures arising from the Fabergé brand.

(4) That, although recognizing that the Pallinghurst agreements had not been signed, nonetheless they should apply to the Fabergé brand (albeit that the Fabergé brand itself would be owned by BrandCo).

Mr. Kalberer (who, as the judge said, was on holiday in Brazil at this time) replied, by email sent to Mr. Sean Gilbertson on that evening, stating that he would go through the third draft IA the next day and revert with his comments.

55   The judge noted (at para. 9.38 of his judgment) that it was Mr. Gilbertson's evidence that he awoke on January 1st, 2007 with a realization that agreement was not going to be reached in time to make the payment to Unilever on January 3rd, 2007, and so decided to implement his plan to acquire the Fabergé rights himself with the assistance of his consortium of investors and not through or with Mr. Vekselberg/Lamesa/Renova. He noted, further, that it was Mr. Gilbertson's evidence that he then proceeded, without further delay, to finalize the arrangements which he had already discussed and put in place with Mr. Mende and Dr. Jelinek over the previous weeks. Mr. Gilbertson sent an email to Mr. Mende, copied to Dr. Jelinek, which was in these terms (so far as material):

"Good Morning Hans, and a happy New Year to you. I would like to phone you today to wish you all the best, and also to brief you on the status of Project Egg. Deal now being pushed by the Russians will seriously sub-optimise for us. *I think you, Milan and I should do it 20:10:10. then negotiate with Russians from a position of strength.* Is there a good time to call you about this?

*Frankly I don't see how we can lose by such a strategy, and could have very much to gain.* Our exposure need be only a few months, as we manoeuvre through the Alrosa negotiations." [Emphasis supplied.]

The judge explained that the reference to "the Alrosa negotiations" was to discussions with a major Russian diamond producer with whom

Mr. Gilbertson hoped to make an agreement in relation to marketing Fabergé diamonds. The judge found that Mr. Mende then emailed his business partner Mr. Kundrun, with a copy to Mr. Gilbertson:

"Renova/Vechselberg [*sic*] came back at the end and wanted to put some conditions into the agreement that would have limited our rights. Brian feels that it is best to negotiate out of position of strength with Vechselberg and buy the name outright and then deal with him. We would have to close on Wednesday, [January 3rd, 2007] *BG is so convinced he would put up USD Mio [sic] of his own money* and Milan Jelinek also USD 10 Mio and they would you and me do the rest [*sic*], i.e. 20 Mio together. PP is 38 Mio for the brand name from Unilever. *Vechselberg wants the name but we don't have much leverage unless we own it*, that is why BG thinks we need to only bridge finance it for few months before we sell down. I am okay with this provided you join as well. Need to know urgently. Pls call Brian in case you want to hear from him directly as well." [Emphasis supplied.]

On receipt of that email, Mr. Gilbertson sent a further email to Mr. Mende and Mr. Kundrun, copied to Dr. Jelinek and Mr. Sean Gilbertson, in these terms:

"Thank you Hans. Greatly appreciate your support. *This opportunity could be worth serious money for us after only a few months*: We need those few months—and the brand name—to negotiate with Alrosa, and/or to develop the non diamond-angle, and we would add substantially to the current brand valuation which Unilever has BADLY mis-managed for decades.

*We cannot lose. Viktor will be willing to buy us out at the $38m + at any time. (I told him some months ago that he/we would have to pay $100M for the name: he winced, but said he could live with it. Remember that he paid $120M for the eggs. The brand gives him serious cred in Russia/the Kremlin).*" [Emphasis supplied.]

The judge found (at para. 9.40 of his judgment) that Mr. Mende replied to Mr. Gilbertson, by an email sent that evening (January 1st, 2007), with a copy to Mr. Kundrun, confirming that Mr. Kundrun had agreed to the proposal in principle, and that they could move fast if the funds were needed on January 3rd, 2007.

56   Early on January 2nd, 2007, Mr. Gilbertson responded to Mr. Mende's email of the previous day, with copies to Mr. Kundrun and Dr. Jelinek:

"You are an absolute star. Many thanks. I await your call.

We need to deliver proof of transfer of funds by noon London time tomorrow, Wednesday. I ask that you pay the full $38 million. The Unilever payaway details appear below. For your comfort, I attach hereto a copy of the Sale and Purchase Agreement between 'Project Egg Limited' and Unilever . . .

*I (and I am sure Milan [Dr. Jelinek]) will refund you promptly $9.5 Million, hopefully tomorrow, but more realistically it will take a few working days (as I have to extract it from a set of Trusts in Jersey), so say by Tuesday at the latest.* Obviously I will refund your loss of interest over those days. Please let me have the appropriate payaway instructions to your account.

*Shortly thereafter, I propose that each of the 4 parties pay an additional $500000 into 'Project Egg Limited' as a loan to give it $2M working capital while we negotiate with Mr. Vekselberg*, and in parallel, with Alrosa.

If you are in agreement with this, I shall draft a simple letter confirming these arrangements, for you to modify as you deem fit." [Emphasis supplied.]

Mr. Mende replied to that email, with copies to Mr. Kundrun and Dr. Jelinek, confirming that they would wire transfer US$38m. to Unilever that day and that Dr. Jelinek and Mr. Gilbertson would repay their share, amounting to US$9.5m. each, within 7 days. He wrote that they understood that Mr. Gilbertson felt confident that he could work out a solution with "the Vekselberg group" which would give the consortium "optimal economic benefits." An hour later, Mr. Gilbertson confirmed his agreement with what Mr. Mende had written.

57    The judge observed (at para. 9.41 of his judgment) that, "while Mr. Gilbertson was communicating in this way with Mr. Mende and copying Mr. Kundrun and Dr. Jelinek about financing the purchase price payable to Unilever and the profit they would make," Mr. Sean Gilbertson was sending to Mr. Kalberer, with a copy to Mr. Kuznetsov, some further comments on the third draft IA in response to a voicemail from Mr. Kalberer on the previous evening; in particular, he observed that, in an email sent on January 1st, 2007, Mr. Sean Gilbertson referred, *inter alia*, to the "Pallinghurst principles as already modified for Project Egg . . ." The judge said that that seemed to him to indicate "that the Gilbertsons were accepting the modification of the structure for Project Egg as an Investment Project, as required by Mr. Vekselberg." He found that, later in the evening of January 1st, 2007, Mr. Gilbertson sent an email to Mr. Kalberer, copied to Mr. Kuznetsov, adding a further comment to those made by Mr. Sean Gilbertson earlier that day on the third draft IA. The

188

judge explained (at para. 9.44 of his judgment) that the third draft IA was the last draft implementation agreement seen by Mr. Gilbertson before, early on January 1st, 2007, he decided to, and did, finalize the arrangements for the purchase of the Fabergé rights by Mr. Mende, Mr. Kundrun, Dr. Jelinek and himself (the consortium).

58　On January 2nd, 2007, Mr. Kalberer sent an email to Mr. Sean Gilbertson from Brazil, copied to Mr. Gilbertson and Mr. Kuznetsov, attaching his revision of the third IA. The revised draft ("the fourth draft IA") was produced and circulated by Mr. Kalberer before he, Mr. Vekselberg, Lamesa or any of the Renova parties were aware of the steps which Mr. Gilbertson had taken to finalize the arrangements for the funding of the purchase of the Fabergé rights by the consortium. Shortly after that, Mr. Kuznetsov sent an email to Mr. Kalberer, with a copy to Mr. Sean Gilbertson, setting out some brief comments of his own on the fourth draft IA. The judge held that the fourth draft IA made no significant changes to the provisions of the third draft IA with regard to the payment of the purchase price to Unilever by Lamesa Arts, the transfer of the Fabergé brand to BrandCo (Lamesa) for nominal consideration and the change of the directors of OpCo (PEL). It removed the words "perpetual" and "irrevocable" from the licence to be negotiated in good faith between BrandCo and OpCo. And it inserted a new clause (cl. 2e) which provided that BrandCo should have the right to terminate the licence on 60 days notice without having to pay anything to OpCo if the master fund disposed of OpCo or if the master fund were wound up pursuant to the Pallinghurst agreements. The judge observed (at para. 9.44 of his judgment) that—

> "this [the new cl. 2e] clearly an uncommercial provision as far as the Master Fund was concerned and obviously was not going to be acceptable. It was also not consistent with clause 8 which made specific provisions, as in the Third draft IA, for the circumstances contemplated and provided for the payment of a 'value-add' in respect of enhancement of the value of the Fabergé brand by the Master Fund on its termination. Mr. Kalberer's evidence was that he inserted clause 2e by mistake and that its provisions were unintended. He freely accepted that it should not have been in the draft and that he would have agreed to remove it in any future discussions of the terms of the Fourth draft IA. In my opinion, it would have been, and indeed was, obvious to the Gilbertsons that the terms of proposed clause 2e were uncommercial and inconsistent with the rest of the Fourth draft IA and that it could not have been thought through or intended by Mr. Kalberer, as indeed was the case."

59　Also on January 2nd, 2007—and in order to fund his commitment to the other members of the consortium to contribute 25% of the purchase price for the Fabergé rights with his own money—Mr. Gilbertson telephoned Mr. Justin Thomas (the managing director of Fairbairn, the

trustee of the Gilbertson Family Trusts), to request the necessary funds (US$9.5m.) from the BPG settlement. A transcript of that telephone conversation was produced and referred to at the trial. The judge set out (at para. 9.45 of his judgment) those extracts from the transcript which (as he said) seemed to him to be the most relevant and significant:

> "*Brian Gilbertson*: Now, the reason I'm calling you so early in the    New Year is I have bought myself a Christmas present.
>
> *Justin Thomas*: Okay.
>
> *Brian Gilbertson*: And I need some money to pay for it.
>
> *Justin Thomas*: [laughter] Okay.
>
> *Brian Gilbertson*: Shall I give you the background?
>
> *Justin Thomas*: Yes please, Brian, fire away. What have you bought yourself?
>
> *Brian Gilbertson*: Um, we have bought from Unilever—all the rights to the Fabergé brand.
>
> . . .
>
> *Brian Gilbertson*: Okay, so we have signed an agreement with them [Unilever] about 10 days ago.
>
> . . .
>
> *Brian Gilbertson*: And it required payment to be made tomorrow.
>
> . . .
>
> *Brian Gilbertson* Payment to be made, be presented tomorrow. Now the original intention up until yesterday, today, was that the payment would be made out of Pallinghurst. Are you familiar with Pallinghurst?
>
> *Justin Thomas*: Yes, I am, yes, yeah.
>
> *Brian Gilbertson*: But a complication came in, and the complica tion is that Victor Vekselberg, the Russian oligarch . . . is really taken by this idea and, rather than do it through Pallinghurst, as was the original intention, he has insisted that, in order for him to pay he wants the brand to be transferred to one of his companies which would then license it on to Pallinghurst to develop.
>
> . . .
>
> *Brian Gilbertson*: And so we will negotiate with him [Mr. Vek selberg] after we have acquired and paid for the brand.
>
> . . .

*Brian Gilbertson*: So that leaves the problem of paying for the brand.

. . .

*Brian Gilbertson*: And the purchase price is 38 million dollars.

. . .

*Brian Gilbertson*: And to that I have added 2 million dollars worth of working capital into the company that has negotiated and signed the agreement.

. . .

*Brian Gilbertson*: And there are a consortium of four of us who will put up that money.

. . .

*Brian Gilbertson*: Um, myself, and then three other relatively wealthy gentlemen who—and one of them will make the full payment tomorrow.

. . .

*Brian Gilbertson*: But I need to refund him very promptly after that with 10 million dollars or . . . 9.5 million dollars.

. . .

*Brian Gilbertson*: I'm not unhappy with it being held by the trust.

*Justin Thomas*: Okay. So we could make this as an investment rather than a distribution, okay.

. . .

*Brian Gilbertson*: Project Egg Limited is a Cayman Islands registered company.

. . .

*Brian Gilbertson*: It's a subsidiary of Pallinghurst.

. . .

*Justin Thomas*: What would Victor Vekselberg's thoughts be if you do this without using Pallinghurst?

*Brian Gilbertson*: He'll be extremely pissed off I would think.

*Justin Thomas*: [laughter]

*Brian Gilbertson*: But we'll come back to the table and we'll negotiate something else.

. . .

*Brian Gilbertson*: But not with a gun to my head, you know.

*Justin Thomas*: No.

*Brian Gilbertson*: Tomorrow's the deadline, if they don't do it we lose the transaction and he can step in and take it, and I'm not going to have that happen."

60   The judge found that, in the afternoon of January 2nd, 2007, Mr. Kalberer spoke to Mr. Sean Gilbertson on the telephone about the fourth draft IA and that, in the course of that conversation, a number of the disputed terms were resolved, but that Mr. Sean Gilbertson said nothing to Mr. Kalberer as to Mr. Gilbertson's plans for alternative funding of the purchase of the Fabergé rights by other investors, including the BPG Settlement.

61   In the evening of the same day (January 2nd, 2007), Mr. Gilbertson sent to Mr. Vekselberg, copied to Mr. Kuznetsov and Mr. Kalberer, what the judge described (at para. 9.47 of his judgment) as "a very significant email":

"I am sure you are aware that I have been trying, ever since Pallinghurst bought the Fabergé Brand on the evening of 21 December, to achieve an agreement with your colleagues, Messrs Kuznetsov and Kalberer that would satisfy the basic understanding that you and I struck that evening. I believe that I have leaned over backwards to accommodate the (extraordinary) requirement from your side that one of your companies should own the brand outside of the Pallinghurst structure that we have so carefully negotiated, over so long a period, but which yet remains unsigned.

This morning I turned on my computer to find 90 odd lines of proposed amendment to the text that we had previously exchanged. [The judge found this to be a reference to the fourth draft IA.] Some of these, 7 in total, were completely unacceptable, with clause 2e being perhaps the most glaring example. In a telephone conversation between Mr Kalberer and Sean this afternoon, less than 22 hours from the payment deadline, a number of the conflict issues were resolved, but late today we are told that a 25%-plus participation of 3rd parties in Pallinghurst Fabergé initiatives (I am NOT referring to your 100% ownership of the brand itself, which we had accepted) was a deal breaker.

The background will explain why it became clear to me today that there was little likelihood that we could reach an agreement in time that would satisfy the requirements of both Parties. I could not take the risk that payment would not be made under Pallinghurst's Sale

and Purchase agreement with Unilever. Accordingly I have triggered alternative arrangements, so that payment has now been made, and Pallinghurst now owns the Fabergé brand.

I reconfirm to you my desire to reach an agreement with your team that will accommodate your wishes as well as mine. I hope that, with the looming payment dead-line removed, and the vacation season soon to end, we will be able to make orderly progress towards such an outcome.

I am available at your convenience to discuss any of the above, or matters arising therefrom, should you or your colleagues so wish . . ."

The judge made two comments on that letter. First, he pointed out that Mr. Gilbertson's statement that it became clear to him that day, January 21st, 2007, "that there was little likelihood of reaching an agreement in time" was "again not strictly correct." The judge said this (at para. 9.47):

"As I have already mentioned, his evidence was that it was when he first awoke the previous day, 1st January 2007, that he decided that agreement would not be reached in time and that he would therefore implement and did implement his strategy of purchasing the Rights himself with his consortium, as he had already been putting in place before then."

Secondly, he pointed out that it could not have been correct that it was the proposals contained in the fourth draft IA, received by Mr. Gilbertson that morning, which caused him to "trigger alternative arrangements," as the judge said (*ibid.*):

"[I]t was, according to his own evidence, early the previous morning, before the Fourth draft IA had been sent out, that he decided to and did proceed with the alternative financing arrangements."

62   The judge found (at para. 9.48 of his judgment) that the purchase of the Fabergé rights from Unilever by PEL was completed on January 3rd, 2007 by payment of US$38m. by K-MIC (the holding company owned by Mr. Mende and Mr. Kundrun). He found, also, that:

(1) The minutes of a PEL board meeting held on January 3rd, 2007 recorded the approval of a loan to PEL of US$38m. from Autumn, K-MIC and Dr. Jelinek, repayable on 7 days' notice either (at the lenders' option) in cash or by the transfer of all PEL's assets to a vehicle nominated by the lenders, with interest at US$ LIBOR + 1.5% compounded monthly.

(2) The minutes also recorded approval of the issuance of 100 new shares in PEL at par value to the lenders, pro rata to their contribution to the loan.

(3) The master fund held one share in PEL. The register of members of PEL showed that the additional 100 new shares were issued to Autumn, K-MIC and Dr. Jelinek on January 3rd, 2007 in accordance with the board approval recorded in the minutes of that date.

(4) The register showed a transfer [*sic*] of 25 shares each on that date to Autumn and Dr. Jelinek and of 50 shares to K-MIC.

(5) The issue of those 100 shares on January 3rd, 2007 was subsequently confirmed in a letter dated February 26th, 2007 from the Gilbertson parties' London solicitors, Clifford Chance.

The judge noted (at para. 9.48 of his judgment) that, notwithstanding the record in the minutes and the register of members, and the confirmatory statement in their solicitors' letter, the Gilbertson parties pleaded in their amended defence that it was not in fact until January 19th, 2007, some two weeks after the date recorded, that the additional 100 shares in PEL were issued. He rejected that contention.

(iii) *The period after January 3rd, 2007*

63   On the evening of the same day, January 3rd, 2007, Mr. Gilbertson had sent an email to Mr. Kuznetsov, copied to Mr. Vekselberg, Ms. Irina Vekselberg (who, the judge explained, was Mr. Vekselberg's daughter and was taking a particular interest in the Fabergé brand) and Mr. Kalberer, with a proposed public announcement about the acquisition of the Fabergé brand. In that email he requested their comment. On January 4th, 2007, in an email sent to Mr. Gilbertson and copied to Mr. Sean Gilbertson and Mr. Kuznetsov, Mr. Kalberer responded to that request. After explaining that, given the developments of the previous two weeks, Renova needed to discuss the Pallinghurst project internally, he asked them not to publish any press releases or to contact the press in relation to Project Egg or any of the Pallinghurst projects in the meantime. Later that day, Mr. Gilbertson confirmed that he had stopped the issue of the press release about acquisition of the Fabergé brand. Mr. Gilbertson and Mr. Vekselberg met in Moscow on January 16th and 17th, 2007 to discuss Project Egg but that meeting was not fruitful. On January 21st, 2007, after further communications, Mr. Sean Gilbertson, on behalf of Mr. Gilbertson, sent an email to Mr. Vekselberg and Mr. Kuznetsov with a proposed omnibus agreement relating not only to the Pallinghurst structure and agreements and the Fabergé rights but also to Project Charlie and to Mr. Gilbertson's employment with SUAL. That draft agreement contained the proposal (made for the first time) that—

"1. The partnership between Renova and Pallinghurst envisaged by the unsigned Pallinghurst agreements shall be abandoned, and Pallinghurst shall be further developed independently by [Mr. Gilbertson]."

64   From January 21st, 2007 the discussions between the parties departed from the proposals reflected in the draft IAs exchanged prior to January 3rd, 2007. Certain negotiations in relation to the Fabergé rights took place thereafter but without any obvious involvement of the master fund. The judge took the view that the details of those negotiations were of no relevance to Renova's claims in these proceedings, and that it was sufficient to record that the subsequent negotiations and discussions in relation to the Fabergé rights were not successful. Following a meeting in London on May 5th, 2007, between Mr. Gilbertson, Mr. Vekselberg and Mr. Kuznetsov, Renova Holding gave written notice of termination of the letter agreement (under cl. 8) on May 27th, 2007.

### The judge's findings as to the applicable principles of law

65   At the section beginning at 2012 (2) CILR 416, para. 2, of his judgment, the judge considered the applicable principles of law. He referred to passages in judgments delivered in three cases before the Court of Appeal of England and Wales: first, in the judgment of Millett, L.J. in *Bristol & West Bldg. Socy.* v. *Mothew* (10); secondly, in the judgment of Jonathan Parker, L.J. in *Bhullar* v. *Bhullar* (8); and thirdly, in the judgment of Mummery, L.J. in *Gwembe Valley Dev. Co. Ltd.* v. *Koshy (No. 3)* (21). He referred, also, to observations of Patten, J., sitting in the High Court of England and Wales in *Halton Intl. Inc. (Hldgs.) SARL* v. *Guernroy Ltd.* (22). He went on to say this (2012 (2) CILR 416, at para. 11):

"The cases make it clear, and leading counsel for the parties did not disagree, that whether or not someone is a fiduciary depends on whether he is acting for or on behalf of another 'in a particular matter in circumstances which give rise to a relationship of trust and confidence': see *Bristol & W. Bldg. Socy.* v. *Mothew* ([1998] Ch. at 18); see also *Boardman* v. *Phipps . . . per* Lord Upjohn, as cited in *Bhullar* v. *Bhullar . . .* The first question therefore is whether, in the particular circumstances of this case, Mr. Gilbertson was in a relationship of trust and confidence with the company, with the core obligation of loyalty to the company and the consequent fiduciary duties as outlined by Lord Millett in the *Bristol & W. Bldg. Socy.* case. In other words, was there an obligation on Mr. Gilbertson to act in the interests of the company in the circumstances? (see *Hospital Prods. Ltd.* v. *United States Surgical Corp. . . .* cited in the *Halton Intl. Inc.* case . . .). If Mr. Gilbertson was subject to such obligations to the company, he was a fiduciary: see the reference to Dr. Finn's *Fiduciary Obligations*, at 2 (1977), referred to in *Bristol & W. Bldg. Socy.*"

195

### The judge's reasoning and conclusions on the question whether Mr. Gilbertson owed fiduciary duties to the company

66    At the section starting at 2012 (2) CILR 416, para. 12, the judge addressed the question: "Did Mr. Gilbertson owe fiduciary duties to the company?" He concluded (*ibid.*, at para. 33) that, in the circumstances of the present case, and in relation to an investment opportunity which Mr. Gilbertson had, himself, brought to the investment committee, established pursuant to the letter agreement, the answer to that question was "Yes."

67    The reasoning which led the judge to that conclusion may, I think, be summarized as follows:

(1) The judge explained that Renova's case was that, as a director of the company, Mr. Gilbertson owed fiduciary duties to the company. He said this (*ibid., at para. 12*):

"It is a well-established principle of law that a director of a limited company owes fiduciary duties to the company of which he is a director, those duties principally being to act in the best interests of the company and the consequent duties referred to in the cases cited above, such as the duty to avoid a conflict of interest between his own interest and that of the company, not to make a profit for himself from his position as a director (at least without the informed consent of the company) and so on."

It was submitted on behalf of Renova, he said, that Mr. Gilbertson owed these fiduciary duties to the company as a *de jure* director.

(2) The judge went on to observe (*ibid.*, at para. 13) that it was also established that—by a provision in a company's articles of association, by agreement of the shareholders or by clear implication from the particular circumstances of the case—the obligations of a director to the company might be modified so as (for example) to enable the director to act in his own interests or in the interests of another in relation to a particular matter notwithstanding that those interests might not necessarily be the same as the interests of the company in relation to the particular matter. At para. 14, he referred to observations in the judgment in *Japan Abrasive Materials Pty. Ltd.* v. *Australian Fused Materials Pty. Ltd.* (23)—a case before the Supreme Court of Western Australia, on which reliance had been placed in argument on behalf of the Gilbertson parties—and on a passage in the judgment of Burnton, L.J., sitting in the Court of Appeal of England and Wales, in *Re Neath Rugby Ltd.* (26). The judge explained (2012 (2) CILR 416, at para. 19) that it was submitted on behalf of the Gilbertson parties that that principle—that, in appropriate circumstances, it was possible to vary or dispense entirely with a director's fiduciary duties to the company of which he was a director—was applied in the *Japan Abrasive Materials* case, and that, in the present case, the letter

agreement was such an agreement. In particular, it was submitted that the terms of the letter agreement were such as to entitle Mr. Gilbertson to act in his own interest in relation to an investment project which required his consent to pursue—or which, put another way, he was entitled to veto—and not necessarily in the interests of the company.

(3) Nevertheless, as the judge observed (2012 (2) CILR 416, at para. 20), the terms of the shareholders' agreement in the *Japan Abrasive Materials* case, "were entirely different from the terms of the letter agreement and the surrounding circumstances in that case were entirely different from the circumstances in the present case." Renova's case—as the judge explained (*ibid.*, at para. 21)—was that the source of Mr. Gilbertson's fiduciary duties to the company was "the *de jure* role that he occupied as a director of the company"; that the letter agreement was not a shareholders' agreement; that, in any event, the terms of the letter agreement did not have the effect of modifying Mr. Gilbertson's fiduciary duties to the company; and that the only question was whether there was anything in the arrangements between the Renova parties and the Gilbertson parties which did have that effect.

(4) The judge summarized the arguments which had been put to him (*ibid.*, at paras. 21–24):

"22    . . . The plaintiff contended that there was . . . an obligation of loyalty on Mr. Gilbertson as a director and a duty to act in the interests of the company and, through the company, the master fund. That, it was argued, was the foundation of the fiduciary relationship in the present case, even if it could have been qualified . . .

23    On the other hand, the case for the Gilbertson parties was that careful consideration of the nature of the company's business and of the provisions of the letter agreement demonstrated that Mr. Gilbertson did not owe the company any fiduciary duties with regard to investment projects which he was free to withhold his consent to or veto in his capacity as a member of the investment committee. Project Egg, they said, fell into that category. Mr. Gilbertson was, they contended, entitled in the circumstances to act as a director of the company in his own interests.

24    The Gilbertson parties argued that the Pallinghurst structure, including the company, was established pursuant to the letter agreement. They said that the letter agreement reflected a joint venture between Mr. Gilbertson and Renova Holding, although the principles were agreed between Mr. Gilbertson and Mr. Vekselberg, who owns and controls the Renova group. They submitted that the company was of a joint venture character and that the directors, Mr. Gilbertson and Mr. Kuznetsov, were in effect nominated by the partners of the joint venture as defined in the letter agreement, namely Renova,

through Renova Holding, and Mr. Gilbertson. Similarly, the shareholders were so nominated by the partners in the joint venture. In Mr. Gilbertson's case, he nominated Fairbairn as trustee of the Gilbertson Family Trusts and Renova Holding nominated Renova Resources. They say that, accordingly, any duties Mr. Gilbertson owed as a director of the company are to be derived from the letter agreement, which reflects the joint venture and is the source of the agreement between the joint venturers and the surrounding circumstances."

The judge referred (*ibid.*, at para. 25) to the provision (at cl. 2.5 of the letter agreement) on which, as he said, the Gilbertson parties placed particular reliance: "approval to proceed with an investment project *via* the investment fund at an agreed value, shall require the unanimous consent of the investment committee." He went on to say this (*ibid.*):

"As I have said, the Gilbertson parties' principal submissions are based upon the terms of the letter agreement. They rely in particular upon the provision in cl. 2.5 of the letter agreement that 'approval to proceed with an investment project *via* the investment fund at an agreed value, shall require the unanimous consent of the investment committee.' They say that that provision relates to the rights of the investment committee, of which Mr. Gilbertson and Mr. Kuznetsov were the two members. It provided each of them with a right effectively to veto proceeding with any investment project. That right, they say, may be exercised by either of them in their own interest, without regard to the interests of the master fund and the company. Accordingly, they contend that it follows that Mr. Gilbertson had no duty to act in the best interests of the company, as opposed to his own personal interest, with respect to any investment project. The letter agreement, they say, constituted the agreement between the partners of the joint venture which, *inter alia*, governed Mr. Gilbertson's rights and obligations with regard to investment opportunities and accordingly governed Mr. Gilbertson's relationship with the company to be. If he was clearly entitled to act in his own interest in relation to investment projects, he clearly had no duty to act in the interests of the company in relation to such investment projects."

(5) The judge rejected (*ibid.*, at paras. 26–28)—as "somewhat artificial in light of the commercial realities of the situation"—the contentions, advanced on behalf of Renova, that the letter agreement (which had been made between Mr. Gilbertson personally and Renova Holding, neither of whom was a member of the company) was not an agreement between the shareholders of the company, was "clearly not akin to a shareholders' agreement of the kind in the *Japan Abrasive Materials* case," and was not to be treated as such. But he accepted that the circumstances in relation to

198

the directors and the shareholders of the company were not as straightforward as they were in the *Japan Abrasive Materials* (23) case in that, at the time when the letter agreement was entered into, the company did not exist and the Pallinghurst structure of which the company was to become part had not been devised. He said that, accordingly, "the letter agreement did not contain any provisions in relation to the company, or its shareholders' or directors' rights or any terms of the kind contained in the shareholders' agreement in the *Japan Abrasive Materials* case." And he went on to point out that it was clear from the comments of Mummery, L.J. in the *Gwembe Valley Dev.* case (21) that "the mere fact that a company is of a joint venture character is not enough to justify an implication that the directors' fiduciary duties are modified so as to entitle them to act in their own interests rather than in the interests of the company concerned."

(6) The judge emphasized that—having regard to the meaning given to the term "Investment Project" in cl. 2.1 of the letter agreement—it was important to keep in mind that investment projects were opportunities and that the purpose of the investment fund was to explore, acquire and develop such opportunities. An opportunity, he said, could be at the stage of exploration but still constitute an investment project. He went on (2012 (2) CILR 416, at para. 30):

"30   In these circumstances, it seems to me that the mere fact that approval to proceed with an investment project required the unanimous consent of the investment committee did not mean that Mr. Gilbertson owed no fiduciary duty at all in respect of an opportunity which he had brought for consideration by the investment fund and fund management vehicle and which was being explored. In my view, Mr. Gilbertson had a fiduciary duty as a director of the company in respect of any potential investment project which was being explored by him with the agreement of Mr. Kuznetsov, as the other member of the investment committee, at least until such time as there was clearly no longer unanimous consent to proceed with it or it was actually vetoed. Indeed, in accordance with the authorities referred to earlier, any such veto would have to be on the basis of full information being disclosed by or to Mr. Gilbertson or by or to Mr. Kuznetsov, as the case may be. In my opinion, once an opportunity was in the process of being explored or acquired as an investment project, even if Mr. Gilbertson then vetoed it as a member of the investment committee, nothing less than a fully informed and express consent by the company could possibly permit Mr. Gilbertson to pursue such investment project for himself."

And—after observing that, in his view, it would be contrary to the overall intent, as reflected in the letter agreement, for a party to seek to veto or withdraw consent to an investment project in order to enable him to

pursue that investment project for himself—the judge said this (*ibid.*, at paras. 31–32):

> "The letter agreement expressly provided that the partners would work together to add value to the investment fund, that Mr. Gilbertson would be the chairman of the investment fund and the fund management vehicle and that he would assume responsibility for developing and implementing the strategy for all investment projects. The letter agreement also provided that the duties owed by Mr. Gilbertson to the investment fund and the fund management vehicle (which would subsequently include the company) would be those customary for an executive chairman of a company and would include, *inter alia*, searching for and introducing investment projects to the investment committee and supervising the implementation of approved investment projects. He was also to provide strategic advice on investment projects.
>
> 32  All of this is, in my opinion, consistent with the proposition that once a proposed investment project had been brought by Mr. Gilbertson for consideration by the investment committee and proceeding with it had not been consented to by Mr. Kuznetsov, Mr. Gilbertson as a director of the company was subject to the fundamental principles of loyalty and good faith in relation to that investment project, including not making a profit for himself out of his position, not placing himself in a position where his interest may conflict with that of the company and not acting for his own benefit or exploiting the opportunity for himself, at least without the informed consent of the company, all as explained in the English cases cited above."

The judge went on to say (*ibid.*, at para. 33) that, in his view, it was immaterial whether the correct approach was that advanced on behalf of Renova (that is to say, to start from the premise that Mr. Gilbertson had fiduciary duties to the company as its director as a matter of legal principle, subject to any agreement or implication from the circumstances abrogating or modifying such duties) or that advanced on behalf of the Gilbertson parties (that is to say, to ask if the particular circumstances, including any relevant agreements, were such that Mr. Gilbertson was subject to obligations to the company which were of a fiduciary nature): whichever approach was adopted, the conclusion was the same.

68  In the section beginning at para. 36, the judge addressed the submission, advanced on behalf of the Gilbertson parties at the trial, that, because the investment committee never consented to Project Egg, it never became "an approved Investment Project" in the sense required by the letter agreement. He rejected that submission.

69  In his section beginning at para. 39, the judge addressed the question whether Mr. Vekselberg's requirement that the Fabergé rights should be

200

owned by a Lamesa company, outside the Pallinghurst structure—which, as he said, represented a change to the structure through which those rights as an investment project would be held—had any effect on the nature or extent of the fiduciary duties which (as he had held, in the section beginning at para. 12) Mr. Gilbertson owed to the company. He concluded, at para. 43, that he could "see no reason why the fiduciary duties to the company which Mr. Gilbertson owed as a director should have been any different after 20th or 21st December 2006 from his fiduciary duties before that time."

***The judge's reasoning and conclusions on the question whether Mr. Gilbertson was in breach of fiduciary duties which he owed to the company***

70    After restating his conclusion that Mr. Gilbertson remained in the same fiduciary relationship with the company after December 20th, 2006 as he did before that date, the judge went on to say this (2012 (2) CILR 416, at para. 57):

> "In such circumstances, it was not open to Mr. Gilbertson to take the rights for himself or to seek thereby to make a profit for himself and the other members of his consortium. In my opinion that was inconsistent with and amounted to a breach of his fiduciary duties. This was exacerbated by the fact that he diverted the rights, including the economic benefit of developing, exploiting and managing the Fabergé brand, from the master fund as part of the Pallinghurst structure to himself covertly without any disclosure to the company until after the event and, even then, it was not full disclosure. In summary, therefore, I am of the opinion that in the circumstances Mr. Gilbertson owed the duties of a fiduciary as a director of the company throughout the relevant period and that he was in breach of those duties in acting as he did in late December 2006 and January 2007."

71    In reaching that conclusion the judge had held (i) (*ibid.*, at para. 50), that it was an essential part of Mr. Gilbertson's strategy—that is to say, his strategy to "negotiate with the Russians from a position of strength" after having taken the Fabergé rights out of the Pallinghurst structure—to divert those rights from the master fund by diluting its 100% ownership of PEL by the issue of further shares in PEL to Autumn and the other members of the consortium so as to give them almost 100% ownership of PEL; and (ii) (*ibid.*, at para. 55) that there was no legitimate reason for Mr. Gilbertson not to discuss with Mr. Vekselberg his stated concern about possible failure to pay the purchase price under the SPA on the due date. It was, the judge held, Mr. Gilbertson's duty to seek to resolve that concern with the Renova parties and with Unilever, and not "to secretly take the Rights for himself with a view to making a profit."

### *The submissions advanced on behalf of the parties*

72    It is said in the memorandum of grounds of appeal filed on behalf of Autumn on February 1st, 2013, that the judge misdirected himself and erred in law and/or fact in holding that Mr. Gilbertson owed or was in breach of any fiduciary duty in relation to the Fabergé rights or the Brand, and in holding that there was any substratum on which to found a claim against Autumn. More particularly, it is said that the judge misdirected himself: (i) as to whether Mr. Gilbertson owed fiduciary duties to the GPLP and/or the master fund; (ii) in holding that Mr. Gilbertson owed fiduciary duties to the company which he did not owe; (iii) in such findings as he made that Mr. Gilbertson breached any fiduciary duties; and (iv) in relation to the issue of shares in PEL to members of the consortium. Those submissions were developed in extensive written submissions filed on May 24th, 2013, and in oral submissions at the hearing of the appeal.

73    In response to those submissions it is said on behalf of the Renova parties that, "despite the length and complexity of Autumn's Written Submissions the response to them can be boiled down to [a number of] short propositions." In the present context, the relevant propositions are these:

(1) Mr. Gilbertson was a *de jure* director of the company. The fiduciary duties that he owed to the company extended to protecting its assets and interests, including ensuring that the assets and interests owned or controlled by the entities in the Pallinghurst structure beneath the company (and, principally, the assets and interests of the master fund) were safeguarded and exploited for the ultimate benefit of the company. Those interests included the opportunity to acquire the Fabergé rights, and, once the Fabergé rights were secured by PEL (a Pallinghurst structure company) on December 22nd, 2006, to keep them there.

(2) The content and scope of Mr. Gilbertson's fiduciary duties were never attenuated, in particular either (a) by the terms of the letter agreement, or (b) by the fact that on December 20th, 2006, Renova introduced the requirement that the Fabergé rights be held by a Lamesa company (with the full economic benefit being held within the Pallinghurst structure), or (c) by the nature or proposed terms of (and the parties to) the draft implementation agreements or the fact of their negotiation. Mr. Gilbertson was at all times precluded by his duties of loyalty to the company, and to the GPLP and the master fund, from having regard to his own interests.

(3) Mr. Gilbertson acted in breach of the fiduciary duties which he owed to the company and the master fund by procuring that his consortium (of which Autumn was a 25% member) acquire 99% ownership of PEL. Indeed, it is said that "Autumn all but concedes that, if Mr. Gilbertson owed the company or GPLP or the master fund duties which

precluded him for having regard to his own interests, then he breached those duties."

74    Before addressing the substantive question whether the judge was wrong to hold that Mr. Gilbertson was in breach of fiduciary duties which he owed to the company, it is convenient to consider, first, whether there is any substance in the submissions—numbered (i) and (iv) in the summary of the memorandum of grounds of appeal which I have just set out—that the judge misdirected himself as to whether Mr. Gilbertson owed fiduciary duties to the GPLP and/or the master fund and in relation to the date on which 100 new shares in PEL were issued to members of the consortium.

### Whether Mr. Gilbertson owed fiduciary duties to the GPLP and/or the master fund

75    In support of the submission that the judge was wrong to hold that Mr. Gilbertson owed fiduciary duties to the GPLP and/or to the master fund—and by way of particulars—it is said on behalf of the Gilbertson parties that:

   (1) The judge erred in law in failing to address the question whether, on its case as pleaded, it was open to Renova to contend that Mr. Gilbertson owed fiduciary duties to the GPLP and/or the master fund, and that, had he done so, he ought to have held that there was no, or no properly pleaded, case before him with respect to GPLP and/or the master fund and refused to award either of them any relief.

   (2) In so far as the judge held that, or proceeded on the basis that, Mr. Gilbertson owed fiduciary duties to the GPLP and/or the master fund in relation to the Fabergé rights or the Fabergé brand at any time (and, in particular, at such time as the judge may have held that he was in breach of such duties), the judge misdirected himself and/or erred in law and/or fact in so doing, given Renova's failure to plead any such fiduciary duties properly or at all.

76    In the previous section of this judgment I addressed the question whether the judge was wrong to entertain (and grant relief in respect of) derivative claims that were not before him. I concluded—for the reasons which I set out in that section—that the judge was correct to take the view (2012 (2) CILR 416, at para. 60) that, having chosen not to appeal from the order which he had made some three and a half years earlier (in his ruling of April 14th, 2009), it was not open to the Gilbertson parties to challenge, at trial, the standing of Renova to advance claims in the action on behalf of GPLP and the master fund including, in particular, a claim founded on the unpleaded contention that Mr. Gilbertson had acted in breach of fiduciary duties which he owed to the master fund. In those circumstances it is unnecessary to revisit the question whether—on the basis of the alleged defects in Renova's pleaded case—the judge was

wrong to hold that Mr. Gilbertson owed fiduciary duties to the GPLP and/or to the master fund.

77   In any event, as it seems to me, the judge did not need to hold that Mr. Gilbertson owed fiduciary duties to the GPLP or to the master fund which were independent of the fiduciary duties which (as a director) he owed to the company, and, as I shall explain later in this judgment, on a proper analysis of his judgment of November 5th, 2012 (read with his ruling of April 14th, 2009) he did not do so.

### The issue of shares in PEL to members of the consortium

78   As I have said, the judge found (at para. 9.48 of his judgment) that the minutes of a PEL board meeting held on January 3rd, 2007 recorded the approval of the issuance of 100 new shares in PEL at par value to Autumn, K-MIC and Dr. Jelinek, that the register of members of PEL showed that those additional shares were issued pursuant to the board approval, and that the issue of those 100 shares on January 3rd, 2007 was subsequently confirmed in a letter dated February 26th, 2007 from the Gilbertson parties' London solicitors, Clifford Chance. He rejected the contention, pleaded by the Gilbertson parties in their amended defence that, as a matter of fact, those additional 100 shares were not issued by PEL until January 19th, 2007, or thereabouts. He did so for the reasons which he set out at para. 9.49 of his judgment. He said this:

"Section 48 of the Companies Law (2011 Revision) provides that the Register of Members '*shall be prima facie evidence of any matters by this Law directed or authorized to be inserted*'. Accordingly PEL's Register of Members recording that the new shares were issued to the members of the consortium on 3rd January 2007 is *prima facie* evidence of that. That evidence is supported by the Minute of the PEL board meeting on 3rd January 2007 and by the Letter dated 26th February 2007 from Clifford Chance. The evidence of the witnesses in this regard was not particularly satisfactory. Mr. Gilbertson said that the new shares were not issued on 3rd January 2007 but he was unable to say when they were issued. He suggested that the Minute of the PEL board meeting had been backdated, although that would obviously be inappropriate since the Minutes clearly say that the meeting concerned took place on 3rd January 2007. It seems improbable to me that the registered office of PEL, Walkers, Attorneys-at-law, would be party to any backdating of an entry in the Register of Members maintained by them. Unfortunately, Sean Gilbertson, who was a director of PEL at the time, was not cross-examined on this point. On balance, in the circumstances I am not satisfied that the *prima facie* evidence of the Register together with the other supporting evidence has been displaced. In my

judgment the probability is that the new shares in PEL were indeed issued on or with effect from 3rd January 2007 and I so find."

79   In their memorandum of grounds of appeal, the Gilbertson parties challenge the judge's conclusion that the 100 new shares were issued by PEL on January 3rd, 2007. In developing the submission that the judge misdirected himself, it is said on behalf of the Gilbertson parties that:

(1) The judge erred in law, in that (i) he relied on a presumption or rule of evidence that shares in a Cayman Islands company are issued on the date of issue entered in the register of members; and (ii) he held that any such presumption or rule of evidence was not displaced on the evidence before him.

(2) The judge erred in fact in failing to hold that the PEL shares were not issued on January 3rd, 2007 but, on the balance of probabilities, were issued on January 19th, 2007.

In particular, it is said that the judge was wrong in failing to give weight to the unchallenged evidence of Mr. Sean Gilbertson (a director of PEL), said to be supported by contemporaneous documents, that PEL did not issue any shares on January 3rd, 2007.

80   In my view the judge was entitled to reach the conclusion that he did. I reject the submission that he erred in law. He was entitled—indeed, bound—to have regard to the direction, in s.48 of the Companies Law (2011 Revision), that the register of members shall be *prima facie* evidence of the date of issue of the shares, and he was entitled to take the view that the evidence of the register of members was not displaced by the other evidence that was before him. As he said (at para. 9.49 of his judgment) "the evidence of the witnesses in this regard was not particularly satisfactory."

### Whether Mr. Gilbertson owed fiduciary duties to the company in relation to Project Egg

81   I turn, therefore, to address the substantive question: whether the judge was wrong to hold that Mr. Gilbertson was in breach of fiduciary duties which he owed to the company in relation to the acquisition of the Fabergé rights (Project Egg).

82   In reaching his conclusion that—in the circumstances of the present case and in relation to Project Egg)—Mr. Gilbertson did owe fiduciary duties to the company, the judge said this (at para. 33):

"[I]t seems to me that the company and the master fund, as part of the Pallinghurst structure, were entitled to expect, in relation to such an investment project, the 'single-minded loyalty' of Mr. Gilbertson, whose relationship with the company (and the Pallinghurst structure

205

generally), was one of trust and confidence in the sense explained in the *Bristol & W. Bldg. Socy.* case . . ."

In that context "the Pallinghurst structure" comprised—as the judge had explained (at para. 4 of his judgment)—the three Cayman Islands entities established pursuant to the letter agreement dated November 24th, 2005 to which he had referred at para. 3.2. "Investment Project" had the meaning given to that expression in the letter agreement, that is to say (as the judge explained (at para. 29)), an opportunity which it was the purpose of the master fund to explore, acquire and develop.

83   The three entities which comprised the Pallinghurst structure were the master fund (Pallinghurst Resources Management LP), GPLP (Pallinghurst (Cayman) General Partner LP) and the company (Pallinghurst (Cayman) General Partner LP (GP) Ltd.). GPLP and the master fund were exempted limited partnerships established under the Exempted Limited Partnership Law (Law 11 of 1991, as amended). Section 4(2) of that Law provided that an exempted limited partnership should consist of one or more persons called general partners and one or more persons called limited partners. General partners were liable, in the event that the assets of the exempted limited partnership were inadequate, for all debts and obligations of the partnership. Section 4(3) required that a general partner "shall act at all times in good faith in the interests of the exempted limited partnership." Section 7(1) required that a limited partner should not take part in the conduct of the business of the exempted limited partnership.

84   It was not in dispute—and, in any event the judge so found—that the company was the sole general partner of GPLP and that GPLP was the sole general partner of the master fund. The judge noted (by reference to the diagram of the Pallinghurst structure which he set out at para. 4.2 of his judgment) that Mr. Sean Gilbertson was a limited partner of GPLP and that the Founder fund (Pallinghurst (Cayman) General Partner LP) was a limited partner of the master fund. But there was no evidence to suggest that existence of those limited partners affected GPLP's power (as the general partner of the master fund) to control the master fund; or which affected the company's power (as the general partner of GPLP) to control GPLP; or which affected the company's power (through GPLP) to control the master fund. Nor was there any evidence to suggest that, in the exercise of their powers in relation to the master fund, GPLP (and, through GPLP, the company), did not owe the duties (imposed by s.4(3) of the Exempted Limited Partnership Law) "to act at all times in good faith in the interests of the exempted limited partnership."

85   As Lord Millett had observed, in his judgment in *Waddington* v. *Chan Chun Hoo Thomas* (40) (to which the judge referred (2012 (2) CILR 416, at para. 59)) "if wrongdoers must not be allowed to defraud a parent company with impunity, they must not be allowed to defraud its subsidiary

206

with impunity" ([2008] HKCFA 63, at para. 75). The judge held (2009 CILR 268, at para. 66) that, by reason of the company's power to control the master fund, the position of the master fund was analogous to that of a sub-subsidiary. In my view, he was right to reach that conclusion: the submission that the judge needed to hold that Mr. Gilbertson owed fiduciary duties to GPLP or the master fund which were independent of the fiduciary duties which he owed to the company—or that he did so—is not well-founded. If and in so far as the judge was correct to conclude that Mr. Gilbertson owed duties of loyalty and good faith to the company in relation to the pursuit of Project Egg as an investment project, he was correct to hold that such duties entitled GPLP and the master fund to rely upon his loyalty and good faith in relation to that project.

86    As I have said, the judge addressed and rejected (2012 (2) CILR 416, at the section beginning at para. 36) the submission, advanced on behalf of the Gilbertson parties, that Project Egg never became an approved investment project for the purposes of the letter agreement, and so never became a project in relation to which Mr. Gilbertson owed fiduciary duties, whether to the company or, more generally, to the Pallinghurst structure. The Gilbertson parties challenge that conclusion on this appeal. It is said in this court—as it was said below—that the judge was wrong to hold that Project Egg could become an approved investment project in the absence of unanimous consent of the members of the investment committee (Mr. Gilbertson and Mr. Kuznetsov).

87    In rejecting the submission that Project Egg never became an approved investment project for the purposes of the letter agreement, and so never became a project in relation to which Mr. Gilbertson owed fiduciary duties, the judge said this (*ibid.*, at para. 36):

> "It was suggested on behalf of Mr. Gilbertson that the investment committee in fact never did unanimously consent to Project Egg and therefore it was never an approved investment project in the sense required by the letter agreement. Having regard to the terms of the letter agreement and the circumstances generally, I did not find that to be a persuasive argument. The overall evidence clearly indicated to me that the investment committee, that is Mr. Gilbertson and Mr. Kuznetsov, operated in an informal way. They had meetings and discussions and both clearly acted from the start on the basis that Project Egg, which was initially proposed as an investment project by Mr. Gilbertson, should proceed as an opportunity to be explored and then acquired at an agreed price by the master fund. It is clear that, at the outset, Mr. Gilbertson introduced Project Egg and then explored it and implemented the strategy for the acquisition of the rights as an investment project of the master fund. He procured PEL, as a wholly-owned subsidiary of the master fund, and thus a Pallinghurst structure company, to enter into the SPA with Unilever

to acquire the rights, all as an investment project for the master fund, and all as agreed by Mr. Kuznetsov, as the other member of the investment committee. The purchase offers to Unilever made by Sean Gilbertson were made with the knowledge and consent of the investment committee. Agreement was reached on the price for the rights as an investment project. The initial offer of US$20m. by Renova and then the offer of US$30m. and the final offer price of up to US$40m., both to be paid by Mr. Vekselberg, all had the consent of the investment committee. In my view, Mr. Gilbertson would have done or procured none of this to be done if he did not consider that he had the consent of Mr. Kuznetsov and therefore the investment committee. I do not consider it is now open to him, in all the circumstances, to contend that Project Egg was never an approved investment project of the master fund."

88   I am of opinion that, for these reasons which the judge gave, he was entitled to find that, in the events to which he referred, Mr. Gilbertson would not have acted as he did in procuring the acquisition of the Fabergé rights by PEL on December 22nd, 2006 "if he did not consider that he had the consent of Mr. Kuznetsov and therefore the investment committee," and was entitled to hold that, "it is [not] now open to [Mr. Gilbertson], in all the circumstances, to contend that Project Egg was never an approved Investment Project of the Master Fund."

89   I should add that I am also of opinion that, if the judge were correct in his view that, prior to the issue of the additional shares, PEL was "a wholly-owned subsidiary of the Master Fund," the question whether or not Project Egg had become an approved investment project for the purpose of the letter agreement prior to the purchase of the Fabergé rights by PEL from Unilever under the agreement of December 22nd, 2006, was of little importance after that date. If, at the time when PEL became the contractual purchaser of the rights, it was wholly owned by the master fund, then, as it seems to me, whatever fiduciary duties may have been owed by Mr. Gilbertson to the company (or, more generally, to the Pallinghurst structure) in relation to Project Egg (as an investment project) under the terms of the letter agreement had become subsumed in the fiduciary duties which he owed as a director of the company in relation to the assets of the entities (including the master fund) which it controlled. Those assets included PEL and (through PEL) the contractual interest as purchaser of Fabergé rights.

90   As I have said, Project Egg Ltd. (PEL), a Cayman Islands limited company, was incorporated on December 1st, 2006 by Mr. Gilbertson as a special purpose vehicle for the purpose of acquiring the Fabergé rights from Unilever. The directors of PEL were Mr. Sean Gilbertson and Mr. Andrew Willis (an employee of Pallinghurst LLP). In taking the view throughout his judgment—and, in particular, at para. 36 (in the passage

which I have set out)—that, until the issue of the additional shares, PEL was a 100% subsidiary of the master fund, the judge made no reference to the corporate records of PEL itself. He seems to have taken that premise to be common ground between the parties. There was material before him to support that conclusion:

(1) On December 18th, 2006, Mr. Sean Gilbertson sent an email to Mr. Kalberer in the terms set out by the judge at para. 9.14 of his judgment. In that email he wrote:

> "As mentioned we incorporated a Cayman Island based limited company called Project Egg Limited ('SPV') which, based on advice from Clifford Chance, should acquire the portfolio of trademarks . . . The SPV is a 100% subsidiary of our fund 'Pallinghurst Resources Management L.P. . . .'"

It is plain that the judge took the view, understandably if I may say so, that the fund to which Mr. Sean Gilbertson referred as "our fund 'Pallinghurst Resources Management L.P.'" was the master fund: that that was his view can be seen from his addition to the passage of the email set out at para. 9.14 of his judgment, by way of annotation to those words, the comment "[i.e. the Master Fund]."

(2) Paragraph 1 of the first draft IA—sent by Mr. Sean Gilbertson to Mr. Kalberer (with copies to Mr. Kuznetsov and Mr. Vekselberg) on December 21st, 2006—recorded that—

> "the parties agree that the Fabergé brand name and associated rights (the 'Rights') be purchased forthwith by 'Project Egg Limited' (the 'SPV', presently a 100% subsidiary of Pallinghurst Resources Management L.P.) upon terms negotiated between Pallinghurst Resources LLP and Unilever . . ."

(3) The second draft IA—which (as the judge found at para. 9.33 of his judgment) was sent by Mr. Sean Gilbertson, on behalf of Mr. Gilbertson, to Mr. Kuznetsov and Mr. Kalberer (with a copy to Mr. Vekselberg) on December 26th, 2006—referred to PEL (Opco) managing and operating the Fabergé rights "as a portfolio company of the master fund pursuant to the Pallinghurst Agreements."

(4) The intended parties to the third draft IA—sent by Mr. Sean Gilbertson to Mr. Kalberer (with copies to Mr. Kuznetsov and Mr. Vekselberg) on December 30th, 2006—included "Project Egg Ltd. a 100% subsidiary of PRM." PRM was identified as "Pallinghurst Resources Management LP" (the master fund).

(5) The fourth draft IA—sent by Mr. Kalberer to Mr. Sean Gilbertson (with copies to Mr. Gilbertson and Mr. Kuznetsov) on January 2nd,

2007—also identified PEL (an intended party) as a 100% subsidiary of the master fund.

91   Nevertheless, it is, I think, pertinent to note that not all the material before the judge supported his assumption that it was common ground between the parties that, until the issue of the additional shares, PEL was a 100% subsidiary of the master fund. There was also material before him which was difficult to reconcile with that assumption:

   (1) If, from the date of its incorporation, PEL were wholly owned by the master fund, it is surprising (i) that—as the judge found at para. 9.13 of his judgment—it was not until receipt of an email sent by Mr. Sean Gilbertson to Mr. Cheremykin (copied to Mr. Kuznetsov) on December 15th, 2006 that the Renova parties first became aware of its incorporation and intended purpose; and (ii) that neither of the directors of PEL (Mr. Sean Gilbertson and Mr. Andrew Willis) were nominees of the Renova parties.

   (2) Mr. Sean Gilbertson's description of PEL in his email sent on December 18th, 2006 as a 100% subsidiary of "our fund Pallinghurst Resources Management L.P." is difficult to reconcile with Mr. Gilbertson's response to Mr. Kalberer's request—in an email sent to him (and to Mr. Sean Gilbertson) on December 21st, 2006—for confirmation as to who controlled PEL and how. As the judge recorded (at para. 9.24 of his judgment), Mr. Gilbertson responded to that request on the same day—in an email sent to Mr. Kalberer (and copied to Mr. Kuznetsov and Mr. Vekselberg)—in these terms:

   "In response to your questions in item 2, 100% of the equity in Project Egg Ltd is held by Pallinghurst Resources LP, and the directors are Sean and Andrew Willis, as we have previously advised you."

   (3) Mr. Sean Gilbertson's description of PEL as a 100% subsidiary of Pallinghurst Resources Management LP is not easy to reconcile with the description of the party joined as "Guarantor" to the acquisition agreement dated December 22nd, 2006 (the SPA) as "Pallinghurst Resources LLP (Company Number 0C31585) having its registered office at 54 Jermyn Street, London . . ."

92   As to the third of those points, the judge recorded (at para. 9.26 of his judgment) that it had been agreed between Mr. Sean Gilbertson and Mr. Kalberer in the course of a telephone conversation on December 20th, 2006, that the guarantor of PEL's obligations under the SPA would be "Pallinghurst Resources Management LP." The judge addressed (at para. 9.27 of his judgment) the question whether Mr. Sean Gilbertson had, indeed, changed his intention in relation to the identity of the guarantor of PEL's obligations under the SPA, but accepted the explanation, recorded

in a letter from the Gilbertson parties' then solicitors, Clifford Chance, that Pallinghurst LLP had been named as guarantor "as a result of a clerical error." He said this (at para. 9.27):

> "[Mr. Sean Gilbertson] said in evidence that he did not believe that it made any practical difference for Pallinghurst LLP to be the guarantor rather than the Master Fund and that he did not point out the change to Mr. Kalberer or Mr. Kuznetsov at the time because he did not consider it to be a matter of relevance for them. Sean Gilbertson did not appear to recognise that signing the SPA in its incorrect form amounted to a change of intention on his part, namely that Pallinghurst LLP should be the guarantor rather than the Master Fund . . . The impression I got from his evidence was that Sean Gilbertson did not appreciate the significance of this change and the reason why it had been intended and agreed that the Master Fund should be the guarantor rather than a Gilbertson entity."

And he went on (at para. 9.28 of his judgment) to say this:

> "In his evidence, Mr. Gilbertson accepted that when he procured PEL, acting by Sean Gilbertson, to sign the SPA with Unilever on 22nd December 2006 he acquired the contractual entitlement to the Rights for the Master Fund and entities within the Pallinghurst Structure and not for himself personally . . . Furthermore, Mr. Gilbertson accepted that not only was it a subsidiary of the Master Fund (namely PEL) which contracted to purchase the Rights from Unilever but that Unilever must have considered that it was contracting to sell the Rights to PEL, ultimately for Renova money, and not to Mr. Gilbertson for Gilbertson money. Accordingly Unilever still required to see Renova money behind PEL and accordingly to have the Master Fund as guarantor. It was clearly a PEL/Master Fund/Pallinghurst Structure for their benefit; it was not a Gilbertson transaction for the Gilbertsons' benefit."

The judge must, as it seems to me, have treated the statement in Mr. Gilbertson's email of December 21st, 2006, that 100% of the equity in PEL was held "by Pallinghurst Resources LP" as a further example of "the clerical error" which had led to the inclusion of Pallinghurst LP, rather than the master fund, as the guarantor named as party to the SPA.

93    There was, if I may say so, obvious potential for confusion between "Pallinghurst Resources LLP" (the English limited partnership established by Mr. Gilbertson on October 27th, 2005 as an investment management vehicle, to which I have referred earlier in this judgment as "Pallinghurst LLP") and "Pallinghurst Resources Management LP" (the Cayman Islands exempt limited partnership, to which the parties referred as "the master fund"). Be that as it may and whatever the true position, there is no challenge on this appeal to the judge's assumption that it was common

ground that, until the issue of additional shares in January 2007, PEL was a wholly owned subsidiary of the master fund. In those circumstances, as it seems to me, it is not open to this court to question whether the judge was right to proceed on that basis.

94   It follows that I am satisfied that, whatever fiduciary duties may have been owed by Mr. Gilbertson to the company (or, more generally, to the Pallinghurst structure) in relation to Project Egg (as an investment project) under the terms of the letter agreement, the judge was correct to accept—and the Renova parties are correct to submit in this court—that, *prima facie*, Mr. Gilbertson owed fiduciary duties as a director of the company in relation to the assets of the entities (including the master fund and, from and after its incorporation on December 1st, 2006, PEL) which it controlled, and that, from and after the execution of the SPA on December 22nd, 2006, those assets included the contractual interest of PEL as purchaser of the Fabergé rights and, after completion of the purchase under the SPA on January 3rd, 2007, as owner of those rights. The further question for the judge—as he recognized—was whether the fiduciary duties which, *prima facie*, Mr. Gilbertson owed as a director of the company in that context were modified or attenuated so as to enable him to act in his own interests (or in the interests of the consortium) in relation to the master fund's ownership (through PEL) of the rights acquired under the SPA. It is to that question that I now turn.

### *Whether, in the events which happened, the fiduciary duties which Mr. Gilbertson owed to the company in relation to Project Egg were modified or attenuated*

95   As I have said, the judge accepted (2012 (2) CILR 416, at para. 13) that the obligations of a director to the company might be modified so as to enable the director to act in his own interests or in the interests of another in relation to a particular matter, notwithstanding that those interests might conflict with the interests of the company in relation to that matter. Such a modification or attenuation, the judge accepted, might be found in the company's articles of association, in an agreement between the shareholders or (by clear implication) in the particular circumstances of the case. In the course of setting out the respective submissions of the parties, he observed (*ibid.*, at para. 25) that the Gilbertson parties relied principally upon the terms of the letter agreement. He held (*ibid.*, at para. 33) that there was nothing in the letter agreement which would entitle Mr. Gilbertson to take for himself a project which he had brought to the investment committee for consideration as an investment project of the master fund, which the investment committee had agreed to pursue, and which was being actively pursued. He went on to say this (*ibid.*, at para. 35):

"Even if Mr. Gilbertson may have been entitled, pursuant to the letter agreement, to withdraw his consent to or to veto proceeding with such an investment project, in my opinion it does not follow that he was entitled to take that investment project for himself without the informed consent of the company, the ultimate owner and controller of the master fund. At the very least, as long as proceeding with such an investment had the unanimous consent of the investment committee, Mr. Gilbertson was subject to the fiduciary duties which I have outlined in respect of that investment project. In my view, those duties on the part of Mr. Gilbertson as a director of the company were not attenuated by anything in the letter agreement or by implication from the surrounding circumstances."

96   The judge's conclusion that there was nothing in the letter agreement, or by implication from the surrounding circumstances, which would entitle Mr. Gilbertson to take for himself a project which he had brought to the investment committee is challenged by the Gilbertson parties in this court. It is said on their behalf that the judge erred in law and/or in fact in failing to hold that, on the evidence of context and circumstances which was before him at trial, Mr. Gilbertson was released from such fiduciary duties (if any) as he did owe to the company (or, more generally, to the Pallinghurst structure) in respect of Project Egg or the Fabergé brand or the Fabergé rights (meaning, respectively, the name Fabergé itself and the rights in that name) before he did anything that might otherwise have constituted a breach of fiduciary duty.

97   The context and circumstances (referred to in the memorandum of grounds of appeal as "the Context and Circumstances") which, it is said, ought to have led the judge to the conclusion Mr. Gilbertson was released from such fiduciary duties (if any) as he did owe to the company in respect of Project Egg included the dealings between the relevant parties in relation to the acquisition and/or exploitation of the Fabergé rights and the Fabergé brand. In particular, the context and circumstances included (i) "the veto by the Renova parties of the acquisition of those Rights for Project Egg as envisaged"; (ii) "the failure of the investment committee to approve pursuit by the master fund of any interest in the Fabergé Brand prior to the conclusion of the implementation agreement in accordance with the terms of the Agreement or Understanding"; and (iii) "the fact that Mr. Gilbertson's consent to Mr. Vekselberg's scheme for the acquisition of the Rights and the exploitation of the Brand was conditional on the parties entering into an implementation agreement and PEL being put in funds to complete the purchase of the rights." For convenience I will refer to those as "the veto point," "the mutual understanding point," and "the failure of condition point." In advancing the veto point, the Gilbertson parties rely upon what is said to be Mr. Vekselberg's refusal to fund the acquisition of the Fabergé rights and/or his insistence that, if he were to fund the

acquisition of those rights, the Fabergé brand would have to be held by one of his privately owned companies (Lamesa Arts Inc.) outside the Pallinghurst structure. The "Agreement or Understanding" was defined in the memorandum of grounds of appeal to mean "an oral agreement or understanding reached between Mr. Gilbertson and Mr. Vekselberg on or about December 21st, 2006, the terms and performance of which became a matter of dispute." In advancing the failure of condition point, the Gilbertson parties rely upon what is said to be "the failure of the Renova parties to honour the Agreement or Understanding."

(i) *The veto point*

98   It is submitted on behalf of the Gilbertson parties that Mr. Gilbertson owed no relevant fiduciary duties to the company (or, more generally, to the Pallinghurst structure) in respect of potential investment projects after December 20th, 2006. In support of that submission it is said, first, that any fiduciary duties that a member of the investment committee may have owed to a fund entity in respect of a potential investment project ceased once the project had been vetoed by the other member of the investment committee, and secondly, that—in the events which happened—Project Egg was the subject of such a veto by or on behalf of Mr. Kuznetsov.

99   In developing the first of those submissions—that such fiduciary duties as a member of the investment committee may have owed to a fund entity in respect of a potential investment project ceased once the project had been vetoed by the other member of the investment committee—it is accepted on behalf of the Gilbertson parties that a member of the investment committee could not divest himself of any fiduciary duty that he might otherwise have owed to a fund entity in respect of a potential investment project by vetoing it himself. But it is submitted that the position is different where the veto is exercised by the other member of the investment committee. There is no express restriction on a party to the letter agreement pursuing a project that has been vetoed by the other party, and there is no reason to read any such restriction into the letter agreement as a matter of business efficacy.

100   In developing the second of those submissions—that, in the events which happened, Project Egg was the subject of such a veto by or on behalf of Mr. Kuznetsov—it is said that Mr. Vekselberg's insistence (on December 20th, 2006 and thereafter) that he should own the Fabergé rights through a Lamesa company did amount to a veto of Project Egg. In particular it is said that, given that the letter agreement did not lay down any formalities in relation to the exercise of a veto, the expression by one member of the investment committee that he is willing to proceed with an investment project if, but only if, the terms can be improved in some way may or may not amount to a veto, and that whether it does amount to a veto turns on whether the project in the modified form proposed falls

214

within the scope of the potential investment project that the investment committee had agreed to explore.

101   In response to the submission that the judge ought to have held on the evidence that, before Mr. Gilbertson did anything that might otherwise have constituted a breach of such fiduciary duties (if any) as he did owe to the company (or, more generally, to the Pallinghurst structure) in respect of Project Egg and the acquisition of the Fabergé rights, he was released from such fiduciary duties by "the veto by the Renova parties of the acquisition of those Rights for Project Egg as envisaged," it is said on behalf of the Renova parties that the judge was correct to reach the conclusion (2012 (2) CILR 416, at para. 33) that he did. In particular, it is said that Mr. Gilbertson owed fiduciary duties to the company in relation to any potential investment project unless and until it was actually vetoed by Mr. Kuznetsov (on behalf of Renova) on the basis of full disclosure by Mr. Gilbertson. That, it is said, followed from the following propositions which had been advanced by Renova at the trial and which were relied upon in this court:

  (1) The members of the investment committee could exercise their right of veto (or, more accurately, their right not to agree to proceed) in their own interests but that self-interest was not unconstrained. They could not exercise the veto for the purposes of allowing them to take, or compete for, the investment project for their own benefit. As I have said, the Gilbertson parties do not dissent from this proposition.

  (2) If, before the Fabergé rights had been acquired by the Pallinghurst structure, Project Egg had been actively vetoed by one member of the investment committee (say, Mr. Kuznetsov) after full disclosure by the other member (say, Mr. Gilbertson), that other would have been free to pursue the opportunity to acquire the Fabergé rights in his own interests. But, unless and until Project Egg was actively vetoed, it remained a business opportunity of the Pallinghurst structure and both Mr. Gilbertson and Mr. Kuznetsov, as directors of the company, had a duty to pursue it in the interests of the Pallinghurst structure: neither was free to pursue the acquisition of the Fabergé rights in his own interests.

  (3) Once the Fabergé rights had been acquired for the Pallinghurst structure—through any sub-structure under the company that the parties might agree—neither party was free to divert that asset or project or opportunity to himself or exploit it for his own benefit (whether by using the veto or otherwise); the exercise of a "veto" once the Fabergé rights had been acquired was limited to a refusal to agree the manner in which those rights were to be developed and exploited.

The Renova parties point out that, in the course of his oral evidence at trial, Mr. Gilbertson agreed with the second limb of the proposition numbered (2) above— that, unless or until one member of that investment

committee (say, Mr. Kuznetsov) had actively vetoed Project Egg, it remained a business opportunity of the Pallinghurst structure and the other member (say, Mr. Gilbertson) was not free to pursue that opportunity in his own interests.

102    The judge was not persuaded that either Mr. Kuznetsov or Mr. Gilbertson had vetoed Project Egg before January 3rd, 2007. In particular, he held (2012 (2) CILR 416, at para. 49) that—

> "in no sense could the requirements of Mr. Vekselberg be seen as a veto of the opportunity to exploit the economic benefit of the rights as an investment project of the master fund and the evidence is that Mr. Gilbertson did not see it or treat it that way either. There was no rejection of [Mr. Vekselberg's requirement] or refusal to consent to it by Mr. Gilbertson."

The Renova parties submit that the judge was correct to take that view.

103    In support of the submission that—

> "the simple point is that Project Egg was pursued as an investment project of the Pallinghurst structure throughout until Mr. Gilbertson's waking decision on January 1st, 2007 to divert it to himself and try to use it to extract from Mr. Vekselberg in excess of the US$38m. he had procured to be paid for it"—

it is said on behalf of the Renova parties to be clear from the evidence that:

(1) Project Egg was, from the outset, an investment project of the Pallinghurst structure: in May 2006, the investment committee was prepared to, and did, approve the making of a bid of US$20m. to acquire the Fabergé rights.

(2) When the price that Unilever required for the Fabergé rights rose above that which Renova would (or could) fund without a detailed business plan and analysis, it was accepted that Mr. Vekselberg might provide the funding privately but that the opportunity would still fall within the Pallinghurst structure. That possibility was discussed between the parties in July 2006 and it was not suggested that it would have the effect that Project Egg could be treated as vetoed. Indeed, as the judge found (2012 (2) CILR 416, at para. 36), the subsequent offer of US$30m. (to be funded by Mr. Vekselberg) had the approval of the investment committee.

(3) Had Mr. Gilbertson been minded to treat the message given by Mr. Kalberer to Mr. Sean Gilbertson in the course of the telephone conversation on December 20th, 2006 (to which the judge had referred at para. 9.16 of his judgment and which is described by the Gilbertson parties in their written submissions as the "not-pleasurable conversation")—that the

216

acquisition cost (US$38m.) would be provided by one of Mr. Vekselberg's companies on the basis that the Fabergé rights would be held outside the Pallinghurst structure (but that the economic benefits of those rights would be held within it)—as a veto by the investment committee he would have needed to make it clear to Renova that "the line had been crossed." He did not do so.

(4) After a number of email exchanges and telephone conversations on December 21st, 2006—including a telephone conversation between Mr. Gilbertson and Mr. Vekselberg—(i) Mr. Gilbertson sent an email to Mr. Vekselberg stating that he would trigger the "Unilever-Pallinghurst transaction to conclude the deal" so that PEL, "a Pallinghurst company, would be the owner of the Faberge brand" and that he would advise "as soon as you are officially the global 'Mr. Fabergé'"; and (ii) Mr. Gilbertson did as he had said he would do, in that he procured that PEL execute the SPA the next day.

(5) In an email sent to Mr. Vekselberg on December 23rd, 2006, Mr. Gilbertson wrote: "Pallinghurst is now the owner of the Fabergé brand . . . I congratulate you on this entrenchment of your interests in this revered brand name."

In those circumstances, it is said that it is impossible for Mr. Gilbertson to suggest that he was treating the change of plan on December 20th, 2006 as a veto by Renova, or to treat his own reaction to that change of plan as a veto by himself: on the contrary, he was proceeding, as Mr. Sean Gilbertson described the position to Mr. Kalberer in the email which he sent on January 1st, 2007, on the basis of "the Pallinghurst principles as already modified for Project Egg." If Mr. Gilbertson were free, after the "not-pleasurable conversation" on December 20th, 2006, to pursue the Fabergé rights for himself, then—in procuring PEL to execute the SPA on December 22nd, 2006 on behalf of the Pallinghurst structure (and not for his own personal benefit)—he must be taken to have waived any such right. His email of December 23rd, 2006 was "an unequivocal and outward manifestation" of Mr. Gilbertson's acceptance that, whatever right he might have had as a member of the investment committee to veto, or to treat Renova as having vetoed, Project Egg, he was proceeding on the basis that there had been no such veto and Project Egg remained an investment project.

104   In my view, the judge was correct to reject the veto point. For the reasons which he gave in his judgment—and for the reasons advanced on behalf of the Renova parties in this court—the evidence does not support the contention that Mr. Kuznetsov (or, more broadly, the Renova parties through Mr. Vekselberg or Mr. Kalberer) did anything which could be construed as a veto of Project Egg or that, at the relevant time, Mr. Gilbertson sought to treat anything done as having that effect.

(ii) *The mutual understanding point*

105   The judge referred ([2012 (2) CILR 416, at para. 40](#)) to the submission advanced on behalf of the Gilbertson parties that what had been said to Mr. Sean Gilbertson by Mr. Kalberer on December 20th, 2006, agreed (informally) between Mr. Gilbertson and Mr. Vekselberg in their telephone conversation on December 21st, 2006 and reflected in the draft implementation agreements which followed, did not involve the master fund at all but amounted to an entirely new and separate arrangement ("the Lamesa project") outside the Pallinghurst structure. The judge rejected that submission. The Gilbertson parties submit in this court that the judge was wrong to do so.

106   In support of their submission that, in the course of their telephone conversation on December 21st, 2006 (to which the judge referred at para. 9.25 of his judgment), Mr. Gilbertson and Mr. Vekselberg reached a mutual understanding ("the agreement or understanding") as to the acquisition, development and exploitation of the Fabergé rights and the Fabergé brand which constituted a new and separate arrangement outside the Pallinghurst structure (and in relation to which the master fund had no part), it is said on behalf of the Gilbertson parties that:

(1) The telephone conversation on December 21st, 2006 followed the earlier conversation (the "not-pleasurable conversation") between Mr. Gilbertson and Mr. Kalberer on December 20th, 2006 in which, as the judge found (at para. 9.16 of his judgment), the Gilbertson parties had learnt for the first time of Mr. Vekselberg's requirement that the Fabergé rights would be purchased by a Lamesa company.

(2) On learning of the "not-pleasurable conversation," Mr. Gilbertson felt that Mr. Vekselberg was acting unscrupulously. The Renova parties had, as he saw it, changed their position at the eleventh hour. He felt that he was entitled to take Project Egg for himself, but he also felt he had no option but to look to do a deal with Mr. Vekselberg. Reliance is placed on the following passage in his oral evidence at trial:

"*Q.* Now, he [Mr. Vekselberg] says that his belief, at the time, was that you were negotiating the deal with Unilever, acting in the best interests of the Fund. And that's right. You were, weren't you?

*A.* No, I was negotiating with Mr. Vekselberg directly as the two partners in the Letter Agreement.

*Q.* It may be my fault. Let me ask the question again. You were negotiating this deal with Unilever and, in doing so, acting or purporting to act in the best interests of the Fund.

    *A.* (Pause) The deal with Unilever had reached a certain stage. The lawyers were sitting there ready to sign. It was ongoing. However, the fundamental agreement between me and Viktor Vekselberg was in . . . had been breached. I needed to establish from him that we could go forward. I was discussing with Viktor not as representing a fund or representing anything else; I was discussing with Viktor as the partner against his being a partner in the Letter Agreement. Viktor, we are the counterparties. What are we going to do?"

(3) Evidence of what was said in the conversation on December 21st, 2006 is found in the email—set out by the judge in para. 9.25 of his judgment (and earlier in this judgment)—which Mr. Gilbertson sent to Mr. Vekselberg shortly after it had taken place.

(4) The "deal" between Mr. Vekselberg and Mr. Gilbertson was made between the two of them. Neither will have thought that it was made under the letter agreement; neither will have thought it was made on behalf of the company or the master fund. Both regarded themselves as the real players, and both saw the letter agreement and the Pallinghurst structure from that perspective.

(5) The judge seems to have assumed (as appears from 2012 (2) CILR 416, at para. 45) that the agreement or understanding was to be treated as an act of the investment committee and that, as a result of the agreement or understanding, Mr. Gilbertson is to be taken to have consented to the Lamesa project being treated as a potential investment project of the master fund. Yet none of this will have been dealt with expressly in the conversation between Mr. Gilbertson and Mr. Vekselberg and it is hard to see on what basis it could be implied.

(6) In the circumstances that Unilever was pressing for the SPA to be executed, Mr. Gilbertson had to decide what to do. In his email to Mr. Vekselberg, sent shortly after their telephone conversation on December 21st, 2006, Mr. Gilbertson recorded that he had received an "assurance" from Mr. Vekselberg and that he, Mr. Gilbertson, would work closely with Mr. Vekselberg's team to agree a structure that suited Mr. Vekselberg's purposes, thereby acknowledging that he did not have a binding commitment from Mr. Vekselberg and that he would be flexible about the structure of the deal that remained to be worked out. In effect, he was seeking to reassure Mr. Vekselberg that there was nothing sinister about the use of PEL, and that "we can still agree whatever we want to agree."

It is said that, taking Mr. Gilbertson's evidence as a whole, it is clear that, although after December 21st, 2006 he thought he was entitled to pursue Project Egg for himself, it never occurred to him to do so in that, until January 3rd, 2007, he was seeking to come to an agreement with Mr. Vekselberg.

107    The Gilbertson parties submit that, in reaching the conclusion that he did in relation to the mutual understanding point—that is to say, in rejecting their contention that the agreement and understanding amounted to an entirely new and separate arrangement outside the Pallinghurst structure—the judge erred in that he failed to consider the significance of the difference between Project Egg and the Lamesa project. In particular, it is said the judge failed to appreciate that the effect of the agreement or understanding was that under the Lamesa project, what was described as "the Pallinghurst team" (comprising Mr. Gilbertson, Mr. Sean Gilbertson and the two employees of Pallinghurst LLP, namely Mr. Willis and Mr. Priyank Thapliyal, who Mr. Gilbertson intended would be involved in the actual management of the Fabergé rights)—rather than the Pallinghurst structure—would enjoy the economic benefit of developing, exploiting and managing those rights. It is said that, had the judge appreciated that, under the Lamesa project, the Pallinghurst team—rather than the Pallinghurst structure—was to enjoy the economic benefit of developing, exploiting and managing the Fabergé rights, he would have held that, from and after December 21st, 2006, "the discussions were simply as between Mr. Vekselberg and his people on the one hand and Mr. Gilbertson and his people on the other hand"; that the entities within the Pallinghurst structure had no interest in the Fabergé rights, and that, therefore, Mr. Gilbertson owed those entities no fiduciary duties.

108    In response to the mutual understanding point, it is submitted on behalf of the Renova parties that, properly understood, the agreement or understanding did not have the effect that it was the Pallinghurst team—and not the Pallinghurst structure—that would benefit from the acquisition of the Fabergé rights. It is said that the distinction between "Pallinghurst team" and "Pallinghurst structure"—and the purpose for which it was advanced—was not only a new point introduced at trial but was wholly inconsistent with the evidence as to how Mr. Gilbertson himself saw the position at the time. The Renova parties point out that, although in the email which he sent to Mr. Vekselberg on December 23rd, 2006 (which the judge set out at para. 9.30 of his judgment), Mr. Gilbertson had referred to the Lamesa project in these terms:

"*Mr Kuznetsov and I have discussed arrangements to transfer 100% of the ownership of the brand to one of your companies, and I confirm to you my willingness to do so against binding commitments that the Pallinghurst team will retain all of the economic benefits and management rights that it would have under Pallinghurst's agreements with Renova . . .*" [Emphasis in original.]

He accepted in his oral evidence at trial (transcript, May 4th, 2012, p.33, ll. 5–24) that the reference to "the Pallinghurst team" in that context was to the Pallinghurst structure. In that respect, his oral evidence was consistent with his pleaded case and his written evidence, which were to

the effect that his intention at the time of the agreement and understanding was that the Pallinghurst structure would retain the economic benefit of the Fabergé rights. Further, it is said that it was clear that all parties understood that the way that the Pallinghurst team—defined in the draft IAs to mean the Gilbertsons and the individuals who worked for them—would be rewarded was by the economic benefits of the Fabergé rights being held in the Pallinghurst structure: the "Pallinghurst Team" would be rewarded through their limited partnership interest in the GPLP.

109   At section 14 of his judgment, the judge addressed, and rejected, the submission that the effect of the agreement or understanding was that the Pallinghurst team—rather than the Pallinghurst structure—would enjoy the economic benefit of developing, exploiting and managing the Fabergé rights. He observed (2012 (2) CILR 416, at para. 41) that the "purported distinction between the so-called 'Pallinghurst team' and the management under the Pallinghurst structure and letter agreement" had not been raised by the Gilbertson parties in their pleadings, their written evidence or their written opening submissions. He pointed out (*ibid.*, at para. 42) that Mr. Gilbertson, in his affidavit of January 29th, 2009, had sworn that he—

"managed to secure the contract for the purchase of the rights for the benefit of the master fund; simultaneously however, I continued to explore with Mr. Vekselberg the possibility of an arrangement whereby ownership of the rights might be transferred to one of Mr. Vekselberg's entities outside the Pallinghurst structure, but with *the Pallinghurst structure retaining the economic and management benefits and entitlements that we had hitherto envisaged that it would have*," [Emphasis in original]

and that, in the same affidavit, Mr. Gilbertson, in referring to the ownership of the Fabergé rights by one of Mr. Vekselberg's companies, had added the qualification "provided that the rights of the Pallinghurst Structure (or what was referred to as 'Pallinghurst Team') were protected"; so equating the "Pallinghurst Team" with the Pallinghurst structure. The judge went on to observe that the case that the Pallinghurst team, rather than the Pallinghurst structure, would enjoy the economic benefit of developing, exploiting and managing the Fabergé rights—which, as he said, the Gilbertson parties sought to advance for the first time at trial—was contradicted by the evidence given on behalf of the Renova parties. Mr. Vekselberg (he said) was adamant that his agreement with Mr. Gilbertson was that, while one of his personal companies would own the title to the Fabergé rights, the economic benefit of developing, exploiting and managing those rights would remain with the master fund within the Pallinghurst structure, and the evidence of Mr. Kuznetsov and Mr. Kalberer was to the same effect. There was no intention or suggestion that the economic benefits of managing the Fabergé rights would be outside the Pallinghurst structure or the Pallinghurst agreements; those benefits

were to remain with the management team headed by Mr. Gilbertson as provided by the letter agreement and through the Pallinghurst structure pursuant to the Pallinghurst agreements as always intended.

110    The judge found (*ibid.*, at para. 42) that, after December 20th, 2006, Mr. Gilbertson clearly understood that the economic benefits and the management of the Fabergé rights were intended to remain with the master fund (as they would have done under the previous arrangements), and that, in practical terms, the only change to the previous structure which Mr. Vekselberg was requiring was that the title to the Fabergé brand itself would be owned outside the Pallinghurst structure. In those circumstances, the judge concluded (*ibid.*) that "the suggested distinction between the Pallinghust team on the one hand and the Pallinghust structure on the other hand, which was first made during the trial, was not, in my view, justified or valid."

111    In my view, the judge was correct to reject the mutual understanding point. For the reasons which he gave in his judgment—and for the reasons advanced on behalf of the Renova parties in this court—the evidence does not support the contention that what had been said to Mr. Sean Gilbertson by Mr. Kalberer on December 20th, 2006, agreed (informally) between Mr. Gilbertson and Mr. Vekselberg in their telephone conversation on December 21st, 2006, and reflected in the draft implementation agreements which followed, did not involve the master fund at all but amounted to an entirely new and separate arrangement outside the Pallinghurst structure.

(iii) *The failure of condition point*

112    At the section of his judgment starting at 2012 (2) CILR 416, at para. 46, the judge addressed the question whether the fiduciary duties which (as he had held) Mr. Gilbertson owed to the company (and, more generally to the Pallinghurst structure) in relation to Project Egg before the execution of the SPA between PEL and Unilever on December 22nd, 2006 were affected by the agreement and understanding. He recorded (*ibid.*) that Mr. Gilbertson had suggested, in the course of his oral evidence at trial, that—notwithstanding his agreement with Mr. Vekselberg on December 21st, 2006 that PEL would enter into the SPA with Unilever on the following day (and so become the contractual purchaser of the Fabergé rights)—the effect of the understanding or agreement was that if Mr. Vekselberg "walked away from our deal," he (Mr. Gilbertson) could take whatever steps he thought fit to acquire those rights for his own benefit. He went on (*ibid.*, at para. 50) to explain that, on January 1st, 2007, Mr. Gilbertson had decided to proceed to secure the Fabergé brand for himself with the assistance of his consortium and thereafter to "negotiate with the Russians from a position of strength." This, the judge said, meant that the Fabergé brand would be paid for by Mr. Gilbertson and his consortium

and owned by them in all respects and not in any way by the master fund or through the Pallinghurst structure. He pointed out (*ibid.*) that "the consequence of that was that if further negotiations with Mr. Vekselberg then failed, Mr. Gilbertson and his consortium would keep the rights, as indeed happened."

113    The suggestion which Mr. Gilbertson had made in his evidence at trial—that, notwithstanding his agreement with Mr. Vekselberg that PEL would enter into the SPA with Unilever, the effect of the understanding or agreement was that "if Mr. Vekselberg walked away from our deal" he (Mr. Gilbertson) could take whatever steps he thought fit to acquire those rights for his own benefit—was advanced on his behalf as a submission in this court.

114    The response of the Renova parties to that submission is twofold: it is said that (i) the submission as to the effect of the agreement and understanding is not supported by the evidence; and (ii) in any event, at the time that Mr. Gilbertson took the steps that he did to acquire the Fabergé rights for his own benefit, Mr. Vekselberg had not "walked away from the deal."

115    As I have said, the judge found that Mr. Gilbertson decided that PEL would acquire the Fabergé rights from Unilever by entering into the SPA as a result of his telephone conversation with Mr. Vekselberg on December 21st, 2006. The basis upon which he reached that decision appears from the email which he sent to Mr. Vekselberg (with copies to Mr. Kuznetsov and Mr. Kalberer) later on that day. In that email (the terms of which the judge set out at para. 9.25 of his judgment), Mr. Gilbertson wrote:

"Acting on the assurances that you gave me during this evening's telephone conversation, namely that you want me to buy the brand on the basis of the arrangements that we have established between us over the past many months, I will therefore now trigger the Unilever-Pallinghurst transaction to conclude the deal. Project Egg Ltd, a Pallinghurst company, will be the owner of the Fabergé brand. I confirm that I shall work closely with your team to conclude payment and to achieve a structure that suits your needs . . ."

There is nothing in that email to support the contention that, if it proved impossible "to conclude payment and achieve a structure that suits your needs," the effect of the agreement or understanding (arising out of "the assurances that you gave me during this evening's telephone conversation") was that Mr. Gilbertson would be entitled to take whatever steps he thought fit to acquire the Fabergé rights for his own benefit; *a fortiori*, nothing to support the contention that Mr. Gilbertson would be entitled to procure the issue of shares by PEL to Autumn and the other members of his (then undisclosed) consortium so as to deprive the master fund of its

100% ownership of PEL. Nor was there any other evidence to support those contentions. Further:

(1) Mr. Gilbertson accepted in evidence (as the judge found at para. 9.28 of his judgment) that in "no sense was PEL acting as his own nominee or agent when entering into the contract for the Rights" and that "it was clearly a PEL/Master Fund/Pallinghurst structure for their benefit; it was not a Gilbertson transaction for the Gilbertsons' benefit."

(2) Mr. Gilbertson knew very well (as the judge found at 2012 (2) CILR 416, at para. 55) that what he was doing—in pursuing arrangements for Autumn and the other members of the consortium to fund the purchase of the Fabergé rights through PEL and procuring PEL to issue 100 new shares to them without informing Mr. Vekselberg, Mr. Kuznetsov or Mr. Kalberer—was "inappropriate and wrong," and that Mr. Vekselberg and the Renova parties would justifiably consider it to be contrary to the agreement (the agreement or understanding) that had been reached on December 21st, 2006.

116   Nor was there evidence to support the contention that, at the time that Mr. Gilbertson took the steps that he did to acquire the Fabergé rights for his own benefit, Mr. Vekselberg had "walked away from the deal"; in the sense that he had abandoned the agreement (the agreement or understanding) that had been reached on December 21st, 2006. The agreement or understanding required that Mr. Gilbertson (or Mr. Sean Gilbertson on his behalf) should work with Mr. Kuznetsov and Mr. Kalberer (as members of Mr. Vekselberg's team) "to achieve a structure that suits your [Mr. Vekselberg's] needs." Those needs included the transfer of the Fabergé brand to a Lamesa company on terms that the economic benefits of developing, managing and exploiting the Fabergé rights should be enjoyed by the Pallinghurst structure (through the master fund). In section 9 of his judgment, the judge described the negotiations—and the exchange of the first, second, third and fourth draft IAs—which took place between December 21st, 2006 and January 2nd, 2007. He found nothing to suggest that the negotiations had stalled or that they had identified a "deal breaker." At para. 9.47, the judge set out the terms of the email sent by Mr. Gilbertson to Mr. Vekselberg (with copies to Mr. Kuznetsov and Mr. Kalberer) on January 2nd, 2007 in which—after stating that, although he had been trying, ever since PEL bought the Fabergé brand on the evening of December 21st, "to achieve an agreement . . . that would satisfy the basic understanding that you and I struck that evening," it had become clear to him "today" that there was little likelihood that "we could reach an agreement in time that would satisfy the requirements of both Parties"—Mr. Gilbertson informed Mr. Vekselberg and his team that—

224

"I could not take the risk that payment would not be made under Pallinghurst's Sale and Purchase agreement with Unilever. Accordingly I have triggered alternative arrangements, so that payment has now been made, and Pallinghurst now owns the Fabergé brand."

As I have said, the judge observed, first, that Mr. Gilbertson's statement that it became clear to him on that day, January 2nd, 2007, "that there was little likelihood of reaching an agreement in time," was "not strictly correct" in that, as the judge pointed out, Mr. Gilbertson's evidence was that it was when he first awoke the previous day, January 1st, 2007, that he decided that agreement would not be reached in time "and that he would therefore implement and did implement his strategy of purchasing the Rights himself with his consortium, as he had already been putting in place before then." And secondly, that it could not have been correct that (as Mr. Gilbertson had suggested in his email) it was the proposals contained in the fourth draft IA, received by him that morning, that had caused him to "trigger alternative arrangements"—in that Mr. Gilbertson's evidence was that he decided to and did proceed with the alternative financing arrangements "early the previous morning, before the Fourth draft IA had been sent out." Further, the judge recorded (2012 (2) CILR 416, at para. 46) that Mr. Gilbertson's evidence was that it was in mid-January 2007 that Mr. Vekselberg "walked away" from their "deal," and (*ibid.,* at para. 54) that Mr. Kuznetsov's "unchallenged evidence" was that "only one or two more rounds of negotiation following the fourth draft IA would have resulted in agreement." As to the need to complete the purchase of the Fabergé rights on January 3rd, 2007 under the terms of the SPA, the judge said this (*ibid.*):

"There was no provision in the SPA with Unilever making time of the essence, and before the January 3rd completion date was agreed it was made clear on behalf of Unilever that if that date were not convenient, Sean Gilbertson, who was negotiating with them, should let them know. That was never done . . . Although [Mr. Kuznetsov's] evidence that agreement could have been achieved by the completion date of January 3rd was clearly over-optimistic, it does seem probable that only a few more days would have sufficed. The evidence suggested to me that a request for such a short extension would have been sympathetically considered by Unilever."

117    In my view, the judge was correct to reject the failure of condition point. The evidence supports neither the contention that the effect of the agreement and understanding was that "if Mr. Vekselberg walked away from our deal," Mr. Gilbertson could take whatever steps he thought fit to acquire the Fabergé rights for his own benefit, nor the contention that, at the time that Mr. Gilbertson took the steps that he did to acquire the Fabergé rights for his own benefit, Mr. Vekselberg had "walked away from the deal."

*Whether Mr. Gilbertson acted in breach of the fiduciary duties which (as the judge held) he owed to the company or the master fund*

118   It is submitted on behalf of the Renova parties that, once the contract to purchase the Fabergé rights had been executed on December 22nd, 2006, Project Egg was no longer simply an investment opportunity: for the reasons that have been explained, the effect of the SPA was that the master fund (through its 100% ownership of PEL) became the contractual purchaser of those rights. The fiduciary duties owed by Mr. Gilbertson, as a director of the company, included duties to preserve and exploit that asset for the benefit of the master fund (and, more generally, for the Pallinghurst structure).

119   It is submitted, further, that Mr. Gilbertson accepted, in the course of his oral evidence at trial, that—whatever might have been the position prior to the execution of the SPA by PEL—that asset belonged to the Pallinghurst structure through the master fund's 100% shareholding of PEL: he accepted that the execution of the SPA was "a crossing of the Rubicon" because the Pallinghurst structure had "bought the Egg." The asset did not belong to Mr. Gilbertson: it was not his to do with as he pleased. Any suggestion that, in acquiring the right to purchase the Fabergé rights, PEL was somehow acting as Mr. Gilbertson's agent, trustee or nominee was repeatedly and unequivocally denied by Mr. Gilbertson in his evidence. In those circumstances it is impossible to contend (as Mr. Gilbertson did in his amended defence and counterclaim) that "the company's interest in PEL was of no or no substantial value as long as PEL merely held the legal interest in the [Unilever SPA] subject to Mr. Gilbertson's beneficial interest in it"; at no stage did Mr. Gilbertson have a beneficial interest in the SPA.

120   It is submitted that it is also impossible for the Gilbertson parties to contend that, in the event that the agreement or understanding reached on December 21st, 2006 did not lead to an agreement with Mr. Vekselberg (or with Lamesa), it was open to Mr. Gilbertson to take the benefit of the SPA for himself. On a true analysis, if no implementation agreement could be agreed, the default position was that it would be open to Mr. Gilbertson to attempt to procure that PEL borrowed funds, on terms acceptable to Renova, with which to fund the completion payment. If he could not procure borrowed funds on terms which were acceptable to Renova, then (*prima facie*, at least) PEL would be unable to complete the purchase of the Fabergé rights under the SPA. In those circumstances, if Mr. Gilbertson wished to acquire the Fabergé rights for himself—and could assert that Renova's refusal to permit borrowing was a veto of Project Egg—it would be open to him to seek a new purchase contract from Unilever.

121   It is said on behalf of the Renova parties that, rather than taking that course—which would or might give rise to the risk that he would be in a competition with Mr. Vekselberg for the Fabergé rights, which he would lose—Mr. Gilbertson chose "to stultify Mr. Vekselberg in a fake round of negotiations for two days on and after 1 January 2007 while he raised money from his funding consortium, completed the SPA and had the new shares in PEL issued to the funders, thus achieving his goal of positioning himself to 'negotiate with the Russians from a position of strength.'" But that goal was achieved at the expense of the Pallinghurst structure: it was not a goal which could be pursued bona fide in the best interests of the Pallinghurst structure.

122   In those circumstances, it is said, Mr. Gilbertson acted in breach of the fiduciary duties which he owed to the company and the master fund by procuring that his consortium (of which Autumn was a 25% member) acquire 99% ownership of PEL. Indeed, it is said that "Autumn all but concedes that, if Mr. Gilbertson owed the company or GPLP or the master fund duties which precluded him for having regard to his own interests, then he breached those duties."

123   The judge accepted that, in acting as he did, Mr. Gilbertson was in breach of the fiduciary duties which he owed to the company and the master fund. The Gilbertson parties challenge that conclusion. It is said on their behalf that the judge erred in law in that:

(1) There was no, or no sufficient, evidence that Mr. Gilbertson caused or was party to or was aware of the issue of the PEL shares (whether on January 3rd, 2007 or a later date) and, in particular, the judge ignored the failure of the Renova parties to put to Mr. Gilbertson, at trial, any allegation that he did cause, or was party to, or was aware of the issue of the PEL shares.

(2) The judge assessed Mr. Gilbertson's conduct by reference to a notional set of facts based on his finding that the PEL shares were issued "with effect from" January 3rd, 2007; had he directed himself properly, the judge should have assessed Mr. Gilbertson's conduct by reference to the facts as at the later date (January 19th, 2007) on which the PEL shares were actually issued.

(3) If the judge had assessed Mr. Gilbertson's conduct on the basis that the PEL shares were issued on that later date, he should have found that Mr. Gilbertson was not in breach of any fiduciary duties having regard to the dealings between the parties in the period after January 3rd, 2007 and to the fact that no entity within the Pallinghurst structure was involved in the proposals that the parties were entertaining, in particular (i) he should have had regard to the basis on which the parties were then negotiating, as evidenced by the proposal which Mr. Vekselberg and Mr. Kuznetsov made to Mr. Gilbertson on January 18th, 2007, and (ii) he should have

found on the evidence (a) that the parties were proceeding on the basis that the master fund had no separate interest in Fabergé rights, (b) that Mr. Kuznetsov, in particular, was negotiating on that basis, and (c) that Mr. Gilbertson was entitled to do so also.

124   In my view there is no substance in any of those points. On the facts found by the judge it is, if I may say so, fanciful to suggest that the decision to issue the 100 new PEL shares in January 2007—although implemented by Mr. Sean Gilbertson and Mr. Andrew Willis (as the directors of PEL)—was not a decision taken by Mr. Gilbertson as a necessary element in his scheme to obtain control of the Fabergé rights (by diverting effective ownership of PEL from the master fund to his consortium) in order, thereafter, to "negotiate with the Russians from a position of strength." When Mr. Gilbertson wrote in the email which he sent to Mr. Vekselberg on the evening of January 2nd, 2007 (with copies to Mr. Kuznetsov and Mr. Kalberer)—the terms of which were set out by the judge at para. 9.47 of his judgment—that "I have triggered alternative arrangements . . . and Pallinghurst now owns the Fabergé brand" he was not suggesting that the "alternative arrangements" which he had made had triggered the result that the ownership of Fabergé rights had passed to the master fund as part of the Pallinghurst structure: he was asserting that the ownership of those rights had passed to "Pallinghurst" companies which he controlled. And that could only have occurred because he and the members of his consortium had taken control of PEL. It was the issue of the 100 new PEL shares which had that effect. As I have said, I take the view that the judge was correct to conclude that those shares were issued on January 3rd, 2007 (as recorded in the register of members) but, as the judge appreciated, his conclusion that the new shares were issued on January 3rd, 2007, rather than on January 19th, 2007 (or on some later date) is not of significance in relation to his conclusion that Mr. Gilbertson was in breach of his fiduciary duties. In that context, the significant date is the date on which Mr. Gilbertson took the decision (which the directors of PEL could be relied upon to implement) that the new PEL shares should be issued.

125   For the reasons which I have set out in this section of my judgment, I am satisfied that the judge was correct to hold (2012 (2) CILR 416, at para. 57) that Mr. Gilbertson owed the duties of a fiduciary as a director of the company throughout the relevant period and that he was in breach of those duties in acting as he did in late December 2006 and January 2007.

**Was the judge wrong to hold that the conduct of the Renova parties was not such as to disentitle Renova from any relief, having regard to the rule in _Nurcombe_ v. _Nurcombe_?**

126   It is said on behalf of the Gilbertson parties that, had the judge directed himself properly, he should have held that the conduct of the

228

Renova parties rendered it unconscionable to grant Renova the relief sought in these proceedings (or any relief), and that he should have applied the rule in *Nurcombe* v. *Nurcombe* (28) to refuse relief.

127    The so-called rule in *Nurcombe* v. *Nurcombe* derives from a passage in the judgment of Browne-Wilkinson, L.J. in that case. After referring to the earlier decision of the Court of Appeal of England and Wales in *Towers* v. *African Tug Co.* (37), he said this ([1985] 1 W.L.R. at 378–379):

> "In my judgment, that case established that behaviour by the minority shareholder, which, in the eyes of equity, would render it unjust to allow a claim brought by the company at his instance to succeed, provides a defence to a minority shareholder's action. In practice, this means that equitable defences which would have been open to defendants in an action brought by the minority shareholder personally (if the cause of action had been vested in him) would also provide a defence to those defendants in a minority shareholder's action brought by him.
>
>     . . . Since the wrong complained of is a wrong to the company, not to the shareholder, in the ordinary way the only competent plaintiff in an action to redress the wrong would be the company itself. But, where such a technicality would lead to manifest injustice, the courts of equity permitted a person interested to bring an action to enforce the company's claim. The case is analogous to that in which equity permits a beneficiary under a trust to sue as plaintiff to enforce a legal right vested in trustees (which right the trustees will not themselves enforce), the trustees being joined as defendants. Since the bringing of such an action requires the exercise of the equitable Jurisdiction of the court on the grounds that the interests of justice require it, the court will not allow such an action to be used in an inequitable manner so as to produce an injustice. The *Towers* case [1904] 1 Ch. 558 shows that 'all personal objections against the individual plaintiff' must be considered. It is for this reason that, in my judgment, a court of equity will not allow a minority shareholder to succeed in a minority shareholder's action where there are equitable defences which, as between the shareholder personally and the defendants, the defendants could properly rely on in equity, eg, the duty to elect between conflicting rights, acquiescence, or laches of the minority shareholders."

Lawton, L.J., who agreed with Browne-Wilkinson, L.J., commented (*ibid.*, at 376) that—

> "since the procedural device has evolved so that justice can be done for the benefit of the company, whoever comes forward to start the proceedings must be doing so for the benefit of the company and not for some other purpose."

229

And, in *Barrett* v. *Duckett* (6), Peter Gibson, L.J. observed that an action brought for an ulterior purpose would not be allowed to continue.

128   In the course of his ruling on April 14th, 2009, the judge had considered the question whether that principle should lead him to refuse Renova the leave to pursue these derivative proceedings which it had sought by its summons of July 29th, 2008. In a section of that ruling, under the heading "Conduct of the plaintiff," he had said this (2009 CILR 268, at paras. 42–43):

> "42   Mr. Gilbertson also contends that the conduct of the Renova Group renders it inequitable to grant leave to the plaintiff, a member of that group, to continue these proceedings. As explained above, Mr. Gilbertson argues that the position taken by the plaintiff in these proceedings (that Mr. Gilbertson diverted the rights away from the Pallinghurst structure) is inconsistent with the position taken by Renova Holding in 2007, and particularly in its letter of May 25th, 2007. He says that this *volte face* demonstrates that the plaintiff has not brought this action *bona fide* for the benefit of the company or the Pallinghurst structure.
>
> 43   It is said also on behalf of Mr. Gilbertson that the conduct of Mr. Vekselberg as the ultimate principal of the Renova Group and thus of the plaintiff, in seeking to procure the transfer of the ownership of the rights outside the Pallinghurst structure, itself resulted in breaches of duty to the company by Mr. Kuznetsov, Mr. Gilbertson's fellow director. It was contended that it was Mr. Kuznetsov who acted in breach of his fiduciary duties to the company by pursuing Mr. Vekselberg's personal agenda rather than the best interests of the company and the Pallinghurst structure. It was submitted that the Renova Group have been the authors of their own misfortune by insisting that the rights should be owned outside the Pallinghurst structure and that a court of equity should not assist a party who has brought about the very matters complained about."

And, after referring to Browne-Wilkinson, L.J.'s observations in *Nurcombe*, the judge went on (*ibid.*, at paras. 44–47):

> "The defendant argues this conduct by the plaintiff shareholder or those behind it renders it inequitable to allow a claim brought by it on behalf of the company to proceed.
>
> 45   The plaintiff argues that the contentions on behalf of Mr. Gilbertson are a misinterpretation of the facts and that it was always intended by the plaintiff and the Renova Group that the economic benefit and management of the rights should remain within the Pallinghurst structure and that it was the actions of Mr. Gilbertson which diverted that economic benefit and control away from the

Pallinghurst structure, and thus the company, in breach of his duties to the company. What is more, the plaintiff says, the Gilbertsons clearly initially agreed with this proposal and entered into negotiations about the precise terms of a draft agreement giving effect to it. There was no suggestion by them at the time that it was not in the best interests of the Pallinghurst structure or of the company, or that Mr. Gilbertson was somehow released from his duties as a director of the company as a result. Indeed, there was nothing to indicate, until Mr. Gilbertson's email of January 2nd, 2007, that everything was not proceeding on this basis and that the Pallinghurst structure, with the company at its head, would not shortly be the owner of the economic benefit and the manager of the rights.

46   The plaintiff contends that Mr. Gilbertson's real intention from a much earlier stage was to acquire the rights himself and, as he said himself in an email, to 'warehouse' them with a view to then negotiating about the possible return of the rights to the Pallinghurst structure from a position of strength. As far as the letter of May 25th, 2007 is concerned, the plaintiff argued that it is simply not relevant in determining the true position which must be derived from the contemporary communications documentation and actions of the parties and not ex post facto at a time when the Renova Group were negotiating months later to resolve a situation caused by Mr. Gilbertson's breaches of duty. The plaintiff contends that the letter does not provide an equitable defence to Mr. Gilbertson of the kind envisaged in *Nurcombe* . . . and that what matters is the conduct of the parties at the relevant time. The plaintiff says the case it pleads represents its position as it was at the material time.

47   In my view, the letter of May 25th, 2007, and indeed, the comments of Renova Holding in March 2007, while no doubt material for cross-examination if the case were to proceed, do not constitute conduct of a kind which, at least at this stage and for this purpose, sufficiently impacts on the *bona fides* and equity of the plaintiff's case such as to satisfy me that in the light of it the plaintiff should not have leave to continue the action."

129   Nevertheless, as the judge explained (2012 (2) CILR 416, at para. 67) he rejected the submission (advanced on behalf of the Renova parties) that the issue was not open to reconsideration at the trial. He said this (*ibid.*):

". . . I am conscious of the fact that at the leave stage in the present case, while affidavit evidence had been filed and was relied upon, the court had obviously not seen or heard all the evidence, written and oral, of the witnesses at trial. Accordingly, I have considered whether in light of all that evidence the conduct of the plaintiff was such as to

provide an equitable defence to the action as submitted on behalf of the Gilbertson parties."

130    The judge referred (*ibid.*, at para. 68) to the features listed by counsel for the Gilbertson parties in their written opening submissions which, it was said, would make it unjust for Renova to succeed in this action. But, he said, "most of the matters on which they rely are inevitably based on their own interpretation of particular facts or circumstances before any evidence was heard and much of which, in the event, I did not accept," and that "furthermore, some of the matters on which they relied were not put to the Renova parties' witnesses in cross-examination." He went on to address two further points which had not, I think, been advanced at the 2009 hearing: first, the submission that Renova's claims against the Gilbertson parties were of no commercial benefit to the Renova parties and were motivated solely by malice towards Mr. Gilbertson; and secondly, the submission that, as a result of his broader relationship with Mr. Vekselberg through his employment at SUAL and his financial expectations, both consequent upon that employment and pursuant to the letter agreement, Mr. Gilbertson was under considerable pressure in dealing with Mr. Vekselberg and the Renova parties generally. In relation to the first of those points, the judge said this (*ibid.*, at paras. 70 and 73):

"70    . . . it was never put to Mr. Vekselberg that the present proceedings were solely motivated by malice on his part. While it was clear to me that Mr. Vekselberg was upset and annoyed and felt he had been wronged by what he described as Mr. Gilbertson's 'violation' of the agreement which he said he had made with him, it does not seem to me that it can therefore inevitably be inferred that Mr. Vekselberg had procured the present proceedings to be brought solely out of malice. No doubt many plaintiffs are aggrieved and motivated by what they see as the wrong done to them by the defendant. It does not follow, in my view, that their motives in bringing court proceedings are therefore necessarily inequitable such that their claims should be refused on that ground. In the present case, the plaintiff has pleaded and put forward a perfectly arguable case on the merits of its claim and also in relation to loss . . .

73    Although Mr. Vekselberg was annoyed and upset as a result of Mr. Gilbertson's covert actions, it does not follow, in my opinion, that these proceedings were actuated by malice. In fact Mr. Vekselberg is anyway not the plaintiff. Even if the reality is that, as the principal owner and chairman of the group of which the plaintiff is a member, he procured the plaintiff to bring these proceedings, a circumstance which was never put to Mr. Vekselberg in cross-examination, it does not follow that the plaintiff's conduct in this case is inequitable in the *Nurcombe* v. *Nurcombe* . . . sense so as to

provide a defence to the plaintiff's claims. I therefore reject the submissions of the Gilbertson parties in that respect."

And, in relation to the second of those points, the judge said this (*ibid.*, at para. 72):

"Mr. Gilbertson clearly knew Mr. Vekselberg well. He knew what Mr. Vekselberg's expectations were but he nonetheless did not hesitate to act as he did in order to make a profit at Mr. Vekselberg's expense. In my assessment, that is consistent with my overall impression of Mr. Gilbertson as a hardened and ambitious businessman quite capable of looking after his own interests and taking advantage of any opportunity available to him to benefit financially, knowing very well that Mr. Vekselberg, his supposed partner and his employer, would be extremely annoyed. I do not accept the suggestion that Mr. Gilbertson was brow-beaten or pressured into agreeing with Mr. Vekselberg's wishes as he did; my clear impression of Mr. Gilbertson is that he was perfectly capable of refusing to do so had he wished."

### The submissions advanced on behalf of the parties

131    It is said in the memorandum of grounds of appeal filed on behalf of Autumn on February 1st, 2013, that the judge misdirected himself and erred in law and/or fact in not applying the rule in *Nurcombe* v. *Nurcombe* (28) to refuse Renova relief in that it was unconscionable for Renova to be granted relief, having regard to the following, amongst other (unspecified) matters:

(1) The conduct of Mr. Kuznetsov, in relation to whom it is said that the judge should have found that he was acting at all material times in the interests of Mr. Vekselberg and the Renova group, rather than of the company, the GPLP and/or the master fund.

(2) The crisis caused by the Renova parties and their ultimate veto of the approval of Project Egg as an investment project on December 20th, 2006.

(3) The oppressive terms that the Renova parties sought to impose in the draft implementation agreements prior to January 3rd, 2007.

(4) The attempts of the Renova parties to procure Mr. Gilbertson's agreement to the proposal that the Fabergé rights should be owned outside the Pallinghurst structure and exploited pursuant to an arrangement which did not involve the master fund at all.

(5) The Renova parties' pursuit of their own interests without regard to any interests of the master fund, and, in particular, their appropriation of the shares acquired in connection with Project Charlie.

(6) The conduct of the Renova parties—found by the judge to be "culpable and blameworthy"—in destroying relevant documents; such conduct being inconsistent with the equitable relief sought and the indulgence to pursue derivative proceedings which they had been granted.

Had the judge directed himself properly, it is said, he should have held that the conduct of the Renova parties rendered it unconscionable to grant Renova the relief which it sought.

132    In development or amplification of those submissions it is said on behalf of the Gilbertson parties in their memorandum of grounds of appeal that, although the judge stated (2012 (2) CILR 416, at para. 67) that he had considered "whether in light of all that evidence the conduct of the plaintiff was such as to provide an equitable defence to the action as submitted on behalf of the Gilbertson parties," he failed to make any findings with regard to six matters on which the Gilbertson parties had relied at trial: (i) the complicity of the Renova parties in Mr. Gilbertson's negotiating with them on his own behalf; (ii) the inconsistency between the Renova parties' own conduct with the case which they advanced in these proceedings; (iii) the conduct of the Renova parties in relying on Mr. Gilbertson's appropriation of Project Egg to justify their appropriation of the profits of Project Charlie and, then, resiling from the set-off; (iv) the attempt by the Renova parties to intimidate Mr. Gilbertson; (v) Mr. Vekselberg's conduct in causing SUAL to withhold the bonus which Mr. Gilbertson should have received in connection with the merger with RUSAL and to terminate his employment (notwithstanding that he had made a profit in excess of US$1 bn. for Mr. Vekselberg as a result of that merger); and (vi) the fact that these proceedings were not being pursued for the benefit of the company.

133    In response to those submissions it is said on behalf of the Renova parties that there is no separate *Nurcombe* v. *Nurcombe* defence to Renova's claims. The judge was right to conclude that, although Mr. Vekselberg may have been "upset and annoyed" at Mr. Gilbertson's actions, his irritation does not debar Renova from pursuing those claims on behalf of the company and the master fund, even if the action had been motivated (whether solely or partly) by some personal animus on the part of Mr. Vekselberg—and no such suggestion was put to him at the trial— that would be irrelevant in circumstances where the claims were good claims on the merits, and the same can be said for Renova's unfortunate failures in the discovery process. The points advanced on behalf of the Gilbertson parties in this context were fairly considered and rejected by the judge (*ibid.*, at para. 64). No error in the judge's detailed analysis has been identified.

134    In addressing those submissions it is, I think, important, to keep in mind that—as the judge observed (*ibid.*, at para. 65)—the contention that

the conduct of Renova and those associated with it in relation to the claims made on behalf of the company in these derivative proceedings rendered it inequitable to allow Renova to pursue those claims as plaintiff had already been argued at length at the hearing of Renova's application for leave to continue and had been rejected by the judge in his ruling of April 14th, 2009. There was no appeal from that ruling. In those circumstances, in revisiting that contention at the trial, it was not open to the judge to depart from his earlier ruling unless persuaded that the evidence given by the witnesses at trial provided good reasons for doing so.

135    It is important, also, to keep in mind the basis of the *Nurcombe* v. *Nurcombe* defence as explained in the authorities to which the judge referred. The underlying principle is that, in permitting a derivative action to be brought by a person (say, A) in whom the cause of action is not vested (and who is not the "proper" plaintiff) for the benefit of the person (say, B) in whom the cause of action is vested (and who would be the "proper" plaintiff), the court is exercising an equitable jurisdiction on the ground that justice so requires. Four propositions follow from that underlying principle. First, the jurisdiction is exercised on the application of A only in circumstances where A has an interest (recognized by the law) in the pursuit of the cause of action for B's benefit: such circumstances are likely to exist where, for example, A is a shareholder of B (and so has an interest in the outcome of litigation which, if successful, will benefit B and, indirectly, B's shareholders. Secondly, the need for the exercise of the equitable jurisdiction to avoid injustice arises because the circumstances are such that B is not able to bring the action itself (usually because B is under the control of the wrongdoer who would be the defendant). Thirdly, the jurisdiction is not exercised unless A's purpose in seeking to pursue the cause of action is to benefit B; although, consistently with the second proposition, it is no bar to the exercise of the jurisdiction that A may benefit indirectly (say, for example, as a shareholder of B) if the outcome of the litigation is successful. Fourthly, the jurisdiction will not be exercised where to do so would lead to injustice. Circumstances in which the exercise of the jurisdiction on the application of A would lead to injustice would include those in which A would benefit indirectly (say, as a shareholder of B) from the successful pursuit of a claim to which (as between A and the defendant) the defendant would have had an equitable defence on which he would have succeeded if (on the hypothesis that A had been a proper plaintiff) the action had been brought by A in his own right. As Browne-Wilkinson, L.J. pointed out in the *Nurcombe* case (28), such equitable defences would include A's obligation to elect between conflicting rights, acquiescence or laches.

136    It is convenient to address the submissions advanced on behalf of the parties under two heads, reflecting the third and fourth of the propositions which I have just set out, and to ask, first, whether (on a true

analysis of the position) Renova is not pursuing this derivative action for the benefit of the company (or, more generally, the Pallinghurst structure) but, rather, is pursuing the action for some other—or ulterior—purpose, and secondly, whether the other matters (or any of them) upon which the Gilbertson parties rely in support of their challenge to the judge's conclusion that the conduct of the Renova parties was not such as to disentitle Renova from any relief, having regard to the rule in *Nurcombe* v. *Nurcombe*, would have given rise to an equitable defence on which the Gilbertson parties would have succeeded if the action had been brought by Renova in its own right.

### Ulterior purpose

137   In developing their submissions under this head it is said on behalf of the Gilbertson parties that the judge failed to make any findings with regard to "(vi) the fact that these proceedings were not being pursued for the benefit of the company" and, further, that these proceedings have been brought and pursued for a collateral purpose in that "this is not the master fund's dispute, let alone the company's . . . it is and always has been Mr. Vekselberg's."

138   The submission that the judge made no finding on the issue whether these proceedings were being pursued for the benefit of the company but for a collateral purpose, might be thought to overlook the judge's observations (*ibid.*, at paras. 70 and 73, to which I have referred earlier in this section of this judgment). But, in relation to the judge's observations (*ibid.*, at para. 70), it is said on behalf of the Gilbertson parties that he was wrong to take the view that malice was of no relevance in the context of the *Nurcombe* defence, save where it was the sole factor driving the proceedings. In the present case, it is said that Mr. Vekselberg was using the proceedings as an indirect means of asserting what he chose to believe to be due to him and "was seeking to enforce in the name of the company an unenforceable agreement made with him personally." Although it is accepted that "this may not necessarily be sufficient to found a *Nurcombe* defence in itself," it is said to be "something that the court should weigh in the balance." Further, it is submitted that the judge was wrong "to overlook the fact that [these proceedings] might have been brought and pursued out of enmity," and wrong to take the view that "it was sufficient to dispose of the issue that Mr. Vekselberg had a genuine sense of grievance."

139   In response, it is said on behalf of the Renova parties that in circumstances that (as the judge held after hearing evidence at the trial) the derivative claims brought by Renova on behalf of the company (or the master fund) were good on their merits, then the fact that Mr. Vekselberg was angered or upset by what Mr. Gilbertson had done was irrelevant to the question whether Renova was an appropriate claimant or, at the least,

236

not a sufficient reason to conclude that it was not. The judge was plainly correct to take the view (expressed, *ibid.*, at para. 70) that a finding that Mr. Vekselberg was angered and upset by what Mr. Gilbertson had done did not of itself justify a finding that Mr. Vekselberg was acting out of malice. The judge did not overlook the possibility that proceedings might be brought out of enmity: rather, he considered that possibility and rejected it. Further, it is said that the allegation that the action was actuated by malice—which was advanced at trial by counsel on behalf of the Gilbertson parties in the course of his opening submissions—was of such a serious nature (in that it amounted to an allegation that the action had been brought in bad faith and for a collateral purpose) that it was necessary (if it were to be pursued) that it be put to Mr. Vekselberg. As the judge noted (*ibid.*, at para. 70) that allegation was never put to Mr. Vekselberg. And, it is said, the contention that Mr. Vekselberg was seeking, for his own purposes "to enforce in the name of the company an unenforceable agreement with him" cannot be sustained: Mr. Vekselberg is not the derivative plaintiff and is not seeking to enforce any agreement made with him. He was joined in the action as a defendant to counterclaims which were wholly unsuccessful and, in the event, for the most part abandoned.

140    In my view, the judge was entitled to reject the contention that these proceedings were not brought and pursued by Renova for the benefit of the company (or, more generally, for the benefit of the master fund and the other entities within the Pallinghurst structure), but for the benefit of Mr. Vekselberg personally. There was no direct evidence to support that contention. Not only was the contention never put to Mr. Vekselberg himself; it was not put to Mr. Kuznetsov or Mr. Kalberer. There was no indirect evidence from which it could be inferred that Renova had brought, and was pursuing, the action for the benefit of Mr. Vekselberg; rather than for the benefit of the company or the Pallinghurst structure. In particular, the judge was entitled—indeed, in my view, correct—to hold that his conclusion that "Mr. Vekselberg was upset and annoyed and felt that he had been wronged by what he described as [Mr. Gilbertson's] 'violation' of the [agreement and understanding]" was an insufficient basis upon which to infer that Mr. Vekselberg (or others in control of Renova) had caused Renova to bring and pursue this action for an ulterior purpose: that is to say, for a purpose which was not that on the basis of which permission to bring derivative proceedings had been sought and obtained.

### *Equitable defences*

141    I have explained that the jurisdiction to permit a person who is not the "proper" plaintiff (in that he or it is not the person in whom the relevant cause of action is vested) to bring a derivative action for the benefit of the person whose cause of action it is (the "proper" plaintiff)

will not be exercised where to do so would lead to injustice. The purpose of the rule in *Nurcombe* v. *Nurcombe* (28), in this context, is to avoid the injustice which would arise from allowing the derivative plaintiff to benefit from the pursuit of a claim in relation to which his, or its, own conduct has been inequitable or, to put the point another way, to avoid the injustice which would arise if the defendant were to be denied the benefit of an equitable defence which would have been available to him if the claim made against him had been made otherwise than in derivative proceedings.

142   There are, as I have said, six matters in relation to which it is said that the judge misdirected himself and erred in law in failing to have proper regard to what I have described as the fourth proposition which follows from the principle underlying the jurisdiction to permit a person who is not the "proper" plaintiff to bring and pursue a derivative action: that is to say, the proposition that the jurisdiction will not be exercised where to do so would lead to injustice. Three of those matters were elaborated further in the course of the submissions advanced on behalf of the Gilbertson parties:

(1) *The conduct of Mr. Kuznetsov*

It is said that the judge should have found that Mr. Kuznetsov was acting at all material times in the interests of Mr. Vekselberg and the Renova group, rather than of the company, the GPLP and/or the master fund. In advancing the case that they did, it was inconsistent for the Renova parties to ignore the fact that (as the Gilbertson parties had pointed out at the trial), Mr. Kuznetsov recognized no conflict which precluded him from promoting the interests of Mr. Vekselberg and Lamesa where they conflicted with those of the Pallinghurst structure, notwithstanding that he was a member of the investment committee and a director of the company. The judge was wrong to make no finding in relation to that alleged inconsistency.

(5) *The Renova parties' pursuit of their own interests without regard to any interests of the master fund, and, in particular, their appropriation of the shares acquired in connection with Project Charlie*

(i) In developing the first limb of this submission, it is said that, although the Renova parties complain in this action that Mr. Gilbertson was not adhering to the "no-conflict" and "no-profit" rules, they were happy to negotiate with Mr. Gilbertson in relation to the Lamesa project—and did so without making any such complaint at the time—notwithstanding (a) that they had contended in their pleadings and written opening submissions at trial that Mr. Gilbertson was acting in his capacity as a director of the company in his negotiations with them in relation to the Lamesa project and, accordingly, was obliged to get the best deal he

238

could for the company or, perhaps, the master fund, without regard to his own interests or those of his team; and (b) that Mr. Kuznetsov and Mr. Kalberer knew—as they each acknowledged in the course of their oral evidence—that they were negotiating with Mr. Gilbertson in relation to the Lamesa project on the basis that they would need to come to an agreement which was acceptable to Mr. Gilbertson and his team.

   (ii) In developing the second limb of this submission, it is said that, in the events which happened, Project Charlie progressed further than Project Egg in that (a) it was the subject of a formal investment committee minute; (b) shares were purchased on behalf of the master fund; and (c) profits were made on behalf of the master fund. Those profits were, it is said, retained by the Renova parties for their own benefit on the ground that—as Mr. Kuznetsov acknowledged in his oral evidence, although subsequently denied—they were keeping Project Charlie profits because Mr. Gilbertson had kept Project Egg. It is accepted that (a) Project Charlie was not the subject of any detailed consideration at the trial, and that the judge was not asked to rule either on the set-off that the Renova parties purported to exercise or on their entitlement to do so; and (b) "the Renova parties will have no difficulty in presenting a thicket of fine distinctions . . . to explain how the Renova parties might be entitled to keep the profits from Project Charlie and Mr. Gilbertson not be entitled to keep the [Fabergé] Rights." But, it is said that that is not how the Renova parties saw the matter at the time; they treated the two projects as comparable. Notwithstanding that they retain the fruits of the one; they seek, in these proceedings, to recover the fruits of the other. If and insofar as there is any merit in their arguments in relation to the Fabergé rights, the Renova parties come before the court as wrongdoers, and that this court is not precluded, when assessing what may be just between the parties, from taking into account the justice that the parties sought for themselves in relation to the two projects.

### (6) *The conduct of the Renova parties . . . in destroying relevant documents*

   Although the judge found (2011 (2) CILR 148, at para. 62 of his ruling on the application to strike out the statement of claim) that the destruction of documents by the Renova parties was "blameworthy and culpable," he attached no significance to this finding. The judge failed to have regard (i) to the nature of the prejudice that the destruction of documents on a wholesale scale may have to the judicial process; (ii) to the sense of injustice caused to other litigants; and (iii) to the distortion of the court process that it implies. It is said that the conduct of the Renova parties was inconsistent with the equitable relief sought and the indulgence to pursue derivative proceedings which they had been granted.

In addition to those numbered submissions, the Gilbertson parties submit that the judge failed to make any findings with regard to two other matters on which the Gilbertson parties had relied at trial:

*The attempt by the Renova parties to intimidate Mr. Gilbertson*

There is no challenge to the judge's finding (2012 (2) CILR 416, at paras. 71–72) that "the suggestion that Mr. Gilbertson was brow-beaten or pressured into agreeing with Mr. Vekselberg's wishes as he did" was not made out on the evidence; indeed, it is said that no such suggestion was advanced at the trial. But the Gilbertson parties do rely on Mr. Gilbertson's evidence (in his witness statement) that, during the course of negotiations following the "not-pleasurable conversation," Mr. Kuznetsov had advised him to submit to Mr. Vekselberg's wishes rather than to make an enemy of him, and to Mr. Kuznetsov's evidence, when that statement was put to him in cross-examination that he did no more than offer "friendly advice." It is said that to advise someone to submit to another's demand lest he makes an enemy of him might be seen as a threat, *a fortiori*, in circumstances where that other is a Russian oligarch and, in substance, the employer of the advisee.

*Mr. Vekselberg's conduct in causing SUAL to withhold the bonus which Mr. Gilbertson should have received in connection with the merger with RUSAL and to terminate his employment*

Shortly after Mr. Kuznetsov had offered his "friendly advice," Mr. Gilbertson's employment at SUAL was terminated, and a bonus to which he claimed to have been entitled (having generated profits for Mr. Vekselberg in excess of US$1 bn.) was withheld. Mr. Vekselberg's evidence was that the employment was terminated and the bonus withheld because he was not happy with Mr. Gilbertson's performance. That evidence was described by counsel for the Gilbertson parties as "chilling." The judge was wrong to see the termination of Mr. Gilbertson's employment and the withholding of the bonus "simply as part of the fall out from the breakdown in the relationship between Mr. Gilbertson and Mr. Vekselberg, but otherwise unrelated to it"; he should have recognized that "the mere fact that the break down in the relationship between the two men over the Lamesa project should have led to Mr. Gilbertson being fired as he was" was itself "a harsh illustration of the fact that the operative relationship in all the dealings of Project Egg and the Lamesa project was that between Mr. Gilbertson and Mr. Vekselberg, a personal relationship which both men felt personally." There is no challenge to the judge's observation (2012 (2) CILR 416, at para. 73) that it would have been obvious to Mr. Gilbertson that he would be taking a risk in angering Mr. Vekselberg. But it does not follow that the way in which Mr. Vekselberg

vented his anger in the past is of no relevance to the question whether the court should assist him in doing so in these proceedings.

143   In response to the submissions advanced on behalf of the Gilbertson parties, the Renova parties emphasize the points to which I have already drawn attention: (i) that the judge gave leave to bring this derivative claim in 2009, after a two-day hearing in the course of which the Gilbertson parties deployed many of the arguments now advanced; and (ii) that there was no appeal from his order. The Renova parties accept that, in a case where new evidence emerges during the trial which casts significant doubt on the earlier decision to grant leave, the trial judge may revisit that decision but, it is said, this is not such a case. More particularly—and in response to the numbered submissions to which I have referred in the preceding paragraph of this judgment—it is said on behalf of the Renova parties:

(1) *The conduct of Mr. Kuznetsov*

There is no basis on which the Gilbertson parties can advance a submission that, if Mr. Gilbertson was in breach of his fiduciary duties to the company, so also was Mr. Kuznetsov. The allegation that Mr. Kuznetsov was in breach of his fiduciary duties to the company was pleaded in these proceedings in the context of a counterclaim for contribution against Mr. Kuznetsov, but the counterclaim was not pursued and it was abandoned before closing submissions (as the judge recorded, 2012 (2) CILR 416, at para. 103). The allegation cannot be revived in this court.

(5) *The Renova parties' pursuit of their own interests without regard to any interests of the master fund, and, in particular, their appropriation of the shares acquired in connection with Project Charlie*

(i) Even if Mr. Vekselberg's insistence that—if he were funding the purchase—the Fabergé rights were to be held in Lamesa Arts Inc. represented a departure from the original structure contemplated, that was acceptable to Mr. Gilbertson in principle subject to the negotiation of terms to be set out in an agreed implementation agreement reflecting Pallinghurst principles "modified for Project Egg." The negotiation of terms was proceeding towards a mutually acceptable conclusion when Mr. Gilbertson decided, unilaterally, to bring negotiations to an end by depriving the master fund of its 100% ownership of PEL and to secure the Fabergé rights for himself and his consortium. The process of negotiating mutually acceptable terms upon which Mr. Vekselberg would fund the purchase of the Fabergé rights cannot be treated as justifying Mr. Gilbertson's breach of duty, in unilaterally preferring his own interests to those of the master fund.

(ii) The complaint as to Mr. Vekselberg's retention of the profits of Project Charlie is of no substance. The point "barely feature[d]" at the trial; it was not pleaded as a point which should lead to the refusal to grant relief in this case; and Autumn simply purported to reserve the right of the Fairbairn Trust to bring a derivative claim.

(6) *The conduct of the Renova parties . . . in destroying relevant documents*

The complaint that the judge erred in failing to refuse relief—on *Nurcombe* grounds—on the basis of his criticism of Renova's conduct in relation to discovery is not well founded, in that the judge had already refused to strike out the action on the grounds of Renova's failure to give discovery; holding (at paras. 59–62 of his ruling of August 5th, 2011, reported at 2011 (2) CILR 148) that—notwithstanding that failure—it remained possible to have a fair trial in which, if and so far as necessary, inferences adverse to Renova could be drawn from the absence of documents.

And, in response to the allegation that the judge failed to make findings in relation to the two other matters to which I have referred in the preceding paragraph, it is said:

*Attempt at intimidation*

There is no substance in the complaint as to the "friendly advice": the judge was entitled to have regard to Mr. Kuznetsov's evidence, in which he rejected the suggestion that he had threatened Mr. Gilbertson with reprisals if he did not submit to Mr. Vekselberg's demands. But, in any event, as the judge found, Mr. Gilbertson was tough and exacting and perfectly capable of standing up for himself. There is no basis upon which this court can properly reject that finding by a judge who, having seen Mr. Gilbertson and Mr. Vekselberg in the witness box, was entitled to make that assessment.

*Mr. Vekselberg's conduct in relation to SUAL. The attempt by the Renova parties to intimidate Mr. Gilbertson*

The complaint is "no more than an attempt to paint Mr. Vekselberg as a bully who got no more than he deserved."

144    In my judgment, none of the matters upon which the Gilbertson parties rely in support of their challenge to the judge's conclusion would have given rise to an equitable defence on which the Gilbertson parties would have succeeded if the action had been brought by Renova in its own right. I am satisfied that the judge was correct to take the view that there was no reason, under this head, to refuse Renova the equitable relief which it sought in this derivative action. In rejecting the submissions

which have been advanced on behalf of the Gilbertson parties, I have had regard to the position as it was at the time when the conduct which has led to the conclusion that Mr. Gilbertson acted in breach of fiduciary duty took place and, in particular, to the following factors:

(1) The conclusion that Mr. Gilbertson acted in breach of fiduciary duty is founded on his conduct in causing or procuring the issue by PEL of 100 new shares. Whether or not those shares were issued on January 3rd, 2007 as the judge found (correctly in my view) or some two and a half weeks later (as the Gilbertson parties contend), there is no doubt that they were issued pursuant to the decision taken by Mr. Gilbertson on January 2nd or 3rd, 2007 that he would secure the Fabergé rights for himself (or for the benefit of his consortium) by divesting the master fund of its ownership and control of PEL.

(2) At the time when Mr. Gilbertson took that decision, PEL was the contracting purchaser of the Fabergé rights. The terms of the SPA required payment of the purchase price (US$38m.) to be made on January 3rd, 2007. But time was not of the essence, and there was evidence to suggest that, if payment were not made on January 3rd, 2007, Unilever would not have treated the SPA as having determined forthwith (even if it would have been entitled to do so as a matter of law).

(3) Mr. Gilbertson had caused PEL to enter into the SPA on December 22nd, 2006 in circumstances when (as he knew) neither PEL nor the master fund (which, it appears, was the intended guarantor) had—or had obtained an unconditional commitment from Mr. Vekselberg (or from anyone else) in respect of—the US$38m. which would be needed to complete the purchase on January 3rd, 2007.

(4) The position immediately before PEL entered into the SPA (agreed on December 21st, 2006 between Mr. Gilbertson and Mr. Vekselberg) was that Mr. Vekselberg would provide the funds to complete the purchase provided that title to the Fabergé brand was transferred to a Lamesa company. That was acceptable to Mr. Gilbertson, provided that terms (in the form of an implementation agreement) could be agreed which would provide for the master fund (or some other entity within the Pallinghurst structure) to benefit from the promotion, management and exploitation of the Fabergé rights.

(5) That remained the position from December 21st, 2006 until January 3rd, 2007. In particular, it remained the position at the time when Mr. Gilbertson took the decision to cause or procure PEL to issue the 100 new shares. At the time when that decision was taken, negotiations as to the terms of the intended implementation agreement were continuing, and Mr. Vekselberg was not in breach of any agreement or understanding in relation to the provision of the funds required for the completion of the purchase by PEL of the Fabergé rights.

In those circumstances, as it seems to me, none of the matters relied upon by the Gilbertson parties in support of their challenge under this head—that is to say, the conduct of Mr. Kuznetsov, the "crisis" caused by the Renova parties, the terms that the Renova parties sought to impose in the draft implementation agreements, the attempts of the Renova parties to procure Mr. Gilbertson's agreement to the proposal that the Fabergé rights should be owned outside the Pallinghurst structure, the Renova parties' pursuit of their own interests and their appropriation of the shares acquired in connection with Project Charlie, the conduct of the Renova parties in destroying relevant documents, the attempt by the Renova parties to intimidate Mr. Gilbertson and Mr. Vekselberg's conduct in relation to SUAL—would have provided equitable defences to the claim against Mr. Gilbertson in respect of his breach of fiduciary duty. Put shortly, none of those matters, even if made out on the facts, would have led to the conclusion that it was inequitable for Renova to pursue that claim, had it been able to do so in its own right.

145   In reaching that conclusion I have not overlooked the detailed and extensive submissions advanced on behalf of the Gilbertson parties in support of their contention that the judge erred in failing to hold that the destruction of documents by the Renova parties was a matter which led to the conclusion that it was not in the interests of justice that Renova be permitted to pursue a derivative action. In addition to the submissions to which I have already referred, it was said that he did not consider whether it was right that the Gilbertson parties were obliged to speculate as to what the documents that had been destroyed would show, and he did not consider whether it was right for the court to grant derivative relief on the basis of equity to a claimant who was in culpable disregard of its rules in such a manner. Rather, it is submitted, the judge appears to have taken the view that it was sufficient for him to consider the destruction of documents in the context of the specific findings that he needed to make. But, as it seems to me, those submissions overlook, first, the judge's earlier ruling (not challenged on appeal) that a fair trial of a derivative action was possible notwithstanding that (as he had found) there had been serious failures of document preservation and, secondly, that there was no sensible basis to dismiss the action, after a trial which was not, in the event, unfair on the ground that (by reason of those failures) Renova was not a proper derivative claimant. It is important to have in mind that, in referring to his earlier ruling (2012 (2) CILR 416, at para. 68), the judge said this:

"As I have already mentioned . . . during the course of this action there have been several contested applications concerning discovery and the destruction of certain back-up tapes, which may have contained relevant emails and other documents, by the Renova parties following a computer crash at their administrative offices in Zurich. In that respect I have made it clear more than once that as a

result, if appropriate and justified, the court could draw inferences against the Renova parties at the trial in light of their destruction of potentially discoverable documents. However . . . apart from the question of the alleged motivation of the plaintiff in bringing the present claim, which was not clearly put to the Renova parties' witnesses, I was not invited to draw any specific inferences"

If Renova were otherwise a proper person to bring the action on behalf of the company (or, more generally, the master fund and other entities in the Pallinghurst structure), its failure to comply with its discovery obligations might expose it to the court's procedural sanctions, including striking out. But, where the judge—properly, and upon authority—had refused to strike out the action because he considered that a fair trial was possible and was not persuaded that the trial that he had subsequently conducted was unfair, he was correct to recognize that the past failures in relation to discovery provided no ground upon which the action should be dismissed. In particular, he was correct to recognize that the principle underlying the decision in *Nurcombe* v. *Nurcombe* (28) did not lead to a different conclusion in a derivative action.

146   For the reasons which I have set out in this section of my judgment, I am satisfied that the judge was correct to hold that the conduct of the Renova parties was not such as to disentitle Renova from equitable relief in this action on *Nurcombe* grounds.

**Was the judge wrong to value at nil the loss which Mr. Gilbertson was liable to make good to the master fund by way of equitable compensation?**

147   In its amended statement of claim, Renova sought an account of the profits received by Mr. Gilbertson as a result of his acquisition of the Fabergé rights in breach of fiduciary duty or, in the alternative, payment to the company (and/or to GPLP and/or to the master fund) of equitable compensation for the loss of those rights. During the course of the trial Renova abandoned its claim for an account of profits and so elected to pursue its claim against Mr. Gilbertson for equitable compensation.

148   The judge explained (2012 (2) CILR 416, at para. 115) that equitable compensation in respect of loss caused by breach of fiduciary duty was to be assessed as the monetary amount required to put a plaintiff back into the position in which he would have been at the time of the trial if he had not sustained that loss. Renova's claim, he said, was for compensation in the amount required to reconstitute the master fund to the position in which it would have been at the date of judgment but for Mr. Gilbertson's breach of fiduciary duty: it was not a claim for compensation in the amount required to put the master fund into the position in which it would have been (but for Mr. Gilbertson's breach of duty in January 2007)

at the time of that breach. The court's task was to determine the monetary value of the loss suffered by the Pallinghurst structure as a result of the diversion from the master fund of the economic benefit of development, exploitation and management of the Fabergé rights. He recorded that the trial proceeded on that basis.

149   The Renova parties contended at trial that the value of the economic benefit of development, exploitation and management of the Fabergé rights was to be treated as equal to the value of full ownership of those rights, and that, accordingly, the equitable compensation payable by Mr. Gilbertson was to be assessed at an amount equal to the whole monetary value of Fabergé Ltd. (formerly PEL)—the sole asset of which was the Fabergé rights—as at the date of assessment. On that basis, Renova initially sought payment to the master fund of US$177m. by way of equitable compensation, that being the value attributed to Fabergé Ltd. as at January 31st, 2012 in the report of Ms. Elizabeth Gutteridge, a partner of Deloitte LLP, London, on whose expert opinion Renova invited the judge to rely.

150   The Gilbertson parties did not accept the value (US$177m.) attributed to Fabergé Ltd. in Ms. Gutteridge's report. They contended that the value to be attributed to Fabergé Ltd. as at February 10th, 2012 was no more than US$120m., a figure based on the first report of Mr. Christopher Osborne, a senior managing director (in the London office) of FTI Consulting Ltd., but which Mr. Osborne himself regarded as "potentially high." As between the figure in Ms. Gutteridge's report (US$177m.) and that in Mr. Osborne's first report (US$120m.), the judge preferred the latter. He said this (2012 (2) CILR 416, at para. 133):

> "While Mr. Osborne accepted that under the DCF valuation method a wide range in value will result from only small changes in assumptions made, I nonetheless found his approach and analysis more persuasive overall in the circumstances than Ms. Gutteridge's. While the valuation of Fabergé Ltd. is clearly a matter of opinion and not of absolute certainty, having regard to all of the factors identified in their reports, including their report of their meeting on May 1st, 2012, which I directed, together with their oral evidence and also that of Mr. Gilbertson and Sean Gilbertson, I found the opinion of value by Mr. Osborne more plausible and probable. I therefore prefer his opinion that the current value of Fabergé Ltd. is not more than US$120m. and possibly significantly less for these purposes."

151   Nevertheless, that conclusion did not lead the judge to assess equitable compensation at an amount equal to the then current value (US$120m.) attributed to Fabergé Ltd. in Mr. Osborne's first report. As the judge explained (*ibid.*, at para. 134), it had been contended on behalf of the Renova parties that, prior to January 3rd, 2007, Mr. Gilbertson had

agreed that, while the actual title to the Fabergé brand itself would be owned by one of Mr. Vekselberg's private companies within the Lamesa group, the full economic benefit of the Fabergé rights—that is to say, the commercial benefit of developing, exploiting and managing the Fabergé business—would remain with the master fund within the Pallinghurst structure. In those circumstances, the judge thought it necessary to ask whether the value of what (absent the change in the ownership of Fabergé Ltd. resulting from Mr. Gilbertson's breach of fiduciary duty) would have accrued to the master fund was properly to be equated with the full ownership of the Fabergé rights; that is to say, to ask whether, in assessing equitable compensation, it was appropriate to apply some discount to the current value of Fabergé Ltd. (as, in the events which happened, the full owner of the brand and the rights) to reflect the separation of the right to develop, exploit and manage the rights from the ownership of the brand which (absent Mr. Gilbertson's breach of duty) was in contemplation. After setting out the arguments advanced on behalf of the parties, the judge concluded (*ibid.*, at para. 141) that—

> "It does appear improbable that any potential purchaser would pay the same amount for a business, the principal income producing asset of which does not actually belong to it and which has a limited life span, as it would pay for a business that actually owns the principal asset and does not have such a limited period of likely profitability. Mr. Osborne's opinion on this aspect of the matter, and as I have said, his evidence on this was not really challenged in cross-examination, was that it is most unlikely that an investor would value a company owning only the full economic benefit of the rights at more than half the value such a potential purchaser would be likely to pay if the business had owned the income-producing asset as well as the right to develop, exploit and manage it. I found that opinion plausible and persuasive. It follows that if, as I have accepted, the current value of Fabergé Ltd. when it does own the entire rights is no more and possibly less than US$120m., the value of the company if it owned only the economic benefit of the rights but not the brand itself would be only approximately US$60m. or possibly less. Having regard to the amount already invested in the company and its business, which the experts both agreed was US$140m. in total, the position is that more has been invested in the company than it may be worth. That of course ignores the further investment which the company obviously requires and has recently been seeking."

152   That, as the judge said, was the first of two issues of principle as to the methodology applicable to the assessment of equitable compensation. He identified the second of those issues (*ibid.*, at para. 142): "whether, in the circumstances, the master fund would in fact anyway have actually obtained the full economic benefit of the rights but for Mr. Gilbertson's

breach of fiduciary duty . . .” In order to answer that question, he said, it was necessary to consider what (on the balance of probability) the position would have been if Mr. Gilbertson had not acquired the Fabergé rights for his consortium (as, in the event, happened), but had continued to negotiate to final agreement with the Renova parties as, until January 2nd, 2007, he had been doing (at least purportedly). After examining the evidence (*ibid.*, at paras. 143–148), the judge concluded (*ibid.*, at paras. 146–148) that “but for the actions of Mr. Gilbertson in late December 2006 and January 2007 the master fund would most probably have had the economic benefit of developing and exploiting the Fabergé brand and the management thereof on the terms of the fourth draft IA or very similar terms,” and that, “accordingly the amount, if any, appropriate to reconstitute the master fund and to put it in the position in which it would now have been would be the present financial value of that.”

153   The judge explained (*ibid.*, at paras. 148–150) that, although the Renova parties had (in opening their claim at trial) sought payment of equitable compensation in an amount equal to the full value of Fabergé Ltd. (which they had put at US$177m.), they did not maintain that position in their closing submissions. Rather, he said, Renova produced a spreadsheet with its closing submissions in which the calculations of the equitable compensation claimed was shown at US$82.38m. That calculation was based on Ms. Gutteridge’s valuation of Fabergé Ltd. at US$177m. but after (i) making allowance for sums invested in Fabergé Ltd. since acquisition—an amount which the two experts agreed at US$140m.—and (ii) adding various other sums, including the US$38m. paid on the acquisition of the Fabergé rights. The judge rejected the claim in that revised amount. He said this (*ibid.*, at paras. 149–150):

“However, I have found the current value of Fabergé Ltd. to be no more than US$120m. and Mr. Osborne has explained why in his opinion that figure is probably too high and that the value may be as low as US$56m., which I also accept. Furthermore, the plaintiff’s calculations are obviously based also on their contention that the present value to the master fund would not be affected by the fact that the master fund would not own the income-producing asset, the Fabergé brand, itself, but solely the economic benefits and management of it with which I have disagreed. Nor has the plaintiff’s calculation taken account of the fact that the master fund would only be entitled to such economic benefits pursuant to a licence from the owner of the income producing asset and on terms the same or very similar to those in the fourth draft IA as I have determined would probably be the case.

150   Mr. Osborne’s opinion which, as I have said, I accepted, was that the consequence of only owning the economic benefit would be to reduce the value of the rights (or of Fabergé Ltd.) by half, namely

to US$60m. on his valuation figure. Although no figure was put forward in relation to the consequence of the qualifications to the economic benefit implicit in the licence arrangement and likely other terms, it is in my opinion probable that even if that did not warrant a further specific reduction in value, it would undoubtedly go to substantiate Mr. Osborne's US$60m. assessment. Also, having regard to the fact that Fabergé Ltd. has been a loss-making business from the start and still is at present and clearly requires significant further investment it seems to me that the submission on behalf of the Gilbertson parties that the master fund has in reality sustained no significant economic loss is correct."

In those circumstances, the judge concluded that, but for Mr. Gilbertson's breach of fiduciary duty, the master fund would have been in a significantly negative financial position as at the date of trial; that it would be of no benefit to the master fund to put it into the financial position in which it would have been at the date of the judgment but for Mr. Gilbertson's breach of fiduciary duty; and that, accordingly, no equitable compensation was payable.

### The parties' submissions on the cross-appeal

154   The Renova parties cross-appeal (Appeal No. 22 of 2012) from so much of the order of November 6th, 2012 as dismissed the claim for equitable compensation. As I have said, it is submitted (in support of that cross-appeal) that the judge erred in law and/or in principle and/or misdirected himself as to the evidence in valuing at nil the loss which Mr. Gilbertson was liable to make good to the master fund. More particularly, it is submitted (i) that the judge was wrong to conclude that the value of Fabergé Ltd. at the date of trial was US$120m., or less, rather than (as Renova had contended) US$177m.; (ii) that the judge was wrong to apply a discount of 50% to the value (US$120m.) which he had placed on Fabergé Ltd. in order to reflect his (incorrect) finding that (had Mr. Gilbertson not acted in breach of fiduciary duty) the master fund would not have become the owner of the Fabergé rights but would have been entitled only to develop, exploit and manage those rights (through OpCo) under licence for a limited period; and (iii) that the judge was wrong in treating US$38m. (the price paid on acquisition of those rights) as a cost that would have been paid by the master fund—given that, had Mr. Gilbertson not acted in breach of fiduciary duty, the acquisition price would have been paid by Lamesa Arts Inc. and not by the master fund—in calculating the total figure to be discounted (if, which is denied, any discount were appropriate).

155   In response to those submissions it is said on behalf of the Gilbertson parties that the judge's approach—and the conclusions which he reached—were correct. It is pointed out that neither the judge's

approach—to assess the value of Fabergé Ltd. (PEL) as at the date of the trial and, having made a finding as to that value, to consider the extent to which it should be discounted—nor the performance figures for the business carried on by Fabergé Ltd. following the acquisition of the Fabergé rights were in dispute. Having described the steps which led the judge to the conclusion which he reached—in substantially the same terms as those in which I have analysed the judge's reasoning but emphasizing, in particular, that the judge's finding that the parties would have concluded their negotiations with an agreement along the lines of the fourth draft IA, excluding cl. 2(e), was consistent with Renova's pleaded case—the Gilbertson parties addressed those submissions under four main heads: (i) assessing the value of Fabergé Ltd.; (ii) the discount that should be applied to reflect the judge's finding that the master fund would not have become the owner of the Fabergé rights; (iii) the allocation of the discount; and (iv) the proper treatment of the acquisition price.

156   For convenience, I will address the submissions advanced on behalf of the parties under the three heads adopted on behalf of the Renova parties—to which I will refer, respectively, as "the undiscounted value point," "the discount point," and "the acquisition and development cost point." Under the third of those heads—the acquisition and development cost point—I will address the questions how (if at all) the development costs and the acquisition price should be taken into account (heads (iii) and (iv) of the analysis adopted on behalf of the Gilbertson parties).

***The undiscounted value point***

157   In developing the first of those submissions—that the judge was wrong to conclude that the value of Fabergé Ltd. at the date of trial was US$120m., or less, rather than (as Renova had contended) US$177m.—it is said on behalf of Renova that:

   (1) The judge was wrong to accept the opinion of Mr. Osborne that a DCF methodology was the most appropriate valuation methodology in preference to the opinion of Ms. Gutteridge that a subject company transaction methodology was the most appropriate. The judge ought to have preferred the opinion of Ms. Gutteridge, in that: (i) the subject company transaction basis of valuation of Fabergé Ltd. had been used by the board of that company and by the board and auditors of Pallinghurst Resources Ltd. (which, at the relevant time, held 49% of the shares in Fabergé Ltd.) in their most recent available reports and accounts, expressly in preference to a DCF valuation; (ii) Mr. Osborne had selected the DCF valuation methodology in an unfair and imbalanced way, without conducting a rational and transparent comparison of the available methodologies (as Ms. Gutteridge had done) and without explaining the reasons for his choice of DCF methodology (other than by *a posteriori* reasoning in reliance on the result of that choice); (iii) Mr. Osborne had rejected

Ms. Gutteridge's subject company valuation methodology on the flawed and illogical basis that the results were not compatible with the results of his own chosen DCF methodology; (iv) Mr. Osborne had failed to adopt the approach (which, as was common ground, was consistent with International Financial Reporting Standards) that DCF valuations should be used with caution when valuing unlisted investments, that another methodology (such as a subject company transaction valuation) should be used as a guide to value, and that the result of a DCF approach should be cross-checked against the results of another approach; (v) Mr. Osborne's own evidence was that it is "uniquely difficult" to apply a DCF valuation methodology to a start-up company (such as Fabergé Ltd.) with a limited track record of past performance; (vi) at the time that the trial began (and, if relevant, at all times thereafter), the board of Fabergé Ltd. and the auditors and the board of Pallinghurst Resources Ltd. (of which Mr. Gilbertson himself was chairman) considered that a value of US$88.06 per share (that is to say, US$177m. in aggregate) remained the most appropriate value for Fabergé Ltd. and that Mr. Osborne did not criticize their approach as unreasonable; and (vii) Mr. Osborne's DCF valuation was based on a financial forecast that was, as the Gilbertson parties accepted in their oral evidence, no more than a "back of the envelope calculation" done for a different purpose.

(2) The judge was wrong in failing to take any or any adequate account of the manifest failings of Mr. Osborne as an independent expert witness; in that, in particular, (i) he showed an imbalanced and one-sided approach to his work; and (ii) he did not show all of his workings in a clear and transparent manner.

(3) The judge was wrong in failing to fix the date for valuation of Fabergé Ltd. as the first day of the trial (as he ought to have done) but admitted and gave weight to evidence (which, as a matter of law, he should have ignored) of events purportedly affecting the value of Fabergé Ltd. that had occurred during the trial: that is to say, (i) the failure of the share offer by Fabergé Ltd. to existing shareholders at US$79.50 per share; and (ii) the subsequent offer at US$50 per share ("the April 2012 offers").

(4) Notwithstanding that he had held (correctly; see 2012 (2) CILR 416, at para. 128) that the April 2012 offers were "not of the same evidential value as a share acquisition by an independent non-shareholder investor," the judge was wrong to give that evidence weight equal to or greater than the evidence that underpinned the valuation of Fabergé Ltd. by Ms. Gutteridge, the boards of Fabergé Ltd. and Pallinghurst Resources Ltd. and the auditors of Pallinghurst Resources Ltd., at US$88.06 per share on a subject company transaction basis (which was based on a share acquisition by an independent non-shareholder investor) and, further, was wrong then to rely on the evidence of the April 2012 offers (the prices of which

offers were not market tested but offered only to the 19 existing shareholders) when preferring Mr. Osborne's valuation to that of Ms. Gutteridge notwithstanding that both Mr. Osborne and Ms. Gutteridge agreed that the factors which would affect the decision of an existing shareholder whether or not to buy at a particular price are necessarily different from the factors which govern the decision of an independent non-shareholder.

158   The Gilbertson parties prefaced their submissions in support of the judge's assessment of the value of Fabergé Ltd. by explaining why—as they submitted—the judge was correct to prefer the evidence of Mr. Osborne to that of Ms. Gutteridge. They pointed out that (2012 (2) CILR 416, at para. 131) the judge had observed that he found Ms. Gutteridge "somewhat inflexible and dogmatic in her insistence that the value of [Fabergé Ltd.] should be determined by reference to the single small share transaction in September 2009" and in her unwillingness "to consider any adjustment to her [US$177m.] in light of the factors identified by [Mr. Osborne] . . ." He might also, it is said, have mentioned: (i) the weight which she gave in her oral evidence to "the wholly exceptional sales multiple" at which Hermes' shares trade (on which she relied to support her valuation, notwithstanding the obvious difference between a struggling start up and one of the most established and successful luxury goods brands ever); (ii) her refusal to acknowledge the importance of sales to a business trying to take off; and (iii) her unwillingness to acknowledge "the obvious fact" that a potential new investor would be concerned if asked to pay a higher price for the shares than that at which the existing investors had been prepared to take them. By contrast, they pointed out, the judge had said (*ibid.*, at para. 133) that he found Mr. Osborne's approach and analysis more persuasive overall in the circumstances than that of Ms. Gutteridge, and that the judge had noted (*ibid.*, at para. 125) that Mr. Osborne was not cross-examined to any significant extent on the substance or detail of his valuation or on how and why he had reached the conclusions that he did.

159   After explaining why (it was said) the judge was right to prefer the evidence of Mr. Osborne to that of Ms. Gutteridge, the Gilbertson parties addressed two issues under this head: (i) whether the judge was correct to take the date for assessment of equitable compensation as at the date of the judgment (rather than as at the commencement of the trial) and so take into account the attempts by Fabergé Ltd. to raise funding in April 2012; and (ii) whether the judge was correct to accept Mr. Osborne's valuation of that company, made on the basis of DCF methodology, and to reject the related party valuations made by the boards of both Fabergé Ltd. and its principal shareholder, Pallinghurst Resources Ltd. and by the auditors of Pallinghurst Resources Ltd.

160   In addressing the first of those two issues, it is pointed out on behalf of the Gilbertson parties that Renova itself had submitted (at para. 115(b) of its written opening submissions at trial) that equitable compensation was to be assessed as at the date of judgment (and had relied upon observations in *Target Hldgs. Ltd.* v. *Redferns* (35) ([1996] A.C. at 434, 437, 440) and in *Snell's Principles of Equity* at para. 40–016 in support of that submission), had not opposed the introduction of evidence in relation to the take up of the then pending share offer and had cross-examined Mr. Gilbertson, Mr. Sean Gilbertson and Mr. Osborne on that evidence.

161   In addressing the second of those issues, it was pointed out on behalf of the Gilbertson parties that the judge was presented with two materially different approaches to the valuation exercise: (i) that adopted by Mr. Osborne—described as "a DCF analysis based on the fundamentals of the business"—which, for the reasons that he described in his oral evidence, led him to conclude that the value of Fabergé Ltd. at the relevant date could not exceed US$120m.—and (ii) that adopted by Ms. Gutteridge which—for the reasons which she described, shortly, in her oral evidence—led her to dismiss the DCF analysis as an appropriate methodology in this case and to conclude (on the basis of valuations made by others, described as "related party valuations" or a "subject company analysis") that the value was US$177m. It is submitted that, although Renova had contended that—

> "it would take a serious and fundamental error of approach on the part of the boards of Fabergé Ltd. and PRL and their auditors to justify the Judge's departure from the approach and result used by Fabergé Limited, PRL and their auditors"—

it had cited no authority (nor referred to any academic writing) in support of that proposition; Ms. Gutteridge had not adopted it in her own evidence, in the course of which she had said this:

> "I was forming a view of my own and looking around at the available material to allow me to form that type of view. And when one is aware that other informed people have expressed a view, and that that view has been tested, I considered it reasonable that that was further affirmation and confirmation of my view."

Renova had not put its case so high at the trial, and, in principle, the proposition cannot be correct (given that, although the directors of a company or its principal shareholder may well possess information concerning the company that puts them in a better position than others to value it, they may well have an interest in the outcome). Further, it is said that, as the judge observed (2012 (2) CILR 416, at para. 130), the directors

and auditors were "not carrying out quite the same exercise for the same purpose as the court is required to do": in that the judge was required to determine the value of Fabergé Ltd. on the balance of probability on the basis of the evidence before him, whereas the directors of Fabergé Ltd. and Pallinghurst Resources Ltd. "were required to reiterate the valuation that they had previously placed on the company, unless they considered there was conclusive contradictory evidence to either increase or decrease the value" and the auditors' task was to consider and comment on the reasonableness of the valuations made by the directors. The Gilbertson parties draw attention to Mr. Osborne's evidence that the most recent transaction on which Ms. Gutteridge could base her assessment of value was the issue of shares to the value of US$100,000 to a prospective director of PEL in 2009. They rely on the view expressed at para. 4.2 of his second report, that—

> "in adopting that approach, Ms Gutteridge ought in my opinion to have given greater consideration to two questions in particular than it appears that she has. The first of those is whether any new information since September 2009 argues for a revision to the valuation; and the second is whether the valuation remains plausible, having regard to the current forward projections"—

and, on his answer—rejecting the suggestion that "a fair and open minded valuer of Fabergé Limited, valuing as at today, would take into account the conclusions of the Board and of the auditors of PRL," that—

> "The guidelines require an independent valuer to be concerned about the extent to which the 2009 capital raising continues to be of relevance … And the directors have concluded, I think it's fair to say, cautiously that it does. And my own conclusion is that it does not. And I think that's a conclusion that I'm entitled to reach; and it's the conclusion that I have reached."

In reaching that conclusion, Mr. Osborne had expressed the view (at para. 4.6 of his second report) that "the 2009 transaction price on which the recent company valuations are based is, in practice, of diminishing relevance to a current valuation of Fabergé Limited" and, in his oral evidence that "the relevance of the 2009 transaction price has diminished to the point where it cannot be used as the primary valuation approach" and, further, that "there are no plausible assumptions that could be applied to current forward projections in a Discounted Cash Flow sense that would give rise to a valuation of USD 177 million." It is said that the weight to be put on related person valuations in the circumstances of the case was a matter for expert evidence. Both experts addressed the question, and "the judge was entitled and required to form his own view in the light of that evidence."

254

162   I reject the submission, advanced on behalf of Renova, that the judge erred in principle in failing to fix the date for valuation of Fabergé Ltd. as the first day of the trial. In my view, in reaching his conclusion the judge was entitled (for the reasons advanced on behalf of the Gilbertson parties) to have regard to the April 2012 offers. The assessment of the undiscounted value of Fabergé Ltd. was essentially a matter for the judge to determine on the evidence before him at the trial. In carrying out that task, the judge had to evaluate the opinion evidence of the two expert witnesses, Ms. Gutteridge and Mr. Osborne. For the reasons that he gave, the judge preferred the evidence of Mr. Osborne. In challenging the judge's determination of the undiscounted value of Fabergé Ltd., Renova seeks to persuade this court to take a different view. An appellate court must recognize that where (as in this case) the expert witnesses have given oral evidence at trial, it should be cautious before rejecting the trial judge's evaluation of that evidence, unless satisfied that he failed to take advantage of seeing and hearing the evidence tested under cross-examination. In my view there is nothing to suggest that the judge failed to do so. I reject Renova's challenge to the judge's determination that the undiscounted value of Fabergé Ltd. as at the date of trial was not more, and possibly significantly less, than US$120m.

### The discount point

163   In developing the second of those submissions—that the judge was wrong to apply a discount of 50% to the value (US$120m.) which he had placed on Fabergé Ltd. (rather than, as Renova had contended, no discount or a nominal discount) in order to reflect his (incorrect) finding that, had Mr. Gilbertson not acted in breach of fiduciary duty, the master fund would not have become the owner of the Fabergé rights but would have been entitled only to develop, exploit and manage those rights under licence for a limited period—it is said on behalf of the Renova parties that the judge erred in law and/or misdirected himself as to the evidence in that: (i) he failed to pay sufficient regard to his earlier finding that the parties intended and agreed that the master fund would end up with the full economic benefit of the Fabergé rights, and not only with a portion of that economic benefit; (ii) he ought to have assumed that, had Mr. Gilbertson acted fairly and honestly and in the best interests of the master fund (and but for his breach of fiduciary duty), the parties would have arrived at a legally binding agreement which enshrined that intention and understanding; (iii) he wrongly assumed, as the basis for his conclusion that the master fund would not have obtained the full economic benefit of those rights, that (contrary to his own earlier findings) the detailed terms of the fourth draft IA would have reflected the final terms on which the master fund would have enjoyed the Fabergé rights; (iv) he ought to have proceeded on the basis that, had Mr. Gilbertson not acted in breach of his fiduciary duty, the fourth draft IA would not have

represented the final agreed terms on which the master fund was to enjoy the economic benefit of the Fabergé rights, but rather (a) that Mr. Gilbertson would, consistently with his fiduciary duties to the Pallinghurst structure (which was the relevant assumption on which the judge was proceeding), have insisted that the terms were those contained in Mr. Sean Gilbertson's amended third draft IA (in that those most closely reflected the basic agreement that the full economic benefit would be enjoyed by the master fund), and/or (b) that the parties would have concluded their discussions with an agreement which gave the master fund the full economic value of the Fabergé rights (or, at the least, allowed for that possibility when assessing the probable terms on which the Fabergé rights would have been held by the master fund); (v) he failed to pay any attention to the fact that it was entirely possible to have a licence arrangement or split between "Brandco" and "Opco" that left the full economic benefit of the Fabergé rights with Opco (that is to say, with the master fund), and that this would have been the likely outcome had Mr. Gilbertson not breached his fiduciary duty; and, in any event (vi) he failed to pay any or any adequate attention to the unchallenged view of Ms. Gutteridge (as expressed in section 5 of her second report) that cl. 8 of the fourth draft IA, on its true construction, would not have created a risk such as to justify any or any significant discount to the value of Opco (even if the fourth draft IA had represented the final terms of the agreement on which the master fund would have enjoyed the Fabergé rights), given that there was no basis for the judge's implicit rejection of Ms. Gutteridge's opinion on that point in the absence of any finding by the judge that cl. 8 was ambiguous (which, it is said for the avoidance of doubt, it was not).

164   In response to those submissions, the Gilbertson parties point out that Mr. Osborne's evidence—which, they say, was not challenged, in that Ms. Gutteridge provided no comparable figure because she was instructed not to consider the issue—was that the appropriate discount to be applied to the assessed value of Fabergé Ltd. in order to reflect the difference between ownership of the Fabergé rights and a terminable licence was 50% or thereabouts. Further, it is said that the Fabergé business had been loss making in each year since acquisition; so that if the licence had been granted at the beginning of 2007, the first 5 years of the contemplated 10-year term would have been loss making and the expectation was that it would continue to make losses for another 3 years. In those circumstances the Renova parties had not, at trial, pressed an argument that there should be no discount, and the argument advanced on their behalf on the appeal—that, as the parties intended the master fund to enjoy the economic benefit of the Fabergé rights, the court should value the master fund on the basis that it owned those rights, since any difference between its value with and without the rights would be contrary to what the parties intended should happen—should be rejected as "sophistry,"

being, it is said, contrary to the Renova parties' pleaded case, contrary to the terms that the parties were actually negotiating and based on the (false) assumption that there was any concluded agreement or understanding between the parties.

165   It is submitted on behalf of the Gilbertson parties that, in the absence of any concluded agreement or understanding between Mr. Gilbertson and Mr. Vekselberg as to the terms on which the master fund would have been entitled to enjoy the economic benefit of the Fabergé rights, the judge had to consider (as he did, 2012 (2) CILR 416, at paras. 153–145) what would have been the likely outcome of the negotiations had they continued. He did so on the basis of implicit assumptions which (it is said) were favourable to the Renova parties, in that (i) he assumed that, although—given Mr. Gilbertson's right to veto the proposed project—it was "far from clear" that the project that was in negotiation would have gone ahead, Mr. Gilbertson would negotiate on the basis that he would choose to close a deal for the benefit of the master fund; (ii) he found (*ibid.*, at paras. 146–148), in favour of the Renova parties, that Lamesa (BrandCo) would have not have pressed for the inclusion of cl. 2(e) in the fourth draft IA and that the parties would have closed a deal in the same or similar terms to the fourth draft IA without cl. 2(e) (notwithstanding Renova's pleaded case that the terms of the fourth draft IA (including cl. 2(e)) were reasonable and that the subsequent implementation agreements discussed between the parties would have excluded the master fund entirely); (iii) he assumed that Lamesa or Renova would have provided the necessary funding to enable the business to carry on without external participation in the form of an investment in the master fund (which would have had the likely effect that the interests of the company and GPLP in the master fund would have become nominal and that the constitution of the master fund would itself change); and (iv) he assumed that Lamesa would have left the project with the master fund and continued to fund it, notwithstanding that it was loss making (an assumption which—given the breakdown in confidence between the Renova parties and the Gilbertson parties that had already taken place, the unwillingness of either side to cede control of the venture to the other and the need (to which it would give rise) for them to agree at every stage if the master fund were to continue to function— might well be considered highly optimistic). Further, it is said that:

(1) Given that the Renova parties were in a position to veto further investments by the master fund, they were in a position to bring the fund to a close whenever they chose. Accordingly, if the project had started to generate profits, the Renova parties would have been able to choose whether profits should (in the future) be applied for the benefit of

the Gilbertson parties or be allocated between Lamesa and Renova as Mr. Vekselberg thought fit.

(2) The Renova parties had contended, at trial, that the Lamesa project should be valued by reference to the value of Fabergé Ltd., and the judge adopted that approach. The argument that the judge was wrong to have regard to the terms of the draft IAs is now advanced on behalf of the Renova parties only because they now recognize that the terms that were actually in the course of negotiation would not have given the master fund the "full economic benefit of the Rights."

(3) Both the ownership of rights themselves and the ownership of a licence to exploit those rights are assets: a discount is appropriate to reflect the difference between the value of ownership of the assets themselves and the value of a business based upon the exploitation of those assets under licence. The application of a discount to the value of the assets in themselves is a tool to measure the gross value of the business as carried on by a rights-licensee; it is not concerned with measuring any investment that he may have made in connection with that business, whether wisely or unwisely. In explaining why a discount was appropriate in principle, Mr. Osborne had said this (at para. 3.15 of his first report):

"The level of discount applicable to OpCo when compared to the value of an otherwise similar venture holding the Rights themselves cannot be assessed precisely. Increased risk warrants higher discount rates applied to future economic benefits, reducing their perceived present value. Liquidity discounts, which have been subject to much academic research, albeit generally in different contexts, are generally assessed as lying in the range of 20% to 50%. The impact of transaction costs is impossible to assess precisely, but could be substantial. I consider it unlikely on any basis that a rational investor would have valued OpCo at more than half the value otherwise placed on an entity holding the Rights themselves."

166   As the judge appreciated, the court's task was to determine the monetary value of the loss suffered by the Pallinghurst structure as a result of the diversion from the master fund of the economic benefit of development, exploitation and management of the Fabergé rights. He had concluded that, but for the actions of Mr. Gilbertson in late December 2006 and January 2007, the master fund would probably have had the economic benefit of developing and exploiting the Fabergé brand and the management thereof on the terms of the fourth draft IA or on very similar terms. In my view, that was a conclusion that the judge was entitled to reach on the evidence at trial, and I reject Renova's challenge to that conclusion. Accordingly, as the judge held, equitable compensation was to be assessed in an amount equal to that required to put the master fund in the position in which it would have been at trial if

(through OpCo) it had had the economic benefit of developing and exploiting the Fabergé brand and the management thereof on the terms of the fourth draft IA or on very similar terms: the question for his determination was, as he said, what would be the present financial value of that.

167    In order to answer that question, the judge thought it necessary to ask whether the value of what (absent the change in the ownership of Fabergé Ltd. resulting from Mr. Gilbertson's breach of fiduciary duty) would have accrued to the master fund was properly to be equated with the full ownership of the Fabergé rights. In my view, the judge was correct to conclude that the answer to that question was "No." He went on to ask himself whether, in assessing equitable compensation, it was appropriate to apply some discount to the current value of Fabergé Ltd. (as full owner of the brand and the rights) to reflect the separation of the right to develop, exploit and manage the rights from the ownership of the brand which (absent Mr. Gilbertson's breach of duty) was in contemplation. Again, the judge was correct to conclude that some discount from the value of full ownership was appropriate.

168    The only evidence before the judge as to the appropriate discount from the value of full ownership in the circumstances of this case was that of Mr. Osborne. His evidence, at para. 3.15 of his first report (as the Gilbertson parties point out), was that it was unlikely that a rational investor would have valued the master fund (as the holder of a licence to develop, exploit and manage the Fabergé rights) at more than half the value otherwise placed on an entity having full ownership of those rights themselves. On the basis of that evidence, which (again, as the Gilbertson parties point out) was not challenged, the judge was entitled to conclude that a discount of 50% from the value of full ownership was appropriate.

### The acquisition and development cost point

169    In reaching his conclusion that the loss which Mr. Gilbertson was liable to make good to the master fund by way of equitable compensation was nil, the judge took into account (as he said at para. 9.25 of his judgment) that the amount already invested in PEL (Fabergé Ltd.) and its business was US$140m., or thereabouts. Given that, as the judge held, the current value of Fabergé Ltd. (having full ownership of the Fabergé rights) was no more, and possibly less, than US$120m., and that the value of the master fund (if it had owned, through OpCo, only the economic benefit of those rights but not the brand itself) would be only some US$60m., he concluded that the amount invested was more than the relevant value (whichever of those two figures was taken to be the relevant value), so that, on a proper analysis, the master fund had suffered no loss in respect of which it should receive equitable compensation. As the judge said

(*ibid.*) "the position is that more has been invested in the company than it may be worth."

170   The judge went on to explain (2012 (2) CILR 416, at paras. 148–150) that, in the course of his closing submissions, counsel for Renova had produced a spreadsheet in which the calculations of the equitable compensation claimed was shown at US$82.38m. Renova advanced that figure after allowing, as a deduction from Ms. Gutteridge's valuation of Fabergé Ltd. (US$177m., being the amount which it had claimed in opening its case), development expenses—being the US$139.8m. for equity and debt that (as Ms. Gutteridge and Mr. Osborne agreed) had been injected into Fabergé Ltd. since January 2007 less the US$38m. paid on the acquisition of the Fabergé rights—and adding interest or other sums. The position at the end of the trial, therefore, was that Renova accepted that development expenses (but not the acquisition cost of the Fabergé rights) were a proper deduction from the current value of Fabergé Ltd. in determining the amount of the loss which Mr. Gilbertson was liable to make good to the master fund by way of equitable compensation.

171   In this court, Renova submits that, even if any discount greater than nominal was justified (which the Renova parties deny), the judge was wrong to deduct from the discounted figure which he treated as representing the value of Fabergé Ltd. the full amount of the debt and equity raised by that company (so arriving at a negative figure), rather than to apply the discount (if any) to a net figure representing the value of Fabergé Ltd. after taking account of the debt and equity raised (and so arriving at a positive figure). It is said that, in adopting the (flawed) approach that he did, the judge erred in principle and misdirected himself as to the evidence in that he failed to apply the discount fairly and equitably across the board to both the value of Fabergé Ltd. and the amount of debt and equity raised, and so failed to apply consistent assumptions about each, and failed to take account of the evidence (a) that, had the master fund acquired the Fabergé rights, the purchase price (US$38m.) would have been provided by Lamesa and would not have been raised by the acquiring party (as it was in the case of the acquisition by PEL (Fabergé Ltd.)); and (b) that the funding of the expenses and future investment incurred in respect of the development, exploitation and management of the Fabergé rights (had they been held by the master fund) would not have been borne by the master fund but by Lamesa (outside the Pallinghurst structure) and repaid by the master fund only on a sale of those rights by the master fund (as contemplated by cl. 8 of the fourth draft IA).

172   That submission raises two issues: (i) in assessing equitable compensation, what (if any) acquisition and development expenses should be deducted from the current value of the asset to which the master fund would have been entitled but for Mr. Gilbertson's breach of fiduciary duty

260

and, if so, (ii) should the discount (which is appropriate to reflect the difference in the value of full ownership of the Fabergé rights themselves and the value of a business based upon the exploitation of those rights under licence) be applied before or after the deduction of acquisition and development expenses.

173    The first of those issues itself raises two questions: (a) whether the judge was wrong in treating US$38m. (the price paid by PEL on the acquisition of the Fabergé rights) as a cost that (but for Mr. Gilbertson's breach of fiduciary duty) would have been paid by the master fund; and (b) whether the judge was wrong in treating the expenses and future investment incurred in respect of the development, exploitation and management of the Fabergé rights as costs which (had those rights been developed, exploited and managed by the master fund (through OpCo) under licence, as would have occurred but for Mr. Gilbertson's breach of fiduciary duty) would have been funded by the master fund.

174    In relation to the first of those questions—whether the acquisition price was a cost that would have been paid by the master fund—it is said on behalf of the Renova parties that the judge was wrong in failing to give effect to the evidence that, but for Mr. Gilbertson's breach of fiduciary duty, the purchase price for the Fabergé rights would have been paid by Lamesa. Had he given effect to that evidence, it is said, he would have reduced the amount of debt and equity to be deducted from the value of Fabergé Ltd. by US$38m. He was wrong to take the view (2012 (2) CILR 416, at paras. 148–150) that—having concluded that Fabergé Ltd. was worth no more than US$120m. and that he should apply a discount of 50% to that value (with the consequence that the discounted value of Fabergé Ltd. was greatly exceeded by the total amount that had been invested whether or not the cost of acquisition was taken into account)—he did not need to decide the correct treatment of the purchase price paid for the Fabergé rights. In response to that submission it is said on behalf of the Gilbertson parties to be "of academic interest only," in that, unless the discount is applied after (and not before) the deduction of acquisition costs (which, it is said, is wrong in principle), it is immaterial whether the amount of debt and equity to be deducted is US$140m. or US$102m. (that is to say US$140m. less US$38m.).

175    Further, it is said on behalf of the Gilbertson parties, Renova's submission fails to take account of the documents, is contradicted by the evidence of Ms. Gutteridge and cannot be sustained. Clause 8 of the fourth draft IA was in these terms:

"8. Upon the earlier of: (a) a disposal by PRM [the master fund] of OpCo, or (b) the winding up of PRM pursuant to the Pallinghurst Documents, PRM shall in case of a disposal by PRM of OpCo to a third party receive the respective consideration and in case of a

transfer to BrandCo or one of its affiliates or the winding up of PRM pursuant to the Pallinghurst Documents a cash sum (the 'Value Add') equivalent to the enhancement of the value of the Fabergé Brand by PRM, exceeding the Purchase Price, as mutually agreed by BrandCo and PRM or, failing agreement, as quantified by a valuation of an assessor mutually agreeable to the parties, or failing agreement, by KPMG United Kingdom, taking into account any reasonable incurred expenses (including but not limited the Purchase Price) related to the Fabergé Brand of BrandCo and its affiliates."

It is said that, since the exercise is concerned to identify the net additional value of the enhanced rights, it would plainly have taken into account the initial value of the rights, and it was no part of the Renova parties' case at the trial that the rights were worth less than what PEL had paid for them. If Lamesa had directly or indirectly funded the acquisition of the Fabergé rights and a master fund entity had exploited those rights (under licence) on the same or similar terms to those of the fourth draft IA (other than cl. 2(e)), then the cost of acquisition would not have appeared as a payable on the master fund's balance sheet (because that cost would not have been a liability of the master fund) but would, nevertheless, have affected the value of the master fund's business (because it would have affected the payment that the fund was to receive under cl. 8 of the fourth draft IA on the termination of the licence or the sale of the business). Ms. Gutteridge confirmed that analysis in her oral evidence, both as to the US$38m. and in relation to any further investments:

"My reading of the agreement in draft, as it stood, was that the overriding imperative in the introduction was that economic benefits should flow to OpCo, the licensee, if you like, in the analogy; and that the value add provision provided for in clause 8 was such that one was able to consider the increment, the enhanced value at the end of the term, and that that would be divided between the parties in the way that it is provided for within that document, namely, as I understood it, net of the purchase price that we spoke about and of further investments; but that that enhanced value would recognise the efforts and commercial exploitation of getting it to the point at which it was in the positive cash flow situation you've described."

176   In relation to the second of those questions—whether the development costs would have been funded by the master fund—it is said on behalf of the Renova parties that the judge was wrong in failing to give effect to the evidence that, but for Mr. Gilbertson's breach of fiduciary duty, the funding of the expenses and future investment incurred in respect of the development, exploitation and management of the Fabergé rights would have been borne by Lamesa or by Renova (outside the Pallinghurst structure) and repaid by the master fund only on a sale of those rights by

the master fund (as contemplated by cl. 8 of the fourth draft IA), and that "there would have been no need for Fabergé Ltd. to raise any debt or equity because the costs of the future development of the Rights would have come from Lamesa." In response to that submission, it is said on behalf of the Gilbertson parties that the argument that the additional moneys would have come from Lamesa is quite separate from the argument in relation to the US$38m. The argument raised in relation to Lamesa's additional funding was not raised at trial and it was not to be found in the Renova parties' grounds of appeal. If the argument were correct, it would lead to the conclusion that any and all of the additional investment should be ignored, which is not a contention that the Renova parties have hitherto advanced. Even now, the only specific expense incurred by Fabergé Ltd. that Renova suggests the master fund would not have had to incur is the cost of acquiring the Fabergé rights, that is, US$38m.

177    The true position, it is said, was that neither Lamesa nor Renova had committed itself to providing the necessary funding. Mr. Kuznetsov's evidence was that Renova would have been prepared to commit funds, but he also confirmed that there was no understanding between Lamesa and Renova as to how this might have been done, and he failed to explain why Renova should have been willing to provide funds in excess of US$100m. or more when it was unwilling to put up the initial US$38m. In his oral evidence he said this:

"Let me be very clear. The project, Egg . . . was developing and developed by December 2006, consisted of two parts. One part was ownership—acquisition and ownership of the Rights. And the other part, which was by far more interesting from a business standpoint, was business development related to the Fabergé brand. And whereas Renova, indeed, was not prepared to commit 38 million for acquisition of the brand, and ultimately Lamesa company either committed or at least, through Mr Vekselberg, made it known that they would be prepared to put 38 million for acquisition of the brand, Renova was very happy to commit to inclusion of the business part of the Project Egg or the acquisition of Fabergé brand to the Fund. And, clearly, initial investments into the first part were 38 million. However, subsequent investments in development of the business related to Fabergé were expected to be significantly higher. And this is a part to which Renova was prepared to commit funds, of course based on further investigation and further development of the business case."

And, in answer to a question whether the licence revenues to which he had referred could have justified an investment of many tens of millions of dollars, he replied: "Absolutely not." In those circumstances, it is said on behalf of the Gilbertson parties that, if the additional funding were to have

come from Renova, it would have appeared as a cost of investment to the master fund. If it were to have come from Lamesa, it would have been taken into account under cl. 8 of the fourth draft IA. Moreover, unless it is being suggested that Lamesa was going to invest in excess of US$100m. over the lifetime of the fund's exploitation of the Fabergé rights without seeking any interest, the cost of the investment was bound to be reflected in the books of the master fund in some way. The fact that it is unclear quite how it would have been reflected in the fund's books reflects the fact that it was wholly unclear what arrangements (if any) the parties might have been able to put in place. But as 75% of the master fund was owned by the Gilbertson parties, it is safe to assume that Lamesa would not have provided the funding without demanding participation in the fund (as an investor) or a commercial return on its moneys.

178   In addressing the second issue—should the discount (which is appropriate to reflect the difference between the value of full ownership of the Fabergé rights themselves and the value of a business based upon the exploitation of those rights under licence) be applied before or after the deduction of acquisition and development expenses—it is said on behalf of the Gilbertson parties that the contention that any discount should be applied to the net value of the business (after deducting the expenses incurred in developing it), rather than to the actual current value of the business, was not advanced at trial on behalf of the Renova parties. Renova's submission that, in adopting the approach that he did, the judge erred in principle, in that he failed to apply the discount fairly and equitably across the board to both the value of Fabergé Ltd. and the amount of debt and equity raised, is said to be "manifestly" flawed, in that "there is no basis in law, fact or logic to justify discounting the expenses incurred in developing a business of a rights-licensee simply because the business in which the expenses were incurred is worth less than it might have been as that of a rights-owner."

179   In my view, the judge was correct to adopt the approach that he did. In assessing the loss (if any) which the master fund had suffered by reason of Mr. Gilbertson's breach of fiduciary duty—and in respect of which equitable compensation should be awarded—he was correct, first to apply the appropriate discount to the current value of Fabergé Ltd. (as the full owner of the Fabergé rights) in order to determine the (hypothetical) current value of the business which (but for Mr. Gilbertson's breach of duty) the master fund would have carried on as licensee since January 2007 and, secondly, to deduct from the current value of that business the costs and expenses which would have been incurred by the master fund in carrying on that business under licence since that date. I am satisfied, also, for the reasons advanced on behalf of the Gilbertson parties, that the costs and expenses to be deducted included the post-acquisition expenses and

264

future investment incurred in respect of the development, exploitation and management of the Fabergé rights: that is to say, an amount of US$102m. or thereabouts. It follows, in my view, that the judge was correct to hold that he did not need to decide how the acquisition cost of the Fabergé rights (US$38m.) should be treated. His conclusion that—after deducting post-acquisition costs of US$102m. from the (hypothetical) current value of the business which (but for Mr. Gilbertson's breach of duty) it would have carried on since January 2007—the master fund had suffered no loss was the same whether or not the acquisition cost of the Fabergé rights was included in the costs and expenses to be deducted.

180   For the reasons set out in this section of my judgment I would uphold the judge's decision that the loss which Mr. Gilbertson was liable to make good to the master fund by way of equitable compensation should be valued at nil. It follows that I would dismiss Renova's appeal from the judge's order dismissing its claim to equitable compensation.

**Was the judge wrong to hold that Autumn was liable as a constructive trustee of the shares issued by PEL in January 2007?**

181   The judge explained (2012 (2) CILR 416, at para. 74) that Renova's claim against Autumn was for an order that Autumn account as a constructive trustee for the shares in PEL issued to it in January 2007, or their value, on the ground that Autumn knowingly received those shares as property misapplied or procured to be misapplied by Mr. Gilbertson in breach of his fiduciary duties to the company or, in the alternative, on the ground that it was a volunteer (in that it provided no consideration for the issue of those shares in PEL).

182   The judge recorded (*ibid.*, at para. 75) that there was no dispute between the parties that the elements which needed to be established in order to found a claim based on liability for knowing receipt were set out by Hoffmann, L.J. in *El Ajou* v. *Dollar Land Hldgs.* (16) ([1994] 2 All E.R. at 700):

"... the plaintiff must show, first, a disposal of his assets in breach of fiduciary duty; secondly the beneficial receipt by the defendant of assets which are traceable as representing the assets of the plaintiff; and thirdly, knowledge on the part of the defendant that the assets he received are traceable to a breach of fiduciary duty."

Each of those elements was in dispute but the judge was able to approach the claims against Autumn on the basis that, as he had held earlier in his judgment, Mr. Gilbertson had acted in breach of fiduciary duty in procuring the issue to members of the consortium (including Autumn) of PEL shares in January 2nd, 2007, thereby diluting the previous interest of the master fund in PEL (as owner of all of the issued shares) to virtually nil (as owner of less than 1% of the issued shares).

183   The judge addressed the first element—whether the issue of PEL shares to Autumn in January 2007 had been a disposal of assets of the master fund—2012 (2) CILR 416, at para. 76(i)–(v). He explained that the Gilbertson parties disputed Renova's case that the dilution of the previous interest of the master fund in PEL from 100% to less than 1% constituted a disposal of the assets of the master fund. As he said (at sub-para. (ii)) it was their contention that there had been no disposal of any assets of the master fund in that the new shares issued by PEL in January 2007 did not constitute property of PEL (or of anyone else) prior to issue and that, accordingly, the issue of those shares could not constitute a disposal of assets. In support of that contention, the Gilbertson parties had relied (in their written closing submissions) on observations in the judgments of the High Court of Australia in *Pilmer* v. *Duke Group Ltd.* (30), to which the judge referred. The judge rejected that contention. He said this (2012 (2) CILR 416, at para. 76(v)):

> "(v) In my view, the position taken on behalf of the Gilbertson parties, in the circumstances of this case, is unduly restrictive and strict. This is an equitable concept and it does not seem to me that the reference to disposal of assets in Lord Hoffmann's first requirement for liability for knowing receipt in *El Ajou* v. *Dollar Land Holdings* . . . would have been intended to or did restrict the terms 'a disposal of his [the plaintiff's] assets' or 'assets which are traceable as representing the assets of the plaintiff' to mean pre-existing tangible items of property already legally and beneficially owned by the plaintiff. The court must look at the particular circumstances concerned in order to achieve a fair and equitable result. In the present case, in my opinion, the issue of the new PEL shares which had the effect of reducing the master fund's ownership and control of PEL from 100% to just under 1% did amount in the circumstances to disposal of an asset of the master fund (and, derivatively, the company) in the sense required to comply with the first principle in the *El Ajou* case."

184   Having reached that conclusion, the judge was able to address the second of the three elements identified by Hoffmann, L.J. in the *El Ajou* case (16)—whether the issue of shares in January 2007 to Autumn constituted a receipt by Autumn of assets traceable as representing assets of master fund which had been disposed of in breach of fiduciary duty—without further elaboration. He said this (2012 (2) CILR 416, at para. 76(vi)):

> "(vi) It follows, in light of my views above, that the second element identified by Lord Hoffmann, namely that the defendant has beneficially received assets which are traceable as representing assets of the plaintiff, is in principle also made out."

266

And he went on to explain that he would have been of the same view even if he had been wrong in holding (earlier in his judgment) that the new PEL shares had been issued on January 3rd, 2007 (rather than on a later date—January 19th, 2007—as contended by the Gilbertson parties). He rejected the argument, advanced on behalf of the Gilbertson parties, that the issue of shares on January 19th, 2007 (some 16 days after Mr. Gilbertson's breach of fiduciary duty on January 3rd, 2007, if any)—even if constituting a disposal of the assets of the master fund—could not be said to be the disposal of assets traceable to any breach of fiduciary duty by Mr. Gilbertson. He said this (*ibid.*, at para. 77):

> "[T]hat date [January 19th, 2007] is in my view sufficiently close to January 3rd, 2007 and the share issue sufficiently related to the actions of Mr. Gilbertson at about that time to satisfy me that in the circumstances the assets received by Autumn in the form of the new shares may be said to be traceable to Mr. Gilbertson's breach of fiduciary duty."

In the alternative, he said, Mr. Gilbertson's procurement of the issue of the new PEL shares, even if not effective until January 19th, 2007, was not disclosed and was unknown to the Renova parties and it might be argued that that was simply a perpetuation of Mr. Gilbertson's breach of duty. The judge concluded that the PEL shares issued to Autumn in January 2007 were "traceable as representing assets which ought to properly have belonged to the master fund" and that "the issue of the PEL shares provided Autumn with a gratuitous share of the rights through a shareholding in PEL which belonged to and should have remained with the master fund."

185   The judge then turned to what he described as "the key question": whether Autumn had the requisite knowledge. He addressed that question: 2012 (2) CILR 416, at paras. 79–91. He explained (*ibid.*, at para. 79) that Autumn was an "off-the-shelf" BVI company that had been acquired on January 2nd, 2007 by Fairbairn, as trustee of the BPG Settlement, as a special purpose vehicle through which the BPG Settlement would make a loan by to PEL in order to fund Mr. Gilbertson's share of the purchase price of the Fabergé rights and to hold the new PEL shares which Mr. Gilbertson would procure to be issued to it; that Autumn was wholly owned by Fairbairn and Fairbairn's associated company, Fairbairn Corporate Services Ltd. ("FCSL"); that Mr. Thomas was a director of Fairbairn; that Mr. Thomas became Autumn's sole director; and that Mr. Thomas was also a director of FCSL. He went on to say (*ibid.*, at para. 80) that there were, arguably, two different ways in which Autumn could be said to have the requisite knowledge: (i) by imputation to it of Mr. Gilbertson's actual knowledge, or (ii) through what Mr. Thomas knew or should have known.

186    The judge set out (*ibid.*, at para. 81, in seven numbered sub-paragraphs) the factors on which Renova relied in support of its submission that "Mr. Gilbertson was in reality and in practice the directing mind and will of Autumn which was an entity effectively controlled by Mr. Gilbertson"; that Fairbairn (through Mr. Thomas) "was simply going through the motions in relation to his request for the money but in reality was acting on Mr. Gilbertson's instructions"; and that, accordingly, Mr. Gilbertson's knowledge of all the relevant background and circumstances was to be imputed to Autumn. He explained (*ibid.*, at para. 84) that it was submitted on behalf of the Gilbertson parties that, in order to hold that Mr. Gilbertson was in practical terms the directing mind and will of Autumn, it was necessary to conclude that "Mr. Thomas had failed in his duties in respect of Autumn as a matter of fact"; that (it was said) the evidence of Mr. Thomas demonstrated that he took his duties very seriously; and that there was no basis for the suggestion that he allowed Mr. Gilbertson to override him. The judge rejected that approach. He said this (*ibid.*, at para. 85):

"From my own assessment of the evidence, I consider that the reality is, as I have already said, that Mr. Gilbertson is a forceful and tough businessman and he is no doubt the source of the funds in all three of the Gilbertson family trusts. He was not, in my view, the kind of man who would readily take no for an answer. Mr. Thomas would not want to upset or disagree with his client. My impression was that he was very ready to comply with Mr. Gilbertson's requirements and to place great reliance upon him in doing so. There was no question of Mr. Gilbertson overriding him; there was little or nothing to override. Mr. Thomas went through the motions but there was never any doubt that he would comply with Mr. Gilbertson's request and Mr. Gilbertson knew and relied upon that."

187    The judge directed himself (*ibid.*, at para. 86 of his judgment) that the answer to the question whether Autumn could be said to have the requisite knowledge as a consequence of what Mr. Thomas knew or should have known turned on whether Mr. Thomas knew, or should have known if he had made appropriate independent enquiries, that the Fabergé rights were being acquired by or for the benefit of Mr. Gilbertson in circumstances which amounted to a breach of his fiduciary duties, and that the "requisite knowledge," in that context, was knowledge that the shares issued by PEL in January 10th, 2007 were traceable to a breach of fiduciary duty by Mr. Gilbertson. He explained (*ibid.*, at para. 87) that Renova's case was that Mr. Thomas knew all about the Pallinghurst structure and knew that Renova had an interest under that structure: as he said, the structure chart (which Mr. Thomas had seen) made that clear. He referred (*ibid.*, at para. 88) to the evidence of the telephone conversation between Mr. Thomas and Mr. Gilbertson on January 2nd, 2007 in the

268

course of which, he said, Mr. Thomas enquired about the relationship between Pallinghurst and Mr. Vekselberg and received an answer from Mr. Gilbertson which "clearly indicated that Mr. Vekselberg would think Mr. Gilbertson was doing something which he was not entitled to do with regard to Mr. Vekselberg and the duties which Mr. Gilbertson owed in respect of the Pallinghurst structure." That telephone conversation, he said, "should . . . have alerted Mr. Thomas and caused him to at least make further independent enquires" but "he did not do so because he did not feel able or willing to seriously challenge or question what Mr. Gilbertson wanted." He explained (*ibid.*, at para. 89) that it had been submitted on behalf of the Gilbertson parties that there was no evidence that Mr. Thomas knew that Mr. Gilbertson was a director of the company but said that it was hard to believe that he did not, given his familiarity with the Pallinghurst structure and the fact that Fairbairn was a 50% shareholder of the company, and that, in his view, the probability was that Mr. Thomas did know that Mr. Gilbertson was a director of the company. He went on to say this (*ibid.*, at paras. 90–91):

"90   With regard to the issue of the new shares in PEL to Autumn, Mr. Thomas knew PEL was a Pallinghurst company, wholly owned by the master fund and indirectly owned through the company which was owned 50% by the plaintiff, Renova Resources, and 50% by Fairbairn itself. Mr. Thomas must have realized that the master fund's, and thus indirectly the company's, interest in PEL was going to be diluted as a result of the issue of such shares which would be seriously prejudicial to the master fund and the Pallinghurst structure in which Renova, and so indirectly Mr. Vekselberg, had an interest. Mr. Gilbertson's answer to his question about Mr. Vekselberg's likely reaction to Mr. Gilbertson purchasing the Fabergé brand as a Christmas present for himself should have alerted him to the fact that there would be a problem as a result of what Mr. Gilbertson was doing.

91   It was argued on behalf of the Gilbertson parties that Mr. Vekselberg would be 'extremely pissed off' because Mr. Vekselberg wanted to acquire the rights for himself. That is, of course, a rather incomplete description of Mr. Vekselberg's position in that he also took the position that the economic benefits and management of the Fabergé brand should remain with the master fund. However, the fact is that that suggestion was anyway not made entirely clear to Mr. Thomas in the telephone conversation. In my view, the only interpretation available to Mr. Thomas of Mr. Vekselberg's likely reaction, in light of his own knowledge of the Pallinghurst structure and what he had otherwise been told by Mr. Gilbertson, was that Mr. Gilbertson was doing or proposing to do something contrary to the interests of the master fund, which was indirectly owned by the company, of which Mr. Gilbertson was a director and Fairbairn was a 50%

shareholder, as part of the Pallinghurst structure, in which Renova and Mr. Vekselberg had an interest. Mr. Thomas knew, or at least should have known, that he should at least make further enquiries in relation to Mr. Gilbertson's actions or proposed actions. In my view, Mr. Thomas must or ought to have realized that Mr. Gilbertson was or was likely to be in breach of his director's duties and that proceeding to implement Mr. Gilbertson's request in the circumstances without more information and without the knowledge of Renova and/or Mr. Vekselberg would be inappropriate for a prudent trustee."

188   The judge (2012 (2) CILR 416, at paras. 93–95) addressed the question whether Autumn was to be treated as a constructive trustee of the PEL shares issued to it in January 2007 (independently of "knowing receipt") because it received those shares as a volunteer. He explained (*ibid.*, at para. 93) that Autumn never paid for those shares: it received them at the same time as, but not as part of, the loan transaction whereby it lent PEL the sum of US$9.5m. (and then the further sum of US$0.5m.) at interest. He noted that the board resolution of PEL on January 3rd, 2007 described the issue of the shares as being "in addition to the loan," and said that there was no apparent commercial connection between the loan and the issue of the shares. It was apparent, he said, that "the shares were a gift from the start and they were treated as such when the loan was repaid." He rejected (*ibid.*, at para. 94) the submissions advanced on behalf of the Gilbertson parties that "whatever the precise circumstances in which the new shares were issued, such issue was part of the wider commercial transaction and should not be separated from the loan transaction," and that, if (as he held) Autumn did not pay for the PEL shares, "as a result of its acquisition of the shares it is a debtor of Fabergé Ltd. in respect of the shares and accordingly not a volunteer." He rejected each of those contentions on the ground that they did not accord with the evidence or the circumstances. He said this (*ibid.*):

"The new shares were issued in January 2007, some 5½ years ago, and there is no evidence that any demand for payment in respect of the shares has ever been made nor any indication that Autumn (or for that matter any of the other members of the consortium) is expected to pay for the new shares or is considered a debtor in respect of them. Nor, as far as I am aware, has Autumn or any of the other members of the consortium ever made any offer to pay for the shares. In my opinion, the evidence clearly indicates that Mr. Gilbertson procured PEL (now Fabergé Ltd) to issue the new shares gratuitously for no consideration or expected consideration."

And he went on to say this (*ibid.*, at para. 95):

270

"Accordingly, the plaintiff argues, Autumn was never a *bona fide* purchaser for value without notice. Equity will not assist a volunteer: see *In re Diplock* ... ([1947] Ch. at 781–784, *per* Wynn-Parry, J.). Therefore, on this basis also, Autumn holds the shares concerned in Fabergé Ltd. (formerly PEL) on constructive trust for the master fund/GPLP/the company and is liable to account for them. In the circumstances I agree with that submission."

189    The judge gave effect to his conclusion by declaring, at para. 1 of his order of November 6th, 2012, that Autumn held the shares issued to it by PEL in January 2007 (which had become 25,000 ordinary shares in Fabergé Ltd., following a change of name and a sub-division of shares in 2008) as constructive trustee for the master fund, and by directing (at para. 2) that Autumn should forthwith transfer those 25,000 ordinary shares to the master fund.

***The parties' submissions on this appeal***

190    Autumn appeals against that declaration and the order to transfer. The grounds on which that appeal is advanced are that the judge misdirected himself and erred in law and/or fact (i) in relation to the issuance of shares in PEL to members of the consortium; (ii) in holding that Autumn was liable in knowing receipt having regard to its relationship with Mr. Gilbertson, the property which it received, the person from whom it received the property and its state of knowledge at the time of receipt; and (iii) in holding that Autumn was liable as a volunteer. In resisting Autumn's appeal, it is submitted on behalf of Renova that the judge was correct to make the findings of law and of fact that he did.

191    It is said on behalf of Autumn, by way of introduction, that a claim that it holds the PEL shares which it received as a constructive trustee cannot arise unless there was a relevant breach of fiduciary duty by Mr. Gilbertson. But (given the judge's finding that Mr. Gilbertson was in breach of fiduciary duty), it is submitted that it is important to keep in mind that (prior to the issue of the PEL shares) Autumn was not a fiduciary in relation to the master fund, and that, in this context, there is a significant difference between claims against fiduciaries and claims against third parties. A fiduciary may be required to account for an asset or opportunity that it acquires for itself in breach of duty notwithstanding that the beneficiary had no proprietary claim to that asset. A third party can only be required to account as a constructive trustee for an asset to which the beneficiary does have a proprietary claim, although (it is accepted) it is unnecessary for the beneficiary to show that it has suffered loss.

192    It is pointed out that, in the present case, Renova had pleaded a claim against Autumn based on the premise that Autumn was

Mr. Gilbertson's alter ego, on that premise Renova was able to formulate a non-proprietary claim against Autumn for an account of profits. But, it is said, Renova did not pursue its pleaded allegation that Autumn was Mr. Gilbertson's alter ego and, in those circumstances, there was no longer any basis for a non-proprietary claim for an account of profits: in order to obtain the relief which it sought, it was necessary for Renova to advance a proprietary claim against Autumn. The proprietary claims advanced were (i) a claim in knowing receipt; and (ii) a claim for the return of property acquired as a volunteer. The elements of the two proprietary claims are not the same but, it is said, the requirement that Autumn was the recipient of property, or the traceable proceeds of property, of the master fund is common to both.

193   Properly analysed, as it seems to me, the requirement common to both proprietary claims is that Mr. Gilbertson's breach of fiduciary duty to the company (and, more generally, to the master fund and the other entities within the Pallinghurst structure) caused Autumn to receive property of the master fund, or the traceable proceeds of such property. If that condition is satisfied, then Autumn is required to account to the master fund as a constructive trustee for what it received, unless it can rely upon circumstances which lead to the conclusion that such an order would be inequitable. Those circumstances include receipt of the property (or proceeds) as a bona fide purchaser without notice. A claim on the basis of "knowing receipt" is a claim that the recipient knew (or ought to have known) of the breach of fiduciary duty, and so cannot assert that it would be inequitable to require it to account as a constructive trustee.

194   In those circumstances, it is convenient to address the submissions of the parties under four heads: (i) whether the judge was wrong to make the findings of fact that he did in respect of the issue of the new PEL shares in January 2007; (ii) whether, upon the issue of the new PEL shares in January 2007, Autumn was the recipient of property of the master fund, or the traceable proceeds of such property; (iii) whether Autumn received the new PEL shares as a volunteer and not as a purchaser for value and so held those shares as a constructive trustee for the master fund; and (iv) whether, if (and notwithstanding that) Autumn received the new PEL shares as a purchaser for value, it held those shares as a constructive trustee for the master fund on the basis of "knowing receipt."

(i) *Whether the judge was wrong to make the findings of fact that he did in respect of the issue of the new PEL shares in January 2007*

195   It is said on behalf of Autumn that the judge misdirected himself and erred in law and/or in fact in holding:

  (1) That the new shares issued by PEL were issued on January 3rd, 2007.

Had the judge directed himself properly, it is said, he should have found (i) that the new shares were issued at a later date (said, on the evidence before the judge, to be January 19th, 2007); and (ii) that, on that basis, Mr. Gilbertson was not in breach of any fiduciary duty he owed to the company, given the evidence as to the dealings between the parties in the period after January 3rd, 2007.

(2) That Autumn had not given value for the new PEL shares.

Although the judge may have been correct to find that neither Autumn nor the other members of the consortium paid for the shares, nevertheless, it is said the issue of the shares served a clear commercial purpose, in that the issue was "clearly calculated to cause the consortium to forbear from demanding repayment" of the moneys lent to fund the acquisition of the Fabergé rights and by way of working capital and such forbearance may be seen as giving value in equity. Further, it is said, the new PEL shares served as a form of alternative security. In all the circumstances, it is said that, far from giving no value, the value Autumn and the other members of the consortium gave was what enabled PEL to survive.

(3) That Mr. Gilbertson had procured the issue of the new PEL shares.

In the circumstances that, it is said, the judge referred to no evidence to support a finding that Mr. Gilbertson procured the issuance of the new PEL shares, he appears to have been content to assume that Mr. Gilbertson must have done so. There was no basis for this assumption.

196    As I have said, earlier in this judgment, the judge found (at para. 9.48 of his judgment) that the register of members of PEL showed that the new shares were issued on January 3rd, 2007, and he rejected the contention, pleaded by the Gilbertson parties in their amended defence, that, as a matter of fact, those additional 100 shares were not issued by PEL until January 19th, 2007, or thereabouts. I have already explained why I take the view that the judge was entitled to reach the conclusion that he did. It is unnecessary to revisit that point under this head. But I should add, for completeness, that I agree with the judge—and I accept the submission advanced on behalf of Renova on this appeal—that, in any event, success on its contention that the new PEL shares were not issued until January 19th, 2007, or thereabouts, would not assist Autumn in the present context. I reach that conclusion for three reasons:

(1) There is no dispute that 100 new PEL shares were issued in January 2007 (whether on January 3rd, 2007, or on a later date), and that 25 of those shares were issued to Autumn: the actual date upon which those shares were issued is irrelevant to the question whether the 25 new PEL shares issued to Autumn in January 2007 could be the subject of a proprietary claim in these proceedings.

(2) As I have explained, Mr. Gilbertson's breach of fiduciary duty occurred when he decided that new PEL shares should be issued to his consortium in order to obtain control of the Fabergé rights for his own benefit (or for the benefit of the consortium): the actual date upon which the shares were issued is irrelevant to the question whether or not there was a breach of fiduciary duty upon which Renova can rely in these proceedings. Even if (which I do not accept) the evidence of events which took place after January 3rd, 2007 would, or should, have led the judge to find that, by January 19th, 2007, the parties were negotiating on the basis that the master fund had no separate interest in the Fabergé rights, there was no evidence to support the view that that finding would, or should, have led to judge to conclude that Mr. Gilbertson took the decision which led to the issue of the new PEL shares later than January 3rd, 2007.

(3) For the reasons which I shall explain in this section of my judgment, Autumn had knowledge of that decision—and knowledge that it gave rise to a breach of duty by Mr. Gilbertson—on, or just before, January 3rd, 2007 when, following the telephone conversation between Mr. Gilbertson and Mr. Thomas on January 2nd, 2007 and the transfer by Fairbairn, as trustee of the BPG Settlement, of US$9.5m. to enable Autumn to reimburse K-MIC in respect of 25% of the US$38m. loan to PEL by means of which the cost of acquiring the Fabergé rights from Unilever was funded: the actual date upon which the new shares were issued by PEL is irrelevant to the question whether or not Autumn had the requisite knowledge in the context of the claim in these proceedings based on knowing receipt (save, perhaps, that—if the new shares were not issued until January 19th, 2007, as Autumn contends—there was all the more reason for Mr. Thomas to make enquiries as to the reason for the time that had elapsed following the acquisition of the Fabergé rights some two and a half weeks earlier).

197   In developing the submission that the judge was wrong to find that the members of the consortium had not given value for the PEL shares that were issued to them in January 2007, it is said on behalf of Autumn that:

(1) The directors of PEL must be taken to have thought that those to whom the new PEL shares were issued were giving value for those shares in that they caused those shares to be entered in the register of members as fully paid. The entry in the register is, it is said, *prima facie* evidence that Autumn paid for the shares. Mr. Thomas was unable to recall one way or the other, and the Renova parties elected not to cross-examine Mr. Sean Gilbertson on the issue.

(2) Mr. Thomas gave evidence to the effect that he had expected Autumn to receive shares by way of security. It is true that the loan documentation simply provided the consortium with a lien over the Fabergé rights by way of security but the loan documentation was "only

part of the story." The moneys to fund the acquisition of the Fabergé rights were raised in a hurry: formal arrangements took time to catch up.

(3) The lien over the Fabergé rights and the issue of the new PEL shares should be seen as complementary: the PEL shares "were no more than Autumn had expected it would have when the transaction was initially put to it." Autumn advanced—and refrained from seeking to recover—US$9.5m. on the basis that its interests were sufficiently protected by its ownership of PEL shares.

198     In response to those submissions it is said on behalf of Renova that:

(1) It is well established that it is for a third party who has acquired property as a result of a breach of trust by a fiduciary—and who seeks to resist a constructive trust claim—to satisfy the court that it was a bona fide purchaser of the property acquired for value and without notice. In support of that proposition reliance is placed on observations of Sir Collins, M.R. and of Cozens-Hardy, L.J. in *Re Nisbet & Potts' Contract* (27) ([1906] 1 Ch. at 403 and 410), and in *Lewin on Trusts* (18th ed., para. 41–114, at 1720, paras. 42–22 – 42–23, at 1743–1744 (2008)). Autumn bears the burden of proving that it gave value for the new PEL shares that were issued to it in January 2007. On the evidence before the judge it cannot discharge that burden.

(2) Autumn appears to accept that the consortium gave no consideration for the new PEL shares in the sense in which the term is used at common law. If it gave no consideration sufficient even to support a contract, then it must follow that it gave no value in the context of the bona fide purchaser defence to a constructive trust claim. In support of that proposition Renova relies on observations of Neuberger, J. in *Nurdin & Peacock plc* v. *DB Ramsden & Co. Ltd.* (29) ([1999] 1 EGLR at 123):

"Second, it was contended that the payment of £1 under the 1995 transfer constituted sufficient 'value' to render Nurdin a 'purchaser for value'. In the field of contract, it is well established that the court does not inquire into the adequacy of consideration: once it has established that some consideration has moved, that is enough for establishing the essential prerequisite of a contract. However, the doctrine of consideration has been developed in the context of the common law, whereas the concept of a 'purchaser for value' in a case such as this has a very different history, being solidly based on equity. In this connection, it is worth remembering that equity looks at the substance and not at the form. It seems to me that, particularly in the context of an intra-group transfer, the substance of a payment of £1 does not render a transferee a 'purchaser for value.'"

Accordingly, even if, on the basis of the Register of Members, Autumn were presumed to have paid the par value for the new PEL shares issued to

it in January 2007, such a nominal consideration (far below the commercial value of the new shares) does not support a defence of "purchaser for value."

(3) Further, equity requires that value is actually paid. In support of that proposition, Renova relies on the decision in *Story* v. *Windsor (Lord)* (34) and the commentary in Megarry & Wade, *The Law of Real Property*, 7th ed., para. 8.008, at 257 (2008). The evidence given by Mr. Thomas at trial was that he could not recall that Autumn ever paid for the new PEL shares.

(4) The submissions that the new PEL shares were issued as security for the loans or to persuade the lenders not to demand repayment of the loans—advanced on behalf of Autumn in this court—were not advanced at trial and are "manifestly contrary to all the evidence." In particular:

  (i) The board resolution of January 3rd, 2007 contains an express statement that the share issue was "in addition to the loan" made to enable PEL to pay Unilever.

  (ii) In their evidence at trial, Mr. Gilbertson and Mr. Thomas accepted, without equivocation, that the issue of the new PEL shares was not a term or condition of the loan by Autumn. The draft loan agreement (which post-dated both the making of the loan and the issue of the shares, which was never finalized or executed and which contained a term as to security) made no reference to the issue of the new PEL shares.

  (iii) There was no evidence of any discussion that the issue of the shares would be taken to be in substitution of the grant of security, and such a discussion would be inconsistent with the order in which events occurred.

  (iv) The consortium did not need security for their loans because the terms of the loans (as recorded in the board minutes of January 3rd, 2007) entitled its members to call for repayment of the loan within seven days either in cash or (at their discretion) by the transfer of all of the assets, contracts and receivables of PEL to a vehicle nominated by them. It was for that reason that cl. 11 of the subsequent draft loan agreement took the form that it did.

  (v) In his evidence at trial, Mr. Thomas accepted that he had been wrong to say (in his witness statement) that he had expected to receive shares by way of security.

(5) As all the evidence shows, the loans and the issue of new PEL shares were separate transactions. The new PEL shares were not consideration for the loans: they were simply a gift, "to sweeten the deal for the consortium and to enable Mr. Gilbertson to follow through on his plan to 'negotiate with the Russians from a position of strength.'" The shares were not accepted by the consortium as the price of its forbearing to demanding security for the loan.

199    I reject the submission that the judge was wrong to find that the members of the consortium had not given value for the PEL shares that were issued to them in January 2007. The description in the register of members of the new shares as "fully paid" is no more than a statement that there is no liability on the holders of those shares to pay future calls: it is not a statement that the persons to whom the shares have been issued have paid (or otherwise given value) for those shares. Nor is there any evidence that the new PEL shares were issued by way of security for repayment of the moneys lent by members of the consortium in order to fund the purchase of the Fabergé rights. As the minutes of the directors' meeting held by telephone conference call on January 3rd, 2007 record, the loans were made on terms that the lenders might, at any time, call for repayment within seven days; such repayment to be made either in cash or (in the sole discretion of the lenders) by the transfer of all the assets, contracts and receivables of PEL "to a vehicle nominated by the Lenders." In those circumstances, ownership of the new PEL shares provided no additional security for the repayment of the loan—in that, if the loans were not repaid on demand, those shares would become worthless. Further, there was no provision for the redemption—by cancellation (or re-transfer to PEL)—of the new shares in the event that the loan were repaid.

200    I have addressed, in an earlier section of this judgment, the submission that the judge was wrong to hold that Mr. Gilbertson had procured the issue of the 100 new PEL shares in January 2007. For the reasons that I have already set out, it is fanciful to suggest that the decision to issue those shares—although implemented by Mr. Sean Gilbertson and Mr. Andrew Willis (as the directors of PEL)—was not a decision taken by Mr. Gilbertson as a necessary element in his scheme to obtain control of the Fabergé rights (by diverting effective ownership of PEL from the master fund to his consortium) in order, thereafter, to "negotiate with the Russians from a position of strength." It is unnecessary to revisit that point.

(ii) *Whether, consequent upon the issue of new PEL shares in January 2007, Autumn was the recipient of property, or the traceable proceeds of property, of the master fund*

201    Autumn reminded the court of Hoffmann, L.J.'s observation in *El Ajou* v. *Dollar Land Hldgs. plc* (16) ([1994] 2 All E.R. at 700), and

submitted that "opportunities" must be distinguished from "assets." In support of that distinction, Autumn relied on passages in *Cook* v. *Deeks* (14); *Competitive Ins. Socy. Co. Ltd.* v. *Davies Invs. Ltd.* (13); *Belmont Fin. Corp.* v. *Williams Furniture Ltd. (No. 2)* (7); *Charter plc* v. *City Index Ltd.* (11), and, by contrast, *Satnam Invs. Ltd.* v. *Dunlop Heywood & Co. Ltd.* (33), and *Commonwealth Oil & Gas Co. Ltd.* v. *Baxter* (12).

202   Renova recognizes the distinction between opportunities and assets but submits that what it describes as "the controversial issue about whether corporate opportunities or information are property for the purposes of a proprietary claim" does not arise in the present case. That issue does not arise, it is said, because the assets in respect of which Renova's proprietary claim is advanced are the new PEL shares issued to Autumn in January 2007, and those new shares are "the traceable product of either the Rights, or the contractual right to the Rights under the SPA." This, it is said, differs from the more usual corporate opportunity case—of which *Satnam Invs.* provides an example—in which the asset in respect of which the proprietary claim is advanced was acquired (by the defendant) by the use or exploitation of a commercial opportunity wrongfully diverted from the claimant. Properly understood, the new PEL shares issued to Autumn represented substantially the whole of the value of an asset (the Fabergé rights) which, at the time the shares were issued, was owned by PEL and so, indirectly, owned by the master fund as the owner of 100% of PEL. The Fabergé rights were not a "corporate opportunity"—comparable to the confidential information in the *Satnam* case— they were themselves an asset. So, also, was the master fund's holding (immediately prior to the issue of the new shares) of 100% of the issued share capital of PEL.

203   It is submitted on behalf of Autumn that the master fund had no proprietary interest in the new PEL shares issued in January 2007: in that, until those shares were issued by PEL, they did not exist. In support of that submission, Autumn relies on observations in the judgment of the majority in *Pilmer* v. *Duke Group Ltd.* (30) ([2001] 2 BCLC 773, at para. 20), a decision of the High Court of Australia. It is pointed out that, before the issue of the new PEL shares to members of the consortium in January 2007, the master fund was the owner of one PEL share, and that, after the issue of the new PEL shares to members of the consortium, the master fund remained the owner of that PEL share. What changed was not the identity of the asset owned by the master fund, but the characteristic of that asset in relationship to the ownership of PEL. The effect of the issue of the new shares to members of the consortium was that the proportionate interest in PEL associated with ownership of that one share changed from 100% to less than 1%. Those submissions are, if I may say so, self-evidently correct, and they are not, I think, in dispute. But they provide no

278

answer to what (as Renova submits) is the relevant question for determination under this head: whether, consequent upon the issue of new PEL shares in January 2007, Autumn was the recipient of the traceable proceeds of property of the master fund.

204    It is accepted on behalf of Autumn that there is a sense in which the master fund may be said to have owned the Fabergé rights, albeit indirectly, and that what was diverted to Autumn (and the other members of the consortium) was that indirect ownership. But, it is said, although "indirect ownership" might be sufficient to describe that in relation to which the master fund may have suffered any loss, "indirect ownership," short of equitable title, does not constitute an asset. Upon acquisition of the Fabergé rights by PEL from Unilever (on completion of the SPA on January 3rd, 2007), PEL became the legal owner of those rights. It is not suggested—and could not be suggested—that PEL held those rights as trustee for the master fund. Again, as it seems to me, those submissions are correct but, again, they provide no answer to the question for determination under this head.

205    As I have said, the question for determination under this head is not (or not limited to) whether assets of the master fund were diverted to Autumn: the question for determination includes whether Autumn was the recipient of the traceable proceeds of property of the master fund: as Autumn accepts, a proprietary claim is not confined to the initial property, since the claimant's interest in the initial property may be traced into other property that the defendant holds in its place. But, it is said correctly, in order to trace into substitute property, it is first necessary to identify the initial property for which the substitute property is to be a substitute. In the present case, as it seems to me, the relevant question in this context is whether the master fund's holding (immediately prior to the issue of the new shares) of 100% of the issued share capital of PEL can be traced into the PEL shares issued to Autumn (and, so far as material, to the other members of the consortium). It is said on behalf of Autumn that the answer to that question must be "No," but it is significant that the reason given by Autumn for that conclusion is not that, at all relevant times, the master fund remained the holder of the single share in PEL (so that it could not be said that that share had been diverted to Autumn, or to any other entity); rather, it is said that the single PEL share owned by the master fund "hardly offers an auspicious starting point for any claim by Renova on behalf of the master fund, since, if Renova had had its way, the Rights would not have been acquired in the name of a Fund entity and the share would have remained of no more than nominal value." If I may say so, that ignores the undisputed fact that, immediately before the 100 new PEL shares were issued, PEL, as contractual purchaser under the SPA (into which it had entered with the knowledge and consent of Renova), had acquired the Fabergé rights from Unilever.

206  It is said on behalf of Renova that the judge was correct, for the reasons which he set out (2012 (2) CILR 416, at paras. 76–77), to conclude that the answer to the question whether the master fund's holding (immediately prior to the issue of the new shares) of 100% of the issued share capital of PEL can be traced into the PEL shares issued to Autumn was "Yes." The short point, it is said, is that "tracing" in equity is concerned with value, not with assets *in specie.* In support of that proposition, Renova submits:

(1) It is common ground in this court that a claim against a non-fiduciary third party for an account as a constructive trustee is a proprietary claim. When Hoffmann, L.J. referred, in the *El Ajou* (16) case ([1994] 2 All E.R. at 700) to "assets traceable as representing the assets of the plaintiff" he chose his words with care. He was referring to the need for the asset in the hands of the defendant to be such as would entitle the plaintiff to trace into it at law or in equity. In other words, the defendant need not be shown to have received *in specie* the actual asset which was previously owned beneficially by the plaintiff; it is enough if what he received was "traceable as representing" that asset. It is plain that Hoffmann, L.J. had equitable tracing in mind.

(2) There is a difference between "following" and "tracing." Tracing is concerned not with locating the asset formerly owned by the plaintiff but with identifying whether there is an asset in the hands of the defendant in which the value of the original asset is now located. That equitable tracing is about tracing value is clear from the speech of Lord Millett in *Foskett* v. *McKeown* (17) ([2001] 1 A.C. at 127–128):

"The process of ascertaining what happened to the plaintiffs' money involves both tracing and following. These are both exercises in locating assets which are or may be taken to represent an asset belonging to the plaintiffs and to which they assert ownership. The processes of following and tracing are, however, distinct. Following is the process of following the same asset as it moves from hand to hand. Tracing is the process of identifying a new asset as the substitute for the old.

. . .

The claimant claims the new asset because it was acquired in whole or in part with the original asset. What he traces, therefore, is not the physical asset itself but the value inherent in it.

Tracing is thus neither a claim nor a remedy. It is merely the process by which a claimant demonstrates what has happened to his property, identifies its proceeds and the persons who have handled or received them, and justifies his claim that the proceeds can properly be regarded as representing his property."

207    In the present case, it is said:

(1) As at December 22nd, 2006, the master fund owned 100% of the share capital of PEL. It did so by holding the single issued share which it had acquired on December 1st, 2006.

(2) From that date, PEL had a valuable contractual right under the SPA; that is to say, the right to purchase the Fabergé rights from Unilever on payment of US$38m. at completion. It acquired that right with the intention that it, and through it the master fund, would keep the full economic benefit of the Fabergé rights at completion.

(3) On January 3rd, 2007, PEL completed the SPA and acquired the Fabergé rights unconditionally. In order to do so, PEL incurred a loan liability to members of the consortium who had funded the purchase, and a liability for interest on that loan. At that point, the master fund owned 100% of PEL, which held the rights and owed US$38m. Any upside value of the rights over and above US$38m. would accrue for the benefit of the master fund.

(4) Also on January 3rd, 2007, according to its records, 100 new PEL shares were issued to the members of Mr. Gilbertson's consortium; in particular, 25 new PEL shares were issued to Autumn. The master fund's interest in PEL was thereby diluted from 100% to less than 1%. The effect of the share issue was that, although the master fund still owned its single PEL share, the value of its holding in PEL was reduced by over 99%. The value lost to the master fund was transferred to the consortium as the holders of the new shares.

(5) By this means (as was intended) the value of the 100% ownership of PEL (formerly represented by the single share held by the master fund) came to be represented by the 101 shares in PEL which existed post-dilution. Given that only one of those 101 shares was then held by the master fund, in excess of 99% of the value of the ownership of PEL was transferred to the members of the consortium.

In those circumstances, it is said, it is easy to see how the new PEL shares represent virtually the whole of the value of the formerly single PEL share owned by the master fund. It matters neither that the new shares are newly created property nor that the master fund still holds its one share. The value in the single share has moved and can be traced to the new shares in the hands of the recipients: they are in all senses its substitutes in value. The new shares thus represent the single share or, rather, represent the value of the economic and control rights inherent in ownership of the single share. If this analysis were wrong it would enable corporate form to defeat commercial substance. It would be anomalous if equity would (as it would) permit a tracing claim where Mr. Gilbertson procured PEL to transfer the rights (or to assign the SPA) to the consortium, or procured the

master fund to transfer PEL itself to the consortium, each of which transactions which would undoubtedly give rise to a proprietary claim against the consortium, but would not permit a tracing claim if he resorted to the simple expedient of procuring PEL to issue the consortium with 100 new shares in PEL. This anomalous conclusion is avoided if one follows Lord Millett's analysis in *Foskett* v. *McKeown* (17) and treats the tracing exercise as an exercise in the tracing of value and not an exercise in the following of property *in specie*.

208   I accept Renova's submission that the judge was correct to conclude that the value of the master fund's holding (immediately prior to the issue of the new shares) of 100% of the issued share capital of PEL can be traced into the PEL shares issued to Autumn in January 2007. In the events which happened, the position immediately before the issue of the 100 new shares was that PEL was the owner of the Fabergé rights, and as the holder of the single share then in issue, the master fund was the owner of 100% of the issued capital of PEL. The position immediately after the 100 additional shares were issued was that PEL remained the owner of the Fabergé rights but that the issued capital of PEL was owned as to 100/101 by the members of the consortium and as to 1/101 by the master fund; or, to put the point another way, substantially the whole of the value of the master fund's interest in PEL and (indirectly, through PEL) in the Fabergé rights had been transferred to the members of the consortium as owners of the new shares. In those circumstances, as it seems to me, the effect of the issue of the new PEL shares was that 100/101 parts of the master fund's ownership of the whole issued share capital of PEL was transferred to the members of the consortium and, in particular, 25/101 parts of the master fund's ownership of the whole issued share capital of PEL was transferred to Autumn. The value of what was transferred was represented by the new shares held by Autumn and the other members of the consortium, and can be traced accordingly. As Renova points out, to hold otherwise would be to allow corporate form to defeat commercial substance. It cannot be doubted that, had the transaction been carried out (as a matter of corporate form) in a slightly different way—by subdividing the existing single share in PEL into 101 new shares and then causing the master fund (as the owner of those 101 new shares) to transfer 100 of those shares to members of the consortium—the 100 shares so transferred could be followed into the hands of the transferees and could be the subject of a proprietary claim. To deny a proprietary claim in circumstances where what is, as a matter of commercial substance, the same transaction is carried out by the issue of new shares (rather than the creation of new shares by the subdivision of an existing share) would, indeed, be anomalous.

282

(iii) *Whether Autumn received the new PEL shares as a volunteer and not as a purchaser for value and so held those shares as a constructive trustee for the master fund*

209    As I have said earlier in this section, it is submitted on behalf of Autumn that the judge was wrong to hold that it received the new PEL shares issued in January 2007 as a volunteer and not as a purchaser for value. In particular, it is said that the evidence established (contrary to the judge's finding) that the new PEL shares were issued as security for the repayment of the loan which Autumn made to PEL, and that, had the judge directed himself properly, he should have concluded that Autumn did provide adequate consideration for the issue of the new shares. I have already rejected those submissions.

210    Nonetheless, the submission that the judge was wrong to hold that Autumn was liable to account as a constructive trustee for the PEL shares which it received in January 2007 is pursued on the ground that, even if Autumn (and the other members of the consortium) gave no consideration (in the sense in which that term is generally understood) for the shares that were issued to them, the issue of those shares served a clear commercial purpose—in that it was clearly calculated to cause the consortium to forbear from demanding repayment of the moneys lent—and such forbearance may be seen as giving value in equity. It is said, correctly (i) that PEL required moneys to pay for the acquisition of the Fabergé rights and by way of working capital; (ii) that the consortium lent PEL the moneys required on terms that entitled them to require PEL to transfer the Fabergé rights to them in the event that PEL was unable to repay those moneys within seven days of demand; (iii) that the issue of the new PEL shares had the effect that the consortium had no motive to demand repayment of the moneys within seven days; and, accordingly (iv) that PEL was given the time it required to raise the moneys needed to repay the loans by the issue of further shares. It is said, further, that—had there been a claim by PEL to recover the shares, founded on the allegation that, in causing the new shares to be issued, the directors of PEL had acted in breach of duty—the remedy sought would have been an order setting aside the issue of the new shares and that, in answer to that claim, Autumn would have been able to rely upon "change of position." Autumn would have been able to assert that, by accepting the shares issued in January 2007, it changed its position because it forbore from insisting on the security rights which it was promised under the loan agreement. A defence of change of position ought also to be available in a case brought against Autumn directly by or on behalf of the master fund as a shareholder in PEL.

211    Renova accepts that Autumn did lend money to PEL to assist PEL to pay Unilever, and provided further loan funds (US$0.5m.) for working capital. But, in response to the submission that the new PEL shares were

issued "to cause the consortium to forbear from demanding payment" of the moneys lent, it is said on behalf of Renova that to issue the shares for that purpose would make "no sense at all" because "that would have turned the loan into the price for the shares, which it was clearly not." Further, if the new shares had been issued for that purpose, when the consortium later came to demand repayment in September 2007, "they were doing something they were not entitled to do (and, what is more, in any event they held on to their existing shares)."

212   In my view it is unnecessary, in the circumstances of the present case, to address the question whether, in principle, a change of position defence could have been advanced in response to the claim against Autumn as a volunteer. It is unnecessary to address that question because there was no evidence to support the contention that, in making no call for repayment of the loans, the members of the consortium did change their position. It is clear from the evidence at trial that the members of the consortium were assured by Mr. Gilbertson that the loans were required as short term funding while the terms of an advantageous sale of the Fabergé rights to Mr. Vekselberg (whom, they were assured, was a ready and willing purchaser) were negotiated. There is nothing in the evidence to support the conclusion that the members of the consortium ever considered calling for repayment of the loans or that they forbore from doing so in reliance on a belief that their position as the holders of the PEL shares issued in January 2007 was unchallenged.

213   In those circumstances I reject the submission that the judge was wrong to hold that (whether or not it had knowledge of Mr. Gilbertson's breach of fiduciary duty in relation to the issue of the new PEL shares in January 2007) Autumn was liable to account for those shares as a constructive trustee.

(iv) *Whether, if (and notwithstanding that) Autumn received the new PEL shares as a purchaser for value, it held those shares as a constructive trustee for the master fund on the basis of "knowing receipt"*

214   In developing the second of its grounds of appeal—that the judge was wrong to hold that Autumn was liable as a constructive trustee on the basis of knowing receipt—it is said on behalf of Autumn that the judge was wrong to hold, or to proceed as if he had held, that the master fund had a sufficient proprietary interest in the new PEL shares to found a claim for knowing receipt. It is unnecessary to address that submission under this head. I have already held that the judge was entitled to take the view that the master fund had a sufficient proprietary interest in the new PEL shares to found a claim that Autumn account as a constructive trustee for the shares that were issued to it.

215   It is said, further, that the judge was wrong to hold, or to proceed as if he had held, that the issue of the new PEL shares by the directors of PEL involved a breach of their fiduciary duty such that the transaction could be impugned. Had the judge directed himself properly, it is said, he would have held that Renova had failed to plead any such case, and that any such case would have been hopeless in any event. It is unnecessary to address that submission under this head. Renova's claims in these proceedings (and, in particular, its claim that Autumn account as constructive trustee for the PEL shares issued to it in January 2007) are not founded on an allegation that—in causing those PEL shares to be issued—the directors of PEL (Mr. Sean Gilbertson and Mr. Willis) were in breach of the fiduciary duties which (as directors) they owed to that company; they are founded upon the allegation that—in causing the directors of PEL to give effect to his decision that the new PEL shares be issued—Mr. (Brian) Gilbertson was in breach of the fiduciary duties which he owed (as a director of the company) to the company and (more generally) to the master fund and/or the other entities within the Pallinghurst structure. I have already accepted that the judge was entitled to take the view that that allegation is well-founded.

216   It is also submitted under this head that Autumn lacked the requisite knowledge to make it unconscionable for it to retain the PEL shares issued to it in January 2007. Renova's primary response to that submission is that (as the judge held) Autumn was a volunteer in respect of those PEL shares, and that, as such, its knowledge (or alleged lack of relevant knowledge) of the circumstances in which they were issued is irrelevant. Equity does not aid a volunteer. I have already explained why I take the view that Renova is correct: on a true analysis it is unnecessary to address the issue whether Autumn knew or ought to have known of Mr. Gilbertson's breach of fiduciary duty in relation to the issue of the new PEL shares in January 2007. Nevertheless (although not strictly necessary) it is, I think, appropriate to do so.

217   As the judge found (at para. 2.3 of his judgment), Autumn was a special purpose vehicle set up by the professional trustees of one of Mr. Gilbertson's family trusts to hold the investment in PEL on behalf of a family trust. He held that Autumn had the requisite knowledge of Mr. Gilbertson's breach of fiduciary duty on the basis that there was to be attributed to it (a) Mr. Gilbertson's own knowledge; and/or (b) the knowledge of Mr. Thomas. It is said on behalf of Renova to be common ground that the relevant enquiry was whether Autumn had such knowledge of the circumstances in which the new PEL shares were issued in January 2007 that it would be unconscionable for it to retain those shares. In support of that proposition, Renova relies on observations in *Bank of Credit & Commerce Intl. (Overseas) Ltd.* v. *Akindele* (4). It is submitted

that the judge applied the right test, and that his analysis of the evidence of knowledge (2012 (2) CILR 416, at paras. 79–91) was correct.

(a) *The attribution to Autumn of Mr. Gilbertson's own knowledge*

218    It is, of course, accepted on behalf of Autumn that Mr. Gilbertson possessed the requisite knowledge of his own actions. The judge imputed Mr. Gilbertson's knowledge to Autumn on the basis of a number of factors (*ibid.*, at para. 81)—and concluded (*ibid.*, at para. 85) that Mr. Thomas "was very ready to comply with Mr. Gilbertson's requirements" and that "there was never any doubt that he would comply with Mr. Gilbertson's request and Mr. Gilbertson knew and relied upon that." In effect, it is said, the judge held that Mr. Gilbertson controlled Autumn and was its directing mind and will. It is submitted on behalf of Autumn that that finding was "plainly wrong as a matter of fact and as a matter of law," in that:

  (1) As Hoffmann, L.J. observed in the Court of Appeal of England and Wales in *El Ajou* v. *Dollar Land Hldgs. plc* (16) ([1994] 2 All E.R. at 705–707)—and (as Lord Hoffmann) when delivering the opinion of the Judicial Committee of the Privy Council in *Meridian Global Funds Mgmt. Asia Ltd.* v. *Securities Commn.* (24), the answer to the question whether a person is the directing mind and will of a company depends upon the proper application of the rules of attribution in any given case. The directing mind and will of a company is either the person who is given the relevant responsibility by the constitution of the company or one who, by reason of the particular function he carries on within the company or by what he did with the acquiescence of the company, can be said to be the directing mind and will for the purposes.

  (2) Mr. Gilbertson was not given any relevant responsibility in relation to Autumn by the constitution of that company; nor did he have such responsibility by reason of any particular function he carried on within that company; nor, given that the loan was not authorized by Mr. Gilbertson, can Autumn be said to have acquiesced in his authorization of it.

  (3) In those circumstances, the facts found by the judge would not be sufficient to justify the attribution of Mr. Gilbertson's knowledge to Autumn, even assuming them to be true. It is said that:

    (i) It may well have been the case that "Mr. Thomas would not want to upset or disagree with his client"; but "the vast majority of professionals will feel the same way."

    (ii) It may well have been the case that Mr. Thomas was "very ready to comply with Mr. Gilbertson's requirements" but, as the settlor and a beneficiary, "Mr. Gilbertson was entitled to

286

expect Mr. Thomas to have regard to his wishes insofar as it was proper to do so without fettering his discretion."

(iii) It is true that Mr. Thomas was willing "to place great reliance upon [Mr. Gilbertson]" (as he accepted in evidence) but, "on the basis of his past dealings with Mr. Gilbertson Mr. Thomas had the highest regard for him."

(iv) The judge was wrong to hold that there "was little or nothing to override," in that there was unchallenged evidence before the court that Mr. Thomas had refused to make a loan on an interest free basis.

(4) To find that a professional trustee had allowed his will to be suborned to that of a beneficiary to such an extent as to justify treating the acts of the trustee as acts of the beneficiary and thus, attributing the knowledge of the beneficiary to the trust is a serious matter. It implies a degree of impropriety on the part of the professional trustee which the court should not find in the absence of compelling evidence. The judge referred to no such evidence to support his finding and the evidence was in fact to the contrary.

(5) For the court to hold that the independent mind and will of Autumn was defeated in the circumstances of this case would be to impose an unrealistic and unwarranted standard of independence on trustees.

219   In response to those submissions, it is said on behalf of Renova that the judge was right to conclude (2012 (2) CILR 416, at para. 85) that Mr. Gilbertson's knowledge could be imputed to Autumn, in that:

(1) In asking whether Fairbairn (as director of Autumn) and Mr. Thomas (as director of Fairbairn) deferred to Mr. Gilbertson in respect of the relevant decision (whether to accept the new PEL shares issued to the members of the consortium), instead of exercising autonomy, the judge (correctly) applied the principle identified in *Meridian Global Funds Mgmt. Asia Ltd.* v. *Securities Commn.* (24).

(2) There was "a wealth of evidence" to support the judge's conclusion that the answer to that question was "Yes":

(i)      Autumn was a special purpose vehicle established solely for the purposes of making the loan to PEL to pay Unilever under the SPA and to receive the new PEL shares. It had no pre-existing business, and no other function. It was established as an immediate consequence of Mr. Gilbertson's demand of the trustees of his family settlement, the BPG Discretionary Settlement, for urgent payment. That was its *raison d'être.*

(ii)     This was all Mr. Gilbertson's deal. As he told Mr. Thomas in the telephone conversation on January 2nd, 2007 "I have bought myself a Christmas present . . . and I need some money to pay for it."

(iii)    It is plain that Mr. Gilbertson never doubted that the settlement trustees would do as he asked. He told Mr. Mende in his email of January 2nd, 2007 (to which the judge referred at para. 9.42 of his judgment) that he had to "extract it [the payment] from a set of Trusts in Jersey," and, as the judge noted (2012 (2) CILR 416, at para. 81(iii)), he described the role of the trustees as simply "processing paperwork."

(iv)    Autumn was described by Clifford Chance (solicitors acting on Mr. Gilbertson's instructions) in a letter dated March 7th, 2007 as "in practice an entity controlled by [Mr. Gilbertson]." Mr. Gilbertson's complete confidence at the time that (as he told Mr. Mende) he would be able to "extract" US$9.5m. from the trust within a few days, and the fact that he did so, bears that out entirely.

(v)     As the judge noted, during the time between Mr. Gilbertson's first call to Mr. Thomas on January 2nd, 2007 and his email to Mr. Vekselberg (in which he wrote that he had triggered alternative arrangements and bought the Fabergé rights)—a period of only some eight hours—Mr. Thomas had not got back to him to confirm that he would make the payment. Mr. Gilbertson's confidence that the trustees would do as he asked was such that he felt no need for such confirmation.

(vi)    Fairbairn, as the director of Autumn, was content to let Mr. Gilbertson lead the commercial discussions with the other members of the consortium about the loan and the payment to Unilever: at no stage did Fairbairn (or Mr. Thomas) have any direct contact with the other members of the consortium.

(vii)   Mr. Thomas was prepared to sanction paying away US$9.5m. of trust money at Mr. Gilbertson's request, without a signed or even finalized loan agreement, and without having carried out even minimal due diligence into the standing of PEL or the value of the Fabergé rights.

(viii)  Autumn and Mr. Gilbertson shared a single defence team and a joint defence. Autumn did not produce its own discovery list and did not verify on oath such discovery as it made. Notwithstanding that there was an obvious conflict of

interest between Mr. Gilbertson and Autumn in relation to the issues in this case—not least in that it was in Autumn's interests to deny all knowledge of any breach and in Mr. Gilbertson's interests to say that he had made full disclosure to Autumn (or the trustees)—Mr. Thomas confirmed in his evidence at trial that Autumn had not taken its own independent legal advice. Not to do so would, he said, be cheaper and would simplify the process of getting the legal advice.

In those circumstances it is hard to see what further evidence Renova needed to adduce or rely upon in order to establish that Mr. Gilbertson was the directing mind and will of Autumn in relation to the loan and the receipt of the new PEL shares. Autumn's suggestion that Mr. Thomas's independence of mind is demonstrated by his refusal to make the loan on an interest-free basis is not well-founded: the evidence is clear that it was Mr. Sean Gilbertson (and not Mr. Thomas) who actually proposed that interest on the loan be paid at the rate of 1.5%—in order to make the loan "look commercial"—and that Mr. Thomas agreed to that proposal.

220   In my view, the submissions advanced in respect of this issue on behalf of Renova are to be preferred to those advanced on behalf of Autumn. I am satisfied that the judge was correct to hold (2012 (2) CILR 416, at para. 85) that there was never any doubt that Mr. Thomas would comply with Mr. Gilbertson's wishes in relation to the funding of the acquisition of the Fabergé rights and the receipt of the new PEL shares. In relation to that transaction Mr. Gilbertson was the directing mind of Autumn, and, accordingly, his knowledge is to be attributed to Autumn in that context.

(b) *The attribution to Autumn of Mr. Thomas's knowledge*

221   In advancing the submission that the judge was wrong to conclude that Autumn could be said to have the requisite knowledge as a consequence of what Mr. Thomas knew or should have known—and, in particular, to hold that Mr. Thomas should have known, if he had made appropriate independent enquiries, that the Fabergé rights were being acquired by Mr. Gilbertson in circumstances which amounted to a breach of his fiduciary duties—Autumn invites the court to have regard to the chronology of events (which it summarized as follows): (i) on January 2nd, 2007, Mr. Gilbertson telephoned Mr. Thomas to request that the trust make an investment of US$9.5m. to acquire the Fabergé rights for PEL plus a further US$0.5m. working capital; (ii) later on that day, Mr. Sean Gilbertson had a conversation with Mr. Thomas in which he explained to Mr. Thomas that the "investment" the trust was being asked to make was a loan; (iii) on January 3rd, 2007, Mr. Thomas approved the loan, indicating that he anticipated that it would be on commercial terms; (iv) on January 4th, 2007, Mr. Sean Gilbertson sent an email to Mr. Thomas indicating

that the loan would not be on commercial terms but would be a one-year interest-free arrangement, secured against the assets and receivables of PEL; (v) later that day, Mr. Sean Gilbertson spoke to Mr. Thomas—and to Mr. Daniel Hawson (a co-director of the corporate trustee)—on the telephone. They agreed a commercial rate of interest; (vi) later, but also on January 4th, 2007, Mr. Thomas committed Autumn to making the loan and instructed that the funds be wired to the K-MIC account, the details of which he had been given; and (vii) on January 5th, 2007, Mr. Thomas informed Mr. Gilbertson that he could "confirm that the USD9.5m. was sent yesterday for value yesterday" and that he had authorized the payment "on the basis that the Loan Agreement will stand as currently drafted (allowing for some minor amendments)." With that chronology in mind, it is said on behalf of Autumn that:

(1) In the course of the telephone conversation on January 4th, 2007 (before authorizing the loan), Mr. Thomas had asked Mr. Sean Gilbertson whether PEL (which, as he observed, had been established as recently as December 1st, 2006) was a "shell company, without anything else in it?" Mr. Sean Gilbertson's response was:

"That is absolutely correct, it is an absolute fresh start and I can't even remember how many shares were issued, I mean it's probably one or two or something along those lines and there is—it would have been issued to a thing called Pallinghurst Resources Management LP, which is our fund entity."

Mr. Thomas then asked "who's the sort of shareholders behind that?" and was told:

"Well, there aren't shareholders per se, I mean it's—it's literally a fund entity, so basically it's the fund entity into which the various investors of our fund would come into. At this point in time, there are basically zero investors, because the documentation—you've got all the documentation, Daniel has had the unfortunate task of having to trawl through it all, but the documentation is not signed and there are no technical investors in the fund entity itself. However, um, Brian serves as the chairman of that fund and it's by virtue of all the groundwork that we're doing that we're able to put this transaction into that structure, which obviously makes the fund that much more appetising."

It was not suggested to Mr. Thomas at the trial that he should have disbelieved what he was told by Mr. Sean Gilbertson in that telephone conversation.

(2) In those circumstances, it should not be in dispute that Mr. Thomas had reason to believe (i) that PEL had no substantial shareholders; (ii) that there were no investors in the fund; (iii) that the fund documentation

290

was yet to be effected; and (iv) that Mr. Sean Gilbertson and his father, Mr. Gilbertson, saw themselves as free to acquire the rights in PEL as an attraction to a potential investor in the fund.

(3) There was nothing complicated or obscure in what Mr. Sean Gilbertson told Mr. Thomas; nothing of which it could sensibly be contended that it was unconscionable of Mr. Thomas not to have enquired further, and the judge was wrong to have ignored that conversation on January 4th, 2007 and to focus his attention on the earlier conversation (on January 2nd, 2007) in which Mr. Gilbertson explained that Mr. Vekselberg would be "pissed off" to discover that Mr. Gilbertson had acquired the rights without doing a deal with him.

(4) The judge was wrong to hold (2012 (2) CILR 416, at para. 91) that Mr. Thomas knew, or could be taken to know, that Mr. Gilbertson was a director of the company or that the company had a place in the Pallinghurst structure, and wrong to hold (implicitly) that Mr. Thomas knew, or could be taken to know, that Mr. Vekselberg represented an interest in the fund and that the explanation for Mr. Vekselberg being "pissed off" was likely to reflect a breach of fiduciary duty to the master fund, rather than any agreement or understanding he may have had with Mr. Gilbertson personally or perhaps, simply the fact that he had not got his own way. None of those propositions could be sustained, in that:

  (i) It was quite unrealistic to think that Mr. Thomas would know that Mr. Gilbertson was a director of the company. It was not alleged that Mr. Thomas had been told that Mr. Gilbertson was a director of the company or that he had seen any document which indicated that Mr. Gilbertson was a director of the company.

 (ii) It was quite unrealistic to think that Mr. Thomas would have understood the place of the company in the Pallinghurst structure, or that (even if he did understand the company's place in the structure) he would have understood that that place in the structure gave the company an interest in any opportunity which might be exploited by the master fund. Indeed, had Mr. Thomas acquainted himself with the full suite of documentation that Mr. Hewson was sent by Mr. Sean Gilbertson on September 7th, 2006, he would have seen that the company was only to receive US$20,000 per year to cover its administrative expenses and that it was to have an executive committee, the members of which were charged with dealing with restricted matters.

(iii) The judge identified no basis on which he might have found that Mr. Thomas knew anything of significance about Mr. Vekselberg.

    (iv) The judge identified no basis on which he might have found that Mr. Thomas knew that the relationship between Mr. Gilbertson and Mr. Vekselberg was governed within the pro forma structure rather than, for example, a separate agreement such as the letter agreement.

  (5) The judge's view (expressed, *ibid.*, at para. 91) that Mr. Thomas should have made further enquiries is difficult to reconcile with the fact that the further enquiries that Mr. Thomas did make provided him with the assurance that the judge expected him to seek and obtain. If Mr. Thomas failed to make further enquiries, it was not because he wilfully failed to do so, or closed his eyes to the obvious; rather it was because, in the light of what he had been told by Mr. Sean Gilbertson—which he had no reason not to believe—there was no need for any further enquiries.

  (6) Mr. Gilbertson and Mr. Sean Gilbertson considered themselves to be acting perfectly properly. Even if the judge were correct to hold otherwise—it cannot sensibly be said that the matter was so obvious that Mr. Thomas should have dismissed the assurances given to him by Mr. Sean Gilbertson. Indeed, it is unclear what Mr. Thomas might have been expected to do which would have caused him to reject what Mr. Sean Gilbertson told him, short of instructing lawyers to carry out an exhaustive due diligence or demanding to speak directly to Mr. Vekselberg.

  (7) The judge appears to have assessed the conduct of Mr. Thomas on the basis of a presumption that had no relevance to his actual state of mind in that the judge found (at para. 9.49 of his judgment) that the new PEL shares were issued on "or with effect from" January 3rd, 2007. The relevant date for assessing the knowledge of Mr. Thomas must be the actual date of receipt of the new PEL shares by Autumn (said to have been on or about January 19th, 2007); for the judge to have assessed Mr. Thomas's knowledge on an earlier (and notional) date of issue was wrong in principle.

  (8) Equity operates on the conscience, and that the "mere fact that Mr. Thomas failed to join up the dots as the learned judge would have had him do" does not show him to have acted unconscionably. Mr. Thomas knew Mr. Gilbertson and Mr. Sean Gilbertson well enough to have formed a view of them, and the view that he had formed was favourable. In the circumstances, Mr. Thomas relied upon what they told him, and, it is said, there was nothing so inherently implausible in what they told him that he can fairly be criticized for having done so.

222    In response to those submissions, it is said on behalf of Renova that the judge was right to conclude (*ibid.*, at para. 91) that Mr. Thomas's knowledge was sufficient to support the view that it would be unconscionable for Autumn to retain the PEL shares issued to it in January 2007. In particular:

292

(1) The judge's conclusion, it is submitted, was consistent with the evidence at trial, in that:

(i) The draft Pallinghurst structure documents had been sent to Mr. Thomas's colleague, Mr. Daniel Hawson, on September 7th, 2006, under cover of a note stating that the Pallinghurst structure entities had all been set up except the feeder fund. Mr. Thomas accepted in evidence that he had discussed the structure of the fund with Mr. Hawson in broad terms, and that he recalled looking at the structure chart and flow of funds. Further (as the judge noted at para. 9.45 of his judgment), when Mr. Thomas was asked by Mr. Gilbertson in the telephone conversation on January 2nd, 2007 whether he was "familiar with Pallinghurst," his answer was unqualified: "I am, yes, yeah."

(ii) Mr. Thomas would have seen from the structure documents that the BPG discretionary settlement had a 50% shareholding in the company. It is probable, given that he had seen all the structure documents, that he knew that Mr. Gilbertson was a director of the company. He was unwilling to accept that in evidence, stating that he could not recall whether he knew that Mr. Gilbertson was a director of the company. In the light of that evidence, the judge was entitled to take the view (*ibid.*, at para. 89) that he found it hard to believe that Mr. Thomas did not know that Mr. Gilbertson was a director of the company and to conclude that he probably did.

(iii) Mr. Thomas could see that the other 50% shareholder of the company was Renova, and so would know that Renova had an interest in the Pallinghurst structure.

(iv) During their telephone conversation on January 2nd, 2007 Mr. Gilbertson told Mr. Thomas—

(a) that the original intention had been to acquire the Fabergé rights "through Pallinghurst," but that Mr. Vekselberg had insisted that (if he were to fund the purchase) he wanted the brand transferred to one of his private companies which would then license it on to "Pallinghurst" to develop;

(b) that the Fabergé rights had been purchased by PEL under the SPA;

(c) that PEL was "a subsidiary of Pallinghurst";

(d) that the reason why Mr. Gilbertson wanted the funds from his trust was to be able to finance part of the completion payment himself as part of a consortium "rather than as Pallinghurst"; and

(e) that it was necessary to establish a corporate vehicle (which became Autumn)—through which to make the investment—because the trust was not being asked simply to lend to PEL/Pallinghurst but to invest in the Fabergé rights *per se*.

It was against that factual background that Mr. Thomas asked Mr. Gilbertson, in the course of the telephone conversation on January 2nd, 2007, what Mr. Vekselberg's thoughts would be "if you do this without using Pallinghurst"; a question to which Mr. Gilbertson's response was "He'll be extremely pissed off I would think."

(2) It is said that it was completely understandable (indeed, that it was positively desirable) in those circumstances that Mr. Thomas would want to know what Mr. Vekselberg's reaction would be to the course proposed by Mr. Gilbertson in that he (Mr. Thomas) knew and understood, at the very least, that Mr. Vekselberg and Mr. Gilbertson were in business together, that the proposed acquisition was contrary to the express wishes of Mr. Vekselberg (in that what Mr. Vekselberg wanted was to take the Fabergé rights into one of his own companies and license them back to the Pallinghurst structure), that Mr. Vekselberg was not aware of what Mr. Gilbertson was proposing to do, and that the acquisition involved third parties. Mr. Thomas asked the question that he did because, as he accepted in evidence, he knew that the original intention had been to buy the Fabergé rights "through the Pallinghurst fund" and that what Mr. Gilbertson was proposing was contrary to that proposal. He knew, or ought to have appreciated, that the effect of what Mr. Gilbertson was proposing was that the Pallinghurst structure, having obtained the benefit of the Fabergé rights as purchaser under the SPA, would end up without any interest (even as licensee) in the value of those rights. It follows that Mr. Thomas knew, or ought to have realized, that the reason why Mr. Vekselberg would be "extremely pissed off" was because Mr. Gilbertson was doing something he was not entitled to do *vis-à-vis* Renova and the Pallinghurst structure and that the Pallinghurst structure would lose out.

(3) In those circumstances, it is submitted, the judge's conclusions (2012 (2) CILR 416, at para. 91) are supported by the evidence as to what Mr. Thomas knew of (i) Mr. Gilbertson's role as director of the company; (ii) Mr. Vekselberg's interest in the Pallinghurst structure; and (iii) the adverse effect of Mr. Gilbertson's proposed course on the interests of the Pallinghurst structure. The judge was right to hold that Mr. Thomas

294

should, as a minimum, have asked how or why it was thought that the Pallinghurst structure would benefit if the master fund's interest in PEL was to be reduced from 100% ownership to less than 1% ownership.

(4) It is said that Autumn's reliance on what Mr. Thomas was told by Mr. Sean Gilbertson in the course of their telephone conversation on January 4th, 2007 is misplaced. There was nothing in that conversation to explain to Mr. Thomas why Mr. Vekselberg would have been "pissed off" if the purchase from Unilever was completed "without using Pallinghurst," and nothing in that conversation to explain to Mr. Thomas how or why it was thought that the Pallinghurst structure would benefit if the master fund's interest in PEL was to be reduced from 100% ownership to less than 1% ownership. Further (as Mr. Thomas must have realized, because he could see from the structure documents that Renova had a share in the Pallinghurst structure), what Mr. Sean Gilbertson told him in that conversation was inaccurate and incomplete: in that there was no mention of Renova, no mention of the fact that Renova had spent US$3.5m. in setting up the Pallinghurst structure, and no mention of the fact that the Pallinghurst structure entities existed and had already conducted some business (the May 2006 offer for the rights, the Angola deal and Project Charlie).

(5) For Autumn to suggest that the "mere fact that Mr. Thomas failed to join up the dots as the learned judge would have had him do" does not show him to have acted unconscionably is wrong. Properly understood, the criticism of Mr. Thomas's conduct was not that he "failed to join up the dots." The dots, it is said, were joined up for him by what Mr. Gilbertson had told him, and if Mr. Thomas "genuinely did not see the ugly shape made by the dots" then that was sufficiently culpable to constitute unconscionable conduct. *A fortiori* in circumstances where Mr. Thomas was in a position of trust and had a duty to act independently and to make proper inquiry, and where he knew, as he did, that the new shares were in essence a gift. It is no answer for Autumn to suggest, in answer to the criticism that "Mr. Thomas would not want to upset or disagree with his client," that "the vast majority of professionals will feel the same way"; or, in answer to the criticism that Mr. Thomas was "very ready to comply with Mr. Gilbertson's requirements," that (as the settlor and a beneficiary of the BPG settlement), "Mr. Gilbertson was entitled to expect Mr. Thomas to have regard to his wishes insofar as it was proper to do so without fettering his discretion" or, in answer to the criticism that Mr. Thomas was willing "to place great reliance upon [Mr. Gilbertson, that] on the basis of his past dealings with Mr. Gilbertson Mr. Thomas had the highest regard for him."

223   Again, I take the view that the submissions advanced in respect of this issue on behalf of Renova are to be preferred to those advanced on behalf of Autumn. I am satisfied that the judge was correct to hold (2012 (2) CILR 416, at para. 91) that Mr. Thomas knew, or ought to have

realized, that what Mr. Gilbertson was asking him to do on behalf of Autumn in relation to the funding of the acquisition of the Fabergé rights and the receipt of the new PEL shares was, or was likely to be, contrary to the interests of the master fund, and so was likely to be in breach of his (Mr. Gilbertson's) fiduciary duties as a director of the company, and that "proceeding to implement Mr. Gilbertson's request in the circumstances without more information and without the knowledge of Renova and/or Mr. Vekselberg would be inappropriate for a prudent trustee." In so far as Mr. Thomas's own knowledge was of relevance—given the judge's finding (with which I concur) that Mr. Gilbertson was the directing mind of Autumn in this context—it is not, I think, in dispute that his knowledge is to be attributed to Autumn.

224   It follows that if (and notwithstanding that) Autumn received the new PEL shares as a purchaser for value, it held those shares as a constructive trustee for the master fund on the basis of "knowing receipt."

225   More generally, it follows, also, that—for the reasons set out in this section of my judgment—I reject Autumn's contention that the judge was wrong to hold that it was liable to account as a constructive trustee for the PEL shares which it received in January 2007.

**Was the judge wrong in failing to hold that the entirety of Autumn's shareholding in Fabergé Ltd. (and not just the 25,000 shares which represented the 25 shares issued by PEL in January 2007) should be held on constructive trust for (and transferred to) the master fund?**

226   As I have said, the judge gave effect to the conclusion which he had reached (2012 (2) CILR 416, at para. 95) that Autumn held the shares issued to it by PEL in January 2007 (which had become 25,000 ordinary shares in Fabergé Ltd. following a change of name and a sub-division of shares in 2008) as constructive trustee for the master fund—by the declaration which he made in para. 1 of his order of November 6th, 2012 and the direction (in para. 2 of that order) that Autumn transfer those 25,000 shares to the master fund. In a ruling delivered on November 5th, 2012 (following a post-trial hearing held on October 26th, 2012), the judge made it clear that he did not intend to include in that declaration or in that direction any shares in Fabergé Ltd. subsequently acquired by Autumn. The relief sought by the Renova parties in their cross-appeal (Appeal No. 22 of 2012) includes an order that it be declared that Autumn holds a further and additional 16,190,575 ordinary shares in Fabergé Ltd. as constructive trustee for the master fund, and that Autumn shall forthwith transfer full legal title in those further shares to the master fund.

227   It is, I think, common ground between the parties—although not pleaded in Renova's amended statement of claim—that, following the sub-division of the original shares issued to it by PEL in January 2007 and

the change of name, Autumn acquired further shares in Fabergé Ltd. in the amounts and on the various dates between February 13th, 2008 and November 17th, 2010 set out in the table to which Mr. Thomas had referred at para. 25 of his expert report, and that those acquisitions were funded by, or through, Autumn in an amount of US$1,455,466. It is said that the purpose and effect of those acquisitions was to maintain Autumn's proportionate interest in the share capital of Fabergé Ltd. Save that the judge referred (*ibid.*, at para. 122)—albeit, not in this context—to a rights issue in September 2009, he made no findings of fact as to the number of further shares acquired by Autumn, the circumstances in which those further shares were acquired or the cost of acquisition.

228   In advancing their claim that Autumn holds a further and additional 16,190,575 ordinary shares in Fabergé Ltd. as constructive trustee for the master fund, it is said on behalf of the Renova parties that the judge erred in that he failed to pay any or any adequate attention to the fact that Renova had argued in its opening at trial and in its closing written submissions that Autumn's entire holding of shares in Fabergé Ltd. should be the subject of a constructive trust, failed to pay any attention to the fact that Renova's arguments in support of that claim had not been addressed by the Gilbertson parties in their closing submissions, and failed to give any reasons for rejecting Renova's arguments. In particular, it is said that, notwithstanding that the claim was expressly brought to his attention at the post-judgment hearing on October 26th, 2012, following which he made certain changes to the written judgment which he had issued, the judge did not amend that judgment to explain why he was rejecting those arguments.

229   In response to the criticism that the judge failed to address Renova's claim that Autumn's entire holding of shares in Fabergé Ltd. should be the subject of a constructive trust, it is said on behalf of Autumn that the judge was correct to take the view that that claim was not before him. The claim had not been pleaded (as Renova acknowledged at the post-trial hearing on October 26th, 2012), and counsel for the Renova parties expressly disclaimed any intention of applying to amend the pleading in order to raise it; rather, counsel submitted (at that post-trial hearing) that it was sufficient that Renova had raised the issue in its opening skeleton and that the Gilbertson parties allowed the claim into the action by failing to raise any objection to it at that time. But that submission could not be sustained in the circumstances that the Gilbertson parties had noted in their written opening that "Renova had not formulated any claim in respect of [the] later acquired shares" and that Renova did not seek leave to amend to add any such claim, "even though it appreciated that it had no such claim on its pleadings."

230    In summarizing Renova's claim (at para. 6.5 of his judgment and 2012 (2) CILR 416, at para. 74)) the judge had said this:

> "6.5    With regard to Autumn, the Plaintiff claims that it should account for the shares that it was given gratuitously and now holds in Fabergé Limited (formerly PEL) . . ."

> "74    The Plaintiff's claim against Autumn is to account as a constructive trustee for the new shares in PEL issued to it or their value, on the ground that it knowingly received them as property misapplied or procured to be misapplied by Mr. Gilbertson in breach of his fiduciary duties to the company. Alternatively, Autumn is said to be liable to account as a constructive trustee on the ground that it was a volunteer, since it did not pay for the new shares in PEL."

He made it clear, at para. 2.4 of the supplemental ruling, which he gave on the same day (following the post-trial hearing on October 26th, 2012), that he took the view that no claim in respect of the additional 16,190,575 ordinary shares in Fabergé Ltd. was before the court at trial. He said this:

> "In the instant case I consider that it is clear from the judgment as a whole that the court was considering, and only considering, the position in relation to the 25 shares in PEL, which it has found were gratuitously procured to be issued to Autumn by Mr. Gilbertson on or with effect from 3rd January 2007. The Court was not considering and did not consider any further or other shares in that company which were subsequently purchased by Autumn. Paragraphs 6.5 and 17.1 of the judgment summarizing the Plaintiff's claim make that clear, as do other paragraphs of the judgment, such as paragraphs 17.3 and 19.30."

In my view, there is no doubt that the question whether a claim in respect of the additional 16,190,575 ordinary shares in Fabergé Ltd. were held by Autumn as constructive trustee for the master fund had been before the court at the trial was an issue at the hearing on October 26th, 2012, and that it is clear that the judge held that the answer to that question was "No." Given that the Gilbertson parties had pointed out in their written opening submissions that the claim had not been pleaded and that, nevertheless, Renova had declined to seek leave to amend its pleading in order to raise it, I find it impossible to see how it could be said that the judge was wrong to reach that conclusion. In any event, the Renova parties have not appealed that ruling. In my view, it is not open to Renova to contend, on this appeal, that the Gilbertson parties allowed the claim in respect of the additional 16,190,575 ordinary shares in Fabergé Ltd. into the action by failing to raise any objection to it at the appropriate time.

298

231 On the basis that the claim in respect of the additional shares in Fabergé Ltd. was not before the court at the trial, the judge cannot be criticized for failing to address arguments advanced in support of that claim in the course of Renova's opening and closing submissions.

232 Nevertheless—notwithstanding that (understandably in the circumstances) the judge made no relevant findings of fact in respect of Renova's unpleaded claim in respect of the additional 16,190,575 ordinary shares in Fabergé Ltd.—the Renova parties seek to pursue that claim in Appeal No. 22 of 2012. It is said on their behalf that the judge would have been wrong to give Autumn and/or Mr. Gilbertson an allowance in respect of the sums paid by Autumn in order to maintain its proportionate shareholding—in that (it is said), as a matter of law, those sums were spent maintaining the dishonestly diverted property and so neither Mr. Gilbertson nor Autumn was entitled to an allowance in respect of them—and that the judge ought to have held that the additional 16,190,575 ordinary shares in Fabergé Ltd. were simply accretions to the 25,000 shares already held on constructive trust. In developing those submissions it is said on behalf of the Renova parties that:

(1) It is necessary to have in mind that all but US$100,000 of the moneys paid by Autumn in acquiring additional shares in Fabergé Ltd. were paid after the date of the commencement of these proceedings (May 20th, 2008), and so were paid by Autumn at a time when it knew that an adverse claim in relation to its existing holding of Fabergé Ltd. shares was being pursued. Given that Autumn was (as the judge held) a constructive trustee of the PEL shares issued in January 2007—and given, critically, that Autumn could only acquire the additional shares by the exercise of rights attached or incidental to the shares which it held on constructive trust—the additional shares which it acquired should be treated as accretions to the shares which it already held, were themselves property traceable to the original single share in PEL by the master fund and were received by Autumn with the requisite knowledge of Mr. Gilbertson's breach of fiduciary duty. Accordingly, Autumn must hold the entirety of its present shareholding in Fabergé Ltd. on constructive trust for the master fund. In support of that proposition, reliance is placed, by way of analogy, on observations in *Att. Gen. (Hong Kong)* v. *Reid* (3).

(2) The judge failed to appreciate that he had not ordered Autumn to account *in personam* as constructive trustee for the value of the 25 PEL shares issued in January 1st, 2007 but, rather, had declared that Autumn held those shares *in specie* on constructive trust for the master fund. It was on that basis that he made the order for the transfer of the 25,000 Fabergé Ltd. shares to the master fund. That was a proprietary remedy which recognized the master fund's restitutionary rights, and was appropriate, given that a proprietary claim (including a tracing claim) had been clearly

pleaded by Renova in its amended statement of claim. In those circumstances the judge was wrong to make no order for the transfer of the additional 16,190,575 shares in Fabergé Ltd.

(3) Neither Mr. Gilbertson nor Autumn was entitled to an allowance in respect of the costs of acquisition of the additional shares. As a matter of equitable principle there is no allowance to be given by way of compensation for work and effort done by a defaulting fiduciary where the defaulting fiduciary comes to court without clean hands. In support of that proposition, reliance is placed on *Guinness plc* v. *Saunders* (20). Neither Autumn nor Mr. Gilbertson had clean hands.

233    In response to the claim in respect of the additional Fabergé Ltd. shares, it is said on behalf of Autumn that, first, there is no foundation of fact upon which a tracing claim in respect of the additional shares can be advanced on appeal and, secondly, that—even if Renova could demonstrate that the master fund could establish a right to trace in respect of those shares—it would be wrong, as a matter of law, for this court to grant the relief sought save upon terms which required the Renova parties to reimburse to Autumn the moneys (US$1,455,466) which it had expended in acquiring those additional shares. In developing those submissions it is said that:

(1) In seeking to trace into the additional 16,190,575 Fabergé Ltd. shares, the Renova parties are obliged to contend that the right to acquire those shares was a right attached, or incidental, to the PEL shares issued to Autumn in January, 2007, so that the constructive trust to which (as the judge held) the 25,000 Fabergé Ltd. shares were subject extends to the additional shares acquired by the exercise of that right. But Renova failed to plead, or to establish at trial, that any such right was attached, or incidental, to the PEL shares issued in January, 2007; the judge made no finding to that effect; and there is no appeal from his failure to do so. Further, it is said, the fact that Fabergé Ltd. shares carried no pre-emption rights until the articles of association were amended in 2009 suggests that the factual position differed from time to time.

(2) It would have been wrong, as a matter of law, for the judge to order the transfer of the additional 16,190,575 ordinary shares in Fabergé Ltd. to the master fund—or for this court now to do so—save on terms that the master fund reimburse Autumn for the price which Autumn paid for those shares, in that—

   (i) an allowance may be given for work and effort done to maintain trust property by an innocent constructive trustee, and moneys properly expended by a constructive trustee (innocent or otherwise) may be allowed as a deduction on the taking of an account; and

(ii) where new property is acquired using trust property and non-trust property, it may be possible for those interested under the trust to claim part of, or an interest in, the new property on a pro rata basis; but it is not possible for them to claim the whole of the new property, *a fortiori*, not possible for them to claim the whole of the new property without giving credit for the non-trust property by the use of which it has (in part) been acquired.

In support of the first of those propositions, Autumn relies on observations in *Boardman* v. *Phipps* (9), and *Ultraframe (UK) Ltd.* v. *Fielding* (38) ([2005] EWHC 1638 (Ch), at paras. 1513–1514) and on the statement in *Snell's Equity*, 32nd ed., para. 7–055, at 226 (2010) that the obligation to account is to account for actual or net profits. In support of the second, Autumn relies on the statement in Underhill & Hayton, *The Law of Trusts and Trustees*, 18th ed., art. 90.1(2), at 1150 (2010)).

(3) The decisions in *Guinness plc* v. *Saunders* (20) and *Att. Gen.* (*Hong Kong*) v. *Reid* (3)—on which the Renova parties seek to rely—provide no support for the propositions advanced. The issue in the *Guinness* case was whether a consultant (Mr. Ward) should receive an allowance against a claim by Guinness plc for repayment of moneys which he had received for services which he had rendered in connection with the takeover of the Distillers' Company plc, by way of compensation for his work and effort in that context. The Renova parties seek to equate compensation for work and effort with reimbursement of moneys paid to acquire property which would not otherwise have become subject to the trust. There is no true analogy. The issue in the *Reid* case was whether moneys acquired by a senior public official (Mr. Reid) by way of a bribe (and so in breach of fiduciary duty) were held on constructive trust for the Crown and traceable into the properties that, it was alleged, Mr. Reid had used those moneys to acquire. There was no evidence that any of the moneys that he invested in those properties had their source otherwise than from the bribe. The *Reid* case, also, affords no true analogy with the present case.

(4) The reason why Renova did not include a claim in respect of the additional 16,190,575 shares in Fabergé Ltd. in the relief sought in these proceedings was that the master fund had no interest in taking those shares on terms that it reimburse Autumn for the price which Autumn had paid for those shares, in that (amongst other considerations) by the time these proceedings were commenced the additional shares were not worth the amount that Autumn had paid for them. It is pertinent to have in mind that the Renova parties did not offer (at trial)—and have not offered (in the context of their cross-appeal)—to accept a transfer of the additional 16,190,575 shares on terms that recognize that Autumn has invested US$1,455,466 of its own moneys in acquiring those shares.

In those circumstances, it is said on behalf of Autumn, that—in the absence of a relevant pleading, appropriate evidence, necessary findings or a willingness to make any allowance for the cost of Autumn's acquiring the additional 16,190,575 Fabergé Ltd. shares—the Renova parties are obliged to contend that it makes no difference whether those shares were acquired by the exercise of a legal right; whether that right (if any) had any value; or whether Autumn acquired those additional shares by payment (and in what amount) out of its own moneys. It is accepted that the claim might be arguable if the Renova parties were willing to recognize the fact that Autumn should be reimbursed for the moneys spent in acquiring the additional Fabergé shares but, as it stands, "it is just frivolous and plain greedy."

234   In my view the judge was correct in refusing to hold that the additional 16,190,575 shares in Fabergé Ltd. acquired by Autumn were held upon constructive trust for (and should be transferred to) the master fund. I agree that the material before him at the trial did not enable the judge to make the findings of fact which would have been necessary in order to support Renova's claim to those additional shares. Nor is this court in a position to do so.

**Was the judge wrong to grant relief against Autumn by way of an account of profits (comprising the payment which Autumn received on September 28th, 2007 in respect of interest on the loan which it had made to PEL on January 3rd, 2007) and, if not, was the judge wrong to award pre-judgment interest from January 3rd, 2007 (rather than from September 28th, 2007) on the payment which Autumn received?**

235   At para. 3 of his order of November 6th, 2012, the judge ordered that Autumn pay to the master fund the sum of US$2,306,320.35. It is stated in the order that that sum included pre-judgment interest of US$507,347.35 from January 3rd, 2007 until the date of the order. The balance (US$1,798,973) represented a payment in respect of interest made by Fabergé Ltd. to Autumn on September 28th, 2007, being interest on loans (amounting in aggregate to US$10m.) which had been made by Autumn to PEL (as Fabergé Ltd. then was) in January 2007, at the time of the acquisition of the Fabergé rights. In its appeal from para. 3 of the order of November 6th, 2012, Autumn challenges each of the elements which make up the sum which it was ordered to pay.

*The payment in respect of interest received by Autumn in September 2007*

236   The judge treated the payment received by Autumn in September 2007 (US$1,798,973) as moneys for which Autumn was liable to account

in respect of profits. Under the heading "The claim for profits," he explained (2012 (2) CILR 416, at para. 96) that—

"Apart from its gratuitous receipt of the new PEL/Fabergé Ltd. shares, Autumn made profits on the loan to PEL, namely the interest that it was paid. In his witness statement, Mr. Thomas explained that on September 28th, 2007, the sum of US$11,798,973 was paid by Fabergé Ltd. to Autumn, representing the loan of US$9.5m. together with the further loan of US$0.5m. for working capital advanced to PEL/Fabergé Ltd., together with interest on those sums. His evidence was that the initial interest on the loan was US LIBOR plus 1.5% which at the time would have been a total interest rate of about 7%. However, in May 2007 the interest rate on the loans, including Autumn's loan, was unilaterally increased by Fabergé Ltd. to 25% per annum pursuant to a proposed call-option agreement. There was no reasonable explanation by the Gilbertson parties' witnesses for this unusually high rate of interest. The total interest paid on the loans was a profit to Autumn in respect of funding of the acquisition of the rights and the further working capital. The plaintiff's argument is that since the acquisition of the rights was an economic opportunity diverted away from the Pallinghurst structure by Mr. Gilbertson in breach of fiduciary duty, such profit is directly traceable to that breach. Accordingly, the plaintiff contends that Autumn is also liable to account for the amount of that interest."

The judge accepted that argument. Under the heading "Quantum in respect of Autumn," he said this (*ibid.*, at para. 151):

"As I have already explained, the plaintiff's claim against Autumn is for an account in respect of the interest which Autumn received on the loan which it made to PEL out of the BPG settlement on behalf of Mr. Gilbertson and in respect of the shares which it holds in what is now Fabergé Ltd., which were procured to be gratuitously issued to it by Mr. Gilbertson. For the reasons I have already explained, I consider that such account should be given in each case."

And he said this (*ibid.*, at para. 153):

"In relation to the plaintiff's claims against Autumn, I have concluded that, in the circumstances, Autumn must account for the shares in PEL (now called Fabergé Ltd.) which Mr. Gilbertson gratuitously caused to be issued by PEL to Autumn in January 2007 and also for the interest it received on the loans it made to PEL on behalf of Mr. Gilbertson."

237   In challenging para. 3 of the judge's order—in so far as it relates to the payment received by Autumn in September 2007 in respect of interest on the loans which it had made to PEL in January 2007—it is submitted

on behalf of Autumn that the judge misdirected himself and erred in law and/or fact in ordering an account of profits comprising that payment. Had the judge directed himself properly, it is said that he should have refused to accede to, or grant any relief in respect of, the claim to the moneys paid to it as interest on the loans. In developing those submissions, it is said on behalf of Autumn that:

(1) Autumn and the Gilbertson parties were entitled to know (from Renova's pleaded case) what claims they had to meet at trial. Once Renova had abandoned its contention that Autumn was Mr. Gilbertson's alter ego, there was no pleaded claim in respect of which relief could be granted in respect of the moneys paid to Autumn in respect of interest on the loans which it had made to PEL. In particular, there was no pleaded claim that the master fund had any proprietary interest in those moneys which could found a claim in knowing receipt. In their written opening submissions at trial (at para. 324), the Gilbertson parties had put the Renova parties and the court on notice of their objection to any such claim (on the grounds that it had not been pleaded) but Renova made no application to amend its pleaded case in the course of the trial. There was no basis on which the judge could fairly disregard the fact that no claim for knowing receipt of the moneys paid as interest on the loans had been pleaded. In support of that submission, reliance was placed on observations in *Rolled Steel Products (Hldgs.) Ltd.* v. *British Steel Corp.* (31) ([1986] Ch. at 309) and *The Supreme Court Practice 1999* vol. 1, para. 18/714, at 314.

(2) Not only was there no pleaded claim that the payment to Autumn had been made out of the assets of the master fund—or that Autumn was in knowing receipt of moneys into which assets of the master fund could be traced—there was no evidence to support such a claim. In those circumstances, the judge ordered an account of profits against a party (Autumn) which was not in knowing receipt of moneys misapplied in breach of trust, and was neither itself a fiduciary nor the alter ego of a fiduciary (Mr. Gilbertson). He was wrong to do so: there was no juridical basis upon which he could properly hold that Autumn was liable to account to the master fund for the moneys which it received as interest on the loans which it had made to PEL.

(3) The judge was wrong to take the view (expressed at 2012 (2) CILR 416, at para. 96) that the acquisition of the Fabergé rights was an economic opportunity of the master fund, and wrong to take the view that there was a sufficient nexus between the acquisition of the Fabergé rights and the receipt of interest on the loans. The master fund had no interest in the economic opportunity of earning interest on loans made to PEL in January 2007 (at a time when, it is important to have in mind, the master fund owned the whole of the issued share capital of PEL and had no funds of its own out of which to make such loans). Although the opportunity to

earn a high rate of interest on a loan could constitute a corporate opportunity—and it may be said that the opportunity to earn the interest would not have arisen unless PEL had taken the US$9.5m. loan in order to fund the acquisition of the Fabergé rights—the applicable test for the purposes of tracing is not a "but for" test; the test is one of nexus and there was no basis on which the judge could find a sufficient nexus in this case.

238   Further (and in the alternative) it is submitted that—even if he were right to find a sufficient nexus between the acquisition of the Fabergé rights and the making of the loans to PEL—the judge erred in holding that Autumn should account for the whole of the interest received on those loans. As there was no evidence that Autumn had acted dishonestly, had the claim been properly pleaded by Renova, Autumn would have claimed an equitable allowance in respect of the costs which it incurred in making the loans. Had the judge directed himself properly, it is said that he should have allowed those costs.

239   In response to the submissions advanced on behalf of Autumn in support of its challenge to the judge's order that it account for the moneys which it received in September 2007 as interest on the loans which it had made to PEL in January 2007, it is said on behalf of Renova that the receipt of those moneys was a profit on funding the acquisition of the Fabergé rights, and that, given that (as the judge held) the acquisition of the Fabergé rights was an opportunity diverted away from the Pallinghurst structure in breach of fiduciary duty, that profit is directly traceable to that breach. It is submitted that, although it may be said that the interest was not paid with the master fund's own moneys, the test is one of nexus, and that it is clear that there was a sufficient nexus between Mr. Gilbertson's breach of fiduciary duty and the receipt of the interest payment. At the least, it is said, there is a sufficient nexus between Mr. Gilbertson's failure to disclose to the company, or to the master fund or GPLP, that the loan (at interest) was to be made by a special purpose vehicle controlled by his family trust. Furthermore, the interest was paid by Fabergé Ltd. out of moneys that could be traced back to the Fabergé rights, in that Fabergé Ltd. had no moneys out of which to pay the interest other than the moneys raised by it in September 2007 by way of a rights issue based on its underlying ownership of the Fabergé rights. Accordingly, it is said, the moneys paid to Autumn by way of interest (at 25%) on its loans are directly traceable to the Fabergé rights and the economic control over them represented by the shares issued by PEL in January 2007.

240   In my view, the judge was wrong to order that Autumn account as a constructive trustee for the payment of US$1,798,973 which it received in September 2007 in respect of interest on the loans made to PEL on January 3rd, 2007.

241   I accept that (as Autumn submits) the juridical basis on which the judge held that an obligation to account arose in respect of that payment is unclear; in particular, I accept that there was no sufficient basis on the pleadings for a claim for such an account. But, in the light of the judge's observations (2012 (2) CILR 416, at paras. 96, 151 and 153, to which I have referred earlier in this section), I think it must be assumed that, in reaching the conclusion that he did, the judge accepted Renova's submission that the payment was a profit derived from the funding of the acquisition of the Fabergé rights which was "directly traceable" to the "economic opportunity" of acquiring those rights which was "diverted away from the Pallinghurst structure by Mr. Gilbertson's breach of fiduciary duty." I am satisfied that he was wrong to do so.

242   At the time when the loans were made (on January 3rd, 2007) the "economic opportunity" of acquiring the Fabergé rights lay with PEL as the contracting purchaser from Unilever plc under the SPA dated December 22nd, 2007. The loans did not have the effect of diverting the economic opportunity of acquiring the Fabergé rights away from PEL; the effect of the loans was that PEL was able to take advantage of that economic opportunity by using the funds lent to it to complete the purchase. Nor did the loans have the effect of diverting the economic opportunity of acquiring the Fabergé rights away from the master fund (or, more generally, away from the Pallinghurst structure). As I have mentioned earlier in this judgment, the judge recorded (at paras. 9.26 and 9.27 of his judgment) that it was the common intention of the Gilbertson parties on the one hand and the Renova parties on the other hand (as had been agreed between Mr. Sean Gilbertson and Mr. Kalberer in the course of a telephone conversation on December 20th, 2006) that the role of the master fund would be as guarantor of PEL's obligations under the SPA; it was not intended (at least, not intended from and after December 20th, 2006) that the master fund would, itself, be the purchaser of the Fabergé rights. The judge did not find that Mr. Gilbertson was in breach of his fiduciary duty in failing to procure that the master fund lent moneys to PEL to fund the completion of the purchase: there was no evidence that the master fund was in a position to do so.

243   Immediately before the loans were made on January 3rd, 2007, the interest of the master fund in the acquisition of the Fabergé rights by PEL was as the owner of 100% of the issued capital of PEL. The making of the loans did not alter that position. What did alter that position was Mr. Gilbertson's breach of fiduciary duty (as the judge found) in procuring the dilution of the master fund's ownership of the share capital of PEL by the issue of 100 new PEL shares to the members of the consortium. But—as the judge found, in the context of addressing the question whether Autumn received the new PEL shares as a volunteer and not as a purchaser—the terms of the loans were agreed without regard to the decision to issue the

PEL new shares. In those circumstances, although it can be said that the payment by PEL to Autumn in September 2007 of interest on the loans made in January of that year was a profit derived from the funding of the acquisition of the Fabergé rights and that the "economic opportunity" to fund the acquisition arose from PEL's rights as contractual purchaser under the SPA, there is no basis on which it can be said that the opportunity to fund the acquisition or PEL's rights as contractual purchaser were "diverted away from the Pallinghurst structure by Mr. Gilbertson's breach of fiduciary duty." Properly understood, what was diverted away from the Pallinghurst structure by Mr. Gilbertson's breach of fiduciary duty was substantially the whole (more precisely, 100/101 parts) of the ownership of PEL (and so, indirectly, substantially the whole of the value of the Fabergé rights after deduction of the cost of acquisition), not the right to receive interest paid by PEL on the loans which enabled it to acquire those rights.

### Pre-judgment interest from January 3rd, 2007

244   As I have said, Autumn challenges each of the elements which make up the sum which it was ordered to pay under para. 3 of the order of November 6th, 2012. In challenging the second of those elements—pre-judgment interest pursuant to s.34 of the Judicature Law (2007 Revision) on the payment received by Autumn in September 2007—it is submitted, first, that—given that (for the reasons advanced in support of the challenge to the first element) it was not open to the judge to hold that Autumn was liable as a "knowing recipient" of the moneys which it received by way of an interest on the loans—there was no basis on which he could have awarded pre-judgment interest on that sum and, secondly, that—assuming (which is not admitted) that the judge was right to hold that Autumn was liable to account as a "knowing recipient" for those moneys—no claim against Autumn based on "knowing receipt" could arise before the payment was actually received by Autumn and so there was no sensible basis on which the judge could have awarded pre-judgment interest in respect of a period before the date (September 28th, 2007) on which the cause of action accrued.

245   I have explained, in the earlier paragraphs of this section of my judgment, why I take the view that the judge was wrong to hold that Autumn was liable as a "knowing recipient" of the moneys which it received by way of interest on the loans. It follows that I would hold that Autumn is entitled to succeed in its challenge to the order for payment of pre-judgment interest on the first of the grounds advanced: there was no basis on which the judge could have awarded pre-judgment interest on moneys which, although claimed in these proceedings, were not, themselves, either paid or properly the subject of an order for payment. Nevertheless, in case others take a different view, it is necessary that I

address the second of the grounds advanced: that there was no basis on which the judge could have awarded pre-judgment interest in respect of a period before the date on which the cause of action in respect of the moneys in respect of which Autumn was said to be a "knowing recipient" accrued.

246   In developing that second ground, Autumn pointed out that the statutory provision under which the judge purported to award pre-judgment interest—s.34 of the Judicature Law (2007 Revision)—was in these terms (so far as material):

> "(1) Subject to rules of court, in proceedings (whenever instituted) before the Grand Court . . . for the recovery of a debt or damages there may be included in any sum for which judgment is given simple interest at such rate as the court thinks fit, not exceeding the rate prescribed from time to time by rules of court, on all or any part of the debt or damages in respect of which judgment is given or payment is made before judgment, for all or any part of the period between the date when the cause of action arose, and—

> > (a)   in the case of any sum paid before judgment, the date of payment; and

> > (b)   in the case of the sum for which judgment is given, the date of the judgment."

It is said that if—as the judge thought—the amount which he ordered to be paid by Autumn to the master fund on the taking of an account in respect of the moneys received by Autumn in September 2007 by way of interest on the loans made in January 2007 was payable as a "debt or damages in respect of which judgment [was] given" for the purposes of s.34(1) of the Law, the power of the court to award pre-judgment interest under that section was limited to interest in respect of "all or any part of the period between the date when the cause of action arose," and (in this case) "(b) . . . the date of the judgment." Accordingly, it is said, the judge was "plainly wrong" to award pre-judgment interest from January 3rd, 2007, in that:

> (1) The cause of action for knowing receipt is predicated upon receipt. As Sir Terence Etherton, C. observed, when delivering the judgment of the Privy Council in *Arthur* v. *Att. Gen. (Turks & Caicos Islands)* (2) ([2012] UKPC 30, at para. 31):

> > "A defendant incurs an equitable liability for knowing receipt when he or she acts unconscionably by receiving and retaining trust property with the knowledge that it was transferred in breach of trust. Liability for knowing receipt can also be incurred when property is transferred in breach of a fiduciary duty other than a breach of trust."

(2) As Lord Scott of Foscote made clear in *Criterion Properties plc* v. *Stratford UK Properties LLC* (15) ([2004] 1 W.L.R. 1846, at para. 27), "receipt"—in the context of a claim founded on equitable liability for knowing receipt—is to be distinguished from a contractual right to receive (*ibid.*):

"The word 'receipt' in the expression 'knowing receipt' refers to the receipt by one person from another of assets. A person who enters into a binding contract acquires contractual rights that are created by the contract. There may be a 'receipt' of assets when the contract is completed and the question whether there is 'knowing receipt' may become a relevant question at that stage. But until then there is simply an executory contract which may or may not be enforceable. The creation by the contract of contractual rights does not constitute a 'receipt' of assets in the sense that a 'knowing receipt' involves a receipt of assets. The question whether an executory contract is enforceable is quite different from the question whether assets of which there has been a 'knowing receipt' are recoverable from the recipient."

(3) The judge held (2012 (2) CILR 416, at para. 96), accepting Mr. Thomas's evidence that Autumn received the payment in respect of interest on the loans on September 28th, 2007. That was the date on which the cause of action arose. There was no power under s.34(1) of the Law to award pre-judgment interest in respect of a period prior to that date. Had the judge directed himself properly, he should have held and ordered that pre-judgment interest (if any) should run from September 28th, 2007.

247    In response to the submission that the judge was "plainly wrong" to award pre-judgment interest from January 3rd, 2007, it is said on behalf of the Renova parties that the judge was entitled and correct to award pre-judgment interest from that date, in that January 3rd, 2007 was the date when the loans were made to PEL and the contractual right to interest on the loans arose. Although Autumn did not receive payment until September 2007, the relevant chose in action—representing the profit for which Autumn was liable to account—accrued on January 3rd, 2007. A secret profit is no less a secret profit if the payer is bound to pay it but has not yet done so: the profit is not earned only upon its conversion to cash. It is said that Autumn's reliance on the observations of Lord Scott in *Criterion Properties plc* v. *Stratford UK Properties LLC* (15)—in support of the proposition that a mere contract cannot be an asset for the purpose of knowing receipt—is misplaced, in that (i) the judge was not shown that case (either at the trial or at the post-trial hearing on October 26th, 2012, when he was asked to amend his judgment) and so never had an opportunity to consider it; and (ii) the decision in the *Criterion* case was on an appeal from an order made on an application for summary judgment and not after a trial. Further, it is said, Lord Scott referred to no authority

to support his view, and it is difficult to accept that executory contracts (for example, cheques, or insurance policies) cannot be assets capable of being traced in equity or received for the purposes of knowing receipt. The Renova parties invite this court to decline to follow Lord Scott's approach or, at the least, to distinguish that approach on the basis that contractual rights as against third parties can form an asset capable of being transferred in breach of trust.

248   If (contrary to my view) the judge was correct to hold that Autumn was liable to account as a "knowing recipient" for the moneys which it received in September 2007, then I am satisfied that, in awarding pre-judgment interest on the amount (US$1,798,973) for which he held Autumn was accountable, he was wrong to include in the sum awarded (US$507,347.35) an amount (said to be US$95,407.18) in respect of interest attributable to the period from January 3rd, 2007 to September 27th, 2007. Even if, as the Renova parties contend, a debt owed to the defendant by a third party can be the subject of a claim for an account in equity on the basis of "knowing receipt," it seems to me impossible to hold (on the facts of this case) that, on January 3rd, 2007, the amount of the interest on the loans for which Autumn was liable to account as a "knowing recipient" was equal to the amount (US$1,798,973) which it received in September 2007. In that context it is relevant to have in mind (i) that the terms of the loan (as recorded in the minutes of the meeting of the directors of PEL held on January 3rd, 2007) provided for interest on the loan at US$ LIBOR plus 1.5%, compounded monthly and payable at repayment of the loan; (ii) that (as the judge recorded at 2012 (2) CILR 416, at para. 96) that rate would have been equivalent to about 7% p.a.; (iii) that, although (as the judge also recorded, *ibid.*) the rate of interest was increased to 25% p.a. in May 2007, there was no evidence that the terms as to the payment of interest on the loan were otherwise altered between January 3rd, 2007 and September 28th, 2007—or that any demand for repayment of the loan was made before September 28th, 2007; and (iv) that, in the events which happened, the accrued interest (US$1,798,973) was paid at the same time as the loans were repaid. In those circumstances, as it seems to me, it was not open to the judge to hold that Autumn was liable to account for interest on the loans in the amount of US$1,798,973 (or at all) as a "knowing recipient" before September 28th, 2007; it was on that date—and not before that date—that the relevant cause of action (if any) for the purposes of s.34(1) of the Judicature Law (2007 Revision) arose.

310

**Whether, in making no order as to the costs of the action and the counterclaim, the judge exercised his discretion outside the ambit within which reasonable disagreement is possible and, if so, what orders as to cost should be made**

249    Paragraph 6 of the order dated November 6th, 2012 provided that, subject to any earlier orders which required the costs of one party or parties to be paid by another party or other parties, each party should bear its own costs of the proceedings (including any costs which had been ordered to be in the cause). The judge set out the reasons which led him to make an order for costs in those terms, at paras. 3.1–3.12 of the ruling which he delivered on November 5th, 2012, following the post-trial hearing on October 26th, 2012 (that judgment is noted at 2012 (2) CILR *N* [10]).

250    After recording that the Renova parties had contended that the appropriate order should be that the Gilbertson parties pay the costs of the action on the standard basis and the costs of the counterclaim on the indemnity basis and that the Gilbertson parties had contended that they should be awarded their costs of the action (while accepting that the Renova parties should have their costs of the counterclaim but on the standard basis) and reminding himself of the provisions in O.62, r.4(2) and (5), of the Grand Court Rules, the judge said this (at paras. 3.4–3.12):

"3.4    Accordingly the objective of O.62 is that the successful party should recover its reasonable costs or, to put it as in r.4(5), costs should follow the event. However, both rules contemplate that the Court may order otherwise and that must mean that it may do so in the exercise of the generally accepted discretion which it has in relation to costs having regard to the circumstances of the particular case.

3.5    The obvious first question therefore in seeking to apply the general objective is to determine which party was the successful one or, as put as in r.4(5) to determine the event which costs should follow. The Renova Parties contend that they succeeded overall and were successful on 'the main issue'. They say that in the end of the day there was a finding of serious wrong-doing by Mr. Gilbertson and a significant award on liability against Autumn. They contend that the overriding objective should be followed and that they are the successful parties and should accordingly be awarded the costs of the proceedings. They relied on *National Trust for the Cayman Island v Planning Appeals Tribunal* [2002] CILR N.24 and *Banks v Arch* [2004–05] CILR N.40. The Renova Parties submit that the onus is on the Gilbertson Parties to show why the Court should depart from the usual order.

3.6    The Gilbertson parties argue that the Renova Parties did not succeed in obtaining any relief against Mr. Gilbertson and that they effectively lost the principal part of the action. They refer to *Texaco Ltd v Arco Technology Inc* (unreported—The Times, 13th October 1989). The Gilbertson Parties also argue that the relief obtained against Autumn is, in the circumstances, nominal and that the Plaintiff has in effect lost the whole action. In the alternative they rely upon GCR O.62 r.4(5) and submit that in the particular circumstances of this case the Court is entitled to depart from the usual rule in its discretion and award costs as it sees fit. As a final alternative they propose that a fair outcome would be for the parties to each bear their own costs.

3.7    The Renova Parties and the Gilbertson parties each submitted detailed skeleton arguments which I have considered and taken into account. They also supplemented these in oral submissions which I have also taken into account.

3.8    I have been the judge assigned to and have dealt with the entirety of these proceedings since they were commenced over four years ago in May 2008, culminating in a four week trial in April and May this year. During the course of the proceedings there have been several hotly contested and significant interlocutory hearings, which have resulted in four substantial written rulings and an ex tempore written ruling. A significant issue has been the Renova Parties' discovery, to which I refer below. The issues argued by both parties at the trial departed in several respects from their respective pleadings.

3.9    There is in my view in this case no one obvious event for costs to follow; there has been no one clearly successful party overall. Each party has had victories and defeats on various claims and issues. The Plaintiff has succeeded in establishing Mr. Gilbertson's breach of fiduciary duty but has failed in establishing any consequential loss, notwithstanding the very substantial claim in respect of equitable compensation which it made. If the reasoning of Phillips J. (as he then was) in the *Texaco* case (*supra*) is adopted, the Plaintiff therefore lost the case. The Plaintiff also abandoned its claim against Mr. Gilbertson to account himself for the profit made by Autumn. Although the Plaintiff has established liability against Autumn to account for the 25 gratuitously issued shares, it seems to me that the net gain to the Plaintiff as a result can fairly be said to be minimal in the context of what was claimed. I also consider that, although legally separate, it is somewhat artificial for these proposes in these proceedings to distinguish between Mr. Gilbertson and Autumn in light of my acceptance in the judgment of the Plaintiff's claim that Mr. Gilbertson was the directing mind and will of Autumn. Of

course, the Gilbertson Parties' own counterclaims were either withdrawn or have been dismissed, although in the end of the day the counterclaims accounted for a very limited part of the trial and earlier in the proceedings I declined to strike them out. I see the counterclaims as part of the ebb and flow of each parties' various successes and defeats.

3.10   In all the circumstances, I am of the view that there has been no clearly overall wholly successful party. I consider that this is a case in which the overriding objective is either not applicable at all or that it should be departed from and some other order made in light of the circumstances of the case.

3.11   Notwithstanding that discovery did not ultimately feature significantly at the trial, I consider that I should at least have some regard in considering the overall costs of the proceedings, to the Renova Parties' failure to comply with their discovery obligations. I expressly found that to be blameworthy and culpable, although in the end of the day I did not consider that it precluded the possibility of a fair trial. Nonetheless, it seems to me that, in exercising my discretion in relation to the costs of the proceedings, blameworthy and culpable conduct of one of the parties in relation to a very important part of the proceedings is at least a factor which I am entitled to take into account, at least to some extent, in reaching my overall decision.

3.12   In my view it would not be fair or appropriate to award the costs of the whole proceedings to either party. On the other hand an issue by issue allocation of costs would, in my opinion, be very difficult to apply in practice in this case and would be likely to result in interminable argument and debate, which would not be desirable. In any event the costs payable by each party on an issue by issue basis would, in this case, probably largely cancel each other out. In all the circumstances, I consider that the fairest approach in light of the conduct of these proceedings over the past four years and their eventual outcome after trial is that each party should bear their own costs of the proceeding, and I so order. That is, of course, subject to all orders for costs in favour of one or other party which have already been made and which shall stand and be complied with."

251   In its notice of appeal in Appeal No. 21 of 2012, Autumn seeks an order that the Renova parties pay Autumn's costs of the proceedings in the Grand Court (including any costs ordered to have been costs in the cause) on the standard basis, to be taxed if not agreed. An order in those terms is sought, also, in para. 41(4) of Autumn's memorandum of grounds of appeal filed on February 1st, 2013, but no grounds for making such an order are advanced in that memorandum. An order in those terms is amongst the relief listed at para. 304 of the written submissions dated May

24th, 2013 served on behalf of Autumn in support of its appeal but, again, the basis upon which that order is sought is not explained. At para. 120 of the written submissions dated June 21st, 2013, served on behalf of the Gilbertson parties in opposition to Renova's cross-appeal (Appeal No. 22 of 2012) it is said that—

> "the Gilbertson parties urged the learned judge to award costs against the Renova parties to reflect, amongst other things, the court's disapproval of the Renova parties' deliberate destruction of documents in the course of the proceedings. But, the learned judge did not go any further than to find it 'a factor which [he was] entitled to take into account, at least to some extent, in reaching [his] overall decision.'"

And, at para. 142 of those written submissions, it is said that "in the circumstances, the learned judge could have quite properly made a costs order in favour of the Gilbertson parties, as the Gilbertson parties urged him to do." In those circumstances, although Autumn has not formally withdrawn its appeal against the judge's order as to costs (made in its notice of appeal in Appeal No. 21 of 2012), this court may, I think, proceed on the basis that it does not seek to challenge the judge's view that the appropriate order is that (subject to any earlier orders which required the costs of one party or parties to be paid by another party or parties), each party should bear its own costs of the proceedings (including any costs which had been ordered to be in the cause). Mr. Gilbertson has not appealed from the judge's order.

252   In Appeal No. 22 of 2012, the Renova parties also seek an order that the judge's order in respect of costs be set aside but they invite this court to substitute an order that the Gilbertson parties pay their costs of the action on the standard basis and their costs of the counterclaims on the indemnity basis that (it is said) being the only just order to make in all the circumstances. It is said that, in making no order as to the costs of the action and the counterclaims, the judge exercised his discretion outside the ambit within which reasonable disagreement is possible, and that, in those circumstances, this court should set aside his order and make the order that the judge should have made. In that context, this court was referred to the well-known observations of Lord Fraser of Tullybelton in *G* v. *G (Minors: Custody Appeal)* (19) ([1985] 1 W.L.R. at 652).

### The costs of the action

253   The Renova parties draw attention to GCR O.62, r.4(5): "[T]he Court shall order the costs to follow the event, except when it appears to the Court that in the circumstances of the case some other order should be made as to the whole or any part of the costs." They rely in this court (as they did before the judge) on the principle, recognized in this jurisdiction

in *National Trust for the Cayman Islands* v. *Planning Appeals Tribunal* (25) and *Banks* v. *Arch* (5) (to which the judge referred), that the burden lies on the party seeking a departure from the usual order to show why such departure is justified.

254   In developing their submission that, in departing from the usual order that costs should follow the event, the judge exercised his discretion in a way which fell outside the ambit within which reasonable disagreement is possible, it is said on behalf of the Renova parties that the judge was wrong to conclude that there was no clear overall winner and that there was no one obvious event which his order for costs should follow. He ought to have concluded that the relevant event or events to be followed for the purposes of GCR O.62, r.4(5) were the finding against Mr. Gilbertson for dishonest breach of fiduciary duty and the finding that Autumn was liable to account as constructive trustee for the new PEL shares issued to it in January 2007 and for the payment in respect of interest on the loans which it received in September 2007. In particular, it is said that:

  (1) The judge should have addressed the position of Autumn separately from that of Mr. Gilbertson.

  (2) As between Renova and Autumn, there was no reason why Autumn should not pay the whole of Renova's costs. In that context, the relevant "event," for the purposes of GCR O.62, r.4(5), was the liability of Autumn to account as constructive trustee for the Fabergé Ltd. shares. On that issue there was only one winner: Renova.

  (3) The judge was wrong to take account of—or placed too much weight on—the facts (i) that (as he held) Renova had failed to establish any loss as against Mr. Gilbertson, and (ii) that Renova abandoned its claim against Mr. Gilbertson for an account of profits.

255   In advancing the first of those three points—that, in determining what order to make as to costs, the judge should have addressed the position of Autumn separately from that of Mr. Gilbertson—it is said on behalf of the Renova parties that the facts (i) that (as the judge held) Renova had failed to establish any loss as against Mr. Gilbertson, and that (ii) Renova abandoned its claim against Mr. Gilbertson for an account of profits did not provide a basis for failing to make a costs order against Autumn. Autumn and Mr. Gilbertson had argued strongly that it was not permissible to pierce the corporate veil and, indeed, it was in response to (and in recognition of the force of) that argument that Renova had abandoned its attempt to do so and, in consequence, had been led to abandon its claim for an account of profits as against Mr. Gilbertson. If, as the Gilbertson parties contended (and Renova accepted), Mr. Gilbertson and Autumn were to be treated as legally separate and distinct in that

context, they should be treated as separate and distinct in the context of liability for costs.

256   In advancing the second of those three points—that, as between Renova and Autumn, there was no reason why Autumn should not pay the whole of Renova's costs—it is said on behalf of the Renova parties that the judge was wrong to characterize the liability of Autumn to account as "minimal." Even on the judge's own findings, Autumn's liability was substantial: the cash component was US$2.3m. and the shares ordered to be transferred to the master fund were worth a further US$1.5m. or thereabouts (even if Fabergé Ltd. were to be valued, as the judge held, at no more than US$120m.). But, even if recoveries of some US$3.8m. could be described as "minimal" in the context of the claims advanced by Renova in the action, the judge erred in law in treating that factor as a reason for refusing Renova an order for costs. In support of that submission, the Renova parties rely on the observation of Sanderson, J. in *Banks* v. *Arch* (5), that it is no answer to a claim for costs for the defendant to say that the award was only marginal and that therefore the plaintiff should not have his costs.

257   In advancing the third of those three points—that, in failing to make an order for costs against Mr. Gilbertson, the judge placed too much weight on the facts that (as he held) Renova had failed to establish any loss as against Mr. Gilbertson and that Renova abandoned its claim against Mr. Gilbertson for an account of profits—it is said on behalf of the Renova parties that the judge failed to take into account, or gave too little weight to, the following factors: (i) that it was Mr. Gilbertson's dishonest conduct which gave rise to these proceedings; (ii) that the main issue at trial—on which Renova was successful—was whether Mr. Gilbertson had dishonestly diverted the Fabergé rights to Autumn (and others) in breach of his fiduciary duties; (iii) that that issue was common both to the claim against Mr. Gilbertson and to the claim against Autumn; (iv) that success against Mr. Gilbertson on that issue, in relation to a claim for breach of fiduciary duty, was a legitimate end in itself (as Phillips, J. had held in *Texaco Ltd* v. *Arco Technology Inc.* (36)); Autumn was a company in which he had an obvious financial interest; (v) that the only substantive issue which the judge decided against Renova (the quantum of loss in respect of which equitable compensation should be awarded) occupied a relatively small part of the time at trial; (vi) that the claim against Mr. Gilbertson for equitable compensation—although ultimately unsuccessful at trial on the issue of loss—was never unreasonable or lacking a sensible basis; the judge found (2012 (2) CILR 416, at para. 70) that Renova had "put forward a perfectly arguable case on the merits of its claim and also in relation to loss"; (vii) that late evidence on quantum (which was disclosed to Renova only during the trial) formed a significant part of the judge's conclusions on equitable damages (as appears from, *ibid.*, paras.

127–128); and (viii) that the claim against Mr. Gilbertson for an account of profits (which Renova abandoned in the course of the trial) took up little or no time at any stage in the proceedings and added little to the costs of the proceedings in that, had that claim not been advanced, no less evidence (factual and expert) would have been adduced.

258    Further, it is said on behalf of the Renova parties that, in determining what order to make in respect of costs, the judge was wrong to take account of his conclusion, at an earlier stage in the proceedings, that Renova's failure to comply with its discovery obligations was "blameworthy and culpable." That conclusion was irrelevant in relation to the question where the costs of the proceedings should fall, in that: (i) the Gilbertson parties' strike-out application of April 27th, 2011 (founded on the alleged failure by Renova to give discovery) failed on the basis that the matter could be pursued at trial and adverse inferences drawn, if necessary; (ii) at the trial no questions about discovery—nor, indeed, any questions relevant to the allegation as to intention to harm (to which the documents not disclosed by the Renova parties were said to be germane)—were put to any of Renova's witnesses (amongst whom was Mr. Vekselberg); (iii) the Gilbertson parties made no submissions at trial as to deficiencies in Renova's (or any other Renova party's) discovery and did not ask the judge to draw any adverse inferences from the absence of documents; (iv) the judge (correctly) did not draw any adverse inferences against the Renova parties from any failure to give discovery; (v) the Gilbertson parties' application against Mr. Vekselberg for specific discovery of his TNK-BP documents was also rejected by the court at the interlocutory stage; and (vi) the documents that were the subject of the Gilbertson parties' applications based on non-disclosure went solely to the counterclaims, which were barely pursued and were either abandoned or ultimately dismissed. And it is said that, in taking account of his conclusion that Renova's failure to comply with its discovery obligations was "blameworthy and culpable" (as he did), the judge was wrong in failing, also, to take into account the following matters (each of which was a relevant matter which he should have taken into account), that is to say: (a) that he had ordered the costs of the Gilbertson parties' failed strike-out application and the specific discovery application against Mr. Vekselberg to be costs in the cause; (b) that the relevant cause (namely the counterclaims) was, on any view, won by the Renova parties; and (c) that the effect of making no order for costs following the trial was that the Renova parties were unjustly deprived of the (very substantial) costs of resisting those failed applications to which they should have been entitled, given that the Gilbertson parties failed properly to pursue the counterclaims, abandoned some of them late in the day and had the remainder dismissed.

259    For those reasons, it is said on behalf of the Renova parties that the only fair order was that Renova should have its costs of the action;

whether those costs were awarded against both Mr. Gilbertson and Autumn jointly or against Autumn alone.

260   In response to the submissions that, in determining what order to make as to costs, the judge should have addressed the position of Autumn separately from that of Mr. Gilbertson and that the liability of Autumn as constructive trustee could not be seen as "minimal"—it is said on behalf of the Gilbertson parties that each is inconsistent with the position adopted by the Renova parties in the proceedings, in that:

(1) At the hearing on October 26th, 2012—at which the parties made their respective submissions as to costs—the Renova parties urged the judge to treat the Gilbertson parties as one and the same. They cannot now complain that, in addressing the question of costs, the judge failed to treat Mr. Gilbertson and Autumn as separate and distinct.

(2) The Renova parties obtained leave to continue the action on the basis that the company and/or the GPLP and/or the master fund had suffered a substantial loss; which they put at US$82m. The judge found that the true loss should be assessed at nil. Although the Renova parties now complain that the judge did not give weight to the proposition that establishing that Mr. Gilbertson had acted in breach of fiduciary duty was a legitimate end in itself, that was not how the case had been presented to him when the Renova parties sought leave to bring the action at the outset.

261   Further, it is said on behalf of the Gilbertson parties that the judge was entitled to take into account the "blameworthy and culpable" destruction of documents by the Renova parties. The court's attention was directed to the judge's observations, in the course of his ruling on the application to strike out Renova's statement of claim, that the destruction of the documents was deliberate and on a wholesale scale. The judge had said this (at paras. 25 and 60 of that ruling, reported at 2011 (2) CILR 148):

"25   . . . [I]t is accepted that the Renova I.T. department took a series of very significant decisions in the period January 2008 to December 2010, which has resulted in the effective eradication of all potential sources of any relevant electronic documentation saved on the crashed Zurich server. The evidence of the Gilbertson parties' independent I.T. experts, which is not disputed in this respect by the Renova parties' own independent I.T. experts, is that it would not have been difficult or expensive for the Renova Group to make different decisions at the time which would have ensured that all of the potential sources of data concerned were preserved for expert forensic examination, particularly given that these proceedings were clearly in contemplation at the time of the Zurich computer crash and commenced shortly thereafter, and given also that the Renova Group had already received legal advice prior to the server crash that they

318

should preserve all relevant documentation for the purposes of these proceedings. Notwithstanding that advice, the Renova Group took deliberate steps, in most instances after these proceedings had commenced, which destroyed any prospects of recovering for discovery purposes e-mail and other electronic data from any potential sources, apparently without any regard for their discovery obligations and the need to preserve any potentially relevant e-mails and other documents."

"60   . . . My overall impression of the evidence filed by the Renova parties in response to the Gilbertson parties' strike out application is that, notwithstanding the legal advice concerning discovery given to them in January 2007 and again in October 2009 (which itself seems to me to have been surprisingly late in the day), there was a complete disregard by the Renova Group of the need to preserve all relevant documents, including the potential sources of such documents for discovery purposes. The Zurich server crash shortly before these proceedings were commenced was obviously unfortunate. However the steps taken thereafter to destroy over time all the possible alternative sources of e-mail or other electric data, some of which may well have been relevant to these proceedings, to my mind amounts to a complete lack of consideration for and disregard of the need to preserve all potential sources of relevant documents."

It is pointed out that the Renova parties have not challenged those observations. It is said, also, that the Renova parties are wrong to submit that the judge erred in taking their destruction of documents into account in the circumstances that (in the event) the documents which the judge found they had destroyed would have had no relevance to the issues in the proceedings. The submission is wrong, both as a matter of principle—in that the serious nature of the Renova parties' disregard of the court's process is not to be assessed only in the light of its consequences—and as a matter of fact—in that the wholesale nature of the destruction (and the sense of injustice and distortion of the court process which resulted from that destruction) had an impact on the trial which was both far-reaching and regrettable, notwithstanding that there was limited scope to test or pursue those concerns in the course of the trial. A court has jurisdiction to mark, by an appropriate order for costs, its disapproval of conduct that disregards or serves to undermine the integrity of its process. The steps taken by the Renova parties in relation to electronic documents (as described by the judge in the passages cited) were, on any view, a glaring example of such conduct. The contention that the judge should have taken no account of such conduct (on the ground that there is no jurisdiction to do so) is contrary to principle, misconceived and should be rejected.

262   More generally, it is said on behalf of the Gilbertson parties that, in determining whether to make any (and, if so, what) order as to costs, the

judge was entitled to take the view that the action was out of all proportion to the dispute. It is pointed out that the judge queried the purpose of the action at the outset of the trial:

> "Now that the openings have finished, and I, of course, have listened to them carefully, I do consider that a further serious attempt should be made to settle this matter with a view to saving time, cost and court time as well, having regard, in particular, to the overriding objectives of the court rules, which I'm sure you're familiar with. And I would request that you pass that message to your clients . . . with the ability to give instructions how to deal with the matter."

And, it is said, the judge can only have been confirmed in his view as to the disproportionate nature of the proceedings after his determination that the master fund had suffered no loss. Although the judge does not allude to this in his costs decision, it would have been open to him to find the proceedings oppressive and to award, or decline to award, costs accordingly. In particular, it is said that:

(1) The Renova parties should have appreciated (not later than at the time that Renova received Mr. Osborne's report) that there was no realistic prospect that Renova would be awarded equitable compensation in an amount which was proportionate to the costs of the proceedings and the amount of court time that was occupied.

(2) Further, the proceedings were disproportionate having regard to the fact that, on the basis of the short forms, the Renova parties are only entitled to 25% of the relief awarded against Autumn, the other 75% going to Mr. Sean Gilbertson and Fairbairn Trust Ltd. (in its capacity as trustee of a Gilbertson family settlement).

(3) Renova's claim against Mr. Gilbertson was in excess of US$80m. It was calculated to ruin all but those of the most exceptional wealth. It is reasonable for a party that faces such a claim to investigate and even take points that it would not be proportionate to take in other circumstances and, where the enormous claim turns out to have nil value, the court may well consider that the costs were incurred as a result of the extravagance of the claim.

(4) Renova had originally pleaded that the terms of the fourth draft IA were reasonable, and were terms that Mr. Gilbertson should have been prepared to agree. But, in the course of his opening submissions at trial, it was said by counsel that one of the clauses in that draft IA was, in fact, wholly absurd and uncommercial. Renova made an 11th hour change to its pleaded case on equitable compensation, abandoning the claim by reference to the fourth draft IA, thereby recognizing that the long-standing pleaded case, in which it had relied on the fourth draft IA, had always been unsustainable.

(5) There is good reason to think that the judge would never have given leave to continue the action had he appreciated how disproportionate the dispute was likely to prove.

263    In my view there is no proper basis upon which this court can, or should, interfere with the judge's order in relation to the costs of the action. As the judge recognized, correctly, the starting point for his consideration was GCR O.62, r.4(5): costs should follow the event, "except when it appears to the court that in the circumstances of the case some other order should be made as to the whole or any part of the costs." A proper reason for "some other order"—as, again, the judge recognized—was that in the circumstances of this case there was no single "event" which the costs should follow. Although it is said on behalf of the Renova parties that the judge ought to have concluded that the relevant event or events to be followed were the finding against Mr. Gilbertson for dishonest breach of fiduciary duty and the finding that Autumn was liable to account as constructive trustee, that is to overlook the important findings that the master fund suffered no loss in respect of which Mr. Gilbertson should be ordered to pay equitable compensation and that the assets for which Autumn was liable to account as a constructive trustee were substantially less (and very substantially less in value) than Renova had claimed. The judge was plainly entitled to take the view that this was a case in which it was appropriate to depart from the rule that costs should follow the event, and that some other order was required.

264    Renova abandoned its claim against Mr. Gilbertson for an account of profits and failed in its claim against him for equitable compensation: it succeeded in its claim against Autumn, but to an extent which the judge described as minimal. It would have been open to the judge to make an order which differentiated (on the basis of outcome) between the claims against Mr. Gilbertson and the claims against Autumn: in particular, it would have been open to him to order that Renova pay to Mr. Gilbertson the costs attributable to the claim against him for an account of profits and for equitable compensation and that Autumn pay to Renova the costs attributable to the claims against it for an account as constructive trustee on which Renova was successful. But the judge was entitled to take the view that a "differential order" of that nature would not be appropriate: first, for the reason that he gave at para. 3.9 of his ruling of November 5th, 2012 (that it would be artificial to do so in the light of his acceptance of Renova's contention that Mr. Gilbertson was the directing mind and will of Autumn), and, secondly, because there was an important issue (whether Mr. Gilbertson was in breach of fiduciary duty) which was common to both claims.

265    The judge again correctly recognized (at para. 3.12 of his ruling on costs) that this was a case in which it would be open to him to make an issue-based order: that is to say, an order either that each party pay to the

other the costs attributable to discrete issues (which would require separate, issue-by-issue, assessments of such costs) or an order that one party pay to the other a proportion of the overall costs (such proportion to reflect success on some issues and failure on others). In that context he would have had regard to Renova's success (broadly, at least) on the following issues: (i) whether Mr. Gilbertson owed fiduciary duties of care to the company (and, more generally, to the master fund and the Pallinghurst structure); (ii) whether (in so far as it was in dispute), in procuring the issue of 100 new shares in PEL in January 2007, Mr. Gilbertson was in breach of those duties; (iii) whether Renova should be denied equitable relief on *Nurcombe* v. *Nurcombe* grounds; (iv) whether the 25 PEL shares issued to Autumn in January 2007 were assets into which the master fund was entitled to trace; (v) whether Autumn received those shares as a volunteer; (vi) whether (in so far as relevant) Autumn received those shares with relevant knowledge of Mr. Gilbertson's breach of trust; and (wrongly, as I would hold) (vii) whether the interest payment received by Autumn in September 2007 was also an asset into which the master fund was entitled to trace, and to its failure on the issues; (viii) whether the master fund had suffered loss by reason of Mr. Gilbertson's breach of duty; and (ix) whether the additional shares issued to Autumn after January 2007 were traceable assets. The judge rejected an issue-based order for the reasons which he gave (at para. 3.12): that an issue-by-issue allocation of costs would be very difficult to apply in practice in this case, would be likely to result in interminable argument and debate, which would not be desirable, and in any event the costs payable by each party on an issue-by-issue basis would probably largely cancel each other out. As the judge who (as he observed at para. 3.8 of his ruling) had dealt with the entirety of these proceedings since they were commenced in May 2008—and, in particular, over a four-week trial—the judge was well placed to form that judgment; this court must, I think, respect his view.

266   The judge directed himself (at para. 3.11 of his costs ruling) that he should have some regard, in considering the overall costs of the proceedings, to the failure of the Renova parties to comply with their discovery obligations which, as he said (*ibid.*) he had found blameworthy and culpable. In giving himself that direction, he did not err in principle; but it is difficult to find in his ruling any indication that, having regard to the defects in the compliance with discovery obligations of the Renova parties, led him to make an order for costs after trial which he would not otherwise have made. That is not, in my view, a matter for criticism: in determining the strike-out application made on the basis of culpable non-discovery, the judge had ordered that the costs of that application be costs in the cause: nothing had occurred during the trial which could have led him to vary that order (assuming that, absent an appeal, he

would have had power to do so); there was no need for him to revisit the point.

267   For those reasons, I would reject the submission (advanced on behalf of the Renova parties) that, in making no order as to the costs of the action, the judge exercised his discretion outside the ambit within which reasonable disagreement is possible. I should add that I am not persuaded that the fact that (as I would hold) the judge was wrong to treat the interest payment received by Autumn in September 2007 as an asset into which the master fund was entitled to trace is a sufficient reason for this court, itself, to make a different order in respect of the costs of the action.

### The costs of the counterclaims

268   It is submitted on behalf of the Renova parties that the judge ought to have awarded the costs of the counterclaims to the Renova parties in any event. It is said that he was wrong to treat the costs of the counterclaims as "part of the ebb and flow of each [party's] successes and defeats", and that, in exercising his discretion, he failed to take the following matters into account: (i) that the counterclaims were not made against, or made only against, Renova but were made against persons who were not parties to the proceedings and had to be joined for that purpose; (ii) that they raised very serious allegations against individuals of intention to harm (and in the case of Mr. Kuznetsov, allegations of disloyalty and "moral guilt"); (iii) that they were advanced in a perfunctory manner in the Gilbertson parties' written opening submissions; (iv) that they were barely mentioned at all in oral openings; (v) that they were not then pursued in cross-examination of any of the witnesses called by the Renova parties; (vi) that, when evidence was closed (and only after being pressed by the Renova parties), the Gilbertson parties expressly abandoned their counterclaims for lawful means conspiracy and breach of fiduciary duty by Mr. Kuznetsov; (vii) that the remaining counterclaims (two of which were for torts of intentional harm) were not pursued with any genuine vigour in the Gilbertson parties' oral submissions or written closing submissions; and (viii) that those remaining counterclaims were dismissed by the judge.

269   It is said, further, that not only should the judge have awarded the costs of the counterclaims to the Renova parties but that he should have done so on the indemnity basis in that they were pursued improperly, unreasonably and negligently within the meaning of GCR O.62, r.11(4) or r.11(2). In support of that submission, it is said that (in addition to the matters mentioned in the immediately preceding paragraph) the judge ought to have taken into account that:

  (1) There was no rational explanation for the slow collapse of the counterclaims other than that the Gilbertson parties sought "to hang on to

the counterclaims, good bad or indifferent", in order to maximize the pressure on the Renova parties. In that context it is pertinent to have in mind that the case was opened on behalf of the Gilbertson parties on the basis that the action had been brought out of malice but that this very serious allegation was not then put to Mr. Vekselberg in cross-examination. The Gilbertson parties were "willing to wound and yet afraid to strike." As the judge said (2012 (2) CILR 416, at para. 104):

> ". . . I think it right to say that the overall impression which I gained during the course of the trial was that the counterclaims were pursued on behalf of the Gilbertson parties with increasingly less enthusiasm. Apart from the fact that the specific claims which I have mentioned were expressly dropped, it seemed to me that the detailed basis of the counterclaims changed to some extent from the Gilbertson parties' pleadings as well as varying somewhat also between the Gilbertson parties' written and oral opening submissions on the one hand and their closing submissions on the other hand. Also not all of the alleged facts on which the counterclaims are based were put to the Renova parties' witnesses in cross-examination. In summary, I was left with the distinct impression that counsel for the Gilbertson parties were less than convinced themselves of the merit of the remaining individual counterclaims."

(2) In similar circumstances, in *Sagicor Gen. Ins. Cayman Ltd.* v. *Crawford Adjusters (Cayman) Ltd.* (32), Henderson, J. made an indemnity costs order against plaintiffs who pursued a case of fraud and dishonesty for two years before abandoning it on the eve of the trial. After noting (2008 CILR 482, at para. 2) that "such allegations have a detrimental effect on the reputations of those involved and that such allegations should never be made lightly." Henderson, J. went on to observe (*ibid.*):

> "From the failure of these plaintiffs to prosecute their case, I infer that they have never been in possession of a body of evidence capable of establishing fraud or conspiracy. These few comments, without more, provide ample justification for an award of indemnity costs."

Those comments are in point in the present case in that, although the counterclaims did not allege dishonesty, they did allege conspiracy and other torts involving an intention to harm. Those are serious allegations to make against individuals (Mr. Vekselberg and Mr. Kuznetsov).

(3) The allegations of conspiracy and intention to harm should never have been made—in that there was never evidence to support them—and should not have been maintained once the Gilbertson parties had chosen not to put them to Mr. Vekselberg or to Mr. Kuznetsov in cross-examination. It should be inferred that the counterclaims were only made

in order, improperly, to bring pressure to bear against, in particular, Mr. Vekselberg personally. As Smellie, C.J. said in *Ahmad Hamad Algosaibi & Bros. Co.* v. *Saad Invs. Co. Ltd.* (1) (unreported, at para. 21):

> "The institution and maintenance of a patently speculative and weak case merely with the opportunistic intention of embarrassing or compelling an opposite party to comply with a claim will be conduct coming within the embrace of GCR O.62 r.11(4) as being 'improper' and 'unreasonable.'"

270    In response to those submissions, it is said on behalf of the Gilbertson parties that:

(1) The judge's view that the costs of the counterclaims were "part of the ebb and flow of each party's various successes and defeats" was a perfectly proper view for him to take. The counterclaims were all contingent on liability in the main action, and specific counterclaims were contingent on such liability arising in particular ways. The relief sought on behalf of Autumn was by way of contribution or indemnity in respect of any liability in the main action as, in substance, was the relief sought on behalf of Mr. Gilbertson. In those circumstances, it was reasonable for the judge to see the counterclaims as part of the Gilbertson parties' defences.

(2) The Renova parties' complaint that Mr. Vekselberg and Mr. Kuznetsov were joined as parties without proper cause is misconceived. Mr. Vekselberg and Mr. Kuznetsov were witnesses which Renova needed to call in order to establish its case (which, as developed at trial—in particular, in relation to the agreement or understanding and the negotiations of the implementation agreements—depended on the evidence of Mr. Vekselberg and Mr. Kuznetsov). It cannot be suggested that any, or any substantial part, of their evidence went exclusively to the counterclaims.

(3) In his ruling on the strike-out application the judge said this (2011 (2) CILR 148, at para. 28):

> "Mr. Vekselberg has been less than enthusiastic in complying with [his discovery obligations]. I am somewhat cynical about the explanation which he has given for his contention that such e-mails are not within his possession, custody or power."

It is true that, at the subsequent hearing of the specific discovery application, Mr. Vekselberg successfully maintained his contention that the emails of which discovery was sought were not in his possession, custody or power; but the fact that the Renova parties were able to avoid giving any further discovery on behalf of Mr. Vekselberg is not a ground on which they can seek an order for costs in relation to the counterclaims generally, let alone costs on an indemnity basis.

(4) The contention that the counterclaims were hopeless was determined by the judge on the application to strike them out. At para. 19 of his ruling on that application (dated May 5th, 2010, unreported), the judge said this:

"As I have said above, a consideration of the evidence to which I was referred by both leading counsel does not cause me to believe that the plaintiffs counterclaim have only a faint possibility of success in the claims which they make. On the contrary, this seems to me to be very much a case which should go to trial in the usual way and is not one in which judgment on any of the respective claims of the parties should be granted summarily. I would, had I considered that I had jurisdiction to consider the applications of the defendants to counterclaim pursuant to GCR O.14, r.12, have refused to grant them summary judgment on the counterclaim or any part thereof. In my opinion, this is undoubtedly a case which should go to trial and the respective claims of the parties determined after full discovery and oral evidence with cross examination in the usual way."

(5) The criticism of the Gilbertson parties for having abandoned some of the counterclaims is misconceived. It is perfectly proper for a party to abandon claims in the event that the course of the evidence makes it appropriate. The Renova parties abandoned their claim for an account of profits against Mr. Gilbertson in the course of oral closing. And this was but one of the ways in respect of which the Renova parties changed their case at trial.

271   In my view, there is force in the submission that the judge ought to have awarded the costs of the counterclaims to the Renova parties (other, perhaps, than to Renova itself). In seeking to justify his decision not to make a separate order for the costs of the counterclaims—for the reasons that (as he said at para. 3.10 of his ruling on November 5th, 2012) (i) the counterclaims accounted for a very limited part of the trial; (ii) he had declined to strike out the counterclaims at an earlier stage in the proceedings; and (iii) he saw the counterclaims "as part of the ebb and flow of each parties' various successes and defeats"—the judge overlooked three important factors: first, that three of the defendants to the counterclaims (Mr. Vekselberg, Mr. Kuznetsov and Renova Holdings) were not claimants in the action; secondly, that (whether or not the counterclaims had occupied time at trial) there had been costs incurred in interim applications to which they were parties; and thirdly, that he had made orders that the costs of those interim applications should be costs in cause.

272   As I have said earlier in this judgment, the judge explained (at para. 6.7 of his judgment) that Mr. Gilbertson and Autumn counterclaimed in the proceedings, not only against Renova, but also against Mr. Vekselberg, Mr. Kuznetsov and Renova Holding, for an indemnity on various grounds

for any liability which they were found to have in respect of Renova's derivative claims. They did so by serving with their defence to Renova's claim a counterclaim (subsequently slightly amended by their amended defence and counterclaim served pursuant to an order made on November 30th, 2011) which included the following paragraph by way of introduction:

"57. If, contrary to the primary case set out in the Defence, Mr. Gilbertson and Autumn are liable in respect of any of the relief claimed against them in the name of the Company (whether in its own right and/or on behalf of the Master Fund), Mr. Gilbertson and Autumn will counterclaim as set out below."

In the events which happened, Autumn was held liable in respect of relief claimed against it on behalf of the master fund, so the counterclaims (in so far as they had survived to trial) had to be addressed.

273    As the judge explained (2012 (2) CILR 416, at paras. 100–101), the pleaded counterclaims included: (i) at paras. 59–60, a claim for damages against Renova Holding—on the ground that Renova Holding acted in repudiatory breach of the letter agreement; (ii) at paras. 61–63, claims for damages against Mr. Vekselberg and Mr. Kuznetsov—on the ground that they had induced or procured Renova Holding to act in repudiatory breach of the letter agreement; (iii) at paras. 64–65, a claim for damages against Mr. Vekselberg, Mr. Kuznetsov and Renova Holding (and against Renova itself)—on the ground of conspiracy, by both lawful means and unlawful means; and (iv) at para. 66, a claim against Mr. Kuznetsov for indemnity or contribution as a co-director of Mr. Gilbertson for breach of his fiduciary duties to the company. By summons dated September 29th, 2009, the defendants to the counterclaims applied, pursuant to GCR O.14, r.12, for an order that each of the counterclaims should be dismissed and summary judgment entered for them on the ground that the Gilbertson parties, as plaintiffs to the counterclaims, had no prospect of success at trial. They also applied pursuant to GCR O.18, r.19 for orders, *inter alia*, that certain specific paragraphs of the counterclaims should be struck out on the ground that they disclosed no reasonable cause of action. After a three-day hearing in early March 2010 and a further hearing on April 15th, 2010, the judge declined to strike out any part of the counterclaims on a summary basis. It was in that context that he made the observation, on which the Gilbertson parties rely: that this was undoubtedly a case which should go to trial and the respective claims of the parties determined after full discovery and oral evidence with cross-examination in the usual way, and, consistently with that view, he directed that the costs of the application to strike out should be costs in the cause.

274    The judge went on to explain (*ibid.*, at para. 103) that, on May 11th, 2012, during the course of the trial, it was confirmed on behalf of the

Gilbertson parties that they were no longer pursuing the specific counterclaims for damages for lawful means conspiracy and for indemnity and contribution by Mr. Kuznetsov for breach of fiduciary duty, and that, accordingly, they were only pursuing the specific counterclaims for repudiatory breach of the letter agreement, for procuring that breach of the letter agreement and for unlawful means conspiracy. In those circumstances, as the judge observed (*ibid.*), the only counterclaims which he needed to address were (i) the claim for damages against Renova Holding in respect of alleged repudiatory breach of the letter agreement; (ii) the claims for damages against Mr. Vekselberg and Mr. Kuznetsov for allegedly inducing or procuring Renova Holding to act in repudiatory breach of the letter agreement; and (iii) the claim in tort against all the defendants to counterclaim for conspiracy by unlawful means.

275 Before turning to address those counterclaims, the judge made the observations (*ibid.*, at para. 104) on which the Renova parties rely: that his overall impression (gained during the course of the trial) was that the counterclaims were pursued on behalf of the Gilbertson parties with increasingly less enthusiasm; that not all of the alleged facts on which the counterclaims were based were put to the Renova parties' witnesses in cross-examination; and that he was left with the distinct impression that counsel for the Gilbertson parties were less than convinced themselves of the merit of the remaining individual counterclaims.

276 The judge addressed the first of the counterclaims (*ibid.*, at paras. 105–109) that remained outstanding: the claim against Renova Holding for damages in respect of alleged repudiatory breach of the letter agreement. He concluded, in the circumstances which he set out and for the reasons which he gave, that there was "no merit in this particular claim in the counterclaim." He addressed the second of the outstanding counterclaims (*ibid.*, at para. 109): the claim for damages against Mr. Vekselberg and Mr. Kuznetsov for allegedly inducing or procuring Renova Holding to act in repudiatory breach of the letter agreement. He observed (*ibid.*) that it was "a crucial ingredient of the tort that the defendant should have intended that the contract be breached. That was not put to any of the Renova parties' witnesses." In those circumstances, he said, "I am of the view that there is no merit in this claim either." The judge addressed (*ibid.*, at paras. 110–111) the third of the outstanding counterclaims: the claim for damages against all the defendants to counterclaim for conspiracy by unlawful means. He pointed out that the pleaded claim included (at para. 64.2) the allegation that the alleged conspiracy was "to commit unlawful acts against the master fund and hence Mr. Gilbertson." He accepted the submission, advanced on behalf of the Renova parties, that Mr. Gilbertson's economic interest in the master fund was not such as to give him a cause of action. He said this (*ibid.*, at para. 111):

"Only the master fund (or GPLP or the company) could sue in respect of alleged unlawful acts against the master fund. Mr. Gilbertson has no standing to sue in respect of an alleged conspiracy to commit unlawful acts against the master fund."

In those circumstances the judge concluded (*ibid.*, at para. 113) that "the three remaining specific counterclaims by the Gilbertson parties are not made out and should be dismissed." There has been no appeal against that part of his order.

277   For my part, I am content to accept that the judge was entitled to take the view that the counterclaim made against Renova for damages for conspiracy (by lawful or unlawful means)—which was the only counterclaim made against Renova—could properly be regarded "as part of the ebb and flow" of the "various successes and defeats" of the claims in the action (that is to say, the claims made by Renova against Mr. Gilbertson and Autumn), and that, on that basis, if it was appropriate to make no order for the costs of the action, then it was also appropriate to make no order for costs (as between Renova and the Gilbertson parties) in respect of the costs of that counterclaim. But I am not persuaded that that reasoning can be applied to the costs as between the Gilbertson parties and the other three defendants to the counterclaims). In my view, the judge erred in failing to distinguish between the position of Renova, on the one hand, and the other co-defendants to counterclaim (Mr. Vekselberg, Mr. Kuznetsov and Renova Holding), on the other hand. Had he done so, he would have appreciated that it was necessary, in the circumstances of this case, to make a separate order as to the costs of the counterclaim.

278   In the circumstances that the judge erred in making no separate order as to the costs of the counterclaim, it is necessary for this court to consider what order should be made. In my view, having the provisions of O.62, r.4(5) in mind, the costs of the counterclaims (as between the Gilbertson parties and the three defendants, other than Renova) should follow the event: that is to say, those costs should be paid by the Gilbertson parties. There can be no doubt that, in relation to all the counterclaims against them, Mr. Vekselberg, Mr. Kuznetsov and Renova Holding were the successful parties. The effect of that order will be that they will be entitled to receive not only their costs (if any) of defending the counterclaims at trial (including those that were abandoned) but also costs which they incurred in pursuing or resisting interlocutory applications and in respect of which there are existing orders for costs in cause. In that context, as between the Gilbertson parties and Mr. Kuznetsov and Renova Holding, the relevant "cause" is that brought by the counterclaim.

279   I turn, therefore to consider the basis upon which the costs payable to Mr. Vekselberg, Mr. Kuznetsov and Renova Holding should be assessed: an issue which, given that he made no order for costs, the judge

did not need to (and did not) address. The receiving parties seek an order that such costs should be assessed on an indemnity basis. They rely upon GCR O.62, r.11(4), which enables the court to make such an order where claims have been pursued improperly, unreasonably or negligently. In considering that application, it is pertinent to have in mind not only the submissions which they advance (and, of course, those advanced by the Gilbertson parties in response), but also the judge's observations (2012 (2) CILR 416, at paras. 104 and 112). Reference has already been made to his observations at para. 104. The judge said this (*ibid.*, at para. 112):

> "As I have also mentioned, leading counsel for the Gilbertson parties, as plaintiffs to the counterclaim, cross-examined the Renova parties' witnesses, including Mr. Vekselberg and Mr. Kuznetsov, the first and second defendants to the counterclaim. I accept the submission of leading counsel for the Renova parties that the essential factual elements of the three remaining specific counterclaims were not put to those witnesses. In particular in this context, it was not put to either Mr. Vekselberg or Mr. Kuznetsov that their purpose, whether predominant or otherwise, was to harm the master fund and thereby Mr. Gilbertson. Furthermore, the evidence in the case simply does not support any contention that the intention of Mr. Vekselberg and Mr. Kuznetsov, by their insistence on ownership of the title to the Fabergé brand by one of Mr. Vekselberg's private companies outside the Pallinghurst structure or their alleged refusal to provide funding to the master fund through PEL for the purchase of the rights, was intended to harm Mr. Gilbertson. At most, and on the Gilbertson parties' best case, the intentions of Mr. Vekselberg and Mr. Kuznetsov were to further and protect the interest of Mr. Vekselberg in owning the title to the Fabergé brand."

280   In my view there is force in the submissions made on behalf of the Renova parties that Mr. Vekselberg, Mr. Kuznetsov and Renova Holding were joined as parties without proper cause; that there was no rational explanation for the slow collapse of the counterclaims other than that the Gilbertson parties sought "to hang on to the counterclaims, good bad or indifferent," in order to maximize the pressure on the Renova parties; that the allegations of conspiracy and intention to harm should never have been made—in that there was never evidence to support them—and should not have been maintained once the Gilbertson parties had chosen not to put them to Mr. Vekselberg or to Mr. Kuznetsov in cross-examination; and that it should be inferred that the counterclaims were only made in order, improperly, to bring pressure to bear on Mr. Vekselberg personally. The submission advanced on behalf of the Gilbertson parties—that the complaint that Mr. Vekselberg and Mr. Kuznetsov were joined as parties without proper cause is misconceived, in that Mr. Vekselberg and Mr. Kuznetsov were witnesses which Renova needed to call in order to

establish its case—is, itself, misconceived. If Mr. Vekselberg and Mr. Kuznetsov were witnesses on whose evidence Renova would need to rely in any event, there was no reason why they should be joined as parties to the proceedings so that they could be cross-examined by the Gilbertson parties. In my view, the costs which Mr. Vekselberg, Mr. Kuznetsov and Renova Holding are entitled to receive should be assessed on an indemnity basis.

**Conclusions**

281   For the reasons which I have set out in the preceding sections of this judgment, I take the view that:

(1) The judge was right to entertain the derivative claims advanced by Renova. In particular, he is correct to hold (2012 (2) CILR 416, at para. 60) that, having chosen not to appeal from the order which he had made some three and a half years earlier, it was not open to the Gilbertson parties to challenge, at trial, the standing of Renova to advance claims in the action on behalf of GPLP and the master fund including, in particular, a claim founded on the unpleaded contention that Mr. Gilbertson had acted in breach of fiduciary duties which he owed to the master fund.

(2) The judge was right to hold that Mr. Gilbertson owed and was in breach of fiduciary duties in relation to the Fabergé rights. In particular, he was correct to hold (*ibid.*, at para. 57) that, as a director of the company, Mr. Gilbertson owed the duties of a fiduciary to the company (and, more generally, to the master fund and the Pallinghurst structure) throughout the relevant period and that he was in breach of those duties in acting as he did in late December 2006 and January 2007.

(3) The judge was right to hold that, notwithstanding the so-called rule in *Nurcombe* v. *Nurcombe* (28), the conduct of the Renova parties was not such as to disentitle Renova from equitable relief in this action.

(4) The judge was right to value at nil the loss which Mr. Gilbertson was liable to make good to the master fund by way of equitable compensation. In particular, he was correct to hold on the evidence before him that the current value (as at the date of trial) of the right to manage and exploit the Fabergé rights as licensee to which the master fund (through OpCo) would probably have been entitled but for Mr. Gilbertson's breach of fiduciary duty was less than the costs (other than acquisition costs) and expenses that would have been incurred in funding the development of those rights.

(5) The judge was right to hold that Autumn was liable to account as a constructive trustee of the shares issued by PEL in January 2007 (i) because it received those shares as a volunteer; and (ii) because, in any event, it was in "knowing receipt" having regard to its relationship with

331

Mr. Gilbertson, the property which it received, the person from whom it received the property, and its state of knowledge at the time of receipt. In particular, the judge was correct to hold that the value of the single share in PEL held by the master fund before the issue of 100 new PEL shares on January 3rd, 2007 could be traced (in part) into the 25 new PEL shares issued to Autumn on that date; correct to hold that Autumn gave no value for those 25 new PEL shares; and correct to hold that the knowledge of Mr. Gilbertson (and, so far as relevant, the knowledge of Mr. Thomas) as to the circumstances in which those new PEL shares were issued was to be attributed to Autumn.

(6) The judge was right to hold that Autumn was not liable to account as constructive trustee for shares (other than the 25,000 shares which represented the 25 shares issued by PEL in January 2007) which it held in Fabergé Ltd. at the date of the trial, and so did not have to transfer such additional shares to the master fund. In particular, the judge was correct to reject Renova's claims in respect of the additional 16,190,575 shares in Fabergé Ltd., in that the material before him at the trial did not enable the judge to make the findings of fact which would have been necessary in order to support that claim.

(7) The judge was wrong to hold that Autumn was liable to account (by way of an account of profits) for the payment (US$1,798,973) which it received on September 28th, 2007 in respect of interest on the loans which it had made to PEL on January 3rd, 2007. In particular, he was wrong to hold that the value of any asset held or formerly held by the master fund could be traced into that payment. It follows that he was wrong, also, to award pre-judgment interest—in the amount of US$507,347.35 or in any other amount—on an amount equal to that payment. If (contrary to my view) the judge was not wrong to hold that Autumn was liable to account for the payment of US$1,798,973 which it received on September 28th, 2007, he was nevertheless wrong to include in the sum awarded (US$507,347.35) as pre-judgment interest an amount (said to be US$95,407.18) in respect of interest attributable to the period from January 3rd, 2007 to September 27th, 2007. He was wrong to do so because, on the material before him, it was not open to him to hold that Autumn was liable to account for interest on the loans in the amount of US$1,798,973 (or at all) as a "knowing recipient" before the date (September 28th, 2007) on which the relevant cause of action for the purposes of s.34(1) of the Judicature Law (2007 Revision) arose.

(8) It cannot be said that, in making no order as to the costs of the action—or (as between the Gilbertson parties and Renova) in making no order as to the costs of the counterclaim—the judge exercised his discretion outside the ambit within which reasonable disagreement is possible: there is no proper basis upon which this court can, or should, interfere with the judge's order in relation to those costs. Nevertheless, in

relation to the costs of the counterclaims, the judge erred in failing to distinguish between the position of Renova, on the one hand, and the other co-defendants to counterclaim (Mr. Vekselberg, Mr. Kuznetsov and Renova Holding), on the other hand. Had he done so, he would have appreciated that it was necessary, in the circumstances of this case, to make a separate order as to the costs of the counterclaim. In those circumstances it falls to this court to make an appropriate order in respect of the costs incurred by the three other co-defendants to counterclaim. The appropriate order, having the provisions of O.62, r.4(5) in mind, is that the costs of the counterclaims (as between the Gilbertson parties and the three defendants, other than Renova) should follow the event: those costs should be assessed on an indemnity basis (if not agreed) and paid by the Gilbertson parties.

282 It follows from the conclusions which I have reached that I would dismiss Autumn's appeal from paras. 1 and 2 of the order of November 6th, 2012, but would allow its appeal from para. 3 of that order. I would dismiss Renova's cross-appeal from paras. 4 and 6 of that order, and I would dismiss Renova's appeal from para. 6. I would allow the appeals of Mr. Vekselberg, Mr. Kuznetsov and Renova Holding from para. 6 of the order. As between the Gilbertson parties and the three defendants to counterclaim just mentioned, I would vary para. 6 of the order by setting aside that paragraph in so far as (and only in so far as) it relates to their costs of defending the counterclaims and by adding a direction that the Gilbertson parties pay the costs of the counterclaims incurred by Mr. Vekselberg, Mr. Kuznetsov and Renova Holding (including costs ordered to be costs in cause), such costs (if not agreed) to be assessed on the indemnity basis. I would stand over further consideration of the costs of the appeal and cross-appeal for determination on an application made to the Court of Appeal: such application (or applications) to be made in writing within 28 days of the delivery of this judgment and to be supported (if so advised) by short written submissions. I would give liberty to apply to the Court of Appeal for such further directions as may be required.

283 **MOTTLEY, J.A.:** I agree.

284 **FORTE, J.A.:** I agree.

*Order accordingly.*

Attorneys: *Appleby (Cayman) Ltd.* for Autumn Holdings Asset Inc. and Gilbertson; *Maples & Calder* for Renova Resources Private Equity Ltd. and the other respondents/cross-appellants.

———————————————

**Ch.**

A

# CASES

determined by the

# CHANCERY DIVISION

B

and the

# COURT OF PROTECTION

and on appeal therefrom in the

C

# COURT OF APPEAL

———————

[COURT OF APPEAL]

D

## BRISTOL AND WEST BUILDING SOCIETY v. MOTHEW

1996 May 21, 22;                                 Staughton, Millett and Otton L.JJ.
July 24

E   *Solicitor—Negligence—Incorrect advice or information—Mortgage
transaction—Solicitor acting for borrowers and lender—Solicitor
negligently giving lender incorrect information—Lender suffering
loss—Whether lender merely having to prove reliance on
information—Whether necessary to show loss attributable to
negligence—Whether breach of trust or fiduciary duty*

In 1988 the defendant solicitor acted for a husband and wife
F   in the purchase of a house for £73,000 and also for the plaintiff
to whom the purchasers had applied for a loan of £59,000 to
finance the purchase. The plaintiff offered to advance the money
on the express condition that the balance of the purchase price
was provided by the purchasers without resort to further
borrowing, and it instructed the solicitor to report, prior to
completion, any proposal that the purchasers might create a
second mortgage or otherwise borrow in order to finance part of
G   the purchase price. The solicitor knew that the purchasers were
arranging for an existing bank debt of £3,350 to be secured by a
second charge on the new property but, due to an oversight, he
stated in his report to the plaintiff that the balance of the
purchase price was being provided by the purchasers without
resort to further borrowing. The plaintiff advanced the loan and
the purchase was completed. When the purchasers defaulted on
H   their mortgage repayments the plaintiff enforced its security and
the house was sold at a loss. The plaintiff sought to recover the
whole of its loss on the transaction from the solicitor, alleging
breach of contract, negligence and breach of trust. The district
judge gave the plaintiff summary judgment for damages to be

assessed for breach of contract and negligence and for damages    A
of £59,000 less the amount received on the sale of the property
for breach of trust. The judge affirmed those decisions.

On appeal by the solicitor:—

*Held,* allowing the appeal, (1) that, where a client sued his
solicitor for negligently giving him incorrect advice or information,
the client did not have to show that he would not have acted as
he did if he had been given the proper advice or correct
information but merely that he had relied on the incorrect advice    B
or information; that the evidence showed that the plaintiff had
relied on the solicitor's report in advancing the loan and,
therefore, the necessary causal link between the solicitor's
negligence and the loan was proved; but that the plaintiff had still
to establish what, if any, loss was attributable to the solicitor's
negligence and, as there was an issue as to what loss was
occasioned by the existence of the second charge and the    C
purchasers' indebtedness to the bank, damages remained to be
assessed (post, pp. 11D–E, F–H, 13B–C, 24E–F, 25E–F, 28A).

*Banque Bruxelles Lambert S.A. v. Eagle Star Insurance Co.
Ltd.* [1997] A.C. 191, H.L.(E.) and *Downs v. Chappell* [1997]
1 W.L.R. 426, C.A. applied.

(2) That the solicitor's conduct in providing the plaintiff with
the wrong information, although a breach of duty, was neither
dishonest nor intentional but due to an oversight and was    D
unconnected to the fact that he was also acting for the purchasers;
that, accordingly, his conduct and subsequent application of the
money advanced by the plaintiff to complete the purchase was
not a breach of trust or fiduciary duty; and that the order for
damages for breach of trust would therefore be set aside (post,
pp. 15H–16A, 19E, 20G, 22A–C, 24E–F, 25E–F, 26C–E, 28A).

Decision of Chadwick J. reversed.    E

The following cases are referred to in the judgments:

*Banque Bruxelles Lambert S.A. v. Eagle Star Insurance Co. Ltd.* [1997]
A.C. 191; [1996] 3 W.L.R. 87; [1996] 3 All E.R. 365, H.L.(E.)
*Bristol and West Building Society v. May May & Merrimans* [1996] 2 All E.R.
801
*Clark Boyce v. Mouat* [1994] 1 A.C. 428; [1993] 3 W.L.R. 1021; [1993] 4 All    F
E.R. 268, P.C.
*Commonwealth Bank of Australia v. Smith* (1991) 102 A.L.R. 453
*Coomber, In re; Coomber v. Coomber* [1911] 1 Ch. 723, C.A.
*Downs v. Chappell* [1997] 1 W.L.R. 426; [1996] 3 All E.R. 344, C.A.
*El Ajou v. Dollar Land Holdings Plc.* [1993] 3 All E.R. 717
*Girardet v. Crease & Co.* (1987) 11 B.C.L.R. (2d) 361
*Henderson v. Merrett Syndicates Ltd.* [1995] 2 A.C. 145; [1994] 3 W.L.R. 761;    G
[1994] 3 All E.R. 506, H.L.(E.)
*Kelly v. Cooper* [1993] A.C. 205; [1992] 3 W.L.R. 936, P.C.
*LAC Minerals Ltd. v. International Corona Resources Ltd.* (1989) 61 D.L.R.
(4th) 14
*Lewis v. Hillman* (1852) 3 H.L.Cas. 607, H.L.(E.)
*Lipkin Gorman v. Karpnale Ltd.* [1991] 2 A.C. 548; [1991] 3 W.L.R. 10; [1992]
4 All E.R. 512, H.L.(E.)    H
*Moody v. Cox and Hatt* [1917] 2 Ch. 71, C.A.
*Mortgage Express Ltd. v. Bowerman & Partners* [1996] 2 All E.R. 836, C.A.
*Nocton v. Lord Ashburton* [1914] A.C. 932, H.L.(E.)
*Permanent Building Society v. Wheeler* (1994) 14 A.C.S.R. 109

A    *Sykes v. Midland Bank Executor and Trustee Co. Ltd.* [1971] 1 Q.B. 113;
        [1970] 3 W.L.R. 273; [1970] 2 All E.R. 471, C.A.
     *Target Holdings Ltd. v. Redferns* [1996] A.C. 421; [1995] 3 W.L.R. 352; [1995]
        3 All E.R. 785, H.L.(E.)
     *Westdeutsche Landesbank Girozentrale v. Islington London Borough Council*
        [1996] A.C. 669; [1996] 2 W.L.R. 802; [1996] 2 All E.R. 961, H.L.(E.)

B    The following additional cases were cited in argument:

     *Alliance & Leicester Building Society v. Edgestop Ltd.* (unreported), 18 January
        1991, Hoffmann J.
     *Brickenden v. London Loan & Savings Co.* [1934] 3 D.L.R. 465, P.C.
     *Canson Enterprises Ltd. v. Boughton & Co.* (1991) 85 D.L.R. (4th) 129
     *Gemstone Corporation of Australia Ltd. v. Grasso* (1994) 12 A.C.L.C. 653
     *Gray v. New Augarita Porcupine Mines Ltd.* [1952] 3 D.L.R. 1
C    *Sinclair v. Brougham* [1914] A.C. 398, H.L.(E.)
     *Wan v. McDonald* (1992) 105 A.L.R. 473
     *Witten-Hannah v. Davis* [1995] 2 N.Z.L.R. 141

     The following cases, although not cited, were referred to in the skeleton
     arguments:

D    *Attorney-General for Hong Kong v. Reid* [1994] 1 A.C. 324; [1993] 3 W.L.R.
        1143; [1994] 1 All E.R. 1, P.C.
     *Bishopsgate Investment Management Ltd. v. Maxwell (No. 2)* [1994] 1 All
        E.R. 261, C.A.
     *Chase Manhattan Bank N.A. v. Israel-British Bank (London) Ltd.* [1981]
        Ch. 105; [1980] 2 W.L.R. 202; [1979] 3 All E.R. 1025
     *Dawson, decd., In re; Union Fidelity Trustee Co. Ltd. v. Perpetual Trustee Co.
        Ltd.* [1966] 2 N.S.W.R. 211
E    *Farrington v. Rowe McBride & Partners* [1985] 1 N.Z.L.R. 83
     *McPherson v. Watt* (1877) 3 App.Cas. 254, H.L.(Sc.)
     *Miller's Deed Trusts, In re* (1978) 75 L.S.G. 454
     *Nelson v. Rye* [1996] 1 W.L.R. 1378; [1996] 2 All E.R. 186
     *Nestlé v. National Westminster Bank Plc.* [1993] 1 W.L.R. 1260; [1994] 1 All
        E.R. 118, C.A.

F    INTERLOCUTORY APPEAL from Chadwick J.
        On 21 June 1995 Deputy District Judge Raskin granted the plaintiff,
     Bristol and West Building Society, summary judgment pursuant to R.S.C.,
     Ord. 14 of its claims against the defendant solicitor, Anthony Paul
     Mothew (trading as Stapley & Co.), for damages to be assessed for breach
     of contract and negligence and damages for breach of trust. On 27 July
G    1995 Chadwick J. dismissed the defendant's appeal against that order.
        Pursuant to leave granted by Nourse L.J. on 29 December 1995 and
     by a notice of appeal dated 5 January 1996 the defendant sought to set
     aside the orders and be granted unconditional leave to defend on the
     grounds that the judge had erred in holding (1) that money paid to the
     defendant by the plaintiff was impressed with a constructive trust in
     favour of the plaintiff; (2) that the money was paid to the defendant under
H    a mistake of fact or had been induced by the defendant's misrepresentation,
     when no such allegations were made in the statement of claim; (3) that it
     was not necessary for the plaintiff to establish that it had sustained loss
     and damage as a result of the defendant's alleged breach of trust; (4) that

the defendant had no arguable defence to the claim for breach of trust   A
based upon acquiescence or affirmation by the plaintiff; and (5) that the
defendant had no arguable defence to the allegation that the plaintiff had
sustained loss and damage as a result of the breach of contract and
negligence.

By a respondent's notice dated 25 January 1996 the plaintiff contended
that it was entitled to judgment for the sum claimed in respect of its
claims for breach of contract and negligence.                             B

The facts are stated in the judgment of Millett L.J.


*Jonathan Sumption Q.C.* and *Glenn Campbell* for the defendant.
A breach of a solicitor's conveyancing duty which makes no difference to
the lender's decision and has no impact on the value of the security cannot
result in the solicitor becoming the underwriter of the transaction when   C
the security is later sold at a loss: see *Target Holdings Ltd. v. Redferns*
[1996] A.C. 421. Although a solicitor has a number of fiduciary obligations
to his client, not every duty which is owed in the context of a fiduciary
relationship is a fiduciary duty: see *Girardet v. Crease & Co.* (1987)
11 B.C.L.R. (2d) 361, 362; *LAC Minerals Ltd. v. International Corona
Resources Ltd.* (1989) 61 D.L.R. (4th) 14, 28 and *In re Coomber; Coomber*   D
*v. Coomber* [1911] 1 Ch. 723, 728. A solicitor's duty to report to his client
the outcome of conveyancing and allied inquiries is the ordinary
contractual duty of a professional to comply with his instructions and to
do so with reasonable skill.

*Brickenden v. London Loan & Savings Co.* [1934] 3 D.L.R. 465 does
not assist the plaintiff as it was concerned only with a breach by a
fiduciary of his obligation to disclose to his principal his own personal   E
interest in the transaction. [Reference was also made to *Nocton v. Lord
Ashburton* [1914] A.C. 932.] The principle that relief is granted for such a
breach, without regard to what the plaintiff would have done if disclosure
had been made reflects the rule of equity that where a fiduciary has dealt
personally with the plaintiff without full disclosure to him the latter's
relief is not compensatory at all. He has, irrespective of his loss, an   F
absolute right to set aside the transaction or to claim an account of
profits. The compensation awarded to him is simply the financial
equivalent of setting aside: see *Gray v. New Augarita Porcupine Mines Ltd.*
[1952] 3 D.L.R. 1, 12–15. Compensation cannot be awarded for breach of
a duty as to the manner in which work should be carried out: see
*Permanent Building Society v. Wheeler* (1994) 14 A.C.S.R. 109, 164–165.
[Reference was also made to *Canson Enterprises Ltd. v. Boughton & Co.*   G
(1991) 85 D.L.R. (4th) 129; *Wan v. McDonald* (1992) 105 A.L.R. 473;
*Witten-Hannah v. Davis* [1995] 2 N.Z.L.R. 141 and *Target Holdings Ltd.
v. Redferns* [1996] A.C. 421.]

There is no distinction between a solicitor who breaches his duty by
failing to report in accordance with his instructions before the mortgage
advance cheque is received and a solicitor who fails to deal with the
advance in accordance with his instructions after it is received. In neither   H
case does the breach of duty have the effect of terminating the solicitor's
retainer and his authority to complete the transaction. Equally, the
argument that the solicitor held the advance as soon as it was received on

A     a constructive trust to return it forthwith to the plaintiff cannot be supported. There cannot be a constructive trust inconsistent with the existing express trust to apply the loan moneys in completing the transaction, unless the solicitor's authority and obligation to complete the transaction are first brought to an end. [Reference was made to *Westdeutsche Landesbank Girozentrale v. Islington London Borough Council* [1996] A.C. 669; *Sinclair v. Brougham* [1914] A.C. 398 and *Lipkin Gorman*
B     *v. Karpnale Ltd.* [1991] 2 A.C. 548.]

If the plaintiff is to be awarded the amount of the advance money (less actual recoveries) it must be on the basis that that money has been misapplied. If the defendant had no authority to pay out the money to the vendor the payment was a breach of trust: see *Target Holdings Ltd. v. Redferns* [1996] A.C. 421 and *Alliance & Leicester Building Society v.*
C     *Edgestop Ltd.* (unreported), 18 January 1991.

The plaintiff's loss on the loan transaction is due to the default of the purchasers and the fact that the security was not sufficient to cover the loan when it came to be realised, neither of which is the responsibility of the solicitor. The loss is not due to the existence or non-disclosure of a second mortgage.

*Nicholas Patten Q.C.* and *Timothy Higginson* for the plaintiff. The
D     relationship between a solicitor and his client gives rise to fiduciary obligations on the part of the solicitor in the handling of his client's affairs. A failure to perform those obligations gives rise to a remedy in equity regardless of whether the acts complained of also constitute a breach of contract with a right to damages: see *Nocton v. Lord Ashburton* [1914] A.C. 932, 956–957. The underlying contractual relationship between
E     the parties cannot dictate or limit the scope of the concurrent fiduciary duties, as the defendant was expressly required to report any proposal for further borrowing before releasing the plaintiff's mortgage advance: see *Henderson v. Merrett Syndicates Ltd.* [1995] 2 A.C. 145, 205–206.

A solicitor who acts for both lender and borrower in the same transaction has an unrestricted obligation to each client to act in his own best interests, including an obligation to disclose to the lender information
F     about the borrower which is material to the transaction: see *Clark Boyce v. Mouat* [1994] 1 A.C. 428, 437. [Reference was also made to *Lewis v. Hillman* (1852) 3 H.L.Cas. 607; *Kelly v. Cooper* [1993] A.C. 205; *Moody v. Cox and Hatt* [1917] 2 Ch. 71 and *Bristol and West Building Society v. May May & Merrimans* [1996] 2 All E.R. 801, 817–818.]

The non-disclosure of the proposed further borrowing was a breach of
G     trust. In addition, the release of the advance by the defendant when he had failed to disclose the proposed further borrowing in breach of his express instructions was made without authority and was itself a breach of trust. The right of the plaintiff to recover its advance is unaffected by *Target Holdings Ltd. v. Redferns* [1996] A.C. 421 because the payment of the advance to the defendant (and therefore the creation of his agency to hold the money for the purpose of the intended transaction) was the direct
H     result of the reliance by the plaintiff upon the contents of the defendant's report on title. Therefore the defendant's ability to utilise the payment for the benefit of the borrowers in breach of trust was caused by the report on title.

Breaches of trust or fiduciary duty must cause the loss complained of    A
but the test of causation is not the common law test. The inquiry is not to
determine what position the plaintiff would have been in had the contract
been performed but rather whether the loss would have been sustained
but for the breach of trust. The non-disclosure in the report on title caused
the loss because it induced the plaintiff to advance the funds in reliance
on the report. To inquire as to what the plaintiff would have done had
disclosure been made is to apply the common law test and is wrong in    B
principle: see *Brickenden v. London Loan & Savings Co.* [1934] 3 D.L.R.
465, 469; *Gray v. New Augarita Porcupine Mines Ltd.* [1952] 3 D.L.R. 1,
15; *Commonwealth Bank of Australia v. Smith* (1991) 102 A.L.R. 453 and
*Gemstone Corporation of Australia Ltd. v. Grasso* (1994) 12 A.C.L.C. 653.

Sumption Q.C. replied.

*Cur. adv. vult.*     C

July 24.    The following judgments were handed down.

MILLETT L.J.    This is an appeal brought by the defendant with the
leave of the single Lord Justice from an order for summary judgment
given initially by the district judge and affirmed (for different reasons) by    D
Chadwick J. It raises important questions of principle in relation to a
claim by a mortgagee to recover from the solicitor who was acting for
both mortgagor and mortgagee the loss arising from the mortgagor's
subsequent default.

The collapse in the property market which accompanied the recession
at the beginning of the present decade caused mortgage lenders to suffer    E
serious losses. Unable to recover their advances from the borrowers or by
the enforcement of their security they have sought to recover them from
the valuers or solicitors on whose valuations or advice they have relied. In
some cases they have been the victims of a fraud to which the valuers and
solicitors have been parties. In other cases, such as the present, they have
been unable to accuse their solicitor of anything more serious than
negligence. Believing that the common law rules of causation and    F
remoteness of damage might not enable them to recover the whole amount
of their loss they have turned to equity and alleged breach of trust or
fiduciary duty. We have thus been concerned to decide just what is
involved in these concepts.

*The facts*     G

The facts are not in dispute. The defendant is a solicitor. In August
1988 he acted for a Mr. and Mrs. Towers in the purchase of 17, Thameshill
Avenue, Romford for £73,000. In accordance with the usual practice he
also acted for the Bristol and West Building Society ("the society") to
which the purchasers had applied for an advance of £59,000 in order to
finance the purchase. (This was the Cheshunt Building Society, but its
rights have since vested in the society.) In their application form the    H
purchasers had stated that the balance of the purchase price of £14,000
was being provided by them personally and that they were not applying
elsewhere for financial assistance towards the purchase price.

7

Ch.          Bristol and West Building Society v. Mothew (C.A.)          Millett L.J.

A     The society offered to advance to the purchasers £59,000 on the
security of a first mortgage of the property on the express condition that
unless otherwise agreed in writing the balance of the purchase price was
to be provided by the purchasers personally without resort to further
borrowing and that no second mortgage or other loan was being arranged
or contemplated in connection with the purchase. The defendant was
provided with the offer of advance (but not with the purchasers'
B     application).
     The society's standing instructions to solicitors acting for the society
required them to report to the society prior to completion, inter alia:

> "(viii) Any proposal that the applicant may create a second mortgage
> or enter into a promissory note or otherwise borrow in order to
> finance part of the purchase price. (ix) Any incorrect information
C     > given in the solicitor's instructions. (x) Any other matters which
> ought to be brought to the notice of the society . . ."

The solicitor was required to submit a report on title and request for
advance cheque to the society at least five clear working days before the
cheque was required. This was done on a form by which the solicitor was
asked to confirm, inter alia, that the title was good and marketable and
D     might safely be accepted by the society, that to the best of his knowledge
and belief the balance of the purchase money was being provided by the
applicant personally without resort to further borrowing, and that the
special conditions attached to the offer of advance had been, or would be,
complied with.
     Mr. and Mrs. Towers intended to provide the balance of the purchase
E     price from the net proceeds of sale of their existing property after
discharging a subsisting mortgage. As it happens, they owed money to
Barclays Bank which was secured by a second charge on that property.
They arranged with the bank to allow a small part of the debt (£3,350) to
remain outstanding after the sale of the existing property and to be
secured by a second charge on the new property. The defendant was
informed of these arrangements and gave an undertaking to the bank to
F     hold the title deeds to its order pending registration. Unfortunately, he
either failed to appreciate that, although they related to old borrowing,
they were a matter which he was required to report to the society, or he
had forgotten or overlooked them when he made his report.
     By his report dated 2 August 1988 the defendant confirmed that to the
best of his knowledge and belief the balance of the purchase money was
G     being provided by the applicants personally without resort to further
borrowing and that the special conditions attached to the offer of advance
had been or would be complied with. He failed to disclose the fact that
Mr. and Mrs. Towers were making arrangements for a second mortgage
in connection with the purchase.
     It is conceded by the defendant that his statements were untrue and
that his failure to report the purchasers' arrangements for a second
H     mortgage was a breach of his instructions. The society alleges that the
defendant acted negligently and in breach of contract, and this is admitted.
There is no allegation of dishonesty or bad faith, and if any such allegation
were made it would be strongly resisted. The society does not allege that

the defendant made the statements in question knowing them to be untrue. A It alleges only that he "knew or ought to have known" that they were untrue, and this is consistent with oversight.

Following the receipt of the report the society forwarded a cheque for the amount of the advance to the defendant in readiness for completion on 30 August. Completion took place on that date when the mortgage advance was released to the vendor's solicitors as part of the purchase price for the property. Mr. and Mrs. Towers executed a first charge in B favour of the society and a second charge in favour of the bank. On 25 November the defendant applied to the society for its consent to the registration of the second charge in favour of the bank. The society granted its consent on 10 March 1989. It does not appear that the society was aware of the date of the bank's charge (and so was aware that it constituted a breach of the conditions of the advance) when it gave its C consent, but it is alleged that the society must have learnt of it shortly afterwards and nevertheless took no action.

The purchasers defaulted after making only small repayments and the society enforced its security. The property was sold on 6 February 1991 and realised net proceeds of a little under £53,000. The society claimed to recover the whole of its net loss on the transaction from the defendant, alleging breach of contract, negligence and breach of trust. As I have D already indicated, breach of contract and negligence are admitted; breach of trust is denied.

It has always been the defendant's case that the society would not have been concerned by the purchasers' proposal to grant a second charge to the bank if this had been disclosed to it in August 1988, that it would still have proceeded with the transaction and that it would have suffered E precisely the same loss in that event. It is alleged that, in the heady days of 1988, when the property market was at its height and mortgage lenders were falling over themselves to advance money to house purchasers, the society would not have been concerned by a proposal to grant a second charge to secure a relatively trivial indebtedness which did not even represent fresh borrowing; and it is contended that this is demonstrated by the lack of concern shown by the society when it was asked to give its F consent to the registration of a second charge in March 1989. Despite the submissions of the society to the contrary, I am satisfied that, if legally relevant, these allegations raise a triable issue.

*The course of the proceedings below*

G

It was common ground below that no damages would be recoverable at common law for breach of contract or tort unless the society could show that it would not have proceeded with the transaction if it had been informed of the facts. The society, however, submitted that the position was different in equity. It alleged that the defendant had committed a breach of trust or fiduciary duty, and submitted that common law principles of causation and remoteness of damage have no application in H such a case so that it was not necessary for the society to show that it would not have proceeded with the transaction if it had been informed of the facts.

9

Ch.               Bristol and West Building Society v. Mothew (C.A.)        Millett L.J.

A      The district judge accepted these arguments. In respect of the common law claims for breach of contract and negligence she gave summary judgment for damages to be assessed. This was apparently on the basis that the judgment would leave it open to the defendant to contend that no loss was caused by the breach.

      The district judge also gave summary judgment for the society for breach of trust for the sum of £59,000 less the sums received by the society B  on the sale of the property, and this was affirmed by the judge, who was satisfied that there was no question or issue to be tried in the action and dismissed the appeal.

*The course of the appeal*

C      In the course of the appeal the defendant submitted that, by consenting to the registration of the second charge, the society waived the breaches of which complaint is made; and that this raises a triable issue on liability which entitles him to unconditional leave to defend in relation to all the pleaded causes of action. In the absence of any evidence or reason to suppose that the society was aware of the date of the second charge when it gave its consent to its registration, I am not persuaded that there is a D  triable issue on waiver, and I would not disturb the order below on this ground.

      When the appeal was first argued before us it was still conceded by the society that it could not recover damages at common law for breach of contract or negligence unless it could show that it would not have proceeded with the mortgage advance if it had been informed of the facts. E  The society, however, maintained that it could escape this principle because the defendant was also guilty of a breach of trust and that common law rules of causation and remoteness of damage have no application in such a case. The critical questions, therefore, appeared to be whether the defendant was guilty of a breach of trust or fiduciary duty and if so whether the society needed to prove that it would not still have proceeded with the transaction if it had been told of the facts.

F      After we had reserved judgment on the appeal, however, the society informed us that it wished to resile from its concession. Relying on the recent decision of this court in *Downs v. Chappell* [1997] 1 W.L.R. 426, the society submitted that it was entitled to recover the whole of its net loss on the transaction by way of damages for negligence at common law without having to establish that it would not have proceeded with the G  transaction if it had been informed of the facts. If correct, it submitted, this would be determinative of the case, and it would not be necessary for the society to rely on any breach of trust or fiduciary duty. Before the defendant's advisers could respond to this, speeches were delivered in the House of Lords in *Banque Bruxelles Lambert S.A. v. Eagle Star Insurance Co. Ltd.* [1997] A.C. 191. These were relevant to the common law position. For the reasons given by Staughton L.J., however, we decided that it was H  not necessary to restore the appeal for further argument. This was because the assessment of damages at common law is still pending. They will have to be assessed in conformity with the decision of the House of Lords in *Banque Bruxelles Lambert S.A. v. Eagle Star Insurance Co. Ltd.* and not

with any gloss which, in the absence of argument, we may inadvertently     A
have put upon that decision.

*The claims at common law*

The society has served a respondent's notice, in which it contends that
it is entitled to judgment for the sum claimed, and not merely for damages
to be assessed, in respect of its common law claims. If this is correct, then     B
the society does not need to establish that the defendant was guilty of a
breach of trust or fiduciary duty.

This question depends upon an alleged difference between the tests of
causation and remoteness of damage at common law and in equity. In a
case of the present kind, however, two different questions of causation are
involved and it is necessary to distinguish between them. Where a plaintiff
claims that he has suffered loss by entering into a transaction as a result     C
of negligent advice or information provided by the defendant, the first
question is whether the plaintiff can establish that the defendant's
negligence caused him to enter into the transaction. If he cannot his claim
must fail. But even if he can, it is not sufficient for him to establish that
the transaction caused him loss. He must still show what (if any) part of
his loss is attributable to the defendant's negligence. This is usually treated     D
as a question of the measure of damages rather than causation, and for
convenience I shall so treat it in this judgment, but it must be
acknowledged that it involves questions of causation.

In *Downs v. Chappell* [1997] 1 W.L.R. 426 the plaintiffs bought a small
business in reliance on trading figures contained in a letter from
the vendor's accountants which was forwarded to them by the vendor.
The vendor knew that the figures contained in the letter were false. The     E
plaintiffs sued the vendor for deceit and the accountants for negligence.
The judge accepted the plaintiffs' evidence that they would not have
contracted to purchase the business without verification of the figures by
the accountants. But he was not satisfied that they would not still have
bought the business even if the correct figures had been supplied, and
dismissed the action against both defendants.

This court allowed the plaintiffs' appeal against both defendants.     F
Hobhouse L.J. gave the only reasoned judgment. In relation to the vendor,
he pointed out that for a plaintiff to succeed in the tort of deceit it was
necessary for him to prove (1) a fraudulent representation, (2) materiality
and (3) inducement. All three elements had been proved. The judge had
found that the representations did induce the plaintiffs to enter into the
transaction: they would not have done so without them. This was sufficient     G
proof of causation. Whether the plaintiffs would have entered into the
transaction if they had been told the truth was irrelevant.

We are not concerned with this part of the decision, since the present
case is not one of fraud. But Hobhouse L.J. held that the position was the
same in relation to the accountants, who were charged with negligence
only. Here the question was not inducement but reliance. The relevant
question was simply whether the plaintiffs had entered into the contract     H
in reliance upon the figures contained in the accountants' letter. The judge
had answered that question in the affirmative: the plaintiffs would not
have entered into the contract if they had not been provided with the

11

Ch.          **Bristol and West Building Society v. Mothew (C.A.)**          Millett L.J.

A    letter. The causal relationship between the accountants' negligence and the plaintiffs' purchase was established. It was not necessary to consider whether the plaintiffs would have purchased the business if they had been supplied with the correct figures.

In the present case the society's claim is not for misrepresentation. Accordingly, questions of inducement and materiality are not relevant. Its claim lies in negligence, and the relevant concept is reliance. In considering
B    the issue of causation in an action for negligence brought by a client against his solicitor it appears from *Downs v. Chappell* that it is necessary to distinguish between two different kinds of case.

Where a client sues his solicitor for having negligently failed to give him proper advice, he must show what advice should have been given and (on a balance of probabilities) that if such advice had been given he would
C    not have entered into the relevant transaction or would not have entered into it on the terms he did. The same applies where the client's complaint is that the solicitor failed in his duty to give him material information. In *Sykes v. Midland Bank Executor and Trustee Co. Ltd.* [1971] 1 Q.B. 113, which was concerned with a failure to give proper advice, the plaintiff was unable to establish this and his claim to damages for negligence failed. In *Mortgage Express Ltd. v. Bowerman & Partners* [1996] 2 All E.R. 836,
D    which was concerned with a failure to convey information, the plaintiff was able to establish that if it had been given the information it would have withdrawn from the transaction and its claim succeeded.

Where, however, a client sues his solicitor for having negligently given him incorrect advice or for having negligently given him incorrect information, the position appears to be different. In such a case it is
E    sufficient for the plaintiff to prove that he relied on the advice or information, that is to say, that he would not have acted as he did if he had not been given such advice or information. It is not necessary for him to prove that he would not have acted as he did if he had been given the proper advice or the correct information. This was the position in *Downs v. Chappell* [1997] 1 W.L.R. 426.

In the present case the society makes complaints of both kinds. It
F    alleges that the defendant negligently and in breach of his instructions failed to report the purchasers' proposed arrangements with the bank prior to completion. This is a claim of the first kind, and if it were all the society would have to establish that if it had been informed of those arrangements it would not have proceeded with the mortgage advance. But the defendant went further than this. He did not merely fail to report
G    the arrangements to the society; he expressly represented to the society that no such arrangements existed. That brings the case within the second category. It follows from the decision of this court in *Downs v. Chappell* that it is sufficient for the society to prove that it relied on the representations in the report. Although the judge spoke in terms of inducement, he plainly found reliance. The society's procedures were designed to ensure that no cheque would be issued in the absence of a
H    satisfactory report from its solicitor.

In my judgment we are bound by the decision in *Downs v. Chappell* to hold that the necessary causal link between the defendant's negligence and the mortgage advance was proved.

*Measure of damages*                                                                A

It does not, however, follow from the fact that the defendant's
negligent statements caused the society to make the mortgage advance
that the whole of the society's loss is attributable to his negligence. Having
regard to the date of the advance, some part at least of the society's loss
may well be attributable to the fall in property values which had occurred
by the time that it was able to sell the property.                                  B

In *Banque Bruxelles Lambert S.A. v. Eagle Star Insurance Co. Ltd.*
[1997] A.C. 191 the House of Lords ruled definitively on the correct
measure of damages for the negligent provision of information on which
the plaintiff relied in entering into a transaction from which loss resulted.
The only speech was delivered by Lord Hoffmann. He distinguished
between the measure of damages for (1) breach of a contractual warranty
and (2) breach of a duty (whether contractual or tortious) to take care    C
(i) to give proper advice and (ii) to provide accurate information.

In the case of breach of warranty, the comparison is between the
plaintiff's position as a result of entering into the transaction and what it
would have been if the facts had been as warranted. The measure of
damages is the extent to which the plaintiff would have been better off if
the information had been right. In the case of a breach of duty to take     D
care the measure of damages is the extent to which the plaintiff is worse
off because the information was wrong. Since he entered into the
transaction in reliance on the advice or information given to him by the
defendant, the starting point is to compare his position as a result of
entering into the transaction with what it would have been if he had not
entered into the transaction at all.

But that is only the starting point. Lord Hoffmann distinguished         E
between a duty to advise someone as to what course of action he should
take and a duty to provide information for the purpose of enabling
someone else to decide upon his course of action. In the former case, the
defendant is liable for all the foreseeable consequences of the action being
taken. In the latter case, however, he is responsible only for the
consequences of the information being wrong. The measure of damages is
not necessarily the full amount of the loss which the plaintiff has suffered   F
by having entered into the transaction but only that part if any of such
loss as is properly attributable to the inaccuracy of the information. If the
plaintiff would have suffered the same loss even if the facts had actually
been as represented the defendant is not liable.

Accordingly, in this class of case the plaintiff must prove two things:
first, that he has suffered loss; and, secondly, that the loss fell within the   G
scope of the duty he was owed. In the present case the society must prove
what (if any) loss was occasioned by the arrangements which the
purchasers had made with the bank.

The society was told that Mr. and Mrs. Towers had no other
indebtedness and that no second charge was contemplated. The existence
of the second charge did not affect the society's security. The absence of
any indebtedness to the bank would not have put money in the purchasers'   H
pocket; it would merely have reduced their liabilities. Whether their
liability to the bank affected their ability to make mortgage repayments to
the society has yet to be established, but given the smallness of the liability

13

Ch.        **Bristol and West Building Society v. Mothew (C.A.)**        Millett L.J.

A    its effect on the purchasers' ability to meet their obligations to the society may have been negligible. It may even be, for example, that the purchasers made no payments at all to the bank at the relevant time, and if so it is difficult to see how any part of the loss suffered by the society can be attributable to the inaccuracy of the information supplied to it by the defendant. It would have occurred even if the information had been correct.

B

### Conclusion

The society has proved the causal link between the defendant's negligence and the making of the mortgage advance but it has not yet established the amount of its loss (if any) which is properly attributable
C    to the defendant's negligence. Damages remain to be assessed. We are bound by the decision of this court in *Downs v. Chappell* [1997] 1 W.L.R. 426 to hold that the society will not have to prove that it would not have made the mortgage advance if it had known the true facts; but it will be required to establish what it has lost as a result of the existence of the second charge and the purchasers' indebtedness to the bank. It can maintain the money judgment which it has obtained below only if it can
D    invoke equitable principles.

### The claims in equity

#### The judge's reasoning

The judge found that, in the events which happened, the defendant
E    committed a breach of trust by applying the mortgage advance in the purchase of the property, that he was accordingly liable to restore the trust property, viz. the £59,000 with interest less receipts, that no question of damages at common law or of compensation for loss arose, and that it was irrelevant whether, had it been told of the position, the society might still have chosen to make the advance notwithstanding the arrangements
F    which had been made with the bank. Accordingly the judge concluded that there was no question or issue to be tried in the action and gave summary judgment for the whole of the society's claim.

The judge's conclusion that the defendant had committed a breach of trust in applying the mortgage advance in the purchase of the property was based on the fact that he had obtained payment of the mortgage advance by misrepresentation. The judge said:
G

"it seems to me beyond argument that [the defendant] received the cheque . . . for £59,000 as a direct result of the misleading report which he had supplied to the society on 2 August 1988. The money was paid to the defendant . . . as a result of a misrepresentation made to the society by the defendant. . . . *The effect, in my judgment, was that from the moment when [the] cheque for £59,000 was received*
H    *by [the defendant] he held it upon a constructive trust to return it forthwith to the society, unless authorised by the society to retain, or dispose of, it after a full knowledge of the facts had been disclosed.*" (My emphasis.)

In the judge's opinion it necessarily followed that the defendant's    A
subsequent application of the mortgage money in the purchase of the
property constituted a breach of trust. He said:

> "In making that payment there is, in my view, no doubt that the
> defendant acted in breach of the trust which had been imposed upon
> him by the circumstances in which he had received the society's
> cheque. That trust required him to return the £59,000 to the society.    B
> Any payment of that £59,000 to a third party, albeit to the vendors
> of the property, was a breach of that trust."

The judge dismissed the submission that the society had to establish that
it would not have made the advance if it had known the facts. He said:

> "But that point affords no defence to the [society]'s claim. It is
> nihil ad rem that if the true position had been disclosed to the society,    C
> the society might or might not have issued an amended offer of
> advance. Liability to repay arises in this case because [the defendant]
> received money from the society as a result of his own
> misrepresentation. He cannot be heard to say that he could retain
> that money against the society, or dispose of it to the vendors,
> because, in other circumstances, the society might have chosen to
> make the advance notwithstanding the borrowing from [the bank]."    D

The judge did not explain why the consequence of the defendant's
misrepresentation was that he held the mortgage advance on a constructive
trust for the society, or why the defendant's authority to apply the money
in accordance with the society's instructions was determined, but he took
the opportunity to do so when he revisited these questions a few months
later in *Bristol and West Building Society v. May May & Merrimans* [1996]    E
2 All E.R. 801 after two county court judges had declined to follow his
decision in the present case. The later case involved a number of
transactions in which the same society had made mortgage advances and
suffered loss when the borrowers defaulted which it sought to recover
from the solicitors who had acted for both parties to the lending
transactions. In some cases the solicitor knew nothing, prior to the receipt    F
of the cheque for the mortgage advance, which ought to have led him to
qualify his report, though he discovered the facts afterwards and before
he disbursed the money on completion. In other cases the solicitor's
breach of his instructions preceded his receipt of the mortgage advance,
as it did in the present case.

The judge distinguished between the two groups of cases. In relation
to the first group he reluctantly felt compelled by the decision in *Target*    G
*Holdings Ltd. v. Redferns* [1996] A.C. 421 to conclude that, at least for the
purpose of an application for summary judgment, it was necessary for the
society to show that it would not have proceeded with the transaction if it
had known the facts. In relation to the second group, however, where the
society paid the cheque for the mortgage advance to the solicitor in
response to a request based upon a warranty or representation which (as
the judge put it) the solicitor "knew or must be taken to have known" to    H
be misleading, he confirmed his previous decision in the present case. He
held that the society was entitled to succeed in such cases whether or not
it would have still made the advance if it had known the facts.

15

Ch.        Bristol and West Building Society v. Mothew (C.A.)        Millett L.J.

A    In the course of his judgment the judge explained how the constructive trust in question arose. It was, he said, because the solicitor had given misleading information to his client. This constituted a breach of fiduciary duty which enabled the court to impose a constructive trust on the property acquired as a result of the breach of duty. He said [1996] 2 All E.R. 801, 818:

B        "where moneys have been received by the solicitor from the society following a request based upon a warranty or representation which he knew, or must be taken to have known, to be misleading in some material respect, equity will give a remedy in respect of any loss which the society may suffer as a result of its payment in reliance upon that request. That will be a remedy based upon breach of fiduciary duty and may, where necessary, take the form of the
C        imposition of a constructive trust on those moneys to enforce the solicitor's obligation to return them to the society forthwith. The constructive trust imposed by equity to enforce the obligation to make immediate restitution overrides any express or implied trust which might otherwise arise out of any instructions given by [the society] when the money is paid to the solicitor. No reliance can be
D        placed on ... those instructions, because they are vitiated by the breach of duty by which they were obtained.... In the absence of some fresh instructions, given by the society after full disclosure of the matters in respect of which it has been misled, the only course properly open to the solicitor is to repay the moneys to the society with interest."

E    The judge evidently considered himself to be imposing a remedial constructive trust as the appropriate remedy for a prior breach of fiduciary duty.

    The judge's references to the solicitor having made a representation which "he knew, or must be taken as having known" to be misleading is not an accurate description of the facts of the present case. It is not alleged that the defendant "knew or must be taken to have known" the
F    facts, but only that he "knew or ought to have known" them, which is a very different matter. In explaining his decision in the present case the judge said that the defendant's misrepresentation could not be described as innocent because he "clearly had the knowledge which made the representation false:" see [1996] 2 All E.R. 801, 832. That confuses knowledge with the means of knowledge. On the society's pleaded case
G    the defendant must be taken to have known the facts at one time but to have forgotten or overlooked them so that they were not present to his mind when he came to complete his report to the society.

    It is not alleged that the defendant deliberately concealed the arrangements which the purchasers had made with their bank from the society or that he consciously intended to mislead it. Nothing in this judgment is intended to apply to such a case. My observations are
H    confined to the case like the present where the provision of incorrect information by a solicitor to his client must be taken to have been due to an oversight. In such a case his breach of duty is unconscious; he will ex hypothesi be unaware of the fact that he has committed a breach of his

instructions; and if this means that his subsequent application of the   A
mortgage money constitutes a breach of trust then it will be a breach of a
trust of which he is unaware. I would not willingly treat such conduct as
involving a breach of trust or misapplication of trust money unless
compelled by authority to do so, and in my judgment neither principle
nor authority compels such a conclusion.

Before us the defendant submits that, while he was guilty of negligence
and breach of contract, he was not guilty of a breach of trust or fiduciary   B
duty. It is convenient to take first the question of fiduciary duty, and then
to consider the question of breach of trust.

### Breach of fiduciary duty

Despite the warning given by Fletcher Moulton L.J. in *In re Coomber;
Coomber v. Coomber* [1911] 1 Ch. 723, 728, this branch of the law has   C
been bedevilled by unthinking resort to verbal formulae. It is therefore
necessary to begin by defining one's terms. The expression "fiduciary
duty" is properly confined to those duties which are peculiar to fiduciaries
and the breach of which attracts legal consequences differing from those
consequent upon the breach of other duties. Unless the expression is so
limited it is lacking in practical utility. In this sense it is obvious that not   D
every breach of duty by a fiduciary is a breach of fiduciary duty. I would
endorse the observations of Southin J. in *Girardet v. Crease & Co.* (1987)
11 B.C.L.R. (2d) 361, 362:

> "The word 'fiduciary' is flung around now as if it applied to all
> breaches of duty by solicitors, directors of companies and so
> forth. . . . That a lawyer can commit a breach of the special duty [of
> a fiduciary] . . . by entering into a contract with the client without   E
> full disclosure . . . and so forth is clear. But to say that simple
> carelessness in giving advice is such a breach is a perversion of
> words."

These remarks were approved by La Forest J. in *LAC Minerals Ltd. v.
International Corona Resources Ltd.* (1989) 61 D.L.R. (4th) 14, 28 where
he said: "not every legal claim arising out of a relationship with fiduciary   F
incidents will give rise to a claim for breach of fiduciary duty."

It is similarly inappropriate to apply the expression to the obligation
of a trustee or other fiduciary to use proper skill and care in the discharge
of his duties. If it is confined to cases where the fiduciary nature of the
duty has special legal consequences, then the fact that the source of the
duty is to be found in equity rather than the common law does not make   G
it a fiduciary duty. The common law and equity each developed the duty
of care, but they did so independently of each other and the standard of
care required is not always the same. But they influenced each other, and
today the substance of the resulting obligations is more significant than
their particular historic origin. In *Henderson v. Merrett Syndicates Ltd.*
[1995] 2 A.C. 145, 205 Lord Browne-Wilkinson said:

> "The liability of a fiduciary for the negligent transaction of his duties   H
> is not a separate head of liability but the paradigm of the general
> duty to act with care imposed by law on those who take it upon
> themselves to act for or advise others. Although the historical

17

Ch.          Bristol and West Building Society v. Mothew (C.A.)          Millett L.J.

A   development of the rules of law and equity have, in the past, caused different labels to be stuck on different manifestations of the duty, in truth the duty of care imposed on bailees, carriers, trustees, directors, agents and others is the same duty: it arises from the circumstances in which the defendants were acting, not from their status or description. It is the fact that they have all assumed responsibility for the property or affairs of others which renders them liable for the

B   careless performance of what they have undertaken to do, not the description of the trade or position which they hold."

I respectfully agree, and endorse the comment of Ipp J. in *Permanent Building Society v. Wheeler* (1994) 14 A.C.S.R. 109, 157:

C   "It is essential to bear in mind that the existence of a fiduciary relationship does not mean that every duty owed by a fiduciary to the beneficiary is a fiduciary duty. In particular, a trustee's duty to exercise reasonable care, though equitable, is not specifically a fiduciary duty . . ."

Ipp J. explained, at p. 158:

D   "The director's duty to exercise care and skill has nothing to do with any position of disadvantage or vulnerability on the part of the company. It is not a duty that stems from the requirements of trust and confidence imposed on a fiduciary. In my opinion, that duty is not a fiduciary duty, although it is a duty actionable in the equitable jurisdiction of this court. . . . I consider that Hamilton owed P.B.S. a duty, both in law and in equity, to exercise reasonable care and skill,

E   and P.B.S. was able to mount a claim against him for breach of the legal duty, and, in the alternative, breach of the equitable duty. For the reasons I have expressed, in my view the equitable duty is not to be equated with or termed a 'fiduciary' duty."

I agree. Historical support for this analysis may be found in Viscount Haldane L.C.'s speech in *Nocton v. Lord Ashburton* [1914] A.C. 932, 956.

F   Discussing the old bill in Chancery for equitable compensation for breach of fiduciary duty, he said that he thought it probable that a demurrer for want of equity would always have lain to a bill which did no more than seek to enforce a claim for damages for negligence against a solicitor.

In my judgment this is not just a question of semantics. It goes to the very heart of the concept of breach of fiduciary duty and the availability of equitable remedies.

G   Although the remedy which equity makes available for breach of the equitable duty of skill and care is equitable compensation rather than damages, this is merely the product of history and in this context is in my opinion a distinction without a difference. Equitable compensation for breach of the duty of skill and care resembles common law damages in that it is awarded by way of compensation to the plaintiff for his loss. There is no reason in principle why the common law rules of causation,

H   remoteness of damage and measure of damages should not be applied by analogy in such a case. It should not be confused with equitable compensation for breach of fiduciary duty, which may be awarded in lieu of rescission or specific restitution.

This leaves those duties which are special to fiduciaries and which      A
attract those remedies which are peculiar to the equitable jurisdiction and
are primarily restitutionary or restorative rather than compensatory.
A fiduciary is someone who has undertaken to act for or on behalf of
another in a particular matter in circumstances which give rise to a
relationship of trust and confidence. The distinguishing obligation of a
fiduciary is the obligation of loyalty. The principal is entitled to the single-
minded loyalty of his fiduciary. This core liability has several facets.      B
A fiduciary must act in good faith; he must not make a profit out of his
trust; he must not place himself in a position where his duty and his
interest may conflict; he may not act for his own benefit or the benefit of
a third person without the informed consent of his principal. This is not
intended to be an exhaustive list, but it is sufficient to indicate the nature
of fiduciary obligations. They are the defining characteristics of the      C
fiduciary. As Dr. Finn pointed out in his classic work *Fiduciary Obligations*
(1977), p. 2, he is not subject to fiduciary obligations because he is a
fiduciary; it is because he is subject to them that he is a fiduciary.

(In this survey I have left out of account the situation where the
fiduciary deals with his principal. In such a case he must prove
affirmatively that the transaction is fair and that in the course of the
negotiations he made full disclosure of all facts material to the transaction.      D
Even inadvertent failure to disclose will entitle the principal to rescind the
transaction. The rule is the same whether the fiduciary is acting on his
own behalf or on behalf of another. The principle need not be further
considered because it does not arise in the present case. The mortgage
advance was negotiated directly between the society and the purchasers.
The defendant had nothing to do with the negotiations. He was instructed      E
by the society to carry out on its behalf a transaction which had already
been agreed.)

The nature of the obligation determines the nature of the breach. The
various obligations of a fiduciary merely reflect different aspects of his
core duties of loyalty and fidelity. Breach of fiduciary obligation, therefore,
connotes disloyalty or infidelity. Mere incompetence is not enough.
A servant who loyally does his incompetent best for his master is not      F
unfaithful and is not guilty of a breach of fiduciary duty.

In the present case it is clear that, if the defendant had been acting for
the society alone, his admitted negligence would not have exposed him to
a charge of breach of fiduciary duty. Before us counsel for the society
accepted as much, but insisted that the fact that he also acted for the
purchasers made all the difference. So it is necessary to ask: "Why did the      G
fact that the defendant was acting for the purchasers as well as for
the society convert the defendant's admitted breach of his duty of skill
and care into a breach of fiduciary duty?" To answer this question it is
necessary to identify the fiduciary obligation of which he is alleged to have
been in breach.

It is at this point, in my judgment, that the society's argument runs
into difficulty. A fiduciary who acts for two principals with potentially      H
conflicting interests without the informed consent of both is in breach of
the obligation of undivided loyalty; he puts himself in a position where
his duty to one principal *may* conflict with his duty to the other: see *Clark*

19

Ch.        **Bristol and West Building Society v. Mothew (C.A.)**        Millett L.J.

A *Boyce v. Mouat* [1994] 1 A.C. 428 and the cases there cited. This is sometimes described as "the double employment rule." Breach of the rule automatically constitutes a breach of fiduciary duty. But this is not something of which the society can complain. It knew that the defendant was acting for the purchasers when it instructed him. Indeed, that was the very reason why it chose the defendant to act for it. The potential conflict B was of the society's own making: see *Finn, Fiduciary Obligations*, p. 254 and *Kelly v. Cooper* [1993] A.C. 205.

It was submitted on behalf of the society that this is irrelevant because the defendant misled the society. It did not know of the arrangements which the purchasers had made with their bank, and so could not be said to be "fully informed" for the purpose of absolving the defendant from the operation of the double employment rule. The submission is C misconceived. The society knew all the facts relevant to its choice of solicitor. Its decision to forward the cheque for the mortgage advance to the defendant and to instruct him to proceed was based on false information, but its earlier decision to employ the defendant despite the potentially conflicting interest of his other clients was a fully informed decision.

D That, of course, is not the end of the matter. Even if a fiduciary is properly acting for two principals with potentially conflicting interests he must act in good faith in the interests of each and must not act with the intention of furthering the interests of one principal to the prejudice of those of the other: see *Finn*, p. 48. I shall call this "the duty of good faith." But it goes further than this. He must not allow the performance of his obligations to one principal to be influenced by his relationship with E the other. He must serve each as faithfully and loyally as if he were his only principal.

Conduct which is in breach of this duty need not be dishonest but it must be intentional. An unconscious omission which happens to benefit one principal at the expense of the other does not constitute a breach of fiduciary duty, though it may constitute a breach of the duty of skill and F care. This is because the principle which is in play is that the fiduciary must not be inhibited by the existence of his other employment from serving the interests of his principal as faithfully and effectively as if he were the only employer. I shall call this "the no inhibition principle." Unless the fiduciary is inhibited or believes (whether rightly or wrongly) that he is inhibited in the performance of his duties to one principal by reason of his employment by the other his failure to act is not attributable G to the double employment.

Finally, the fiduciary must take care not to find himself in a position where there is an *actual* conflict of duty so that he cannot fulfil his obligations to one principal without failing in his obligations to the other: see *Moody v. Cox and Hatt* [1917] 2 Ch. 71; *Commonwealth Bank of Australia v. Smith* (1991) 102 A.L.R. 453. If he does, he may have no H alternative but to cease to act for at least one and preferably both. The fact that he cannot fulfil his obligations to one principal without being in breach of his obligations to the other will not absolve him from liability. I shall call this "the actual conflict rule."

In the present case the judge evidently thought that the defendant was A in breach of both the duty of good faith and the actual conflict rule. In *Bristol and West Building Society v. May May & Merrimans* [1996] 2 All E.R. 801, 817–818 he said:

> "there can be no doubt that the requirement of unconscionable conduct is present where a solicitor who is acting for both borrower and lender misrepresents to the lender some fact *which he knows, or* B *must be taken to know,* will or may affect the lender's decision to proceed with the loan. In those circumstances the solicitor *is abusing his fiduciary relationship with one client, the lender, to obtain an advantage for his other client, the borrower.* It is as much 'against the dictates of conscience' for a solicitor *knowingly to prefer the interests of one client over those of another client* as it is for him to prefer his own interests over those of his client." (My emphasis.) C

I respectfully agree; but no such allegation is made in the present case.

As to the actual conflict rule, the judge said, at p. 832:

> "First, in *Mothew,* the 'agent' was a fiduciary who had put himself in a position in which his duty to the lender *was* in conflict with the interests of his other client, the borrower." (My emphasis.) D

I do not accept this. By instructing him to act for them, the purchasers must be taken to have authorised the defendant to complete the report without which the mortgage advance would not have been forthcoming; and to complete it truthfully. The defendant was required by the society to report on the purchasers' title as well as to confirm the absence of any further borrowing. The two stood in exactly the same case. The defendant E would not have been in breach of his duty to the purchasers if he had disclosed the facts to the society any more than if he had reported a defect in their title.

This proposition can be tested by considering what the defendant's position would have been if he had acted for the purchasers and another solicitor had been instructed to act for the society. He would have been required to deduce the purchasers' title to the satisfaction of the society's F solicitor, and to confirm to him that no further borrowing or second charge was in contemplation. His duty to the purchasers would have required him to ascertain the facts from them and to report them to the society. Unless they told him the facts and instructed him to lie to the society, instructions which he would be bound to refuse, his duty to the purchasers would not inhibit him in providing full and truthful information G to the solicitor acting for the society.

In my judgment, the defendant was never in breach of the actual conflict rule. It is not alleged that he acted in bad faith or that he deliberately withheld information because he wrongly believed that his duty to the purchasers required him to do so. He was not guilty of a breach of fiduciary duty.

The judge relied on *Nocton v. Lord Ashburton* [1914] A.C. 932 and H *Commonwealth Bank of Australia v. Smith,* 102 A.L.R. 453 to hold that a party who pays money to his solicitor in reliance on a representation *known* by the solicitor to be false has a remedy for breach of fiduciary

21

Ch.        Bristol and West Building Society v. Mothew (C.A.)        Millett L.J.

A duty. Neither case is authority for the proposition (though its correctness is not in issue); certainly neither is authority for the proposition that a party who pays money to a solicitor in reliance on a representation which the solicitor *ought to have known* to be false has such a remedy.

In *Nocton v. Lord Ashburton* [1914] A.C. 932 a solicitor had an undisclosed personal interest in a transaction on which he gave his client B advice which was to his own advantage and the disadvantage of his client. The plaintiff pleaded breach of the duty of good faith. In fact this was unnecessary; the existence of the defendant's undisclosed interest was enough: see *Lewis v. Hillman* (1852) 3 H.L.Cas. 607. The plaintiff was entitled to receive, and thought that he was receiving, the disinterested advice of a solicitor with no other interest in the transaction. *Commonwealth Bank of Australia v. Smith*, 102 A.L.R. 453 involved a C breach of the actual conflict rule. The defendant, who was acting for both parties to a proposed transaction, placed himself in an impossible position by undertaking to advise one of them on the merits of the transaction.

In *Moody v. Cox and Hatt* [1917] 2 Ch. 71 a solicitor, who was acting for both vendor and purchaser, was in possession of valuations which showed that the property was not worth the price which the purchaser D had agreed to pay. He did not disclose them to the purchaser, and claimed that his duty to the vendor precluded him from doing so. The purchaser was allowed to rescind. The case bears a superficial resemblance to the present but there are two crucial differences: (i) the vendor was under no obligation to disclose the valuations to the purchaser and did not wish his solicitor do so; and (ii) the vendor and the solicitor tacitly agreed to E conceal the valuations from the purchaser. The solicitor was in breach of both the duty of good faith and the actual conflict rule; his defence fell foul of the no inhibition principle.

That was a case of deliberate concealment. Non-disclosure and concealment are two very different things. This has been a truism of the law from the time of Cicero (De Officiis, lib. 3, c. 12, 13 citing Diogenes F of Babylon). It is even enshrined, like other such truisms, in a Latin tag: aliud est celare, aliud tacere.

The society placed much reliance on a dictum by Lord Jauncey of Tullichettle in *Clark Boyce v. Mouat* [1994] 1 A.C. 428, 437 where he said:

> "Another case of breach [of fiduciary duty] is where a solicitor
> acts for both parties to a transaction without disclosing this to one of
> G       them *or where having disclosed it he fails, unbeknown to one party, to
> disclose to that party material facts relative to the other party of which
> he is aware.*" (My emphasis.)

But I do not think that Lord Jauncey meant to include an inadvertent failure which owes nothing to the double employment. Where such failure H is to the advantage of the other party, the court will jealously scrutinise the facts to ensure that there has been nothing more than inadvertence, but there can be no justification for treating an unconscious failure as demonstrating a want of fidelity.

In my judgment the distinction drawn by Ipp J. in *Permanent Building Society v. Wheeler*, 14 A.C.S.R. 109 is sound in principle and is decisive of the present case. On the society's pleaded case the fact that the defendant was acting for the purchasers played no part in his failure to report the true state of affairs to the society. It did not inhibit him from fulfilling his obligations to the society. It is consistent with its pleaded case that the defendant would have done so but for a negligent oversight. It would have been exactly the same if he had failed to notice and report the existence of a defect in the purchasers' title. To characterise either such failure as a breach of fiduciary duty because he was acting for both parties in a situation where that fact did not contribute to his failure is, in my opinion, to substitute a verbal formula for principle.

In my judgment the judge's conclusion that the defendant was in breach of fiduciary duty cannot be supported. It follows that it cannot be sustained as a ground for holding the defendant in breach of a constructive trust of the mortgage money.

### Breach of trust

It is not disputed that from the time of its receipt by the defendant the mortgage money was trust money. It was client's money which belonged to the society and was properly paid into a client account. The defendant never claimed any beneficial interest in the money which remained throughout the property of the society in equity. The defendant held it in trust for the society but with the society's authority (and instructions) to apply it in the completion of the transaction of purchase and mortgage of the property. Those instructions were revocable but, unless previously revoked, the defendant was entitled and bound to act in accordance with them.

The society's instructions were not revoked before the defendant acted on them, and in my judgment there was no ground upon which the judge could properly conclude that his authority to apply the money in completing the transaction had determined.

If his judgment in the present case is considered without the benefit of his later explanation in *Bristol and West Building Society v. May May & Merrimans* [1996] 2 All E.R. 801, it would appear that the judge was of opinion that the defendant's authority to deal with the money was automatically vitiated by the fact that it (and the cheque itself) was obtained by misrepresentation. But that is contrary to principle. Misrepresentation makes a transaction voidable not void. It gives the representee the right to elect whether to rescind or affirm the transaction. The representor cannot anticipate his decision. Unless and until the representee elects to rescind the representor remains fully bound. The defendant's misrepresentations merely gave the society the right to elect to withdraw from the transaction on discovering the truth. Since its instructions to the defendant were revocable in any case, this did not materially alter the position so far as he was concerned, though it may have strengthened the society's position in relation to the purchasers.

The right to rescind for misrepresentation is an equity. Until it is exercised the beneficial interest in any property transferred in reliance on the representation remains vested in the transferee. In *El Ajou v. Dollar*

23

Ch.     **Bristol and West Building Society v. Mothew (C.A.)**     Millett L.J.

A   *Land Holdings Plc.* [1993] 3 All E.R. 717, 734 I suggested that on rescission the equitable title might revest in the representee retrospectively at least to the extent necessary to support an equitable tracing claim. I was concerned to circumvent the supposed rule that there must be a fiduciary relationship or retained beneficial interest before resort may be had to the equitable tracing rules. The rule would have been productive of the most extraordinary anomalies in that case, and its existence continually threatens

B   to frustrate attempts to develop a coherent law of restitution. Until the equitable tracing rules are made available in support of the ordinary common law claim for money had and received some problems will remain incapable of sensible resolution.

But all that is by the way. Whether or not there is a retrospective vesting for tracing purposes it is clear that on rescission the equitable title

C   does not revest retrospectively *so as to cause an application of trust money which was properly authorised when made to be afterwards treated as a breach of trust.* In *Lipkin Gorman v. Karpnale Ltd.* [1991] 2 A.C. 548 Lord Goff of Chieveley said, at p. 573:

> "Of course, 'tracing' or 'following' property into its product involves a decision by the owner of the original property to assert his title to
>
D   > the product in place of his original property. This is sometimes referred to as ratification. I myself would not so describe it, but it has, in my opinion, at least one feature in common with ratification, that it cannot be relied upon so as to render an innocent recipient a wrongdoer (cf. *Bolton Partners v. Lambert* (1889) 41 Ch.D. 295, 307, *per* Cotton L.J.: 'an act lawful at the time of its performance [cannot]
>
E   > be rendered unlawful, by the application of the doctrine of ratification.')"

In *Westdeutsche Landesbank Girozentrale v. Islington London Borough Council* [1996] A.C. 669 Lord Browne-Wilkinson expressly rejected the possibility that a recipient of trust money could be personally liable, regardless of fault, for any subsequent payment away of the moneys to third parties even though, at the date of such payment, he was ignorant

F   of the existence of any trust. He said, at p. 705:

> "Since the equitable jurisdiction to enforce trusts depends upon the conscience of the holder of the legal interest being affected, he cannot be a trustee of the property if and so long as he is ignorant of the facts alleged to affect his conscience, i.e. until he is aware that he is intended to hold the property for the benefit of others in the case
>
G   > of an express or implied trust, or, in the case of a constructive trust, of the factors which are alleged to affect his conscience."

Mutatis mutandis that passage is directly applicable in the present case. The defendant knew that he was a trustee of the money for the society; but he did not realise that he had misled the society and could not know that his authority to complete had determined (if indeed it had). He could

H   not be bound to repay the money to the society so long as he was ignorant of the facts which had brought his authority to an end, for those are the facts which are alleged to affect his conscience and subject him to an obligation to return the money to the society.

Before us the society put forward a more sophisticated argument. The    A
defendant's instructions, it pointed out, expressly required him to report
the arrangements in question "to the society prior to completion." This, it
was submitted, made it a condition of the defendant's authority to
complete that he had complied with his obligation. Whether he knew it or
not, he had no authority to complete. It was not necessary for the society
to revoke his authority or withdraw from the transaction. I do not accept
this. The society's standing instructions did not clearly make the    B
defendant's authority to complete conditional on having complied with
his instructions. Whether they did so or not is, of course, a question of
construction, and it is possible that the society could adopt instructions
which would have this effect. But it would in my judgment require very
clear wording to produce so inconvenient and impractical a result. No
solicitor could safely accept such instructions, for he could never be    C
certain that he was entitled to complete.

In my judgment the defendant's authority to apply the mortgage
money in the completion of the purchase was not conditional on his
having first complied with his contractual obligations to the society, was
not vitiated by the misrepresentations for which he was responsible but of
which he was unaware, had not been revoked, and was effective to prevent
his payment being a breach of trust. Given his state of knowledge (and,    D
more importantly, that his authority had not been revoked), he had no
choice but to complete.

### Conclusion

In my judgment the defendant was not guilty of breach of trust or
fiduciary duty. This makes it unnecessary to consider what the    E
consequences of such a breach would have been. I would allow the appeal
and set aside the money judgment. I would leave undisturbed the
judgments for damages to be assessed for breach of contract and
negligence, but make it clear that it does not follow that the society will
establish any recoverable loss.

OTTON L.J.    I have read with advantage the judgments of Staughton    F
and Millett L.JJ. I agree with the analysis and reasoning regarding breach
of trust and of fiduciary duty. I wish only to add a few words on the
extant common law claims.

I am satisfied that there was sufficient evidence before the judge to
establish negligence on the part of the defendant. There was the requisite
proximity between the parties, and there was foreseeability of damage.    G
Thus a duty of care arose. This duty included answering correctly such
questions as were posed by the proposed lender and which it was
reasonable for him to be required to answer. The answer sought was one
of fact and not opinion. The fact sought could have been supplied
accurately by information which was within his knowledge. If it was not
at his fingertips the information was either on file or could easily have
been obtained by direct inquiry of the intending purchaser. His breach of    H
duty occurred when he conveyed the inaccurate information to the
plaintiff. The duty was not simply a duty not to act carelessly; it was a
duty not to inflict damage carelessly. Damage is the gist of the action.

25

Ch.          **Bristol and West Building Society v. Mothew (C.A.)**          Otton L.J.

A    The more complex issues are whether the inaccurate information given was causative of damage, and if so what measure. To my mind it is not necessary to adopt a particular procedural path to find the answer. I appreciate that Lord Hoffmann suggests that it is first necessary to decide the kind of loss to which the plaintiff is entitled. This may be appropriate in most cases where negligence/causation is involved. From a practical point of view in some cases it may be more expedient to establish

B    the causal link between the negligent act or omission and the reliance by the plaintiff or the course of action which he was induced to take. The judge may find as a fact that there was no reliance or that the plaintiff would have behaved in the same or substantially the same manner if he had been given accurate information; in either event the negligence had no causative potency. That is the end of the matter. The chain is broken,

C    there is no loss at all and there is no need to consider or determine the kind of loss.

    In other cases it may be appropriate to identify the type or particular head of damage claimed. This may identify damage which is too remote and for which no remedy lies (e.g. economic loss), and the claim in respect of it fails in limine. As I concur that the damages award must now be set aside the issue of the measure of damage, if any, is now at large. I regard

D    the evidence (in particular the hearsay evidence of Ms Samantha Bennett at paragraph 29 of Mr. Prees's affidavit) as falling short of resolving the issues of causation or damage. It does not (for example) address the possibility of a revised offer if the accurate and full position had been explained to the plaintiff.

    I do not think it necessary to conclude whether there was a breach of

E    contract. This cause of action probably adds nothing to the case in negligence. It is unlikely that there is any practical difference between a breach of the duty of care and a breach of contract, or in the issues arising on causation, or the measure of damages. If there is any issue it can be determined by the trial judge. I also consider that there was no waiver.

    For these reasons I consider that there are triable issues and they should be determined by a judge at first instance.

F    I would therefore allow the appeal and remit the assessment of damages as proposed by Staughton L.J. and dismiss the respondent's notice.


    STAUGHTON L.J.  Mr. Mothew made his report to the Cheshunt

G    Building Society on 2 August 1988. In it he answered one of the questions asked as follows:

        "Q. Please confirm that (to the best of your knowledge and belief) the balance of the purchase money is being provided by the applicant(s) personally without resort to further borrowing. If not please give details. A. Confirmed."

H    That was untrue. There were other aspects of the same error, but I need not go into them in detail. Although Mr. Mothew had the means of knowledge in his possession, which could have brought the error to his attention, it is not said that he acted fraudulently or in bad faith.

The ordinary remedy of a client who has received wrong information    A
or advice from his solicitor is to claim damages for negligence, whether as
a breach of contract or as a tort. For such a claim to give rise to
substantial damages the building society would have to show that the
breach of contract or negligence caused them loss. By their respondent's
notice they seek to say that, if they had known the true facts, they would
not have lent any money to Mr. and Mrs. Towers.

The judge regarded that point as immaterial, since the building society    B
succeeded on other grounds. If it is material, in my opinion it raises a
triable issue. According to Samantha Bennett of the society's advances
department, the offer of advance would have immediately been withdrawn
if the society had known that even £3,350 was being borrowed elsewhere.
In the nature of things Mr. Mothew is unlikely to have evidence which
directly controverts that statement. But there are grounds for supposing    C
that it may be open to question. I would not give judgment under R.S.C.,
Ord. 14 on the basis that it is true. If it is critical, the case must go to
trial, perhaps with the aid of interrogatories and discovery of documents.

However in this particular case the building society were not the sole
clients of Mr. Mothew; he was also the solicitor acting for Mr. and
Mrs. Towers. That is said to make all the difference, because Mr. Mothew    D
then became under a fiduciary duty to the building society. And the
argument is that for breach of fiduciary duty the remedy does not depend
on causation or remoteness; all that is necessary is that the loss would not
have occurred *but for* the breach of duty.

It seems to me wrong that a breach of contract or tort should become
a breach of fiduciary duty in that way. I am glad to find that the
authorities relied on by Millett L.J. show that it is wrong. In my judgment    E
Mr. Mothew was in breach of a duty of care and nothing more. True he
was in a situation where he owed duties to two clients, and those duties
might conflict with each other. But he did not prefer the interest of one
client to that of another; at most he was guilty of negligence which had
that unintended effect.

Alternatively it is said that Mr. Mothew was in breach of trust because    F
he paid away the trust fund contrary to his instructions. He did indeed
hold the £59,000 in trust; it was not his own money. There was in my
opinion an express or implied trust, and not (as the judge held) a
constructive trust. But he did not pay it away contrary to the society's
instructions. The cheque reached Mr. Mothew with a letter dated
23 August 1988, which in effect instructed him to use it for completion of    G
the proposed purchase. That was what he did.

There being in my opinion no breach of fiduciary duty or breach of
trust, it is unnecessary to consider what remedy such a breach might have
afforded.

Thus far the appeal succeeds, but there remains judgment on the cause
of action at common law for damages to be assessed. Mr. Sumption says
that even that must go, since there is a triable issue as to waiver by the    H
building society. The problem that he faces is that, although the building
society readily agreed when they were asked to consent to the registration
of the second charge, they are not shown to have known that the second

27

Ch.        Bristol and West Building Society v. Mothew (C.A.)        Staughton L.J.

A  charge was contemplated and intended at the time of Mr. Mothew's report. There has been ample opportunity to produce evidence that they knew, if indeed they did. In my judgment there was no waiver.

When the argument before us was concluded on 21 May that was all that we had to decide. But we have since been asked to consider the judgment of Hobhouse L.J. in *Downs v. Chappell* [1997] 1 W.L.R. 426 and

B  the speech of Lord Hoffmann in *Banque Bruxelles Lambert S.A. v. Eagle Star Insurance Co. Ltd.* [1997] A.C. 191. Such has been the volume of litigation on the topic of loss to lenders following negligent professional advice and the collapse of the property market that judges risk being overtaken by new authority.

The Court of Appeal in the *Banque Bruxelles* case began with a reference to the well known principle that damages should be as nearly as

C  possible the sum which would put the plaintiff in the position in which he would have been if he had not been injured. That would lead to two possible answers in the present case. (1) If there had been no report from Mr. Mothew to the building society, the money would not have been lent; the society would still have their £59,000. There would have been no transaction, a phrase which I use not as a label for anything but as a

D  description of the fact. (2) If Mr. Mothew had provided an accurate report to the building society, then they might have been content to proceed on the terms previously proposed, or they might have made a revised offer, or they might have proceeded as in (1) above. There is a triable issue as to that. Left to myself, I would have ruled that (2) was the appropriate situation for the judge to consider in assessing the damages.

E  But I have to acknowledge that Hobhouse L.J. in *Downs v. Chappell* [1997] 1 W.L.R. 426, with the agreement of Butler-Sloss and Roch L.JJ., preferred method (1), both for fraudulent misrepresentation and for negligence.

Lord Hoffmann, in the *Banque Bruxelles* case [1997] A.C. 191, 211, as it seems to me, considered that either method was the wrong place to

F  begin:

> "Before one can consider the principle on which one should calculate the damages to which a plaintiff is entitled as compensation for loss, it is necessary to decide for what kind of loss he is entitled to compensation."

G  There follows an exposition of the problem and the answer to it, as set out in the judgment of Millett L.J.

For my part I feel that we should not at this stage purport to instruct the judge who has to assess the damages by a paraphrase or interpretation of that decision, for a number of reasons. First, we have not heard argument on it, and our judgment is already long delayed by intervening

H  material. I am told it would be impractical for us to have a further hearing before October. Secondly, the judge has yet to find the facts relating to the assessment of damages. Thirdly, the judge must be guided by what Lord Hoffmann has said and not by any gloss of ours.

A

I would allow the appeal and remit the assessment of damages, either to Chadwick J. or to another judge of the Chancery Division as the exigencies of business may require. The cross-appeal should be dismissed.

*Appeal allowed.*
*Cross-appeal dismissed.*

B

*Solicitors: Wansbroughs Willey Hargrave; Osborne Clarke, Bristol.*

[Reported by JILL SUTHERLAND, Barrister]

C

———

[COURT OF APPEAL]

TURNER v. STEVENAGE BOROUGH COUNCIL

D

1997  March 6                          Staughton, Pill and Mummery L.JJ.

*Arbitration—Arbitrator—Misconduct—Application to remove arbitrator—Lengthy correspondence and preliminary proceedings—Arbitrator proposing interim payment of fees and expenses—Payment by one party only—Subsequent return of payment—Whether misconduct—Whether arbitrator to be removed—Arbitration Act 1950 (14 & 15 Geo. 6, c. 27), s. 23*

E

In February 1993 an arbitrator was appointed to conduct arbitration proceedings relating to a rent review between the council, as landlords of a shop, and the tenant. The arbitrator's terms of appointment contained no express provision for payment of interim fees or expenses. The parties contemplated that the arbitration would be concluded within about three months and the arbitrator stated that the award would be made by 30 June 1993. In May 1994, after lengthy correspondence and five preliminary hearings, the arbitration had still not concluded and the arbitrator wrote to both parties suggesting a timetable for the hearing and requesting payment by each party of half his interim fees and expenses. The tenant objected and asked whether, if payment were not made, the arbitrator would not hear the arbitration. The arbitrator replied that the first priority was to fix the hearing and to resolve the dispute, but that he hoped the parties would agree that it was reasonable that he should receive interim payment for time expended on the matter. The council paid the sum to the arbitrator, but three months later, after taking legal advice, he returned it. The tenant applied for the arbitrator to be removed for misconduct under section 23 of the Arbitration Act 1950[1] on the ground that he had no power to

F

G

H

———

[1] Arbitration Act 1950, s. 23: "(1) Where an arbitrator or umpire has misconducted himself or the proceedings, the High Court may remove him."

**CAYMAN ISLANDS**



# COMPANIES ACT

**(2025 Revision)**

Supplement No. 3 published with Legislation Gazette No. 6 dated 28th January, 2025.

# PUBLISHING DETAILS

Cap. 22 [Law 3 of 1961 and 12 of 1962] of the 1963 Revised Edition of the Laws consolidated with Laws 12 of 1962, 9 of 1966, 1 of 1971, 7 of 1973, 24 of 1974, 25 of 1975, 19 of 1977, 16 of 1978, 6 of 1980, 21 of 1981, 34 of 1983, 2 of 1984, 22 of 1984, 15 of 1985, 38 of 1985, 24 of 1987, 14 of 1988, 14 of 1989, 10 of 1990, 3 of 1991, 23 of 1991 (part), 11 of 1992, 3 of 1993, 23 of 1993, 33 of 1993, 2 of 1994, 8 of 1994, 14 of 1996, 26 of 1997, 4 of 1998, 6 of 1998, 20 of 1998 (part), 5 of 1999, 7 of 2000 (part), 5 of 2001, 10 of 2001, 29 of 2001, 46 of 2001, 22 of 2002, 26 of 2002, 28 of 2003, 13 of 2006, 15 of 2007, 12 of 2009, 33 of 2009, 37 of 2010, 16 of 2011, 29 of 2011, 6 of 2012, 14 of 2012, 29 of 2012, 1 of 2013, 6 of 2013, 14 of 2015, 3 of 2016, 2 of 2017, 42 of 2017, 37 of 2018, 46 of 2018, 10 of 2019, 4 of 2020, 19 of 2020 and Acts 56 of 2020, 60 of 2020, 6 of 2021, 15 of 2023, 11 of 2024 and the Companies (Amendment of Schedule) Order, 2011, Schedule 4 of the Companies Law Departmental Notice, 2015, Schedule 4 of the Companies Law Departmental Notice, 2017, the Companies (Amendment of Section 254) Regulations, 2022, the Companies (Amendment of Schedule 4) Order, 2023, the Companies (Amendment of Schedule 5) Order, 2023 and the Companies (Amendment of Schedule 5) Order, 2024.

Revised under the authority of the *Law Revision Act (2020 Revision).*

Originally enacted —

Cap. 22-1st January, 1964  
Law 9 of 1966-14th March, 1966  
Law 1 of 1971-15th December, 1970  
Law 7 of 1973-28th June, 1973  
Law 24 of 1974-22nd November, 1974  
Law 25 of 1975-9th December, 1975  
Law 19 of 1977-10th November, 1977  
Law 16 of 1978-8th September, 1978  
Law 6 of 1980-17th March, 1980  
Law 21 of 1981-13th October, 1981  
Law 34 of 1983-24th November, 1983  
Law 2 of 1984-28th February, 1984  
Law 22 of 1984-7th September, 1984  
Law 15 of 1985-24th May, 1985  
Law 38 of 1985-19th December, 1985  
Law 24 of 1987-17th November, 1987  
Law 14 of 1988-9th September, 1988  

Law 10 of 2001-25th May, 2001  
Law 29 of 2001-26th September, 2001  
Law 46 of 2001-14th January, 2002  
Law 22 of 2002-5th December, 2002  
Law 26 of 2002-5th December, 2002  
Law 28 of 2003-3rd December, 2003  
Law 13 of 2006-1st June, 2006  
Law 15 of 2007-17th September, 2007  
Law 12 of 2009-20th March, 2009  
Law 33 of 2009-2nd December, 2009  
Law 37 of 2010-15th September, 2010  
Law 16 of 2011-11th April, 2011  
Law 29 of 2011-18th November, 2011  
Law 6 of 2012-29th August, 2012  
Law 14 of 2012-31st August, 2012  
Law 29 of 2012-19th November, 2012  
Law 1 of 2013-10th January, 2013



Law 14 of 1989-5th September, 1989

Law 10 of 1990-18th July, 1990

Law 3 of 1991-21st February, 1991

Law 23 of 1991-12th December, 1991

Law 11 of 1992-13th July, 1992

Law 3 of 1993-26th March, 1993

Law 23 of 1993-29th September, 1993

Law 33 of 1993-29th November, 1993

Law 2 of 1994-9th March, 1994

Law 8 of 1994-23rd September, 1994

Law 14 of 1996-5th September, 1996

Law 26 of 1997-9th March, 1998

Law 4 of 1998-4th March, 1998

Law 6 of 1998-9th March, 1998

Law 20 of 1998-15th February, 1999

Law 5 of 1999-14th April, 1999

Law 7 of 2000- 20th July, 2000

Law 5 of 2001-20th April, 2001

Law 6 of 2013-15th March, 2013

Law 14 of 2015-12th August, 2015

Law 3 of 2016-6th May, 2016

Law 2 of 2017-27th February, 2017

Law 42 of 2017-16th November, 2017

Law 37 of 2018-22nd November, 2018

Law 46 of 2018-17th December, 2018

Law 10 of 2019-26th July, 2019

Law 4 of 2020-31st January, 2020

Law 19 of 2020-20th May, 2020

Act 56 of 2020-7th December, 2020

Act 60 of 2020-16th December, 2020

Act 6 of 2021-8th December, 2021

Act 15 of 2023-23rd November, 2023

Act 11 of 2024-11th December, 2024

Consolidated and revised this 1st day of January, 2025.

*Note (not forming part of this Act): This revision replaces the 2023 Revision which should now be discarded.*

## Liability of members in respect of reduced shares

**18**. (1)  In the case of a reduction of share capital, a member of the company, past or present, shall not be liable in respect of any share to any call or contribution exceeding in amount the difference, if any, between the amount of the share as fixed by the minute and the amount paid or the reduced amount, if any, which is to be deemed to have been paid on the shares, as the case may be:

Provided that, if any, creditor entitled in respect of any debt or claim to object to the reduction of share capital is, by reason of that person's ignorance of the proceedings for reduction or of their nature and effect with respect to that person's claim, not entered on the list of creditors, and after the reduction the company is unable, within the meaning of this Act with respect to winding up by the Court, to pay the amount of that person's debt or claim, then —

(a)  every person who was a member of the company at the date of the registration of the order for reduction and minute shall be liable to contribute for the payment of that debt or claim an amount not exceeding the amount which that person would have been liable to contribute if the company had commenced to be wound up on the day before the said date; and

(b)  if the company is wound up, the Court, on the application of any such creditor and proof of that person's ignorance as aforesaid, may if it thinks fit, settle accordingly a list of persons so liable to contribute, and make and enforce calls and orders on the contributories in a winding up.

(2)  Nothing in this section shall affect the rights of the contributories among themselves.

## Penalty for concealment of names of creditors

**19**.  A person who, being a director, manager, secretary or other officer of the company —

(a)  wilfully conceals the name of any creditor entitled to object to the reduction;

(b)  wilfully misrepresents the nature or amount of the debt or claim of any creditor; or

(c)  aids, abets or is privy to any such concealment or misrepresentation as aforesaid,

commits an offence and is liable on summary conviction to a fine of five thousand dollars or to imprisonment for a term of one year, or to both.



# IN THE MATTER OF CHINA SHANSHUI CEMENT GROUP LIMITED

GRAND COURT, FINANCIAL SERVICES DIVISION (Mangatal, J.) November 25th, 2015

*Companies—compulsory winding up—petition—locus standi to petition—director not entitled to petition without express authorization of shareholders or articles of association—general terms in articles giving director all powers of company insufficient as Companies Law (2013 Revision), s.94 clearly states petition to be presented by company not directors—case law to contrary not followed as clearly wrong—legislative amendment necessary to allow directors to present petitions without authorization*

*Courts—Grand Court—precedent—court to follow previous Grand Court decisions unless convinced they are incorrect*

The directors of the company petitioned for the appointment of joint provisional liquidators ("JPLs").

The company was incorporated in the Cayman Islands as a holding company for a group of Chinese companies; it issued a number of senior notes which were repayable in 2020, with biannual interest payments in March and September of each year. Interest payments were duly made until September 2015, but the company subsequently became cash-flow insolvent (though it remained balance-sheet solvent) and was unable to make any further interest payments. The board of directors of the company resolved to wind up the company and to present a petition seeking the appointment of JPLs.

The petition was opposed by the company's majority shareholders and a number of noteholders, who applied for it to be struck out as an abuse of process as the Companies Law (2013 Revision), s.94 did not allow directors to present winding-up petitions unless authorized to do so by the company or its articles of association.

The majority shareholders submitted that (a) English case law concerning the Companies Act 1948, s.224(1) (the equivalent of s.94) indicating that directors could not present petitions without authorization had been followed in the Cayman Islands; (b) judgments of the Grand Court suggesting the contrary had not been subsequently followed and were wrongly decided, as s.94 clearly indicated that directors could not present winding-up petitions without authorization; (c) the Companies Law had

been comprehensively reviewed in 2007 and the legislature had made a clear decision not to alter the unambiguous wording of s.94, unlike in England where legislation had been enacted in order to alter the rule; (d) the company's articles did not grant authorization to present the petition as they did not expressly stipulate that directors were empowered to present winding-up petitions; and (e) a creditor should not be substituted as petitioner as it was necessary that a creditor petition be substituted, and no creditor had done so.

The company submitted in reply that (a) the English case law supporting the proposition that directors could not present winding-up petitions without authorization had only been reluctantly endorsed in the Islands; (b) the judgments of the Grand Court which had held that directors could present winding-up petitions should be followed as they were judgments of courts of co-ordinate jurisdiction, which should not be overturned unless they were clearly erroneous; (c) it was settled practice in the Islands, England and the Commonwealth that directors could present winding-up petitions; (d) in any event, the company's articles of association authorized the directors to present the petition as they were granted all powers that could be exercised by the company; and (e) the court should not strike out the petition if it concluded that the directors had no standing to present the petition, but should instead allow the substitution of a creditor as petitioner as CWR, O.3, r.10(1) should be read disjunctively in order to allow substitution either (i) when a creditor presented a petition and was found not to be entitled to do so; or (ii) when one of the grounds in paras. (a)–(e) was established (*e.g.* by showing that a petitioner consented to his petition being withdrawn (CWR, O.3, r.10(1)(b)).

**Held,** striking out the winding-up petition:

(1) The directors did not have standing to petition for the winding up of the company or the appointment of joint provisional liquidators and the petition would therefore be struck out. Section 94 of the Companies Law (2013 Revision) clearly stated that an application to wind up a company was to be made by a company and not its directors, unless they were expressly authorized to do so by the company's articles of association. The section had not been amended when the Companies Law was considered by the legislature in 2007, indicating a deliberate legislative decision that directors should continue to be required to seek authorization before presenting a winding-up petition. Further, it did not appear that prohibiting directors from presenting winding-up petitions without authorization produced impracticable results, as was confirmed by the fact that this prohibition had applied in the Islands for a significant period of time prior to 2011 (paras. 69–70; paras. 72–74; paras. 81–82; para. 84).

(2) Judgments of the Grand Court indicating that directors were entitled to present winding-up petitions without authorization if the company was balance-sheet solvent would not be followed, as there was no evidence that they had subsequently been applied by the court, and prior to 2011 the case law had held that directors were prohibited from presenting

winding-up petitions without authorization. Though the court was generally to follow previous decisions of the Grand Court in the interest of certainty, it was entitled to depart from such decisions if convinced that they were incorrect. As the wording of the legislation clearly established that directors were not to present winding-up petitions without authorization, contrary case law would not be followed, although such a rule was no longer applied in many Commonwealth jurisdictions. The foregoing was also confirmed by the fact that the English courts had continued to apply the rule prohibiting presentation of a winding-up petition by a director without the company's authorization until the Insolvency Act 1986 was enacted, suggesting that legislative amendment was necessary in order to discontinue application of the rule (paras. 37–39; paras. 64–65; para. 71; paras. 77–79).

(3) The company's articles of association did not specifically authorize the directors to present a winding-up petition as they merely stated in general terms that the directors were vested with the same powers as the company (paras. 75–76).

(4) A creditor would not be substituted pursuant to CWR, O.3, r.10 as petitioner in place of the directors, as no petition had been presented indicating that any of the creditors was prepared to take their place, and no creditor had otherwise indicated an intention to be substituted. CWR, O.3, r.10(1) was not to be read disjunctively so as to permit substitution either (a) when "a creditor petitions and is subsequently found not to have been entitled to do so"; or (b) when one of the grounds specified in paras. (a)–(e) was established. It was necessary, therefore, for a creditor's petition to be presented in order for a petitioner to be substituted (para. 83).

**Cases cited:**
(1) *Alibaba.com, In re*, 2012 (1) CILR 272, referred to.
(2) *Banco Economico S.A.* v. *Allied Leasing & Fin. Corp.*, 1998 CILR 102, followed.
(3) *China Milk Products Group Ltd., In re*, 2011 (2) CILR 61, not followed.
(4) *Dyxnet Holdings Ltd.* v. *Current Ventures II Ltd.*, 2015 (1) CILR 174, referred to.
(5) *Emmadart Ltd., In re*, [1979] Ch. 540; [1979] 2 W.L.R. 868; [1979] 1 All E.R. 599, followed.
(6) *Fernlake Pty. Ltd., Re* (1994), 13 ACSR 600, considered.
(7) *First Virginia Reinsurance Ltd., Re* (2003), 66 WIR 133, referred to.
(8) *Global Opportunity Fund Ltd., In re*, 1997 CILR N–7, followed.
(9) *Inkerman Grazing Pty. Ltd., Re* (1972), 1 ACLR 102, referred to.
(10) *Interchase Mgmt. Servs. Pty. Ltd., Re* (1992), 9 ACSR 148, referred to.
(11) *Lornamead Acquis. Ltd.* v. *Kaupthing Bank HF*, [2013] 1 BCLC 73; [2011] EWHC 2611 (Comm), referred to.

(12) *Miharja Dev. Sdn. Bhd.* v. *Heong*, [1995] 1 MLJ 101, referred to.
(13) *Siebe Gorman & Co. Ltd.* v. *Barclays Bank Ltd.*, [1979] 2 Lloyd's Rep. 142, considered.
(14) *Spectrum Plus Ltd., In re*, [2004] 2 W.L.R. 783; [2004] 1 All E.R. 981; [2004] BCC 51; [2004] 1 BCLC 335; [2004] EWHC 9 (Ch), followed.
(15) *Trans Pacific Corp., Re* (2009), 72 ACSR 327, referred to.
(16) *Xinhua Sports & Entertainment Ltd., In re*, Grand Ct., Fin. Servs. Div., Case No. FSD 48 of 2011, unreported, considered.

**Legislation construed:**

Companies Law (2013 Revision), s.94: The relevant terms of this section are set out at para. 26.

Companies Winding Up Rules 2008, O.3, r.10(1):
"This Rule applies where a creditor petitions and is subsequently found not to have been entitled to do so or where the petitioner—
(a) fails to advertise his petition;
(b) consents to his position being withdrawn;
(c) fails to appear on the hearing of his petition;
(d) allows his petition to be adjourned or dismissed; or
(e) appears, but does not apply for an order in terms of the prayer of his petition."

*M. Crawford* and *Ms. A. Perry* for the company;
*S. Moverley-Smith, Q.C*, *U. Payne*, *O. Payne* and *M. Kish* for the majority shareholders;
*G. Manning*, *G. Cowan*, *N. Lupton*, *Ms. F. McAdam*, *J. Golaszewski* and *Ms. A. Dixon* for the creditors.

1   **MANGATAL, J.:** China Shanshui Cement Group Ltd. ("the company") was incorporated in the Cayman Islands on April 26th, 2006 as an exempted non-resident company limited by shares under the Companies Law (2004 Revision), with a registered office situated at PO Box 309, Ugland House, South Church Street, George Town, Grand Cayman.

2   The company's headquarters are situated at Sunnsy Industrial Park, Gushan Town, Changqing District, Jinan, Shandong, in the People's Republic of China ("PRC").

3   The authorized share capital of the company is US$100m. divided into 100 bn. ordinary shares of US$0.01 each.

4   The objects for which the company was established are unrestricted and are more particularly set out in its memorandum of association. The company's principal business activity is acting as the holding company of an international group of companies whose operating subsidiaries are located in the PRC ("the Group"). The Group is one of the leading

producers of cement in the PRC with a dominant market position in the Shandong and Liaoning provinces.

5    The company's shares are publicly listed on the Stock Exchange of Hong Kong ("SEHK") under the short stock name "Shanshui Cement."

6    The company's main asset is its shares in a wholly-owned, Hong Kong incorporated subsidiary, China Shanshui Cement Group (Hong Kong) Co. Ltd. ("CSHK"). CSHK is in turn also a holding company, its main asset being its shares in another wholly-owned, Hong Kong incorporated subsidiary, China Pioneer Cement (Hong Kong) Co. Ltd. ("Pioneer"). Pioneer's primary assets are its direct shareholdings in Shandong Shanshui Cement Group Co. Ltd. ("Shandong Shanshui"), American Shanshui Development Inc. and Continental Cement Corp.

7    The company claims its principal creditors are the holders ("the 2020 noteholders") of US$500m. of 7.5% senior notes, due in 2020 ("the 2020 notes"), issued by it in around March 2015 pursuant to an indenture governed by New York law dated March 10th, 2015 between itself, Citicorp Intl. Ltd. ("the trustee") and CSHK, Pioneer and Continental Cement Corp. as guarantors.

8    The 2020 notes were initially allocated to around 300 institutions and are listed on the SEHK. For that reason, the company states, it does not have details of the current ultimate holders of the 2020 notes.

**The petition and claims of insolvency**

9    On November 10th, 2015, the company filed a winding-up petition ("the petition") in which it stated that the 2020 notes are currently repayable on March 10th, 2020, with biannual interest payments to be made on March 10th and September 10th of each year. The company states that it has duly met all such interest payments through to September 10th, 2015. However, the petition pleads that a debt arising under the 2020 notes is imminent and/or immediately due and payable, which debt the company is unable to pay within the meaning of s.92(d) of the Companies Law (2013 Revision) ("the Law"). Particulars are set out in para. 13 of the petition.

10    The company indicates that it has an excess of assets over its liabilities and is seeking, contemporaneously with the petition, the appointment of joint provisional liquidators ("JPLs") under s.104(3) of the Law. Additionally, that it is otherwise just and equitable for the company to be wound up. On the company's evidence, it has a market capitalization of over US$2.7bn., and while the company is cash-flow insolvent, it is considerably balance-sheet solvent.

11    The company states that its board of directors has unanimously resolved to present this petition.

**The *ex parte* summons for the appointment of provisional liquidators**

12   The *ex parte* summons seeks to have David Walker of PwC Corporate Finance & Recovery (Cayman) Ltd., Man Chun "Christopher" So of PricewaterhouseCoopers in Hong Kong, and Yat Kit "Victor" Jong of PricewaterhouseCoopers in Shanghai, in the PRC, appointed as JPLs.

13   The summons also seeks for the JPLs to be authorized to develop and propose any compromise or arrangement with the company's creditors or any class thereof.

**The majority shareholders**

14   China Shanshui Inv. Co. Ltd. ("CSI") and Tianrui (Intl.) Holding Co. Ltd. ("Tianrui") (together "the majority shareholders"), are shareholders of the company, together holding 53.27% of its issued share capital.

**The 2020 noteholders who have come forward to date**

15   Taconic Opportunity Master Fund LP ("Taconic"), Claren Road Asset Management ("Claren Road"), and ASM Connaught House Fund LP ("ASM") are said to form part of an *ad hoc* group ("the AHG") of beneficial interest 2020 noteholders. The parties either in, or supporting, the AHG indicate that they hold 21.30% of the notes.

16   Clearwater Capital Partners ("Clearwater") is another 2020 noteholder which is said to represent another group of 2020 noteholders ("Clearwater Group"). On his first appearance on November 18th, 2015, Mr. Golaszewski, who appears for Clearwater, indicated to the court that the Clearwater Group consisted of a group of 2020 noteholders, said to hold 18% of the value of the 2020 notes, but that number was likely to increase. On November 19th, 2015, the court was informed that the Clearwater Group now consists of a 31.66% interest.

17   Asia Cement Corp. ("ACC") holds 3.6% of the 2020 notes and also holds 20.96% of the company's total issued shares and controls the voting rights attached to a further 4.22% of the total issued shares. In the aggregate, ACC controls the exercise of 25.18% of the voting rights at general meetings of the company.

**The *ex parte* hearing of the summons for appointment of JPLs**

18   The *ex parte* summons was listed for hearing before me on the morning of November 11th, 2015. Although s.104(3) of the Law permits the company to make an *ex parte* application for the appointment of JPLs on certain grounds, the rules of the SEHK required that the company announce the filing of the winding-up petition and the application for the appointment of JPLs. This announcement was made by the company on

the SEHK a matter of hours before the hearing was scheduled to take place.

19   On that morning, leading counsel for the company attended. In addition, counsel for Tianrui, CSI and Taconic attended the hearing, seeking to have the matter heard *inter partes* and for the matter to be adjourned for that purpose. This application was vehemently opposed by counsel for the company, who was insistent that s.104(3) allowed the application to be made *ex parte*, that the matter was urgent, and that the company wished to proceed with the application right away.

20   Having considered the arguments made, I granted a short adjournment until November 18th, 2015, to have a hearing where all interested parties could be heard. The hearing date was announced on the SEHK.

**The summons filed by CSI seeking to strike out the petition and the preliminary point taken as to jurisdiction—the arguments of the majority shareholders**

21   This matter has, understandably, been unfolding rapidly, with numerous affidavits, submissions and authorities being filed over a matter of hours and days. On November 17th, 2015, CSI and Tianrui filed a joint summons seeking to have the petition struck out as being an abuse of the process of the court.

22   I wish to thank counsel for the very high quality of the submissions and preparation. This has been of invaluable assistance to the court throughout the proceedings.

23   In summary, the majority shareholders say that the Law allows only a limited category of persons to apply to wind up a company, the company being one of them. However, whilst a company acts through its directors, directors have no authority to present a winding-up petition absent—

   (a) a resolution of the shareholders of the company resolving that the company present a winding-up petition; or

   (b) an express provision in the articles of association of the company authorizing the directors to present a winding-up petition on behalf of the company (a general provision giving the directors all of the powers of the company being insufficient).

24   In the present case, the directors of the company ("the directors") presented the petition without (a) having obtained any resolution of the shareholders of the company, which would not in any event have been obtained (for reasons that I need not go into for this application); or (b) there being any express provision in the articles of association ("the articles") authorizing such conduct.

25   The argument therefore continued that the directors accordingly have no standing to present, and the court accordingly has no jurisdiction to hear (a) the petition, or (b) the application to appoint the JPLs.

26   Mr. Moverley-Smith, Q.C. for the majority shareholders undertook an admirable tracing of the evolution of the Law in relation to the relevant section, which is s.94(1). Section 94 of the Law reads as follows:

"(1) An application to the Court for the winding up of a company shall be by petition presented either by—

(a)  the company;

(b)  any creditor or creditors (including any contingent or prospective creditor or creditors);

(c)  any contributory or contributories; or

(d)  subject to subsection (4), the Authority pursuant to the regulatory laws.

(2) Where expressly provided for in the articles of association of a company the directors of a company incorporated after the commencement of this Law have the authority to present a winding up petition on its behalf without the sanction of a resolution passed at a general meeting."

27   Reference was made to s.224(1) of the English Companies Act 1948, which, leaving aside sub-s. (d) (which is of no relevance), is in identical terms, merely paragraphed differently.

28   Section 224(1) was the subject of consideration by Brightman, J. in *In re Emmadart Ltd.* (5). The case involved an application by a receiver to wind up a company on the grounds of insolvency. The receiver contended that he possessed all the powers of the directors of the company and that they had the authority to apply for the winding up of the company on the grounds of insolvency on their own motion, without the sanction of a resolution of the company. Brightman, J. concluded ([1979] 1 Ch. at 546–547):

"It would be theoretically possible for the articles of association of a company to be drawn in terms which confer power on the board of directors to present a winding up petition, but an article on the lines of article 80 of Table A is not so drawn. The board of directors can resolve to present a petition in the name of the company but such action by the board must be authorised or ratified by the company in [a] general meeting. Clearly the board can cause a petition to be presented in the name of the company if a special resolution has already been passed resolving that the company be wound up by the court, because that is expressly covered by section 222(a). The board

262

can also properly act on an ordinary resolution of the shareholders conferring the requisite authority on the board provided that this does not contravene any provision in the articles.

. . . The practice which seems to have grown up, under which a board of directors of an insolvent company presents a petition in the name of the company where this seems to the board to be the sensible course, but without reference to the shareholders, is in my opinion wrong and ought no longer to be pursued, unless the articles confer the requisite authority, which article 80 of Table A does not."

29   It was submitted that the principles in *Emmadart* (5) have been applied in the Cayman Islands, notably in the decision of Smellie, J. (as he then was) in *Banco Economico S.A.* v. *Allied Leasing & Fin. Corp.* (2).

30   Reference was also made to the decision of Jones, J. in *In re China Milk Products Group Ltd.* (3). That decision has become the fulcrum of the discussion and submissions in respect of this application to strike out, and rightly so. This is because in that case Jones, J. decided that, upon the true interpretation of s.94(1)(a) of the Companies Law (2010 Revision), the directors of an insolvent company were entitled to present a winding-up petition on behalf of and in the name of the company without reference to the shareholders and irrespective of the terms of the articles of association. It is to be noted that s.94 of the 2010 Revision is identical to s.94 of the Law. Jones, J. further held that s.94(2) only applied to solvent companies.

31   It is the majority shareholders' submission that *In re China Milk* was wrongly decided, in that Jones, J. wrongly construed the meaning and effect of s.94(1)(a).

32   It was asserted that, as s.94(1) has remained unchanged, the issue of agency recognized in *Emmadart* (5) by Brightman, J., *i.e.* that the directors do not have the authority to bring the petition, has not been addressed in s.94(1) at all. Further, reference was made to the fact that, on the face of it, s.94(1) and (2) do not make any distinction between solvent and insolvent companies.

33   Reference was made to the fact that there has been no amendment to the relevant sub-section such as has occurred in England, where s.124(1) of the Insolvency Act 1986 now empowers an additional category of persons, *i.e.* directors, to petition for the winding up of the company.

34   It was also further submitted that, even if Jones, J.'s reasoning was correct, his logic could not apply where a company is balance-sheet solvent but suffering cash-flow difficulties, as is the company.

35   It was the learned Mr. Moverley-Smith, Q.C.'s position that this point as to the lack of authority of the directors to bring the petition needs to be decided *in limine.*

**The arguments in response by the company and by the AHG and ACC**

36   Essentially, Mr. Crawford, on behalf of the company, as would be expected, took the lead in opposing the application to strike out. He submitted that the court should not entertain the submission that *China Milk* (3) was wrongly decided as it was decided by an experienced Judge of the Grand Court with "an unmatched knowledge of this area, including the effect of the 2007 Law." Further, that it has not been doubted in any subsequent case. AHG and ACC supported the submission of the company. Clearwater, on the other hand, which was seeking an adjournment of the summons for appointment of the JPLs, has adopted no position, one way or the other, on the strike-out application.

37   Counsel submitted that the decision of Jones, J. has been acted upon numerous times since the decision was made, is settled law, and that it is an important part of the corporate insolvency rescue operation landscape. However, no cases were cited to me in this regard. It is also not clear to me whether what counsel are saying is that Jones, J. has continued to apply the same interpretation, or that other Grand Court Judges have, after consideration of the relevant issues, also adopted this position.

38   It is in that context that the majority shareholders' counsel referred me to an article, written by the law firm Maples & Calder (who incidentally, are counsel for the company), giving a critique of *China Milk* (3). It is also in that context that I think it permissible to refer to this article briefly, since I have not had any authorities handed to me to show there is settled practice since *China Milk* endorsing the approach of Jones, J. The article, entitled "*Litigation and Insolvency Update,*" was written in the summer of 2011, and does raise some issues in relation to the reasoning in *China Milk.* Interestingly, the article states that until the decision in *China Milk*—

> "it was generally accepted that, while directors could make a recommendation to the shareholders (or the creditors), they could not by themselves cause the company to file a winding up petition unless the company falls within the specific parameters of s.94(2)."

Further, the article concludes that "with all the above in mind, it is not entirely clear whether another Grand Court Judge (or the Court of Appeal) in a future contested proceeding would reach the same conclusion as did Jones, J. in *China Milk.*"

39  Whilst I appreciate that this article is not evidence, at the same time the statements by counsel that *China Milk* is settled law, without the accompaniment of authorities, were not of great probative value either. They can both therefore be put side by side for consideration as to whether any settled practice has been established.

40  It was also submitted that the established practice is that a Judge of the Grand Court should follow a decision of another Judge of the Grand Court unless convinced that the first decision is wrong. Reference was made to principles of judicial comity and certainty and to 11 *Halsbury's Laws of England*, 5th ed., at para. 98, and the cases of *In re Alibaba.com* (1) (2012 (1) CILR 272, at para. 63), *In re Spectrum Plus Ltd.* (14) ([2004] 2 W.L.R. 783, at paras. 8 and 9) and *Lornamead Acquis. Ltd.* v. *Kaupthing Bank HF* (11) ([2013] 1 BCLC 73, at para. 52).

41  It was posited that it would be highly unsatisfactory to have different views at first instance on a point of this sort, which is relied upon by companies seeking relief in the Cayman Islands.

42  In response to questions from me regarding the principles of co-ordinate jurisdiction, judicial comity and their applicability to the decision in *Banco Economico* (2), it was Mr. Crawford's submission that, in the first place, *Banco Economico* was decided when the Law had not yet undergone major reform. His second response was that Smellie, J. had, in the circumstances of that case, indicated that it was by parity of reasoning, as opposed to it being a central issue in the case before him, that he had come to the view that *Emmadart* (5) was applicable in this jurisdiction.

43  It was, further, Mr. Crawford's submission that even if I were to conclude that the reasoning in *China Milk* (3) was wrong, the relevant article in this case (art. 18.1) is broader in terms than the issues covered in *Emmadart*, and than the terms of art. 80 of Table A.

44  A more far-reaching submission was made to me in the further alternative. It was put forward that, even if it were to be found that the reasoning in *China Milk* was wrong, this court should not in any event follow *Emmadart*. Reference was made to numerous factors, such as the fact that *Emmadart* had gone against what had become a practice in England. Further, that, by way of the English Insolvency Act 1986, *Emmadart* was put to rest and the earlier prevailing practice revived. But, in addition, it was pointed out that there are a number of jurisdictions where *Emmadart* has been rejected or not followed.

45  Mr. Crawford argued that *Emmadart* (5) has not been followed in Australia, and he referred me to *Re Inkerman Grazing Pty. Ltd.* (9), *Re Interchase Mgmt. Servs. Pty. Ltd.* (10), and *Re Trans Pacific Corp.* (15).

46   It was asserted that *Emmadart* has been rejected in Malaysia—see *Miharja Dev. Sdn. Bhd.* v. *Heong* (12)—and in Bermuda—see *Re First Virginia Reinsurance Ltd.* (7).

47   Counsel rounded off his submission on this point by saying that, in like fashion, *Emmadart* should not be followed in the Cayman Islands.

**Substitution of a creditor for the company**

48   Mr. Crawford, at the later stages of the submissions being made before me, has submitted that, in the event that the preliminary point succeeds, instead of striking out the petition by the company the court should instead allow for substitution of a creditor who wishes to be so substituted.

49   Mr. Moverley-Smith's submission in response was that substitution was only possible in relation to a creditor's petition, and reference was made to CWR, O.3, r.10.

50   Mr. Crawford then made further submissions that CWR, O.3, r.10 is not limited to creditors' petitions, and he referred to the winding-up order made on July 11th, 2011 and the amended winding-up petition in *In re Xinhua Sports & Entertainment Ltd.* (16), a decision of Jones, J., referred to in *China Milk* (3) (2011 (2) CILR 61, at para. 16). In *In re Xinhua*, the order expressly stated that the substitution for the company of a party that counsel say was a creditor was being made under CWR, O.3, r.10. Counsel asked the court to read CWR, O.3, r.10(1) disjunctively so that any petitioner may be substituted either "where a creditor petitions and is subsequently found not to have been entitled to do so" or "where the petitioner (creditor or not) falls within one of the grounds specified in sub-paragraphs (a) through (e)." Reference was also made to the Australian decision in *Re Fernlake Pty. Ltd.* (6), where it was submitted that an individual who was a contributory, director and creditor was substituted as petitioner in relation to a petition originally presented by an insolvent company.

51   It was submitted by Mr. Crawford that, in the alternative, if the court were to find that no power of substitution exists under CWR, O.3, r.10, then the court retains an inherent power to allow for substitution. Reference was made to a number of cases, including a decision of the Court of Appeal in *Dyxnet Holdings Ltd.* v. *Current Ventures II Ltd.* (4) (2015 (1) CILR 174, at para. 35).

52   I asked counsel why the court should be considering the issue of substitution of a creditor when no creditor had to date indicated any interest in being substituted as petitioner. At this stage, Mr. Manning, on behalf of the AHG, indicated that in the event that the court were to find that the petition ought to be dismissed, he had prepared a draft application

266

in which one of his clients would be seeking, as creditor, to be substituted as petitioner. Mr. Manning also made reference to *Re Fernlake* (6) (13 ACSR at 609).

53    Mr. Moverley-Smith has indicated that until he has seen any such application he would not be in a position to say much more upon this subject. Learned Queen's Counsel did however foreshadow that there are, in his view, certain contractual bars that exist in relation to the AHG seeking to bring a petition for the winding up of the company.

**Discussion and analysis**

54    As previously discussed, the principles enunciated in *Emmadart* (5) have been followed and applied in the Cayman Islands at a particular point in time. In *Banco Economico S.A. (2)*, a decision which was, of course, made long before the Companies (Amendment) Law 2007, which became the Companies Law (2009 Revision), Smellie, J. (as he then was) had before him a case in which a petitioning creditor had obtained the appointment of provisional liquidators over the company. A director of the company, a Mr. Donnelly, sought to discharge that appointment. At that time, by virtue of GCR, O.102, the English Insolvency Rules 1986 applied in the Cayman Islands to applications to wind up companies. An application to discharge the appointment of a provisional liquidator could only be made by persons entitled to apply for the provisional liquidator's appointment. Those persons did not include directors but did include the company. The director claimed he was making the application on behalf of the company. Smellie, J., having been referred to *Emmadart*, concluded (1998 CILR at 108):

"... [E]ven if Mr. Donnelly is in fact the sole director of the company and therefore exercises the full powers of the board, in the absence of any express powers in the articles the result must be the same under the current Cayman Islands law: He may not stand to resist the petition without the sanction of the company in general meeting.

    Having regard to that conclusion, I should specifically note that to the extent that there is disagreement between them, I have accepted as being more persuasive the later decision in *In re Emmadart Ltd.* [[1979] Ch. 540] instead of that in *in re Union Accident Ins. Co. Ltd.* [[1972] 1 W.L.R. 640]. I do so for the obvious reason that *In re Emmadart Ltd.* is more fully researched and reasoned, and also because it had clearly been regarded in the United Kingdom as carrying the day and so necessitating legislation there to reintroduce the earlier prevailing and more convenient but impugned practice evidenced in *In re Union Accident Ins. Co. Ltd.*

Whatever, against that historical background, may be the practical strictures of that construction of the present state of the Cayman law and rules governing *locus standi*, I consider that this court is obliged to apply them in the present state of our legislation. Accordingly, my decision is that Mr. Donnelly has no *locus standi* (whether he be a director or the sole director) to apply to discharge the provisional liquidators, nor *locus standi* to appear to oppose the petition and therefore the ordinary application must be dismissed as presently framed."

55   I now turn to look at *China Milk* (3). In the judgment, Jones, J. discusses (2011 (2) CILR 61, at paras. 7–9) the "directors' standing to present a winding-up petition prior to March 1st, 2009." He specifically acknowledges (*ibid.*, at paras. 8–9) that *Emmadart* (5) has been applied in this jurisdiction, and in that regard discusses *In re Global Opportunity Fund Ltd.* (8) as well as *Banco Economico* (2). He acknowledges (*ibid.*, at para. 9) that Smellie, J. held that the rule in *Emmadart* constituted good law in this jurisdiction. He describes Smellie, J., based on his comments in the judgment, as seeming to have reached that conclusion "somewhat reluctantly."

56   Jones, J. discusses (*ibid.*, at paras. 10–13) the Companies (Amendment) Law 2007, which became the 2009 Revision. He starts with the statement: "The Companies Law, Part V has been the subject of a major policy review lasting over several years." Jones, J. then discusses (*ibid.*, at paras. 14–20) his interpretation of s.94(1)(a) and 94(2).

57   It is difficult to avoid extensive quotation from the judgment in order to discuss the issues at hand. Jones, J. states the following (*ibid.*, at paras. 10–13):

"**Amendment of Part V of the Companies Law**

10   The Companies Law, Part V has been the subject of a major policy review lasting over several years. It was reviewed by a private sector committee sponsored by the Law Society, whose report was, in large part, adopted by the newly created Law Reform Commission. The ultimate result of this review was the enactment of the Companies (Amendment) Law 2007. The provision establishing the Insolvency Rules Committee came into force immediately and the remainder of the Law was brought into force on March 1st, 2009, together with the Companies Winding Up Rules 2008 and the Insolvency Practitioners' Regulations 2008. *The rule in In re Emmadart Ltd. was one of many matters to which consideration was given as part of this policy review.* It was generally agreed that, in principle, the directors of a solvent company should not have the power to present a winding-up petition in the name of the company on the just and equitable ground unless authorized to do so either by

an express provision in the articles of association or by an ordinary resolution passed by the shareholders in a general meeting. *In other words, it was felt that the rule in In re Emmadart Ltd. should be restricted to circumstances in which the directors of a solvent company seek to present a winding-up petition on the just and equitable ground, as was the case in In re Global Opportunity Fund Ltd. However, it was generally accepted that different considerations come into play if a company is insolvent or of doubtful solvency.*

11    In my view, there are sound policy reasons why the board of directors of an insolvent company should be allowed to present a winding-up petition (either on behalf, and in the name, of the company, or in their own right), whether or not they are empowered to do so by the articles of association or an ordinary resolution passed by the shareholders in a general meeting. When a company becomes insolvent, its shareholders cease to have any economic interest and the directors must act in the interests of its creditors. In my view, it is wrong in principle that the directors' ability to commence insolvency proceedings, and seek the protection of the automatic stay imposed by s.97, should be dependent upon the terms of the company's articles of association or the co-operation of shareholders who no longer have any economic interest. For these reasons, it was proposed by the review committee that the rule in *In re Emmadart Ltd.* should be abolished, at least in so far as it is capable of preventing the directors of an insolvent company from presenting a winding-up petition in the name of the company. *As Smellie, C.J. observed in Banco Economico S.A.* v. *Allied Leasing & Fin. Corp., the position in England was subsequently changed by the Insolvency Act 1986, s.124(1), which empowered the directors to present a petition on grounds of insolvency in their own right, which is another way of producing the same result.*

12    *The contrary argument was made by capital market lawyers who pointed out that countless transactions have been conducted through Cayman Islands incorporated companies on the basis that their directors would have no power to present a petition on grounds of insolvency and that the law should not be changed in this regard with retrospective effect.* It is relevant to understand that this argument was made in relation to companies incorporated for the sole purpose of entering into conventional off-balance-sheet bond issue transactions. Invariably, such companies are owned by a charitable trust, the trustee of which is a licensed trust corporation which specializes in this type of work. In such cases, the power to present a winding-up petition is vested in (a) the bondholders as creditors (usually acting through a trustee); and (b) the trustee of the special purpose charitable trust as sole shareholder (which will be a licensed

trust corporation). *In these particular circumstances, there may be sensible commercial reasons for restricting the directors' right to present a winding-up petition (or some other form of insolvency proceeding in a foreign jurisdiction) on their own initiative and it was said that the rating agencies took this factor into account when rating Cayman Islands bond issues.* However, it must be noted that China Milk is not a special purpose bond issuing vehicle of this type.

13    *It was proposed by the review committee that these conflicting arguments should be resolved by amending the law in the following way. First, it would be amended to empower the directors of all the companies then in existence to present a winding-up petition on behalf of, and in the name of, the company on the grounds of insolvency, whether or not authorized to do so by their articles of association. Secondly, new companies incorporated after the amendment Law came into force would have the ability to adopt articles of association which expressly reserve to the shareholders the right to present a winding-up petition (or any other kind of insolvency proceeding in any other jurisdiction) on grounds of insolvency. Companies would have no power to amend their articles in this way. Only newly incorporated companies would be able to adopt articles in this form. A review of the memorandum of objects and reasons contained in the Companies (Amendment) Bill suggests that this recommendation was accepted by Government, but the language of what became s.94(2) does not, by itself, come close to enacting the intention stated in the Bill. However, when read with ss. 91–95, s.104, and the Companies Winding Up Rules, Part II, O.4, I think that the overall intention of what was actually enacted becomes clear.*" [Emphasis supplied.]

58    Jones, J. conducted (*ibid.*, at para. 17) a very helpful and useful analysis of all the changes that were brought into the Law after the review process. He then conducted a contextual analysis of the legislation, comparing what was in the Law previously with what was now there.

59    Jones, J. then sets out (*ibid.*, at paras. 18 and 20) his conclusions as follows:

"18    *Having regard to this overall legislative objective, it is clear that the legislature must have intended to abolish or circumscribe the rule in In re Emmadart Ltd., because it does not distinguish appropriately between solvent and insolvent companies.* As I have already said in para. 11 above, it is wrong in principle that the ability of the directors of an insolvent company to present a winding-up petition on the ground of insolvency should vary according to the language of its articles of association or be dependent upon the co-operation of shareholders whose economic interest has disappeared. *I remind*

*myself of the rule that the court should seek to avoid a construction of [a] statute that produces an unworkable or impracticable result, since this is unlikely to have been intended by the legislature.* The difficulties which have arisen both in this case and in the recent case of *In re Xinhua Sports & Entertainment Ltd.* demonstrate only too clearly how such a result would be unworkable and impracticable. *The court should also seek to avoid a construction that causes unjustifiable inconvenience to persons who are subject to the statute, since this is unlikely to have been intended by the legislature.* Bearing in mind that the directors of an insolvent company . . . owe duties to safeguard the interests of creditors (whereas the shareholders . . . do not), the legislature cannot have intended to inconvenience their ability to seek the protections which flow from the presentation of the winding-up petition. *In my judgment, upon the true interpretation of s.94(1)(a), the directors of an insolvent company . . . are entitled to present a winding-up petition on behalf [of] and in the name of the company/partnership without reference to the share-holders . . . and irrespective of the terms of the articles of association.* The directors of China Milk were empowered to present this petition." [Emphasis supplied.]

**Approach to decisions of co-ordinate courts**

60　In 11 *Halsbury's Laws of England*, 5th ed., at paras. 98 and 99, as quoted in *In re Alibaba.com* (1), the following guidance is provided:

"**98. Decision of co-ordinate courts.** There is no statute or common law rule by which one court is bound to abide by the decision of another court of co-ordinate jurisdiction. Where, however, a judge of first instance after consideration has come to a definite decision on a matter arising out of a complicated and difficult enactment, the opinion has been expressed that a second judge of first instance of co-ordinate jurisdiction should follow that decision; and the modern practice is that a judge of first instance will as a matter of judicial comity usually follow the decision of another judge of first instance unless he is convinced that that judgment was wrong. Where there are conflicting decisions of courts of co-ordinate jurisdiction the later decision is to be preferred if reached after full consideration of earlier decisions.

**99. Decisions followed for a long time.** A long-standing decision of a judge of first instance ought to be followed by another judge of first instance, at least in a case involving the construction of a statute of some complexity, unless he is fully satisfied that the previous decision is wrong. Apart from any question as to the courts being of co-ordinate jurisdiction, a decision which has been followed for a long period of time and has been acted upon by persons in the

formation of contracts or in the disposition of their property, or in the general conduct of affairs, or in legal procedure or in other ways, will generally be followed by courts of higher authority than the court establishing the rule, even though the court before which the matter arises afterwards might not have given the same decision had the question come before it originally."

61   In *In re Spectrum Plus Ltd.* (14) ([2004] 2 W.L.R. 783, at paras. 8–9), the consideration of certainty is raised as follows by Morritt, V.-C.:

"8   In some of them the reason why a judge should follow the decision of a judge of co-ordinate jurisdiction unless convinced it is wrong has been described as 'judicial comity'. I do not doubt that comity is one reason for the rule or convention. In my view there is another, more compelling, reason, namely certainty. Unless the second judge is convinced that the first was wrong his, contrary, decision merely creates uncertainty. If, by contrast, he leaves the issue to the Court of Appeal the decision of that court, whichever way it goes, will (subject to any further appeal to the House of Lords) bind all lower courts as well as the Court of Appeal itself. Thus, in *In re Hotchkiss's Trusts* (1869) L.R. 8 Eq. 643, 647 Sir William James V.-C. said:

'In this case, if the words of the will had been the same as the words in *In re Potter's Trust* (1869) L.R. 8 Eq. 52, I should, without expressing any opinion of my own, simply have followed the decision of Sir R. Malins V.-C. in that case; because I do not think it seemly that two branches of a court of co-ordinate jurisdiction should be found coming to contrary decisions upon similar instruments, and encouraging as it were a race, by inducing persons who wish one construction to go to one court, and those who wish for another construction to go to another. I should simply have affirmed the Vice-Chancellor's decision, with the intimation of my wish that the whole matter should be brought before a Court of Appeal.'

9   Some might think that statement has a rather dated ring to it, given the extremely high cost of litigation and the present emphasis on case management and expedition. But, in my view, on a point of general importance such as the correctness or otherwise of *Siebe Gorman* . . . the approach of Sir William James V.-C. remains valid because of the overriding need, going beyond the interests of the parties, for certainty."

62   It is to be noted, however, that, unlike in the instant case, in *In re Spectrum* numerous subsequent cases were cited to the Vice-Chancellor where the decision of the judge of co-ordinate jurisdiction, Slade, J. in *Siebe Gorman & Co. Ltd.* v. *Barclays Bank Ltd.* (13), had been applied,

accepted without qualification or distinguished (*ibid.*, at para. 17). Significantly, Morritt, V.-C. elected not to follow the decision of Slade, J., despite the fact that the decision was said to have stood for 25 years, with little criticism, and was said to be the basis on which contracts had been entered into and the general conduct of affairs had been ordered (*ibid.*, at paras. 26–27). Indeed, the learned Vice-Chancellor stated (*ibid.*, at para. 27):

> "It is pointed out that the *Siebe Gorman* case has stood for 25 years with little criticism. It is suggested that most bank's [*sic*] standard forms are drafted on the assumption that *Siebe Gorman* was correctly decided and that thousands of liquidations have been conducted on the same assumption. It is emphasised that notwithstanding numerous legislative opportunities the Crown has not sought to reverse its effect until the decision of the Privy Council in *Agnew's* case."

63    Nevertheless, because he felt that the decision in *Siebe Gorman* was wrong, Morritt, V.-C. declined, with the greatest of regret, to follow it (*ibid.*, at paras. 39–41).

**Resolution of the issues**

64    I have, therefore, the uncommon, unwelcome and uninvited task of having to look at another judge's judgment in order to see what I make of its correctness. This in circumstances where I sit as a judge of co-ordinate jurisdiction and not as an appellate judge. I appreciate that, in the interests of judicial comity and certainty, I would be inclined to follow the judgment, unless I am convinced that it is wrong. I am also, on the other hand, cognizant that if I am convinced the decision is wrong, I cannot shy away from not following it.

65    In relation to the issue of certainty, as I indicated earlier in this judgment no specific cases were cited to me or referred to indicating that the decision of Jones, J. has been applied generally in this jurisdiction. In any event, the *Spectrum* (14) decision demonstrates that a judge may, even in the face of longstanding practices and ordering of persons' affairs based upon the decision, if convinced that the decision is wrong, not feel bound to follow the decision of the co-ordinate court.

**The judgment in *China Milk***

66    It is to be noted that although in *China Milk* (3) Jones, J. had heard extensive submissions on the issue of standing, there was really no party before the court, such as the majority shareholders are in the case before me, contending for an opposite conclusion, ventilating numerous additional arguments, and testing the position. In other words, it was not a decision arrived at after an opposed argument or application.

67    It is also of passing note, although Jones, J. made it clear that this did not form part of his *ratio*, and that he would have made the decision he did even if no power were included in art. 162(1) of China Milk's articles in fact empowering the directors to bring a winding-up petition in the name of the company.

68    I appreciate that Jones, J. recognized that there were problems with coming to the conclusions that he did in relation to s.94(1) and (2) if one only had regard to the language of those sub-sections themselves (2011 (2) CILR 61, at para. 13). Hence, he sought, as is perfectly permissible, if I may say so, to analyse the general legislative scheme. Jones, J. reached the conclusion that, under s.94(1)(a), directors of an insolvent company or a company of doubtful insolvency can present a winding-up petition on behalf of the company without reference to the shareholders and irrespective of whether the articles of association permit them so to do.

69    However, the difficulty is that the 2007 amendments did not make any change of substance to s.94(1)(a) or s.94(1). A materially similar section was in place when it was decided in *Banco Economico* (2) that *Emmadart* (5) applied in the Cayman Islands. It is therefore in my judgment hard to see why the common law position, being the rule in *Emmadart*, would not continue to apply to the materially similarly worded section.

70    Looking to s.94(2) really also does not assist, as I agree with Mr. Moverley-Smith's submission that, whatever the intention of the legislature may have been, all s.94(2) did was to provide statutory confirmation that, as was previously held in *Emmadart*, where the articles of association of a company expressly authorize its directors to present a winding-up petition on its behalf, the directors do not also need to obtain the sanction of a resolution passed in general meeting.

71    Jones, J. reached the conclusion that sub-s. (2) only applied to solvent companies. There is nothing on the face of the section that points to such a conclusion. However, even if s.94(2) only applied to solvent companies, that does not explain why it would follow that directors of an insolvent company have standing to petition, given the lack of change in wording of s.94(1)(a). In any event, for the purposes of the instant case s.94(2) would be irrelevant to the company because the company was incorporated in 2006 and it also did not have the requisite article in its articles of association.

72    The fact that other material legislative changes were made cannot, in the circumstances, with all due respect, assist in interpreting what are substantially the same clear and unambiguous words in s.94(1)(a). The other legislative changes made could also not themselves, and did not, thereby make the words of s.94(1) ambiguous or render their previous interpretation unworkable or impracticable. Reference has been made by

Jones, J. to all of the material that the review committee had before it, and which would have been before the legislators, including the English Insolvency Act's way of eliminating *Emmadart*. Jones, J. also recounts (2011 (2) CILR 61, at para. 12) that there were contrary arguments against eliminating *Emmadart*. All of these are pointers in the opposite direction from that which was taken. There is on the face of it, in my judgment, no reason to assume that this was not a deliberate decision on the part of the legislature not to adopt that course. Section 94(2) does not assist either because all it does is confirm the *Emmadart* position.

73    Jones, J. was of the view that he should seek to avoid a construction of s.94(1)(a) that would produce "an unworkable or impracticable result." However, the interpretation of s.94(1)(a) up to the time of his decision had been producing workable results previously, even if there are persons who did not like those results or considered them impracticable by the application of the *Emmadart* rules. It was not unworkable when it was held applicable in *Banco Economico* (2). Even if the rule is or was inconvenient, the point is that it was held to apply in the Cayman Islands. I agree with Mr. Moverley-Smith that *Emmadart* was fundamental to the decision in that case, and not just incidental. Smellie, J. made that quite clear in the passage quoted at para. 54 above.

74    I appreciate that the way in which Jones, J. decided *China Milk* (3) may well have allowed the court to reach the best commercial result in the circumstances of that particular case. However, this preliminary point in the circumstances of this case involves the construction of statutory provisions where there cannot be said to be any ambiguity. Therefore, in all of the circumstances, it is with great hesitation and reluctance that I disagree with the interpretation of s.94 arrived at by Jones, J. It is with regret, and with the greatest of respect, that I find myself convinced that his construction of the statutory provisions was wrong and feel obliged to differ.

75    I now turn to deal with Mr. Crawford's submission that, even if I conclude that the reasoning in *China Milk* is wrong, art. 18 is in wider terms. I assume that counsel is saying that this article therefore permits the directors to present the petition. I have examined the terms of art. 18.1. They are as follows:

"Subject to any exercise by the Board of the powers conferred by Articles 19.1 to 19.3, the management of the business of the Company shall be vested in the Board which, in addition to the powers and authorities by these Articles expressly conferred upon it, may exercise all such powers and do all such acts and things as may be exercised or done or approved by the Company and are not hereby or by the Law expressly directed or required to be exercised or done by the Company in general meeting, but subject nevertheless to the

provisions of the Law and of these Articles and to any regulation from time to time made by the Company in general meeting not being inconsistent with such provisions or these Articles, provided that no regulation so made shall invalidate any prior act of the Board which would have been valid if such regulation had not been made."

76   Whilst the wording in art. 18.1 is not identical to the wording considered in *Emmadart* (5), *i.e.* art. 80 of Table A, I agree with counsel for the majority shareholders that it is clear that no significant distinction can be drawn between the operative provisions of art. 18.1, which describes the powers conferred for the purpose of managing the company's business, and the operative parts of art. 80, to the same effect. The provisions of art. 80 were in *Emmadart* held to be insufficient to authorize the directors in that case to present a winding-up petition. In my view, the provisions of art. 18.1 are equally insufficient in this case.

77   As his most sweeping submission, Mr. Crawford invited this court, if it came to the conclusion that the reasoning in *China Milk* (3) was wrong, in any event not to follow *Emmadart*. In that regard numerous authorities have, as discussed earlier, been cited to me from all over the Commonwealth.

78   Whilst it is clear that *Emmadart* has been a remarkably unpopular decision, in certain ways and in numerous jurisdictions, I am afraid I must decline to enter that arena. This is not because I have any personal view in relation to the correctness of *Emmadart*, and nor would that matter. Indeed, one can think of more compelling causes to inspire a chivalrous defence of the common law. However, I am really quite convinced that, in the Cayman Islands, given all the reforms and express discussions that took place not many years ago when the 2007 amendments came into being, and which, as I have opined, have left the common law position with regard to the ruling in *Emmadart* intact, it would be wrong of me now, as a judge, to take it upon myself to sweep all of that away. This is particularly so given that similarly worded sections of the Law that existed in the earlier Revisions of the Companies Law have been judicially considered by a court of co-ordinate jurisdiction in *Banco Economico* (2). This decision in *Banco Economico* has not been questioned, and could not be questioned as being correct, given the wording of the legislation in this jurisdiction at the time, and as it remains. Indeed, from the background recounted by Jones, J. in *China Milk* there are persons who have ordered their commercial and business affairs and contracts on the basis of the existence of the rule in *Emmadart* being applied in this jurisdiction.

79   I am bolstered in that view because it is clear from the background described in *China Milk* (3) that those reviewing the law, as well as the legislature, were well aware of the English legislation that eliminated *Emmadart* (5) in England. In England, it was plainly felt necessary to

override *Emmadart* by legislation. The legislature was no doubt aware of the treatment of *Emmadart* in other parts of the Commonwealth as well. Based upon Jones, J.'s description of the contrary arguments put forward by capital market lawyers about countless transactions conducted in reliance on the existence of these rules, and, indeed, even the statement that rating agencies took this factor into account when rating the Cayman Islands, plainly the legislature had a number of different and inconsistent views to consider. The important point is that I have to construe the relevant provisions based upon the ordinary principles of statutory construction in relation to the statutory provisions as they do in fact exist.

80   As Michael Fordham, Q.C. eloquently describes the position in his well-known work *Judicial Review Handbook*, 5th ed., at para. 13.1 (2008): "In constitutional terms, just as judicial vigilance is underpinned by the rule of law, so judicial restraint is underpinned by the separation of powers."

81   In all of the circumstances, the preliminary point succeeds. My ruling is that the directors of the company had no authority or standing to present the winding-up petition and nor did they have the power or authority to apply for the appointment of the JPLs.

82   In the circumstances, the majority shareholders are in my judgment entitled to the striking-out order sought, unless I am persuaded that an order substituting a creditor as petitioner can and should be made.

**Substitution of creditor**

83   The company had asked me to consider whether a substitution of a creditor could be made. Having re-read the Companies Winding Up Rules 2008 in their entirety, and specifically O.3, r.10, it does appear to me that the rule really ought not to be read disjunctively, and that substitution is specifically contemplated by the CWR only in relation to creditors and creditors' petitions. However, I am not, as presently advised, able to say that definitively. Nor am I able to say that the court is without inherent power to substitute a creditor for the company in this case. The case of *Re Fernlake* (6) is helpful on the question of substitution on a petition commenced by a company. I would in the circumstances wish to hear further argument on this. However, if any such argument is to be made it would have to be in the context of an existing creditor stepping forward and confirming its present and settled intention to apply to be substituted. The proceedings before me have not yet reached that stage so I intend to enquire of counsel now before proceeding further.

84   In the event, there was no application made for substitution, and thus the petition is struck out.

**Costs**

85    I will hear submissions from the parties as to costs.

*Orders accordingly.*

Attorneys: *Maples & Calder* for the company; *Ogier* and *Harney Westwood & Riegels* for the majority shareholders; *Campbells*, *Walkers* and *Carey Olsen* for the creditors.

———————————————

BETWEEN    RUBY EHRENFRIED COLEMAN
of Auckland, Spinster

**First Appellant**

AND    MICHAEL PIERS COLEMAN of
Auckland, Company Director

**Second Appellant**

AND    ANTHONY CLIVE COLEMAN of
Auckland, Company Manager

**Third Appellant**

AND    ARTHUR DOUGLAS MYERS of
Auckland, Company Director

**First Respondent**

AND    KENNETH BEN MYERS of Auckland
Company Director

**Second Respondent**

AND    PADDINGTON HOLDINGS LIMITED
a duly incorporated company
having its registered office
at Auckland and carrying on
business there and elsewhere
as a Property Dealer

**Third Respondent**

Coram:    Woodhouse J.
Cooke J.
Casey J.

Hearing:    13, 14, 15, 16, 17, 20, 22, 23, 24, 27, 28,
29 June 1977

Counsel:    J.H. Wallace Q.C., R.J. Sutton and R.J. Moody
for Appellants
P.B. Temm Q.C. and D.A.R. Williams for First
and Third Respondents
M.J. O'Brien Q.C. and A.H. Brown for Second
Respondent

Judgment:    11 August 1977

---

JUDGMENT OF COOKE J.

---

There are some preliminary observations which, though
rather trite, I would not leave unsaid.  It is regrettable
that this dispute has arisen within the circle of the
families linked with an old-established, well-known and
still highly flourishing company.  Perhaps all concerned
would now agree on one point at least:  that the very

attempt to change its character from a family company to a one-man company, a vehicle for a single business career, involved risks of dissension not adequately guarded against at the time. Adjudication on the resulting allegations is not a task to be relished, especially in a community of this size, but of course the responsibility must be accepted. A further particularly unhappy aspect is that, like the other members of the Court, I am driven to disagree with the result reached by Mahon J. in a long judgment notable for sustained power of presentation. Naturally one does not differ from it without anxious consideration. Some fortification may be had, however, from being confident that no point of significance is likely to have been left uncovered in the thorough arguments we heard from counsel; and also that, as the first and second respondents gave no evidence in answer to the allegations against them and as the differences between the expert witnesses were in the realm of opinion rather than fact, this is not a case where the trial Judge's decision has been based on comparative credibility.

## Fiduciary Duty

It is mainly under this heading and that of duty of care that I propose to approach the case. As to fiduciary duty Mahon J. examined the development of the relevant law fully, covering the United States position as well as that in various Commonwealth countries. He expressed the view that <u>Percival</u> v. <u>Wright</u> [1902] 1 Ch. 421 was wrongly decided. His conclusions about the law appear from the following two extracts from his judgment:

> In the present case, which is the case of a private
> company with unlisted shares, it seems an untenable
> argument to suggest that the shareholders on an offer

to buy their shares are not perforce constrained to
repose a special confidence in the directors that they
will not be persuaded into a disadvantageous contract
by non-disclosure of material facts.  In my opinion,
therefore, there is inherent in the process of
negotiation for sale a fiduciary duty owing by the
director to disclose to the purchaser any fact, of which
he knows the shareholder to be ignorant, which might
reasonably and objectively control or influence the
judgment of the shareholder in forming his decision in
relation to the offer.  The application of the rule so
assumed to exist must necessarily be confined to
private companies and to such transactions in public
company shares, listed or otherwise, where the identity
of the shareholder is known to the director at the
time of sale.  The liability of the director cannot
be enforced in the absence of proof that he was capable
in the specified transaction of compliance with the
duty of disclosure.  Thus in the case of stock exchange
purchases and sales the regulation of insider trading
must be left to the legislature.

. . . . .

Applying such considerations to the problem in
hand, I reach the unhesitating conclusion that the
decision in Percival v. Wright, directly opposed as it
is to prevailing notions of correct commercial practice,
and being in my view wrongly decided, ought no longer
to be followed in an impeached transaction where a
director dealt with identified shareholders.  I accor-
dingly accede to the submission of Mr Wallace that
on the facts of this case, where the director of a
private company made an offer to shareholders to
purchase their shares, he had a duty to disclose to
such shareholders any material fact of which to his
knowledge they were unaware, and which reasonably
might, from an objective viewpoint, materially affect
the decision of those shareholders as to whether they
would sell or as to the terms of sale.

In Percival v. Wright the plaintiffs themselves
opened negotiations for the sale of their shares, which
were ultimately purchased by the chairman and other directors
at the revised price sought by the plaintiffs.  Later the

plaintiffs discovered that at the time of the negotiations
the board were also being approached by another person,
who had in mind purchasing the entire undertaking at a
price per share considerably above that for which the
plaintiffs were willing to sell. But this proposal came
to nothing, and the Judge was not satisfied on the evidence
that the board ever intended to sell. Nevertheless the
plaintiffs sought to have their sale to the directors set
aside for non-disclosure of the would-be purchaser's
approach. As reported, counsel for the plaintiffs conceded
that there was no unfair dealing or purchase at an under-
value, and also - somewhat surprisingly, I think - that
the defendants would not have been bound to disclose such
things as a large casual profit or the discovery of a
new vein. The argument was that the position was altered
as soon as negotiations for the sale of the undertaking
were on foot. Swinfen Eady J. accepted the concessions
but declined to draw the distinction. He held that the
purchasing directors were under no obligation to disclose
to their vendor shareholders the negotiations which ulti-
mately proved abortive.

Swinfen Eady J. did not say that directors can never
be in a fiduciary position vis-a-vis shareholders with
whom they are dealing. The actual outcome of that case
certainly does not shock the conscience. As has been seen,
major concessions were made in argument. It was a decision
of a single Judge at first instance. Apparently it has
never even been considered in any reported New Zealand
case. It is not cited in either of the main textbooks on
company law published in New Zealand for practitioners,
Anderson & Dalglish and Morrison. It was distinguished in
non-committal language by the Privy Council in <u>Allen</u> v.
<u>Hyatt</u> (1914) 30 T.L.R. 444. Insofar as it might be thought

to lay down a general proposition that no fiduciary duty
is owed by a director dealing with individual shareholders
to disclose particular inside information acquired by him,
that proposition was criticised in England by the Cohen
Committee in 1945 (Cmd. 6659, para.86) and by the Jenkins
Committee in 1962 (Cmnd. 1749, para.89) and in New Zealand
by the Macarthur Committee in 1973 (para.312). While the
result of _Percival_.v. _Wright_ may have been correct on its
facts, the judgment can carry little authority for any
general proposition in this country; and, with respect, I
do not find it of much help in the present case.

On one interpretation the first of the passages I
have quoted from Mahon J.'s judgment might be understood to
propound a general rule applicable to directors of private
companies with unlisted shares and to certain kinds of
transactions in public company shares. But such may not
have been the learned Judge's intention. At all events,
in the present case it is not necessary to go as far as
attempting to lay down any general rule, nor have counsel
for the appellants invited the Court to do so. On the
other hand Mr Williams, who argued this part of the case
for the respondents, acknowledged that even if _Percival_
v. _Wright_ were accepted as undoubted law in New Zealand,
it would merely exclude any _automatic_ fiduciary duty,
leaving open the possibility of such a duty falling on a
director in particular circumstances.

In the particular circumstances of this case it seems
to me obvious that each of the respondent directors did owe
a fiduciary duty to the individual shareholders. To that
extent I fully agree with Mahon J. Broadly, the facts
giving rise to the duty are the family character of this
company; the positions of father and son in the company

and the family; their high degree of inside knowledge;
and the way in which they went about the takeover and the
persuasion of shareholders. In more detail the facts
include the following.

From its early days the company had been very much a
family one. For many years the second respondent had been
its key figure. Inevitably and justifiably the share-
holders must have come to repose confidence in him. The
son was his natural successor. The very fact that he was
his father's son must have been an advantage for him in
dealing with shareholders. Together father and son evolved
proposals, initially for the son acquiring a majority
holding (50 per cent plus one share), later for his
acquiring all the shares. Extensive advice and reports,
such as Dr Lau's advice and the Tse reports, were obtained.
These showed how a 100 per cent takeover by the son could
be expected to be entirely financed by him by resort to
the company's own assets and without his contributing any
capital at all. Features of the scheme were the use of
about $1.8 million available liquid assets and the sale of
free assets of the company - including, I have no doubt,
the Strand-Coburg property, if, as was likely, a suitable
price could be obtained. The Tse reports indicated that
for Strand-Coburg alone a price as high as $4.4 million -
more than twice the figure at which the property was shown
in the company's accounts - could persuasively be sought
from purchasers. Negotiations with the National Mutual
Insurance company revealed that a valuer engaged by that
company, who in reporting to a prospective buyer might be
expected to be conservative, had arrived at a figure of
$2.85 million. Both father and son must have known more
certainly than anyone else the facts about the availability
of $1.8 million in liquid assets; they were both directors

of the wine and spirit company and must have been familiar
with the policies and likely requirements and prospects
of that company. A price of $4.80 for C. & E. shares
was being used as a basis of calculation. At that price a
total of approximately $5.65 million was required to buy
out all shareholders. Especially if a sale of Strand-
Coburg could be made at a price somewhere between the figure
in the Tse report and the National Mutual valuation, there
was every likelihood that the son would achieve at no or
negligible cost to himself sole ownership of a company
having in effect a most valuable partnership with the
country's largest brewery company in the wholesale wine
and spirit side of the latter's activities. The book value
of the continuing interests of C. & E. which he thus stood
to acquire unencumbered was of the order of $5 million.
The true value need not now be considered. On any view it
ran into millions. So there were prospects of brilliant
gain.

In that setting the two directors made approaches
to various shareholders - some written, some oral -
representing the merits of selling to the son at the price
of $4.80 and expressly or impliedly urging the shareholders
to do so. For example, the son wrote to his aunts, Mrs
Ross-Lowe and Mrs Barbara Myers, in March 1972; to Mr
Vincent of the Guardian Trust company on 9 May 1972; and
to Mrs Bickerton-Fisher on 12 and 24 May 1972. He had
correspondence and discussions with Mr Geoffrey Myers. He
had meetings with the Coleman brothers and with Mr Athol
Wells, the chairman of the Logan Campbell trustees. The
father, as well as writing to his sister, took part in
the meeting with Mr Wells. Indeed he was himself one of
the Logan Campbell trustees. He had his own meetings with
Mr Anthony Coleman (whom he invited to his office) and

Mr Michael Coleman. It must have been obvious that the Colemans were not anxious to sell and that they and all the other shareholders approached were looking to these directors for reliable information and advice. And in their letters and the personal interviews the first and second respondents stressed as reasons why the shareholders should accept the offer matters, such as the prospects of C. & E. and the wine and spirit company, which in effect they held themselves out as especially able to assess because of their knowledge as directors. It is impossible, I think, to read the letters by which they approached shareholders without seeing that they were holding themselves out as people in whom confidence should be reposed because of their inside knowledge.

Further, by use of the powers of majority shareholders they removed the only other director, Mr Geoffrey Myers, from the C. & E. board before the formal takeover offer was made. They alone were the directors at the time when Mr Wilkinson was instructed to prepare the report circulated to shareholders with the takeover papers; so they were in a position to control the information given to him. In the statutory statement by directors sent out to the shareholders they elected to recommend acceptance of the takeover offer. In argument in this Court it was rightly admitted that their recommendation was a material factor in their attempt to consummate the takeover. Undoubtedly they were anxious that the shareholders should accept, not only because of the position which the son would thereby achieve but also because money was needed to meet the commitment of the father's trust to pay for the shares already acquired from the trusts for his sisters. They were not content to leave the shareholders to make up their own minds - although, as the experienced evidence of Mr Ross

underlines, when directors have a conflict of interest that course is well open to them.

In short, at all material times the respondent directors had, and emphasised that they had, inside knowledge of all the company's affairs; while the son certainly and the father probably had intimate knowledge of the detailed plan of acquisition and all its advantages and implications. In the light of the history and character of the company and their offices as chairman and managing director and representatives on the wine and spirit company board, they were in a position where confidence had to be placed in them. And in the negotiations and recommendation they invited that confidence. Any suggestion that in the matter of selling shares to the son shareholders were able to negotiate effectively at arm's length would be unreal.

In principle the case falls, in my opinion, within the broad class of fiduciary relationships arising from special facts, a class explained and illustrated by the judgment of Lord Chelmsford L.C. affirming Sir William Page Wood V.-C. in <u>Tate</u> v. <u>Williamson</u> (1866) L.R. 2 Ch.App. 55; L.R. 1 Eq. 528; and the judgments of the Court of Appeal in England in <u>Tufton</u> v. <u>Sperni</u> [1952] 2 T.L.R. 516 - a case referred to with approval by the Judicial Committee in the <u>Netherlands Society</u> case, to be cited shortly - and <u>Lloyds Bank</u> v. <u>Bundy</u> [1975] Q.B. 326. Certainly the facts here are not closely comparable with the facts of any of those cases, but the judgments are replete with warnings about not circumscribing the juris- diction and avoiding the temptation to catalogue. Not infrequently such cases are said to come under the law of undue influence, and that description is warranted by the judgments, but perhaps it can be something of a trap. In

_Tufton_ v. _Sperni_ a Judge of the Chancery Division had rejected the claim on the ground that undue influence, as the phrase is more commonly understood, had not been established: the purchaser's mind had not been dominated by the vendor (see pp.519-20). In _Lloyds Bank_ v. _Bundy_ a County Court Judge had done much the same (see p.342). But in each case the Court of Appeal pointed out that where a fiduciary relationship exists, that is not the true test. As Evershed M.R. said in _Tufton_ at p.524, 'Blind and unquestioning trust is not required ...' At p.520 he spoke of such cases as coming within 'the broad jurisdiction of the Court of Equity to relieve a party from a bargain made with another where, on a consideration of the facts of a case, it is shown that that other stood in such a relation to the first party that he owed him a duty of care and candour, and was bound to make to him full disclosure of all material facts'. Jenkins L.J. said at pp.531-2 that by joining a certain committee the defendant 'must be taken to have held himself out as interested in, and ready to aid with his advice, the attainment of that committee's object' and 'it must be assumed that such advice would, by reason of their special relationship, carry more weight with, and be more likely of acceptance by, the plaintiff than the advice of a stranger, and for the purposes of the principle here in question, I think this provides a sufficient degree of potential influence'. In reviewing various categories of cases in _Bundy_ Lord Denning M.R. has spoken of 'a single thread ... of inequality of bargaining power'. That was clearly the situation here; but as Dr L.S. Sealy says in his note in 34 C.L.J. 21, 'These observations are to be welcomed, but with caution'. For it is quite clear, as indeed the Master of the Rolls himself indicates, that such inequality is not alone enough to bring a fiduciary relationship into existence. In the same case Sir Eric

Sachs, with whose conclusion Cairns L.J. concurred, said
that the relationship tends to arise where someone relies
on the guidance or advice of another, where the other is
aware of that reliance, and where the person upon whom
reliance is placed obtains, or may well obtain, a benefit
from the transaction or has some other interest in it being
concluded. In addition, he said, there must be shown to
exist a vital element to which he referred to as 'confiden-
tiality'. I think that these conditions are satisfied here;
and that it is also clear, both from those judgments and
in principle, that a fiduciary does not lose that character
merely because the persons to whom his duty is owed, or
some of them, begin to have doubts or suspicions. Among the
shareholders here the Colemans and Mr Geoffrey Myers
evidently came to entertain some misgivings about the
intentions of the first respondent. I cannot think that a
Court of Equity could allow this to abrogate his duty of
care and candour.

As to the content of the fiduciary obligation, in
delivering the judgment of the Judicial Committee in New
Zealand Netherlands Society v. Kuys [1973] 2 N.Z.L.R. 163,
166 Lord Wilberforce said:

> Their Lordships are in agreement with these
> contentions in so far as they stress the necessity to
> give consideration to the nature of the relationship
> between Kuys and the society and to the question whether
> that relationship imposed upon him, in relation to the
> particular transaction under investigation, duties
> of a fiduciary character. The obligation not to profit
> from a position of trust, or, as it is sometimes
> relevant to put it, not to allow a conflict to arise
> between duty and interest, is one of strictness.
> The strength, and indeed the severity, of the rule
> has recently been emphasised by the House of Lords
> (Boardman v. Phipps [1967] 2 A.C. 46). It retains

its vigour in all jurisdictions where the principles
of equity are applied. Naturally it has different
applications in different contexts. It applies, in
principle, whether the case is one of a trust, express
or implied, of partnership, of directorship of a
limited company, of principal and agent, or master and
servant, but the precise scope of it must be moulded
according to the nature of the relationship. As Lord
Upjohn said in Boardman v. Phipps:

> "Rules of equity have to be applied to such a
> great diversity of circumstances that they can be
> stated only in the most general terms and applied
> with particular attention to the exact circum-
> stances of each case".

Other similar statements were cited in argument. As the
broad principle has been stated by our highest authority
so recently, there is no point in multiplying citations.
With regard to the moulding of the precise scope of the
obligation here, it must be important to remember that
directors are free to profit from their position, in the
sense that there is no reason why they should not make a
profit from dealings with shareholders. The obligation
has to be worked out in terms of representations and
disclosures.

Particularised in those respects, in the setting seen
here there must be an obligation not to make to shareholders
statements on matters material to the proposed dealing
which are either deliberately or carelessly misleading. And
in my opinion there must at least be an obligation to dis-
close material matters as to which the director knows or
has reason to believe that the shareholder whom he is trying
to persuade to sell is or may be inadequately informed.
As to what matters are material, there was some debate in
argument before us. In his judgment Mahon J. uses
sometimes the expression might influence the shareholder,
sometimes would. Mr Williams preferred would. I think it

is often easier to assess whether a statement or omission
is in the circumstances truly significant than to propound
a watertight test. If forced to a formula, I would select
one somewhere between the alternatives just mentioned. The
leading New Zealand case on the valuation of company shares
is <u>Hatrick</u> v. <u>Commissioner of Inland Revenue</u> [1963] N.Z.L.R.
641, where the shares had to be valued for stamp and estate
duty purposes. Delivering the joint judgment of himself
and Turner J., McCarthy J. said:

> We have derived considerable advantage from
> reading the judgment prepared by North J. and just
> delivered. We agree that the test which the Commis-
> sioner was required to apply is established beyond
> argument by the decided cases. The test has been
> variously phrased, but in essence it calls for an
> enquiry as to the value at which a willing but not
> anxious vendor would sell and a willing but not anxious
> purchaser would buy. This, it must be emphasised,
> is essentially a practical question, not to be overlaid
> by philosophical or legal niceties. The Commissioner
> is bound to take into account all those matters which
> would, in fact, influence a potential purchaser. This
> does not mean that he must make allowances for mere
> possibilities. In approaching a practical question in
> a practical way, he is obliged to give attention only
> to those considerations which can reasonably be said,
> in the particular case, to be likely materially to
> effect the mind of a vendor or of a purchaser. Of
> course, if the shares are quoted on the Stock Exchange
> no great difficulty arises; but if the shares are not
> quoted, and especially in the case of family companies,
> the application of the test mentioned is not a simple
> matter. There are various methods or lines of approach
> to this test which have been accepted over the years,
> and in some cases approved by the Courts; for example,
> the assets-value method, the dividend-yield method.
> But the method of approach must not be elevated to
> become the test itself: it is only an aid to ascertain
> the market value. Each method of approach, and whether
> more than one should be employed, depends in each case
> on the circumstances which will include the type of
> business which the company conducts, its record of

earnings and dividends, its likelihood of future
profits, the classes of potential buyers of the
paticular shares, the extent of those classes, the
nature of the asset of the company, and whether those
assets are readily convertible to cash. If it is
objected that all this places serious practical
difficulties in the way of the Commissioner in the
administration of his duties, the answer is that they
are unavoidable, if the market price is to be found;
and it is excusable to observe that it is generally
thought that taxation on that basis is the fairest.
However, in point of fact, the Commissioner's task
in the great majority of cases is not as difficult
as might at first sight appear. In a large number of
valuations one method of approach soon becomes apparent
as being the most suitable as the primary method.
Other methods then become of value merely as checks
against the figure obtained through the primary method.

As a broad test of materiality, then, one may speak of
'those considerations which can reasonably be said, in the
particular case, to be likely materially to affect the mind
of a vendor or of a purchaser'. The same idea is expressed
more fully by Marshall J. in delivering the opinion of the
United States Supreme Court in TSC Industries Inc. v.
Northway Inc. (1976) 426 U.S. 438, 449, a case under the
Securities Exchange Act and concerning proxy solicitation:

The general standard of materiality that we think
best comports with the policies of Rule 14a-9 is as
follows: An omitted fact is material if there is a
substantial likelihood that a reasonable shareholder
would consider it important in deciding how to vote.
This standard is fully consistent with Mills' general
description of materiality as a requirement that
"the defect have a significant propensity to affect
the voting process." It does not require proof of a
substantial likelihood that disclosure of the omitted
fact would have caused the reasonable investor to
change his vote. What the standard does contemplate
is a showing of a substantial likelihood that, under
all the circumstances, the omitted fact would have
assumed actual significance in the deliberations of

the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

Mr Williams, to whom we are indebted for that reference, in the end accepted the principle stated in that passage as applicable here in its entirety. Mr Wallace likewise accepted it. I am well content to do the same.

## Factors Material on Takeover Offers

Probably what I have said about the content of the fiduciary duty would in principle reflect Mahon J.'s views also. But, as to the application of principle to the facts of this case, it is now necessary to deal with one of the recurring themes in the learned Judge's reasoning. This is an emphasis on the limited nature of the rights of a minority shareholder in an incorporated company - in particular his inability to control management policy or (in ordinary circumstances) to insist on a distribution of assets. The expert witnesses for the plaintiffs, the leading chartered accountants Mr L.N. Ross and Mr D.L. Hazard, had stressed in their evidence regarding the value of the company's shares the fact that what was under consideration was a takeover offer; and that, if it succeeded, the purchaser would be able to realise assets at substantially in excess of book values, so reaping capital profits. For example, Mr Ross described this prospect, as 'not only a major factor but it would be a critical factor in any valuation'. The Judge thought that the conclusions of Mr Ross and Mr Hazard were founded on 'two major misconceptions', one of which he described as follows:

The evidence of Mr Ross and Mr Hazard is said by them
to refer to a take-over bidder. But the facts of the
case were that a take-over bid was being made, and
was being directed to a group of shareholders who,
with the exception of the K.B. Myers Trust, each held
a minority interest. The question for determination
is not what a purchaser would have paid, and the
sellers accepted, for a united controlling block of
shares in the company, but what the agreed market
price would have been between the bidder for the
shares and each of the minority shareholders to whom
he was making a separate offer.

With respect, that passage is clearly right up to a point;
but nowhere does the judgment seem to meet the further
point that the prospect of large capital profits for the
bidder is a factor which all the existing shareholders in
the company, whether minority shareholders or not, and
directors making recommendations in the interests of the
shareholders, are likely, if they know of it, to take into
account in deciding on whether the best response to the
offer is to accept or to decline or to bargain. It is true
that the prospect cannot be realised by the minority share-
holders themselves, except perhaps by collective action.
But there is no reason why they should consider only their
own position. Each minority shareholder is free and, if
adequately informed, likely to have some regard also to
what the offeror stands to make.

As Viscount Simonds said about shares in Scottish
Co-operative Wholesale Society Ltd v. Meyer [1959] A.C.
324, 343, 'Necessarily a price cannot be scientifically
assessed'. In similar vein Sir Raymond Evershed M.R.,
in Dean v. Prince [1954] Ch. 409, 419, spoke of the intention
of a company article as being that an auditor should arrive
at a view of what the shares in question were really worth
having regard to all relevant circumstances, and added

' ... I do not think there is applicable any rule of thumb or accountancy principle which fixes or limits the possible bases of calculation to be adopted'. (Break-up value was in fact upheld in that particular case, but the circumstances were not comparable.) Here I cannot help thinking that the learned Judge has gone too far in the direction of treating the case as governed by some principle of law or valuation concerning minority shareholdings. It is true that, in the words of Lord Salmon in <u>Arenson</u> v. <u>Casson</u> [1975] 3 All E.R. 901, 921, ' ... there is normally a substantial difference between the value per share of small minority holding and the value per share of the entire holding in a private company'; but it would be fallacious, in my view, to deduce from that normal truth some limitation of the extent to which minority shareholders would or should take into account asset backing when considering a takeover offer made to them.

As McCarthy J. indicated in <u>Hatrick</u>, if shares are quoted and regularly traded on the stock exchange, assessment will usually be relatively easy; though, even so, it is common knowledge that rumours of a takeover offer may increase their value. Near the opposite extreme of difficulty of assessment must be a case where a takeover offer is being made for the shares of a private and unlisted company with very valuable assets not committed to its trading activities. In such a case the value of the shares to the buyer may make it worth his while to pay a substantial premium above the value that the shares could have if the company were to be carried on as a going concern with no significant restructuring. Thus in the chapter on Takeovers in his book on The Valuation of Unquoted Shares in New Zealand, published in 1965, Mr G.S. Crimp says at p. 44:

### Basic Grounds in Fixing Offers

The buyers are not philanthropic institutions, in spite of offers that appear high. Opportunity occurs when the market price of a company's shares is smaller than the bidder thinks he can make them worth, because assets are not producing what they should and dividends are ultra conservative, where there is opportunity to sell real estate, lease back, and have funds for expansion, and opportunity to improve profits from a merger with the bidder's own organisation to give improved management, economies in buying, etc.

The obvious bait is often a high market premium on the shares offered. The purchaser must consider the effect on his own profits and dividend, what present yield is obtained on the price paid, and what increase is anticipated from a merger by way of better management, elimination of competition and other advantages.

### What is Value?

This is mainly a case of bargaining by a special buyer, keeping in mind what he hopes to gain in the short or long term.

We have seen many examples of competitive bidding lifting a price much above the original offer. When Imperial Chemical Industries made a second offer for Courtaulds, it lifted its offer by £10,800,000.

To obtain complete control, bidders ask for 90% acceptance of their offer. If they get this they have power under the Companies Act to acquire compulsorily the balance of the shares, thus eliminating outside shareholders. To obtain this response to an offer it is obvious that it must be quite an attractive one.

Similarly in the English textbook, Weinberg on Takeovers and Mergers, 3rd ed. (1971), the following analysis is made in paragraphs 2024-5:

### Valuation in a take-over

A take-over, like any other contract of purchase and sale, involves the striking of a bargain between

the buyer (H.Co.) and the seller (the shareholders of
S.Co.) in regard to the price. Within a range between
the maximum price which H.Co. is prepared to pay and
the minimum price which a sufficient number of S.Co.
shareholders are prepared to accept, the price actually
paid will depend on such factors as:

(a) the eagerness of H.Co. to buy;

(b) the eagerness of the shareholders of S.Co. to sell
    and, in the case of a share-for-share offer, the
    willingness of the S.Co. shareholders to become
    shareholders of H.Co.;

(c) the skill, judgment and timing of H.Co.'s campaign,
    including the persuasiveness with which H.Co.'s
    case is expressed in the offer documents and other
    circulars to shareholders, the success of H.Co.'s
    purchases of S.Co.'s shares in the open market in
    support of the bid and the degree of enthusiasm
    of the S.Co. directors in recommending acceptance
    of the bid;

(d) if the S.Co. directors resist the bid, the skill,
    judgment and timing of their defensive campaign
    and the degree of support they receive from their
    merchant bankers, associates and other financial
    institutions;

(e) whether the directors of S.Co. hold a large block
    of effectively controlling shares or the shares
    are widely dispersed;

(f) fortuitous factors, such as the behaviour during
    the offer period of the Stock Market in general,
    economic developments, and sometimes even political
    events which affect investment sentiment.

The maximum price H.Co. is prepared to pay where
S.Co. is being acquired with a view to selling off its
assets (see paras. 307 et seq. on "assets at a discount")
creates no greater problem than estimating the prices
that those assets will realise. In the more usual case
of an acquisition with a view to the continuation of
the business (see paras. 324 et seq. on "earnings at
a discount") the maximum price should be determined
with reference to the expected earnings, and should
in theory ideally be determined by the application of
discounted cash flow analysis...

With reference to the last two sentences, it is to be noted that the present case is one of mixed purposes, the intention of the offeror being to sell certain major assets but to retain the lucrative wine and spirit trading interest. A footnote on p.306 of Weinberg quotes results of a survey reported in G.D. Newbould's Management and Merger Activity (1970): the premiums of the final prices paid over the quoted prices of shares four weeks before the announcement of the proposed bids are said to have averaged 77 per cent for bids defended by the directors and 73.9 per cent for bids contested by a rival bidder, compared with 33.4 per cent for agreed or unopposed bids. The footnote adds: 'It is fair to point out that this may mean simply that directors oppose when the price is too low, which is exactly what they should do!' The particular figures arrived at by the English survey are of no real relevance to the present case. The point of these citations is simply to bring out that, in the case of a takeover in circumstances such as we are concerned with, there are a wide range of considerations which can reasonably be said to be likely materially to affect the mind of a vendor or a purchaser. Among these, I think, Mr Ross and Mr Hazard were on sound ground in stressing the attraction of the free assets to the offeror.

No excursion into economic theory is called for. I merely mention that it is possible to apply a similar approach to other cases where vendors each have minority interests in an asset of restricted potential in their several hands but of great value to a single purchaser. It is worthy of mention also that in a case relating to arbitration in an admittedly different field - the valuation for rental purposes of land in the centre of Wellington city - Turner J. went as far as to say that as a matter of common sense he agreed with the learned umpire, Sir Douglas Hutchison, that 'it is matters that affect the lessee and

the lessee alone that are important in arriving at what he is prepared to pay': Wellington City v. National Bank Properties Ltd [1970] N.Z.L.R. 660, 678. Of course I am not suggesting that in the present case the only material matters were those affecting the offeror: merely that the potential of the company in the offeror's hands was one very material matter for the purpose of any properly informed consideration of the offer.

In summarising the evidence of the expert witnesses called for the defendants, which he plainly preferred, the learned Judge stated that they all said that the purchaser of shares in a company, other than the purchaser of a controlling interest, pays no regard to asset backing except as an element in the stability and profitability of a company. This proposition does indeed appear to be the effect of their evidence. In a very general sense it is no doubt true. What it does not explicitly state is that the purchaser of a controlling interest may pay, or be induced to pay, considerable regard to asset backing as a source of capital profits, notwithstanding that he may be trying to purchase that interest by assembling a number of minority interests; and in their bargaining members of the minority may well place reliance on this. The point was touched on in cross-examination of Mr Ross by counsel for the second respondent:

> In reality, there is no such thing as a "takeover value"? I'd agree with that. It is a matter of what the vendor can get, what the buyer is willing to pay, what extraneous matters influence a vendor in wanting to get out and what extraneous matters influence a purchaser in wanting to get in and many other things? I'd agree.

It is of interest to see that Quilliam J. accepted the special importance of asset backing in takeover valuations and negotiations in <u>Scott Group Ltd</u> v. <u>McFarlane</u> [1975] 1 N.Z.L.R. 582, a case concerning whether the auditors of a public company owe a duty of care to a company making a takeover offer in reliance on the audited accounts. The case is currently under appeal to this Court, but the accuracy of the following passage in the judgment at pp.590-1 has not been questioned insofar as it draws a distinction between normal sharemarket trading and a takeover bid:

> The decision I have reached makes it unnecessary for me to consider the question of whether or not there has been any proof of loss induced by the defendants' negligence. But in case that decision is wrong, I think I should indicate briefly my view on this aspect. It was the plaintiff's case that the error in the balance sheet amounting, as it did, to an overstatement of $38,000 in the shareholders' funds, produces a loss to them of that sum. It was acknowledged for the defendants that the effect of the error was that the plaintiff, in acquiring all the shares in John Duthie Holdings Ltd, received a total asset value which was $38,000 less than had been expected. The question of loss is not, however, so simply determined. It was argued for the defendants that if the true position had been known the result of the takeover negotiations would have been no different than in fact they were. This was because of the evidence of Mr Duthie's comment that his company would not, in any event, have entertained any lower offer than that to which it agreed. I do not think this can be correct. The calculations which lead to offer and acceptance in a takeover bid such as the present one are based on careful evaluation of the amounts involved. This is apparent from the series of alternative calculations made by Mr Paul, each of which differed only very slightly from the others. The defendants' expert witness, Mr McCaw, agreed that while he did not think the error would have made any difference to the market value of the shares for the purposes of normal sharemarket trading, he

would have expected that it would have been a factor taken into account by both the plaintiff and John Duthie Holdings Ltd in considering the amount of a takeover transaction.

In _Short_ v. _Treasury Commissioners_ [1948] A.C. 534, cited by Mahon J. in the present case, a Minister had first appointed a controller of the undertaking of a company and then, a few days later, had made an order transferring all the shares in the company to his nominees. The relevant regulation provided that the price in respect of 'any shares transferred' should be a price which, in the opinion of the Treasury, was not less than the value of those shares between a willing buyer and a willing seller <u>on the date of the order appointing the controller</u>. The House of Lords held that 'any shares' referred to those embraced in an individual parcel and it was those shares, not the shares of the company as a whole, the value of which was to be ascertained as between a willing buyer and a willing seller. I read this as a decision on the interpretation of a particular regulation, as indeed their Lordships emphasised: see, for instance, Lord Porter's speech at p.544. Moreover, as Lord Porter also said at p.543, ' ... it is difficult to see why the shares if bought in individual blocks should have any increased value attributed to them because the whole were transferred at a subsequent date'. That their Lordships were not laying down general principles is suggested by the fact that they did not differ from the general statements by the Privy Council in _Vyricharla_ v. _Revenue Officer, Vizagapatam_ [1939] A.C. 302, which include recognition that the value of a potentiality may have to be taken into account even if the vendor is himself unable to exploit it and even if there is only one potential purchaser who could do so. Mr Wallace placed some reliance on the Privy Council case in his argument in

this Court, but it is remote from the present case on the facts. What is more important, I think, is that <u>Short's</u> case was not concerned with the factors material in arriving at a share price under a takeover offer. This kind of question has assumed much greater prominence with the surge in takeover activity in more recent years, as witness the publication of the first edition of Mr Weinberg's book in 1961. It is not surprising that the House of Lords did not mention takeover offers as such in speeches delivered in 1948. Still less of course was the House concerned with the duties of directors when such offers are received.

Finally under the present heading mention may be made of the City of London Code on Takeovers and Mergers. Admittedly it is intended as a supplement to the law and to be in the nature of a code of business ethics. Moreover the administering Panel claims no jurisdiction over transactions in the shares of private companies. And the Code has not been officially adopted in any way in New Zealand. Despite these qualifications, when one is considering the obligations which equity imposes on a director <u>in a fiduciary position in particular circumstances</u>, I think the Code has some value as suggesting a standard of business morality. Rule 15 therein reads:

> 15. Shareholders must be put in possession of all the facts necessary for the formation of an informed judgement as to the merits or demerits of an offer. Such facts must be accurately and fairly presented and be available to the shareholder early enough to enable him to make a decision in good time. The obligation of the offeror in these respects towards the shareholders of the offeree company is no less than its obligation towards its own shareholders. In particular, whether or not the consideration in an offer is cash, information should be given about the offeror (including the names of its Directors) and its intentions in regard to the future of the offeree.

The statement about intentions in regard to the future of
the offeree seems especially pertinent when a fiduciary
is both the sole owner of the offeror company and the
current managing director of the offeree company, as he is
in a unique position to know all the important facts and
plans.

When that paragraph in the Code was put to Dr Lau in
cross-examination, he maintained that it does not refer to
the obligation of the offeror towards the shareholders of
the offeree company but 'means to give the public, its own
shareholders, what it purports to do with the offeree.
I can't see one reason why, in a cash offer, information
should be given what is happening to the offeree company'.
But quite clearly, it seems to me, the paragraph is not
limited in that way.  Its wording and its context in the
Code show that the emphasis is on information for share-
holders of the offeree.


## Duty of Care

Although the first and second respondents by their
counsel denied that they were under any fiduciary duty,
it was conceded by Mr O'Brien, who argued the part of the
case concerning negligence on behalf of them both, that
because they had chosen to make a recommendation in terms
of the Companies Amendment Act 1963, there was a duty of
care in respect of the formulation of that recommendation.
Referring to Mr Wilkinson's report, he went on to submit
that the taking of independent advice was as much as was
required of them to fulfil that duty:  which submission
may be more conveniently considered when dealing with the
question of breach of duty.  Here it is enough to say that
I entirely accept as rightly made counsel's concession
that a duty of care in formulating the recommendation did

exist. Earlier in his argument Mr O'Brien said that their
duty in respect of the statement required by the Act was
to exercise care to see that the factual information
required to be given was correct; and that, if they elected
to give an opinion, they had to act honestly and reasonably
and take into account the interests of all shareholders.
The duty of honesty is axiomatic. The duty of reasonable
care, when they chose to make a positive recommendation,
seems to me scarcely less so. The New Zealand Parliament
has laid down a statutory procedure for takeovers, applying
to this case, and as part of it has given the directors
of an offeree company certain options, one of which is to
make a positive recommendation likely to have a strong
influence on their shareholders. If they take that course,
it is hardly conceivable that the Legislature would have
intended them to be legally free to do so carelessly. I
would base the duty of care on the need to give efficacy
to the assumption of Parliament in enacting the statute.
Alternatively, however, the case may be brought within the
ambit tentatively contemplated by the majority of their
Lordships in <u>Mutual Life and Citizens' Assurance Co. Ltd</u>
v. <u>Evatt</u> [1971] A.C. 793, 809, in that the directors had
financial interests in the transaction upon which they
gave advice. As the duty is conceded, further discussion
of the authorities about when a duty of care arises in
the making of a recommendation is not called for.

What was not conceded by Mr O'Brien, at any rate
expressly, but seems to me a commonsense consequence
nevertheless, is that a reasonably careful director in such
circumstances would have regard to much the same range of
considerations as have already been traversed. In particular,
he would take into account those factors which he realises
or ought to realise would be likely to have a material
influence on shareholders in their attitude to the offer.

For this reason I think that in the end in this case little
turns, except perhaps as to remedy, on whether one approaches
the duty as fiduciary or simply as a duty to take reasonable
care in making a recommendation. This becomes more apparent
when considering breach of duty.

## Breach of Fiduciary Duty

The gist of the complaint made by the appellants
against the first respondent is that he planned to acquire
total control of the company at virtually no cost to himself
by means of selling the Strand-Coburg and other properties
of the company and making use of its liquid capital reserves;
that his inside knowledge of the company's affairs and the
advice he obtained showed him that there were good prospects
of accomplishing this, leaving him sole owner of an
unencumbered asset worth some millions; and that he not
only refrained from disclosing to the shareholders generally
his plan and the magnitude of his potential gain, but also
made misrepresentations tending to conceal the plan.
During the hearing of the appeal counsel naturally took
us fully through the relevant parts of the evidence and
the judgment under appeal, and I inclined to the view that
regrettably the complaint was in substance made out.
Further consideration has led me definitely to that conclusion.
The evidence leading to it has been extensively reviewed
by Woodhouse J., but because of the nature of the case I
will deal with the main points in my own words.

The plan. As for the first respondent's plan, it was
not disputed in argument on his behalf, as I understand it,
that in a general sense he intended to finance his acquisi-
tion of the total shareholding exclusively by resort to
the free assets of the company, including the monies on
deposit amounting to about $1.8 million. There is no

documentary evidence, nor - save for a fleeting reference
in cross-examination to his directorship of another company
which made a takeover offer - any other evidence of the
extent of his own assets, apart from such beneficial
interests as he already had in C. & E. shares. (The
statutory statement by directors in respect of the takeover
offer showed that he held 22,013 shares in C. & E. through
a nominee, and jointly with his parents held 378,927 shares;
Dr Lau in his evidence calculated that he owned 82,490
shares and said that the total of his own shares, together
with his beneficial interest in two trusts, added up to
about 200,000 shares.) The late Dr Lau in his various
letters and his evidence nowhere envisaged his client's
financing the purchase otherwise than by some use of C. &
E. assets. None of the other documents put in evidence,
to which the plaintiffs obtained access by discovery, so
much as hint that he ever contemplated providing capital
himself or injecting assets into the company. The only
real point of dispute in this regard is whether he planned
to sell the company's most valuable free asset, Strand-
Coburg. At one stage of his judgment the learned Judge
states, apparently as a finding of virtually uncontroversial
fact, 'In the early part of 1972 it was decided to sell
the Strand-Coburg block if a suitable price could be
negotiated'. The context in the judgment indicates that
February was the month. There is ample to support this
conclusion in the correspondence with Mr Tse and the
evidence of Mr Kostanich and Mr Lau and Mr Bent; and I
should have thought it correct beyond dispute. Mr Kostanich
said that the first respondent approached him about selling
Strand-Coburg 'very early in 1972'. In the result
Mr Kostanich approached the National Mutual company in
mid-February. Mr Bent of the A.M.P. Society testified that
the first respondent approached him about selling Strand-

Coburg, the Star and the Victoria 'about five years ago'.
In cross-examination Mr Temm put to Mr Bent that
the first respondent's diary showed that it was on 10
February 1972. Mr Bent said that could have been the date.
Negotiations with the National Mutual company and the
A.M.P. Society continued until May or June. In May the
first respondent also approached Mr Menzies of the Mainzeal
Corporation. Later in his judgment, however, when dealing
with the evidence of Anthony Coleman (mistakenly referred
to in the judgment at this point as Michael) that in May
the first respondent told him that he was going to keep
the block for the head office of the company, the Judge
describes that as an intention which may well at that time
have been entertained by the directors. Later again he
says that ' ... the very late decision to sell the Strand-
Coburg block is corroborated by unassailable evidence'
and that the facts to which he refers are 'totally incon-
sistent with any existing intention, at the time of the
takeover bid, to sell the Strand-Coburg block at that
particular time'. And again: 'As stated earlier, the
directors plainly did not intend to sell the Strand-Coburg
block, and after success of the takeover bid Mr A.D. Myers
elected to raise a large loan on the security of that
property in order to meet his impending pay-out for the
shares required'.

This attribution of fluctuating intentions to the
directors does not seem to me supported by the evidence.
There is no real evidence that they ever seriously contem-
plated that the company itself would undertake any major
redevelopment of the block. On the contrary there is the
unquestioned evidence of Michael Coleman that Mr K.B. Myers
told him in May that C. & E. was not in a position
financially to undertake a development of that magnitude,
being a private company. Perhaps the general commercial

property market was temporarily in something of a trough
during the earlier part of 1972; but, be that as it may,
we are concerned with a special site: it was of nearly
one acre and was described by the Tse Group as 'probably
the largest single property in Queen Street under single
ownership and in a most prestigious location'. Moreover,
as late as 29 May 1972 the first respondent was negotiating
personally with the National Mutual company, who were showing
interest in a price of $3 million and revealed to him that
they had a valuation of $2.85 million. On that day the
only reason why more headway was not made was that he told
the National Mutual representatives that he had information
that the property was worth $4.6 million. He also suggested
that Mr Tse in Wellington be given a copy of Mr Jefferies'
report for the National Mutual company. In the result
negotiations continued in Wellington until June. In the
cross-examination of Mr Hazard by counsel for the first
respondent it was indicated that they did not break down
until 19 June, but there is no evidence on the point. In
June and July the statutory takeover procedure was followed,
and in July and August the acceptances came in. At about
the same time as the takeover scheme was issued, arrange-
ments were made with the National Bank and approval in
principle obtained from the Reserve Bank for a Eurodollar
loan of up to $1.7 million, if required. C. & E. was to
give notice within six months as to whether it wished to
proceed with the borrowing; the loan would be for 18 months
but with options to repay earlier at six-monthly intervals.
The Queen Street property was to be the security, and the
Reserve Bank was informed that the money was for working
capital requirements pending sale of that property. In
the absence of evidence to the contrary, everything in the
correspondence points to the inference that the first respon-
dent was making sure that bridging finance would be
available if Strand-Coburg was not sold at a sufficiently

early date. In the event the loan on the security of
Strand-Coburg did not have to be taken up. Towards the
end of July the Tse Group, who had been employed as the
company's property consultants since March, began the
negotiations with the Broadlands Group which resulted in
agreement later in the year on a sale at $3.5 million. So
the first respondent certainly did not elect to raise a
loan on the security of the property. The view that at
the time of the takeover offer the directors plainly did
not intend to sell the property seems to me correct only
in the rather strained sense that they were not then
committed by contract to do so. That they were hoping and
trying to do so soon at a favourable price is the obvious
inference from the history and the available documents.

The plan being as just outlined, and including as I
think the contemplated sale of Strand-Coburg, it is
necessary to turn to the questions of misrepresentation
and non-disclosure. Two matters undoubtedly established
by the evidence have a general bearing on these questions.
First, the method of financing the takeover by short-term
loans from the company itself, followed by the declaration
of dividends, principally from capital reserves, was
realised by the first respondent and his advisers to be of
doubtful legality in the light of s.62 of the Companies Act
1955. The report of Re Wellington Publishing Company
Limited [1973] 1 N.Z.L.R. 133 shows that in that case a
proposal to finance a takeover by subsequently declaring
dividends out of the revenue reserves of the offeree company
had been questioned by dissenting directors of the offerer
company; and that before the takeover offer was sent to
shareholders the offeror company had taken out an origina-
ting summons for determination of that question. The
report also shows that the case was heard in the Supreme
Court in 1972 on 30 May and 8 June, the judgment of

Quilliam J. being given on 12 June. The first respondent and his advisers were aware of the litigation. There is a mention of the doubt about legality in a letter from the first respondent to Dr Lau on 14 April 1972. Then, in his letter to Dr Lau of 10 May 1972, the first respondent indicated that he had been advised that it was a mistake to make an announcement prior to an offer as to how it was to be financed: ' ... I should keep the methods of financing to myself, and as I have up to six months to make settlement of the bulk of the monies, to merely quietly make the distributions within that period'.

Secondly, in the same letter he said that although he was more or less certain to get 90 per cent of the total outstanding shares in C. & E., it could be difficult to get 90 per cent of the outstanding shares excluding those of Paddington Properties Limited. And that he had been advised that it was legal to set up another company. This was a device to bring the case potentially within the compulsory acquisition powers of s.208(1) of the Companies Act, which arise on approval of the offer by the holders of not less than nine-tenths in value of <u>the shares whose transfer is involved</u> (other than shares already held at the date of the offer by, or by a nominee for, the transferee company or its subsidiary). In his reply of 15 May 1972 Dr Lau expressed inter alia some surprise at the advice about setting up another company. Perhaps he knew of the decision of the Court of Appeal in England in <u>Re Bugle Press Ltd</u> [1961] Ch. 270, which shows that such a course can lead to problems under the section. Be that as it may, the device was adopted, Paddington Holdings Limited being formed for the purpose of making the takeover offer. Quilliam J.'s judgment turned out to be in favour of the legality of the dividend procedure in the <u>Wellington</u> case, but it was not concerned with the question of loan assistance

to a managing director and was in any event open to appeal. From all this it is apparent that the first respondent knew that his takeover scheme might meet with some opposition and that, particularly if the method of financing came out, legal questions could well arise. Even if any objections were ultimately overcome, litigation would be time-consuming and unwelcome. In the absence of evidence from the first respondent the fair inference from his letter of 10 May 1972 was that he was minded to keep his plan to himself. Indeed the Judge accepts that this was so, saying that the first respondent's experts had so advised for reasons which he accepted as 'entirely adequate'. I must confess to difficulty, however, in reconciling this with the Judge's holding of fiduciary duty. It must be remembered that in both Courts it has been argued for the first respondent that he was not in that position at all.

There being no evidence from either the first respondent or his solicitor, we have to guard against assuming that the letter is necessarily a full or accurate version of the legal advice given to him at that time about disclosure. But the letter does provide unmistakable evidence that the first respondent meant to keep his plan from the shareholders if he could. Against that background it is convenient to consider the questions of misrepresentation and non-disclosure in terms of four topics: Strand-Coburg, the Tse reports, liquid assets, and the Wilkinson report.

(i) <u>Strand-Coburg</u>. Anthony Coleman gave evidence that at a meeting with the first respondent, now agreed by counsel to have taken place some time in May 1972, he himself brought up the matter of selling properties and gained the impression that the first respondent did not anticipate selling the Strand-Coburg: the first respondent gave the reason, Mr Coleman said, that he was going to keep

it for his head office. And again: 'He denied that he would sell assets'. This evidence was not challenged in cross-examination. The Judge's reference in his judgment to the evidence of the 'head office' statement does not

suggest any reservation about the acceptability of that evidence. During the hearing of the appeal I thought at first that Mr Temm might be implying in his argument for the first respondent that, if the statement was made, it was nevertheless disbelieved by Anthony Coleman. But when questioned Mr Temm disclaimed any such suggestion. What was argued for the first respondent was that the statement may not have been made at all; and further that, if made, it was correct and in any event not material and not an inducement. I will deal separately later with inducement. As to the other arguments, I do not think we would be justified on appeal in rejecting the uncontradicted evidence that the statement was made. As already indicated, it was plainly incorrect: while not committed to sale, the first respondent had obviously not decided <u>against</u> sale. Sale was very prominently in his mind. As also already indicated, I think the statement was material, in that it would have a major bearing on the purchaser's anticipated profit and so would naturally be of legitimate interest to a prospective vendor, especially when invited to sell to one of his fiduciaries.

(ii) <u>The Tse reports</u>. Mr Tse was retained as property consultant to the C. & E. company (and also the wine and spirit company) in March 1972. The correspondence, particularly the first respondent's letter to Mr Tse of 6 March 1972, shows that the primary purpose of the appointment was to bring about a sale of the Strand-Coburg block and also the Star and Victoria hotel properties. From the first Mr Tse was impressed with the potential of

the Queen Street site. In a letter to the first respondent
of 12 April 1972 he said that if time was really of the
essence the sale outright of the Star and Victoria hotels
should be the first priority. With regard to the Strand and
Coburg site, he expressed the opinion that 'its present and
future value is so large that it would be in your company's
interest to commence more detailed analysis in order to
realise the maximum from its sale or redevelopment'. To
this end, on 9 May 1972 he sent to the first respondent a
report on the Coburg hotel 'aimed at increasing the total
income of the premises to achieve a more satisfactory holding
return to a prospective purchaser'. In the same covering
letter he mentioned that calculations had been based on a
figure of $4 million for the combined sites, 'but this has
yet to be proven. We should be in a position to fully
demonstrate the site's value and potential in our report
which is currently being compiled, and should be available
next week'. That further report, dated simply May 1972,
is a feasibility study for a major redevelopment of the
combined site and shows the land cost at $4.4 million. Mr
Temm rightly pointed out in his argument that it was not a
valuation, but he invited us to imagine his client presenting
it to the bank manager as evidence of the value of the
property as a security. Prepared as it was by leading New
Zealand commercial property consultants, it would be of much
interest to a prospective purchaser - subject, one would
suppose, to the qualification that some reserve might be
warranted because it had been prepared for the would-be
vendor. Whether Mr Tse's figure or near it could have been
realised in time cannot now be known, but the $3.5 million
agreed on later in the same year certainly shows that he was
right in showing the property at much more than the figure of
about $2 million at which it stood in the company's books.
In argument it was suggested for the appellants that the first
respondent may have deliberately deferred selling the property
until after the takeover. Be that as it may, he did not wait

For two reasons I think the existence of the Tse
reports should have been disclosed to shareholders asked
to sell to their managing director. First the very
engagement of the Tse Group as consultants to the company,
primarily for the purpose of bringing about sales of
Strand-Coburg, the Star and the Victoria, was a major
development in the affairs of the company and of legitimate
interest to the shareholders. Particularly when questioned
by the Colemans about the possible sale of assets, I think
the first respondent should have explained that the Tse
Group had been retained for that very purpose. In addition
to the representations about Strand-Coburg made to Anthony
Coleman, with which I have already dealt, the first
respondent told Michael Coleman, according to the latter's
uncontradicted evidence, that he was not going to change
the general structure of the company 'other than what was
required under normal managerial positions, from day to day';
and that C. & E. was going to be carried on more or less
in the manner it was run at that time. These rather vague
statements to Michael Coleman may perhaps just fall short
of being actionable misrepresentations; but, when such
statements were being made, I think openness of dealing
required mention of Mr Tse's role and reports, if only to
avoid any misunderstanding. The 'head office' misrepresen-
tation to Anthony Coleman made disclosure of these matters
all the more important.

Secondly, bearing in mind that Strand-Coburg was shown
in the company's accounts at not much over $2 million, I
think that the existence of the Tse feasibility study and
the figure of $4.4 million there shown were sufficiently
material to the value of the company's assets, and to the
advantages accruing from sole ownership of the company,
to require disclosure. Of course it would have been proper
to add that a sale at or near that figure was certainly

not assured, or words to that effect. On the other hand
the Jefferies valuation, and the National Mutual interest
based on it, showed that there were excellent prospects of
succeeding in selling at much above book value. Even
Dr Lau, who was naturally far from being in an independent
position, acknowledged or suggested in cross-examination
that if the directors had a strong, reasonable belief that
they would sell properties for between $1 million and
$1.5 million over book values, disclosure would have been
called for. Strand-Coburg alone brings the case within
the scope of this concept, if the inference is drawn, as is
inevitable in the absence of any other explanation from the
first respondent himself, that on 29 May 1972 he brought
the discussion with the National Mutual representatives
to an end because he was confident that he could obtain
more than $3 million for the block.

When a fiduciary, and a fortiori a trustee, has
entered into a transaction of sale or purchase with a
person to whom he stand in that relationship, the Courts
have often held that valuations and the like should be
disclosed. In _Tate_ v. _Williamson_ the critical breach of
duty was failure to disclose an estimate of the value of
mines made by a mining engineer. See also, for example,
what was said by Lord Thurlow L.C. in _Fox_ v. _Mackreth_
(1788) 2 Cox 320, 326; and _Dougan_ v. _Macpherson_ [1902]
A.C. 197. Though not strictly a valuation, the Tse
reports were sufficiently analogous, in my opinion, to fall
within the same category.

(iii) _Liquid assets_. Both Anthony and Michael Coleman
gave evidence that in May 1972 when asked about the prospect
of a bonus issue the first respondent said that the money
had been committed for other purposes or other use.
Anthony's recollection was that the effect of the first
conversation with him was that the money was going to be

needed for the wine and spirit company; Michael, who was
present only on the second occasion, could not recall
whether any particular purpose was mentioned then.  In
his report of 27 June 1972, circulated to shareholders with
the statutory statement of the directors in respect of the
takeover offer, Mr Wilkinson said that he did not think the
directors of the company would be holding cash resources
without good reason.  In cross-examination he accepted that
the existence of free assets not required by the company
in its business is a factor always to be taken into account
by valuers, but added that there was no evidence at the
time he made his valuation that those assets might not have
been required for a purpose.  Pressed to be specific, he
mentioned the cash investments as assets which in his
opinion the directors would have to bear in mind might be
required by the wine and spirit company:  that appealed to
him as a very good reason why they should be held.  But he
made it clear that this was not based on anything he had
been told.  The respondent directors had circulated his
report without comment on this point.  Its natural tendency
must have been to give the impression that the money was
being held for some company purpose.  To the Coleman
brothers the first respondent's statements about its having
been committed must have given the same impression.

The Judge took the view that at the time of the take-
over the possibility of having to retain the funds within
the company to provide further working capital for the
wine and spirit company was real; and that it would have
been dangerous for the directors at that stage to have
taken the responsibility of correcting Mr Wilkinson's
report in that respect, and to have suggested that share-
holders ought to regard the market value of the shares to
be enhanced to some extent by reason of the existence of
those liquid assets.  Yet in 1971 the directors were

contemplating a cash distribution of $2 per share in connec-
tion with a scheme whereby the first respondent would buy,
not all the shares held by the Ross-Lowe and Barbara Myers
trusts, but only enough to enable him to have just over 50
per cent of the company's total shares. Under that scheme
the company would still have had a family character: as
the second respondent pointed out in the lists of advantages
sent by him to his sisters, the latter would still retain
substantial interests in C. & E. There is no evidence of
any change in the policy or prospects of the wine and spirit
company which could have accounted for any change in the
practicability of distributing C. & E. cash reserves in or
after May 1972. The obvious inference is simply that the
first respondent intended to use ~~it~~ them to finance his total
share purchase. The discovered documents show that options
over the Ross-Lowe and Barbara Myers trust shares were
obtained in May, and clearly the company's money would be
convenient in paying for those shares or others.

Dr Lau said in evidence in chief that during the first
year of the wine and spirit company's operations, ending in
March 1972, it appeared clearly that the minimum required
would be some more additional borrowing and no distribution
of profits; but he added that from time to time it varied
during the year. He said there had been additional borrowing
since and guarantees by the two shareholding companies. In
cross-examination, however, he said he did not know why the
$1.8 million was being held by the directors in May 1972
and at that moment there was no reason for retaining it
connected with the operations of the C. & E. company. He
was not re-examined on the point. Evidently he was not
prepared to go to the length of maintaining that the directors
were holding the money in case C. & E. were to contribute
further loan capital to the wine and spirit company.

In this Court the argument for the respondents on the
cash point was marked by changes of front, perhaps reflecting
the unenviable nature of counsel's task. First it was put
in the way that the representation that the $1.8 million
was committed was correct, because while C. & E. had a
multiplicity of shareholders the directors could not take
the risk of not keeping it available in case it was needed
for the wine and spirit company. That submission was hard
to reconcile with the scheme for a cash distribution in
1971. On the next hearing day an elaborate series of
submissions were presented in writing and developed orally,
the writing including the following:

> 19. ONCE the shares were transferred A.D. Myers had
> to assume responsibility for raising the money to
> pay for them by selling assets, and for raising money
> if required by NZWS. But he could take that risk on
> his own once the former shareholders were no longer
> dependent upon dividends from C. & E.

> 20. WHEN Mr Wilkinson expressed the opinion in his
> report ... that he thought the directors would not
> be holding cash resources without good reason, and
> that they were the only persons who could decide
> whether that course would operate to the best advantage
> of the shareholders, he expressed no particular reason
> for the retention of those funds.

> 21. THERE is no direct evidence as to why the
> directors were holding cash resources, but they
> could have had more than one reason for doing so e.g.
> to meet any call from NZWS, or more likely, to meet
> the wishes of the majority of shareholders by unlocking
> the cash in the company and getting this into the
> shareholders' hands without taxation.

> 22. THE learned Judge saw the former of these reasons
> as being the more likely, perhaps because he seems to
> have understood that Mr Wilkinson was given some
> information to that effect. But the evidence does
> not disclose that fact, at least according to the
> record of Mr Wilkinson's evidence.

At that stage Mr Temm accepted that he had to concede that the Judge was mistaken in his view that the money was being held because of a contingent liability to the wine and spirit company. But on a later day counsel withdrew that concession - as he was entitled to - and presented further written submissions ending:

> 4. THE reason for holding cash resources was to meet N.Z.W.S. requirements, but if that company did not require further capital, then the cash resources were being held until they could be distributed to the shareholders in a way satisfactory to the majority - by a sale and purchase of shares at $4.80.

> 5. THE reasons for holding the cash resources were therefore multiple in nature, with different reasons having different importance or emphasis at different times.

Thus the final position taken for the respondents was in substance that unless and until the takeover offer was accepted the money was being held to meet wine and spirit company requirements, but that once the offer was accepted the money was to be used to help finance the first respondent's purchase of the shares at $4.80. With all respect, it seems to me patently unlikely that any shareholder, reading (in effect) that the money was probably being held by the directors for good reason, or told that it was committed, would have understood that a purpose for which it was being held was to help pay him and the other shareholders the $4.80 per share if they decided to accept the offer. There is an unacceptable cynicism about any suggestion that shareholders should have taken that meaning from what they were told.

I have traversed the argument for the respondents on this matter at some length. In the end it seems to me that the force and care with which it was put forward by Mr Temm

cannot dispose of the basic problem with which counsel was faced. I cannot avoid the conclusion that as to the retention of liquid assets there were serious and material misrepresentations, partly express, partly implied.

(iv) The Wilkinson report. Mr E.D. Wilkinson is one of the most senior chartered accountants in practice in New Zealand and his opinion on a share valuation must obviously carry weight. In their statutory statement in respect of the takeover offer the first and second respondents emphasised that they had obtained an independent valuation from him, a copy of which they attached. In his own letter to shareholders, written as governing director of Paddington Holdings Limited, the first respondent underlined the point further, saying:

> It is clear from Mr Wilkinson's report that he agrees with Mr Steen that the shares must be valued on the basis of the Company as a going concern as liquidation of the Company is not in contemplation and that on that basis the price offered by Paddington Holdings Limited is fair and reasonable.

Mr Wilkinson's report was indeed to that effect. In the report itself and his evidence at the trial, he explained that he only took into account the very high asset backing as a factor demonstrating the stability of the company and enabling it to distribute most of its annual profits as dividends. His mode of valuation was to assess likely dividends and then to arrive at a market value of the shares by postulating that the dividends should represent a certain percentage of that value. On the assumption that a purchaser of shares not quoted on the stock exchange expects a higher dividend yield on his outlay than is obtainable from quoted shares – to compensate for having a restricted market if in turn he wishes to sell – Mr Wilkinson reasoned that the C. & E. dividend yield

would be higher than that from brewery shares. For C. & E.
he took a notional yield of 5.3%. Applying that approach
and calculating notional dividends, he reached the conclusion
that the $4.80 offer was not only fair but liberal.

In his report Mr Wilkinson quoted a passage from the
judgment of North P. in the **Hatrick** case [1963] N.Z.L.R.
at p.660, and went on to say: 'It follows that as a
liquidation of the C. & E. Coy is not in contemplation, a
nett assets or notional liquidation value is not a proper
method of valuation to adopt, especially in the case of a
company paying a steady 12½% dividend ...'  In the passage
quoted, however, North P. himself was by no means so
dogmatic.  His observations included:

> In the case of the Public Trustee's appeal I agree
> that in view of the low earnings of the two major
> companies, the respondent was quite entitled to regard
> the assets-value method as the more appropriate approach,
> but he was then required to go on and ask himself
> what sum would a purchaser have had to pay for those
> shares, and this at once involved an inquiry into all
> the circumstances both favourable and unfavourable
> likely to influence a vendor and purchaser in their
> friendly negotiations to fix a fair price.

And in their joint judgment, from which I have cited earlier,
Turner and McCarthy JJ. said at p.663:

> Turning now to the particular shares, it seems to us
> that so far as the Hale Motor Co. Ltd and the Gardenhyl
> Co. Ltd are concerned, the choice of an assets-value
> method as the primary method of approach was unobjec-
> tionable, for whilst it might be that purchasers could
> be found to buy those shares with the intention or
> expectation of the companies remaining in operation,
> it is more probable that they would be located amongst
> persons wishing to put them into liquidation.

That case was not concerned with takeover offers. It seems
right to assume that Mr Wilkinson would not have invoked
it in the way he did if he had been informed that, although
a full liquidation of C. & E. was certainly not in mind, it
was contemplated that very valuable assets were to be or
might well be liquidated at an early date. The tenor of
the Hatrick judgments could lend no support to any claim
that such a prospect would be ignored in negotiations
between vendor and purchaser. Likewise the analogy with
the shares of New Zealand Breweries Limited and Dominion
Breweries Limited loses much of its force when one asks
whether it is at all likely that half the assets of either
are about to be sold.

I have already discussed the part of Mr Wilkinson's
report in which he expressed the opinion that the directors
of C. & E. would not be holding cash resources without good
reason. As to the existence of other free assets, mention
has been made of his acceptance in cross-examination that
this is a factor always to be taken into account by valuers
if known to them. A slightly earlier passage in his
cross-examination should be set out in full:

> Before making your valuation did you make any
> enquiries concerning the value of the property assets?
> ... I knew that continuous efforts had been made to
> sell them without success; I knew that the properties
> were recorded in the books at the most recent G.V.,
> and I observed that the valuation made by Mr Gardner,
> a valuer for the plaintiffs, showed a value of the
> major property, the Strand-Coburg complex, at a figure
> almost exactly in line with the G.V. and that satisfied
> me that the property was shown at a fair value.
> Now if you had been advised by the C&E Coy directors
> when you made your report that if the takeover did
> not proceed they hoped to sell assets, property
> assets, within say 9 months, which might have realized,
> might well have realized, a capital profit in excess
> of book values of something like $2m. would that

information have caused you to change your report in
any way?... I must say that there was no evidence of
that at the time when I made my report.
You had no knowledge of that?... I had no knowledge
of that or that it was likely to happen - nor do I
think the Directors had thought so.
If you had been told that, would it have affected
your valuation?... Only to the extent that I might
have reduced the dividend yield because of the heavier
asset-backing, which would have increased the value
of the shares, very slightly.
By how much? That is very hard to say, I would have to
examine them at some length before answering precisely,
but it would not be significant.
By 'not significant' can you give us it would not be
more than a particular figure?... No I wouldn't
attempt to do that, it wouldn't be fair to give this
Court such information where I would not be satisfied
But you accept it would has caused you to alter your
figure?... It would have caused me to 'consider'.

Although the questions (as recorded) were on the footing that
the takeover did not proceed, Mr Wilkinson's answers are at
least consistent with the view that knowledge of a probable
early sale of assets at so much above book values may affect
a share valuation. He was not to be drawn into any precision
as to figures.

Another aspect not without importance is his reference
to Mr Gardner's figure for Strand-Coburg. That figure had
been used by Mr Ross in his report of 7 June 1972 in arriving
at an asset backing assessment of $7.75, to be reduced to
$7.31 for the reasons there given. In his own report of 27
June 1972 Mr Wilkinson referred to Mr Ross's $7.75. Mr
Wilkinson was presumably unaware that Mr Gardner's figure on
which Mr Ross had worked had been advanced by Mr Gardner (in
a letter dated 6 June 1972) with the qualification that in
the very limited time available he was providing 'not an
accurate appraisal, but rather an informal estimate'. His
figure was $2.025 million - not significantly different from
Government valuation. Nor apparently did Mr Wilkinson
know that on 29 May 1972 the first respondent had learnt

that a valuation obtained by the National Mutual company
was $2.85 million; nor that the Tse feasibility study of
the same month showed $4.4 million. On the evidence the
directors circulated Mr Wilkinson's report without informing
him of these last matters.

Mr Wilkinson had made earlier valuations for C. & E.
One was dated 5 May 1971 and assumed a cash distribution
of $2 per share. The other was dated 9 December 1971 and
assumed a cash distribution of $3 per share. The respective
valuations, immediately before the assumed distributions,
were $4.17 and $5.08 per share. In his December report
Mr Wilkinson had taken into account the sales of certain
properties, but he showed the Queen Street complex as
retained. In argument in this Court Mr Temm pointed out
that, on the evidence, no further instructions regarding
intentions to sell the company's properties or regarding
other proposals were given to Mr Wilkinson in June 1972
when he was asked for his third valuation. Since his
earlier valuations had envisaged cash distributions and
recognised them as practicable because of the strong
financial structure of the company after the alliance with
New Zealand Breweries Limited, it is surprising that the
directors gave no specific instructions about the surplus
cash to Mr Wilkinson in June. But that is more relevant
to the representations about the liquid assets, with which
I have already dealt.

What has to be added under the present head applies
not only to the cash resources but the saleable properties,
including Strand-Coburg, the Victoria and the Star. The
clear premise of Mr Wilkinson's report on 27 June 1972
was that a liquidation was not contemplated. The same
point was stressed in the first respondent's letter to
shareholders of 8 July 1972. In the light of the proposal

as to how the takeover was to be financed, this was only a
half-truth. When the two directors were using Mr Wilkinson's
report to persuade shareholders to sell to one of them, I
cannot think that as fiduciaries they were entitled to
withhold from Mr Wilkinson all knowledge of that proposal
and of the prospects of prices much above book values,
especially for Strand-Coburg. As the evidence stands,
they did not give him any information on those matters.
Nor was any attempt made in his re-examination, after he
had given the evidence in cross-examination already quoted,
to suggest that he was or should have been aware of them.
A general knowledge that properties are commonly shown in
the books of companies at less than market value would be
no substitute for specific information of intentions and
proposals.

By way of summary of the facts relating to the four
topics, I think the evidence shows that there were express
oral misrepresentations that Strand-Coburg was going to be
kept for the company's head office and that liquid assets
were committed; implied written misrepresentations on the
latter point in the circulation of the Wilkinson report;
non-disclosure of the plan to finance the takeover virtually
exclusively from the company's own assets and without the
injection of any capital or assets by the first respondent;
and non-disclosure of the engagement of property consultants
with a view to selling the main free assets and of advice
received from them having an important bearing on the value
of Strand-Coburg. These misrepresentations and non-
disclosures are largely inter-related. As a whole they
amount, in my opinion, to clear breach of fiduciary duty
in the circumstances of this case. Some of the shareholders,
including the appellants, had some expert advice at a
stage before accepting the $4.80 offer; but this is no answer,
as the misrepresentations and non-disclosures meant that

neither the shareholders nor their advisers were properly informed: Inche Noriah v. Shaik Allie Bin Omar [1929] A.C. 127; Tate v. Williamson L.R. 2 Ch.App. at 65; Tufton v. Sperni [1952] 2 T.L.R. at 523. I must add that the incorporation of a new company as a vehicle for the takeover was designed to outmanoeuvre the opposition feared from some shareholders; and, without treating this as necessarily itself a breach of fiduciary duty, I think that it certainly contributed to make disclosure of his proposals incumbent on the first respondent.

The position of the second respondent has to be considered separately. That he was in a fiduciary position I have no doubt. Not only was there his role in the company and in the family and the fact that the proposed sale was to his son. As well he took an active part in the negotiations, first with his sisters and their representatives, later with the Cornwall Park trustees and the Colemans. Purchases of some shares by trusts of which the second respondent was a trustee, before ultimate sale to the first respondent's company, were a significant element in the whole process. Moreover the second respondent joined in the positive recommendation in the statutory statement by the directors. His voice could well have been especially influential. As to breach of duty, the evidence does not implicate him in the express oral misrepresentations. Nor does it show that he was necessarily aware of all the advice received by the first respondent. Mr O'Brien elicited in cross-examination of Anthony Coleman that he could not pass a comment or express a view on whether the second respondent knew that the first respondent meant to sell many of the assets of the company. Mr O'Brien obtained admissions to the same effect from Michael Coleman. On the other hand the second respondent must have known of the contents of the Wilkinson report. As an exponent of

the earlier proposal involving a cash distribution to
C. & E. shareholders, and as a director of all three
companies - C. & E., New Zealand Wines and Spirits, New
Zealand Breweries - he must have well known that a cash
distribution to C. & E. shareholders would have been
feasible for the company despite Mr Wilkinson's opinion
that the directors would not be holding the money without
good reason. And in practical business experience he may
well surpass anyone else involved in this unhappy case.

One cannot realistically avoid the conclusion that
father and son were working in close alliance in the whole
matter. Since neither of them gave evidence it would be
difficult to apportion blame. Nor is that called for by
the way in which the case has been presented. On such
evidence as we have, I am driven to conclude that in some
measure the second respondent did not act in accordance
with his fiduciary duty.

The conclusions I have reached about fiduciary duty
make it unnecessary to consider the appellants' other
causes of action, although it will be as well to deal
separately with the related subject of negligence. As to
fraud, the allegation against the second respondent has
not been raised again in this Court. In relation to the
allegation against the first respondent it is enough to say
that, with the greatest respect to the learned trial Judge,
I do not agree that it was irresponsible.

## Breach of Duty of Care

From the point of view of the respondents the case
seems to me no better if approached without regard to
fiduciary duty and simply on the footing of the now
acknowledged duty of care in recommending shareholders to

accept the offer. The family nature of the company and
the clauses in the management contract with the wine and
spirit company concerning relations by blood adoption or
marriage of Louis Mielziner Myers might have discouraged
an outside takeover bid. But if a corporate raider - to
use a term found in the evidence - had appeared on the
scene with such a bid of $4.80 per share, one can hardly
doubt that in their advice to shareholders the directors
would have placed much emphasis on asset backing. In my
view, reasonably prudent directors would also have taken
care to see that any accountant asked by them to report
for the benefit of shareholders was fully briefed as to
the first respondent's plans and with all the information
they had bearing on the true value of the free assets and
on the needs of the wine and spirit company. Common sense
and fairness alone would surely point to the advisability
of seeing to that; but here the evidence supplies two added
factors: (1) the directors knew that Mr L.N. Ross, whose
standing as a chartered accountant is perhaps unsurpassed
in New Zealand, was of the opinion that knowledge about
asset backing was material to shareholders; (2) the first
respondent knew of the Tee report and the other steps he
himself was taking towards the sale of assets. If the
second respondent did not have the same detailed knowledge,
he could easily have acquired it by making appropriate
enquiries of his son in the interests of shareholders.
The unqualified recommendation to accept the first respon-
dent's takeover offer meant that after making his initial
offer he was never called upon to bargain. In the
circumstances of this company it was not unreasonable of
the directors to refrain from investigating the possibility
of any outside takeover bid; but the extracts from Weinberg
quoted earlier only underline the obvious - that directors
who oppose a bid or seek a higher price from the offeror
may well succeed in securing an improved offer. A case

already quoted, <u>Scott Group</u> v. <u>McFarlane</u> [1975] 1 N.Z.L.R.
582, 584, and <u>Gething</u> v. <u>Kilner</u> [1972] 1 All E.R. 1166,
which calls for reference later in another connection,
provide typical examples of that sort of bargaining by
directors. At the stage of the takeover offer no attempt
in that direction was made by the directors here; indeed it
would have been difficult because of the conflict of interest.
Yet in the earlier negotiations with the Ross-Lowe and Barbara
Myers trusts they had been in effect compelled to increase
their offer, even when Whinney Murray & Co. had, in the words
of the letter written by Mr Masters on 14 September 1971,
'very little information on which to found an accurate
assessment'. The shares of those trusts had been secured
before the takeover offer was made. The asset position
was thoroughly known to the first two respondents. One can
be sure that, if faced with an outside bidder and if pre-
pared to entertain at all the possibility of selling, they
would certainly not have recommended acceptance of a first
offer of $4.80 without bargaining. In these circumstances
I think that at the very least they should have refrained
from a positive recommendation; and that the appellants have
made out their allegation that the first and second respon-
dents knew or ought to have known that the price of $4.80
per share was not a fair one and should not have been recom-
mended to the shareholders. Even assuming that they were
under no fiduciary duty, I do not think that the recommenda-
tion to sell at $4.80 was made with reasonable care for the
interests of shareholders.

## Causation

The immediate cause of the decision of the appellants
to accept the takeover offer was a notice dated 4 August
1972 under s.208(2) of the Companies Act 1955 that Paddington
Holdings Limited had acquired not less than nine-tenths
in value of the shares involved in the scheme. They

believed throughout that the shares were worth more than
$4.80 and that the assets were worth much more than book
values. Mr Anthony Coleman thought that Strand-Coburg
was worth more than $3 million. They were in touch with
Mr Geoffrey Myers who, until his removal as a director
just before the formal takeover bid, was generally familiar
with C. & E. affairs. They suspected that there might be
some asset-stripping by the first respondent if he acquired
control. Mr Michael Coleman and his associates themselves
made a belated attempt to take over the company, though
probably as a forlorn hope, offering the first respondent
$5.25 for the shares. Selling or borrowing on assets of
the company was in their minds as a way of financing their
purchase, and they conducted some preliminary negotiations
to that end. In his report of 7 June 1972 Mr Ross pointed
out that the company apparently had a substantial liquid
sum, estimated by him at $1.5 million, in excess of working
requirements. On the basis of the facts just outlined, it
is submitted for the respondents in effect that the
appellants sold with their eyes open: that, if there were
breach of duty by the directors, it was not a cause or
inducement of the sale.

The same approach found a place in the reasons of the
learned Judge. For as well as holding that the method of
financing the first respondent's takeover offer was 'not
relevant to the decision of any shareholder' - in the
sense, as I understand his judgment, that the first and
second respondents were not obliged to treat it as a
material matter which should be disclosed - he expressed
the view that the experts retained on behalf of all major
shareholders could see that the purchase would obviously
be financed from the company's free assets. He also
attached some weight to the plaintiffs' own intentions as

to financing their offer and to their beliefs about the
value of Strand-Coburg.

That way of looking at the case is captured in the
image conjured up for us by Mr Temm of 'smoke-filled rooms'.
I have felt the force of the argument and at first sight
it would be quite easy to accept; but on further considera-
tion it can be seen to be superficial. As Mahon J. says,
according to his letter of 10 May 1972 to Dr Lau, the first
respondent had been advised to keep his intentions to
himself. In this he was successful, inasmuch as the most
that can be attributed to the appellants is suspicion.
He misrepresented his intentions regarding Strand-Coburg
by saying that he was going to keep it for his head office,
when in fact he was trying to sell it. As already mentioned,
his counsel shrank from claiming that the representation was
disbelieved. It is not suggested that the appellants knew
that he was trying to sell this major property. The Judge
was not troubled by this point, because he was able to
find that the directors plainly did not intend to sell the
Strand-Coburg block - a finding with which I am compelled
to disagree for the reasons already given. It would be
fallacious to assume that because the appellants themselves
would probably have had to sell this block to finance a
takeover, they must have known that the first respondent
was in the same position. Indeed it was put to Anthony
Coleman in cross-examination and ultimately accepted by
him that about June 1972 it was being said among the family
that someone was behind Douglas, putting up the money.
Likewise as to the money on deposit and the representations
that it was committed or being kept for good reason, the
Judge saw as one of the reasons why the plaintiffs began
the action that about two years after selling their shares
'They also found that the cash reserves of the company had
not been required for investment in New Zealand Wines and

Spirits Limited'. This lends tacit support to the view
that if they had known that the first respondent intended
to pay out the cash to himself almost immediately, they
might well not have been content to let matters rest at
that stage.

In the cross-examination of Anthony Coleman it was
even suggested by counsel for the second respondent, and
in substance accepted by the witness, that Mr Coleman was
not in a position to assert that the second respondent knew
that his son meant to sell many of the assets of the
company. In argument on this appeal, counsel for the first
respondent made some comments about the Colemans' lack of
experience or qualifications in financial matters on this
plane. It was suggested that the term 'asset-stripping'
was not truly understood by Michael Coleman. Obviously
we cannot form a view about this sort of point on the
written record. But, by the same token, we cannot realis-
tically attribute to the Colemans in 1972 the insights
that they have now.

As to experts retained during the takeover negotiations,
Mr Wilkinson did not suggest at any stage of his evidence
that when preparing his report of 27 June 1972 he understood
that the first respondent planned to sell virtually all the
free assets as soon as he could after the takeover. The
cross-examination of the plaintiffs' experts stopped short
of putting to them that the purchase by the first respondent
would obviously be financed from the company's free assets.
In the re-examination of Mr Ross by counsel for the
plaintiffs the following passage is recorded:

You have been asked by both counsel who cross-examined
you to state what Mr Geoffrey Myers told you. At the
time you made your initial valuation were you aware
that the managment of C&E Coy, were selling or endeavouring
to sell the remaining properties assets on the books
of the Coy including the Strand?... No there was no
clear indication to me at that time that that was the
position.
Had you been given that indication, would it have
affected the opinion which you expressed at that
time? ... It would have strengthened my view that
far greater emphasis still should be placed on the
asset-value.

The only other expert witness who had been concerned in
advising offeree shareholders before the takeover was
Mr D.H. Steen. He had reported to the chairman of the
trustees of the Sir John Logan Campbell residuary estate
and to the Guardian Trust company for the Coleman estate.
He was called for the first respondent but did not say
anything to the effect that it was obvious to him that
the takeover would be financed from the free assets. His
position was rather that the method of financing was 'not
particularly relevant', as he put it in evidence in chief.
In cross-examination he mentioned inter alia as a general
proposition that ' ... it may be the intention of the
directors of the company to utilise assets which may be
free for some other purpose within the ambit of the
company's operations'; and again ' ... one does not know
what the intentions of the directors are, neither do I
think it necessary for this to be so'. On the evidence I
think that, to someone not privy to the first respondent's
intentions at the time, their transparency is largely
brought about by hindsight.

Moreover, in considering whether breaches of duty by
the directors caused damage to the appellants, the knowledge
and actions of other shareholders are relevant. Mahon J.

accepted this in principle, citing the judgment of Brightman
J. in Gething v. Kilner [1972] 1 All E.R. 166, and I
respectfully agree with both Judges on the point. Gething
v. Kilner is of no more than limited assistance on the
facts, as it was only an application for interlocutory
relief and as the takeover offer there was made by a company
not necessarily identified with the directors of the offeree
company - so there was not necessarily a fiduciary duty to
shareholders. But Brightman J.'s statement of principle
at p.1170 is helpful:

> I accept that the directors of an offeree company
> have a duty towards their own shareholders, which in
> my view clearly includes a duty to be honest and a
> duty not to mislead. I also accept that a shareholder
> in an offeree company may be prejudiced if his co-
> shareholders are misled into accepting the offer. I
> express this view because as soon as the appropriate
> percentage of shareholders have been misled and have
> assented, the minority become subject under s.209 of
> the Companies Act 1948 to statutory powers of compul-
> sory purchase. It therefore seems to me that a minority
> could complain if they were being wrongfully subjected
> to that power of compulsory purchase as a result of a
> breach of duty on the part of the board of the offeree
> company.

Looking by way of illustration at the evidence
concerning other shareholders, one finds nothing to suggest
that the Logan Campbell trustees, who held 17.84 per cent
of the C. & E. shares, appreciated that the first respondent
meant to sell Strand-Coburg and other free assets and to use
the cash resources, and thereby had good prospects of finan-
cing the takeover entirely. Certainly the second respondent
was one of the Logan Campbell trustees, but there is no
reason to suppose that he disclosed these matters; indeed,
he could not have done so if the suggestion be accepted
that he did not himself know the first respondent's

intentions. One of the trustees, Mr Stevenson, gave
evidence for the plaintiffs; but he had not been involved
in the negotiations, which had been conducted for the trust
by the late Mr Athol Wells. The burden of Mr Stevenson's
evidence was that the trustees relied on Mr Steen's valuation
and were influenced by the thought that the proceeds of
$4.80 per share, if invested otherwise, would produce a
better return than the trust had been receiving from C. &
E. One cannot exclude the possibility that they might have
felt bound to negotiate for a higher price if they had known
how much the first respondent stood to gain.

Mr W.H. Ross-Lowe, a trustee of his wife's trust,
testified that at the time of the takeover he did not have
any information concerning sales or attempts to sell any
of the company's properties or indicating that book values
were less than market values. He had first learnt how the
sale to the first respondent was financed from reading
newspaper reports of the case. He was not cross-examined
on these matters. The letters by himself and his wife put
to him in cross-examination show that in 1972 they were
sympathetic to the first and second respondents. The late
Mrs Ross-Lowe gave evidence on similar lines. She said,
however, that in 1972 she was not concerned about price
and would not have been interested if told that valuable
properties were being sold; but she did not now consider
the price fair. Litigation is pending concerning the sale
of the Ross-Lowe trust shares, but that cannot influence
us one way or the other in the present case. Suffice it
to say that the evidence of the Ross-Lowes would not
support any suggestion that the first respondent's intentions
were obvious to them at the time.

Mr J.L.M. Horrocks, an Auckland solicitor, had been consulted by his mother-in-law, Mrs Bickerton-Fisher, about the takeover offer. He said in evidence that in discussion with her he tried to distinguish for her benefit a valuation based on profitability and one based on asset backing. Being concerned that 'with such enormous assets, some could be sold' he rang a member of the firm of solicitors acting for the company and the respondents and

> ... made my comments to him as to whether assets were to be sold or whether the whole show would be kept together. He couldn't express any opinion but he said he would get in touch with Mr A.D. Myers. The conv. was left on the basis that I would expect a telephone call from him. What was the next development following that conversation, by way of reply?... My mother-in-law rang one day and said she'd had a letter from Mr A.D. Myers. I produce this letter dated 24th May which is now shown to me. When Mrs Fisher told me of the letter I subsequently saw the letter. I regarded the letter - my mother-in-law she was quite convinced that everything was in order and that I had gone to unnecessary trouble. I read it, and I took it that it was quite in order, from her point of view. Following that was a decision at some stage made to sell the shares to Paddington Holdings?... Oh yes. My wife signed the documents, after some time.

The letter of 24 May 1972 from the first respondent to Mrs Bickerton-Fisher includes this passage:

> John said that Mac was wondering whether I had the intention of making a sale of Campbell & Ehrenfried once I had gained control. I should like to inform you this could not be further from my mind. The intention is rather the opposite to have a greater say and control in the company with which I have chosen to spend my working life.

That statement seems to me less candid than appropriate for a fiduciary. While Mrs Bickerton-Fisher was evidently content with it, the evidence of Mr Horrocks does underline

that on a takeover offer a knowledgeable offeree may well treat the offeror's intentions regarding the company as material. Mr I.M. Phillips, who held the smallest parcel of shares, also gave evidence that he was in possession of no information as to what the company was doing at the time in relation to its property.

During the hearing in this Court Mr Williams prepared as requested a chronology of the movement of C. & E. shares. It shows that by 21 June 1972 the K.B. Myers Trust held 32.20 per cent of the total shares. These included Ross-Lowe shares. Mr Williams also submitted that other shares were by then committed to the first respondent by reason of agreement or family allegiance, bringing the total at his command by that date to 70.28 per cent. As to the Logan Campbell trust, whose shares are not included in those calculations, Mr Williams pointed to letters from the first respondent to the Guardian Trust company and Dr Lau showing that he was already counting those shares as his. Although one of his letters said that the Logan Campbell trustees had agreed, it cannot be inferred that they were legally committed. The takeover offer was sent to them, and they resolved to accept it on 25 July 1972; and the offer itself, dated 8 July 1972, states that Paddington Holdings Limited is not beneficially entitled to any shares in the capital of C. & E., while the statutory statement by the C. & E. directors dated 30 June 1972 shows that the shares then held by or on behalf of the first respondent totalled only 22,013.

The facts which I have traversed rule out any assumption that if full disclosure of the first respondent's intentions had been made, he would necessarily still have acquired 90 per cent of the shares covered by the scheme. And even if he had acquired 90 per cent or more, leaving

the Coleman brothers and perhaps a few allies in a small
minority, their position under s.208 of the Companies Act
would have been by no means hopeless. If informed of the
plan to sell Strand-Coburg and to use the liquid assets,
they would probably have taken further legal advice. Such
advice could properly have been to apply at the appropriate
time for relief under s.208(1) or (2). Under subs.(1), if
the transferee company has acquired nine-tenths of the shares
involved (as there computed) there is machinery whereby it
can insist prima facie on acquiring the remainder on the
same terms; but this does not apply if, on application by
a dissenting shareholder, the Court thinks fit to order
otherwise. Under subs.(2) inter alia the Court has power,
on application by the dissenting shareholder, to settle
terms for the acquisition of his shares other than the
terms of the scheme.

The section has not yet arisen for consideration by
a New Zealand Court in any reported case. It corresponds
to s.209 of the United Kingdom Act of 1948. The reported
English decisions on the section have been mainly at first
instance and under subs.(1). They have displayed a tendency
to place a heavy onus on dissenting shareholders in normal
circumstances. In Re Grierson, Oldham & Adams Ltd [1968]
Ch. 17, 36-7, Plowman J. was of the opinion that on general
principle the element of control was not one which ought
to have been taken into account as an additional item of
value in an offer for certain minority shares. But that
was not a case, it would seem, of alleged fiduciary duty or
non-disclosure or negligence. Although Somervell L.J. and
Wynn-Parry J. seem to have inclined towards a similar view,
without deciding the point, in the Court of Appeal in Re
Press Caps Ltd [1949] Ch. 435, 443, 448, Evershed L.J. at
p. 445 was careful to express no opinion on it. In both

Grierson and Press Caps the shares were quoted on the stock
exchange:   that background alone would in any event limit
the assistance to be had from those cases in a case like
the present.   And what are particularly important in the
present context are the decisions by Buckley J. and the
Court of Appeal in Re Bugle Press Ltd [1961] Ch. 270.
There the device of incorporating a holding company, so as
to use the section to expropriate a minority shareholder,
was viewed unfavourably and treated as shifting the onus
to the transferee company.   It was declared that the trans-
feree was not entitled to acquire the dissentient's shares
on the terms of the scheme.   The Supreme Court of Canada
followed that approach in Esso Standard (Inter-America)
Inc. v. J.W. Enterprises Inc. (1963) 37 D.L.R. (2d) 598,
the Court attaching weight to the fact that the 90 per
cent of shares acquired were not independent of the trans-
feree company.   The judgments of a Court of five Judges
approved observations by Rand J. in Rathie v. Montreal
Trust Co. [1953] 4 D.L.R. 289, 298, including these:

> This comparatively new power by which a majority
> may coerce a minority is one to be exercised in good
> faith and with the controlling facts available to
> shareholders to enable them to come to a decision one
> way or the other.   In most, at least, of the cases
> which have reached the Courts in England, the circum-
> stances showed a straightforward transaction with
> its business considerations made evident to shareholders.

In my opinion the approach of the English Court of
Appeal and the Supreme Court of Canada to the section should
be followed in New Zealand and would have placed the third
respondent in difficulty if faced with an application
under one or other of the two subsections.   Of course the
facts of the present case are different in detail from
those of Bugle Press and Esso Standard, but there are some

similarities in principle. And here there is the added
element of fiduciary duty. The first respondent, himself
owning only a comparatively few shares in the company of
which he was managing director but confident of being able
to acquire many other shares because of family allegiance,
formed a new company so as to be in a position to invoke
the compulsory acquisition provisions of the section against
foreseen opposition from minority shareholders to whom,
in the opinion of both this Court and the Judge in the
Supreme Court, he owed a fiduciary duty.

For the purposes of s.208 the degree of identity between
the transferee company and the majority shareholders in the
transferor company would have taken this case quite out of
the ordinary category. Instead of the earlier arrangement
for the first respondent to buy the shares of the Barbara
Myers and Ross-Lowe trusts, these had been acquired by
the K.B. Myers trust. The statutory statement of the
directors shows that trust as holding 378,927 shares at
30 June 1972. It controlled other shares through Paddington
Properties Limited. The Judge says that at the date of
the takeover bid it owned or controlled over 60 per cent
of the total C. & E. shares. As already mentioned,
Mr Williams worked out a de facto figure of over 70 per
cent of shares committed to the first respondent. The plan
was to transfer all these shares to the first respondent's
new company. The holding by the K.B. Myers trust was
intended to be temporary only. The trustees were the first
respondent himself and his parents. Though presumably not
legally committed to sell, they were in fact virtually
holding the shares at the first respondent's disposal.
The state of affairs was remote from the ordinary case
contemplated by s.208(1), where 90 per cent of the existing

shareholders, being independent of the offeror company,
decide to accept the offer and it is reasonable to compel
the minority to fall in with their decision. If all the
facts had been known to the appellants at the time, I
think they could have mounted a strong case for relief
under one or other subsection. The Court would have
scrutinised the transactions very carefully and with no
disposition to make the appellants shoulder the onus.

It may be mentioned that in branches of company law
other than s.208 the Courts in England appear recently to
have been laying some stress on equitable considerations
and showing rather more willingness to protect a minority.
I refer particularly to the speech of Lord Wilberforce in
Ebrahimi v. Westbourne Galleries Ltd [1973] A.C. 360 and
the judgments of Templeman J. in Re Hellenic & General
Trust Ltd [1975] 3 All E.R. 382 and Daniels v. Daniels
(The Times, 26 July 1977) and Foster J. in Clemens v.
Clemens Bros Ltd [1976] 2 All E.R. 268. While respectfully
welcoming this tendency, I think that Mr Wallace was right
to emphasise that basically this case turns on what he
called 'age-old principles of honesty, equity and disclosure'.

To that, in relation to causation, a specific reference
to negligence should be added. The recommendation to sell
made by the directors in their statutory statement was
directed, according to the tenor of that statement itself,
to all shareholders save the K.B. Myers trust (378,927
shares) and A.D. Myers (22,015 shares). The discovered
documents show that not until early August was 90 per cent
acceptance obtained. On 2 August 1972 a letter had to be
written to the Trust Department of the New Zealand Insurance
Company, saying that the first respondent was leaving for
England on Saturday and that his company was dependent on

obtaining the acceptance of the Russell estate and a majority of the Bankart estate to have more than 90 per cent. This produced an acceptance on behalf of the Bankart estate on the following day. Presumably the Russell estate accepted likewise. There can be no doubt that, as is conceded, the recommendation of the directors - thus followed up in at least two instances - was a material factor in bringing about acceptances of the offer. How many shareholders were influenced by it, one cannot say; but in this particular company it was a recommendation naturally likely to have strong influence.

The appellants did not accept until faced with notice that 90 per cent had been achieved. Then they did so, as the Judge says, reluctantly. Putting aside fiduciary duty and considering for the moment only the cause of action in negligence, I think the appellants can be heard to say that the directors owed them a duty of care in making a positive recommendation to the shareholders; and that, on what may conveniently be called the Gething v. Kilner principle, if breach of that duty was a material cause of the decision of other shareholders to sell, with the result that the appellants were boxed in and felt driven to sell also, that foreseeable consequence was not at all remote.

For those reasons I think that on the evidence the breaches of fiduciary duty, and also the breaches of the duty of care if regarded separately, must be treated as substantial causes of the appellant's ultimate decision to sell on the terms of the scheme. On no view of the law can it be necessary for the appellants to show that they were the only causes. As to fiduciary duty indeed, it has been held that, once the relevant duty is established, it is contrary to public policy that benefit of the transaction be retained by the person under that duty unless he positively

shows that the duty of fiduciary care has been fulfilled:
there is normally no room for debate on the issue as to
what would have happened had the care been taken. See
Lloyds Bank v. Bundy [1975] QB. 326, 346. And in Tate v.
Williamson L.R. 2 Ch. 55, 66, the Lord Chancellor said that
even if the defendant could have shown that the price which
he gave was a fair one, this would not alter the case against
him. But, on the view of the facts which I have reached,
those aspects need not be considered.


## Remedy

The primary claim of the appellants is rescission.
In the alternative they ask for damages. On the cause of
action for negligence, only damages could be available.
Rescission, with restitution, is available for breach of
fiduciary duty or fraud. The respondents resist rescission
and naturally seek to minimise damages. But they do not
contend that monetary compensation or damages may not be
awarded for breach of fiduciary duty. That such an award
may be made is shown by the speech of Viscount Haldane L.C.
in Nocton v. Ashburton [1914] A.C. 932, 950. Hedley Byrne
v. Heller [1964] A.C. 465 and M.L.C. v. Evatt [1971] A.C.
793 are other high authorities pointing in the same
direction. Since the fusion of common law and equity and
the twentieth century developments in the law of negligence,
any argument to the contrary would be of unattractive
technicality, but as no such argument was advanced by any
counsel the point need not be taken further.

The appellants say that upon returning the purchase
money of $4.80 per share with interest under the Judicature
Act, they should have back their shares with the dividends
that in the meantime have been declared thereon. The claim
for rescission was not made when the action was originally

notified, by letter dated 24 May 1974: the draft statement
of claim enclosed with that letter sought damages basically,
as did the statement of claim itself when filed on or about
12 June 1974. Only the present first and second respondents
were named as defendants at that stage. But by letter of
29 August 1975 the plaintiffs' solicitors notified the
defendants' solicitors that 'in the light of various matters
which have come to the Plaintiffs' knowledge' it had been
decided to seek rescission and that a motion to join
Paddington Holdings Limited as third defendant and a further
amended statement of claim would be filed. That was done
and an order adding the company as third defendant was made
by consent.

    In the Supreme Court little seems to have been said
for the defendants about remedy, their counsel having
perhaps concluded that the subject would not prove to be
relevant there. In particular it was not contended, or
at least not expressly, that if liability were established
rescission should be refused. The subject came into more
prominence in this Court. Mr O'Brien presented this part
of the argument for all the respondents. He did not contend
- and in fairness to the appellants this should be recorded
- that the omission to claim rescission until August 1975
was due to any default or neglect on the part of the
appellants. Nor does the cross-examination in the Supreme
Court seem to have been directed to establishing that the
appellants had or should have discovered earlier the facts
leading them eventually to claim rescission. But Mr O'Brien
did stress the lapse of time and changes since the takeover
and the impossibility, as he submitted, of reconstituting
the company as it was in August 1972. Referring to capital
dividends only, he said that those declared on the shares
acquired from the appellants would amount to $5.81 per share,

a total of £79,757.06. (To that it may be added that, while it is not necessary to determine the value of C. & E. shares at the date of the Supreme Court hearing or at the present day, they are plainly most valuable shares. Mr Ross calculated on the basis of information supplied to him by New Zealand Wines and Spirits Limited that the shareholders' funds of that company had doubled between 1971 and 1975.) Mr O'Brien also contended that Paddington Holdings Limited might not have declared any dividends had there still been other shareholders: that other ways of financing the takeover would have been found, at least until s.208 proceedings had been resolved.

The sheet anchor of the argument on this point by Mr Wallace and Mr Sutton for the appellants was Spence v. Crawford [1939] 3 All E.R. 271. Delivering the leading speech there, Lord Thankerton said that broadly, in his opinion, a purchaser who has been guilty of fraudulent misrepresentation is not entitled in bar of restitution to found on dealings with the subject purchased, which he has been enabled by his fraud to carry out. He left open the possibility that the position might be different if the misrepresentation were without fraud. In the only other full speech delivered in that case Lord Wright emphasised that rescission with restitutio in integrum is an equitable remedy, its application discretionary. He said that in Erlanger v. New Sombrero Phosphate Co. (1878) 3 App.Cas. 1218 Lord Blackburn had been careful not to seek to tie the hands of the Court by attempting to form any rigid rules; the Court must fix its eyes on doing what is practically just.

I do not think it would be practically just to grant rescission here. It would put the appellants in a much better position than they could have expected if there had

been no breach of duty. Only in a formal sense would the
shares revested be the same as the shares sold in 1972:
the advantages attaching to them would be much greater.
Had there been full disclosure, no misrepresentations and
no negligent advice from the directors, the initial
probability is, I think, either less than a ninety per cent
acceptance or, in the event of that percentage of acceptance,
proceedings under s.208. In either event the likely
ultimate result would have been a takeover at a better
price for the minority, whether achieved by negotiation or
Court order. The company might have carried on for a time
with a number of shareholders, but capital dividends of the
same magnitude would hardly have been forthcoming during
such a period. All this is inevitably somewhat speculative;
but what is highly unlikely is that the appellants and a
few others would have been left indefinitely as a minority
of shareholders, receiving spectacular capital dividends
and enjoying the growing prosperity of the wine and spirit
company. To put the appellants in that position now, at
a stage when s.208 is no longer available to bring about a
settlement by the Court if the parties cannot agree, would
be to promote discord. I think that a very clear case for
rescission would be needed to justify an order having that
likely consequence; and that the changed circumstances mean
that this case is not strong enough in that regard.

Spence v. Crawford was not concerned with bringing a
small minority back into a company. The point about s.208
being no longer available had no equivalent in that case.
Originally the company there had been virtually a partnership
between two shareholders, and the result of rescission was
that the successful appellant would be probably in a
somewhat stronger position than the respondent: see p.281
of the report. One would suppose that a winding up would
have been reasonable and practicable in the event of a

deadlock in the affairs of that company. Such a course would not readily be contemplated by anyone in this case. The cases are distinguishable on the facts.

So I would award the appellants compensation for the sale of their shares at $4.80 in August 1972 when, but for the breaches of duty by the directors, they would have had good prospects of obtaining a higher price. In some cases there may be differences between compensation for breach of fiduciary duty and damages for negligent advice. In this case I do not think it would be practicable to draw any distinction. As to amount, we can obtain little help from the evidence of the respondents' experts, as in the main they resolutely ignored asset backing except insofar as it bore on dividend policy. Of the appellants' experts, Mr Ross arrived at an asset value of $9.34 per share at the date of the takeover. On that basis he gave the opinion that at arm's length if an offer were made for the C. & E. shares with the intention of realising a major proportion of the assets, a reasonable price would have been in the region of $7.50 to $8 per share. Mr Hazard valued the shares, on the basis of the information that would appear to have been available to the directors at the date of the takeover, at $7.68. He thought that a corporate raider would probably 'go in' at about $7.50. But he did say in answer to the Judge that he would advise a minority shareholder to accept a lower figure. 'Speaking entirely off the cuff I may well have visualised myself saying to the minority shareholder, assuming I knew what I have just said, maybe you should take $6 or $6.50 and get your money out. Particularly if I knew the method of financing my advice would have been firm'.

In their statement of claim the plaintiffs alleged that the shares were worth at least $4.54 more per share than the price of $4.80 paid by the third defendant. In this

Court Mr Wallace accepted (i) that neither Mr Ross nor Mr
Hazard had suggested that $9.34 was the market value of the
shares at the time of the takeover; (ii) that Mahon J. 'may
originally have gained the impression that the plaintiffs
were contending that they should be paid the entire net
asset backing of their shares because this was the basis of
computation in the statement of claim'. He said, however,
that it was submitted to the Judge that, if market value
were the measure of damages, the appellants contended that
the correct figure was the difference between $4.80 and
$7.50; and that the higher figure was claimed on the basis
of the lost opportunity of staying in the company. He said
that this had been put forward to the Judge as supported by
Canavan v. Wright [1957] N.Z.L.R. 790 and was now supported
by Esso Petroleum Co. Ltd v. Mardon [1976] Q.B. 801, 820-1.

About those points I would say two things. First, we
have recognised in Schilling v. Kidd Garrett Ltd [1977] 1
N.Z.L.R. 243 that a valuation of lost opportunity may be a
proper basis on which to assess damages in some cases. But
a share is a right to remain in a company, and it would
usually be unrealistic to regard the loss of the opportunity
of remaining as worth more than the right itself. At all
events in this case it seems to me that fair compensation
between the appellants and the first and second respondents
should be based on the value of the shares as between those
parties at the date of the takeover: a figure not yielded
by any accountancy formula, for the reasons already discussed.
Secondly, the refinements of the argument for the plaintiffs
on those points, coupled with some answers given by the
Coleman·brothers in cross-examination, may help to explain
the Judge's opinion that they held an insistent view that
they were entitled to a proportionate division of all the
corporate assets. I fully agree with him that any such view
would be wrong, as Mr Wallace readily acknowledges.

Considering the evidence as a whole and bearing in mind that Mr Hazard's answer to the Judge was very tentative, I think that fair compensation should be based on a value of $7 per share. This is $2.20 more than the appellants received. They had 13,710 shares. The first and second respondents are both answerable to the appellants. We have not been asked to determine any question as to how the first and second respondents should bear this responsibility between themselves.

Accordingly I would allow the appeal and direct that the judgment of the Supreme Court be vacated and that the case be remitted to that Court for entry of judgment for the plaintiffs jointly against the first and second defendants jointly in the sum of $30,162 together with interest at 7½ per cent per annum from 7 August 1972 until the date of judgment.

The appellants are entitled to costs against the first and second respondents in both Courts. I would not make any order regarding the costs of the proceedings against the third respondent, as it is the alter ego of the first respondent. As the costs payable to the defendants under the Supreme Court judgment were agreed and as the rules of this Court about costs have recently been amended, I would reserve the question of amount, giving leave to the parties to submit memoranda if agreement cannot be reached.

RB Cooke J.

**Solicitors**

Malloy, Bramwell, Moody & Greville, Auckland, for Appellants

Russell, McVeagh, McKenzie, Bartleet & Co., Auckland, for Respondents.

C.A.70/76

|          |                                                                                                                                                             |
|----------|-------------------------------------------------------------------------------------------------------------------------------------------------------------|
| BETWEEN  | RUBY EHRENFRIED COLEMAN of Auckland, Spinster                                                                                                                |
|          | **FIRST APPELLANT**                                                                                                                                          |
| A N D    | MICHAEL PIERS COLEMAN of Auckland, Company Manager                                                                                                           |
|          | **SECOND APPELLANT**                                                                                                                                         |
| A N D    | ANTHONY CLIVE COLEMAN of Auckland, Company Manager                                                                                                           |
|          | **THIRD APPELLANT**                                                                                                                                          |
| A N D    | ARTHUR DOUGLAS MYERS of Auckland, Company Director                                                                                                           |
|          | **FIRST RESPONDENT**                                                                                                                                         |
| A N D    | KENNETH BEN MYERS of Auckland, Company Director                                                                                                              |
|          | **SECOND RESPONDENT**                                                                                                                                        |
| A N D    | PADDINGTON HOLDINGS LIMITED a duly incorporated company having its registered office at Auckland and carrying on business there and elsewhere as a Property Dealer |
|          | **THIRD RESPONDENT**                                                                                                                                         |

Coram     —   Woodhouse J.
                  Cooke J.
                  Casey J.

Hearing   —   13, 14, 15, 16, 17, 20, 22, 23, 24, 27, 28, 29th June 1977

Counsel   —   J.H. Wallace Q.C., R.J. Sutton and R.J. Moody for Appellants
                  P.B. Temm Q.C. and D.A.R. Williams for First and Third Respondents
                  M.J. O'Brien Q.C. and A.H. Brown for Second Respondent

Judgment   —   11th August 1977

---

### JUDGMENT OF CASEY J.

---

The appeal against the learned Judge's finding that there was no fraud on the part of Mr A.D. Myers was advanced in relation to the sale of assets and the disposal of the liquid cash held by C. & E. at the time of the takeover. The question is whether any deliberately false or misleading information was given on these matters to the Appellants. It is important in

this case (as Counsel for the Respondents have urged) that the
temptation of judging by hindsight should be resisted, and that
proper account be taken of the events leading up to sale of the
Appellants' shares at $4.80.  Woodhouse J. has traversed the
history in detail, setting the stage for the discussions which
took place between Mr Myers and the Appellants after 9th May 1972,
when they learned of the proposal to buy the shares, as a result
of the letter to the Guardian Trust enclosing a copy of Mr Steen's
valuation, both of which they saw.  Mr A.C. Coleman's evidence
of his discussions with Mr A.D. Myers is conceded by Mr Temm as
probably taking place about 12th May at the earliest.  According
to his evidence he made it clear that he and Michael did not want
to sell, and that Mr Myers explained his reasons for wanting all
the shares.  They talked about price; Mr Coleman pointed to the
real properties and cash, and he asked about utilising the latter
for a bonus issue which he thought would be about $2.00 or $3.00.
His evidence reads:-

> "When I asked him about the bonus issue he stated that the
> money had been committed to other purposes.  To the best
> of my recollection the money was going to be needed for
> the N.Z. Wines & Spirits Co.  He commented that in
> combination with partnership with the much larger
> participation with N.Z. Breweries a lot of money was needed
> to keep up that 50/50 balance in the two Companies.  Still
> on the bonus issue did he indicate whether there was any
> possibility of a bonus issue being made?  He quite emphatically
> said there would not be a bonus paid.  It was a fairly
> long conversation and it is fairly hard to get everything
> altogether.  The impression was that the money was
> required to keep up the Company's image in the N.Z. Wines
> & Spirits."

There followed a reference to the lack of dividends
from the latter Company in the short to medium term.

On the question of sale of assets Mr Coleman said:-

> "Was there any discussion as to the way in which the
> takeover was to be financed?  To be honest I can't
> remember his answer on that although I did discuss it
> with him.  In that context was there any discussions
> of the sale of assets?  Yes, I mentioned selling the
> various properties and my impression was that he
> definitely did not anticipate selling the Strand Arcade
> that he was going to retain that particularly.  Did he
> give any reason for that?  Yes he said he was going to
> keep that as his head office."

They also discussed the assets further and Mr Coleman, suggested
that Mr Myers was going to use the Company money to pay for the

takeover or sell the assets, but the latter denied he would sell
assets and "To the best of my knowledge he denied using company
funds but I wouldn't be prepared to swear to that part of the
conversation.

The next meeting with Mr A.D. Myers was the one held
at Mr Vincent's office in the Guardian Trust with Messrs Anthony
and Michael Coleman on 29th May.    Anthony said Mr Myers
reiterated his previous stand and that he and his brother decided
against selling.    Mr Michael Coleman's evidence about that
meeting is not very specific.    I quote the following extract
from his evidence:-

> "Was any reference made to the properties of C. & E.?
> Yes, I asked him if he intended the Company going as
> it was, and he said within all reasonable possibilities.
> I think by that he meant that as far as one could foresee
> into the future there'd be no need to sell assets or
> change the general structure of the Company.    The Court:
> Did he say that, or was that your understanding?    I think
> his words were that he was not going to change the general
> structure other than what was required under normal
> managerial positions from day to day.    Counsel: Anything
> further said about the properties of the Company?    No I
> don't think so.    Nothing more that I can remember.    Was
> there any discussion concerning the bonus issue?    Yes I
> think my brother asked him if it was intended that he be
> paid out.    He replied that this was already committed
> for other use."

He could not recall any questions about the way the takeover was
to be financed.    In cross-examination Mr Michael Coleman agreed
that the answers given to him about not changing the general
structure of the Company were in reply to his enquiries whether
Mr Myers intended to sell the shares on, or liquidate the Company,
and that no specific reference was made to selling assets.

On paper these extracts from the evidence establish
that Mr A.D. Myers told both Appellants that the cash in the
Company was committed, and he may have told Mr Anthony Coleman that
he did not intend selling assets to finance the takeover, but
specifically disclaimed any intention to sell the Strand property;
it is, I think, a fair conclusion that in the later conversation
with both of them at the Guardian Trust he left the same
impression on Mr Michael Coleman.    There was no cross-examination
on these matters - either of the statements alleged to have been
made or of their impression on the hearers, with the exception I
have quoted about Michael's evidence on liquidation or sale of

shares. The first important point is whether the learned Judge, who saw and heard these witnesses, accepted their version. It stands uncontradicted by Mr A.D. Myers, who gave no evidence at all. Mr Temm pointed to a number of findings of fact and inferences drawn by the learned Judge about the Appellants' knowledge of the C. & E. assets, previous attempts to sell and value of shares – much of which was never contested by them. If I understand his submissions correctly, he advanced these grounds for supporting a view that the trial Judge did not believe Appellants' claims that they were not aware of the intention to sell assets, or that they were given to understand the cash reserves were committed. Mr Temm added some further comment about their behaviour and attitude. None of this amounted to any challenge of their credibility over their version of these discussions with Mr Myers.

Nor did Mahon J. criticise the Appellants' account of the meetings with Mr A.D. Myers. Indeed (as Woodhouse J. points out) his judgment proceeds on a misapprehension of the significance of the cash reserve issue in this context. He made no reference to the evidence I have quoted, but dealt with this issue on the assumption that Mr Wilkinson had received advice from the Directors that there were reasons for holding these funds, when compiling his last report. The latter made it clear in cross-examination that he had in fact received no such advice, his remarks to that effect being his own opinion. The Judge held there was in fact a need to keep this reserve for N.Z. Wines & Spirits Limited, thereby justifying any statement that it was committed. I can only conclude that Mr Myers did tell the Coleman brothers the reserves were committed.

With the Strand block, the learned Judge also seems to have accepted that an assurance along the lines mentioned by Anthony Coleman was given, (although he mistakenly attributed this evidence to Michael) and he dealt with it on the basis of what Mr A.D. Myers' intentions about sale might have been at the time, reaching the conclusion that it was also justified. With respect to him, I must agree with Woodhouse J. that both these statements

were false at the time they were made.

The documentary evidence leads overwhelmingly to the conclusion that once Mr A.D. Myers had decided to go for total ownership, all the "free assets" had to be sold. This was the unequivocal advice given by Dr Lau, and as unequivocally acted upon by the steps taken through Mr Kostanich, the discussions with the National Mutual Life Association and the instructions given to Mr Tse about a sale, and by the actual sale effected shortly afterwards. No matter how one looks at this evidence, it is impossible to accept it as indicating that Mr Myers was merely considering the alternatives of selling or retaining the Strand block when he spoke to the Coleman brothers. Furthermore, there was the clear statement by Mr Myers in his letter to the Reserve Bank for permission to borrow $1.7 million "should the Company find it necessary to do so" for "working capital requirements pending sale of our Queen Street properties", which was to be repaid on sale. In spite of Mr Temm's efforts to explain this by suggesting that Mr Myers was really contemplating either loan finance or sale to effect the takeover, the letter obviously confirms his continuing intention to sell,and puts the loan in perspective as bridging finance should there be any delay. In the event it was not needed. I find it impossible against such a background to regard this letter as support for a view that Mr Myers contemplated retaining that property.

I have also tried to find any justification for the statement that the cash reserves were committed, other than the reason accepted by the learned Judge that they might be needed for N.Z. Wine & Spirit Co. The whole of the documentary evidence indicates that Company's capital requirements were to be provided by its earnings, and the earlier proposal to use the reserves for the bonus distribution, coupled with Mr Myers' prompt use of it in this way after the takeover, leads to the inevitable conclusion that they were never committed for any commercial purpose of the Company. Mr Temm submitted that there could be different reasons influencing Mr Myers' decision about these funds at different times, and both Woodhouse and Cooke JJ. have

dealt with the series of explanations he offered. I feel some further comment on one of them is warranted. He suggested that once the 100% takeover had been decided upon, the value of this asset was taken into account by an enhanced offer for the shares - "they were being held until they could be distributed to the shareholders in a way satisfactory to the majority - by a sale and purchase of shares at $4.80." There is a reference along these lines in the letter Mr A.D. Myers wrote to the Logan Campbell Trustees where he points out that for tax reasons it was impossible to make a bonus distribution to the U.K. trust, "but a profit taken on a share sale would avoid this liability." In it he referred to the agreement reached with Whinney Murray & Co. for an option of $4.80 and added "It is considered that this price fully reflects the sale of the vast bulk of the Company's assets and is realistic in terms of profit potential and dividend expectations." A similar reference will be found in the letter he wrote to Mr G.E. Myers on 18th April 1972. While there is no evidence about how he arrived at the figure of $4.80 in November 1971, it was probably fixed in the light of Mr Wilkinson's valuation of May 1971, based on a capital distribution of $2.00, no doubt also taking account of Whinney Murray's figure of $5.50 as a fair price. About this time he asked Mr Wilkinson for another valuation based on a distribution of $3.00. Accordingly he must have had in mind that the price for the shares would reflect the capital distribution which was earlier contemplated, at something over $2.00. Mr Wilkinson's series of reports make interesting reading in this light. On 4th May 1971 he thought the value of the C. & E. shares without a distribution was $2.78 and with a proposed distribution of $2.00 it was $4.17. In December 1971 (with an assumed distribution of $3.00) he arrived at $5.08. In June 1972 (when he reported for the formal takeover bid) he thought the figure was $4.47, on the basis that asset backing was relevant only to maintaining dividends and that the Directors would not be holding the cash resources without a good reason. In his evidence at the trial he confirmed that valuation,

again with no capital distribution envisaged. One can only
speculate what his assessment would have been at that date had he
known of Mr Myers' intention to reflect the equivalent of a
capital distribution in his offer. These considerations also
affect the learned Judge's view of the correct method of valuation.
While his conclusion that the Directors had abandoned the original
idea of a capital distribution may be literally correct, it by no
means follows that the proper approach to valuing the shares
against this background was on an earnings related basis only, or
that a fair price in these circumstances was their ordinary
market value.

In a sense the cash reserves could be said to be
committed in this way in order to compensate Mr Myers for
"unlocking" them to shareholders, although it would be far from
obvious to an enquirier ignorant of the way he proposed to effect
the takeover. But accepting Mr Wilkinson's valuation of $4.47
as the true market value of the shares on an earnings-related
basis in June 1972 I see a difference of only 33 cents per share
between it and the offer of $4.80, to reflect the element of
capital distribution - far lower than the $2.00-plus which Mr Myers
appears to have had in mind when originally fixing the price, and
representing a distribution of some $388,000.00 only, out of the
cash reserves of $1.8 million. I have adopted Mr Wilkinson's
valuation as being appropriate for this exercise because he was
the expert chosen by the Directors to advise them, and his opinion
was sent to the shareholders. Taking into account the higher
distribution originally contemplated, the fair price for these
shares as at June 1972, calculated in the way Mr Myers seems to
have viewed it, could have been close to Mr Hazard's snap
estimate of $6.50 for a compromise sale.

If this is what Mr Myers had in mind, I would have
expected him to have said so in reply to straightforward enquiries
about a bonus issue by the Coleman brothers. In the context of
Mr Anthony Coleman's questions it must have been clear to him
that he was talking in terms of retaining his shares and getting
a bonus, and I find it impossible to draw any other conclusion

than that Mr A.D. Myers meant them to understand that the funds were committed to the normal commercial requirements of the Company.

Of special significance in arriving at his intentions in making these statements is the advice he received on 10th May 1972, recorded in a letter to Dr Lau of that date. Because of doubts at that stage over the legality of paying for the shares by way of dividends, he said he was recommended to say nothing about his method of financing. This would furnish strong reasons for him to give misleading answers to enquiries likely to disclose his method which, under Dr Lau's plan, was the realisation of free assets and the declaration of capital dividends.

I have gone into these matters in some detail to satisfy myself on the propriety of this Court reaching a conclusion which differs from the view of the learned trial Judge. I accept that the statements attributed to Mr Myers and relied on by Appellants were made, and that they were false. That they were material to a shareholder contemplating an offer to buy in these circumstances seems to be obvious. The Respondents argued that the only area in which they could be material was in relation to the share values, and that all their expert evidence indicated that with a minority group of shareholders, the existence of these "free" assets would not have taken the price beyond the $4.80 offered. This was strongly disputed by the experts called for The Appellants, and indeed the issue of a fair price received the most careful investigation by the trial Judge because it formed one of the bases of the allegations of fraud in the Court below, and he accepted the figure of $4.80. The Respondent's experts generally made their valuations on earning capacity, taking the asset backing as relevant only to ensure the continuity of dividends, on the basis that there was no intention to realise or dispose of major assets, although Mr Cox did take into account a possible distribution of $1.00 per share. Appellants' experts tried to take these assets into account in what appears to me a more realistic manner, having regard to the specific takeover transaction they were advising on, as did the London Accountants (Messrs Whinney Murray & Co.) in their reaction to Mr Wilkinson's

first valuation. There is no evidence that the experts on either side had any idea of the wholesale realisation of free assets intended by Mr Myers, and Mr Ross had no doubt that in a takeover situation the possibility or probability that assets will be sold is a relevant factor and should be disclosed.

The real question in deciding materiality in this situation is not whether the shareholders or their advisors would have reached a right or wrong conclusion on the value of their shares. The shareholders were not so much interested in market value assessed on orthodox principles, but on whether they should sell at that price, or decline, or hold out for something better. On any basis of commercial common sense, the knowledge that these assets were available for distribution and that Mr Myers was going to realise all the free assets and acquire the N.Z. Wine & Spirit shares for virtually nothing - even on book value - must be factors very relevant to the decision they had to make.

Mr Myers' intentions in making these statements is also obvious. I have no doubt he was following the advice said to be given to him by putting the Colemans off the scent of possible illegality in the dividend proposals. He needed only to decline to tell them his plans for that purpose, not make untrue statements. But he was also attempting to allay their suspicions that he proposed taking a large profit from these assets as soon as the takeover was complete, and thereby remove their opposition to a sale and their reservations about price. By reason of his commitments to the Trusts, he needed all the shares, and as quickly as possible, so he could begin distributing the capital dividends.

The next question is whether or not these statements did induce the Appellants to get rid of their shares in the end at $4.80. Mr Temm submitted that in association with Mr Geoffrey Myers, they and their advisors must have known that Mr A.D. Myers would use the assets and reserves (including the Strand/Coburg) to pay for the takeover. The formal takeover offer under the 1963 Amendment Act was made after Mr Myers felt assured of nearly 90% of the shares. Up to then it cannot be said that the Appellants had acted to their disadvantage by relying on his

representations, because they not only refused to sell, but took
active steps (in conjunction with Mr Geoffrey Myers) to move in
themselves, while the latter tried to dissuade other shareholders
from accepting.   In the event, at the time of the formal offer he
could only have influenced the Logan Campbell Trust and the
smaller shareholders, but the disclosure of just how much Mr
Myers intended to realise might have strengthened his hand.
The Respondents point to the fact that the Appellants intended
to sell the Strand/Coburg block themselves if their counter offer
to buy the shares at $5.25 had succeeded, this being borne out
by Mr Michael Coleman's evidence.   They received backing from
Broadbank, who indicated their interest in the Strand property
as a Head Office, and might pay up to $4 million for it.   Clearly
the Appellants realised that Strand/Coburg could be sold and must
have been worth a great deal more than its book value, and Mr
Temm attached much weight to this on the issue of inducement.
But the real point is not what the Appellants might have done
if they gained control, but what they believed Mr Myers was
going to do, as a consequence of what he told them.   Mr Temm
specifically disclaimed any suggestion that Anthony Coleman did
not believe Mr Myers' statement about his intentions regarding
the Strand.   While Mr Michael Coleman believed there would be
an asset stripping operation his evidence indicates that he did
not include this property.   I agree that they and their advisors
must have realised that other properties could be sold.   But,
having regard to their lack of any detailed knowledge about the
capital requirements of N.Z. Wines & Spirits Limited, they could
not have known Mr Myers was misleading them when he said that
the cash reserves were committed.   The misrepresentation was
substantial, and remained material and causative throughout all
stages of the transaction.   Mr Ross, their advisor at the time,
made it very clear in his cross-examination by Mr Temm that he
had no knowledge of the Company's requirements or policy about
its assets.

        The evidence from the Appellants about how they were

affected by these statements relates to their decision to sell the shares after they receiced the notices under s.208(2). They apparently did not take advice on it, but came to the conclusion they had no option, in view of their minority position and of Mr Myers' attitude, which would have made it very difficult for them to stay in the Company. I agree with Mr Wallace's closing submissions that, by the time they received the notice, they felt there was nothing in it for them and it wasn't worth carrying on the fight. The respresentations by Mr Myers about his intention not to sell the Strand and that the cash reserves were committed were significant factors in leading them to this decision.

In his evidence in chief Mr Michael Coleman asserted that his decision on the notice would have been affected by the knowledge that major property assets were to be sold, and of the way the purchase was to be financed, among other factors relating to non-disclosure. He said he would have taken all steps to avoid a sale and would have sought further legal advice to see if it would have been possible for the Court to decide on the value of the shares, as well as considering a meeting of shareholders to explain the situation. In reply to the learned Judge he said the knowledge of how the takeover was to be financed altered in his view the basis of the valutions supporting $4.80 on a going-concern basis, because the Company was going to be broken up.

Mr Anthony Coleman left the final decision to sell after the notice largely in his brother's hands. He obviously felt they had come to the end of the road, but he agreed that had he realised there was going to be asset stripping to that extent, it would have influenced him to go into it more closely with his solicitor, but really, as he saw it, there didn't seem much they could do. In reply to the learned Judge he said:-

"However, had I realised he was selling up assets, it would have made me more annoyed at the time, in view of the fact he was doing something he said he wasn't going to do. What I could have done about it is very hard to say. What I know now about it and what I knew at the time, it is now very hard to keep them as two separate issues."

(On this part of the record Mr Coleman emerges as a genuine witness trying not to overstate his case.)

It seems fair to say that had Mr Michael Coleman taken the more assertive stand contemplated in his evidence, his brother would have gone along with him. The learned Judge made no finding on inducement because of his view that the statements made were not false. I have been carefully through those parts of the judgment relating to breach of fiduciary duty to see whether there is any finding which might affect the prima facie credibility of this evidence, which was not directly challenged in cross-examination. There is nothing, because again the learned Judge, though ruling that a fiduciary duty existed, found no breach.

I accept the propositions set out at p.139 (para.129) of Spencer Bower and Turner "Actionable Misrepresentation" (3rd Edition):-

> "It is sufficient to prove that the representation was
> an inducing cause. It is not necessary to establish
> that it was the inducing cause. Whether, if full
> disclosure had been made the representee would or
> would not have altered his position in the manner in
> which he did, is a question to which the law does not
> require an answer. It is enough if a full and exact
> revelation of the material facts might have prevented
> him from doing so - if it might have "given him pause"."

In considering their position under this notice, the views of Mr Ross on the 94.8. offer must have been of critical importance to the Appellants. The knowledge that an expert of his undoubted calibre thought it was a fair price on an earnings basis indicated that they had little hope of persuading a Court to make a higher assessment, unless the basis of valuation could be changed by taking into account a partial liquidation and cash distribution. Because of what Mr A.D. Myers had told them, they had no reason to suppose that he was going to do this, and accordingly no firm information to put before Mr Ross enabling him to prepare a case for a higher price. If they had been given true answers by Mr Myers - a fortiori if he had told them that the cash reserves were being "unlocked" in the price offered - I think both Appellants would have realised the implications, and Mr Ross would have been able to support with some confidence in a Court hearing under s.209 a price considerably higher than the

$4.80. He said that if he had known they intended selling the
Strand, it would have strengthened his view "that far greater
emphasis still should be placed on the asset value" but he had no
information about the Company's capital requirements. Mahon J.
felt that all the shareholders' advisors must have known that the
takeover was to be financed out of all the free assets in this way.
As Woodhouse J. points out, this is not borne out by the evidence,
nor by Mr Wilkinson's ignorance about the availability of the cash
reserves, evident from his last report. If he then thought the
Directors would not be retaining these without good reason, I fail
to see why Mr Ross should have appreciated that these assets were
available and intended to be used for the takeover. Granted the
firm conviction of these Appellants that they wanted to retain
their shares and that the price was too low, it seems right to
accept their evidence of likely reaction to the s.208 notice had
they known the full extent of Mr A.O. Myers' plans about the Strand
and the cash reserves, with the consequence that he was getting
the N.Z. Wine & Spirit shares for virtually nothing. But it is
not enough to say that they would have taken this further advice
if, in fact, there was nothing they could do but bow to the
inevitable.

In the light of the way their solicitor (Mr Malloy)
attacked the Guardian Trust over the earlier takeover proposal,
I think a similar degree of aggression on his part could be
expected on the action available under s.208. The obvious step
would have been an application to Court, disputing the compulsory
acquisition itself as well as the price. Not only would this
have taken time which Mr Myers may have found very inconvenient
in view of his commitments but, (as Mr Wallace pointed out in his
final submissions) there was at least an arguable case that the
Court might not have sanctioned the acquisition. He referred
to In re Bugle Press (1961) 1 Ch. 270 where the Court refused to
sanction the transfer of shares, holding that the formation of
the offeror Company by the majority, for the purpose of being
able to appropriate the holding of a minority shareholder under

the equivalent of s.208, was an unfair exercise of this power under the Companies Act. From Mr Myers' comments in his letter of 10th May 1972 to Dr Lau it is clear that Paddington Holdings Ltd. was set up to be the offeror Company because of his doubts about getting 90% of the outstanding shares by other means, and that Dr Lau had questioned the legality of this. This is not to say that the Court may have found the present acquisition unfair, because the circumstances are very different here, with no suggestion of intentional oppression by the other shareholders who did sell. Mr Wallace also suggested that the offeror Company might have been in the embarrassing position of having to explain the financing of the transaction by a loan contravening s.62, which might still have been owing because of Mr Myers' inability to declare the capital dividends necessary to repay it until the offeror owned these shares. It transpired that this loan had been required for a few days only by the delay in getting capital issues consent to the dividends after the acceptances. However, with his bridging finance arrangements, Mr Myers may have been able to overcome this difficulty although it might have cost him a lot in interest, either to the bank or to the vendors of other shares. The delays in getting a disputed s.208 application to a hearing in these circumstances could have been formidable. Finally there was every prospect of the Court taking a more realistic view of price in a takeover situation in 1972, in the particular circumstances of this case, rather than adopting the strict earnings-related approach which characterised the reports and evidence of the Respondents' experts. Cooke J. has dealt with this more fully in his judgment.

Whatever the outcome of an application to the Court, I am satisfied that the delays involved in such a step taken at that time would have caused great embarrassment to Mr A.D. Myers, quite apart from any risks of an unfavourable decision on acquisition or price, and would very likely have led to a settlement on terms far more favourable to Appellants' than $4.80. I have approached this issue of fraud with a full appreciation of the reluctance an Appellate Court must feel about differing

from the findings of a trial Judge on such a matter; I also bear
in mind the seriousness of the allegation, especially against
the background of this transaction.  However, I am satisfied
that no doubt about the Appellants' credibility has been raised
on any material part of their evidence and it has not been answered
by any evidence from Mr Myers.  On all other aspects, the primary
evidence is established by the admitted documents.  In my view
the facts and the necessary inferences to be drawn from them,
clearly support the allegations of fraud in the two areas relied
on in this appeal.

Breach of Fiduciary Duty:

After a review of the authorities and a lengthy
consideration of Percival v. Wright, the learned Judge felt it
had been wrongly decided and should not be followed.  Insofar as
it may suggest that a Director can never be in a fiduciary
relationship with a shareholder, I concur.  But in view of its
own facts and of the concessions made, the case may have been
correctly decided on the basis that the relation of Director/
shareholder does not by itself give rise to a fiduciary duty, and
that Swinfen-Eady J. did not consider the circumstances warranted
such a finding.  I agree with Mahon J. where he says that "the
creation of a fiduciary obligation is not conditioned by the
existence of settled categories of circumstances."  Its existence
depends upon a consideration of all the circumstances establishing
that one party was known to be reposing trust and confidence in
the other in the particular transaction and justifying the
intervention of the Court.  I think the following extract from
the judgment of Fletcher Moulton L.J. in In re Coomber (1911) 1 Ch.
723 at p. 728 is apt:-

> "Fiduciary relations are of many different types; they
> extend from the relation of myself to an errand boy who
> is bound to bring me back my change up to the most
> intimate and confidential relations which can possibly
> exist between one party and another where the one is
> wholly in the hands of the other because of his
> infinite trust in him.  All these are cases of fiduciary
> relations, and the Courts have again and again, in cases
> where there has been a fiduciary relation, interfered
> and set aside acts which, between persons in a wholly
> independent position, would have been perfectly valid.

> Thereupon in some minds there arises the idea that if
> there is any fiduciary relation whatever any of these
> types of interference is warranted by it.  They
> conclude that every kind of fiduciary relation justifies
> every kind of interference.  Of course this is absurd.
> The nature of the fiduciary relation must be such that
> it justifies the interference.  There is no class of
> case in which one ought more carefully to bear in mind
> the facts of the case, when one reads the judgment of
> the Court on those facts, than cases which relate to
> fiduciary and confidential relations and the action of
> the Court with regard to them."

Like Cooke J. I find <u>Percival v. Wright</u> of no great
relevance here and, for the reasons he and Woodhouse J. have set
out, I have no doubt that in this tightly-held family Company,
both Directors owed a fiduciary duty to the Appellants and to
the other shareholders,  It must have been clear to Mr A.D.
Myers particularly that they were reposing trust and confidence
in him, from their discussions and the enquiries they made.
I have no doubt Sir Kenneth Myers was in everyone's eyes the head
of the family group and its associated shareholders, whom they
respected and trusted to look after their personal interests
in the management of the Company.  Typical of this concern are
the letters he wrote to his sisters about the earlier proposals
for a distribution, and his separate discussions with the
Appellants, when they sought his advice on Mr A.D. Myers' bid.
In such a family situation the latter, as Managing Director,
would inevitably have been expected to continue the care and
prudence displayed by his father for the welfare of family and
associates, notwithstanding the fact that he was bidding for
their shares.  The evidence points to his recognition of this,
in the discussions he willingly held with the Appellants about
the reasons for his takeover and his plans, and a letter among
the exhibits suggests a similar discussion with Mr G.E. Myers.
Add to this special relationship their exclusive knowledge of
facts and intentions affecting the shareholders in relation to the
offer and there can be only one conclusion.  These two Directors
clearly owed a fiduciary duty not to make deliberately or carelessly
misleading statements on material matters, and to make proper
disclosure.  As Mahon J. put it, there was "a duty to disclose
to such shareholders any material fact of which to his knowledge
they were unaware and which reasonably might from an objective

viewpoint materially affect the decision of those shareholders as to whether they would sell or as to the terms of the sale." Like Cooke J. I go along with Counsels' view that "would" should be substituted for "might" in this passage, following the reasoning in T.S.C. Industries Inc. v. Northway Inc.

A number of instances of non-disclosure are pleaded as breaches of this duty, but at the appeal these were crystallised down to four.   The first is non-disclosure of the existence and value of the Company's assets and the dealings with them both past and contemplated.   There had been attempts to sell properties from 1970 to mid 1972, which Mahon J. thought must have been known to Mr G.E. Myers, who attended all Directors' meetings until his removal in June 1972.   He inferred that the Appellants must have been aware of the existence of these assets and the endeavours to sell them by the time they accepted the offer, through their association with Mr G.E. Myers.   Such a finding means (according to the Respondents) that he did not accept their evidence that they knew little about the Company beyond the existence of its major assets, because of insufficient detail in the balance sheets to give a full picture, and no other information being available to shareholders generally.   With respect, there is considerable force in Mr Wallace's submission that the evidence simply does not justify this finding and that, although they conferred with Mr G.E. Myers, the Appellants were unaware of the assets in any detail or of an overall intention to sell them.   Mr Ross gave evidence and was cross-examined about his knowledge of the Company's position following his discussion with Mr G.E. Myers, when he was asked to prepare a share valuation.   He knew at that stage - the information coming from Mr G.E. Myers - that the Company owned definitely the Strand the Coburg and Victoria Hotels, and he believed it owned a number of hotel properties.   This hardly suggests detailed knowledge by Mr G.E. Myers, who would presumably be concerned to tell him as much as possible about the position for his valuation. Mr Gardiner was asked to make an appraisal of only these three properties at that time.   Furthermore, Mr Ross was quite definite

that he was not informed the Company was either considering or in
the process of selling any of the property assets.  Again, this
was something one would have expected Mr Myers to have told him
if he had been aware of it.  Through illness, Mr G.E. Myers was
not available to give evidence, but this independent and
uncontradicted evidence from Mr Ross suggests he may have known
little more than the Appellants themselves about the real position
of the Company's assets and of its intentions.  Mr Ross was not
alone in his understanding; Mr Steen's valuations for the Logan
Campbell Trust and Guardian Trust proceeded on the basis that
assets were being held, and the only information he was given by
the Company Secretary related to their value.

The learned Judge stated it was common knowledge that
the Company had attempted to sell all its properties to N.Z.
Breweries, with the possible exception of the Strand/Coburg block.
But this broad comment is not necessarily borne out by the
Statement to Shareholders of 11th December 1970, advising of the
deal concluded with N.Z. Breweries and stating "A small number of
hotels whose worth is reflected in high real estate value, have
been retained", and concluding "your Directors feel that this
rationalization will strengthen your Company's trading position and
provide the basis for further expansion."  Far from suggesting a
continuing intention to sell all the hotel properties, this
Statement rather implies that no settled decision had been reached.

However, with the exception of the Strand block, I
agree with Mahon J. in not placing much importance on non-disclosure
of the hotel properties in detail or of the attempts to sell them.
Both Anthony and Michael Coleman believed there would be some asset
stripping on a takeover by Mr A.D. Myers - this being the factor
prompting the latter to make his counter-offer - and by that stage
they must have realised those hotel properties were "free assets"
which could be sold.  Mr A.D. Myers' ability to reach assets was
also apparent to Whinney Murray & Co., so they may well have had
the possibility of realisation in mind in making their assessment
of value on the original offer.

I except the Strand block because of the representations

made by Mr A.D. Myers, which Mr Temm conceded were believed by Mr A. Coleman.. This was a major asset which both Directors and the Appellants thought could be sold at very much more than book value, and, while I consider the intention to do so should have been disclosed, undoubtedly they should not have been deceived into thinking it was to be retained. Plans about its disposal would be important to shareholders in reaching a decision on the offer and I have dealt with this more fully under fraud, when considering Mr Ross' ability to present a case for increased price. There is no evidence that Mr G.E. Myers knew anything about the Tse investigations, or of the other enquiries and proposals about selling this property before the takeover, enabling him to give information affecting the Colemans' belief that it would not be sold.

The next area of non-disclosure related to the Directors' knowledge that market value of the assets exceeded their book value, and in his judgment Mahon J. took this as being relevant only to the Strand/Coburg block and the Victoria Hotel. However, the Appellants added the Star Hotel ($150,000.00 excess) and other properties ($100,000.00 excess), based on the schedule the Company Secretary supplied to Dr Lau and containing his estimates of sale value above book values. Taking the Strand/Coburg as worth $3 million against book value of about $2 million, and an excess of $240,000.00 for the Victoria Hotel, Mr Wallace submitted that in fact the Directors knew all the assets had a combined market worth of nearly $1.5 million over book value.

The learned Judge dismissed the Victoria Hotel on the basis that attempts to sell it had been unsuccessful, although there had been a tentative offer before the takeover of $480,000.00, against its book value of $231,000.00. It was eventually sold in March 1973 for $475,000.00. In his appraisal for Mr Ross, Mr Gardiner had valued it at $400,000.00. While I consider the Directors had firm grounds for believing this hotel was worth substantially more than book value and should have disclosed this, the figure supplied by Mr Gardiner may have gone some way to fill

this gap in the Appellants' knowledge, although it was known to
be only a hasty estimate. But his figure of $2,025,000.00 for the
Strand/Coburg block was very little above book value, and well
below the $3 million which I am satisfied the Directors believed
to be a realistic assessment of its true market value at the date
of the offer. Mr Jeffries' valuation for the National Mutual
Life Association ($2.85 million) was known to Mr Myers, who refused
to consider its serious overtures to buy at $3 million, on the
basis that the block was worth over $4 million. Mahon J. relied
on evidence about the state of the Auckland commercial property
market at the time, suggesting a steep decline between 1971 and
1973. However, the Strand/Coburg was sold in October 1972 for
$3.5 million, negotiations with its purchasers commencing on 29th
July. Whatever the effect of this evidence about the state of
the property market, with respect I find it impossible to accept
the finding that the Directors, on the facts and opinions at their
disposal, "may well have considered that <u>at some indeterminate</u>
<u>time in the future</u> (emphasis mine) the property could bring $3
million." In my view, they believed there and then that they
could get at least this figure, and their prompt action in selling
after the takeover at $3.5 million amply confirms this.

Mahon J. conducted an extensive research into the
circumstances obliging a Director to disclose his belief about
the value of assets in this situation. Most of the authorities
were American, dealing with Rule 10b-5 of the Securities Act. He
mentioned the caveat imposed by Dr Lau (and other experts for the
Respondents) against adopting too liberal a standard, on the
sensible ground that a Director could do shareholders a disservice
by expressing opinions which might not be borne out by events.
They thought it would be wrong to transmit to shareholders any
opinion of value which was not supported by an assured pending sale.
Mahon J. adopted this view, following a line of American decisions
under Rule 10b-5, although Mr Wallace referred to other cases from
the same jurisdiction where special circumstances formed the basis
of such disclosure, and it was not limited to a situation of
"assured sale" or its equivalent. He held the mere possibility

of sales of corporate assets did not call for disclosure and he
put Mr A.D. Myers' belief of value in respect of Strand/Coburg
within this category.   With respect to this view reached by
Mahon J., I think the "assured sale" concept is not the only
consideration to be adopted in determining whether a Director
should disclose his belief about market value in a fiduciary
relationship.   Like so much in this field, the Court must look at
all the relevant circumstances and measure his obligation by
reference to the commercial common-sense of the situation.   A
consideration of the material available to the Directors in this
case will demonstrate this proposition.

The main breach alleged by the Appellants was non-
disclosure of the Directors' knowledge of the substantial
difference of about $1 million between market value and book
value of the Strand/Coburg.   Assuming such a difference, it seems
beyond argument that it should have been disclosed, if the
Directors had proper grounds for their belief.   I accept that an
isolated offer, or negotiations, from someone who may or may not
have a special interest in acquiring the property cannot give a
reliable assessment of its true market value, and such a trans-
action might well be suspect unless there is an assured sale or its
equivalent.   But this is not the only way in which knowledge of
market value can be acquired in New Zealand, whatever the situation
may be in the United States.   A full and up-to-date valuation by
an experienced valuer is generally recognised as a sound basis,
and Mr Jeffries' valuation of $2.85 million is clearly of that
calibre - very different from the hasty informal estimate made
by Mr Gardiner and qualified by him in these terms.   The expert
opinion of Mr Kostanich would also provide further grounds for the
Directors' belief.   On 6th June he recommended they fix $3 million
as a starting point in negotiations for sale.   There were the
serious proposals for a $3 million option by National Mutual and
the study in depth by the Tse organisation.   All this was
followed by the prompt sale for $3.5 million after the takeover.
On any view of these facts, it must be inferred not only that the
Directors believed the market value of this block was close to

$3 million when the offer was made, but also that they knew this figure had solid and acceptable support.   If this had been a take-over offer from an "outside" bidder, I am certain that both of them would have felt no hesitation in putting these factors before the shareholders, to justify a market value of at least $3 million; and I also believe they would have included the Victoria Hotel in their comments.   They are far removed from the situation envisaged by Dr Lau when he spoke of Directors giving opinions about market value or likely sales from inconclusive negotiations. In my opinion the confidence reposed in these Directors by the shareholders required the disclosure of their belief about the value of the Strand/Coburg block and the Victoria Hotel, as if they were advising them on an outside bid at arm's length.

In the case of the other assets I think on the whole there was insufficient evidence of increased value in any particular case, imposing a positive duty on the Directors to disclose any belief they may have held which differed from the individual book values.   However, it must be remembered that a number of assets are involved, of varying values; and the combined difference between the book values and the Company's estimates of market value was substantial.   Mahon J. felt that because the Appellants believed Strand/Coburg to be worth $3 million, non-disclosure made no difference to them.   But all they had to go on by way of concrete information was Mr Gardiner's quick appraisal (made with clearly expressed reservations) and the book values.   Knowledge that the Directors also believed the market value accorded with their uninformed opinion must have been important as materially altering the "mix" of information on which their final decision had to be made.   This point was made by Mr Michael Coleman in his cross-examination about his belief of its value "It would have enlightened me to know the true value of the properties" and he said much the same thing when he asked about his view of the Broadbank proposals for this block, if he had gained control of the Company.

The next aspect of non-disclosure on the appeal related

to Mr A.D. Myers' financial arrangements for the takeover.
Mahon J. could not accept the relevance of this to any shareholder,
but Mr Wallace submitted that when the unconditional offer by
Paddington Holdings Ltd. was made, Mr A.D. Myers was committed to
buy over 60% of the C. & E. shares, and that when the other 40%
came to consider the merits of the bid, a capital distribution
was inevitable, and this fact was of the highest importance in
valuing their shares and was never disclosed.   If they had
retained them, the Appellants along with other shareholders could
have expected to share in it.   Mr Wallace says the learned Judge
did not deal with this submission although it was stressed by
Mr Hazard in his evidence and in submissions.   He thought that
all ideas of a capital dividend to existing shareholders had been
abandoned because of the U.K. tax problems for Barbara Myers, but
I find it difficult to accept this as the real reason for the
Directors' change of plan.   The letters from Whinney Murray & Co.
emphasised their preference for the original scheme, and Dr Lau
gave the simple solution to Sir Kenneth Myers' estate problems
on such a distribution - he needed only to transfer his shares
first.   I think the real explanation was the decision by Mr A.D.
Myers to obtain 100% control, and the idea of a capital distribution
was never abandoned - it was simply postponed until after that
occurred.

Mr Wallace also submitted that disclosure of these
plans would have made it obvious to the shareholders that all the
free assets were available for sale or realisation and that a
capital distribution could be made, as none of them were required
for the Company's intended business.   Instead of this, the
Directors in effect told the shareholders there would be no cash
issue; that liquid cash and the major property were committed to
the Company carrying on, so that the shares should be valued on
an earning capacity basis only.   I have already expressed the
view that disclosure of how the takeover was to be financed would
have made a substantial difference in the way shareholders and
their advisors would react to the offer, and I adopt what Cooke J.
has said in relation to share prices on a takeover bid.

The learned Judge felt it must have been obvious to
the shareholders and their advisors that Mr A.D. Myers was going to
pay them out of surplus assets "Where else would Mr A.D. Myers
obtain the $5.6 million involved?" he asked.    There was no
evidence about other assets available to him.    But in the belief
of these Appellants, he was not getting it from the liquid cash
or the Strand block anyway - representing at least $4 million of
assets.    None of the experts on either side seemed aware of the
wholesale realisation and capital dividends intended by Mr Myers;
nor did other witnesses indicate that they anticipated he would
act in this way.    While I agree that in some cases it may be of
no relevance to a shareholder to know how a bidder proposes to
finance his offer, in the circumstances of this case it was
material, at least to the extent of providing them with information
that the assets were free and available for distribution.    Once
again, the Directors' duty becomes clear if one askes what advice
they would have given their shareholders on a similar outside bid,
knowing the offeror's intentions and the dimensions of the coup
contemplated by use of the Company's assets.    Can there be any
doubt that they would immediately inform the shareholders and
point out the implications?

        Appellants' next submissions dealt with non-disclosure
of the prospects of New Zealand Wine & Spirits Ltd.    On the
evidence, the Directors informed all shareholders that the dividend
outlook from C. & E. was bleak  because all profits from New Zealand
Wines & Spirits would be used for its own needs and expansion in
the short to medium term.    Yet, after the takeover was completed,
Mr Wallace says that not only were the large capital dividends paid
out, but a dividend of $750,000.00 was paid from C. & E's revenue
reserves, which was five times the usual annual dividend of 12½%
on all its share capital.    This submission really has more
relevance to the non-disclosure of the financial arrangements
proposed by Mr A.D. Myers for the takeover, including what must
have been his intention throughout of cleaning out the revenue
reserves.    The future profitability of New Zealand Wines &
Spirits was obvious to the Directors.    In his letter to Dr Lau

of 24th November 1971 Mr A.D. Myers referred to net pre-tax profit
of $1.6 million for the current year, with a target of $2 million
the following year.   By March 30th 1972 he expected the position
about its properties to be resolved enabling a detailed cash flow
forecast over five years to be made.   It was a most valuable
partnership with N.Z. Breweries and this was recognised by the
Appellants, and formed a strong motive for their desire to remain
in the Company.   Mahon J. referred to the way Mr Wilkinson had
dealt with its profitability in the report sent out to shareholders,
and I agree with his conclusion that the picture presented was one
of a potentially prosperous Company which might need to retain
profits for capital expansion; and that there was no element of
non-disclosure with regard to its prospects, at least so far as
Appellants are concerned.

The final allegation of non-disclosure was the failure
to inform the shareholders of alternative possibilities for the
conduct of C. & E's business by re-investing the proceeds from
the sales of properties to maintain the dividend of 12½%, with
recourse to capital/funds if necessary.   Mahon J. disposed of this
by pointing out that such a proposal could not have affected the
basis of valuation of shares at $4.80, and the reduction of capital
may have prejudiced this by removing the security for a continuing
dividend requiring nearly all the annual profits, especially if
the original capital distribution of $2.00 per share had been made.
Mr Wallace criticised this approach on the grounds that Mr
Wilkinson's valuation, assuming a $3.00 distribution, was $5.08
per share, and that this should have been disclosed.

The Respondents answered this by pointing out that
Mr Wilkinson's valuations were of no practical use to anybody,
because the capital distribution he assumed could only be made by
selling assets, and that all indications were that the properties
would remain difficult to dispose of.   I have already expressed
my contrary view on this in relation to the major Strand/Coburg
block, whose sale would have enabled these distributions with cash
to spare.   By itself this point may not have been sufficiently
important to affect a shareholder's decision, but it brings me to

Mr Wallace's final point on non-disclosure which I think is valid.
He said that in considering this question, the important thing to
bear in mind is the totality of the situation, and that it is not
appropriate to review each individual item (as the learned Judge
has done) and reject it as being insufficiently material.     I
agree that such a limited approach does give a distorted picture
of the advantage the Directors and their advisors had over the
shareholders, in the total amount of information available to them,
enabling them to make accurate judgments and decision, whereas the
recipients of the offers were left guessing in many important areas.
It is true that they had Mr Wilkinson's report commissioned by the
Directors, but this (like Mr Steen's) dealt with the assessment of
a fair valuation on orthodox principles, and on the basis that there
was to be no realisation of assets on the scale contemplated by
Mr Myers.    They gave the shareholders little to go on in reaching
a decision in their own interests in the actual takeover situation
confronting them.    On an overall view of these allegations of non-
disclosure, I think it can be fairly said that Mr A.D. Myers
disclosed nothing more than a good salesman would have done in
attempting to persuade a vendor to sell.    This is hardly surprising
in view of the Respondent Directors' attitude throughout the trial
that they were not fiduciaries; but such an attitude falls well
short of the duty a Director in such a position of trust owes to
those shareholders with whom he is dealing.    I also conclude that
in joining in the recommendation to sell, and with the knowledge
he must have had of the circumstances, Sir Kenneth Myers also
shares this responsibility.

          The Appellants' evidence, to which I referred in
dealing with inducement in the fraud issue, indicates that they were
also affected by the non-disclosure they have established, in
reaching their final decision to sell at $4.80.    The combined
effect of the fraud and non-disclosure left the Appellants
believing that major assets were not going to be available for
distribution under Mr Myers' control, and they would have no way of
reaching them as minority shareholders.    Without information about
his plans or his ability to use these assets, they had no basis

share adopted by Cooke J. can be supported by the only direct evidence (from the Appellants' experts) as the price they would most likely have settled for. I have already commented on Mr Wilkinson's differing valuations from May 1971, taking into account capital distributions and ending up with a figure of $4.47 on a straight-out earnings basis; by adding in the allowances for capital distribution previously suggested by Mr A.D. Myers, his final figure may also have come close to $7.00.

I therefore agree with the judgment proposed by Cooke J.

M.E. Casey J.

Solicitors for Appellants:   Malloy Bramwell Moody & Greville
                             Auckland

Solicitors for Respondents:  Russell McVeigh McKenzie
                             Bartleet & Co.
                             Auckland

*a*  Divisional Court gave its decision, that is as much as I need to say about irrationality in the context of this case.

*(6) Reasons*

Finally, Mr Gordon attacked the tribunal's reasons. They were not, as I have said, well expressed, largely because question 8 on the form failed to reflect the *b*  statutory wording and so asked the wrong question, and if the factual situation was still as it was at the time when the matter before the Divisional Court I would order that the matter be remitted to a differently constituted tribunal so that clear findings could be made in relation to s 72(1)(b) and, if appropriate, in relation to s 72(2) in the light of the judgments of this court. To that extent I would have considered it appropriate to vary the order of the Divisional Court, *c*  but in the circumstances which prevail at the present time it seems to me inappropriate for any specific order to be made.

**NOURSE LJ.** I have had the advantage of reading in draft the judgments of Kennedy and Roch LJJ. On the true construction of s 72(1)(b) of the Mental *d*  Health Act 1983, the only point on which they differ, I prefer the view of Kennedy LJ to that taken by Roch LJ and the Divisional Court. There is nothing I can usefully add to the reasoning of Kennedy LJ on that question. On all other questions I agree with both the judgments in this court.

I too would allow the tribunal's appeal.

*e*  *Appeal allowed.*

*27 April. The Appeal Committee of the House of Lords (Lord Jauncey of Tullitchettle, Lord Browne-Wilkinson and Lord Nolan) refused leave to appeal.*

*f*                                                                          Frances Rustin    Barrister.

# El Ajou v Dollar Land Holdings plc and another

*g*  COURT OF APPEAL, CIVIL DIVISION
NOURSE, ROSE AND HOFFMANN LJJ
13, 14, 15 OCTOBER, 2 DECEMBER 1993

*h*  *Company – Director – Company receiving improperly obtained money – Whether knowing receipt – Whether director having knowledge – Knowledge to be attributed to company – Directing mind and will of the company – Whether knowledge of agent could be imputed to company – Basis on which company liable to owner of money.*

The plaintiff owned substantial funds and securities which were under the *j*  control of an investment manager in Geneva who was bribed to invest the plaintiff's money, without the plaintiff's authority, in fraudulent share selling schemes operated by three Canadians through the medium of two Dutch companies. The proceeds of the fraudulent share selling schemes were channelled through Geneva, Gibraltar, Panama and back through Geneva from where some of it was invested in a London property development project in conjunction with the first defendant ('DLH'), a property company which

was controlled by persons unconnected with the Canadians' fraud and which
had required financial backers for a speculative building project which it          *a*
proposed to enter into. DLH had been acquired by those persons on the advice
of S, who had been introduced to them by F, a Swiss fiduciary agent who also
acted for the Canadians. DLH's affairs were conducted by its controlling
shareholders and S, who was managing director of a subsidiary. F was the
chairman of DLH but played no active part in its management. S had          *b*
approached F for assistance in obtaining finance for the development project
and F had introduced S to the Canadians, who provided £270,000 as a deposit
for the purchase of a site by a DLH subsidiary, DLH London. The Canadians
through various companies controlled by them provided further funding of
£1,030,000 to DLH to develop the project. The Canadians had also deposited
money with a company controlled by F which F had misappropriated and was          *c*
unable to return.    To resolve matters a meeting took place at DLH's
headquarters in London at which DLH agreed to guarantee F's indebtedness
to the Canadians subject to a specified limit. F later resigned as a director of
DLH in June 1987 for health reasons. The Canadians subsequently indicated
that they wished to withdraw from the property development project and S          *d*
was able to negotiate very favourable terms for the purchase by DLH of the
Canadians' interest in March 1988. The plaintiff when he discovered the fraud
perpetrated by the Canadians and his agent brought proceedings against DLH
to recover the money received by it from the Canadians on the grounds that
DLH had received the money with knowledge that it represented the proceeds
of fraud or, alternatively, sought to recover the value of the Canadians'          *e*
investment on the grounds that DLH had knowledge of the fraud before it
bought the Canadians out. The judge dismissed the plaintiff's claim, holding
that although the plaintiff was entitled in equity to trace his money to the DLH
venture, he could not succeed in his claim for knowing receipt because he had
failed to establish that DLH possessed the requisite degree of knowledge          *f*
through either F or S that the funds received by DHL from the Canadians were
the proceeds of fraud, because F had played only a minor role in the
management of DLH and his knowledge could not be attributed to the
company since he could not be considered the directing mind and will of the
company and the information he had acquired as to the Canadians' fraud had
been acquired by him in his capacity as an officer of another company and in          *g*
the case of S there was no evidence that he knew that the Canadians were using
money which they had obtained improperly.    The plaintiff appealed,
contending that F's knowledge should be treated as the knowledge of DLH on
the ground that F was, in relation to DLH's receipt of the fraudulently acquired
assets, its directing mind and will and/or he was its agent in the transaction.          *h*

**Held** – The appeal would be allowed for the following reasons—

(1) The directing mind and will of a company was not necessarily that of the
person or persons who had general management and control of the company
since the directing mind and will could be found in different persons in respect          
of different activities. It was therefore necessary to identify the person who          *j*
had management and control in relation to the act or omission in point. The
judge had been wrong to hold that a non-executive director such as F who was
responsible for formal paperwork but not for the business and who had played
no part in business decisions could not be for certain purposes the directing
mind and will of the company. On the facts, the transactions to be considered
were those by which DLH received assets representing the moneys

a  fraudulently misapplied and the crucial considerations were that F made all the arrangements for the receipt and disbursement of the £270,000 and the £1,030,000 and significantly, on 6 May 1986 signed the funding agreement whereby DLH obtained the £1,030,000 since it was those steps that caused DLH to become involved in the project and enabled it later to acquire the assets representing the moneys fraudulently misapplied. Each of those steps

b  was taken without the authority of a resolution of the board of DLH, which showed that F had the de facto management and control of the transactions. The directing mind and will of DLH in relation to the relevant transactions was thus the mind and will of F and no one else, so that F's knowledge that the moneys were the proceeds of fraud could be attributed to DLH and therefore the claim to enforce a constructive trust on the basis of knowing receipt

c  succeeded. That conclusion was not affected by the fact that F ceased to be a director of DLH in June 1987 or that DLH did not receive the asset representing the £1,030,000 until March 1988, since the steps that caused DLH to become involved in the project and enabled it later to acquire the asset were all taken when F and consequently DLH had the requisite knowledge. The subsequent

d  acquisition was sufficiently connected with the original investment to be affected by the same knowledge (see p 696 b j to p 697 f, p 698 a to d, p 699 j to p 700 e and p 706 f to p 707 b , post).

(2) However, F's knowledge could not as a matter of law be imputed to DLH on the basis that he had acted as the agent of DLH in the transaction because DLH was under no duty to inquire as to the source of the offered

e  money. Further, even if F, in his capacity both as broker and as chairman of DLH, was under a duty to inform DLH that the moneys in question were the proceeds of fraud, that duty alone was not a ground for imputing such knowledge to DLH. Moreover, as F had acquired the information about the fraud while acting for the Canadians and not in his capacity as agent for DLH,

f  the principle that communication to an agent was deemed to be communication to the principal did not apply. Accordingly, F's knowledge could not be imputed to DLH on the ground of agency (see p 698 f to j, p 700 f g and p 703 e to p 704 b, post).

Decision of Millett J [1993] 3 All ER 717 reversed.

g  **Notes**

For following trust property, see 16 *Halsbury's Laws* (4th edn) paras 1460–1464 and 48 *Halsbury's Laws* (4th edn) para 941, and for cases on the subject, see 20 *Digest* (1982 reissue) 900, 6706 and 48 *Digest* (1986 reissue) 728–738, 6687–6751.

h  **Cases referred to in judgments**

*Baldwin v Casella* (1872) LR 7 Exch 325.

*Blackburn Lowe & Co v Vigors* (1887) 12 App Cas 531, HL.

*Blackley v National Mutual Life Assurance* [1972] NZLR 1038, NZ CA.

*Carew's Estate Act, Re (No 2)* (1862) 31 Beav 39, 54 ER 1054.

j  *Dresser v Norwood* (1864) 17 CBNS 466, 144 ER 188.

*Fenwick Stobart & Co Ltd, Re, Deep Sea Fishery Co's Claim* [1902] 1 Ch 507.

*Gladstone v King* (1813) 1 M & S 35, 105 ER 13.

*Hampshire Land Co, Re* [1896] 2 Ch 743.

*Kelly v Cooper* [1992] 3 WLR 936, PC.

*Lennards Carrying Co Ltd v Asiatic Petroleum Co Ltd* [1915] AC 705, [1914–15] All ER Rep 280, HL.

*Montagu's Settlement Trusts, Re, Duke of Manchester v National Westminster Bank*     *a*
    *Ltd* (1985) [1992] 4 All ER 308, [1987] Ch 264, [1987] 2 WLR 1192.
*Payne (David) & Co Ltd, Re, Young v David Payne & Co Ltd* [1904] 2 Ch 608, CA.
*Powles v Page* (1846) 3 CB 15, 136 ER 7.
*R v Andrews Weatherfoil Ltd* [1972] 1 All ER 65, [1972] 1 WLR 118, CA.
*Regina Fur Co Ltd v Bossom* [1957] 2 Lloyd's Rep 466.
*Tesco Supermarkets Ltd v Nattrass* [1971] 2 All ER 127, [1972] AC 153, [1971] 2   *b*
    WLR 1166, HL.
*Turton v London and North Western Rly Co* (1850) 15 LTOS 92.

**Appeal**
The plaintiff, Abdul Ghani El Ajou, appealed from the judgment of Millett J
([1993] 3 All ER 717) delivered on 12 June 1992 whereby he dismissed the action   *c*
brought by the plaintiff against the defendants, Dollar Land Holdings plc
(DLH) and Factotum NV (Factotum), in which the plaintiff had claimed, inter
alia, (i) damages from DLH, seeking to recover the sum of £1,300,000 being the
property of the plaintiff or otherwise money traceable as money of the plaintiff
in a development at 22–50 Nine Elms Lane, London SW8 on the ground that   *d*
DLH received it with knowledge that it represented the proceeds of fraud, or,
alternatively, the value of the investment of three Canadians whose interest in
the joint venture at Nine Elms was bought out by DLH, the plaintiff alleging
that DLH acquired such knowledge before it bought the Canadians out, (ii) a
declaration that the said advance was at all times the property of the plaintiff,
and/or was at all times held by DLH and Factotum upon trust for the plaintiff   *e*
absolutely, (iii) a declaration that DLH had received the amount of the advance
as a constructive trustee for the plaintiff absolutely and was liable to account
to the plaintiff as such trustee, (iv) an order that there an account of all money
paid or payable to or received or receivable by DLH (including any profits) in
respect of the aforesaid development of the site be taken, (v) an order for the   *f*
payment of the amount of the advance and all profits earned by DLH by the
utilisation thereof and (vi) a declaration that the plaintiff was entitled to
payment of all money found due on the taking of the accounts. The facts are
set out in the judgment of Nourse LJ.

*Michael Beloff QC, Roger Ellis* and *Sarah Moore* (instructed by *Bower Cotton &*   *g*
    *Bower*) for the appellant.
*Romie Tager* (instructed by *Kaufman Kramer Shebson*) for the respondents.

                                                     *Cur adv vult*

                                                      *h*
2 December 1993. The following judgments were delivered.

NOURSE LJ.

*Introduction*
    Of the questions that remain in dispute in this case, the most important is  *j*
whether, for the purposes of establishing a company's liability under the
knowing receipt head of constructive trust, the knowledge of one of its
directors can be treated as having been the knowledge of the company. That
is essentially a question of company law. There are or have been other
questions on tracing and constructive trust.

*a* The company is the first defendant, Dollar Land Holdings plc ('DLH'). The director is Mr Sylvain Ferdman, who was the chairman and one of the three directors of DLH between June 1985 and June 1987. The party who seeks to recover against DLH in constructive trust is the plaintiff, Abdul Ghani El Ajou. He has put his claim at £1·3m. On 12 June 1992, after a trial extending over some 11 days, Millett J delivered a reserved judgment dismissing the plaintiff's

*b* action (see [1993] 2 All ER 717). He held that the plaintiff had an equitable right to trace the money into the hands of DLH, but that Mr Ferdman's knowledge of their fraudulent misapplication could not be treated as having been the knowledge of DLH, either on the ground of his having been its directing mind and will or on the ground of his having been its agent in the transaction. The judge found that another person closely concerned with the affairs of DLH, Mr

*c* William Stern, did not have the requisite knowledge of the misapplication. The plaintiff now appeals to this court. He does not seek to upset the judge's finding in regard to Mr Stern. DLH has put in a respondent's notice whose primary purpose is to impugn the judge's finding as to one part of the tracing exercise.

*d* Because the report sets out in full the judge's clear and necessarily lengthy statement of the facts and because the issues have narrowed in this court, the facts can now be stated relatively briefly. I will state them mainly in the judge's own words.

*e* *The facts*

The plaintiff is a wealthy Arab businessman resident in Riyadh. He was the largest single victim, though only one of many victims, of a massive share fraud carried out in Amsterdam between 1984 and 1985 by three Canadians, Allan Lindzon (or Levinson), Lloyd Caplan and Harry Roth ('the Canadians'). Some of the proceeds of the fraud were passed from Amsterdam through

*f* intermediate resting places in Geneva, Gibraltar, Panama and Geneva (again) to London, where in 1986 they were invested in a joint venture to carry out a property development project at Nine Elms in Battersea in conjunction with DLH. The interest of the Canadians in the joint venture was bought out in 1988 by DLH, which is a public limited company incorporated in England but resident for tax purposes in Switzerland. It is a holding company. Its principal

*g* activities, carried on through its subsidiaries, are property dealing and investment. At the material time it was in a substantial way of business. It denies that in 1986 it had any knowledge that the money which the Canadians invested in the project represented the proceeds of fraud. Moreover, in buying out their interest in 1988 it claims to have been a bona fide purchaser for value

*h* without notice of the fraud.

Mr Ferdman is a Swiss national, resident in Geneva. He worked for many years for the Bank of International Credit in Geneva. In 1972 he left the bank and set up his own company, Société d'Administration et de Financement SA (SAFI), through which he acted as a fiduciary agent. SAFI was originally

*j* owned jointly by Mr Ferdman and an old-established Swiss cantonal bank of good reputation, but in 1982 Mr Ferdman became its sole proprietor. SAFI acted as a fiduciary agent for clients who did not wish their identities to be disclosed. Two of its clients were a Mr Singer and a Mr Goldhar, who were associates of the Canadians. Mr Ferdman was accustomed to accept funds from clients without questioning their origin, and to act for clients who were

anxious to conceal their identity. He regarded the need to preserve his clients'
anonymity as paramount—without it he would have had no business—and to
this end he was willing on occasion to present himself or SAFI as a beneficial
owner and to make false statements to that effect. The judge found that it
must have been plain to Mr Ferdman by the end of October 1985 that Singer
and Goldhar were implicated in a fraud. Moreover, Mr Ferdman admitted to
the judge at the trial that he knew perfectly well that the Canadians were
involved with Singer and Goldhar in the fraud and were not just behind them.
The Canadians also had a fiduciary agent resident in Geneva who acted for
them. He was Mr David D'Albis, an American citizen.

DLH is an English company which was formerly listed on the London Stock
Exchange. In June 1985 its entire issued share capital was acquired by Keristal
Investments and Trading SA (Keristal), a Panamanian company beneficially
owned by a Liechtenstein foundation. In the annual reports of DLH Mr
Ferdman described himself as the beneficial owner of Keristal, but that was not
the case. He was simply preserving the anonymity of his principals, the
founders and beneficiaries of the Liechtenstein foundation, who were two US
citizens resident in New York ('the Americans'). The judge recorded that the
plaintiff was satisfied that the Americans had no connection of any kind with
the Canadians or their associates or any of the other persons involved in the
fraud.

DLH was acquired as a vehicle for the Americans' property dealings in the
United Kingdom. Its business activities were under the direction of Mr
William Stern, described by the judge as a property dealer who suffered a
spectacular and well-publicised bankruptcy as a result of the 1974 property
crash. He was engaged in the business of identifying opportunities for
property investment and introducing them to investors willing to pay him a fee
or a share in the eventual profits. Mr Stern had lived in Geneva as a boy and
was acquainted with Mr Ferdman. They became friends, though they lost
contact with each other for some years. Mr Stern knew that he was a fiduciary
agent and had established SAFI, which he believed still to be jointly owned by
Mr Ferdman and a reputable cantonal bank. From time to time he suggested
deals to Mr Ferdman and inquired of him whether he had any suitable
investors among his clients.

Mr Ferdman introduced the Americans to Mr Stern, who was able to
recommend a successful investment in a United Kingdom property. The
Americans were willing to make further investments in the United Kingdom,
and Mr Stern suggested that he should look for a suitable English vehicle, if
possible a quoted company, which they could acquire and use as a medium for
further investment. Mr Stern found DLH and Keristal acquired it as a pure
cash shell in June 1985. Mr Ferdman and Mr Favre and Mr Jaton, two fellow
directors of SAFI, were appointed to be the directors of DLH and Mr Ferdman
its chairman. The judge described the three of them as nominee directors
representing the interests of the beneficial owners. They played no part in the
conduct of DLH's business which was carried on by Mr Stern in consultation
with the Americans. Mr Stern was not a director of DLH, but he was appointed
managing director of Dollar Land Management Ltd, one of its subsidiaries.
DLH was in a substantial way of business and was able to raise very large sums
on the security of its assets. At the end of 1986 it had secured bank loans and

*a*  other mortgage creditors of more than £10m. By the end of 1987 that figure had risen to more than £30m.

Mr Stern asked Mr Ferdman if he could find an investor willing to put up equity finance for the Nine Elms project. Mr Ferdman, who was to receive from DLH an introductory commission of 5% of the funds obtained, brought one of the Canadians, Roth, to London in March 1986 and introduced him to *b*  Mr Stern, who provided him with a detailed investment proposal which included a profit forecast. All negotiations were conducted between Roth and Mr Stern. Mr Ferdman played no part. By a letter dated 20 March 1986 and addressed to Roth, care of SAFI in Geneva, the terms which had been agreed between him and Mr Stern were set out. Although that letter was signed by Mr Ferdman, it was composed entirely by Mr Stern. I will return to it later in this *c*  judgment.

On 25 March Mr Ferdman copied the letter of 20 March (with two variations which the judge inferred were made at the request of the Canadians) by telex to Mr D'Albis, who gave instructions on the same day for £270,000 to be transferred from Geneva to the Royal Bank of Scotland in London for the *d*  account of DLH's solicitors, Grangewoods. The judge found that that sum represented proceeds of the fraud and that finding has not been questioned in this court. Subsequently, Mr Ferdman despatched a duplicate of the telex in the form of a letter on DLH's headed paper, and over his own signature, to Yulara Realty Ltd (Yulara) in Panama. That letter was dated 7 April. Again, I will return to it later. Yulara was a Panamanian company owned by the *e*  Canadians, which Mr Ferdman knew was a vehicle for their investment in the Nine Elms project. Mr Ferdman retained on his own files a copy of the letter countersigned by a Panamanian lawyer on behalf of Yulara by way of acceptance.

Contracts for the purchase of the Nine Elms site were exchanged on 26 *f*  March. The purchaser was a subsidiary of DLH, Dollar Land (London) Ltd ('DLH London'). The £270,000 which Grangewoods had received on the previous day was used to pay the deposit. On 11 June 1986 DHL London assigned the benefit of the contract to DLH for £100,000 and on the same day DLH entered into a contract for the sale of the site to Regalian Properties (Northern) Ltd ('Regalian'). Completion took place on the same day at a price *g*  of £2·7m, £1m of which was recorded as being paid by DLH.

The further funding of the project was complex. Reduced to its essentials, the method adopted was as follows. On 6 May 1986 Keristal (expressed to be represented by Mr Ferdman) and Yulara (expressed to be represented by the Panamanian lawyer) entered into a written loan agreement which was signed *h*  by them on behalf of Keristal and Yulara respectively. The agreement recited that Keristal was the holding company of DLH and that Yulara and DLH had entered into an agreement as per the letter dated 7 April. Article 1 was in substance a further recital to the effect that Yulara was making available or had given to Keristal (it is not clear which) the amount of up to $US2·5m for as long *j*  as the agreement as per the letter of 7 April would be in force. By art 2 Keristal accepted that amount on terms that it undertook to use the funds (a) 'in order to make a joint venture in a certain real estate investment in London' in accordance with the terms contained in the letter dated 7 April and (b) 'in order to [obtain] a bank guarantee of £1,300,000 to be issued in favour of [DLH London] or another company owned by [DLH]'.

On 12 and 16 May respectively two sums of $US1,541,432 and $US1,143,000, making a total of $US2,684,432, were credited to an account of Keristal (the Keristal No 2 account) at Banque Scandinave in Geneva. The account was operated by SAFI and was used exclusively for the purpose of funding the Nine Elms project. The bank statement for the account shows that the first sum came from the Bank of America; the source of the second is not shown. The judge found that both sums were traceable to Panama as proceeds of the fraud. That is the finding which the respondent's notice seeks to impugn. I will return to it shortly.

Pursuant to arrangements made by Mr Ferdman, Scandinavian Bank Group plc in London then agreed to advance £1·3m to Factotum NV ('Factotum'), a shelf company previously incorporated by Mr Ferdman in the Netherland Antilles, which he decided to make use of as a convenient vehicle for channelling the money to DLH. (Factotum is the second defendant in the action, but it has no assets and has never been served.) The advance was supported by a guarantee given by Banque Scandinave secured on the moneys in the Keristal No 2 account. The whole of the loan from Scandinavian Bank in London to Factotum was drawn down and £1,030,000 was paid into Grangewoods' client account on 29 May. Of those moneys £745,598·60 were used to discharge the amount due from DLH on completion of the purchase of the site on 11 June. The balance was used to discharge obligations of DLH and to make various other payments at the direction of DLH, including payment to Mr Ferdman of his introductory commission of £65,000.

It is clear from the foregoing that the £1,030,000 paid to Grangewoods represented moneys that had been credited to the Keristal No 2 account. It is also clear that the moneys so credited belonged to the Canadians. What is in dispute is the judge's finding that they represented moneys which Mr D'Albis had sent to Panama from Gibraltar on 30 March and 1 April 1986, a fact that had to be established in order that they could be treated as proceeds of the fraud. It is convenient to deal with that question now.

*Tracing through Panama*

The question was dealt with by Millett J (see [1993] 3 All ER 717 at 734–736). He said that the plaintiff was unable, by direct evidence, to identify the moneys in the Keristal No 2 account with the money which Mr D'Albis had sent to Panama only a few weeks before. However, he thought that there was sufficient funds, though only just, to enable him to draw the necessary inference. He continued (at 734–735):

'One of the two sums received in the Keristal No 2 account was $1,541,432 received on 12 May 1986 from Bank of America. That corresponds closely with the sum of $1,600,000 transferred to Bank of America, Panama on 1 April 1986. In relation to the later transaction, Bank of America may, of course, merely have been acting as a correspondent bank in New York and not as the paying bank; and the closeness of the figures could be a coincidence. It is not much, but it is something; and there is nothing in the opposite scale. The source of the other money received in the Keristal No 2 account is not known, but from the way in which the Canadians appear to have dealt with their affairs, if one sum came from Panama, then the other probably did so, too.'

*a* After considering other points on each side, the judge said that the fact remained that there was no evidence that the Canadians had any substantial funds available to them which did not represent proceeds of the fraud (see at 735). He concluded (at 736):

*b* 'In my judgment, there is some evidence to support an inference that the money which reached the Keristal No 2 account represented part of the moneys which had been transmitted to Panama by the second tier Panamanian companies some six weeks previously, and the suggestion that it was derived from any other source is pure speculation.'

Mr Tager, for DLH, submitted that neither of the routes followed by the judge led to the conclusion that he reached. He took us carefully through the *c* bank statement for the Keristal No 2 account. He relied on the fact that there were two separate credits to it of very precise amounts, the second having been made four working days after the first. It had been impossible to identify the source of the second credit. All this suggested that the two credits had come from different sources. There was no necessary connection between the first *d* and the sum of $US1·6m that had been sent from Gibraltar to the Bank of America in Panama on 1 April. Mr Tager argued that there were other very substantial funds available to the Canadians. He disputed the judge's view that there was no evidence that they had any substantial funds available to them that did not represent proceeds of the fraud. He submitted that the plaintiff had not discharged the evidential burden of establishing the necessary link.

*e* Having carefully considered these and other arguments of Mr Tager, I remain unconvinced that the judge drew the wrong inference. I well appreciate both that the question is of critical importance to the plaintiff's case and that, since it depends almost entirely, if not exclusively, on documentary evidence and undisputed events, we in this court are, in theory at any rate, in *f* as good a position to draw an inference as the judge himself. In practice, however, the judge, after an 11-day trial, was in a much better position than we are. From all that I have seen and heard of the case, I would feel no confidence at all in saying that the judge had drawn the wrong inference.

*The assets received by DLH*

*g* On the footing that the moneys credited to the Keristal No 2 account were proceeds of the fraud, it becomes necessary to identify the assets received by DLH and the dates when it received them. The plaintiff's position is a simple one. He says that DLH received £270,000 on 25 March 1986 and a further £1,030,000 in June 1986 (though logically he ought to say on 29 May 1986, when *h* the latter sum was paid into Grangewoods' client account; see further below). The judge considered these questions. He thought that the position was somewhat more complicated than the plaintiff would have had it.

As to the £270,000, the judge said (at 738):

*j* 'The sum of £270,000 was never received by DLH. It was paid into Grangewoods' client account, and their client at the time must be taken to have been DLH London. DLH London was not a nominee or agent for DLH. As had previously been agreed between Roth and Mr Stern, it was the intended contractual purchaser of the site, and the money was to be used exclusively for the payment of the deposit on exchange of contracts. In my judgment, DLH did not receive the money at all, and DHL London

did not receive it beneficially but upon trust to apply it for a specific purpose. DLH London used the money, as it was bound to do, to pay the deposit on the site, and thereby acquired for its own benefit a corresponding interest in the site which it subsequently sold and transferred to DLH. The plaintiff can follow his money through these various transactions, but the relevant asset capable of being identified as having been received by DLH is an interest in the site corresponding to the payment of the deposit.'

This question depends on the true construction and effect of the letter of 20 March 1986. Both Mr Beloff QC, for the plaintiff, and Mr Tager for DLH referred to its terms at some length in order to determine whether DLH London had acted as principal or as agent for DLH. Although he was not greatly concerned either way, Mr Beloff submitted that DLH London had acted as agent and that the £270,000 was accordingly received by DLH on 25 March. But in my view the judge was right, as a matter of construction, to conclude that DLH London, and not DLH itself, was the principal, so that it was that company that was Grangewoods' client when the money was received. I therefore agree with the judge that DLH did not receive anything on 25 March, but that on the assignment of the benefit of the contract to it on 11 June it received an interest in the site corresponding to the payment of the deposit.

As to the balance of £1,030,000, the judge said (at 738):

'The sum of £1,030,000 was also paid into Grangewoods' client account, but by then their client had become DLH. The money was disbursed on the instructions and for the benefit of DLH. Only £745,598·60 was used to pay the money due to the vendor on completion, but this was the result of the arrangements which DLH had made with Regalian. So far as Yulara is concerned, the whole £1·3m must be taken to have been disbursed as agreed between them on the acquisition of a 40% interest in the project. Moreover, in my judgment, on a proper analysis of the transaction between Yulara and DLH, Yulara's money should be treated as having been invested in its share of the project, and not in or towards the acquisition of DLH's share. The investment proved highly successful. In itself it was not a breach of trust and caused the plaintiff no loss. Had he been able to intervene before the Canadians were bought out, he could have claimed the whole of Yulara's interest in the project; but whatever the extent of DLH's knowledge of the source of Yulara's funds, his claim would have been confined to Yulara's interest in exoneration of that of DLH. In the events which have happened, the plaintiff is in my judgment bound to treat his money as represented by Yulara's interest in the project, and must rely exclusively on the transaction on 16 March 1988 when Yulara's interest was bought out by DLH.'

For a reason which will become clear when I deal with the question whether Mr Ferdman was the directing mind and will of DLH, Mr Beloff expressed greater concern at the judge's decision of this question. However, subject to one point, I feel unable to differ from his reasoning on it.

I am puzzled by the judge's suggestion that by the time the £1,030,000 was paid into Grangewoods' client account their client had become DLH. He had found that that payment was made on 29 May, before the assignment of the

*a*  benefit of the contract by DLH London to DLH on 11 June (see at 730). However, this point (which was not addressed in argument), though it may be of importance in relation to the date at which DLH must be treated as having had knowledge of the fraud (see below), does not affect the judge's view of the asset received by DLH in respect of the £1,030,000 and the date when it received it.

*b*
### Knowledge

It having been established that DLH received assets representing proceeds of the fraud, I come to the question of knowledge. By the end of the hearing there could have been no doubt that Mr Ferdman himself had the requisite knowledge. The judge said of him (at 740):

*c*
'He freely admitted that he knew that the persons who were providing the money for the Nine Elms project were the persons who had been behind the fraud in Amsterdam; and that by 7 April 1986, when he signed the letter to Yulara, he knew (or assumed) that the money which he would be receiving into the Keristal No 2 account was part of the proceeds of the

*d*
fraud.'

Thus arises the most important question remaining in dispute, which is whether Mr Ferdman's knowledge can be treated as having been the knowledge of DLH. The plaintiff contends that it can and ought to be, first, on the ground that Mr Ferdman was, in relation to DLH's receipt of the assets

*e*  representing the moneys fraudulently misapplied, its directing mind and will; secondly and alternatively, on the ground that he was its agent in the transaction. Because a company's directing mind and will are often the mind and will of one or more of its directors and because a director is for many purposes an agent of the company, there is a danger of confusion between the

*f*  two grounds on which the plaintiff relies. But they are, as the judge made clear, quite separate. The plaintiff can succeed on either. The convenient course is to deal with the law and the facts in regard to each of them in turn.

### Directing mind and will

*g*  This doctrine, sometimes known as the alter ego doctrine, has been developed, with no divergence of approach, in both criminal and civil jurisdictions, the authorities in each being cited indifferently in the other. A company having no mind or will of its own, the need for it arises because the criminal law often requires mens rea as a constituent of the crime, and the civil law intention or knowledge as an ingredient of the cause of action or defence.

*h*  In the oft-quoted words of Viscount Haldane LC in *Lennards Carrying Co Ltd v Asiatic Petroleum Co Ltd* [1915] AC 705 at 713, [1914–15] All ER Rep 280 at 283:

'My Lords, a corporation is an abstraction. It has no mind of its own any more than it has a body of its own; its active and directing will must consequently be sought in the person of somebody who for some purposes

*j*  may be called an agent, but who is really the directing mind and will of the corporation, the very ego and centre of the personality of the corporation.'

The doctrine attributes to the company the mind and will of the natural person or persons who manage and control its actions. At that point, in the words of Millett J ([1993] 3 All ER 717 at 740): 'Their minds are its mind; their

intention its intention; their knowledge its knowledge.' It is important to
emphasise that management and control is not something to be considered      *a*
generally or in the round. It is necessary to identify the natural person or
persons having management and control in relation to the act or omission in
point. This was well put by Eveleigh J in delivering the judgment of the
Criminal Division of this court in *R v Andrews Weatherfoil Ltd* [1972] 1 All ER 65
at 70, [1972] 1 WLR 118 at 124:                                              *b*

> 'It is necessary to establish whether the natural person or persons in
> question have the status and authority which in law makes their acts in the
> matter under consideration the acts of the company so that the natural
> person is to be treated as the company itself.'

Decided cases show that, in regard to the requisite status and authority, the   *c*
formal position, as regulated by the company's articles of association, service
contracts and so forth, though highly relevant, may not be decisive. Here
Millett J adopted a pragmatic approach. In my view he was right to do so,
although it has led me, with diffidence, to a conclusion different from his own.

DLH contends that its directing mind and will in relation to its receipt of the  *d*
assets representing the moneys fraudulently misapplied were either the mind
and will of Mr Stern alone or of Mr Stern and the Americans together. They
were not the mind and will of Mr Ferdman. The judge's acceptance of this
contention is expressed (at 741):

> 'In 1986 [DHL's] directors were all officers of SAFI, but they were merely   *e*
> nominee directors representing the interests of the Americans. Mr
> Ferdman was a non-executive director. His only executive responsibilities
> were to act as a fiduciary agent, represent the interests of the Americans,
> and ensure that the necessary corporate documentation was in order. The
> witnesses agreed that, in the early days of DLH, Mr Ferdman played a       *f*
> bigger role than he did [later]; but I do not think that that was due to any
> change in his role. He was always responsible for the formal paperwork,
> but not for the business. As the business expanded, so his relative
> importance diminished. Even in 1986, he played no part in business
> decisions. These were taken by Mr Stern in consultation with the
> Americans. In my judgment, Mr Ferdman's position as chairman and         *g*
> non-executive director of DLH was insufficient by itself to constitute his
> knowledge ipso facto the knowledge of DLH. It has not been alleged, still
> less established, that the other two officers of SAFI, who with Mr Ferdman
> constituted the board of DLH in 1986, shared Mr Ferdman's knowledge of
> the source of the Canadians' money, but in my judgment it would make      *h*
> no difference if they did. Like Mr Ferdman, they were merely nominee
> directors with non-executive responsibility. They had no authority to take
> business decisions. In relation to its business affairs in 1986, neither Mr
> Ferdman alone nor the board as a whole can realistically be regarded as the
> directing mind and will of DLH.'
                                                                            *j*

In disagreeing with the judge on this question, I start from the position that
the transactions to be considered are those by which DLH received assets
representing the moneys fraudulently misapplied. The responsibility for the
management and control of those transactions is not to be determined by
identifying those who were responsible for deciding that DLH would

*a*   participate in the Nine Elms project and the nature and extent of that participation, far less by identifying those who were responsible for business decisions generally. Neither Mr Stern nor the Americans made any of the arrangements for the receipt or disbursement of the moneys by Grangewoods. Nor did they commit DLH to the obligations correlative to their receipt. None of them had the authority to do so. That was the responsibility of Mr Ferdman.

*b*   The crucial considerations are that Mr Ferdman made all the arrangements for the receipt and disbursement of the £270,000 and the £1,030,000; that it was he who signed the letter of 20 March to Roth; that it was he who, on 25 March, copied that letter to Mr D'Albis; that it was he who signed and dispatched the letter of 7 April to Yulara; that it was he who, on 6 May, signed the agreement with Yulara; and that it was those steps that caused DLH to become involved

*c*   in the project and enabled it later to acquire the assets representing the moneys fraudulently misapplied.

Each of the steps taken by Mr Ferdman was taken without the authority of a resolution of the board of DLH. That demonstrates that as between Mr Ferdman on the one hand and Mr Favre and Mr Jaton on the other it was Mr

*d*   Ferdman who had the de facto management and control of the transactions. It may be that that state of affairs involved some breach of the directors' duties to DLH. But that would not enable DLH to say that Mr Favre and Mr Jaton were parties to its directing mind and will in any relevant respect. Mr Tager sought to show that they did perform duties as directors of DLH. No doubt they did. But there is no real evidence that they had any responsibility for the

*e*   transactions in question. In my view the directing mind and will of DLH in relation to the relevant transactions between March and June 1986 were the mind and will of Mr Ferdman and none other. That means that DLH had the requisite knowledge at that time.

Next, I must consider whether the plaintiff's right to recover is affected by

*f*   Mr Ferdman's having ceased to be a director of DLH in June 1987. This question is of significance only in relation to the £1,030,000. It has no bearing on the £270,000. Millett J, having repeated his view that, in regard to the £1,030,000, the relevant transaction was the acquisition by DLH of Yulara's interest in the joint venture on 16 March 1988, continued (at 743):

*g*        'By then Mr Ferdman had ceased to be a director of DLH for nine months, and he had nothing at all to do with the transaction. Even if, contrary to my judgment, Mr Ferdman's knowledge should be attributed to DLH in 1986, it would be quite wrong to treat DLH as still possessing that knowledge in 1988. As Megarry V-C pointed out in *Re Montagu's*

*h*   *Settlement Trusts* [1992] 4 All ER 308 at 329, [1987] Ch 264 at 284, a natural person should not be said to have knowledge of a fact that he once knew if at the time in question he has genuinely forgotten all about it. In my judgment, where the knowledge of a director is attributed to a company, but is not actually imparted to it, the company should not be treated as continuing to possess that knowledge after the director in question has

*j*        died or left its service. In such circumstances, the company can properly be said to have "lost its memory".'

While I might agree with the judge that the knowledge of a director, who had known of a misapplication of trust moneys at the time of their misapplication but had genuinely forgotten all about it by the time that they

were received by the company, could not be attributed to the company, I am
unable to see how that can assist DLH here. The steps that caused DLH to  *a*
become involved in the project and enabled it later to acquire the asset
representing the £1,030,000 were all taken between March and June 1986.
Moreover, although the judge held that the plaintiff was bound to treat the
£1,030,000 as represented by Yulara's interest in the project, he found that that
sum had been paid into Grangewoods' client account on 29 May 1986 and had  *b*
thereafter been wholly disbursed as directed by DLH, £745,000 approximately
in satisfaction of the purchase price (see at 730). In the circumstances, DLH
having had the requisite knowledge at the time that it became involved in the
project and when the £1,030,000 was disbursed as it directed, it would in my
view be unrealistic to hold that it ceased to have that knowledge simply
because the mind and will that had been the source of it played no part in the  *c*
receipt of the asset itself. I am therefore of the opinion that DLH is on this
ground liable to the plaintiff in constructive trust.

*Agency*

Although the views so far expressed are enough to dispose of the appeal in  *d*
favour of the plaintiff, I turn briefly to the alternative question whether Mr
Ferdman's knowledge ought to be imputed to DLH, on the ground that he
acted as DLH's agent in the transaction.

Millett J thought that it was not accurate to describe Mr Ferdman as having
acted as the agent of DLH in obtaining money from the Canadians. I am not  *e*
sure that I would agree with him on that question. The real question is
whether Mr Ferdman acted as the agent of DLH in the transactions by which
it received assets representing the moneys fraudulently misapplied. I find it
unnecessary to answer either question. That is because I agree with the judge
that, even if Mr Ferdman was DLH's agent, his knowledge could not, as a  *f*
matter of law, be imputed to it.

It is established on the authorities that the knowledge of a person who
acquires it as a director of one company will not be imputed to another
company of which he is also a director, unless he owes, not only a duty to the
second company to receive it, but also a duty to the first to communicate it: see  *g*
*Re Hampshire Land Co* [1896] 2 Ch 743 and *Re Fenwick Stobart & Co Ltd, Deep Sea
Fishery Co's Claim* [1902] 1 Ch 507.

Mr Ferdman acquired his knowledge of the fraudulent misapplication as a
director of SAFI. I do not doubt that he owed a duty to DLH to receive it. But
I agree with the judge that he owed no duty to SAFI to communicate it. I also  *h*
agree with him that the facts of this case are indistinguishable in any material
respect from those in *Re David Payne & Co Ltd, Young v David Payne & Co Ltd*
[1904] 2 Ch 608.

*Conclusion*                                                                       *j*

I would allow the appeal. On that footing, it becomes necessary to consider
the relief to which the plaintiff is entitled, a consideration so far made
unnecessary by the judge's dismissal of the action. Although it would be
possible for this court to deal with that question itself, I think it preferable to
remit it for consideration by the judge.

*a* **ROSE LJ.** I gratefully adopt the recital of facts in the judgment of Nourse LJ. For the reasons which he gives, I agree that the appellant's submissions with regard to the payment of the deposit and the balance of the money fail. Millett J's conclusions, namely that the deposit was paid to Dollar Land Holdings London beneficially and that the balance was received by Dollar Land Holdings plc ('DLH') on trust to invest on behalf of Yulara Realty Ltd ('Yulara')
*b* pursuant to a joint venture agreement, were, on the evidence before him, correct. Equally, the judge's finding, which DLH seek to challenge, that the money can be traced to the proceeds of fraud by the Canadians, is, in my view, unimpeachable.

The submissions with regard to the role of Ferdman and whether his knowledge of the fraudulent origin of the invested funds should be attributed
*c* to DLH raise considerations of more general importance. In English law the concept of a company's directing mind and will has its origins in the speech of Viscount Haldane LC in *Lennards Carrying Co Ltd v Asiatic Petroleum Co Ltd* [1915] AC 705 at 713, [1914–15] All ER Rep 280 at 283. In *Tesco Supermarkets Ltd v Nattrass* [1971] 2 All ER 127 at 155, [1972] AC 153 at 200 Lord Diplock
*d* identified those who are to be treated in law as being the company as—

> 'those natural persons who by the memorandum and articles of association or as a result of action taken by the directors, or by the company in general meeting pursuant to the articles are entrusted with the exercise of the powers of the company.'

*e* Lord Reid said ([1971] 2 All ER 127 at 132, [1972] AC 153 at 171):

> 'Normally the board of directors, the managing director and perhaps other superior officers of a company carry out the functions of management and speak and act as the company ... But the board of directors may delegate some part of their functions of management giving
*f* to their delegate full discretion to act independently of instructions from them.'

Lord Pearson said ([1971] 2 All ER 127 at 148, [1972] AC 153 at 190):

> 'There are some officers of a company who may for some purposes be
*g* identified with it, as being or having its directing mind and will, its centre and ego, and its brains ... The reference in s 20 of the Trades Descriptions Act 1968 to "any director, manager, secretary or other similar officer of the body corporate" affords a useful indication of the grades of officers who may for some purposes be identifiable with the company ...'

*h* There are, it seems to me, two points implicit, if not explicit, in each of these passages. First, the directors of a company are, prima facie, likely to be regarded as its directing mind and will whereas particular circumstances may confer that status on non-directors. Secondly, a company's directing mind and will may be found in different persons for different activities of the company.
*j* It follows that Millett J's unchallenged conclusion that Stern, although neither a director nor an employee, was the 'moving force' behind the company's activities does not preclude a finding that Ferdman was the company's directing mind and will in relation to some activities.

In the present case, the company's activity to which Ferdman's knowledge was potentially pertinent was the receipt of over £1m for investment.

Ferdman had been appointed by the Americans for two reasons in particular: first, as a Swiss resident operating the formal aspects of the company he was able to confer the tax advantages of non-resident status on DLH on the basis that its 'central management and control' was in Switzerland not England; and secondly because the Americans did not want Stern to be seen to have any official role in the company. Ferdman was a director and chairman of the board and his services were charged for at a higher rate than that for other directors. He instructed accountants and solicitors. He convened meetings. He claimed in the company's accounts to be its ultimate beneficiary. He was a necessary signatory of legal documents and signed the Yulara agreement without needing the authority of a board resolution to do so: by so doing he committed the company to that agreement.

Having regard to these matters, it seems to me to be plain that, for the limited purposes here relevant ie the receipt of money and the execution of the Yulara agreement, he was the directing mind and will of the company. In consequence, his knowledge of the fraud was DLH's knowledge and, in this respect, I differ from Millet J. It is immaterial that by March 1988, when DLH acquired Yulara's interest, Ferdman had ceased to be a director. That cessation did not deprive DLH of its continuing knowledge in relation to the transaction, which embraced both the initial receipt of the money in May 1986 and the ultimate acquisition of Yulara's interest.

If the appellant does not succeed on this point, Mr Beloff's alternative submission based on agency is, in my view, doomed to fail. This court is, in my judgment, bound to hold, on the authority of *Re David Payne & Co Ltd, Young v David Payne & Co Ltd* [1904] 2 Ch 608 that, qua agent, Ferdman was under no obligation to disclose his knowledge to DLH, there being no duty on DLH to inquire as to the source of the offered money. I agree with Hoffmann LJ's analysis of the three categories of agency cases to which he refers and with his conclusion that they have no application in the present circumstances.

To the extent indicated I would allow this appeal.

**HOFFMANN LJ.** This is a claim to enforce a constructive trust on the basis of knowing receipt. For this purpose the plaintiff must show, first, a disposal of his assets in breach of fiduciary duty; secondly, the beneficial receipt by the defendant of assets which are traceable as representing the assets of the plaintiff; and thirdly, knowledge on the part of the defendant that the assets he received are traceable to a breach of fiduciary duty.

There is no dispute that the first requirement is satisfied. The Canadians bribed the plaintiff's fiduciary agent to give them over $US10m of his money in return for worthless shares. The argument in this appeal has been over, first, which assets were received beneficially by Dollar Land Holdings plc ('DLH'); secondly, whether they are traceable as representing the plaintiff's money; and thirdly, whether the admitted knowledge of the frauds on the part of Mr Ferdman, chairman of DLH, can be imputed to the company.

1. IDENTIFYING THE ASSETS BENEFICIALLY RECEIVED

The judge has found as a fact that certain assets received by DLH, namely the benefit of the deposit paid under the contract for the purchase of the Nine Elms site and Yulara Realty Ltd's ('Yulara') interest in the development, were traceable in equity as proceeds of fraud. Both sides have challenged certain aspects of this finding.

*a*

(*a*) The deposit

The plaintiff says that the asset received by DLH was not the benefit of the deposit but the money used to pay it. This had been sent on 25 March 1986 to DLH's subsidiary Dollar Land (London) Ltd ('DLH London'), which entered into the contract to buy the site and afterwards assigned that contract (with the benefit of the deposit) to DLH. The plaintiff says that DLH London received

*b* the money as agent for DLH. The only evidence for this claim is that it was paid pursuant to an agreement between Roth and DLH. But that in my judgment is no reason why DLH London should not have received the money beneficially and this would be consistent with its having been the contracting party and subsequently assigning that contract for a substantial consideration

*c* to DLH.

(*b*) The main investment

The plaintiff says that the other asset received by DLH was not Yulara's interest in the project, which it acquired on 16 March 1988, but the £1,030,000

*d* invested by Yulara on 29 May 1986. In my judgment the judge was right in holding that that money was not received by DLH beneficially but on trust to invest on behalf of Yulara. DLH and Yulara were joint venturers. Yulara was making an equity investment by which it acquired a proprietary interest in half the share of profits due to DLH under its arrangements with Regalian Properties (Northern) Ltd (Regalian) and the benefit of a guarantee by DLH that its capital

*e* would be repaid. DLH received no part of this investment beneficially until it bought out Yulara's interest.

2. TRACING

*f* DLH challenges the judge's finding that the money can be traced to the proceeds of fraud which the Canadians had remitted to Panama. In my view, this was a finding which the judge was entitled to make. Mr Tager says that it might have been the proceeds of frauds on other people or even the money realised by the Canadians when they sold the business. It might have been, but as against the plaintiff I do not think that the Canadians would have been

*g* entitled to say so. Nor is DLH. The mixed fund was impressed with an equitable charge in favour of the plaintiff which was enforceable against the Canadians and persons claiming under them.

3. KNOWLEDGE

*h* The judge correctly analysed the various capacities in which Mr Ferdman was involved in the transaction between DLH and the Canadians. First, he acted as a broker, introducing the Canadians to DLH in return for a 5% commission. In this capacity he was not acting as agent for DLH but as an independent contractor performing a service for a fee. Secondly, he was

*j* authorised agent of DLH to sign the agreement with Yulara. Thirdly, he was at all material times a director and chairman of the board of DLH.

There are two ways in which Mr Ferdman's knowledge can be attributed to DLH. The first is that as agent of DLH his knowledge can be imputed to the company. The second is that for this purpose he *was* DLH and his knowledge was its knowledge. The judge rejected both.

*(a) The agency theory*

The circumstances in which the knowledge of an agent is imputed to the principal can vary a great deal and care is needed in analysing the cases. They fall into a number of categories which are not always sufficiently clearly distinguished. I shall mention three such categories because they each include cases on which Mr Beloff QC placed undifferentiated reliance. In fact, however, they depend upon distinct principles which have no application in this case.

*(i) Agent's knowledge affecting performance or terms of authorised contract*

First, there are cases in which an agent is authorised to enter into a transaction in which his own knowledge is material. So, for example, an insurance policy may be avoided on account of the broker's failure to disclose material facts within his knowledge, even though he did not obtain that knowledge in his capacity as agent for the insured. As Lord Macnaghten said in *Blackburn Lowe & Co v Vigors* (1887) 12 App Cas 531 at 542–543:

> 'But that is not because the knowledge of the agent is to be imputed to the principal but because the agent of the assured is bound as the principal is bound to communicate to the underwriters all material facts within his knowledge.'

In this category fall two of the cases upon which Mr Beloff relied, namely *Turton v London and North Western Rly Co* (1850) 15 LTOS 92 and *Dresser v Norwood* (1864) 17 CBNS 466, 144 ER 188. In the former case the agent was authorised to conclude a contract of carriage on behalf of the principal. The agent's knowledge of the carrier's standard terms of business was held sufficient to enable those terms to be treated as included in the contract. The agent, said Pollock CB, 'made the same contract in this case as if he had made it for himself'. In the latter case, the agent was authorised to enter into a contract for the purchase of wood. His knowledge that the vendor was a factor dealing for a principal was held sufficient to enable the contract to be treated as made with the principal and so preclude the purchaser from relying on a set-off against the factor. Neither are cases of imputation of knowledge. Rather, the agent's knowledge affects the terms or performance of the contract which he concludes on behalf of his principal.

These principles have no application in this case. We are not concerned with the contractual terms upon which DLH received the traceable assets but whether it had the knowledge which would impose a constructive trust. In other words, real imputation of knowledge is required.

*(ii) Principal's duty to investigate or make disclosure*

Secondly, there are cases in which the principal has a duty to investigate or to make disclosure. The duty to investigate may arise in many circumstances, ranging from an owner's duty to inquire about the vicious tendencies of his dog (*Baldwin v Casella* (1872) LR 7 Exch 325 at 326–327) to the duty of a purchaser of land to investigate the title. Or there may be something about a transaction by which the principal is 'put on inquiry'. If the principal employs an agent to discharge such a duty, the knowledge of the agent will be imputed to him. (There is an exception, the scope of which it is unnecessary to discuss, in cases in which the agent commits a fraud against the principal.) Likewise in

*a*    cases in which the principal is under a duty to make disclosure (for example, to an insurer) he may have to disclose not only facts of which he knows but also material facts of which he could expect to have been told by his agents. So in *Gladstone v King* (1813) 1 M & S 35, 105 ER 13 a marine insurance policy was avoided because the master of the ship knew that it had suffered damage, even though he had not in fact communicated this information to the owner. *Regina*

*b*    *Fur Co Ltd v Bossom* [1957] 2 Lloyd's Rep 466 upon which Mr Beloff strongly relied, also concerned the duty to make disclosure under an insurance policy and therefore falls within the same category.

None of these cases are relevant because in receiving the traceable assets, DLH had no duty to investigate or make disclosure. There was nothing to put it on inquiry.

*c*

*(iii) Agent authorised to receive communications*

Thirdly, there are cases in which the agent has actual or ostensible authority to receive communications, whether informative (such as the state of health of an insured: *Blackley v National Mutual Life Assurance* [1972] NZLR 1038) or

*d*    performative (such as a notice to quit: *Tanham v Nicholson* (1872) LR 5 HL 561) on behalf of the principal. In such cases, communication to the agent is communication to the principal. These cases also have no application here. Mr Ferdman did not receive information about the frauds in his capacity as agent for DLH. He found it out while acting for the Canadians.

*e*

*(iv) Agent's duty to principal irrelevant*

What it therefore comes to is that Mr Ferdman, an agent of DLH, had private knowledge of facts into which DLH had no duty to inquire. Mr Beloff said that Mr Ferdman nevertheless owed DLH a duty to disclose those facts. He then submits that because he had such a duty, DLH must be treated as if he

*f*    had discharged it.

I am inclined to agree that Mr Ferdman did owe a duty, both as broker employed by DLH to find an investor and as chairman of the Board, to inform DLH that the Yulara money was the proceeds of fraud. I reject Mr Tager's submission, based on *Kelly v Cooper* [1992] 3 WLR 936, that no term can be

*g*    implied in a contract with a Swiss fiduciary agent which requires him to disclose that the money for which he is being paid a 5% procurement commission has been stolen. There is no evidence that Switzerland will enforce a confidence in iniquity any more than this country.

But Mr Beloff's submission that DLH must be treated as if the duty had been discharged raises an important point of principle. In my judgment the

*h*    submission is wrong. The fact that an agent owed a duty to his principal to communicate information may permit a court to infer as a fact that he actually did so. But this is a rebuttable inference of fact and in the present case the judge found that Mr Ferdman did not disclose what he knew to anyone else acting on behalf of DLH. In some of the cases in the third of the categories I have

*j*    mentioned, the fact that an agent with authority to receive a communication had a duty to pass the communication on to his principal is mentioned as a reason why the principal should be treated as having received it. I think, however, that the true basis of these cases is that communication to the agent is treated, by reason of his authority to receive it, as communication to the principal. I know of no authority for the proposition that in the absence of any

duty on the part of the principal to investigate, information which was
received by an agent otherwise than as agent can be imputed to the principal     *a*
simply on the ground that the agent owed to his principal a duty to disclose it.

On the contrary, I agree with the judge that *Re David Payne & Co Ltd, Young
v David Payne & Co Ltd* [1904] 2 Ch 608 at 611 is authority against such a
proposition. In that case the Exploring Land and Minerals Co Ltd lent £6,000
to David Payne & Co Ltd for 30 days on the security of a debenture. One     *b*
Kolckmann, a stockbroker who was concerned in an ambitious and somewhat
dubious scheme of flotation involving David Payne & Co Ltd, was also a
director of the Exploring Land Co. In his capacity as stockbroker he knew that
the money would not be applied to any authorised purpose of the company but
diverted to the use of its controlling shareholder. He actually signed the
cheque by which the money was advanced. David Payne & Co Ltd went into     *c*
liquidation and the liquidator challenged the validity of the debenture on the
ground that Kolckmann's knowledge of the ultra vires purposes for which the
money would be used should be imputed to the Exploring Land Co.

Buckley J appears to have assumed that, as a director of the Exploring Land
Co, Kolckmann owed a duty to disclose what he knew about the real purposes     *d*
for which the money would be used. But he regarded this as insufficient to
enable that knowledge to be imputed to the company. He said (at 611):

> 'I understand the law to be this: that if a communication be made to an
> agent *which it would be his duty to hand on to his principals* ... and if the agent
> has an interest which would lead him not to disclose to his principals the     *e*
> information that he has thus obtained, and in point of fact he does not
> communicate it, you are not to impute to his principals knowledge by
> reason of the fact that their agent knew something which it was not in his
> interest to disclose, and which he did not disclose.' (My emphasis.)

It is true that in the Court of Appeal, both Vaughan-Williams and Romer LJJ     *f*
said that Kolckmann owed no duty to impart his knowledge to the Exploring
Land Co. Thus Romer LJ said (at 619):

> 'I take it that in such a transaction the lending company was not bound
> to inquire as to the application of the money at all by the borrowing     *g*
> company. That being so, it appears to me that knowledge independently
> acquired by a director in his personal capacity in respect to a matter which
> was irrelevant so far as concerned the lending company is knowledge
> which cannot be imputed to the company, for it was knowledge of
> something which really did not concern the lending company as a matter     *h*
> of law. Therefore, you cannot imply a duty on the part of the director to
> have told these facts to the lending company, or a duty on the part of the
> lending company to have inquired into that question.'

It is however clear from the process of reasoning that what Romer LJ means is
that in the absence of a duty to inquire, there was no duty of disclosure on the     *j*
part of the director on which an outsider could rely for the purpose of imputing
his knowledge to the company. I do not think that it would have affected his
conclusion if the director had for some other reason (eg some internal
company rule) owed a duty of disclosure with which he did not in fact comply.
I agree with Buckley J that this would have been irrelevant.

a    It follows that in my judgment Millett J was right to hold that Mr Ferdman's position as agent or broker does not enable his knowledge to be imputed to DLH.

(b) The 'directing mind and will' theory

b    The phrase 'directing mind and will' comes from a well-known passage in the judgment of Viscount Haldane LC in *Lennards Carrying Co Ltd v Asiatic Petroleum Co Ltd* [1915] AC 705, [1914–15] All ER Rep 280 which distinguishes between someone who is 'merely a servant or agent' and someone whose action (or knowledge) is that of the company itself. Despite their familiarity, it is worth quoting the terms in which Viscount Haldane LC said that the directing mind could be identified ([1915] AC 705 at 713, [1914–15] All ER Rep 280 at 282):

c    'That person may be under the direction of the shareholders in general meeting; that person may be the board of directors itself, or it may be, and in some companies it is so, that that person has an authority co-ordinate with the board of directors given to him under the articles of association, and is appointed by the general meeting of the company, and can only be removed by the general meeting of the company. My Lords, whatever is not known about Mr. Lennard's position, this is known for certain, Mr. Lennard took the active part in the management of this ship on behalf of the owners, and Mr. Lennard, as I have said, was registered as the person designated for this purpose in the ship's register.'

d

e    Viscount Haldane LC therefore regarded the identification of the directing mind as primarily a *constitutional* question, depending in the first instance upon the powers entrusted to a person by the articles of association. The last sentence about Mr Lennard's position shows that the position as reflected in the articles may have to be supplemented by looking at the actual exercise of the company's powers. A person held out by the company as having plenary authority or in whose exercise of such authority the company acquiesces, may be treated as its directing mind.

f

g    It is well known that Viscount Haldane LC derived the concept of the 'directing mind' from German law (see Gower *Principles of Modern Company Law* (5th edn, 1992) p 194, n 36) which distinguishes between the agents and organs of the company. A German company with limited liability (GmbH) is required by law to appoint one or more directors (Geschäftsführer). They are the company's organs and for legal purposes represent the company. The knowledge of any one director, however obtained, is the knowledge of the company (see Scholz *Commentary on the GmbH Law* (7th edn, 1986), s 35). English law has never taken the view that the knowledge of a director ipso facto imputed to the company: see *Powles v Page* (1846) 3 CB 15, 136 ER 7 and *Re Carew's Estate Act (No 2)* (1862) 31 Beav 39, 54 ER 1054. Unlike the German Geschäftsführer, an English director may, as an individual, have no powers whatever. But English law shares the view of German law that whether a person is an organ or not depends upon the extent of the powers which in law he has express or implied authority to exercise on behalf of the company.

h

j

Millett J did not accept that Mr Ferdman was the directing mind and will of DLH because he exercised no independent judgment. As a fiduciary he acted entirely upon the directions of the American beneficial owners and their

consultant Mr Stern. All that he did was to sign the necessary documents and
ensure that the company's paper work was in order. This involved seeing that *a*
decisions which had really been taken by the Americans and Mr Stern were
duly minuted as decisions of the board made in Switzerland.

But neither the Americans nor Mr Stern held any position under the
constitution of the company. Nor were they held out as doing so. They signed
no documents on behalf of the company and carried on no business in its name. *b*
As a holding company, DLH had no independent business of its own. It
entered into various transactions and on those occasions the persons who
acted on its behalf were the board or one or more of the directors.

It seems to me that if the criterion is whether the candidate for being the
'directing mind and will' was exercising independent judgment, as opposed to *c*
acting upon off-stage instructions, not even the board of directors acting
collectively would in this case have qualified. It also did what it was told. But
Mr Tager was inclined to concede that the board, acting as a board, could
properly be regarded as the directing mind and will. It was certainly held out
in certain quarters as such. DLH claimed non-resident status from the Inland
Revenue on the ground that its 'central management and control' was situated *d*
in Switzerland.

The authorities show clearly that different persons may for different
purposes satisfy the requirements of being the company's directing mind and
will. Therefore the question in my judgment is whether in relation to the
Yulara transaction, Mr Ferdman as an individual exercised powers on behalf of *e*
the company which so identified him. It seems to me that Mr Ferdman was
clearly regarded as being in a different position from the other directors. They
were associates of his who came and went. SAFI charged for their services at
a substantially lower rate. It was Mr Ferdman who claimed in the published
accounts of DLH to be its ultimate beneficial owner. In my view, however, the *f*
most significant fact is that Mr Ferdman signed the agreement with Yulara on
behalf of DLH. There was no board resolution authorising him to do so. Of
course we know that in fact he signed at the request of Mr Stern, whom he
knew to be clothed with authority from the Americans. But so far as the
constitution of DLH was concerned, he committed the company to the
transaction as an autonomous act which the company adopted by performing *g*
the agreement. I would therefore hold, respectfully differing from the judge,
that this was sufficient to justify Mr Ferdman being treated, in relation to the
Yulara transaction, as the company's directing mind and will. Nor do I think it
matters that by the time DLH acquired Yulara's interest in the Nine Elms
project on 16 March 1988, Mr Ferdman had ceased to be a director. Once his *h*
knowledge is treated as being the knowledge of the company in relation to a
given transaction, I think that the company continues to be affected with that
knowledge for any subsequent stages of the same transaction. So, for example,
if (contrary to the judge's finding) the £1,030,000 sent by Yulara on 29 May 1986
had been received beneficially by DLH as a loan, but Mr Ferdman had resigned
or died a week earlier, I do not think that DLH could have said that it received *j*
the money without imputed knowledge of the fraud. And in my judgment the

*a* subsequent acquisition of Yulara's interest was sufficiently connected with the original investment to be affected by the same knowledge.

I would therefore allow the appeal. I do not regard this as an unsatisfactory outcome. If the persons beneficially interested in a company prefer for tax or other reasons to allow that company to be for all legal purposes run by off-shore fiduciaries, they must accept that it may incur liabilities by reason of *b* the acts or knowledge of those fiduciaries.

*Appeal allowed. Case remitted to judge to determine relief to which plaintiff was entitled.*

*c* 16 May 1994. *The Appeal Committee of the House of Lords (Lord Jauncey of Tullichettle, Lord Slynn and Lord Woolf) refused leave to appeal.*

Frances Rustin    Barrister.

*d*

# Marchant v Onslow

CHANCERY DIVISION

*e* DAVID NEUBERGER QC SITTING AS A DEPUTY JUDGE OF THE HIGH COURT

14, 17 SEPTEMBER 1993

*Education – School – Conveyance under School Sites Act 1841– Reverter – Cesser for use for purposes of Act – Land conveyed for full value – Provision for land to 'revert to and become a portion of ... Estate' – Whether provision capable of applying to* *f* *freestanding land not part of an estate – Whether reverting to original grantor and successors – School Sites Act 1841, s 2 – Reverter of Sites Act 1987, s 1.*

In 1848 the defendant's predecessors in title conveyed a piece of land to the plaintiffs' predecessors in title to be held by them on trust for use as a school *g* pursuant to the School Sites Act 1841, s 2[a] of which provided, inter alia, that any person seised of and having the beneficial interest in any land could grant or convey 'any Quantity [of that land] not exceeding One Acre ... as a Site for a School' provided that 'upon the said Land so granted ... ceasing to be used for the Purposes [of] this Act ... the same shall thereupon immediately revert to and *h* become a portion of the said Estate'. By virtue of s 1[b] of the Reverter of Sites Act 1987, which was passed in order to amend the law with respect to the reverter of sites that had ceased to be used for particular purposes, the proviso to s 2 of the 1841 Act had effect as if the land, instead of reverting, vested in a trust to sell the land with the proceeds being held on trust for the persons otherwise entitled to the reversion. The land conveyed in 1848 ceased to be used for school purposes *j* in 1984 and was sold in 1987, and the question arose whether the proceeds of sale were held on trust by the plaintiffs for the benefit of the successors in title to the grantors of the 1848 conveyance, as the defendant contended, or for the successors in title to the grantor's land of which the site once formed part.

---

a    Section 2, so far as material, is set out at p 709 *e* to *h*, post
b    Section 1, so far as material, is set out at p 709 *j* to p 710 *b*, post

A

# JJ Harrison (Properties) Ltd v Harrison.

[2001] EWCA Civ 1467
Chancery Division and Court of Appeal (Civil Division).
Kevin Garnett QC (sitting as a deputy High Court judge); Chadwick and
Laws L JJ and Sir Anthony Evans.
Judgments delivered 27 November 2000 and 11 October 2001.

B

*Directors' duties – Fiduciary duties – Breach of trust – Conflict of interest and duty –*
*Self dealing – Disclosure of interest – Director acquired land from company –*
*Director did not vote on resolution to sell company's land to him – Director failed to*
*disclose development potential of land – Director had already applied for planning*
*permission to develop land prior to conveyance to him – Director in breach of*
*duty – Whether company entitled to account of profits or equitable compensation –*

C

*Whether director a constructive trustee of the land – Whether claim time barred –*
*Whether defence of laches applied – Appeal – Limitation Act 1980, s. 21(1), (3).*

This was an appeal against a decision of Kevin Garnett QC, sitting as a deputy High
Court judge, that a former director of a property company who had acquired property
from the company without properly disclosing the development potential of the property
was in breach of duty and liable to account for the profits he made from the acquisition;

D

the appeal was on the grounds that the deputy judge should have held that the company's
claim was time barred under the Limitation Act 1980, alternatively that the deputy judge
was wrong to reject the former director's defence based on laches. The company cross-
appealed on the ground that the deputy judge ought to have ordered the former director
to account for the value of the land as at the date of sale of part of it to a third party.

The company was a family company which owned a considerable amount of
agricultural and residential property in Yorkshire. Its general policy was to maximise the

E

development potential of land which it owned and then to sell it. From 1975 the directors
of the company were the defendant and his three sisters, although the sisters took little or
no part in the day-to-day affairs of the company, which was managed by their brother,
the defendant, as chairman and managing director. The company owned a farm
consisting of a farm house, a number of outbuildings and about 136 acres of farmland in
an around the village of Arkendale, Yorkshire. The defendant had his home in
Arkendale. The farm was let to a tenant in the 1980s but she found it difficult to make a

F

success of the farm and in the mid-1980s she vacated the premises and gave up the
farmland. Part of the farm was a large barn with further farm buildings and a large
paddock (the 'development land'); the whole site of the development land extended to
over three acres. The company had, in 1983, applied for planning permission to convert
the barn into two residential units and the farm building to the rear into one residential
unit, but the application was refused as the property was then in agricultural use at that

G

time before the tenant moved out. In July 1985 the general manger of the company sought
a valuation of the development land from a local valuer who because of the dilapidated
state of the buildings valued it at £8,400, expressly ignoring development potential. The
defendant was interested in acquiring the development land for himself and in September
1985 a contract of sale was drawn up between him as buyer and the company as vendor at
the price of £8,400. The company made a further application for planning permission to
convert the barn into a single dwelling and for demolition of the farm buildings and for

H

the construction of a replica Elizabethan manor house in their place. The application was
refused in January 1986 but architects on 5 February 1986 submitted amended plans in
the company's name to avoid the objections of the planning authority. At a company
meeting on 10 February 1986 the company resolved to convey the property to the
defendant. The defendant, having an interest, did not vote on the resolution. The sisters,
who voted in favour of the conveyance, were not told of the planning applications of

A

November 1985 or 5 February 1986 or that the architects were, as the defendant knew, confident that planning permission would be granted. The conveyance was completed on 12 February 1986 at the earlier valuation price of £8,400. Planning permission was granted on 3 April 1986, together with listed building consent in relation to the barn conversion. The defendant started some conversion work on the barn but this was not completed and it was sold incomplete in December 1988 for £110,300. The defendant also began construction work on the manor house but for various reasons decided not to pursue the project. The manor house site was put up for sale with only some foundations in place and was eventually sold in April 1992 for £122,500. The defendant resigned as director of the company in March 1992 and ceased to have any executive role in its affairs. The other directors knew that the defendant had made a profit on the sales but did not think at that time that anything improper had taken place. Only in 1997, when a proposed motorway extension over some of the company's remaining farmland at Arkendale would have required the company to sell part of the land so that all the old files in relation to the development land and other land were brought out, did the directors realise what had happened between the valuation of July 1985 and the granting of planning permission on the company's application and paid for by the company.

B

C

The company commenced an action against the defendant in July 1998 claiming that by reason of the defendant's failure to make full disclosure at the meeting on 10 February 1986 and on account of his use of the company's resources and diversion to himself of the business opportunity in relation to the development land which it was his duty to raise for the company, the defendant held the development land for the company as constructive trustee. The claim was for an account of the proceeds of sale of the land with compound interest; alternatively for equitable compensation for fraudulent breach of trust and breach of fiduciary duty. The deputy judge held that the defendant was in breach of his statutory duties of disclosure and also in breach of his equitable duty to act bona fide in the best interest of the company. The deputy judge was not prepared to hold that the defendant held the land conveyed to him in consequence of those breaches of duty on trust for the company. The transaction could not be set aside as the land had been sold to third parties and so the available remedies were either an account of profits or equitable compensation. The deputy judge ordered an account of profits. The defendant was granted permission to appeal on the ground of laches (a letter from the solicitors then instructed by the company in February 2001 stated that when the defendant left the company in 1992 his sister, a director of the company, was most concerned that his reputation should not be tarnished – the defendant took this as an acknowledgement that the sister had made a conscious decision in March 1992 that the company would not pursue any claims against him) and that the company's claim was time barred under s. 21(3) and 23 of the Limitation Act 1980. The company cross-appealed against the deputy judge's refusal to hold that the defendant was trustee of the land for the company, to provide a foundation that he should be required to account for the value of the land as at 23 December 1988 when the barn was sold.

D

E

F

G

*Held*, dismissing the appeal and allowing the cross appeal:

1. It was beyond argument that (i) a company incorporated under the Companies Acts was not trustee of its own property; it was both legal and beneficial owner of that property; (ii) the property of a company so incorporated could not lawfully be disposed of other than in accordance with the provisions of its memorandum and articles of association; (iii) the powers to dispose of the company's property, conferred upon the directors by the articles of association, had to be exercised by the directors for the purposes, and in the interests, of the company; and (iv) in that sense, the directors owed fiduciary duties to the company in relation to those powers and a breach of those duties was treated as a breach of trust.

H

A    2. It followed also from the principle that directors who disposed of the company's property in breach of their fiduciary duties were treated as having committed a breach of trust that a director who was, himself, the recipient of the property held it upon a trust for the company. He was described as a constructive trustee.

3. A director who obtained a company's property for himself by misuse of the powers with which he had been entrusted as a director was a constructive trustee. Although not expressly appointed a trustee he assumed the duties of a trustee by a lawful transaction
B    which was independent of and preceded the breach of trust: a director, on appointment to office, assumed the duties of a trustee in relation to the company's property. (Belmont Finance Corp v Williams Furniture Ltd (No. 2) [1980] 1 All ER 393; Paragon Finance plc v D B Thakerar & Co [1999] 1 All ER 400.) The conveyance of the property to himself by the exercise of his powers in breach of trust did not release him from those obligations. He was trustee of the property because it had become vested in him; but his obligations to
C    deal with the property as a trustee arose out of his pre-existing duties as a director, not out of the circumstances in which the property was conveyed.

4. In the present case the deputy judge found that on the conveyance of the development land to the defendant in February 1986 there was a failure by the defendant to comply with the statutory disclosure requirements of a director and, more pertinently in this context, that he acted in breach of his fiduciary duties as a director in failing to ensure that the land was sold at its full value. Further, his existing duties as a director
D    required him to ensure that the development land was not conveyed at all until the company had received and considered advice as to its value in the light of the change in planning potential. In those circumstances it was impossible to reach a conclusion that the defendant did not hold the development land as a constructive trustee. There could be no basis for the deputy judge not so finding and he was wrong not to have done so.

5. Section 21(3) of the Limitation Act 1980 provided a limitation period of six years
E    from the date the right action accrued for a beneficiary to recover trust property in respect of any breach of trust. This was, however, subject to s. 21(1)(b) for which there was no limitation period for a beneficiary under a trust to recover from the trustee trust property or the proceeds of trust property in the possession of the trustee or previously received by the trustee and converted to his use. The present action was not an action to recover trust property or the proceeds of trust property 'in the possession of trustee' as
F    the development land was no longer vested in the defendant and there was no claim to trace the proceeds of sales of 1998 and 1992. But the action was an action to recover trust property or the proceeds of trust property 'previously received by the trustee and converted to his use' and so the Limitation Act provided the defendant with no defence.

6. There was no basis upon which the deputy judge's conclusion that laches afforded no defence could be challenged. The failure by the defendant to disclose could not be dismissed as a technical breach of trust: the deputy judge was right to regards the
G    defendant's failure to disclose what he knew to the board as a serious breach of duty. The conclusion that the other directors did not until 1997 appreciate what had really happened could not be challenged. The question whether the fact that the means of discovering the position earlier lay within the company's files made it unconscionable for the company to assert its rights some six years after the defendant resigned was a question for the deputy judge at the trial and it was impossible to hold that he erred in principle. The new evidence of the solicitor's letter of 21 February 2001 did not alter the
H    position: the Court of Appeal could not, now, take the view on the basis of the letter that the deputy judge's conclusion of fact on the relevant point should be reversed and to order a new trial on the point would be a disproportionate response.

7. On the basis that the defendant held the development land as trustee for the company, the remedy sought by the cross-appeal was for an order that he account for the value of the land at the date of sale of the barn at 23 December 1988. It was right that he

should account for the £110,300 received on that sale, subject to his entitlement to the    A
credit of that account a proportionate part of the £8,400 which he paid for the
development land and the cost of works which led to an enhancement in the value of that
part of the land. It would not be right to require the defendant to account for the value of
the remainder of the development land, i.e. the replica manor house, at its 1988 value. In
the absence of any evidence that the value of the development land as a whole was
diminished by the sale of part in December 1988, the appropriate order was to require the
value of the manor house site to be brought in at the price (£122,500) obtained on the    B
further sale in April 1992, again after bringing to the credit of that account the balance of
the £8,400 and the cost of any works which led to an enhancement in the value of that part
of the land.

The following cases were referred to in the judgment of Kevin Garnett QC:

*Aberdeen Railway Co v Blaikie Bros* (1854) 1 Macq 461.
*Cook v Deeks* [1916] AC 554.    C
*Frawley v Lindley* (unreported, 1 March 1999, CA).
*Movitex Ltd v Bulfield* (1986) 2 BCC 99,403.
*Regal (Hastings) Ltd v Gulliver* [1967] 2 AC 134n.

The following additional cases were referred to in the judgment of Chadwick LJ:

*Belmont Finance Corp Ltd v Williams Furniture Ltd (No. 2)* [1980] 1 All ER 393.
*Clarkson v Davies* [1923] AC 100.    D
*Lands Allotment Co, Re* [1894] 1 Ch 616.
*Nant-y-glo and Blaina Ironworks Co v Grave* (1878) 12 ChD 738.
*Paragon Finance plc v Thakerar & Co* [1999] 1 All ER 400.
*Richardson, Pole v Pattenden, Re* [1920] 1 Ch 423.
*Sharpe, Re; Masonic and General Life Assurance Co v Sharpe* [1892] 1 Ch 154.
*Soar v Ashwell* [1893] 2 QB 390.    E
*Target Holdings Ltd v Redferns (a firm)* [1996] AC 421.
*Taylor v Davies* [1920] AC 636.
*Timmis, Re; Nixon v Smith* [1902] 1 Ch 176.
*Tito v Waddell (No. 2)* [1977] Ch 106.

Anthony Mann QC (in the Court of Appeal) and Christopher Parker (instructed by Herbert
Smith (in High Court, Hamlins)) for the claimant/respondent company.

Robin Hollington QC and Paul Morris (instructed by Hammond Suddards (in the High    F
Court, Keeble Hawson Moorhouse, Sheffield)) for the defendant/appellant.

HIGH COURT JUDGMENT

(Delivered 27 November 2000)

**Kevin Garnett QC:** 1. By this action, the claimant company ('Harrison Properties') seeks to    G
impugn a conveyance executed in February 1986, whereby certain land at Arkendale in
Yorkshire was conveyed by the company to the defendant ('Peter Harrison'), who was then a
director. The claim is primarily based on an allegation that Peter Harrison failed to make proper
disclosure to the meeting of the board of directors at which the transaction was approved. For
the reasons which appear below, the claim succeeds.

**Introduction**    H

2. Harrison Properties is a family company. The family business was established by Peter
Harrison's father, who was a successful builder and property developer in Yorkshire. He had
six children and established a number of trusts for their benefit. The assets of the trusts were
primarily shares in a holding company, namely JJ Harrison (Investments) Ltd ('Harrison
Investments'). Harrison Properties was a wholly owned subsidiary of Harrison Investments.

A    3. Following the death of Mr Harrison senior, Peter Harrison and his three sisters, namely Miss Terry Harrison ('Terry Harrison'), Mrs Christine Lean and Mrs Mary Farmer ('Mrs Farmer') took over the running of Harrison Properties. The four of them were the directors of the company. The other two brothers, David and Michael, managed the other companies.

     4. Harrison Properties owned a considerable amount of agricultural and residential land in the Yorkshire area. The general policy of the company was to maximise the development potential of land which it owned and then to sell it. It operated from a small office in
B    Boroughbridge, near Ripon, in North Yorkshire. Although there were four directors of Harrison Properties, Peter Harrison was responsible for the day-to-day management. Apart from board meetings, his three sisters only became involved when there was something in particular which Peter Harrison wished to discuss. The company was run with the help of a number of professional advisers and professionally qualified employees.

C    **The land at Arkendale**

     5. Harrison Properties owned land in and around the village of Arkendale, not far from Boroughbridge. Two pieces of land in particular feature in this action, namely Holgate Bank Farm and Hollins Farm. Holgate Bank Farm consisted of a farm house, a number of outbuildings close by and about 136 acres of farmland. In the early 1980s it was subject to a tenancy in favour of a Miss Naylor, who had succeeded to the tenancy on her father's death. It
D    seems that she was finding it difficult to make a success of the farm and in the summer of 1984 she eventually agreed to vacate for £37,500. She gave up the farmland shortly afterwards and it was amalgamated with that of the nearby Hollins Farm, which was being operated by another tenant farmer of Harrison Properties.

     6. By April 1985, she had also vacated the farmhouse. As to this, the plan was for it to be renovated and sold to Mrs Farmer's son, Mr Sean Frank. In the event this did not happen, and the renovated property was later sold off to a third party.

E    7. As I have already indicated, apart from the farmhouse and farmland, Holgate Bank Farm consisted of a number of outbuildings, including a large barn (the 'barn') and a further large farm building to the rear. There was also an adjoining paddock, the whole site extending in total to something over three acres. I will refer to this site as the 'development land'. The buildings were generally in a very poor state of repair. Harrison Properties had for some time been attempting to do something with them and in July 1983 had applied for planning permission to convert the barn into two residential units and the farm building to the rear into one residential
F    unit. The application was refused on the basis, it seems, that conversion of the existing buildings would only be allowed if they were redundant as agricultural buildings, and the planning authority was not satisfied that this was the case. The possibility of the barn becoming listed was also raised and in fact this happened shortly afterwards.

     **Peter Harrison's plans**

G    8. In fact, Peter Harrison was interested in acquiring the development land from the company for himself. His particular ambition, which took root some time in 1983 and which he described, probably accurately, as his 'folly', was to build a replica of an Elizabethan manor house on part of the site. It later became clear that he intended to build this where the large farm building to the rear of the barn stood (the 'Manor House site'). Apart from his own pleasure in carrying out such a project, his evidence was that he believed that it would provide a focal point for the village of Arkendale and lift its standing in the area and thus help to enhance land
H    values. His evidence also was that this project, which he described as being one very near to his heart, was well known to his sisters and everyone else in the office. I will deal later with my findings as to what his sisters knew about this. Peter Harrison said that he could not afford to live in the Manor House when built and I infer from what happened later that it was his intention to sell off the Manor House once it had been built, and also the barn site, whenever he could most profitably do so.

A

9. Following vacation of the Holgate Bank Farm by Miss Naylor the facts that the buildings on the development land were no longer being used in connection with the farmland, and were not needed in connection with the farmhouse, clearly altered the planning position. I infer that this prompted the next phase of activity.

**The valuation**

B

10. On 27 June 1985, Mr Reeves, the general manager of Harrison Properties, and acting on Peter Harrison's instructions, wrote to a local valuer, Mr Paul Johnston of Messrs James Johnston, asking him to value the development land. His valuation, as at 13 July 1985, was £8,400 with vacant possession. In the valuation he described the buildings as 'very dilapidated and of little value for agricultural purposes'. The contents of his letter to Mr Reeves dated 15 July 1985, which accompanied the valuation, is one of the matters which give rise to the complaint against Peter Harrison and has somewhat tendentiously been described as 'the side letter'. Its terms are as follows:

C

'Further to your letter of 27th June, I have now completed my Valuation... and enclose the same herewith. I would point out, as you will be aware, that the Farm buildings are in a very dilapidated condition and as such are really of very little value. I appreciate the brick barn [i.e. the barn] may have some development potential for conversion purposes and I have not taken this into account in my Valuation. As far as the land is concerned, these paddocks on the edges of villages can, as you will be aware, sometimes command very high prices indeed. For the purposes of this valuation I have tried to take a middle of the road figure.'

D

11. To anticipate, although the valuation was duly disclosed at the crucial meeting of directors which approved the purchase, this letter was not. It is said that such non-disclosure is material because the letter indicates that the valuation was not a proper one since development value was excluded as a factor and thus, by inference, the value of the development land must have been greater.

E

12. The letter can certainly be read in two ways. On the one hand, since development potential was expressly not taken into account in the valuation, it might be inferred that the valuation would otherwise have been different. On the other hand, it could mean that although there was the possibility of development potential, this was so uncertain as not to be capable of affecting the valuation. Mr Johnston was not called as a witness and so I know nothing about how he arrived at his valuation. There was no evidence, and it was not suggested to Peter Harrison, that any attempt had been made to get Mr Johnston to leave any such factor out of his valuation.

F

13. Peter Harrison, for his part, says that he understood that any development potential was speculative and incapable of valuation. For what it is worth, I can say at this stage that I accept that Peter Harrison did not think at this stage that any development potential which the barn had affected the valuation. He thus thought that Mr Johnston's valuation was a proper one. He did not later deliberately decide to conceal the contents of this letter because of what it might indicate.

G

14. I will deal later with whether the failure to disclose this letter was a material non-disclosure.

**Peter Harrison contracts to buy the development land**

H

15. Armed with the valuation, Peter Harrison proceeded with his plan to buy the property. On 24 July 1985, Mr Reeves wrote to Mr King of Simpson Curtis & Co, solicitors, asking him to prepare an option for Peter Harrison to purchase the property at the valuation figure. Mr King habitually acted for Harrison Properties in the company's conveyancing transactions and in what followed Mr King also acted for Peter Harrison. Mr King sent back a form of

A    option agreement on 31 July 1985 and in doing so pointed out that, given that the price was fixed, an option to purchase at this price, valid for an extended period, was hardly appropriate and suggested instead a contract to purchase with a completion period delayed for up to 12 months. This suggestion was accepted by Peter Harrison and Mr King duly prepared a form of contract which was signed by Peter Harrison as purchaser and by Mr Weaving, the company secretary, on behalf of Harrison Properties as vendor, in early September 1985. Mr Reeves returned the signed contract to Mr King on 6 September 1985, adding that 'Mr Harrison would

B    like to complete the purchase at once and perhaps you will go ahead and prepare the necessary documents'. Mr King sent back a form of conveyance on 16 September 1985. Mr King chased for the conveyance on 4 November but there then emerged a problem with the precise access shown on the conveyance plan. This was sorted out by 25 November 1985, when Mr King returned the conveyance with a corrected plan.

C    16. I can pause in this account of the narrative to state that there is no real evidence to suggest that at this stage the question of the purchase of the property by Peter Harrison was a matter which had been properly discussed by Peter Harrison with his co-directors, let alone was a transaction which had been authorised by the directors. It is clear that Peter Harrison effectively ran the company and I find that as far as he was concerned there was no need to discuss the matter at this point. The question was formally raised for the first time at a board meeting on 10 February 1986. I will come on later to explain what information was available

D    by the time of that meeting.

**The delay in completion**

17. The reason for the delay in completing the sale at this point is unclear. Peter Harrison had indicated (via Mr Reeves, in his letter to Mr King), that Peter Harrison wanted to complete without delay, and I am satisfied that, had he wanted to, the matter could have been dealt with

E    earlier than it in fact was. The suggestion made to Peter Harrison by Mr Parker, who appears for Harrison Properties, was that Peter Harrison was delaying until the outcome of the planning application in respect of the property, which I am about to refer to. In the end, however, it is not necessary to reach a conclusion on this minor issue.

**The November planning application**

F    18. I must now deal with the further developments which occurred in relation to the planning status of the development land. First, on 1 November 1985, a further application was made for planning permission. This time the application was for conversion of the barn (which, as I have indicated, was now listed, Grade 2) into a single dwelling and the demolition of the derelict farm buildings on the Manor House site and the construction of the Manor House in their place. The application was made on behalf of Harrison Properties by Mr Roy Geden, an architect, who had also drawn up the plans for the application, on which Harrison Properties is

G    named as the client. Quite how it was considered appropriate in November 1985, at a time when the company had contracted to sell the property to Peter Harrison, for the company to have development plans prepared for it, and to have a planning application made in the company's name, was not explored in the evidence.

19. Despite the changed position, the local authority still had objections to the development, as can be seen from a letter from Mr Geden written to Peter Harrison on 30 December 1985.

H    The principal objection was that the Manor House development comprised undesirable 'backland' development: it would overlook and adversely affect the converted barn and also the former farmhouse (i.e. the farmhouse previously being occupied by Miss Naylor). Mr Geden stated in his letter that, to answer this point, he had:

> '... stated that both properties will remain in your ownership but they [i.e. the planning authority] say that this may not be a permanent relationship.'

A

The reference to both properties remaining in 'your ownership' is clearly a reference to Harrison Properties' ownership. I say clearly, because (a) Harrison Properties was Mr Geden's client, (b) there is no evidence that Mr Geden knew that Peter Harrison intended to buy the development land and (c) Peter Harrison does not really dispute that this was the case. Peter Harrison said in evidence that to have pointed out the error would have unnecessarily complicated matters and that it was an irrelevant consideration anyway.

B

20. What is also clear from Mr Geden's letter of 30 December 1985 is that the main problem with the application was not conversion of the barn (an application for listed building consent had also been made) but with the Manor House development. Mr Geden concluded his letter by saying that he was due to meet the Chief Planning Officer on 6 January, the day before the application was due to be considered, to endeavour to get him to change his mind or at least get consideration of the application put off. There is no evidence about the outcome of this meeting but on 7 January 1986 Harrogate Borough Council refused the application for planning permission, citing three grounds:

C

(a) construction of the Manor House to the rear of existing dwellings was undesirable development, involving (i) difficulties of deliveries, etc., (ii) an invasion of privacy and (iii) the extension of the built up limits of the village;

(b) interference with traffic on the existing highway at the point of access; and

(c) the proposed access to the Manor House, which was through an archway in the barn, was unsatisfactory.

D

21. There appeared to be no planning problems so far as the barn was concerned. As regards the listed building aspect, listed building consent was refused on the grounds that approval was inappropriate until planning permission was obtained.

**Mr Geden's efforts**

E

22. Despite this setback, Mr Geden pursued his negotiations with the planning authority, clearly with considerable success. This can be seen from his letter dated 20 January 1986 to Peter Harrison in which he states:

'I am pleased to say that my negotiations with the County Surveyors at Skipton have been successful in so far as they will totally withdraw their objections if we omit the vehicular access though the archway of the barn and make that access into a pedestrian one only.

F

I have taken the opportunity to inform Mr Colin Brown, the Chief Planning Officer, of this situation, and although he was not at the Committee Meeting on site, he felt that by removing the direction for refusal we have a greatly improved chance of success. I enclose a set of drawings with revisions that I suggest we make marked in red, and would strongly recommend that a new application be made which, even if refused by the committee would certainly put us in a very strong position on Appeal.

G

If you are anxious to proceed urgently with the barn conversion, I see no reason why we should not make two application on the same plans as I feel it will be now virtually impossible to refuse that part of the scheme.'

**The February application**

23. Peter Harrison replied to this letter on 22 January 1986 agreeing to Mr Geden's suggestion to omission of the vehicular access through the barn and to a new application being made. It is plain from the terms of his reply that he wished Mr Geden to make one application for the whole site, rather than pursue Mr Geden's alternative suggestion of two separate applications.

H

24. Mr Geden duly made such an application on 2 February 1986, it being accompanied by an application for listed building consent. The application was again made in the name of

A     Harrison Properties. The application was accompanied by a letter dated 5 February 1986, from Mr Geden in which he made the following points on behalf of Harrison Properties:

      (a)     After discussion with the county surveyors, he had been able to remove the highway objections under grounds (b) and (c) of the earlier refusal by altering the means of access.

B       (b)     One of the apparent objections to the previous application, namely that the development would extend the village boundary, was now removed by a sympathetic treatment of the existing buildings and deletion of some of the additions which had been proposed to them.

      (c)     Fears in relation to the reasonable privacy of the barn and farmhouse were exaggerated. He stated:

C             'The proposed building at the rear [the Manor House] is over thirty metres from the rear of the barn and farmhouse, which are incidentally both in the ownership of the applicants. This distance is considerably more than is required by your own authority on new housing schemes. My clients are not proposing to sell any of these properties, but even if they did, new purchasers would have the ability of deciding whether they felt over-looked for themselves. There are no objections from the current occupiers of the farmhouse.'

D        The statement that Mr Geden's clients, namely Harrison Properties, were not proposing to sell the barn and the farmhouse were of course untrue, but there is no suggestion that Mr Geden knew this.

### The February board meeting

E        25. Before this application came to be considered, there occurred the crucial directors' meeting on 10 February 1986 at which the proposed sale to Peter Harrison was considered. The minutes and an agenda for this meeting have survived but the parties' actual recollection of what took place is almost non-existent. Of the four directors of the company, only Peter Harrison and Terry Harrison were present, together with the company secretary, Mr Weaving.

F     ### What Terry Harrison knew

       26. Before dealing with what took place, I need to step back and consider what the other directors, and in particular Terry Harrison, knew about the matters in dispute. As I have already indicated, of the four directors, it was only Peter Harrison who was involved in the day-to-day running of the company. The others left decisions to Peter Harrison and they were effectively non-executive directors. They attended meetings or became involved only when asked to do so by Peter Harrison. Terry Harrison knew some of the details about Holgate Bank Farm, however. She had been told by Peter Harrison that the tenant, Miss Naylor, was unsuitable and had vacated after being bought out, and that the farmland had been amalgamated with other farmland owned by the company. Although she knew Arkendale (because she occasionally visited Peter Harrison, who lived there), she did not, however, know where the piece of land was. She clearly knew something of Peter Harrison's wish to buy the land because her evidence

H       was that Peter Harrison said he wished to buy the land to plant trees, and that she thought £8,400 was rather a lot just for this. Peter Harrison denies ever saying such a thing and he points out that the existing planning consent relating to the land would have prevented him from doing this. She says, however, that she had never heard of his plans to build a Manor House.

       27. I accept that Terry Harrison's state of knowledge was as she describes and that she thought, for whatever reason, that Peter Harrison wanted to plant trees on the land.

**What happened at the meeting**                                                                          A

28. Returning to what happened at the meeting, Peter Harrison's wish to buy the land at the valuation figure of £8,400 was put to the meeting. Since Peter Harrison could not vote on the matter, and since without him the meeting was not quorate, Mrs Farmer was contacted by telephone and the matter was put to her. There is no evidence as to her state of knowledge. The relevant part of the minutes of the meeting read as follows:

> 'Conveyance of 3.28 acres of land forming part of Holgate Farm to Mr J.P. Harrison at     B
> the price of £8,400 as shown in the valuation of James Johnston. Mr Harrison, having an
> interest, did not vote and in order to obtain a quorum on this matter, Mrs M.C. Farmer
> was contacted by telephone.
>
> **Resolved** by Mrs M.C. Farmer and Miss M.T. Harrison that the transaction be approved
> and that the Common Seal of the Company be affixed by one Director and Secretary.'

29. I find, as is effectively admitted by Peter Harrison, that there was no discussion at the     C
meeting about the recent events which had occurred in relation to the planning applications for
the property. There was also no reference at the meeting to the letter from Mr Johnston dated
15 July 1985 which had accompanied his valuation. I should note that Peter Harrison's
evidence was that 'everyone' knew about his plans and he had not made any secret about them,
but at the outset of the trial I disallowed an application to amend the defence, in effect, to plead
this general allegation (since it was late, largely unparticularised and speculative). It is
therefore not open to Peter Harrison to suggest otherwise. The whole point of attempting to     D
bring these matters in, however, was that it was plain that there was no evidence which could
support a case that these matters had been raised at the meeting on 10 February 1986.

**Peter Harrison's attitude**

30. It is appropriate at this stage to say something about Peter Harrison's general attitude to
this transaction and why so little was said by him at the meeting. It is reasonably clear that, as     E
often happens in these kinds of cases, Peter Harrison did not always distinguish sufficiently
between his own interests and the interests of the company. As to the price, he was forced to
admit in cross-examination that the fact that in February 1986 it now looked as though planning
permission would be granted in respect of the barn conversion might have meant that an
outsider would have been willing to pay more than Mr Johnston's valuation figure. I think the
same must be said in respect of the Manor House site. Although the permission was for
construction of a replica Manor House, the fact that the prospects for the grant of permission     F
for some kind development on this site were clearly improved must realistically have affected
its value, particularly bearing in mind that Mr Johnston does not appear to have considered the
possible development of this part of the site at all. Peter Harrison's attitude was, however, that
conversion of the barn, being listed, was likely to be expensive, and was therefore not a
commercial proposition. His attitude to the Manor House, however, was that planning
permission was not inevitable (which was obviously the case) and in any event, the Manor
house project was a gamble and was also unlikely to be a profitable exercise. From his     G
perspective, therefore, £8,400 was still a fair price for the development land.

31. As to the issue of non-disclosure, I find that Peter Harrison did not make a conscious
decision to conceal his plans, or the developments in relation to planning, or Mr Johnston's
letter of 15 July, from his fellow directors. In fact all the relevant documents remained
somewhere within the company's files and I find that there was no attempt to conceal them or,
obviously, to destroy them. It is simply that it did not occur to him that these were things which     H
his fellow directors needed to be informed about. If they wanted to ask questions or look at the
files, they were free to do so.

32. A comment made by Mr Hollington QC, who appears for Peter Harrison, was that Terry
Harrison was totally indifferent to what happened to this piece of land at the time and only
raised objections, for ulterior purposes, later. While it is true that she (and her fellow directors)

A    seem to have been very incurious about this transaction, this does not absolve Peter Harrison
     from any failure as regards his own obligations. It is not necessary to reach any conclusions
     about what she, or Mrs Farmer, might have done had they known everything about the
     development land.

### Peter Harrison acquires the land and planning permission is granted

B    33. On 12 February 1986, the conveyance was executed. On 3 April 1986, Harrison
     Properties' application for planning permission and listed building consent was granted
     without any significant conditions being imposed. On 14 April 1986, Mr Geden submitted his
     invoice to Harrison Properties for his work in the sum of £2,780.96.

### What Peter Harrison did with the land

C    34. Peter Harrison had some work done on the barn but its development was never
     completed. In December 1988 he sold it to a Mr McRae for £110,300 on the basis that it was
     still a property needing conversion. Mr King, now employed in-house by the company, acted
     for Peter Harrison on this sale. In the course of doing so, he obviously learnt of the April 1986
     planning permission but he attached no special significance to it.

     35. Peter Harrison also started construction work on the Manor House but for various
     reasons he decided not to pursue this project. He was running into financial difficulties, his
D    builder had died and the market had collapsed. The Manor House site was put up for sale with
     only some foundations in place. A sale to a Mr Newsham fell through in 1991 but the property
     was eventually sold to a Mr and Mrs Braithwaite in April 1992 for £122,500.

     36. The figures of £110,300 plus £122,500, less £8,400, do not represent the actual profit, if
     any, made by Peter Harrison out of the development land since he had various expenses. If it
     becomes relevant, the extent of any profit made by him will be the subject of a subsequent
E    hearing.

### What was happening to Harrison Properties

     37. I need to deal with the events surrounding the sale of the Manor House site, but before I
     do so I must refer to other matters which had been going on around this time in relation to the
     company. In January 1992, Peter Harrison's two brothers, David and Michael, had presented a
     petition on behalf of their children alleging minority oppression in relation to the holding
F    company, Harrison Investments. The upshot of this was that on 27 March 1992, this company
     was placed in members' voluntary liquidation and partners in the firm of KPMG were
     appointed liquidators. The liquidation lasted about 18 months. The subsidiaries were not put
     into liquidation and continued to operate, but obviously the liquidators oversaw the running of
     Harrison Properties. Peter Harrison had resigned as a director on the commencement of the
     liquidation and Terry Harrison had become the chairman and an executive director. Mr Giles, a
G    solicitor and partner in Hamlins, also became a director. In September 1990 Peter Harrison had
     engaged a Mrs Anne Fuller as his personal assistant and in early 1992 she became the general
     manager of Harrison Properties. Mr King, who as I have said previously acted for the company
     in its conveyancing transactions and had become the company's in-house solicitor, retired in
     1990, thereafter doing only occasional work for the company.

### The sale of the Manor House site: what Mrs Fuller found out

H    38. At the end of 1991 and in early 1992, Mrs Fuller assisted in Peter Harrison's sale to the
     Braithwaites. She had no in-depth knowledge of the property but had access to the papers
     relating to the abortive sale to Mr Newsham, and to both Mr King's file and some of Peter
     Harrison's papers in relation to the sale to Mr McRae and, of course, Peter Harrison himself.
     Her evidence generally about the company's files, which I accept, is that there were many,
     many files stored in various places and they were not in good order.

39. Mrs Fuller's particular involvement in the sale was in answering Raworths' pre-contract    A
inquiries. In the course of doing so, she dealt with Raworth's inquiries about planning
permission and therefore extracted the planning permission of 3 April 1986 from the files. She
also extracted the refusal of 7 January 1986 and was aware of its date. She says she did not read
the permission thoroughly but checked to see that it referred to the correct property. She
appreciated that planning permission had been granted only a couple of months after
completion of the sale, which she says struck her as surprising. By reading the planning
permission it can be seen that the application had been made on 2 February 1986, i.e. before the    B
date of the conveyance. Mrs Fuller, however, denied that she appreciated this fact. Generally,
her position was that she was just helping Peter Harrison out but in the end these inquiries were
matters for him. She had plenty of other things to do in the company at the time. I will return to
state my conclusions about this aspect of the case in a moment.

40. Mrs Fuller accepts that in the course of assisting on the sale to the Braithwaites she
became aware that the development land had been bought by Peter Harrison for £8,400 in    C
1986, that he had sold part of in 1988 for £110,300 and that he was about to sell the remainder
for £122,500. Obviously he had had expenses but nevertheless it looked as though a good profit
had been made.

**Mrs Fuller asks about Peter Harrison's profit**

41. It is not in dispute that Mrs Fuller raised the matter of the apparent profit with a number    D
of people.

First, Peter Harrison. Mrs Fuller says she asked Peter Harrison at around the time of the sale
how he had made such an apparent profit, to which he replied that he had 'got lucky'. For his
part, Peter Harrison thinks the question of a profit may have been raised by Mrs Fuller but
denies having said anything about 'getting lucky'.

Secondly, Terry Harrison. Mrs Fuller says that some time after the sale she asked Terry    E
Harrison how Peter Harrison had been able to make such a profit but she did not know. Mrs
Fuller says that she told Terry Harrison that Peter Harrison had been able to sell with the benefit
of planning permission obtained on 3 April 1986. She says that Terry Harrison's recollection
was that Peter Harrison had said he wanted the land to plant trees. Mrs Fuller says that she does
not recall it as a 'significant' conversation.

For her part, Terry Harrison's evidence was that Mrs Fuller told her what Peter Harrison was    F
selling the land to the Braithwaites for, and what the land had been sold to Mr McRae for, and
that obviously she knew the original purchase price. She says Mrs Fuller showed her a plan of
the property and asked her if she knew anything about it. Terry Harrison says that Mrs Fuller
did not refer to the planning permission obtained in 1986 (and in this her evidence was
therefore different from Mrs Fuller's). She told Mrs Fuller of Peter Harrison's plans to plant
trees but that otherwise she knew nothing about it. She appreciated that it seemed as if a large
profit had been made but she presumed he had been able to do some deal. It looked 'perfectly    G
normal'.

Thirdly, Mrs Fuller says that at some stage, probably in the course of the sale to the
Braithwaites, she asked Mr King whether he had any 'further' information about the sale to
Peter Harrison, but he had nothing to add to what she already knew. I infer, however, that this
was merely a general question asked in the light of the inquiries which Raworths were making.

H

**What Mrs Fuller and Terry Harrison had learnt**

42. I can now state my conclusions about this part of the evidence.

(a)     As to Mrs Fuller, she was not of course involved with the company in 1985 or 1986 and
        had no reason to know what the other directors might have been told about the sale to
        Peter Harrison. Her actions in asking the questions which she did ask in 1992 certainly

A     show more than idle curiosity about how Peter Harrison had managed to make such an apparent profit but it seems to me, however, that her curiosity was focussed on how he had made the apparent profit and not whether anything had been concealed from the company at the time of the purchase. It is possible with hindsight to put together the various bits of information which were available to her in 1992 to show that she could have worked out that something might have been amiss, in particular, that planning permission had been applied for before the conveyance of the property, and that this

B     ought perhaps to have raised the question of whether the board had known of this. I do not accept, however, that she did in fact pursue this detailed train of thought. I think it is relevant to make the point that at this time there was no reason why anyone should generally have been suspicious of Peter Harrison and, further, that although the date of the February 1986 planning application can be discovered from the planning permission dated 3 April 1986, the possible significance of this did not even apparently occur to

C     anyone on the defendant's side until after this trial had started. Mrs Fuller's own evidence, which I accept; was that it was only during the course of the trial that she appreciated the point. It had never been suggested to her before. This shows the dangers of picking over the bones after the event.

    (b)    My conclusion is that Mrs Fuller was certainly curious about how the apparent profit had come about but she learnt nothing which made her think that anything improper had taken place or that there was any reason for thinking that the directors might not have

D           been properly informed.

    (c)    As to Terry Harrison, I find that she did not appreciate from the questions which Mrs Fuller asked her, or from what she learnt from Mrs Fuller about the apparent profit which Peter Harrison had made, that planning matters had reached the stage which they in fact had at the date of the February 1986 meeting. Her knowledge about these matters in 1992 was no different from what it had been at date of the meeting. It seems likely that

E         Mrs Fuller did mention the date of the planning permission to her, and I so find, but I think this was only in passing and I do not think it had the significance for her which is now claimed. I should again make the point that, at this time, relations between Terry Harrison and Peter Harrison were not especially strained and she had no other reasons for being suspicious of Peter Harrison.

F     **Old papers come to light**

    43. In 1997, the possibility arose of part of Hollins Farm being acquired for a motorway services area as part of the A1(M) extension. For the purposes of the public inquiry which was held in about October 1997, a search was made amongst Harrison Properties' files to investigate the planning history of Hollins Farm. This search was carried out by a company employee, Mr Tom Aylmer. He did not give evidence but Mrs Fuller stated that he brought to

G     her a number of papers, which included the following:

    (a)    Mr Johnston's letter of 15 July 1985; and

    (b)    the correspondence relating to the planning applications passing between Mr Geden and Peter Harrison at the end of 1985 and the beginning of 1986, namely the letters dated 30 December 1985, 20 January, 22 January and 14 February 1986.

H     44. Both Mrs Fuller and, according to her, Mr Aylmer clearly regarded what these documents revealed as suspicious. Mrs Fuller's evidence is that she put the documents in a safe. Sometime later, it is not clear when, she added these documents to those in the company's files relating to Holgate Bank Farm, together with the planning documents, to create a single chronological file. She says she was immediately aware that Mr Johnston's valuation did not reflect the full value of the land because it had been overtaken by the likely planning consent. She says she passed the papers over to Terry Harrison who, she says, was appalled.

45. Terry Harrison then showed them to the board, who took legal advice. On 9 March 1998, a letter before action was written. Given that the events in question had taken place at least 12 years before, the terms of the letter were hardly appropriate. It set out a fairly bare statement as to the nature of the claim and said that unless an admission of liability was made within seven days, proceedings would be commenced. Be that as it may, proceedings were in fact subsequently launched on 6 July 1998.

46. One of the suggestions which has been made is that Harrison Properties, in the form of Terry Harrison and Mrs Fuller, had been well aware of the matters complained of since at least 1992, and that these proceedings were only brought as part of wider plan of campaign to bring Peter Harrison to heel. First, it was said that an objection made by Peter Harrison to the proposed motorway service station in the summer of 1997 had infuriated the rest of the family. Secondly, it was said that Peter Harrison's criticisms of the way in which Harrison Properties was being run, which led to his solicitors' letter of 26 February 1998, also provoked Harrison Properties into bringing this claim. It was therefore said that bringing of these proceedings was purely tactical, and the claims of earlier ignorance and expressions of shock at what was discovered in 1997 were feigned.

47. I don't doubt that Peter Harrison's actions may have played some part in bringing on this claim but I reject the wider submission. I am satisfied that it was only when the further papers relating to Holgate Bank Farm were brought to light in 1997 did Mrs Fuller, and Terry Harrison in particular, realise for the first time what had not been disclosed to the board in 1986, and the significance of it.

## The claim

48. The first way in which the claim is put is that on the sale of the development land to Peter Harrison, he had put himself into a position where his personal interests conflicted with those of Harrison Properties. He was therefore subject to the equitable 'self-dealing' rule whereby he was not entitled to enter into the transaction unless the shareholders gave their informed consent to it. If this rule was broken then Harrison Properties is entitled, subject to any equitable defences, to set aside the transaction or to other appropriate relief without any inquiry as to whether it was on proper or fair terms. See *Aberdeen Railway Co v Blaikie Bros* (1854) 1 Macq 461. None of this is in dispute.

49. As is commonly the case, the strict application of the rule is modified in the case of Harrison Properties by the articles of the company, art. 1 of which applies reg. 84(1) of Pt. I of Table A in the First Schedule to the *Companies Act* 1948. This provides as follows:

> 'A director who is in any way, whether directly or indirectly, interested in a contract or proposed contract with the company shall declare the nature of his interest at a meeting of the directors in accordance with section 199 of the Act.'

Section 199 of the *Companies Act* 1948 imposed a duty on a director in similar terms.

50. In this case it is alleged that no sufficient declaration was made. It was obviously known to the other directors that Peter Harrison was interested as purchaser but it is said that they did not have other information about the transaction, in particular, that:

(a) Mr Johnston's valuation was not a true market value because it did not take into account the development potential of the barn, as shown by his letter of 15 July 1985;

(b) planning permission for residential development had been applied for, and Harrison Properties had been advised by Mr Geden that refusal of permission for development of the barn was 'virtually impossible'; and

(c) the planning application had been made on the basis that Harrison Properties had no intention of selling the development land.

51. As to the second of these matters, I am satisfied that the fact that planning permission had recently been applied for was clearly material and the other directors should have been informed of what Peter Harrison himself knew about the application. Mr Geden's statement

A    about the prospects of planning permission for the barn clearly represented an altered position
     from that which had existed when Mr Johnston made his valuation, and was a matter which
     was capable of affecting that valuation. I also consider that the planning position in relation to
     the Manor House site had changed due to Mr Geden's efforts such that the grant of planning
     permission for the whole of the development land appeared more likely in February 1986 than
     it had, say, six months earlier. The extent to which Mr Johnston had considered this aspect, if at
     all, is unclear. As I have said, it seems unlikely that he had considered anything other than the

B    possible development of the barn. At the very least, the position had clearly improved.

       52. As to what was said in Mr Johnston's letter of 15 July 1985 about his valuation, as I
     have already indicated it is not clear that Mr Johnston's valuation was flawed for the reason
     suggested: his letter is ambiguous. In any event, this aspect had been overtaken by Mr Geden's
     subsequent efforts.

       53. As to what was said about Harrison Properties' intention not to sell the development

C    land, it does not seem to me that this was of any real significance.

       54. It follows that, subject to the defence of laches, acquiescence and delay which is raised
     by Peter Harrison. Harrison Properties would have been entitled to set aside the conveyance of
     the development land without further inquiry. As the land has now all been sold to third parties,
     this is no longer possible and so the available remedies are either an account of profits or
     equitable compensation. See, for example, *Movitex Ltd v Bulfield* (1986) 2 BCC 99,403 at

D    p. 99,440.

       55. The main remedy which Harrison Properties seeks, however, is payment of a sum
     representing the value of the land as at 23 December 1988, the date of the sale of the barn site to
     Mr McRae. The figure would, if necessary, be the subject of a subsequent inquiry but it is put at
     £191,900. Mr Parker's argument is that he is not obliged to base his case solely on a breach of
     the self-dealing rule or thus limit the relief sought to an account of profits or equitable
     compensation. Peter Harrison also owed positive duties to Harrison Properties, and these

E    included in particular a duty to act bona fide in the interests of the company. His failure to fully
     inform the other directors about the development land and the use of the company's resources
     to obtain planning permission were breaches of such duty. Further, the taking of a conveyance
     of this property at a time when it had ripened for development amounted to the taking of a
     business opportunity which he had a duty to realise for the company such that, drawing an
     analogy with such cases as *Cook v Deeks* [1916] AC 554 and *Regal (Hastings) Ltd v Gulliver*

F    [1967] 2 AC 134n, Peter Harrison held the development land on trust for Harrison Properties
     from the outset. The property now having been sold, the company can claim its value at the
     highest point during Peter Harrison's trusteeship, which is taken to be the date of the sale of the
     barn site to Mr McRae.

       56. I accept that simply because the conveyance of the development land was liable to be set
     aside on the grounds of self dealing and inadequate disclosure is not the end of the matter so far
     as other possible breaches of Peter Harrison's duties as a director are concerned. This is clear

G    from the judgment of Vinelott J in *Movitex*, above. In his judgment, he had to consider the
     apparent conflict between Article 84 of Table A, which on its face permits self dealing if the
     conditions there are satisfied, and s. 205 of the *Companies Act* 1948, which provided that:

              '... any provision, whether contained in the articles of a company or in any other
              contract with a company or otherwise, for exempting any officer of the company ...
              against, any liability which by virtue of any rule of law would otherwise attach to him in

H             respect of any... breach of duty or breach of trust of which he may be guilty in relation to
              the company shall be void ...'.

       57. He resolved the apparent conflict as follows (at p. 99,432):

              'The true principle is that if a director places himself in a position in which his duty to
              the company conflicts with his personal interest or his duty to another, the court will
              intervene to set aside the transaction without inquiring whether there was any breach of

A

the director's duty to the company. That is an over-riding principle of equity. The shareholders of the company, in formulating the articles, can exclude or modify the application of this principle. *In doing so they do not exempt the director from or from the consequences of a breach of duty owed to the company.*' (My emphasis.)

Peter Harrison's duties to the company therefore remain unaffected in this respect.

B

58. Further, I accept that Peter Harrison was in breach of his duty to act bona fide in the best interests of Harrison Properties. It seems to me that his breaches included his failure to inform the other directors of the company fully of the facts about the planning status of the development land, his failure to do what he could to ensure that, if the company decided to sell the land, whether to him or someone else, steps were taken such that it was sold at its full market value, and finally the use of the company's resources to prepare and apply for planning permission in the company's name at a time when Peter Harrison intended that he should buy the property and thus have the benefit of that work.

C

59. It does not follow however, that because of these breaches he held development land on trust for Harrison Properties. It seems to me that the normal remedy for such breaches would be equitable compensation. *Cook v Deeks* and *Regal Hastings Ltd v Gulliver* are quite different cases on their facts.

D

60. Even if in this case it had been correct that Peter Harrison became a constructive trustee of the development land, the remedy which the claimants seek is not one, assuming that I have a discretion, which I would have been prepared to grant in this case. Not only do the remedies of an account of profits or equitable compensation seem to me to be adequate and appropriate to meet the circumstances of the case, but the remedy sought takes no account of any expenditure incurred by Peter Harrison himself on the property.

### Laches, acquiescence and delay

E

61. It is accepted on both sides that the modern approach to these equitable defences is not to attempt to see whether the particular circumstances of the case can be fitted within one of the various formulae derived from the older cases but to ask whether in all the circumstances it would be unconscionable for a party to be permitted to assert his beneficial right. See *Frawley v Lindley* (unreported, 1 March 1999, CA).

62. In the present case, the following factors are in my judgment relevant:

F

(a)    The failure to disclose the relevant facts, and the breaches of duty, were serious and not technical matters.

(b)    Peter Harrison, nevertheless, did not act dishonestly, and made no positive attempt to conceal the relevant documentary material.

(c)    The events in question took place over 12 years before the writ was issued.

G

(d)    It inevitably follows that the availability and quality of the evidence about what took place at the crucial times has deteriorated. This has not, however, prevented me from being able to reach a clear conclusion about the central issue of non-disclosure. Nevertheless, it may well be that, because of the lapse of time and disappearance of the relevant evidence, it will be difficult to work out the financial aspects of the remedy.

(e)    Related to the length of time which has elapsed is the consideration that Peter Harrison has no doubt conducted his affairs on the basis that this claim did not exist. At the start of the trial I disallowed an amendment by him to plead one particular transaction which had occurred but the general point remains, and is of course inherent in most cases of an 'old' claim.

H

(f)    More specifically, Peter Harrison spent money on the property and has since sold it.

(g)    Harrison Properties knew some of the relevant facts by 1992 and had the means to find out all of them.

A    (h)    Harrison Properties did not discover the most significant of the relevant facts, and did
not appreciate the significance of what had not been disclosed, until the second half of
1997. Thereafter the company brought proceedings reasonably swiftly.

63. In my judgment the fact that the non-disclosure was a serious one coupled with the fact
that Harrison Properties did not discover what had really happened until 1997 tip the balance in
Harrison Properties' favour. I do not consider that it would be unconscionable for Harrison
B    Properties to assert its claim. I therefore reject this defence.

64. I will hear counsel on the appropriate form of order.

*(Order accordingly)*

COURT OF APPEAL JUDGMENT

C    (Delivered 11 October 2001)

**Chadwick LJ:** 1. This appeal and cross-appeal are from an order made on 7 December
2000 by Mr Kevin Garnett QC, sitting as a deputy judge of the High Court in the Chancery
Division, in proceedings brought by JJ Harrison (Properties) Ltd against Mr Peter Harrison, a
former director of that company, in relation to the purchase by Mr Harrison in February 1986
of land at Arkendale, North Yorkshire. The land was purchased by Mr Harrison from the
D    company in circumstances in which Mr Harrison, as the deputy judge held, failed to make
proper disclosure to the board of directors of the company of information which was material to
its value.

2. The deputy judge was satisfied that, for so long as the land remained vested in
Mr Harrison as purchaser from the company, the conveyance or transfer to him was liable to be
set aside at the suit of the company without enquiry as to the adequacy of the price which
Mr Harrison had paid. But the land had long since been sold on by Mr Harrison to third-party
E    purchasers; with the consequence that the court could not order the land to be retransferred to
the company. In those circumstances the deputy judge made an order that Mr Harrison account
for the profits he had made from the land. Mr Harrison does not challenge the deputy judge's
finding that he failed to make proper disclosure to the board of directors of the company at the
time of his purchase in February 1986. He appeals against the deputy judge's order on the
grounds (i) that the deputy judge ought to have held that the company's claim against him was
F    barred by the *Limitation Act* 1980, alternatively (ii) that the deputy judge was wrong to reject
his defence based on laches. The company cross-appeals on the grounds that the deputy judge
ought to have ordered Mr Harrison to account to it for the value of the land as at 23 December
1988; that being the date upon which part of the land was first sold on to a third party.

**The underlying facts**

G    3. The company, to which I will refer as 'Harrison Properties', was, until 1993 or
thereabouts, a wholly owned subsidiary of JJ Harrison Investments Ltd. Harrison Investments
was the holding company of a group of construction, property and investment companies
established by Mr Harrison's father, the late Mr James Joseph Harrison. In or about 1949 Mr JJ
Harrison transferred the shares which he held in Harrison Investments to the trustees of
settlements which he had made for the benefit of his six children. Harrison Investments was
placed in voluntary liquidation in March 1992 in accordance with terms of compromise agreed
H    following the presentation by the children of Mr Peter Harrison's brothers (Mr David Harrison
and Mr Michael Harrison) of a petition seeking relief under s. 459 of the *Companies Act* 1985.
In 1993 a scheme was agreed under which Harrison Properties (and other subsidiaries of
Harrison Investments) was transferred to a new company, JJ Harrison Estates Ltd and the
shares of the petitioners in Harrison Investments were converted into shares in Harrison Estates
and bought out. The effect of that transaction is that, since 1993, Harrison Properties has been

owned by Mr Peter Harrison and his three sisters (Miss Marie-Therese Harrison, Mrs Christine     A
Lean and Mrs Mary Farmer) and their children through the trustees of their respective
settlements.

4. From 1975, or thereabouts, the directors of Harrison Properties were Mr Peter Harrison
and his three sisters. The three sisters took little or no part in the day-to-day affairs of the
company, which was managed by their brother. That remained the position until March 1992,
when Mr Peter Harrison resigned as a director of Harrison Properties (and as a director of other     B
subsidiaries of Harrison Investments) in order to give effect to the terms of compromise to
which I have referred. Thereafter the company has been managed by Miss Marie-Therese
(Terry) Harrison and Mrs Gwen Fuller. Mrs Fuller has been employed by Harrison Properties
since September 1990; initially as personal assistant to Mr Peter Harrison and, from 1992, as
general manager.

5. In the 1980s Harrison Properties owned a considerable amount of agricultural and
residential land in Yorkshire. As the deputy judge held, its general policy was to maximise the     C
development potential of land which it owned and then to sell it. The claim in this action relates
to land in and around the village of Arkendale (where Mr Peter Harrison had his home) known
as Holgate Bank Farm. The deputy judge described the position at para. 5–7 of his judgment:

> '5. . . . Holgate Bank Farm consisted of a farm house, a number of outbuildings close by
> and about 136 acres of farmland. In the early 1980s it was subject to a tenancy in favour
> of a Miss Naylor, who had succeeded to the tenancy on her father's death. It seems she     D
> was finding it difficult to make a success of the farm and in the summer of 1984 she
> eventually agreed to vacate for £37,500. She gave up the farmland itself shortly
> afterwards and it was amalgamated with the nearby Hollins Farm, which was being
> operated by another tenant farmer of Harrison Properties.

> 6. By April 1985, she had also vacated the farmhouse. As to this the plan was for it to be
> renovated and sold to Mrs Farmer's son, Mr Sean Frank. In the event this did not     E
> happen, and the renovated property was later sold off to a third party.

> 7. As I have already indicated, apart from the farmhouse and farmland, Holgate Bank
> Farm consisted of a number of outbuildings, including a large barn (the "barn") and a
> further large farm building to the rear. There was also an adjoining paddock, the whole
> site extending to something over 3 acres. I will refer to this site as the development land.
> The buildings were generally in a very poor state of repair. Harrison Properties had for     F
> some time been attempting to do something with them and in July 1983 had applied for
> planning permission to convert the barn into two residential units and the farm building
> to the rear into one residential unit. The application was refused on the basis, it seems,
> that conversion of the existing buildings would only be allowed if they were redundant
> as agricultural buildings, and the planning authority were not satisfied that this was the
> case. The possibility of the barn becoming listed was also raised and in fact this
> happened shortly afterwards.'     G

6. The position altered on the vacation of Holgate Bank Farm by Miss Naylor and the sale
off of the farmhouse. Thereafter the existing buildings on the development land were no longer
required for agricultural use. On 17 June 1985 Mr Reeves, then general manager of Harrison
Properties, sought a valuation of the development land from a local valuer. He did so on the
instructions of Mr Peter Harrison. The valuation obtained, dated 13 July 1985 and sent to
Mr Reeves under cover of a letter dated 15 July 1985, placed a value of £8,400 on the land with     H
vacant possession. The letter contained the following comment:

> 'I would point out, as you will be aware, that the Farm buildings are in a very dilapidated
> condition and as such are really of very little value. I appreciate the brick barn may have
> some development potential for conversion purposes and I have not taken this into
> account in my Valuation.'

© **2002 Sweet and Maxwell Ltd**
bcp2002 bcp   247 Mp   746—bcp23075

A    7. Mr Peter Harrison was interested in acquiring the development land for himself. Without reference to the board of directors of Harrison Properties, but on the instructions of Mr Reeves, solicitors prepared a contract for the sale of the land to Mr Harrison at the valuation figure of £8,400. The contract was signed by Mr Harrison as purchaser, and by the company secretary on behalf of Harrison Properties, on or about 6 September 1985. The contract provided for completion within 12 months.

B    8. On 1 November 1985 a further application was made for planning permission in respect of the development land. The application was made on behalf of Harrison Properties; and was for the conversion of the barn into a single dwelling, for the demolition of the derelict farm buildings and for the construction of a replica Elizabethan manor house in their place As the deputy judge commented (para. 18):

C    '"Quite how it was considered appropriate in November 1985, at a time when the company had contracted to sell the property to Peter Harrison, for the company to have development plans prepared for it, and to have a planning application made in the company's name, was not explored in the evidence."'

   9. The application was refused by the local planning authority at a meeting on 6 January 1986. The refusal was on specified grounds, which included an objection in relation to the proposed access to the highway. But further negotiations then took place between the architect instructed by Harrison Properties, the county surveyors and the planning officers. The progress made in those negotiations enabled the architect to inform Mr Peter Harrison, by letter dated

D    20 January 1986, that:

   'I am pleased to say that my negotiations with the County Surveyors at Skipton have been successful in so far as they will totally withdraw their objections if we omit the vehicular access through the archway of the barn and make that access into a pedestrian one only.

E    I have taken the opportunity to inform Mr Colin Brown, the Chief Planning Officer, of this situation, and although he was not at the Committee Meeting on site, he felt that by removing the direction for refusal we have a greatly improved chance of success. I enclose a set of drawings with revisions that I suggest we make marked in red, and would strongly recommend that a new application be made which, even if refused by the committee would certainly put us in a very strong position on Appeal.

F    If you are anxious to proceed urgently with the barn conversion, I see no reason why we should not make two applications on the same plans as I feel it will be now virtually impossible to refuse that part of the scheme.'

   Following that letter, Mr Peter Harrison authorised the architect to make a fresh planning application in the name of Harrison Properties. That application was submitted on 5 February 1986. It was granted on 3 April 1986 (together with listed building consent in respect of the barn conversion) without the imposition of any significant planning conditions. The architect invoiced Harrison Properties for his work shortly thereafter.

G    10. In the meantime, the sale of the development land to Mr Peter Harrison had been considered at a meeting of the board of directors of Harrison Properties held on 10 February 1986. The minutes of that meeting record:

   'Conveyance of 3.28 acres of land forming part of Holgate Farm to Mr J P Harrison at the price of £8,400.00 as shown in the valuation by James Johnston. Mr Harrison, having an interest, did not vote and in order to obtain a quorum on this matter, Mrs Farmer was contacted by telephone.

H    Resolved by Mrs M. C. Farmer and Miss M.T. Harrison that the transaction be approved and the Common Seal of the Company be affixed by one Director and Secretary.'

   The conveyance of the land to Mr Harrison was completed on 12 February 1986.

   11. The deputy judge found the following facts in relation to the meeting of 10 February 1986: (i) the valuer's letter of 15 July 1985 – which pointed out that his valuation did not take

account of any development potential – was not disclosed at the meeting; (ii) that the meeting    A
was not told of the planning application made in November 1986, nor – more pertinently – of
that made on 5 February 1986; (iii) that the meeting was not told of the advice from the
architect, in his letter of 20 January 1986, that there was now 'a greatly improved chance of
success' and that, in relation to the barn conversion, 'it will now be virtually impossible to
refuse that part of the scheme'; and (iv) that Miss Terry Harrison did not know of those matters
from any other source. The deputy judge found that she 'knew something of Peter Harrison's
wish to buy the land'; that she understood that 'he wished to buy the land to plant trees', and    B
that 'she thought £8,400 was rather a lot just for this.' She had never heard of his plans to build
a replica Elizabethan manor house. There was no evidence as to Mrs Farmer's state of
knowledge and the deputy judge made no express finding as to what she did or did not know. It
is implicit, I think, that he assumed that she had no relevant knowledge.

12. Following the conveyance to Mr Harrison, some work was done on the barn; but (as the
deputy judge found), its development was never completed and it was sold on in December    C
1988 on the basis that it was in need of conversion. The price obtained by Mr Harrison on that
sale was £110,300. The position in relation to the remainder of the land is described by the
deputy judge at para. 35 of his judgment:

> 'Peter Harrison also started construction work on the Manor House but for various
> reasons he decided not to pursue this project. He was running into financial difficulties,
> his builder had died and the market had collapsed. The Manor House site was put up for    D
> sale with only some foundations in place. A sale to a Mr Newsham fell through in 1991
> but the property was eventually sold to a Mr and Mrs Braithwaite in April 1992 for
> £122,500.'

13. Until Mr Peter Harrison resigned as a director of Harrison Properties in March 1992,
and thereupon ceased to have any executive role in its affairs, Mrs Fuller was his personal
assistant. She was involved, on his behalf, in providing answers to pre-contract enquiries raised
by the solicitors acting for the purchasers, Mr and Mrs Braithwaite. She became aware that    E
planning permission had been granted on 3 April 1986, following the earlier refusal in January
1986. She accepted that she also became aware that part of the land for which Mr Harrison had
paid £8,400 in February 1986 had been sold in 1988 for £110,300; and that the remainder of the
land was about to be sold to Mr and Mrs Braithwaite for £122,550. It struck her that
Mr Harrison had made a substantial profit. She told the deputy judge that, when she mentioned
that to him, Mr Harrison's comment was that he had 'got lucky'. She had some conversation    F
with Miss Terry Harrison about the matter at the time.

14. The deputy judge's conclusion was that, although Mrs Fuller was curious in 1992 as to
the circumstances in which the profit had arisen 'she learnt nothing which made her think that
anything improper had taken place or that there was any reason for thinking that the directors
might not have been properly informed.' In relation to Miss Terry Harrison's knowledge at that
time, the deputy judge said this, at para. 42c of his judgment:    G

> '... I find that she did not appreciate from the questions which Mrs Fuller asked her, or
> from what she learnt from Mrs Fuller about the apparent profit which Peter Harrison had
> made, that planning matters had reached the stage which they in fact had at the date of
> the February 1986 meeting. Her knowledge about these matters in 1992 was no different
> from what it had been at the date of the meeting. It seems likely that Mrs Fuller did
> mention the date of the planning permission to her, and I so find, but I think this was only
> in passing and I do not think it had the significance for her which is now claimed. I    H
> should again make the point that, at this time, relations between Terry Harrison and
> Peter Harrison were not especially strained and she had no other reasons for being
> suspicious of Peter Harrison.'

15. It was not until late 1997 that Mrs Fuller became aware of Mr Johnston's letter of
15 July 1985, and of the architect's letter of 20 January 1986. Those letters came to light on a

A    search of Harrison Properties' files in connection with a possible disposal of Hollins Farm for
     use as a motor way services area adjacent to the proposed A1(M) extension. When Mrs Fuller
     put those letters onto a single chronological file, with the planning consents and other
     documents relating to Holgate Bank Farm, she realised what had happened. In particular, she
     appreciated that, at the time when the board of directors considered the sale in February 1986,
     Mr Johnston's valuation of 13 July 1985 had been overtaken by events. The discovery of those
     letters, and the conclusion that Mrs Fuller and, subsequently, Miss Terry Harrison and her co-
B    directors (after receiving legal advice) drew from them, led to the claim in these proceedings.
     A letter before action was sent in March 1998.


**These proceedings**

     16. These proceedings were commenced by writ issued on 6 July 1998. Paragraph 19 of the
C    statement of claim, endorsed on the writ, contains the assertion that, by reason of the non-
     disclosure to the meeting of 10 February 1986 of the matters to which I have referred 'and on
     account of the Defendant's use of the resources of the Company and diversion to himself of the
     business opportunity presented by the possible residential development of the Land which it
     was his duty to realise for the Company' Mr Harrison held the development land on trust for
     the company as constructive trustee. The claim is for an account of the proceeds of sale of the
     land, with compound interest; alternatively for equitable compensation for fraudulent breach of
D    trust and breach of fiduciary duty.

     17. A defence was served on or about 5 November 1999 in which the allegations of non-
     disclosure were put in issue. Paragraph 21 of that defence contained the assertion that 'insofar
     as the Plaintiff's claim is based upon allegations of breach of trust and/or fiduciary duty, the
     same are statute barred and any allegation of fraud is denied.' The trial commenced on
     18 October 2000. On the first day of the trial, Mr Harrison sought and obtained permission to
E    make extensive amendments to his defence; the purpose of which was to set up a defence of
     laches based on the company's alleged knowledge (through, in particular, Mrs Fuller and Miss
     Terry Harrison) of, and acquiescence in, the circumstances surrounding the sale to him of the
     land since 'at least 1992'. It is, however, pertinent to note that he was not given the permission
     which he had sought to make amendment in the following terms:

          'In the premises, at all material times until March 1998 the defendant was led to believe
F         by the plaintiff that the said sale was a proper and unimpeachable transaction. In reliance
          upon the said belief, the defendant has changed his position and/or acted to his detriment
          by concurring with two shareholder buyouts by the plaintiff in 1990 and 1994 and in
          particular, by entering into an agreement dated 16 January 1990.'

     The effect of refusing to allow that amendment was that the deputy judge did not have to
     consider a defence of laches based upon change of position.

G    18. The deputy judge delivered a written judgment on 27 November 2000. He held that
     there had been a failure by Mr Harrison, in February 1986, to disclose to his co-directors of
     Harrison Properties material facts in relation to the value of the land which he was buying; in
     particular, a failure to disclose that the planning position had changed, that there was a strong
     prospect that planning permission would be granted for the conversion of the barn and the
     development of the remainder of the site, and that Mr Johnston's valuation, made in July 1985,
     had taken no account of development potential and so could not be relied upon. In the light of
H    that failure to disclose material facts, Mr Harrison was in breach of the duties imposed upon
     him as a director by reg. 84(1) of Pt. I of Table A in the First Schedule to the *Companies Act*
     1948 and s. 199 of that Act (now s. 317 of the 1985 Act). He was subject to the rule identified in
     *Aberdeen Railway Co v Blaikie Bros* (1854) Macq 461 – see, in particular, the passage in the
     speech of Lord Cranworth LC at p. 471, cited by Viscount Sankey in *Regal (Hastings) Ltd v
     Gulliver* [1967] 2 AC 134n at p. 138. Subject to any equitable defences, Harrison Properties

A

was entitled to set the transaction aside or to other appropriate relief without any enquiry whether the sale was on proper or fair terms. At para. 54 of his judgment the deputy judge said this:

> '... subject to the defence of laches, acquiescence and delay which is raised by Peter Harrison, Harrison Properties would have been entitled to set aside the conveyance of the development land without further inquiry. As the land has now all been sold to third parties, this is no longer possible and so the available remedies are either an account of profits or equitable compensation. See, for example, *Movitex Ltd v Bulfield* (1986) 2 BCC 99,403 at p. 99,440.'

B

19. The deputy judge went on to consider whether, in addition to the breach of the statutory duties of disclosure, Mr Harrison was in breach of his equitable duty to act bona fide in the best interests of the company. The deputy judge held that he was – see, at para. 58 of the judgment:

> 'Further, I accept that Peter Harrison was in breach of his duty to act bona fide in the best interests of Harrison Properties. It seems to me that his breaches included his failure to inform the other directors of the company fully of the facts about the planning status of the development land, his failure to do what he could to ensure that, if the company decided to sell the land, whether to him or someone else, steps were taken such that it was sold at its full market value, and finally the use of the company's resources to prepare and apply for planning permission in the company's name at a time when Peter Harrison intended that he should buy the property and thus have the benefit of that work.'

C

D

Nevertheless, the deputy judge was not prepared to hold that Mr Harrison held the land conveyed to him in consequence of those breaches of duty on trust for the company.

20. It is not at all clear, at least to me, whether – and, if so, to what extent – the deputy judge was invited to deal with the Limitation Act defence raised in Mr Harrison's pleaded case. We were told that counsel took the view that the defence was unlikely to succeed at first instance in the light of observations made by Sir Robert Megarry V-C in *Tito v Waddell (No. 2)* [1977] Ch 106, at pp. 249F–250B. It may be that, having reached the conclusion that Mr Harrison never held the land as trustee, the deputy judge himself took the view that the company's claim did not fall within s. 21(3) of the Act. Whatever the reason, the deputy judge did not find it necessary to refer to the Limitation Act defence in his judgment. He dealt with the matter on the basis that relief should be granted unless barred by the equitable defences of laches, acquiescence or delay. In that context he held that, although the company knew some of the relevant facts by 1992, and had the means to find out all of them, it did not discover the most significant of the relevant facts, and did not appreciate the significance of what had not been disclosed, until the second half of 1997. In those circumstances the deputy judge was not persuaded that it would be unconscionable for Harrison Properties to assert its claim.

E

F

21. As I have indicated, the deputy judge had directed himself that the available remedies were either an account of profits or equitable compensation – see the passage at para. 54 of his judgment which I have set out, and a further passage at para. 60 to the same effect. Faced with a choice between one or other of those remedies, the company elected for an account of profits. The deputy judge's order of 7 December 2000 reflects that choice. It is fair to point out, however, that the company has never abandoned its claim to an account of the proceeds of sale. Indeed, the primary claim advanced at the trial – to which the deputy judge referred at para. 55 of his judgment – was to payment of a sum representing the value of the land as at 23 December 1988.

G

H

**The new evidence**

22. Mr Harrison did not lodge an appellant's notice within the time limited by the rules. Indeed he accepts, I think, that he had decided not to appeal; in the belief that it would appear, on the taking of an account of profits, that there was nothing due from him to the company. In those circumstances it is unfortunate that the appeal now before us was provoked by a letter

247-10-02

A   sent to Mr Harrison by Mr Nicholas Giles, a partner in the firm of solicitors formerly instructed by the company in these proceedings and, himself, a director of Harrison Estates. In that letter, dated 23 February 2001, Mr Giles wrote:

'When you left the company in what might best be described as ignominious circumstances, Terry was most concerned that your reputation should not be tarnished and there should be no muck raking about your stewardship of the company. It was hoped that you would be able to enjoy a dignified retirement with your reputation intact

B   and with a reasonable standard of living.'

Mr Harrison has taken that letter to be an acknowledgement – by Mr Giles, at least – that Miss Terry Harrison made a conscious decision in or shortly after March 1992 that the company would not pursue any claims against him. Further, he submits that the letter shows that, contrary to the evidence which the deputy judge accepted, Miss Terry Harrison had suspicions about his stewardship of the company at the time of his resignation as a director. It is said that,

C   if that material had been before the deputy judge, he would have reached a different conclusion on the issue of laches.

**This appeal**

    23. It was in those circumstances that Mr Harrison sought permission, by notice dated 27 March 2001, to appeal out of time and to adduce the letter of 23 February 2001 at the

D   hearing of that appeal. Permission was granted by this court (Mummery LJ and Wilson J) on 16 July 2001. The court granted permission to appeal, not only on the issue of laches but also on the ground that the company's claim was barred under the provisions of s. 21(3) and 23 of the *Limitation Act* 1980. The grant of permission to appeal prompted an application by Harrison Properties for permission to cross appeal against the deputy judge's refusal to hold that Mr Harrison was trustee of the land for the company. The object of that challenge is to provide a foundation for the company's claim that he should be required to account for the

E   value of the land as at 23 December 1988. Permission to cross-appeal was granted by Robert Walker LJ on 16 August 2001. The hearing of the appeal and cross-appeal has been expedited in order that the question whether the deputy judge's order should stand in its present form should be resolved before the parties proceed to a contested hearing on the taking of the account; a hearing which, we understand, is fixed to commence at the end of this month with an estimated duration of five days.

F     24. It is convenient to consider, first, the issue raised by the cross-appeal: whether Mr Harrison held the land conveyed to him in 1986 as constructive trustee for the company of which he was a director. Resolution of that question provides the foundation upon which to address the first issue raised by the appeal: whether the company's claim is barred by limitation. It is only if that issue is determined against Mr Harrison that it is necessary to go on to consider the equitable defence of laches.

G
**The constructive trust issue**

    25. I start with four propositions which may be regarded as beyond argument: (i) that a company incorporated under the Companies Acts is not trustee of its own property; it is both legal and beneficial owner of that property; (ii) that the property of a company so incorporated cannot lawfully be disposed of other than in accordance with the provisions of its memorandum and articles of association; (iii) that the powers to dispose of the company's

H   property, conferred upon the directors by the articles of association, must be exercised by the directors for the purposes, and in the interests, of the company; and (iv) that, in that sense, the directors owe fiduciary duties to the company in relation to those powers and a breach of those duties is treated as a breach of trust. If authority for those propositions is required it can be found in *Re Lands Allotment Co* [1894] 1 Ch 616 – see the judgments of Lindley LJ, at p. 631, and Kay LJ, at p. 638 – *Cook v Deeks* [1916] AC 555 – see the advice of the Privy Council

delivered by Lord Buckmaster LC at p. 564 – and *Belmont Finance Corp Ltd v Williams Furniture Ltd (No. 2)* [1980] 1 All ER 393 – see the judgment of Buckley LJ (with whom the other members of the court agreed), at p. 405c–f.

26. It follows from the principle that directors who dispose of the company's property in breach of their fiduciary duties are treated as having committed a breach of trust that a person who receives that property with knowledge of the breach of duty is treated as holding it upon trust for the company. He is said to be a constructive trustee of the property. The position was explained by Buckley LJ in the *Belmont* case, in the passage to which I have just referred:

'So, if the directors of a company in breach of their fiduciary duties misapply the funds of their company so that they come into the hands of some stranger to the trust who receives them with knowledge (actual or constructive) of the breach, he cannot conscientiously retain those funds against the company unless he has some better equity. He becomes a constructive trustee for the company of the misapplied funds. This is stated very clearly by Jessel MR in *Russell v Wakefield Waterworks Co* [(1875) LR 20 Eq 474, 479], where he said:

"In this Court the money of the company is a trust fund, because it is applicable only to the special purposes of the company in the hands of the agents of the company, and it is in that sense a trust fund applicable by them to those special purposes; and a person taking it from them with notice that it is being applied to other purposes cannot in this Court say that he is not a constructive trustee."'

27. It follows, also, from the principle that directors who dispose of the company's property in breach of their fiduciary duties are treated as having committed a breach of trust that, a director who is, himself, the recipient of the property holds it upon a trust for the company. He, also, is described as a constructive trustee. But, as Millett LJ explained in *Paragon Finance plc v Thakerar & Co* [1999] 1 All ER 400, at pp. 408g–409g, his trusteeship is different in character from that of the stranger. He falls into the category of persons who, in the words of Millett LJ (at [1999] 1 All ER 400, 408j) . . . 'though not strictly trustees, were in an analogous position and who abused the trust and confidence reposed in them to obtain their principal's property for themselves.'

28. Millett LJ referred to persons within that category – that is to say, persons who had abused their powers so as to obtain their principal's property for themselves – as 'persons [who] are properly described as constructive trustees'. He went on to say this:

'Regrettably, however, the expressions "constructive trust" and "constructive trustee" have been used by equity lawyers to describe two entirely different situations. The first covers those cases already mentioned, where the defendant, though not expressly appointed a trustee, has assumed the duties of a trustee by a lawful transaction which was independent of and preceded the breach of trust and is not impeached by the plaintiff. The second covers those cases where the trust obligation arises as a direct consequence of the unlawful transaction which is impeached by the plaintiff.

A constructive trust arises by operation of law whenever the circumstances are such that it would be unconscionable for the owner of property (usually but not necessarily the legal estate) to assert his own beneficial interest in the property and deny the beneficial interest of another. In the first class of case, however, the constructive trustee really is a trustee. He does not receive the trust property in his own right but by a transaction by which both parties intend to create a trust from the outset and which is not impugned by the plaintiff. His possession of the property is coloured from the first by the trust and confidence by means of which he obtained it, and his subsequent appropriation of the property to his own use is a breach of that trust . . .

The second class of case is different. It arises when the defendant is implicated in a fraud. Equity has always given relief against fraud by making any person sufficiently implicated in the fraud accountable in equity. In such a case he is traditionally though I

**© 2002 Sweet and Maxwell Ltd**
bcp2002 bcp 247 Mp 752—bcp23075

A      think unfortunately described as a constructive trustee and said to be "liable to account as a constructive trustee". Such a person is not in fact a trustee at all, even though he may be liable to account as if he were ...'

29. There is no doubt that Millett LJ regarded it as beyond dispute that a director who obtained the company's property for himself by misuse of the powers with which he had been entrusted as a director was a constructive trustee within the first category. He referred to
B      'directors and other fiduciaries' in that context – at [1999] 1 All ER 400, 408h–j. There is also no doubt, if I may say so, that he was correct to do so – see *Re Sharpe; Masonic and General Life Assurance Co v Sharpe* [1892] 1 Ch 154, at p. 172, *Soar v Ashwell* [1893] 2 QB 390, at p. 398. The reason is that a director, on appointment to that office, assumes the duties of a trustee in relation to the company's property. If, thereafter, he takes possession of that property, his possession 'is coloured from the first by the trust and confidence by means of which he obtained it'. His obligations as a trustee in relation to that property do not arise out of the
C      transaction by which he obtained it for himself. The true analysis is that his obligations as a trustee in relation to that property predate the transaction by which it was conveyed to him. The conveyance of the property to himself by the exercise of his powers in breach of trust does not release him from those obligations. He is trustee of the property because it has become vested in him; but his obligations to deal with the property as a trustee arise out of his pre-existing duties as a director; not out of the circumstances in which the property was conveyed.

D      30. In the present case the deputy judge found that, on the conveyance of the development land to Mr Harrison in February 1986, there was a failure by Mr Harrison to comply with the requirements of s. 199 of, and reg. 84 in Pt. I of Table A in the First Schedule to, the *Companies Act* 1948. But, more pertinently in this context, the deputy judge also found that Mr Harrison acted in breach of his fiduciary duties as a director in failing to ensure that the land was sold at its full value – see the passage at para. 58 of the judgment to which I have referred. Not only did Mr Harrison fail to make a proper disclosure of his interest; his existing duties as a director
E      required him to ensure that the development land was not conveyed at all until the company had received and considered advice as to its value in the light of the change in planning potential. In those circumstances it seems to me impossible to reach a conclusion that Mr Harrison did not hold the development land as a constructive trustee, in the sense described by Millett LJ in the first of the two categories identified in the *Paragon Finance* case. The deputy judge does not explain the basis for his finding, in para. 59 of his judgment, that: 'It does not follow, however, that because of these breaches [Mr Harrison] held the development land on trust for Harrison
F      Properties.' In my view there can be no basis for that finding. I would reverse the deputy judge on that point.

### The defence under the Limitation Act 1980

31. Sections 21 and 23 of the *Limitation Act* 1980 are in these terms, so far as material:

G      '21(1) No period of limitation prescribed by this Act shall apply to an action by a beneficiary under a trust, being an action–

         (a)     in respect of any fraud or fraudulent breach of trust to which the trustee was a party of privy; or

         (b)     to recover from the trustee trust property or the proceeds of trust property in the possession of the trustee, or previously received by the trustee and converted to
H            his use.

     ...

(3) Subject to the preceding provisions of this section, an action by a beneficiary to recover trust property or in respect of any breach of trust, not being an action for which a period of limitation is prescribed by any other provision of this Act, shall not be brought after the expiration of six years from the date on which the right of action accrued.

23 An action for an account shall not be brought after the expiration of any time limit    A
under this Act which is applicable to the claim which is the basis of the duty to account.'

In the present case, s. 23 requires no separate consideration. The relevant question is whether
Mr Harrison can rely upon the six-year period of limitation prescribed by s. 21(3) of the Act.
The answer to that question turns upon two sub-issues: (i) whether the present action is 'an
action by a beneficiary to recover trust property in respect of any breach of trust'; and (ii), if
so, whether the present action is taken out of s. 21(3) by the provisions of s. 21(1)(b) of the Act.    B

32. As I have indicated, it seems that, at trial, both counsel took the view that an action to
recover property from a person subject to the self-dealing rule in circumstances in which, in
breach of that rule, there had not been proper disclosure, was not an action to which s. 21(3) of
the 1980 Act had any application. That view was based upon observations made by Sir Robert
Megarry V-C in *Tito v Waddell (No. 1)* [1977] Ch 106, at pp. 246E–250B. Put shortly, the
Vice-Chancellor held that a trustee was not, or not necessarily, in breach of duty if he
purchased trust property without making proper disclosure of his interest; the true analysis was    C
that the fair-dealing rule or the self-dealing rule (as the case might be) imposed a disability on
the person subject to the rule. The effect of that disability was that a person subject to the rule
who had not made the disclosure required by the rule had no answer to a claim to set the
purchase aside – see, in particular, at [1977] Ch 106, p. 248D–H.

33. It is unnecessary to decide, on the present appeal, whether the Vice-Chancellor was
correct in his analysis in *Tito v Waddell (No. 2)*. For my part I can see force in the proposition    D
that a trustee is not necessarily in breach of a duty if he purchases trust property without making
proper disclosure of his interest. It is not difficult to envisage circumstances where the sale of
the trust property – at the given price and at the relevant time – is unquestionably in the interests
of the trust; and where the only feature which engages the self-dealing rule is the trustee's
inadvertent failure to disclose that he has some interest in the purchaser. But I am not at all sure
why, in such a case, an action to set aside the sale does not come within the other limb of what is
now s. 21(3) of the 1980 Act – 'an action to recover trust property'. Be that as it may, this is not    E
a case in which the sale of the company's property to Mr Harrison in February 1986 was
unquestionably in the interests of the trust. This is a case in which, as the deputy judge has
found, Mr Harrison was in breach of trust in allowing the sale to proceed without insisting on
an up-to-date valuation. The answer to the question whether s. 21(3) of the 1980 Act has any
application to the present case is not to be found in *Tito v Waddell (No. 2)*.

34. The answer, in the present case, is provided by Millett LJ's historical analysis in    F
*Paragon Finance plc v Thakerar & Co* [1999] 1 All ER 400. After describing the distinction
between the two categories of constructive trustee, in the passages to which I have already
referred, he went on, at pp. 409h–410f:

'The importance of the distinction between the two categories of constructive trust lies
in the application of the statutes of limitation. Before 1890 constructive trusts of the first
kind were treated in the same way as express trusts and were often confusingly    G
described as such; claims against the trustee were not barred by the passage of time.
Constructive trusts of the second kind however were treated differently. They were not
in reality trusts at all, but merely a remedial mechanism by which equity gave relief for
fraud. The Court of Chancery, which applied the statutes of limitation by analogy, was
not misled by its own terminology; it gave effect to the reality of the situation by
applying the statute to the fraud which gave rise to the defendant's liability: see *Soar v
Ashwell* [1893] 2 QB 390 at 393, [1891-4] All ER Rep 991 at 993 per Lord Esher MR:    H

"If the breach of the legal regulation relied on ... makes, in the view of a Court of
Equity, the defendant a trustee for the plaintiff, the Court of Equity treats the
defendant as a trustee ... by construction, and the trust is called a constructive trust;
and against the breach which by construction creates the trust the Court of Equity
allows Statutes of Limitation to be vouched."

© **2002 Sweet and Maxwell Ltd**

A          Lord Esher MR's reference to the breach of the legal relation shows that while the first
        kind of constructive trust was a creature of equity's exclusive jurisdiction the second
        arose in the exercise of its concurrent jurisdiction. For a fuller discussion of the
        distinction between the two categories of constructive trust, see *Hovenden v Lord
        Annesley* (1806) 2 Sch & Lef 607 at pp. 632–633, *Soar v Ashwell*, *Taylor v Davies*
        [1920] AC 636, *Clarkson v Davies* [1923] AC 100, *Selangor United Rubber Estates Ltd
        v Craddock (No 3)* [1968] 1 WLR 1555, and *Competitive Insurance Co Ltd v Davies*
B       *Investments Ltd* [1975] 3 All ER 254, [1975] 1 WLR 1240.

           It was evidently considered unduly harsh that trustees should remain liable indefinitely
        for innocent breaches of trust when even common law actions for fraud were barred
        after six years and s. 8 of the 1888 Act introduced a period of limitation (effectively six
        years) for such claims. Its purpose was to provide protection for trustees who would
        otherwise be liable without limitation of time (laches and acquiescence apart) where the
C       breach of trust was committed innocently; see *Re Richardson, Pole v Pattenden* [1920] 1
        Ch 423 at p. 440. It excepted two cases from its provisions: (i) where the claim was
        founded upon any fraud or fraudulent breach of trust to which the trustee was party or
        privy, and (ii) where the proceeds were still retained by the trustee or had previously
        been received by the trustee and converted to his use. The same scheme was adopted by
        s. 19 of the 1939 Act and s. 21 of the 1980 Act.'

D          The position, therefore is that, since the coming into operation of s. 8 of the *Trustee Act* 1888,
        express trustees and constructive trustees within Millett LJ's first category have been able to
        rely upon the limitation period now prescribed by s. 21(3) of the 1980 Act, subject to the saving
        provisions now contained in s. 21(1) of that Act.

           35. Mr Hollington QC, on behalf of Mr Harrison, while urging us to take the view that this
        was 'an action by a beneficiary ... in respect of any breach of trust' within s. 21(3) of the 1980
        Act – so that the six-year period prescribed by that section applied – sought to persuade us that
E       it was not 'an action by a beneficiary under a trust ... to recover from the trustee trust property
        ... previously received by the trustee' within s. 21(1)(b) of that Act. He submitted, in effect,
        that it would be wrong to treat a director who, through an abuse of the trust and confidence
        reposed in him as such, had taken a transfer of the company's property to himself as if he were a
        trustee who had received trust property. In support of that submission he referred us to two of
        the cases cited by Millett LJ in the passage which I have just set out: *Taylor v Davies* [1920] AC
        636 and *Clarkson v Davies* [1923] AC 100. In both cases the decision to which we were
F       referred was that of the Privy Council on appeal from the Supreme Court of Ontario, Appellate
        Division. The relevant statutory provisions were those in s. 47 of the *Limitations Act* 1914, then
        in force in Ontario (R.S. Ont. 1914, c. 75). The section – which is set out at [1920] AC 636 at
        p. 649 – contained provisions which corresponded with those in s. 8 of the *Trustee Act* 1888. In
        particular, s. 47(2) contained the saving provisions formerly in s. 8(2) of the 1888 Act and now
        found in s. 21(1)(b) of the 1980 Act.

G          36. The first question in *Taylor v Davies* was whether the principal defendant to the action
        (Mr Davies) could rely upon a transfer of property made by the assignee under an assignment
        for the benefit of creditors – itself made under the Assignments and Preferences by Insolvent
        Persons Act of 1897 (R.S. Ont 1897, c. 147) – in circumstances where he, the defendant, was an
        inspector appointed for the purposes of s. 20 of that Act. The complaint against the defendant
        was that he had failed to make disclosure of all material facts within his knowledge and to
        obtain the informed consent of the creditors to the transfer. That question was determined
H       against the defendant by the trial judge. The second question was whether the defendant could
        rely on the Limitations Act. That turned on whether he was a person within the saving
        provisions in s. 47(2) of that Act – that is to say, whether he was to be treated as a trustee for the
        purposes of those provisions. It was held that he was not; and that, accordingly, he was not
        precluded from relying upon a limitation defence under s. 5 of that Act. In delivering the advice
        of the Privy Council, Viscount Cave said this, at pp. 650–651:

'In order to ascertain the effect of the Trustee Act, 1888, and the corresponding
Canadian statute, it is necessary to refer to the antecedent law of limitation as it applied
to trustees. It is clear that apart from these statutes an express trustee could not rely, as a
defence to an action by his beneficiary, either upon the statutes of limitation or upon the
rules which were enforced by Courts of equity by analogy or in obedience to those
statutes. The possession of an express trustee was treated by the Courts as the possession
of his cestuis que trustent, and accordingly time did not run in his favour against them.
This disability applied, not only to a trustee named as such in the instrument of trust, but
to a person who, though not so named, had assumed the position of a trustee for others or
had taken possession or control of property on their behalf, such (for instance) as the
persons enumerated in the judgment of Bowen L.J. in *Soar v. Ashwell*, or those whose
position was in question in *Burdick v. Garrick, In re Sharpe, Rochefoucauld v.
Boustead*, and *Reid-Newfoundland Co. v. Anglo-American Telegraph Co.* These
persons, though not originally trustees, had taken upon themselves the custody and
administration of property on behalf of others; and though sometimes referred to as
constructive trustees, they were, in fact, actual trustees, though not so named. It
followed that their possession also was treated as the possession of the persons for
whom they acted, and they, like express trustees, were disabled from taking advantage
of the time bar. But the position in this respect of a constructive trustee in the usual sense
of the words – that is to say, of a person who, though he had taken possession in his own
right, was liable to be declared a trustee in a Court of equity – was widely different, and
it had long been settled that time ran in his favour from the moment of his so taking
possession.'

It is plain, therefore, that the Privy Council, in *Taylor v Davies*, recognised the distinction, to
which Millett LJ referred in the *Paragon Finance* case some 70 years later, between
constructive trustees of the first category and what Viscount Cave described as 'a constructive
trustee in the usual sense of the words' – that is to say, a person in Millett LJ's second category
(to whom, I think, he would prefer to deny the description 'constructive trustee' at all, if it were
not already so deeply entrenched – see [1999] 1 All ER 400, 409e–f, 414g).

37.  The problem addressed in *Taylor v Davies* was whether s. 47(1) of the Ontario statute –
which defined a trustee to include 'a trustee whose trust arises by construction or implication of
law' had altered the pre-existing law, so as to apply the saving, or exclusionary, provisions of
s. 47(2) to property in the hands of a constructive trustee in the second category. Millett LJ
addressed the same problem, in the context of s. 19 of the *Limitation Act* 1939 and s. 21 of the
1980 Act, in the *Paragon Finance* case – see [1999] 1 All ER 400, 411d–414e. The conclusion,
in *Taylor v Davies*, was that the pre-existing law had not been altered in that respect. That is not
the problem in the present case. The relevance of *Taylor v Davies* in the present context is that
the Privy Council rejected the submission that the defendant fell within the first category of
constructive trustee – see [1920] AC 636 at p. 650. He was treated as within the second
category of constructive trustee. It is clear that, if he had fallen within the first category of
constructive trustee, he would not have been able to take advantage of a limitation defence. The
reason why he was not within the first category is that he did not have power to dispose of the
company's property; that power lay in the assignee, subject to the supervision of the inspectors.
*Taylor v Davies* is not authority for the proposition that a person in the position of Mr Harrison
is not within the first category of constructive trustee; and, not being authority for that
proposition, it does not assist Mr Hollington's argument. The decision provides support (if
support be needed) for Millett LJ's approach in the *Paragon Finance* case.

38.  The other decision upon which Mr Hollington QC relies in this context, *Clarkson v
Davies* [1923] AC 100, takes the point no further. The distinction made in *Taylor v Davies*
some three years earlier between 'a trust which arises before the occurrence of the transaction
impeached and cases which arise only by reason of that transaction' was recognised and

A  applied – see [1923] AC 100 at p. 111. The defendant in *Clarkson v Davies* was a director of Provincial Building and Loan Association, whose assets were sold to Dominion Permanent Loan Co; but he was not a director of the Dominion company. The claim by the liquidator of the Dominion company to recover $30,000 paid to the defendant out of the assets of the Dominion company on the occasion of the sale was met by a defence under the Limitations Act; on the basis that, if the defendant became a constructive trustee of that money, the trust arose by reason of the transaction. In relation to that money he owed no duties to the Dominion company

B  prior to the occurrence of the transaction impeached; he was a constructive trustee (if at all) within the second category.

39. In the context of a claim against a director who, in breach of trust – that is to say, through an abuse of the trust and confidence reposed in him as a director – has taken a transfer of the company's property to himself, 'the beneficiary', for the purposes of s. 21(1)(b) of the Act is the company, 'the trustee' is the director and 'the trust property' is the property which has been

C  transferred from the company to the director. That must follow from the proposition that a director is, in those circumstances, to be treated as a trustee within the first of Millett LJ's categories. I go on, therefore, to consider whether the present action is 'an action . . . to recover . . . trust property or the proceeds of trust property in the possession of the trustee or previously received by the trustee and converted to his use'.

40. The present action is not an action 'to recover trust property or the proceeds of trust

D  property *in the possession of the trustee*'. That is because the development land is no longer vested in Mr Harrison; and there is no claim to trace the proceeds of the sales off in 1988 and 1992. But the action is an action 'to recover trust property or the proceeds of trust property *previously received by the trustee and converted to his use*.' The effect of the provisions now found in s. 21 of the 1890 Act was put succinctly by Kekewich J in *Re Timmis: Nixon v Smith* [1902] 1 Ch 176, at p. 186:

E  'The intention of the statute was to give a trustee the benefit of the lapse of time when, although he had done something legally or technically wrong, he had done nothing morally wrong or dishonest, but it was not intended to protect him where, if he pleaded the statute, he would come with something he ought not to have, i.e., money of the trust received by him and converted to his own use.'

41. I accept, therefore, that Mr Harrison is a person within s. 21 of the 1980 Act. But if he

F  were permitted to rely on the period of limitation prescribed by s. 21(3) of that Act, he would, indeed, be a person who 'would come off with something he ought not to have'; that is to say, he would retain, to the exclusion of the company, the benefit of the moneys which he received on the sale off of the development land in 1988 and 1992. It is to prevent that result that s. 21(1)(b) of the Act contains the saving provisions which it does. In that way the position as it was before 1890 is preserved in those cases where the trustee would otherwise profit from his breach of trust. For those reasons I would hold that the *Limitation Act* 1980 provides no defence

G  in the present case.

**Laches**

42. Mr Harrison's first challenge is to the conclusion which the deputy judge reached on the evidence before him. It is said, in the grounds of appeal set out at s. 7 of the appellant's notice,

H  that the deputy judge failed to give sufficient weight to the findings summarised in para. 62 of his judgment and gave excessive weight to his views, expressed in para. 63, that the failure to disclose was serious and that Harrison Properties 'did not discover what had really happened until 1997'.

43. For my part I would reject any submission that the failure to disclose can be dismissed as a technical breach of trust. The true position was that Mr Harrison obtained property from the

A

company on the basis of a valuation which, had he thought about the point at all, he must have appreciated had been overtaken by events. The deputy judge acquitted Mr Harrison of dishonesty; and I do not, of course, go behind that finding. But a director who fails to appreciate that a valuation made on the basis that land has no planning potential provides no proper foundation upon which to proceed with the purchase of that land for himself after he has been told that 'it will be now virtually impossible' for planning permission to be refused for part, at least, of the development which he proposes – and that, in relation to the other part of the development there was 'a greatly improved chance of success' on a new application – cannot be heard to say that his breach of duty is 'technical'. The deputy judge was correct to regard the failure by Mr Harrison to disclose to the board what he knew as a serious breach of duty.

B

44. Nor do I think that the deputy judge's conclusion, on the evidence before him, that neither Miss Terry Harrison or Mrs Fuller appreciated, until 1997, what had really happened, can be challenged. He was entitled to accept their evidence that they did not, in fact, 'put two and two together' until the relevant letters came to light, by chance, in 1997. There is no basis upon which an appellate court could properly interfere with the conclusion which the deputy judge reached after hearing and seeing the witnesses. I would reject the appellant's challenge to the conclusion which the deputy judge reached on the material before him.

C

45. Given the conclusion that neither Miss Terry Harrison nor Mrs Fuller appreciated, until 1997, what had really happened, the question whether the fact that the means of discovering the position earlier lay within the files of the company made it unconscionable for the company to assert its rights some six years after Mr Harrison had resigned as chairman and managing director was, essentially, a question for the trial judge. In my view it is impossible to hold that he erred in principle.

D

46. It is necessary, therefore, to go on to consider whether the new evidence – in the form of the letter from Mr Giles dated 23 February 2001 – alters the position. In particular it is necessary to consider whether the contents of that letter should lead this court to take the view that the deputy judge's conclusion that neither Miss Terry Harrison or Mrs Fuller were 'on enquiry' as to Mr Harrison's conduct, in relation to his purchase of the development land, before 1997, was unsafe. It is plainly impossible for this court to take the view, on the basis of the letter of 23 February 2001, that the deputy judge's conclusion of fact on the relevant point should be reversed. In effect, the court is asked to order a new trial, so that the evidence can be reheard in the light of the view which Mr Giles has now expressed.

E

47. It is important to have in mind that Mr Giles did not give evidence at the trial. Accordingly, nothing in his letter of 23 February 2001 casts doubt upon any finding based on evidence from him. Further, his perception that Mr Harrison left the company in 1992 'in what might best be described in ignominious circumstances' is clearly based upon the terms of the compromise agreement of 27 March 1992, under which Mr Harrison was required to give up his role at the helm of Harrison Properties. There is nothing new about that. If Mr Harrison had wished to advance a case at trial that the circumstances in which he left the company in 1992 were such as to put his sister on enquiry as to his purchase of the development land, he had the material to do so. The most that can be said is that if Mr Giles' view that Miss Harrison's concern, in 1992, that 'your reputation should not be tarnished and there should be no muck raking about your stewardship of the company' had been known to Mr Harrison and his advisers at or before the trial, the point could have been put to Miss Terry Harrison in cross-examination. But I am not persuaded that, if that point had been put to Miss Harrison there is any real possibility that it would have received an answer which would have affected the deputy judge's appreciation of the position in the light of all the evidence which he had heard.

F

G

H

48. In those circumstances I am satisfied that an order for a new trial so that Mr Giles' views, as they appear from his letter of 23 February 2001, could be put to Miss Terry Harrison would be a disproportionate response. I would hold that there is no basis upon which the deputy judge's conclusion that laches afforded no defence in this case can be challenged.

**© 2002 Sweet and Maxwell Ltd**
bcp2002 bcp  247 Mp  758—bcp2307S

A     **The appropriate remedy**

49. On the basis that Mr Harrison held the development land as trustee for the company, the remedy sought by the cross-appeal is an order that he account for the value of the land as at 23 December 1988 – that being the date of the sale of the barn.

50. It seems to me right that Mr Harrison should account for the £110,300 which he received on that sale. He should be entitled to bring to the credit of that account a proportionate

B     part of the £8,400 which he paid for the development land and the cost of any works which led to an enhancement in the value of that part of the land. It is pertinent to have in mind that the costs of pursuing planning applications has already been born by the company.

51. I am not persuaded, however, that it would be right to require Mr Harrison to account for the value of the remainder of the development land – that is to say, the site of the replica Elizabethan manor house – at its 1988 value. I do not think that the decision upon which the

C     company relies – *Nant-y-glo and Blaina Ironworks Co v Grave* (1878) 12 ChD 738 – requires an order to be made in those terms. It is, I think, clear that Lord Browne-Wilkinson, in *Target Holdings Ltd v Redferns (a firm)* [1996] AC 421, did not regard the decision in the *Nant-y-glo* case as authority for any such rule of law as that for which Mr Mann QC contends. As Lord Browne-Wilkinson pointed out, [1996] AC 421 at p. 440D–E, the claim in the *Nant-y-glo* case was not a claim against a trustee for breach of trust in relation to trust property. It was a claim for an account of profits made against a person (albeit a director) who, in relation to the

D     property which he had received, was a constructive trustee within the second of the categories identified by Millett LJ in the *Paragon Finance* case. The case is of no relevance in the present context.

52. In the absence of any evidence that the value of the development land as a whole was diminished by the sale of part in December 1988, it seems to me that the appropriate order is to require the value of the manor house site to be brought in at the price (£122,500) obtained on

E     the further sale in April 1992. Again Mr Harrison can bring to the credit of that account the balance of the £8,400 and the cost of any works which led to an enhancement in the value of that part of the land. Subject to the proviso that he is not to take credit for expenditure which did not preserve or lead to an enhancement in the value of the land, the question what costs and allowances can be set off against the proceeds of sale will be determined on the taking of the account.

F

    **Conclusion**

53. I would dismiss the appeal. I would allow the company's cross-appeal to the extent of substituting for the words 'all profits' where they appear in paragraph (1) of the order of 7 December 2000, the words 'the proceeds of the sales of the Land made by the defendant in 1988 and 1992 and all other profits'. I would invite the parties to consider whether the order requires any other variation in the light of our judgments.

G     **Laws LJ:** 54. I agree.

**Sir Anthony Evans:** 55. I also agree.

*(Appeal dismissed. Cross-appeal allowed. Application for permission to appeal to the House of Lords refused)*

H     ————————————————

broker of the customer. It is a well-established principle that the broker has as against the customer the right to hold those securities for the amount due.

Under those circumstances this summons, which asks for a declaration that the official receiver—that is to say, the customer—is entitled as against the official assignee—that is to say, the broker—fails, and I dismiss it with costs.

Solicitors for applicant: *Michael Abrahams, Sons & Co.*

Solicitors for respondent: *Travers-Smith, Braithwaite & Robinson.*

F. E.

BUCKLEY J.

1902

LONDON AND GLOBE FINANCE CORPORATION, *In re.*

---

## PERCIVAL v. WRIGHT.

[1901 P. 1375.]

*Company—Directors—Fiduciary Position—Purchase of Shares—Negotiations for Sale of Undertaking—Obligation to Disclose.*

SWINFEN EADY J.

1902

June 20, 21, 23.

The directors of a company are not trustees for individual shareholders, and may purchase their shares without disclosing pending negotiations for the sale of the company's undertaking.

WITNESS ACTION.

This was an action to set aside a sale of shares in a limited company, on the ground that the purchasers, being directors, ought to have informed their vendor shareholders of certain pending negotiations for the sale of the company's undertaking.

In and prior to October, 1900, the plaintiffs were the joint registered owners of 253 shares of 10*l.* each (with 9*l.* 8*s.* paid up) in a colliery company called Nixon's Navigation Company, Limited.

The objects of the company, as defined by the memorandum of association, included the disposal by sale of all or any of the property of the company. The board of directors were empowered to exercise all powers not declared to be exercisable by general meetings; but no sale of the company's collieries could be made without the sanction of a special resolution.

The shares of the company, which were in few hands and

were transferable only with the approval of the board of directors, had no market price and were not quoted on the Stock Exchange.

On October 8, 1900, the plaintiffs' solicitors wrote to the secretary of the company asking if he knew of any one disposed to purchase shares.

On October 15, 1900, in answer to the secretary's inquiry as to what price they were prepared to accept, the plaintiffs' solicitors wrote stating that the plaintiffs would be disposed to entertain offers of 12*l*. 5*s*. per share. This price was based on a valuation which the plaintiffs had obtained from independent valuers some months previously.

On October 17, 1900, the chairman of the company wrote to the plaintiffs' solicitors stating that their letter of October 15 had been handed to him, and that he would take the shares at 12*l*. 5*s*.

On October 20, 1900, the plaintiffs' solicitors having taken a fresh valuation, replied that the plaintiffs were prepared to accept 12*l*. 10*s*. per share.

On October 22, 1900, the chairman wrote accepting that offer, and stating that the shares would be divided into three lots.

On October 24, 1900, the chairman wrote stating that eighty-five shares were to be transferred to himself and eighty-four shares apiece to two other named directors.

The transfers having been approved by the board, the transaction was completed.

The plaintiffs subsequently discovered that, prior to and during their own negotiations for sale, the chairman and the board were being approached by one Holden with a view to the purchase of the entire undertaking of the company, which Holden wished to resell at a profit to a new company. Various prices were successively suggested by Holden, all of which represented considerably over 12*l*. 10*s*. per share ; but no firm offer was ever made which the board could lay before the shareholders, and the negotiations ultimately proved abortive. The Court was not in fact satisfied on the evidence that the board ever intended to sell.

The plaintiffs brought this action against the chairman and the two other purchasing directors, asking to have the sale set aside on the ground that the defendants as directors ought to have disclosed the negotiations with Holden when treating for the purchase of the plaintiffs' shares.

*Eve, K.C.*, and *Vaughan Hawkins*, for the plaintiffs. There is no suggestion of unfair dealing or purchase at an under-value; but the defendants as directors were in a fiduciary position towards the plaintiffs, and ought to have disclosed the negotiations for sale of the undertaking, in which case the plaintiffs would have retained their shares, on the chance of that sale going through.

The primâ facie obligation of directors purchasing shares to disclose all information as to the shares is, no doubt, tacitly released as to information acquired in the ordinary course of management. The defendants, for instance, would not have been bound to disclose a large casual profit, the discovery of a new vein, or the prospect of a good dividend. But that release did not relieve them from disclosing the special information acquired during their negotiations for the sale of the entire undertaking. At the commencement of those negotiations they became trustees for sale for the benefit of the company and the shareholders, and could not purchase the interest of an ultimate beneficiary without disclosing those negotiations : *Fox* v. *Mackreth* (1) ; *Ex parte Lacey.* (2)

[SWINFEN EADY J. Assuming that directors are, in a sense, trustees for the company, are they trustees for individual shareholders ?]

They are trustees both for the company and for the shareholders who are the real beneficiaries. No question of privity can arise in the case of trusts : Lindley on Companies, 5th ed. p. 364; Buckley on Companies, 8th ed. p. 560; *York and North Midland Ry. Co.* v. *Hudson* (3) ; *Ferguson* v. *Wilson* (4) ; *Wilson* v. *Lord Bury* (5) ; *In re German Mining Co.* (6)

(1) (1791) 2 W. & T. 7th ed. p. 709 ;
2 Cox, 320 ; 2 Bro. C. C. 400 ; 4 Bro.
P. C. 258 ; 2 R. R. 55.

(2) (1802) 6 Ves. 625 ; 6 R. R. 9.

(3) (1853) 16 Beav. 485, 491, 496.

(4) (1866) L. R. 2 Ch. 77, 90.

(5) (1880) 5 Q. B. D. 518, 527.

(6) (1853) 4 D. M. & G. 19.

SWINFEN
EADY J.

1902

PERCIVAL
v.
WRIGHT.

Now, " a share in a company, like a share in a partnership, is a definite proportion of the joint estate, after it has been turned into money, and applied as far as may be necessary in payment of the joint debts ": Lindley on Companies, 5th ed. p. 449; *Watson* v. *Spratley*. (1) The undertaking of the company is, therefore, merely the sum of the shares. No doubt at law it belongs to the company, but in equity it belongs to the shareholders, and the directors as trustees for sale of the undertaking cannot purchase the interest of a beneficiary without giving him full information. In this respect the shareholders inter se are in the same position as partners, or shareholders in an unincorporated company. If managing partners employ an agent to sell their business, he cannot purchase the share of a sleeping partner without disclosing the fact of his employment. Incorporation cannot affect this broad equitable principle. It does not alter the rights of the shareholders inter se, though it affects their relations to the external world.

In the present case the plaintiffs knew that the directors were managing the business, but not that they were negotiating a sale of the undertaking, and the non-disclosure of the latter fact entitles them to set aside the sale of their shares.

*Hon. E. C. Macnaghten, K.C.*, and *Mark Romer*, for the defendants. Even if the directors were trustees for sale of the undertaking, they were not trustees for sale of the plaintiffs' shares. The suggested equity has never been applied between a director and a shareholder, although a director purchasing shares must always purchase from a shareholder. The company is a legal entity quite distinct from the shareholders: *Salomon* v. *Salomon & Co.* (2) ; so that a sale by a mortgagee to a company in which he is a shareholder is neither in form or substance a sale to himself : *Farrar* v. *Farrars, Limited* (3) ; and a sale by a company to a shareholder cannot be impeached on the ground that the resolution authorizing that sale was carried by the votes of that shareholder : *North Western Transportation Co.* v. *Beatty*. (4) The principle underlying these decisions is quite inconsistent with the plaintiffs' contention.

*Eve, K.C.*, in reply.

(1) (1854) 10 Ex. 222.     (3) (1888) 40 Ch. D. 395.
(2) [1897] A. C. 22, 42, 51.    (4) (1887) 12 App. Cas. 589.

SWINFEN EADY J. The position of the directors of a company has often been considered and explained by many eminent equity judges. In *Great Eastern Ry. Co.* v. *Turner* (1) Lord Selborne L.C. points out the twofold position which directors fill. He says: " The directors are the mere trustees or agents of the company—trustees of the company's money and property —agents in the transactions which they enter into on behalf of the company." In *In re Forest of Dean Coal Mining Co.* (2) Jessel M.R. says: " Again, directors are called trustees. They are no doubt trustees of assets which have come into their hands, or which are under their control, but they are not trustees of a debt due to the company. The company is the creditor, and, as I said before, they are only the managing partners." Again, in *In re Lands Allotment Co.* (3), Lindley L.J. says : " Although directors are not properly speaking trustees, yet they have always been considered and treated as trustees of money which comes to their hands or which is actually under their control; and ever since joint stock companies were invented directors have been held liable to make good moneys which they have misapplied upon the same footing as if they were trustees, and it has always been held that they are not entitled to the benefit of the old Statute of Limitations because they have committed breaches of trust, and are in respect of such moneys to be treated as trustees."

It was from this point of view that *York and North Midland Ry. Co.* v. *Hudson* (4) and *Parker* v. *McKenna* (5) were decided. Directors must dispose of their company's shares on the best terms obtainable, and must not allot them to themselves or their friends at a lower price in order to obtain a personal benefit. They must act bonâ fide for the interests of the company.

The plaintiffs' contention in the present case goes far beyond this. It is urged that the directors hold a fiduciary position as trustees for the individual shareholders, and that, where negotiations for sale of the undertaking are on foot, they are

SWINFEN
EADY J.

1902

PERCIVAL
*v.*
WRIGHT.

---

(1) (1872) L. R. 8 Ch. 149, 152.    (3) [1894] 1 Ch. 616, 631.
(2) (1878) 10 Ch. D. 450, 453.    (4) 16 Beav. 485, 491, 496.
(5) (1874) L. R. 10 Ch. 96.

SWINFEN
EADY J.

1902

PERCIVAL
v.
WRIGHT.

in the position of trustees for sale. The plaintiffs admitted that this fiduciary position did not stand in the way of any dealing between a director and a shareholder before the question of sale of the undertaking had arisen, but contended that as soon as that question arose the position was altered. No authority was cited for that proposition, and I am unable to adopt the view that any line should be drawn at that point. It is contended that a shareholder knows that the directors are managing the business of the company in the ordinary course of management, and impliedly releases them from any obligation to disclose any information so acquired. That is to say, a director purchasing shares need not disclose a large casual profit, the discovery of a new vein, or the prospect of a good dividend in the immediate future, and similarly a director selling shares need not disclose losses, these being merely incidents in the ordinary course of management. But it is urged that, as soon as negotiations for the sale of the undertaking are on foot, the position is altered. Why? The true rule is that a shareholder is fixed with knowledge of all the directors' powers, and has no more reason to assume that they are not negotiating a sale of the undertaking than to assume that they are not exercising any other power. It was strenuously urged that, though incorporation affected the relations of the shareholders to the external world, the company thereby becoming a distinct entity, the position of the shareholders inter se was not affected, and was the same as that of partners or shareholders in an unincorporated company. I am unable to adopt that view. I am therefore of opinion that the purchasing directors were under no obligation to disclose to their vendor shareholders the negotiations which ultimately proved abortive. The contrary view would place directors in a most invidious position, as they could not buy or sell shares without disclosing negotiations, a premature disclosure of which might well be against the best interests of the company. I am of opinion that directors are not in that position.

There is no question of unfair dealing in this case. The directors did not approach the shareholders with the view

of obtaining their shares. The shareholders approached the directors, and named the price at which they were desirous of selling. The plaintiffs' case wholly fails, and must be dismissed with costs.

Solicitors : *Eyre, Dowling & Co.; Ince, Colt & Ince.*

G. R. A.

---

BAXENDALE *v.* NORTH LAMBETH LIBERAL AND RADICAL CLUB, LIMITED.

[1902 B. 274.]

*Right of Way—Grant—" Executors, Administrators, and Assigns, Under-
tenants and Servants "—Licensees.*

A grant of a right of way extends to all licensees of the grantee lawfully going to and from the dominant tenement, although the grantee, " his executors, administrators, and assigns, undertenants and servants," are the only persons specified in the grant.

WITNESS ACTION.

This was an action by the lessee of Blackacre against the defendant club and one of its members claiming (inter alia) an injunction to restrain the members, honorary members, guests, visitors, officers, and tradespeople of the defendant club, the present lessee of Whiteacre, from using a passage across Blackacre as a carriage or foot way from Whiteacre into a public road.

The defendant club, a society registered and incorporated under the Industrial and Provident Societies Act, 1893 (56 & 57 Vict. c. 39), had recently built a workmen's club on Whiteacre, the only present access to which was over the passage in dispute. There were a large number of members, each of whom had liberty to introduce a guest, in addition to which all associates of the Working Men's Club and Institute Union, Limited, were entitled to be honorary members and to the free use of the club.

The right of way was claimed under a lease of November 8, 1879, by which the common owner of Blackacre and Whiteacre

# Peskin & Anor v Anderson & Ors.

Court of Appeal (Civil Division).
Simon Brown, Mummery and Latham L JJ.
Judgment delivered 14 December 2000.

> *Directors – Directors' duties – Fiduciary duties – Club operated companies – Directors negotiated to sell business of company – Members unaware of negotiations – Some club members resigned or retired – Companies sold rendering windfall profit for remaining members – Former members claimed breach of fiduciary duty owed to them – Application for summary judgment to strike out – Whether claims had real prospect of success – Whether special circumstances giving rise to fiduciary relationship between directors and individual members – Claim struck out – Appeal.*

This was an appeal against a decision of Neuberger J ([2000] BCC 1,110) summarily dismissing a claim alleging breach of fiduciary duty by the directors of a company to its members.

The Royal Automobile Club was owned by a holding company, 'RACL'. The club's valuable motoring services business was run by 'RACMS', which was also owned by RACL. The directors of RACL were the committee of the club and the members of RACL were the full members of the club. The objects clause in the memorandum of association of RACL allowed the business of the company to be sold but a clause prohibited assets from being distributed to the members. The motoring services business was sold in 1999 after the court sanctioned schemes of arrangement of RACMS and RACL. The scheme included deleting the provision in RACL's memorandum preventing assets being distributed to members. Thereafter the members of the club as at July 1998 received payments of about £34,000 each for the sale of the business. The claimants ceased to be members between 1995 and 1998 by retiring or allowing their membership to lapse. Their claim was against the directors of RACL and committee members of the club at the relevant time for breach of fiduciary duty in failing to disclose the plans for the de-mutualisation of the club and de-merger of RACMS and in particular the fact that the directors were incurring expenditure, which was allegedly ultra vires, for the purpose of removing the prohibitions in the memoranda on distributions to members. If such matters had been disclosed the claimants would have been able to make a properly informed choice as to whether to remain members of the club. Neuberger J summarily dismissed the claims as having no real prospect of success on the basis that the directors did not in the circumstances owe any fiduciary duty to the members who had ceased to be members of their own motion when no specific transaction was in contemplation.

*Held*, dismissing the appeal:

1. Fiduciary duties owed by directors to a company arose from the legal relationship between directors and the company directed and controlled by them. Fiduciary duties owed by directors to shareholders did not arise from that legal relationship but were dependent on establishing a special factual relationship between the directors and the shareholders in the particular case. Events could take place which brought the directors into direct and close contact with the shareholders in a manner capable of generating fiduciary obligations, such as a duty of disclosure of material facts, or an obligation to use confidential information and valuable commercial opportunities, acquired by the directors in their office as such, for the benefit of shareholders and not to prefer and promote the directors' own interests at the expense of the shareholders.

2. There were instances of directors making direct approaches to, and dealing with, the shareholders in relation to a specific transaction and holding themselves out as agents for the shareholders in connection with the acquisition or disposal of shares; or making material representations to them; or failing to make material disclosure to them of

© 2001 Sweet and Maxwell Ltd

A   insider information in the context of negotiations for a take-over of the company's
    business; or supplying to them specific information and advice on which they relied.
    These events were capable of constituting special circumstances and of generating
    fiduciary obligations, especially in those cases in which the directors, for their own
    benefit, sought to use their position and special inside knowledge acquired by them to
    take improper or unfair advantage of the shareholders. This was especially so in the
    context of familial relationships of the directors and shareholders and their relative
B   personal positions of influence in the company concerned. (Coleman v Myers [1977] 2
    NZLR 225 and Brunninghausen v Glavanics (1999) 46 NSWLR 538 considered.)

    3. The judge was right that the factors were insufficient to found a claim for the
    existence and breach of a fiduciary duty to disclose to the claimants the proposals and
    plans for de-mutualisation. There was nothing special in the factual relationship between
    the directors and the members to give rise to a fiduciary duty of disclosure. In particular
C   there were no relevant dealings, negotiations, communications or other contact directly
    between the directors and the members. The actions of the directors had not caused the
    members to retire when they did. Probably most important of all, prior to March 1998
    there was nothing sufficiently concrete and specific, either in existence or in
    contemplation, for the directors to disclose to the members.

    4. In this case there was no distribution contrary to the prohibitions in the
D   memorandum before those prohibitions were deleted under the schemes of arrangement.
    It was not ultra vires for the directors to authorise expenditure of the company's money
    on investigating proposals to sell RACMS, or proposals to de-mutualise the company and
    distribute assets to members and, for that purpose, to amend the memorandum. Even a
    provision purporting to entrench the prohibition in the memorandum could lawfully be
    removed by a scheme of arrangement. The removal of the prohibition was plainly
    incidental to the purpose of selling the motoring services business which was lawful under
E   the memorandum. There was no wrongdoing and no duty to disclose.

    5. There was insufficient evidence that the directors were acting wrongfully by
    benefiting personally from the de-mutualisation and there was therefore no duty to
    disclose. Even if the strongly disputed allegations of personal benefit were established, the
    duty to disclose ultra vires acts would be owed to the company and not to individual
    members of the club. In any event, any breach in relation to personal benefits would not
F   have been causative in relation to claimants' decisions to cease to be members.

    The following cases were referred to in the judgment of Mummery LJ:

    *Allen v Hyatt* (1914) 30 TLR 444.
    *Brunninghausen v Glavanics* (1999) 46 NSWLR 538.
    *Chez Nico (Restaurants) Ltd, Re* [1991] BCC 736.
    *Coleman v Myers* [1977] 2 NZLR 225.
G   *Company (No. 004377 of 1986), Re (Re XYZ Ltd)* (1986) 2 BCC 99,520.
    *Howard Smith Ltd v Ampol Petroleum Ltd* [1974] AC 821.
    *Percival v Wright* [1902] 2 Ch 421.
    *Sherborne Park Residents Co Ltd, Re (Company (No.005136 of 1986)* (1987) 3 BCC 99,528.
    *Stein v Blake* [1998] BCC 316.

    Geoffrey Vos QC and Daniel Lightman (instructed by Class Law) for the appellants.

H   Lord Grabiner QC and Craig Orr (instructed by Slaughter and May) for the respondents.

                                     JUDGMENT

    **Mummery LJ:** 1. This is an appeal from the order of Neuberger J on 7 December 1999
    under the *Civil Procedure Rules* 1998 (SI 1998/3132) ('CPR'), Pt. 24. He summarily
    dismissed claims for damages for breach of duty brought (or intended to be brought) by about

355 former full members of the Royal Automobile Club ('the club') against the committee of the club and against its holding company. His judgment is now reported in [2000] BCC 1,110.

    A

2. He refused permission to amend the statement of claim dated 21 July 1998. He refused permission to appeal, which was granted by a single Lord Justice on 19 April 2000.

3. The dispute arises out of the fact that the claimants did not obtain any benefit from the de-mutualisation of the club. That took place after their membership of the club (and of its holding company) had ceased, either by their retirement from membership or by them allowing their membership to lapse, during the period from 9 July 1995 to 28 March 1998. The substantial sums (£34,161 each) distributed to those who were members of the club at 8 July 1998 stemmed from the sale in mid-1999 of the valuable motoring services business associated with the club and its holding company.

    B

4. It is common ground that the relevant question is whether the claims have a real prospect of succeeding. If they do not, then the judge was right to dismiss them at this stage. If they do, then they should be allowed to proceed to trial in the usual way.

    C

## The club, the companies and the members

5. The Club was a proprietary club. It was not a members' club. It was the property of its holding company, The Royal Automobile Club Ltd ('RACL'), which was incorporated in 1897 as a company limited by guarantee.

    D

6. The full members of the club were members of RACL. The board of directors of RACL for the time being constituted the committee of the club. The committee was vested with the entire management of the club in accordance with the rules of the club. The rules provided for the submission of an annual report by the committee to the annual general meeting under r. 19 and for the election of members. Membership was from year to year ending on 31 December in each year. Subscriptions were due and payable on 1 January in each year. Membership ceased for non-payment of subscriptions. Members were permitted to resign in accordance with a notice procedure in r. 56. If a member resigned and re-applied for membership within three years, he might be re-elected without being proposed and seconded, if the committee so decided.

    E

7. RAC Motoring Services Ltd ('RACMS'), which operated the motoring services business, was also owned by RACL. So the full members of the club had an indirect interest in it.

    F

8. The memorandum of association of RACL contained provisions at the heart of this dispute between the former members and the committee. The objects of RACL stated in cl. 3 of the memorandum included:

> '(a) To establish, maintain and conduct a club for the encouragement and development in Great Britain of the auto-motor vehicle and other allied industries, and for the accommodation of Members of the Company and their friends, and to provide a club-house or club-rooms, and other conveniences, and generally to afford to Members and their friends all usual advantages, conveniences, and accommodation of a social club and centre of information and advice on all matters pertaining to auto-motor vehicles.

    G

> ...

> (m) To sell or dispose of the undertaking of the Company, or any part thereof, for such consideration as the Company may think fit, and in particular for shares, debentures, or securities of any other company.

    H

> ...

> (p) To do all such other things as are incidental or conducive to the attainment of the above objects, or any of them ...'

**© 2001 Sweet and Maxwell Ltd**
bcp2001 bcp   239 Mp   876—bcp23075

A    Clause 4 provided that:

'The income and property of the Company, whensoever derived, shall be applied solely towards the promotion of the objects of the Company as set forth in this Memorandum of Association, and no portion thereof shall be paid or transferred directly or indirectly, by way of dividend, bonus or otherwise howsoever, by way of profit to the Members of the Company. And upon the winding up of the Company, the surplus assets (if any) of the Company or funds arising from the realisation thereof which shall remain, after
B    payment of all the debts and liabilities of the Company, shall not be paid or distributed among Members of the Company, but shall be given, paid or transferred to such public museum or to such institution or institutions connected with engineering, or with the objects of the Company as the Directors of the Company shall determine at or before the time of dissolution of the Company ...'

Article 67 of the articles of association provided that:

C    'If upon the winding up or dissolution of the Company there remains ... any property whatsoever, the same shall not be paid to or distributed among the Members of the Company but shall be paid or applied as provided for by the Memorandum of Association.'

Clause 4 of the memorandum of RACMS contained a prohibition on distribution to members in slightly different terms with a further cl. 5 which stated that:

D    'No addition, alteration or amendment shall be made to Clause 4 hereof.'

9. In mid-1998, after all the claimants had ceased to be members of the club, these prohibitions were deleted from the memorandum of each company by the combined effect of special resolutions and two schemes of arrangement made by the court under s. 425 of the *Companies Act* 1985.

**The sale of RACMS**
E
*A. The negotiations for sale to Cendant*

10. The defendants' case is that in March 1998 an approach was made to RACL by Cendant Corporation ('Cendant') with a view to acquiring the business of RACMS. This is disputed by the claimants. Coincidentally, a proposal to call an extraordinary general meeting, as the first step in a process to de-mutualise the club and to de-merge RACMS, was made in a letter dated 27 March 1998 from the then chairman of RACL, Mr Jeffrey Rose, to all the full members of
F    the club. The board resolved that it would not elect any person as a member of RACL after 27 March 1998. In May 1998 the terms of sale of RACMS to Cendant for £450m were finally agreed.

*B. The scheme*

11. On 4 June 1998 a meeting was held for a scheme of arrangement of RACMS. On
G    19 June 1998 a meeting was held for a scheme of arrangement of RACL. At that meeting a special resolution was passed for the deletion of cl. 4 of the memorandum.

12. On 8 July Neuberger J approved the schemes of arrangement of RACMS and RACL under s. 425 of the *Companies Act* 1985: see *Re RAC Motoring Services Ltd* [2000] 1 BCLC 307. The schemes of arrangement became effective on 9 July 1998. They facilitated the transaction for the disposal of RACMS to Cendant and enabled the members to realise their indirect interest in RACMS.
H
13. The effect of the scheme was that the members ceased to be members of RACL at the close of business on 8 July 1998. A new company named RAC Acquisitions became the sole member of RACL. RAC Acquisitions itself became a subsidiary of RAC Holdings Ltd ('RACH'). One share of £1 each in RACH was allotted to each person who was a member of RACL at the close of business on 8 July 1998. That share was later divided into two shares of 50p each.

14. In addition, each of those former members of RACL became a member of New Club Co Ltd, to which the entire share capital of a company called Club Acquisition Co Ltd ('CACL') was transferred. CACL had, while it was a subsidiary of RACL, acquired all the assets of RACL.

15. The New Club Co, which became and remains the ultimate proprietor of the club, was later re-named 'The Royal Automobile Club Ltd.' RACL was re-named 'RAC Ltd' and was subsequently re-registered as an unlimited company with a share capital, whereupon its name became 'RAC'.

### C. The sale to Lex Service

16. On 4 February 1999 it was announced that Cendant had decided not to proceed with the purchase in view of conditions imposed by the Secretary of State for Trade and Industry on competition grounds.

17. On 9 February 1999 Lex Service plc announced that it was making a bid. On 21 May Lex Service made an offer to the shareholders in RACH to purchase their shares. That offer became unconditional on 9 July 1999. The sale took place for £437m.

18. The end result was that Lex Service became the holding company of RACH, RACL and RACMS and that the members, in their new capacity as shareholders in RACH, received about £34,000 each direct from Lex Sevice in respect of the sale of their shares in RACH.

### The proceedings

19. As the claimants had all ceased to be members of the club and to be members of RACL before the schemes of arrangement took effect, they never became shareholders in RACH. So they never became entitled to receive any part of the benefits flowing from the sale of RACMS to Lex Service.

20. The majority of the personal defendants were the directors of RACL and the members of the committee at the material time. Four of the defendants only became directors of RACL and members of the committee on or after 1 January 1998, by which time most, if not all, of the claimants had ceased to be members. RACL is a proposed defendant under its new name RAC Ltd.

21. The claims in the draft amended statement of claim were for damages for breach of fiduciary duties of disclosure and for being wrongfully deprived of the opportunity to make a fully informed choice as to whether or not to continue their membership of the club. The basis of the claims was that the defendants, in breach of a fiduciary duty owed by them to the claimants, failed to disclose to them the plans, discussions, proposals, investigations and instructions relating to the de-mutualisation of the club and the de-merger of RACMS, in particular the expenditure by them of the assets of RACL on the proposed cancellation of cl. 4 of the memorandum of RACL, so as to permit distributions to be made to the members.

22. It is alleged that, if these matters had been disclosed to the claimants before they retired, they could then have made an informed decision about their membership. They would have decided not to retire. Instead, they would have remained members of the club and shareholders in RACL. They would then have been entitled to benefit from the sale of RACMS to Lex Service in 1999.

23. On 7 December 1999 Neuberger J acceded to an application by the defendants under CPR, Pt. 24 to dismiss the action on the ground that it had no real prospect of success.

### The judgment of Neuberger J

24. The claims were unsuccessfully advanced to the judge on a number of grounds which have now been dropped from the draft re-amended statement of claim.

A     25. The judge rejected the claimants' contentions that the rules of the club, (including r. 19 which required the committee to report annually 'on the work done by The Club'), represented the terms of a contract between the members of the club or between the members and the committee; that r. 19 of the club put the committee under an obligation to inform the members about the developments and all likely future developments affecting the club and the company and its subsidiaries, including discussions, investigations and proposals with a view to selling RACMS; and that r. 56 (which conferred a discretion on the committee to re-elect a member

B     who had resigned and re-applied for membership within three years of his resignation) entitled former members to be re-instated automatically.

26. As for the remaining claims based on breach of fiduciary duty as pleaded in the draft amended statement of claim, the judge held that they had no real prospect of succeeding. In outline, his reasoning on this issue was as follows:

    1. A director does not owe a general fiduciary duty to shareholders of the company.

C     2. A director of a company could owe a fiduciary duty to shareholders, if he had, in relation to the sale of shares, special knowledge not possessed by the shareholders.

3. There was no fiduciary duty in the circumstances of this case. The judge identified eight factors leading him to that conclusion:

    (1)     the absence of any special facts in the relationship of the directors and the members of

D             RACL, which would make the existence of a fiduciary duty more likely;

    (2)     the claimants had resigned membership of their own motion, uninfluenced by any information provided by, or views expressed by, the directors;

    (3)     no specific transaction was in contemplation at the time of the resignations;

    (4)     the defendants did not, in their capacity as directors of RACL, benefit from the claimants ceasing to be members, either directly (e.g. they did not acquire shares from the

E             members or encourage them to part with their shares) or indirectly (e.g. by minimising the number of members, so as to increase their share of the proceeds of sale);

    (5)     the alleged interest of the directors in profits from the sale in the form of 'golden hellos and employment contracts' did not impinge on the issue whether they were under a duty to disclose at an early stage the possibility of selling off the RACMS business;

    (6)     the investigation and promotion of proposals for the de-mutualisation of RACL

F             (including the incurring of costs in relation to the amendments of the memoranda of RACL and RACMS sanctioned by the court) did not involve the directors in the pursuit of an unauthorised and improper object;

    (7)     it was unreasonable for directors to be put in the sort of position which the claimants' contentions would necessarily involve with regard to the disclosure of contemplated arrangements or transactions best kept confidential; and

G     (8)     the claimants' arguments would place directors in the unfortunate position of being 'damned if they do and damned if they don't', if they were put under a duty to disclose to the members a contemplated sale which might, or might not, happen.

### Fiduciary duties – the legal principles

27. There was no serious dispute between Mr Vos QC, for the claimants, and Lord Grabiner

H     QC, for the committee and RAC Ltd, about the relevant legal principles governing the fiduciary duties of company directors.

28. For his part, Mr Vos accepted that the fiduciary duties owed by the directors to RACL do not necessarily extend to the individual members of the club and that, in general, directors do not, solely by virtue of the office of director, owe fiduciary duties to the shareholders, collectively or individually.

29. According to the headnote in *Percival v Wright* [1902] 2 Ch 421 that case decided that:       A
'The directors of a company are not trustees for individual shareholders, and may purchase their shares without disclosing pending negotiations for the sale of the company's undertaking.'

30. The apparently unqualified width of the ruling has, over the course of the last century, been subjected to increasing judicial, academic and professional critical comment; but few would doubt that, as a general rule, it is important for the well being of a company (and of the wider commercial community) that directors are not over-exposed to the risk of multiple legal actions by dissenting minority shareholders. As in the affairs of society, so in the affairs of companies, rule by litigation is not to be equated with the rule of law.       B

31. For his part, Lord Grabiner QC accepted that the fiduciary duties owed by the directors to the company do not necessarily preclude, in special circumstances, the co-existence of additional duties owed by the directors to the shareholders. In such cases individual shareholders may bring a direct action, as distinct from a derivative action, against the directors for breach of fiduciary duty.       C

32. A duality of duties may exist. In *Stein v Blake* [1998] BCC 316 at pp. 318 and 320 Millett LJ recognised that there may be special circumstances in which a fiduciary duty is owed by a director to a shareholder personally and in which breach of such a duty has caused loss to him directly (e.g. by being induced by a director to part with his shares in the company at an undervalue), as distinct from loss sustained by him by a diminution in the value of his shares (e.g. by reason of the misappropriation by a director of the company's assets), for which he (as distinct from the company) would not have a cause of action against the director personally.       D

33. The fiduciary duties owed to the company arise from the legal relationship between the directors and the company directed and controlled by them. The fiduciary duties owed to the shareholders do not arise from that legal relationship. They are dependent on establishing a special factual relationship between the directors and the shareholders in the particular case. Events may take place which bring the directors of the company into direct and close contact with the shareholders in a manner capable of generating fiduciary obligations, such as a duty of disclosure of material facts to the shareholders, or an obligation to use confidential information and valuable commercial and financial opportunities, which have been acquired by the directors in that office, for the benefit of the shareholders, and not to prefer and promote their own interests at the expense of the shareholders.       E

34. These duties may arise in special circumstances which replicate the salient features of well established categories of fiduciary relationships. Fiduciary relationships, such as agency, involve duties of trust, confidence and loyalty. Those duties are, in general, attracted by and attached to a person who undertakes, or who, depending on all the circumstances, is treated as having assumed, responsibility to act on behalf of, or for the benefit of, another person. That other person may have entrusted or, depending on all the circumstances, may be treated as having entrusted, the care of his property, affairs, transactions or interests to him. There are, for example, instances of the directors of a company making direct approaches to, and dealing with, the shareholders in relation to a specific transaction and holding themselves out as agents for them in connection with the acquisition or disposal of shares; or making material representations to them; or failing to make material disclosure to them of insider information in the context of negotiations for a take-over of the company's business; or supplying to them specific information and advice on which they have relied. These events are capable of constituting special circumstances and of generating fiduciary obligations, especially in those cases in which the directors, for their own benefit, seek to use their position and special inside knowledge acquired by them to take improper or unfair advantage of the shareholders.       F       G       H

35. The court has been referred to the valuable and detailed surveys of the authorities, expounding the special circumstances which justify the imposition of fiduciary duties on directors to individual shareholders, in the judgments of Court of Appeal in New Zealand in *Coleman v Myers* [1977] 2 NZLR 225 (especially pp. 323–325, 328–330) and of the Court of

© **2001 Sweet and Maxwell Ltd**
bcp2001 bcp  239 Mp  880—bcp23075

A     Appeal of New South Wales in *Brunninghausen v Glavanics* (1999) 46 NSWLR 538 (especially pp. 547–560). In both of those cases fiduciary duties of directors to shareholders were established in the specially strong context of the familial relationships of the directors and shareholders and their relative personal positions of influence in the company concerned.

36. The cases of *Allen v Hyatt* (1914) 30 TLR 444 at p. 445 (directors making representations to secure options to purchase shares of shareholders and undertaking to sell shares of shareholders in agency capacity); *Howard Smith Ltd v Ampol Petroleum Ltd* [1974]

B     AC 821 at pp. 834, 837–838 (directors' use of fiduciary power of allotment of shares for a different purpose than that for which it was granted, and so as to dilute the voting power of the majority shareholding of issued shares); *Re Sherborne Park Residents Co Ltd (Company (No.005136 of 1986)* (1987) 2 BCC 99,528 at p. 99,531; and *Re Chez Nico (Restaurants) Ltd* [1991] BCC 736 at p. 750 were also cited. See also the discussion in *Spencer-Bower on Actionable Non-Disclosure* (2nd edn, 1990) at pp. 417–435.

C     37. The claims for breach of fiduciary duty owed by the directors to the members of the club are put in several different, though interrelated and overlapping, ways. They have been argued on the appeal by Mr Vos QC (who did not appear below) with a somewhat different emphasis than before the judge as indicated in a draft re-amended statement of claim. This judgment will refer to certain passages in the draft amended statement of claim (which have since been deleted), since they were the pleaded claims before the judge.

D

### The ultra vires expenditure point

38. Mr Vos's primary attack on the judgment focused on point (6) in the above summary of the list of factors considered by the judge.

39. He asserted, and Lord Grabiner accepted, that directors act in breach of the fiduciary duties owed by them to the company, if they participate in the commission of acts ultra vires the

E     company.

40. Mr Vos went further and asserted that, where all the directors are involved in the same ultra vires act, they are under a duty to disclose to the individual members their intention to commit, and their commissions of, ultra vires acts and the ultra vires intentions and acts of their fellow directors. In such a case proper disclosure by the directors to the company cannot be made. The duty to disclose to the company would lack content, if all the directors are embarked

F     on a course which is ultra vires and benefits them all, but is detrimental to the shareholders at large.

41. This additional duty to disclose ultra vires intentions and acts to individual shareholders does not, he emphasised, depend on establishing special circumstances justifying an exception to the general rule that fiduciary duties are owed by the directors only to the company. He made separate submissions on that exception to the principle in *Percival v Wright* (supra). They are discussed later in this judgment.

G     42. Further, liability for non-disclosure to the shareholders is not abrogated by s. 35 of the *Companies Act* 1985, as amended by s. 108(1) of the *Companies Act* 1989. It is true that subs. (1) provides that:

> 'The validity of an act done by a company shall not be called into question on the ground of lack of capacity by reason of anything in the company's memorandum.'

H     But subs. (2) provides that:

> 'A member of a company may bring proceedings to restrain the doing of an act which but for subsection (1) would be beyond the company's capacity...'

and subs. (3) provides that:

> 'It remains the duty of the directors to observe any limitations on their powers flowing from the company's memorandum; and action by the directors which but for subsection

(1) would be beyond the company's capacity may only be ratified by the company by   **A**
special resolution.'

43. The claimants' primary case in this court is that the directors of RACL owed a fiduciary
duty to disclose to them their ultra vires intentions and acts; and that they acted in breach of
duty by not disclosing to them their intentions not to observe, and their failure to observe, the
limitations on their powers flowing from the provisions of cl. 4 of the memorandum of RACL.
If there were no such duty of disclosure to the members, the right of the members to seek to
restrain the commission of ultra vires acts under s. 35(2) would be sterilised. Disclosure was   **B**
also required so that the members could consider whether to ratify under s. 35(3) the ultra vires
acts by special resolution.

44. Mr Vos reminded the court of the approach which it should take at this early stage
(without the benefit of disclosure and evidence) in these unprecedented proceedings: when the
full facts are not known and when the legal principles are in a state of development, the court
should be cautious in concluding that the claims have no real prospect of succeeding.   **C**

45. The argument was developed in this way. The fiduciary duty of disclosure of ultra vires
intentions and acts is owed to the members, because the damage caused by the breach of duty is
to the personal interests of the individual shareholders (in this case the retired members), not to
the value of the company or its assets or the shares in it.

46. The directors should have disclosed to the members intended and actual expenditure
from 1996 onwards of RACL's assets (e.g. on professional advice), which was considerable   **D**
and was committed to the furtherance of complex proposals for the restructuring of the
company in order to allow distribution of the proceeds of the intended sale of RACMS among
the members of the club.

47. This was not simply a case of proposing to change the objects of a company, so that it
could sell an existing business or engage in a new business. The proposal was for the
distribution of the company's property in the face of an express absolute prohibition in cl. 4 on
the distribution to members of any part of the property of RACL. That clause is not the same as   **E**
an object of the company, which may be changed by special resolution. As a matter of
construction of cl. 4 of the memorandum, that expenditure on the formulation and
implementation of the proposal for the sole purpose of de-mutualisation was ultra vires RACL.
That purpose was prohibited.

48. The directors were in breach of fiduciary duty in committing the company to that ultra
vires expenditure and in not disclosing that conduct to the members. The members should have   **F**
been consulted. The directors should have sought the approval of the members in general
meeting about the proposals to investigate and prepare a scheme for de-mutualisation before
assets were expended on that prohibited purpose. Had the claimants been consulted, they
would have known about it. They would have decided to remain full members of the club. They
could have obtained an injunction under s. 35(2) of the *Companies Act* 1985; or they could
have ratified the expenditure under s. 35(3), so as to benefit from the de-mutualisation. As it
was, they made their decision to retire from the club in ignorance of the commitment of the   **G**
directors to impermissible and significant actual and intended expenditure in pursuing and
achieving an expressly prohibited object.

49. In my judgment, this flight of fancy does not, on the pleaded facts, even make it to the
point of take off and should be grounded immediately under CPR, Pt. 24.

50. It is not even alleged that the directors caused any distribution of the assets of RACL to
be made to members in breach of cl. 4 of the memorandum before 8 July 1998, when that   **H**
clause was cancelled under the scheme of arrangement. It was not ultra vires for the directors to
authorise the expenditure of the company's money on investigating proposals to sell RACMS,
or on proposals to de-mutualise the company and distribute assets to the members and, for that
purpose, to amend the memorandum. That expenditure was not caught by cl. 4. The prohibition
in cl. 4 did not extend to attempts to change the law of the company by altering the clause or

A     cancelling it from the memorandum, so as to permit what was previously prohibited. Even if it did, such as by a prohibition of the kind to be found in cl. 5 of the memorandum of RACMS, the entrenching provision could also be lawfully removed by a scheme of arrangement.

B

51. In substance the expenditure complained of in this case is no different from expenditure, which Mr Vos accepts may be permitted, on changing the objects in the memorandum, so as to allow the company to carry on a different business, which is impliedly prohibited until the objects are changed. It is lawful for a company to change its objects and to amend its memorandum by means of the appropriate procedures: *Companies Act* 1985, s. 4 (special resolution altering memorandum with respect to the statement of the company's objects) and s. 17 (special resolution altering a condition in the company's memorandum which could have been lawfully contained in the articles of association and cancellation of the condition so far as it is confirmed by the court).

C

52. It must follow that it is lawful for the directors to authorise the expenditure of company's money for the purpose of the cancellation of cl. 4. That expenditure is reasonably incidental to the attainment or pursuit of the lawful purpose of the cancellation of cl. 4 from the memorandum in the context of giving effect to the overall object permitted in cl. 3(m) of selling or disposing of RACMS. I do not agree with Mr Vos's contention that the de-mutualisation was completely unrelated and irrelevant so far as the sale of RACMS was concerned. The expenditure was not made to achieve a prohibited object. There was no

D     wrongdoing on the part of the directors in relation to the expenditure, which it was their duty to disclose either to the company or to the individual shareholders in RACL.

### The special circumstances point

53. Quite apart from the alleged fiduciary duty of directors to disclose their own and each others' intended and actual ultra vires acts to the members, Mr Vos submitted that there was a
E     free-standing fiduciary duty of full disclosure of the de-mutualisation and de-merger plans, discussions and proposals to the members, as well as to the company, by reason of special circumstances. Had all the members been made aware of these matters, they would not have resigned their membership of the club.

54. It was pleaded in the draft amended statement of claim that the duty of the directors was not to withhold from the members of the club or the company any information, which they
F     obtained as members of the committee or the board and which they knew, or ought to have known, would be, or might be, material to their decisions each year whether or not to renew their membership of the club or to dispose of their interests in the company. Further, in the event that the committee or the board were considering plans for and/or were in the course of conducting negotiations with third parties concerning the disposal of substantial assets of the company, there was a duty to disclose all matters relevant to the interests of the members of the
G     club, or the company, who were contemplating retirement from the club (and thereby a disposal of their interests in the company) in circumstances where they knew, or had reason to believe, that such retiring members were inadequately informed. The directors were in exclusive possession of information, which they had acquired by virtue of their office, affecting the potential financial value of membership of the club and of RACL. The members would not have had that information. In their state of knowledge (or ignorance), the members could only have placed a nil value on their membership.

H     55. It was also alleged that, for a period of at least 18 months prior to March 1998, the committee had been actively considering taking professional advice concerning and discussing the sale and disposal of RACMS and the possibility of de-mutualisation of the club and the potential de-merger of RACMS. At a meeting in about October 1996 the committee and/or the board is alleged to have considered and rejected a scheme for de-mutualisation and/or de-merger of RACMS, but still continued to seek to formulate a workable plan to that end.

56. As already indicated in the submissions on the ultra vires point, it is alleged that the committee had, in relation to those matters, incurred a liability on behalf of the club and RACL for professional fees, expenses and disbursements, including a liability in respect of the retainer of Slaughter and May to prepare a scheme for de-mutualisation and/or de-merger of RACMS.

57. Mr Vos submitted that this duty of disclosure to the members fell within an exception to the general rule laid down in *Percival v Wright* (supra). The special facts from which it is contended that this fiduciary duty to the members emerges are that knowledge of the proposal by the directors was inside information of which the directors had exclusive possession; that they had acquired the information by virtue of their office; that the information provided knowledge to the directors of the potential financial value of membership of the club and RACL, which was not known to the members; that that knowledge was, contrary to their expectations, that their membership (which could not have been sold or transferred) could have any value; that, by resigning membership, the claimants had given up any right to participate in the substantial assets of RACL; and that they had done so in ignorance of the directors' plans to allow members to benefit from a distribution.

58. I agree with the judge that these factors are insufficient to found a claim for the existence and breach of a fiduciary duty to disclose to the claimants the proposals and plans for de-mutualisation.

59. There was nothing special in the factual relationship between the directors and the members in this case to give rise to a fiduciary duty of disclosure. In particular there were no relevant dealings, negotiations, communications or other contact directly between the directors and the members; the actions of the directors had not caused the members to retire when they did; and, probably most important of all, prior to March 1998 there was nothing sufficiently concrete and specific, either in existence or in contemplation, for the directors to disclose to the members.

## The benefits to directors and associates point

60. The third area of alleged fiduciary duty to the members is that the directors failed to disclose to the members of the club that they had committed breaches of duty to RACL, in that they personally and their associates stood to benefit, and had in fact benefited, from the proposed de-merger and de-mutualisation and that, had they made disclosure of these matters to all the members, as they should have done, the claimants would have chosen to remain members and would have benefited from the distribution of the proceeds of sale of RACMS.

61. In particular, the draft amended statement of claim pleaded that the members of the committee were under a duty to treat all the members of the club fairly; not to disclose to a third party any information which they had obtained as members of the committee or the board of RACL and which was material to the interests of the members of the club and the company, without first informing all of the members; and not to disclose any such information to some members and not others.

62. An assortment of personal benefits constituting breaches of the duty to disclose are alleged, though it has to be said that the pleading is short on particulars and the evidence is exiguous. The claimants contend that this is almost bound to be the case in advance of disclosure of documents by the defendants and, indeed, they rely on that as a factor relevant to the court's discretion under Pt. 24.

63. The allegations in the draft amended statement of claim may be summarised as follows: there was a conflict of interest between, on the one hand, the interests of the members of the committee and of the board and, on the other hand, the interests of the members, who were ignorant of these material matters; the directors stood to benefit as more existing members retired and gave up their shares in the company; under the Cendant proposal some directors were to receive substantial additional personal benefits in the form of shared bonuses and, in the case of Mr Neil Johnson (the fifth defendant), office as chief executive in the new group; under the sale to Lex Service the directors received undisclosed bonuses and one (Mr Ian

**© 2001 Sweet and Maxwell Ltd**
bcp2001 bcp　239 Mp　884—bcp23075

A    Mavor – the twelfth defendant) was to be appointed to a consultancy; some directors were able to, and did, fast track friends into full membership of the club before March 1998, in the knowledge of the intended disposal of RACMS and the distribution of the proceeds; the directors were in a position to, and did, slow down the waiting list for full membership of the club (e.g the case of a Mr Malcolm Bissiker) and that would increase the value of their own membership on de-mutualisation.

B    64. At the end of the day, however, these additional allegations add nothing of substance to the arguments already deployed and rejected. The points made on directors' benefits are essentially the same as the other arguments, i.e. that it was the duty of the directors to disclose to the members that they were committing, or intending to commit, ultra vires acts (e.g. by benefiting, or intending to benefit, personally from the distribution of the sale proceeds to the members) and in circumstances which justified an exception to the general rule that the directors' fiduciary duties are owed only to the company. For the above reasons and for the

C    reasons given by the judge, the facts pleaded are insufficient to support the existence of a duty of disclosure to the members.

65. Even if the allegations were established (and they are strongly disputed by the defendants), the duty to disclose the ultra vires acts in this case would be owed by the directors to the company and not, in the absence of special circumstances, to the individuals members of the club.

D    66. I would add that these alleged breaches of duty do not appear to impact on the alleged duty to disclose to the members, before their decision to resign, the plans and proposals to de-mutualise the Club and to de-merge RACMS. It was non-disclosure at an earlier stage of those plans and of the alleged ultra vires commitment to expenditure on them, rather than non-disclosure of the personal benefits for directors and associates, that would have affected the opportunity of the members to make an informed decision on membership.

E    67. It is also contended that there was a breach of fiduciary duty to shareholders by one of the directors (Mr Johnson), who frequented a Warwickshire shooting club. It was alleged that, in consequence of the disclosure of inside information, about ten members of the shooting club were fast tracked into full membership of the club early in 1998, shortly before de-mutualisation. The claim was that this involved unfairness between shareholders, as the inside information should have been shared with all the members of the club. That allegation would not, however, justify claims for breach of fiduciary against all the members of the committee.

F    For the reasons already stated, however, this claim does not, in any event, have any real prospect of succeeding against any of the defendants.

**Conclusion**

68. In my judgment, the claims, as pleaded and as proposed to be amended or re-amended, have no real prospect of succeeding at trial against the personal defendants or against the

G    company. The judge was right to make an order under CPR, Pt. 24. I would dismiss the appeal.

**Latham LJ:** I agree with both judgments.

**Simon Brown LJ:** 69. The Royal Automobile Club has over 12,000 members. All those who were full members on 8 July 1998 received windfall payments of some £34,000 following the sale of the RAC motor services business. It was for them a happy and unexpected event: until March that year they had had no reason to suppose that their membership was of any

H    financial value whatever.

70. The appellants represent 355 retired members of the club who resigned (or in a few cases failed to pay their annual subscription) in the three years prior to this payout. To them, understandably, it seemed a less happy event: their chagrin is not difficult to imagine.

71. The appellants' complaint in these proceedings is against the committee (strictly the board of the company of which all full members of the club were members) and is to the effect

that the committee kept from them the various discussions and investigations which led to this    **A**
payout. Had they known it was in the offing, they would never, of course, have resigned.

72. They cannot complain simpliciter that the committee should have kept them in the
picture: Mr Vos QC was constrained to recognise that no such general duty is cast upon
directors. He has therefore had to argue a more circuitous case. What he asserts is first that the
board acted ultra vires and therefore in breach of their fiduciary duty, and secondly that they
thereby came under a further duty to disclose their ultra vires conduct to the members. Thus    **B**
would the members have discovered the financial value of their membership.

73. The conduct which principally Mr Vos contends to have been ultra vires was the
defendants' expenditure of company funds on preparing for the sale of the motor services
business and, more particularly, for the scheme of de-mutualisation which was a necessary
pre-condition of any payment to members. Clause 4 of the company's memorandum of
association is central to the argument. Let me read only the most material part:

> '4. The income and property of the Company, whensoever derived, shall be applied    **C**
> solely towards the promotion of the objects of the Company as set forth in this
> Memorandum of Association, and no portion thereof shall be paid or transferred directly
> or indirectly, by way of dividend, bonus or otherwise howsoever, by way of profit to the
> Members of the Company. And upon the winding up of the Company, the surplus assets
> (if any) of the Company or funds arising from the realisation thereof which shall remain,
> after payment of all the debts and liabilities of the Company, shall not be paid to or    **D**
> distributed among Members of the Company, but shall be given, paid or transferred to
> such public museum or such institution or institutions connected with engineering, or
> with the objects of the Company as the Directors of the Company shall determine ...'

The objects of the company most relevant to this appeal are:

> '3(a) To establish, maintain and conduct a club for the encouragement and development
> in Great Britain of the auto-motor vehicle and other allied industries, and for the    **E**
> accommodation of Members of the Company and their friends, and to provide a club-
> house or club-rooms, and other conveniences, and generally to afford to Members and
> their friends all usual advantages, conveniences and accommodation of a social club and
> centre of information and advice on all matters pertaining to auto-motor vehicles.
>
> ...
>
> 3(m) To sell or dispose of the undertaking of the Company, or any part thereof, for such    **F**
> consideration as the Company may think fit, and in particular for shares, debentures, or
> securities of any other company.
>
> ...
>
> 3(p) To do all such other things as are incidental or conducive to the attainment of the
> above objects, or any of them ...'

74. As I understand the appellants' argument with regard to these clauses it runs essentially    **G**
as follows:

(1) Clause 4 constituted a fundamental prohibition against any form of payment out to
embers. Any scheme for de-mutualisation clearly, therefore, required its removal.

(2) De-mutualisation was distinct from the sale of the motor services business and did not
itself fall within any of the objects clauses. In particular it was not to be regarded (within
cl. 3(p)) as 'incidental or conducive to the attainment of' the sale of the motor services business    **H**
(within cl. 3(m)).

(3) The defendants were, therefore, forbidden to apply any company funds towards de-
mutualisation.

75. The difficulty with this argument is that it appears to overlook the plain fact that, by the
same token as a company may seek to change its objects, so too it may seek to change its other

A  rules such as the prohibition constituted by cl. 4 in the present case. And if a company can seek to change its rules, then in my judgment it must also be entitled to expend such sums (for example by way of legal fees) as are reasonably incurred in exploring the need for and effecting such change. This, we kept suggesting to Mr Vos in argument, was the complete answer to his case. Not so, he repeatedly submitted, but, I confess, I never came to understand why not. All I can do is to quote verbatim from the last of the relevant passages in the transcript of the argument before us to indicate my difficulty:

B  'Mr Vos: It is, of course, not illegal to change the law of the company. But the question is, whether on the facts . . . that expenditure . . . was in fact directly spent for the purpose, not just of changing the law of the company, but for the purpose of ensuring that monies were paid to members in violation of the memorandum . . . The scheme was not directed at just changing, that was just one small part of the scheme. The scheme was directed at distributing the money to the members indirectly . . . Let us assume that in order to

C  transfer to the members of the company you have to expend £1 million, and let us assume that the assets of the company are £10 million, and that the object of the scheme and the proposal is to get the £10 million to the Members, that is what is intended and that is what is alleged. In order to achieve it, you have to spend £1 million and therefore the distribution is only £9 million; it can only be. It would be, because you have spent £1 million of the £10 million of the assets of the company on achieving the purpose . . .

D  Assume that is all right, can it really be said that you have not expended that £1 million for this prohibited purpose? In our respectful submission, you have obviously expended it for that purpose and it is not an answer to say that the mechanics, the way in which you achieved it, was by changing this provision . . .

Lord Justice Mummery: It is spent for the purposes of removing the prohibition.

Mr Vos: That is the dispute, with respect. Your Lordship says it is spent just for the purpose of removing the prohibition, and I say it is spent for achieving the prohibited

E  object . . . It is an obvious wrong to go about doing something before you change the provision. You have to change it first. That is why s.35(3) says so . . . You go to the general meeting, under s.35(3), which assumes you do, and say, "We want to spend money on this ultra vires act, may we do so?", and you can have it approved.'

76. For the life of me, I remain unable to see how payments (say to solicitors) expended to remove a prohibition against making payments to members can themselves be characterised as payments to members in violation of the prohibition, and nor can I see how s. 35(2) of the

F  *Companies Act* 1985 advances the appellants' argument. Section 35(3) provides:

'It remains the duty of the directors to observe any limitations on their powers flowing from the company's memorandum; and action by the directors which but for subsection (1) would be beyond the company's capacity may only be ratified by the company by special resolution.

G  A resolution ratifying such action shall not affect any liability incurred by the directors or any other person; relief from any such liability must be agreed to separately by special resolution.'

Section 35(1) prevents third parties from calling into question the validity of an act done by a company on the ground of lack of capacity by reason of anything in the company's memorandum.

77. Mr Vos's submission on s. 35(3) begs rather than answers the question at issue. If, as I

H  think, it is lawful to spend money changing the company's rules, then there can be no occasion to seek ratification of such expenditure from the company (even assuming, which I doubt, that s. 35(3) contemplates advance rather than retrospective ratification).

78. I referred earlier to Mr Vos having acknowledged that directors (at least of private companies) are under no general duty to inform shareholders of developments or proposals which may increase the value of their shareholding. Were it otherwise, I for my part would

regard this as a prime case for asserting a breach of such duty. After all, nothing could more
fundamentally affect the value of club memberships than the de-mutualisation scheme here
devised which overnight transformed a worthless membership into one worth £34,000. But the
same surely is true of a company which strikes a rich vein or contemplates takeover; or a
building society which contemplates de-mutualisation. And yet no one suggests that those
unlucky enough to miss out on these bonanzas have any claim in law.

79. The RAC's ex-members' *cri de coeur* is, as I began by saying, understandable. Given,
however, that they cannot frontally attack their directors for not keeping them informed – and
thereby giving them an opportunity to prolong a membership they had not otherwise thought
worth maintaining – it seems to me not merely contrived but unattractive to criticise, not de-
mutualisation itself (the necessary foundation of their damages' claim), but rather the
inevitable expense of de-mutualising. And the same can be said too of their further complaints
about the directors gaining personal advantages from the eventual scheme – complaints which
might more logically come from members who remained than those who resigned (certainly
absent any shred of evidence that the directors were allowing numbers to dwindle to enhance
the value of their own individual memberships).

80. Although agreeing with all that Mummery LJ has said I have been anxious in addition to
indicate my own basic reasoning for rejecting this claim. One way or another I have no doubt
that it is worthless and must fail. I too would dismiss the appeal.

*(Appeal dismissed with costs. Permission to appeal to the House of Lords refused)*

© **2001 Sweet and Maxwell Ltd**
bcp2001 bcp   239 Mp   888—bcp23075

C. A.

1894

THORNE

*v.*

HEARD.

A. L. Smith, L.J.

that the decision in *Blair* v. *Bromley* (1) was unaffected by the *Trustee Act,* 1888, s. 8, and pointed out how that case rested upon principles of law relating to misrepresentation and partnership.

It was not contended in this Court that the payment of the interest by *Searle* to the Plaintiff took the case out of the statute.

In my opinion, the judgment of Mr. Justice *Romer* must be upheld, and the appeal dismissed.

Solicitors for Appellant: *Mear & Fowler,* agents for *G. H. Thorne, Nottingham.*

Solicitors for Respondents: *Yarde & Loader,* agents for *Prickman & Risdon, Exeter.*

G. I. F. C.

---

C. A.

1893

WRIGHT, J.

*Dec.* 13, 14.

C. A.

1894

*Jan.* 31;

*Feb.* 1, 2

## *In re* LANDS ALLOTMENT COMPANY.

*Company—Directors—Liability—Ultrà vires—Investment of Money in Shares of another Company—Temporary Investment—Statute of Limitations— Trustee Act,* 1888 (51 & 52 *Vict. c.* 59), *ss.* 1, 8.

Directors of a company are trustees as to moneys of the company which have come to their hands or are under their control within the meaning of the *Trustee Act,* 1888, s. 1, sub-s. 3, and therefore can, in the absence of fraud, take advantage of the *Statute of Limitations* in proceedings against them for misapplication of the funds of the company.

The directors of the *L. A. Company,* which had no power to invest its capital in the shares of other companies, in March, 1885, accepted fully paid-up shares in the *B. S. Company* to the amount of £35,000 in discharge of a debt. This was referred to in the balance-sheet of the *L. A. Company* as "Assets. By *B. S. Company,*" and the entry was explained by the chairman at the general meeting in April, 1885, to mean that it represented the amount due from the *B. S. Company* for an estate purchased from the *L. A. Company.* The same item was repeated in successive balance-sheets till 1889. The investment was made without any fraudulent intent. The *L. A. Company* was wound up in 1893 :—

*Held* (affirming the decision of *Wright,* J.), that, assuming that the directors had been guilty of a breach of trust in investing the money in shares of the *B. S. Company,* they were protected by the *Statute of Limitations*; and that there had been no such fraudulent concealment on

---

(1) 2 Ph. 354.

C. A.

1894

*In re*
LANDS
ALLOTMENT
COMPANY.

their part, notwithstanding the false statement by the chairman at the meeting, to prevent time from running under the statute.

Whether the directors had not power to accept the shares of the *B. S. Company*, if they took them as a compromise for the debt, and not with the intention of retaining them as a permanent investment—*Quære.*

In July, 1889, the directors of the same company passed a resolution to invest a further sum of £5200 in more paid-up shares of the *B. S. Company*. Two directors, *B.* and *T.*, were not present at the meeting, but they were present at the next meeting, at which the minutes of the previous meeting were read and confirmed. *B.* was in the chair and signed the minutes. *B.* was also in the chair at the next general meeting of the company, and he then referred to the new investment, and, speaking on behalf of the directors, said : " We carefully considered the matter, and deemed it advisable to exercise our right of subscription, and have no reason to regret our decision " :—

*Held* (reversing the decision of *Wright*, J.), that although the presence of *B.* and *T.* at the meeting at which the minutes of the previous meeting were confirmed was not sufficient in itself to make either of them liable for the *ultrà vires* investment, yet *B.* had by his action as chairman at that meeting, and by his statement at the general meeting, shewn that he took an active part in the investment, and must be held responsible for it.

THE *Lands Allotment Company, Limited,* was registered as a limited company on the 25th of November, 1867.

By the memorandum of association the objects of the company were stated to be the purchasing, acquiring, improving, dealing with, and disposing of lands of any tenure situate in *Great Britain* or elsewhere ; the constructing and repairing buildings and erections thereon ; the granting rights and easements over any land acquired by the company ; the raising money by way of mortgage or charge of or upon any land or property which should have been purchased or acquired by the company, or of or upon any estate or interest therein, and the raising money upon debenture bonds, deposit notes, or other securities of the company ; the lending money by way of mortgage or charge of or upon any land which should have been sold, demised, exchanged, or granted or agreed to be sold, demised, exchanged, or granted by the company, or of or upon any estate or interest therein, and the carrying on of business as land agents and negociations for the sale and purchase of land.

By the 99th article of the articles of association the directors were empowered " to employ and invest the capital paid up and other moneys received by the company whether upon deposit

C. A.
1894
*In re*
LANDS
ALLOTMENT
COMPANY.

or otherwise in or upon such securities, real, personal or mixed, other than their own shares, as they might from time to time approve."

Early in 1885 a builder named *J. W. Hobbs* was indebted to the *Lands Allotment Company* to the value of £35,000. A joint stock company called the *Building Securities Company* was formed for the purpose of taking over his business and liabilities, and among other things they undertook the liability of paying the debt of £35,000 to the *Lands Allotment Company*. But the *Building Securities Company*, not having the money at their disposal, made an arrangement with the directors of the *Lands Allotment Company* that the last-mentioned company should take 7000 shares of £5 each in the *Building Securities Company* in full discharge of this liability. Accordingly, at a meeting of the board of directors of the *Lands Allotment Company*, held on the 2nd of March, 1885, at which the following directors were present, *S. R. Pattison*, Rev. *Dawson Burns*, *G. Dibley*, *M. Theobald*, and *G. E. Brock*, and also *H. G. Wright*, the solicitor of the company, a resolution was passed to apply for 7000 shares in the *Building Securities Company*, and to pay the same up in full. This resolution was confirmed at the next meeting of the board on the 9th of March, when the same directors were present, and also Mr. *Jabez S. Balfour*, the chairman of the company. The shares were in due course allotted and paid for by a cheque for £35,000, which was balanced by a cheque for the same amount drawn by the *Building Securities Company* in discharge of their liability to the *Lands Allotment Company*.

This transaction was referred to in the balance-sheet of the *Lands Allotment Company*, issued in March, 1885, as follows: "Assets. By *Building Securities Company*, £35,000." At the annual general meeting of the *Lands Allotment Company*, held on the 18th of April, 1885, at which Mr. *Jabez S. Balfour* presided, and at which the other above-mentioned directors were present, Mr. *Balfour* was questioned by Mr. *Wratten*, one of the shareholders, as to the meaning of this item, and he replied, according to the minutes of the shorthand writer, that it was an asset representing an amount to be paid by the *Building Securities Company* in respect of an "estate" which they had purchased

C. A.

1894

In re

LANDS
ALLOTMENT
COMPANY.

from the *Lands Allotment Company*, and that it was put down as an unpaid item in order that the shareholders might see what it was. There was, however, some doubt whether the word used by Mr. *Balfour* was "estate" or "asset." The same item appeared in the balance-sheet in the four following years.

At the general meeting on the 16th of April, 1887, *Dibley*, who was chairman, was asked by one of the shareholders for an explanation of the item in the balance-sheet, and he replied that the *Building Securities* investment was the same as it had been for the last two or three years; and that the *Building Securities Company* was a very good company indeed, and the directors considered it a very capital investment.

At the general meeting on the 16th of May, 1888, the item was again referred to as an investment which could be disposed of in due time.

At the general meeting on the 28th of November, 1888, *Dibley* was again in the chair, and he stated that the directors were perfectly satisfied with the investment in the shares of the *Building Securities Company*, and that the investment paid a very good rate of interest, and they thought it would be unwise at the present time to disturb it.

At the general meeting on the 15th of April, 1889, *Brock*, who was in the chair, referred to the investment in similar terms of approbation.

At a meeting of the directors on the 1st of July, 1889, at which *E. Barnard* and *J. W. Dresser* were present, but *Theobald* and *Brock* were both absent, it was resolved to apply for 1040 more paid-up £5 shares in the *Building Securities Company*, and the money was paid to that company by three bills, which were duly met by the *Lands Allotment Company*.

At a board meeting on the 9th of October, 1889, during the currency of the last of the bills, *Brock*, who had been chairman of the company since April, was present. The minutes of the yearly meeting, among other minutes, were read and confirmed, and were signed by *Brock* as chairman. *Theobald* was also present, and did not oppose the confirmation of the minutes.

At the general meeting on the 17th of April, 1890, *Brock* was in the chair. He then said: " With respect to this new

C. A.
1894
*In re*
LANDS
ALLOTMENT
COMPANY.

investment. You will no doubt observe that we have increased our holding in the shares of the *Building Securities Company*. That company decided last year on making a further issue of capital, and they intimated to us, with other shareholders, that we were entitled to so many additional shares. We carefully considered the matter, and, having regard to the excellent return on our then holding, and our confidence in the management of the company, we deemed it advisable that we should exercise our right of subscription, and we have had no reason to regret this decision, seeing that the company is paying an eminently satisfactory dividend of 7 per cent."

The *Building Securities Company* was ordered to be wound up in 1892.

The *Lands Allotment Company* was ordered to be wound up on the 16th of January, 1893, and in August, 1893, the official liquidator took out a summons to make the directors *Pattison, Burns, Dibley, Brock*, and *Theobald* jointly and severally liable to make good to the assets of the company the sum of £35,000 improperly invested by them in the purchase of 7000 shares of the *Building Securities Company*.

He also took out another summons to declare *Barnard, Dresser, Brock*, and *Theobald*, jointly and severally liable for the sum of £5200 invested by them in 1040 other shares in the same company.

The summonses came on for hearing before Mr. Justice *Wright* on the 13th of December, 1893.

*Finlay*, Q.C., *E. S. Ford*, and *Muir Mackenzie*, in support of the summonses :—

As regards the first summons: The investment in shares was *ultrà vires*. Having regard to art. 99, it would have been an improper investment even without reference to the wording of the memorandum of association. But the case must be decided on the wording of the memorandum of association alone, without reference to the articles, and the investment was clearly not within the powers given by the memorandum. If the investment was *ultrà vires*, the Respondents are clearly liable. If it was *intrà vires*, they are liable because, under the circumstances, it

C. A.

1894

*In re*
LANDS
ALLOTMENT
COMPANY.

was an improper investment, and they have fallen short of the standard of care required from directors: *In re Oxford Benefit Building and Investment Society* (1); *Leeds Estate Building and Investment Company* v. *Shepherd* (2). The Respondents may contend that they are entitled to set up the defence of the *Statute of Limitations*; but this cannot be raised where what is complained of is a continuing act: *In re Swain* (3).

Moreover, directors, being in a fiduciary position as regards the company, or "*quasi* trustees," are not entitled to set up the defence of the statute: *Flitcroft's Case* (4); *In re Oxford Benefit Building and Investment Society* (5); *In re Faure Electric Accumulator Company* (6); *In re Sharpe* (7). Nor is the position of a director improved by the *Trustee Act*, 1888. He is not a trustee within the meaning of sect. 1, sub-sect. 3, of that Act—that is to say, "an executor or administrator," "a trustee whose trust arises by construction or implication of law," or "an express trustee": *Sovereign Life Assurance Company* v. *Wilmot* (8); *In re Bowden* (9).

And, even if a respondent was a trustee within the Act, he could not avail himself of its protective provisions, because sect. 8 expressly excepts the case in which "the claim is founded upon any fraud or fraudulent breach of trust."

[*Herbert Reed*, Q.C., for *Theobald*:—The question of fraud cannot be raised, as the summons does not specifically allege fraud: *Bentinck* v. *Fenn* (10); *In re New Mashonaland Exploration Company* (11).]

[They also referred to *Moore* v. *Knight* (12); *In re Page* (13); *In re Gurney* (14); *In re National Permanent Mutual Benefit Building Society* (15).]

As regards the second summons: All the Respondents are

| | |
|---|---|
| (1) 35 Ch. D. 502. | (8) 9 Times L. R. 525 |
| (2) 36 Ch. D. 787, 805. | (9) 45 Ch. D. 444. |
| (3) [1891] 3 Ch. 233. | (10) 12 App. Cas. 652. |
| (4) 21 Ch. D. 519, 535. | (11) [1892] 3 Ch. 577. |
| (5) 35 Ch. D. 509. | (12) [1891] 1 Ch. 547. |
| (6) 40 Ch. D. 141, 150. | (13) [1893] 1 Ch. 304 |
| (7) [1892] 1 Ch. 154. | (14) Ibid. 590. |

(15) 43 Ch. D. 431.

C. A.

1894

*In re*
LANDS
ALLOTMENT
COMPANY.

liable. It is unnecessary to shew that each director was present at every meeting.

*Ingpen,* for *Burns* :—

The *Trustee Act,* 1888, affords this Respondent complete protection if he has been guilty of any misfeasance, for no fraud on his part is alleged. Before that Act the ground on which a director was held liable on a misfeasance summons was that he was a " constructive trustee," and the Act expressly applies to such a trustee.

There was no continuing breach of trust in this case.

*Farwell,* Q.C., and *Bramwell Davis,* for *Dresser* :—

No case of acting *ultrà vires* or fraudulently has been established. As regards the investment, it can be supported as an interim investment. It was not a speculative one. Under the circumstances, the directors, having exercised a discretion and acted honestly, are not liable, even although a mistake has been made : *London Financial Association* v. *Kelk* (1) ; *Lindley* on Companies (2).

*Woodfall,* for *Dibley* :—

Although the articles of association cannot extend the memorandum, they may be read to explain it. They may define the directors' powers as to the management of the company's affairs. If the investment had been a speculative one, there might be a liability attaching; but this is not so where what has been done is simply taking the best you can get to cover a bad debt : *Royal Bank of India's Case* (3).

[He also referred to *Parker* v. *Lewis* (4) ; *Harbor Bank* v. *Lewis Co. Bank* (5) ; *British and American Telegraph Company* v. *Albion Bank* (6).]

*Marshall Hall,* and *R. E. Moore,* for *Brock* :—

As regards the first summons, the purchase of shares was

(1) 26 Ch. D. 107.            (4) Law Rep. 8 Ch. 1035.

(2) 5th Ed. p. 373.            (5) 11 Barb. 213, cited in *Brice* on

(3) Law Rep. 4 Ch. 252.        *Ultrà Vires,* 3rd Ed. p. 177.

(6) Law Rep. 7 Ex. 119.

C. A.
1894
In re
LANDS
ALLOTMENT
COMPANY.

within the wording of the memorandum of association, for it authorizes dealings in land, and land was the only commodity with which the *Building Securities Company* had anything to do.

*Brock* is under no liability in respect of the matter referred to in the second summons. He was present only at the confirming meeting, and before that was held everything had been arranged.

*Herbert Reed*, Q.C., and *C. E. E. Jenkins*, for *Theobald* :—

The Court has many times said that directors are not trustees, but agents to conduct the business of the company. If that is so, they are entitled to set up the *Statute of Limitations* ; if not, they are entitled to the protection of the *Trustee Act*, 1888. At any rate, they are constructive trustees : *Charitable Corporation* v. *Sutton* (1).

As to the second summons, *Theobald* only attended the confirming meeting, and cannot be held liable for what had already been decided on.

*Houghton*, for *Pattison*, was not called on.

*Muir Mackenzie*, in reply :—

Before the *Trustee Act*, 1888, directors were held not to be trustees, but to stand in such a fiduciary position towards the company that they were liable as trustees. The Act only affords a director protection if he is actually a trustee, as the word is therein defined ; and it is plain that a director does not come within the definition. But if the directors are trustees in the strictest sense, the case made out against them brings them within the exception in sect. 8 of the Act.

As regards the second summons, *Barnard* and *Dresser* are in the same position. *Brock* and *Theobald* cannot escape liability because they were not present at all the meetings : *Joint Stock Discount Company* v. *Brown* (2).

[They also referred to *Darby* and *Bosanquet* on the *Statutes of Limitations* (3).]

(1) 2 Atk. 400.          (2) Law Rep. 8 Eq. 381.
(3) 2nd Ed. p. 556.

C. A.

1894

*In re*
LANDS
ALLOTMENT
COMPANY.

WRIGHT, J.:—

As regards the first summons in this case, I am of opinion that it must be dismissed. The *Lands Allotment Company*, of which the Respondents were directors, had made advances to *J. W. Hobbs*, a builder, and in respect of these advances he owed them £35,000 or upwards. A new company, called the *Building Securities Company*, was then being formed for the very purpose of taking over the business of *J. W. Hobbs*; and as this company had undertaken to pay off *Hobbs's* liabilities, it would have had to pay the *Lands Allotment Company* this debt of £35,000. For the common convenience of both companies, or at any rate for the convenience of Mr. *Balfour*, and those in whose interests he acted, a proposal was made—it does not at all appear by whom—that in substance the *Building Securities Company* should hand ever 7000 of their £5 shares to the *Lands Allotment Company*, and that *Hobbs's* liability, which otherwise the *Building Securities Company* would have had to pay off to the *Lands Allotment Company*, should be treated as extinguished. There is no evidence that any of the gentlemen who are Respondents to this summons had any doubt that that was an excellent business arrangement. The *Building Securities Company* went on for a considerable time without getting into any difficulties, and there was nothing to shew that there was any reason to suppose that what had been done was in any way a waste of the assets of the *Lands Allotment Company*.

I am of opinion that it was entirely *ultrà vires* of the *Lands Allotment Company*, under their memorandum of association, to put any of their capital or any of their assets into the shares of a company trading. for purposes entirely foreign to the purposes of that memorandum of association. In my opinion, there are no such words in the memorandum as could possibly be held to justify an investment in the shares of the *Building Securities Company*. "But it is merely a question of *ultrà vires*," then say the Respondents, "and we are saved by the *Statute of Limitations*. It is true that we were trustees, or we admit we were trustees, and should therefore be liable but for the *Trustee Act*, 1888; but we are saved by that Act." No decision on that point, as regards the directors of a company, has been cited to

me, though a case before Mr. Justice *Chitty* (*Sovereign Life Assurance Company* v. *Wilmot* (1)) has been referred to, in which it appears to me he did not decide the point at all; but it is a point of the greatest importance, which, no doubt, must be decided sooner or later, and I hope very soon by a higher tribunal than this. Without at all deciding that the *Trustee Act*, 1888, does not apply of its own force to directors of companies as directors, as to which there is a great deal of doubt, I incline to the opinion that it does not apply to them. The trustees mentioned in the Act of 1888 are persons who in the contemplation of Law are in reality trustees, and I think that of itself the Act would not apply to relieve directors of companies acting as such, as distinguished, of course, from cases in which they may be trustees of property or anything else for their company or for anybody else. But then, I think that, under sect. 165 of the *Companies Act*, 1862—for which sect. 10 of the *Companies* (*Winding-up*) *Act*, 1890, under which this summons has been issued, has been substituted—the Courts have always treated directors as being, although not trustees, very much in the position of, or for most purposes in the position of, trustees; and it is as being assimilated to trustees that they are sought to be held liable in this case. But if they had been trustees in the fullest sense, they would have been relieved by the Act of 1888; and since their liability is only because of, or depends upon, their being assimilated to trustees, it seems to me it would be wrong to hold them entitled to less protection than the protection to which real trustees would be entitled. It seems to be an *à fortiori* case. If they are treated as trustees merely on the ground that, although they are not trustees, they ought to be treated like them, it seems to follow that they ought to be entitled to at least the same protection, in the matter of limitation, as real trustees.

If that is the case, it rests upon the Applicant to shew that the directors are disentitled to claim the benefit of the *Statute of Limitations* on the ground of " fraud or fraudulent breach of trust to which the trustee was party or privy." Then, is there evidence on which I ought to act, that there has been fraud or fraudulent breach of trust to which the Respondents were parties

C. A.

1894

*In re*
LANDS
ALLOTMENT
COMPANY.

Wright, J.

(1) 9 Times L. R. 525.

C. A.
1894
In re
LANDS
ALLOTMENT
COMPANY.

Wright, J.

or privy ?   I am not quite sure that that is exactly the question to be decided, because if I am right in saying that directors are within the protection of the Act, not because of the words of the Act, but because the Court assimilates them to trustees, it may well be that directors will be disentitled to protection by something short of what would disentitle a real trustee to the protection of the Act. I do not wish to decide any such question. But here only one charge of fraud is made—that is, a fraud of concealment, which is sought to be supported by evidence of what took place at a meeting in 1885. Apart from that, I am quite satisfied that there was neither fraud nor negligence on the part of any of these gentlemen, unless it were Mr. *Balfour*. I think they might perfectly well believe themselves justified in acting upon the articles of association ; and on the articles of association, apart from the memorandum of association, I have no doubt that this investment would have been within the powers of the company: in which case there is no evidence to shew it was any such irrational thing for the directors to do so as to make them guilty of misfeasance.

[His Lordship concluded by dealing with the evidence, and, as regards that which related to the charge of concealment, held that it was too slender, when standing by itself, to be acted upon in a case of this kind.]

Then we come to the second summons. It seems to me that the further investment of the sum of £5200 in the additional shares was *ultrà vires*, and I cannot see any answer on behalf of Mr. *Dresser* or Mr. *Barnard* as regards that part of the case. As regards Mr. *Brock* and Mr. *Theobald*, there is no real evidence to shew that either of these gentlemen was party beforehand to the transaction being brought forward before the board. There is merely the statement by Mr. *Brock* on a subsequent occasion that the directors had all thought it an excellent investment ; but neither *Brock* nor *Theobald* was present at the meeting at which the resolution was passed for taking up these further shares, and, although they did attend what is called the confirming meeting in October, it does not appear to me that that mere fact, by itself, makes any difference, because before the confirming meeting in October the whole thing had been carried

into execution. All the bills given for the shares had either been paid or put into currency, and all that was done at the so-called confirming meeting was that the usual resolutions were carried, and the minutes of the previous meeting were read and confirmed.

I think that all this is not enough to fix liability upon anybody. But inasmuch as Mr. *Theobald* and Mr. *Brock* ought to have considered this matter, and as it must be imputed to them that they must have known that the investments were improper ones, I cannot say that it was wrong to make the application against them. As against them, the summons will be dismissed without costs; as regards *Dresser* and *Barnard*, it will be allowed with costs.

F. E.

From the judgment on both summonses the Official Liquidator appealed. *Dresser* and *Barnard* did not appeal.

The appeal came on to be heard on the 31st of January, 1894.

*Finlay*, Q.C., *E. S. Ford*, and *Muir Mackenzie*, for the Appellant :—

The investment of the capital of the *Lands Allotment Company* in the shares of another limited liability company was not sanctioned by the memorandum of association or the articles of association. It was not merely a temporary investment of shares taken in satisfaction of a debt, but a permanent investment of the assets of the company. It was, therefore, an *ultrà vires* act for which the directors who were present at the meetings when the investment of the £35,000 was made were liable. This applies to all the directors named in the first summons. Their only defence is the *Statute of Limitations*, and they claim the benefit of the *Trustee Act*, 1888 (51 & 52 Vict. c. 59), s. 8, sub-s. 1 (*a*), which puts trustees, except in cases of fraud, or where they are in possession of trust property, on the same footing as persons who are not trustees. But the directors of a company are not trustees within the meaning of this clause. It is true that sect. 1 of the Act provides that, for the purpose of the Act, the expression " trustee " shall be deemed to include a trustee whose trust

C. A.

1894

*In re*
LANDS
ALLOTMENT
COMPANY.

Wright, J.

C. A.

C. A.
1894
~~~
*In re*
LANDS
ALLOTMENT
COMPANY.

arises by construction or implication of law as well as an express trustee; but that does not include persons in the position of directors. They have been held in several cases to be persons in a fiduciary position; but they have never been held to be trustees either express or constructive. A trustee implies the possession of trust funds, which the directors have not; they have only the power of dealing with the funds of the company: *In re Faure Electric Accumulator Company* (1); *Flitcroft's Case* (2); *In re Sharpe* (3). But if the Court should be against us on the construction of the statute, there is another reason why the directors cannot take advantage of the *Statute of Limitations*, namely, that the investment in question was fraudulently concealed from the shareholders. In the first general meeting after the investment was made, the chairman stated that the sum of £35,000 which appeared in the balance-sheet as an asset of the company represented an amount which had been paid by the *Building Securities Company* in respect of an estate which they had purchased from the *Lands Allotment Company*. This was entirely false, and, though the entry appeared every year in the balance-sheet, it was never explained to the shareholders till the meeting in November, 1888, which is within the limit of six years. The balance-sheet was in fact delusive, and deceived the shareholders. The directors were all responsible for the concealment, and they cannot therefore rely upon the statute: *Moore* v. *Knight* (4).

[KAY, L.J., referred to *Willis* v. *Earl Howe* (5).]

With respect to the second appeal, which relates to the additional investment of £5200, both *Theobald* and *Brock* were present at the meeting of the directors in October, 1889, when the minutes of the meeting at which the investment was made were confirmed. They ought to have objected to it as *ultrà vires*, and had the resolution revoked. With respect to *Brock* the case goes further, for he was in the chair and signed the minutes; and also, at the subsequent general meeting on the 17th of April, 1890, he called attention to the additional investment, and said:

(1) 40 Ch. D. 141.                    (3) [1892] 1 Ch. 154.
(2) 21 Ch. D. 519.                    (4) [1891] 1 Ch. 547.
              (5) [1893] 2 Ch. 545.

C. A.

1894

*In re*

LANDS
ALLOTMENT
COMPANY.

"We carefully considered the matter, and deemed it advisable that we should exercise our right of subscription" to the *Building Securities Company.* He thus admitted his concurrence in the investment, and his consequent liability: *Joint Stock Discount Company* v. *Brown* (1); *Ashhurst* v. *Mason* (2).

LINDLEY, L.J., said the Court did not desire to hear counsel for any of the Respondents except *Brock*.

*Swinfen Eady,* Q.C., *Woodfall,* and *G. E. Tyrrell,* appeared for *Dibley.*

*Houghton,* for *Pattison.*

*Ingpen,* for *Burns.*

*Herbert Reed,* Q.C., and *C. E. E. Jenkins,* for *Theobald.*

*Marshall Hall,* and *R. E. Moore,* for *Brock*:—

When *Brock* signed the minutes of the previous meeting of July, 1889, it was too late to object to the investment. The minutes were only confirmed as to their accuracy. A director is not bound to proceed against his brother directors to revoke *ultrà vires* acts which they have committed. With respect to his speech at the general meeting, when he said "we" he did not speak for himself personally, but as the mouthpiece of the board, as the editor of a newspaper speaks on behalf of the proprietors.

LINDLEY, L.J.:—

This is an application under sect. 10 of the *Companies (Winding-up) Act,* 1890, which has replaced a previous section of the Act of 1862.

Two summonses have been taken out against former directors of this *Lands Allotment Company* which is now being wound up. The object of the first summons is to compel certain gentlemen to refund or make good the sum of £35,000, and the object of the second is to compel two of them, viz., Mr. *Brock* and Mr. *Theobald,* to make good a sum of £5200.

(1) Law Rep. 8 Eq. 381.       (2) Law Rep. 20 Eq. 225.

C. A.
1894
In re
LANDS
ALLOTMENT
COMPANY.

Lindley, L.J.

As to the £35,000, the case stands in this way. It appears that a builder named *Hobbs* was indebted to this company to the extent of £35,000, and that a company, called the *Building Securities Company*, was formed to purchase *Hobbs*' business, to take over his assets and his liabilities. Under the arrangements made in the formation, or after the formation, of the *Building Securities Company*, it became their duty, as between them and *Hobbs*, to pay off that sum of £35,000 which he owed to the *Lands Allotment Company*, and they proceeded to do that in this way. They had not, as I infer from the form taken by the transaction, £35,000 to pay off *Hobbs*' debt with, and so they said to the *Lands Allotment Company*, " If you will buy our shares to the amount of £35,000 and send us a cheque for that sum, you shall have the cheque back, and so we will repay you *Hobbs*' debt." And that farce was gone through.

Now, what is the effect of that ? In point of fact, no money passed out of the coffers of the *Lands Allotment Company* into the coffers of the *Building Securities Company*. It was a mere paper transaction so far as cash was concerned. It is very true cheques were handed into the bank one day and taken out the next ; but the real substance of that transaction, when you see through the cloak which is thrown around it, is that the *Lands Allotment Company* took £35,000 worth of shares in the *Building Securities Company* in satisfaction of *Hobbs*' debt. That was what was really done.

Now it is said that that is a transaction which is *ultrà vires* of the directors of the *Lands Allotment Company*. I doubt, if you look at it as I am disposed to do as a matter of substance, whether it is. I have not the slightest intention of throwing any doubt whatever upon its being *ultrà vires* if the effect of it was to invest money for the *Lands Allotment Company* in the purchase of shares in the *Building Securities Company*. I have not the slightest doubt that that would be *ultrà vires*, notwithstanding the ingenious argument we have heard upon the memorandum of association of the *Lands Allotment Company*. But, in substance, I doubt whether it was not within the powers of the directors to take fully paid-up shares of any company in satisfaction of a debt which they could not get paid. At all events, I shall pass

C. A.

1894

*In re*
LANDS
ALLOTMENT
COMPANY.

Lindley, L.J.

that over, and for the rest of my observations I shall assume that the learned Judge was right in holding it to be an *ultrà vires* transaction. Then, if it was an improper transaction, all those directors who were parties to this improper investment, for in this point of view it was improper, would naturally and obviously be liable to make good the money. All that is conceded if the assumption is granted. Then comes the question whether they are protected by the *Statute of Limitations* which is applicable to trustees, and the learned Judge has held that they are, and, I confess, it appears to me that he is obviously right in the construction which he puts upon that statute. Just consider what we are asked to do here. We are really asked to put ourselves in a most grotesque position. We are asked to say that the directors are liable for these moneys upon the footing that they committed a breach of trust, but that they are not entitled to the benefit of the *Statute of Limitations* which was passed for the benefit of trustees. I cannot be party to any decision so supremely absurd. Although directors are not properly speaking trustees, yet they have always been considered and treated as trustees of money which comes to their hands or which is actually under their control; and ever since joint stock companies were invented directors have been held liable to make good moneys which they have misapplied upon the same footing as if they were trustees, and it has always been held that they are not entitled to the benefit of the old *Statute of Limitations* because they have committed breaches of trust, and are in respect of such moneys to be treated as trustees. Then, when the Legislature passed an Act of Parliament—the *Trustee Act*, 1888 (51 & 52 Vict. c. 59)—protecting trustees against actions for breaches of trust, how can it be with any reason said that directors are not to have the benefit of this statute ? I cannot go that length. I am satisfied that the statute does apply. Let us look at the words of it. The first section of the Act with which we are dealing says this : " For the purposes of this Act the expression ' trustee ' shall be deemed to include an executor or administrator and a trustee whose trust arises by construction or implication of law as well as an express trustee, but not the official trustee of charitable funds." I rather think when you

C. A.

1894

*In re*
LANDS
ALLOTMENT
COMPANY.

Lindley, L. J.

look at the case of *Soar* v. *Ashwell* (1), in which Lord Justice
Bowen took so much pains to classify trustees and to distin-
guish constructive trustees from express trustees, you will find
that directors are considered as express trustees of money which
they have control of. But, if not, certainly they come within
the other part of the definition of "construction or implica-
tion of law." It is precisely because they are one or the other
that they always have been held liable and have always been
denied the benefit of the old *Statute of Limitations*. That being
the case, I have no hesitation in saying that these gentlemen are
entitled to the benefit of the statute. The statute applies to
them, and applies to all directors who have in their hands or
under their control moneys of a company and who by mistake
or carelessness misapply it. There are words in sect. 8 which
render this statute inapplicable to cases of misappropriation of
money to the use of the persons misapplying it and to cases of
fraud. But no charge of such misappropriation or of fraud is
brought against the directors in the present case.

But although, so far, I have no doubt whatever that this
statute is applicable, another point is raised which is important.
It is said that this was one of those cases of concealed fraud in
which the cause of action did not accrue until the fraud was
discovered. Now the misapplication in this case was not fraudu-
lent in any sense. I am quite satisfied from the affidavits of the
directors that they thought they were doing what was right and
beneficial to the company. They made a mistake in their
powers, assuming as I do now that this was an *ultrà vires* trans-
action. But the case of concealed fraud is attempted to be made
out in this way—that, at a meeting when this matter was referred
to, the £35,000 was entered in the first balance-sheet, and sub-
sequent balance-sheets, as an asset under the words which I
will read. It is on the credit side. "Assets. By *Building
Securities Company*, £35,000." Now that by itself, to my mind,
may mean anything. It is clear that it means an asset. But it
may mean land owned by the *Building Securities Company*; it
may mean that it is an investment in that company. That
entry in the balance-sheet is quite consistent with either view.

(1) [1893] 2 Q. B. 390, 395.

C. A.
1894
*In re*
LANDS
ALLOTMENT
COMPANY.

Lindley, L.J.

But we have it proved, subject to a remark which I will make presently, that shortly after this transaction, viz., on the 18th of April, 1885, and after the balance-sheet to which I referred had been circulated among the shareholders, Mr. *Balfour* made a speech or answered a question put to him by one of the shareholders. The shareholder asked the chairman, Mr. *Balfour*, " I see an item of £35,000 *Building Securities Company* in the assets. Is there any reason why we should not know what those securities are ? " Then Mr. *Balfour* says this, in answer to that question, " It will be probably best to answer the question of Mr. *Wratten* right away. There is no reason for anybody not having any information they want. Everybody apparently but Mr. *Wratten* knows that the ' £35,000. By *Building Securities Company* ' is an asset representing an amount which is to be paid by the *Building Securities Company* in respect of an estate they have purchased from us."

Now, whether the real word used here was " estate," as the shorthand writer maintains, or was " asset," as is suggested in the statement by Mr. *Balfour,* the statement that £35,000 is an asset representing an amount which is to be paid by the *Building Securities Company* is untrue. No one could justify that in any sense : whether you treat the words as " an estate " or " an asset," the statement is untrue. The argument is then put in this way —that this untrue statement was made by Mr. *Balfour* at a meeting at which these other gentlemen who are sought to be charged with this sum were present, and that, unless they did not then and there get up and deny it and put it right, they are to be treated as parties to the untrue statement, and as concealing the transaction. I think it would be pressing that contention against them a great deal too far if we gave effect to it. In the first place, I can easily understand that they did not realize the effect of his statement about the money being paid at all; and the affidavits which they have filed, and to which I have referred, satisfy me that they thought it was a thing not to be concealed, but a thing rather to be proud of. They thought they had done an uncommonly good thing for this company in putting £35,000 into the shares of this building society. Why should they want to conceal it ? Why Mr. *Balfour* should have

C. A.

1894

*In re*
LANDS
ALLOTMENT
COMPANY.

Lindley, L.J.

gone out of his way to say what he did I do not know, and I think the evidence is far too weak to justify us in holding the other directors liable for these moneys on the ground that they were parties to a fraud in concealing what they had done. I am strengthened very much in that conclusion by expressions which were used at subsequent meetings, and to which I will refer. At the meeting of 1887, Mr. *Dibley* was then in the chair. He said: "The *Building Securities* investment is just the same as it has been for the last two or three years. The *Building Securities* is a very good company indeed, and we consider it is a very capital investment by the board." And later on, in 1888, it is quite obvious that everybody knew the exact nature of this investment—knew that it was an investment of money in shares of the *Building Securities Company.* Now, the only deduction which I can draw from these materials is, that it would not be right to saddle these gentlemen with a charge of fraud or concealment of fraud in respect of this transaction—I do not think that any jury would do that—and I acquit them of it altogether. Although, therefore, if the true view is that this was an *ultrà vires* transaction, the directors would be liable to replace the money, they are protected by the *Statute of Limitations* to which I have referred, and the appeal against the learned Judge's decision as regards them must be dismissed with costs as against all of them.

I now come to the second transaction, which is a different matter altogether. It appears that in July, 1889, a further sum of £5200 was invested. It really was this time invested in the purchase of shares of this *Building Securities Company.* There were 1040 shares of £5 each which were applied for and taken. They were not paid for in cash at the time. They were paid for by three bills at various dates. At the meeting of the 1st of July, 1889, neither Mr. *Brock* nor Mr. *Theobald,* who are sought to be made liable for this improper investment, were present. On the 9th of October, after two of the bills which had been given had become due and had been paid, and whilst the third bill was running, and before it became due, the minutes of the meeting of the 1st of July, 1889, were confirmed. At that confirmation meeting on the 9th of October, 1889, Mr.

C. A.

1894

*In re*
LANDS
ALLOTMENT
COMPANY.

Lindley, L.J.

*Theobald* and Mr. *Brock* were both present, and it is because Mr. *Theobald* was present at that meeting that it is sought to charge him with liabilities in respect of this sum. Now, it is quite certain upon the evidence that he had nothing to do with the transaction originally. He was away on the sea, and had nothing to do with this at all, and the case against him is simply that he was party to the confirmation, and it is put in this way—that he thereby adopted or ratified it, and that he, at all events, might have taken legal proceedings, or induced the company to take legal proceedings, to set aside the transaction. Now, I am not aware of any authority which goes the length of saying that a director who is not a party to any misapplication of a company's funds is liable for not taking legal proceedings to upset the transaction after the thing is done, and I do not think it would be in accordance with the principles applicable to these cases if we were now first to make a precedent of that kind. I am satisfied from Mr. *Theobald's* affidavit that he knew nothing at all about the matter, and when he did come back, and found out what was done, it was too late to stop it, the matter was over, and past praying for, so far as he was concerned. It appears to me, therefore, that Mr. Justice *Wright* was quite right in exonerating Mr. *Theobald* from all liability in respect of that sum.

As regards Mr. *Brock*, the case is a very different one indeed. Mr. *Brock*, although he was absent in July, 1889, had been a director of this company for some time, and had been chairman of the directors, and when he came back—which he did before the 9th of October, 1889—he, as an acting director and as chairman of directors, took the chair at the meeting, and he signed the resolutions confirming what had taken place. If the matter had stood there, I should have thought that he would have been in the same position as Mr. *Theobald*; but the case does not stop there, for on the 17th of April, 1890, there was a meeting at which Mr. *Brock* made this speech, as appears from the evidence which has been given. There is no reason for distrusting the evidence of the shorthand writer upon this point. Mr. *Brock* was in the chair at the annual general meeting of the 17th of April, 1890, and he says this : " You will no doubt observe that we have increased our holding in the shares of the

C. A.
1894
~~~
*In re*
LANDS
ALLOTMENT
COMPANY.

Lindley, L.J.

*Building Securities Company.*" This is true: they had increased it by £5200. "That company decided last year on making a further issue of capital, and they intimated to us, with other shareholders, that we were entitled to so many additional shares. We carefully considered the matter, and having regard to the excellent return on our then holding, and our confidence in the management of the company, we deemed it advisable that we should exercise our right of subscription, and we have had no reason to regret this decision, seeing that the company is paying an eminently satisfactory dividend of 7 per cent." Now, it is impossible, I think, after that to say that Mr. *Brock* knew no more about it than Mr. *Theobald.* I cannot construe that speech, even making all allowance for the use of the word " we," as amounting to anything else than this: a statement by Mr. *Brock* that " we," including the directors and including himself, " carefully considered " this application before they made up their minds to accept that offer. He was chairman from April, and his chairmanship covered the whole period of the negotiations which led to this, and he says : " We carefully considered the matter, and we deemed it advisable that we should exercise our right of subscription." I have come to the conclusion from his own statement, that Mr. *Brock* was so mixed up in this, and took so active a part in it, that he is liable ; and I think his view was, until the matter got into liquidation, that it was a judicious thing to do. He not only approved of it, but he thought it was an uncommonly good thing for the shareholders, and he claims credit to himself for his intelligence in seeing, as he thought, that it was an uncommonly good thing. I take him as doing exactly what he says he did—exercising his judgment upon it, believing perfectly honestly it was *intrà vires,* but making a mistake as to the powers of directors in investing money. As regards him, therefore, it appears to me that the appeal must succeed, and he must be held liable for this £5200, together with the other two directors who have not appealed.

KAY, L.J. :—

The transaction as to the £35,000 seems to have been of this kind. This *Allotment Company* had been formed, and *Hobbs,* the

builder, was indebted to them in a sum of £35,000. Then
shortly afterwards the *Building Securities Company* was formed,
and we are told it was formed for the purpose, amongst other
things, of taking over the building business of Mr. *Hobbs.* Then
the parties were in this position. The *Building Securities Com-
pany* were going to buy *Hobbs'* business, and, of course, they
would owe to *Hobbs* a large sum for the purchase of that business.
What the amount was we are not told. *Hobbs* was indebted in
£35,000 to the *Lands Allotment Company,* and an arrangement
was made between *Hobbs* and the *Lands Allotment Company* and
the *Building Securities Company* by which the *Building Securities
Company* were to pay *Hobbs'* debt upon condition that the
£35,000 should be invested in shares of the *Building Securities
Company.* In point of fact, it was a kind of compromise of the
indebtedness of *Hobbs* to the *Lands Allotment Company.* I do
not know, of course, what all the circumstances were, but it is
quite possible it may have been the very best way of getting
*Hobbs'* debt paid, because it seems that these *Building Securities
Company* shares were very valuable at that time and for some
time afterwards, and for some years paid a very large dividend.
I will not pause to consider whether that was *intrà vires* of the
*Lands Allotment Company* or *ultrà vires,* but it would require a
great deal of argument to convince me that the directors of a
company like the *Lands Allotment Company* might not make
a compromise of that kind if it was a compromise with a person
largely indebted to their company. I conceive that the directors
of every company being the managing agents of a trading concern
have considerable authority and power in dealing with outstand-
ing debts due to the concern, and it is quite possible that this may
have been the very best arrangement that could have been made
for compromising that large liability of *Hobbs* to the *Lands Allot-
ment Company.* But I will assume it was not, and treat this for
the purpose of argument as an investment in shares of the *Build-
ing Securities Company* of £35,000, which were the moneys of the
*Lands Allotment Company.* I am very clearly of opinion that if
they did buy shares in that company it might be an act beyond
their powers—buying them, not, be it observed, as an *interim*
investment of moneys that they wanted at the time to invest in

C. A.

1894

*In re*
LANDS
ALLOTMENT
COMPANY.

Kay, L.J.

C. A.
1894
In re
LANDS
ALLOTMENT
COMPANY.

Kay, L.J.

certain securities, but buying them, as it appears they did buy
them, as shareholders out and out in this *Building Securities
Company*—shares which they intended to hold and which they
did hold for a very long time afterwards. Then comes the
question, what was the position of the directors who made an
improper and *ultrà vires* investment of that kind? Now, case
after case has decided that directors of trading companies are
not for all purposes trustees or in the position of trustees, or
*quasi* trustees, or to be treated as trustees in every sense; but if
they deal with the funds of a company, although those funds are
not absolutely vested in them, but funds which are under their
control, and deal with those funds in a manner which is beyond
their powers, then as to that dealing they are treated as having
committed a breach of trust. I do not believe that there has
ever been any deviaton from the language of the late Sir *George
Jessel* in the case of *In re Forest of Dean Coal Mining Com-
pany* (1). Sir *George Jessel* said this: "Directors are called
trustees. They are no doubt trustees of assets which have
come into their hands, or which are under their control, but they
are not trustees of a debt due to the company." So that, when
they get assets of the company under their control, or into their
hands, and deal with them in a way which is beyond the powers
of the company, they are liable as for a breach of trust. Well,
then, that is not denied; but it is said that they are not abso-
lutely trustees, they are *quasi* trustees; and, being in that
position, they do not come within, and were designedly omitted
from, the definition of trustees in the Act of 1888, one section of
which limits the liability of trustees. I entirely dissent from
that argument. It seems to me the words used in the definition
clause of that Act—the 1st section—do expressly include pre-
cisely such a case as a director dealing with moneys of the com-
pany in such a way as to make him liable as trustee, because the
words are these: "For the purposes of this Act the expression
'trustee' shall be deemed to include an executor or administrator
and a trustee whose trust arises by construction or implication
of law as well as an express trustee." Now, how does this obliga-
tion of a director and trustee arise if it does not arise "by con-

(1) 10 Ch. D. 450, 453.

C. A.

1894

*In re*
LANDS
ALLOTMENT
COMPANY.

Kay, L.J.

struction or implication of law " ? It seems to me that the words are apt to include that very case, and were intended to include a case of that kind. It is said, by way of argument, " Why did not the definition clause expressly include directors ? " But it would have been quite wrong to have included directors, because directors are not always trustees. As directors they are not trustees at all. They are only trustees *quâ* the particular property which is put into their hands or under their control, and which they have applied in a manner which is beyond the powers of the company. I conceive that *quâ* such fund they are constructive trustees, or trustees by implication of law, and they come exactly within the words of this definition in the Act, and therefore the 8th section of the Act, which applies to all persons who come within this definition of trustees, does apply to exonerate these directors from that misapplication of funds for which otherwise, I assume, they would have been liable.

But then it is said—and upon this part of the case I desire to add a few words to what Lord Justice *Lindley* has said—that if that was so, still the fact of this investment was concealed by a fraud of one of the directors in which the other directors concurred, and that concealment by fraud prevents time from running in favour of the directors until the fact was discovered. Well, I do not wish at all at present to express any decided opinion whether, if the fraudulent statement could be traced to all these directors and they could be made responsible for it, time would or would not run until it was discovered. The ordinary application of that doctrine is where you are suing people, and the ground of your action is the fraud which has been committed. Then undoubtedly where the ground of the action is fraud committed, time does not begin to run until the discovery of the fraud. That I quite admit. But it is not quite the same thing where the ground of the action is not fraud at all, but where the ground of the action was, as here, a perfectly honest misapplication of money—a misapplication made by persons who might not unreasonably believe they had power to do that which they were doing, and which was not as far as any one of them was concerned in the least degree a corrupt dealing. The investment of these moneys, however wrong it might be with regard to the powers

C. A.
1894
*In re*
LANDS
ALLOTMENT
COMPANY.

Kay, L.J.

of the company as being beyond those powers, could in no sense be said to be a fraud on the part of the particular persons who made the investment; and I do not wish to express any decided opinion as to the rights of the shareholders in respect of that investment if the fact of that investment had been fraudulently concealed from the shareholders. It might be that time would not begin to run until the discovery of the facts which gave them a right to sue.

But the question is, Is that fraud, if there was a fraud, brought home so clearly to these particular directors whom it is now sought to make liable as to bring them within that doctrine if such a doctrine exists? Now, if we were dealing with Mr. *Balfour* the case would undoubtedly be very different, because Mr. *Balfour*, according to the evidence before us, did make a statement at a public meeting of the shareholders which was, which-ever view you take of the actual words used, whether it was " estate " or " asset," an utterly untrue statement; and if the action were against Mr. *Balfour* and it was said, " Time did not begin to run in your favour until the untruth of that statement was discovered by the shareholders, because that statement put them off their guard completely, and prevented them knowing the facts which gave them a right to sue you," I do not say that that argument might not prevail. But we have not got Mr. *Balfour* before us. The persons who are before us are persons who were present at that meeting, and it is sought to make them liable because they, being present at that meeting, must be taken to have heard Mr. *Balfour's* statement, and therefore to have concurred in that statement, and thus to have joined in misleading the shareholders. I am not prepared to say that the evidence is sufficient. All the evidence we have got is that they were at the meeting. I have no doubt that the directors at the time—all those directors, at any rate, who are sought to be charged—believed, as they say they believed, that this was a perfectly valid and proper transaction, and they had no ground whatever for concealing it, and in order to bind them by a false statement of this kind made by Mr. *Balfour*, speaking for myself, I should require it to be proved very clearly that they thoroughly apprehended the falseness of the statement that was made, and

concurred in it for the purpose of deceiving the shareholders
who were present. I do not think the evidence comes up to
that. The mere fact that they were present at the meeting does
not seem to me enough to enable the Court to treat them as
having committed a fraud for the purpose of concealing the
actual facts from the shareholders in reference to this investment
in the shares. Therefore, I think the learned Judge was quite
right in treating them as absolved from liability for this invest-
ment by the lapse of time that has taken place.

Now, I will say only a few words with reference to points
arising on the second summons, namely, the liability of ·Mr.
*Brock* and Mr. *Theobold,* together with the two gentlemen who
have been declared liable, *Barnard* and *Dresser,* for the second
investment in the shares of the *Building Securities Company.*
That investment was not made till 1889, and therefore six years
had not run when this proceeding was taken against them to make
them liable. The *Statute of Limitations,* therefore, has nothing to
do with that case, and the only question is who were the persons
who really did concur in making that investment, a thing beyond
the powers of the company, and all the directors who did concur
in that misapplication of the funds of the company to the extent
of £5200 would be jointly and severally liable. *Barnard* and
*Dresser* were the persons who were present at the meeting of the
1st of July, 1889, when it was resolved to make this purchase of
further shares in the *Building Securities Company,* and they have
been declared liable, and I understand there is no appeal on their
part. *Brock* was at that time and had been for some time previously
the chairman of the company. He was not present at that
meeting; but before that meeting he had expressed at previous
meetings his approval of the holding of the £35,000 of shares in
the company. For example, on the 28th of November, 1888, he
was present at the meeting when Mr. *George Dibley* was in the
chair, and said this, in reply to a question by a correspondent:
" We are perfectly satisfied with our investment in these shares.
The investment pays us a very good rate of interest; we think it
would be unwise at the present time to disturb it." Then again,
on the 15th of April, 1889, he was at another shareholder's meet-
ing; he was then in the chair and he said this: " The *Building*

C. A.

1894
‿
*In re*
LANDS
ALLOTMENT
COMPANY.

Kay, L.J.

C. A.
1894
*In re*
LANDS
ALLOTMENT
COMPANY.

Kay, L.J.

*Securities Company,* £35,427 10s., is an item with which you are now becoming familiar. It represents shares in a company which pays a good dividend." Now, if Mr. *Brock* held those views as to the very advantageous nature of the first investment, and if the question had come before him, "Shall we increase our holding or not?" the great probability is that he would have concurred. Did he concur or did he not? I have said he was not present at the meeting of the 1st of July, 1889. He was present in October, 1889, at a meeting which confirmed the minutes of the meeting of the 1st of July, 1889, amongst other minutes, and then we have got that speech of his when he was in the chair on the 17th of April, 1890, which Lord Justice *Lindley* has read, where he says, "We have increased our holding in the *Building Securities Company,*" and, after stating that they had offered additional shares, he says, "We carefully considered the matter, and having regard to the excellent return on our then holding, and our con-- fidence in the management of the company"—that means the *Building Securities Company*—"we deemed it advisable that we should exercise our right of subscription, and we have had no reason to regret this decision, seeing that the company is paying an eminently satisfactory dividend of 7 per cent." Observe, this is said by a gentleman whose language I have read before of high approval of the first investment of £35,000. He was perfectly satisfied with it, thought it a very good investment, and thought it would be unwise to sell these shares. It is the language of a man who, if he had been asked to concur in this further investment, would most probably, judging from what he had said on previous occasions, have concurred without the least hesitation. Now, can any one reading this speech of Mr. *Brock* believe that the investment was made without his concurrence? I have listened with interest to all the ingenious arguments of Mr. *Marshall Hall* on the subject of the editorial "we," and so on. But the editorial "we" is not quite the same thing as the "we" of a director who, being at the time the chairman of a company, is speaking of an investment and says, "We carefully considered the matter and agreed that an investment ought to be made." I cannot possibly allow him to escape under that extremely ingenious argument from the conclusion to which

I have come from this statement of his own, that he was one of
the persons who, before the investment was made, concurred in
the propriety of making that investment, carefully considered it,
and agreed that it should be done.   That being so, I think it is
clear that he must be made liable together with Messrs. *Dresser*
and *Barnard.*   As to Mr. *Theobald,* there is nothing to make him
party to this further investment except the fact that he was
present at the meeting of the 9th of October, 1889, at which,
among other things, the minutes of the meeting of the 1st of
July, 1889, were read and confirmed.   I agree with Lord Justice
*Lindley* as to that.   I do not think there was enough in that
circumstance alone to make him liable, looking to the evidence
that he himself has given; and therefore I think that Mr. *Theobald*
cannot be made liable as to this further investment.

C. A.

1894

*In re*
LANDS
ALLOTMENT
COMPANY.

Kay, L.J.

A. L. SMITH, L.J.:—

My Brethren have fully covered this case as regards the
different points which have to be adjudicated upon, and I entirely
agree with them, and have nothing to add thereto, but I wish to
say one word about the *Trustee Act* of 1888.   As I understand
the argument, it is this: It is said that within the Act there
may be an express trustee, there may be a trustee whose trust
arises by implication of law (I leave out " construction of law "),
and there may also be a *tertium quid,* and the *tertium quid* which
Mr. *Finlay* suggests is a gentleman in a fiduciary position.   Now
I do not agree with him at all as to this *tertium quid,* for it
seems to me that the *tertium quid* would be a man who is not an
express trustee or whose trust arises by implication of law; and
therefore would not be within the Act.   But if he does come
within this *tertium quid,* that is not being an express trustee or
not a trustee whose trust arises by implication of law, he then
has the ordinary *Statute of Limitations* to rely upon, which gives
him a defence after a lapse of six years.   If, however, the
Respondents are express trustees, or trustees " whose trust arises
by implication of law," then they have the defence of the *Statute
of Limitations* which is afforded by this Act of 1888, unless they
are deprived thereof by reason of the three exceptions which are
set out in sect. 8 of the Act.   Therefore it seems to me, whichever

O. A.
1894
In re
LANDS
ALLOTMENT
COMPANY.

A. L. Smith, L.J.
way you take this case, the *Statute of Limitations* is an available defence for these gentlemen.

I now come to the second point—the question of fraudulent concealment. That arises under both statutes, and it arises upon the fact that although under both statutes the Defendant may after six years plead the *Statute of Limitations,* yet, if there had been a sufficient fraudulent concealment, then he cannot set up the defence which is given to him either under the Act of 1888 or the old Act. I think there was no such fraudulent concealment in the present case. It seems to me, that as regards this £35,000, these gentlemen can rely on the limitations in the statute of 1888, inasmuch as they are gentlemen who were trustees whose trust arises by implication of law.

As regards the last gentleman, Mr. *Brock,* I agree with what the Lords Justices have said, though he thought he was acting in the best interests of the company, he did that which was *ultrà vires*—that which he cannot justify, and, therefore, he must be made liable in the present case for the £5200.

Solicitors for Appellant: *Phelps, Sidgwick, & Biddle.*
Solicitors for Respondents: *Snow, Snow, & Fox; Beaumont, Son, & Rigden; A. F. Church; E. Rawlings; W. D. Cunningham.*

M. W.

[2012 (2) CILR 416]

## RENOVA RESOURCES PRIVATE EQUITY LIMITED

*v.*

## GILBERTSON and FOUR OTHERS

*Grand Court, Financial Services Division*

(Foster, J.)

**5 November 2012**

*Companies—directors—powers and duties—general principle that director of limited company owes fiduciary duties—principal duties to act in company's best interests, avoid conflict of interest and not profit from position—may be varied by company's articles, shareholders' agreement or clear implication from circumstances*

*Companies—directors—powers and duties—requirement for director's consent to proceed with investment project—fiduciary duties not weakened in respect of opportunities being explored—director not to veto project to pursue for himself without company's consent—not inferred that because company is joint venture with director he may act in own interests*

*Companies—directors—breach of fiduciary duty—equitable compensation payable for loss caused by breach of fiduciary duty—designed to put plaintiff back into position would otherwise have enjoyed—account of profits is alternative remedy and plaintiff to elect between them—if diversion of rights to loss-making business causes no economic loss, no compensation payable*

*Trusts—constructive trusts—knowing receipt—liable to account as constructive trustee if disposal of assets in breach of fiduciary duty; beneficial receipt by defendant of traceable assets; and knowledge on defendant's part that assets traceable to breach—flexible concept—requirement for disposal of assets not limited to pre-existing tangible assets owned by plaintiff—court to achieve fairness in particular circumstances*

The plaintiff brought a multiple derivative action in respect of an alleged breach of fiduciary duty and knowing receipt of property.

Between 2004 and 2005, Mr. Gilbertson, an experienced businessman, and Mr. Vekselberg, the principal beneficiary and chairman of the large Renova Group, had agreed to set up a new private equity fund as a joint venture. Mr. Gilbertson would manage the fund and it would be financed by Renova, with the profits to be shared between them. From the start, Mr. Gilbertson had identified—and, with his son, Sean Gilbertson, had been actively exploring—the acquisition of the rights to the Fabergé luxury

goods brand and business from Unilever PLC as a potential investment project. Mr. Vekselberg, as a collector of Fabergé items, was enthusiastic about the project, termed "Project Egg."

In January 2006, the terms of the joint venture were set out in a letter from Renova Holding Ltd. to Mr. Gilbertson, signed by both parties as "partners." It confirmed that Renova Holding would establish the investment fund and the fund management vehicle and that Mr. Gilbertson would be responsible for all investment projects; he would be appointed chairman of the investment fund and the fund management vehicle, his duties being those customary for an executive chairman of a company. Clause 2.5 of the letter agreement provided that approval to proceed with an investment project required the unanimous consent of the investment committee (which comprised Mr. Gilbertson and Mr. Kuznetsov, Renova's chief investment officer). Further, cl. 8.2 provided that the agreement would automatically terminate if the investment fund and fund management vehicle were not operating in a way reasonably satisfactory to each of the partners within 16 months.

In March, the investment structure ("the Pallinghurst structure") was established, which consisted of the second defendant ("the company") as general partner of the third defendant ("GPLP"), which was in turn general partner of the fourth defendant ("the master fund")—all Cayman entities. Mr. Gilbertson and Mr. Kuznetsov were appointed as the two directors of the company, and the trustee of Mr. Gilbertson's family trusts ("Fairbairn") and the plaintiff were the two equal shareholders. Long form agreements ("the Pallinghurst agreements") setting out the terms of the partnership between Renova and the Pallinghurst structure were agreed, but not signed.

In May, an offer was made on behalf of the master fund to purchase the rights for US$20m., which Unilever declined. Since the maximum bid Mr. Kuznetsov could approve on Renova's behalf (without detailed due diligence, a business assessment and various internal approvals) was US$20m., he suggested that Mr. Vekselberg consider investing his personal funds to acquire the rights. Mr. Vekselberg agreed personally to put forward US$30m., but in August that offer was also declined. It had, by that time, become apparent that Unilever was seeking about US$40m.

On December 1st, Mr. Vekselberg agreed personally to put forward up to US$40m., and a Cayman company called Project Egg Ltd. ("PEL," now "Fabergé Ltd.") was incorporated as a wholly-owned subsidiary of the master fund to acquire the rights. By December 15th, a purchase price of US$38m. had been agreed with Unilever and negotiations about completion were taking place. On December 20th, however, it became clear to the Gilbertsons that in return for his personal investment, Mr. Vekselberg required ownership of the Fabergé brand through the Lamesa group, which comprised his personal companies, on the basis that the management, control and economic benefits of the brand would be licensed to the master fund. The Gilbertsons ostensibly accepted Mr. Vekselberg's requirements for restructuring and, the next day, Sean Gilbertson emailed

Mr. Kalberer, the deputy chief legal officer of Renova Management AG ("Renova Management") a draft "implementation agreement" ("the first draft IA") relating to the implementation of Project Egg in accordance with them.

On December 22nd, the sale and purchase agreement ("SPA") was signed by Unilever and PEL on the basis that Mr. Vekselberg's structure would be pursued (although the precise terms of the restructuring had not been finally agreed). In the following days, Sean Gilbertson sent Mr. Kalberer further draft implementation agreements ("the second draft IA" and "the third draft IA"). The third draft IA provided, *inter alia*, that a Lamesa group company ("BrandCo") would, upon the transfer to it of the Fabergé brand in return for Lamesa Arts Inc. ("Lamesa") procuring payment of the purchase price to Unilever, grant PEL ("OpCo") a licence to use and exploit the Fabergé brand, which would be valid until the winding up of the master fund pursuant to the Pallinghurst agreements, at which time BrandCo could terminate the licence on 90 days' notice.

Over the previous two weeks, however, Mr. Gilbertson had been secretly setting up a consortium of investors consisting of himself, Dr. Jelinek, Mr. Mende and Mr. Kundrun, to purchase the rights without any involvement by Mr. Vekselberg, Lamesa or Renova. On January 1st, 2007, he decided to implement this plan and "then negotiate with [Mr. Vekselberg] from a position of strength"; he therefore proceeded to finalize the arrangements with his consortium, pursuant to which he would contribute 25% of the purchase price from his own money.

While Mr. Gilbertson was communicating with his consortium of investors, the Gilbertsons continued to communicate with Mr. Kalberer about the third draft IA and, on January 2nd, Mr. Kalberer provided a revision of the third draft IA ("the fourth draft IA"). This draft did not significantly change the provisions of the third draft IA—but it did insert a new cl. 2e which provided that BrandCo could terminate the licence on 60 days' notice without having to pay anything to OpCo if the master fund disposed of OpCo or if the master fund were wound up under the Pallinghurst agreements.

Also on January 2nd, Mr. Gilbertson contacted Mr. Thomas, a director of Fairbairn, to request his contribution to the purchase price (US$9.5m.) from one of his family trusts, the Brian Patrick Gilbertson Settlement ("the BPG Settlement"). Mr. Gilbertson reported that he had "bought [himself] a Christmas present" and requested "some money to pay for it," which Mr. Thomas readily approved. Mr. Gilbertson then sent an email to Mr. Vekselberg stating that there was little likelihood of reaching an agreement in respect of the implementation of Project Egg in time to meet the scheduled completion date of January 3rd and that, accordingly, he had "triggered alternative arrangements."

On January 3rd, the SPA was completed by payment of US$38m. by Mr. Mende's and Mr. Kundrun's company, K-M Investment Corporation. The same day, a loan to PEL from Autumn Holdings Asset Inc. ("Autumn") (a wholly-owned subsidiary of Fairbairn in its capacity as

trustee of the Gilbertson family trusts), K-M Investment Corporation and Dr. Jelinek, of US$38m., repayable on seven days' notice plus interest at about 7% compounded monthly, was approved. Additionally, 100 new shares in PEL were issued at par value to the lenders, *pro rata* to their contribution to the loan, so that the master fund's interest in PEL was reduced from 100% to just under 1%. In May, the interest rate on the loan was unilaterally increased by PEL to 25% per annum.

The subsequent negotiations between Mr. Gilbertson and Mr. Vekselberg concerning the rights were not successful and, on May 27th, Renova Holding gave written notice of termination of the letter agreement under cl. 8.2. The plaintiff then brought the present multiple derivative action on behalf of the company, as ultimate owner and controller of the master fund, for compensation for breach of fiduciary duty by Mr. Gilbertson and knowing receipt by Autumn. Mr. Gilbertson defended the claims on various grounds and counterclaimed against the plaintiff, Mr. Vekselberg, Mr. Kuznetsov and Renova Holding ("the Renova parties"). After a contested hearing, the Grand Court (Foster, Ag. J.) gave the plaintiff leave to continue the action pursuant to GCR, O.15, r.12A(2) (in proceedings reported at *2009 CILR 268*). At a further contested hearing, the Grand Court (Foster, J.) dismissed its application for summary judgment against the counterclaim (in proceedings reported at *2010 (1) CILR 344*).

*Breach of fiduciary duty*

The plaintiffs submitted that (i) as a *de jure* director of the company, Mr. Gilbertson owed fiduciary duties to act in its best interests, avoid a conflict of interest and not profit from his position (at least without the company's informed consent); (ii) the letter agreement did not vary those duties—it was not an agreement between the company's shareholders (being Fairbairn and the plaintiff, not Mr. Gilbertson and Renova Holding) and, in any event, its terms did not have that effect; (iii) there were no other agreements, expressed or implied, which qualified his fiduciary duties; and (iv) he breached those duties by covertly diverting away from the master fund, for his own benefit, the valuable economic benefit of developing, exploiting and managing the Fabergé brand.

The defendants submitted in reply that (i) as the company was of a joint venture character and its directors and shareholders were nominated by the partners in the joint venture, Mr. Gilbertson's duties should be derived from the joint venture agreement, *viz.* the letter agreement; (ii) its terms entitled him to act in his own interest in relation to investment projects, which he could veto; (iii) in any event, he could rely on the exoneration provisions of art. 131 of the company's articles or the indemnity rights in art. 132 to avoid liability; (iv) alternatively, the conduct of the plaintiff and those associated with it rendered it inequitable to allow its claim to succeed; and (v) in particular, the plaintiff's claims were of no commercial benefit to the Renova parties and were motivated solely by malice towards

Mr. Gilbertson, who was also illegitimately pressured into agreeing with Mr. Vekselberg's wishes.

*Quantum*

The plaintiff submitted that (i) owning the rights to use and exploit the brand equated in practical terms with owning the whole rights, including the title to the Fabergé brand outright; (ii) the amount of equitable compensation payable was therefore equivalent to the present value of Fabergé Ltd., whose sole asset was the whole rights; and (iii) this was calculated as US$177m., based on a market-based valuation method which extrapolated the company's value from a past transaction of its shares.

The defendants submitted in reply that (i) the current value of the whole rights (or Fabergé Ltd.) was no more than US$120m., based on the discounted cash flow ("DCF") valuation method, which used the present value of its anticipated future cash flows; (ii) the value to the master fund of the rights to use and exploit the brand would have been no more than half the value of the whole rights, *i.e.* US$60m.; (iii) in fact, Fabergé Ltd. was loss-making and significantly more had been invested in it than it was worth; and (iv) Mr. Gilbertson's actions therefore caused no loss to the master fund and no equitable compensation was required to put it into the financial position it would have otherwise been in.

*Knowing receipt*

The plaintiff submitted that (i) Autumn knowingly received property misapplied or procured to be misapplied by Mr. Gilbertson in breach of his fiduciary duties to the company; (ii) the property was the master fund's 100% ownership and control of PEL, which was effectively disposed of in favour of Autumn (and the other members of the consortium) by the issue of the new shares; (iii) Autumn was to be imputed with Mr. Gilbertson's actual knowledge on the basis that he was effectively Autumn's directing mind; (iv) in any event, Mr. Thomas knew or should have known that Mr. Gilbertson's proposed actions were likely to be a breach of his director's duties; (v) Autumn was not, therefore, a *bona fide* purchaser for value without notice—in any event, it did not pay for the shares and so was not even a purchaser; and (vi) accordingly, Autumn should be held to account as constructive trustee for the shares or their value and the profit it made on its loan to PEL.

The defendants submitted in reply that (i) the issue of shares did not amount to a disposal of the master fund's assets as the new shares were not PEL's property prior to their issue; (ii) it was not open to the court to treat Mr. Gilbertson as the directing mind of Autumn unless it was established that Mr. Thomas had failed in his duties, which was not the case; (iii) Autumn was not a mere volunteer—the share issue was part of a wider commercial transaction which included the loan to PEL as consideration; (iv) alternatively, either it paid for the new shares or it became a debtor in respect of them; and (v) in any event, Mr. Gilbertson was exonerated from liability for his breach by art. 131 of the company's

articles and Autumn could not, therefore, have any liability arising in this way.

*Counterclaims*

The defendants submitted that (i) Renova Holding was in repudiatory breach of the letter agreement by refusing to procure the funding unless Mr. Gilbertson agreed to its non-contractual re-structuring demands; (ii) Mr. Gilbertson was obliged to pursue Project Egg without reference to Renova to preserve the opportunity to acquire the rights and prevent PEL from incurring liability for failing to complete; (iii) accordingly, Renova Holding was liable to Mr. Gilbertson for damages for breach of contract to the same extent that he might be held liable to the company; (iv) Mr. Vekselberg and Mr. Kuznetsov were additionally liable for inducing or procuring Renova Holding's breach; and (v) the Renova parties were all further liable for conspiracy to commit unlawful acts against the master fund and hence Mr. Gilbertson.

The Renova parties submitted in reply that (i) the essential factual elements of the counterclaims were not put to their witnesses and could not therefore be made out—in particular, whether their purpose was to harm Mr. Gilbertson; and (ii) further, since the letter agreement was void by virtue of its mutual termination, there could be no claim for the tort of procurement of its breach.

**Held,** allowing the claims in part and dismissing the counterclaims:

### Breach of fiduciary duty

(1) Mr. Gilbertson owed fiduciary duties to the company in his capacity as director. Whether someone was a fiduciary depended on his acting for or on behalf of another in a particular matter in circumstances which gave rise to a relationship of trust and confidence. It was a general principle of law that a director of a limited company owed fiduciary duties to the company—principally being to act in its best interests, avoid a conflict of interest and not to profit from his position—subject to the particular circumstances of each case (paras. 11–13).

(2) Mr. Gilbertson could not therefore veto or withdraw consent to an investment project in order to pursue it for himself, without the company's fully informed and express consent. In principle, a director's fiduciary duties could be varied by the company's articles of association, a shareholders' agreement or by clear implication from the circumstances of the case. In the light of the commercial realities of the situation, the letter agreement was regarded as a shareholders' agreement—Fairbairn being effectively controlled by the first signatory, Mr. Gilbertson, and the plaintiff being a wholly-owned subsidiary of the second signatory, Renova Holding. The requirement for the unanimous consent of the investment committee to proceed with an investment project did not, however, weaken Mr. Gilbertson's fiduciary duties in respect of opportunities being explored. It would have been contrary to the parties' overall intent for him to have been able to veto a project in order to pursue it for himself, and

nothing less than the company's fully informed and express consent could have permitted such a course of action. Further, the mere fact that the company was of a joint venture character was not enough to infer that he was entitled to act in his own interests rather than the company's (para. 13; paras. 28–35).

(3) His duties were unaffected by Mr. Vekselberg's modifications to the project. It was clearly in the interests of the company, as part of the Pallinghurst structure, that the master fund should have the economic benefits of the Fabergé brand, albeit pursuant to a licence from one of Mr. Vekselberg's personal companies, as owner of the brand. Further, even if Mr. Gilbertson were entitled to refuse consent to the new structure, he could not, without the informed and express consent of the company, have taken the rights for himself; in the event, he consented to and actively pursued the new structure (paras. 43–45; para. 49; para. 57).

(4) He breached his fiduciary duties by taking the rights for his own benefit. He was clearly expecting significant profit from the acquisition, there being no other commercial justification for issuing the PEL shares gratuitously or agreeing an interest rate of 25% on the loans. Further, he had no legitimate reason not to seek to resolve the timing of completion with the Renova parties and Unilever and it was his duty as director to have done so. His breach was exacerbated by the fact that he diverted the rights from the master fund to himself covertly without any disclosure to the company until after the event and, even then, it was not full disclosure (paras. 53–57).

(5) The exoneration provisions and indemnity rights in arts. 131 and 132 of the company's articles did not provide a valid defence. The court had considered this argument in detail at the leave hearing and dismissed it, and there was no appeal against that ruling. As nothing had emerged since, whether in the process of discovery, the witness statements or the oral evidence at the trial, which could alter its analysis, the court would not depart from its previously stated position, particularly as Mr. Gilbertson's conduct fell below the objective standard of an ordinary honest director (paras. 62–63).

(6) The court would consider whether the plaintiff's conduct was inequitable so as to provide a defence to its claims. If a shareholder's behaviour would have rendered it unjust to allow a claim brought by the company at its instance to succeed, this could provide a valid defence. However, since the introduction of a requirement for leave to bring a derivative action, it would generally be preferable that such a question of *locus standi* be addressed at the leave stage and not at the trial if leave to proceed were granted. In the present proceedings, these considerations were in fact considered at the leave stage, but in the light of the new evidence available it was appropriate to re-open the issue (paras. 65–67).

(7) The plaintiff's conduct did not provide a valid defence. Whilst many plaintiffs would be motivated by what they considered to be the wrong

done to them by the defendant, it did not necessarily follow that their motives in bringing proceedings were inequitable so that their claims should be refused. In the present case, the plaintiff pleaded and put forward a perfectly arguable case on the merits of its claim, and the court would not infer that Mr. Vekselberg had procured the present proceedings to be brought solely out of malice towards Mr. Gilbertson. Further, Mr. Gilbertson was not pressured into agreeing with Mr. Vekselberg's wishes—he was an experienced and tough businessman, perfectly capable of refusing to do so had he wished. In any event, Mr. Vekselberg was not the plaintiff (even if the reality was that, as the principal owner and chairman of the Renova group, he had procured the plaintiff to bring these proceedings) (paras. 70–73).

**Quantum**

(8) The court considered the nature of a claim for equitable compensation. It was payable in respect of loss caused by breach of an equitable duty, *e.g.* a fiduciary duty, to put a plaintiff back into the position in which he would otherwise have been at the time of the trial. In the present case, the quantum of the award was therefore the monetary value of the loss to the Pallinghurst structure incurred as a result of the diversion from the master fund of the rights, and the current value of Fabergé Ltd. would be the starting point in assessing that loss. A claim for equitable compensation was alternative to and inconsistent with an account of profits and the plaintiff was therefore required to elect between them (paras. 114–115).

(9) Fabergé Ltd. would be valued at a maximum of US$120m. and possibly significantly less. Although its valuation was clearly a matter of opinion and not of certainty, the court would seek to determine its probable value in all the circumstances at the time. It rejected the plaintiff's market-based method of calculation as unrealistic—in the light of Fabergé Ltd.'s current financial difficulties, it was inappropriate to rely almost wholly upon a single small historic share transaction to determine its present value. The defendants' DCF method of valuation was more persuasive and would be adopted (para. 130; para. 133).

(10) No equitable compensation would be ordered. But for Mr. Gilbertson's breach, the master fund would probably only have had the economic benefit of developing and exploiting the Fabergé brand and its management, on the terms of the fourth draft IA or similar. It was unlikely that any potential purchaser would pay the same amount for a business, the principal income-producing asset of which did not actually belong to it and which had a limited life span, as it would pay for a business that owned the principal asset and did not have a limited period of potential profitability. The court therefore accepted that this would have been no more than half the value of the whole rights (or of Fabergé Ltd.), namely US$60m. Having regard to the US$140m. already invested and the fact that Fabergé Ltd. was currently a loss-making business which clearly required significant further investment, the master fund had in reality sustained no economic loss (paras. 140–150).

### Knowing receipt

(11) The court would hold Autumn liable to account as constructive trustee for knowing receipt. The plaintiff had to establish (i) a disposal of the master fund's assets in breach of fiduciary duty; (ii) the beneficial receipt by the defendant of traceable assets; and (iii) knowledge on the defendant's part that the assets received were traceable to a breach of fiduciary duty (para. 75; para. 92).

(12) Autumn held the new shares in PEL and the profit on the loans as a constructive trustee for the company. Knowing receipt was a flexible concept and the requirement for a disposal of assets was not necessarily limited to pre-existing tangible items of property, already legally and beneficially owned by the plaintiff—the court should look at the particular circumstances concerned in order to achieve a fair and equitable result. In the present case, the issue of the new PEL shares had the effect of reducing the master fund's ownership and control of PEL from 100% to just under 1% and should therefore be treated as the disposal of the master fund's assets (and, derivatively, the company's) in the sense required. Similarly, the profit on the loans was derived from the funding of the acquisition of the rights, which were diverted away from the company, and it was therefore traceable to a disposal of the master fund's assets (para. 76).

(13) The share issue also constituted the beneficial receipt of assets traceable to Mr. Gilbertson's breach of fiduciary duty. The court found that the new shares were issued on the same day as the purchase of the rights which constituted the breach; however, even accepting the premise that the shares had been issued some two weeks later, that would have been sufficiently related to the purchase that in the circumstances the assets should be considered traceable to the breach. Alternatively, Mr. Gilbertson's procurement of the issue of the new shares, even if not effective until some two weeks later, was not disclosed and was unknown to the Renova parties and this was arguably a perpetuation of his breach (paras. 76–77).

(14) Autumn had the requisite degree of knowledge. There were two ways in which it could be treated as having had knowledge of the breach: first, by imputation to it of Mr. Gilbertson's actual knowledge and, secondly, through what Mr. Thomas knew or should have known had he made appropriate independent enquiries. The court held that Mr. Gilbertson was effectively the controlling mind of Autumn and on this basis imputed his actual knowledge to it. Moreover, Mr. Thomas knew that Mr. Gilbertson was a director of the company and did or should have realized that he was likely to be in breach of his director's duties—he should not therefore have approved the payment without making further enquiries (para. 80; paras. 85–91).

(15) Autumn could not raise a defence of *bona fide* purchaser for value without notice. It had received the shares as a mere volunteer—it did not

pay for them and there was no evidence that any demand for payment had been or would be made. Further, the shares were not received as part of a wider commercial transaction which included the loan as consideration. It was consistent with the issue of the shares being gratuitous that, even after the loan was repaid with interest, Autumn and the other investors retained the shares (paras. 92–95).

(16) Moreover, art. 131 of the company's articles did not provide a valid defence. Autumn was not a party to the articles and clearly could neither enforce them directly nor benefit from them indirectly. In the light of the finding that Mr. Gilbertson was not protected by art. 131, then *a fortiori* neither was Autumn. In any event, even if Mr. Gilbertson had been exonerated by art. 131, Autumn's liability would not have been affected as (i) the claim was to account for assets as a constructive trustee, which was outside the scope of art. 131; and (ii) the article operated as an undertaking to Mr. Gilbertson alone that he would be excused liability, and did not excuse third parties from claims based on the consequences of his breach (paras. 97–99).

### Counterclaims

(17) The court would not allow the counterclaims against the Renova parties. The defendants had accepted that it was open to Renova Holding to approve a particular project only if it was held in a different structure, a concession which was inconsistent with their case that Renova Holding was in repudiatory breach of the letter agreement by insisting on the restructuring. In any event, Mr. Gilbertson did not accept any purported repudiation and accordingly the letter agreement remained in force until its termination by mutual consent, at which point it was as if it had never been entered into, thereby nullifying any accrued claims relating to its breach. Further, the essential factual elements of the counterclaims had not been put to the Renova parties' witnesses; in particular, it had not been put to either Mr. Vekselberg or Mr. Kuznetsov that their purpose, whether predominant or otherwise, was to harm the master fund and thereby Mr. Gilbertson, and the evidence did not support that contention. In respect of the conspiracy counterclaim, Mr. Gilbertson did not even have standing to sue—the defendants' plea was that the master fund was the target of the intended injury and Mr. Gilbertson's indirect economic interest in it was not enough to give him a cause of action (paras. 104–113).

### Cases cited:

(1) *Armitage v. Nurse*, [1998] Ch. 241; [1997] 3 W.L.R. 1046; [1997] 2 All E.R. 705; [1997] Pens. L.R. 51; (1997), 74 P. & C.R. D13, referred to.

(2) *Bhullar v. Bhullar*, [2003] 2 BCLC 241; [2003] EWCA Civ 424; *sub nom. Re Bhullar Bros. Ltd.*, [2003] BCC 711, *dicta* of Jonathan Parker, L.J. considered.

(3) *Boardman v. Phipps*, [1967] 2 A.C. 46; [1966] 3 All E.R. 721, *dicta* of Lord Upjohn considered.

(4) *Bristol & W. Bldg. Socy. v. Mothew*, [1998] Ch. 1; [1997] 2 W.L.R. 436; [1996] 4 All E.R. 698, *dicta* of Millett, L.J. considered.

(5) *Bristol Fund Ltd., In re*, 2008 CILR 317, referred to.

(6) *Diplock, In re*, [1947] Ch. 716; [1947] 1 All E.R. 522, referred to.

(7) *El Ajou v. Dollar Land Holdings PLC*, [1994] 2 All E.R. 685; [1994] 1 BCLC 464; [1994] BCC 143; [1993] N.P.C. 165, *dicta* of Hoffmann, L.J. applied.

(8) *Furs Ltd. v. Tomkies* (1936), 54 CLR 583; 9 ALJ 419; [1936] HCA 3, referred to.

(9) *Gwembe Valley Dev. Co. Ltd. v. Koshy*, [2004] 1 BCLC 131; [2003] EWCA Civ 1048, *dicta* of Mummery, L.J. considered.

(10) *Halton Intl. Inc. (Holdings) SARL v. Guernroy Ltd.*, [2006] 1 BCLC 78; [2005] EWHC 1968 (Ch), *dicta* of Patten, J. considered.

(11) *Hospital Prods. Ltd. v. United States Surgical Corp.* (1984), 156 CLR 41; 58 ALJR 587; 55 ALR 417; [1984] HCA 64, referred to.

(12) *Japan Abrasive Materials Pty. Ltd. v. Australian Fused Materials Pty. Ltd.*, [1998] WASC 60, considered.

(13) *Lee (Joe) Ltd. v. Lord Dalmeny*, [1927] 1 Ch. 300, referred to.

(14) *Neath Rugby Ltd., Re*, [2009] 2 BCLC 427; [2010] BCC 597; [2009] EWCA Civ 291, considered.

(15) *New Zealand Netherlands Socy. "Oranje" Inc. v. Kuys*, [1973] 1 W.L.R. 1126; [1973] 2 All E.R. 1222, *dicta* of Lord Wilberforce considered.

(16) *Nurcombe v. Nurcombe*, [1985] 1 W.L.R. 370; [1985] 1 All E.R. 65; [1984] BCLC 557; (1984), 1 BCC 99269, considered.

(17) *Pilmer v. Duke Group Ltd.*, [2001] 2 BCLC 773; [2001] 5 LRC 417, considered.

(18) *Regal (Hastings) Ltd. v. Gulliver*, [1967] 2 A.C. 134; [1942] 1 All E.R. 378, referred to.

(19) *Towers v. Africa Tug Co.*, [1904] 1 Ch. 558, referred to.

(20) *Waddington Ltd. v. Chan Chun Hoo*, [2008] HKEC 1498, referred to.

*R. Millett, Q.C.*, *J. Eldridge* and *M. Kish* for the plaintiff;

*M. Bloch, Q.C.* and *D. Butler* for the first and fifth defendants.

1. **FOSTER, J.:**

[The learned judge set out the factual background as summarized in the headnote and continued:]

**Fiduciary duty**

2. The relevant law on fiduciaries and their duties was not greatly disputed by leading counsel for the parties, although, of course, they strongly disagreed over whether Mr. Gilbertson was, in the circumstances, a fiduciary in relation to the company and had the duties to the company

in respect of Project Egg and the rights which the plaintiff contended he did.

3. With regard to the general principles, I was referred to various cases, but a helpful guide is to be found in *Bristol & W. Bldg. Socy.* v. *Mothew* (4), a decision of the English Court of Appeal. In that case, Millett, L.J. set out a statement of fiduciary duties and what the characteristics of a fiduciary are. He said ([1998] Ch. at 18):

"A fiduciary is someone who has undertaken to act for or on behalf of another in a particular matter in circumstances which give rise to a relationship of trust and confidence. The distinguishing obligation of a fiduciary is the obligation of loyalty. The principal is entitled to the single-minded loyalty of his fiduciary. This core liability has several facets. A fiduciary must act in good faith; he must not make a profit out of his trust; he must not place himself in a position where his duty and his interest may conflict; he may not act for his own benefit or the benefit of a third person without the informed consent of his principal. This is not intended to be an exhaustive list, but it is sufficient to indicate the nature of fiduciary obligations. They are the defining characteristics of the fiduciary. As Dr. Finn pointed out in his classic work *Fiduciary Obligations* (1977), p. 2, he is not subject to fiduciary obligations because he is a fiduciary; it is because he is subject to them that he is a fiduciary."

4. I note that Millett, L.J. also said (*ibid.*):

"The nature of the obligation determines the nature of the breach. The various obligations of a fiduciary merely reflect different aspects of his core duties of loyalty and fidelity. Breach of fiduciary obligation, therefore, connotes disloyalty or infidelity."

5. I was also referred to *Bhullar* v. *Bhullar* (2), again in the Court of Appeal in England. In his judgment, Jonathan Parker, L.J. said ([2003] 2 BCLC 241, at paras. 27–28):

"I agree with Mr. Berragan that the concept of a conflict between fiduciary duty and personal interest presupposes an existing fiduciary duty. But it does not follow that it is a prerequisite of the accountability of a fiduciary that there should have been some improper dealing with property 'belonging' to the party to whom the fiduciary duty is owed, that is to say with trust property. The relevant rule, which Lord Cranworth, L.C. in *Aberdeen Rly. Co.* v. *Blaikie Bros.* (1854), 1 Macq. 461 at 47l. described as being 'of universal appli    cation,' and which Lord Herschell in *Bray* v. *Ford* . . . [1896] A.C. 44 at 51, described as 'inflexible,' is that (to use Lord Cranworth's formulation) no fiduciary—

'shall be allowed to enter into engagements in which he has, or can have, a personal interest conflicting, or which may possibly conflict, with the interests of those whom he is bound to protect.'

In a case such as the present, where a fiduciary has exploited a commercial opportunity for his own benefit, the relevant question, in my judgment, is not whether the party to whom the duty is owed (the company, in the instant case) had some kind of beneficial interest in the opportunity: in my judgment that would be too formalistic and restrictive an approach. Rather, the question is simply whether the fiduciary's exploitation of the opportunity is such as to attract the application of the rule. As Lord Upjohn made clear in *Boardman* v. *Phipps* [1966] 3 All E.R. 721 at 756 . . . flexibility of application is of the essence of the rule. Thus, he said:

'Rules of equity have to be applied to such a great diversity of circumstances that they can be stated only in the most general terms and applied with particular attention to the exact circumstances of each case.'

Later in his speech Lord Upjohn gave this warning against attempting to reformulate the rule by reference to the facts of particular cases . . .

'The whole of the law is laid down in the fundamental principle exemplified in Lord Cranworth's statement [in *Aberdeen Ry. Co.* v. *Blaikie Bros.*] . . . But it is applicable, like so many equitable principles which may affect a conscience, however innocent, to such a diversity of different cases that the observations of judges and even in your lordships' House in cases where this great principle is being applied must be regarded as applicable only to the particular facts of the particular case in question and not regarded as a new and slightly different formulation of the legal principle so well settled.'"

6. Then Jonathan Parker, L.J. referred (*ibid.*, at para. 31) to the opinion of Lord Wilberforce in the Privy Council decision in *New Zealand Netherlands Socy. "Oranje" Inc.* v. *Kuys* (15), where he said ([1973] 2 All E.R. at 1225):

"The obligation not to profit from a position of trust, or, as it is sometimes relevant to put it, not to allow a conflict to arise between duty and interest, is one of strictness. The strength, and indeed the severity, of the rule has recently been emphasised by the House of Lords (*Boardman* v. *Phipps*). It retains its vigour in all jurisdictions where the principles of equity are applied. Naturally it has different applications in different contexts. It applies, in principle, whether the

case is one of a trust, express or implied, of partnership, of directorship of a limited company, of principal and agent, or master and servant, but the precise scope of it must be moulded according to the nature of the relationship."

7. Finally, Jonathan Parker, L.J. said ([2003] 2 BCLC 241, at para. 36):

"In so far as reference to authority is of assistance in applying the rule to the facts of any particular case, the authority which (of those cited to us) is nearest on its facts to those of the instant case is the decision of Roskill, J. in *Industrial Development Consultants Ltd.* v. *Cooley* [1972] 2 All E.R. 162 ... In that case, a commercial opportunity was offered to the defendant, who was at the time the managing director of the plaintiff company, in his private capacity. The defendant subsequently obtained his release by the company in order to exploit that opportunity for his own benefit. Had the company known that he had been offered that opportunity, it would not have agreed to release him. He was held accountable for the benefits he had received by exploiting the opportunity. The opportunity was not one which the company could itself have exploited."

8. The plaintiff particularly relied on *Gwembe Valley Dev. Co. Ltd.* v. *Koshy* (9), which is also a decision of the English Court of Appeal. It concerned self-dealing, fair dealing and secret profits. Mummery, L.J., under the heading "the no profit rule," said ([2004] 1 BCLC 131, at paras. 44–45):

"The relevant principle was forcefully expressed and elegantly explained in the joint judgment of Rich, Dixon and Evatt, JJ. in the High Court of Australia in *Furs Ltd.* v. *Tomkies* (1936), 54 CLR 583 at 592 as:

'... the inflexible rule that, except under the authority of a provision in the articles of association, no director shall obtain for himself a profit by means of a transaction in which he is concerned on behalf of the company unless all the material facts are disclosed to the shareholders and by resolution a general meeting approves of his doing so or all the shareholders acquiesce. An undisclosed profit which a director so derives from the execution of his fiduciary duties belongs in equity to the company. It is no answer to the application of the rule that the profit is of a kind which the company itself could not have obtained, or that no loss is caused to the company by the gain of the director. It is a principle resting upon the impossibility of allowing the conflict of duty and interest which is involved in the pursuit of private advantage in the course of dealing in a fiduciary capacity with the affairs of the company. If, when it is his duty to safeguard and further the interests of the company,

he uses the occasion as a means of profit to himself, he raises an opposition between the duty he has undertaken and his own self interest, beyond which it is neither wise nor practicable for the law to look for a criterion of liability. The consequences of such a conflict are not discoverable. Both justice and policy are against their investigation.'

That is the same equitable doctrine of accountability for unauthorised profits as was applied by the House of Lords in *Regal (Hastings) Ltd.* v. *Gulliver* [1942] 1 All E.R. 378 .. to the directors of a company, who, while not express trustees of the property of the company, occupy a fiduciary position towards the company, but, in conflict with that overriding duty, use their powers as directors to make an unauthorised profit for themselves. As Lord Russell of Killowen said ([1942] 1 All E.R. 378 at 386 . . .):

'The rule of equity which insists on those, who by use of a fiduciary position make a profit, being liable to account for that profit, in no way depends on fraud, or absence of *bona fides*; or upon such questions or considerations as whether the profit would or should otherwise have gone to the plaintiff, or whether the profiteer was under a duty to obtain the source of the profit for the plaintiff, or whether he took a risk or acted as he did for the benefit of the plaintiff, or whether the plaintiff has in fact been damaged or benefited by his action. The liability arises from the mere fact of a profit having, in the stated circumstances, been made. The profiteer, however honest and well-intentioned, cannot escape the risk of being called upon to account.'"

9. In the same decision, Mummery, L.J. went on to say (*ibid.*, at paras. 55–56):

"Mr. Koshy's second ground of appeal under this head also emphasised the special joint venture character of GVDC [that was the company]. It was submitted that none of the members of the board of GVDC would expect other members of the board to disclose their principal's profits from transactions with GVDC. The board was made up of representatives of the investors. They would protect the interests of the shareholders who appointed them, rather than the interests of the shareholders generally. It was not intended to be an independent board. The directors did not owe fiduciary obligations to GVDC in respect of transactions between the principals they represented and GVDC. In particular, it was argued that the directors of GVDC were well aware that Mr. Koshy had a conflict of interest and was making a personal profit. It was to be implied from all the

circumstances that the fiduciary's duty of disclosure of interests in relation to transactions with the company was excluded.

This argument should be rejected. It has no valid factual or legal basis. The articles constituted an express contract between the members of GVDC. The articles contained express provisions for the relaxation of the strict duties of the directors in equity. There was no evidence of any other express agreement modifying the fiduciary duties owed to GVDC by its directors. It is not possible to imply from the surrounding circumstances any additional or different agreement modifying the scope of the fiduciary duties owed by the directors to GVDC as a joint venture company. *Kelly* v. *Cooper* [1994] 1 BCLC 395 at 400–401 . . . which was cited by Mr. Page, was a different case. The court there was able to imply into an express contract of agency a term entitling an estate agent to act for numerous other competing principals selling similar properties and to keep confidential information received from each principal. It was known to the principal that the estate agent would be so acting in the course of its business. The effect of the implied term was to modify the normally strict fiduciary duties owed by an agent to the principal not to put himself into a position where his duty and interest conflicted, not to profit from his position (for example, by earning commissions from selling properties for rival principals) and to make disclosure of confidential information to the principal."

10. I was also referred by leading counsel for the plaintiff in his oral submissions to the decision of Patten, J. in *Halton Intl. Inc. (Holdings) SARL* v. *Guernroy Ltd.* (10). That case concerned whether a contractual voting agreement gave rise to fiduciary duties. The judge referred to the judgment of Millett, L.J. in *Bristol & W. Bldg. Socy.* v. *Mothew* (4), and then he said ([2006] 1 BCLC 78, at paras. 147–148):

"Although I have rejected the case of deliberate disloyalty on the facts, the allegation of breach of fiduciary duty based on an undisclosed profit remains. It is therefore necessary to begin by considering the first and most fundamental point which is whether the voting agreement gave rise to any of the fiduciary duties alleged.

The claimants' approach to this question is to stress what they say are the essential features of the arrangements contained in the voting agreement: *i.e.* the grant to Guernroy of the voting rights belonging to the granting shareholders and the trust and confidence placed in Guernroy that the powers would be exercised in 'their best interests.' A critical and usually determinative feature of any fiduciary relationship is the agreement of the fiduciary to act in the interests of the principal in the exercise of the power which is granted or in relation to the principal's property or business affairs. But absent express

agreement to operate on these terms, it is always necessary to examine the terms of the contract between the parties in order to discover whether the powers [conferred] on the agent are circumscribed in this way. In a later passage in his judgment in the *Hospital Products* case, Mason, J. explains the issue in these terms:

'But entitlement to act in one's own interests is not an answer to the existence of a fiduciary relationship, if there be an obligation to act in the interests of another. It is that obligation which is the foundation of the fiduciary relationship, even if it be subject to qualifications including the qualification that in some respects the fiduciary is entitled to act by reference to his own interests. The fiduciary duty must then accommodate itself to the relationship between the parties created by their contractual arrangements. And entitlement under the contract to act in a relevant matter solely by reference to one's own interests will constitute an answer to an alleged breach of the fiduciary duty. The difficulty of deciding under the contract when the fiduciary is entitled to act in his own interests is not in itself a reason for rejecting the existence of a fiduciary relationship, though it may be an element in arriving at the conclusion that the person asserting the relationship has not established that there is any obligation to act in the interests of another.'"

11. The cases make it clear, and leading counsel for the parties did not disagree, that whether or not someone is a fiduciary depends on whether he is acting for or on behalf of another "in a particular matter in circumstances which give rise to a relationship of trust and confidence": see *Bristol & W. Bldg. Socy.* v. *Mothew* ([1998] Ch. at 18); see also *Boardman* v. *Phipps* (3), *per* Lord Upjohn, as cited in *Bhullar* v. *Bhullar* (2). The first question therefore is whether, in the particular circumstances of this case, Mr. Gilbertson was in a relationship of trust and confidence with the company, with the core obligation of loyalty to the company and the consequent fiduciary duties as outlined by Lord Millett in the *Bristol & W. Bldg. Socy.* case. In other words, was there an obligation on Mr. Gilbertson to act in the interests of the company in the circumstances? (see *Hospital Prods. Ltd.* v. *United States Surgical Corp.* (11), cited in the *Halton Intl. Inc.* case (10)). If Mr. Gilbertson was subject to such obligations to the company, he was a fiduciary: see the reference to Dr. Finn's *Fiduciary Obligations*, at 2 (1977), referred to in *Bristol & W. Bldg. Socy.*

**Did Mr. Gilbertson owe fiduciary duties to the company?**

12. The plaintiff's case was that, as a director of the company, Mr. Gilbertson owed fiduciary duties to the company as a matter of established law on the duties of directors. In the *New Zealand Netherlands Socy.* case

(15), referred to by Jonathan Parker, L.J. in the *Bhullar* case, Lord Wilberforce said ([1973] 1 W.L.R. at 1129–1130) that the obligation not to profit from a position of trust applies in principle "whether the case is one of a trust, express or implied, of partnership, *of directorship of a limited company* . . ." [Emphasis supplied.] Also, in the *Gwembe Valley Dev.* case (9), Mummery, L.J. cited *Regal (Hastings) Ltd.* v. *Gulliver* (18) and referred ([2004] 1 BCLC 131, at para. 45) "to the directors of a company, who . . . occupy a fiduciary position towards the company . . ." It is a well-established principle of law that a director of a limited company owes fiduciary duties to the company of which he is a director, those duties principally being to act in the best interests of the company and the consequent duties referred to in the cases cited above, such as the duty to avoid a conflict of interest between his own interest and that of the company, not to make a profit for himself from his position as a director (at least without the informed consent of the company) and so on. Leading counsel for the plaintiff argued that Mr. Gilbertson owed these fiduciary duties to the company as a *de jure* director.

13. However, it is also established that by provision in a company's articles of association or by agreement of the shareholders or by clear implication from the particular circumstances of the case, the obligations of a director to the company may be modified so as, for example, to enable the director to act in his own interests or the interests of another in relation to a particular matter, which may not necessarily be the same as the company's interests in relation to the particular matter. In the *Gwembe Valley Dev.* case, Mummery, L.J. cited the judgment in the Australian *Furs Ltd.* v. *Tomkies* (8) case, which referred (54 CLR at 592) to "the inflexible rule that, *except under the authority of a provision in the articles of association*, no director shall obtain for himself a profit . . ." [Emphasis supplied.]

14. Leading counsel for the Gilbertson parties relied upon a case from the Western Australian Supreme Court: *Japan Abrasive Materials Pty. Ltd.* v. *Australian Fused Materials Pty. Ltd.* (12). That was a case concerning a joint venture in the mining industry in which there was a shareholders' agreement. The judge said, in referring to the shareholders' agreement, to which the company concerned was itself a party: "It is provided by cl. 4.1 that the Board shall consist of six members. Clause 4.2 provides that each shareholder shall nominate two natural persons to be directors of the Company .. ." Then, after pointing out that notice of board meetings and of the detailed agenda was to be given to the shareholders as well as the directors, the judge referred to cl. 4.7 and said:

"Pursuant to cl. 4.7, the directors nominated by each of the shareholders who are present at Board meetings in person or by their alternates, are to have between them the same total number of votes

as that shareholder would have at a general meeting of the Company... The clause continues:

'It is the intention of the parties that wherever possible the directors will use their best endeavours to achieve a consensus which is in the best interests of the Company.'

Clause 4.10 provides that:

'Notwithstanding anything in this Agreement, a resolution of the Board or of a general meeting of the Company in respect of any of the following matters, shall require a unanimous vote . . .'"

And then the shareholders' agreement set out a list of ten matters which required unanimity, such as disposal of the whole or any of the major assets of the company; granting of a charge over the company's assets; winding up the company; diversification into activities other than production and sales of minerals and associated activities; making loans *etc.*

15. The judge went on:

"Considering the Shareholders Agreement as a whole, it appears to be in the nature of a joint venture agreement: the Company being the vehicle by which the joint venture is to be carried into effect.

Equality as between the joint venturers is achieved by the equal shareholdings in the Company through the plaintiff and the second and third defendants: and by the provisions which entitle each of them to nominate two members of the Board.

The provisions which require notice of Board meetings to be given to shareholders and directors well in advance of the meetings, appear to have been intended to ensure that the joint venturers have ample time in which to consider proposed business and to inform the nominee directors of their respective wishes.

It is therefore immaterial whether the business of the Company is conducted by the Board or by the shareholders in general meeting: ultimately, the decisions are taken by the joint venturers.

This, I think, explains cl. 4.10, which requires the unanimous approval either of the shareholders or of the directors in relation to various matters having the potential to effect substantial changes to the relationship between the joint venturers or to their financial obligations. In a commercial context, it is only to be expected that such matters would require unanimous approval: and that in relation to them, joint venturers who had established a corporate entity to carry the joint venture into effect would be free to vote as shareholders entirely in accordance with their own interests."

16. The judge pointed out that it is well settled that shareholders voting at a general meeting do not exercise any power of fiduciary character and he then said:

"By providing that resolutions relating to the cl. 4.10 matters shall require a unanimous vote, whether at a general meeting or a Board meeting, cl. 4.10 equates shareholders and directors. It follows, I think, that cl. 4.10 permits the directors to vote in accordance with the wishes of the joint venturers who have appointed them, so that the same result is achieved as if the joint venturers had voted as shareholders at a general meeting."

17. The *Japan Abrasive Materials* case (12) was mentioned in passing as one of several Australian cases referred to by the judge below by the English Court of Appeal in *Re Neath Rugby Ltd.* (14), but it was not analysed. The *Neath Rugby Ltd.* case was an appeal relating to an unfair prejudice winding up on the just and equitable ground. However, the court also considered the duties of a director of another rugby club, Ospreys, who had been nominated by Neath Rugby Club ("Neath") as part of a joint venture between two individuals to take over the two rugby clubs, Neath and Ospreys, and to divide the management of the clubs between them. Leave to appeal his decision was given by the judge at first instance (Lewison, J.) on two issues, the first of which was: what duty does a nominee director of a company (Ospreys) owe to (a) the company; and (b) to his appointor (Neath)?

18. In the course of the judgment of the Court of Appeal, Stanley Burnton, L.J. said ([2009] 2 BCLC 427, at paras. 32–33):

"In my judgment, the fact that a director of a company has been nominated to that office by a shareholder does not, of itself, impose any duty on the director owed to his nominator. The director may owe duties to his nominator if he is an employee or officer of the nominator, or by reason of a formal or informal agreement with his nominator, but such duties do not arise out of his nomination, but out of a separate agreement or office. *Such duties cannot however, detract from his duty to the company of which he is a director when he is acting as such* . . .

As the Australian cases to which the judge referred indicate, an appointed director, *without being in breach of his duties to the company, may take the interests of his nominator into account, provided that his decisions as a director are in what he genuinely considers to be the best interests of the company*; but that is a very different thing from his being under a duty to his nominator by reason of his appointment by it." [Emphasis supplied.]

19. The Gilbertson parties' submission was that the *Japan Abrasive Materials* case (12) is an example of the proposition that in appropriate circumstances it is possible to vary or dispense entirely with a director's fiduciary duties to the company of which he is a director and, for example, entitle him to act in his own interest, or the interest of a third party in relation to a particular matter or matters, rather than the interest of the company. The Gilbertson parties contend that in the present case the letter agreement was such an agreement and that its terms were such as to entitle Mr. Gilbertson to act in his own interest in relation to an investment project which required his consent to pursue or which, put another way, he was entitled to veto, and not necessarily in the interest of the company.

20. It is made very clear in the cases that, as Lord Upjohn said in the *Boardman* v. *Phipps* case (3) ([1967] 2 A.C. at 123), the relevant rules "can be stated only in the most general terms and applied with particular attention to the exact circumstances of each case." He reiterated later in his judgment that the principle that no fiduciary may have a personal interest conflicting with the interest of his principal is applicable only to the particular facts of the particular case in question. While the *Japan Abrasive Materials* case may be an example of a particular shareholders' agreement which was interpreted by the judge as enabling each director nominated by a shareholder to vote according to the instructions of the nominating shareholder in its own interests, the judge's conclusions are clearly based on the precise wording of the shareholders' agreement and the particular surrounding circumstance of that case. The terms of the shareholders' agreement in that case were entirely different from the terms of the letter agreement and the surrounding circumstances entirely different from those in the instant case.

21. Although the facts and circumstances of the *Japan Abrasive Materials* case (12) are obviously distinguishable from the present case, I did not understand leading counsel for the plaintiff to dispute the principle that in certain circumstances, whether by the articles of association or an appropriate shareholders' agreement or otherwise, it is possible to modify or vary a director's fiduciary duties to the company so as to entitle him to act in his own interest, rather than the company's interest, in relation to a particular matter. However, the plaintiff's position was that the letter agreement was not a shareholders' agreement, that its terms did not have that effect anyway and that it was simply background as far as Mr. Gilbertson's fiduciary duties to the company were concerned. The plaintiff's case was that the source of Mr. Gilbertson's fiduciary duties was the *de jure* role that he occupied as a director of the company. The only question then was whether there was anything in the arrangements, expressed or implied, which operated to qualify or limit those fiduciary duties, which, leading counsel for the plaintiff contended, there was not.

22. In any event, he argued, even if Mr. Gilbertson was entitled somehow to act in his own interests, then, on the principle outlined by Mason, J. in the *Hospital Prods.* case (11), cited by Patten, J. in the *Halton Intl. Inc.* case (10), that was not an answer to the existence of a fiduciary relationship, as long as there was an obligation of loyalty towards, and a duty to act in the interests of, the company. The plaintiff contended that there was such an obligation of loyalty on Mr. Gilbertson as a director and a duty to act in the interests of the company and, through the company, the master fund. That, it was argued, was the foundation of the fiduciary relationship in the present case, even if it could have been qualified, although in the present case it was not.

23. On the other hand, the case for the Gilbertson parties was that careful consideration of the nature of the company's business and of the provisions of the letter agreement demonstrated that Mr. Gilbertson did not owe the company any fiduciary duties with regard to investment projects which he was free to withhold his consent to or veto in his capacity as a member of the investment committee. Project Egg, they said, fell into that category. Mr. Gilbertson was, they contended, entitled in the circumstances to act as a director of the company in his own interests.

24. The Gilbertson parties argued that the Pallinghurst structure, including the company, was established pursuant to the letter agreement. They said that the letter agreement reflected a joint venture between Mr. Gilbertson and Renova Holding, although the principles were agreed between Mr. Gilbertson and Mr. Vekselberg, who owns and controls the Renova group. They submitted that the company was of a joint venture character and that the directors, Mr. Gilbertson and Mr. Kuznetsov, were in effect nominated by the partners of the joint venture as defined in the letter agreement, namely Renova, through Renova Holding, and Mr. Gilbertson. Similarly, the shareholders were so nominated by the partners in the joint venture. In Mr. Gilbertson's case, he nominated Fairbairn as trustee of the Gilbertson Family Trusts and Renova Holding nominated Renova Resources. They say that, accordingly, any duties Mr. Gilbertson owed as a director of the company are to be derived from the letter agreement, which reflects the joint venture and is the source of the agreement between the joint venturers and the surrounding circumstances.

25. As I have said, the Gilbertson parties' principal submissions are based upon the terms of the letter agreement. They rely in particular upon the provision in cl. 2.5 of the letter agreement that "approval to proceed with an investment project *via* the investment fund at an agreed value, shall require the unanimous consent of the investment committee." They say that that provision relates to the rights of the investment committee, of which Mr. Gilbertson and Mr. Kuznetsov were the two members. It provided each of them with a right effectively to veto proceeding with any

investment project. That right, they say, may be exercised by either of them in their own interest, without regard to the interests of the master fund and the company. Accordingly, they contend that it follows that Mr. Gilbertson had no duty to act in the best interests of the company, as opposed to his own personal interest, with respect to any investment project. The letter agreement, they say, constituted the agreement between the partners of the joint venture which, *inter alia*, governed Mr. Gilbertson's rights and obligations with regard to investment opportunities and accordingly governed Mr. Gilbertson's relationship with the company to be. If he was clearly entitled to act in his own interest in relation to investment projects, he clearly had no duty to act in the interests of the company in relation to such investment projects.

26. The plaintiff disputes this analysis in several respects. It was argued that not only do the articles of the company not attenuate the fiduciary duties owed by the company's directors as a matter of law, but that there is also no agreement between the shareholders of the company providing that the directors' *de jure* fiduciary duties should be moderated, reduced or dispensed with, notwithstanding the joint venture nature of the company's business. It was submitted that the letter agreement was clearly not akin to a shareholders' agreement of the kind in the *Japan Abrasive Materials* case (12) and it may not be treated as such. It was emphasized that the letter agreement was not an agreement between the shareholders of the company. It was an agreement between Mr. Gilbertson personally and Renova Holding, neither of whom were shareholders of the company. It was emphasized that there was no evidence that Mr. Gilbertson sought the approval of Fairbairn as trustee of the Gilbertson Family Trusts, which was one of the two shareholders, to enter into the letter agreement or, for that matter, that he even sought Fairbairn's approval to be nominated by him as a shareholder. Mr. Gilbertson did not act as Fairbairn's agent or nominee in entering into the letter agreement, even if Fairbairn may have known about it, which was not clear. It was submitted that the rules of privity of contract applied and that the separate identities of the signatories to a contract governed by English law, as the letter agreement was, cannot simply be ignored.

27. On the other hand, in the context of its claim against Autumn, to which I shall refer later in this judgment, the plaintiff contended that Autumn, which was wholly owned by Fairbairn, was in practice controlled by Mr. Gilbertson. This contention was based mainly on the evidence of Mr. Gilbertson's comments and actions in relation to Fairbairn as trustee of the Gilbertson Family Trust at a time before Autumn was acquired by Fairbairn (albeit it was accepted by the Gilbertson parties for purposes of the plaintiff's claim against Autumn that such evidence could be treated as applicable also to Autumn). In light of that evidence and the plaintiff's contentions it seems to me that, in considering the plaintiff's argument

based on privity, the distinction which the plaintiff seeks to draw between Mr. Gilbertson on the one hand and Fairbairn on the other is somewhat inconsistent with its submissions in relation to Mr. Gilbertson's control of Autumn. Also, although the other shareholder of the company was the plaintiff and not Renova Holding, the fact is that the plaintiff is a 100%-owned subsidiary of Renova Holding and both are members of the Renova group, as is Renova Management which nominated Mr. Kuznetsov as a director to represent the interests of the Renova group generally.

28. In my opinion, the arguments regarding privity are somewhat artificial in light of the commercial realities of the situation. Nonetheless, the circumstances in relation to the directors and the shareholders of the company were clearly not as straightforward as they were in the *Japan Abrasive Materials* case (12). At the time when the letter agreement was entered into, the company did not even exist. Indeed, the Pallinghurst structure, of which the company was to become part, had not even been devised. Accordingly, the letter agreement did not contain any provisions in relation to the company, or its shareholders' or directors' rights or any terms of the kind contained in the shareholders' agreement in the *Japan Abrasive Materials* case. Furthermore, it is clear from the comments of Mummery, L.J. in the *Gwembe Valley Development* case (9) that the mere fact that a company is of a joint venture character is not enough to justify an implication that the directors' fiduciary duties are modified so as to entitle them to act in their own interests rather than in the interests of the company concerned.

29. Having regard to the terms of the letter agreement, it is important, in my view, to note that "investment projects" had the meaning described in cl. 2.1, which provided that "the purpose of the investment fund will be to explore, acquire and develop opportunities in the metals and mining industry (the 'investment projects')." Accordingly, investment projects were opportunities and the purpose of the investment fund was to explore, acquire and develop such opportunities. An opportunity could therefore be at the stage of exploration but still constitute an investment project.

30. In these circumstances, it seems to me that the mere fact that approval to proceed with an investment project required the unanimous consent of the investment committee did not mean that Mr. Gilbertson owed no fiduciary duty at all in respect of an opportunity which he had brought for consideration by the investment fund and fund management vehicle and which was being explored. In my view, Mr. Gilbertson had a fiduciary duty as a director of the company in respect of any potential investment project which was being explored by him with the agreement of Mr. Kuznetsov, as the other member of the investment committee, at least until such time as there was clearly no longer unanimous consent to proceed with it or it was actually vetoed. Indeed, in accordance with the authorities referred to earlier, any such veto would have to be on the basis

of full information being disclosed by or to Mr. Gilbertson or by or to Mr. Kuznetsov, as the case may be. In my opinion, once an opportunity was in the process of being explored or acquired as an investment project, even if Mr. Gilbertson then vetoed it as a member of the investment committee, nothing less than a fully informed and express consent by the company could possibly permit Mr. Gilbertson to pursue such investment project for himself.

31. I consider that it would be contrary to the overall intent, as reflected in the letter agreement, for a party to seek to veto or withdraw consent to an investment project as defined, in order to enable him to pursue that investment project for himself. The letter agreement expressly provided that the partners would work together to add value to the investment fund, that Mr. Gilbertson would be the chairman of the investment fund and the fund management vehicle and that he would assume responsibility for developing and implementing the strategy for all investment projects. The letter agreement also provided that the duties owed by Mr. Gilbertson to the investment fund and the fund management vehicle (which would subsequently include the company) would be those customary for an executive chairman of a company and would include, *inter alia*, searching for and introducing investment projects to the investment committee and supervising the implementation of approved investment projects. He was also to provide strategic advice on investment projects.

32. All of this is, in my opinion, consistent with the proposition that once a proposed investment project had been brought by Mr. Gilbertson for consideration by the investment committee and proceeding with it had not been consented to by Mr. Kuznetsov, Mr. Gilbertson as a director of the company was subject to the fundamental principles of loyalty and good faith in relation to that investment project, including not making a profit for himself out of his position, not placing himself in a position where his interest may conflict with that of the company and not acting for his own benefit or exploiting the opportunity for himself, at least without the informed consent of the company, all as explained in the English cases cited above.

33. In the circumstances, it seems to me that the company and the master fund, as part of the Pallinghurst structure, were entitled to expect, in relation to such an investment project, the "single-minded loyalty" of Mr. Gilbertson, whose relationship with the company (and the Pallinghurst structure generally), was one of trust and confidence in the sense explained in the *Bristol & W. Bldg. Socy.* case (4). Once Project Egg had been introduced by Mr. Gilbertson to the investment committee as an opportunity and was being explored and proceeded with on the consent of the investment committee, Mr. Gilbertson was entrusted with the task of pursuing it in the interests of the master fund and thereby the company. The company and the master fund were reliant upon and trusted him with

the project in their interests and not his own interests; they were entitled to his loyalty and good faith in respect of that project.

34. In my judgment, Mr. Gilbertson was subject to fiduciary duties to the company as a director in respect of such an opportunity in such circumstances. Whether the correct approach is that adopted by the plaintiff, namely to start from the premise that Mr. Gilbertson had fiduciary duties to the company as its director as a matter of legal principle, subject to any agreement or implication from the circumstances detracting from such duties, or whether the correct approach is to determine if the particular circumstances, including any relevant agreements, were such that he was subject to obligations to the company which were of a fiduciary nature, does not, in my opinion, in this particular case affect the ultimate conclusion.

35. There was, in my view, nothing in the letter agreement which would entitle Mr. Gilbertson to take for himself an investment project which he himself had brought to the investment committee for consideration as an investment project of the master fund and which the investment committee had agreed to pursue and which was being actively pursued. Even if Mr. Gilbertson may have been entitled, pursuant to the letter agreement, to withdraw his consent to or to veto proceeding with such an investment project, in my opinion it does not follow that he was entitled to take that investment project for himself without the informed consent of the company, the ultimate owner and controller of the master fund. At the very least, as long as proceeding with such an investment had the unanimous consent of the investment committee, Mr. Gilbertson was subject to the fiduciary duties which I have outlined in respect of that investment project. In my view, those duties on the part of Mr. Gilbertson as a director of the company were not attenuated by anything in the letter agreement or by implication from the surrounding circumstances. Indeed, it seems to me that the provisions of the letter agreement tend to support my view that Mr. Gilbertson owed fiduciary duties as a director of the company in respect of an investment project in the circumstances explained above.

**The investment committee**

36. It was suggested on behalf of Mr. Gilbertson that the investment committee in fact never did unanimously consent to Project Egg and therefore it was never an approved investment project in the sense required by the letter agreement. Having regard to the terms of the letter agreement and the circumstances generally, I did not find that to be a persuasive argument. The overall evidence clearly indicated to me that the investment committee, that is Mr. Gilbertson and Mr. Kuznetsov, operated in an informal way. They had meetings and discussions and both clearly acted from the start on the basis that Project Egg, which was initially proposed

as an investment project by Mr. Gilbertson, should proceed as an opportunity to be explored and then acquired at an agreed price by the master fund. It is clear that, at the outset, Mr. Gilbertson introduced Project Egg and then explored it and implemented the strategy for the acquisition of the rights as an investment project of the master fund. He procured PEL, as a wholly-owned subsidiary of the master fund, and thus a Pallinghurst structure company, to enter into the SPA with Unilever to acquire the rights, all as an investment project for the master fund, and all as agreed by Mr. Kuznetsov, as the other member of the investment committee. The purchase offers to Unilever made by Sean Gilbertson were made with the knowledge and consent of the investment committee. Agreement was reached on the price for the rights as an investment project. The initial offer of US$20m. by Renova and then the offer of US$30m. and the final offer price of up to US$40m., both to be paid by Mr. Vekselberg, all had the consent of the investment committee. In my view, Mr. Gilbertson would have done or procured none of this to be done if he did not consider that he had the consent of Mr. Kuznetsov and therefore the investment committee. I do not consider it is now open to him, in all the circumstances, to contend that Project Egg was never an approved investment project of the master fund.

37. It should also be noted that Project Egg was not the only investment project of the master fund. Various potential projects were considered, some of which were vetoed but some of which were consented to by Mr. Gilbertson and Mr. Kuznetsov and proceeded with. The most noteworthy of those, which became known as Project Charlie, was a proposal for the acquisition of an Australian manganese mining company and was a major project for the master fund. Another investment project was the Angola Project in respect of which the sum of US$780,000 was paid by Renova on behalf of the master fund with the consent of the investment committee in December 2006. I was not shown any evidence of formal written unanimous consents by the investment committee in respect of these projects either; they were also proceeded with on the informal consent of the investment committee.

38. In my opinion Project Egg was clearly consented to as an investment project, as defined in the letter agreement, by the investment committee and proceeded with as such.

**The agreement with Mr. Vekselberg**

39. The telephone conversation, during which Mr. Kalberer informed Sean Gilbertson that Mr. Vekselberg was requiring that one of his personal companies should own the title to the Fabergé rights outside the Pallinghurst structure, was on December 20th, 2006, and Mr. Gilbertson spoke to Mr. Vekselberg about this the following day, December 21st, 2006. Mr.

Vekselberg's requirements, of course, represented a change to the structure through which the rights, as an investment project, were to be further pursued. The question therefore arises whether this change had any effect on the nature or extent of the fiduciary duties which Mr. Gilbertson owed to the company as I have found them to be. The nature and extent of the duties owed by a director depend upon the circumstances and this arguably represented a change in circumstances.

40. It was submitted by leading counsel for the Gilbertson parties that what was said by Mr. Kalberer on December 20th and Mr. Vekselberg on December 21st, 2006, and reflected in the draft IAs which followed, did not involve the master fund at all but amounted to an entirely new and separate arrangement outside the Pallinghurst structure and that the economic benefit of developing, exploiting and managing the rights was to what he referred to as "the Pallinghurst team." It was said that the Pallinghurst team comprised Mr. Gilbertson, Sean Gilbertson and the two employees of Pallinghurst LLP (the Gilbertsons' English LLP), namely Mr. Willis and Mr. Priyank Thapliyal, who Mr. Gilbertson intended would be involved in the actual management of the rights, although that was a matter for him. It was their benefits and entitlements through managing the rights in respect of which Mr. Gilbertson was seeking commitments from the Renova parties.

41. This purported distinction between the so-called "Pallinghurst team" and the management under the Pallinghurst structure and letter agreement was not foreshadowed in the Gilbertson parties' pleadings, or their written evidence or their written opening submissions. However, quite apart from that, this belated argument was not consistent with the evidence. Mr. Vekselberg, although hazy about the timing of his agreement with Mr. Gilbertson, was nonetheless adamant and reiterated several times that the agreement was that, while one of his personal companies would own the title to the Fabergé brand, the economic benefit of developing, exploiting and managing the brand would remain with the master fund within the Pallinghurst structure. The evidence of Mr. Kuznetsov and Mr. Kalberer was to the same effect. There was no intention or suggestion that the economic benefits of managing the rights would be outside the Pallinghurst structure, or the Pallinghurst agreements; that was to remain with the management team headed by Mr. Gilbertson as provided by the letter agreement and through the Pallinghurst structure pursuant to the Pallinghurst agreements as always intended.

42. Perhaps more significantly, the evidence of Mr. Gilbertson himself was not consistent with this submission on his behalf. As far back as his first affidavit in these proceedings, sworn on January 29th, 2009, Mr. Gilbertson deposed that he—

"managed to secure the contract for the purchase of the rights for the benefit of the master fund; simultaneously, however, I continued to explore with Mr. Vekselberg the possibility of an arrangement whereby ownership of the rights might be transferred to one of Mr. Vekselberg's entities outside the Pallinghurst structure, but with *the Pallinghurst structure retaining the economic and management benefits and entitlements that we had hitherto envisaged that it would have.*" [Emphasis supplied.]

In the same affidavit, Mr. Gilbertson referred to the ownership of the rights by Mr. Vekselberg's company "provided that the rights of the Pallinghurst structure (or what was referred to as 'Pallinghurst team') were protected." He clearly equated the "Pallinghurst team" with the Pallinghurst structure. In my assessment, after December 20th, 2006, Mr. Gilbertson clearly understood that the economic benefits and the management thereof were intended to remain with the master fund as they would have done under the previous arrangements, and that in practical terms the only change to the previous structure which Mr. Vekselberg was requiring was that the title to the Fabergé brand itself would be owned by one of his personal companies outside the Pallinghurst structure. The suggested distinction between the Pallinghurst team on the one hand and the Pallinghurst structure on the other hand, which was first made during the trial, was not, in my view, justified or valid.

43. There was no reason, from December 20th, 2006 through January 2007, to suppose that the economic benefits and management of the Fabergé brand would not be of significant commercial value to the master fund, even if, as proposed in the later draft IAs, the entitlement of the master fund in that respect would be pursuant to a licence from one of Mr. Vekselberg's personal companies, as owner of the brand. Mr. Vekselberg never proposed to remove the whole rights, including the economic benefit of developing, exploiting and managing them, from the master fund; what he was proposing would remain of obvious commercial benefit to the master fund and the Pallinghurst structure of which it was part. Indeed, even under the original proposed structure within which Project Egg was to be pursued, the benefit to the master fund would have been the commercial benefit derived from developing, exploiting and managing the investment and, for Mr. Gilbertson's team, the benefit of managing such development and exploitation of the brand would be the fees and other benefits they would receive pursuant to, originally, the letter agreement and, latterly, the Pallinghurst agreements.

44. I can see no reason why the fiduciary duties to the company which Mr. Gilbertson owed as a director should have been any different after December 20th or 21st, 2006 from his fiduciary duties before that time. It was clearly in the interests of the company as part of the Pallinghurst structure that the master fund should have that commercial benefit.

Nonetheless, if cl. 2.5 of the letter agreement is to be interpreted as the Gilbertson parties contend, Mr. Gilbertson may have been entitled to decline to consent to the new structure for the investment project which was being put forward, even though that would not have been in the interests of the company. However, even if he had done that, it seems to me, having regard to the authorities to which I have referred above, he would still not have been entitled without the informed consent of the company to simply take the rights for himself. However, Mr. Gilbertson did not do that; he consented to and proceeded upon the basis of the new structure which Mr. Vekselberg and the Renova group required.

45. It was also pointed out by leading counsel for the plaintiff that Mr. Gilbertson at no time treated the "deal" which he and Mr. Vekselberg agreed on the telephone on the evening of December 21st, 2006 as conditional. He agreed that Mr. Vekselberg would be "the global Mr. Fabergé." In his email to Mr. Vekselberg two days later, on December 23rd, Mr. Gilbertson congratulated him unconditionally on the entrenchment of his interest in the Fabergé brand and he did not purport to reserve any right to "unentrench" Mr. Vekselberg's interest. In any event, he had no such right. There was nothing contingent or conditional about what Mr. Gilbertson said in that email. He accepted in cross-examination that he had no entitlement to withhold for himself the rights which he had procured PEL, which was a Pallinghurst company, to contract to purchase under the SPA the previous day, even if Mr. Vekselberg's commitments were not forthcoming. There was some suggestion on behalf of the Gilbertson parties that if Mr. Vekselberg's commitments were not honoured, the entitlement to the rights would somehow revert to Mr. Gilbertson personally. However, that does not seem to me to accord with the evidence, including that of Mr. Gilbertson himself. In my view, it was clear that Mr. Gilbertson's agreement with Mr. Vekselberg involved the master fund from the outset. The first draft IA produced by Sean Gilbertson involved the master fund as guarantor of PEL and he provided that the agreement was to be signed by Mr. Gilbertson, not in his personal capacity, but in his capacity as a director of the company. The master fund and the Pallinghurst structure, including the company, was clearly involved and the "deal" was not, as submitted by leading counsel for the Gilbertson parties, simply an agreement between two individuals, Mr. Vekselberg and Mr. Gilbertson, with no relation to the master fund.

**Mr. Gilbertson's position following December 20th, 2006**

46. Mr. Gilbertson contended that Mr. Vekselberg's insistence on changing the structure to enable him to own the title to the Fabergé brand outside the Pallinghurst structure amounted to Mr. Vekselberg rejecting and "walking away" from the original agreement with Mr. Gilbertson. He said in evidence: "But if he [Mr. Vekselberg] walked away from our deal,

well then we didn't have a deal and I was entitled to develop it in my own best interest." He also said:

"I was trying very hard to get the agreement with Mr. Vekselberg's empire, as encapsulated in the letter agreement. If that broke down and we couldn't get the agreement then I think all bets were off and I could do whatever I thought was proper in my own interest."

However, subsequently when questioned about when he claimed that Mr. Vekselberg "walked away" from their "deal," he said that it was in mid-January 2007. He then went on to say that the symptom of that was actually Mr. Vekselberg's refusal to proceed with Project Charlie which was not until after a meeting in March 2007. Whichever of those dates is correct, according to Mr. Gilbertson, Mr. Vekselberg had not "walked away" at any time in December 2006.

47. In fact, as I have already pointed out, the evidence is that Mr. Gilbertson accepted Mr. Vekselberg's proposed change to the structure through which the rights as an investment project were to be pursued and held. In his email of December 21st, 2006, immediately following his telephone conversation with Mr. Vekselberg, Mr. Gilbertson confirmed to Mr. Vekselberg that he would work closely with his team to achieve a structure that suited Mr. Vekselberg's needs. He knew, of course, that Mr. Vekselberg's needs were that he would own the title to the Fabergé brand outside the Pallinghurst structure. He informed Mr. Vekselberg that he would advise him as soon as he was officially "the global Mr. Fabergé." Mr. Vekselberg could only have been seen as "the global Mr. Fabergé" if he was himself the owner of the Fabergé brand (or owned the brand through one of his personal companies run by his family office), not through the industrial conglomerate of Renova.

48. In his email to Mr. Vekselberg two days later, on December 23rd, 2006, confirming that the purchase of the Fabergé brand was complete (meaning the SPA had been executed), Mr. Gilbertson expressly confirmed that he was discussing with Mr. Kuznetsov arrangements to transfer the ownership of the title to the Fabergé brand to one of Mr. Vekselberg's companies. He confirmed his willingness to do that against a commitment that the economic benefits and management rights that the Pallinghurst management team, headed by him as originally provided by the letter agreement, would retain their rights under the Pallinghurst structure and agreements; in other words a confirmation that apart from the actual ownership of the title to the Fabergé brand being held outside the Pallinghurst structure, everything else would remain as before.

49. In my opinion, in no sense could the requirements of Mr. Vekselberg be seen as a veto of the opportunity to exploit the economic benefit of the rights as an investment project of the master fund and the evidence is that Mr. Gilbertson did not see it or treat it that way either. There was no

rejection of it or refusal to consent to it by Mr. Gilbertson. He consented to the revised structure and acted upon it. He continued, after December 20th, 2006, to pursue the economic benefits of the rights for the master fund and to seek confirmation of the entitlements of his management team as referred to in the letter agreement and as stipulated in the Pallinghurst agreements. As I have already pointed out, he accepted that Mr. Vekselberg and Renova did not "walk away" nor, in my opinion, can it be said that Mr. Vekselberg, Mr. Kuznetsov or Renova Holding vetoed the opportunity to exploit the economic benefit of the rights as an investment project of the master fund.

50. It was when he awoke on the morning of January 1st, 2007 that Mr. Gilbertson decided to proceed to secure the Fabergé brand himself with the assistance of his consortium and thereafter "negotiate with the Russians from a position of strength." That meant that the Fabergé brand would be paid for by Mr. Gilbertson and his consortium and owned by them in all respects and not in any way by the master fund or through the Pallinghurst structure. The essential part of that strategy required the diversion of the rights from the master fund by diluting its 100% ownership of PEL by the issuing of further shares in PEL to Mr. Gilbertson and his consortium to give them almost 100% ownership of PEL and so out of the Pallinghurst structure. The consequence of that was that if further negotiations with Mr. Vekselberg then failed, Mr. Gilbertson and his consortium would keep the rights, as indeed happened. Mr. Gilbertson committed to this strategy at a time when he knew and accepted that Mr. Vekselberg had not "walked away" and at a time when he knew or ought to have known that he was not entitled to pursue the rights for the benefit of anybody but the master fund, least of all for himself. Mr. Gilbertson kept the benefit of the rights by not only procuring PEL to purchase them with financing from his consortium and himself through Autumn, but also by separately gratuitously procuring the issue of the new shares in PEL to Autumn and the other members of the consortium, thereby diluting the interest of the master fund in PEL and, therefore, the rights to virtually nothing. This would not only give himself and the consortium complete ownership of PEL and the rights but would also serve his purpose of negotiating with Mr. Vekselberg from a position of strength in order to extract financial profit for himself and the rest of his consortium from Mr. Vekselberg.

51. However, at the same time as Mr. Gilbertson was implementing his strategy, he continued to purport to negotiate with the Renova parties during the period of time between the morning of January 1st, 2007 and the late evening of January 2nd, 2007. Those two days cover the period of time between Mr. Gilbertson's decision upon his awakening on January 1st, 2007 to put and then putting in place his strategy and the time when he told Mr. Vekselberg that he had purchased the rights by alternative

means and without Mr. Vekselberg/Lamesa/Renova. Of course even then he did not tell Mr. Vekselberg of the proposed issue of the new shares in PEL to Autumn, which was wholly owned by the BPG settlement and the other consortium members.

52. It was submitted on behalf of the plaintiff that, having repeatedly said that he had come to a firm decision on the morning of January 1st, 2007 that negotiations had reached the point that no deal would be done in time, there is no honest and rational explanation for Mr. Gilbertson continuing to discuss terms on behalf of the master fund with Mr. Kalberer and Mr. Kuznetsov and for not telling them, particularly Mr. Kuznetsov, his fellow director, what he was proposing to do. To my mind, the inference to be drawn from Mr. Gilbertson's actions is that he was deliberately keeping the Renova parties in the dark about his true intentions. If Mr. Gilbertson was concerned about the forthcoming due date for payment of the purchase price to Unilever, the obvious, appropriate and honest course for him to adopt was not to negotiate alternative financing in secret whereby he, and others with no interest in the Pallinghurst structure, would acquire the rights on the basis which he procured, but to openly discuss the timing problem with the Renova parties, and Mr. Kuznetsov in particular, with a view to resolving the problem on an agreed basis having regard to the interests of the master fund and thereby the Pallinghurst structure, including the company.

53. I did not find Mr. Gilbertson's evidence that he was simply acting to "save" the rights at all plausible. His comments to Mr. Mende copied to Mr. Kundrun and Dr. Jelinek about the acquisition of the rights enabling them to negotiate with Mr. Vekselberg from a position of strength and about the potential profit for them made it clear to me that Mr. Gilbertson was expecting significant profit from what he was doing in secret. It must also have been obvious that involving third parties, particularly by procuring the gratuitous issue to them of shares in PEL and who he told could expect significant profit, would encourage their financial expectations, in addition to his own, and make any future negotiation with Mr. Vekselberg much more complicated but, no doubt, in Mr. Gilbertson's mind nonetheless lucrative. There was no good commercial justification for issuing the PEL shares and no need to do so unless to make a profit; it was clearly contrary to the interests of the master fund and the company to dilute the master fund's interest in PEL, and thus the rights, to virtually nothing. There was no need and no good commercial reason for subsequently agreeing an interest rate of 25% on the loans to PEL and it was clearly not in the interests of PEL to do so except to make extra profit for Autumn and the rest of his consortium.

54. There was no provision in the SPA with Unilever making time of the essence, and before the January 3rd completion date was agreed it was made clear on behalf of Unilever that if that date were not convenient,

Sean Gilbertson, who was negotiating with them, should let them know. That was never done. Mr. Kuznetsov's unchallenged evidence was that only one or two more rounds of negotiation following the fourth draft IA would have resulted in agreement. Although his evidence that agreement could have been achieved by the completion date of January 3rd was clearly over-optimistic, it does seem probable that only a few more days would have sufficed. The evidence suggested to me that a request for such a short extension would have been sympathetically considered by Unilever.

55. The evidence also suggested to me that Mr. Gilbertson knew very well that what he was doing was inappropriate and wrong and that Mr. Vekselberg and the Renova parties would justifiably consider it to be contrary to the agreement which they had made and not in accordance with the loyalty and good faith towards the company as part of the Pallinghurst structure which they and the company were entitled to expect from him. He clearly appreciated that Mr. Vekselberg would be most annoyed and upset. In my view, there was no legitimate reason for Mr. Gilbertson not to discuss his stated concern about possible failure to pay the purchase price on the due date, and for him not to seek to resolve it with the Renova parties and with Unilever and in my view his duty was to do so, not to take the rights for himself secretly with a view to making a profit.

56. There was some suggestion on behalf of the Gilbertson parties that Mr. Gilbertson effectively vetoed Project Egg, within the meaning of cl. 2.5 of the letter agreement, by his decision to implement his strategy for alternative financing through his consortium and then doing so. However, any such veto, if there was one, was not communicated until it was too late. I have already expressed my view that if an investment project was to be vetoed under the terms of the letter agreement by a party in order to take an investment project for himself, then it had to be done openly and with full disclosure and informed consent. In this context, it was suggested that the reality was that at no stage prior to his acquisition of the rights could Mr. Gilbertson afford an open veto of Project Egg, as such a veto would have released Renova or Mr. Vekselberg thereafter to compete with Mr. Gilbertson for the rights and Mr. Gilbertson said that he feared that. For that reason, Mr. Gilbertson may have been unwilling to tell Mr. Vekselberg or his fellow director what he was proposing to do until he had actually done it and secured the rights for himself and his consortium. The argument was that in order to meet and overcome that fear, Mr. Gilbertson led the Renova parties to think that he was continuing negotiations while behind their backs he was acquiring the rights for himself and his consortium. However, Mr. Gilbertson's alleged fear that Renova or Mr. Vekselberg would compete with him to acquire the rights for themselves was not put to Mr. Vekselberg or any of the other Renova parties'

witnesses and there was no evidential basis for Mr. Gilbertson's alleged concern. In any event, it does not seem to me to be relevant to Mr. Gilbertson's duties to the company.

57. In the circumstances as I have found them to be, and in light of my analysis and comments above, I have concluded that Mr. Gilbertson remained in the same fiduciary relationship with the company after December 20th, 2006 as he did before that date. In my judgment, he had the same fiduciary duties to the company as he had before. The change to the structure through which the rights were to be pursued as an investment project whereby Mr. Vekselberg would own the title to the Fabergé brand outside the Pallinghurst structure did not amount to a veto of the investment project and anyway that change to the structure was accepted and pursued by Mr. Gilbertson. His fiduciary duties in respect of the investment project as modified continued notwithstanding the modification. In such circumstances, it was not open to Mr. Gilbertson to take the rights for himself or to seek thereby to make a profit for himself and the other members of his consortium. In my opinion that was inconsistent with and amounted to a breach of his fiduciary duties. This was exacerbated by the fact that he diverted the rights, including the economic benefit of developing, exploiting and managing the Fabergé brand, from the master fund as part of the Pallinghurst structure to himself covertly without any disclosure to the company until after the event and, even then, it was not full disclosure. In summary, therefore, I am of the opinion that in the circumstances Mr. Gilbertson owed the duties of a fiduciary as a director of the company throughout the relevant period and that he was in breach of those duties in acting as he did in late December 2006 and January 2007.

**Mr. Gilbertson's other defences**

58. The other defences in relation to the liability of Mr. Gilbertson for breach of fiduciary duty were put forward as follows.

*Availability of derivative relief*

59. In their pleading and opening submissions, the Gilbertson parties raised again the derivative nature of the plaintiff's claim and contended that the plaintiff was not entitled, on behalf of the company, to claim for alleged loss sustained by the master fund. I say that they raised this issue "again" because the entitlement of the plaintiff to pursue this action derivatively on behalf of the company (including by way of multiple derivative action also on behalf of GPLP and/or the master fund) in respect of loss sustained by the master fund was addressed in the ruling dated April 14th, 2009 giving leave to the plaintiff to proceed with this action (in proceedings reported at *2009 CILR 268*). The question was fully argued at the hearing which resulted in that ruling by reference to the

relevant authorities, including and particularly *Waddington Ltd.* v. *Chan Chun Hoo* (20) in the Court of Final Appeal in Hong Kong and the judgment of Lord Millett, N.P.J., as well as the other authorities referred to in the ruling.

60. The uncontroversial facts necessary to enable this court to rule on this issue were before me at that hearing and in my view no facts relevant to this relatively limited legal argument have emerged since. As I have already said, there was no appeal from any part of the ruling, including the decision on this particular issue, which, although made in the context of the plaintiff's application for leave to proceed with this action, is nonetheless, in my view, a conclusive and not a summary ruling on this particular issue. There having been no appeal against the court's decision on this particular issue, in my opinion it was not open to the Gilbertson parties to revisit it at the trial. Accordingly, I reject the Gilbertson parties' submissions in this regard.

### *Articles 131 and 132 of the company's articles of association*

61. In the amended defence it is pleaded that Mr. Gilbertson can rely on the exoneration provisions of art. 131 of the company's articles of association ("the articles") and on the indemnity contained in art. 132. The articles provide as follows:

"131. Every director (including for the purposes of this article any alternate director appointed pursuant to the provisions of these articles), secretary, assistant secretary, or other officer for the time being and from time to time of the company (but not including the company's auditors) and the personal representatives of the same shall be indemnified and secured harmless out of the assets and funds of the company against all actions, proceedings, costs, charges, expenses, losses, damages or liabilities incurred or sustained by him in or about the conduct of the company's business or affairs or in the execution or discharge of his duties, powers, authorities or discretions, including without prejudice to the generality of the foregoing, any costs, expenses, losses or liabilities incurred by him in defending (whether successfully or otherwise) any civil proceedings concerning the company or its affairs in any court whether in the Cayman Islands or elsewhere.

132. No such director, alternate director, secretary, assistant secretary or other officer of the company (but not including the company's auditors) shall be liable (a) for the acts, receipts, neglects, defaults or omissions of any other such director or officer or agent of the company or (b) for any loss on account of defect of title to any property of the company or (c) on account of the insufficiency of any security in or upon which any money of the company shall be

invested or (d) for any loss incurred through any bank, broker or other similar person or (e) for any loss occasioned by any negligence default, breach of duty, breach of trust, error of judgment or oversight on his part or (f) for any loss, damage or misfortune whatsoever which may happen in or arise from the execution or discharge of the duties, powers authorities, or discretions of his office or in relation thereto, unless the same shall happen through his own dishonesty."

62. I also considered this argument in detail in my ruling dated April 14th, 2009 by which I gave the plaintiff leave to continue this derivative action (in proceedings reported at *2009 CILR 268*). After an analysis of the judgments in *In re Bristol Fund Ltd. (5)* and *Armitage* v. *Nurse* (1) in particular, I concluded that this argument was not sufficiently compelling to justify the refusal of leave to the plaintiff to proceed with this action. There was no appeal against my ruling on this argument (or, as I have said, any of my rulings). There was very little reliance upon this purported defence at the trial. It was only very briefly mentioned in a short paragraph in the Gilbertson parties' written opening submissions but was not otherwise referred to at the trial at all and noticeably not in any of the closing submissions, written or oral.

63. In fact, nothing that has emerged since my ruling, whether in the process of discovery, the witness statements or the oral evidence at the trial, has altered my analysis of the position. In fact, having now considered all the written and oral evidence in the case, I remain of the view that the circumstances are such that Mr. Gilbertson cannot rely on the provisions of the relevant articles, particularly since I consider, as explained above, that his conduct did fall below the objective standard of an ordinary honest director. In the Gilbertson parties' brief written opening submission on this issue, they sought to compare the position of Mr. Gilbertson with that of his fellow director, Mr. Kuznetsov. The Gilbertson parties' counterclaim, to which I shall refer later, did originally claim for breach of fiduciary duty by Mr. Kuznetsov but that was expressly abandoned during the trial. In any event, no allegation of dishonesty was made against Mr. Kuznetsov. Furthermore, whether or not Mr. Kuznetsov was in breach of any fiduciary duty is not, in my opinion, relevant to the claims against Mr. Gilbertson. In the circumstances as I have found them to be, I see no basis for changing my previously expressed opinion that Mr. Gilbertson is not entitled in the circumstances to rely upon arts. 131 and 132 of the company's articles of association.

***Conduct of the plaintiff***

64. In their amended defence, the Gilbertson parties pleaded, *inter alia*:

"Further and alternatively, Mr. Gilbertson and Autumn will contend that the company is not entitled to any such relief as it might

otherwise be directly or derivatively entitled against since it would be contrary to the principles set out in *Nurcombe* v. *Nurcombe* . . . and unjust to award the company any such relief, having regard to the facts and matters and alleged in this amended defence and counterclaim concerning the conduct of Renova and those associated with it."

65. The contention by the Gilbertson parties that the conduct of Renova and those associated with it renders it inequitable to allow the claim brought by the company at the instance of the plaintiff to succeed by reference to the *Nurcombe* v. *Nurcombe* case (16) was also argued at length at the hearing in late February 2009 of the plaintiff's application for leave to continue with this derivative action, which resulted in the ruling of April 14th, 2009, to which I have already referred. In *Nurcombe* v. *Nurcombe*, Browne-Wilkinson, L.J., by reference to the case of *Towers* v. *Africa Tug Co.* (19), said ([1985] 1 W.L.R. at 378):

"In my judgment, that case established that behaviour by the minority shareholder, which, in the eyes of equity, would render it unjust to allow a claim brought by the company at his instance to succeed, provides a defence to a minority shareholders' action. In practice, this means that equitable defences which would have been open to defendants in an action brought by the minority shareholder personally (if the cause of action had been vested in him) would also provide a defence to those defendants in a minority shareholder's action brought by him."

66. Following the hearing in February 2009, I concluded, as set out in the ruling (*2009 CILR 268, at para. 47*), that while the particular circumstances relied upon by the Gilbertson parties to found such a defence might be material for cross-examination if the case were to proceed to trial, they did not constitute conduct of a kind which sufficiently impacted on the *bona fides* and equity of the plaintiff's case such as to satisfy me that the plaintiff should not have leave to continue this derivative action.

67. It was pointed out by leading counsel for the plaintiff that *Nurcombe* v. *Nurcombe* (16) was a case decided at a time before there was a leave requirement for a derivative action provided by the rules of court in England (and such requirement was not included in the GCR until even later) and thus there was no procedural filter for such actions. Accordingly, at that time all questions of *locus standi* such as the equity of the plaintiff's conduct would have to be addressed at trial if the defendant chose not to apply to strike out the claim beforehand. It was submitted that the considerations to which Browne-Wilkinson, L.J. was referring would nowadays all be addressed at the leave stage and not at the trial if leave to proceed were granted. As I have pointed out, these considerations were indeed considered in the present case at the leave stage and addressed in

the ruling against which there was no appeal. However, I am conscious of the fact that at the leave stage in the present case, while affidavit evidence had been filed and was relied upon, the court had obviously not seen or heard all the evidence, written and oral, of the witnesses at trial. Accordingly, I have considered whether in light of all that evidence the conduct of the plaintiff was such as to provide an equitable defence to the action as submitted on behalf of the Gilbertson parties.

68. In their written opening submissions, the Gilbertson parties set out a list of features of the dealings between Mr. Gilbertson and the Renova parties which they contended would make it unjust for the plaintiff to succeed in this action. However, most of the matters on which they rely are inevitably based on their own interpretation of particular facts or circumstances before any evidence was heard and much of which, in the event, I did not accept. Furthermore, some of the matters on which they relied were not put to the Renova parties' witnesses in cross-examination. For example, in their written opening submission the Gilbertson parties submitted the following:

"In so far as there is any defence which Mr. Gilbertson might have been able to make good by reference to the documents which the Vekselberg Parties [*i.e.* the Renova parties] have destroyed, it would be unjust for Renova to profit from its own wrong."

69. As I have already mentioned earlier, during the course of this action there have been several contested applications concerning discovery and the destruction of certain back-up tapes, which may have contained relevant emails and other documents, by the Renova parties following a computer crash at their administrative offices in Zurich. In that respect I have made it clear more than once that as a result, if appropriate and justified, the court could draw inferences against the Renova parties at the trial in light of their destruction of potentially discoverable documents. However, as also explained earlier in this judgment, apart from the question of the alleged motivation of the plaintiff in bringing the present claim, which was not clearly put to the Renova parties' witnesses, I was not invited to draw any specific inferences.

70. Leading counsel for the Gilbertson parties did submit that the plaintiff's claims against the Gilbertson parties were of no commercial benefit to the Renova parties and were motivated solely by malice towards Mr. Gilbertson. Certain steps taken or, it was alleged, procured by Mr. Vekselberg towards Mr. Gilbertson, in particular the termination of Mr. Gilbertson's employment by Siberian Urals Aluminium Co. ("SUAL"), one of Mr. Vekselberg's major interests, in February 2007 and certain alleged comments by Mr. Kuznetsov to Mr. Gilbertson at a time not long before that, were alleged to demonstrate malice towards Mr. Gilbertson on the part of Mr. Vekselberg. However, the factual allegations were strongly

denied by Mr. Vekselberg and by Mr. Kuznetsov and it was never put to Mr. Vekselberg that the present proceedings were solely motivated by malice on his part. While it was clear to me that Mr. Vekselberg was upset and annoyed and felt he had been wronged by what he described as Mr. Gilbertson's "violation" of the agreement which he said he had made with him, it does not seem to me that it can therefore inevitably be inferred that Mr. Vekselberg had procured the present proceedings to be brought solely out of malice. No doubt many plaintiffs are aggrieved and motivated by what they see as the wrong done to them by the defendant. It does not follow, in my view, that their motives in bringing court proceedings are therefore necessarily inequitable such that their claims should be refused on that ground. In the present case, the plaintiff has pleaded and put forward a perfectly arguable case on the merits of its claim and also in relation to loss.

71. While it is a slightly different point, it was also submitted on behalf of Mr. Gilbertson that, as a result of his broader relationship with Mr. Vekselberg through his employment as CEO of SUAL, and his financial expectations, both consequent upon that employment and pursuant to the letter agreement, Mr. Gilbertson was under considerable pressure in dealing with Mr. Vekselberg and the Renova parties generally. In this context, at one point in his telephone conversation with Mr. Thomas, Mr. Gilbertson used the expression "negotiating with a gun to his head." Quite apart from whether this allegation is relevant, as to which I am doubtful, I did not anyway find it particularly convincing.

72. While Mr. Vekselberg is undoubtedly a very wealthy and influential businessman and, at least indirectly in practical terms, Mr. Gilbertson's employer at SUAL, Mr. Gilbertson is himself a very experienced, seasoned and successful businessman. My impression of him is that he is a tough individual, exacting, and perfectly capable of standing up for himself and looking after his own interests and considerable ambitions. For example, he clearly anticipated deriving significant financial benefit at the expense of Mr. Vekselberg from what he considered would be a strong negotiating position once he had covertly acquired the rights in early January 2007. He did not hesitate to discuss with Mr. Mende the potential profit they could anticipate by taking advantage of Mr. Vekselberg's obvious enthusiasm for the Fabergé brand. Indeed, in my view, to a less hardened and ruthless person, the whole venture of acquiring the rights for himself, in the way he did without Mr. Vekselberg's knowledge when he obviously knew Mr. Vekselberg would be extremely displeased about it, would have been too much of an obvious risk. Mr. Gilbertson clearly knew Mr. Vekselberg well. He knew what Mr. Vekselberg's expectations were but he nonetheless did not hesitate to act as he did in order to make a profit at Mr. Vekselberg's expense. In my assessment, that is consistent with my

overall impression of Mr. Gilbertson as a hardened and ambitious businessman quite capable of looking after his own interests and taking advantage of any opportunity available to him to benefit financially, knowing very well that Mr. Vekselberg, his supposed partner and his employer, would be extremely annoyed. I do not accept the suggestion that Mr. Gilbertson was brow-beaten or pressured into agreeing with Mr. Vekselberg's wishes as he did; my clear impression of Mr. Gilbertson is that he was perfectly capable of refusing to do so had he wished.

73. Although Mr. Vekselberg was annoyed and upset as a result of Mr. Gilbertson's covert actions, it does not follow, in my opinion, that these proceedings were actuated by malice. In fact Mr. Vekselberg is anyway not the plaintiff. Even if the reality is that, as the principal owner and chairman of the group of which the plaintiff is a member, he procured the plaintiff to bring these proceedings, a circumstance which was never put to Mr. Vekselberg in cross-examination, it does not follow that the plaintiff's conduct in this case is inequitable in the *Nurcombe* v. *Nurcombe* (16) sense so as to provide a defence to the plaintiff's claims. I therefore reject the submissions of the Gilbertson parties in that respect.

**The claims against Autumn**

74. The plaintiff's claim against Autumn is to account as a constructive trustee for the new shares in PEL issued to it or their value, on the ground that it knowingly received them as property misapplied or procured to be misapplied by Mr. Gilbertson in breach of his fiduciary duties to the company. Alternatively, Autumn is said to be liable to account as a constructive trustee on the ground that it was a volunteer, since it did not pay for the new shares in PEL. Autumn is also said to be liable to account for the profit it made on its loan to PEL/Fabergé Ltd., namely the interest on the money lent.

*Autumn as knowing recipient*

75. There is no dispute between the parties that the essential elements of liability for knowing receipt are as set out by Hoffmann, L.J. in *El Ajou* v. *Dollar Land Holdings PLC* (7) ([1994] 2 All E.R. at 700):

". . . [T]he plaintiff must show, first, a disposal of his assets in breach of fiduciary duty; secondly, the beneficial receipt by the defendant of assets which are traceable as representing the assets of the plaintiff; and thirdly, knowledge on the part of the defendant that the assets he received are traceable to a breach of fiduciary duty."

76. The parties dispute whether the three elements identified by Hoffmann, L.J. have been made out in this case.

(i) The plaintiff's case, of course, is that Mr. Gilbertson committed a breach or breaches of fiduciary duty in early January 2007 by secretly procuring the consortium, which included Autumn, to lend PEL the money to purchase the rights and also by procuring the gratuitous issue of the new shares in PEL to Autumn and the other members of the consortium, thereby diluting the master fund's previous 100% interest in PEL to virtually nothing. The plaintiff contends that there has been a disposal of assets of the master fund, and thereby of the company, by Mr. Gilbertson in breach of fiduciary duty.

(ii) Assuming a breach or breaches of fiduciary duty by Mr. Gilbertson, the Gilbertson parties nonetheless contend that the issue of the new shares in PEL did not amount to a disposal of assets of the master fund. They submit that the unissued shares *per se* were not assets of the master fund or PEL and that there is no authority in which it has been held that the unissued shares of a company belong in equity to the company or its shareholders. They say that the new shares issued by PEL did not constitute property of PEL prior to their issue and that accordingly their issue did not amount to a disposal of assets. Reference was made in the Gilbertson parties' written closing submissions to a case in the High Court of Australia, *Pilmer* v. *Duke Group Ltd.* (17), in which it was said ([2001] 2 BCLC 773, at para. 20):

"Before the shares in question were issued, they did not exist as an item of property whether of the company or anyone else (*Federal Commissioner of Taxation* v. *St. Helens Farm (ACT) Pty. Ltd.* (1981), 146 CLR 336 at 427 *per* Aickin, J.). It was the act of issuing the shares and agreeing to allot them which created the relevant item of property—property which was never owned by the company …"

(iii) The consequence of the issue of the new shares in PEL was that the interest of the master fund in PEL was reduced from 100% of that company to just under 1%. It was contended on behalf of the plaintiff that the asset of the master fund was its 100% ownership and control of PEL and it was that which was effectively disposed of in favour of Autumn (and the other members of the consortium) by means of the issue to them of the new shares in PEL. It was contended that the new shares were simply fungible items of property which represented ownership and control of PEL, in other words the new shares were in reality simply a "currency of ownership and control" which had passed from the master fund to Autumn. The plaintiff's claim is a multiple derivative one in respect of the alleged diversion by the company's director, Mr. Gilbertson, of a commercial opportunity, ultimately of the company through its subsidiary, the master fund. It was argued for the plaintiff that, but for Mr. Gilbertson's breach of duty, the master fund would have owned 100% of PEL, the owner of the economic benefit of the rights. Accordingly, the company, as the master fund's ultimate holding company and trustee of its

assets, suffered loss as a result of the transfer of the master fund's 100% ownership and control of PEL, through the issue of the new shares, to Autumn. It was submitted that commercially there would be no difference between either effecting a transfer of the rights *in specie* from PEL to Autumn or leaving the rights in PEL but issuing new shares in PEL to Autumn. It was said that in equity there should be no difference either.

(iv) It was also emphasized on behalf of the plaintiff that the role of the directors of PEL themselves was not in issue or impugned on the basis of any defect in their performance as such directors. The plaintiff's claim is that it was Mr. Gilbertson who procured the issue of the new PEL shares and that he did so in breach of his fiduciary duties to the company. It is Mr. Gilbertson's duty to the company that is in issue.

(v) In my view, the position taken on behalf of the Gilbertson parties, in the circumstances of this case, is unduly restrictive and strict. This is an equitable concept and it does not seem to me that the reference to disposal of assets in Lord Hoffmann's first requirement for liability for knowing receipt in *El Ajou* v. *Dollar Land Holdings* (7) would have been intended to or did restrict the terms "a disposal of his [the plaintiff's] assets" or "assets which are traceable as representing the assets of the plaintiff" to mean pre-existing tangible items of property already legally and beneficially owned by the plaintiff. The court must look at the particular circumstances concerned in order to achieve a fair and equitable result. In the present case, in my opinion, the issue of the new PEL shares which had the effect of reducing the master fund's ownership and control of PEL from 100% to just under 1% did amount in the circumstances to disposal of an asset of the master fund (and, derivatively, the company) in the sense required to comply with the first principle in the *El Ajou* case.

(vi) It follows, in light of my views above, that the second element identified by Lord Hoffmann, namely that the defendant has beneficially received assets which are traceable as representing assets of the plaintiff, is in principle also made out. However, the Gilbertson parties contended that the new shares in PEL were not in fact issued until January 19th, 2007, some 16 days after the purchase of the rights from Unilever on January 3rd, 2007, which, the Gilbertson parties suggested, constituted the alleged breach of fiduciary duty by Mr. Gilbertson, if there was one. Accordingly, they argued, even if the issue of the new shares constituted a disposal of the assets of the master fund, that is not traceable to any breach of fiduciary duty by Mr. Gilbertson. In fact, the documentary and other evidence is to the effect that the new shares were indeed issued on January 3rd, 2007 and not on January 19th, 2007 and I have so concluded.

77. I should also say that, even if my conclusion about the date of issue of the new PEL shares is unjustified and they were issued on January 19th, as pleaded by the Gilbertson parties, that date is in my view sufficiently

close to January 3rd, 2007 and the share issue sufficiently related to the actions of Mr. Gilbertson at about that time to satisfy me that in the circumstances the assets received by Autumn in the form of the new shares may be said to be traceable to Mr. Gilbertson's breach of fiduciary duty. Alternatively, Mr. Gilbertson's procurement of the issue of the new PEL shares, even if not effective until January 19th, 2007, was not disclosed and was unknown to the Renova parties and it may be argued that this was simply a perpetuation of Mr. Gilbertson's breach of duty.

78. In light of the above, the new PEL shares are, in my opinion, traceable as representing assets which ought to properly have belonged to the master fund. The issue of the PEL shares provided Autumn with a gratuitous share of the rights through a shareholding in PEL which belonged to and should have remained with the master fund.

### Autumn's knowledge

79. The key question is whether Autumn had the requisite knowledge. Autumn itself is an off-the-shelf BVI company which was acquired on January 2nd, 2007 by Fairbairn as trustee of the BPG settlement. Mr. Thomas was a director of Fairbairn. Autumn was acquired specifically as a special purpose vehicle through which to make the loan by the BPG Settlement to PEL to meet Mr. Gilbertson's share of the purchase price of the rights and to hold the new PEL shares which Mr. Gilbertson procured to be issued to it. Autumn was wholly owned by Fairbairn and Fairbairn's associated company, Fairbairn Corporate Services Ltd. ("FCSL"), became Autumn's sole director. Mr. Thomas was also a director of FCSL and therefore in practical terms also the sole director of Autumn.

80. There are arguably two different ways in which Autumn could be said to have the requisite knowledge: (a) by imputation to it of Mr. Gilbertson's actual knowledge; or (b) through what Mr. Thomas knew or should have known.

81. First, it was argued on behalf of the plaintiff that Autumn was to be imputed with Mr. Gilbertson's actual knowledge on the basis that he was effectively Autumn's directing mind and will for the purposes of the loan and the PEL share issue, and that his knowledge is attributable to Autumn. It was said on behalf of the plaintiff that it was clear that Autumn was for practical purposes from the outset a "Gilbertson" vehicle rather than a company which was in reality independently operated by the trustee of the BPG settlement. It was contended that this was made clear by the following matters.

  (i) The fact that Clifford Chance, Mr. Gilbertson's English solicitors, said in their letter dated March 7th, 2007 to the Renova parties' English solicitors that Autumn was "in practice, an entity controlled by [Mr. Gilbertson]."

(ii) The fact that Mr. Gilbertson represented to Mr. Mende and the other members of his consortium that his share of the purchase price for the rights was being made with his own money. Also, at no stage was Fairbairn involved with the commercial discussions which were all led by Mr. Gilbertson on his own initiative;

(iii) The fact that Mr. Thomas carried out minimal due diligence on the loan transaction and was able to agree to make the payment, which was substantial (US$9.5m.), within 48 hours of being told by Mr. Gilbertson that he needed the money to pay for his "Christmas present." It was clear from the evidence that Mr. Thomas placed great faith and trust in Mr. Gilbertson and that in reality he relied on him entirely as to whether it was a sound and appropriate investment for the trust to lend such a significant sum for the purchase of 25% of the rights. There was no evidence that Fairbairn as trustee gave any consideration to the interests of the other beneficiaries of the BPG Settlement. Mr. Gilbertson himself, in his email to Mr. Mende, described Fairbairn's role as simply "processing paperwork."

(iv) It was evident that Mr. Gilbertson's own assessment of the BPG settlement, of which he was the settlor, was that he was free and able to direct Fairbairn as the trustee to apply the funds in that trust exactly how and when he wanted and that he expected Mr. Thomas to act upon his request to procure Fairbairn to transfer a large amount of money from the trust to him or for his benefit within a very short space of time. He told Mr. Mende that he would refund him promptly with the US$9.5m., which was his share of the purchase price for the rights, the following day or at least within a few working days as he had to extract it from a trust in Jersey. He said he could do so within a few days. In his oral evidence he said he was "confident" that he could extract the money from the BPG settlement in Jersey. In the event his confidence was justified as he had no difficulty in doing so within the few days which he had told Mr. Mende it would take.

(v) It was Mr. Gilbertson, with the assistance of Sean Gilbertson, who in effect made all the decisions with regard to the loan and its terms and Mr. Thomas did not seriously question what he was being asked to do with a substantial amount of trust money. Furthermore, the period of time between Mr. Gilbertson's first call to Mr. Thomas on January 2nd, 2007, and his email to Mr. Vekselberg informing him that same evening that he had triggered alternative arrangements and bought the rights was only about 8 hours. There is no evidence that during that time Mr. Thomas had reverted to Mr. Gilbertson and agreed to make the payment. Mr. Gilbertson cannot have been in any doubt that Fairbairn would pay the money which he had told Mr. Thomas he needed only a short time before.

(vi) There was no evidence to suggest that at any time during his discussions and negotiations after January 3rd, 2007, Mr. Gilbertson discussed any of the proposals or possibilities with Mr. Thomas, even though Autumn had made a substantial loan and also held equity in PEL, latterly Fabergé Ltd.

(vii) It was also pointed out that from the outset of these proceedings Autumn has shared a single defence and a single legal team with Mr. Gilbertson and has wholly aligned itself with him. It has not been separately represented. Autumn did not produce its own list of documents on discovery separate from those of Mr. Gilbertson and he himself verified Autumn's discovery on oath.

82. The plaintiff contends that all of these factors demonstrate that Mr. Gilbertson was in reality and in practice the directing mind and will of Autumn which was an entity effectively controlled by Mr. Gilbertson. It was argued that the trustee was simply going through the motions in his request for the money but in reality was acting on Mr. Gilbertson's instructions. Accordingly, Mr. Gilbertson's knowledge of all the relevant background and circumstances is to be imputed to Autumn. As I mentioned earlier in this judgment, it was pointed out by leading counsel for the Gilbertson parties that most of these matters took place prior to Autumn's acquisition by Fairbairn but he accepted that for this purpose, insofar as they related to Fairbairn as trustee of the BPG Settlement and to Mr. Thomas, they could be considered applicable to Autumn.

83. I should mention that the plaintiff pleaded and, until late in the trial was apparently maintaining, a claim against Mr. Gilbertson for an account of the profits of Autumn, apparently on the basis that Autumn was Mr. Gilbertson's alter ego for those purposes. Leading counsel for the plaintiff expressly abandoned the claim against Mr. Gilbertson personally to account for Autumn's receipts "because we accept that we cannot lift the veil of incorporation as between him and Autumn." But he went on to say "but that is not the same thing as saying that he is not the directing mind and will of Autumn .. to be clear,  we do maintain a case that Mr. Gilbertson's knowledge should be attributed to Autumn on the footing that he is its directing mind and will. And our submission is that you do not have to lift the veil of incorporation in order to attribute knowledge."

84. Leading counsel for the Gilbertson parties' position was that in order to establish that Mr. Gilbertson was in practical terms the directing mind and will of Autumn it was necessary to conclude that Mr. Thomas had failed in his duties in respect of Autumn as a matter of fact. He argued that the evidence of Mr. Thomas demonstrated that he took his duties very seriously and that there was no basis for the suggestion that he allowed Mr. Gilbertson to override him. The Gilbertson parties say that therefore

the only issue in this regard has to be Autumn's knowledge through Mr. Thomas.

85. From my own assessment of the evidence, I consider that the reality is, as I have already said, that Mr. Gilbertson is a forceful and tough businessman and he is no doubt the source of the funds in all three of the Gilbertson family trusts. He was not, in my view, the kind of man who would readily take no for an answer. Mr. Thomas would not want to upset or disagree with his client. My impression was that he was very ready to comply with Mr. Gilbertson's requirements and to place great reliance upon him in doing so. There was no question of Mr. Gilbertson overriding him; there was little or nothing to override. Mr. Thomas went through the motions but there was never any doubt that he would comply with Mr. Gilbertson's request and Mr. Gilbertson knew and relied upon that.

86. With regard to Autumn's knowledge through Mr. Thomas, the question is whether Mr. Thomas knew, or should have known if he had made appropriate independent enquiries, that the rights were being acquired by Mr. Gilbertson in circumstances which amounted to a breach of his fiduciary duties. In this regard the knowledge concerned is that referred to in the third element set out by Lord Hoffmann in *El Ajou* v. *Dollar Land Holdings* (7) ([1994] 2 All E.R. at 700), namely "knowledge on the part of the defendant that the assets he received are traceable to a breach of fiduciary duty." The defendant here is, of course, Autumn (by its indirect director Mr. Thomas) and the knowledge is that the assets (the new shares in PEL) were traceable to a breach of fiduciary duty by Mr. Gilbertson.

87. The plaintiff contended, first, that Mr. Thomas knew all about the Pallinghurst structure and he knew that Renova had an interest in it. Fairbairn was after all a 50% shareholder in the company, the other 50% being owned by Renova Holding. The structure chart, which Mr. Thomas said he saw, made that clear. All the Pallinghurst documents had been sent to Fairbairn on September 7th, 2006, with the structure chart.

88. Secondly, the exchange referred to earlier in Mr. Thomas's telephone conversation with Mr. Gilbertson on January 2nd, 2007, is particularly relevant in this context:

"Justin Thomas: What would Viktor Vekselberg's thoughts be if you do this without using Pallinghurst?

Brian Gilbertson: He'll be extremely pissed off, I would think.

Justin Thomas: [laughs]."

Mr. Thomas obviously knew enough to enquire about Pallinghurst and Mr. Vekselberg. He understood the connection and he was given an answer that would, in my view, have alerted an objective and independent trustee to the fact that there seemed to be a problem. Mr. Gilbertson's answer

clearly indicated that Mr. Vekselberg would think Mr. Gilbertson was doing something which he was not entitled to do with regard to Mr. Vekselberg and the duties which Mr. Gilbertson owed in respect of the Pallinghurst structure. It is not clear why Mr. Thomas did not follow up on Mr. Gilbertson's reply. His reaction of laughter seems to me to confirm that Mr. Thomas was somewhat in awe and in the thrall of Mr. Gilbertson and did not want to question why Mr. Vekselberg would be "pissed off." That does not seem to me to be the response of a cautious objective trustee who was being asked out of the blue by one of the beneficiaries to make an urgent payment of US$9.5m. or US$0.5m. out of the trust. The fact that he had been told by Mr. Gilbertson that he was acquiring the Fabergé brand for himself as a Christmas present should, in light of his knowledge of the Pallinghurst structure and Mr. Vekselberg's interest and likely reaction, in my view, have alerted Mr. Thomas and caused him to at least make further independent enquiries. My impression was that he did not do so because he did not feel able or willing to seriously challenge or question what Mr. Gilbertson wanted.

89. Leading counsel for the Gilbertson parties submitted that there was no evidence that Mr. Thomas knew that Mr. Gilbertson was a director of the company. Mr. Thomas's own evidence about that was somewhat vague but I find it hard to believe that he did not realize that, given his familiarity with the Pallinghurst structure, which he expressly confirmed, and the fact that Fairbairn was a 50% shareholder of the company. In my view, the probability is that Mr. Thomas knew that Mr. Gilbertson was a director of the company.

90. With regard to the issue of the new shares in PEL to Autumn, Mr. Thomas knew PEL was a Pallinghurst company, wholly owned by the master fund and indirectly owned through the company which was owned 50% by the plaintiff, Renova Resources, and 50% by Fairbairn itself. Mr. Thomas must have realized that the master fund's, and thus indirectly the company's, interest in PEL was going to be diluted as a result of the issue of such shares which would be seriously prejudicial to the master fund and the Pallinghurst structure in which Renova, and so indirectly Mr. Vekselberg, had an interest. Mr. Gilbertson's answer to his question about Mr. Vekselberg's likely reaction to Mr. Gilbertson purchasing the Fabergé brand as a Christmas present for himself should have alerted him to the fact that there would be a problem as a result of what Mr. Gilbertson was doing.

91. It was argued on behalf of the Gilbertson parties that Mr. Vekselberg would be "extremely pissed off" because Mr. Vekselberg wanted to acquire the rights for himself. That is, of course, a rather incomplete description of Mr. Vekselberg's position in that he also took the position that the economic benefits and management of the Fabergé brand should remain with the master fund. However, the fact is that that suggestion was

anyway not made entirely clear to Mr. Thomas in the telephone conversation. In my view, the only interpretation available to Mr. Thomas of Mr. Vekselberg's likely reaction, in light of his own knowledge of the Pallinghurst structure and what he had otherwise been told by Mr. Gilbertson, was that Mr. Gilbertson was doing or proposing to do something contrary to the interests of the master fund, which was indirectly owned by the company, of which Mr. Gilbertson was a director and Fairbairn was a 50% shareholder, as part of the Pallinghurst structure, in which Renova and Mr. Vekselberg had an interest. Mr. Thomas knew, or at least should have known, that he should at least make further enquiries in relation to Mr. Gilbertson's actions or proposed actions. In my view, Mr. Thomas must or ought to have realized that Mr. Gilbertson was or was likely to be in breach of his director's duties and that proceeding to implement Mr. Gilbertson's request in the circumstances without more information and without the knowledge of Renova and/or Mr. Vekselberg would be inappropriate for a prudent trustee.

### Autumn as a volunteer

92. The plaintiff's case is that Autumn is liable to account as a constructive trustee for the PEL shares it received. It is said that Autumn was not a *bona fide* purchaser for value without notice because it knew or ought to have known of Mr. Gilbertson's breach of fiduciary duty. Anyway, Autumn did not pay for the PEL shares and accordingly is not a purchaser in any event. Thus, it is argued, Autumn holds the shares concerned in what was PEL, now Fabergé Ltd., on constructive trust for the master fund/GPLP/the company and is liable to account for those shares. In all the circumstances I am inclined to agree with that.

93. The plaintiff submits that as Autumn did not pay for the shares in PEL/Fabergé Ltd., it received them as a volunteer. It is correct that Autumn never paid for them. It appears to have received them at the same time as but not as part of the loan transaction whereby it lent the sums of US$9.5m. and then US$0.5m. at interest. The board resolution of PEL on January 3rd, 2007 refers to the issue of the shares as "in addition to the loan." There is no apparent commercial connection between the loan and the issue of the shares. No satisfactory justification for the issue of the shares was given in the evidence, particularly since the loan was not only at interest but also conferred on Autumn and the other members of the consortium the right to compel PEL to transfer to them the whole rights *in specie* on seven days' notice. It is also consistent with the issue of the PEL shares being gratuitous that when the loan was repaid by Fabergé Ltd. with interest in September 2007, Autumn retained the shares, as did the other members of the consortium. It is apparent that the shares were a gift from the start and they were treated as such when the loan was repaid.

94. The Gilbertson parties said two things with regard to the plaintiff's claim that Autumn should be treated as a volunteer. First, they argued that whatever the precise circumstances in which the new shares were issued, such issue was part of the wider commercial transaction and should not be separated from the loan transaction. However, that does not seem to me to accord with the evidence to which I have already referred. Secondly, the Gilbertson parties submitted that either Autumn paid for the new shares, which in fact it did not, or that as a result of its acquisition of the shares it is a debtor of Fabergé Ltd. in respect of the shares and accordingly not a volunteer. I also consider that this argument does not accord with the circumstances here. The new shares were issued in January 2007, some 5½ years ago, and there is no evidence that any demand for payment in respect of the shares has ever been made nor any indication that Autumn (or for that matter any of the other members of the consortium) is expected to pay for the new shares or is considered a debtor in respect of them. Nor, as far as I am aware, has Autumn or any of the other members of the consortium ever made any offer to pay for the shares. In my opinion, the evidence clearly indicates that Mr. Gilbertson procured PEL (now Fabergé Ltd.) to issue the new shares gratuitously for no consideration or expected consideration.

95. Accordingly, the plaintiff argues, Autumn was never a *bona fide* purchaser for value without notice. Equity will not assist a volunteer: see *In re Diplock* (6) ([1947] Ch. at 781–784, *per* Wynn-Parry, J.). Therefore, on this basis also, Autumn holds the shares concerned in Fabergé Ltd. (formerly PEL) on constructive trust for the master fund/GPLP/the company and is liable to account for them. In the circumstances I agree with that submission.

### The claim for profits

96. Apart from its gratuitous receipt of the new PEL/Fabergé Ltd. shares, Autumn made profits on the loan to PEL, namely the interest that it was paid. In his witness statement, Mr. Thomas explained that on September 28th, 2007, the sum of US$11,798,973 was paid by Fabergé Ltd. to Autumn, representing the loan of US$9.5m. together with the further loan of US$0.5m. for working capital advanced to PEL/Fabergé Ltd., together with interest on those sums. His evidence was that the initial interest on the loan was US LIBOR plus 1.5% which at the time would have been a total interest rate of about 7%. However, in May 2007 the interest rate on the loans, including Autumn's loan, was unilaterally increased by Fabergé Ltd. to 25% per annum pursuant to a proposed call-option agreement. There was no reasonable explanation by the Gilbertson parties' witnesses for this unusually high rate of interest. The total interest paid on the loans was a profit to Autumn in respect of funding of the acquisition of the rights and the further working capital. The plaintiff's argument is that

since the acquisition of the rights was an economic opportunity diverted away from the Pallinghurst structure by Mr. Gilbertson in breach of fiduciary duty, such profit is directly traceable to that breach. Accordingly, the plaintiff contends that Autumn is also liable to account for the amount of that interest.

### Autumn's reliance on the company's articles of association

97. Autumn relies in its pleaded defence on what it contends is Mr. Gilbertson's exoneration from liability for breach of fiduciary duty under art. 131 of the company's articles of association ("the articles"), and submits that accordingly Autumn can have no liability arising from such breach either. Clearly Autumn was not a party to the articles and therefore may not rely on them or seek to enforce them directly. However, in my view, Autumn may not rely on art. 131 indirectly either. For the reasons I have already explained earlier in this judgment, in my opinion Mr. Gilbertson cannot have the protection of art. 131 in the circumstances of this case. If that is correct and Mr. Gilbertson is not exonerated from liability for his breach of fiduciary duty by art. 131, then *a fortiori* neither is Autumn.

98. In any event, even if Mr. Gilbertson could be exonerated by art. 131, the liability of Autumn would not be affected for the following reasons:

   (i) The claim against Autumn is to account as a constructive trustee, and not, as in the case of the claim against Mr. Gilbertson, for equitable compensation for breach of fiduciary duty. Claims for account of assets or profits are not covered by art. 131.

   (ii) The fact that a claim for breach of fiduciary duty might not be actionable against the fiduciary himself by virtue of the articles does not preclude a claim against a third party recipient of property transferred in breach of such fiduciary duty. The effect of art. 131 is not that the acts of Mr. Gilbertson did not amount to a breach of fiduciary duty at all. It operates in effect only as an undertaking to him alone that he will be excused liability for any such breach of fiduciary duty. Accordingly, even if the effect of the article were to excuse Mr. Gilbertson from liability for breach of fiduciary duty, it would not operate to excuse Autumn from a claim based upon the consequences of such breach of duty.

99. I therefore do not accept the submissions on behalf of Autumn that it may rely in any way on the company's articles.

### The counterclaims

100. With their defence to the plaintiff's claim, the Gilbertson parties served a counterclaim, which was subsequently slightly amended by their amended defence and counterclaim served pursuant to an order made on

November 30th, 2011. There are several individual claims in the counterclaim, all of which are said to be expressly conditional and contingent upon the plaintiff establishing liability in respect of the relief it is claiming against the Gilbertson parties. The counterclaim is accordingly not a stand-alone claim. The introductory paragraph to the counterclaim states as follows:

"57. If, contrary to the primary case set out in the defence, Mr. Gilbertson and Autumn are liable in respect of any of the relief claimed against them in the name of the company (whether in its own right and/or on behalf of the master fund), Mr. Gilbertson and Autumn will counterclaim as set out below."

101. The individual claims pleaded in the counterclaim are as follows:

   (a) A claim for damages against Renova Holding on the ground that Renova Holding acted in repudiatory breach of the letter agreement (counterclaim paras. 59–60);

   (b) A claim in tort against Mr. Vekselberg and Mr. Kuznetsov for damages for inducing or procuring Renova Holding to act in repudiatory breach of the letter agreement (counterclaim paras. 61–63);

   (c) A claim in tort against all the defendants to counterclaim (Mr. Vekselberg, Mr. Kuznetsov, Renova Holding and the plaintiff) for damages for conspiracy, by both lawful means and unlawful means (counterclaim paras. 64–65);

   (d) A claim against Mr. Kuznetsov for indemnity or contribution as a co-director for breach of his fiduciary duties to the company and who, it is alleged, must share the blame for the loss to the company (counterclaim para. 66); and

   (e) A reservation of rights by Fairbairn as 50% shareholder in the company to bring a derivative action against the defendants to counterclaim for the claims for conspiracy and the claim for indemnity and contribution (counterclaim para. 67).

In each case, other than (e), which is simply a reservation of alleged rights by Fairbairn, the claim for damages is in the same amount as the Gilbertson parties are found liable for if the plaintiff's claims are successful.

102. By summons dated September 29th, 2009, the four defendants to the counterclaim applied, pursuant to GCR, O.14, r.12, for an order that the whole of the counterclaim should be dismissed and summary judgment entered for them on the ground that the Gilbertson parties, as plaintiffs to the counterclaim, had no prospect of success at trial. They also applied pursuant to GCR, O.18, r.19 for orders, *inter alia*, that certain specific paragraphs of the counterclaim should be struck out on the ground

that they disclosed no reasonable cause of action. After a three-day hearing in early March 2010 and a further hearing on April 15th, 2010, I declined to strike out any part of the counterclaim on a summary basis.

103. On May 11th, 2012, during the course of the trial, it was confirmed on behalf of the Gilbertson parties that they were no longer pursuing the specific counterclaims for lawful means conspiracy and for breach of fiduciary duty by Mr. Kuznetsov and that they were accordingly only pursuing the specific counterclaims for repudiatory breach of the letter agreement, for procuring that breach of the letter agreement and for unlawful means conspiracy. I should also say that in respect of the reservation of right by Fairbairn to bring a derivative action against the defendants to the counterclaim as pleaded in the counterclaim at sub-para. (e) above, no such action has in fact been brought and there has been no indication that any such action will be brought. Accordingly, it does not seem necessary for me to address that particular counterclaim any further. The only counterclaims which I therefore propose to consider are the claim against Renova Holding in respect of alleged repudiatory breach of the letter agreement; the claim in tort against Mr. Vekselberg and Mr. Kuznetsov for allegedly inducing or procuring Renova Holding to act in repudiatory breach of the letter agreement; and the claim in tort against all the defendants to counterclaim for conspiracy by unlawful means.

104. Before turning to analyse these three remaining individual counterclaims, I think it right to say that the overall impression which I gained during the course of the trial was that the counterclaims were pursued on behalf of the Gilbertson parties with increasingly less enthusiasm. Apart from the fact that the specific claims which I have mentioned were expressly dropped, it seemed to me that the detailed basis of the counterclaims changed to some extent from the Gilbertson parties' pleadings as well as varying somewhat also between the Gilbertson parties' written and oral opening submissions on the one hand and their closing submissions on the other hand. Also not all of the alleged facts on which the counterclaims are based were put to the Renova parties' witnesses in cross-examination. In summary, I was left with the distinct impression that counsel for the Gilbertson parties were less than convinced themselves of the merit of the remaining individual counterclaims.

105. The first remaining individual counterclaim as pleaded is in respect of the alleged repudiatory breach of the letter agreement by Renova Holding by:

"59.1 Insisting on the rights being owned otherwise than through the master fund within the Pallinghurst structure (namely, by an entity of Mr. Vekselberg's choosing outside the Pallinghurst structure); and

59.2 Refusing to procure the funding which it was obliged to provide pursuant to clause 2.4 of the letter agreement unless Mr. Gilbertson

agreed to its non-contractual demand as set out in paragraph 59.1 above.

60 By reason of such breach, Mr. Gilbertson was obliged to pursue Project Egg in the way he did, without reference to Renova Holding and/or the plaintiff in order to preserve the opportunity to acquire the rights and/or prevent PEL from incurring liability for failing to complete the agreement with Unilever. If and to the extent that such action has resulted in the company suffering any loss and having a claim against Mr. Gilbertson in respect of such loss, Mr. Gilbertson will contend that his consequential liability to the company is the result of Renova Holding's own breach of the letter agreement as aforesaid and that Renova Holding is accordingly liable to him for damages for breach of contract to the same extent that he may be held liable to the company."

106. Rather surprisingly, in light of this pleading, in his opening submissions leading counsel for the Gilbertson parties said:

"But, for the avoidance of doubt, we accept it was open to Renova to say that it would only approve a particular project on the basis that it was held in a different structure to other projects. As a matter of construction [of the letter agreement], that was open to it. And we also accept that it was open to Renova to propose that a project be taken forward with the involvement, for example, of Lamesa.

The timing in this case, we say, was, to say the least, unfortunate. It may not have been fair. It may not have been gentlemanly. We say it wasn't fair. We do say that it was not gentlemanly. But, as a matter of principle, it was open to Renova to do what it did as long as one accepts that the investment committee is the gateway or, as it were, the gatekeeper to the fund . . .

What we are concerned with here is the interpretation of the letter agreement. What the Vekselberg parties were free to do as matter of law, and what they were free to do as a matter of decency, are not the same thing. They did move the goalposts at the eleventh hour. Mr. Gilbertson did feel he was being expected to negotiate with a gun to his head. But there is no law against playing hardball."

107. In my view, this concession was inconsistent with the Gilbertson parties' case that Renova Holding was in breach of the letter agreement or that Mr. Vekselberg and Mr. Kuznetsov induced or procured such breach, as pleaded in the second remaining individual counterclaim. It is also inconsistent with pleading that such a breach of the letter agreement could form the basis of an unlawful means conspiracy by the defendants to the counterclaim.

108. Furthermore, even assuming hypothetically that Renova Holding was in repudiatory breach of the letter agreement, it is clear from the evidence of Mr. Gilbertson himself that he did not accept any such repudiation. Mr. Gilbertson clearly regarded the letter agreement as continuing in effect in early 2007 and, indeed, up until its formal termination in May 2007. Mr. Gilbertson said as much during his oral evidence under cross-examination at the trial. In fact, the overall evidence is clear that Mr. Gilbertson repeatedly and unequivocally affirmed the letter agreement and pressed for its performance in numerous different respects until its mutual termination pursuant to its terms in late May 2007. Nor was the contrary put to any of the Renova parties' witnesses and Mr. Kuznetsov's evidence in his witness statement that the letter agreement was terminated by consent on May 25th, 2007, was not challenged. In fact, it was common ground that the letter agreement was terminated by consent under cl. 8.2 thereof and accordingly treated as being null and void by mutual consent of both parties. In my opinion, therefore, even if, which does not seem to me to be the case anyway, Renova Holding repudiated the letter agreement by "moving the goalposts," such alleged repudiation was not accepted by Mr. Gilbertson and the alleged breach did not bring, and was never treated as bringing, the letter agreement to an end prior to its contractual termination by mutual consent. At that point, the letter agreement having been terminated under cl. 8.2, it was as if it had never been entered into, thereby nullifying any accrued claim, if there was one, for its breach. I accordingly conclude that there is no merit in this particular claim in the counterclaim in the circumstances.

109. The second remaining specific counterclaim is, as I have mentioned, the claim against Mr. Vekselberg and Mr. Kuznetsov for alleged inducement and/or procurement of Renova Holding's alleged breach of the letter agreement. The short point here is that, for the reasons set out above, there was no breach of the letter agreement and, even if there were, the letter agreement is itself null and void *ab initio* as a result of its mutual termination pursuant to cl. 8.2 and accordingly there is no basis for a claim for inducement and/or procurement of a breach of it. Furthermore, it was pointed out by leading counsel for the Renova parties, first, that it is well established that if the contract is void (as is the case in respect of the letter agreement as a result of its consensual termination) then no claim for the tort of procurement of its breach will lie in law (see *Joe Lee Ltd.* v. *Lord Dalmeny* (13) ([1927] 1 Ch. at 306–307)). Secondly, it is also a crucial ingredient of the tort that the defendant should have intended that the contract be breached. That was not put to any of the Renova parties' witnesses. In the circumstances, I am of the view that there is no merit in this claim either.

110. The last remaining specific counterclaim is against the four defendants to the counterclaim for the tort of conspiracy by unlawful means. The relevant pleadings of the alleged conspiracy are as follows:

"64.2 To commit unlawful acts against the master fund and hence Mr. Gilbertson, namely:

64.2.1 By insisting on the transfer of the ownership of the rights outside the Pallinghurst structure in breach of the letter agreement as aforesaid and in breach of Mr. Kuznetsov's fiduciary duty to the company as set out in para. 66.1.1 below; and/or

64.2.2 By refusing to provide funding to the master fund in breach of the letter agreement as aforesaid.

65 Accordingly, Messrs. Vekselberg [and] Kuznetsov, Renova Holding and the plaintiff are liable to Mr. Gilbertson for damages for the tort of conspiracy to injure and/or to commit unlawful acts, the measure of damages being the same as that claimed at paras. 60 and 63 above."

It will be noted that para. 64.2.1 is based on alleged breach of the letter agreement and alleged breach of Mr. Kuznetsov's fiduciary duty to the company. As I have explained above, it was effectively conceded that there was no breach of the letter agreement and the original specific counterclaim in respect of the alleged breach of Mr. Kuznetsov's fiduciary duty to the company has been abandoned.

111. Further, the Gilbertson parties' pleading at para. 64.2 avers that the alleged conspiracy was "to commit unlawful acts against the master fund and hence Mr. Gilbertson." Accordingly, the plea is that the master fund was the target of the alleged intended injury and consequently Mr. Gilbertson. However, it was submitted, in my view correctly, that Mr. Gilbertson's economic interest in the master fund was not enough to give him a cause of action. Only the master fund (or GPLP or the company) could sue in respect of alleged unlawful acts against the master fund. Mr. Gilbertson has no standing to sue in respect of an alleged conspiracy to commit unlawful acts against the master fund.

112. As I have also mentioned, leading counsel for the Gilbertson parties, as plaintiffs to the counterclaim, cross-examined the Renova parties' witnesses, including Mr. Vekselberg and Mr. Kuznetsov, the first and second defendants to the counterclaim. I accept the submission of leading counsel for the Renova parties that the essential factual elements of the three remaining specific counterclaims were not put to those witnesses. In particular in this context, it was not put to either Mr. Vekselberg or Mr. Kuznetsov that their purpose, whether predominant or otherwise, was to harm the master fund and thereby Mr. Gilbertson. Furthermore, the evidence in the case simply does not support any

contention that the intention of Mr. Vekselberg and Mr. Kuznetsov, by their insistence on ownership of the title to the Fabergé brand by one of Mr. Vekselberg's private companies outside the Pallinghurst structure or their alleged refusal to provide funding to the master fund through PEL for the purchase of the rights, was intended to harm Mr. Gilbertson. At most, and on the Gilbertson parties' best case, the intentions of Mr. Vekselberg and Mr. Kuznetsov were to further and protect the interest of Mr. Vekselberg in owning the title to the Fabergé brand. Arguably, the intentions of Mr. Vekselberg and Mr. Kuznetsov were also to protect the interest of the Pallinghurst structure and the master fund insofar as the economic benefits and management of the rights were concerned, while providing Mr. Vekselberg with the legal title to the Fabergé brand as the price for personally funding the purchase from Unilever and giving him, in Mr. Gilbertson's own words, the ability "to be able to hang on your wall the certificate that says: I am the owner of the Fabergé rights . . ."

113. For the various reasons above I have concluded that the three remaining specific counterclaims by the Gilbertson parties are not made out and should be dismissed.

**Quantum**

114. The financial relief sought by the plaintiff against Mr. Gilbertson in respect of his alleged breach of fiduciary duty as set out in its amended statement of claim is, first, an account of the profits received by Mr. Gilbertson as a result of his acquisition of the rights and, secondly and alternatively, payment to the company (and/or GPLP and/or the master fund) of equitable compensation for the loss of the rights. An account of profits and equitable compensation are alternative and inconsistent remedies and a plaintiff must elect between them. During the course of the trial, the plaintiff's claim for an account of profits against Mr. Gilbertson was abandoned and accordingly the plaintiff elected to pursue its claim against Mr. Gilbertson for equitable compensation for his breach of fiduciary duty.

115. Equitable compensation may be payable in respect of loss caused by breach of an equitable duty, such as a fiduciary duty. It is compensation calculated to put a plaintiff back into the position in which he would have been at the time of the trial had he not sustained the wrongfully caused loss. In the present case that means the monetary value of the loss to the Pallinghurst structure incurred as a result of the diversion from the master fund of the economic benefit of development, exploitation and management of the Fabergé brand. The plaintiff's claim is not for loss of the opportunity on the part of the master fund to enjoy such benefits. It is a claim to reconstitute the master fund to the position in which it would now have been but for Mr. Gilbertson's breach of duty.

116. In his oral closing submissions, leading counsel for the plaintiff said:

"My Lord, the case that we advance is by the company in order to reconstitute the master fund and the relief that is set out in the pleadings is that an order for payment is made to the master fund and/or GPLP and/or the company. It is a re-constitution claim."

At an earlier stage in his closing he had said:

"All we are asking your lordship to decide is that, had Mr. Gilbertson not walked away and had complied with his fiduciary duties, the parties would have ended up where they had aimed to end up, which is that the full economic benefit of the rights—and I emphasize the word 'full'—would have lain with the fund and that Mr. Vekselberg would have ended up with a piece of paper which said 'rights' on it and that that is what the parties were trying to achieve."

117. The case proceeded on the basis that the appropriate time at which the reconstitution of the master fund should be considered was at the time of the trial. It was the monetary compensation required to restore the master fund to the situation in which it would have been at the date of the trial that was in issue and not the position in which the master fund would have been at the time of Mr. Gilbertson's breaches of duty in late December 2006/January 2007. Leading counsel for the parties proceeded on that basis, as did the expert witnesses who addressed value as at the time of the trial.

118. In summary, the plaintiff's case on quantum was that the master fund owning the full economic benefits and management of the rights equated in practical terms with owning the whole rights, including the title to the Fabergé brand outright. The plaintiff therefore contended that the amount of equitable compensation payable was equivalent to the whole present monetary value of Fabergé Ltd. (formerly PEL), as the present owner of the whole rights. Accordingly, the opinion and evidence of the plaintiff's expert focused almost entirely on the current value of the company Fabergé Ltd., whose sole asset is the whole rights.

119. In brief, the Gilbertson parties accepted that the current value of Fabergé Ltd. was the starting point in assessing the position, although their expert valued Fabergé Ltd. at a considerably lower figure than the plaintiff's expert did. However, they did not accept that the value to the master fund of the economic benefits and management of the Fabergé brand equates to the value of the whole rights. That is because, in these circumstances, the whole rights themselves would not have been owned by the master fund and, they argued, the value of the economic benefits and management of the rights, without ownership of the income producing asset itself, namely the Fabergé brand, is considerably less than the value

of owning the whole rights, including the brand itself. They also argued that the master fund would not, on this hypothesis, own the whole unrestricted economic benefits of the rights in any event since such ownership would be pursuant to the terms of a licence from the owner of the title to the brand, Lamesa Arts Inc. They also contended that the financial position of Fabergé Ltd. is such that it is a loss-making business in which much more has been invested than it is worth. The upshot of their contentions is that Mr. Gilbertson's actions have caused no loss to the master fund, that nothing is required to put it into the financial position it would have been in today and accordingly no equitable compensation is payable.

120. The plaintiff's expert witness was Ms. Elizabeth Gutteridge, a partner of Deloitte LLP in London. In her first report, Ms. Gutteridge, identified three generally accepted methods for valuing companies, namely a market-based approach using the company's share prices, an income-based approach and an asset-based approach. After explaining and discussing each approach, she concluded that, in the case of Fabergé Ltd., the market-based valuation method was the most appropriate. This extrapolated the value of the company from the prices at which transactions in its shares had taken place ("subject company transactions"). She specifically rejected the income-based method of valuation known as Discounted Cash Flow ("DCF"), which estimates the value of a business by calculating the present value of the anticipated future cash flows of the business. She argued that Fabergé Ltd. is at a relatively early stage of growth with only modest revenues, which are yet to result in profits, and therefore significant assumptions about future cash flow would be required which would be potentially unreliable. She considered the evidence produced by subject company transactions would be a better and more reliable basis for valuation. Her approach was supported by the valuations of Fabergé Ltd. by its own directors and also by the directors of Pallinghurst Resources Ltd., an English company substantially owned and controlled by Mr. Gilbertson, which is the majority shareholder in Fabergé Ltd., owning directly or indirectly 49.1% of its shares.

121. Ms. Gutteridge expressed her opinion of the value of Fabergé Ltd. as at January 31st, 2012, as being US$177m. Her assessment of the value was based upon dealings in the shares of Fabergé Ltd., which the directors had themselves used to value the company in March 2011 for the purpose of the company's audited financial statements to March 31st, 2011. The same share transaction was also used by the directors of Pallinghurst Resources Ltd., the majority shareholder. That valuation was made for inclusion in the interim report of Pallinghurst Resources Ltd. dated June 30th, 2011. The valuations of Fabergé Ltd. arrived at by both the directors of Fabergé Ltd. itself and the directors of Pallinghurst Resources Ltd. were also US$177m., extrapolated from the same share transaction. Ms.

Gutteridge also relied upon the fact that the valuations by the directors of Fabergé Ltd. and by the directors of Pallinghurst Resources Ltd. were subject to review by their respective auditors and she saw no evidence to suggest that the respective auditors questioned those valuations.

122. Ms. Gutteridge, as did the directors of Fabergé Ltd. and the directors of Pallinghurst Resources Ltd., based her assessments of value on that implied by a past transaction in the shares of Fabergé Ltd. on the basis of a share price of US$88.07 per share. This was derived from a capital raising by Fabergé Ltd. in September 2009. In the view of Ms. Gutteridge, as well as in the view of the Gilbertson parties' expert, Mr. Chris Osborne, share transactions involving non-shareholders are of considerably greater assistance in this context than share transactions involving existing shareholders. The most recent non-shareholder transaction was as a result of the capital raising by Fabergé Ltd. in September 2009 when an investment of US$100,000 was made at a share value of US$88.07 by a third party who was not an existing share-holder. Notwithstanding that the total capital raising at that time by way of the issue of new shares at that price was US$35m., so that by far the greater part of the subscription for new shares was made by the existing shareholders, Ms. Gutteridge relied heavily upon the non-shareholder investment of US$100,000 in concluding that the shares of Fabergé Ltd. at that time had a value of US$88.07. She used that to arrive at a valuation of the company of US$177m. She considered that her opinion was supported by the assessments of value by the directors of the company and by the directors of Pallinghurst Resources Ltd. who, as I have already explained, had adopted the same approach. Ms. Gutteridge also identified several other factors which, while not considered primary grounds for establishing a value, she nonetheless contended supported her opinion of the value of Fabergé Ltd. in January 2012 as being US$177m.

123. The Gilbertson parties' expert was Mr. Osborne, a senior managing director in the London office of FTI Consulting Ltd., a firm specializing, *inter alia*, in litigation support and valuation. In his report he estimated the value of Fabergé Ltd., as at February 10th, 2012, as being not more than US$120m., using the DCF method of valuation. This was of course a method which was rejected by Ms. Gutteridge, the plaintiff's expert.

124. In his first written report, Mr. Osborne determined that Fabergé Ltd. was, from a practical point of view, a start-up business when it was first acquired from Unilever on January 3rd, 2007. In Mr. Osborne's opinion, the most widely adopted and recognized valuation method for a going concern is the DCF method, although he acknowledged that start-up businesses are notoriously difficult to value because they have no significant record of past performance. Nonetheless, he ruled out the subject company transactions method of valuation used by Ms. Gutteridge, on the

ground that Fabergé Ltd. had been a loss-making business since acquisition by PEL in January 2007, so that using a single small share transaction as a basis for expressing the value of the company was of very limited or no assistance. Mr. Osborne accordingly valued Fabergé Ltd. using what he called in his first report a "simplified DCF module." His estimates of the cash flows of Fabergé Ltd. were based on the 2011 financial forecast of the company, but applying a discount rate of 20% for anticipated risks with the cash flows and assuming that from February 1st, 2012, Fabergé Ltd. would meet the 2011 financial forecast. He assumed that by 2015 Fabergé Ltd. would have reached a more mature stage of development and he therefore estimated the value of cash flows after that date as a multiple of the sales forecast for 2015. Based on these assumptions and his consequent calculations, Mr. Osborne expressed the view that the current value (at February 10th, 2012) of Fabergé Ltd. was approximately US$120m., although he also said he regarded this estimate of the value as "potentially high." Mr. Osborne went on to explain that there were several reasons for this view. They included the accepted need for further significant investment in the business, the apparent risk of under performance by reference to the 2011 financial forecast and the fact that the value of the principal comparable business used as a factor in assessing the value of Fabergé Ltd., namely Bulgari, was itself high for reasons specific to that business. He said that, assuming a more realistic lesser terminal value of 2 times for Fabergé Ltd.'s forecast sales, rather than the 3.8 times which he had applied in his valuation, would result in a valuation of Fabergé Ltd. of US$56m. rather than US$120m. For those reasons, amongst others, he felt a valuation of US$120m. was definitely on the high side.

125. Leading counsel for the Renova parties was critical of Mr. Osborne's expert report for not referring in detail to the alternative valuation methods considered by Ms. Gutteridge and for not explaining sufficiently why he considered the subject company transactions method to be inappropriate and the DCF method to be more appropriate in this case. Mr. Osborne was criticized for using the DCF method. However, in her evidence, Ms. Gutteridge did say that at an early stage in her consideration of the value of Fabergé Ltd. she had herself carried out a DCF assessment and had reached conclusions on value similar to those of Mr. Osborne. She had nonetheless disregarded that as she considered the DCF method to be inappropriate in valuing Fabergé Ltd. in the circumstances. However, the cross-examination of Mr. Osborne was almost entirely confined to challenging his suggested failure in his report to explain and consider the different valuation methods or to explain in detail why he had used the DCF method; he was not cross-examined to any significant extent on the substance or detail of his valuation or how and why he had reached the conclusions which he did.

126. In May 2010, Fabergé Ltd. had entered into a loan agreement with Pallinghurst Resources Ltd. for US$25m. in order to provide Fabergé Ltd. with sufficient finance to enable it to continue as a going concern. During the second half of 2010, Fabergé Ltd. started to draw down funds under this loan agreement in order to continue operations. In April 2012, Fabergé Ltd. made the final draw down against this loan. In November 2010, Fabergé Ltd. undertook a further capital raising seeking to raise a total of US$40m. The share price for the potential issue was at a 9.7% discount on the previous share price of US$88.07, namely US$79.50. The directors' report of March 31st, 2011 states that this discount was "aimed to attract a new potential strategic investor." However, this capital raising was not successful and two target closing dates in November 2010 and a further one in December 2010 all lapsed. Eventually the process was abandoned.

127. During the course of the trial, the Gilbertson parties gave further discovery in relation to quantum. This, it was said, was as a result of Fabergé Ltd.'s continuing attempts to raise further funding to enable it to continue its business. A second witness statement by Sean Gilbertson dated April 30th, 2012, together with two further supplemental lists of documents of the same date, were produced. A few days previously a copy of the consolidated financial statements of Fabergé Ltd. for March 2012 was also produced. The import of this additional evidence was that on April 10th, 2012, at about the time of its final draw down of its loan from Pallinghurst Resources Ltd., Fabergé Ltd. had initiated a US$50m. rights issue, inviting existing shareholders to take up their pro rata rights and to apply for additional shares, at a share price of US$79.50 per share, that is at the same share price as the unsuccessful capital raisings in November and December 2010. As the response to this rights issue in April 2012 was poor, after further discussions, a revised offer at the significantly discounted price of US$50 per share was sent to Fabergé Ltd.'s shareholders on April 27th, 2012, with a request for responses no later than Friday May 11th, 2012. No application for leave to adduce any further evidence relating to the outcome of that rights offer was made prior to the conclusion of the trial on May 18th, 2012 or has been since.

128. These further unsuccessful attempts by Fabergé Ltd. to raise a further US$50m. in equity funding during April and May 2012, initially at US$79.50 per share and latterly at US$50 per share, are not of the same evidential value as a share acquisition by an independent non-shareholder investor. The latest capital raising attempts have been directed to existing shareholders and, secondly, the outcome of the latest attempt at US$50 per share was not put before the court. However, it does nonetheless seem to me somewhat artificial to ignore entirely the level at which these latest attempts to raise capital at significantly reduced share prices have been

pitched in assessing the probable present value of Fabergé Ltd. Mr. Osborne was of a similar view.

129. In his second report Mr. Osborne said:

"Ms. Gutteridge's valuation is based on the same methodology as that used in [Pallinghurst Resources Ltd.'s] interim financial statements on 30th June 2011 and is apparent from the accounts themselves. That valuation is based upon the price at which share transactions took place in September 2009. In adopting that approach Ms. Gutteridge ought, in my opinion, to have given greater consideration to two questions in particular than it appears that she has. The first of those is whether any new information since September 2009 argues for a revision to the valuation and the second is whether the valuation remains plausible having regard to the current forward projections. The fact that the directors of [Pallinghurst Resources Ltd.] will have considered those same questions in 2011 does not, in my opinion, relieve Ms. Gutteridge of her obligation to form an independent view."

130. I should point out that Mr. Osborne's comments were of course made before he knew about the unsuccessful capital raising at US$79.50 per share in April 2012 and the latest attempt at capital raising at US$50 per share. Although Ms. Gutteridge, and indeed the directors of Fabergé Ltd. and the directors of Pallinghurst Resources Ltd. decided slightly more than a year ago that there was no basis for changing the valuation which they arrived at in reliance upon the share transaction in September 2009, now almost three years ago, the court requires to determine the probable value of Fabergé Ltd. in all the circumstances at this time. I agree with Mr. Osborne that it is unrealistic in light of the current circumstances of Fabergé Ltd. to rely almost wholly upon such a single small historic share transaction for this purpose. It is, of course, argued on behalf of the plaintiff that in saying what he does, Mr. Osborne is saying something which is said by neither the auditors or directors of Fabergé Ltd., nor by the directors of its principal shareholder. However, they were not carrying out quite the same exercise for the same purpose as the court is required to do and were doing so before the recent unsuccessful capital raisings at significantly reduced share prices. In my view, to ignore the evidence of the fundamental financial difficulties which Fabergé Ltd. clearly now faces and to rely almost wholly on a single small company share transaction which is now some three years ago is not persuasive.

131. In cross-examination, I found Ms. Gutteridge somewhat inflexible and dogmatic in her insistence that the value of Fabergé Ltd. should be determined by reference to the single small share transaction in September 2009 and to the valuations, using a similar approach, by the directors of Fabergé Ltd. and the directors of Pallinghurst Resources Ltd. She was

unwilling to consider any adjustment to her US$177m. valuation in light of any of the factors identified by Mr. Osborne in reaching his valuation of not more than US$120m. or in light of any of the more recent capital raising attempts or in light of any of Mr. Osborne's comments on the company's actual and forecast financial performance.

132. Both experts agreed that, in round figures, US$115m. of equity and US$25m. of debt, that is a total of US$140m., has so far been invested in Fabergé Ltd. as at March 31st, 2012. Although the outcome of the latest attempt to raise further equity capital at a price of US$50 per share was not put before the court prior to the end of the trial, the evidence to date strongly suggests that the current investors in the company are at least reluctant and possibly unwilling to invest further. I also note the latest evidence of Sean Gilbertson that even he and Mr. Gilbertson, had they been directly involved personally in setting the share price of US$50 for the latest offering, would probably themselves have recommended a price of US$55 to US$60 per share. Mr. Gilbertson, therefore, the greatest enthusiast for the Fabergé brand (other than perhaps, for different reasons, Mr. Vekselberg), recognized that a very substantial discount from the price of US$88.07 per share in 2009 was appropriate at this time.

133. While Mr. Osborne accepted that under the DCF valuation method a wide range in value will result from only small changes in assumptions made, I nonetheless found his approach and analysis more persuasive overall in the circumstances than Ms. Gutteridge's. While the valuation of Fabergé Ltd. is clearly a matter of opinion and not of absolute certainty, having regard to all of the factors identified in their reports, including their report of their meeting on May 1st, 2012, which I directed, together with their oral evidence and also that of Mr. Gilbertson and Sean Gilbertson, I found the opinion of value by Mr. Osborne more plausible and probable. I therefore prefer his opinion that the current value of Fabergé Ltd. is not more than US$120m. and possibly significantly less for these purposes.

134. However, as I have already said, in quoting leading counsel for the plaintiff, this is a claim for reconstitution of the master fund to the financial position in which it would now be but for Mr. Gilbertson's breach of fiduciary duty and there is an important dispute between the parties as to how that should be calculated and what it amounts to. As I have already summarized, the plaintiff contends that prior to January 3rd, 2007, Mr. Gilbertson had agreed that, while the actual title to the Fabergé brand itself would be owned by one of Mr. Vekselberg's private companies within the Lamesa group, the full economic benefit of the rights, that is the commercial benefit of developing, exploiting and managing the Fabergé business, would remain with the master fund within the Pallinghurst structure. The plaintiff contends that in economic terms, the division of interests in the rights between the interest in the title to the Fabergé brand on the one hand and the interest in the economic benefit of

developing, exploiting and managing the Fabergé brand on the other hand is not material to the value of the whole economic benefit of developing, exploiting and managing the rights to the master fund, or at least it would make only such a negligible difference that it can be ignored for valuation purposes. Accordingly, it was argued, the loss to the master fund and the amount required to reconstitute it to the financial position in which it would be today is the whole current value of the rights, as now owned by Fabergé Ltd. as its only asset, worth, on the plaintiff's case, US$177m., or no more and possibly less than US$120m., as I have determined the current value of Fabergé Ltd. to be.

135. The plaintiff's argument was that economically it would make no difference to the master fund that the actual title to the Fabergé brand was not owned by it, provided that the master fund had the whole economic benefit of the rights, which the plaintiff says was the agreed intention. Leading counsel for the plaintiff submitted in his closing:

"My Lord, we say it's either not different or, if it is different, it is negligibly different. The aim of the parties—and we say where the parties would have ended up had Mr. Gilbertson not committed his breach of fiduciary duty—is that the Pallinghurst structure, the fund, would have ended up with the full economic benefit of the rights and their control. And if there is any value to be shaved off in favour of Lamesa because there is a split and Lamesa has the piece of paper which says 'rights' on it then that diminution in value so far as the value is concerned is negligible."

So the argument was therefore that in order to reconstitute the master fund to the financial position in which it would be today, an amount equal to the full current value of Fabergé Ltd. should be paid by way of equitable compensation by Mr. Gilbertson in respect of his breach of fiduciary duty.

136. The plaintiff's leading counsel reiterated the plaintiff's position later in his closing submissions:

"My Lord, I am not, I think, in a position to push too hard the suggestion that there is a zero deduction in circumstances where there is no evidence about precisely how much one should or should not deduct in light of the split [between the title to the brand and the economic benefit of the brand]. But our submission is—I have said it before and I will say it again—if Mr. Gilbertson had not breached his fiduciary duty then the parties would have continued to negotiate to the end point by which they would have achieved what they had started out trying to achieve, which is that the full economic benefits ended up with the fund. I can see that if it was done by a way of a licence that might not have objectively produced that result. But so far as it was different in quantification terms, it's negligible and we say to be ignored."

137. On the other hand, leading counsel for the Gilbertson parties, in his oral submissions, said:

"But, my Lord, the value of the company is just the beginning of the calculation that needs to be done in relation to any equitable compensation. Because, of course, that is the highest figure from which one has to identify the value of what it is that is said to have been lost. There are two aspects to the next stage of the analysis .. . The first question is: what is the value to be attached to the full economic benefit of the rights? The second question is: has it been shown, either on the balance of probability, or on the basis of some loss of a chance analysis, that the company or the fund would have obtained the full economic benefit of the rights but for the breach of duty which is alleged against Mr. Gilbertson."

138. As is clear from the extract from leading counsel's submissions above, the Gilbertson parties disagree with the plaintiff's approach, as did their expert, Mr. Osborne. They contend that in assessing and calculating appropriate reconstitution of the master fund in this case, the proper approach is to identify exactly what it is, if anything, that has been lost to the master fund at this time and the present value of that. The first issue is: what is the value to be attached to the full economic benefit of the rights, when that economic benefit is split from the actual ownership of the Fabergé brand itself? What, if any, is the level of discount which should be applied to the value of an otherwise similar venture holding the whole rights themselves?

139. Mr. Osborne's evidence was that it is most unlikely that an independent investor would have valued a company holding only the full economic benefit of the rights but not owning the brand itself, that is the actual income producing asset, at more than half the value otherwise placed on an entity holding and owning the entire rights. That evidence was not challenged in cross-examination, nor was it dealt with in any detail by Ms. Gutteridge, who was apparently instructed not to deal with that issue in detail in her reports. That is, of course, a very significant discount and, on the basis of Mr. Osborne's opinion of the current value of Fabergé Ltd. of not more than US$120m., which I have accepted, would place the current value of the company if it owned only the economic benefit of developing, exploiting and managing the Fabergé brand, but not the brand itself, at US$60m. It is noteworthy that, although for entirely different reasons, as I have already mentioned, Mr. Osborne also expressed the opinion that a present value of Fabergé Ltd. as it is of US$56m. was possible and indicated that his value of US$120m. was probably too high anyway.

140. Ms. Gutteridge did recognize that under the Pallinghurst agreements the life of the master fund was to be only 10 years, which would clearly

affect the current value of Fabergé Ltd. if it were now an asset of the master fund. As Mr. Osborne said, in such circumstances, where the economic business of the Fabergé brand has already been loss making for the more than five years since acquisition in January 2007, the real value will only arise once it starts to generate significant profit which is unlikely for another few years. That will be getting close to the time when the master fund would terminate. Therefore, so it was argued, the history of the master fund since early 2007 would be about six or seven years of losses and then, if the financial forecasts are met, about three years of profit before the business of the master fund, including its investment in the economic development, exploitation and management of the Fabergé brand, was sold or otherwise terminated. As I have said, the court should of course be considering value at present and not in the future, but in those circumstances it seems clear that the value of the economic business and management of the Fabergé brand today would be significantly affected by such considerations.

141. It does appear improbable that any potential purchaser would pay the same amount for a business, the principal income producing asset of which does not actually belong to it and which has a limited life span, as it would pay for a business that actually owns the principal asset and does not have such a limited period of likely profitability. Mr. Osborne's opinion on this aspect of the matter, and as I have said, his evidence on this was not really challenged in cross-examination, was that it is most unlikely that an investor would value a company owning only the full economic benefit of the rights at more than half the value such a potential purchaser would be likely to pay if the business had owned the income-producing asset as well as the right to develop, exploit and manage it. I found that opinion plausible and persuasive. It follows that if, as I have accepted, the current value of Fabergé Ltd. when it does own the entire rights is no more and possibly less than US$120m., the value of the company if it owned only the economic benefit of the rights but not the brand itself would be only approximately US$60m. or possibly less. Having regard to the amount already invested in the company and its business, which the experts both agreed was US$140m. in total, the position is that more has been invested in the company than it may be worth. That of course ignores the further investment which the company obviously requires and has recently been seeking.

142. The second issue, and to my mind also a significant one, is whether, in the circumstances, the master fund would in fact anyway have actually obtained the full economic benefit of the rights but for Mr. Gilbertson's breach of fiduciary duty in the circumstances. In seeking to answer that, it seems to me, it is appropriate to have regard to what the position would probably have been had Mr. Gilbertson not acquired the rights himself with his consortium but had continued to negotiate to final agreement with

the Renova parties as he had been purportedly doing until January 2nd, 2007. It was on December 30th, 2006 that Sean Gilbertson emailed with the third draft IA. That remained the latest draft IA over January 1st, 2007 while Mr. Gilbertson finalized arrangements with the members of his consortium and with Mr. Thomas to pay the purchase price for and to acquire the rights. It was early on January 1st, 2007 that Mr. Gilbertson, according to his own evidence, awoke and decided to proceed with and implement such alternative financing. It was therefore only after Mr. Gilbertson had made that final decision and committed to it (albeit he had been discussing it previously with the members of his consortium), that he and Sean Gilbertson received the fourth draft IA from Mr. Kalberer the following day, January 2nd, 2007. Leading counsel for the plaintiff generally disputed that it was appropriate to have regard to the draft IAs in determining what would probably have happened but for Mr. Gilbertson's acquisition of the rights for himself and his consortium. However, if it is appropriate to do so, he contended that it is the third draft IA that should be considered and not the fourth draft IA. He argued that Mr. Gilbertson's breach of duty largely occurred before the fourth draft IA was sent out and that therefore the fourth draft IA is not relevant.

143. There is a conflict between the parties as to precisely when Mr. Gilbertson made his decision and committed to pay for and acquire the rights himself with his consortium and, indeed, as to whether or not that decision anyway actually constitutes the breach of fiduciary duty by Mr. Gilbertson, if there was one. However, even if the analysis of the facts by leading counsel for the plaintiff is correct, I do not anyway accept his argument. In my opinion, in order to ascertain what probably would have occurred but for Mr. Gilbertson's alleged breach of duty and thus determine the correct basis for the contended restitution of the master fund as claimed, I consider it relevant and appropriate to have regard to what actually happened before the Renova parties became aware of what Mr. Gilbertson had done. What actually happened is that following the provision of the third draft IA by Sean Gilbertson on December 30th, 2006, the Renova parties responded with the fourth draft IA on January 2nd, 2007, at which time they were unaware of Mr. Gilbertson's actions with regard to alternative funding.

144. Accordingly, in my view, the probability is that the parties would, but for what Mr. Gilbertson actually did in breach of his fiduciary duties prior to the knowledge of the Renova parties, have probably concluded their negotiations with an agreement along the lines of the fourth draft IA (except cl. 2e). As I have previously pointed out, the evidence of Mr. Kuznetsov was that in his view as at January 2nd or 3rd, 2007 another one or two rounds of negotiation between the parties would have resulted in a concluded agreement and, if that is correct, it seems unlikely that there would have been any significant changes from the fourth draft IA, other

than the removal of the obviously uncommercial provisions of cl. 2e, which Mr. Kalberer admitted was clearly a mistake.

145. I did not find the argument on behalf of the plaintiff that, at the end of the day, the master fund would have ended up with the full economic benefit of the rights persuasive, in light of the nature of the detailed negotiations reflected in the later draft IAs, the last of which, before the Renova parties became aware of Mr. Gilbertson's actions, was the fourth draft IA. It seems most improbable to me that the further couple of rounds of negotiation which Mr. Kuznetsov envisaged would have taken such a significantly different course that the master fund would have ended up being entitled to the full economic benefit of the rights, without the licence provisions in particular.

146. The fourth draft IA perpetuated the concept of the separation of the ownership of the brand (by Lamesa Arts Inc. or its nominee, referred to as "Brandco") from the economic benefit of developing, exploiting and managing the business of the brand by the master fund through PEL (described as "Opco"), with Opco's entitlement to do so being pursuant to a licence granted by Brandco as the owner of the brand. Mr. Osborne's opinion was that in the absence of complete and permanent alignment between the rights of Brandco and the rights of Opco and that being understood to be the case by any potentially interested investor, such investor would only invest, if it all, on onerous terms. The precise terms of the proposed licence were to be the subject of negotiation, but it appears from the terms of the fourth draft IA that the Renova parties were not willing to agree to a perpetual and irrevocable licence.

147. It is clear that the parties agreed to the concept that the entitlement of the master fund/Opco to the economic benefit and management of the Fabergé brand would be pursuant to a licence from the actual owner of the brand, Brandco/Lamesa. It was, after all, Sean Gilbertson, who instigated that concept in the third draft IA, which Mr. Kalberer then followed in the fourth draft IA. Mr. Kalberer's removal of the provision that the licence would be perpetual was logical since the life of the master fund was not perpetual. As to whether the licence should be revocable, it seems to me probable that the parties would have been able to agree whether it could be revoked in the certain obvious circumstances and I have already explained why it was inevitable that cl. 2e would have been removed by agreement. In my judgment, but for the actions of Mr. Gilbertson in late December 2006 and January 2007, the master fund would most probably have had the economic benefit of developing and exploiting the Fabergé brand and the management thereof on the terms of the fourth draft IA or very similar terms. Accordingly, the amount, if any, appropriate to reconstitute the master fund and to put it in the position in which it would now have been would be the present financial value of that.

148. The plaintiff produced a spreadsheet with its closing submissions setting out its calculations of the equitable compensation which it claimed, which totalled some US$82.38m. It was, of course, based on the plaintiff's valuation of Fabergé Ltd./the rights at US$177m. It did make allowance for the sums invested in Fabergé Ltd. since acquisition, which, as I have said, the experts have since agreed totals US$140m. and which obviously reduces the sum of US$177m. significantly. However, the plaintiff added various other sums to its claim, including the purchase price of US$38m. paid for the rights, to bring its claim to US$82.38m.

149. Obviously the plaintiff's calculations are based on the plaintiff's own case. However, I have found the current value of Fabergé Ltd. to be no more than US$120m. and Mr. Osborne has explained why in his opinion that figure is probably too high and that the value may be as low as US$56m., which I also accept. Furthermore, the plaintiff's calculations are obviously based also on their contention that the present value to the master fund would not be affected by the fact that the master fund would not own the income-producing asset, the Fabergé brand, itself, but solely the economic benefits and management of it with which I have disagreed. Nor has the plaintiff's calculation taken account of the fact that the master fund would only be entitled to such economic benefits pursuant to a licence from the owner of the income producing asset and on terms the same or very similar to those in the fourth draft IA as I have determined would probably be the case.

150. Mr. Osborne's opinion which, as I have said, I accepted, was that the consequence of only owning the economic benefit would be to reduce the value of the rights (or of Fabergé Ltd.) by half, namely to US$60m. on his valuation figure. Although no figure was put forward in relation to the consequence of the qualifications to the economic benefit implicit in the licence arrangement and likely other terms, it is in my opinion probable that even if that did not warrant a further specific reduction in value, it would undoubtedly go to substantiate Mr. Osborne's US$60m. assessment. Also, having regard to the fact that Fabergé Ltd. has been a loss-making business from the start and still is at present and clearly requires significant further investment it seems to me that the submission on behalf of the Gilbertson parties that the master fund has in reality sustained no significant economic loss is correct. In the circumstances, if the master fund were to be put in the position in which it would now be, it would be in a significantly negative financial position. I must therefore conclude that it would be of no benefit to put the master fund into the financial position in which it would now have been but for Mr. Gilbertson's breach of fiduciary duty and that no equitable compensation is payable.

*Quantum in respect of Autumn*

151. As I have already explained, the plaintiff's claim against Autumn is for an account in respect of the interest which Autumn received on the loan which it made to PEL out of the BPG settlement on behalf of Mr. Gilbertson and in respect of the shares which it holds in what is now Fabergé Ltd., which were procured to be gratuitously issued to it by Mr. Gilbertson. For the reasons I have already explained, I consider that such account should be given in each case.

**Conclusions**

152. For the reasons set out and explained above, I have reached the following conclusions in relation to the plaintiff's claims against Mr. Gilbertson in the particular circumstances of this case, namely, first, that Mr. Gilbertson owed the company during the whole of the relevant period the usual fiduciary duties of a director in respect of Project Egg/the rights and the economic benefits and management thereof; secondly, that Mr. Gilbertson, in acting as he did in late December 2006 and in January 2007, was in breach of his fiduciary duties; and, thirdly, that nonetheless the company has as at this date suffered no loss as a result of Mr. Gilbertson's breaches of his fiduciary duties and I therefore refuse the plaintiff's claim for equitable compensation.

153. In relation to the plaintiff's claims against Autumn, I have concluded that, in the circumstances, Autumn must account for the shares in PEL (now called Fabergé Ltd.) which Mr. Gilbertson gratuitously caused to be issued by PEL to Autumn in January 2007 and also for the interest it received on the loans it made to PEL on behalf of Mr. Gilbertson. Interest shall be payable on sums due by Autumn as a result of these conclusions at the relevant rates pursuant to the Judicature Law (2007 Revision) with effect from January 3rd, 2007.

154. I shall therefore make orders in accordance with these conclusions. I direct that counsel shall submit a draft order agreed as to form and content reflecting these conclusions for approval by the court. With regard to costs, if counsel are unable to agree costs in light of these conclusions, I shall hear their submissions on costs as soon as practical.

*Order accordingly.*

*Maples & Calder* for the plaintiff; *Appleby* for the first and fifth defendants.

## [2018 (1) CILR 529]

## RITTER and GENEVA INSURANCE SPC LIMITED (in voluntary liquidation) v. BUTTERFIELD BANK (CAYMAN) LIMITED

GRAND CT. (Williams, J.) May 29th, 2018

*Estoppel — representation — forgery of bank customer's signature — customer required promptly to report forgery to bank — intentional silence is representation — bank suffers detriment if chance of recovery from forger materially prejudiced by delay — may rely on estoppel in action by customer for damages*

The plaintiffs sought damages for, *inter alia*, breach of contract, negligence and breach of fiduciary duty/dishonest assistance.

The first plaintiff was a director, sole shareholder and beneficial owner of the second plaintiff, a captive insurance company incorporated in the Cayman Islands. DS was a director of the second plaintiff and the company secretary. The second plaintiff was managed by a company licensed as an insurance manager ("Monkton") which was the corporate entity of DS, who was its managing director. The second plaintiff and Monkton were regulated by the Cayman Islands Monetary Authority

In 2008, the second plaintiff opened a corporate bank account with the defendant bank. DS, who was an authorized signatory on the account and the main point of contact, made nine fraudulent transactions on the account between December 28th, 2008 and September 13th, 2010 by forging the first plaintiff's signature. The payments were honoured by the bank, and the account was debited for a total of US$725,177.02. DS also defrauded the bank accounts of other Monkton clients at the bank.

In 2011, the first plaintiff had decided to wind down the second plaintiff's operations and transfer the funds held in the account to the United States. On September 1st, 2011, he contacted the bank and was

informed that the balance of the account was far less than he had believed, there was a shortfall of US$872,000. DS informed him on the same day that he had borrowed money from the account by forging the first plaintiff's signature. DS said that he would make immediate arrangements to repay the sum. In order to do so, on the same day DS fraudulently transferred sums of US$550,000 and US$276,000, respectively, from accounts held by two other Monkton clients. Those transactions were likely completed by the bank on September 2nd, 2011. Payments totalling US$875,000 were made to the first defendant's personal US account. The first plaintiff did not inform the bank of the forgeries.

Monkton was subsequently liquidated and controllers were appointed. From their investigations it became evident that the second plaintiff was not the only client of Monkton that had been defrauded. DS's assets were frozen by a court order. Total realizable assets of around US$160,000 were available from the liquidation of DS's estate.

On August 27th, 2012, Krys Global, whom the first plaintiff had initially instructed to conduct a forensic investigation, wrote to the bank to notify it of the fraud on the bank account and that the first plaintiff would challenge payments on the company's account.

Monkton's liquidators served notice of claim against the first plaintiff in Texas in June 2012 for the recovery of the US$875,000 paid to him fraudulently from the accounts of other clients of Monkton. The first plaintiff sought to join the bank as a third party in the Texan proceedings, which was refused. The bank incurred costs of US$183,000 in defending its position that it should not be joined to the proceedings. Those proceedings were subsequently settled by the first plaintiff.

The plaintiffs brought proceedings against the defendant in this court claiming damages for breach of contract, negligence and dishonest assistance. They contended that by allowing the withdrawals of money from the bank account based on forged signatures, the bank breached its mandate, and the resultant net loss was US$529,191.

The bank claimed that the first plaintiff became aware of the fraudulent transactions on September 1st, 2011 but failed to inform it until August 27th, 2012, depriving it of the opportunity to prevent a number of other transactions and to recover the money wrongfully paid. The plaintiffs should therefore be estopped from asserting the forgeries on which the claim was based.

The plaintiffs submitted that there was no estoppel by representation preventing it from claiming against the bank as (a) the bank had at least constructive notice of the fraud or forgery before August 2012, as *inter alia* DS had been arrested and Monkton's assets were subject to a freezing order; (b) notification of the fraud by the first plaintiff in September 2011 would have alerted the authorities and Monkton's controllers, who would have taken steps to limit recovery by the bank so that it had not been materially prejudiced by the first plaintiff's failure to notify it; (c) had the bank had notice in September 2011 it was unlikely that it would have reimbursed the second plaintiff and commenced proceedings against DS

as it would have first considered its legal position, in which time DS would likely have dissipated his assets; (d) the bank would in any event have had no cause of action between September 2011 and August 2012 as the plaintiffs believed that they had been repaid in full; (e) the legal fees incurred in the Texan proceedings could not be viewed as detriment for the purposes of estoppel; and (f) if the court were to find that the bank had been materially prejudiced by a loss of opportunity to sue DS, it should find that estoppel by representation operated *pro tanto* so that the plaintiffs should not be estopped to the full extent of their claims, but only to the extent of actual potential detriment found to have been suffered by the bank.

The bank submitted that (a) if it had been informed of the forgeries on September 1st, 2011 it could have brought proceedings against DS when he likely had assets greater than US$160,000; (b) the first plaintiff's failure to notify the bank of the fraud or forgery amounted to a representation for the purposes of estoppel by representation; (c) the bank had relied on the representation by the first plaintiff to its detriment including lost opportunity to seek recovery from DS, and incurring significant legal fees in proceedings in Texas and the Cayman Islands; and (d) the plaintiffs' dishonest assistance claim should be dismissed as it was not properly pleaded and failed to identify any individual employees of the bank who had acted dishonestly.

**Held,** ruling as follows:

(1) The responsibility and liability of a bank towards its customer was governed by the applicable law and the relevant contract entered into by the parties. The contract determined the manner in which services were to be provided and recorded the obligations of each party. In the event of an alleged breach by the bank of an express or implied term of a contract, three elements needed to be satisfied in order to establish liability: (i) proof of breach by the bank against the customer; (ii) damages; and (iii) causation between the breach and damage suffered by the customer. In the present case, the parties had agreed to limit the issues to be determined by the court to (i) whether the plaintiffs were estopped from advancing claims against the bank in contract and negligence; and (ii) whether the bank dishonestly assisted in a fraud involving forgeries of the first plaintiff's signature by DS. The general rule was that a bank was ordinarily not entitled to debit a customer's account if it had honoured a wire transfer bearing a forged signature. However, a defence available to a paying bank might arise if the customer breached his duty to the bank by failing to inform it of any forgery on the account as soon as the customer became aware of it (paras. 127–129).

(2) To establish the defence of estoppel the bank had to prove that the first plaintiff intentionally failed to promptly report to it what he knew about the forgery. The bank had to prove that the first plaintiff's not informing it of the forgery amounted to a representation that the transfer requests were in order, and that by its acts or omissions it relied on the representation to its detriment. When a customer's signature was forged, on discovering the forgery, he was required to inform the bank. If he deliberately abstained from doing so with the result that the bank lost its remedy against the forger, the customer would be estopped from relying on the forgery. It was clear in the present case that the first plaintiff had a responsibility to inform the bank of DS's forgery when he first became aware of it on September 1st, 2011, which he had failed to do. The bank was not made aware of the forgery until August 27th, 2012. The first plaintiff's conduct, by remaining silent, was deliberate and intended to ensure receipt of the funds transferred by DS into his personal account in the United States. His remaining silent against his duty to inform the bank of the forgery amounted to a representation. The bank had also proved material detriment as a consequence of the first plaintiff's representation as its chance of recovering from DS had been materially prejudiced. DS's assets were no longer available by the time the bank first became aware of the forgery. (The legal fees incurred by the bank in the Texan proceedings could not be characterized as detriment because they were unrelated to any relevant loss.) In addition, the plaintiffs' submission that estoppel by representation operated *pro tanto*, *i.e.* that they should not be estopped to the full extent of their claims but only to the extent of actual potential detriment found to have been suffered by the bank was not correct (paras. 130–173).

(3) There were three elements of a dishonest assistance claim which must be pleaded and proved: (i) that there had been a disposal of assets in breach of trust or a fiduciary duty; (ii) that the defendant assisted in that breach or disposal; and (iii) that the defendant assisted the breach of trust dishonestly. The third element was the only element in dispute between the parties in the present case. The key issue was therefore not whether the bank assisted in the fraud but whether it did so dishonestly. The standard of proof required was the civil standard of proof, the balance of probabilities. It was not an absolute standard. When considering allegations of dishonesty and fraud, a court would naturally require a higher degree of probability than it would require when asking if negligence was established. It did not adopt as high a degree as a criminal court but it did require a degree of probability commensurate with the occasion and seriousness of the allegation. It was not necessary for the court to establish whether the defendant considered that he was acting dishonestly, the defendant's knowledge of the transaction had to be such as to render his participation contrary to normally acceptable standards of honest conduct. An honest person did not deliberately not ask questions lest he learn something he would rather not know. A dishonest state of mind might

532

consist in suspicion combined with a conscious decision not to make inquiries which might result in knowledge. In a commercial setting, dishonesty could be found on the basis of commercially unacceptable conduct. In a case including a claim of dishonesty, that claim must be clearly pleaded first, before any claim of negligence, and be adequately particularized (paras. 176–185).

(4) In the present case, the plaintiffs had failed to plead the claim of dishonesty first or separately plead the negligence claim. The dishonesty claim appeared after the breach of contract and negligence claims in the pleadings. No individual employees were identified by name or position in the bank as conducting themselves dishonestly. In cases of dishonest assistance against a corporate entity, a particular individual or particular individuals must be identified as having acted dishonestly given the fact that, although a company has legal personality and capacity, it functions through human agents. The statement of claim must therefore identify and particularize what the defendant did to assist in the breaches of fiduciary duty or trust, how the assistance caused, contributed or resulted in the plaintiff's loss and how the defendant was alleged to have acted dishonestly in assisting the main perpetrator. The bank rightly highlighted the requirement that it might be permissible not to identify the relevant dishonest individual(s) at the stage of pleading the case, if the plaintiff were unaware at that stage of their identity, provided the plaintiff otherwise properly pleaded and particularized the dishonest conduct and identified an individual employee by name or even by post with relevant knowledge. The plaintiffs had failed to identify in the pleadings or at trial any individual(s) with any knowledge of the fraud or who acted dishonestly. As dishonesty was a serious allegation it was not to be pleaded lightly. The claim would therefore be dismissed. Even if the court were wrong in reaching this conclusion, the plaintiffs had not provided sufficient evidence to prove such a serious allegation (paras. 187–202).

**Cases cited:**

(1) *Avon County Council* v. *Howlett*, [1983] 1 W.L.R. 605; [1983] 1 All E.R. 1073; [1983] I.R.L.R. 171, followed.

(2) *Derby* v. *Scottish Equitable plc*, [2001] EWCA Civ 369; [2001] 3 All E.R. 818; [2001] 2 All E.R. (Comm) 274; [2001] OPLR 181, distinguished.

(3) *Ewing* v. *Dominion Bank*, [1904] A.C. 806; (1904), 35 S.C.R. 133, considered.

(4) *Foley* v. *Hill* (1848), 9 E.R. 1002; 2 H.L. Cas. 28, referred to.

(5) *Freeman* v. *Cooke* (1848), 154 E.R. 652; 2 Ex. 654, *dictum* of Parke, B. considered.

(6) *Fung Kai Sun* v. *Chan Fui Hing*, [1951] A.C. 489, referred to.

(7) *Greenwood* v. *Martins Bank*, [1932] 1 K.B. 371; on appeal, [1933] A.C. 51, followed.

(8) *Holt* v. *Markham*, [1923] 1 K.B. 504, referred to.

(9) *Kelly* v. *Fraser*, [2012] UKPC 25; [2013] 1 A.C. 450; [2012]

3 W.L.R. 1008; [2012] I.C.R. 1408, *dicta* of Lord Sumption considered.
(10) *Lipkin Gorman* v. *Karpnale Ltd.*, [1991] 2 A.C. 548; [1991] 3 W.L.R. 10; [1992] 4 All E.R. 512, applied.
(11) *McKenzie* v. *British Linen Co.* (1881), 6 App. Cas. 82; 8 R. (H.L.) 8, considered.
(12) *National Westminster Bank plc* v. *Somer Intl. (UK) Ltd.*, [2001] EWCA Civ 970; [2002] Q.B. 1286; [2002] 3 W.L.R. 64; [2002] 1 All E.R. 198; [2001] Lloyd's Rep. Bank 263; [2001] CLC 1579, considered.
(13) *Ogilvie* v. *West Australian Mortgage & Agency Corp. Ltd.*, [1896] A.C. 257, considered.
(14) *Pickard* v. *Sears* (1837), 112 E.R. 179; 6 Ad. & El. 469, considered.
(15) *Publishers Representatives Ltd.* v. *UBS (C.I.) Ltd.*, 2000 CILR 473, distinguished.
(16) *Royal Brunei Airlines Sdn. Bhd.* v. *Tan Kok Ming*, [1995] 2 A.C. 378; [1995] 3 All E.R. 97, referred to.
(17) *Singularis Holdings Ltd.* v. *Daiwa Capital Markets Europe Ltd.*, [2017] EWHC 257 (Ch); [2017] 2 All E.R. (Comm) 445; [2017] 1 Lloyd's Rep. 226; [2017] 1 BCLC 625; [2017] Bus. L.R. 1386; on appeal, [2018] EWCA Civ 84; [2018] 1 W.L.R. 2777; [2018] Bus. L.R. 1115; [2018] 1 Lloyd's Rep. 472; [2018] 2 BCLC 1, applied.
(18) *Skyring* v. *Greenwood* (1825), 107 E.R. 1064; 4 B. & C. 281, referred to.
(19) *Stokors SA* v. *IG Markets Ltd.*, [2013] EWHC 631 (Comm), applied.
(20) *Tai Hing Cotton Mill Ltd.* v. *Liu Chong Hing Bank Ltd.*, [1986] A.C. 80; [1985] 2 All E.R. 947; [1985] 2 Lloyd's Rep. 313; [1986] FLR 14; (1985), Sol. Jo. 503, applied.

*S. Dobbyn* for the plaintiffs;
*S. Said* and *J. Hale* for the defendant.

1 **WILLIAMS, J.:**

**The application**

The second plaintiff, Geneva Insurance SPC Ltd. ("Geneva"), was incorporated in the Cayman Islands on March 28th, 2000 with the sole purpose to act as a captive insurance company serving the insurance needs of medical professionals practising in the United States. Geneva was Cayman Islands Monetary Authority ("CIMA") regulated. The first plaintiff, William Ritter ("Mr. Ritter"), is and was at all material times a director, sole shareholder and beneficial owner of Geneva. David Self ("DS") was a director and the company secretary of Geneva.

2 From May 12th, 2000, Geneva was managed by Monkton Insurance Services Ltd. ("Monkton"), a company licensed as an insurance manager which managed captive insurance companies in the Cayman Islands.

Monkton was the corporate entity of DS who was its managing director. From May 1st, 2006 it was resolved by Geneva that Monkton would act as its secretary and as its registered office. DS was also the insurance manager of a number of other captive insurance companies with accounts at the defendant, Butterfield Bank (Cayman) Ltd. ("the bank"). One of those customers was Canadian Livestock Insurance Co. ("Canadian Livestock") and another was Warco Insurance Corp. ("Warco"). DS was a signatory and the main point of contact in respect of both of those accounts.

3   Both Monkton and Geneva were CIMA regulated.

4   On March 20th, 2008, Geneva opened a corporate bank account ("the Geneva account") with the bank. The bank was incorporated in the Cayman Islands on November 22nd, 1967, and holds a Class A banking licence registered with CIMA. The bank provided banking services to Geneva between 2008 and 2011. Geneva remained a customer with the bank until the Geneva account was closed in October 2013.

5   It is common ground that there were nine fraudulent transactions made by DS on the Geneva account between December 28th, 2008 and September 13th, 2010. These included eight forged payment transfer requests from the Geneva account and one fraudulent request for a payment from another account into the Geneva account. These payments were honoured by the bank and the Geneva account was debited for a total of US$725,177.02. DS also defrauded the bank accounts of other Monkton clients at the bank.

6   Due to the fraudulent transactions, on April 30th, 2012 a shareholder's resolution was passed for the voluntary liquidation of Geneva. By a deed of assignment dated November 7th, 2012, Geneva acting through the appointed joint voluntary liquidators assigned all its potential rights, remedies and claims against the bank to Mr. Ritter. On February 27th, 2015, Mr. Ritter was appointed as the sole voluntary liquidator of Geneva.

**The claim**

7   The plaintiffs' claim is brought by a 54-page amended writ of summons and statement of claim filed on November 2nd, 2016. The allegation therein is that the bank is liable for breach of contract, negligence and dishonest assistance in facilitating a fraud carried out by DS. The plaintiffs claim—

   (i) damages for breach of contract;

   (ii) damages for negligence/breach of duty of care;

   (iii) damages and/or equitable compensation for breach of fiduciary duty/dishonest assistance;

535

(iv) any necessary enquiries into damages;

(v) compound interest of all claims from the date of each respective loss in accordance with the rates in the Judgment Debt (Rates of Interest) Rules; and

(vi) costs.

8  DS provided false bank statements for the Geneva account to Mr. Ritter to conceal the fraud mentioned in para. 5 above and outlined in greater detail from para. 31 herein. The plaintiffs contend that the bank, by allowing the withdrawals of money from the Geneva account based on forged signatures, is in breach of their mandate and that their resultant net loss (excluding lost interest) from the Geneva account is US$529,191.72.[1] The plaintiffs seek an order for reimbursement of that amount together with interest and costs.

9  In its amended defence filed on November 8th, 2016, the bank denies any liability, contending that it provided banking services to Geneva on its standard terms and thereafter conducted itself in accordance with those terms and with good banking practice. It contends that Geneva failed to comply with its duties as the bank's customer, because when Mr. Ritter became aware of the forgery on the Geneva account on September 1st, 2011 he failed to inform the bank of the same until August 27th, 2012. It is further contended that this deprived the bank of the opportunity to properly act to prevent a number of other transactions and to enable it to take steps towards recovering money wrongfully paid on the forged signatures. In such circumstances, the bank argues that Geneva is estopped from asserting the forgeries upon which its claim is based.

10  The bank submits that the main issues for the court to determine are:

(a) The date on which the bank received notice of DS's forgery on the Geneva account—the bank claims this was on August 27th, 2012, when the joint official liquidators ("JOLs") for Geneva informed them that Mr. Ritter was challenging payments on the Geneva account.

(b) Whether Mr. Ritter discharged a duty to disclose DS's forgery on the Geneva account to the bank—the bank claims that Mr. Ritter failed to discharge his duty on September 1st, 2011 immediately after he became aware that DS had forged his signature.

(c) If the court finds that Mr. Ritter had not discharged his duty to disclose the fraud, whether his silence amounts to a representation—the bank submits that Mr. Ritter deliberately failed to inform the bank of the

---

1    Net balance after DS caused the fraudulent transfers to be repaid, US$148,180.74 on June 23rd, 2009 and US$47,804.56 on August 25th, 2011.

forgery as he had a strategy to focus on the return of his money via a private arrangement with DS and that he intended to notify the bank only if the money were not repaid by DS.

(d) If the court finds that there has been conduct amounting to a representation, whether the bank has suffered material detriment—the bank claims that it has suffered detriment in the form of material prejudice as it has lost the opportunity to seek recovery from DS, due to it paying out large sums on September 2nd, 2011 and incurring significant legal fees in proceedings in both Texas and in the Cayman Islands.

(e) Whether the bank dishonestly assisted in DS's fraud—the bank denies that it or any of its employees have acted dishonestly in the operation of the Geneva account.

11    The bank seeks an order from the court dismissing the plaintiffs' dishonesty claim, which is based on the same factual allegations relied upon by them for breach of contract and negligence, on the basis that there is a lack of evidence to justify such serious findings. It is also submitted that the claim is "defectively pleaded," the bank stating that the plaintiffs have failed to identify any employee(s) at the bank who they claim has acted dishonestly. The bank highlights that Mr. Ritter made no allegation of dishonesty against the bank in the Texas proceedings.

12    The plaintiffs argue that the court should dismiss the bank's estoppel defence and should also find in their favour in relation to the claim that the bank was liable to account as a constructive trustee for dishonest assistance.

13    It is agreed that if the bank's estoppel defence succeeds, the plaintiffs' breach of contract and negligence claims should be dismissed. The bank agrees that if its estoppel defence fails, it will pay to the plaintiffs (without admission of liability) the full amount of the fraudulent transfers claimed.

14    It is agreed by the parties that the question of consequential losses would be determined at a later date depending on the ruling of the court on the main estoppel defence and the claim for dishonest assistance.

**The background—Geneva opening the account at the bank**

15    In 2008, following representations made to him by DS, Mr. Ritter agreed that Geneva's banking should be moved to the bank. To enable the Geneva account to be opened, six main account opening documents had to be processed and these documents governed the bank/customer relationship and constituted the bank's mandate.

16    The first account opening document is an undated and unsigned "Corporate Banking: Captive Insurance Company—Account Opening

Checklist" ("the checklist"). It was recorded in this form that the purpose of the Geneva account was "for core cell operating funds." The form also recorded that the nature of the anticipated transactions through the Geneva account were "cell fees and charges paid in quarterly, operating expenses, licence fee, audit admin, fee paid out." It is submitted by the plaintiffs that it was an express term that the Geneva account would be used only for the above purpose and that it was an implied term that payments other than those listed would be out of the ordinary course of business transactions. The bank denies this contention, pointing out that the purpose of the checklist is to act as a general guide to the bank as to the nature and dollar volume of the anticipated transactions through the account to enable it to comply with its obligations under the Proceeds of Crime Law and Money Laundering Regulations.

17    The second account opening document is the "New Account Memorandum—Business" ("the memorandum") and it was filled out by DS and signed by Mr. Ritter as an authorized signatory on March 20th, 2008. The court has not been shown any similar memorandum signed by DS as an authorized signatory. The plaintiffs contend that it was an express implied term of the memorandum that the authorized signature of Mr. Ritter would be identical or closely resemble those entered on documents for the purposes of the Geneva account at the bank. The bank denies the above contention and correctly states that the signature on the memorandum is not the signature that would be used or should be used for comparison with any subsequent signature received by the bank on other documentation and that the appropriate comparison signature would be found on the signature card. The memorandum provided only Monkton's and DS's numbers as the points of contact and therefore if there were any issues relating to a transaction DS, and not Mr. Ritter, would be the person who the bank would reach out to.

18    The third account opening document is a "Resolution Authorising Banking Account, Loans and Related Matters" ("the resolution"), which was filled out by DS. It was signed by DS on March 20th, 2008 in his role as a director and as the secretary of Geneva. This document was also signed by Mr. Ritter as a director of Geneva. DS and Mr. Ritter placed their initials on each page of the document. The document sets out the details of the resolution accepted by the Board of Directors held at a meeting on March 20th, 2008. The Board of Directors resolved that Geneva was authorized to establish an account or accounts with the bank for the purposes of buying, selling, paying or collecting bills of exchange or other instruments for the payments of money, issuing letters of credit, transmitting moneys by draft cheques or wire transfer, or otherwise borrowing money for which the assets of Geneva may be pledged as collateral security and for any incidental purpose. The document recorded that the Board resolved that DS and Mr. Ritter, as long as they signed

together, were authorized on behalf of Geneva to conduct affairs with the bank in matters such as opening a bank account or accounts with the bank, endorsing cheques, drafts, note acceptances and other instruments and to make unsigned cheques, drafts, notes, acceptances and other instruments and orders with respect of any funds at any time to the credit of Geneva with the bank. The Board of Directors also resolved that the bank was authorized to pay and debit cheques, drafts and orders from the Geneva account without enquiry as to the circumstances of their issue or for the disposition of their proceeds if the same were signed by DS and Mr. Ritter. The Board of Directors also resolved that DS and Mr. Ritter, if they signed together, were authorized on behalf of Geneva to enter into any agreement relating to any general or specific transaction at the bank. The Board of Directors further resolved that DS or Geneva's assistant secretary were authorized and directed to certify to the bank the names of persons authorized to sign for it[2] and to provide them with specimens of their signatures. The Board resolved that the bank should be fully protected in relying on the above certifications including the signatures and would be "indemnified and held harmless from any claims, demands, expenses, loss or damage resulting from or arising out of or in any signature so certified . . ."

19    The purpose of the document was to record the resolutions of the Board of Directors of Geneva in relation to its dealings with the bank in relation to the Geneva account. The bank does not accept the plaintiffs' contention that (i) there is a resultant implied term that, for any document to be valid in relation to any banking transaction instruction, DS and Mr. Ritter had to sign it; and (ii) for any agreement with the bank relating to banking services to be binding on Geneva, that agreement also had to be signed by DS and Mr. Ritter. The bank contends that agreements between Geneva and itself can be entered into by anyone with actual or ostensible authority to bind Geneva in accordance with normal principles in company law. If DS and Mr. Ritter had together duly authorized only one of them to sign a document or contract, then only one signature would be required. It is contended that there is an express term that DS, as Geneva's secretary, is authorized to certify to the bank the names of the present officers of the company and other persons authorized to sign for it. It is also contended that a further express term is that all business conducted between the bank and Geneva is subject to the "General Regulations and Conditions" ("the regulations") for conducting business with the bank and that a copy of the same may be executed and agreed by DS in his role as secretary of Geneva.

---

2    In the resolution this certified it was DS and Mr. Ritter.

20    The bank also does not agree with the plaintiffs' contention, arising from the resolution document, that—

(i) there is a further implied term that the bank had no authority to accept or approve any account opening document or agreement unless it was signed by Mr. Ritter and DS;

(ii) there is no authority to accept the regulations signed only by DS as company secretary; and

(iii) there is no authority to accept an "Online Banking Application" signed only by DS. The bank reiterated that the resolution provided that all business conducted be subject to the regulations and that these were duly signed by DS.

21    The plaintiffs further contend that there is an implied term from the resolution that the bank had no authority to pay or debit any cheques, drafts orders from the Geneva account without enquiry unless they were signed by both Mr. Ritter and DS and that the bank was required to compare the signatures carefully with the certified signatures on the signature card. The plaintiffs submitted that the bank could not rely upon the indemnity set out in the resolution if it honoured a signature which was not a certified signature as evidenced by the signature card. The bank denies that the contents of the resolution can amount to these implied terms. The bank rightly submits that it need only make enquiries as to the circumstances of payments out of the account where there is reason to believe that the transaction was fraudulent or was suspicious. The bank accepted that its contractual obligation was to make sure that instructions had been authorized in accordance with the mandate. The bank also states that the standard of care for its employees is not one of "carefully" as suggested by the plaintiffs, but is one that requires them to exercise reasonable skill and care.

22    The fourth account opening document is the "New Account Signature Card" ("the signature card"). Pursuant to the express terms of the resolution, DS and Mr. Ritter each wrote their names and placed their signatures on the signature card. It is contended by the plaintiffs that it was an implied term of the signature card that any signature on any transactional document which did not closely resemble a genuine signature thereon could not be relied upon by the bank. The bank denies that such a term may be implied from the signature card and contends that its obligations in this regard are governed by the express terms set out in the regulations.[3]

_____

3    See regulation 11—para. 27 herein.

23   Mr. Ritter contends that for a two signatories account the bank should have had his contact telephone number as well as DS's. During cross-examination this was put to Mr. Skinner, Head of Corporate Banking at the bank since 2011, and he answered that the standard practice for banks is to usually only have one point of contact and number to call for a company. Mr. Skinner added that for captive insurance companies, where the owners or shareholders are in the United States, they often do not wish to give their contact details for tax reasons. He stated that it was "exceptionally rare" for there to be a fraud between two authorized signatories named on a particular account. This is a factor to take into account when one considers whether the bank was dishonest and wilfully closed its eyes to the transactions on the Geneva account at a time when it was not known by anybody that DS was a fraudster.

24   As mentioned above in para. 17, DS's numbers were provided as the point of contact in the memorandum. Mr. Skinner said that the bank's call-back procedure is not designed for a situation where the designated contact is the person committing the fraud. So following the right procedure in this matter, if there was to be a call back, Mr. Skinner clarified that it would have been to DS who at the time of the relevant transactions was not a known fraudster. This standard banking practice is a further factor to take into account when considering the issue of dishonesty raised by the plaintiffs.

25   The fifth account opening document is the "General Regulations and Regulations for Conducting Business with the Bank" which was signed, as per the resolution,[4] by DS in his capacity as Geneva's secretary around March 20th, 2008. The plaintiffs are wrong when they state that the resolution was ambiguous and that DS's signature was not sufficient as Mr. Ritter's signature was also required. In the plaintiffs' amended statement of claim they refer to regulations 3, 5, 10 and 11.

26   Regulation 5 provides:

"The Bank is entitled, but is not obliged, to rely upon an act in accordance with any notice, demand or other communication which may from time to time be given by any verbal, telephone, telegraphic, telex or electronic message is believed by the bank to be genuine and be presented or delivered by on behalf of the customer, without incurring liability should be false or there be any error or ambiguity therein."

The plaintiffs contend in their amended statement of claim that if reliance is placed by the bank on this regulation in avoiding all liability for the

---

4   Which were signed by both DS and Mr. Ritter.

reliance on any notice or other communication supposedly made on behalf of Geneva, any subjective belief held by it or its employees that such a notice or communication was presented or delivered on behalf of Geneva, would have to be a reasonably held and honest belief that it was so made.

27    Regulation 11[5] deals with how the bank verifies the signature as follows:

"The Bank verifies the signature by comparing it with the specimen on file. The Bank shall be entitled but not required to go beyond such verification. The Bank shall not be liable consequence [*sic*] of forgery unless such forgery should through observance of due diligence have been readily detected."

The plaintiffs claim, if the bank seeks to rely upon this regulation to avoid all liability flowing from the forgery, that it is an implied term of this regulation that the bank must demonstrate that it had observed due diligence in its efforts to detect the forgery. The bank claims that it is not an implied term and in fact it was an express term of the contract that it would not be held liable for consequence of forgery unless the forgery could, through due observance of due diligence, have been readily detected and that it had an obligation to observe due diligence.

28    The plaintiffs contend that they are not bound by the regulations and that the bank cannot rely upon them to avoid its liability for reasons that will be expanded on later herein. In the alternative, the plaintiffs argue that if the regulations are held to be binding then they were unusual and onerous clauses which were not properly notified to them and therefore they cannot be relied upon by the bank. Mr. Ritter claims that DS never showed him a copy of the document, if that is right, the fault for that cannot be laid at the door of the bank. I note that when talking about July 2008 Mr. Ritter said that "I had no reason to doubt (DS) or his honesty as a professional insurance manager" and the bank was entitled to share his view at that time. The bank claims that the plaintiffs were properly notified and have actual notice of the regulations which were signed by DS on March 20th, 2008. The bank submits that the regulations are sufficiently clear and unambiguous and that it is entitled to rely on instructions given to it if it believed those to be genuine and presented on behalf of the customer and it is not liable for any forgery if it compares the signature with the specimen on file and observes due diligence.

29    The sixth account opening document is the "Online Banking Application" which was completed and signed by DS on March 20th, 2008 in his capacity as the secretary of Geneva. Mr. Ritter also claims that this was

_____

5    See para. 22 herein.

never sent to him and he submitted that the entry on the form in which DS nominated himself as administrator for online banking purposes authorized to sign the online banking application contradicted the two signature requirement in the resolution.

30   The account opening documents were sent by Monkton to the bank on March 20th, 2008 and they were accepted by the bank on or around March 28th, 2008.

**Background—the nine fraudulent transactions on the Geneva account between December 28th, 2008 and September 14th, 2010—the bank's processing procedure**

31   It is agreed that the relevant fraudulent transactions are as follows:

   (i) December 28th, 2008; US$148,180.74—DS forged Mr. Ritter's signature on a wire transfer instruction, in the form of a faxed letter, to Warco who was also a client of Monkton and who was also a customer of the bank. At the time of processing DS described the payment on the instruction as being "in respect of the Quota Share Reinsurance Premium Due." Mr. Ritter states that the forgery of the signature is a poor one and that anyone paying attention at the bank should have detected it when comparing it with his genuine signature. He stated that if the bank had then contacted him to verify the signature and the transaction he would have confirmed that it was not authorized and the fraud would have been halted at its inception. Mr. Ritter contends that captive insurance companies do not transfer funds to each other, and it was irregular or questionable for it to have been done. However, during cross-examination he accepted that it could be possible that two captive insurers purchase reinsurance together and then share the premium. Mr. Skinner contends that the signature was not an "obvious" forgery and that the content of the instruction would not "raise any alarm bells" for a processing bank employee in the situation where the bank was unaware of any misappropriation on the Warco account, as it would not be unusual for a regulated insurance manager to transfer money from one captive to another, especially as the stated purpose of the transfer on the instruction would be consistent with that. Mr. Skinner pointed out that, from the face of the document, one could deduce that two authorized staff members from the bank had reviewed the transaction. Mr. Skinner does not agree that captive insurance companies do not transfer funds to each other, and it was irregular or questionable for it to have been done. He referred to the Shoreline loan which was approved by Mr. Ritter when he signed the wire transfer on July 24th, 2008 authorizing US$300,000 to be transferred to Shoreline Commodity Trading. However, counsel for the plaintiffs rightly highlights that Shoreline Commodity Trading was not a captive insurance company. In any event, the plaintiffs concede that these funds were repaid

by means of the below mentioned transaction carried out on June 23rd, 2009 and that the amount was therefore not lost and is not claimed.

(ii) June 23rd, 2009; US$148,180.74—DS, by letter of instruction sent by email, authorized the bank to repay the six months earlier fraudulent transfer outlined in para. 31(i) above from the Warco account to the Geneva account. This transfer did not involve a forged signature and both of Warco's authorized signatories had signed this transfer request. At the time of processing DS described the payment on the instruction as being an "inter-company loan." Mr. Ritter contends that a transfer of this sum of money by one of Monkton's managed captives to another should have been viewed as being unusual activity. Mr. Skinner contended that inter-company loans are not uncommon and, having regard to the procedures in place, a bank employee would not find the instruction to be unusual or irregular. He added that although it is for the same amount as the transfer made six months earlier that would not necessarily make it unusual. I accept Mr. Skinner's evidence in this regard and do not find that the bank acted dishonestly or was "closing its eyes" by any employee not regarding this transaction as being "a red flag" and allowing the transaction to process.

(iii) July 31st, 2009; US$16,250—DS forged Mr. Ritter's signature on a wire transfer to Monkton's Cayman National Bank account contained in a formal request for wire transfer form. At the time of processing DS described the payment on the form as being for "Management Fees." Mr. Ritter contends that the signature if compared to the one on the signature card is "very clearly" not the same signature. Mr. Skinner contends that it is not an "obvious forgery."

(iv) August 17th, 2009; US$30,050—DS again forged Mr. Ritter's signature on a wire transfer instruction to Monkton's Cayman National Bank account contained in a formal request for wire transfer form. At the time of processing DS gave the details of the payment on the instruction as "F/F/C Monkton Insurance Services" with no further elaboration. It is contended by the plaintiffs that if this and the July 31st, 2009 transfers totalling US$46,300 were for management fees, then that would be an abnormally high amount for Geneva to have paid in a 19-day period. Mr. Ritter again contends that the signature, if compared to the one on the signature card, is very clearly not the same signature. Mr. Skinner contends that it is not an "obvious forgery." Mr. Skinner said that this would not be considered an abnormal amount for management fees and in any event the bank would not be aware of the arrangements between Geneva and its insurance managers. Mr. Skinner states that the bank employee processing the transaction would not be expected to check when the last management fee was paid or carry out the exercise of totalling the transfers instructed to be made under this head. He added that the system at the bank would not have picked up cumulative amounts for the same

beneficiary. Again, in light of the evidence of Mr. Skinner, which I accept, I do not find that the bank acted dishonestly or was "closing its eyes" by any employee not regarding this transaction, or this transaction coupled with the July 31st, 2009 transaction, as meriting further enquiry and allowing the transactions to process.

(v) October 29th, 2009; US$16,581.72—DS forged Mr. Ritter's signature on a wire transfer instruction to Monkton's Cayman National Bank account. At the time of processing DS again gave the details of the payment on the instruction as "F/F/C Monkton Insurance Services" with no further elaboration. Mr. Ritter contends that the forged signature is very poor and looks like it has been photoshopped. Mr. Ritter stated that if a proper comparison had been carried out with the specimen signature the fraud would have been detected. However, during cross-examination Mr. Ritter accepted that "it was more than likely" that the two bank officers who conducted the verification process on this transaction concluded that the signature was within either a known or natural range of variation rather than noticed that the signature was obviously forged.

(vi) December 18th, 2009; US$435,100—DS forged Mr. Ritter's signature on a wire transfer to Monkton contained in a formal request for wire transfer form. At the time of processing DS described the payment on the instruction as being "Capital Funds for Captive." Mr. Ritter contends that the signature on the request clearly does not resemble his signature on the account opening documents and the fraud should have been detected by the bank. Mr. Skinner stated that the signature may have been regarded by the staff as being a natural variant of the signature, but he accepts that, now that they are being challenged and it is known that DS, the point of contact, was a fraudster, they may have invited further inquiry. Mr. Ritter also highlights the size of this transaction, and argues that it should not have been processed simply on the telephone verification by DS but only after contacting him also. Mr. Skinner points out that if a transaction exceeds US$100,000 where the beneficiary is someone other than the account holder, the bank must telephone the account holder. In this case the account holder was Geneva and not Mr. Ritter personally and the bank telephoned the contact phone numbers recorded on the client file, namely Monkton's and DS's numbers. No number was provided for Mr. Ritter, so the bank would not have contacted him. It is clear from the new account memorandum form which had been signed by Mr. Ritter, that Mr. Ritter agreed that DS would be the point of contact for the account.[6] In any event, Mr. Skinner says that there is no requirement to contact every signatory on the account. Mr. Skinner added that, despite the amount, there is nothing unusual or irregular in this transaction as it involved a

_____

6    See paras. 17 and 24 above.

regulated insurance manager transferring money to itself for capital for another captive, which appears to be for a captive insurance related payment. Mr. Skinner's evidence in this regard does not point to a wilful closing of eyes, but to the adoption of established process when transacting larger sums of this amount.

(vii) July 14th, 2010; US$16,205—DS forged Mr. Ritter's signature on a wire transfer instruction to Monkton. At the time of processing DS described the payment on the instruction as being "Management Fees." Mr. Ritter contends that the signature on the request is "poorly forged" and very clearly not the same as his one on the account opening documents. The bank forthrightly accepts that this signature may, in the present circumstances where one is aware of what one knows now, have merited further inquiry.

(viii) August 3rd, 2010; US$15,005—DS forged Mr. Ritter's signature on a wire transfer instruction to Monkton. At the time of processing DS again described the payment on the instruction as being "Mgmt Fees." Mr. Ritter contends that if one looks at the copy of the document a faint box appears, giving the impression that the signature had been cut and pasted from another document and that "this is another instance of the banker parties shutting his eyes to obvious fraud." Mr. Ritter accepted that there is a clearer copy of the allegedly photoshopped document which, if produced, may have made it clearer whether his belief had actually occurred. The bank contends that this is not an obvious forgery and that one cannot deduce, due to the quality photocopy of this faxed document, whether it contains a cut and paste signature.

(ix) September 13th, 2010; US$47,804.56—DS forged Mr. Ritter's signature on a letter instructing the bank to issue an international draft payable to J.E. Elliott. At the time of processing DS described the payment on the instruction as "Policy Loan." Mr. Ritter contends that on careful scrutiny one can see that the signature on the letter of instruction is again cut and pasted. Mr. Skinner again submits that there is no reason why any employee would view these instructions as being unusual or irregular or see the need to question why a regulated insurance manager was transferring money to a person for a policy loan.

32   Mr. Ritter summarizes that the above-mentioned forgeries of his signature were so obvious that the bank was being "wilfully blind to the fraud" when allowing the "irregular transactions" in and out of the Geneva account, and accounts of other DS/Monkton managed client companies to go through. It is contended that the transactions were outside the normal course of business for a captive insurance company and/or were highly irregular and suspicious and, as a result, the bank must have deliberately or recklessly turned a blind eye and have therefore acted dishonestly. The plaintiffs correctly contend that when considering the facts the court

should consider the bank's actions or inaction in the context of it holding itself out to be a specialist in the financial services industry in the Cayman Islands.

33   Mr. Skinner provided some detail about the bank's general wire transfer procedures which he believes would have been followed in relation to the relevant transactions now before this court. It is rightly contended that the procedures and the facts in this case must be put into context where the staff members at the bank have to process around 20–30 wire transfers per day for corporate clients and around 8,000 wire transfers per month for clients in all divisions of the bank. Mr. Skinner opines that, bearing this in mind, the appropriate validation enquiries cannot and do not require a detailed review and cross-reference of each and every transaction. Mr. Skinner understandably stated that attempted fraud by an authorized signatory like DS is "extremely unusual . . . and difficult to detect, mostly because the Bank has to operate from a basis of trust with a known authorized signatory." There is force in this statement, especially when considering whether the bank has dishonestly assisted DS by not stopping the transactions.

34   The first step of the wire transfer procedure is when a faxed request for a wire transfer is received by the Corporate Banking Team or by Central Operations. The staff member is required to check whether there are sufficient funds in the account, that the signatures are verified, that the account numbers are correct and that there is no notation or block on the account preventing wire transfers. On occasion, the verification process may require the staff member to get in touch with the customer's designated point of contact for the account. This additional procedure may be used where—

   (i) the transaction appears unusual;

   (ii) there appears to be some difference between the signature(s) and the provided specimen signature(s);

   (iii) the transfer sum is over US$100,000; or

   (iv) attempted fraud is suspected.

This call-back procedure was introduced in 2006 but the requirement for a stamp to be placed on the request confirming that the procedure was not introduced until 2011, so after the last relevant fraudulent transaction in the matter before me. Mr. Skinner indicated that if the request is received from a known customer contact, fax number and location (as they were in the matter before me) and it appears that it is signed by the authorized signatories, then the processing member of staff would ordinarily be content about its validity and sign and stamp the document before passing it on to another officer. If the initial member of staff had concerns then he

would be obligated to refer it to more senior members of the banking team.

35    The second bank official who must look at the request carries out the same verification exercise as that conducted by the first, before also signing the request document. If the second official feels there are any irregularities or anything is unusual he should refer the request to a senior officer.

36    Once the second officer has given his approval, the initial officer will send the document to the Payment Central Operations Department for processing. Under the current procedure, that department should only accept the request if it is evident from the document that at least two officers have signed it to signify that they have carried out the required checks. If the officer in that department is so satisfied, after an administrator has entered the SWIFT details on the request, the wire details are entered into the banking system by an input clerk. The request is then seen by a third employee in the department who is a supervisor or manager who authorizes the transaction in the system and initials the request form.

37    Mr. Skinner, who I found to be a reliable witness as it relates to established banking practices, goes so far as to say that if he had been asked to approve any of the above transactions at the time that they were requested, he would have done so as on the face of them no suspicions would have been raised. Although Geneva's audited accounts for 2005 and 2006 show the management fees were for a lesser sum, in the region of US$15,000, Mr. Skinner rightly states that the bank's processing team could not be expected to review Geneva's audited accounts to satisfy themselves that the level of management fees in some of the above transactions were appropriate for the industry. I do not accept that under the bank's policy and procedure a review of audited accounts is strictly required when using "all reasonable means" to ascertain likely account usage. It is for the customer when opening the account to inform the bank about the expected level of activity. Accordingly, the fact that a bank employee did not conduct such a review for what were much later disclosed as being fraudulent transactions, does not amount to a closing of eyes and is not sufficient to base a finding of the nature of dishonesty required[7] to prove a dishonest assistance claim.

38    Mr. Skinner accepts that some of the signatures on the various requests, especially with the benefit of hindsight and now knowing that the signatures are being challenged with more time to study the request in detail, "do vary to a degree which might have invited enquiry" and states that there was no evidence of dishonesty but more likely to be "innocent

_____

7    As highlighted from para. 176 herein.

error." Mr. Ritter submits, although not accepted by the bank, that this is an admission of negligence on the part of the bank. Mr. Skinner states that, having regard to the procedures in place and the volume of wire transfer requests, the banking officers have not processed the transactions improperly and that even if they had noticed any variation in the signatures that the standard practice would have required them to call DS who was the point of contact for Geneva with any request for Mr. Ritter to re-sign the document. The frank admission by Mr. Skinner that the signatures might have invited enquiry, in circumstances where there is more clarity with hindsight and in context due to what we know about the established fraudulent conduct of DS, the agreed point of contact for this account who Mr. Ritter and the bank regarded at the time to be an honest officer of Geneva, does not prove that the bank through unidentified member(s) of its employees was dishonest or closing its eyes in its approval or handling of the transactions

**Background—events in August to September 2011**

39    Mr. Ritter told the court that in August 2011, due to his dissatisfaction with the level of service being provided to Geneva by Monkton coupled with a change in the law in Texas in 2005, he had decided to wind down Geneva's operations in the Cayman Islands and to close the Geneva account and transfer the funds therein to the United States. Mr. Ritter also said that a further reason for making the decision was that DS become increasingly unresponsive to his phone calls and evasive, specifically in relation to providing the necessary information for the completion of the long outstanding 2007 and 2008 audit of Geneva by its auditors, BDO Tortuga ("BDO"). One might have thought that such a concern and state of affairs in relation to Geneva, one which the bank could not have known about at the time, should have raised some alarm bells for Mr. Ritter concerning DS's handling of Geneva's finances and whether this merited scrutiny by him.

40    Mr. Ritter states that he informed DS that Geneva's three brokerage accounts at Abshier Webb Donnelly Baker should be closed and the funds should be transferred to the Geneva account. The transferred funds totalling US$510,062.90 resulting from the closure of the accounts were credited in the Geneva account on August 16th, 2011. Mr. Ritter says that, between August 16th to 23rd, 2011, he informed DS of his wish to close the Geneva account and transfer the funds to the United States. At that time, based on the bank statements provided to him by DS, Mr. Ritter believed there to be around US$1,495,000 in the Geneva account.

41    Mr. Ritter stated that, when he informed DS of his intentions, DS told him that the maximum which could be withdrawn from the Geneva account in August 2011 was US$620,000, because CIMA had imposed minimum capital requirements for captive insurance companies. Mr. Ritter

told DS that he still wished to close the Geneva account, to debit the US$620,000 and have the balance of around $875,000 transferred thereafter. Accordingly, albeit belatedly at around 1.01 p.m.[8] on September 1st, 2011, US$620,000 was transferred from the Geneva account to Mr. Ritter's account in the United States.

**Background—events on September 1st, 2011**

42   At around 10.31 a.m. on September 1st, 2011, before the transfer had been processed, Mr. Ritter telephoned the bank to ascertain the account balance. When he was put through to the bank's Corporate Banking Department he was informed by an employee that the same was "far less" than the figure he had given to her. Mr. Ritter argues that the bank had thereby been put on notice that there was an US$872,000 shortfall on the account. In his oral evidence, Mr. Ritter rightly conceded that he had not informed the employee that sums in the account had been withdrawn without his knowledge or consent. Although Mr. Ritter, after the employee's limited disclosure to him about the account, may have been able to then express a view that this is what must have caused the reduced account balance, he of course could not put, and cannot say that he put, the bank on notice of the forgery or fraud, as he was not aware of the same at the time, as this was before DS had confessed to him. He said that the information received from the employee made him "shocked, concerned and confused" and his "thoughts were spinning." Although Mr. Ritter told her that he was a director and shareholder of Geneva as well as being a signatory on the account, the employee refused to provide him with details about the account balance or how much less the balance was than the figure he cited, citing the bank's confidentiality policy. Mr. Skinner confirmed that the bank does not ordinarily provide information to customers over the telephone about their accounts. Mr. Ritter said that he was "irritated" and "frustrated" by the employee who he viewed as being "uncooperative." Mr. Ritter states that the employee would have been aware that he was "extremely alarmed" and that he had an "upset tone of voice and aggressive speech pattern" which "must have made . . . [her] nervous." A member of staff tasked with taking telephone calls from customers being confronted by an irate customer is not a unique situation and I do not accept Mr. Ritter's argument that his demeanour, coupled with his comment to that staff member that the amount in the account was far less than he believed it to be, was anywhere near sufficient to constitute putting the bank on notice or "on inquiry" of a forgery or fraud. I do not accept that the nature and content of this call and the later calls made to

---

8   The wire transfer instruction having been received by the Bank at 12.32 p.m.

this and other bank employees amounted to putting the bank on constructive notice of DS's fraud. Mr. Ritter's contention that this constituted notice of the fraud is inconsistent with his different position, namely that he believed and expected that such notice was actually given by Mr. Arbo at BDO, who were Geneva's auditors, or by Krys Global who he had instructed to conduct a forensic investigation of the Geneva account.

43   Interestingly, in an email sent to Krys Global on September 6th, 2011, Mr. Ritter informed them that he had not spoken with the bank "at all on the matter." During evidence-in-chief, he elaborated on the content in his email stating his view that it was very clear to the first bank employee that there was a significant problem on the account, but then went on to say:

> "I have never told the bank that there had been a forgery, nor had I told the bank some of the intervening things that had gone on since my awareness there. And so I am now saying to Margot, I haven't spoken to them on this matter."

44   Mr. Skinner indicated that the bank employee who took Mr. Ritter's first two phone calls had followed the correct procedure in not providing confidential account information, although with hindsight she could have suggested that he speak to the relationship manager for the Geneva account. If Mr. Ritter was unhappy with the service he was receiving from this employee and so concerned about the account, one might have expected him to ask her if she could connect him with a more senior member of staff, something which he chose not to do.

45   As a result of what he had been told by the bank's employee, Mr. Ritter spoke to DS on the phone at 10.39 a.m. and again at 10.46 a.m. They had about eight further brief telephone conversations on that day. DS informed him that he "borrowed money" from the Geneva account and, although not using the word "forgery," he admitted that he had signed Mr. Ritter's name when doing so. DS informed Mr. Ritter that he would make immediate arrangements for the sums to be repaid, and DS, despite being initially evasive, during one of the later telephone conversations on that day confirmed that the amount owing was about US$875,000 which he promised to repay.

46   At this stage on September 1st, 2011, following some of the eight calls between Mr. Ritter and DS, but before Mr. Ritter's second telephone call to the bank at 12.39 p.m., DS embarked on further fraudulent activity on accounts at the bank by initiating the transfer of funds from two captives also managed by Monkton to the Monkton account at the Cayman National Bank in order to fulfil his promise to Mr. Ritter to repay the money removed from the Geneva account into his personal account. DS actually instructed a transfer of US$550,000 from the account of Warco to Monkton at 11.47 a.m. and a transfer of US$276,000 from the

account of Canadian Livestock at 12.32 p.m. to Monkton. As there was no notice or block on the accounts operated by DS, which Mr. Skinner stated would have been put in place if Mr. Ritter had notified the bank about his knowledge of the forgeries, these transfers were not questioned and were processed in the normal way. In relation to the Warco and Canadian Livestock transactions, the entries on the face of the document indicate that the bank conducted a call-back to verify the transaction. The transaction, which Mr. Skinner stated would have been viewed at the time by bank processing staff working with such a corporate customer as a payment being made for a legitimate commercial purpose, was actually authorized by the signatories, so was not a forgery. The transactions were likely completed around 12.10 a.m. on September 2nd, 2011.

47   Wire transfers of US$75,000 and US$225,000 were received on Monday, September 7th, 2011 and a wire transfer of US$575,000 was received on September 7th, 2011 from the Monkton account at Cayman National Bank by Mr. Ritter into his personal US account. It is common ground that these payments totalling $875,000 had been misappropriated by DS using the two above-mentioned transfers from the accounts of captive insurance clients of Monkton at the bank. Mr. Ritter said that he had been led to believe by DS that the funds would be coming from DS's family members in the United Kingdom and it was not until he read the confidential report of the Monkton controllers dated February 21st, 2012 that he became aware that the funds had been stolen.

48   Mr. Ritter states that, after his initial telephone conversations with DS, he again telephoned the bank and had a 13-minute conversation with the same bank employee commencing at 12.39 p.m. Importantly, Mr. Ritter was at this time already aware of the forgery on the account, as DS had admitted it to him. He conceded during cross-examination that at that point, in his mind, it was "a fraud and a forgery." It is therefore rather surprising that in a letter of September 29th, 2015 from Mr. Ritter's attorney to the bank's attorney, presumably written on instructions, it was stated that the bank had not been informed of the admitted fraud by Mr. Ritter in September 2011 because it was "premature and imprudent" to do so prior to an investigation and that it was "only a suspected fraud." Mr. Ritter indicated that the employee again refused to provide him with the amount of the balance in the Geneva account, indicating to him that she had "told [him] too much already" and was not permitted to verify his identity over the telephone. Mr. Ritter failed to tell the bank employee what he had just been told by DS about the forged signatures, something he accepted during cross-examination. Mr. Ritter said that the employee did not offer or suggest transferring his call to a manager or anyone more senior but, on the other hand, there is no evidence that Mr. Ritter asked her during this telephone call to transfer him to speak with a manager or a more senior officer. This is surprising, as Mr. Ritter says that he was

extremely dissatisfied with the two telephone calls he had with this employee. One would have expected a seasoned businessman in the financial industry, such as Mr. Ritter, to have asked to speak to the Fraud Department at the bank as DS had informed him about the forgery, especially if he was so dissatisfied with the more junior bank employee with whom he had been speaking and was so concerned about the account. Mr. Skinner understandably said that he would have expected a person in Mr. Ritter's position, with the knowledge he had due to DS's confession to him, to "be bashing the door down to get to a very senior person to report of fraud—forgery."

49    At 1.01 p.m. Mr. Ritter telephoned the bank's switchboard, this time he asked to speak to someone in the Wire Transfer Department. He had a 14-minute discussion during which he was informed that the instruction for the US$620,000 wire transfer had been received. This employee was also not willing to provide Mr. Ritter with the figure for the remaining balance in the Geneva account. He said that this employee "*also* declined" [emphasis supplied] to refer him to someone more senior in the bank who could assist him. However, it is not clear whether Mr. Ritter had actually asked to speak to someone more senior in the bank or whether, like with the first employee, that employee did not offer or suggest transferring the call to a senior bank officer.

50    Mr. Ritter made his fourth telephone call to the Wire Transfer Department at the bank at 2.29 p.m., at which time a further bank employee confirmed in a three-minute conversation that the wire transfer had been processed but, similar to her colleagues, refused to give him any details about the balance in the Geneva account. Mr. Ritter said at that stage he gave up trying to receive any co-operation or assistance from the bank, as he believed the staff's attitude to be unhelpful and it actually made him: "wonder if [DS] had had any inside help from the employees at the bank, in undertaking whatever it was [DS] had done on the Geneva Account." There is absolutely no evidence that anyone employed by the bank had acted in such a way. In fact, in his statement sworn on December 8th, 2016 Mr. Ritter states: "I have never formally alleged and do not allege now that [DS] had an accomplice-fraudster in the corporate banking team at Butterfield, and I do not seek to impeach the bank's reputation in this way." During her opening submissions at the hearing, Mr. Ritter's counsel conceded that an allegation that DS had "inside help" at the bank was not being pursued.

51    Mr. Ritter characterized the employees' responses as being "unhelpful" and like a "recorded script." Mr. Ritter wrongly contends that he had, by the above conversations with the three different members of staff, put the bank on notice of money being withdrawn from the Geneva account without his consent and that they should have immediately known this due to the difference in the amount in the account and the figure he

553

provided. It is clear that the three employees, by following the bank's procedures appropriately, felt unable to provide information about the account to Mr. Ritter. Mr. Ritter could have been an unauthorized voice on the phone, and Mr. Skinner rightly points out that in such circumstances the bank could not have taken any information provided by Mr. Ritter on that day as accurately stating the position on the account. The similar manner in which the three different bank officers handled his calls is consistent with there being a policy to preserve confidentiality, which they commendably followed despite the pressure Mr. Ritter was putting on them to do otherwise. If Mr. Ritter had shared his knowledge of the forgery at the time, which he had a duty to do, there is little doubt that they would have referred him and the matter to a more senior member of staff.

52    Importantly, what Mr. Ritter failed to do in any of the three telephone calls lasting a total of 40 minutes which he made to the bank after DS had admitted his fraudulent actions by forging Mr. Ritter's signature to him was to inform the bank about what DS had told him. In fact, during cross-examination Mr. Ritter agreed that "if he had intended to tell the bank about the admission of forgery," these three calls were a "perfect opportunity" for him to have done that. Mr. Ritter later added that he agreed "in general" with the proposition that if in a personal banking situation there has been a fraud on one's account, one should call the bank immediately to let them check the compromised account and that this may lead to security measures being put in place by the bank, including a block being placed on the account. It is clear that the purpose of these calls made by Mr. Ritter was not for him to in any way notify the bank or put them on inquiry of the forgery or fraud which he was aware of after the first phone call, but for Mr. Ritter to obtain information about the balance on the account. I do not accept the contention that the making of the calls to the bank by Mr. Ritter and the content of the conversations about the account balances between him and the bank employees "contrast with the deliberate conduct of the culpable customers in successful estoppel cases." Mr. Skinner correctly contends that Mr. Ritter, in his capacity as a director of Geneva, had a duty to inform the bank about the forgery as soon as he had been made aware of it by DS on September 1st, 2011 and that he had ample opportunity to do so during any of the later three telephone calls that he made to the bank on that day.

53    Mr. Skinner states that if the bank had been notified of the fraud, then he would have been made aware of the same because any member of staff who received such notification would have reported the matter to a supervisor or senior manager, who in turn would have passed the information on to him. Mr. Skinner would then have informed the head of

554

compliance and a block preventing any further transactions[9] would have been placed on the Geneva account. An investigation would then have been conducted in relation to all accounts to which DS was a signatory, and it is likely that blocks, or at the very least warning notices which would require approvals from senior management before allowing transactions to process on the relevant account, would also have been placed on those accounts.[10] The head of compliance at the bank would then have notified the Financial Crimes Unit ("FCU") and a suspicious activity report ("SAR") would likely have been filed with the Financial Reporting Authority. The bank would have sought legal advice from its attorneys and this would have included advice about how to recover any sums fraudulently removed from the Geneva account. Mr. Skinner stated that recovery proceedings could have then been brought at a time when DS was still solvent, before any of the later default judgments were entered against him and before he had divested his personal assets by the later grant of a power of attorney in settlement of the later default judgment obtained by the Monkton JOLs. Any block on the relevant account(s) would not have been lifted unless the bank received advice to do so by the FCU or the bank's attorneys.

54    At 3.29 p.m., less than half an hour after his last conversation with the bank and despite him saying that he was in a "profound state of shock," Mr. Ritter had the presence of mind to telephone Paul Arbo with whom he had recent contact concerning the preparation of past-due audits for Geneva. In his witness statement Mr. Arbo stated: "I recall thinking throughout my conversations with Mr. Ritter at that time how composed he was, so I did not feel any need to try to calm him down." Mr. Arbo answered in his evidence-in-chief when asked whether Mr. Ritter was upset: "No, I was actually thinking to myself he was fairly well composed, given the nature of what he was calling me about" before adding, when asked about Mr. Ritter's demeanour between September 1st at 3.29 p.m. until September 6th, 2011, that he remembered that "he was quite composed."

55    It is also clear that Mr. Ritter had the clarity of mind to develop a dual strategy at the time, namely to first put pressure on DS to make repayment and not doing anything in relation to reporting to third parties as that might detrimentally affect that course until he was paid and, secondly, if the first option failed, then seek to recover from the bank. Interestingly, unlike his communications with the bank on that day,

_____

9    Including the two fraudulent transfers detailed in para. 47 herein.
10   Mr. Skinner contends that two payments totalling US$825,000 paid to Monkton on DS's instructions could have been blocked if such notice had been given by Mr. Ritter to the Bank after DS's confession to him on September 1st, 2011.

Mr. Ritter chose to inform Mr. Arbo about what DS had told him about his fraudulent actions and the forged signatures. Mr. Arbo confirmed in his evidence that Mr. Ritter told him that he had spoken to DS who had admitted to him that he had taken money out of the Geneva account by forging Mr. Ritter's signature on cheques.

56   Mr. Ritter stated that he "remembered clearly" that Mr. Arbo advised him in their discussion to obtain a full picture and to be in possession of all the facts before doing anything or notifying anyone including the CIMA. Mr. Ritter stated that he was at the time "influenced" by Mr. Arbo and BDO, in particular when they expressed caution to him "not to act rashly." Mr. Ritter said that he relied upon them as he felt that he was "in a completely new situation and in an unfamiliar country with the legal system regulatory system I knew almost nothing about." Although the forgeries had commenced in 2008, and although no audits had been completed by BDO from 2008 onwards, Mr. Ritter added that he believed in retrospect that Mr. Arbo was concerned about BDO's reputation as auditors if they had overlooked fraudulent activity and that this was why Mr. Arbo did not want to cause any unnecessary trouble for DS or BDO. In his first written statement, Mr. Ritter wrongly stated that Mr. Arbo suggested that a special audit should take place, and he later accepted that this was inaccurate as in fact he had been the one to ask Mr. Arbo if he would do the forensic work. When first asked to do that by Mr. Ritter, Mr. Arbo stated that he would have to think about whether he could take on an engagement to conduct a forensic accounting investigation to reconcile the transactions on the Geneva account.

57   Mr. Arbo's recollection of their discussion is very different. He accepts that BDO had duties as auditors which Mr. Ritter could rely upon. He also accepted in cross-examination that he did not have the sense that Mr. Ritter wanted to cover up this fraud for DS and he was not concerned about DS's welfare. During re-examination he reiterated that reporting to the bank was not a matter for the auditor and that it was a matter for the client. He added that he was "under the impression that we had no responsibility to report to Butterfield." Mr. Arbo stated:

"At no time during discussions with Mr. Ritter or email correspondence reporting on those discussions was there ever any talk of notifying the Bank or any other parties aside from the regulator and the police. All of the conversations were about BDO's obligation as an accounting firm to report suspicious activity. I do not, therefore, believe that Mr. Ritter could have reasonably presumed or expected that BDO would notify any other party as suggested in paragraph 100A and 102 of the Amended Statement of Claim. This is also inconsistent with Mr. Ritter's specific request to me on 2 September to keep the information confidential and his requests on 5 and 6 September to delay notifying only the regulator and the police."

Mr. Arbo was adamant that he did not tell Mr. Ritter to keep knowledge of the forgery and fraud to himself and not to report it, stating during examination in chief: "I'm sure I spoke, generally, about the importance of gathering all facts. And in the kind of context of an essential forensic audit, but certainly not any context of delaying notifying CIMA." Mr. Arbo also denied Mr. Ritter's statement that he had told him that DS had a nephew working as a chartered accountant at a competing accountancy firm, which Mr. Ritter said he had done possibly to emphasize that DS was a reputable professional.

58   Mr. Ritter stated that he wished to be "proactive," so at around 3.56 p.m. he telephoned the CIMA's Enforcement and Insurance Company number, having been redirected to them by someone at the CIMA whose number he had been able to search for and find, with the intention of reporting the fraud. This is an illustration that he had clarity of thought to partly recognize the obligation to make such a report. He failed to inform the CIMA staff member of his suspicions about DS's irregular dealings with Monkton, stating that "as he was about to" do so he terminated the call as he then recalled the "clear advice" which he said Mr. Arbo had given to him not to make any serious allegations until he knew the facts. However, very shortly after this call, he telephoned Mr. Arbo at 4.05 p.m. to request the details of the person at the CIMA who was responsible for Geneva. It is evident that Mr. Ritter's concerns about the Geneva account did not hinder these lucid thought processes.

59   At 4.09 p.m., following the request for the information, Mr. Arbo provided Mr. Ritter with the details of the Head of Insurance Supervision at the CIMA who would be responsible for Geneva. Mr. Ritter stated that Mr. Arbo reiterated to him that, before the CIMA was informed, there should be an investigatory audit undertaken. Mr. Arbo indicated that his providing Mr. Ritter with the CIMA contact details and his reaching out to the attorneys concerning BDO's reporting obligations, was inconsistent with Mr. Ritter's contention that Mr. Arbo had told him to delay notifying anyone, including the CIMA, until there was a fuller picture. Mr. Arbo says that it was Mr. Ritter who was driven to delay informing the authorities because he wanted to first focus on being repaid by DS. Mr. Ritter said it was correct, when it was put to him in cross-examination, that from the time DS said he was going to repay him on September 1st that his "focus was on making sure he did repay." He also accepted when asked that his "objective was to secure full repayment from him as quickly as [he] could." This evidence tends to show that Mr. Ritter's deliberate silence was intentional and that its purpose was to ensure a smooth recovery of the funds from DS without any hindrance that would likely flow from reporting what he knew about the fraud.

60   At 4.49 p.m., Mr. Arbo indicated in an email that he felt that, due to potential conflict issues relating to DS, the accounting assignment should

557

be carried out by another accountancy firm instead of BDO and he made recommendations of other firms including Krys Global. At 5.09 p.m., Mr. Arbo emailed the CIMA about the insurance coverage requirements for captive managers.

**Background—events from September 2nd, 2011 to December 2011 and the duty to report the forgery/fraud**

61    At 4.19 a.m. on September 2nd, 2011, Mr. Ritter sent an email to Mr. Arbo in which he confirmed his belief that the embezzlement could be in the region of $875,000. He also sought to persuade Mr. Arbo that he could carry out the forensic analysis and sought advice about a suitable attorney to instruct as well or chartered accountant to help him resolve the issues as they arose. In his reply at 8.54, Mr. Arbo reiterated his view that he could not accept the instruction to carry out a forensic analysis and recommended that, although BDO would "offer whatever assistance we can," both an attorney and accountant should be instructed by Mr. Ritter. Despite this recommendation, and despite his expressed view that he was concerned about dealing with matters in this alien jurisdiction and that he needed local "boots on the ground," Mr. Ritter accepted during cross-examination that he did not at any time instruct a Cayman attorney. In his earlier reply at 8.27 a.m., Mr. Arbo had forwarded an email to Mr. Ritter stating that there were no insurance coverage requirements for captive managers.

62    Mr. Ritter telephoned Margot MacInnis at Krys Global on September 2nd, 2011. Mr. Ritter said that he informed her about his concerns with DS and about his dealings with the Geneva account as well as the advice he said he had received from Mr. Arbo concerning the need for forensic investigation to be undertaken. At 9.05 a.m., Mr. Ritter told Mr. Arbo that he was retaining Krys Global.

63    Around the time that the bank was processing the two fraudulent transfers involving Warco and Canadian Livestock outlined at para. 46 above, Cayman National Bank received a request from Monkton to transfer $75,000 to Mr. Ritter's personal account in the US.

64    BDO, being aware that Krys Global was being instructed in relation to the forensic analysis, contacted the Appleby law firm for legal advice concerning its obligations as Geneva's auditors to report the fraudulent conduct to the CIMA and in relation to the filing of a SAR. On the same day Mr. Arbo informed Mr. Ritter by email that BDO had obtained the legal advice and that he had been advised that, as BDO had been made aware of a forgery, it was obliged to file a SAR.

65    Mr. Arbo sent a further email to Mr. Ritter at 4.29 p.m. informing him that, as BDO had received advice from Appleby, the firm could not be

Geneva's attorneys due to conflict issues. He suggested that Mr. Ritter ask Krys Global about recommendations for suitable attorneys.

66   Mr. Ritter stated that he understood the content of the communications from BDO to mean that: "BDO would be taking action and making a report about this to the appropriate Cayman Islands authorities." He said that the veracity of his belief that BDO was taking immediate action on behalf of Geneva was later fortified when he received an invoice from them in October 2011 which included charges for their time spent dealing with the suspected fraud. Mr. Ritter stated that Mr. Arbo told him on October 11th, 2011 that the disbursement included the preparation, by attorneys instructed by BDO, of the SAR dated September 5th, 2011 and that this meant that BDO had taken the necessary actions and "all required steps to comply with the letter of the law" in September 2011, which he assumed to include being in contact with the police or the Cayman Islands authorities and "notifying anyone who needed to be notified."

67   On September 4th, 2011, Mr. Ritter had made clear to Krys Global in his email to them that he was going to meet DS and "focus on getting" his money. Krys Global, clearly with one eye on due diligence issues, responded concerning the documents that should be obtained about the funds coming from DS. Ms. MacInnis wrote:

"... [Y]ou should also request information to support the funds transfer to yourself—you will want a paper trail of the source of funds, so for instance keep e-mails where David Self explains them (i.e. as loans) or to the extent he explains in your meeting take a good note. One would expect he would transfer the funds through the company for legitimacy.

I am not a lawyer and cannot provide legal advice, to the extent you want to obtain legal advice in regard to these concerns you we [*sic*] can provide you with some of the names of attorneys we've worked with."

68   On September 5th, 2011, after his arrival in the Cayman Islands, Mr. Ritter met with DS. Mr. Ritter had the presence of mind to heed the advice of Ms. MacInnis and record the meeting. DS showed him fax instructions on Monkton letterhead dated September 1st, 2011 addressed to the Beckenham branch of NatWest Bank in the UK with instructions to wire a single transfer of US$800,000 from the UK account to one of Mr. Ritter's accounts in the United States and a print out of the branch's opening times. Despite this, DS told him that the repayment of the funds had already been sent to Monkton at the Cayman National Bank. Mr. Ritter said that DS told him that the funds were from family money in the United Kingdom and, when asked, indicated that did not come from other customers or clients. As highlighted by the bank, despite the advice from Ms. MacInnis about the need for a paper trail, only this inadequate

559

documentation was provided to Mr. Ritter. Mr. Ritter in his evidence agreed that this documentation was "completely inconsistent" with what he said he had been told about the money coming from family money. He accepted in cross-examination that an honest person would need sufficient proof of the legitimate source of funds allowing the repayment of $875,000. It is also inconsistent with what actually happened with the three payments coming from Cayman National Bank. Mr. Ritter accepts that he failed to ask for the documentation to verify the source of the funds.

69   Mr. Ritter has provided an agreed transcript of the digital recording of what was stated at that meeting. Mr. Ritter agreed during cross-examination that DS was a "liar," a "fraudster," a "forger" and a "thief" who had admitted to his actions to him on September 1st, 2011. With this in mind, it is clear from the transcript and the evasive answers of DS that alarm bells should have been ringing about the source of the funds to be paid to Mr. Ritter as they may not be coming from family members. Mr. Ritter wrote in the record of the meeting that when he asked DS about insurance, Mr. Ritter stated: "If I get the money, I don't care, but if I don't I care a lot." The transcript also records Mr. Ritter stating: ". . . [U]sually you can't insure yourself for criminal acts." This record shows an acknowledgment about the criminality of DS's conduct as well as a primary focus on getting the money back from DS.

70   The record of the meeting also reflects Mr. Ritter stating to DS: "So I guess my only hope if your relatives don't come through is the bank. Because the instruments are forged they would have a duty." It is also clear that, as far back as September 5th, 2011, Mr. Ritter was mentally able to strategize and was considering the fallback option of seeking to be repaid by the bank if the funds were not forthcoming from DS despite the fact that he had not, and did not for a long period of time, notify them of the forgery. He accepted during cross-examination that there could be no insurance claim in relation to the stolen funds, he having had the presence of mind to raise insurance issues in his very early discussions with Mr. Arbo, and that "the fall back [he] had in mind . . . if he didn't get [his] money was the bank." In fact, during cross-examination of Mr. Skinner by Mr. Ritter's counsel, it was made clear that Mr. Ritter's "Plan A" was to seek payment from DS via his family and that "Plan B" was "to look to the bank." The fact that Mr. Ritter was even contemplating the possibility of seeking recovery from the bank supports a contention that he had a duty to promptly report to the bank to enable them to immediately try to mitigate any potential losses.

71   It is evident that Mr. Ritter had his suspicions about the source of the funds as he stated in an email sent on September 6th, 2011 to Krys Global: "Obviously the miraculous relative loan has not materialized." During cross-examination Mr. Ritter accepted that there was a real risk that the

funds might be stolen from other customers' funds to repay him and that what DS was proposing was dubious. However, he later added when asked whether he had some doubt about the source of the funds: "Yes, but very little doubt. I thought it was family money, but I had some doubt." He then added that he wanted to believe that the money was coming from the family source and so he took DS at his word. He accepted in cross-examination that, although a doubt existed about the source of the money when he received it, he felt that there was no need to tell the bank about the fraud as he had been paid. Despite accepting the "dubious" nature of DS's proposals and the "real risk" that the funds he was to receive from DS might be stolen from other customers, Mr. Ritter deliberately chose not to warn the bank by disclosing the forgery as he made a conscious decision to prioritize the unhindered receipt of the funds into his US account.

72    On September 5th, 2011, following his meeting with DS, Mr. Ritter also met with Ms. MacInnis and Mr. Krys, but he did not attend at or contact the bank. The meeting was held in relation to them conducting a forensic investigation into the transactions on the Geneva account. Although aware that Krys Global were being retained to first carry out a forensic investigation, Mr. Ritter said that he felt that this was to be only the first phase of their activity and that their involvement would be more expansive and to an extent, as with BDO, he relied upon the content of their invoices to him to support such a view. Mr. Krys informed the court that Mr. Ritter did not show them any documentation at the meeting to support the source of the funds coming from DS, nor did he express any doubts to them about whether the money was actually coming from family members.

73    From the content of the later August 27th, 2012 letter from Krys Global to the bank, and due to Mr. Krys's oral evidence that he had no recollection of Mr. Ritter sharing with him the fact DS had told him about forging his signatures on the transfers to enable him to remove the funds, it is clear that Mr. Ritter was not forthright with them about the forgery. For Mr. Ritter to seek to place any reliance on any advice he received from Krys, who were accountants and not attorneys and so could not advise about the legal issues resulting from a forgery,[11] it would have required him to provide full details to them, so that they might have proffered any advice in an informed manner. I carefully note that Mr. Ritter contends that Mr. Krys's recollection of the meeting is "so poor" and that "most certainly" he had told the "Krys Global team" about everything DS had

---

11  Ms. MacInnis having made clear in an email to Mr. Ritter sent on September 4th, 2011 that she could not provide legal advice and that she could provide details of attorneys—see para. 67 herein.

said to him during the phone calls of September 1st and 2nd, 2011 as well as reporting the content of his meeting with DS on September 5th, 2011. I also note that, in an email sent to Ms. MacInnis sent on September 6th, 2011, Mr. Mr. Ritter refers to the Geneva account "from which the embezzlement occurs," but in their email exchanges there is no detail from him about what form that took or any reference to forgery. He states that Mr. Krys's memory may be poor because of "professional detachment." On the other hand, despite him also claiming that the nature of his interaction and sharing of information with the bank had been hindered by the shock of the disclosure to him by DS about the forgery,[12] Mr. Ritter contends that his powers of recollection should be preferred as he was "experiencing uniquely distressing circumstances" of him losing US$875,000. When one considers the August 27th, 2012 letter from Krys Global to the bank in which no mention of the admission of forgery is made, it appears more consistent with the evidence of Mr. Krys that nothing was said by Mr. Ritter concerning the forgery.

74   Mr. Ritter said in his first witness statement and in his oral evidence that at the meeting Mr. Krys gave him some hope that he would be reimbursed with funds coming from DS's relatives "as the word on the island was that [DS's] business was derived from family money" in England. Mr. Ritter said that this reinforced his belief that such money was lawfully funding the transfers to his US account mentioned in para. 47 above. In his evidence-in-chief Mr. Krys forcefully denies ever having made this comment and stated that he did not know DS or his family and he would not have spoken to anyone else about DS prior to the meeting, so he would not have known about his family situation. He was not asked about this in cross-examination. I prefer Mr. Krys's unchallenged evidence to that given by Mr. Ritter and, even if I am wrong, it does not minimize the fact that DS accepted in his oral evidence that he had real doubts about the source of the funds.

75   Mr. Ritter said he was aware of Mr. Krys being a former Director of the CIMA and that, as he felt the CIMA had been informed in early September 2011 by BDO and Krys Global about the fraud, he "pictured that officials in black jackets would be entering Monkton offices, and/or the bank itself and telling anyone present to step away from the computers." Although not accepted by Mr. Arbo, Mr. Ritter stated in his second written statement that Mr. Arbo told him, on September 5th, 2011, that the police "would have to look at the bank records to verify the embezzlement." It appeared that Mr. Ritter mistakenly felt that this belief held by him put the obligation on others and excused him from any obligation that

_____

12   At para. 168 of his witness statement dated November 23rd, 2011 confirmed that he was still "very shocked and upset by what he had discovered . . ."

he may have had to notify the bank in specific terms about the fact that there had been a forgery and fraudulent activities on the Geneva account and about the detail he knew about that. That said, Mr. Ritter accepted in his statement signed on November 23rd, 2016 that "the position of [the Bank] and who would be responsible for contacting the Bank with dealing with the Bank was never specifically discussed at any point during" the meeting on September 5th, 2011. Mr. Krys indicated in his statement signed on November 23rd, 2016:

> "From my review of the email correspondence between members of the Krys Global team and Mr. Ritter, the signed engagement letter, the invoices rendered and my recollection of the discussions around September 2011, neither I (nor anyone else in the Krys Global team) gave any assurances that we would take all necessary steps to notify CIMA, the relevant authorities and any other party who was required to be notified of the fraud (as pleaded in paragraphs 102 and 102A of the Amended Statement of Claim). In fact as appears from the emails, it is Mr. Mr. Ritter who is asking us questions such as whether there is anything he 'should do with the bank' as he had 'not spoken with them at all on this matter'. Neither the email correspondence nor the engagement letter states we will undertake such steps. In fact, the engagement letter stipulates that Mr. Ritter acknowledges that we accept no responsibility for directing the Company's affairs, the sole responsibility for which remains with the directors and management of the Company (ie Mr. Ritter) . . . Further, Krys Global would not have been in a position to make any statement or conclusion as to whether there was fraud until the conclusion of the forensic analysis and production of the draft report in late November."

76   In the abovementioned engagement letter, which Mr. Ritter signed on September 22nd, 2011, Krys Global made clear that it had been asked by Mr. Ritter to perform a forensic review of the bank statements for the relevant period to identify any regular withdrawals or transfers. It added that it did so wholly reliant upon the information provided to them by the directors of Geneva without third-party verification. In the letter, as stated above by Mr. Krys, Krys Global also made patently clear that it accepted no responsibility for directing the company's affairs and that the sole responsibility for that remained with the directors and management of the company. It is the terms of that letter that governed the boundaries of the authority or mandate given to Krys Global, and this did not include a usurpation of the powers, duties and obligations of Geneva's directors.

77   Mr. Krys also indicated that the wording in the invoices sent to Mr. Ritter did not mean, and could not have been interpreted to mean, that Krys Global would be taking all necessary steps to notify the CIMA, the

authorities and any other party of the fraud. He reiterated these assurances were never given to Mr. Ritter and that he had no reason from the content of their communications for saying that such assurances were given. I found Mr. Krys to be a forthright witness and his evidence was consistent on these issues.

78   Ms. MacInnis, who had not been provided with any verifying documents and was unaware of Mr. Ritter's concerns about whether DS was really getting the repayment funds from his family and not from other clients, made clear in her email on September 6th, in reply to a question from Mr. Ritter as to whether there was anything that he should do with the bank that "In terms of notifying the bank this should be considered once *you've taken a decision which I appreciate is influenced on whether you get the money back or not.*" [Emphasis supplied.]

79   It appears that Mr. Ritter wrongly relies upon the above email exchange he had with Ms. MacInnis as an excuse for him not notifying the bank about his knowledge of DS's fraudulent conduct. In fact, his question about whether there is anything that he should do with the bank shows that he was then accepting that, he had "not spoken to [the bank] at all on this matter" and acknowledging that he may be obliged to do some things to do with the bank.

80   I prefer the evidence of Mr. Krys to Mr. Ritter's and I am satisfied that Krys Global did not give the impression that, as a part of its engagement by Mr. Ritter to perform forensic duties, it would be notifying the bank of the forgery. In fact, Mr. Ritter agreed in cross-examination that when he met with Krys Global on September 5th, 2011 there was no discussion about who would be responsible for "dealing with and contacting the bank" adding that as Geneva's director and having regard to the terms of the engagement letter he would have been the one who was responsible for doing that. In any event, at the time Mr. Ritter failed to be frank with Krys Global and share with it what DS had confessed to him about the forgeries.

81   Mr. Arbo stated that on September 6th, 2011 Mr. Ritter called him and informed him that the matter had been progressing positively. In his oral evidence Mr. Arbo said that Mr. Ritter did not express any doubt or any concerns to him about the repayment of the funds. Mr. Arbo said that he did not remember Mr. Ritter ever bringing up any doubts about the family money story, nor did he show him any documents he had received in support of that story. If BDO were to take on the wider role involving notification to the bank and communication on Geneva's behalf to the authorities which Mr. Ritter wrongly believed they had, BDO would have rightly expected greater frankness from him. Mr. Arbo shared this detail in an email to Appleby, BDO's attorneys, and added that Mr. Ritter was requesting him to "delay, as much as possible/appropriate, the filing of the

SAR for a few days as he did not want to 'muddy the waters' in terms of coming to resolution with [DS]." This email written by Mr. Arbo shortly after his discussions with Mr. Ritter is highly inconsistent with Mr. Ritter's evidence in his second witness statement when he swore that he "could categorically state that I never asked BDO to delay [the SAR]." Mr. Arbo in an earlier email to Appleby on that day had told them that "[Mr. Ritter] seems to want to delay notifying the police and CIMA until he gets a better sense whether (DS) might be coming through with the money he promised to repay." Mr. Arbo mentioned at para. 10 of his statement sworn on November 21st, 2016 that "he recalled Mr. Ritter saying he was concerned about compromising his efforts to get his money back." These are all consistent with a deliberate decision being made by Mr. Ritter to delay notifying others of the forgery, at the very least until the funds removed from the Geneva account were recovered into his personal US account from DS.

82   Mr. Arbo told BDO's attorneys that Mr. Ritter had informed him that he had already received US$75,000 from DS's company's account and that DS was working toward getting the rest from family members. This is consistent with the bank's case that Mr. Ritter was primarily concentrating on recovering his moneys from DS, over and above any obligations to report the admitted forgery to the bank or to the authorities.

83   Mr. Arbo also informed the attorneys that he had told Mr. Ritter that BDO were obliged to file a SAR and that he was considering what the obligations were in relation to reporting to the CIMA. BDO's attorneys filed the SAR with the Financial Reporting Authority on September 6th, 2011.

84   The funds stolen by DS from Warco and Canadian Livestock were credited into Monkton's account at Cayman National Bank at 11.55 a.m. on September 6th, 2011. DS instructed the bank to transfer US$225,000 and US$575,000 to Mr. Ritter's personal account at HSBC in the United States. At 2.00 p.m., DS informed Mr. Ritter that the money would be coming in three different batches and Mr. Ritter was given two Cayman National Bank receipts for the two above payments.

85   Mr. Ritter received the US$75,000 and the US$225,000 later on September 6th, 2011. He received the final payment, US$575,000, on September 7th, 2011.

86   Thereafter, when Mr. Ritter informed Krys Global that he would sign its engagement letter he added that the "USD800,000 has been received. Hard to believe." Mr. Ritter states that although he had recovered all of Geneva's funds, as a "responsible and concerned citizen," he continued with the appointment of Krys Global to conduct a forensic investigation so that the CIMA could be made aware of the events in an informed manner.

87   On November 16th, 2011, following receipt of the first draft report from Krys Global which had wrongly analysed the fraudulent bank statements produced by DS, Mr. Ritter wrote to the bank requesting reprints of the statements on the Geneva account to cover the period from its opening until October 31st, 2011. Again, although he had known about the forgery for over two months, he failed to make any mention to the bank of the forgery. When he received those statements Mr. Ritter would have seen that the balance which illustrated that the bank, in the absence of Mr. Ritter sharing with them what he had known about the forgeries since September 1st, 2011, was treating the debits as being genuine transactions.

88   Mr. Ritter stated that he had been notified by Krys Global that it had informed the CIMA of the fraud in November 2011 and that at the end of the month he received a copy of the final draft of the Krys Global report dated November 29th, 2011. That report was also sent to the CIMA, but no copy was provided to the bank which therefore would have been unaware of the content. The report confirmed that there were transactions leaving an unaccounted difference of $828,046. However, the report still contained no mention of DS's confession to Mr. Ritter as to the forgeries. This is despite the fact that back in December 2011 the CIMA had asked Mr. Ritter to provide additional information including a chronology of events leading up to and subsequent to his discovery of the missing funds and observations regarding DS's conduct communications with him. In fact the report only mentioned that prior to their appointment Krys Global were advised by Mr. Ritter that he had concerns that funds may have been misappropriated and that he became aware of this after obtaining bank statements from the bank and comparing them to the statements received from Monkton. The report also highlighted that audited accounts had not been prepared by or filed by Geneva since June 30th, 2017, a period of four years, whilst Mr. Ritter and DS were co-directors.

89   On December 1st, 2011, a conference call took place involving Mr. Ritter, Krys Global and the CIMA concerning the report and Geneva. Even after receipt of the final forensic report from Krys Global dated January 18th, 2012,[13] Mr. Ritter still failed to notify the bank of the forgeries.

90   I accept that until the earliest late August 2011 or more likely September 1st, 2011, Mr. Ritter was not aware of these fraudulent transactions, especially as until August 2011 DS had been providing him with false bank statements for the Geneva account which contained

_____

13  A copy of the report was provided to CIMA on or around January 25th, 2012.

inaccurate balances and did not contain details of the fraudulent transactions. It is clear that Mr. Ritter did have a duty to promptly share with the bank in clear and precise terms what he knew about the forgeries after the admissions DS made to him. Mr. Ritter suggests that he should not be criticized for what happened on September 1st, 2011 and thereafter as he acted "as any honest and reasonable man" would have done under the circumstances. It is submitted that his approach was understandable, as he says he immediately took action to recover the funds from DS and, as he was unfamiliar with the laws and regulatory requirements in this jurisdiction, he contends that he appropriately sought expert advice and guidance from BDO, Geneva's auditors, concerning his duties to report the fraud and what interaction he should have with the authorities. From his evidence it is clear that Mr. Ritter seeks to justify his longstanding failure to notify the bank by wrongly blaming others.

91    Both Mr. Krys and Mr. Arbo, although engaged in the past by Geneva, were entitled to give evidence in these proceedings to present their versions of events which are in conflict with that given by Mr. Ritter rather than leave the court to make a decision on incomplete evidence. I note that Mr. Arbo was called as a witness for the bank and that Mr. Ritter chose not to call him as a witness. This may well be because his evidence undermines parts of Mr. Ritter's evidence, especially in relation to the reasons for Mr. Ritter's failure to inform the bank of the forgery. What I have already noted in Mr. Arbo's evidence, that there was no discussion about notifying the bank, is consistent with Mr. Ritter's oral evidence-in-chief when he stated that they discussed informing the CIMA and the police about the fraud but he did not discuss telling the bank and that the topic never came up. Mr. Ritter also confirmed in cross-examination that he did not ask BDO if they had notified everyone who needed to be notified of the fraud.

92    It is understandable that Mr. Ritter put faith in BDO to perform their duties, *but only duties that relate to their capacity as Geneva's auditors.* I accept that, especially after the funds from DS had been received into his US account, Mr. Ritter was content for the authorities to be notified and he did not at that stage seek to cover up for or protect DS. BDO appropriately sought legal advice as to what their legal reporting obligations as auditors were in the circumstances and these were proceeds of crime obligations which did not include a requirement for them to notify the bank. The email from Mr. Arbo on October 11th, 2011 in response to Mr. Ritter's query about the claim by BDO for fees incurred by Appleby in advising them supports and does not detract from this contention. It makes clear that the duties are as Geneva's auditors and not acting in a wider capacity for Geneva.

93    Mr. Ritter's further excuse for not reporting being that he did not want to tip off the bank as a member of staff may have been assisting DS

is also without merit and is to a degree inconsistent with his view that he made the bank aware on September 1st, 2011 of serious irregularities on the Geneva account. It is consistent with a contention that he was deliberately withholding disclosure of the forgery to the bank. I note with great interest that in the letter from his attorneys on May 14th, 2015 at para. 55 they state: "Mr. Ritter's first instinct was that [DS] must have had inside help from someone at Butterfield. He did not therefore contact the bank at this time, preferring to go directly to the Cayman authorities." Mr. Ritter later reiterated in his statement sworn on November 26th, 2016, when seeking to justify his failure to notify the bank about DS's conduct, that he "had been concerned about whether someone at Butterfield could have assisted [DS] and had been uncertain about whether I should say anything to them until the police and CIMA took action." This evidence is inconsistent with what Mr. Ritter said in his statement that he had given "no particular thought at the time[14] about whether [the bank] should or would be notified and by whom."[15] I am satisfied on the evidence that Mr. Ritter made a conscious decision not to tell the bank at that time as he feared that this might create problems in receiving the funds DS promised to transfer into his personal account in the United States. He further stated that this concern about staff members being directly involved in the fraud is why he instructed DS to return the funds to his personal account rather than to the bank. Such a belief, if it genuinely existed at the time, was not well founded and even if it was, should have amounted to a greater reason for Mr. Ritter, as a conscientious corporate customer of the bank who was "acting as a responsible and concerned citizen"[16] to ensure that the bank was aware of the events. As set out in para. 50 herein, it is clear that this allegation is not being pursued by the plaintiffs.

94    Mr. Ritter is an experienced businessman operating in the financial sector and invariably having to deal with banks as he has been launching medical ventures and selling them to public companies since 1982. This is a view shared by Mr. Krys, the Executive Chairman of Krys Global and former Head of Enforcement for the CIMA, which is derived from his dealings with Mr. Ritter and his own knowledge of the complexities of the insurance industry. In this regard, I note the sentiments expressed in the case of *Ewing* v. *Dominion Bank* (3), a case in which estoppel was considered in the absence of a contractual relationship of banker and customer. A majority of the Supreme Court of Canada held that Ewing & Co., whose name had been forged as makers of a promissory note and who had received notice from the bank that it held the note and that payment should be provided at the bank on due date, were estopped by

---

14    "at the time" being September 7th, 2011.
15    Paragraph 187 of Mr. Ritter's statement sworn on November 23rd, 2016.
16    Ibid.

their silence, while they attempted to settle the matter with the forger, from setting up the forgery against the bank, because they could have saved the bank from at least part of its loss if they had promptly shared their knowledge of the forgery with it. In *Ewing*, Girouard, J. opined ([1904] S.C.R. at 143):

"Speaking for myself, I cannot satisfy my mind that when a business man, familiar with banking operations, their meaning and scope, is informed, according to banking usages, that his name is being used as maker of a note in a bank, evidently for cash credit either already made or to be made, he is under no obligation to reply promptly, at least within a reasonable time, that it is used without his authority, or even that it is a forgery."

Then in *Ewing* (3), Davies, J., referring (*ibid.* at 151–152) to the statement concerning estoppel made by Parke, B. in *Freeman* v. *Cooke* (5) (2 Ex. at 663):[17]

"Both parties profess to rely upon this rule in this case though I cannot find that any one of the limitations mentioned in it express or suggest the existence of the relationship of banker and customer or similar relationship as necessary to create the duty the neglect of which imposes the liability. It speaks of a *neglect of duty cast upon a person by the usage of trade or otherwise to disclose the truth* [emphasis in original]. I fail to appreciate the argument which would confine this duty to cases where such relationships already exist as those between banker and customer or seller and buyer. It does seem to me that in a country like Canada where such a large proportion of its business is carried on by credit evidenced by drafts and notes which are discounted by one or other of the chartered banks of the country the usages of trade which create the duty apply to all persons engaged in trade who are notified of the holding by one of these banks of a note or draft professing to be theirs. I cannot believe that such a duty would exist as between the bank and Ewing & Co. if the latter was a regular customer of the former and would not exist otherwise. It seems to me the duty naturally arises out of the usages of trade as they exist. Banks do not confine their discounts to those of their own customers only. It is known to every one engaged in trade that a large part of the bank's business consists in the discounting for its customers of commercial paper professing to be that of other merchants or traders. *And when a business man receives such a notice from a bank as Ewing & Co. did in this case, if such notice contains information of a forgery and fraud being practised upon a*

---

17  See paras. 136 and 138 below.

*bank, in the unauthorized use of the name of the person or persons notified, the latter are bound by every principle of justice and right dealing between man and man, and in accordance with the usages of trade, within reasonable time to give the bank notice of the fraud* [emphasis supplied].[18] Any other rule would seem to me to be fraught with grave danger; would generate want of confidence in the ordinary business relations of life and would offer a premium upon gross business negligence."

95   Mr. Ritter could have had no doubt using his common sense that he had a duty to inform and warn the bank immediately, especially as DS had just admitted to him that there had been forgeries made by him and fraudulent activities on the Geneva account. He could also, at the same time, have cautioned the bank that the details were not fully known as a forensic accounting was to be carried out. Mr. Ritter chose not to do so and he wrongly seeks to shift the blame for that on Mr. Arbo, BDO, Krys Global and the CIMA.

96   I accept the evidence of Mr. Arbo that reporting the fraud to the bank was not the responsibility of Geneva's auditors who had, on September 1st, 2011, just been invited by Mr. Ritter to carry out a forensic review of transactions during the relevant period. I accept Mr. Arbo's evidence that he did not encourage Mr. Ritter to not inform the bank and that there was no discussion about the reporting obligations to the bank. If I am wrong in reaching that conclusion or if Mr. Ritter genuinely believed BDO was going to report, when it became clear that BDO felt conflicted and were no longer advising him and that the bank had not been informed, he had a responsibility to report.

97   Mr. Ritter's contention that he had discharged this duty to report as he believed that the content of his telephone conversations with the bank employees on September 1st, 2011 amounted to putting the bank on notice is misconceived. Mr. Ritter expressing the incorrect "belief" the bank would become aware of the fraud as DS would "be arrested, quite literally, within minutes or hours" which would "freeze everything up" again is not a justifiable excuse for not informing the bank himself, and when it became evident that DS was not arrested at the time the excuse had even less merit.

98   Mr. Ritter's evidence is not convincing and has the character of someone, after the event, searching for and creating excuses for deliberately not doing what he clearly should have done at the time, namely

_____

18   See the Privy Council decision in the more recent case of Tai Hing (20) (at para. 139 herein) where the requirement to report is stricter, as it is to be done as soon as becoming aware of the fraud rather than doing so within a reasonable time.

immediately report the detail of the fraudulent activity on the Geneva account to the bank. Although he did not accept the suggestions that "he intended to keep the bank in the dark to stop them taking actions which [he] could not control which might affect [DS] paying him" and that he "wanted to protect [DS's] ability to repay" him, it is conceded by Mr. Ritter that his primary focus was to ensure that the funds were recovered from DS and this meant receiving them from DS into his US account. Mr. Ritter admitted that he was concerned that DS could be arrested before the wires from DS to his account had been processed and this was confirmed by Mr. Arbo during cross-examination. This, coupled with the evidence of Mr. Arbo, shows that Mr. Ritter acted deliberately in withholding the information and that his silence was intentional. Even after receiving the funds in the account and despite having concerns about the source of the funds he still deliberately failed to inform the bank, and this was consistent with his Plan A. It was only when his Plan A began to fall apart, due to the then imminent Texas proceedings, after he decided to move on to Plan B which involved him coming against the bank for recovery, that adequate disclosure about the existence and detail of the forgery was given.

**Background—the events of February and March 2012—appointment of Monkton controllers**

99   On February 14th, 2012, the bank were notified that the CIMA had appointed Gordon MacRae and Eleanor Fisher of Zolfo Cooper as controllers of Monkton ("the controllers"). On February 14th, 2012, the controllers made a written request to the bank that no instructions issued by Monkton should be processed. It is conceded by Mr. Ritter during cross-examination that there is nothing in the letter which specifically states there had been a forgery on the Geneva account. Although the content of the written request of the controllers did not notify the bank that a fraud had been committed against Geneva or that DS admitted forging Mr. Ritter's signature, Mr. Ritter contends that the notice, request and the receipt of the later freezing order constituted notice to the bank of the forgery on the Geneva account. The bank, until these proceedings, was not provided with any of the reports made by the controllers which contained reliable information about DS's conduct.

100   From the controllers' investigations it was evident that Geneva was not the only client of Monkton who have been defrauded by DS. On February 16th, 2012, the bank was informed by the controllers' attorneys that DS's assets had been frozen by the court and they were served with that order on the following day. There is nothing in the freezing order made by Foster, J. or in any of the correspondence in February relating to the order that refers to any forgery or fraud on the Geneva account. In fact, Mr. Ritter conceded during cross-examination that there was nothing in

the documents or correspondence produced in February 2012 that notified the bank of fraud and forgery on the Geneva account and that the arrest itself did not amount to such notification.

101 On February 17th, 2012, DS was arrested and, again, Mr. Ritter contends that this should have put the bank on notice of the forgery on the Geneva account. I note, when considering the plaintiffs' submissions that disclosure by Mr. Ritter to the bank in September would have resulted in the authorities being notified and in the controllers or the JOL's taking prompt action that would have limited recovery by the bank in any proceedings if brought in relation to DS's assets at the time, that DS's arrest took place five months after the filing of a SAR containing detail about DS's admissions which one would have expected to have been drawn to the Financial Crime Unit's attention. It does not appear that the details of the arrest were widely reported or outlined that it was related to impropriety on the Geneva account. In fact, the news article dealing with the sentence handed down in December 2012 outlined that the thefts that were the subject of the charges occurred between January 12th, 2011 and January 24th, 2012, so outside the period when the forgeries relevant to the proceedings before me occurred.

102 I accept Mr. Skinner's evidence that these events in February 2012 did not draw the bank's attention to specific forgery on the Geneva account, but were an indication that some wrongdoing had taken place in relation to some of Monkton's managed captives. The bank responded appropriately to the request of the controllers and the order of the court. Receipt of the request did not require them to conduct a wide-ranging investigation into forgery for fraud on all the accounts with a connection to Monkton, including the Geneva account. Of course, if Mr. Ritter had shared all of his knowledge with the bank about the forgeries, the bank would not have to embark on the speculative exercise that Mr. Ritter believes they should have carried out in the circumstances.

103 On February 21st, 2012, DS swore an affidavit exhibiting a list of his worldwide assets. The bank submits that, from the date of his confession to Mr. Ritter on September 1st, 2011, DS must have been aware that he could be arrested or be subject to civil proceedings so by February 21st, 2012 he may have siphoned off his assets.

104 On February 23rd, 2012, Mr. Ritter, in response to the request for the detail outlined in para. 88 above, wrote to the Head of the Insurance Division at the CIMA. He informed him that DS had told him that he had borrowed the money and that he had been able to access it by falsely signing Mr. Ritter's name. He also told the CIMA that DS had stated that he would be repaid from funds from his relatives in the United Kingdom, although he did not share the doubts that he has told the court he had about this source of funding. In this communication, as well as during the

conference call on December 1st, 2011, it is clear that Mr. Ritter was not as frank with the CIMA about his concerns about DS and the source of the funds as he should have been. The bank did not see this letter until disclosure was given in these proceedings. By February 23rd, 2012, Mr. Ritter had still failed to inform the bank about the forgeries and DS's admissions about the same, and the bank did not see the letter to the CIMA until these proceedings.

105    On March 8th, 2012, the controllers obtained default judgment with damages to be assessed against DS. Mr. Skinner states that, if Mr. Ritter had informed the bank of the forgeries when he became aware of them on September 1st, 2011, it is very likely that it would have obtained judgment against DS by November 1st, 2011, if not before.

106    It appears that by March 26th, 2012 the controllers had entered into a settlement agreement with DS, under which he granted a power of attorney for the sale of his worldwide assets. On the same day the controllers instructed real estate agents to list for sale DS's Cayman Islands condominium property located on Seven Mile Beach in the Cayman Islands.

**Background—April 2012 to May 2012—Monkton joint voluntary liquidation and official liquidation—Geneva joint voluntary liquidation**

107    On April 2nd, 2012, by a shareholder's resolution, Monkton was placed into joint voluntary liquidation. On April 12th, 2012, the bank was requested to put a freeze on the Warco and the Canadian Livestock accounts following notification from the attorneys for the liquidators that DS had admitted the unauthorized transfers from them. On April 17th, 2012, the liquidators instructed real estate agents to list DS's Florida property for sale.

108    On April 26th, 2012, Monkton was placed into official liquidation by supervision order of Cresswell, J.

109    On April 30th, 2012, Geneva was placed into voluntary liquidation and appointed Mr. Krys and Ms. MacInnis as its joint voluntary liquidators.

**Background—May 2012 to April 2013—the Texas proceedings—recovery by the joint liquidators of Monkton—default judgments against DS**

110    On May 15th, 2012, the bank was informed by Krys Global in writing that joint voluntary liquidators had been appointed to Geneva. The liquidators signed the banking forms, changing the authorized signatories on the Geneva account on May 31st, 2012. In the correspondence Krys

573

Global did not inform the bank about the admitted forgeries by DS on the Geneva account.

111   On June 14th, 2012, the Monkton liquidators' US counsel served notice of claim against Mr. Ritter in Texas for the recovery of $875,000 paid to him fraudulently from the accounts of other captive clients of Monkton.

112   DS's Seven Mile Beach Condominium was sold on June 20th, 2012 and 50% of the US$172,000 proceeds of sale, after the mortgage was discharged, the costs of sale were met and the strata dues paid, was provided to DS's wife and the remaining 50% totalling US$86,000 was paid into the liquidation estate.

113   The Florida property was sold on December 4th, 2012 for US$85,000 and, after deductions, $61,004 was paid into the liquidation estate. US$7,113 was paid into the liquidation estate from the sale of Class A shares in Greenlight Capital Re and US$5,883 was also paid in from the sale of a Ford Motor vehicle.

114   There is some inconsistency in the liquidators' reports, with two figures being given for the total realizable assets, namely US$159,950 and US$154,822. Monkton's liquidators highlight that DS told them that he had sent US$200,000 to Maria Henry (DS's sister-in-law), but they did not seek to investigate or recover that payment. It is clear from their report that the absence of funding resulted in the limitation on the depth of their tracing enquiries, including in relation to the purported $200,000 gift from DS to his sister-in-law. The bank contends that, having regard to the US$875,000 DS received from the defrauding and taking into account the recovered balance of around $160,000 and the abovementioned $200,000, DS must have had other tangible assets as he could not have used up the US$515,000 balance on only luxury travel, university fees for family members and lifestyle expenses between December 28th, 2008 and February 2012. Mr. Skinner stated that the bank would have pursued a greater investigation into DS's financial affairs than the one that the liquidators did, in particular into the US$200,000 payment to Ms. Henry. Despite the submissions by the bank about how DS may have used funds between September 2011 and February 2012, there is insufficient evidence to make a finding that there were additional funds, but it is evident that the late knowledge of the forgeries prevented them having the opportunity to make a timely and thorough investigation into DS's finances. Accordingly, I am only able to ascertain with any certainty that DS's realizable assets available to meet creditors' claims were in the region of US$160,000 during the relevant period of time.

115   The bank claims that if it had been informed about the forgeries on September 1st, 2011 it could have brought legal proceedings at a time when DS still had assets of, at the very least, US$160,000, but probably

more if a more thorough investigation to the one undertaken by the liquidators had been carried out. Mr. Skinner's evidence was that it would take one to two months (to the beginning of November 2011, well before the completion of the Krys Global Report which was sent to the CIMA leading to the appointment of the Monkton controllers in February 2012) to obtain legal advice and to act. It is contended that this is a realistic timeframe, especially if Mr. Ritter had shared his knowledge about the detail/amount of the forgery which in turn would have reduced the length of any initial investigation required to be undertaken by the bank before issuing proceedings. It is also a realistic time frame when considering the actions of the Monkton controllers who within only one day of DS admitting the forgeries to them had obtained a freezing injunction and who within 22 days had a default judgment with damages to be assessed. The bank also suggests that the legal fees, which it would not have been able to recover in proceedings brought against DS, would not have been high, as DS would likely not have defended the proceedings and reached an agreement of the nature that he did with the Monkton liquidators—those proceedings being concluded with a default judgment within ten weeks. It is submitted that these fees should therefore not be regarded as reducing the arguable material prejudice suffered by the bank to its opportunity of recovering against DS. During cross-examination Mr. Ritter agreed that this was "not an insignificant amount of money." The liquidators' fees reached US$322,867 of which US$100,481 arose from their time spent on legal and investigatory work and US$73,647 was spent on the realization and protection of DS's assets. Mr. Skinner during cross-examination contended that he did not feel that it would have cost over US$50,000 for the bank to obtain the assets belonging to DS.

116   Warco, Landrin Insurance Corporation and Landis Insurance Corporation then issued separate writs against DS in the Grand Court and on July 19th, 2012 they obtained separate default judgments of US$886,881.20, US$48,000 and US$54,000.

117   From their investigation, the JOLs of Monkton established that at least US$657,000 of the US$875,000 received by Mr. Ritter had been misappropriated from other Monkton clients, or was otherwise a preferential payment. In light of this, on August 9th, 2012 Monkton's liquidators filed their complaint against Mr. Ritter in the United States District Court, Western District of Texas ("the Texas proceedings") seeking to claw back the US$875,00 which Mr. Ritter had accepted from DS into his US account.

118   This is the stage at which Mr. Ritter changed his strategy concerning recovery of the sums improperly removed from the Geneva account by DS. It became evident that the funds received under his "Plan A" might well have to be returned as the Monkton liquidators were now seeking to recover from Mr. Ritter the stolen funds which had been wired into his

personal account by DS. Mr. Ritter changed to his "Plan B," namely seeking recovery from the bank. On August 27th, 2012, Krys Global as Geneva's joint voluntary liquidators wrote to the bank to notify it of the fraud on the Geneva account and that Mr. Ritter would now be challenging the debits for the payments made on DS's forgeries. Mr. Krys stated in evidence-in-chief that Krys Global did this after it had obtained legal advice, as it felt that there was a duty to put the bank on notice and that he was not aware of Mr. Ritter ever informing the bank of DS's confession to him that he had forged his name to misappropriate funds from the account. The letter did not say that Mr. Ritter had been aware of this since September 1st, 2011, but gave the impression that it was something that he had only recently told Krys, as it said "he has now confirmed that the five payment instructions" had not been authorized by him. During cross-examination Mr. Krys stated that when they met, and when Krys Global was asked to carry out the forensic analysis, Mr. Ritter did not accept that Mr. Ritter told Krys Global what he knew from what DS had told him, and that they "never talked about forgery" but "about there being a risk of fraud" and "concerns that his money may have been stolen." When pressed about Mr. Ritter saying to him specifically that he had been told of a forgery he replied: "I have no recollection of that and had we had that, I would have asked for evidence. And quite honestly, when we did our report, as you know, we say things like 'Mr. Ritter has said that he didn't authorize a transaction.' A much stronger statement would have been 'Mr. Self has already confirmed or we have evidence that Mr. Self had actually forged his signature on this transaction.'" Mr. William King, relationship manager at the Corporate Banking Division of the bank, on September 6th, 2012 in an internal email following receipt of the Krys letter indicated that DS had admitted to major fraud on other accounts he managed, but he made no mention of there being any admission from DS in relation to the Geneva account. It appears from the evidence of Mr. Krys that this was the first time that the bank was made aware that Mr. Ritter was saying that there had been unauthorized transactions on the Geneva account and the bank rightly contend that this is the date they first knew about the fraud on the Geneva account.

119   On November 7th, 2012, the CIMA revoked Monkton's insurance management licence.

120   On or around December 24th, 2012, DS was convicted of theft of moneys from the Geneva account and from other Monkton clients' accounts at the bank.

121   On April 9th, 2013, Mr. Ritter sought to join the bank as a third party in the Texas proceedings. In cross-examination of Mr. Skinner about the Texas proceedings, Mr. Ritter's counsel stated in a question to Mr. Skinner: "Mr. Ritter realizing he hasn't been made whole after all, reverts to his Plan B, which is to seek reimbursement against Butterfield for

breach of mandate." Mr. Ritter accepted when being cross-examined that he sought to join the bank in the Texas proceedings pursuant to his "fallback option" and that this was 18 months after he had first found out about the forgery.

122   Mr. Ritter's third party complaint against the bank was dismissed in the Texas proceedings on September 5th, 2013. The bank incurred US$183,000 Texas and Cayman legal fees in successfully defending its position that it ought not to be joined in the Texas proceedings.

123   Mr. Ritter defended the Texas proceedings incurring a consequential loss of legal fees totalling US$220,871.29. The Texas proceedings were settled by Mr. Ritter, on behalf of Geneva, paying US$500,000 to the Monkton liquidation estate. The Grand Court sanctioned this settlement on March 12th, 2014. Geneva did not receive any dividend distribution from the US$500,000 settlement or at all from the liquidation. Geneva was permitted to retain US$375,000 of the original US$875,000 which Mr. Ritter had received from the evidently misappropriated funds in September 2011. US$330,000 was used to repay the Shoreline loan and interest and it is acknowledged that the balance of US$45,000 is a credit reducing the amount sought to be reimbursed from the bank in these proceedings by US$45,000 and Mr. Ritter submits that, as a consequence, the bank's position has in fact "materially improved" by it not taking action against DS in September 2011 which may have prevented the funds being transferred to Mr. Ritter on the September 6th and 7th, 2011.

124   Mr. Ritter contends that due to the communications from the controllers with the bank, due to the arrest of DS on February 17th, 2012,[19] and the bank being aware of the freezing of the bank accounts of all Monkton managed captive insurance clients due to fraudulent transactions on the same, the bank must have been aware, or put on direct enquiry, about the fraud or likelihood of the fraud on the Geneva account. Mr. Ritter indicates that the bank failed in its "duty" to inform him in February 2012 that the Geneva account had been frozen and to explore with him the reasons why and as a consequence the bank is estopped from denying the fraud and forgery from February 2012. This contention is made even though Mr. Ritter had failed to notify the bank about the fraud/forgeries and that the communications and court documents relating to the events in February 2012 made no mention that DS had forged transactions on the Geneva account. Mr. Ritter highlights that this is consistent with the date for when the bank should be taken to have been aware of the alleged fraud being February 2012, as had been pleaded in the bank's original defence dated February 22nd, 2016. By February 2012

---

19  DS was convicted in December 2012 after pleading guilty to related criminal offences.

there were no default judgments against DS, no creditor had taken action against him and the settlement between DS and the controllers and the liquidators to assign all his assets to them had not yet been reached. It is submitted that the amendment in the amended defence to August 2012 was a tactical one to enable the bank to allege that the July 3rd, 2012 judgments in default made in favour of the other Monkton creditors had materially prejudiced its position.

125   Mr. Skinner stated that, although the bank was aware that controllers had been appointed to Monkton and that DS was subject to a freezing order of his worldwide assets up to US$1.2m., it was not until August 27th, 2012, shortly before the proceedings had been commenced in Texas against Mr. Ritter, that the bank was notified of Geneva's position and that the above-mentioned transfers had not been authorized by Mr. Ritter. This notification did not come from Mr. Ritter, but from the voluntary liquidators of Geneva and it did not disclose any detail about DS admitting the forgeries to Mr. Ritter. The bank accepts that from the date of this letter it was aware of DS's fraud but it was not aware of DS forging Mr. Ritter's signature until the Texas proceedings were filed and served on the bank in May 2013.

126   In light of the above, it is contended by the bank that there was a deliberate decision not to inform the bank with Mr. Ritter "taking matters into his own hands by making sure that [DS] repaid the missing funds to him personally, rather than Geneva" with Mr. Ritter accepting a payment of US$875,000 in suspicious circumstances. It is contended that Mr. Ritter was thereby looking after his own interests and failing in his duty as a director of Geneva to promptly share his knowledge of the admitted forgery with the bank.

**The law**

127   The responsibility and liability of a bank towards its customer is governed by the applicable law and the relevant contract entered into between the two parties. The contract determines the manner in which the services will be provided and records the obligation of each party. In the event of an alleged breach by the bank of an express or implied term of a contract, three elements need to be satisfied in order to establish liability: proof of breach by the bank against the customer, damages and causation between the breach and the damage suffered by the customer.

128   However, when I now move on to consider the law in light of the above detailed factual matrix I remind myself that the parties agreed by court order to limit the issues to the two now before me, namely:

   (i) whether the plaintiffs are estopped from advancing claims against the bank in contract and negligence; when conducting this exercise, in circumstances where it is found that Mr. Ritter wrongly failed to notify the

bank of the forgeries until August 2012, I will also have to consider arguments about whether there is a requirement for the bank to show that it has been materially prejudiced by the delay, and if it has, has there been any such detriment; and then,

(ii) whether the bank dishonestly assisted in a fraud involving forgeries of Mr. Ritter's signature by DS.

129   The general rule is that the bank is ordinarily not entitled to debit the customer's account if it has honoured a wire transfer/a wire transfer instruction bearing a forged signature. However a defence available to a paying bank may arise if the customer has breached his duty to the bank in failing to inform the bank of any forgery on the account as soon as the customer became aware of it. The bank seeks in this matter to prevent the plaintiffs from advancing their claim in contract and negligence against it, arguing that they are estopped from doing so due to a failure to inform.

**The law—general principles regarding the elements of estoppel**

130   To establish the defence of estoppel, the bank will have to prove that Mr. Ritter failed to promptly report what he knew about the forgeries to the bank and that he took that course intentionally. The bank must also prove that his not informing the bank of the forgery amounted to a representation that the transfer requests were in order. If able to prove the above, the bank must then prove that by its acts or omissions it relied upon the representations made, the bank contending that it did so by not bringing recovery proceedings against DS at a time when he still had financial resources/was not subject to default judgments or by allowing later fraudulent transactions to be made from bank accounts held at the bank. If able to prove the same, the bank would then have to prove that the acts and omissions caused it detriment, the bank contending that it did, as it lost an opportunity to recover from DS and it made substantial payments out of other bank accounts and had incurred litigation costs as a consequence. The plaintiffs contend that the bank, to prove detriment, must show that the lost opportunity offered a real prospect of benefit. The plaintiffs contend that the bank has failed to prove the required elements of estoppel.

131   What has commonly been termed the "*Greenwood* duty" arose in the House of Lords case of *Greenwood* v. *Martins Bank* (7). In *Greenwood*, a wife forged her husband's signature on 44 cheques. She then cashed the cheques and used the proceeds for her own use, primarily to support her sister in supposed legal proceedings. Upon discovering the forgeries, under pressure from the wife, the husband failed to at once inform the bank. It was only later that he decided to tell the bank and, after he had informed his wife of his intention, she committed suicide. The failure to inform the bank in a timely manner resulted in the bank losing

its right/opportunity to claim against the wife and the husband for the wife's tort and the court found that this amounted to the bank having suffered loss or detriment. The husband sought a declaration that he was entitled to be credited with the sums debited from his account by the wife using the forged cheques. The court held that where a customer's signature to a cheque is forged, it is the duty of the customer, on discovering the forgery, to bring that fact to the attention of the bank and if he deliberately abstains from doing so, with the result that the bank loses its remedy against the forger, the customer is estopped from relying on the forgery. Accordingly, the House of Lords found that all the essential elements to estoppel were made out and the husband was unable to recover the debited sums.

132   Lord Tomlin stated what the elements of estoppel are ([1933] A.C. at 57–58):

"The essential factors giving rise to an estoppel are I think:–

(1.) A representation or conduct amounting to a representation intended to induce a course of conduct on the part of the person to whom the representation is made.

(2.) An act or omission resulting from the representation, whether actual or by conduct, by the person to whom the representation is made.

(3.) Detriment to such person as a consequence of the act or omission.

Mere silence cannot amount to a representation, but when there is a duty to disclose deliberate silence may become significant and amount to a representation . . .

The deliberate abstention from speaking in those circumstances seems to me to amount to a representation to the respondents that the forged cheques were in fact in order, and assuming that detriment to the respondents followed there were, it seems to me, present all the elements essential to estoppel."

133   Lord Tomlin went on to say that it is immaterial that the bank was guilty of negligence in not detecting the forgery in such circumstances. He rejected the submission that the respondent's initial negligence made a difference stating (*ibid.* at 58–59):

"Further, I do not think that it is any answer to say that if the respondents had not been negligent initially the detriment would not have occurred. The course of conduct relied upon as founding the estoppel was adopted in order to leave the respondents in the condition of ignorance in which the appellant knew they were. It was the duty of the appellant to remove the condition however caused. It

is the existence of this duty, coupled with the appellant's deliberate intention to maintain the respondents in their condition of ignorance, that gives its significance to the appellant's silence. What difference can it make that the condition of ignorance was primarily induced by the respondents' own negligence? In my judgment it can make none. For the purposes of estoppel, which is a procedural matter, the cause of the ignorance is an irrelevant consideration."

134  *Greenwood* (7) does not support the view that an estoppel should arise where the customer has the means, by the exercise of reasonable care, to acquire knowledge of the forgery but fails to do so. On the other hand, I also note that the Court of Appeal and the House of Lords rejected the contention that a bank cannot rely on estoppel ([1932] 1 K.B. at 374): "when the loss is attributable, even in part, to his own negligence; as where he has failed to detect an obvious forgery or alteration . . ."

135  It is evident from Lord Tomlin's judgment that he was aware of the earlier decision of the House of Lords in *McKenzie* v *British Linen Co.* (11) and that the Court of Appeal, whose decision was upheld, had applied the same authority. In that case it was held that a person (even if he was not in a contractual relationship with the bank) who knew that a bank was relying upon a forged signature to a bill of exchange could not lie by and not divulge the fact until he saw that the position of the bank was altered for the worse; but there was no principle on which his mere silence for a fortnight, from the time when he first knew of the forgery during which time the position of the bank was in no way altered or prejudiced, could be held to be an admission or adoption of liability, or an estoppel. Therefore, it was held that he was not estopped because his silence had not prejudiced the bank.

136  In *McKenzie* (11), Parke, B.'s views concerning estoppel expressed by him in *Freeman* (5) were approved, and Lord Watson speaking to the basis of the duty to speak in such circumstances in terms which assumed knowledge of the forgery stated (6 App. Cas. at 109):

"The only reasonable rule which I can conceive to be applicable in such circumstances is that which is expressed in carefully chosen language by Lord Wensleydale in the case of *Freeman v. Cooke.* It would be a most unreasonable thing to permit a man who knew the bank were relying upon his forged signature to a bill, to lie by and not to divulge the fact until he saw that the position of the bank was altered for the worse. But it appears to me that it would be equally contrary to justice to hold him responsible for the bill because he did not tell the bank of the forgery at once, if he did actually give the information, and if when he did so, the bank was in no worse position than it was at the time when it was first within his power to give the information."

581

137    In the House of Lords decision of *Ogilvie* v. *West Australian Mortgage & Agency Corp. Ltd.* (13). Lord Watson said ([1896] A.C. at 268) in regard to *McKenzie* and "similar cases":

> "The ground upon which the plea of estoppel rested in these cases was the fact that the customer, being in the exclusive knowledge of the forgery, withheld that knowledge from the bank until its chance of recovering from the forger had been materially prejudiced."

138    The Court of Appeal in *Greenwood* (7) relied also on the "well established" rule in *Pickard* v. *Sears* (14). Scrutton, L.J., relevant to the issue of intention/representation, referred ([1932] 1 K.B. at 379) to the "classic exposition" of the principle of estoppel given by Parke, B. in *Freeman* when he cited the rule in *Pickard* as:

> "That, where one by his words or conduct, wilfully causes another to believe in the existence of a certain state of things, and induces him to act on that belief, or to alter his own previous position, the former is concluded from averring against the latter a different state of things as existing at the same time."

Scrutton L.J. then added ([1932] 1 K.B. at 380) that—

> ". . . by the term 'wilfully' . . . [in the *Pickard* rule], we must understand, if not that the party represents that to be true which he knows to be untrue, at least, that he means his representation to be acted upon, and that it is acted upon accordingly; and if, whatever a man's real intention may be, he so conducts himself that a reasonable man would take the representation to be true, and believe that it was meant that he should act upon it, and did act upon it as true, the parties making the representation would be equally precluded from contesting its truth."

139    The Privy Council decision in *Tai Hing Cotton Mill Ltd.* v. *Liu Chong Hing Bank Ltd.* (20) considered the scope and extent of the *Greenwood* duty of the customer to inform the bank of a known forgery. In *Tai Hing Cotton Mill Ltd.*, a fraudulent accounts clerk employed by the company forged the signature of the company's managing director on 300 cheques to the value of HK$5.5m., drawn on the company's accounts at three banks, over a period of five years. The company did not learn about the frauds until a newly appointed accountant embarked on a course, one not previously taken, of reconciling the bank statements with the company's account books. When the frauds were uncovered, the company requested each bank to credit its accounts with the amounts of the forged cheques, which the banks had already debited. The banks declined this request and argued that a customer owes a duty of care to his bank to take such precautions as a reasonable customer would take to prevent forged cheques being presented to the bank for payment, and to check his bank

statements for unauthorized debit terms. The Judicial Committee of the Privy Council rejected these arguments of the banks and held that banks which had paid out on forged cheques were not entitled to debit their customers' accounts with these amounts since, unless it was otherwise agreed, the duty of care owed by a customer to his bank in the operation of his current account was limited to a duty to refrain from drawing a cheque in such manner as to facilitate fraud or forgery and the *Greenwood* duty to inform the bank of any forgery of a cheque purportedly drawn on the account as soon as he became aware of it. Lord Scarman referring to the *Greenwood* duty stated ([1986] A.C. at 101):

> "If put in terms of principle, the question is whether English law recognises today any duty of care owed by the customer to his bank in the operation of a current account beyond, first, a duty to refrain from drawing a cheque in such a manner as may facilitate fraud or forgery and, secondly, a duty to inform the bank of any forgery of a cheque purportedly drawn on the account as soon as he, the customer, becomes aware of it. The first duty was clearly enunciated by the House of Lords in *London Joint Stock Bank Ltd. v. Macmillan* [1918] AC 777, and the second was laid down, also by the House of Lords, in *Greenwood v. Martins Bank Ltd.* [1933] A.C. 51, [1932] All ER Rep 318."

It is clear from *Tai Hing Cotton Mill Ltd.* that Mr. Ritter had a responsibility to inform the bank of DS's forgery when he first became aware of it on September 1st, 2011. In the matter before me, it is not one in which the court must consider constructive notice of the forgeries as it is beyond all doubt that he had actual knowledge of them due to the content of his conversation with DS on September 1st, 2011.

140    As highlighted in the *Encyclopaedia of Banking Law*, LexisNexis, Bulletin 148 at C405, with reference by the authors to the decision in *Ogilvie* (13) and the decision in *Fung Kai Sun* v. *Chan Fui Hing* (6), a customer must also immediately notify the bank of the forgery "even though repetition of the forgery (with consequent further loss) is unlikely or impossible as failure to do so" may enable the forger to dissipate sums and remove all his assets, thereby depriving the bank of the effective remedy.

141    It appears that the parties agree the above uncontentious and now established principles concerning the elements of estoppel extracted from the aforementioned cases. However, they disagree about how the law applies to the facts in this matter.

142    In addition, it appears to be wrongly argued by the plaintiffs that the bank also needs to prove that it was otherwise unconscionable for the plaintiffs to be reimbursed. The plaintiffs may also be arguing that the bank also needs to prove that it was otherwise unconscionable for the

plaintiffs to deny their representation that forged transfers were in order. For some types of estoppel (for example promissory estoppel and estoppel by convention), inequitable or unconscionable conduct is a substantive element of the estoppel, whereas in others on a proper analysis it is not. In the above types of estoppel there is no required element that the promisee was induced by the promise or convention to act to his detriment. Equity has also come into play where there are specific other defences, for example, defence of change of position.[20]

143   In the cases of estoppel by representation, on the other hand, there is a required element that has to be proved that the representee was induced to act to his detriment by the representation of the representor and to his knowledge. If all of the elements of the estoppel are present then there will be an estoppel. There is no need for any separate assessment of whether or not the conduct of Mr. Ritter was unconscionable as that question has already been answered if the elements are proved.

144   I will now move on to deal with each element of estoppel and the wider and more contentious case law produced by the parties.

**The law—representation**

145   I have found that Mr. Ritter first became aware of the forgery on September 1st, 2011. I have found that it was not until receipt of the letter from Krys Global on August 27th, 2012 that the bank first received notice of the forgery. I have found that Mr. Ritter failed in his duty ("the *Greenwood* duty") to notify the bank of the forgery, which he should have done on September 1st, 2011 as soon as it came to his notice following DS's confession to him. Mr. Ritter, once he had knowledge of the forgeries, remained silent and did not otherwise act to enable the bank to recover from DS the money already paid out. Despite these findings, the bank must still go on to prove that Mr. Ritter's conduct, by remaining silent between September 1st, 2011 and August 27th, 2012, amounted to a representation.

146   Mr. Ritter rightly points out that *Greenwood* (7) establishes that mere silence cannot amount to representation but, where the duty to disclose exists, as it does in this case "deliberate silence may become significant and amount to a representation."[21] In *Greenwood*, the House of Lords found ([1933] A.C. at 58) that Mr. Greenwood's silence—

"... was deliberate and intended to produce the effect which it in fact produced—namely the leaving of the respondents in ignorance of the true facts so that no action might be taken by them against the

---

20   See from para. 163 herein.
21   Lord Tomlin ([1933] A.C. at 57).

appellant's wife. The deliberate abstention from speaking in those circumstances seems to me to amount to a representation to the respondent that the forged cheques were in fact in order, and assuming that detriment to the respondents followed there were, it seems to me, present all the elements essential to estoppel."

147    In light of my findings and the nature of the clear facts in this case, I need not carry out a wider review of the law on the element of representation. I have found for the reasons already stated herein that Mr. Ritter's silence was deliberate and intended to ensure receipt of and the securing of the funds transferred by DS into his personal account in the United States. The belatedly raised arguments raised in attorney-to-attorney correspondence and at trial concerning the tipping-off offence provisions in the Proceeds of Crime Law, which Mr. Ritter was evidently unaware of at the relevant time, are without merit. His excuse for not telling the bank of the forgery because he was concerned that to do so would tip off any bank employee who might be an accomplice of DS was motivated, not by the provisions in the Proceeds of Crime Law, but by his wish to preserve his financial position.

### Detriment

148    For the defence of estoppel to be established, the bank must also go on to prove material detriment as a consequence of Mr. Ritter's representation. It is clear from Lord Watson's analysis in *McKenzie* (11) (6 App. Cas. at 111–112) that mere silence without resulting injury or prejudice to the bank, would not raise an estoppel.

149    The Privy Council decision in *Fung Kai Sun* (6), which was considered in *Greenwood*, addressed what may amount to detriment. The case involved forged mortgages and it was held following the authorities of *McKenzie* (11) and *Ewing* (3), that the principle of estoppel by silence, where there is a duty to inform, applied to a case in which there was no contractual relationship between the parties, but in the particular circumstances the respondents were not estopped because the appellant had not established detriment. Lord Reid determined that detriment would arise if the bank's chance of recovering from the forger has been "materially prejudiced." He stated ([1951] A.C. at 503–504):

"In their Lordships' judgment it must be held that the respondents were not entitled to withhold from the appellant information that the appellant's mortgages were forgeries, and that when they chose to do so they took the risk that they would later be estopped from asserting that these deeds were forged if by reason of their keeping silent the appellant suffered detriment. Accordingly, the next question for consideration is whether the respondents, having delayed from June 1 to June 23 to inform the appellant that his mortgages were

forgeries, cause any such detriment to the appellant as will now give rise to estoppel. The only detriment suggested is that if the appellant had been informed on or about June 1 he might have been able to take some more effective action to minimize his loss than it was possible for him to take after June 23, and the only action which he could have taken would have been action against the forger or his property. The forger . . . had real property in Hong Kong of substantial value, but there is no evidence that this was less available to the appellant after June 23 than it had been before."

Lord Reid on (*ibid.* at 506): "In their Lordships' judgment, this is the true test: the chance of recovering must have been materially prejudiced by the delay."

150   In the Privy Council decision given in *Kelly* v. *Fraser* (9) further consideration was given to the test for detriment. Lord Sumption stated ([2012] UKPC 25, at para. 17):

"The relevance of detrimental reliance in the law of estoppel by representation is that it is generally what makes it unjust for the representor to resile from his previously stated position. However, for this purpose, the ordinary rule is that the detriment is not the measure of the representee's relief, and need not be commensurate with the loss that he would suffer if the representor did resile: see *Avon County Council v Howlett* [1983] 1 WLR 605, where the authorities are reviewed by Slade LJ at pp 620–625. Indeed, the detriment need not be financially quantifiable, let alone quantified, provided that it is substantial and such as to make it unjust for the representor to resile. A common form of detriment, possibly the commonest of all, is that as a result of his reliance on the representation, the representee has lost an opportunity to protect his interests by taking some alternative course of action. It is well established that the loss of such an opportunity may be a sufficient detriment if there were alternative courses available which offered a real prospect of benefit, notwithstanding that the prospect was contingent and uncertain: *Greenwood v Martins Bank Ltd* [1933] AC 51 and *Ogilvie v West Australian Mortgage and Agency Corporation Ltd* [1896] AC 257, 268, as explained in *Fung Kai Sun v Chan Fui Hing* [1951] AC 489, 505–6."

151   The bank contends that it has suffered material prejudice, especially as DS's assets were no longer available for recovery by them by the time that they were notified of the fraud. The bank contends that it had "a real prospect of benefit, notwithstanding that the prospect was contingent and uncertain." It is argued that any uncertainty in respect of the likely recovery should be decided in favour of the bank and that the inability to quantify the detriment does not mean that the prejudice cannot be established.

152    It is argued that detriment arises as the loss that the bank has suffered is the lost opportunity to recover from DS the funds that it paid out, in a claim under the tort of deceit for DS's fraudulent misrepresentation which would have been brought. DS had assets on September 1st, 2011 when Mr. Ritter first became aware of the forgery, which no longer existed by August 27th, 2012 when the bank first became aware of the forgery. By the time the bank had been made aware of the fraudulent transfers from the Geneva account by Krys Global on August 27th, 2012, due to the four default judgments in the Grand Court against DS and the Monkton liquidators having power of attorney which it exercised over the sale of DS's worldwide personal assets, it is claimed that there was by then no possibility of recovery of sums wrongfully paid on the forged signatures. The bank's case is that DS's assets in September 2011 would have been at the very least US$159,950.50[22] and that this amount is sufficient for its estoppel, as it establishes that it has suffered material prejudice to its opportunity to recover from DS.

153    The plaintiffs accept that the bank could have brought proceedings against DS for the tort of deceit and against Monkton if it had suffered loss and was able to claim damages. It is submitted that for them to be able to do this they would have had to have reimbursed the plaintiffs for the losses arising out of the forgeries in the sum of $529,191. It is suggested, based on the bank's pleaded defence to the plaintiffs' claims relying upon the standard terms and conditions which it is argued excluded liability for forgery and the line of cross-examination of Mr. Ritter set out at para. 28 of the plaintiffs' closing written submissions as well as Mr. Skinner's evidence-in-chief about taking legal advice and considering its position before commencing proceedings against DS, that even if the bank was aware of the forgery on September 1st, 2011, it would not have promptly reimbursed Geneva and would have not done so without a careful analysis of its legal position. It is also contended that the bank's position in resisting the Texas proceedings is an indication that the bank would not have suffered loss by reimbursing the plaintiffs if they had received knowledge of the forgery in September 2011.

154    It is suggested that in light of the fact that the defrauded captive insurance companies[23] only obtained default judgments in relation to other defrauded captive insurance clients in July 2012 after gaining knowledge of those specific frauds in February 2012, it would have taken the bank at least five months to obtain default judgment in relation to the Geneva account fraud. However, I note that the Monkton JOLs obtained their default judgment with damages to be assessed on March 8th, 2012. It

––––––––––––––––––––––

22   US$159,950.05 being the value that DS's assets sold by Monkton' JOLs in 2012.
23   Represented by Campbells, attorneys-at-law.

is further contended that, if the bank had brought proceedings in September 2011, the other defrauded creditors would become aware of that and they would have issued proceedings and that the authorities including the CIMA and the police would also have acted resulting in controllers liquidators being appointed. It is suggested in such a scenario that all the creditors, even with default judgments, would be confined to recovery in the Monkton liquidation. Accordingly, even in light of Mr. Skinner's indication in evidence that he believed that the bank would have been in the same position as the Monkton controllers in relation to assignment of DS's assets within one to two months from first acquiring knowledge of the forgery, it is contended that any advantage from early notification of the forgery would have been lost and there was therefore no real prospect of benefit. However, it is clear that the claim by the bank would be one brought against DS and would therefore not fall within the Monkton liquidation.

155  The plaintiffs contend that, in any event, assets for potential recovery in September 2011 or February 2012 would not have been significant and that, at most, their value would be around US$160,000 which would have to be used to meet the controllers and JOLs' fees and then all creditors' claims. However, the claim if promptly made by the bank would have been made against DS and would not have resulted in them being a creditor of Monkton's. Reliance is placed upon the JOLs' report dated April 30th, 2012 in which there is (i) a finding that DS used his ill-gotten gains from Geneva to pay for intangible items and (ii) a conclusion that "the liquidators do not believe there are any major assets, whether belonging to the Company or [DS], which would likely to result in a substantial recovery for the company were they immediately pursued."

156  The plaintiffs also point out that the funds to repay Mr. Ritter came from Canadian Livestock and Warco Corporation on September 2nd, 2011 and that DS was attempting to re-mortgage his Seven Mile Beach condominium in January/February 2012 and contend that this is an indication that he did not have other assets to draw on despite the threats of Mr. Ritter to report him to the criminal authorities if there was no repayment. The bank, on the other hand, contend that DS is a fraudster and that using these funds, rather than his own assets is to be expected and does not support a contention that he did not have other assets.

157  The plaintiffs highlight that, by September 7th, 2011, it appeared that they had received all the sums due from DS and therefore, at that time, no relief would have been sought from the bank and it is submitted that as a consequence the bank could not have claimed any loss which they would be required to do in the available claim in tort. It is further contended that if the bank had been notified of the forgery after September 7th, 2011 before August 2012, a time period when the plaintiffs believed they had been repaid in full, there would have been no cause of action for

that only arose again in August when Mr. Ritter sought to recover against the bank.

158   The plaintiffs, unlike the bank, contend that the bank may have also brought a subrogated claim against Monkton. It is argued that under such a claim there would have been no assets available for distribution to the bank or to any of the other creditors. The plaintiffs suggest that if a successful claim had been made against Monkton in a two-year period ending in April 2012, the date when the liquidation commenced, any payment may have been set aside as a voidable preference. The bank rightly contends that this matter does not raise a subrogated claim against Monkton as there is no dispute, having regard to the authority of *Foley* v. *Hill* (4), that the funds paid out were the bank's and not the customers' funds and therefore it had its own claim for loss and did not need to be subrogated to Geneva's claim. The immediate and straightforward claim the bank had and makes in tort is against DS as an individual and therefore would not involve a s.145 Companies Law claw back of preferential payment made by a company in liquidation made to creditors.

159   It is further contended by the bank that there is detriment as the bank incurred US$183,000 in legal fees defending the third party complaint issued by Mr. Ritter in the Texas proceedings, which the bank states would not have been commenced if the bank had been informed by Mr. Ritter about the forgery on September 1st. The bank argues that the failure to make the report hindered the ability to prevent further frauds, in particular in relation to the transfers to Warco and Canadian Livestock amounting to US$825,000. DS would have been prevented from transferring the money to Mr. Ritter personally as the bank would have placed a block on and not have then allowed the US$550,000 and US$276,000 payments to be processed in September 2nd, 2011.[24] If these transfers had not occurred then, it is submitted, legal costs would not need to have been spent on the proceedings in Texas by the bank as well as by the liquidators who used up the proceeds that could have gone to creditors including Geneva to meet their costs which had escalated due to the manner of Mr. Ritter's defence to those proceedings.

160   The plaintiffs rightly contend that the legal fees incurred in the Texan proceedings cannot be characterized as detriment, as they were not caused by the Monkton JOLs seeking to recover the payments from Mr. Ritter, but arose because the bank voluntarily contested jurisdiction to resist the third-party claim made by the plaintiffs' claim for reimbursement from the bank based on its *forum non conveniens* argument. The plaintiffs argue that the legal expenses were "wholly unrelated" to any loss

––––––––––––––––––––––

24  See para. 46. The Monkton JOLs sought to claw back these payments in the Texas proceedings.

suffered by the bank or any attempt by the bank to recover the funds for Warco and/or Canadian Livestock.

161   The plaintiffs correctly highlight that these two transactions, which the bank claims that they may have been able to prevent if the fraud had been reported to them, did not result in any direct loss to the bank as they were not liable to reimburse and as a consequence any claim for estoppel cannot be based upon them.

**Can the estoppel operate *pro tanto*?**

162   The plaintiffs submit that if the court were to find that the bank has been materially prejudiced by a loss of opportunity to sue DS, that it should find that estoppel by representation operates *pro tanto*. In other words the plaintiffs should not be estopped to the full extent of their claims, but only to the extent of actual potential detriment found to have been suffered by the bank.

163   This is not in line with the view expressed by Lord Watson in *Ogilvie* (13) who stated ([1896] A.C. at 270):

> "There are some obiter dicta favouring the suggestion that, in a case like the present, where the amount of the forged cheques is about [£1,500], the estoppel against the customer ought to be restricted to the actual sum which the bank could have recovered from the forger. But these dicta seem to refer, not to the law as it was, but as it ought to be; and, in my view of them, they are contrary to all authority and practice."

164   The plaintiffs place reliance upon the developing law in mistaken payment cases which involve both estoppel by representation and the defence of change of position. The use of estoppel in mistaken payment cases was regarded as being unsatisfactory because estoppel by representation was generally viewed as an all or nothing defence. This led to Lord Goff stating in *Lipkin Gorman* v. *Karpnale Ltd.* (10) ([1991] 2 A.C. at 579), the case in which the House of Lords recognized the defence of change of position that "in many cases, estoppel is not an appropriate concept to deal with the problem." This view was held because (i) although in certain factual circumstances where there is no proof of detrimental reliance it will be unlikely, or perhaps even impossible, for the defence to be made out, the position is that, as a matter of law, the defence of change of position is not dependent upon proof of some representation by the payer, nor is it dependent upon proof of any detrimental reliance on the part of the payee, and (ii) estoppel was an inflexible all-or-nothing defence.

165   In *Avon County Council* v. *Howlett* (1), the Court of Appeal held that if a defendant can establish an estoppel, this generally operates as a

complete defence and not *pro tanto*. Slade, L.J. emphasized that estoppel by representation is in origin a rule of evidence, and that that is what confers its "all or nothing" character. In *Avon*, the plaintiff made an £1,007 overpayment of sick pay wages to the defendant, a teacher employee. The teacher queried the overpayments but was told they were correct. By the time the council had realized their mistake, the teacher had spent most of it. The plaintiff sought to recover the overpayment on the grounds that it had been paid by mistake. The Court of Appeal held that the defence of estoppel prevented the council from recovering the whole sum of the overpayment. It was held that as the plaintiff had discharged the onus of proving that the overpayment had occurred due to a mistake of fact, it was *prima facie* entitled to recover the full amount of the overpayment but because the plaintiff had represented to the defendant that he was entitled to the sum of money paid, the plaintiff was estopped from seeking recovery of the overpayment. The estoppel gave a total defence to the claim although the detriment suffered was only in the region of £550.

166    Slade, L.J. stated ([1983] 1 W.L.R. at 622):

> ". . . [I]f a bank's customer is estopped from asserting that the cheque with which he has been debited is a forgery, because of his failure to inform the bank in due time, so that it could have had recourse to the forger, the debit will stand for the whole amount and not merely that which could have been recovered from the forger . . ."

Slade, L.J. then went on to comment upon the cases of *Ogilvie* (13) and *Greenwood* (7) adding (*ibid.*):

> ". . . [S]o far as they go, the authorities suggest in cases where estoppel by representation is available as a defence to a claim for money had and received, the courts similarly do not treat the operation of the estoppel as being restricted to the precise amount of the detriment which the representee proves he has suffered in reliance on the representation."

167    Slade, L.J. also referred to the cases of *Skyring* v. *Greenwood* (15) and *Holt* v. *Markham* (8), commenting (*ibid.* at 624) that if estoppel by representation could operate in a limited and proportionate way the courts which decided those cases "would have been bound to conduct a much more exact process of quantification of the alteration of the financial positions of the recipients, which had occurred by reason of the representations."

168    The members of the Court of Appeal in *Avon* (1) recognized that there may be cases where it was inequitable or unconscionable for the recipient to rely on the fact that he had spent part of the mistaken overpayment to resist a claim for the balance. Slade, L.J. said ([1983] 1 W.L.R. at 625) that an exception might arise to this general rule "where

the sums sought to be recovered were so large as to bear no relation to any detriment which the recipient could possibly have suffered." Apart from that comment the Court of Appeal did not elaborate on what circumstances there might be to make a *pro tanto* approach appropriate and they did not reconcile their comments with their view that, if a defendant can establish an estoppel, this would generally operate as a complete defence and not *pro tanto*.

169   In *Derby* v. *Scottish Equitable plc* (2), the holder of a pension policy was ordered to pay back the full amount of £172,000 after he had been wrongly advised about the total value of his rights under the policy. It is evident that the Court of Appeal felt that the case fell within the exception highlighted by Slade, L.J. in *Avon* when it adopted a *pro tanto* approach. Unlike in the matter before me, the Court of Appeal had to review the law of restitution and the change of position defence, with the Court of Appeal recognizing the link between that and estoppel by representation. When considering the role of the estoppel by representation where the change of position defence also existed, the Court of Appeal highlighted that two conflicting remedial outcomes existed, one in restitution where there was a *pro tanto* change of position defence and in estoppel where there was a complete estoppel by representation defence.

170   Walker, L.J. considered two approaches to the conflict. One avenue being the "minimum equity" concept, which Walker, L.J. called a "more unified doctrine of estoppel" and "a move away from the evidential origin of estoppel by representation," where the estoppel would provide the minimum remedy to reverse the detriment. The second avenue, a novel one suggested by counsel, being that since *Lipkin Gorman* (10) there is no role for estoppel as the defence of change of position pre-empts and disables the defence of estoppel by negativing detriment. Although he did not base his conclusion on the submission, Walker, L.J. stated that he found the argument "ingenious" and "convincing" and he went on, at the penultimate paragraph of his decision, to make the following observation ([2001] EWCA Civ 369, at para. 48):

"Will estoppel by representation wither away as a defence to a claim for restitution of money paid under a mistake of fact? It can be predicted with some confidence that with the emergence of the defence of change of position, the court will no longer feel constrained to find that a representation has been made, in a borderline case, in order to avoid an unjust result. It can also be predicted, rather less confidently, that development of the law on a case by case basis will have the effect of enlarging rather than narrowing the exception recognised by this court in *Avon County Council v Howlett*. That process might be hastened (or simply overtaken) if the House of Lords were to move away from the evidential origin of estoppel by representation towards a more unified doctrine of estoppel, since

592

proprietary estoppel is a highly flexible doctrine which, so far from operating as 'all or nothing', aims at 'the minimum equity to do justice' (*Crabb v Avon District Council* [1976] Ch 179, 198). Paul Key has drawn attention (Excising Estoppel by Representation as a Defence to Restitution [1995] CLJ 525, 533) to two decisions of the High Court of Australia (*Waltons Stores (Interstate) v Maher* (1988) 164 CLR 387 and *Commonwealth of Australia v Verwayen* (1990) 170 CLR 394) which he describes as a fundamental attack on the traditional perception of estoppel as a complete defence."

171   In a more recent decision, made also in the context of restitution for a mistaken payment, *National Westminster Bank plc* v. *Somer Intl. (UK) Ltd.* (12), the bank had by mistake credited the defendant company's account with US$76,706 which had been intended for another customer's account. Upon being notified by the bank that a dollar payment had been received, the company believed it was the payment of between US$72,000 to $78,000 it was expecting from an overseas client, the company released further goods to that client to the value of £13,180.57 (or $21,616.14). When the bank discovered the mistake it sought to recover the sum of $76,708.57 wrongly credited to the company. In the interim, the company's client had ceased to trade, having failed to pay for the further goods delivered to it after April 1997. The company raised a plea of estoppel by representation against the bank as to the entirety of the sum mistakenly transferred, claiming that it had replied to his detriment by despatching the goods. The judge and the court below had allowed the plea only to the extent of the $21,616.14 and ordered the company to repay the balance.

172   The issue for the Court of Appeal was whether the judge was wrong in following the decision in *Scottish Equitable plc* (2) rather than the decision in *Avon* (1). The Court of Appeal held:

   (i) it was unattractive that, in a case of money paid under a mistake of fact, the extent of the recovery should depend on whether or not the payment had been accompanied by a representation that the transferee was entitled to the payment;

   (ii) it was also clear that, where there had been such a representation, the doctrine of estoppel by representation appeared, subject to any equitable adjustment to reflect the actual detriment suffered, to dictate an "all or nothing" approach to the amount that could be recovered;

   (iii) Scottish Equitable recognised that there remained scope for the operation of equity to alleviate the position on grounds of unfairness or unconscionability; and

   (iv) in this case, the judge had been entitled to find that the actual detriment suffered by the company went to only part of the sum

transferred mistakenly transferred to it, and that it would be unconscionable for it to retain the balance.

173 Potter, L.J. observed ([2001] EWCA Civ 970, at paras. 44–45) in relation to the cases *Ogilvie* (13) and *Greenwood* (7):

"44. In *Howlett* the court cited three cases which suggested that, where estoppel by representation is raised as a defence to a claim for money had and received, the courts do not treat the operation of estoppel as being restricted to the precise amount of the detriment which the representee proves he has suffered in reliance on the representation: *Skyring -v- Greenwood* 4B.&C. 281, citing a passage from the judgment of Abbott CJ at 289; *Holt -v- Markham* [1923] 1 KB 504; and *Lloyds Bank Limited -v- Brooks*, 6 Legal Decisions Affecting Bankers for the Arbitrators Award of 14 September 2000. The court also cited *Ogilvie -v- West Australian Mortgage and Agency Corporation Limited* [1896] A.C. 257 and *Greenwood -v- Martins Bank Limited* [1932] 1 KB 371 (affirmed in the House of Lords [1933] A.C. 51) as demonstrating that a claimant who, as a result of being able to rely on estoppel, succeeds on a cause of action on which, without being able to rely on it, he would necessarily have failed, may be able to recover more than the actual damage suffered by him as a result of the representation which gave rise to it.

45. It is difficult to see how the last two cases support the principle for which they were cited. *In each case a bank customer discovered that cheques drawn on his account had been forged, but failed to inform the bank until a substantial period had elapsed. In each case it was held that there was no need to investigate whether the bank could in fact have recovered money from the forger had it acted immediately. The banks had not received benefit, but had suffered loss of any opportunity for recovery elsewhere, as to which the uncertainty of such recovery was resolved in favour of the representee.* That point is made in *Goff & Jones: the Law of Restitution* (5th ed) at 832." [Emphasis supplied.]

This view addresses the unfairness that would result for a bank if it was required to prove precisely what it would have recovered if it had not lost the opportunity for recovery due to the failure of the customer failing to report his knowledge of the forgery for an extended period of time.

174 These modern decisions arose where the courts were dealing with the issue of the relationship between the defence of change of position and the defence of estoppel. However in the matter before me, the change of position defence does not operate and there is no requirement for there to be a restitutionary analysis of detriment. Therefore, the approach should be to revert to estoppel by representation as an evidential concept which is accompanied by the "all or nothing" result. Despite the modern decisions

analysed above, the Supreme Court has not yet evolved the law, where these discrete estoppels exist, possibly by reformulating estoppel by representation to move away from its evidential origin towards a more unified doctrine of estoppel. This means that estoppel by representation remains an evidential doctrine, therefore the *pro tanto* approach in a case where estoppel is the only defence is not appropriate. The defence of estoppel in such circumstances does not require a balancing of equities of the case as may be required, for example, for the defence of change of position.

**Claim of dishonest assistance by the bank in the fraud**

175   The plaintiffs contend, for three reasons, that their claim for dishonest assistance is "intertwined and inextricably linked" with the estoppel defence. The first reason is that the facts of the fraud were suspicious enough for the bank to have been put on inquiry, requiring it to investigate and thereafter pass the information uncovered to the plaintiffs. The second reason given is that it is submitted that the court must apply the equitable doctrine and, having regard to the behaviour, state of mind or circumstances of the parties, then consider whether it be unconscionable for the plaintiffs to be reimbursed. The final reason is that it is claimed that no estoppel may be relied upon as a defence to any claim for accessory liability for dishonest assistance and that the bank, due to its dishonesty, could not avail itself of the estoppel defence.

176   There are three elements of a dishonest assistance claim which should be pleaded and must be proved. The first is that there has been a disposal of assets in breach of a trust or fiduciary duty. The second is that the defendant assisted in that breach or disposal. The third, which is the only element in dispute between the parties, is that the defendant assisted the breach of trust dishonestly. Therefore, the key issue is not whether the bank assisted[25] in the fraud but whether they did so dishonestly.

177   It is accepted by the plaintiffs that there is no allegation made that an individual employee was an accomplice, but they claim that the forgery occurred because of "systemic" or "structural" failure by the bank "wilfully, alternatively recklessly shutting its eyes" when it permitted a number of large payments to Monkton based on forged signatures. The plaintiffs plead in their amended statement of claim:

"146. The Defendant (acting through its employees) wilfully, alternatively recklessly, closed its eyes and ears to the obvious discrepancies and the red flags outlined above in connection with the fraud, and in

---

25   The bank simply making the relevant payments amounts, in the legal sense, to the element of "assistance" required for a dishonest assistance claim.

authorizing multiple fraudulent transactions in the Geneva Account, the Warco Account, and the Bank accounts of other Monkton clients.

> 147. The Defendant deliberately closed its eyes to obviously forged signatures in respect of the Geneva Account."

At para. 147A of the amended statement of claim the plaintiffs then set out 11 particulars of the dishonesty, cross-referencing to a number of transactions which they call "red flags" at paras. 134–140 in the pleadings.

178    The standard of proof required is the civil standard of proof, the balance of probabilities. It is not an absolute standard. When considering allegations of dishonesty and fraud, a court will naturally require for itself a higher degree of probability than that which it would require when asking if negligence is established. It does not adopt so high a degree as a criminal court, but it still does require a degree of probability commensurate with the occasion and the seriousness of the allegation. The more serious the allegation the more cogent the evidence in support needs to be.

179    The law on what constitutes dishonesty for the purposes of dishonest assistance in the cases before me is conveniently set out in an uncontentious manner by Rose, J. in her recent judgment in *Singularis Holdings Ltd.*[26] v. *Daiwa Capital Markets Europe Ltd.* (17),[27] in which she stated ([2017] EWHC 257 (Ch), at paras. 143–147):

> "143. The test for dishonesty in this context is that set out by the House of Lords in *Twinsectra Ltd v Yardley and others* [2002] UKHL 12. There Lord Hutton, with whom Lord Slynn of Hadley, Lord Steyn and Lord Hoffmann agreed, described the three possible standards which can be applied to determine whether a person has acted dishonestly. There is a purely subjective standard whereby a person is only regarded as dishonest if he transgresses his own standard of honesty even if that standard is contrary to that of reasonable and honest people; there is the purely objective standard whereby a person acts dishonestly if his conduct is dishonest by ordinary standards of reasonable and honest people, even if he does not realise this, and there is a combined standard:
>
>> '. . . which combines an objective test and a subjective test, and which requires that before there can be a finding of dishonesty

---

26   Singularis was incorporated in the Cayman Islands (originally under the name "Saad Investments Finance Company (No. 7) Ltd.").

27   Rose, J.'s decision and approach were upheld by the Court of Appeal: Singularis Holdings Ltd. v. Daiwa Capital Markets Europe Ltd. (17) (published February 1st, 2018).

it must be established that the defendant's conduct was dishonest by the ordinary standards of reasonable and honest people and that he himself realised that by those standards his conduct was dishonest.'

144. His Lordship, having considered the test that had been applied by Lord Nicholls of Birkenhead in the earlier case of *Royal Brunei Airlines Snd Bhd v Tan* [1995] 2 AC 378 confirmed that dishonesty is a necessary ingredient of accessory liability and that (at paragraph 36):

> 'dishonesty requires knowledge by the defendant that what he was doing would be regarded as dishonest by honest people, although he should not escape a finding of dishonesty because he sets his own standards of honesty and does not regard as dishonest what he knows would offend the normally accepted standards of honest conduct.'

145. In *Barlow Clowes International Ltd v Eurotrust International Ltd* [2005] UKPC 37, Lord Hoffmann considered whether it must be shown that the alleged dishonest assister turned his mind to the ordinary standards of honest behaviour and to whether his conduct fell below those standards. He held that it was not necessary. It was only necessary to show that the defendant's knowledge of the transaction rendered his participation contrary to normally acceptable standards of honest conduct. He did not need to be shown to have had reflections about what those normally acceptable standards were.

146. It is clear that wilful blindness will satisfy the test for dishonesty. An honest person does not 'deliberately close his eyes and ears, or deliberately not ask questions, lest he learn something he would rather not know, and then proceed regardless': *Royal Brunei*, per Lord Nicholls at p. 389F-G. It is therefore no defence for a defendant to say that he did not realise that he was acting dishonestly: *Starglade Properties Ltd v Nash* [2010] EWCA Civ 1314 at paragraph 32 and my judgment in *Goldtrail Travel Ltd v Aydin & Ors* [2014] EWHC 1587 at paras [143–145].

147. Mr Miles [Q.C., leading counsel for Singularis] accepted that Singularis has to show that a particular person within Daiwa was dishonest. There is an important difference between being incompetent—even grossly incompetent—and being dishonest."

597

180   In *Stokors SA* v. *IG Markets Ltd.* (19),[28] Field, J., after reviewing the judgments in the above cases mentioned by Rose, J. in *Singularis* (17), helpfully set out the following uncontentious principles derived from the authorities ([2013] EWHC 631 (Comm), at para. 11):

> "(1) It is not necessary for the Court to establish whether or not the defendant considered that he was acting dishonestly. Instead, the defendant's knowledge of the transaction has to be such as to render his participation contrary to normally acceptable standards of honest conduct.
>
> (2) An honest person does not deliberately close his eyes and ears, or deliberately not ask questions lest he learn something he would rather not know and then proceed regardless where there may be a misapplication of trust assets to the detriment of beneficiaries.
>
> (3) A dishonest state of mind may consist in suspicion combined with a conscious decision not to make inquiries which might result in knowledge.
>
> (4) In a commercial setting dishonesty can be found on the basis of commercially unacceptable conduct.
>
> (5) Acting in reckless disregard of others' rights or possible rights can be a tell-tale sign of dishonesty.
>
> (6) Recklessness is a species of dishonest knowledge and is therefore relevant to the Court's consideration of dishonesty in this context. 'Not caring' does not mean 'not taking care', rather it means indifference to the truth. The moral obliquity of this position is in the wilful disregard of the importance of truth.
>
> (7) Someone can know, and can certainly suspect, that he is assisting in a misappropriation of money without knowing that the money is held on trust or what a trust means."

181   The bank contends that the plaintiffs have pleaded and advanced their dishonest assistance case improperly and that the claim should be dismissed. It was agreed that the court could exercise its discretion to receive evidence about the dishonesty allegations *de bene esse* and deal with the bank's objection taken on the pleadings in this judgment. The bank contends that, even if the case is not dismissed on the preliminary issues about the pleadings, the plaintiffs have failed to produce any

---

28  Although the decision in Singularis (17) was released after the close of each parties' case and Stokors (19) was not referred to by the parties, I refer to them as the principles set out therein are uncontentious and the cases neatly summarize the law from the earlier cases.

evidence to establish that the bank or any of its employees have acted in any way dishonestly. The bank requests that even if there is a dismissal, the court should still record its views of the allegations of dishonesty advanced by the plaintiffs.

182    Pleadings are governed by GCR O.18, r.7(1) which provides that facts not evidence must be pleaded:

"Subject to the provisions of this rule, and rules 7A, 10, 11 and 12, every pleading must contain, and contain only, a statement in a summary form of the material facts on which the party pleading relies for his claim or defence, as the case may be, but not the evidence by which those facts are to be proved, and the statement must be as brief as the nature of the case admits."

183    Rules 7A, 10 and 11 are not material. Rule 12 deals with particulars of pleading. The relevant part provides:

"(1) Every pleading must contain the necessary particulars of any claim, defence or other matter pleaded including, without prejudice to the generality of the foregoing words—

(a)  particulars of any misrepresentation, fraud, breach of trust, wilful default or undue influence on which the party pleading relies; and

(b)  where a party pleading alleges any condition of the mind of any person, whether any disorder or disability of mind or any malice, fraudulent intention or other condition of mind except knowledge, particulars of the facts on which the party relies."

Thus a statement of claim should contain the material facts, *i.e.* the facts which are necessary as a matter of law to prove a plaintiff's case. They should be as concise as the circumstances of the case permit, while containing sufficient detail to inform a defendant of the nature of that case. The degree of particularity necessary will depend on the particular facts of the case. In a case dealing with a claim of dishonesty the requirement for particularization is greater as the defence must be able to readily deduce from it what the serious allegations are that it must meet. The pleading must be clear and unequivocal and it is not enough to plead that the bank was aware or ought to have been aware of DS's actions to establish dishonest assistance.

184    In *Supreme Court Practice* (1999) Note 18/7/4 at 314 under the heading "Need for Compliance" with O.18 it states as follows:

"Need for compliance—These requirements should be strictly observed (per May L.J. in Lipkin Gorman v Karpnale Ltd [1989] 1 W.L.R 1340 at 1352). Pleadings play an essential part in civil

actions, and their primary purpose is to define the issues and thereby to inform the parties in advance of the case which they have to meet, enabling them to take steps to deal with it, and such primary purpose remains and can still prove of vital importance, and therefore it is bad law and bad practice to shrug off a criticism as a 'mere pleading point' (see per Lord Edmund Davis in Farrell v Secretary of state for Defence [1980] 1 W.L.R 172 at 180, [1980]1 All E.R. 166 at 173)."

185   The bank highlights that, as in this case, where a dishonesty claim and a negligence claim based on similar facts are made, dishonesty must be clearly pleaded first and confined to the fraud, with negligence then being pleaded separately. Reference is made by the bank to *Lipkin Gorman* (10) where May, L.J. stated ([1989] 1 W.L.R. at 1351–1352) that—

"... first, where fraud or dishonesty is material this must be clearly pleaded, if not explicitly, then in such terms that the reader of the pleading can be left in no reasonable doubt that this is being alleged. Secondly, where an element in the alleged fraud or dishonesty relied on is the other party's knowledge of a given fact or state of affairs, this must be explicitly pleaded. It is ambiguous and thus demurrable, if fraud is relied on, to use the common 'rolled up plea' that a defendant knew or ought to have known a given fact.[29] If it is desired to allege and plead fraud and, in the alternative, negligence based upon similar contentions, then the former must be pleaded first and clearly and the relevant part of the plea confined to the fraud. The allegation in negligence can then be pleaded separately and as a true alternative contention."

186   In its written closing submissions, the bank refers to the history of the plaintiffs' pleadings. The bank submits with some force that the claim for dishonest assistance was tagged on to the less serious allegations. In this regard, I note that in the initial statement of claim, found after the allegations of breach of contract and negligence were pleaded, only 9 of the 162 paragraphs related to the issue, and they contained minimal particularization of the dishonesty alleged.

187   The plaintiffs failed to adequately particularize, in the dishonest assistance section of the pleading, its reference in para. 146 to "authorising multiple fraudulent transactions" and "the Bank accounts of other Monkton clients" and its reference in para. 147 to "obviously forged signatures." Paragraph 146 refers to "obvious discrepancies . . . outlined earlier" (in other non-dishonest assistance sections of the pleading).

---

29   See para. 191.

188   At para. 146 of the statement of claim the plaintiffs also refer back to what are termed "red flags" which are pleaded under the heading "Particulars of Negligence/Breaches of Duty" in the part of the pleading dealing with the negligence allegations. Eight of the nine paragraphs in the "Particulars of Red Flags" section use the phrase "knew or ought to have known," "a rolled up plea" which incurred the disapproval of May, L.J. in *Lipkin Gorman* (10) ([1983] 1 W.L.R. at 1352).[30]

189   The dishonesty allegation, which it appears was being based on the similar and earlier contentions relied upon for the alternative negligence claim, was not pleaded first, nor could it be said that the negligence claim was thereafter truly separately pleaded. No individual employee was identified by name or position in the bank as conducting themselves dishonestly.

190   In light of the above, if the initial version of the statement of claim had been the version of the pleading before this court, it would have been found to have failed to provide adequate particulars and to adequately plead dishonest conduct.

191   In the amended statement of claim the same nine paragraphs, with minor amendments made to two of them, remain. In addition, a sub-heading "Particulars of Dishonesty" has been inserted after para. 145 (the third paragraph in the dishonest assistance section) and a new para. 147A which contains 10 sub-paragraphs under the heading "Additional Particulars of Dishonesty" has been added. A number of those additional paragraphs still regretfully simply refer back to the unchanged aforementioned "red flags" set out in the negligence section of the pleading. The dishonesty claim still appears after the breach of contract and negligence claims in the pleading.

192   The bank contends that the dishonest assistance claim is not clearly pleaded in the amended statement of claim and that there remains the overlap with the other allegations. The bank highlights the following content in the amended pleading to be vague and unparticularized:

(i) para. 147A(iv)—"such inquiries and inspections as might reasonably have been made . . .";

(ii) para. 147A(vii)—"failing to investigate . . . or to make appropriate inquiries . . ."

(iii) para. 147A(viii)—"the Defendant's conduct amounted to commercially unacceptable conduct in the context of corporate banking and in the circumstances of the red flags . . ."; and

---

30  See para. 183 herein.

(iv) para. 147A(ix)—"failed to comply with its own internal policy which represented the minimum standard of reasonable and honest conduct the Defendant knew to be required . . ."

193   The rolled-up plea form at paras. 134–140 deemed inappropriate by May, L.J. remains and similar terminology such as "ought reasonably" and "might reasonably" again appears in the para. 147A additional particulars.

194   In the amended statement of claim, again, no individual employee was identified by name or even by position in the bank as conducting themselves dishonestly or as having relevant knowledge. The plaintiffs confirm at para. 226 of their closing written submissions that they—

"never alleged in these proceedings that any one individual [bank] employee was an actual accomplice to [DS] in his fraud with full knowledge of the forgeries. [Mr. Ritter's] position has always been that there was a 'systemic' or 'structural' failure by the Bank . . ."

The plaintiffs contend that they need not identify specific individuals or any—

"actual culprit employees at the Bank who were wilfully shutting their eyes and ears to the obvious fraud in proving dishonest assistance, in light of the fact such misconduct would always have been in the course of employment at the Bank for which it is trite law, Butterfield would be vicariously liable."

195   Mr. Skinner stated that the majority of the transfer requests came via facsimile in the form of a letter or a standard request for wire transfer form. Due to the passage of time, Mr. Skinner indicated that he could not give details about the members of staff who handled the transfers or exact details about the process for each transfer process followed in each transfer. I therefore accept that the plaintiffs may have difficulty naming the precise member of staff who they contend acted dishonestly. However, this did not prevent them from pleading or later clearly specifying in their evidence, which particular individual(s), identified by their post, was culpable.

196   In *Publishers Representatives Ltd.* v. *UBS (C.I.) Ltd.* (15), Sanderson, J. considered the approach taken in *Royal Brunei Airlines Sdn. Bhd.* v. *Tan Kok Ming* (16) to the issue of what constitutes dishonesty. The court was dealing with an application to strike out portions of a statement of claim in which the plaintiffs were seeking damages for alleged fraud or dishonesty and negligence from the defendant bank. The bank had been the trustee of a pension fund for the second plaintiff's employees, but when the bank retired from this role it was replaced by a former trust officer of the bank who had been investigated when employed with them for fraud in relation to trust funds held by the bank. The plaintiffs

contended that the bank should have informed them about the former employee's fraud and supervised his handling of the funds. The defendants did not plead that any one bank employee was dishonest, but contended that the company was dishonest for failing to disclose its knowledge to the plaintiffs. Sanderson, J. stated (2000 CILR at 486):

> "I accept UBS's submission that a company has no mind or will of its own and that the doctrine of directing mind and will attributes to the company the mind and will of the natural person or persons who manage and control its actions: see *R.* v. *Ghosh* . . . and *El Ajou* v. *Dollar Land Holdings PLC* . . . I also accept [counsel for the defendant's] submissions that combining innocent acts of individuals cannot create a fraudulent or dishonest act in a company."

Sanderson, J. then went on to say (*ibid.*):

> "However, in this case it is not known who made the decision not to disclose to Publishers the information that UBS had. The allegation of dishonest conduct by the company has been pleaded and particularized. That is, Publishers rely on the knowledge of Albert Good. He had the knowledge of the conduct of Mr. Randall. His knowledge was therefore the knowledge of UBS. It has been alleged in the pleadings that the person or persons at UBS who were the directing mind and will of UBS made the decision not to disclose what it knew to Publishers. It is not necessary to plead who made the decision if the plaintiffs do not know. To require the plaintiffs to guess would be irresponsible and unfair to both parties.

> Publishers acknowledge that at trial they will have to prove that the directing mind and will of UBS knew of Mr. Randall's conduct and should have done something more than it did. Publisher's claim should not be struck at the pleadings stage because they are unable to say who at UBS made the decision."

197   *UBS* can be distinguished as the court was reviewing pleadings in which the dishonest conduct appears to have been appropriately pleaded, unlike in the matter before me. In *UBS* a bank employee was identified as having direct knowledge of the fraudulent conduct of the employee which the "persons who were the directing mind and will" of UBS made the decision not to disclose to the first plaintiff.

198   In cases of dishonest assistance against a corporate entity, a particular individual (or particular individuals) must be identified as having acted dishonestly given the fact that, although a company has legal personality and capacity, it functions through human agents. Therefore the statement of claim must identify and particularize what the defendant did to assist in the breaches of fiduciary duty or trust, how the assistance caused, contributed or resulted in the plaintiff's loss and how the defendant is

alleged to have acted dishonestly in assisting the main perpetrator. The bank rightly highlights the requirement that it may be permissible not to identify the relevant dishonest individual(s), at the stage of pleading the case, if the plaintiff was unaware, as in this case, of their identity, so long as the plaintiff otherwise properly pleads and particularizes the dishonest conduct and identifies an individual employee by name or even by post with relevant knowledge.

199    The plaintiffs have failed in the matter before me to identify in the pleadings or at trial any individual(s) either by name or by post with any relevant knowledge of the fraud or who acted dishonestly. Due to the inadequacy of the particularization, the bank and the court are unable to identify, even if not by name(s) but by role(s)/position(s) in the bank, who it is alleged has been dishonest or who should have had knowledge of the fraudulent conduct. In addition, the plaintiffs have failed to plead the dishonesty in the appropriate manner commended by May, L.J. in *Lipkin* (10).[31]

200    As dishonesty is a serious allegation it is not to be pleaded lightly. There is merit in the bank's submission at para. 445 of its written closing submissions:

"Re-reading paragraphs 146 to 147A of the Statement of Claim clearly shows the vague and general terms in which the majority of the so-called 'particulars' have been provided. This is improper both as the Bank and its employees are entitled, when being accused of having acted dishonestly, of knowing more than just in general terms how they are being alleged to have been dishonest. They are entitled to know, pursuant to the Grand Court Rules and as a matter of basic procedural fairness, the particular and specific basis on which the Plaintiffs are asking the Court to make dishonesty findings against them, findings which clearly have very serious ramifications for any individual and business, in particular a highly reputable, regulated Bank, such as the Defendant."

201    Accordingly as the above principles of pleadings must be strictly observed, and in the absence of any identified person at the bank who has acted dishonestly, the pleadings would not permit the court to make a finding of dishonesty and I dismiss that claim.

202    In case I am wrong in reaching this conclusion I have felt it appropriate when reviewing the facts earlier in this judgment to address whether the allegations concerning the bank's handling of the transactions made by the plaintiffs were sufficient for them to prove a finding of the

_____

31  See paras. 180–193 above.

element of dishonesty required for dishonest assistance to be made out, even based on an allegation of a bank's employees being reckless or closing their eyes and ears. Having regard to the principles set out in paras. 178–184 above and my earlier comments and findings on the evidence, I do not find that the plaintiffs have provided evidence sufficient to prove such a serious allegation. I accept that, armed with hindsight and with the advantage of the later gained knowledge (unknown at the time by anyone in the bank) the bank, which I accept is a bank with a specialized department serving commercial clients, accepts that some additional enquiries maybe could have been made, but this does not make the bank dishonest when applying the tests set out in the cases analysed herein. There is no evidence that the bank, as is pleaded, deliberately allowed transactions that were fraudulent to be processed.

**Costs**

203   As the bank has been the successful party in this matter, as costs ordinarily follow the event, I am presently minded to make an order for the plaintiffs to pay the bank's costs. Having reviewed the manner in which the case has been argued, I am presently minded to make the order on the standard basis. However, if either party wishes be heard on the issue of costs they should, within 21 days of the circulation of the perfected version of this judgment, file and serve a summons seeking a costs hearing.

**Closing remarks**

204   In reaching this conclusion I have considered the evidence and authorities contained in the large number of files. I have also considered the plaintiffs' 21-page opening written submissions and their 72-page closing written submissions (including schedules). I have also considered the bank's opening written submissions (with schedules) totalling 103 pages and its closing written submission (with schedules) running to 163 pages.

205   Last but not least, I thank counsel for their impressive and prodigious contribution to these proceedings in which many complex issues required their attention and for their and their clients' extreme patience in awaiting this decision.

*Order accordingly.*

Attorneys: *Sinclairs* for the plaintiffs; *Appleby* for the defendant.



Neutral Citation Number: [2017] EWHC 257 (Ch)

Case No: FL-2016-000015

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**
**FINANCIAL LIST**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 16/02/2017

**Before** :

**MRS JUSTICE ROSE**

- - - - - - - - - - - - - - - - - - - - -

**Between :**

| | |
|---|---|
| **SINGULARIS HOLDINGS LTD (IN OFFICIAL LIQUIDATION) (A COMPANY INCORPORATED IN THE CAYMAN ISLANDS)** | **Claimant** |
| - and - | |
| **DAIWA CAPITAL MARKETS EUROPE LTD** | **Defendant** |

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**ROBERT MILES QC, ANDREW DE MESTRE** (instructed by **Jenner & Block London LLP**) for the **Claimant**

**JOHN McCAUGHRAN QC, ADAM GOODISON, MICHAEL WATKINS** (instructed by **Ashurst LLP**) for the **Defendant**

Hearing dates: 23 - 25 November, 28 - 30 November, 1 December, 6 - 8 December, 14 - 16 December

- - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this Judgment and that copies of this version as handed down may be treated as authentic.

.............................

CONTENTS

| | PARA |
|---|---|
| **I. INTRODUCTION** | 1 |
| **II. THE PARTIES AND WITNESSES AT TRIAL** | 5 |
| **(a) Singularis, Mr Al Sanea and the Saad Group** | 5 |
| **(b) Daiwa** | 9 |
| **(c) Expert witnesses** | 15 |
| **III.  THE HISTORY OF DEALINGS BETWEEN THE PARTIES** | 16 |
| **(a) The early relationship between Singularis and Daiwa:  November 2006 to August 2007** | 16 |
| **(b) The period September 2007 to the end of 2008** | 29 |
| **(c) The period 1 January 2009 to 21 May 2009** | 38 |
| **(d) The events of late May 2009 to 2 June 2009** | 46 |
| **(e) Events between 2 June and the first of the disputed payments** | 63 |
| **(f) The disputed payments: 12 June – 27 July 2009** | 80 |
| *(i) $10 million and $3 million payments on 12 June to SSHC* | 80 |
| *(ii) Payment of $180 million to SSHC on 18 June 2009* | 86 |
| *(iii) Payments of $1,090,000 and $2,935,000 to Saad Air on 1 July 2009* | 101 |
| *(iv) Payment of $5.2 million to SSHC on 8 July 2009* | 102 |
| *(v) Payment of $1,093,000 to Saad Air on 20 July 2009* | 103 |
| *(vi) Payment of $1,174,900 to SSHC on 27 July 2009* | 104 |
| **(g) Events after the making of the challenged payments** | 105 |
| **V. THE ISSUES BETWEEN THE PARTIES IN SUMMARY** | 113 |
| **VI.  MR AL SANEA'S ALLEGED BREACH OF FIDUCIARY DUTY** | 119 |
| **(a) Was there a prima facie breach of fiduciary duty by Mr Al Sanea?** | 119 |
| **(b) Could Mr Al Sanea as sole shareholder of Singularis ratify any misappropriation of Singularis funds?** | 128 |
| **(c) Was Mr Al Sanea entitled to make the payments to himself by way of releasing Singularis' debts to him?** | 138 |
| **VII.  DID DAIWA DISHONESTLY ASSIST MR AL SANEA'S BREACH OF FIDUCIARY DUTY?** | 143 |
| **VIII. THE CLAIM IN NEGLIGENCE** | 163 |
| **(a) The scope of the bank's duty under *Lipkin Gorman* and *Quincecare*** | 163 |
| **(b) Was Daiwa subject to a *Quincecare* duty in respect of the money in the Singularis account?** | 171 |

*(i) Is the claim precluded by the fact that the claim is being brought on behalf of the creditors?*     172

*(iii) Is Singularis precluded from bringing the claim because it was a one-man company?*     174

**(c) Was Daiwa in breach of the *Quincecare* duty on the facts of this case?**     191

**(d) The defence of illegality**     206

*(i) Attribution of Mr Al Sanea's wrongdoing to Singularis*     208

*(ii) The test in Patel v Mirza*     216

**(e) Does Daiwa have an equal and opposite claim in deceit against Singularis?**     221

**(f) The inevitable misappropriation of the money**     229

**(g) The application of Daiwa's terms of business**     232

**(h) Contributory negligence**     243

**MRS JUSTICE ROSE:**

## I. INTRODUCTION

1. The Claimant ('Singularis') brings this claim to recover about $204 million that in early June 2009 was held for its benefit in a segregated client account by the Defendant stock broker ('Daiwa'). At that time, Singularis was wholly owned by Maan Al Sanea, a wealthy businessman who also owned a substantial business group called the Saad Group based in Saudi Arabia. The money in the client account came from two main sources. About $124 million was surplus collateral that was left over when Daiwa closed down a long standing, secured lending relationship it had with Singularis at the beginning of June 2009. About $80 million had arrived in Singularis' account with Daiwa on 2 June 2009 in circumstances that I shall describe later.

2. Over the course of a month between mid June and mid July 2009, Daiwa paid out that money on Mr Al Sanea's instructions to bank accounts in the names of three other companies within the Saad Group rather than back to a bank account of Singularis. There are eight disputed payments in all, ranging in size from just over $1 million to one payment of $180 million. The money has now been lost to Singularis.

3. Singularis was incorporated in the Cayman Islands and is now in the hands of liquidators appointed by order of the Grand Court of the Cayman Islands. The liquidators claim back the money from Daiwa on two bases. The first is that Singularis alleges that the employees of Daiwa who authorised the payments dishonestly assisted Mr Al Sanea's breach of fiduciary duty in removing the money from Singularis for the benefit either of himself or of companies in the Saad Group. The second basis is that Daiwa was in breach of the duty of care owed by a bank to its client by negligently failing to realise that Mr Al Sanea was committing a fraud on the company and misappropriating Singularis' monies when he instructed Daiwa to pay the money to third parties. Singularis rely on the duty owed by the bank to its client as described by the Court of Appeal in *Lipkin Gorman (a firm) v Karpnale Limited* [1989] 1 WLR 1340 and by Steyn J in *Barclays Bank plc v Quincecare Ltd and another* [1992] 4 All ER 363.

4. Daiwa defends the claim on the basis that Singularis has not established that Mr Al Sanea was acting in breach of fiduciary duty when asking for the money to be paid to his other companies. They say that Mr Al Sanea was the sole shareholder of Singularis and entitled to move the money to other companies in his control if he so wished. They say that no one in Daiwa acted dishonestly in their dealings with the payments so the claim for dishonest assistance is not made out. As regards the claim in negligence, they say that there was nothing in the surrounding circumstances to alert Daiwa to the possibility that Mr Al Sanea was acting improperly. They also raise a number of legal defences to the claim, asserting for example that the claim is barred by illegality or that the *Quincecare* duty does not arise in the circumstances of this case. Some of these legal defences boil down to an assertion that any fraudulent conduct on the part of Mr Al Sanea must be treated as the misconduct of Singularis itself so that Singularis is precluded from bringing this claim against Daiwa, even if Daiwa were negligent. Finally, Daiwa relies on clauses in its standard terms of business which it says are binding on Singularis and which exclude Daiwa's liability except for gross negligence.

## II. THE PARTIES AND WITNESSES AT TRIAL

### (a) Singularis, Mr Al Sanea and the Saad Group

5.  Singularis was incorporated in the Cayman Islands on 3 October 2006 under the name of Saad Investments Finance Company (No. 7) Limited. It changed its name to Singularis Holdings Limited on 21 December 2006. From incorporation until the appointment of the liquidators in September 2009 Singularis' registered office was in the Cayman Islands. The sole shareholder of Singularis as from 30 December 2008 was Mr Al Sanea. Before that date the ultimate beneficiary of the shares in Singularis was the Saad STAR Trust which was a Cayman Island trust settled by Mr Al Sanea. Singularis was set up to manage Mr Al Sanea's personal assets outside the Saad Group. Singularis was not therefore consolidated with the Saad Group companies. There were a number of directors of Singularis in addition to Mr Al Sanea, including Mr Al Sanea's wife Sana Abdulaziz Al Gosaibi, his daughter and four other people. Mr Al Sanea's wife is significant in this narrative because the first problems affecting the Saad Group appear to have arisen from a default by a group of companies owned by the Al Gosaibi family.

6.  Mr Al Sanea is the founder and Chairman of the Saad Group of companies. In 2006 and 2007 Daiwa was provided with a copy of Mr Al Sanea's personal net worth statements, endorsed by PriceWaterhouse Coopers ('PwC') showing him to be a very wealthy man indeed. One Daiwa witness described Mr Al Sanea as an attractive, honest and admirable business person.

7.  A number of companies within the Saad Group play an important role in the events giving rise to this claim:

    a)   Saad Financial Services SA ('SFS') based in Geneva provided administrative, investment management and advisory services to Singularis. The main contact point for Daiwa with Singularis was through SFS and in particular with Mr Mike Wetherall who worked for SFS in Geneva. It appears that there was no formal services agreement between Singularis and SFS but that the Board of Singularis resolved in March 2007 that the terms of a service agreement between SFS and SICL should apply as between SFS and Singularis. SFS entered into bankruptcy proceedings on 21 January 2013.

    b)   Saad Investment Company Ltd ('SICL') was originally the counterparty for the stock financing arrangement with Daiwa. It was set up by Mr Al Sanea to manage all his non-Saudi investments.

    c)   Saad Specialist Hospital Company ('SSHC') is a company registered in Saudi Arabia and is part of the Saad Group. As at 1 January 2009 SSHC was 100 per cent owned by Mr Al Sanea. SSHC was the recipient of most of the money that Singularis is seeking to recover in these proceedings.

    d)   Saad Air (A320 No 2) Limited and Saad Air (A340-600) Limited (together referred to as 'Saad Air'). These were companies registered in the Cayman Islands which managed the aviation investments of Mr Al Sanea and his family. They were wholly owned subsidiaries of Saad Air Limited of which Mr Al Sanea was the chairman. Saad Air received some of the disputed

payments, through its bank account with HSH Nordbank AG ('HSH'). HSH is a German bank with which Saad Air had entered into mortgage arrangements relating to two Airbus aircraft used for travel by Mr Al Sanea and his family. Singularis is not a party to these arrangements.

8.   Singularis called only one witness in support of their claim, Stephen Akers. Mr Akers is a partner of Grant Thornton UK LLP and was appointed together with Hugh Dickson and Mark Byers also of Grant Thornton to be the Joint Officials Liquidators of Singularis. Mr Akers was a straightforward and truthful witness though of course he was not able to give evidence about the events from which these claims arise.

## (b) Daiwa

9.   Daiwa Capital Markets Europe Ltd ('Daiwa') is the London based subsidiary of the Japanese investment bank and brokerage company Daiwa Securities SMBC Co Ltd headquartered in Tokyo ('Daiwa Tokyo'). In May 2008 Daiwa was principally an equity and bond brokerage business, specialising in the sale of Asian stocks to European investors, facilitating European issuers of notes to sell those notes in the Japanese market through Daiwa and more general bond and equities brokerage and repo activity. One important point to note is that it was not a licensed deposit taker and so could not operate ordinary bank accounts for its clients.

10.   One of the Daiwa witnesses, Mr Blanchard, noted in his witness statement some of the differences between the culture in a Japanese company compared with that in a 'Western' organisation. He described a certain lack of sophistication and a tendency to treat counterparties with the utmost respect. It was not suggested, however, that some different legal test applied to Daiwa from that which would apply to any company doing business in London or that their conduct should be judged by a standard different from the standard set out in the relevant case law.

11.   Daiwa called eight witnesses. Some of them were able to give evidence primarily about the events leading up to the ending of the relationship between Daiwa and Singularis and some gave evidence about the making of the disputed payments:

   a)   Dominique Blanchard was Global Head of Derivatives at Daiwa between May 2008 and December 2012. He had been brought into Daiwa in London to help with the launch of a new area of business for Daiwa in selling derivatives. He now works for an Australasian banking group.

   b)   Charles Day was recruited to Daiwa by Mr Blanchard and occupied the post of Global Head of Equity Finance between October 2008 and November 2010. He then became European Head of Derivatives. Mr Day had previously worked at Lehman Brothers International Europe from 2007 until the insolvency of Lehman Brothers in September 2008. He reported to Mr Blanchard.

   c)   Akihiko Sakashita was Vice Chairman and Deputy Head of Europe and Middle East, a role he took up in April 2008. His role was to oversee or supervise the trading business and risk management function of Daiwa. He reported to Mr Kosuge. He now works for Citigroup.

d)      Christopher Hudson joined Daiwa's Compliance Department in January 2006. In February/March 2009 he was promoted to Head of the Compliance Department and still holds that position. He reported to Mr Wright. He describes the function of the Compliance Department (part of the Compliance Division) as primarily to ensure that the firm's business is conducted in accordance with regulatory requirements. The Compliance Department is responsible for approving new client relationships and for assigning to each client a risk rating, a number from one to four with one being the least risky and four being the most risky.

e)      David Wright was Daiwa's Head of Compliance Division at the relevant time, having joined their Compliance Department in 1999. He was also the firm's money laundering reporting officer. In May 2009 there were six other people working with him in his team. He left Daiwa in December 2014.

f)      Roger Massey joined Daiwa in 1998 and at the time of these events was head of the Legal and Transaction Management Division and Company Secretary of Daiwa. He still holds the position of Company Secretary and is now Head of the Legal and Compliance Division. The main role of the Legal Department in Daiwa was negotiating transaction documents, typically agreeing the terms of one or more master agreements which are industry standard documents.

g)      Jonathan Metcalfe joined Daiwa in 1998 as a credit officer in the Credit Risk Department. He became a director in that department in October 2003 and remains in that post today.

h)      Eishu Kosuge was Chairman of the Board of Directors and Chief Executive Officer of Daiwa between April 2006 and September 2009. He has worked for the Daiwa Securities group of companies since graduating in 1980 and currently works for Daiwa Tokyo's research institute.

12.      Mr Metcalfe and Mr Hudson are the employees who are alleged to have been dishonest in their authorisation of the disputed payments. I therefore deal with their credibility in more detail later. As regards the other witnesses I consider that they were all honest witnesses doing their best to assist the court when giving their oral evidence. One striking feature of the trial was that the tenor of the Daiwa witnesses' written evidence was markedly different from their oral evidence. In their written statements they firmly downplayed the significance of the events that were unfolding at the end of May and beginning of June, whereas in cross-examination they readily agreed that the events were really very worrying indeed. For example, in his witness statement, Mr Blanchard referred to the Bloomberg article published on Sunday 31 May 2009 about the freezing of Mr Al Sanea's bank accounts in Saudi Arabia. He says in his written evidence "This article did not make positive reading" and that although this might have signalled deeper problems for Singularis, it was difficult to draw conclusions about events. He went on "I noted however that the freeze related to [Mr Al Sanea] and not Singularis and therefore Daiwa did not have any evidence that Singularis was experiencing financial difficulties". In cross-examination however he readily agreed that the news on 31 May was "like a bombshell" and did not attempt to minimise the gravity of what was happening so far as the future of Singularis was concerned. Similarly, some of the witnesses when describing their thoughts and concerns over the period 24 May – 1 June 2009 referred to the fact that share prices

had recovered from the lows of 2008 and were on an upwards trajectory. For example, Mr Sakashita said in his written evidence that by May 2009 the value of Singularis' stock held as collateral for the loans "had recovered materially from the lows of January 2009" so that he was "more relaxed" about the credit risk Daiwa faced from Singularis in May than he was in January. However, he and other witnesses whose written evidence referred to the recovery of stock prices as alleviating their concerns readily accepted in cross-examination that in this period of unprecedented stock market turbulence, shares were just as likely to fall dramatically again as they were to continue to rise. Other passages in the written evidence in which the witnesses described factors from which they drew comfort at the time as regards Singularis' financial health, such as the promises of future actions given at a meeting with Mr Wetherall in March 2009 or the rosy picture appearing from Singularis financial information provided in September 2008 were also largely undermined in cross-examination when the witnesses accepted that none of the promises had been fulfilled and the September 2008 figures were hopelessly out of date by mid 2009.

13. In light of this I have relied more on the oral evidence of the witnesses than on their written evidence. That oral evidence about their reactions at the time to unfolding events is much more consistent with the contemporaneous documents, and with commercial business sense, than the more anodyne written statements.

14. Other Daiwa personnel involved in this narrative who did not give evidence include:

    a) Richard Smither who was in the Equity Finance Risk Management department. His role was to analyse the level of collateral required to protect Daiwa from market volatility risk and the risk of a default. He reported to Mr Day.

    b) Francois Faure who was Global Head of Risk Management.

    c) Nick Roberts who worked in Equity Sales and was Daiwa's relationship manager for Singularis. The Daiwa witnesses agreed that Mr Roberts was very 'client-leaning' such that they realised that he would always attempt to put a positive, pro-Singularis spin on events.

    d) Mikita Komatsu was Chief Operating Officer and President of Daiwa who oversaw the internal control divisions such as accounting and finance.

    e) Toshinao Matsushima was Global Head of Markets at Daiwa Tokyo.

    f) Yoshio Urata was Global Head of Equities at Daiwa Tokyo.

    g) Hiroshi Kimura, was Daiwa Tokyo's representative in Bahrain.

**(c) Expert witnesses**

15. Both sides instructed experts on the scope of the regulatory obligations to which Daiwa was subject at the time. Singularis' expert was Simon Elvidge. Mr Elvidge is a former Chief Compliance Officer and Money Laundering Reporting Officer with over 20 years of experience. The Defendant's expert witness was Oliver Lodge. He has

also worked as Head of Compliance and Money Laundering Reporting Officer for clients over many years. Both experts also gave their opinion on the market standards and best practices in place as at 2009. Following the close of the evidence from the factual witnesses, it was agreed by the parties that much of the material in the expert reports was no longer relevant.

## III. THE HISTORY OF DEALINGS BETWEEN THE PARTIES

### (a) The early relationship between Singularis and Daiwa: November 2006 to August 2007

16.     The relationship between Daiwa and the Saad Group started when Daiwa provided SICL with repurchase agreement financing for the acquisition by SICL of an Emirates International Bank bond. Daiwa subsequently financed SICL's acquisition of shares in HSBC Holdings Plc ("HSBC"). SICL and Daiwa entered into a Global Master Repurchase Agreement on 8 October 2006 for the purpose of this repo. In November 2006 the relationship between SICL and Daiwa expanded when they signed a Global Master Stock Lending Agreement.

17.     In January 2007 Mr Wetherall of SFS came to visit Daiwa in London. Daiwa and Singularis entered into a Global Master Securities Lending Agreement on 13 April 2007 (later amended). At the same time Daiwa was provided with a guarantee from SICL for up to 5.5% of the market value of the transactions between Daiwa and Singularis and a separate unlimited guarantee from Mr Al Sanea personally. A few days later, the rights in relation to these HSBC shares and the related financing agreements were novated from SICL to Singularis by a novation agreement dated 16 April 2007 between Daiwa, SICL and Singularis. On the same day Singularis notified the Stock Exchange of its interest in more than 3% of the shares in HSBC. I will consider in more detail the way in which the account was set up in the context of the issue as to whether Daiwa's standard terms of business applied to the relationship between the parties.

18.     Thereafter Daiwa also financed the acquisition by Singularis of further shares in HSBC and in BNP Paribas SA ("BNP") and JP Morgan Chase & Co ("JP Morgan"). These shareholdings were acquired between April and November 2007 and were purchased largely with debt financing provided by large international banks. According to Mr Akers, as at 30 April 2008, Singularis' liabilities to banks and other financial institutions exceeded $14.6 billion. Singularis' shareholdings in HSBC, BNP and JPM comprised the vast majority of Singularis' equity portfolio. As at 30 April 2008, Singularis' equity portfolio was almost entirely invested in financial institutions in the United Kingdom (US$ 6.6 billion) and in France (US$ 3.8 billion). Singularis' shareholding in HSBC was the most significant of its three substantial shareholdings.

19.     Under the terms of the stock lending agreement between Daiwa and Singularis, Daiwa was entitled to hold a margin or 'haircut' of a certain percentage of the total value of the shares lent to Daiwa. If the value of the shares fell such that Daiwa's margin was less than the prescribed percentage, Daiwa was entitled to call for additional margin to bring the haircut back to the prescribed level. If the price of the shares rose so that Daiwa was holding more cash than the prescribed percentage in margin, Singularis was entitled to call some of the margin back. At the outset of the relationship, the prescribed level of collateral which Daiwa was entitled to hold was 5%. This grew to

10 per cent by October 2008. The collateral management team within Daiwa would decide on a daily basis whether any additional margin was due. Instructions to Daiwa about movements into and out of the Singularis account were given by a SWIFT instruction as the most secure way of authenticating that the instruction comes from the person authorised to deal with the account.

20.    In about June 2007, the guarantee that SICL had given for Singularis' obligations to Daiwa was released and replaced by an additional pledge of $90 million held by Daiwa as collateral. This sum of $90 million was the subject of discussion in mid 2009 as its status as support for the stock lending agreement was not entirely clear.

21.    Three aspects of the relationship between Daiwa and SICL/Singularis at this stage emerge from the evidence. First, the relationship was the single most profitable relationship for Daiwa over the years 2007 to 2009. Daiwa made profits on the transaction partly by lending out the stock to other market counterparties and partly by charging interest on the money loaned to Singularis. In an email from Mr Roberts to Mr Kosuge in early February 2009, Mr Roberts said that between March 2007 and the end of January 2009 Daiwa had earned about £13.8 million from trading with Singularis. A great deal of management time and effort was put into maintaining the relationship. Mr Kosuge said that Mr Al Sanea was one of the wealthiest and most sophisticated businessman in Saudi Arabia at the time and Daiwa valued its business relations with the entities which he controlled, including Singularis.

22.    Secondly, Singularis was a very unusual client because it was a private company owned by a high net worth individual rather than a financial institution. This was a unique relationship in that Daiwa did not have any similar size stock lending arrangement with any other counterparty at the time. It was therefore closely monitored by the credit risk function within Daiwa. Mr Blanchard's evidence was that he was concerned that Daiwa in London did not have the understanding and experience to conduct business safely with high net worth individuals, especially those from emerging markets. Mr Blanchard was also concerned that the collateral management function in Daiwa was not run to the market standard needed if Daiwa were to develop more business of the kind that required frequent assessments of risk and collateral requirements. His evidence was that he was looking for a way to bring the relationship with Singularis to an end as soon as the stock market turbulence that brought matters to a head started.

23.    Thirdly, the nature of the business conducted with Singularis was unusual. It was the reverse of a normal stock lending agreement under which, typically, the owner of the shares (the lender) transfers the shares to the borrower and the borrower posts cash collateral equal to the value of the shares plus a specified percentage referred to as the margin or haircut. That collateral is not regarded as a loan to the lender but is security to make sure that the lender gets the shares back. The rationale for the stock lending transaction between Daiwa and Singularis was different. Daiwa lent money to Singularis to buy the shares and then Daiwa received the shares as collateral for what was in effect a commercial loan. This was really more a form of secured lending, the money loaned being secured by the deposit of the shares and margin. Mr Day described the relationship as 'collateralised name lending' by which he meant that Daiwa lent to Singularis on the basis of Mr Al Sanea's name and on the understanding that Mr Al Sanea would fund any future collateral requirements if Singularis could

not do so from its own reserves. In return Daiwa held a significant amount of collateral in the form of the share stocks and cash.

24. Mr Metcalfe describes the information provided to the Credit Risk Department about Singularis on an ongoing basis. The function of the credit risk department is to identify the risk that the counterparty will not settle an obligation when due or at all. Credit Risk checks that the level of collateral held for the client is adequate and also receives and reviews updated financial information about a counterparty as and when it becomes available. Credit Risk sometimes visits the client to discuss their current performance and future plans. From time to time Credit Risk will produce a Credit Review Memorandum setting out a more detailed analysis of the credit risk associated with a client. Mr Metcalfe accepted in his witness statement that because Singularis was a private company, published information about its finances was scarce.

25. On 20 August 2007 the Credit Risk department in Daiwa produced a report on Singularis, based on the most recent set of financial reports for Singularis dated 30 June 2007 and audited by PwC. By this time the stock markets had begun to slide as a result of the first signs of the sub-prime mortgage crisis in the USA. The credit review noted that Singularis had conducted $1.131 billion of share purchases with Daiwa and that Daiwa had financed $1.664 billion of those shares. Between 8 and 16 August 2007 the value of the stock held by Daiwa fell by about $163 million. In addition, Singularis had committed to execute a further $533 million of cash trades through Daiwa. In preparation for the review, Mr Metcalfe spoke to Mr Ravi Uppal, the Financial Controller of the Saad Group in Geneva, and put to him various questions that Mr Sakashita had wanted clarified about the financial accounts. He reported to senior management that he asked Mr Uppal "if there was a limit to the level of Saad group support" for Singularis' liquidity. Mr Uppal had said that Mr Al Sanea would not have made the decision to invest in three banks if he did not have the capital to cover market movements. Mr Metcalfe interpreted this as meaning that it was reasonable to expect that support from Mr Al Sanea would continue. Mr Uppal also told Mr Metcalfe that Singularis was viewed as a 'pension fund for the next generation of the family'. The company's strategy was to invest for a five to seven year period and this strategy was reviewed every six months. Mr Uppal said in relation to the current market declines that 'if HSBC dropped 50p it would be viewed as a buying opportunity'. Mr Metcalfe concluded that it was a very good discussion and 'provided clear statements of high levels of available liquidity to meet current market margin calls'.

26. In the credit review of 20 August 2007, Mr Metcalfe recorded his assessment that the risk of Singularis not being able to meet a margin call was 'very low' and the risk of Mr Al Sanea defaulting on his guarantee was 'very low'. He recognised in the report that Singularis was 'reliant on cash injections from Mr Maan Al Sanea (via shareholder loans &/or equity increases) to maintain sufficient liquidity to meet collateral calls'. This meant that Singularis' liquidity was constrained by Mr Al Sanea's willingness to divert funds from his other businesses to Singularis but Mr Metcalfe was certain that Mr Al Sanea was able and willing to do so. Mr Metcalfe also noted that the experience to date with Singularis has been very positive and proactive. As far as Mr Al Sanea himself was concerned, Mr Metcalfe said:

> "3) Mr. Al-Sanea is a very high profile & wealthy businessman
> in Saudi Arabia. His wealth & cash flow is driven from his

> ownership of the Saad Group of Companies. Such group reported 1H2007 net income of $715mn and equity of $7.4bn (excluding $3bn of personal loans to the group). His personal reputation & standing within Saudi business/political arenas is immensely important to him. As such, we believe that it is highly unlikely Mr. Al-Sanea would not fulfil his financial obligations to us.
>
> Mr Al-Sanea has said to the [Daiwa] Relationship manager "counterparties that stick by the Saad Group during uncertain market conditions will become core members of the inner-circle". This is very much in keeping with Saudi culture."

27. Despite this very positive review, the senior management in Daiwa recognised that care had to be taken with this relationship. In mid-August 2007 Mr Sakashita wrote to his colleagues in Tokyo that the performance of the banking sector was in 'a very critical situation' because of the downturn triggered by the sub-prime mortgage crisis. He continued that 'extremely careful risk management is required' for the financial dealings with the Saad Group. Mr Kosuge and the President of Daiwa in London, Mr Nakamura, also sent a report to senior management in Daiwa Tokyo on 20 August 2007 about financial transactions with the Saad Group. They reported that given the situation of the market turbulence, 'although the risks have not become greater, we will still have to proceed carefully due to the recent drastic changes in the stock market'. Mr Kosuge accepted in cross-examination that from this time onwards, the Singularis account was under close scrutiny as a matter of risk management.

28. Mr Metcalfe, however, did not recall this message being relayed to the Credit Risk department. Mr Wright also said that he was not aware that the relationship had come under particular scrutiny from August 2007.

**(b) The period September 2007 to the end of 2008**

29. In September 2007, senior management from Daiwa travelled to Geneva to meet Mr Wetherall and one of Singularis' directors, Mr Hart. Mr Metcalfe was also present at this meeting. Mr Metcalfe's evidence is that they were told that the business was in good shape and that the market turmoil had had no impact on them. Mr Metcalfe recalls that Mr Hart confirmed that all of Singularis' cash came from Mr Al Sanea but that even if HSBC shares were to fall by 30 per cent, Mr Al Sanea would still have enough cash reserves to cover margin calls. At this meeting the Daiwa people were also told about Singularis' other lenders. They were told that these included Citigroup, Credit Suisse International, Commerzbank (formerly Dresdner Bank AG London Branch), Lehman Brothers International (Europe) and Royal Bank of Scotland plc in addition to Daiwa. Mr Metcalfe's evidence is that he did not know the specifics of their funding arrangements, but that he knew that each of the funders was bigger and more powerful than Daiwa. He drew comfort from the fact that each of them must have done their own due diligence on Singularis and found that it was an acceptable counterparty. At this time, the Daiwa management also asked for details of Mr Al Sanea's personal net worth and were told it was about $15 billion and that this figure had been audited by PwC.

30.     There was a further meeting with SFS personnel in Geneva on 14 November 2007 when Mr Metcalfe was again reassured by Mr Wetherall that despite the very substantial drop in share prices over the summer, Singularis was invested for the long term and had plenty of cash to ride out this storm.  Similar messages were received when there were discussions between the parties in response to more severe falls in share prices.

31.     In March 2008 there was a further credit review of Singularis by Mr Metcalfe. Again this was a very upbeat report, having regard to the way that Singularis had shown itself to be able to meet very substantial margin obligations and that its representatives had confirmed to Daiwa the long term nature of its investments.

32.     In June 2008 there was an internal audit report produced within Daiwa called "Thematic Review of Fraud" ('the Thematic Review').  This document, which is referred to in Mr Wright's witness statement, seems in my judgment to provide a wake up call for the Daiwa management which they would have done well to heed.  The Executive Summary of the Thematic Review refers to the Financial Conduct Authority's report on the importance of antifraud measures in the investment banking industry.  The FCA had highlighted that, although investment banks tended to have some general controls to mitigate the risk of fraud:

> "The main areas that the report highlighted which should be addressed or improved are that senior management should be more proactive in taking responsibility for identifying and assessing fraud risk, as well as ensuring that there is clear and appropriate allocation of anti-fraud responsibilities within firms."

33.     The Thematic Review refers to the objective of the audit being to evaluate and report on the adequacy and effectiveness of internal controls related to fraud.  The Key Issues identified in the Executive Summary included that "Management have not performed a structured assessment of fraud risk within the Firm" and that "Accountability for fraud has not been clearly defined within senior management and committee structure".

34.     The body of the Thematic Review highlighted various problems within Daiwa:

a)      There was no formal departmental responsibility for fraud.  This created the risk that "If accountability for fraud is not clearly defined there may be confusion with regards to whose responsibility it would be to ensure there are sufficient anti-fraud controls in place.  Additionally, these responsibilities may be de-prioritised in favour of other business needs."  The Responsible Owner of the task of setting up a suitable committee to ensure that responsibility for fraud was clearly defined was Mr Wright.

b)      There had been no 'documented holistic fraud risk assessment' performed by senior management to ensure that the full range of potential fraud risks had been considered and were being controlled.  The risk identified as arising from this was that management had not identified all the fraud risks faced by the firm and associated controls and therefore did not have sufficient controls in place to mitigate a potential event.  This would be particularly damaging to

Daiwa, the report noted, if a fraud were to occur. Again Mr Wright was given the task of drafting a plan to move responsibility from Internal Audit to the Operational Risk department.

35.     Although Mr Wright refers to this document as one of a number of reviews that 'may be relevant' he does not mention any action that he took to implement what was said there.

36.     At the start of September 2008, Daiwa received a copy of Singularis' audited financial statements for the year ending 30 April 2008. In the covering letter, Mr Al Sanea said that he had injected about $7.5 billion into the firm to cover its obligations and that he would inject more money if necessary. His view was that the worst was past and that 2009 "will surprise to the upside". This optimism was, as we know, not justified as over the weekend of 14/15 September 2008 the Lehman Brothers bank went into administration. Mr Metcalfe knew that Saad Group was exposed to Lehman because of a discussion a few days earlier on 9 September 2008 in which Mr Wetherall had referred to that exposure. Immediately following the collapse of Lehman Bros, Mr Roberts spoke to SFS in Geneva and reported back that Saad Group owed more money to Lehman than Lehman owed to Saad. SFS had reassured him that they could cover that exposure from cash. Shortly after Mr Roberts emailed his colleagues again reporting a 'Saad update' to the effect that the overall borrowings owed by Singularis to Lehman exceed the value of the stocks held as margin by Lehman. Thus it was clear that from this date Lehman had an uncovered and unsecured claim against Singularis. Mr Metcalfe accepted in evidence that nothing happened thereafter to suggest that that exposure had been removed and Lehman repaid.

37.     In October 2008, Daiwa received a set of 6 month interim accounts from Singularis for the period to 5 October 2008. These had been reviewed by PwC and no qualification had been made. Mr Metcalfe wrote to his colleagues noting that Singularis' investment portfolio did not seem to have suffered as much as some stocks and that the accounts showed 'substantial unencumbered cash liquidity amounting to $6.8bn'.

**(c) the period 1 January 2009 to 21 May 2009**

38.     On 2 January 2009 there was a stock exchange announcement that Singularis had reduced its shareholding of HSBC stocks from 3.24% of the total share capital of HSBC to 2.97%. This would have involved a sale of several hundreds of millions of dollars of stock. There was some discussion about the implications of this sale of stock within the London Daiwa senior management. Mr Sakashita asked in an email of 9 January 2009 why Singularis was disposing of shares or why it was organising further lines of credit if the company had such a strong cash position as shown on their balance sheet in October 2008. Mr Roberts wrote an email to Mr Sakashita amongst others on 8 January 2009 playing down the significance of the development. He ascribed the move to 'political infighting' between two German banks with Singularis being very much the injured party. Mr Sakashita probed a little further but Mr Roberts replied stressing the conservative nature of the Saad group's investment strategy and the value that Mr Al Sanea placed on strong business relationships with business friends who 'stick by you in times of difficulty'.

39.     Then on 21 January 2009 came the news that Singularis had decided to sell its total shareholding in JP Morgan comprising about 7.1 million shares. Mr Roberts wrote to Mr Kosuge and Mr Sakashita and others informing them of this. He again made light of this sale as nothing to worry about, saying that the stake in JP Morgan 'was never a core fundamental investment' for Singularis and Mr Al Sanea. The Daiwa witnesses accepted in cross-examination that this was the first time they had been told by anyone that the JP Morgan investment was not intended to be held by Singularis for the long term and that it was not regarded as the same kind of core investment as the HSBC and BNP shares.

40.     This sale of JP Morgan shares by Singularis triggered the Tokyo senior management to call for a full and urgent review of the overall relationship between Singularis and Daiwa. Mr Smither wrote round to a number of people (including Mr Stanley who was the head of Risk Management though not Mr Metcalfe) asking for information to be provided urgently about the current position of the trades. This request was then cascaded down to various people including Mr Metcalfe and others in the Credit Risk department and to people in the Market Risk department. Mr Metcalfe was asked to provide copies of the last review and financials on Singularis and copies of controlling legal documents. Mr Kosuge was made aware of Singularis' sales of stock by Mr Sakashita. A note that he made in a notebook on 11 February 2009 disclosed during the course of the trial indicates that he or at least someone at the meeting suggested that this was a change of policy on the part of Singularis and that they should have a meeting with Singularis as soon as possible.

41.     In fact it appears that a visit had already been arranged for senior Daiwa management to Saudi Arabia for the end of January 2009. The visit took place on 24 and 25 January 2009 and the itinerary included a visit to the Saad Specialist Hospital, to a school and to an industrial facility.

42.     Also towards the end of January 2009 there was a review carried out by the solicitors Allen & Overy organised by Mr Massey. According to Mr Massey the review focused on three aspects of the relationship between Daiwa and Singularis; (i) whether anything needed to be done to tie in the $90 million additional pledged collateral to be sure that it would be available to offset any liability of Singularis to Daiwa; (ii) more generally to clarify Daiwa's rights over collateral held; and (iii) to consider whether the arrangement between the companies should be replaced with a different kind of agreement form, namely a repo standard agreement rather than a stock lending standard agreement. The result of this review was that Daiwa realised that it needed to make some changes to the wording of the agreements with Singularis. Following the review, in early February it was decided that Mr Sakashita, Mr Smither, Mr Roberts and Mr Metcalfe should visit Saad in Geneva to undertake a detailed overall review of the Singularis account. Mr Sakashita said that he was concerned to find out what Singularis' cash position was and the nature of the assets held by Singularis that were reported as cash in the balance sheet. Delays in organising this meant that the meeting only took place on 19 March 2009.

43.     In the meantime there was a meeting of the London Senior Risk Committee on 12 February 2009. Mr Metcalfe reported that Singularis had been reducing its JP Morgan and HSBC positions, leading to a reduction of its financing requirements. He noted that the prices of all three stocks in which Singularis had been invested were down significantly with liquidity being squeezed:

> "He said large losses were being crystallised on the portfolio
> and that if these positions were being hedged elsewhere,
> [Daiwa] were not seeing them. Mr Sakashita asked that the
> account continued to be monitored carefully."

44. The next important event was the meeting between Daiwa and SFS/Singularis on 19
    March 2009 in Geneva ('the 19 March Meeting'). Those attending were Mr Hart and
    Mr Wetherall from SFS and Mr Roberts, Mr Faure (head of the Risk department
    which covered market risk, operational risk and credit risk), Mr Metcalfe and Mr
    Smither from Daiwa. The main purpose of the meeting from Daiwa's point of view
    was to obtain some updated financial information about the Saad Group and to get
    Singularis' agreement to restructure the legal documentation and increase the level of
    collateral. A detailed note prepared by Mr Smither recorded what happened at the
    meeting with some additional comments added in later by Daiwa personnel:

    a)   SFS said that the rating agency Moody's were undertaking a rating review of
         the Saad Group of companies and SFS expected that the current BAA1 rating
         would be unchanged though it expected to signal an upgrade from 'stable' to
         'positive'.

    b)   Neither SFS nor Singularis had made any further investments in 2008 or so far
         in 2009 and because of volatile market conditions SFS had been 'de-risking
         the portfolios' and hedging their exposure. SFS had said that 90% of the
         Singularis HSBC exposure had been hedged by acquiring put options, most of
         which expired in 2010. They also said that they had 'reduced and hedged' the
         holding in BNP. SFS confirmed that Singularis had been selling off the
         holding in JP Morgan because it had not been a core holding and cited
         'changes in the business model of JPM'. No details were given of the hedging
         other than that some of the instruments had strike prices of £7 or £8.

    c)   There was then a discussion about how much Singularis had lost as a result of
         the falls in the share prices. Mr Hart told the meeting that Mr Al Sanea had
         injected several billion dollars into Singularis to meet margin calls.

    d)   Mr Metcalfe when cross-examined was not able to remember whether anyone
         from Daiwa at the meeting asked for an up to date cash position of Singularis.
         The note does not record any such question being asked or any such
         information about Singularis' cash position being provided. The note of the
         meeting contains an addition, after the meeting, by Mr Metcalfe referring to
         the October 2008 accounts that had previously been provided. However at the
         meeting more recent audited accounts of SICL were provided showing a move
         from a $304 million profit in 2007 to a $75 million loss in 2008. However
         equity capital had been boosted by funds provided by Mr Al Sanea.

    e)   The report of the meeting notes that the credit department had requested the
         latest audited financial net worth statements of Mr Al Sanea. It records that
         Moody's had reviewed the 2008 personal net worth statement and was
         satisfied that resources remained sufficient to support the group and the
         continuation of the investment grade.

f)      There was a discussion about the advice from Allen & Overy about the revision of the documentation. The client raised no concerns other than the fact that their Legal team was 'quite busy' so that execution might take a little longer.

g)      Daiwa also proposed an increase in the margin requirement to 23 per cent. Mr Wetherall acknowledged that market conditions change from time to time but said that 'any decision to agree increased haircuts would have to be sold internally to the Chairman (Maan Al Sanea)'. The note states that it was agreed to come to a decision on margin by 3 April.

h)      The summary section of the note concludes that it was 'a good update meeting'.

45.     The Daiwa witnesses said in their written evidence that they were reassured by what was discussed at the 19 March Meeting. However, they had to accept when questioned at the trial that nothing that had been promised by SFS was actually delivered. There was no additional financial information provided about Singularis or Mr Al Sanea; there was no agreement forthcoming on an increase in the haircut and there was no agreement to revise the legal documentation.

**(d) The events of late May 2009 to 2 June 2009**

46.     On Sunday 24 May 2009 Mr Kitabatake, the branch manager of Daiwa's Dubai office, circulated a news article from the publication MEED (a Middle Eastern business newspaper) giving the news that the Al Gosaibi family had defaulted on a $1 billion debt in Saudi Arabia. The relevance of this was that Mr Al Sanea's wife was from the Al Gosaibi family. The article reported that Saudi bankers with exposure to the group had said that the group had defaulted on three types of financial instruments. One senior banker was reported as saying that there were a lot of banks exposed and a lot of debt. The Al Gosaibi group was described as 'the bluest of the blue chip companies in the country' and blamed the withdrawal of credit lines on the wish of banks to reduce their loan books.

47.     When the Daiwa people returned to work on Tuesday 26 May 2009 after the bank holiday Monday, Mr Day checked the margin available to Daiwa from Singularis to ensure that Daiwa was adequately protected. He concluded that Daiwa had plenty of margin in hand. There was an exchange of emails within Daiwa discussing whether the weekend's development amounted to an 'event of default' by Singularis under the governing trade documentation and also seeking information about the collateral position of Daiwa vis a vis Singularis. Mr Day wanted to know from the credit department 'how closely Mr Al Sanea's core business in Saudi Arabia was linked to that of the Al Gosaibi family'. Mr Sakashita wrote to colleagues on 26 May 2009 that they should assume that some of the credit lines granted to the Saad group may not be extended – they needed to monitor closely the liquidity situation of Saudi companies.

48.     By 28 May 2009, even the client-leaning Mr Roberts' view as expressed to senior Daiwa colleagues was that the Al Gosaibi issue could be 'slightly more problematic than originally thought'. He thought that it would be prudent for Daiwa to monitor all cash movements within SICL and Singularis very closely. It was recognised within Daiwa that there was possible contagion between the Al Gosaibi family and other

Saudi family firms and that even though there were no direct business connections, 'the Saad group could get tarred with the Al Gosaibi brush'.

49.    There was a meeting in the morning of 28 May 2009 of senior people to discuss the situation.  Those attending were Mr Kosuge, Mr Komatsu, Mr Blanchard, Mr Faure, Mr Sakashita, Mr Day, Mr Smither and Mr Metcalfe. During the meeting Mr Kimura (Daiwa's man in Bahrain) called in to the meeting with more bad news.  The Saad Group was reported to be seeking to reschedule its debts with its banking funders and there was said to be a 75% probability that it would default. Mr Kosuge said at the meeting that Daiwa should pay attention to the share prices of HSBC and BNP because if they started to fall, that would thin out the level of surplus margin Daiwa held in the Singularis account and this could be a negative trend.  The concern expressed at the meeting was that if other brokers started to sell off the holdings of HSBC and BNP that they held as collateral for loans to Singularis, that might depress the share price further. Mr Sakashita said in giving evidence that he realised at this point that Saad Group's situation had become very bad.

50.    At lunchtime on 28 May, Mr Blanchard reported to Daiwa Tokyo the decisions taken at the meeting. These were that Daiwa would not pay any cash back to Singularis even if they requested it. Further, Daiwa would seek more legal advice about their termination rights and they would telephone Singularis straight away to proceed with the request made at the 19 March Meeting to increase the haircut and tie in the $90 million additional money in more firmly as collateral.  Mr Blanchard followed this up with an email on 29 May 2009 telling his colleagues that there were three potential ways forward; an 'amicable reduction of the risk within days'; a hedge or 'we pull the plug and exit more abruptly if they do not entertain any of the amicable solutions'.

51.    Mr Sakashita also drafted a long email to senior people in Tokyo on 28 May setting out the position and before sending it he checked its content with Mr Kosuge.  This was sent to Tokyo from London on the evening of 28 May.  Mr Sakashita told his colleagues of the reports that the Saad Group had filed a petition seeking to reschedule its debts and that there was a rumour that it was about to default.  He referred to the possibility that bank lenders might get into a 'panic mindset' following the Al Gosaibi default and that there was a high risk of the Saad Group 'running into a major difficulty with respect to liquidity'.  He then turned to the likely effect on the other companies in the group.  He said that Singularis is outside the Saad Group's consolidation so that it is 'slightly shielded from the risk'. He went on:

> "However, because the owner is the same, funds may flow
> from [Singularis] into Saad in order to support the Saad group,
> in which case [Singularis] will be put in a tight situation as
> well.  Alternatively, funds may be retained in [Singularis] in
> order to preserve the personal assets."

52.    Mr Sakashita referred in that email to the recent change in Singularis' behaviour. This change was that over the past three days, Singularis had started to call for the return to it of excess margin held in the Daiwa client account.  Previously Singularis had been content to let the excess margin lie in their account with Daiwa. In fact, the margin report for Singularis shows that on 26th May 2009 $44.6 million dollars had been repaid by Daiwa to Singularis; on 27th May $2.6 million was repaid and on 28th May $1 million had been withdrawn by Singularis from its margin account.  Mr

Sakashita told the senior Tokyo management that they had decided to refuse to return any further margin so as to stop cash 'draining out of the company'.

53.     On the afternoon of Friday 29 May 2009 there was a phone call between Mr Sakashita, Mr Blanchard, Mr Day and Mr Roberts on the Daiwa side and Mr Wetherall on the Singularis side. What happened was reported by Mr Sakashita to the senior management in Tokyo on the evening of 29 May. The record indicates that Mr Blanchard was fairly blunt in his questioning of Mr Wetherall, pointing out that nothing had happened about the contract review issue raised in March. Mr Wetherall was reassuring both as to the solidity of the Saad Group and about his appreciation that Daiwa might need to take steps to protect its position.

54.     On Sunday 31 May 2009, two further serious negative developments came to Daiwa's attention. The first was when the news came through from Bloomberg on the Sunday morning that Mr Al Sanea's assets and those of his family had been frozen by the Saudi Arabian monetary authority. Mr Kosuge accepted at trial that this had been very alarming news for Daiwa. Mr Sakashita and Mr Metcalfe accepted that this was unprecedented in their experience and was very serious news indeed. Mr Day's response was to arrange an emergency meeting for 7am on the Monday morning and to seek confirmation whether this meant that Singularis was in default of the contractual documents with Daiwa or whether Daiwa had to wait until a payment was missed before they could close out their relationship with Singularis. Mr Metcalfe forwarded the article to Mr Faure and said that his initial view was that this did not constitute a formal event of default though he had not checked this with the Legal department.

55.     The second piece of news arrived from Mr Kimura in Bahrain early on the Sunday morning saying that the Saad Group was reported to have written to 40 lender banks requesting the restructuring of its loans.

56.     There was a great deal of emailing among anxious Daiwa executives during the course of that Sunday. The consensus was reached in Daiwa that on the Monday they would unwind the positions with Singularis either with Singularis' agreement or without it. Mr Blanchard emailed round to say that they would talk to SFS in Geneva on 1 June to unwind the trades amicably but that if no agreement was reached then Daiwa would exit anyway. In the meantime, Mr Blanchard said, 'no cash should go out'. Mr Metcalfe accepted that by this stage there were concerns that since his accounts had been frozen Mr Al Sanea would not be able to inject more cash into Singularis if that were needed because of further falls in the value of the stock held.

57.     At about 3 pm on 31 May 2009, Mr Blanchard wrote round to his colleagues in the following terms:

        "I think we should also have in mind the possibility of not only a liquidity run but also a fraud, a major loss on speculative bets at his level, or something like that. It is unusual that a central bank would freeze the accounts of a locally powerful businessman even when there is a pending restructuring of the foreign debts of its group. There is something fishy."

58.     The Claimant not surprisingly relies on this email as evidence that even at this fairly early stage, senior people at Daiwa suspected that fraudulent misconduct might be behind the startling events in the Middle East. Mr Blanchard denied that this was actually in his mind at the time. He said that at the time this was just speculation on his part; he did not have any reason for suspecting foul play but that he said this to jog the Japanese management out of what he considered a complacent and inappropriate reluctance to exit what was becoming a potentially disastrous relationship. He therefore sent this email "to shake the tree" and push the management to agreeing to close out the relationship whether or not there was a formal act of default. I accept that evidence and I find that at this stage there was no real concern that fraud might be at the bottom of Mr Al Sanea's problems.

59.     That did not of course, reduce the seriousness of those problems so far as Daiwa's position was concerned. It is clear that at this early stage, worries about the continued solvency of Singularis were in the minds of the Daiwa executives. Very early on Monday 1 June, Mr Kimura in Bahrain emailed colleagues in Daiwa with some more news about the reasons for the freeze of Mr Al Sanea's assets.

> "The reason of SAMA circular is that one of Al Sanea's powerful investment partner complained to Saudi regulator that Al Sanea borrowed from banks but doesn't repay his debt to his borrowers and it would expose other partners to huge risk. The complaint used the wording "misused, mismanaged" the borrowed money from banks. Therefore, Saudi regulator order SAMA to issue the circular. Originally it was reported that Al Sanea is a sleeping director of the board of TIBC *[The International Bank Corporation, a large bank in Bahrain]*, but he was actually an influential stake holder of the bank and got a huge loan from the bank as an individual and in addition with his partners' names to invest into many project in Saudi and other countries. TIBC's default reason is his default of the loan from the bank. …
>
> It seems that he has a big dispute with some Saudi powerful ex-investment partner. That unknown partner must be more powerful than Al Sanea, otherwise Saudi regulator would not listen to him. Possibly the member of Al Gosaibi family."

60.     Also on the morning of Monday 1 June 2009, Mr Blanchard reported to Daiwa Tokyo on the weekend's developments and the decision to exit the relationship come what may:

> "As you probably already know, things accelerated over the week-end with the Saudi Central Bank's decision to freeze Al Sanea's accounts in Saudi. This is very unusual and goes much further than a usual Group debt restructuring case. The rumour (from Kimura San's information) is that there might be large amounts of money borrowed by Al Sanea from TIBC and that he failed to repay. Something of this nature could well have happened.

> In any case, the solvability of Al Sanea is now clearly in question and the legal situation may quickly become unstable if creditors try to claw money back at Al Sanea's level and to seek Court injunctions overseas, etc. It is therefore necessary to exit more quickly that envisaged last friday. This morning, we have asked Singularis, by phone, to give us an instruction to sell part of the portfolio in order to repay Daiwa's loan. But we are now also preparing necessary legal steps in order to give notice of termination of this facility (which is rolled over on a daily basis) this afternoon London time if they do not give their instruction before that. We will call their Geneva office to advise them at the same time, by the beginning of this afternoon."

61.   Later on 1 June, Mr Roberts called Mr Wetherall in Geneva to discuss closing out the transactions. SFS agreed that the trades should be terminated by Daiwa selling the stock and using that and the cash collateral held to pay off the loans Daiwa had made to Singularis. Daiwa acted immediately and all the shares were sold by 5 pm on that day. Mr Faure emailed Mr Metcalfe to say "So we are finally out of this trade and maybe out of this relationship. This is a relief". Other Daiwa witnesses also confirmed in their evidence that it was a huge relief for them that Daiwa had been able to get out of the trades with the client's consent and without suffering any losses. Only Mr Metcalfe expressed some sadness because he had been working with the people at SFS for a very long time and the relationship had ended 'just like that'.

62.   Over 2 and 3 June 2009, the fortunes of the Saad Group continued to spiral downwards as its trading partners started to absorb the news about the freezing of Mr Al Sanea's assets. Moody's reported that it had cut the rating for the Saad Group down to 'junk' and on 2 June Moody's withdrew its ratings on Saad Group entities completely 'due to the lack of information on the troubled conglomerate'. Mr Metcalfe said he would have been watching Bloomberg and seeing the ratings fall. He accepted that this was a bad thing as far as Singularis was concerned. On 2 June 2009 Standard & Poor's downgraded the Saad Group's rating to D (default) and then, on the same day, withdrew coverage. Daiwa's witnesses accepted that this was an alarming development and a cause for concern.

**(e) Events between 2 June and the first of the disputed payments**

63.   On 2 June came the first request to pay some of the monies left in Singularis' account out to a third party recipient. SFS people in Geneva asked Daiwa to pay out sums to individuals in SFS. A meeting was called with Mr Blanchard, Mr Sakashita, Mr Roberts, Mr Massey and Mr Wright to discuss the request for the payments because it was such an unusual event. None of those present now recalls much about what was discussed. Mr Sakashita's evidence was that his primary concern was the possibility that the request was from employees of Saad in Geneva trying to embezzle money and that the payment request was not authentic, in the sense that it was not made with the authority of Mr Al Sanea. It appears that people in Daiwa thought that employees of other companies in the Saad Group had not been paid their salaries because of liquidity problems within the group and were trying to access this Singularis money to make up the sums due to them.

64.     The decision was taken to refuse the payment request and Mr Roberts rang Geneva to tell them this. He reported back the very strong reaction this engendered:

> "Have just spoken to SICL Geneva.
>
> They were deeply upset that we were unable to assist (much more so than I anticipated). Indeed the phone was literally slammed down on me!
>
> I guess that currently individuals within SICL are under a lot of stress, and the danger is that by adopting this stance we run the risk of joining the ranks of Citigroup etc who have been seen to let the group down in their hour of greatest need!
>
> Although I did not rule out Daiwa facilitating this Swift altogether, I said it was likely to take time for appropriate approval to be granted after we consultation with various regulatory experts etc.
>
> Is there any way we can reconsider maybe sending one sum to a UK Banking entity?
>
> Thoughts?
>
> Nick"

65.     This caused Daiwa to review their response to see if there was a way they could justify complying with the request. Mr Blanchard thought that there was, namely that if it could be established that the individuals had provided services to Singularis for which Singularis had agreed to pay, then the payment could be made. After some further email discussion it was agreed that the individuals were covered by a service agreement to which Singularis was a party and that they did provide services from time to time to Singularis so that it was legitimate for them to be paid by Singularis. Mr Wright said:

> "I'd agree with that. The risk is that we are later challenged over their authenticity and "should we have made them" in which case we can respond (1) there is no suspicion of criminal activity therefore no need to report to authorities for approval (2) the payments are exceptional but so are the circumstances and the transactions are supported by documentation"

66.     In fact these payments were not made out of the Singularis account though none of the witnesses was able to say why not. The Claimant says that the event was significant because it shows that the concern of the Daiwa executives was not simply about whether the SWIFT instruction was properly authorised but also that payments out of the Singularis account to someone other than Singularis had to be examined to see if there was a legitimate reason for Singularis to be making that payment. It was only because Mr Blanchard was satisfied that the individuals had performed services for Singularis for which Singularis had agreed to pay that it was appropriate to authorise the payment. It seems therefore that Daiwa did recognise that its obligation

was to check that the payments were being made pursuant to a genuine obligation on the part of Singularis.  However, the scope of the duty imposed on Daiwa is a matter of law and cannot be affected by what care the executives thought they should take. The legal duty is discussed later.

67.    On 2 June 2009, another problematic event occurred.  The sum of $80 million was received into the Singularis account with Daiwa for no apparent reason. On 3 June, Mr Day alerted his colleagues to the arrival of this money pointing out that the money did not relate to any open position held by Singularis with Daiwa. Mr Wright agreed when asked about this in the witness box that this was a surprising and extremely unusual event. The concern that the payment caused in Daiwa was that Daiwa was not a licensed deposit taker and was not therefore allowed to operate a bank account for its clients. Mr Wright recalled discussing this with Mr Day and with others. He accepted that it was important to find out why this money had been paid. He accepted that this was a red flag in terms of concerns about money laundering and financial crime more generally.  However, there appears to be no record of any internal discussions or of any discussions with SFS about this.

68.    Mr Massey was not involved in any further handling of this.  He did not consider it was part of his remit in the Legal department to ensure that Daiwa was acting in accordance with its regulatory obligations – he regarded that as a matter for the Compliance department.

69.    By 3 June all the shares held as collateral for Singularis had been sold by Daiwa.  But there was still the outstanding relationship between Daiwa and SICL in relation to the EBI bond that had been the first transaction between the parties.  Daiwa had asked SICL to provide further margin of about $3 million but that money had not been paid. The question arose within Daiwa whether part of the money sitting in the Singularis account could be used to cover this obligation of SICL. Mr Metcalfe recognised at the time that it was unlikely that the money would be paid by SICL. This was because SICL's bank was Citibank which held the bank accounts for the various Saad Group companies.  Citibank were unlikely to agree to release money from those accounts to pay the margin if they were exercising rights of set off across Saad Group bank accounts.  Mr Massey spoke to Tim House, a partner at Allen & Overy, to discuss whether it would be appropriate for money in the Singularis account to be used for the purpose of paying the margin call on the SICL account.

70.    One of the things that came up in this discussion was the need to show that there would be some corporate benefit to Singularis for the payment.  Mr Franks of Allen & Overy wrote to Mr Massey on 3 June 2009 saying that from a contractual perspective the payment could be achieved. He also referred to the question of corporate benefit. Mr Franks raised the question whether in the light of the current financial status of the Saad group the payment could be challenged as a preference or other transaction at an undervalue. The concern was that Singularis was giving up its rights to the excess collateral:

        "… To the extent that Singularis is in a suspect period, the question is whether Singularis' foregoing of that claim is a preference or transaction at an undervalue. This will be very fact specific and will partly depend on whether there are any other benefits to Singularis in entering into this arrangement.  If

Daiwa is aware of any financial difficulties of Singularis, it is likely that the burden of establishing that there was no preference will (from a practical perspective) be more difficult. Of course this would be a question of BVI law, but assuming that BVI law were equivalent to English law, I would have a concerned that (absent other circumstances to the contrary) this could be challenged."

71.   The reference there to BVI law was in error since Singularis is registered in the Cayman Islands.

72.   After further internal discussion, Mr Massey pressed Allen & Overy for some clear advice on whether it was acceptable to use some of the funds in the Singularis account to meet the SICL margin call.   According to the email Mr Massey sent to Mr Sakashita the advice was that because of the uncertain factual situation, it was not possible to say that the arrangement was safe from challenge. However Allen & Overy had been pragmatic in saying that having some money immediately is better than waiting for it and that where a counterparty is struggling to make payments quickly, creditors will normally take what assets are available.   The money in Singularis' account was used to pay the SICL margin call.

73.   On 4 June 2009 the contracts for the sale of the shares that Daiwa had been holding as collateral were settled. The shares were sold for a combined total of $622 million which was used to repay part of the outstanding sums owed by Singularis to Daiwa of $986 million.  The balance of the sums owing were paid from the cash margin held by Daiwa in Singularis' account of $392 million.  This left a surplus of $28 million which, taken together with a 4.5% cash deposit made in June 2007 and a further $80 million received on 2 June 2009 as I have described, left Daiwa holding approximately $204 million for the account of Singularis at this date.

74.   There is plenty of evidence that all the senior people in Daiwa were well aware of the need to take care in the handling of monies coming into and out of Singularis' account after the stock lending relationship had been closed out.   As well as the justified consternation at the arrival of the $80 million on 2 June, the detailed discussions of the proposed payments to individuals on 2 June and the discussions about the $3 million SICL margin call, Mr Wright told an Executive Committee meeting on 3 June 2009 that Daiwa "needs to be cautious in dealings with this client particularly in regards to the operation of their accounts with us".

75.   This led to the circulation on 5 June 2009 of an email by Mr Wright to a number of senior and more junior staff instructing them to be careful in their dealings with the Singularis account.  The email is worth setting out in full and went, amongst others, to Mr Metcalfe and Mr Hudson:

"As you are all aware the SAAD group and some of the related individuals and entities have been experiencing well publicised problems including downgrades and the freezing of bank accounts. Under these circumstances can I reemphasise the need for care and caution in terms of any activity on their accounts with us. Singularis have reasonably large sums of client money lodged with us and we need to ensure we

maintain appropriate oversight of both further deposits and requests for payments. We are not a bank and do not have banking licence and for reasons both regulatory and reputational cannot be seen to be acting as their 'bank account'. We should therefore ensure that any funds received relate to normal business activities and, if they are unsolicited, can clearly be linked back to their normal investment business (e.g. funds from liquidation of positions). Clearly any payment requests we receive must be properly authorised and be 'appropriate' in the context of our business relationship with them. If there are any doubts or concerns please contact Compliance or Legal.

Lastly, our understanding is that the problems that SAAD group is experiencing are fiscal in nature, if that information should change then it is vital that this is communicated to Compliance/Legal as soon as possible so we can take any action necessary.

If there is anyone else who needs to see this note, please forward as necessary.

David"

76.   This email was put to the Daiwa witnesses in cross examination. They accepted that they had never seen an email in these terms sent round about a customer. Mr Wright's evidence in his witness statement was that the email:

"… was an attempt to keep people focussed, to ask them to consider whether any activity on SICL or Singularis' accounts with Daiwa, including payments in or out, passed the 'smell test', and to refer anything to Legal or Compliance that they were unsure of"

77.   As to what he meant by the need for payment requests to "be 'appropriate' in the context" of Daiwa's business relationship with Singularis, Mr Wright explained it in this way:

"Q. … Now, in relation to the payments out, it wasn't enough just to have a proper Swift request, was it, it also had to be appropriate in the context of the business relationship?

A. That's what I say here, yes.

Q. That meant that you would need to know why the payment was being made. Is that right?

A. Sorry, could you repeat that?

Q. All right, I'll ask it in a slightly different way: in order to know whether the payment was appropriate, whoever was

dealing with the payment would need to understand why the proposed payment was being made. Is that right?

A. I don't think in this email I was setting out a fixed process or a policy as such. I was giving broad guidance on the subject to make sure, if we did get payment requests, that people were thinking about those in the context of, you know, is it properly authorised, do we understand the -- who it's being paid to.

Q. Right. Although you didn't spell it out, in order for anyone who received this to then make a decision whether a payment request was appropriate, that person would need to understand why the payment was being made?

MRS JUSTICE ROSE: Is your question limited to third party payments?

MR MILES: Yes, it is.

MRS JUSTICE ROSE: Yes, perhaps make that clear.

MR MILES: Yes. In relation to third party payments, why the payment was being made.

A. And/or is there a valid -- is there an explanation for that, for that payment, yes.

Q. Yes.

A. Yes.

Q. In fact, this email was really prompted by the prospect of third party payments, wasn't it, because you wouldn't have regarded, at this stage, payments back to an account of Singularis itself as really raising these problems, would you?

A. No.

Q. So you're agreeing with me that this part of the email was really concerned with third party payments?

A. Yes."

78.    Unsurprisingly, the presence of a very large outstanding balance held by Daiwa of cash for Singularis caused concern within Daiwa. There were emails to and fro discussing what they should propose to Singularis should happen to the money. On the evening of 5 June 2009 Mr Sakashita sent an email report to senior management in Tokyo. By this stage he was making daily reports to Tokyo. He told them that Daiwa held slightly more than $200 million in cash in the Singularis account. He said 'We have called for extreme caution in regard to the inflow and outflow of the fund in this account' and he attached the 5 June email from Mr Wright. In his witness statement Mr Sakashita said that he thought that if something were to happen to

Singularis, Daiwa should expect legal challenges from their creditors. In his oral evidence he stressed, however, that he did not think that Singularis was at risk of insolvency at this point. However, the records show, and Mr Sakashita accepted when it was put to him that by early June 2009, the share prices were dropping again, although they were still above where they had been in March.

79.    In the days following Mr Wright's email, there was more bad news reported in the press. Mr Kitabatake circulated an article from the Financial Times reporting that Western banks had begun to close down credit lines to Mr Al Sanea and the Saad Group. This move came after an instruction from the United Arab Emirates' central bank restricting lenders' business with Saad or related companies until further notice. The UAE Central Bank had also told banks that they could offset any credit facilities with the Saad Group against deposits held by the companies. Other banks who had loaned money to Mr Al Sanea were starting to sell off their holdings of collateral shares. The Saad Group had appointed advisers to help with the restructuring of its debts. There was a meeting of the London Risk Committee of Daiwa at which Mr Blanchard reported on the close out of the Singularis relationship, emphasising the fact that Daiwa 'had escaped from disaster by a narrow margin'. Mr Sakashita is recorded as having said that Daiwa should have taken steps to reduce its positions as soon as it had heard about the problems of the Al Gosaibi family the week before.

### (f) The disputed payments: 12 June – 27 July 2009

### (i) $10 million and $3 million payments on 12 June to SSHC

80.    On 12 June 2009 Daiwa received requests for $10 million and $3 million to be made from the Singularis account to SSHC. Instructions were received by SWIFT. Both payments were approved without any investigation by Mr Hudson. Mr Metcalfe also approved the payment of $10 million.

81.    A puzzling aspect of this case is why it fell to Mr Metcalfe to handle payment requests made by SFS in relation to Singularis' account. Mr Metcalfe's evidence was that he did not have much experience of dealing with payment requests as it was not part of his day to day job. The processing of payments would normally be handled by the operations team. He says that, based on his limited understanding of payments and Mr Wright's email, he knew that a payment request needed to be supported by a SWIFT instruction and that if he had any doubts about whether it was appropriate he needed to talk to Compliance or Legal. Mr Metcalfe also said that by the time he came to deal with the payments, he no longer had any reason to think about Singularis' financial position because Daiwa was no longer a creditor of Singularis, in fact it was Singularis which was owed money by Daiwa. He did not know who Singularis' other creditors were but assumed that, like Daiwa, they would be secured with sufficient collateral to cover their exposure.

82.    Mr Sakashita said in cross examination that he did not know at the time that the transfer of $180 million was being dealt with by Mr Metcalfe in Credit Risk. He found Mr Metcalfe's involvement surprising because he was not a member of the Compliance team and he was not part of the senior management of Daiwa. Mr Sakashita agreed that Mr Metcalfe had not been the right person to deal with this issue. Mr Wright also accepted that Mr Metcalfe would not have been in a good

position to form a view on Compliance issues and that there should have been someone from senior management overseeing the process.

83. As regards these 12 June payments, Mr Metcalfe signed the SWIFT document for the $10 million but not the $3 million. He said that he does not remember considering this payment at the time. He would have been asked to sign the SWIFT message to confirm that Daiwa no longer had any credit risk on the trade and that therefore the funds could be released. He accepted that on reading this at the time, he would have realised that this was a payment not back to Singularis but to a third party. He accepted that, in the light of Mr Wright's email, he should have realised that it was important to establish that this was an appropriate payment. He did not ask himself why this payment was being made. He denied when it was put to him that he failed to ask the question because he thought he would get an unhelpful answer. It was put to him that Daiwa wanted to get rid of this money in the light of the growing scandal about Mr Al Sanea but Mr Metcalfe says that this did not occur to him in relation to this payment.

84. Mr Hudson also gave evidence about these payments. He was contacted on 12 June about these requests by Mr Churchill (who worked in Settlements). Mr Hudson could not remember what he discussed with Mr Churchill or whether there had been any discussion about who SSHC was. Mr Hudson approved the payments by email on 12 June. He accepted that Mr Churchill would not have been in a position to tell him anything about the payee. At the time, he says, he did not consider it necessary to check anything about why the payment was being made. The only check he carried out was whether the payee was on a list of people subject to international sanctions. When he was cross-examined about his approval of the payment, Mr Hudson accepted that Mr Churchill was relying on him to say whether it was alright to make the payment requested. But despite having received the email from Mr Wright, he carried out no checks as to the purpose of the payment:

> "Q. … You didn't give any thought to whether this might be -- this might involve any misappropriation of assets from Singularis?
>
> A. I had no suspicion that this was, no.
>
> Q. You didn't give any thought to that question?
>
> A. I don't recall giving any conscious thought but …
>
> Q. I am not going to ask you about your unconscious thoughts. I mean, did you think about -- did you give any thought at all to whether there was a risk of misappropriation of assets from Singularis by this payment to a hospital in Saudi Arabia?
>
> A. I don't recall considering that. However, I also had the memo of 5 [June] which said, you know, we do not suspect this is criminal activity, and so I was starting off on that basis, I believe, that everyone thought this was a fiscal situation, no one believed this was any sort of criminal activity with a long-established client. So I'm not saying I ignored the possibility …

but I can't consider -- I can't remember thinking this isn't misappropriation.

Q. And you didn't give any thought to the purpose of the payment beyond just assuming that it was to another Saad Group company; is that right?

A. Yes, I viewed -- as I said, I viewed all these companies as belonging to the same beneficial owner, so I had no suspicion.

Q. I mean, you didn't even know, or check, that it was a Saad Group company, did you?

A. I don't believe I did at the time. With hindsight I should have done.

Q. It was just an assumption you made?

A. Yes.

Q. Did you even know the name of the company that it was being paid to, do you think?

A. I must have known the name in order to put the details in the system or to have the check made.

Q. So it was just an assumption you made without knowing anything about the relationship between these companies?

A. Yes."

85.     Mr Hudson went on to say that he had assumed that senior management were monitoring the account and would be aware of this payment but he did not himself notify them of it and he accepted that he had no basis for making that assumption. He thought the request for payment had come through Mr Roberts but he did not ask Mr Roberts any questions about it. He also denied firmly that he had avoided asking questions because he did not want to know the answer.

*(ii) Payment of $180 million to SSHC on 18 June 2009*

86.     On 16 June 2009 there was further bad news from the Middle East. Under the strap line "Saad, Saad story in Bahrain" a news article referred to the convulsions that had shaken the Saad and Al Gosaibi conglomerates with the Omani banking authorities announcing a $127 million exposure to 'the troubled Saad empire'. It also noted that Al Gosaibi said that it had uncovered evidence of substantial financial irregularities relating to the falsification of documents used to secure credit lines. Investigators were said to be poring over the books of two banks associated with the Al Gosaibi family and Mr Al Sanea.

87.     Also on 16 June 2009 Daiwa received a request to transfer $180 million from the Singularis account to SSHC. There was a conversation that day between Mr Roberts

and Mr Wetherall about the payment.  Mr Metcalfe wrote to Mr Wetherall referring to this and saying:

> "For the record my Compliance people have asked for confirmation that the proposed payment to Saad Hospitals is made pursuant to an appropriate corporate obligation of Singularis Holdings Ltd.  Could you please provide me with this confirmation"

88.     Mr Metcalfe could not recall anything independently of the email about who he spoke to in Compliance or what they discussed. He said in his witness statement that he must have spoken to Mr Massey in Legal because the phrase "appropriate corporate obligation" was not a phrase he would have used. In his oral evidence he was less sure about this – he may have picked up that phrase if someone from Compliance had used it.  Mr Wright and Mr Hudson do not recall any discussions with Mr Metcalfe about the payment at this point. Mr Metcalfe appreciated that Singularis was separate from SSHC and from Mr Al Sanea but he denied that he thought at the time that Mr Al Sanea might want to move money to his other companies given that his own accounts had been frozen.  Although Mr Metcalfe accepted that he knew from the previous September that Lehman Brothers might well still have unsecured debt from Singularis, this was not in his mind at the time he authorised the payments.

89.     In the mid afternoon of 17 June 2009 Mr Wetherall wrote back to Mr Roberts and Mr Metcalfe in response to the request for confirmation of the corporate obligation. He sent a single line email asking if the attached letter would satisfy Daiwa's compliance people.  There were in fact two documents attached to that email.  The first was dated 17 June 2009 and appeared to be a debit note on headed paper of Saad Trading addressed to Singularis in the Cayman Islands saying that "We have charged your account with US\$322,067,386 towards the sale of securities to Singularis Holdings as per details below" and then set out various amounts of stock in HSBC, BNP and JP Morgan as having been sold in January or March 2009.  The debit note purported to be signed by the Chief Accountant.  What the debit note appeared to record was that Saad Trading had, in January and March 2009, sold very large volumes of stock to Singularis and that Singularis owed many millions of dollars to Saad Trading to pay for this stock.  The amounts involved were \$132 million of HSBC stock, \$129 million of BNP stock and about \$60.6 million in J P Morgan stock.  This therefore appeared to record that Singularis owed Saad Trading over \$322 million for the purchase of this stock.

90.     The second document attached to Mr Wetherall's email was a payment request from Saad Trading to Singularis also dated 17 June 2009 asking them to pay \$180 million to SSHC in part settlement of the debit note dated 17 June 2009.

91.     When he was questioned about this at the trial, Mr Metcalfe said that he did not notice that the date on both documents actually post-dated the request he had made to Mr Wetherall for the justification for the payment.  Mr Metcalfe accepted that he probably had not read this as carefully as he should have done even though it was his responsibility to take reasonable care to make sure that the payment was a proper one. He agreed that he had never been told in early 2009 that Singularis had been making these major share purchases.  He was also not aware that the purchases purporting to be evidenced by the debit note were directly contrary to what Daiwa had been told

previously. What Daiwa knew was that Singularis had been selling, not buying, very large quantities of HSBC and JP Morgan shares in January 2009. At the 19 March Meeting SFS had told Daiwa that they had reduced their holding in BNP and had been actively selling off their JP Morgan shares. No one at the 19 March Meeting had mentioned that by that time Singularis owed $322 million to Saad Trading, even though the purpose of that meeting had been to explore the financial position of Singularis. Mr Wetherall had also said at the 19 March Meeting that neither Singularis nor SFS had made any major share investments in 2009, a very odd statement if in fact it had bought $322 million of stock a few days earlier on 6 and 9 March 2009.

92.   When he received the documents from Mr Wetherall, Mr Metcalfe went to see Mr Massey and showed him the two documents that Mr Wetherall had sent through. Together they drafted a reply to Mr Wetherall thanking him for the documents but saying that it remained unclear what corporate benefit Saad Trading had in redirecting a debt owed to it by Singularis for the benefit of the hospital. The email added "It would be far easier for us if these funds could be paid to [a Singularis] account. Please advise if this is possible". Mr Metcalfe could not remember whether he did press Mr Wetherall when they next spoke as to why the money could not be paid back to Singularis as the simplest thing. He cannot remember whether he asked or if he did, what reason he was given by Mr Wetherall why this was not possible.

93.   Mr Wetherall then sent Mr Metcalfe three further documents which he said he trusted would assist Daiwa's compliance process. Those were three bills of sale which purported to show that historically there had been a trust arrangement under which Singularis was holding shares on trust for Saad Trading and that Saad Trading had then sold the shares in three transactions to Singularis in January and March 2009. Mr Metcalfe did not know whether he showed the bills of sale to Mr Massey.

94.   Unlike the earlier payments of $10 million and $3 million, there was some senior management involvement on the question whether the $180 million should be paid. Mr Sakashita wrote on 17 June 2009 to Daiwa Tokyo telling them about the instruction to move the money to the hospital company, SSHC. He said that Daiwa was contractually obliged to comply with the instruction "unless there is a strong suspicion that the money transfer is clearly associated with a criminal act". He referred to their in-house lawyer's advice being 'to confirm the purpose of the fund transfer as a precautionary measure' and said that an arrangement would be made.

95.   Mr Kosuge was one of the recipients of that email. Ten minutes later he wrote back to Mr Sakashita saying words to the effect:

> "It is problematic when they use a hospital as a *front/cover*. Practically speaking, since we will be making a transfer to a recipient other than Singularis, please handle this matter extremely carefully by discussing it well with the Compliance and Legal teams."

96.   The words I have italicised there were the subject of much debate during the hearing with the Japanese interpreter who was translating for some of the witnesses. The word signified by the Japanese symbol used by Mr Kosuge has no direct English equivalent. Different translations of the email used the word 'cloak' or 'shell', the

sense being of an outer cover into which something is put to hide or protect it. In cross-examination Mr Kosuge said that his concern was that it would be embarrassing for Daiwa if the money was being sent to somewhere where it should not be sent. He thought that it was Mr Sakashita's responsibility to check that this was done properly and that all the necessary people who needed to be told and approved did so.

97.     Mr Sakashita accepted when questioned about this that Mr Kosuge's concern was that the money was being channelled elsewhere. He accepted also that the reason for this concern was that payment should only be made to a genuine creditor of Singularis. He accepted that it was important that the Compliance and Legal teams checked the appropriateness of the information provided to support the payment to see whether it was viable information or not. But Mr Sakashita does not remember whether he talked to anyone in the Legal department or to Mr Roberts about the transfer of the $180 million. Mr Metcalfe's evidence was that no one told him of any concern that SSHC might be a front or cover or that it might be being used to channel monies to other companies in the Saad Group.

98.     On the morning of 18 June 2009, Mr Metcalfe had a phone call with SFS in Geneva regarding the proposed payment of $180 million. Mr Metcalfe then emailed Mr Massey to say that he would like to get Mr Massey's view on the 'structure' that SFS had proposed. The 'structure' is apparent from the email that Mr Wetherall sent to Mr Metcalfe at about midday on 18 June. The email said:

> "Jonathan,
>
> As per our discussion, please find the attached Agreement between [Singularis and SSHC] and [SSHC] Invoice.
>
> I trust that they correctly reflect the appropriate corporate obligation between the two parties and will satisfy the requirements of your compliance team.
>
> Please call me if you have further questions.
>
> Thanks once again for bearing with us on this matter.
>
> Kind regards
>
> Mike"

99.     The agreement attached to that email of 18 June 2009 gave a completely different explanation for the proposed payment of $180 million from the explanation arising from the supposed purchases of large volumes of shares by Singularis from Saad Trading discussed the previous day. It was a two-page document dated 2 January 2009 and signed by Mr Al Sanea on behalf of Singularis and also by Mr Al Sanea on behalf of SSHC. It purported to record an agreement whereby Singularis undertook to pay on written demand all running and administrative costs for the hospital in Saudi Arabia for the year of 2009 ('the Hospital Expenses Agreement'). In addition, Mr Wetherall sent through an invoice dated 18 June 2009 from SSHC to Singularis purporting to be an invoice for administrative and running expenses for the year 2009 in the sum of $180 million. Less than half an hour later Mr Metcalfe emailed back to

Mr Wetherall saying that "the documents are acceptable and fully satisfy our compliance team". He asked Mr Wetherall to send him the SWIFT instruction to trigger the payment.

100. There was some uncertainty about whether Mr Metcalfe spoke to anyone in either Legal or Compliance about the new documents in that half hour period between his receiving them and giving approval. He recalled having some discussion with someone about these documents but was not able to say whether it was with someone from Compliance or Legal. Mr Wright's evidence was clear that before preparing for the trial he had not seen the two conflicting sets of documents sent through by Mr Wetherall. In any event it seems clear that there cannot have been any significant consideration of the background facts and there is no written record of any discussion. Mr Metcalfe then emailed Mr Roberts to say that Mr Wetherall had provided him 'with necessary documentation that ticked all compliance/legal boxes' and that the payment would be made that day, as it duly was.

*(iii) Payments of $1,090,000 and $2,935,000 to Saad Air on 1 July 2009*

101. In early July there were further requests for payments from the Singularis account, this time to be directed to HSH Nordbank for the benefit of Saad Air. The payments were of $1,090,000 and $2,935,000. Mr Hudson authorised these payments. He says that these payments were referred to him most likely by someone in the Settlements Department but was not able to remember anything further as to how they came to him. He had no information about what Saad Air was or about the purpose of the payments and he made no effort to find out any information about, for example, how it was related to Singularis. He thought his only job was to check whether the recipient was covered by a sanctions regime or was precluded as a terrorist organisation. On cross-examination he explained what had happened:

> "Q. We've seen that you didn't ask any questions at all about any of these payments. The only thing you did was do your check on the computer; isn't that right?"
>
> A. Yes, that's right.
>
> Q. You didn't check whether senior management were aware of them.
>
> A. No, I assumed they were but I didn't check.
>
> Q. You didn't seek to find out the purposes of the payments on any of these cases?
>
> A. No.
>
> Q. You made an assumption that the payee was something to do with Mr Al Sanea but you had no other information about the payees.
>
> A. That's right.

Q. And you didn't make any enquiries to ensure that these payments were in respect of obligations to the payees, did you?

A. No, I didn't."

*(iv) Payment of $5.2 million to SSHC on 8 July 2009*

102. On 8 July 2009 Mr Roberts wrote to SFS, including Mr Wetherall, telling them Singularis had about $5.3 million left in its account which Daiwa was happy for them to withdraw. SFS promptly sent Mr Roberts an invoice which Mr Roberts forwarded to Mr Metcalfe. The invoice purported to be another invoice from SSHC to Singularis, pursuant to the Hospital Expenses Agreement demanding payment for administrative and running expenses in the sum of $5.2 million. Mr Metcalfe authorised the payment without any further queries and, it appears, without notifying anyone in senior management.

*(v) Payment of $1,093,000 to Saad Air on 20 July 2009*

103. A SWIFT instruction was received from SFS asking for $1,093,000 to be paid to Saad Air from Singularis' account. This was approved by Mr Hudson after checking that the recipient was not on the sanctions list including whether it was a terrorist organisation. When the computer indicated that Saad Air was not on the warned list, Mr Hudson approved the payment. He assumed that the recipient was connected in some way with Mr Al Sanea but made no inquiries as to whether Singularis owed any obligation to Saad Air which might explain the payment.

*(vi) Payment of $1,174,900 to SSHC on 27 July 2009*

104. The final payment made by Daiwa was on 27 July 2009 when it transferred $1,174,900 from Singularis' account to SSHC. The payment was approved by Mr Hudson following the same minimal checks as in relation to the Saad Air payments.

**(g) Events after the making of the challenged payments**

105. On 24 July 2009 a worldwide freezing order was made by the Grand Court in the Cayman Islands against the assets of the Saad Group. On 20 August 2009, Mr Al Sanea, in his capacity as the sole shareholder of Singularis, resolved to place Singularis into voluntary liquidation. Two Cayman Island joint voluntary liquidators were appointed on 24 August 2009.

106. On 1 September 2009, the administrators of Lehman Brothers International (Europe) ('LBIE') issued a default and termination notice in respect of the brokerage agreement between LBIE and Singularis. LBIE is an unlimited company which was the main European trading company of the Lehman group. They cited Singularis' failure to repay the amount of $1.6 billion (excluding accrued fees and interest) required by a demand letter they had sent to Singularis on 21 July 2009. Although LBIE held shares owned by Singularis as security, as at 1 September 2009 the value of this security was around $1.3 billion and so the loans were under-secured.

107. A proportion of Singularis' liabilities to LBIE were subsequently discharged following the sale of the remaining shares held by LBIE as collateral under its

financing arrangements with Singularis. LBIE has asserted a claim in the liquidation of Singularis in the sum of US$143,785,190.

108.    On 14 September 2009, SICL, in its capacity as a creditor of Singularis, presented a petition seeking an order that the voluntary winding up of Singularis continue under the supervision of the Grand Court of the Cayman Islands. The grounds for SICL's petition were, amongst other things, that Singularis was, or was likely to become, insolvent (based upon an unpaid debt in the sum of $171,246,254.17 owed by Singularis to SICL). On 18 September 2009, the Grand Court of the Cayman Islands made an order that the winding up of Singularis continue under the supervision of the Grand Court and appointed three partners of Grant Thornton as Joint Official Liquidators.

109.    Mr Akers' evidence is that there remain substantial creditors' claims, running into hundreds of millions of US dollars, in the winding up of Singularis. By way of overview, the following amounts are currently claimed in the liquidation:

    a)      $171 million remains due to SICL as part of the $192 million of funds provided to Singularis in January 2009;

    b)      $143,785,190 is claimed by LBIE;

    c)      $2.8 million is claimed by Daiwa in relation to fees and rebates arising from the sale by Singularis of the HSBC, BNP and JP Morgan shares in June 2009; and

    d)      $450 million is claimed by Awal Bank, a Bahraini bank which formed part of the Saad Group of companies, relating to equities formerly held by Singularis, which Awal Bank asserts were sold to Awal Bank but retained on trust by Singularis.

110.    One of the issues arising in the liquidation is the authenticity of a promissory note issued by the Ahmad Hamad Al Gosaibi & Brothers Company ('AHAB') to Singularis. There are proceedings brought in the Grand Court of the Cayman Islands against Mr Al Sanea by AHAB and others (the 'AHAB Proceedings'). In those proceedings, AHAB claim against Mr Al Sanea for alleged breaches of fiduciary duty that they say Mr Al Sanea owed to AHAB. It is alleged that Singularis assisted with that breach. Singularis disputes the claim made against it by AHAB and also brings a counterclaim relying on a promissory note dated 28 January 2009, by which AHAB unconditionally promised to pay to the order of Singularis the sum of $4.5 billion on demand (the "Promissory Note"). The counterclaim advanced by Singularis in the AHAB Proceedings is disputed by AHAB and AHAB disputes the authenticity of the Promissory Note.

111.    According to Mr Akers, the liquidators' work has been hampered by a lack of cooperation on the part of Mr Al Sanea in particular as regards obtaining documents. Mr Al Sanea is in breach of various court orders granted to the liquidators against him in the Grand Court requiring him to submit information, deliver up property and attend for oral examination. Mr Akers also says that Mr Al Sanea caused a large amount of documentation to be removed from the offices of SFS in Geneva shortly

before he put Singularis into liquidation. That evidence was not challenged by Daiwa.

112. In addition to bringing this claim against Daiwa in London, the liquidators of Singularis have pursued other claims on behalf of Singularis in respect of some or all of these payments in the Grand Court, in Saudi Arabia and in other proceedings in London. The liquidators will give credit for any monies they recover in those proceedings.

## V. THE ISSUES BETWEEN THE PARTIES IN SUMMARY

113. The first step for Singularis to take to make good their claim to recover the money paid away by Daiwa is to establish that Mr Al Sanea acted in breach of his fiduciary duty to Singularis by instructing Daiwa to make the payments to third parties. Given that Mr Al Sanea was the sole shareholder of Singularis as well as a director, Singularis must show that the company was insolvent or in a state of doubtful solvency such that the directors were bound to take into account the interests of creditors of Singularis as well as the interests of the shareholder.

114. Daiwa also contend that the payments were not a breach of duty by Mr Al Sanea because Singularis' accounts show that the company owed a substantial amount of money to Mr Al Sanea. They say that Mr Al Sanea was entitled to be repaid this money that he had loaned to the company and that the repayment does not constitute an unlawful preference according to the insolvency law in force in the Cayman Islands.

115. If Mr Al Sanea was in breach of his fiduciary duty and was not entitled to repay himself from the funds, the next issue is whether the personnel in Daiwa dishonestly assisted Mr Al Sanea to defraud Singularis of the money. There is no doubt that they did assist him by making the payments. The issue here is whether they did so dishonestly, applying the test for dishonesty expounded in the case law. If Singularis can make good their claim based on dishonest assistance then that is enough to entitle Singularis to the relief that it seeks. None of the defences raised by Daiwa to the negligence claim applies to the dishonest assistance claim.

116. If the dishonest assistance claim fails, Singularis fall back on their claim in negligence and breach of contract relying on the duty owed by a bank to its customers expounded in *Barclays Bank plc v Quincecare Ltd and another* [1992] 4 All ER 363 ('*Quincecare*'). It is clear on the authorities that these two duties are co-extensive when the contract does not provide an alternative basis. There are various issues as to whether the *Quincecare* duty applies in the circumstances of this case, particularly if Singularis was a one-man company so that Mr Al Sanea's knowledge and conduct should be attributed to Singularis.

117. If the *Quincecare* duty does apply here, the next question is whether Daiwa was in breach of that duty. This depends on an analysis of the facts. If there was a breach of duty, there are a number of legal defences on which Daiwa seeks to rely:

   a) Daiwa argue that the claim is barred by illegality, as that defence has recently been explained by the Supreme Court in *Patel v Mirza* [2016] UKSC 42.

b) Daiwa also argue that they can defeat Singularis' claim because Daiwa has an equal and opposite claim in deceit against Singularis. This depends on whether the fraudulent conduct of Mr Al Sanea is to be attributed to Singularis or whether Singularis is vicariously liable for Mr Al Sanea's misconduct. This involves considering the decisions of Evans-Lombe J in *Barings plc (in liquidation) and another v Coopers & Lybrand (a firm) and ors* [2002] EWHC 461 (Ch) and [2003] EWHC 1319 (Ch).

c) Daiwa rely on their General Terms of Business which exclude liability for negligence except for gross negligence, wilful default or fraud.

118. If none of the legal defences avails Daiwa and they are liable to repay the money to Singularis, there is finally the issue of whether a deduction should be made on account of Singularis' contributory negligence.

## VI. MR AL SANEA'S ALLEGED BREACH OF FIDUCIARY DUTY

### (a) Was there a prima facie breach of fiduciary duty by Mr Al Sanea?

119. There is no question here but that Mr Al Sanea had a mandate to give instructions to Singularis about what should happen to the monies in the client account. The allegation made by Singularis which is common to both the dishonest assistance claim and the negligence claim is Singularis' allegation that Mr Al Sanea acted in breach of his fiduciary duty to Singularis when giving the instructions to pay the money to SSHC and Saad Air. The first issue is therefore whether Mr Al Sanea was in breach of his duties to Singularis in giving instructions for the payments to be made. This point is not dependent on the question of what Daiwa knew or ought to have suspected about the payments but is the more straightforward question of whether these payments were a misappropriation of the money by Mr Al Sanea for the benefit of the other companies, SSHC and Saad Air.

120. About $5.1 million was paid by Singularis to Saad Air. There is no explanation as to why Singularis was paying these amounts. The nature of Singularis' business does not indicate that there would be any reason for the officers of the company to need to travel on legitimate company business to the extent of incurring expenses of $5 million. There were no payments out to Saad Air over the years when Singularis held the account with Daiwa and I can think of no reason why there should suddenly be $5 million of travel costs incurred within a period of less than a month. I find that these were not legitimate expenses properly incurred on behalf of Singularis and that it was a breach of fiduciary duty for Mr Al Sanea to direct that Singularis pay these monies to Saad Air.

121. About $199,400,000 was paid by Singularis to SSHC. Whether or not this was a legitimate payment depends on whether I am satisfied that the Hospital Expenses Agreement was genuine so that Singularis had really undertaken on 2 January 2009 to pay for the administrative and running costs of the SSHC hospital. On the evidence before me I am fully satisfied that the Hospital Expenses Agreement is a fraudulent document, fabricated by Mr Al Sanea or at least with his knowledge and approval for the sake of satisfying Daiwa's compliance department and extracting the money from the Singularis account. My reasons for coming to that conclusion are as follows.

122.    First, the Hospital Expenses Agreement was the second explanation produced within two days by SFS in Geneva in response to Mr Metcalfe's request for evidence supporting a genuine obligation from Singularis to SSHC.  It was sent after the first explanation (the supposed payments due from Singularis to Saad Trading for the purchase of large shareholdings in January and March 2009) did not do the trick.  If this obligation had existed, there is no reason why Mr Wetherall would not have immediately provided it when asked by Mr Metcalfe to explain why Singularis should be paying $180 million to SSHC.

123.    Secondly, there is no possible reason why an investment company like Singularis should agree to pay the administrative and running expenses of a large hospital in Saudi Arabia for the year 2009.  There is plenty of evidence to show that SSHC was a highly profitable business earning substantial revenues.  The Saad Group annual report for 2006 (provided to Daiwa in May 2007) showed that SSHC operated a modern private hospital business in Saudi Arabia and that the hospital has 600 beds.  It operated as an independent profit centre for the Saad Group and had made profits of $19 million on revenues of $157 million (after taking into account interest and depreciation).  It had net assets of about $470 million.  Mr Kosuge, who visited the hospital in January 2009, recalled that it was a large hospital with facilities including rooms for special patients, such as members of the Saudi royal family.  He recalled that the hospital was a luxurious building with six or seven floors and a large entrance with a long reception desk and reception area.  On their visit, the Daiwa personnel were shown the suites in the hospital that were designed for wealthy patients with large bedrooms, dining rooms and large reception rooms in which a lot of people could gather.  An interim report of the Saad Group for the half year to 30 June 2008 showed that SSHC had a net income for the six month period of just under SAR94 million (about $25 million).    Expenses (other than non-cash items such as depreciation) were some SAR293 million (about $78 million) while cash and cash equivalents increased by nearly SAR37 million to just over SAR 364 million (about $100 million).  This was clearly not a charitable institution needing support from other companies inside or outside the Saad Group.

124.    Thirdly, if this was a genuine obligation on the part of Singularis it is surprising that nothing had been said about the existence of the agreement before 18 June 2009.  If, a few weeks before the Daiwa senior executives visited Saudi on 24/25 January 2009, Singularis had agreed to pay the expenses of the hospital that year, one would have expected this to be mentioned in the presentation given to the Daiwa executives when they toured the hospital.  But no one from Daiwa knew about this.  Further at the 19 March Meeting nothing was said about Singularis having recently taken on an open ended and potential very substantial liability to pay these expenses during the course of 2009.

125.    Fourthly, it seems particularly improbable that Singularis would have entered into the Hospital Expenses Agreement on 2 January 2009.  It was in early January 2009 that Singularis started selling off its shares in J P Morgan and HSBC. When Mr Roberts sought an explanation for this from SFS because of the disquiet generated in Daiwa about whether this indicated that Singularis was facing liquidity problems, nothing was said about needing to free up cash to meet this new liability.

126.    Fifthly, the unchallenged evidence of Mr Akers is that neither the Hospital Expenses Agreement nor the debit notes are among the documents found at Singularis'

registered office in the Cayman Islands. The law firm at whose offices Singularis is registered have told Mr Akers that they have no record of having received the debit note from SSHC to Singularis on 18 June 2009 and that they are not aware of the Hospital Expenses Agreement. It is true that Mr Al Sanea has caused documents to be removed from some of the group's offices, but there is no reason why he should want to remove that agreement if it really evidences a justification for his instruction that these payments should be made. Further, Mr Akers says that the joint liquidators have written to SSHC requesting information in respect of the payments made and asking for their copy of the agreement. SSHC has not responded to that request. I consider it significant that SSHC has not raised the existence of this agreement in response to a claim from the liquidators to recover the monies from the hospital.

127. I find, therefore, that the Hospital Expenses Agreement is a sham. There was no obligation on the part of Singularis to pay the expenses of the hospital and the agreement was created simply to provide some documentation to persuade Daiwa to make the payment. There was no benefit to Singularis in making the gratuitous payments to the hospital. The five payments made from the Singularis account to SSHC were therefore a misappropriation of Singularis' money by Mr Al Sanea in breach of his fiduciary duty to Singularis.

**(b) Could Mr Al Sanea as sole shareholder of Singularis ratify any misappropriation of Singularis' funds?**

128. If these payments were prima facie a misappropriation of Singularis' assets, could Mr Al Sanea as the sole shareholder have ratified the payments and so prevented them from being a breach of fiduciary duty?

129. Both parties accepted that as a matter of general principle a director of a solvent company, acting with the unanimous approval of the company's shareholders, may, without acting wrongfully, make payments to or for the benefit of a related company. This is so, irrespective of whether the paying company is under any pre-existing obligation to make the payments.

130. The position is different if the paying company is insolvent or of doubtful solvency at the time the payments are made. Although the relevant law governing the operation of Singularis is the law of Grand Cayman, the test to be applied was agreed by the parties to be that discussed in the well-known English cases such as *West Mercia Safetywear Ltd v Dodd* [1988] BCLC 250 and Australian authorities such as *Nicholson v Permakraft* (NZ) Ltd [1985] 1 NZ LR 242. I reviewed those cases in my recent judgment in *BTI 2014 LLC v Sequana SA* [2016] EWHC 1686 (Ch) at paragraphs 464-484. The essence of the test applied in the long line of cases is that the directors ought in their conduct of the company's business to be anticipating the insolvency of the company because the company is in a precarious financial situation or on the brink of insolvency.

131. Daiwa argue that there is nothing in the evidence to suggest that Singularis was in a parlous financial state in June and July 2009 or that its directors ought to have been anticipating the insolvency of the company. They say that the evidence shows that the company could face a cash problem if the market moved against it and if Mr Al Sanea's account freeze were to continue. But, they say, the market did not move against it and such financial difficulties as it did face resulted from the dispute with

AHAB, the Lehman default and SICL calling in its inter-company debt. For these reasons, Daiwa submit, the financial condition of Singularis was not an obstacle to Mr Al Sanea ratifying or authorising the payments.

132.   In my judgment there is overwhelming evidence in this case that Singularis was, at the least, in a highly precarious state and heading towards insolvency at the time Mr Al Sanea instructed the payments to be made.  On this point the question again is not what Daiwa knew about Singularis' position but what Mr Al Sanea must have known about Singularis' financial difficulties and hence whose interests he was bound to take into account when taking decisions about Singularis' affairs.

133.   Singularis became insolvent shortly after the last payment when Mr Al Sanea put the company into voluntary liquidation on 20 August 2009.  In other proceedings arising from this insolvency Mr Al Sanea made an affirmation on 2 December 2009 in which he explained the reason for this.  He said:

> "following consultation with my advisers (and without waiving privilege), I had formed the view that [Singularis'] asset position was considerably weaker than it formerly had been; that even if it was not already insolvent, which it might have been, its insolvency was probably inevitable."

134.   By June 2009, Singularis had at least one very substantial external creditor, LBIE, whose liability was ultimately quantified at some $238 million. The only means of paying this liability were either a further injection of funds from Mr Al Sanea himself or any excess funds held by Singularis at other banks.  But Mr Al Sanea's assets had been frozen and funds held at other banks were subject to any rights of set off those banks may have had against those funds.

135.   Singularis had been and was all along dependent for its continued existence on Mr Al Sanea.  Although of course Singularis is a separate legal entity from Mr Al Sanea and from other companies within the Saad Group, Singularis' fortunes were intimately bound up with those of Mr Al Sanea and the Saad Group.  It was apparent that from the end of May onwards that those fortunes had taken a strong downturn and showed no signs of reviving in light of the withdrawal of credit lines from banks to the Saad Group and of the downgrading and then withdrawal of credit ratings for the Saad Group by Moody's and S&P.

136.   Daiwa has suggested that Singularis' position as to the solvency of Singularis is inconsistent with the case the Joint Liquidators have advanced in other proceedings. This is based on the counterclaim made by Singularis in the AHAB Proceedings in which it seeks judgment against AHAB on the Promissory Note for $4.5 billion, or alternatively recovery of various treasury deposits alleged to have been made by Singularis with AHAB in a similar amount. However, Mr Al Sanea must have been aware by June/July 2009 of the serious dispute between the Saad Group and AHAB about their financial relationship.  Mr Al Sanea cannot possibly have thought, given that AHAB had instigated the freezing of his and his family's accounts, that AHAB would hand over $4.5 billion on the strength of the Promissory Note as soon as Singularis asked for the money. In fact, AHAB's liability under the Promissory Note is hotly disputed and that litigation is currently ongoing in the Cayman Islands. AHAB's assets had also been frozen by Saudi regulatory authorities in May 2009 and

the Al Gosaibi family had their own troubles as reported in the financial press. Mr Akers notes in his witness statement that as a consequence of the freeze imposed by the Saudi Arabian regulatory authorities on the assets of AHAB in around May 2009, it would not have been possible for AHAB to make any payment under the Promissory Note at that time (even if AHAB had not contested the authenticity of the Promissory Note at that time). I reject the suggestion that the Promissory Note could have given Mr Al Sanea any comfort at the time of the disputed payments about Singularis' future prospects.

137. In my judgment Mr Al Sanea must have known that Singularis was insolvent or on the verge of insolvency and that it had major creditors other than himself. Therefore, his duty to Singularis as a director was to act in the best interests of the company's creditors. This precluded making gratuitous payments to other companies in the Saad Group to the detriment of the creditors of Singularis.

## (c) Was Mr Al Sanea entitled to make the payments to himself by way of releasing Singularis' debts to him?

138. Daiwa point out that in the April 2008 and October 2008 accounts for Singularis, an amount in excess of $5 billion was recorded as "funds contributed by shareholder". The notes to those accounts explained that these amounts were "non-interest bearing" and that Mr Al Sanea had confirmed his intention to capitalise them in the future. There is no evidence to suggest that he had in fact capitalised these sums prior to the making of the payments. Singularis has asserted in other proceedings that the $5 billion amounted to shareholder loans, such that the sums were owned by Singularis but owed to Mr Al Sanea by way of a debt that was repayable on demand. Mr Al Sanea must have been a substantial creditor at the date of the earlier payments in June 2009. The effect of this evidence was that Mr Al Sanea could call for repayment of those loans, including by directing payments to third party companies like Saad Air, unless they constituted an unlawful preference. Daiwa submit that Mr Al Sanea, in his capacity as a creditor, was in principle entitled to call in those loans at any time, irrespective of whether it would be for the benefit of Singularis.

139. This point has been raised in other proceedings brought by the Joint Liquidators against Saad Air to recover the sums paid by Singularis to Saad Air. Singularis' answer to the point in those proceedings is to rely on the provisions of section 239 of the Insolvency Act 1986 and its equivalent in Cayman Law which provide for the reversal of transactions amounting to an unlawful preference. In short, it was contended that the payments to Saad Air were made with the intention to prefer Mr Al Sanea's position as creditor over those of other creditors at the time. In these proceedings, however, Daiwa complain that Singularis has not included in its pleaded case against Daiwa any allegation to the effect that the disputed payments were an unlawful preference. Moreover, Daiwa argue that section 145(1) of the Cayman Islands Companies Law is applicable here and that it differs from the corresponding provision in sections 239 and 240 of our Insolvency Act 1986 because it only allows the unwinding of payments if Singularis was actually insolvent at the time of the payments or that it so became as a result of them. It is not sufficient under Cayman Islands law to show that Singularis was on the verge of insolvency, which was the focus of Singularis' case at trial.

140. Singularis have a number of answers to this point. First they point out that it was never pleaded in Daiwa's defence that the payments comprised a repayment of loans Mr Al Sanea had made to Singularis. Mr Miles QC appearing for Singularis submits that this is not a simply a technical point. If the point had been pleaded by Daiwa, then Singularis could have pleaded in response that any such repayment of a loan was an unlawful preference. There could then have been a proper examination of the relevant Cayman Island statutory provisions and how they apply. As it is, this point has only emerged at a late stage. It has not been pleaded as a reason for the payments in Daiwa's defence in these proceedings. There was a brief reference to it in Daiwa's written opening though that did not refer to the relevant Cayman Islands law. Singularis has not had an opportunity to prepare and present a proper response on the point.

141. In my judgment it would not be fair to allow Daiwa to rely on provisions of Cayman Islands insolvency law raised for the first time in their closing submissions to argue a point about whether the payments could or could not be an unlawful preference. I cannot simply look at the wording of a single provision taken from the relevant Cayman Islands law and conclude, on the basis of submissions from one party only, that its scope is very different from that of the equivalent English provision. It would be unfair to criticise Singularis for not pleading that the payments were an unlawful preference when they never realised that they had to meet a case that the disputed payments should be regarded as the repayment to Mr Al Sanea of his loans. That was never put forward by Mr Wetherall as a reason for the payments in the email correspondence between him and Mr Metcalfe or Mr Hudson at the time. On the contrary, the two explanations that were put forward for the largest payment of $180 million were inconsistent with such a suggestion since Mr Wetherall went to some pains to put forward two much more complicated justifications for the payments.

142. I therefore decline to consider this point because it was not part of the pleaded case and Singularis have not had an adequate opportunity to deal with it.

## VII. DID DAIWA DISHONESTLY ASSIST MR AL SANEA'S BREACH OF FIDUCIARY DUTY?

143. The test for dishonesty in this context is that set out by the House of Lords in *Twinsectra Ltd v Yardley and others* [2002] UKHL 12. There Lord Hutton, with whom Lord Slynn of Hadley, Lord Steyn and Lord Hoffmann agreed, described the three possible standards which can be applied to determine whether a person has acted dishonestly. There is a purely subjective standard whereby a person is only regarded as dishonest if he transgresses his own standard of honesty even if that standard is contrary to that of reasonable and honest people; there is the purely objective standard whereby a person acts dishonestly if his conduct is dishonest by ordinary standards of reasonable and honest people, even if he does not realise this, and there is a combined standard:

> "… which combines an objective test and a subjective test, and which requires that before there can be a finding of dishonesty it must be established that the defendant's conduct was dishonest by the ordinary standards of reasonable and honest people and that he himself realised that by those standards his conduct was dishonest"

144.    His Lordship, having considered the test that had been applied by Lord Nicholls of Birkenhead in the earlier case of *Royal Brunei Airlines Snd Bhd v Tan* [1995] 2 AC 378 confirmed that dishonesty is a necessary ingredient of accessory liability and that (at paragraph 36):

>   "dishonesty requires knowledge by the defendant that what he was doing would be regarded as dishonest by honest people, although he should not escape a finding of dishonesty because he sets his own standards of honesty and does not regard as dishonest what he knows would offend the normally accepted standards of honest conduct."

145.    In *Barlow Clowes International Ltd v Eurotrust International Ltd* [2005] UKPC 37, Lord Hoffmann considered whether it must be shown that the alleged dishonest assister turned his mind to the ordinary standards of honest behaviour and to whether his conduct fell below those standards.  He held that it was not necessary. It was only necessary to show that the defendant's knowledge of the transaction rendered his participation contrary to normally acceptable standards of honest conduct.  He did not need to be shown to have had reflections about what those normally acceptable standards were.

146.    It is clear that wilful blindness will satisfy the test for dishonesty.  An honest person does not "deliberately close his eyes and ears, or deliberately not ask questions, lest he learn something he would rather not know, and then proceed regardless": *Royal Brunei*, per Lord Nicholls at p. 389F-G.  It is therefore no defence for a defendant to say that he did not realise that he was acting dishonestly: *Starglade Properties Ltd v Nash* [2010] EWCA Civ 1314 at paragraph 32 and my judgment in *Goldtrail Travel Ltd v Aydin & Ors* [2014] EWHC 1587 at paragraphs 143-5.

147.    Mr Miles accepted that Singularis has to show that a particular person within Daiwa was dishonest.  There is an important difference between being incompetent – even grossly incompetent - and being dishonest. The person that Singularis identify as having been dishonest in relation to the payments of $180 million on 18 June 2009 and the payment of $5.2 million on 8 July 2009 is Mr Metcalfe.  As regards all the payments except the $180 million payment on 18 June, Singularis also allege that Mr Hudson was dishonest.

148.    As regards Mr Metcalfe, Singularis submits that his conduct went beyond what an honest person would do in the circumstances.  They say that in relation in particular to the $180 million payment, no honest person in his position, knowing what he did, would have approved the payment without asking further questions. The same is true of the $5.2 million payment.  They say that this is a case where he turned a blind eye. He did not make the enquiries that would be obvious to any honest person because he did not want to know the answer.  They point in particular to what Mr Metcalfe told Mr Roberts in his email of 18 June that Mr Wetherall had provided him 'with necessary documentation that ticked all compliance/legal boxes'.  They submit that that was a dishonest statement because he knew that he had not properly explained the situation to anyone in the Compliance or Legal departments or got any formal approval.

149.     As to Mr Hudson, Singularis says that no honest person would have acted in the way he did, making the payments without asking a single question.

150.     I am satisfied on the evidence in this case that neither Mr Metcalfe nor Mr Hudson behaved dishonestly in approving the payments, even in the sense of turning a blind eye to what I regard as the very obvious shortcomings in the material provided to them.  Rather they did not understand, despite Mr Wright's email of 5 June 2009, what they had to do in order for Daiwa to fulfil its obligations to Singularis.

151.     So far as Mr Hudson is concerned, his evidence in the witness box was patently frank and open.  Although he had seen Mr Wright's email of 5 June, he was never told that something more was expected of him than to carry out the checks that he had always carried out as to whether the recipient was on the list of sanctioned or terrorist organisations.  He could not be expected to know the scope of the legal duties incumbent on Daiwa in handling the money.  Indeed some of the correspondence cascaded down to Mr Hudson was misleading since it suggested that there would only be a problem if there was evidence that the Saad Group's financial problems were 'criminal' rather than 'fiscal' and stating further that there was no evidence as at the date of the email that this was the case.  There was no explanation of where the borderline between 'criminal' and 'fiscal' lay for this purpose and no assistance as to what kinds of circumstances should prompt Mr Hudson to do something more than he was accustomed to doing.

152.     As will become apparent when I consider the issue of Daiwa's negligence, the explanation for Mr Hudson's conduct in approving these payments without asking any questions was not dishonesty on his part but rather a failure on the part of Daiwa's management to explain to him properly what else he ought to have done or to put in place any procedures to ensure that proper action was taken.  There is no basis for finding that he was in any way dishonest in his handling of the approvals and I find that there was no dishonest assistance in relation to the payments which he approved.

153.     The position of Mr Metcalfe is more problematic.  Again, his evidence in the witness box was given with great clarity and openness and he resisted any temptation to embellish his evidence to excuse his own conduct.  He frankly admitted that he should have been more sceptical about the documents Mr Wetherall provided to him to justify the payment of the $180 million.  But when it was put to him that he deliberately refrained from asking questions because he was turning a blind eye to an obvious fraud, he was emphatic that that was not true.

154.     I have already held that the Hospital Expenses Agreement was a sham document. It was probably created and signed by Mr Al Sanea shortly before it was sent to Mr Metcalfe in response to his request for some evidence of a legal obligation supporting the proposed payment of $180 million.  Some of the factors that push me to that conclusion should have been obvious to Mr Metcalfe as well, in particular the fact that this agreement and accompanying invoice was produced like a rabbit from a magician's hat after the first explanation was rejected.  But even on the slightly expanded concept of dishonesty discussed in the authorities, I accept Mr McCaughran QC's submission on behalf of Daiwa that it is not enough to show that looked at objectively the documents provided to justify the payment were clearly bogus,

Singularis have to show that Mr Metcalfe realised that the documents were very odd indeed.

155. I am satisfied that Mr Metcalfe did not question the authenticity of the documents because he also was not properly instructed as to what he needed to do in response to Mr Wright's email. For some reason which no one was able to explain he was put in charge of authorising these payments despite being inexperienced in such matters and despite the fact that important concerns expressed by senior management were not passed on to him.

156. Some of the factors that point clearly to the falsity of the documents were not in the forefront of Mr Metcalfe's mind by June 2009 although he accepted that he had been told about them earlier. For example, although Mr Metcalfe attended the 19 March Meeting and was aware at that point that Daiwa was looking for information about the financial state of Singularis, it is not altogether surprising that he did not ask himself in June why the existence of the Hospital Expenses Agreement had not been mentioned at that meeting.

157. I also take into account three other factors. First, Mr Metcalfe had worked with Mr Wetherall and other people at SFS over a number of years and had formed the view that they were honest and reputable people. He was slow to form suspicions that they would have a hand in a fraud of this kind. I consider he was rather naïve not to recognise that people who are entirely honest when financial matters are going well can give in to the temptation to act dishonestly when they are facing a slide into financial ruin. He also failed to realise that Daiwa should have been concerned not only with Mr Wetherall's honesty but with that of Mr Al Sanea. Mr Wetherall may well have come under pressure to engage in conduct which he would not have agreed to in other circumstances. But to be naïve is not the same as to be dishonest.

158. Secondly I accept the point that Daiwa make which is that Mr Metcalfe had no possible motive for acting dishonestly in this situation. As Mann J put it in *Mortgage Agency Services Number One Limited v Cripps Harries LLP* [2016] EWHC 2483 (Ch) at paragraph 88 (rejecting a claim in deceit against a solicitor):

> "By and large dishonest people are dishonest for a reason. They tend not to be dishonest wilfully or just for fun. Establishing a motive for deceit, or conspiracy, is not a legal requirement, but if a motive cannot be detected or plausibly suggested then wrongful intention (to tell a deliberate lie in order to deceive) is less likely. The less likely the motive, the less likely the intention to deceive, or to conspire unlawfully. In many, if not most, fraud cases this would not be a particularly live point. The defendant is often a person who would be a direct beneficiary of the fraud, and a plausible motive is, to that extent, relatively easily propounded. The present case is, however, different."

159. The two motives suggested by Singularis seem to me implausible. The first was that Mr Metcalfe knew that Daiwa was very concerned to be rid of the money in the Singularis account because of its concern that it might be regarded as temporarily operating a bank account when it was not licensed to do so. I do not believe that this

thought was in Mr Metcalfe's mind when he approved the payments, even if he was aware that there was this problem in holding onto the cash. It would be very odd to decide to conspire in a substantial fraudulent transaction as a way of avoiding a much less serious regulatory transgression.

160.	The alternative proposed motive was that Mr Metcalfe wanted to help Mr Wetherall whom he trusted and therefore closed his eyes to the impropriety of what was being done. Again, that strikes me as a very unlikely motive for someone to authorise a payment of such a substantial amount of money. The absence of any plausible motive for Mr Metcalfe having acted dishonestly is a material factor against any such finding.

161.	The third factor is that there was at least some attempt by Mr Metcalfe to involve other people in the decision whether to approve the payment or not. Although it appears that Mr Metcalfe did not speak to Mr Massey or Mr Wright, at least at any length, between the time he received the Hospital Expenses Agreement and the time he told Mr Wetherall that the payment would be approved, he had discussed the first explanation given with Mr Massey. It is inconsistent with a dishonest intention for Mr Metcalfe to involve others in the approval of the payment.

162.	I therefore find that the claim based on dishonest assistance of breach of fiduciary duty fails because Mr Hudson and Mr Metcalfe did not act dishonestly when approving the making of the payments.

## VIII THE CLAIM IN NEGLIGENCE

### (a) The scope of the bank's duty under *Lipkin Gorman* and *Quincecare*

163.	The scope of the duty owed by a bank to its customer to refuse to implement a valid instruction to pay money out of the customer's account was considered in *Lipkin Gorman (a firm) v Karpnale Limited* [1989] 1 WLR 1340 ('*Lipkin*'). In that case Mr Cass, a partner in the appellant firm of solicitors withdrew a large amount of money from the solicitors' bank account for which he was a signatory and lost it gambling at a casino. Mr Cass had a personal account with the bank which had also been used to cover gambling expenses. The solicitors brought a claim against the club and the bank. The trial judge found that the bank's manager Mr Fox knew that Mr Cass had been gambling because of his withdrawals of funds from his personal account and that the manager did not believe Mr Cass' assurance that his addiction was under control. Mr Fox did not inform the solicitors that Mr Cass was gambling or that large amounts of money were being withdrawn from the client account under Mr Cass' authority and he made no inquiry as to the propriety of those withdrawals. The trial judge held that the bank's manager had either shut his eyes to the obvious or had wilfully or recklessly failed to make the proper inquiries as to the source of the funds. He held that the bank had been in breach of its duty to the solicitors and was liable as a constructive trustee of the money.

164.	The Court of Appeal allowed the bank's appeal. May LJ dealt first with a point on the scope of the pleaded case against the bank and held that the pleaded case was inadequate to base a finding of fraud or dishonesty on Mr Fox's part. He then turned to the claim against the bank based on contract and negligence. May LJ stressed that the circumstances in which a bank could be held to be under a duty to exercise any degree of care in deciding whether to honour a client's cheque which he has been

instructed to pay would be exceptional. The bank's obligation to honour cheques is largely automatic and mechanical. However, counsel for the bank accepted that if a bank knows of facts which a reasonable bank manager would think are probably dishonest then inquiry would be appropriate. May LJ said:

> "For my part I would hesitate to try to lay down any detailed rules in this context. In the simple case of a current account in credit the basic obligation on the banker is to pay his customer's cheques in accordance with his mandate. Having in mind the vast numbers of cheques which are presented for payment every day in this country, whether over a bank counter or through the clearing bank, it is, in my opinion, only when the circumstances are such that any reasonable cashier would hesitate to pay a cheque at once and refer it to his or her superior, and when any reasonable superior would hesitate to authorise payment without inquiry, that a cheque should not be paid immediately on presentation and such inquiry made. Further, it would, I think, be only in rare circumstances, and only when any reasonable bank manager would do the same, that a manager should instruct his staff to refer all or some of his customer's cheques to him before they are paid."

165.   May LJ considered the facts and accepted that a single phone call from the bank to one of the partners in the solicitors' firm would have brought the enterprise to a close. Was there any duty on the bank to make such a call?  He held that there was not because it would have been a breach of the bank's duty to Mr Cass as its customer to disclose to the solicitors the knowledge that Mr Cass was a compulsive gambler.

166.   Parker LJ held that it was not necessary for the customer to show a want of probity on the part of the bank in order to establish a breach of the bank's duty of care.

> "If a reasonable banker would have had reasonable ground for believing that Cass was operating the client account in fraud, then, in continuing to pay the case cheques without inquiry the bank would, in my view, be negligent and thus liable for breach of contract, albeit neither Mr. Fox nor anyone else appreciated that the acts did afford reasonable grounds and was thus innocent of any sort of dishonesty."

167.   Parker LJ went on:

> "I would not, however, accept that a bank could always properly pay if it had reasonable grounds for a belief falling short of probability. The question must be whether, if a reasonable and honest banker knew of the relevant facts, he would have considered that there was a serious or real possibility, albeit not amounting to a probability, that its customer might be being defrauded, or, in this case, that there was a serious or real possibility that Cass was drawing on the client account and using the funds so obtained for his own and not the solicitors' or beneficiaries' purposes. That, at least, the

customer must establish. If it is established, then in my view a reasonable banker would be in breach of duty if he continued to pay cheques without inquiry. He could not simply sit back and ignore the situation. In order so to establish the customer cannot, of course, rely on matters which a meticulous ex post facto examination would have brought to light. Such an examination may well show that it was indeed obvious what Cass was doing, but in the present case the inquiry is simply whether Mr. Fox, and therefore the bank, had, on the basis of the facts and banking practices established at the time, reason to believe that there was a serious possibility that Cass was misusing his authority to sign under the mandate in order to obtain and misapply the case handed to Chapman in fraud of the solicitors."

168. May LJ in *Lipkin* cited with approval the judgment of Steyn J in *Quincecare* which had been decided between the first instance and Court of Appeal decisions in *Lipkin*. In *Quincecare* Barclays Bank had loaned £400,000 to a company, Quincecare, formed to purchase four chemist shops. The chairman of the company caused about £340,000 to be drawn down and misapplied the money for his dishonest purposes. The bank sued Quincecare and the guarantor of the debt. Steyn J handed down judgment between the date of the first instance decision in *Lipkin* and the date of the Court of Appeal decision. The central issue in the case related to the question whether the bank had acted in breach of duty towards Quincecare. Steyn J said that the most substantial issue in the case was whether the bank, in executing the order to transfer the money was put on notice that the chairman was acting for his own benefit or for an unauthorised purpose. Steyn J examined the nature of the relationship between a bank and its customer in the context of a bank transferring money from a current account on the customer's instructions (though he said that he could not overlook the fact that the chairman could have achieved his dishonest purpose by writing a cheque on the account instead). He held first that it is an implied term of the contract between the bank and the customer that the bank will observe reasonable skill and care in and about executing the customer's orders. He went on to hold that a banker may in such cases be sued in tort as well as in contract, but that the duties in contract and tort are coextensive.

169. Steyn J went on to say that in approaching the problem, everything will depend on the facts of the particular case. Relevant factors may be the standing of the corporate customer, the bank's knowledge of the signatory, the amount involved, the need for a prompt transfer, the presence of unusual features and the scope and means for making reasonable inquiries. But he referred to one particular feature as often being decisive, namely that a bank does not conduct its business on the basis that its customers may be fraudulent: "it is right to say that trust, not distrust, is also the basis of a bank's dealing with its customers". Full weight must, he said, be given to this consideration before one is entitled in a given case to conclude that the banker had reasonable grounds for thinking that the order was part of a fraudulent scheme to defraud the company. Steyn J also warned against the dangers of hindsight when combing through documents in the bank's possession for indications that the chairman was an untrustworthy person. One must make allowance for the fact that in human affairs judgments of character and integrity are notoriously subjective and variable, and

banking officials suffer from the same handicap. He expressed the test to be applied in the following terms:

> "In my judgment the sensible compromise, which strikes a fair balance between competing considerations, is simply to say that a banker must refrain from executing an order if and for as long as the bank is 'put on inquiry' in the sense that he has reasonable grounds (although not necessarily proof) for believing that the order is an attempt to misappropriate the funds of the company. … And, the external standard of the likely perception of an ordinary prudent banker is the governing one. That in my judgment is not too high a standard."

170. The judge then examined whether anything occurred which would have given the bank's personnel reasonable grounds to believe that the chairman was about to commit a major fraud. He emphasised the kinds of factors that are not relevant in the instant case, such as the multiplicity of transactions that the bank is dealing with on behalf of its customers and the limited time available – a matter of minutes – in which bank personnel had to consider and take decisions on any one transaction. He noted that there 'was nothing odd' in the way the instruction had been given. Overall he concluded that the bank had no reason to suspect that the chairman was about to embark on an audacious fraud.

**(b) Was Daiwa subject to a _Quincecare_ duty in respect of the money in the Singularis account?**

171. Daiwa raise a number of threshold points which they submit prevent Singularis from being able to rely on the _Quincecare_ duty in this case.

*(i) Is the claim precluded by the fact that the claim is being brought on behalf of the creditors?*

172. Mr McCaughran argued that it is important to consider whether the claim that is being brought falls within the scope of the duty owed by Daiwa. In the present case he relied on certain passages in _Stone & Rolls Ltd (in liquidation) v Moore Stephens (a firm)_ [2009] UKHL 39 ('_Stone & Rolls_') as emphasising that a duty that is owed to the company is not owed to the creditors of the company. In the present case, given that Singularis contend that it was of doubtful solvency at the time the payments were made, no cause of action can have arisen because at that point the interests of the creditors had intruded. The only people likely to benefit from any damages recovered from Daiwa as a result of these proceedings are the creditors of Singularis. He recognises that so far as directors of a company are concerned, once the company is insolvent or of doubtful solvency the creditors' interests intrude and they come within the scope of the directors' fiduciary duty. The issue here, Mr McCaughran submitted, is whether the _Quincecare_ duty owed by Daiwa has the same elasticity as the directors' fiduciary duty. He submitted that it does not; the creditors of Singularis are the only people who suffer a loss and since creditors are not within the scope of the _Quincecare_ duty, the claim fails for that reason.

173. I reject this argument. It is accepted by Singularis that the *Quincecare* duty is not owed directly to creditors. It is owed to the company and it is the company that is bringing this claim against Daiwa. The fact that the ultimate recipients of any damages awarded will include Singularis' creditors does not preclude the company from pursuing this action. There is no principle of law which requires or entitles the court to consider what a party who has a valid cause of action for a loss intends to do with the money he or she recovers if successful in proceedings based on that cause of action. The solvency or insolvency of Singularis makes no difference to this aspect of the case.

*(ii) Is Singularis precluded from bringing the claim because it was a one-man company?*

174. Many of the points raised by Daiwa in defending the negligence claim depend on an assertion that Mr Al Sanea was in control of the company at the material time. There was some lack of clarity about what was meant by a company being a 'one-man company' in the various contexts in which the point was raised. The phrase is usually used to refer to a company where the sole shareholder is also the sole director - or at least the sole active shareholder and director of the company - so that all decisions made about the company's affairs are in effect his decision. For that purpose, if there are other shareholders and directors, it may be necessary to inquire whether they exercised any independent influence on decisions about what the company would do. In other contexts, however, the existence of other shareholders or directors may be relevant not because they are active or inactive but because they may be innocent of any involvement in the fraud that the controller has perpetrated against the company.

175. It was not clear to me whether Daiwa was asserting that Singularis was a one- man company in both those senses. Certainly, Mr McCaughran submitted, it was a one-man company in the sense that Mr Al Sanea controlled everything Singularis did. There is no evidence to suggest that any of the other directors of Singularis exerted any influence over what happened even in respect of decisions taken to close out the relationship with Daiwa or to put the company into voluntary liquidation in August 2009. However, I did not understand Daiwa to assert positively that the other directors of Singularis knew what Mr Al Sanea was instructing Daiwa to do with the money held in the Singularis account. Daiwa argue that this does not matter because the reason why Mr Al Sanea's fraud is attributed to the company is because of his control, not because of the absence of innocent directors or shareholders. Mr McCaughran submitted that one can explain why the claim fails either on the basis that there is a breach of duty but no causation because the company knows everything that needs to be known about the fraud or because there is no breach of duty because a bank cannot be required to protect a company against a fraud of which it is fully aware itself.

176. In support of this submission Daiwa rely on the judgment of Hobhouse J in *Berg Sons & Co Ltd & ors v Adams & ors* [1992] B.C.C. 661 ('*Berg*'). That case concerned an action brought by an insolvent company's liquidators against the former auditors in respect of alleged losses caused by the auditors' negligence in preparing the audited accounts. All the shares in the company were beneficially owned by one person, Mr Golechha, and it was he who had provided the information on which the auditors had based their opinion. It was not proved that there was any fraud by Mr Golechha. Hobhouse J held that the claim failed because however one identified the company, it was not misled and no fraud was practised upon it. This was, the judge said:

> "a simple and unsurprising consequence of the fact that every physical manifestation of the company Berg was Mr Golechha himself.  Any company must as a last resort if it is to allege that it was fraudulently misled, be able to point to some natural person who was misled by the fraud.  That the plaintiffs cannot do."

177.    Hobhouse J stated that although, of course, the company was a different legal entity from Mr Golechha, he was the directing mind and will of the company – his knowledge was the company's knowledge and there was no body of shareholders to whom the auditors' certificate was addressed other than him.

178.    Daiwa also relied on comments of the members of the House of Lords in *Stone & Rolls*.  For example Lord Phillips of Worth Matravers at paragraph 80 said that:

> " … it is very difficult to see how the law can rationally hold an auditor liable when the entire shareholder body and the entire management is embodied in a single individual who knows everything because he has done everything."

179.    Lord Walker of Gestingthorpe also referred to the 'sole actor' exception at paragraphs 157 onwards in *Stone & Rolls* and Lord Brown of Eaton-under-Heywood gave a forthright description of the principles to be applied in the opening passages of his speech.

180.    Perhaps the clearest statement in support of Daiwa's submissions on this point is that of Lord Sumption at paragraph 91 of the judgments of the Supreme Court in *Jetivia SA & anr v Bilta Limited (in liquidation) & ors* [2015] UKSC 23 ('*Bilta*').   Lord Sumption was considering the attribution of the director's fraud to the company in two contrasting situations; first where the claim is brought by the company against its former director and secondly where the claim is brought by the company against a third party.  In the former, it would be a "remarkable paradox" if the attribution of the director's fraud to the company defeated the company's claim against him. As to the second, Lord Sumption said this:

> "The position is different where the company is suing a third party who was not involved in the directors' breach of duty for an indemnity against its consequences. In the first place, the defendant in that case, although presumably in breach of his own distinct duty, is not seeking to attribute his own wrong or state of mind to the company or to rely on his breach of duty to avoid liability. Secondly, as between the company and the outside world, there is no principled reason not to identify it with its directing mind in the ordinary way. For a person, whether natural or corporate, who is culpable of fraud to say to an innocent but negligent outsider that he should have stopped him in his dishonest enterprise is as clear a case for the application of the illegality defence as one could have."

181.    The upshot of Mr McCaughran's submissions was that where the director of a one-man company perpetrates a fraud on that company then the company has a claim

against him for breach of fiduciary duty and against a third party for dishonest assistance – that is the result of the *Bilta* case. But where there is no dishonesty that is the limit of the company's claims. The company's claim against a third party in negligence is defeated by the attribution of the director's fraud to the company.

182.    In my judgment there is no principle of law that in any proceedings where the company is suing a third party for breach of a duty owed to it by that third party, the fraudulent conduct of a director is to be attributed to the company if it is a one-man company. I do not accept that *Bilta* is authority for any such broad proposition. What emerges from *Bilta* is that the answer to any question whether to attribute the knowledge of the fraudulent director to the company is always to be found in consideration of the context and the purpose for which the attribution is relevant. That is why it does not make sense to attribute the fraud to the company when the suit is against the director himself. That does not mean, however, that it will always be appropriate to attribute the fraud to the company when the suit is against a third party in negligence. Lord Sumption in the paragraph following the one cited above from *Bilta* himself said that:

> "The technique of applying the general rules of agency and then an exception for cases directly founded upon a breach of duty to the company is a valuable tool of analysis, but it is no more than that. Another way of putting the same point is to treat it as illustrating the broader point made by Lord Hoffmann in *Meridian Global* that the attribution of legal responsibility for the act of an agent depends on the purpose for which attribution is relevant. Where the purpose of attribution is to apportion responsibility between a company and its agents so as to determine their rights and liabilities to each other, the result will not necessarily be the same as it is in a case where the purpose is to apportion responsibility between the company and a third party."

183.    The reference to Lord Hoffmann there is to Lord Hoffmann's speech in *Meridian Global Funds Management Asia Ltd v Securities Commission* [1995] 2 AC 500 ('*Meridian*'). He stated that the rule of attribution is a matter of interpretation or construction of the relevant substantive rule, illustrating the point by the contrasting decisions of the House of Lords in *Tesco Supermarkets Ltd v Nattrass* [1972] AC 153 and *In re Supply of Ready Mixed Concrete (No. 2)* [1994] 3 W.L.R. 1249. It is necessary to tailor the attribution rule to the terms and policies of the substantive rule for which it is being applied. The decision of Lord Hoffmann in *Meridian* was referred to with approval by Lord Mance in *Bilta*.

184.    The issue for the court in this case is therefore whether, in the context of a claim by the company against a bank for breach of the *Quincecare* duty, the director's fraud should be attributed to the company in order to defeat the claim. In my judgment it would not be right to do so because such an attribution would denude the duty of any value in cases where it is most needed. The duty is only relevant in a situation where the instructions to pay out the money are given by the person who has been entrusted by the company as a signatory on the bank account. If there were no properly authorised instruction to transfer the money, the company would not need to rely on the *Quincecare* duty. The existence of the duty is therefore predicated on the

assumption that the person whose fraud is suspected is a trusted employee or officer. So the duty when it arises is a duty to save the company from the fraudulent conduct of that trusted person. This is a very different duty from the duty on auditors to report to shareholders about the affairs of the company.

185.   I do not consider that any contrary conclusion can be gleaned from the speeches of the House of Lords in *Stone & Rolls*. *Stone & Rolls* has long been regarded as a problematic case. It was decided by a majority of three to two and the speeches of the three do not disclose any clear single ratio. The Supreme Court more recently in *Bilta* revisited those speeches and attempted to draw out what principles can properly be regarded as having been established by that case. The Supreme Court also gave a strong warning about the dangers of casting around in the speeches of the House in *Stone & Rolls* for support for different propositions. Lord Neuberger stated (paragraph 24) that so far as it is to be regarded as strictly binding authority, *Stone & Rolls* is best treated as a case which solely decided that the Court of Appeal was right to conclude that, on the facts of the particular case, the illegality defence succeeded and that the claim should be struck out. Having set out the three points that he thought could be drawn out of the speeches, Lord Neuberger continued:

> "Subject to these points, the time has come in my view for us to hold that the decision in *Stone & Rolls* should, as Lord Denning MR graphically put it in relation to another case in *In re King* [1963] Ch 459, 483, be "put on one side and marked 'not to be looked at again'". Without disrespect to the thinking and research that went into the reasoning of the five Law Lords in that case, and although persuasive points and observations may be found from each of the individual opinions, it is not in the interests of the future clarity of the law for it to be treated as authoritative or of assistance save as already indicated."

186.   Lord Toulson and Lord Hodge agreed (paragraph 154) that *Stone & Rolls* should be regarded as a case which has no majority ratio decidendi. It stands as authority for the point which it decided, namely that on the facts of that case no claim lay against the auditors, but nothing more.

187.   *Stone & Rolls* was dealing with a very different duty from the one here. To pick out short passages from the various speeches and try to draw from them a principle that is not one of the principles that the Supreme Court said in *Bilta* might be drawn from the earlier case would be to ignore the very clear guidance of the Supreme Court. I therefore resist Mr McCaughran's suggestion that I should, in effect, rush in where the Supreme Court has warned judges that they should fear to tread.

188.   In any event, on the facts of this case, the evidence does not suggest that Singularis was a one-man company in the sense that that term was being used in *Stone & Rolls* and *Bilta*. There were other directors here. They included professional and experienced businessmen who were not relatives of Mr Al Sanea. The board of directors was made up of:

a)      Sana Al Gosaibi, Mr Al Sanea's wife.

b) Suha Al Sanea, Mr Al Sanea's daughter. She was a graduate from Cass Business School with a BSc in Banking and International Finance and an MSc in Finance.

c) Omer El Mardi who previously had worked at the World Bank and the United Nations. He had also held various legal positions in Sudan (including as a judge).

d) Christopher Hart. Mr Hart was a graduate of the University of Michigan and Georgetown University, and worked at Scandinavian Bank, Bank of America and Citibank before becoming General Manager of SFS.

e) Maan Al-Zayer who worked for 13 years at National Commercial Bank before joining the Saad Group as a manager in the Corporate and Institutional Banking Division.

f) Michael Alexander who was a US attorney.

189. It is true that they do not appear to have performed any kind of supervisory function even when the fortunes of the Saad Group and Singularis started to decline. There does not appear to have been any board meeting held in 2008 and 2009. There is no evidence to show that they were involved in or aware of Mr Al Sanea's actions. Daiwa point out that on the facts of *Berg*, there was an innocent director, Mr McCall, who was a partner in the firm of solicitors who used to act for Berg. He was described as a wholly non-executive director who received no remuneration and took no part in the running of the company. That did not prevent the conduct of Mr Golechha being attributed to Berg so as to defeat the company's claim. However, these factual issues are a question of degree; the existence of a single other director may not prevent the company from having effectively a sole proprietor and a sole director for this purpose. In my judgment the position of Singularis is different here. Even though Mr Al Sanea was the dominant influence over the affairs of the company, it had a board of reputable people and a substantial business. I make no finding as to whether the directors at any stage exercised any influence over the management of the company but I cannot make any findings either that they were complicit in the misappropriation of the money – there is no reason why they should have been. Therefore, on the facts this defence fails.

190. I find that Singularis is entitled to rely on the *Quincecare* duty owed to it by Daiwa and is not precluded from such reliance either because it was of doubtful solvency at the time of the payments or because Mr Al Sanea was the sole directing mind of the company as regards the misappropriation of funds.

## (c) Was Daiwa in breach of the *Quincecare* duty on the facts of this case?

191. This is an unusual case because many of the factors put forward by the judges in *Lipkin* and *Quincecare* as to why it would be impractical to impose too heavy a duty on a bank do not apply here. Daiwa was not administering hundreds of bank accounts with thousands of payment instructions every week. It was not impractical to expect Daiwa to look carefully at the instructions that were given for payments out of the account and they were aware that they needed to do so. Whereas the vast majority of payments out of an ordinary current account are made to third party recipients, the

Daiwa witnesses accepted that it was highly unusual, if not unique in their experience, for money in a customer account not to be paid back to another account in that customer's name. Mr Metcalfe told Mr Wetherall that Daiwa would prefer to pay the money back to Singularis rather than to a third party – a request that would not make any sense in a normal banking relationship. Daiwa say that their position was similar to that of an ordinary bank in that they were under an obligation to pay the money out to their client or to someone on the client's instruction. The countervailing *Quincecare* duty entitling or requiring them to disobey that instruction must not be too burdensome since the bank may fear being damned if it does make the payment and damned if it does not.

192. In the circumstances of this case I do not need to decide whether the *Quincecare* duty should be modified to reflect the particular circumstances of this bank account. I have no hesitation in finding that Daiwa was in breach of the duty of care that it owed to Singularis described by the courts in *Lipkin* and *Quincecare*. Any reasonable banker would have realised that there were many obvious, even glaring, signs that Mr Al Sanea was perpetrating a fraud on the company when he instructed that the money to be paid to other parts of his business operations. He was clearly using the funds for his own purposes and not for the purpose of benefiting Singularis. In making the disputed payments without proper or any inquiry, Daiwa were negligent and are liable to repay the money to Singularis.

193. What were these signs? First, the senior management of Daiwa were well aware of the dire financial straits that Mr Al Sanea and the Saad Group found themselves in at the end of May and early June 2009. I have described these in the earlier sections of this judgment. The indicators included the freezing of Mr Al Sanea's assets by the Saudi authorities and the reports in the press about the withdrawal of credit facilities and the need for the group to restructure its very substantial debts and the downgrading and then immediate withdrawal by Moody's and S&P of their credit rating for the group. It is hard to think of what clearer indication there could have been that Singularis was in a very precarious financial state.

194. The Daiwa witnesses in some of their written evidence tried to draw a distinction between the troubles engulfing Mr Al Sanea and the Saad Group at the end of May and the financial position of Singularis as a separate legal entity. They refer to the healthy balance sheet provided for the period up to October 2008 and the recovery of the share prices between March and June. That evidence does not stand up to any scrutiny. Daiwa did not act as if it had no concerns about Singularis' health when acting to protect Daiwa's own interests. The events of Sunday 31 May and Monday 1 June show that Daiwa was extremely concerned about the risks involved for Daiwa in continuing its relationship with Singularis. They fully appreciated that Mr Al Sanea might become unable or unwilling to continue to pour money into Singularis. The decision of the Daiwa management that they would close down the relationship on 1 June, whether or not they had the consent of SFS, thereby taking the risk that this would expose them to later legal challenge shows the lengths to which they were prepared to go to avoid any loss to themselves from the potential collapse of the group. That is not the conduct of a bank which has confidence in the financial health of a long term counterparty.

195. Daiwa was fully aware that Singularis was dependent on Mr Al Sanea for funding even though it was not consolidated into the Saad Group. All the credit reports

prepared by Mr Metcalfe stressed the reliance of Singularis on Mr Al Sanea's continued support when the market was turning against banking shares. Daiwa management realised that the stresses and strains that Mr Al Sanea was under might make him jump one of two ways – he could start extracting money from Singularis to support other companies in the Saad group or he could try to protect his personal wealth in Singularis outside the Saad group. Even before the requests for the disputed payments there were signs that the latter was happening. Daiwa were aware that Singularis had started to ask for excess margin to be returned to it whereas it had previously been content to leave the excess in the Singularis account (see paragraph 52, above).

196.    The Daiwa witnesses accepted in cross examination that the October balance sheet was no longer of any value as an indicator of Singularis' health by June 2009. They also accepted that to the extent that they had taken comfort at the 19 March Meeting from SFS' promises of more up to date financial data about Mr Al Sanea's net worth and an increase in the haircut, that comfort was no longer there by June. No further financial information was provided and there was no agreement to an increase in the haircut.

197.    Secondly, Daiwa was aware that Singularis may have other substantial creditors with an interest in the money held in their account. I found earlier that Mr Metcalfe might not have had in mind the fact that Singularis owed a substantial amount of money to Lehman Bros. But that information was within Daiwa's corporate knowledge and should have influenced the way that Daiwa treated Singularis' money. Daiwa management knew that other banks were selling off the collateral they held for Singularis. References were made at the 19 March Meeting to Singularis having hedged its exposures but Daiwa neither asked for nor was provided with any information about such hedging. There was no basis for Daiwa to assume that Singularis would emerge from its financial difficulties with no creditors looking to the excess money in the Daiwa account. This is not a case where the bank could have continued to act on Mr Al Sanea's instructions on the basis that he was entitled to move money around his own companies even if there was no particular benefit to the particular entity holding the account.

198.    Thirdly, Daiwa say that they were entitled to assume that Mr Al Sanea and the people in Geneva were honest. Mr Massey said in his evidence that he did not doubt the honesty and integrity of the people involved at SFS in providing the evidence of a corporate obligation to support the making of the payment. He said that Daiwa was not involved in "some sort of paranoid investigation of every single fact" that SFS put forward because that is not a valid way of conduct business. I accept that the *Quincecare* duty does not require a bank to become paranoid about the honesty of those it does business with in normal circumstances. But the *Quincecare* duty does require a bank to do something more than accept at face value whatever strange documents and implausible explanations are proffered by the officers of a company facing serious financial difficulties.

199.    There was plenty of evidence to put Mr Massey and his colleagues on notice that there was something seriously wrong with the way that Mr Al Sanea was operating the Singularis account with Daiwa. There was the appearance of $80 million in the Singularis account on 2 June, shortly after Mr Al Sanea's and Saad Group's other bank accounts had been frozen. Although the receipt rightly caused some

consternation within Daiwa, they do not seem to have drawn the obvious conclusion that Mr Al Sanea intended to use the unfrozen Singularis account to bypass the restrictions imposed on the Group by the Saudi authorities. There was the strange request on 2 June to pay sums to individuals within SFS; the extreme reaction of SFS staff slamming down the phone when Mr Roberts told them that Daiwa initially refused to make the payment and then the fact that the payments did not go ahead anyway for a reason no one seems to know.

200.    Fourthly and perhaps most significantly there was the production of the supposed Hospital Expenses Agreement which had never been mentioned before but which was conveniently produced to justify a very substantial payment out of Singularis' funds. Both Mr Kosuge and Mr Sakashita were alive to the possibility at least that the money was being paid to SSHC not because of some genuine obligation on the part of Singularis to meet the running expenses of the hospital but simply as a conduit to get the money back from Daiwa without it being paid to Singularis. That was, I find, the purport of Mr Kosuge's email of 17 June 2009 referring to the possibility that the payment to the Hospital was a front or cover rather than a genuine obligation. Mr Sakashita's evidence was that he understood the nature of Mr Kosuge's concern. Again, although the inconsistencies between this agreement and the earlier information provided about Singularis' affairs may not have struck Mr Metcalfe, they would have come to mind if more care had been taken to consider whether the agreement was likely to be genuine.

201.    Fifthly there is a striking contrast between how some payment requests were processed and how the disputed payments were handled. The request on 2 June for the payments to be made to individuals was the subject of discussion between management and in-house legal and compliance functions. The decision whether to use part of the $80 million received to pay the $3 million margin call owed to Daiwa by SICL was also the subject of extensive discussion at very senior level and of consultation with external legal advisers. However, in respect of most of the disputed payments Mr Hudson and Mr Metcalfe simply signed off on them without any consultation or discussion with anyone. The payments to Saad Air were not queried at all and the initial payments to SSHC on 12 June 2009 were made without any questions being asked.

202.    I do not regard Mr Metcalfe or Mr Hudson as wholly or even primarily to blame for the failure of Daiwa to fulfil its duty of care to Singularis. There was a failure at every level. What emerges from the evidence is a wealth of emails being sent by each senior executive to his colleagues in London and Tokyo stressing how great care, extreme caution and so forth must be exercised in handling any requests for payment from the Singularis account. Everyone recognised that the account needed to be closely monitored even after the trading relationship between the parties had been brought to an end. But no one in fact exercised care or caution or monitored the account themselves and no one checked that anyone else was actually doing any exercising or monitoring either.

203.    None of the witnesses in Daiwa could explain why Mr Metcalfe or Mr Hudson were handling these payments; no one explained to them what they needed to do. They were not put fully in the picture about the worries that senior management had about the handling of the account and about the risks of wrongdoing. No one told Mr Hudson that he had to do something more than check that the recipient was not a

terrorist organisation and no one told Mr Metcalfe that despite the previous good relationship with Singularis, he had to examine carefully any explanation given to support a payment and make sure that he checked properly with the Legal and Compliance departments before authorising the payment. The messages coming from Mr Wright were incorrect and confusing to the extent that they suggested that Daiwa need only be concerned if there was evidence that Mr Al Sanea's financial problems were the result of criminal activity.

204.    I agree with Mr Miles' description of Daiwa here as having a dysfunctional structure leading to a sequence of events where everyone assumes that someone else is dealing with investigating the disputed payments but no one troubles to check whether that is right or not.  What went wrong was that no one seems to have considered it his job to make the inquiries that Mr Wright said should be made or to ensure that the right people were tasked with dealing with payment requests.

205.    This failure is all the more surprising given that it was predicted by the Thematic Review which warned a year earlier that "[i]f accountability for fraud is not clearly defined there may be confusion with regards to whose responsibility it would be to ensure there are sufficient anti-fraud controls in place."  It was remarkable that when Mr Kosuge was asked at the close of his cross-examination who he thought should have been in charge of checking whether the payment of $180 million was a proper one, his answer was confused and confusing.  The real answer is that no one was in charge of protecting Singularis' interest in the money.

**(d) The defence of illegality**

206.    Daiwa submit that Singularis' claim in negligence is defeated by the defence of illegality.  The Supreme Court has recently revisited the test for illegality.  In *Patel v Mirza* [2016] UKSC 42, Mr Patel had given Mr Mirza £620,000 pursuant to an agreement that the money would be used to bet on the price of Royal Bank of Scotland shares on the basis of inside information that Mr Patel thought he was going to receive.  That agreement amounted to a conspiracy to commit an offence of insider dealing contrary to section 52 of the Criminal Justice Act 1993.  Mr Patel did not receive that information and the bets were never placed.  When he sued Mr Mirza for the return of the money, Mr Mirza contended that it was contrary to public policy for the courts to lend their aid to Mr Patel whose claim was reliant on illegality.  In analysing the defence of illegality, Lord Toulson SCJ, with whom four of their Lordships (of a panel of nine) agreed said, having reviewed the authorities:

> "99.  Looking behind the maxims, there are two broad discernible policy reasons for the common law doctrine of illegality as a defence to a civil claim. One is that a person should not be allowed to profit from his own wrongdoing. The other, linked, consideration is that the law should be coherent and not self-defeating, condoning illegality by giving with the left hand what it takes with the right hand."
>
> 100.  Lord Goff observed in the Spycatcher case, *Attorney General v Guardian Newspapers Ltd (No 2)* [1990] 1 AC 109, 286, that the "statement that a man shall not be allowed to profit from his own wrong is in very general terms, and does

not of itself provide any sure guidance to the solution of a problem in any particular case". In *Hall v Hebert* [1993] 2 SCR 159 McLachlin J favoured giving a narrow meaning to profit but, more fundamentally, she expressed the view (at 175-176) that, as a rationale, the statement that a plaintiff will not be allowed to profit from his or her own wrongdoing does not fully explain why particular claims have been rejected, and that it may have the undesirable effect of tempting judges to focus on whether the plaintiff is "getting something" out of the wrongdoing, rather than on the question whether allowing recovery for something which was illegal would produce inconsistency and disharmony in the law, and so cause damage to the integrity of the legal system.

That is a valuable insight, with which I agree. I agree also with Professor Burrows' observation that this expression leaves open what is meant by inconsistency (or disharmony) in a particular case, but I do not see this as a weakness. It is not a matter which can be determined mechanistically. So how is the court to determine the matter if not by some mechanistic process? ..."

207. In conclusion Lord Toulson said:

"120. The essential rationale of the illegality doctrine is that it would be contrary to the public interest to enforce a claim if to do so would be harmful to the integrity of the legal system (or, possibly, certain aspects of public morality, the boundaries of which have never been made entirely clear and which do not arise for consideration in this case). In assessing whether the public interest would be harmed in that way, it is necessary a) to consider the underlying purpose of the prohibition which has been transgressed and whether that purpose will be enhanced by denial of the claim, b) to consider any other relevant public policy on which the denial of the claim may have an impact and c) to consider whether denial of the claim would be a proportionate response to the illegality, bearing in mind that punishment is a matter for the criminal courts. Within that framework, various factors may be relevant, but it would be a mistake to suggest that the court is free to decide a case in an undisciplined way. The public interest is best served by a principled and transparent assessment of the considerations identified, rather than by the application of a formal approach capable of producing results which may appear arbitrary, unjust or disproportionate."

*(i) Attribution of Mr Al Sanea's wrongdoing to Singularis*

208. Since Mr Patel was an individual, the Supreme Court did not have to grapple there with the question that arises in this case namely whether Mr Al Sanea's illegal conduct should be treated as the illegal conduct of Singularis so as to defeat

Singularis' claim against Daiwa. Daiwa says that Singularis' claim for breach of duty of care is barred by the principle of ex turpi causa because the wrongdoing of Mr Al Sanea is to be attributed to Singularis which is therefore relying on its own illegality. The relevant wrongdoing is said to be Mr Al Sanea's deceit of Daiwa into making the Payments. Before I come to apply the three-fold test in *Patel v Mirza* it is therefore necessary to consider that preliminary question of whether Mr Al Sanea's illegal conduct is to be attributed to Singularis.

209. Daiwa argue that Mr Al Sanea's conduct is to be attributed to Singularis either on the basis of company law principles, in particular the Hampshire Land principle discussed in *Bilta* or because Singularis is vicariously liable for Mr Al Sanea's conduct.

210. I have already considered the authorities for the proposition that the key to any question of attribution is ultimately always to be found in considerations of context and purpose: see per Lord Mance in *Bilta* at paragraph 41. Lord Sumption in *Bilta*, analysing the speeches of the House of Lords in *Stone & Rolls*, said that Lord Phillips and Lord Walker had in the earlier case agreed on three points for which the case was accordingly authority. The first was that the illegality defence is available against a company only where it was directly, as opposed to vicariously, responsible for it. Secondly, the majority rejected the argument that once it was shown that the directing mind and will of a company had caused it to defraud a third party, then the illegality defence barred any claim which relied on that fraud to found its cause of action. The House of Lords in *Stone & Rolls* concluded that that was too broad a proposition because it would involve the attribution of the agent's dishonesty to the company even where there were innocent directors or shareholders. Accordingly, they had regarded it as critical that *Stone & Rolls* was a one-man company in the sense that there were no innocent directors or shareholders. Thirdly, Lord Sumption stated, Lord Phillips and Lord Walker were agreed in *Stone & Rolls* that as between a one-man company and a third party, the latter could raise the illegality defence on account of the agent's dishonesty, at any rate where it was not itself involved in the dishonesty.

211. Lord Neuberger in *Bilta* agreed with the second proposition that the defence of illegality 'is not available where there are innocent shareholders (or, it appears, directors)'. He also agreed that if there are no innocent shareholders or directors then the defence is sometimes, but not always available. But Lord Neuberger did not agree that the first proposition, namely that the illegality defence is only available where the company is directly as opposed to vicariously responsible for the illegality, could be derived from *Stone & Rolls*. He preferred to leave entirely open the question whether vicarious responsibility might be enough. Lord Mance also declined to endorse Lord Sumption's suggestion that a distinction between personal and vicarious liability was central to the application of the illegality defence: paragraph 48 of *Bilta*. Lords Clarke and Carnwath agreed with Lord Neuberger's judgment.

212. I have already found that Singularis was not a one-man company in the sense that the House of Lords in *Stone & Rolls* and the Supreme Court in *Bilta* were using that phrase. The directors were not men or women of straw. I will consider the behaviour of the Board later in relation to the question of contributory negligence. Here it suffices to say that even though Mr Al Sanea was sole shareholder and also the only director who took an active part in the management and operation of Singularis so far as these events are concerned, that does not appear to be the relevant test for this

purpose. As to the involvement of the other directors, Daiwa point out that there is no evidence of any board meetings during the course of 2009 and that the minutes of earlier board meetings bear the hallmarks of formal documents which may not record genuine discussion or debate about the company. They also point out that very extensive powers were delegated to Mr Al Sanea by the board to take decisions on behalf of the company, including signing powers on the company's accounts. On the other hand, Singularis was not a company like *Stone & Rolls*, created purely to perpetrate the fraud. It was established for the purpose of carrying out substantial and legitimate transactions, for which it borrowed substantial sums of money under a variety of funding agreements. It therefore had a large and genuine business carried out over a number of years before the events the Court is concerned with here.

213. Further, Lord Toulson and Lord Hodge JJSC said at the opening of their judgment in *Bilta* that in any case where a defence of illegality is raised, "it is necessary to begin by considering the nature of the particular claim brought by the particular claimant and the relationship between the parties": paragraph 122. I consider that the defence of illegality should fail because of the nature of the duty relied on by Singularis here, as I have described in a different context in paragraph 184, above.

214. I do not consider that the issue of whether attribution can be made through the concept of vicarious liability rather than direct attribution arises in this case. There may be cases where the issue arises whether the illegal conduct of a relatively junior employee who could not otherwise be described as the directing mind of the company should be attributed to the company. Vicarious liability may be relevant in those circumstances. I accept the submission of Mr Miles that if a company is to be fixed with vicarious liability for the actions of its directors, then it is difficult to see why the existence or otherwise of innocent directors was regarded as relevant by the Supreme Court in *Bilta*.

215. In my judgment the dishonest conduct of Mr Al Sanea should not be attributed to Singularis so as to provide Daiwa with a defence of illegality.

*(ii) The test in Patel v Mirza*

216. In case I am wrong in coming to that conclusion, I will briefly consider how the three-fold test set out by the Supreme Court in *Patel v Mirza* would apply. Applying the test set out by Lord Toulson points firmly in favour of rejecting the illegality defence put forward by Daiwa. It would not be contrary to the public interest to allow Singularis to enforce its claim, nor would it be harmful to the integrity of the legal system for this claim to succeed.

217. Daiwa identify two illegal acts or prohibitions that have been transgressed to adopt the wording of Lord Toulson setting out the first limb of the test. These are Mr Al Sanea's provision of documents which he knew to be false in order to induce Mr Metcalfe to make some of the payments or, in relation to all of the payments, Mr Al Sanea's breach of his fiduciary duty towards Singularis. I note here that no bogus documents were produced in relation to the payments to Saad Air or in relation to the first payments to SSHC. But I am prepared to assume for present purposes (without so finding) that there was some implied representation in the SWIFT payment instruction that there was a legitimate reason for that payment to be made.

218.    The purpose of the prohibition on breach of fiduciary duty is clearly to protect the company from becoming a victim of the wrongful exercise of power by the officers of the company.  That purpose will certainly not be enhanced by preventing Singularis from claiming the money back.  The purpose of the former prohibition, as it arises in this case, is two-fold; to protect the bank from being deceived and to protect the company from having its funds misappropriated.  Although one could say that the purpose of protecting the bank would be enhanced by denial of the claim, that purpose is achieved here by ensuring that the bank can only be liable if the *Quincecare* duty is breached.  The balance between the competing interests of the customer and the bank as the two victims of the deceit is struck here by the carefully calibrated threshold of the *Quincecare* duty taking into account the factors that were discussed by the judges in *Lipkin* and *Quincecare*.  It would not enhance the integrity of the law to undermine that balance by denying the claim on grounds of illegality in a case where, ex hypothesi, the exceptional circumstances needed for the duty to arise and be breached are found to be present. Neither allowing nor denying the claim is likely to affect the conduct of dishonest directors like Mr Al Sanea.

219.    Turning to the second limb of the *Patel v Mirza* test, I accept Singularis' submission that denial of the claim would have a material impact on the growing reliance on banks and other financial institutions to play an important part in reducing and uncovering financial crime and money laundering.  Both expert witnesses described how these matters have been the subject of substantial policy focus by the Financial Conduct Authority for a number of years.   That was what prompted the commissioning of Daiwa's Thematic Review the recommendations of which might, if implemented, have avoided the current proceedings.  If, however, a regulated entity can escape from the consequences of failing to identify and prevent financial crime by casting on the customer the illegal conduct of its mandated employee, that policy will be undermined.

220.    Thirdly I consider that denial of the claim would be an unfair and disproportionate response to the wrongdoing on the part of Singularis.  That is particularly so in the present case where, as I discuss below, the possibility of making a deduction to reflect any contributory negligence on the customer's part enables the court to make a more appropriate adjustment than the rather blunt instrument of the illegality defence.

### (e) Does Daiwa have an equal and opposite claim in deceit against Singularis?

221.    Daiwa say that they are the victims of Mr Al Sanea's deceitful conduct if they were persuaded to make the third party payments by the creation of bogus documents by Mr Al Sanea.  They argue that the elements of the tort of deceit are made out, namely that there was a false representation known to be untrue; that it was made in circumstances in which it was intended to be acted upon and that loss has resulted from the deceit.  Further Daiwa rely on authority for the proposition that a claim of deceit cannot be defeated by an assertion that the deceived person was negligent in failing to realise that what he was being told was untrue.  Daiwa therefore say that the claim by Singularis against them is offset exactly by the claim that Daiwa has against Singularis for deceit. Singularis accept that for the purposes of this stage of the claim, Singularis is to be treated as vicariously liable for Mr Al Sanea's actions, and indeed for the actions of other director of Singularis, though they reserve the right to take a different stance if this case goes further.

222.   In my judgment this point has been decided against Daiwa by the decision of Evans-Lombe J in the *Barings* litigation.  In those proceedings Barings was suing its auditors for failing to spot the fraudulent conduct of their trader Mr Leeson.  There were two judgments which are relevant.  The first *Barings plc (in liquidation) and another v Coopers & Lybrand (a firm) and others (No. 2)* [2002] EWHC 461 (Ch) was a judgment on a preliminary issue ('the first *Barings* judgment').  The issue was whether the finance director of Barings, Mr Jones, had made fraudulent misrepresentations in various letters sent to the auditors when they were instructed.  The judge ruled that the misrepresentations had not been fraudulent.  However, he went on to consider whether, if the misrepresentations of Mr Jones had been fraudulent, that would have resulted in the auditors having an equal and opposite claim against Barings to cancel out any liability for their own breach of duty.  He stated, obiter, that as a matter of principle it would have had that result because Barings would be vicariously liable for Mr Jones' deceit.

223.   At the main trial of Barings' claim, the defence relied on various fraudulent misrepresentations that Mr Leeson had made to the auditors about the state of various accounts they were looking at.  The judge found that Barings was vicariously liable for Mr Leeson's deceit.  However, he held that the deceit claim failed because there was no causative link between the fraudulent misrepresentations made by Mr Leeson and the loss that the auditor would suffer if they were liable to Barings: *Barings plc (in liquidation) and another v Coopers & Lybrand (a firm) and others (No. 2)* [2003] EWHC 1319 (Ch) ('the Main *Barings* judgment').  Evans-Lombe J explained the distinction between the causative effect of Mr Jones' misrepresentations and that of Mr Leeson's fraudulent statements.  The factor that was not present in relation to the former was that it was not alleged that the auditors were negligent in failing to spot Mr Jones' alleged fraud: see paragraph 725 of the Main *Barings* judgment.  By contrast, the judge held that the auditors were negligent in failing to see that two of Mr Leeson's representations were false. He went on (D&T being the auditors):

>   "In the case of these two representations, D&T were negligent in failing to detect the falsity of the very representations which they now claim induced them to suffer loss. It would seem surprising if D&T were able to extinguish their liability for that failure by bringing a claim in deceit based on those representations and invoking *Standard Chartered Bank* [*sc. Standard Chartered Bank v Pakistan National Shipping* [2002] WLR 1547]. Almost any auditors' negligence case based on a failure to detect fraud at an audit client will involve deception of the auditors by the fraudster. If the auditor has an automatic and complete defence to any negligence claim by bringing a counterclaim in deceit, it is surprising indeed that the auditors in none of the audit cases I referred to in this judgment took that course. Yet, as D&T admit, this argument "has not been run before".

224.   Evans-Lombe J then applied the causation test set out in the speech of Lord Nicholls in *Kuwait Airways v Iraqi Airways (No.s 4 and 5)* [2002] 2 WLR 1353.  Lord Nicholls noted that in most cases, a judge has an 'immediate intuitive response' to the question of how far the responsibility of the defendant ought fairly to extend. Where such

informed common sense fails to give an obvious answer, it is of crucial importance to identify the purpose of the relevant cause of action and the nature and scope of the defendant's obligation in the particular circumstances. What was the ambit of the defendant's duty? In respect of what risks or damage does the law seek to afford protection by means of the particular tort?

225.     In the Main *Barings* judgment, Evans-Lombe J held (paragraph 729) that although there was no doubt that Leeson's deceit was a 'but for' cause of the auditor's exposure, his immediate intuitive response was that that exposure was caused by the breach of the auditor's duty.   The auditors had a contractual duty to Barings to investigate the truth of the representations made to them by Leeson.  They failed to investigate them properly and Barings was suing them for breach of that duty.  That breach was the cause of their loss. Those representations were merely the subject matter upon which the auditors should have exercised their professional skill and failed to do so.  That contrasted with the preliminary issue.  There was no allegation that the auditors should have detected the falsity of Mr Jones' representation letters. Barings could not argue that the auditors' loss was caused by their failure to do so.

226.     Evans-Lombe J also drew a distinction between his case and the cases which have held that the maker of a fraudulent representation, A, cannot rely on the negligence of the claimant, B, in believing him:

> "The present case is different. Here, B was under a pre-existing contractual duty owed to A's employer to test the truthfulness of A's statements. Had B performed his duty, he would have realised the statements were false. B failed in that duty and believed the statements. His only loss is his liability to A's employer for failure to perform that duty. A's employer can say "it was your job to check the truth of what A said. You cannot sue me for being deceived when, if you had done your job, you would not have been."

227.     However, the judge accepted that the answer on causation was not obvious and that he needed to have regard to the purpose of the relevant cause of action and the nature and scope of the defendant's obligation.   He held that an outside third party who was misled by Leeson's false statements into entering into a transaction would be able to recover all losses flowing from that transaction.   But the auditors were not an outside third party.   They were in breach of a pre-existing duty, owed to Barings, to guard against being misled by just such false statements. Having regard to the policy of the two rules, it was clear, he held, that the rule imposing liability on the auditors for their breach should prevail.

228.     The same reasoning applies in the instant case.  By June 2009, as I have held, Daiwa was under a duty to investigate carefully payments out of the Singularis account in case they were a misappropriation of the company's money.  In respect of most of the payments they asked no questions at all. In respect of the largest, they asked the question but were satisfied with an answer that they should have realised was false and could not have withstood any proper scrutiny on their part.  They owed Singularis a duty to guard against being misled into paying away Singularis' money by just such fraudulent instructions.  Their breach, and not Mr Al Sanea's misrepresentations, is the cause of their exposure to the claim for Singularis' loss.

**(f) The inevitable misappropriation of the money**

229.     A further point relied on by Daiwa is that there should be no award of damages in this case because if Daiwa had insisted in paying the money back to an account in Singularis' name with another bank, Mr Al Sanea would most likely have found a way to misappropriate the money anyway.

230.     I do not regard this defence, assuming that it is available as a matter of law to Daiwa, as being made out on the facts.  The evidence shows that Daiwa were keen to pay the money back into an account in Singularis' name.  We do not know why Mr Wetherall was so resistant to the idea – presumably he was merely reflecting Mr Al Sanea's strong wish that the money not simply be paid back to Singularis.  Mr Metcalfe has not kept any record of any discussion he had with Mr Wetherall in that regard or what reason was given why that obviously sensible course could not be taken.  One can speculate why that might have been. If the money had been paid into an account in Singularis' name, the bank concerned may have been able to set that money off against debts that Singularis owed the bank.  Daiwa management were aware, from an article in the Financial Times circulated to them on 11 June 2009 that the UAE Central Bank had told banks that they may offset any credit facilities with the Saad Group against deposits held by the companies.  When Mr Metcalfe was discussing with Mr Sakashita whether to use $3 million of the mysterious $80 million to pay SICL's margin call, he recognised that SICL's bankers Citibank were very unlikely to pay the margin payment on behalf of Saad.  This was because they had probably triggered a right of offset of Saad funds against any exposure they might have to any of the Saad Group subsidiaries that were by that time in default of their revolving credit facilities. Although, of course, Singularis is not formally part of the Saad Group, it may well be that Mr Al Sanea wanted to keep the Daiwa money out of other Singularis accounts because those bankers had rights of set off for debts owed to them either by Singularis or by other companies controlled by Mr Al Sanea.

231.     I bear in mind also that it was only a short time after the disputed payments were made that Singularis was in the hands of court appointed administrators.  I do not consider that it is possible to conclude that Mr Al Sanea would have been able to misappropriate the monies even if Daiwa had fulfilled its duty of care towards Singularis.

**(g) The application of Daiwa's terms of business**

232.     In Daiwa's defence it is asserted that Singularis agreed to Daiwa's standard terms of business. The basis on which it is alleged that these terms bind Singularis is that it was Daiwa's practice to notify clients of the terms of business by sending them to clients at the same time as the client classification letter.  They invite the court to assume that they did so in this case.  The Defence asserts three bases on which Singularis is bound; Singularis expressly agreed the terms of business or alternatively impliedly agreed them, alternatively the terms applied between the parties by course of conduct and by reason of the notification of the terms as sent by Daiwa and by reason of Singularis never having notified Daiwa of any other terms on which it wanted to do business.

233.     Clause 8.1 of the Terms of Business provided as follows (the Company being Daiwa):

"Without prejudice to the specific provisions of these Terms neither the Company, nor its officers, directors, employees or agents shall be liable for any loss suffered by the Client, except to the extent that the same is caused by the Company's officer's, director's, employee's or agent's gross negligence, wilful default or fraud."

234.    Clause 8.3 of the Terms of Business provided as follows:

"The Client will indemnify the Company, its officers, directors, employees and agents including where applicable a Broker against any cost, loss, liability or expense whatsoever which may be suffered or incurred by the Company and/or them directly or indirectly in connection with, or as a result of, any service performed or action permitted under these Terms, including where applicable any liabilities to a Broker, except to the extent that the same is caused by the Company's and/or their gross negligence, wilful default or fraud."

235.    Clause 17 of the Terms of Business provided as follows:

"Clause 17.2:

"The Client confirms and undertakes that they have and will have all necessary consents ... and authorities to enable all Transactions in Investments under these Terms to be effected and that in respect of each such Transaction all Applicable Regulations have been and (so far as the Client can ensure) will be complied with."

Clause 17.3:

"The Client confirms that any information given to the Company ... is complete, accurate and not misleading in any material respect."

Clause 17.7 (a):

"The Company shall not be bound to act in accordance with the instructions of any person, other than the Client, and the Company's liabilities hereunder shall be fully discharged by performing the same in the Client's favour notwithstanding any instructions received from the Client's principal and any notice received that the Client's authority to act on behalf of that principal has been revoked or varied."

Clause 17.7 (b):

"The Client authorises the Company to rely and act on, and treat as fully authorised by and binding upon the Client, any order, instruction or communication (by whatever means

transmitted and whether or not in writing) which purports to have been given and which is reasonably accepted by the Company in good faith as having been given by the Client or on the Client's behalf, without further enquiry on the Company's part as to the genuineness, authority or identity of the person giving or purporting to give such instructions and regardless of the circumstances prevailing at the time; and the Client will be responsible for and bound by all contracts, obligations, costs and expenses entered into or assumed by the Company on the Client's behalf in consequence of or in connection with such orders, instructions or communications."

236. The different ways in which Daiwa alleges that the terms of business applied between the parties are all founded on the averment that its standard terms of business were sent to Singularis. I turn therefore to consider the evidence to support that averment.

237. When Singularis were taken on as a client in April 2007, it was sent a market counterparty notice, signed by Mr Wright saying that Daiwa were going to treat Singularis as a market counterparty for the purpose of FSA rules. Mr Wright said that his signature would have been appended automatically to this letter and he did not personally review the accuracy of the categorisation – he relied on people in his team to do so.

238. In addition to this, there was an internal process whereby Daiwa would assign its own risk assessment level to the client between 1 (not risky) and 4 (very risky). The designation was reviewed periodically and the frequency of review depended on how risky the client was considered to be. In his witness statement, Mr Hudson had said that Singularis was given a risk assessment of 2. When he was sworn in, Mr Hudson had to correct this because he had subsequently seen documents indicating that Singularis' risk assessment was 3, not 2. No explanation was given for this correction other than there were two conflicting documents within Daiwa which Mr Hudson had now seen. Mr Hudson accepted that ordinarily a Cayman Island company would be given a lower risk assessment level of 2. So some factors other than Singularis being incorporated in the Cayman Islands must have influenced the assessment if in fact it was given a rating of 3. Neither Mr Hudson nor Mr Wright could explain why that risk designation might have been given; there seems to be no record of why Singularis was considered more risky than a typical Cayman Island company.

239. There is no record of if or when terms of business were sent out to Singularis. Mr Hudson's evidence was that once the Compliance Department had carried out its initial checks and approved the client as a counterparty for Daiwa, a hard copy of Daiwa's standard terms would be sent to the client by the Compliance Department together with a letter setting out the client's regulatory classification. He said in his witness statement that the terms of business and the classification letter were sent out by normal post but that Daiwa do not keep any records of the notices and terms of business that are sent out. Mr Wright confirmed that this was standard practice at the time. The client classification is recorded on Daiwa's computer database but no record is made of sending out the terms of business. The most that Mr Hudson can say about Singularis is that since Daiwa's database shows that the client classification letter was sent to Daiwa he had no reason to believe that Daiwa's terms of business were not sent to Singularis at the same time. The letter asked the client to return a

signed copy of the terms of business. But Mr Wright said that it was common for clients not to do so and it was not Daiwa's policy or practice to chase for a signed copy of these from each client.

240. Mr Hudson accepted that the Daiwa database was wrong as to the date on which the market counterparty notice was sent to Singularis. The date given in the database is as 7 September 2006. Mr Hudson accepted that this cannot be right because Singularis was only taken on as a client in April 2007 when the SICL agreement was novated. A possible explanation for the wrong date was that someone had just copied across some of the details from the SICL account to the new Singularis account and had failed to change the date.

241. Further, it appears that the market counterparty notice was in fact also wrong. The undated letter states that Daiwa will treat Singularis as a market counterparty because it believes that Singularis fulfils one of five listed criteria, namely it was a bank, a central bank, a government, a state investment body, an FSA regulated firms or overseas financial institution. Mr Wright accepted that actually Singularis does not fulfil any of those five criteria. Mr Wright's evidence when this was put to him was that he could not explain why this market counterparty notice had been sent to Singularis, he was not involved in the categorisation and no records were kept of any reasons. His expectation was that if a client received a counterparty notice and felt for whatever reason that Daiwa had inappropriately categorised them, then they would write back and decline the categorisation and ask to be re-categorised. In fact someone from SFS did email Daiwa on 24 April 2007 saying that they had received the market counterparty notice and querying whether Singularis fell into any of the relevant categories. These seems to have been no response from Daiwa to this query. The email does not mention having received the terms of business.

242. In the light of the haphazard way in which the induction of Singularis as a Daiwa client was carried out, there is no possible basis on which I can find that the company was sent Daiwa's standard terms of business. Daiwa is not therefore entitled to rely on those terms to defeat Singularis' claim.

## (h) Contributory negligence

243. Singularis accept that the final stage in this case is to consider whether to make a deduction from the amount of damages that would otherwise be payable to Singularis to reflect the company's contributory negligence. This emerges from the analysis applied by Evans-Lombe J in the *Barings* case to the effect that for this purpose, Barings was vicariously liable for the deceit of Mr Leeson.

244. I must therefore consider whether to make an apportionment under the Law Reform (Contributory Negligence) Act 1945 ('the 1945 Act'). Section 1(1) of the 1945 Act provides that where any person suffers damage as the result partly of his own fault and partly of the fault of any other person or persons, a claim in respect of that damage shall not be defeated by reason of the fault of the person suffering the damage. The damages recoverable in respect thereof shall be reduced to such extent as the court thinks just and equitable having regard to the claimant's share in the responsibility for the damage. Subsection (2) provides that where such a reduction is made, the court must find and record the total damages which would have been recoverable if the claimant had not been at fault.

245. The amount of damages that Singularis is claiming and for which I have found that Daiwa is liable, subject to this point, to pay is $203,741,900 plus interest. That principal sum is made up of the amount of the disputed payments being $204,494,900 less recoveries of $753,000 made so far in other proceedings relating to the same loss.

246. In the Main *Barings* judgment, Evans-Lombe J considered that there were three kinds of contributory negligence on the part of Barings. The first arose from its vicarious liability for Mr Leeson's fraudulent conduct, the second arose from the failures of the board of directors to monitor and supervise Mr Leeson's conduct, and the third arose from the failings of people employed by a sister company of Barings, BSL, to which Barings had delegated part of the task of supervising certain of Barings' activities. At paragraph 903 of his judgment, Evans-Lombe J recorded the concession made by Barings that it was responsible for the fault in the management of its business even where other companies in the Barings Group employed the individuals concerned. He described that concession as inevitable because directors have both collectively and individually a continuing duty to acquire and maintain a sufficient knowledge and understanding of the company's business to enable them properly to discharge their duties as directors. The exercise of a power of delegation does not absolve a director from the duty to supervise the discharge of the delegated functions.

247. The learned judge in *Barings* made graded deductions of different amounts over different periods. Broadly speaking, for the period when the element of contributory negligence on the part of the bank comprised the fraudulent conduct, the deduction was 50 per cent. The judge said that although Mr Leeson's fraudulent unauthorised trading was overwhelmingly the most important cause of Barings' loss, in common sense terms, he had to recognise the auditors' fault in failing to detect that fraud and therefore could not attribute to it the overwhelming causative influence which it would otherwise have. Over later periods when the contributory negligence also comprised additional failures of management to exercise proper control and supervision over Mr Leeson, the deduction rose to 80 per cent.

248. In these proceedings, the parties were far apart on the size of any deduction I should make. Singularis argued by analogy with what the judge said in *Barings*, that it would be wrong to make a deduction of more than 50 per cent since Singularis' contributory negligence only ever comprised the basic fact of Mr Al Sanea's fraud. However, they argue that no deduction is appropriate in the circumstances of this case or, if I did not agree with that, then a small deduction of no more than 20% should be made. This is because of the difference in the nature of the duty owed in the *Barings* case and the present case. The duty of auditors is not just to identify fraud but to carry out the very complex task of ensuring, apart from any fraud or misconduct, that the accounts give a fair view. Here, the whole focus of the duty of care which Daiwa breached is to identify fraudulent instructions to pay out the customer's money. Singularis rely on the case of *Reeves v Metropolitan Police Commissioner* [2000] 1 AC 360 where the issue of the contributory negligence of a prisoner who had committed suicide had to be assessed in a claim against the police for negligently failing to prevent the prisoner from harming himself. The prisoner's contribution was assessed at 50% because although his action was, of course, a substantial cause of his death, the police were in breach of a duty imposed by law to guard against that very act. That case also held that 'fault' within the meaning of section 4 of the 1945 Act

could include intentional acts as well as negligence, so that Mr Al Sanea's conduct should be included here.

249. Daiwa argued that the 50 per cent contribution should be exceeded here because since Singularis was a one-man company, Mr Al Sanea's fraudulent conduct should be attributed to it on company law grounds as well as by the application of the principles of vicarious liability. I have already explained why I have rejected that argument in other contexts. Daiwa also argue that Singularis' contributory negligence did not only comprise Mr Al Sanea's conduct but also the apparent failure of the board of directors to pay attention to what was happening and the conduct of Mr Wetherall should be taken into account even though he worked for SFS just as the conduct of BSL was taken into account in assessing the extent of Baring's negligence.

250. My conclusion on this point is that the deduction made for Singularis' contributory negligence should be 25 per cent. I accept the point made by Singularis that the duty owed by Daiwa here is different from the duty owed by the auditors to Barings because the very thing that Daiwa were supposed to protect Singularis from was the deliberate wrongdoing of Mr Al Sanea. The situation here is less extreme than the situation in *Reeves* where a deduction of 50 per cent was made.

251. I consider that the failure of Singularis' board of directors does weigh in the balance too. There is no evidence about what communications if any took place between Mr Al Sanea and the directors in the last weeks of Singularis' existence. But those were business people who lent their names to the company knowing that outsiders would take some comfort from the fact that there were people involved in the management other than Mr Al Sanea who were experienced, respectable and financially astute directors. Those directors must have been aware, even if only from the same press reports that Daiwa was receiving, that the company of which they were directors was travelling through very rough waters. They seem to have made no attempt to contact Daiwa independently either before or after the relationship between Daiwa and Singularis was closed down to find out what was happening. As regards Mr Wetherall's involvement, I do not regard it as fair to treat that as something separate from and additional to Mr Al Sanea's conduct.

252. In conclusion I find that:

a) The claim in dishonest assistance fails because Mr Metcalfe and Mr Hudson were not dishonest when they approved the disputed payments.

b) Daiwa is liable to Singularis in negligence and for breach of contract for the sum of $203,741,900.

c) Those damages should be reduced by 25 per cent pursuant to section 1 of the 1945 Act to take account of Singularis' contributory negligence.