**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| HUGHES RIVER FM, LLC,<br>a Delaware limited liability company,<br>individually, and derivatively on behalf of<br>XIMALAYA, INC., | ) <br>) <br>) <br>) <br>) | |
| Plaintiff, | ) <br>) | |
| v. | ) <br>) | Case No. 1:25-cv-06217 |
| XIMALAYA, INC.,<br>a Cayman Islands corporation,<br>YU JIANJUN, an individual,<br>SEAMAN YU, an individual,<br>XIAOYU CHEN, an individual,<br>LI HAIBO, an individual,<br>and TENCENT MUSIC ENTERTAINMENT<br>GROUP, INC., a Cayman Islands<br>corporation, | ) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) | Judge Edmond E. Chang |
| Defendants. | ) | |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION OF XIMALAYA TO DISMISS THE AMENDED COMPLAINT

Plaintiff, HUGHES RIVER FM, LLC ("HR"), by and through its undersigned attorney, submits its Memorandum of Law in Opposition to the Motion to Dismiss of Defendant, XIMALAYA, INC., as follows:

### I.  PRELIMINARY STATEMENT

HR's Amended Complaint ("AC") alleges that Ximalaya, Inc. ("Ximalaya" or the "Company"), its Board of Directors (the "Board Members"), and Tencent Music Entertainment Group, Inc. ("Tencent") deliberately caused economic harm to HR, as well as to other Ximalaya shareholders, located in the State and this judicial district. (AC ¶¶ 1 & 3). This harm arose from the sale of Company assets via a merger with Tencent, a

NYSE-listed company, on terms negotiated by the Board Members, purportedly acting on behalf of HR, that unfairly benefited them at the expense of certain of the shareholders.

Tencent structured the transaction with Ximalaya and its Board Members, paying a premium for their shares in exchange for their agreement to breach the fiduciary duties they owed both to Ximalaya and certain of its shareholders, including HR. A written communication sent to HR and other Illinois-based shareholders by Ximalaya—through its Board Members—before the consummation of the merger, seeking their consent, intentionally omitted critical information, which contributed to the success of the alleged scheme and deception. (AC ¶¶ 29, 34-35, 37-38, 120 & 123).

The AC further asserts that the Board Members intentionally failed to inform shareholders in their written communications and otherwise that Tencent was paying them double per share compared to other shareholders, such as HR, a deliberate act of deceit. (AC ¶¶ 29-40). Additionally, valuable business assets in use by the Company were secretly excluded from the merger (the "Excluded Assets") and retained by Ximalaya's founder, Yu Jianjun, a Defendant (or one of his affiliates), further breaching the Board Members' legal obligations to Ximalaya and certain of its shareholders. *Id.*

Notably, Ximalaya has admitted to the retention of the "Excluded Assets" in its Motion. ("Pursuant to the agreement, two business segments of Ximalaya, the Parent-Child Training Business and Xibo Business ('Carve-Out Business'), will be carved out and divested from the assets acquired by TME prior to the closing of the Cayman Merger. *Id.* ¶ 43, Ex. 8"; "Ximalaya and TME

negotiated the carve-out of two business segments as part of the Cayman Merger. *Id*. ¶ 43." (Motion p. 12, ECF #55). Ximalaya makes no mention in its Motion of where the Excluded Assets (or "Carve-Out Business") will land after the merger is consummated.

Rather than addressing these serious abuses, Defendants have assembled a large legal team (currently 11 lawyers) to overwhelm HR with numerous arguments and three (3) motions—even questioning the ownership of HR's sole manager, Kai Jiang's, residence in Lake Forest, Illinois, which it calls a "dubious assertion." (Motion p. 1). This unorthodox tactic does not alter the fact that Ximalaya's shareholders are being unlawfully exploited and oppressed by the Tencent-Ximalaya merger, from which Tencent (and Tencent's Illinois shareholders) are benefiting economically.

Notwithstanding their efforts to hide behind their shady Cayman Islands domiciles, failing to cite controlling precedent and attempting, improperly, to controvert the allegations of the AC, this filing demonstrates ample grounds for the Court to assert jurisdiction over Ximalaya and adjudicate the claims. For the reasons set forth herein, the Motion should be denied.

## II.   <u>INTRODUCTION AND SUMMARY OF THE ARGUMENT</u>

HR brings two (2) claims against Ximalaya, individually and not derivatively: the first for breach of fiduciary duty based upon the "special relationship" undertaken by its Board Members vis-vis HR (Count III; 1-45 & 70-78); and the second for common law fraud (Count V; AC ¶¶ 1-45 & 87-95). Count III is brought in the alternative to Count II, which is brought derivatively.

3

On August 27, 2025, Ximalaya moved to dismiss those counts under Federal Rules 12(b)(2) and 12(b)(6), arguing that this Court lacks personal jurisdiction over it and that, even accepting the allegations as true as it <u>must</u> (*See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)),* HR fails to state a claim for breach of fiduciary duty and common law fraud (Motion pp. 4-13; ECF #55). Ximalaya further contends that HR has failed to satisfy Federal Rule 23.1 and that the case should be dismissed under the doctrine of *forum non conveniens*. (Motion pp. 8-19 & 13-15).

However, as detailed below, this Court has specific jurisdiction over Ximalaya under the Illinois Long Arm Statute, 735 ILCS 5/2-209(a)(2), due to its "commission of a tortious act within the state." (See IV. Jurisdictional Facts). The Board Members breached the fiduciary duties owed to Ximalaya, including HR. Multiple Ximalaya investors, including HR, Goldman Sachs (Chicago), Sierra Ventures, and CCV Capital, are Illinois residents and/or citizens (AC ¶ 3), and the resulting harm was felt by them in this state. Ximalaya's actions targeted HR, whose shares were essential for completing the merger under unfair terms, partly to benefit Tencent shareholders residing in Illinois—including major pension funds (AC ¶ 12).

Ximalaya has transacted business in Illinois, satisfying 735 ILCS 5/2-209(a)(1), as well. In addition to the transaction of business directly related to the merger, Ximalaya sells products and services in Illinois (directly and through its wholly owned affiliate Himalaya Media, Inc.), and advertises, markets and sells its podcasts, and on-line and educational materials via an app available on Google Play and Apple, to Illinois users, and has been since

at least 2018. These systematic activities also satisfy the Seventh Circuit's standard for general jurisdiction and due process, undermining Ximalaya's jurisdictional objections. (See IV. Jurisdictional Facts).

Third, HR has fully complied with Federal Rule 23.1.

Fourth, the claim brought against Ximalaya for common law fraud is pled with sufficient "particularity." The claim is well-pled and contains all the required elements. Ximalaya cannot attempt to controvert the allegations of the AC.

Fifth, HR acquired its stock in Ximalaya in 2017, which itself was formed in 2016, by Dao Zhikang, Yu Jianjun and others. (Pltf.'s Dec. ¶¶ 10-11 & 13). The organizational structure of Ximalaya was reorganized twice, once in 2015 and again in 2018. (Pltf.'s Dec. ¶¶ 10-11). This is contrary to the factual assertions of Ximalaya in its Motion.

Sixth, the "special circumstances" alleged in the AC establish an individual right of action for HR against the Board Members. Ximalaya is vicariously liable for the Board Members' breaches of fiduciary duty under the doctrine of *respondeat* superior, specifically where Board Members acting as agents for HR negotiated the sale of its shares to Tencent at $5 per share, while negotiating a more favorable $10 per share deal for themselves.

Finally, regarding the doctrine of *forum non conveniens,* Ximalaya provides only speculative assertions regarding convenience and fails to meet its "heavy burden" to show a preferable alternate forum.

More importantly, the Seventh Circuit's decision in *Nulogy Corp. v. Menasha Packaging Co., LLC, 76 F.4th 675, 682 (7th Cir. 2023),* which

Ximalaya does not cite in its Motion but should have, bars Ximalaya from invoking forum selection clauses in agreements to which it is not a party. Hence, as Ximalaya is not a party to any such agreements, the Motion should be denied.

III. **LEGAL STANDARDS**

A motion brought under Rule 12(b)(2) of the Federal Rules of Civil Procedure challenges the Court's jurisdiction over a defendant. While a plaintiff bears the burden of establishing personal jurisdiction, if the issue is raised via a motion to dismiss, "the plaintiff need only make a *prima facie* showing of jurisdictional facts." *Purdue Research Foundation v. Sanofi - Synthelabo*, S.A., 338 F.3d 773, 782 (7th Cir. 2003). To determine if a plaintiff has met its burden, this Court may consider affidavits from a party. *Felland v. Clifton*, 682 F.3d 665, 672 (7th Cir. 2012). It should construe its complaint liberally - drawing all reasonable inferences in its favor. *Central States, Se. & SW Areas Pension Fund v. Phencorp Reinsurance Co.*, 440 F.3d 879, 878 (7th Cir. 2006). Any factual dispute should be resolved in the plaintiff's favor. *Purdue, supra,* at 782–83.

A motion brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure challenges the legal sufficiency of the complaint. The controlling standard comes from *Bell Atlantic Corp. v. Twombley, 550 U.S. 544, 555 (2007),* and *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009). Under those cases, Courts apply a two-part test, discarding conclusory allegations and evaluating whether the remaining facts plausibly support the claim.

## IV. JURISDICTIONAL FACTS

1. HR is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business located at 1100 Jensen Road, Lake Forest, Illinois 60045. HR has been a shareholder at Ximalaya at all relevant times. Kai Jiang is the sole manager and member of HR, a citizen of the State of Illinois, and resides in this judicial district. (Pltf.'s Dec. ¶¶ 2-4).

2. HR acquired its shares in Ximalaya here in the State of Illinois in 2017. (Pltf.'s Dec. ¶ 13).

3. At no time either before or after acquiring its shares in Ximalaya, did anyone, including Yu Jianjun inform HR that what are referred to in the Amended Complaint as the "Excluded Assets" did not belong to Ximalaya. (Pltf.'s Dec. ¶¶ 12 & 14).

4. After acquiring the shares of stock in Ximalaya, Kai Jiang, the manager of HR, had numerous conversations by telephone here in the State of Illinois with Yu Jianjun, the founder of Ximalaya, regarding HR's ownership of stock in Ximalaya and the business dealings of the Company. (Pltf.'s Dec. ¶¶ 15-20).

5. Yu Jianjun, a Board Member, has communicated with HR, through its manager, Kai Jiang, here in the State of Illinois, and in this judicial district, regarding HR's investment in Ximalaya. HR also made efforts on behalf of Ximalaya, through Yu Jianjun, to expand its global reach and enhance its business in the United States and the State of Illinois. (Pltf.'s Dec. ¶¶ 15-20).

6. On April 16, 2025, Ximalaya sent a form entitled "Election To Receive Portion Of Cash Consideration in TME Ordinary Shares" by email to HR in this judicial district notifying it that Tencent was acquiring Ximalaya, and offering HR the choice of either accepting the proceeds of the forced sale of its stock at 5 USD per share for a total of 24,750,390 USD, in either 1) a combination of cash and securities or, 2) all cash. ("Failure to return the completed slip by the deadline will be deemed as a waiver of your election right, and you will receive 100% of your consideration in cash.") ("Election Form"). (Pltf.'s Dec. ¶¶ 27-28).

7. Ximalaya banks at Citibank, N.A. There are many branches of this financial institution in the State of Illinois and this judicial district. (Pltf.'s Dec. ¶ 29).

8. Ximalaya delivers various forms of media and content through its website Ximalaya.com, which is available for subscription or purchase by residents of the State of Illinois, and while in Chinese, can be easily converted through Google Translator into English (Pltf.'s Dec. ¶ 30).

9. Ximalaya advertises, markets, sells, and delivers music, podcasts, educational materials, and online books and other forms of entertainment

in the State of Illinois, through its wholly owned affiliate Himalaya Media, Inc. (Pltf.'s Dec. ¶¶ 30-35).

10. Himalaya Media, Inc., a wholly owned affiliate of Ximalaya, Inc., formed on July 21, 2018, a Delaware corporation, advertises, markets, and sells subscriptions to citizens and residents of the State of Illinois at $11.99 per month and $69.99 per year. (Pltf.'s Dec. ¶ 31).

11. Himalya Media, Inc. is available for download on Google Play and Apple, featuring content focused on issues in the State of Illinois and for the benefit of Illinois citizens and residents, including, among others, the Illini Inquirer podcast (Illinois Fighting Illini), the LCMS Northern Illinois District podcast, and the Illinois catfishing podcast. (Pltf.'s Dec. ¶ 32).

12. Himalaya Media, Inc. consists of "carefully selected 10,000+ bestsellers, and millions of professionals are listening. One hot new book every week, pre-sale of more than 10,000 copies of good books to be the first to listen. There are also 24 million Chinese and English podcasts and +1,000 taught by global elites." www.Himalaya.com. (Pltf.'s Dec. ¶ 33).

13. Many of the products sold by Himalaya Media, Inc. here in the State of Illinois are the property of Ximalaya. (Pltf.'s Dec. ¶ 34).

14. Himalya Media, Inc. has 14,000 ratings on Apple, strongly suggesting that it has hundreds, if not thousands, of subscribers and customers in the State of Illinois. (Pltf.'s Dec. ¶ 35).

15. Ximalaya has over five (5) million content creators, including creators located in the State of Illinois, who Ximalaya pays for their contributions to the app. (Pltf.'s Dec. ¶ 50).

16. Ximalaya has three (3) offices in the United States. ("Our principal executive offices are located in Shanghai. We have offices in 12 cities in China and three offices in the U.S. and Japan.") (Pltf.'s Dec. ¶ 38).

17. 895,000 Asian people reside in the State of Illinois. There are approximately 109,270 residents in the State of Illinois, over the age of 5, who speak Chinese. (Pltf.'s Dec. ¶ 39).

18. The following institutional investors, among others, located in the State of Illinois hold equity positions in Ximalaya, Inc.: Goldman Sachs (Chicago), Sierra Ventures (Chicago and Champaign), and CCV Capital (Chicago). (Pltf.'s Dec. ¶ 41).


V.    **ARGUMENT**

### A. **Ximalaya Is Subject To The General Jurisdiction Of This Court.**

General jurisdiction allows courts to hear cases against a defendant based on activities unrelated to those in the forum state. The threshold for general jurisdiction is whether a party's affiliations with the forum are "so continuous and systematic as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011); Russell v. SNFA, 2013 WL 1683599, ¶ 40, 987 N.E.2d 778, 786 (Ill. 2013)* ("General jurisdiction for a corporate defendant exists when it has engaged in continuous and substantial business activity within the forum.").

"It is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a state in which business is conducted." *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476 (1985).* In other words, "physical presence is not necessary for a defendant to have sufficient minimum contacts with a forum state." *Curry v. Revolutions Laboratories, LLC, 949 F.3d 385, 398 (7th Cir. 2020).*

The Supreme Court in *Goodyear* set out factors for exercising jurisdiction over non-resident corporations, including registration, maintaining employees or accounts, designing or advertising in-state, and selling or soliciting business to in-state customers. *Goodyear, 564 U.S. at 921.*

Illinois has a strong interest in providing a forum for residents injured by out-of-state actors. "[W]here individuals 'purposely derive benefit' from interstate activities, fairness dictates they answer for their actions in that state." *Id. at 473-74.* Personal jurisdiction is proper when "it is fair, just, and

reasonable," considering the quality and nature of the defendant's acts that affect Illinois interests. *RAR v. Turner Diesel, 107 F.3d 1272, 1276 (7th Cir. 1997) (citing Rollins v. Ellwood, 565 N.E.2d 1302, 1316 (Ill. 1990)).*

In its Motion, Ximalaya relies upon the Seventh Circuit's decision in *Curry v. Revolution Laboratories, LLC, 949 F.3d 385, 400 (7th Cir. 2020)*, in support of its claim that this Court cannot exercise jurisdiction over it. (Motion p. 11). But *Curry* actually supports the Court's jurisdiction over it.

There, the Court found that "physical presence is not necessary for a defendant to have sufficient minimum contacts with a forum state." *Curry, 949 F.3d at 398.* Indeed, the Court in *Curry* found it sufficient for the exercise of jurisdiction where "a defendant may cause its products to be distributed in the forum state," citing *Keeton v. Hustler Magazine, 465 U.S. 770, 774-75 (7th Cir. 1983).* (finding purposeful direction where defendant published magazines outside the forum state and circulated them in the forum state). *Id.* Thus, Curry fully supports the exercise of jurisdiction over Ximalaya under very similar, but more modern, circumstances.

As set forth in HR's Declaration, a true and correct copy of which is attached hereto as Exhibit A, Ximalaya meets all these factors except for being registered to do business here. Its continuous, systematic, and targeted business activities in the State of Illinois, as set forth in the Jurisdictional Facts, satisfy general jurisdiction requirements and due process. Its contacts are not "random, fortuitous, or attenuated." *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985).*

10

While Ximalaya claims not to have an office, real estate, or bank account in Illinois, the Jurisdictional Facts (¶¶ 31-36, 38 & 51-53) paint a picture of a business that is actively conducting business in the State of Illinois on a continuous and systematic basis through its sales of on-line subscriptions and media through both its own site (Pltf.'s Dec. ¶ 30), and through Himalaya Media, Inc., its wholly owned subsidiary with whom it files consolidated financial statements, in the State of Illinois. (Pltf.'s Dec. ¶¶ 31-36). Ximalaya has over five million content creators, some of whom reside in the State of Illinois, who are compensated for their work here by Ximalaya. (Pltf.'s Dec. ¶ 37). Ximalaya banks at Citibank, N.A., which has several branches in the State of Illinois. (Pltf.'s Dec. ¶ 29).

Himalaya Media, Inc., through Himalaya.com, sells products and services belonging to Ximalaya in the State of Illinois. (Pltf.'s Dec. ¶ 34). Himalaya Media, Inc. has over 14,000 Apple ratings, strongly suggesting that it has hundreds or thousands of subscribers in Illinois. (Pltf.'s Dec. ¶ 35). Thus, Ximalaya should reasonably expect to be haled into court for litigation in Illinois. The Motion should, therefore, be denied.

**B. Ximalaya Is Subject To This Court's Jurisdiction Under the Illinois Long Arm Statute.**

Specific jurisdiction requires that the defendant has purposefully directed activities at the forum state, and that the cause of action arises out of or relates to those contacts. *Russell v. SNFA, 2013 WL 1683599, ¶ 40, 987 N.E.2d 778, 786 (Ill. 2013) (citing Burger King, 471 U.S. at 472)*. Under specific jurisdiction, a non-resident defendant can be subjected to a forum state's jurisdiction based on certain "single or occasional acts" in the state, but only

as they relate to those acts. Id. *(quoting Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011)).* Specific jurisdiction is, therefore, limited to controversies connected to the acts establishing jurisdiction. *Goodyear, 564 U.S. at 919.*

In this case, Illinois' personal jurisdiction rules apply. *Philos Techs., Inc. v. Philos & D, Inc., 802 F.3d 905, 912 (7th Cir. 2015).* The Illinois Long Arm Statute extends to the limits of due process, so statutory and constitutional inquiries merge. *Hyatt Int'l Corp. v. Coco, 302 F.3d 707, 715 (7th Cir. 2003).* The Due Process Clause allows personal jurisdiction over out-of-state defendants with sufficient minimum contacts, so that litigation does not offend traditional notions of fair play and substantial justice. *Kipp v. Ski Enter. Corp. of Wis., Inc., 783 F.3d 695, 697 (7th Cir. 2015) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)).*

A defendant who purposefully avails itself of conducting activities in Illinois, thereby invoking the benefits and protections of its laws, is subject to the Court's specific jurisdiction. *Bolger v. Nautica Int'l, Inc., 369 Ill. App. 3d 947, 952 (2d Dist. 2007) (quoting Campbell v. Mills, 262 Ill. App. 3d 624, 627 (1994)).*

Here, as alleged in the AC and set forth in the Jurisdictional Facts, the Board Members acting on behalf of Ximalaya structured the merger to favor the Board Members while taking economic advantage of HR and certain other Ximalaya shareholders, including Illinois residents, who were harmed in Illinois. (Pltf.'s Dec. ¶¶ 22-29). Ximalaya's contacts, both directly and through its agents, including Yu Jianjun, were focused on Illinois-based shareholders

like HR, whose shares were necessary for the merger under unfair, unlawful, and oppressive terms. *Id.*

As a result of the "forced sale" of their stock (AC ¶ 50-51), as well as the intentional and actionable omissions in their written communication to HR and other Illinois shareholders (AC ¶¶ 29-40), Ximalaya, through the Board Members, including Yu Jianjun, specifically targeted Illinois citizens and residents. (Pltf.'s Dec. ¶¶ 22-29). Thus, Ximalaya, through the Board Members, including Yu Jianjun, intended to affect Illinois interests. *See Hyperquest, Inc. v. NuGen I. T., Inc., 627 F. Supp. 884, 891 (N.D. Ill. 2008).* And, under the law of the Cayman Islands (a British Overseas Territory), a corporation acts through its directors. *Lennard's Carrying Co Ltd. v. Asiatic Petroleum Co. Ltd., [1915] 705 (House of Lords).*

Moreover, in the negotiation and sale of the Company's shares to HR, Ximalaya had contacts with HR and its manager, Kai Jiang. (Pltf.'s Dec. ¶¶ 12-14). Following the sale, additional contacts were made between Yu Jianjun and Kai Jiang (from Illinois) via the WeChat app regarding the sale and Ximalaya's business expansion in the United States, specifically in the State of Illinois, furthering the knowledge of specific Illinois-based shareholders, including HR. (Pltf.'s Dec. ¶¶ 15-20).

Given these facts, it is not credible for Ximalaya to challenge this Court's jurisdiction. The Jurisdictional Facts satisfy HR's burden to make a *prima facie* case for personal jurisdiction over Ximalaya as both of the claims arise from: (a)(1) the transaction of any business within Illinois, and (a)(2) the

commission of a tortious act within Illinois. The Motion should, therefore, be denied.

### C. **Plaintiff Has Fully Complied With Federal Rule 23.1**

In its Motion, Ximalaya claims that "Hughes River does not fairly and adequately represent the interests of other Ximalaya shareholders as required under Rule 23.1(a)" (Motion p. 12). However, in the AC, HR sets forth viable claims derivatively on behalf of Ximalaya against the Defendants, which, if successful, will fully compensate the class of shareholders who were paid only $5 per share for their losses. (See Counts I, II, IV, VI, VII & VIII). Moreover, the allegations made by HR, both derivatively and individually, are entirely consistent with one another.

As to the issue of "demand futility," there can be little dispute that, assuming, *arguendo*, the allegations of the AC are true, the wrongdoers, its Board Members, including YU Jianjun (whoever they are), control Ximalaya. Those wrongdoers orchestrated what, on its face, is a plainly unfair, unlawful, and oppressive forced sale of certain of the shareholders' shares in Ximlalaya, including those of HR.

The purported fact that there are five independent directors is irrelevant at this stage of the proceeding. Ximalaya has presented no evidence that the purported "independent" directors had any say in the merger or even that they were aware of the disparate terms of the same. In any event, this is neither the time nor the place to attempt to create a factual dispute regarding the allegations of the AC. Indeed, it is improper at

14

this stage of the proceedings. *Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007))*.

HR adequately pleads "demand futility." In the AC, HR pleads that the Board Members, all of whom (whomever they were), and especially Yu Jianjun, the founder of Ximalaya, approved the merger terms to personally profit from the same, while purportedly acting on behalf of HR and certain shareholders who were being paid far less. (AC ¶ 30). The AC alleges that the Board Members did not employ an independent board member or a special committee to validate the disparate merger terms. (AC ¶ 31).

Third, HR has verified the allegations of the AC. While it was not initially verified, that has now been corrected. (See Pltf.'s Dec. ¶¶ 1-8). Hence, the Motion should be denied.

## D. **The Allegations Regarding HR's Purchase Of The Shares In Ximalya Are Accurate.**

Notwithstanding the long-standing rule that the Court must accept all well-pled allegations of the pleading as true, Ximalaya contests HR's allegations of its purchase of the shares at issue. Indeed, the court will "take the plaintiff's asserted facts as true and resolve any factual disputes in its favor." *uBid, Inc. v. GoDaddy Grp., Inc., 623 F.3d 421, 423-24 (7th Cir. 2010)*.

More specifically, Ximalaya, according to its own public filings, was founded in 2016. (Pltf.'s Dec. ¶ 9). HR acquired its shares in Ximalaya in 2017, from a founder, Dai Zhikang. (Pltf.'s Dec. ¶ 13). Ximalaya was reorganized in 2015 and 2018. (Id. ¶¶ 9-11). To the extent there is any ambiguity or confusion, in his Declaration, Kai Jiang, the manager of HR, has clarified the circumstances of HR's purchase of its interest in Ximalaya in 2017, which

Ximalaya, in his Motion, has invited him to do. (Pltf.'s Dec. ¶¶ 12-21). Hence,

the allegations set forth in the AC are accurate.

### E. The Fraud Claim Satisfies The "Particularity" Requirement Of Rule 9(b), And Ximalaya, In Its Motion, Has Acknowledged Its Complete Understanding Of The Nature Of The Claim Asserted Against It.

In its Motion, while acknowledging a complete understanding of the

nature of the fraud claim asserted by HR against it, Ximalaya contends that it

lacks the particularity required under Rule 9(b) of the Federal Rules of Civil

Procedure, as follows:

> "Plaintiff's fraud claim must be dismissed as it fails to meet Rule 9(b)'s heightened pleading standard. The few conclusory allegations that (i) Ximalaya 'failed to disclose to' Plaintiff that the Carve-Out Business was not owned by Ximalaya; (ii) Plaintiff 'relied upon the inclusion' of the Carve-Out Business when acquiring the shares; and (iii) Plaintiff 'would not have acquired' the shares '[h]ad it known' about the ownership of the Carve-Out Business (AC ¶¶ 88–92), fall far short of Rule 9(b)'s particularity requirement." (Motion at p. 12).

The requirements of Rule 9(b) are met when there is sufficient

identification of the circumstances constituting fraud so that the defendant

can prepare an adequate answer to the allegations. 5A CHARLES A. WRIGHT

ET AL., FEDERAL PRACTICE AND PROCEDURE: CIVIL § 1297 (3d ed. 2013). Here,

the fraud claim is suitably robust such that Ximalaya can prepare an answer,

rendering its argument, to the contrary, unconvincing, as follows:

- "At the time it acquired the shares [2017], Ximalaya failed to disclose to Hughes River that substantial and material assets, namely the entertainment and educational segments of Ximalaya, were owned either by Yu Jianjun or an entity owned or controlled by Yu Jianjun, and not Ximalaya itself (the "Excluded Assets")." (AC ¶¶ 88).

- "Ximalaya intentionally failed to disclose the actual ownership of the Excluded Assets to Hughes River. Ximalaya intended the failure to make such a disclosure to deceive Hughes River into believing

the entertainment and educational segments of Ximalaya's business were owned and controlled by Ximalaya." (AC ¶ 89).

- "The entertainment and educational segment of Ximalaya's business was material to the fair market value of its stock, including the preferred shares acquired by Hughes River in 2017, as set forth herein." (AC ¶ 90).

- "Hughes River relied upon the inclusion of the entertainment and educational segments of the business in Ximalaya when acquiring the preferred shares in 2017." (AC ¶ 91).

- "Had it known that the entertainment and educational segments of the business were not owned and controlled by Ximalaya, Hughes River would not have acquired the preferred shares in Ximalaya or would have done so at a materially lower purchase price." (AC ¶ 92).

In its Motion, Ximalaya has admitted that the "Excluded Assets" will not be sold to Tencent (TME) as part of the merger. ("Pursuant to the agreement, two business segments of Ximalaya, the Parent-Child Training Business and Xibo Business ('Carve-Out Business'), will be carved out and divested from the assets acquired by TME prior to the closing of the Cayman Merger. Id. ¶ 43, Ex. 8.") (ECF #55). "Ximalaya and TME negotiated the carve-out of two business segments as part of the Cayman Merger. *Id*. ¶ 43." (Motion p. 12).

Ximalaya makes no mention in its Motion of where the "Excluded Assets" (or "Carve-Out Business") will land after the merger is consummated, nor did it disclose this "carve-out" to HR or the other shareholders in considering the buy-out offer due to the merger with Tencent. (Pltf.'s Dec. ¶¶ 24-26 & 29). No doubt, the "Excluded Assets" cannot be legally transferred to Tencent as part of the merger, as Ximalaya does not own them; instead, they are allegedly owned or controlled by Yu Jianjun or one of his affiliates, as stated in the AC.

Notably, Ximalaya does not assert a lack of understanding of the nature of the fraud claim; rather, it disputes, factually, how and when HR acquired its shares—an issue, as shown *supra*, is inappropriate for resolution at this stage of the proceeding. In any event, the details of the acquisition of these shares by HR are set forth in HR's Declaration at paragraph 13.

Finally, in its Motion, Ximalaya presents an incomprehensible and poorly formulated argument that "because the concept of Carve-Out Business [or Excluded Asserts] did not exist when Plaintiff acquired its shares from ZendaiFM LP" (Motion p. 12), HR can have no claim. This argument lacks merit and should, therefore, be disregarded by the Court. For these reasons, the Motion should be denied.

## F. Ximalaya Cannot Rely On An Agreement To Which It Is Not A Party To Support Its *Forum Non Conveniens* Motion.

Ximalaya seeks to dismiss the AC on the ground of *forum non conveniens*, relying on a purported forum selection clause in an agreement to which it is not a party, which allegedly requires HR to litigate in Hong Kong. (Motion at p. 13.). In its Motion, Ximalaya argues as follows:

> "Plaintiff did not acquire its Ximalaya shares until June 30, 2020. Yu Decl. ¶ 23. The STA concerning that purchase is governed by Cayman Islands law and requires that "all disputes and controversies arising out of or in connection with [the] [a]greement" be referred to final binding arbitration in Hong Kong. *See id.* at Ex. 4, §§ 7.7, 7.8; Henderson Decl. ¶ 21."

Ximalaya contends that the "STA" precludes deference to HR's forum choice, shifts the burden to HR, and renders private interest and choice-of-law considerations irrelevant. Ximalaya's reliance, however, on an agreement it did not sign is misplaced.

18

Even assuming, *arguendo,* that this claim against Yu Jianjun (not Tencent or Ximalaya) is arbitrable, courts routinely allow parallel proceedings in both American and foreign courts. *See Nulogy Corp. v. Menasha Packaging Co., LLC, 76 F.4th 675, 682 (7th Cir. 2023).* Hence, the tort claims against Ximalaya and Tencent can proceed in this Court, while HR arbitrates any claims against the Board Members in Hong Kong, if necessary.

More significantly, under controlling precedent in *Nulogy Corp.,* which Ximalaya failed to cite as required (see Rule 3.3 of the Model Rules of Professional Conduct), the Seventh Circuit held that forum selection clauses only bind the parties to those agreements and cannot be enforced by co-defendants lacking a similar agreement. ("Deloitte should not be allowed the unquestioned benefit of a forum selection clause for which it did not bargain.") *Id.*

Here, Ximalaya is not a party to any agreement containing a forum selection clause and, therefore, cannot enforce such a provision. *Id.* Accordingly, Ximalaya's argument fails as a matter of law, and its Motion should be denied.

## G. **HR—A Domestic Plaintiff's Choice of Forum Merits Deference.**

*Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947),* and *Piper Aircraft Co. v. Reyno, 454 U.S. 235, 248-52 (1981)* establish that a plaintiff's choice of forum is presumed proper and should not be disturbed unless the balance of convenience strongly favors the defendant. *See Gilbert, 330 U.S. at 508; Piper, 454 U.S. at 248-52.* In weighing whether to override this presumption, courts must consider both public and private factors.

As HR is a domestic plaintiff (AC ¶ 1), Ximalaya faces a heavy burden in seeking dismissal for an alternative forum. *See Gilbert, 330 U.S. at 508; Sinochem Int'l Co. Ltd. v. Malay. Int'l Shipping Corp., 549 U.S. 422, 423 (2007)*. Ximalaya has <u>not</u> satisfied this burden.

The possible application of Cayman Islands law to certain, unspecified corporate governance matters, pursuant to the internal affairs doctrine, does not warrant dismissal. Ximalaya has shown no material difference between Cayman Islands and Illinois law, nor has it demonstrated that Cayman Islands law is beyond this Court's capacity to apply. Indeed, by proffering Judge Alexander Henderson as a purported expert in Cayman Islands law, Ximalaya acknowledges that any legal disputes can be readily resolved.

There is also a substantial likelihood that HR, a Delaware and U.S.-based entity domiciled in this district, would not receive a fair trial in Hong Kong—especially considering the U.S. Department of Defense's January 2, 2025, determination that Tencent is an instrumentality of the Chinese military (see Exhibit "B" hereto). *See In re Factor VIII or IX Concentrate Blood Products Litig., 484 F.3d 951, 957 (7th Cir. 2007)* (an alternative forum is only adequate if parties are not denied all remedies or treated unfairly). Tencent's ties to the Chinese military raise significant concerns that HR will not be treated fairly in a Hong Kong forum.

Finally, there are no practical obstacles to litigating this dispute in this forum. Ximalaya is believed to have many shareholders in Illinois and this judicial district (AC ¶¶ 3-5; Pltf.'s Dec. ¶ 41), and conducts extensive business

throughout the U.S., including in this state and judicial district (see AC ¶¶ 3-5; Pltf.'s Dec. ¶¶ 29-40 & 50-54).

As the Seventh Circuit wisely noted in *In re Hudson, 710 F.3d 716, 719 (7th Cir. 2013),* "[i]n our age of advanced electronic communication, including high-quality videoconferencing, changes of venue motivated by concerns with travel inconvenience should be fewer than in the past."

Therefore, this forum does not present an inconvenience that justifies dismissal under the doctrine of *forum non conveniens*, and the Motion should be denied.

### H. Under The Circumstances, Ximalaya Is Vicariously Liable For The Breaches Of Fiduciary Duties Of The Board Members.

In its Motion, Ximalaya argues that the breach of fiduciary duty claim set forth in Count III fails as, under Cayman Islands law, Ximalaya owes no such duty as a matter of law. (Motion pp. 12-13). However, Ximalaya can be held liable to a shareholder for the breaches of fiduciary duties by the Board Members, who, under the circumstances, undertook those duties due to the "special factual relationship" they had with HR and certain shareholders in connection with the negotiation of the merger with Tencent.

Here, like Tencent's purported expert, Ximalaya's purported expert overlooks the fact that, under the specific factual circumstances of this case, the Board Members undertook fiduciary duties to certain shareholders, including HR, for whom they negotiated only $5 per share. In contrast, they negotiated $10 per share for themselves.

In effect, by taking on the responsibility of determining a purchase price for these shareholders' shares and then omitting the truth — the whole

truth — in their written communication with those shareholders (through a lack of transparency), the Board Members acted as agents for them, implicitly recommending the share price as fair. This led Tencent to purchase shares from certain shareholders, including HR, at an artificially low cost. At the same time, the Board Members secretly negotiated with Tencent to sell their own shares at a far fairer price — $10 per share.

Under Cayman Islands law, when directors expressly act as agents for certain shareholders rather than for the company as a whole, they are deemed to owe those shareholders fiduciary duties of honesty, loyalty, and good faith, among others. *See Gao v. China Biologic Products Holdings Incorporated [2018] (2) CILR 591 (1)* ("The position was also different when special circumstances gave rise to an individual right of action by a particular shareholder against the company in respect of a transaction which affected that shareholder in its own right, *e.g.* where the shareholder asserted a personal contractual right to receive dividends or redemption proceeds."); *Brandner v. Peintner [2000] CILR Note 6a; Re Chez Nico (Restaurants) Ltd [1992] BCLC 192; Coleman v. Myers [1977] 2 NZLR 225 (NZCA). See also Tianrui (International) Holding Company Ltd. v. China Shanshui Cement Group Ltd., [2024] UKPC 36, ¶ 72.*

Under Cayman law, directors owe fiduciary duties to individual shareholders to whom they advise on the disposition of their shares. *See Gao v. China Biologic Products Holdings Incorporated [2018] (2) CILR 59.*

As alleged in the AC, the Board Members negotiated a grossly undervalued price for HR and certain other minority shareholders, leaving out

the most valuable aspects of the business (i.e., the "Excluded Assets"), while securing a significant premium for themselves in the Tencent merger. Worse still, both Tencent and the Board Members employed deceptive tactics and omitted material facts in their written communications to achieve this result, despite their duty as fiduciaries to disclose the truth, the whole truth. (See AC at Exhibit "A"). They also failed to use an independent board or special committee to review the proposed terms for fairness. (AC ¶ 31).

By acting as agents for HR and certain other shareholders pursuant to this special factual relationship, the Board Members, including Yu Jianjun, triggered fiduciary duties to certain of the individual shareholders (including HR) under Cayman law.

Under applicable law, Ximalaya can be liable for the acts of its directors performed in the course of their duties. The Court in *Lennard's Carrying Co Ltd. v. Asiatic Petroleum Co. Ltd., [1915] 705 (House of Lords)*, explained the "directing mind" principle of corporate liability as follows:

"...a corporation is an abstraction. It has no mind of its own any more than it has a body of its own; its active and directing will must consequently be sought in the person of somebody who for some purposes may be called an agent, but who is really the directing mind and will of the corporation, the very ego and centre of the personality of the corporation. .... It must be upon the true construction of that section in such a case as the present one that the fault or privity is the fault or privity of somebody who is not merely a servant or agent for whom the company is liable upon the footing respondeat superior, but somebody for whom the company is liable because his action is the very action of the company itself. It is not enough that the fault should be the fault of a servant in order to exonerate the owner, the fault must also be one which is not the fault of the owner, or a fault to which the owner is privy; and I take the view that when anybody sets up that section to excuse himself from the normal consequences of the maxim *respondeat superior* the burden lies upon him to do so."

See also, *Adams v. Cape Industries plc, [1990] Ch 433; Royal Brunei Airlines Sdn Bhd v. Tan, [1995] 2 AC 378.*

The F-1 filed by Ximalaya with the SEC states as follows: "Our directors may exercise all the powers of our company to raise or borrow money, and to mortgage or charge its undertaking, property and assets (present and future) and uncalled capital or any part thereof, to issue debentures, debenture stock, bonds or other securities, whether outright or as collateral security for any debt, liability or obligation of the company or of any third party." (Pltf.'s Dec. ¶ 53).

Because the Board Members in the instant case breached the fiduciary duties they owed to HR, Ximalaya will be vicariously liable for the damages associated with the same. Hence, the Motion should be denied.

## VI.   CONCLUSION

WHEREFORE, Plaintiff, HUGHES RIVER FM, LLC, respectfully requests this Court to deny the Motion of Defendant, XIMALAYA, INC., to Dismiss the Amended Complaint and/or for such other and further relief as the Court deems necessary and/or appropriate under the circumstances.

Respectfully submitted,

HUGHES RIVER FM, LLC,
Plaintiff

By:*/s/Daniel J. Voelker*
Its Attorney

Daniel J. Voelker, Esq.
**Voelker Litigation Group**
33 N. Dearborn Street
Suite 400
Chicago, Illinois 60602
312.505.4841

dvoelker@voelkerlitigationgroup.com
ARDC #6189578

Dated: September 26, 2025

## CERTIFICATE OF SERVICE

I, Daniel J. Voelker, an attorney, hereby certify that on September 26, 2025, I caused to be filed the foregoing **Plaintiff's Memorandum Of Law In**

**Opposition To The Motion Of Ximalaya To Dismiss The Amended Complaint**

with the Clerk of the United States District Court for the Northern District of

Illinois, Eastern Division, via the ECF/ECM Filing System.

/s/Daniel J. Voelker